## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RESIDENTIAL FUNDING COMPANY, LLC,

                Plaintiff,

v.

ACADEMY MORTGAGE CORPORATION,

                Defendant.

Court File No. 13-cv-3451(SRN/JSM)

**PLAINTIFF'S FIRST
AMENDED COMPLAINT**

Plaintiff Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its First Amended Complaint against defendant Academy Mortgage Corporation. ("Academy Mortgage" or "Defendant"), as follows:

## NATURE OF ACTION

1.    This case arises in substantial part from the billions of dollars in liabilities and losses incurred by Plaintiff RFC in and pursuant to its chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York (Case No. 12-12020 (MG)). Those liabilities and losses, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant Academy Mortgage, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

2.    Plaintiff RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

606052.v1

3.     RFC's business model was built on acquiring loans from "correspondent lenders," such as Defendant Academy Mortgage, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.     Over the course of the parties' relationship, Academy Mortgage sold over 600 mortgage loans, with an original principal balance in excess of $77 million, to RFC.

5.     Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including Academy Mortgage, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.     Over the course of RFC's business relationship with Defendant Academy Mortgage, RFC identified loans that contained material defects violating one or more of Academy Mortgage's contractual representations and warranties, and Academy Mortgage in some cases acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent Academy Mortgage repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, many defective loans sold to RFC by Academy Mortgage remain unresolved.  Moreover, Academy Mortgage's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to Academy Mortgage's sale of defective loans to RFC.  The parties' Agreement

entitles RFC to recovery of the additional liabilities and losses it incurred due to Academy Mortgage's breaches

7. Ultimately, due in significant part to the failure of correspondent lenders, including Academy Mortgage, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8. By the time RFC and certain of its affiliates (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9. During the bankruptcy proceeding, hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings). Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by Academy Mortgage.

10. Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims in its bankruptcy case.

This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors. On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the chapter 11 plan.

11. Defendant Academy Mortgage is contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Defendant's representations and warranties.

12. Accordingly, RFC brings this action for breach of contract, and for indemnification of all liabilities and losses RFC has incurred due to Defendant's breaches of its representations and warranties.

## PARTIES

13. Plaintiff RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. RFC was formerly known as Residential Funding Corporation. When this case was commenced, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company. GMAC-RFC Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company. Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital,*

*LLC, et. al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"), on December 17, 2013, GMAC-RFC Holding Company, LLC's interest in RFC was cancelled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights and interests under RFC's Agreement with Academy Mortgage, and now controls RFC.[1]

14.     Defendant Academy Mortgage Corporation is a Utah corporation with its principal place of business at 1220 East 7800 South, Sandy, UT 84094.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy proceedings.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

16.     As set forth in Plaintiff RFC's pending motion to transfer, venue is most appropriate in the United States Bankruptcy Court for the Southern District of New York, because these claims relate to the bankruptcy of Plaintiff RFC and certain of its affiliates already pending in that court as Case No. 12-12020 (MG).  Should RFC's motion to transfer be denied, however, venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, among other things, the parties have contractually agreed that Minnesota is an appropriate venue.

---

[1]     The Trust is organized pursuant to the Delaware Statutory Trust Act.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Academy Mortgage

17.     Over the course of the parties' relationship, Academy Mortgage sold over 600 mortgage loans to RFC pursuant to the Seller Contract attached as Exhibit A (the "Contract").

18.     The Contract incorporates into its terms and conditions the RFC Client Guide, exemplary excerpts of which are attached as Exhibit B-1 through B-15 (the "Client Guide").  (The complete versions of the Client Guide are known to the parties and too voluminous to attach in their entirety; the omitted portions of the Client Guides do not affect the obligations set forth in this Amended Complaint.)  The Contract and Client Guide collectively form the parties' Agreement, and set the standards to which Academy Mortgage's loans sold to RFC were expected to adhere.

19.     A preliminary list of the loans sold by Academy Mortgage to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit C. The original principal balance of these loans exceeds $77 million.

20.     As a correspondent lender, Academy Mortgage had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Academy Mortgage had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was Academy Mortgage, or others from whom Academy Mortgage purchased mortgages, that actually closed the loans with the borrowers.

21.     As Academy Mortgage was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

22.     As Academy Mortgage was also well aware, RFC from time to time sold pools of loans to whole loan investors.

23.     Academy Mortgage knew of RFC's intention to securitize and/or sell the loans.  Specifically, Defendant Academy Mortgage acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB (governing asset-backed securities) and other applicable federal securities laws.  (See Client Guide at A202(II); 206(D).)

24.     Pursuant to the Agreement, Defendant Academy Mortgage made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

    a.  Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (Client Guide A201(K).)

    b.  Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any

occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which … may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor." (Client Guide A201(M).)

c.   "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts.  All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file." (Client Guide A202(A).)

d.   "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate." (Client Guide A202(D).)

e.   "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (Client Guide A202(D).)

f.   "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Defendant] or any other entity involved in originating or servicing the Loan." (Client Guide A202(G).)

g.   "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations, including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act.  This warranty is made by [Defendant] with respect to each GMAC-RFC Loan Application taken and processed for each Loan and with respect to each Loan made by the [Defendant] or any other entity." (Client Guide A202(I).)

    h. "No Loan is a … loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees."   (Client Guide A202(J)(1)(d).)

    i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could:  (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (Client Guide A202(Q).)

    j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide."  (Client Guide A202(T).)

    k. "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (Client Guide A202(T).)

    l. "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the AVM, except to the extent that the market Value of the Mortgaged Premises is lower … due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the [Defendant] has actual knowledge of reasonable grounds to suspect." (Client Guide A202(T).)

    m. "No fraud or misrepresentation by the Borrower or by the [Defendant], broker, correspondent, appraiser or any independent contractor retained by the [Defendant], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to GMAC-RFC in connection with the Loan are complete and accurate." (Client Guide A202(KK).)

25.    These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from Academy Mortgage.   Academy

Mortgage's contractual warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors.  If any of Academy Mortgage's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from Academy Mortgage under which RFC would have recourse for its liabilities and losses on account of defective loans.

26.    Pursuant to the Client Guide, Academy Mortgage's failure to comply with its representations and warranties or <u>any</u> of the other requirements, terms or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner.  (<u>See</u> Client Guide A208.)

27.    Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Academy Mortgage knew of the misrepresentation or incorrect information.  (<u>See</u> Client Guide A208.)

28.    Academy Mortgage expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default.  (<u>See</u> Client Guide A209.)  Moreover, the Client Guide specified that RFC's exercise of

one or more remedies in connection with a particular Event of Default "will not prevent it from exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity." (Id.) RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Academy Mortgage. (Id. at A209(C).)

29.     The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty. The available remedies included, but were expressly not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches. (See Client Guide A210.) The Client Guide expressly stated that RFC was "not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase." (Id.) Further indemnification remedies are set forth in Sections A202 and A212 of the Client Guide. Section A209 of the Client Guide, in turn, makes clear that all of these remedies are non-exclusive and cumulative.

30.     Moreover, RFC alone retained the sole discretion to declare an Event of Default, and to choose what remedy or remedies to pursue. Nothing in the Agreement required RFC to provide Academy Mortgage with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing recovery for materially defective loans at any time. In fact, the United States Court of Appeals for the Eighth Circuit recently confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and correspondent lenders such as

Academy Mortgage have contractually bargained away any right to challenge RFC's determination regarding such an Event of Default. *See Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910 (8th Cir. 2013).

31.     The repurchase provision required Academy Mortgage to compensate RFC for defective loans according to a formula specified in the Client Guide that is based on the original principal balance of the loan.  If RFC determined that repurchase was not appropriate, Academy Mortgage would nonetheless contractually be obligated to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the loan's servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken." (See Client Guide A210.)

32.     Under the terms of the Agreement, Academy Mortgage is obligated to repurchase loans and/or pay RFC the repurchase price even if the loan has already been foreclosed upon. (See Client Guide A210(B).)

33.     Defendant Academy Mortgage also expressly agreed to broad indemnification provisions, including the following:

> [Defendant] shall indemnify GMAC-RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses … includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Guide, (iii) any claim, demand, defense or assertion against or involving GMAC-RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon any warranty, obligation or representation made by [Defendant] contained by the Client Contract and (v) any untrue

statement of a material fact, omission to state a material fact, or false or misleading information provided by the [Defendant] in information required under Regulation AB or any successor regulation.

In addition, [Defendant] shall indemnify GMAC-RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by GMAC-RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [Defendant], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)  Academy Mortgage further agreed:

to indemnify and hold GMAC-RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by GMAC-RFC as a result of any material misstatement in or omission from any information provided by [Defendant] to GMAC-RFC; or from any claim, demand, defense or assertion against or involving GMAC-RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon such misstatement or omission.

(Client Guide A202.)   The Client Guide also entitles RFC to recover all court costs, attorneys' fees and any other costs, fees and expenses incurred by RFC in enforcing the Agreement or Client Guide.

34.    Additionally, prior to the commencement of this lawsuit, Academy Mortgage conceded that certain of its loans sold to RFC were materially defective.   In that regard, Academy Mortgage has already paid RFC to cover those defects.   In this action, RFC is not seeking to recover again on those sums.

35.     RFC at all times performed all of its obligations to Academy Mortgage, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

### Defendant Materially Breached Numerous Loan-Level Representations and Warranties.

36.     As noted above, the loans RFC acquired from Academy Mortgage and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

37.     The loans Academy Mortgage sold RFC were eventually deposited in over 160 RMBS Trusts.   When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.   In making those representations and warranties, RFC relied on information provided to it by Academy Mortgage and other correspondent lenders.   That information in many cases violated Academy Mortgage's representations and warranties to RFC.

38.     Academy Mortgage materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

39.     Over time, many of the loans sold to RFC by Academy Mortgage defaulted or became seriously delinquent.   Numerous loans that Academy Mortgage sold RFC and

RFC securitized eventually sustained losses, collectively totaling over $7 million, exposing RFC to claims from investors, monoline insurers, and others.

40.    These delinquency and default rates far exceed what would normally be expected in a given population of mortgage loans.

41.    Internal reviews conducted by RFC determined that hundreds of the loans sold to RFC by Academy Mortgage violated the Client Guide and/or other representations or warranties made by Academy Mortgage, resulting in an Event of Default under the Agreement.

42.    The types of defects varied, but included income misrepresentation, employment misrepresentation, owner occupancy misrepresentations, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents, among others.  Additional material defects are likely contained throughout the loan population sold to RFC by Academy Mortgage.  Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

43.    By way of example, the following loans sold to RFC by Academy Mortgage were identified as having significant and material defects violating the Client Guide representations and warranties:

>    a.  Loan ID # 8969296 (included in securitization 2004-QS1) – The borrower on this $511,500 loan defaulted shortly after origination.  In addition, the borrower represented that s/he intended to occupy the property as a primary residence, which was required to qualify the borrower for the terms of the loan in question.  In fact, the borrower did

not occupy the property as a primary residence, and review by RFC's internal quality audit personnel determined this was a material misrepresentation. The loan therefore contained material breaches rendering the loan unacceptable under RFC's standards, including breaches of the representations and warranties identified in paragraphs 24(a), (b), (c), (i), (j), and (m) and 27 above. Academy Mortgage acknowledged these defects by repurchasing the loan; however, as discussed below, RFC continued to sustain losses relating to this and other defective loans included in securitizations.

b. Loan ID # 8380328 – The borrower on this $649,000 loan defaulted shortly after origination, which can be a sign of fraud or other problems in the origination and underwriting of the loan. In fact, the borrower in this case misrepresented his/her employment or income, and RFC's internal quality review personnel determined that the loan was unacceptable under RFC standards. Ultimately, the borrower paid the loan off, but the loan nonetheless materially breached representations and warranties made by Academy Mortgage, including those identified in paragraphs 24(a), (b), (c), (i), (j), and (m) and 27 above.

c. Loan ID # 10873847 (included in securitization 2006-QA9) – The borrower on this $417,000 loan defaulted shortly after origination, which can be a sign of fraud or other problems in the origination and underwriting of the loan. In fact, the borrower in this case misrepresented his/her employment or income, and RFC's internal quality review personnel determined that the loan materially breached representations and warranties made by Academy Mortgage. Academy Mortgage's breaches with respect to this loan included breaches of those provisions identified in paragraphs 24(a), (b), (c), (i), (j), and (m) and 27 above. The loan was therefore deemed unacceptable under RFC standards. Academy Mortgage never repurchased this loan.

d. Loan ID # 10514093 (included in securitization 2006-HSA4) – The subject property for this $25,000 second lien loan was a manufactured home, which is an ineligible property type under the relevant program. RFC's internal quality review personnel determined that the loan materially breached representations and warranties made by Academy Mortgage. Academy Mortgage's breaches with respect to this loan included breaches of those provisions identified in paragraphs 24(a), (b), (c), (i) and (j) above. Due to these breaches, the loan was deemed unacceptable under RFC standards. Academy Mortgage never repurchased this loan.

e.  Loan ID # 11082485 – The borrower on this loan misrepresented his/her income.  The borrower represented that s/he was employed by City of Phoenix and Company A, but Company A had no record of such employment.  In addition, the borrower represented income far in excess of actual, verified income, which resulted in an excessive debt-to-income ratio of 57%.  RFC's internal quality review personnel determined that the loan materially breached representations and warranties made by Academy Mortgage and was therefore deemed unacceptable under RFC standards.  Academy Mortgage's breaches with respect to this loan included breaches of those provisions identified in paragraphs 24(a), (b), (c), (i), (j), and (m) and 27 above.  Academy Mortgage never repurchased this loan.

44.   The above examples are not intended to be an exhaustive list of the loans sold by Academy Mortgage to RFC that contained material breaches of representations and warranties.  Rather, these loans represent a sampling of the material defects found in the loans Academy Mortgage sold to RFC.  Many more of the loans sold to RFC by Academy Mortgage contained material defects that violated the representations and warranties Academy Mortgage made in the Agreement.  While Academy Mortgage has, over the parties' course of dealing, repurchased some individual loans (thereby acknowledging it sold defective loans to RFC), it has in no way fully compensated RFC for the breaches of representations and warranties, liabilities, or losses stemming from the universe of defective loans Academy Mortgage sold to RFC over time.

45.   As detailed below, these defects constituted material breaches of Defendant's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches.**

46.     As a direct result of Defendant Academy Mortgage's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from Academy Mortgage.

47.     First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by Academy Mortgage.

48.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by Academy Mortgage and others in extensive federal and state court litigation in which plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

49.     Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Academy Mortgage and others.

50.     The first of these lawsuits was filed by bond insurer MBIA in October 2008.  The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans.  For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

51.     The MBIA lawsuit specifically attacked RFC's RMBS offerings 2006-HSA4, 2006-HSA5, and 2007-HSA1, HSA2 and HSA3, most of which (as shown in Exhibit C) contained Academy Mortgage loans.

52.     Indeed, as part of the MBIA litigation, MBIA hired an expert to review again a sampling of loans across the five securitizations involved in the *MBIA v.*

*Residential Funding Company, LLC* case.  Even in a relatively small sample of loans reviewed, MBIA's expert identified a loan originated by Academy Mortgage that materially breached the weaker representations that RFC had provided to MBIA.  In this loan (Loan ID # 8328780 included in securitization 2006-HSA4), 5 different breaches were identified, including missing documents, inadequate income verification violating Client Guide requirements, missing housing history, a defective mortgage, and a missing permanent resident alien card.

53.    The MBIA lawsuit was followed shortly by a class action suit filed by the New Jersey Carpenters pension funds.

54.    The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  As shown in Exhibit C, over 150 Academy Mortgage loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

55.    The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint.  (NJ Carpenters First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v. Residential Capital, LLC et al.* Case No. 08-cv-

08781 (HB) (S.D.N.Y.).)  Of course, that data was provided to RFC—and represented and warranted to be accurate—by Academy Mortgage and other correspondent lenders.

56.    Similarly, the Federal Housing Finance Authority, as conservator for Freddie Mac, filed suit against RFC in 2011, seeking to recover losses stemming from loan defects in numerous RMBS offerings that contained over a dozen Academy Mortgage loans, including RASC offerings 2005-KS10, 2006-KS3, 2006-KS9, 2007-KS2, and 2007-KS3, the RAMP 2005-RS9 offering, and the RALI 2006-QO9 offering.

57.    Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

58.    All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

59.    Collectively, these lawsuits involved more than one hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

60.    Across the dozens of securitizations involved in these lawsuits, Academy Mortgage was responsible for over 390 of the loans.

61.    As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and

affirmatively took steps to repurchase the loan. As described in more detail above, these included numerous loans sold to RFC by Academy Mortgage.

62.    In May 2012, RFC and certain of its affiliates—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

63.    In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Academy Mortgage. By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

   a.   The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by Academy Mortgage and securitized) were responsible for more than $19.5 billion in repurchase obligations.

   b.   AIG, an investor in over 25 Debtor-sponsored securitizations (a number of which included Academy Mortgage loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

c. Allstate, an investor in 25 Debtor-sponsored securitizations (a number of which included Academy Mortgage loans), filed 20 proofs of claim based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

d. John Hancock, an investor in over 50 Debtor-sponsored securitizations (a number of which included Academy Mortgage loans), filed 43 proofs of claim asserting similar allegations.

e. MBIA, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included Academy Mortgage loans, filed six proofs of claim seeking approximately $2.2 billion in damages based on alleged defects contained in the loans, a number of which (as described above) MBIA had individually reviewed.

f. FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included Academy Mortgage loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had individually reviewed.

64. Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

65. These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from Academy Mortgage, and on which RFC had relied.

66. The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy case. Subsequently, after protracted litigation over the reasonableness and propriety of that

settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which, together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of all of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, FHFA, securities law claimants, and others.

67.     The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement, including the $10 billion-plus settlement of RMBS-related liabilities, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Plan. (See Case No. 12-12020-mg, Doc. 6066 (Findings of Fact) (Glenn, J.), at ¶¶ 98 to 176.) RFC filed this suit on December 12, 2013, after RFC's RMBS-related liabilities became fixed through confirmation of the Plan. The Plan became effective on December 17, 2013. Pursuant to the Plan, the Trust succeeded to all of RFC's rights and interests, including its litigation claims against Academy Mortgage.

68.     Pursuant to its express contractual obligations, Academy Mortgage is obligated to compensate RFC for the portion of global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

## COUNT ONE
## (BREACH OF CONTRACT)

69.     RFC realleges each and every allegation set forth in Paragraphs 1 through 68, above, as if fully rewritten herein.

70.     RFC and Defendant Academy Mortgage entered into a valid and enforceable Agreement pursuant to which RFC acquired over 600 mortgage loans from Academy Mortgage.

71.     Pursuant to the parties' Agreement, Academy Mortgage made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

72.     RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

73.     Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

74.     Defendant's material breaches constitute Events of Default under the Agreement.

75.     RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC

stemming in part from materially defective loans sold to RFC by Defendant, and fees and costs incurred in prosecuting this action.

76.     Accordingly, RFC is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

**COUNT TWO**
**(INDEMNIFICATION)**

77.     RFC realleges each and every allegation set forth in Paragraphs 1 through 76, above, as if fully rewritten herein.

78.     RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans Academy Mortgage sold to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Academy Mortgage.

79.     Defendant expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC has incurred.

80.     Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)     On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)     On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify RFC against liabilities, losses, expenses and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for damages sufficient to reimburse RFC's liabilities, losses, costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(C)     All such further relief, as the Court deems necessary or proper.

Dated:  March 28, 2014

FELHABER LARSON

By:    s/Donald G. Heeman
     Donald G. Heeman, #286023
     Jessica J. Nelson, #347358
     David L. Hashmall, #138162
     220 South Sixth Street, Suite 2200
     Minneapolis, MN  55402-4504
     Telephone:  (612) 339-6321
     Facsimile:  (612) 338-0535
     dheeman@felhaber.com
     jnelson@felhaber.com
     dhashmall@felhaber.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Peter E. Calamari (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
PeterCalamari@quinnemanuel.com

CARPENTER LIPPS & LELAND LLP
Jeffrey A. Lipps (admitted pro hac vice)
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145
lipps@CarpenterLipps.com

ATTORNEYS FOR PLAINTIFF
RESIDENTIAL FUNDING COMPANY,
LLC