# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: RFC and ResCap Liquidating Trust Litigation | Case No. 13-cv-3451 (SRN/JJK/HB) |
| *This document relates to:* | **MEMORANDUM OPINION AND ORDER** |
| Residential Funding Company, LLC v. Primary Capital Advisors, LLC, No. 14-cv-3950 (DWF) | |

SUSAN RICHARD NELSON, United States District Judge

## I.  INTRODUCTION

This matter is before the Court on Defendant Primary Capital Advisors, LLC's Unique Issues Motion to Dismiss [Doc. No. 321]. For the reasons set forth below, the Motion is denied.

## II.  BACKGROUND

The alleged facts giving rise to the lawsuits in this consolidated action have been described in multiple prior Orders from this Court. Briefly stated, this particular lawsuit arises out of Defendant Primary Capital Advisors, LLC's ("Primary Capital") sale of allegedly defective mortgage loans to Residential Funding, LLC ("RFC"). (First Am. Compl. ¶ 1.) Prior to May 2012, RFC was "in the business of acquiring and securitizing residential mortgage loans," (id. ¶ 2), and RFC acquired the loans from "'correspondent lenders,'" such as Primary Capital, (id. ¶ 3). According to RFC, its relationship with Primary Capital was governed by a Seller Contract that incorporated the terms and conditions of the RFC Client Guide, and "[t]he Contract and Client Guide collectively form

the parties' Agreement [and] set the standards to which Primary Capital Advisors' loans sold to RFC were expected to adhere." (Id. ¶¶ 17–18 & Exs. A, B-1, B-5–B-31.) It is alleged that, pursuant to the Agreement, Primary Capital made many representations and warranties regarding the loans. (Id. ¶ 24.) The Agreement also provided for certain remedies for RFC in the event of a breach, including repurchase of the defective loan or indemnification against losses and liabilities resulting from the breach. (Id. ¶¶ 29–33.) The Seller Contract and Client Guide, or excerpts thereof, are attached to the First Amended Complaint as Exhibits A, B-1, and B-5 through B-31.

After purchasing loans from Primary Capital, RFC either pooled the loans to sell into residential mortgage-backed securitization ("RMBS") trusts or sold them to whole loan purchasers. (Id. ¶¶ 3, 36.) According to RFC, many of the loans eventually defaulted or became delinquent and, beginning in 2008, RFC faced claims and lawsuits resulting from defective loans it had purchased, including loans from Primary Capital. (Id. ¶¶ 48, 58.) By May 2012, RFC had spent millions of dollars repurchasing defective loans, including loans sold to it by Primary Capital, (id. ¶ 77), and on May 14, 2012, RFC filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Southern District of New York, (id. ¶ 78; In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.)). RFC alleges that hundreds of proofs of claim related to allegedly defective mortgage loans, including those sold to RFC by Primary Capital, were filed in connection with the bankruptcy proceedings. (First Am. Compl. ¶ 79.)

The Bankruptcy Court eventually approved a global settlement for more than $10 billion in allowed claims. (Id. ¶ 82.) RFC claims that Primary Capital is obligated, pursuant to the Agreement, to compensate RFC for losses and liabilities related to Primary Capital's breaches of representations and warranties. (Id. ¶ 84.) Accordingly, RFC filed a lawsuit asserting two causes of action against Primary Capital. In Count One, a claim for breach of contract, RFC alleges that Primary Capital materially breached the representations and warranties it made to RFC because the mortgage loans it sold to RFC did not comply with those representations and warranties. (Id. ¶ 89.) RFC asserts that these material breaches constitute Events of Default under the Agreements and have resulted in losses and liabilities related to the defective loans, as well as losses associated with defending the lawsuits and proofs of claim that stem from those loans. (Id. ¶¶ 90–91.) In Count Two, RFC alleges that it is entitled to indemnification from Primary Capital for those losses and liabilities. (Id. ¶¶ 93–96.)

## III. DISCUSSION

When evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted, the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations, see Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d

1486, 1488 (8th Cir. 1990). In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. See Fed. R. Civ. P. 12(d). The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).[1]

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The U.S. Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), clarified that this Rule does not require that a complaint contain "detailed factual allegations," but it does require that it contain facts with enough specificity "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In other words, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Id. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

---

[1] Several exhibits were attached to the First Amended Complaint, including the Seller Contract that RFC entered into with Primary Capital (Exhibit A) and excerpts of the Client Guide (Exhibit B). The Court may properly consider these documents because they are attached to the First Amended Complaint and are necessarily embraced by the pleadings.

4

In its Unique Issues Motion to Dismiss, Primary Capital argues that it did not agree to be bound by the Client Guide and that the Court cannot accept as true the First Amended Complaint's allegations to the contrary. (See Primary Capital Advisors' Mem. in Supp. of Its Unique Issues Mot. to Dismiss [Doc. No. 323] ("Primary Capital's Mem.") at 1, 9–12.) Primary Capital points to a provision of its Seller Contract that allowed for incorporation by reference of certain "Guides," including both the Client Guide and the AlterNet Seller Guide, and notes that only the box next to the AlterNet Seller Guide was checked. (See id. at 4–5.) Primary Capital also relies on language in the Seller Contract stating that RFC could approve the sale of loans under an "unchecked" guide only if an addendum to the Seller Contract was executed and delivered. (Id. at 5.) According to Primary Capital, these provisions demonstrate that Primary Capital's Seller Contract was governed only by the AlterNet Seller Guide, and because there are no allegations in the First Amended Complaint that an addendum was executed or that Primary Capital breached the AlterNet Seller Guide, RFC's claims must fail.[2] (See id. at 4–9.)

---

[2] Primary Capital also argues that RFC's claims fail because, even if the Client Guide applies, RFC only attached a March 13, 2006 version of the Client Guide, which would cover at most 22% of the loans it sold to RFC. (Primary Capital's Mem. at 14.) However, as RFC notes in opposition, RFC attached "exemplary excerpts of other editions of the Client Guide," alleged that the "other editions . . . are known to the parties," and alleged that "[t]he provisions of the Client Guide relevant to Plaintiff's claims were substantially similar during all time periods relevant to th[e] Complaint." (First Am. Compl. ¶ 18; see Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss [Doc. No. 381] at 3 n.2.) Assuming these facts to be true, and construing all reasonable inferences in favor of RFC, the Court finds that RFC has sufficiently identified the contractual provisions upon which it is basing its claims.

RFC, on the other hand, argues that the Seller Contract authorized Primary Capital to sell loans to RFC under the AlterNet Program, which—per the terms of the Client Guide—must be done "'in accordance with th[e] Client Guide.'" (Pls.' Mem. of Law in Opp. to Def.'s Mot. to Dismiss [Doc. No. 381] at 5–6 (quoting First Am. Compl., Ex. B-1 at 520).) Thus, RFC argues, "that the AlterNet Program was available to Primary Capital under its agreement with RFC does not negate or invalidate the representations and warranties in the Client Guide." (Id. at 6.)

The Court finds that RFC has plainly alleged that its relationship with Primary Capital was governed by a Seller Contract that incorporated the terms and conditions of the Client Guide and that, pursuant to those documents, Primary Capital made many representations and warranties regarding the loans it sold to RFC. Contrary to Primary Capital's assertions, is not clear from the pleadings or the attachments to the pleadings that RFC's allegations are false. While Primary Capital has identified language in the Seller Contract that—standing alone—appears to state that the parties' relationship is governed by the AlterNet Seller Guide rather than the Client Guide, RFC has identified language in the Client Guide that—standing alone—seems to state that the parties' relationship is, in fact, governed by the Client Guide's terms even if Primary Capital was selling loans under the AlterNet Program. And, although Primary Capital contends that RFC has improperly attempted to equate the terms "AlterNet Seller Guide" and "AlterNet Program," (see Primary Capital's Reply Mem. in Supp. of Its Unique Issues Mot. to Dismiss [Doc. No.

426] at 5–6),[3] the contractual language is—at best—ambiguous, and its interpretation cannot be resolved on a motion to dismiss. See Olympus Ins. Co. v. AON Benfield, Inc., 711 F.3d 894, 898 (8th Cir. 2013) ("If the court determines that a contract is ambiguous, its interpretation then becomes a question of fact for the jury and the district court should not grant a motion to dismiss."). Accordingly, the Court finds that—at this stage of the proceedings—RFC has sufficiently alleged that its contracts with Primary Capital included the representations and warranties upon which it is suing Primary Capital.

## IV.  ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Defendant Primary Capital Advisors, LLC's Unique Issues Motion to Dismiss [Doc. No. 321] is **DENIED**.

Dated:  July 14, 2015  
                                              s/Susan Richard Nelson  
                                              SUSAN RICHARD NELSON  
                                              United States District Judge

---

[3]  Primary Capital also asserts that RFC improperly attached 1,353 pages of documents to its opposition that were not referenced in the pleadings. (See Primary Capital's Reply at 4–6.) However, the Client Guide language referenced above—i.e., defining "Loan Program" to mean "[a]ny one or more of the Loan Programs [described in Chapter 6, which includes the AlterNet Program] pursuant to which a Client may sell Loans in accordance with th[e] Client Guide"—can be found in Exhibit B-1 to the First Amended Complaint. (First Am. Compl., Ex. B-1 at 520.)