## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Litigation | Court File No. 13-cv-3451 (SRN/JJK/HB) |
| *This document relates to:*<br><br>Residential Funding Company, LLC v. Impac Funding Corp., No. 13-cv-3506 | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [*REDACTED*]** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................... 1

COUNTER-STATEMENT OF MATERIAL FACTS........................................................ 3

    A.    Pinnacle Direct Merges Into Its Sister Company Pinnacle Financial .......... 3

    B.    Impac's Interest In Purchasing Pinnacle's Mortgage Business ................... 5

    C.    Impac Acquires Pinnacle's Mortgage Business In May 2007 ..................... 7

ARGUMENT........................................................................................................... 10

I.    PINNACLE FINANCIAL ASSUMED PINNACLE DIRECT'S LIABILITY EXPRESSLY AND AS A COMMON LAW SUCCESSOR .......... 11

    A.    Pinnacle Financial Expressly Assumed Pinnacle Direct's Liability To RFC ............................................................................................ 11

    B.    In The Alternative, Pinnacle Financial Is Liable As Pinnacle Direct's Common Law Successor ............................................................ 14

    C.    RFC's Consent To Transfer The Client Contract Was Not Required......... 16

II.    IMPAC ASSUMED PINNACLE'S LIABILITY EXPRESSLY AND AS A COMMON LAW SUCCESSOR................................................................... 20

    A.    Impac Expressly Assumed Pinnacle's Liability To RFC........................... 20

    B.    In The Alternative, Impac Is Liable As Pinnacle's Common Law Successor .................................................................................... 22

        1.    Florida Law Controls ..................................................................... 24

        2.    Under Florida Law, Impac De Facto Merged With Pinnacle .......... 28

        3.    Under Florida Law, Impac Is Pinnacle's Mere Continuation ......... 32

        4.    Impac's Arguments Regarding Florida Law Are Mistaken............. 36

        5.    Impac Would Also Be Liable Under California Law ...................... 39

CONCLUSION ................................................................................................ 41

Residential Funding Company, LLC ("RFC" or "Plaintiff"), through its successor the ResCap Liquidating Trust, respectfully submits this memorandum in opposition to the motion for summary judgment ("Mot."; ECF 945) filed by defendant Impac Funding Corp. ("Impac").

## INTRODUCTION AND SUMMARY OF ARGUMENT

Over the course of a few months in late 2006 and early 2007, defendant Impac orchestrated a series of transactions for the purpose and with the effect of moving an entire multi-million dollar mortgage origination platform in whole cloth from The Pinnacle Companies into a newly-formed Impac business unit that had no reason for existence other than to inherit Pinnacle's management, employees, office space, business relationships, contracts, licenses, and so on, and that was to be run in the same way it had always been run except with new letterhead.  Impac's corporate representative testified in this action that this was intended to make "Pinnacle … a dba of Impac," and undisputed evidence shows that (a) Impac told its investors, RFC, and the public that the new business unit was a mere continuation of the old; (b) Impac assumed sole responsibility for managing Pinnacle's profits, losses, and operations during a transition period; (c) Impac paid millions of dollars to settle certain of Pinnacle's legacy mortgage liabilities; and (d) Pinnacle shut down shortly after the transaction without paying its liabilities.

Now, faced with RFC's claims for over $150 million in losses on account of nearly 2,000 of Pinnacle's defective loans, Impac has reversed course.  It argues that the merger of Pinnacle Direct and its sister company Pinnacle Financial, done at Impac's

behest, was not actually a merger; that Impac's subsequent acquisition of Pinnacle was neither a merger nor a mere continuation of Pinnacle's business under a new name, but rather a narrowly-circumscribed purchase of a limited subset of assets; and that Impac has no liability at all for RFC's claims.   Impac's arguments are mistaken in all respects.

*First*, the relevant liabilities plainly moved from Pinnacle Direct to Pinnacle Financial as part of the self-described "merger" between those sister companies, which, both before and after the "merger," shared common ownership, management, employees, office space, and so forth.   As discussed in Section I(A) below, Pinnacle Financial expressly assumed all of Pinnacle Direct's "[l]iabilities arising from and after [March 16, 2007] under and pursuant to all Contracts."   Impac cannot overcome that provision because this Court has already held that (a) RFCs indemnity claim arose no earlier than 2008 as a matter of law, and (b) the existing record is insufficient to prove that RFC's contract claim arose before 2008.   Furthermore, as discussed in Section I(B) below, Pinnacle Financial is liable as Pinnacle Direct's common law successor.   Section I(C) briefly addresses Impac's argument that a Client Guide provision giving RFC the right to veto contractual assignments to third parties was actually intended to nullify RFC's ability to pursue a successor following a *merger*, thereby leaving RFC without a remedy.

*Second*, the relevant liabilities also moved from Pinnacle Financial to Impac.   As discussed in Section II(A) below, Impac expressly assumed liabilities that arose after May 2007 in connection with the "ownership and use of [Pinnacle's] Loan Origination Platform and the Assets," including Pinnacle's contract with RFC.   The claims here are encompassed within that express assumption both as to substance and time.   Even were

that not the case, Section II(B) demonstrates that Impac is liable as Pinnacle's common law successor, whether under Florida law (which applies here) or California law (which is the only other possibility).

In view of the foregoing, the Court should deny Impac's motion.  The issues of express assumption of liability as to both Pinnacle Financial (Section I(A)) and Impac (Section II(A)), which are sufficient to deny this motion in its entirety, can be decided in RFC's favor as a matter of law; at minimum, genuine disputes of fact preclude summary judgment for Impac on those issues.   In the alternative, the issues of common law successor liability set forth in Sections I(B) and II(B), which involve the weighing of disparate facts concerning the existence of a de facto merger or mere continuation, provide an alternative basis for denial of this summary judgment motion.

## COUNTER-STATEMENT OF MATERIAL FACTS

### A.    Pinnacle Direct Merges Into Its Sister Company Pinnacle Financial

This action arises from a June 5, 2001 contract pursuant to which Pinnacle Direct sold RFC more than 1,920 loans with an original principle balance over $325 million. Sindberg Porter ("S.P.") Aff. Ex. 3, at RFCCORR-COM2091032 (the "Client Contract"); S.P. Aff. Ex. 54.[1]   At the time of these loan sales, Pinnacle Direct was part of an

---

[1]    This brief uses the term "Pinnacle Direct" to refer to Pinnacle Direct Funding Corporation and "Pinnacle Financial" to refer to Pinnacle Financial Corporation prior to the March 2007 Reorganization, *see infra* 5, and "Pinnacle Financial" or "Pinnacle" to refer to the combined entity following the Reorganization.

Throughout, the parties' affidavits and declarations are referred to by the affiant's or the declarant's last name; exhibits are referred to by exhibit number and bates number; exhibits that are not bates stamped are referred to by ECF docket number and pagination at the top of the document.

integrated Orlando-based enterprise called "The Pinnacle Companies," a self-described "independent mortgage banking company originating residential mortgage loans through retail and wholesale channels."  S.P. Aff. Ex. 5, at IMP005860.  The Pinnacle Companies shared common ownership and management.   As relevant here, Douglas Long and Jeffrey Vratanina were the co-founders, sole shareholders (through individual and family trusts), and directors of not only Pinnacle Direct but also its sister company Pinnacle Financial.  *See* S.P. Aff. Ex. 5, at IMP005860, IMP005864; Tr. 55:2-5 (founders);[2] Long Aff. Ex. A (ECF 950-1, at 11, 22) (directors); S.P. Aff. Ex. 9, at IMP005842; Tr. 58:4-18 (shareholders).

The relationship between Pinnacle Direct and Pinnacle Financial was so close that, over time, Long and Vratanina "gradua[lly] liquidat[ed] and w[ound]-up" the "operations" of Pinnacle Direct and "consolidat[ed] [it] … into" Pinnacle Financial.  S.P. Aff. Ex. 9, at IMP005841.   By summer 2006, Long and Vratanina had completely "integrat[ed] … the business operations" of the two entities.  Tr. 121:25-122:7; *see also* *id*. 114:13-18, 21-25; S.P. Aff. Ex. 5, at IMP005865, IMP005869 (Pinnacle "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").  Then, between October and December 2006, Pinnacle Direct ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[2]    "Tr." citations are to the Rule 30(b)(6) deposition of Impac's corporate representative, Richard Johnson.  *See* Nesser Decl. Ex. A; *see also* S.P. Aff. Ex. 1.

███████████████████████████████████████

████  S.P. Aff. Ex. 9, at IMP005841.

The official "legal merger" between Pinnacle Direct and Pinnacle Financial, planned for late 2006, S.P. Aff. Ex. 5, at IMP005865, eventually took place as of March 16, 2007, when Long and Vratanina "merge[d] the two entities" by means of a formal "Plan of Reorganization," Tr. 96:8-16; *see also id.* 88:10-12; Long Aff. Ex. A, at IMP000678 (Plan).  The Plan stated that "the shareholders and directors" of Pinnacle Direct and Pinnacle Financial, *i.e.*, Long and Vratanina, had "determined that it is … in the best interests of such shareholders for [Pinnacle Direct and Pinnacle Financial] to be reorganized by transferring to [Pinnacle Financial] most of the business rights, claims, and assets of [Pinnacle Direct]."  Long Aff. Ex. A, at IMP000678.  The Plan also characterized the Reorganization as a merger for tax purposes.[3]  Pinnacle Direct retained only nominal assets of approximately $250,000.  *Id.*  All of this confirmed what had been the practical reality since mid-2006:  Pinnacle Financial "continue[d] the mortgage lending business previously carried on by [Pinnacle Direct]."  *Id.*

### B.    Impac's Interest In Purchasing Pinnacle's Mortgage Business

In the summer of 2006, Impac entered discussions to acquire Pinnacle's "business operations."  Tr. 108:1-7.  Impac wanted the whole business—"both … Pinnacle Financial and Pinnacle Direct."  Mot. 5 & n.3; S.P. Aff. Ex. 5, at IMP005865.  Impac's

---

[3]    *See* Long Aff. Ex. A, at IMP000678 (transaction is "a reorganization" under 26 U.S.C. § 368(a)(1)(D), which concerns "a transfer by a corporation of all or a part of its Assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders … is in control of the corporation to which the assets are transferred").

Executive Committee recommended the transaction to its Board in September 2006. S.P. Aff. Ex. 7, at IMP011065-70. Specifically, Impac planned to "acquire the ownership" of Pinnacle Financial and Pinnacle Direct for approximately $30 million in cash and $20 million in Impac stock. *See id*.; Tr. 147:16-148:9, 15-23.

Impac knew it was proposing to acquire Pinnacle Direct and Pinnacle Financial at the same time those entities were "in the process of merging." S.P. Aff. Ex. 6, at IMP005892. Thus, after due consideration, in November 2006, Impac formally "recommend[ed] that Pinnacle do the legal merger … prior to [the Impac] transaction." Nesser Decl. Ex. B, at IMP005816; Tr. 86:20-23 (same). As Impac explained it, the ultimate transaction between Impac and Pinnacle would therefore "reflect the acquisition of [Pinnacle Financial] and a combined entity of [Pinnacle Direct and Pinnacle Financial]." Nesser Decl. Ex. B, at IMP005816. Consistent with this, Impac-Pinnacle term sheets initially referred to Pinnacle Direct and Pinnacle Financial separately, *see* S.P. Aff. Ex. 16, at IMP005530, but later, after the March 2007 Reorganization, referred to Pinnacle Financial alone, *see* S.P. Aff. Ex. 18, at IMP010790.

As of summer 2006, the parties had contemplated a "stock transaction," Tr. 160:12-15, in which Long and Vratanina would "sell [Pinnacle] as a whole, … includ[ing] any and all of its assets, [and] any potential liabilities, whether accrued or unaccrued," *id*. 162:15-18. However, "Impac found itself unable to quantify the contingent liabilities and potential future losses of Pinnacle Financial and Pinnacle Direct." Mot. 5. Impac knew that Pinnacle had been forced to repurchase over $37 million in loans since January 2006 measured by original principal balance, and had

received more than $57 million in additional repurchase demands as of May 2007.  *See* Nesser Decl. Ex. C, at IMP000320-334; *see also* Tr. 328:5-9.  In an attempt to shield itself from these massive liabilities, Impac proposed to restructure the transaction as an asset purchase rather than a stock purchase.  Tr. 166:2-4, 13-15.  Long and Vratanina agreed—indeed, they had little choice but to agree because, as Impac knew, they were faced with an "inability to satisfy their liability," *id*. 346:3-4, so severe that "[i]f they didn't do th[e] transition, they would have shut the [Pinnacle] business down," *id*. 293:24-25.

### C.     Impac Acquires Pinnacle's Mortgage Business In May 2007

In May 2007, just two months after Pinnacle Direct formally merged into Pinnacle Financial, Impac acquired "███████████████████████" Pinnacle's ████████



███████████████████████████████████ S.P. Aff. Ex. 23, at IMP000010.  Pinnacle Direct, the "wholesale" part of the business, Mot. 2, was not separately a party to the transaction because its merger into Pinnacle Financial ████ ███████████████████████████████████ S.P. Aff. Ex. 17, at IMP005347; Tr. 106:15-24.

Undisputed evidence confirms that Impac carried over Pinnacle's Florida-based business intact and essentially in whole cloth.  To begin, Impac continued the Pinnacle operation in a previously non-existent "retail division" of Impac called "Impac Home Loans" ("IHL"), newly-formed specifically to continue the Pinnacle business.  Tr. 231:2-6.  As Impac's corporate representative explained, **the intent was to make "Pinnacle … a dba of Impac**." Tr. 412:3-6 (emphasis added).  To this end, Impac hired Long and

Vratanina to run IHL—a direct continuation of the work they had been doing at Pinnacle. *See* Nesser Decl. Ex. D, at IMP006214-15.   Impac also "offered employment to substantially all (if not all) of [Pinnacle's] … employees," Nesser Decl. Ex. E, at IMP005947, and took over Pinnacle's Florida-based facilities, Nesser Decl. Ex. O, at IMP000162.   There was no new company in any meaningful sense—it was the same company with the same people, except that those "people [would] operate under a new name." Tr. 412:5-6; *id.* 292: 18-21.

Impac also took steps to replicate Long and Vratanina's high-level management functions and compensation.   To this end, Long and Vratanina became executive vice-presidents and officers of Impac.   *Id.* 155:10-156:19; Nesser Decl. Ex. F, at IMP0000411-31; Ex. G, IMP000465-85.   Impac also planned for Long and Vratanina to serve on Impac's Executive Committee, and for at least one of Long or Vratanina to serve on Impac's "Asset/Liability Committee," which was responsible for "manag[ing] and monitor[ing] the interest rate risk and cash management of … the organization."   Tr. 155:19-156:5.   In addition to a base salary, Impac promised Long and Vratanina,



. S.P. Aff. Ex. 18, at IMP010791-94; *see also* Nesser Decl. Ex. F, at IMP000418 (providing for

); Ex. G, at IMP000472 (same).  Long and Vratanina, the Pinnacle shareholders,

*See* S.P. Aff. Ex. 18, at IMP010791-94.

Indeed, not only did Impac intend to continue Pinnacle's business as a "dba," but Impac and Pinnacle also entered into a contract pursuant to which *Impac actually ran the Pinnacle entity itself* during a transition period.   Under this so-called "Management Services Agreement," S.P. Aff. Ex. 30, at IMP000389, Pinnacle functioned solely *for Impac's benefit* "until all items [were] transitioned over" to Impac, Tr. 285:2-4, "[i]n order to effectuate an asset purchase agreement of a mortgage banking business." *Id.* 292:13-14.   Impac was running, paying for, and profiting from Pinnacle:   During the period the Management Services Agreement was in effect, Impac was "responsible for the operational expenses of [Pinnacle's] entire Retail and Wholesale Divisions," *id.* 289:5-12, "*received 100% of [Pinnacle's] revenue*," and "*covered 100% of [Pinnacle's] expenses*," Nesser Decl. Ex. D, at IMP006213 (emphasis added); Tr. 289:13-20.   As Impac's corporate representative described it, if not for the Management Services Agreement, "I just acquire the assets and the people, *I wouldn't be able to operate the business* …." Tr. 292:13-21 (emphasis added).

The parties' conduct after the Pinnacle acquisition further confirms that Pinnacle was merely continued with a new name under the Impac umbrella.   After the transaction, Impac sold loans to the same entities that Pinnacle had.   *See* S.P. Aff. Ex. 39 at IMP007462-64.   Impac paid Pinnacle's creditors more than ███████████ to satisfy *Pinnacle's* repurchase liabilities.   *Id.*   And, as already indicated, Impac planned for Pinnacle to formally dissolve after the transaction.   Tr. 413:12-13, 15-16.   That plan was realized.   *See* S.P. Aff. Ex. 42, IFC1207310-11 (Pinnacle Direct dissolved in January 2008); S.P. Aff. Ex. 47 (Pinnacle Financial dissolved as of 2010); *see also* Tr. 407:3-4.

## ARGUMENT

A court may only grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014) (quoting Fed.R.Civ.P. 56(a)). The movant bears the burden to show that this standard has been met. *Id.* It must either produce evidence that negates the nonmovant's claims, or point to an absence of evidence to support an essential element of the nonmovant's claims. *See Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009). The Court "consider[s] all evidence in the light most favorable to, and mak[es] all reasonable inferences for, the nonmoving party." *Silva*, 762 F.3d at 718. "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).[4]

Under Federal Rule 56(f)(1), "[a]fter giving notice and a reasonable time to respond, the Court may grant summary judgment for a nonmovant." *Camelot LLC v. AMC ShowPlace Theatres, Inc.*, No. 10-CV-4255, 2011 WL 825681, at *1 n.1 (D. Minn. Mar. 7, 2011), *aff'd*, 665 F.3d 1008; *see also Titan Supply Co. v. City of Dundas*, No. 11-CV-3093, 2012 WL 5874453, at *1 (D. Minn. Nov. 20, 2012) (without formally cross-moving, non-movant may ask for summary judgment in its favor).

---

[4]   Contrary to Impac's suggestion Mot. 12-13, there is no requirement that the non-moving party produce in discovery evidence in support of its claims. Unsurprisingly, Impac produced much of the evidence concerning the transactions at issue.

## I.     PINNACLE FINANCIAL ASSUMED PINNACLE DIRECT'S LIABILITY EXPRESSLY AND AS A COMMON LAW SUCCESSOR

Impac argues that it is immune from liability because the Client Contract purportedly did not transfer from Pinnacle Direct to Pinnacle Financial.  Mot. 12-16. That is mistaken.  Undisputed facts prove that Impac is not entitled to summary judgment on the issue of Pinnacle Financial's express assumption of liability, and that, instead, RFC is entitled to summary judgment in its favor.  Alternatively, and as an independent basis upon which to reject Impac's arguments regarding Pinnacle Financial's assumption of liability, a reasonable trier of fact could find that Pinnacle Financial is Pinnacle Direct's common law successor.  RFC is also entitled to judgment as a matter of law that RFC's consent was not required for the transfer of liability from Pinnacle Financial to Pinnacle Direct.

### A.     Pinnacle Financial Expressly Assumed Pinnacle Direct's Liability To RFC

RFC is entitled to judgment as a matter of law holding that Pinnacle Financial expressly assumed Pinnacle Direct's liability to RFC, including the liability at issue in this action, pursuant to the plain terms of the Plan of Reorganization between Pinnacle Direct and Pinnacle Financial.[5]

---

[5]   Impac cannot sustain its summary judgment burden by relying on the self-serving and unsupported affidavit of Mr. Okaty that, "[t]o [his] understanding," Pinnacle Direct did not assign the contract to Pinnacle Financial because Pinnacle Financial had its own contract.  Okaty Aff. ¶ 8.  "To establish a genuine issue of material fact, [the movant] may not merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [its] favor."  *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013).

In the Plan of Reorganization, Pinnacle Financial acquired "all" of Pinnacle Direct's "Contracts," "includ[ing] all investor agreements." Okaty Aff. Ex. A at IMP000679.[6] Pinnacle Financial also expressly assumed all of "*[Pinnacle Direct]'s Liabilities arising from and after the [March 16, 2007] Execution Date under and pursuant to all Contracts*." *Id.* at IMP000681 (emphasis added). That plain language is sufficient to resolve the issue of Pinnacle Financial's express assumption of liability, because RFC's indemnification and contract claims here "arise from and after the Execution Date" of March 16, 2007.

*First*, it is clear as a matter of law—and this Court has already held—that RFC's indemnification claims arose after March 16, 2007. Impac cites and does not contest[7] RFC's allegations that when RFC filed for bankruptcy in 2012, it was sustaining losses and incurring liabilities as a result of lawsuits alleging that the loans RFC had securitized were defective, and that the bankruptcy court confirmed RFC's liquidation plan in December 2013, pursuant to which RFC assumed the liabilities for which it now seeks indemnification. *See* Mot. 3 (citing No. 13-3506-JNE-SER (D. Minn.) ("Impac ECF") 34 ¶¶ 8-10). This Court has held as a matter of law, on those facts, that RFC's claim for indemnification did not accrue until "at least sometime after 2008," when "RFC's

---

[6] RFC was an "investor" of Pinnacle Direct, meaning it purchased Pinnacle Direct's loans. Tr. 216:24-217:1. The Client Contract is not listed as an "Excluded Asset[]" in the Plan. Okaty Aff. Ex. A at IMP000680-81.

[7] Where the movant sets forth facts from plaintiff's complaint, "the plaintiff's facts are deemed admitted for the purposes of the motion" for summary judgment. *Doe v. Todd Cnty. Sch. Dist.*, No. CIV. 05-3043, 2006 WL 3025855, at *7-8 (D.S.D. Oct. 20, 2006).

liability [became] finally fixed and ascertained." *Residential Funding Co., LLC v. Acad. Mortg. Corp.*, 59 F. Supp. 3d 935, 953 (D. Minn. 2014); *see also Residential Funding Co., LLC v. Impac Funding Corp.*, No. 13-cv-3506 (ECF 65) (D. Minn. Sept. 15, 2014). This compels the conclusion:  Because Pinnacle Financial expressly assumed liabilities for claims that accrued after the March 2007 Execution Date of the Plan of Reorganization, it necessarily assumed liability for RFC's post-2008 indemnification claims.

*Second*, Pinnacle Financial also expressly assumed liability for RFC's breach of contract claims that arose after the March 2007 Execution Date.  That is because Section A201(M) of the Client Guide, which Impac does not contest is incorporated into the Client Contract, *see* Mot. 4, imposed a continuing obligation on the loan seller (or its successor) to "promptly notify [RFC] of any occurrence, act, or omission … of which [Seller] has knowledge" that "may materially affect" the loans.  Nesser Decl. Ex. H, at RFCCORR-COM00068546.   This Court has held that Section A201(M) creates a "continuing obligation" to inform RFC of breaching loans.  *See, e.g.*, *In re RFC & ResCap Liquidating Trust Litig. ("Decision One")*, No. 13-CV-3451 SRN/JJK, 2015 WL 3756476, at *11 (D. Minn. June 16, 2015).[8]  Impac provides no evidence at all to suggest that Pinnacle Direct, Pinnacle Financial, or Impac lacked knowledge of breaches.  Nor has it introduced evidence that would overcome the Client Guide's express language establishing a *presumption* of knowledge on the part of the correspondent (and its

---

[8]    Contrary to Impac's argument, Mot. 20 n.10, this Court considered in *Decision One* allegations identical to those RFC made here.  *See* Impac ECF 34 ¶ 24(b).

successors) as to any breach, absent proof to the contrary by the correspondent.  *See* Nesser Decl. Ex. H, at RFCCORR-COM00068527 (under Section 113, correspondent is "presumed" to have "knowledge" of any "representation or warranty that is inaccurate or incomplete in any material respect … unless Client demonstrates otherwise").  Thus, just as with indemnification, Pinnacle Direct's liability for breach of the Client Contract arose after the March 2007 Execution Date and was assumed by Pinnacle Financial.  *See, e.g.*, *Moore v. Medtronic, Inc.*, No. 99-CV-2066, 2001 WL 1636248, at *2 (D. Minn. July 30, 2001) ("Where a contract provides for continuing performance over a period of time," "accrual" of the cause of action "occurs continuously," with "each breach.").[9]  At minimum, genuine disputes of fact concerning the existence of breaches, Impac's knowledge of those breaches, and Impac's notice to RFC of those breaches (or lack thereof), precludes resolution of this issue in Impac's favor at this stage.

### B.      In The Alternative, Pinnacle Financial Is Liable As Pinnacle Direct's Common Law Successor

Although this Court need not reach the question of Pinnacle Financial's common law successor liability if it agrees that Pinnacle Financial expressly assumed Pinnacle Direct's liabilities, common law successor liability provides an independent ground to reject Impac's arguments.  This is because a reasonable trier of fact could conclude that

---

[9]      Impac's reliance on Section 5(f) of the Plan (Mot. 15-16), which purports to absolve Pinnacle Financial of "[l]iabilities of [Pinnacle Direct] for any breach or failure to perform any contract, whether or not assumed hereunder," Okaty Aff. Ex. A at IMP000682, is unavailing.  That Section must be read together with Section 4(b), which states that Pinnacle Financial *will* assume Pinnacle Direct's liabilities "arising from and after the Execution," but not before.  *Id*. at IMP000681-82.  Because, as shown in text, the liabilities under the Client Contract arose after the Execution Date, Section 5(f) does not bar assumption of the liabilities here.

Pinnacle Financial de facto merged with Pinnacle Direct, and merely continued the Pinnacle Direct business.

Under Florida law, which Impac does not contest would apply to this transaction involving two Florida entities, *see* Okaty Aff. Ex. A, at IMP000678, a successor corporation is liable for a predecessor corporation's liabilities if there was a "de facto merger or a mere continuation": "A de facto merger occurs where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger," and mere continuation "arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name." *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 153-54 (Fla. Dist. Ct. App. 1994). In *Amjad Munim*, the court found "mere continuation of business" where the successor "took the business of" the predecessor "lock, stock and barrel" and "commenced full operations[,] provid[ing] the same type of … services in the same office with the same files, patients, nurses, clerical help, office manager and the same major player." *Id*. at 154-55. Those same facts also establish de facto merger if the predecessor dissolves. *See id*.

Here, a reasonable trier of fact could conclude that both de facto merger and mere continuation are present. *First*, Impac's corporate representative testified that Pinnacle Direct and Pinnacle Financial "merge[d]" in the March 16, 2007 Plan of Reorganization, Tr. 88:10-12, *see also id*. 96:15-16, following Impac's request for a "legal merger" between the two companies, Nesser Decl. Ex. B, at IMP005816. *Second*, the Plan of Reorganization itself states that "[Pinnacle Financial] will continue the mortgage lending

business previously carried on by [Pinnacle Direct]." Okaty Aff. Ex. A, at IMP000678. It states that Pinnacle Direct transferred to Pinnacle Financial "most of the business rights, claims, and assets of [Pinnacle Direct]"; that "all the employees of [Pinnacle Direct] were transferred to [Pinnacle Financial]"; and that Pinnacle Direct's remaining assets will have a value of "approximately $250,000." *Id.* Pinnacle Direct's operations were discontinued and Pinnacle Direct's business was continued by Pinnacle Financial in 2006. *See* S.P. Aff. Ex. 5, at IMP005865; S.P. Aff. Ex. 6, at IMP005892; S.P. Aff. Ex. 9, at IMP005841. Pinnacle Direct dissolved thereafter. S.P. Aff. Ex. 42, at IFC1207310-11. The directors and shareholders of Pinnacle Direct and Pinnacle Financial were exactly the same. *See* Long Aff. Ex. A (ECF 950-1, at 11, 22).

Because Pinnacle Financial de facto merged with and continued Pinnacle Direct's business, Impac has failed to adduce evidence showing that Pinnacle Financial is not Pinnacle Direct's common law successor. At minimum, de facto merger and mere continuation here implicate genuine disputes of fact that cannot be resolved on this motion.

## C.    RFC's Consent To Transfer The Client Contract Was Not Required

Impac argues that the Client Contract could not have passed from Pinnacle Direct to Pinnacle Financial in the Reorganization because RFC's consent was required for the transfer but withheld. Mot. 13-15. That is wrong as a matter of law and RFC is entitled to a ruling in its favor so holding.

As Impac acknowledges (*id.* 14 n.7), Section A214 of the Client Guide states that if a correspondent merges into another entity, its obligations to RFC *automatically*

transfer to the merged entity without any action by RFC.   Nesser Decl. Ex. H, at RFCCORR-COM00068571 ("Any ... entity into which the Client may be merged or consolidated ... shall be the successor of the Client under the Client Contract" without any "execution or filing of any paper or any further act.").   Impac does not argue that the Reorganization was not a merger or a consolidation under Section A214.   That is as it should be, because, among other things, its corporate representative admitted that Pinnacle Direct and Pinnacle Financial "merge[d]."   Tr. 88:10-12; *see also id*. 96:15-16. Rather, Impac argues that Section A214 is inconsistent with Paragraph 10 of the Client Contract, which requires RFC's "prior written consent" before a loan seller may "assign or transfer [the Client] Contract."   S.P. Aff. Ex. 3 ¶ 10; *see* Mot. 14 n.7 (citing S.P. Aff. Ex. 3 ¶ 3).

Impac is mistaken because Section A214 (addressing obligations following a merger) and Paragraph 10 (addressing obligations following an assignment) concern fundamentally different scenarios and hence are not in conflict with one another.   On one hand, Paragraph 10 prohibits an "assign[ment] or transfer[]" of the Client Contract without RFC's consent.   S.P. Aff. Ex. 3 ¶ 10.   "Assignment" generally means the transfer of one's rights and/or obligations under a contract to another, *see* 29 Williston on Contracts § 74:1 (4th ed. 2015), and "[t]he primary purpose of clauses prohibiting the assignment of contract rights is to protect the contracting party from dealing with parties [it] has not chosen to do business with," *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).   Thus, Paragraph 10 sensibly prevents a loan seller from assigning away its rights and/or obligations under the Client Contract to another entity,

and thereby giving that entity the right to sell loans to RFC even though RFC had not had the opportunity to determine whether it was willing to do business with that entity. *See* Nesser Decl. Ex. H, at RFCCORR-COM00068532 (under Section 201, sellers must meet certain eligibility standards to sell loans to RFC); *id.* at RFCCORR-COM00068534 (under Section 205, seller may be terminated by RFC).

On the other hand, Section A214 deals with a different situation, stating that RFC's consent is not required for "[a]ny … entity into which the Client may be merged or consolidated [to] be[come] the successor of the Client."   By contrast to the mere assignment of a contract, "merger" and "consolidation" generally "denote various arrangements by which two or more corporations become united in interest," and the successor corporation "acquires the assets and liabilities of the former."  15 Fletcher Cyc. Corp. § 7041 (2015).  The contractual provision is again sensible, because in a merger or consolidation the original correspondent, albeit in new corporate form, continues to be obligated to RFC.

In sum, because Pinnacle Direct and Pinnacle Financial merged, and Section A214 states that RFC's consent is not required for the successor entity to be liable under the Client Contract in a merger, RFC is entitled to judgment as a matter of law that its consent was not required for the Client Contract to transfer to Pinnacle Financial. *See BancInsure, Inc. v. Marshall Bank, N.A.*, 453 F.3d 1073, 1075 (8th Cir. 2006) ("In Minnesota, contract interpretation is determined as a matter of law …").  Alternatively, at minimum, summary judgment cannot be entered in favor of Impac on this issue in

view of what are, at minimum, genuine factual disputes concerning the relationship of the contracts to one another and their intended meaning.

Finally, Impac argues that RFC refused permission to assign a different contract—a warehousing credit agreement between Pinnacle Direct and RFC—from Pinnacle Direct to Pinnacle Financial.  Mot. 14-15.  Impac does not and cannot explain why RFC's lack of consent as to the transfer of a wholly different contract is relevant.  *First*, RFC's refusal to consent to the transfer of *a credit line* on which Pinnacle Financial could draw, *see* Okaty Aff. Ex. B, just a few months before that credit line was to terminate, *see* Nesser Decl. Ex. I, at IFC1207561, has no bearing on whether the Client Contract to sell loans and the attendant obligations transferred from Pinnacle Direct to Pinnacle Financial.  *Second*, in its letter concerning the credit agreement, RFC made clear that the Client Contract *would* transfer from Pinnacle Direct to Pinnacle Financial.  Referencing the "Pinnacle Direct … merger with Pinnacle Financial," RFC gave notice that it may have "repurchase" claims and "reserve[d] all of its rights against Pinnacle Direct *and Pinnacle Financial* to seek payment of such claims."  Okaty Aff. Ex. B (emphasis added).  RFC's repurchase rights arise under the Client Contract.  *See* S.P. Aff. Ex. 3 ¶ 6. Impac's argument that RFC withheld required consent for the transfer of the Client Contract from Pinnacle Direct to Pinnacle Financial should be rejected, and this Court should hold as a matter of law that RFC's consent was not required.

## II.   IMPAC ASSUMED PINNACLE'S LIABILITY EXPRESSLY AND AS A COMMON LAW SUCCESSOR

Just as Pinnacle Financial expressly and impliedly assumed Pinnacle Direct's liability for the claims at issue, so too did Impac expressly and impliedly assume Pinnacle Financial's liability for those same claims.

### A.   Impac Expressly Assumed Pinnacle's Liability To RFC

RFC is entitled to judgment as a matter of law in its favor holding that Impac expressly assumed Pinnacle's relevant liabilities to RFC.[10]

The Client Contract was one of the "Contracts" that Impac acquired from Pinnacle in the Asset Purchase Agreement ("APA").[11]   Specifically, Section 3.15(a)(xiii) of the APA required the scheduling of all Contracts "material to … the operation of the Loan Origination Platform."   S.P. Aff. Ex. 23, at IMP000038.   Schedule 3.15(a) lists the "Mortgage Loan Purchase and Sale Agreements … with the investors listed in Schedule 3.7."   S.P. Aff. Ex. 26, at IMP000272.   "GMAC-RFC" is identified as an "investor" in

---

[10]   Under the APA's choice of law clause, California law governs Impac's express assumption of liability.  S.P. Aff. Ex. 23, at IMP000068.

[11]   Specifically, pursuant to Section 2.1 of the APA, Impac purchased all of Pinnacle Financial's "right, title and interest in the following … to the extent used or held for use in [Pinnacle Financial's] Loan Origination Platform:" "all Contracts and Contract Rights (to the extent assumed under Section 2.6 hereof)."   S.P. Aff. Ex. 23 at IMP000011, IMP000019.  The "Loan Origination Platform" included "the assets used or held for use in connection with [Pinnacle Financial's] mortgage … loan origination process."   *Id*. at IMP000014.  The only "Excluded Assets" were those listed on Schedule E.  S.P. Aff. Ex. 24, at IMP000146 (APA Sched. E).  The Client Contract with RFC is not listed as an "Excluded Asset."   *Id*.   Moreover, because the Client Contract was specifically scheduled, Impac's argument that it did not assume certain other of Pinnacle Direct's assets under the APA, Mot. 8, must be rejected.

Schedule 3.7.  S.P. Aff. Ex. 25, at IMP00204.  Thus, Impac expressly acquired the Client Contract from Pinnacle.[12]

Because Impac acquired the Client Contract from Pinnacle, any liabilities that arose after the acquisition (at minimum) are properly chargeable to and recoverable from Impac.  This is because, as Impac concedes, "Impac specifically assumed ... liabilit[ies] that arose in connection with the 'ownership and use of the Loan Origination Platform and the Assets, other than Excluded Liabilities, that arise *after* the closing.'"  Mot. 7 (quoting S.P. Aff. Ex. 23, at IMP000023 (§ 2.6(d)) (Impac's emphasis).  The APA defines "Liabilities" as "any and all … liabilities and obligations, whether accrued, fixed, absolute or contingent, matured or unmatured … including … those arising under any Contract[.]"  S.P. Aff. Ex. 23, at IMP000014.  The liabilities at issue here clearly meet that definition as to substance, because they arose in connection with a "Contract" of the Pinnacle "Loan Origination Platform."  They likewise meet the definition as to time, because, as indicated above, RFC's indemnity claim accrued "at least sometime after 2008," *Acad. Mortg. Corp.*, 59 F. Supp. 3d at 953, and its contract claim is continuing under Client Guide Section 201(M), *see Decision One*, 2015 WL 3756476, at *11.  RFC is entitled to judgment as a matter of law on this issue.

---

[12]   In fact, Impac admitted in prior briefing in this matter that "Pinnacle's 2001 contract with RFC is included on Schedule 3.15(a) as one of the … MLPA[s] with the investors listed in Schedule 3.7.'"  Impac ECF 49, at 9.  Although it now purports to take a contrary position, Mot. 18, Impac's first position was correct, as shown in text, and is binding on Impac.  *See Holman v. Kemna*, 212 F.3d 413, 417-18 (8th Cir. 2000) ("treating statements by parties made in briefs as judicial admission") (citing *Postscript Enters. v. City of Bridgeton*, 905 F.2d 223, 227-28 (8th Cir. 1990)).

Impac does not meaningfully dispute the foregoing. Instead, it attempts to sidestep the analysis by arguing that RFC's purported failure to consent to a transfer of the Client Contract precluded such a transfer. Mot. 18 n.8. That is incorrect. The APA states that Scheduled Contracts transfer *regardless* of whether consents as to certain specified contracts were required or received. *See* S.P. Aff. Ex. 23, at IMP000021-22 (§ 2.5.1(e)) (requiring delivery of consents only as indicated on the schedules). Because the Client Contract was a contract with an "investor," as discussed above, and the APA does not require consent for agreements with investors, *see* S.P. Aff. Ex. 25 at IMP000203 (Sched. 3.7), Impac is mistaken. The Client Contract transferred whether or not RFC's consent was requested or received.

**B.     In The Alternative, Impac Is Liable As Pinnacle's Common Law Successor**

Although this Court need not address the question of Impac's common law successor liability if it agrees that Impac expressly assumed liabilities under the Client Contract, common law successor liability provides an alternative ground for denial of Impac's motion.

Under governing Florida law, "[t]he imposition of liability upon the successor corporation is grounded upon the notion that no corporation should be permitted to … breach a contract and avoid liability through corporate transformations in form only." *Amjad Munim*, 648 So. 2d at 154. "Proof of fraudulent intent" is not required. *Id.* at 153. Thus, as Impac previously admitted, the question whether Impac is Pinnacle's common law successor, addressed in this Part II(B), must be analyzed separately from the question

22

whether Impac expressly assumed the relevant liabilities under the APA, addressed in Part II(A), *infra*.[13]   That is because "the contracting parties could not have controlled, through express contractual language, whether their agreement in fact constituted a merger," *T.H.S. Northstar Assocs. v. W.R. Grace & Co*., 840 F. Supp. 676, 678 (D. Minn. 1993), and "de facto merger … [is] ultimately designed to look beyond the contract" and "investigat[e] whether a transaction labeled 'Asset Purchase Agreement' in fact constituted a merger," *Berg Chilling Sys., Inc. v. Hull Corp*., 435 F.3d 455, 465 (3d Cir. 2006).   As courts in the Eighth Circuit as well as Florida and California have recognized, common law successor liability determinations are often "fact-intensive."   *Travelers Commercial Cas. Co. v. Sielfleisch Roofing, Inc*., No. 12-CV-1550, 2013 WL 1899557, at *2 (E.D. Mo. May 7, 2013); *see Lab. Corp. of Am. v. Prof'l Recovery Network*, 813 So. 2d 266, 270 (Fla. Dist. Ct. App. 2002); *Greenberg Traurig, LLP v. Gale Corp.*, No. 2:07-CV-01572, 2009 WL 2422815, at *4 (E.D. Cal. Aug. 4, 2009).

The following subsections demonstrate, *first*, that Minnesota law does not determine the successor liability of a California entity contracting with a Florida entity, *second*, that a reasonable factfinder applying Florida law could conclude that Impac de facto merged with Pinnacle, *third*, that a reasonable factfinder applying Florida law could conclude that Impac is a mere continuation of Pinnacle, and *fourth*, that the result would be no different even if California law applied.

---

[13] *See* Impac ECF 49, at 12 ("The issue of implied successor liability does not involve construction, interpretation, or enforcement of the APA," and "the dispute over implied successor liability does not arise from the APA itself.").

### 1. Florida Law Controls

Impac argues that Minnesota law applies to the common law successor liability claims against Impac. Mot 22. That is incorrect. Under Minnesota's choice of law rules, applicable in this Court, *see Matson Logistics, LLC v. Smiens*, No. 12-CV-400, 2012 WL 2005607, at *2 (D. Minn. June 5, 2012), Florida law governs whether Impac is liable as a common law successor for Pinnacle's liabilities.[14]

As a threshold matter, before performing a choice of law analysis, "a court must determine that a conflict exists between the laws of [the] two forums," which occurs when "the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000). Such a conflict exists here because Minnesota law bars common law theories of assumption of liability, *see* Minn. Stat. § 302A.661, subd. 4 (2015), and Florida law recognizes such common law theories, *see Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049, 1051 (Fla. 1982).[15] Where "Minnesota … rules preclude the claim … , while [another state's] law allows such a claim[,] the choice of law is … outcome determinative." *Nodak*, 590 N.W.2d 670, 672 (Minn. Ct. App. 1999), *aff'd*, 604 N.W.2d

---

[14]   *Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1278 (8th Cir. 1994) (cited in Mot. 20), is inapposite because in that case, the parties did not argue that a choice of law analysis was required and the court did not conduct one; if it had, Iowa's choice of law would have applied as the law of the forum; and no party suggested that the outcome would have been different under other possibly relevant laws.

[15]   Similarly, "California law recognizes that a transaction cast in the form of an asset sale which actually achieves the same practical result as a merger will be treated as a merger." *United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1041 (E.D. Cal. 2013).

91; *see also Schumacher v. Schumacher*, 676 N.W.2d 685, 690 (Minn. Ct. App. 2004) (where "under the Iowa statute respondent is immune from liability," but "Minnesota has not enacted a similar immunity statute," "choosing to apply Iowa law over Minnesota law is outcome determinative"). Impac's argument "there is no outcome-determinative conflict" relies on a case that *preceded* Minnesota's 2006 statutory abolition of common law successor liability, Mot. 21-22 (citing *J & B Co. v. Bellanca Aircraft Corp.*, 911 F.2d 152, 153 (8th Cir. 1990)), and thus must be rejected.

Impac also disregards that a state's law "can be constitutionally applied" only if the "state has significant contacts," *Nodak*, 604 N.W.2d at 94 n.2, "creating state interests, with the parties and the occurrence or transaction," *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981). Otherwise, the choice of law is "arbitrary []or fundamentally unfair." *Id.* Here, Impac's corporate representative testified: "No part of th[e] transaction negotiations took place in Minnesota." Tr. 137:7-15. Impac does not argue that it or Pinnacle did business in Minnesota or that the acquired assets were located in Minnesota. To the contrary, Impac concedes that "Pinnacle Financial was based [in Florida] and some of the 2007 APA was negotiated and documented there." Mot. 28. The Pinnacle assets Impac acquired were largely Florida-based. *See* Nesser Decl. Ex. J, at IMP000081 (APA Sched. B). The closing of the Impac-Pinnacle transaction took place in Florida. Tr. 138:8-12; Nesser Decl. Ex. K, at LW_RFC0003722. Although Minnesota is a proper forum for this action (*see* Mot. 28), it has nothing to do with the transaction between Pinnacle and Impac and thus it would be unconstitutional to apply Minnesota law to the question of Impac's successor liability for Pinnacle.

Florida law would in any event apply under Minnesota's "significant contacts" test. That test considers "predictability of results," "maintenance of interstate … order," and the forum's "significant interest[s]" to determine which state's law to apply to a particular question. *Nodak*, 604 N.W.2d at 94-95.[16] Those factors unequivocally point to Florida law, not Minnesota law.

*First*, "predictability of results" would be advanced by applying Florida law, the place of the predecessor corporation's incorporation and principal place of business and the locus of the contract negotiations, Mot. 28, and the location of many of the assets, Nesser Decl. Ex. J, at IMP000081 (APA Sched. B). That result would be in line with rulings from other courts. *See, e.g.*, *Berg Chilling Sys.*, 435 F.3d at 468 (applying successor liability law of principal place of business of company which sold assets); *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 770-71 (E.D. Tex. 2002) (same). In contrast, "[a]pplying forum state law [on successor liability questions] would result, on the same facts, in liability in some cases and not others. Such a result would decrease predictability, complicate the judicial task, disrespect the law of [the] state of incorporation, and encourage forum shopping among plaintiffs." *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, No. 2:11-CV-07154, 2012 WL 1799028, at *7 (C.D. Cal. Feb. 17, 2012). Impac and Pinnacle could not have predicted that Minnesota successor liability law (Mot. 23) would govern their transaction, but could have predicted that Florida law would apply.

---

[16] Two additional factors, "simplification of the judicial task" and "application of the better rule of law" are no longer considered relevant. *See Nodak*, 604 N.W.2d at 95-96.

*Second*, "maintenance of interstate … order," meant to avoid "disrespect for [another forum's] sovereignty," *Nodak*, 604 N.W.2d at 95, is furthered by applying Florida law because Florida has a strong interest in regulating the affairs of its corporations.  *See Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1579 (11th Cir. 1990) ("Florida had an interest in … regulating its businesses" under Florida laws); *Grail Semiconductor, Inc. v. Stern*, No. 12-60976-CIV, 2013 WL 2243961, at *6 (S.D. Fla. May 21, 2013) ("[T]he state of incorporation has a strong interest in regulating potentially illicit stock transfers.").  Because Pinnacle Direct and Pinnacle Financial were Florida corporations, Okaty Aff. Ex. A, at IMP000678, Florida has an interest in governing those corporations' liabilities.

*Third*, the forum's "significant interest," *Nodak*, 604 N.W.2d at 95, would not be advanced here by applying Minnesota law to regulate the affairs and liabilities of Florida (or California) corporations, and foreclosing a Minnesota plaintiff's claims.

Rather than engage with the choice of law factors, Impac relies on *T.H.S. Northstar*, 840 F. Supp. at 678, for the proposition that Minnesota law applies to a Minnesota plaintiff's suit against a non-Minnesota corporation that is a successor to another non-Minnesota corporation.  Mot. 22.  Impac is mistaken.  *T.H.S. Northstar* did not conduct a choice of law analysis at all because the "matter ar[ose] from" events "in the Northstar Center in Minneapolis, Minnesota."  840 F. Supp. at 676.  Minnesota recognized common law successor liability at that time, and the parties did not argue that any other state's law applied.  *T.H.S. Northstar* does not support the application of Minnesota law to the Impac-Pinnacle transaction.

27

2.      *Under Florida Law, Impac De Facto Merged With Pinnacle*

Applying Florida law, a reasonable trier of fact could find that Impac is liable to RFC under the Client Contract because it is Pinnacle's common law successor under a de facto merger analysis.

Under Florida law, "[a] de facto merger occurs where one corporation is absorbed by another without formal compliance with the statutory requirements for a merger," *Lab. Corp. of Am.*, 813 So. 2d at 270 (citing *Amjad Munim*, 648 So. 2d at 153), such as "when … there is a continuity of the selling corporation evidenced by such things as the same management, personnel, assets, location and stockholders," *300 Pine Island Assocs., Ltd. v. Steven L. Cohen & Assocs., P.A.*, 547 So. 2d 255, 256 (Fla. Dist. Ct. App. 1989).  The "bottom-line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton …."  *Amjad Munim*, 648 So. 2d at 154.  Stated another way, "[t]he significant question is whether there has been a change in form, but not in substance."  *Lab. Corp. of Am.*, 813 So. 2d at 270.

 The de facto merger doctrine is an equitable one.  *See id.* ("To determine if a de facto merger has occurred, the finder of fact may look at any factors reasonably indicative of commonality or of distinctiveness."); *see also SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 164 (3d Cir. 1996) (The "equitable" doctrine of de facto merger "avoid[s] the patent injustice which might befall a party simply because a merger has been called something else."); *Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993) ("Not all … factors need be present for a *de facto* merger or continuation to have occurred.").

28

Florida courts have found de facto merger where, for example, the "merged entity managed the combined operations, as a [successor company] division, from [predecessor]'s location, while utilizing [predecessor]'s supplies, customer lists, equipment and other assets." *In re Metro Sewer Servs. Inc.*, 374 B.R. 316, 323 (Bankr. M.D. Fla. 2007). Another court reversed summary judgment entered for a successor company on de facto merger where the successor company operated the same business with substantially the same customers and employees, the same databases, and the same officer and shareholder. *See Lab. Corp. of Am.*, 813 So. 2d at 268-69. Here, where Impac acquired Pinnacle's employees, shareholders/management, assets, and physical locations, and Pinnacle dissolved thereafter, a de facto merger occurred.

***Employees***. Impac's corporate representative explained that "with any mortgage company, you are only as good as your people. So when you buy a mortgage company, if you lose all the employees, you have no company." Tr. 247:19-22. "The employees are the most important part of the transaction." *Id*. 252:9-10. Thus, Impac "offered employment to substantially all (if not all) of [Pinnacle Financial's] existing employees after the closing of the transaction." Nesser Decl. Ex. E, at IMP005947; *see* S.P. Aff. Ex. 23, at IMP000050 (Impac ██████████████████████████████████ ███████████████████████████████████████ ████████████). That amounted to "██████████████," according to Impac's transition plan. Nesser Decl. Ex M, at IMP007755. As Impac's corporate representative

29

described it, "[w]e were going to put them all together under one franchise and originate loans." Tr. 261:23-25.[17]

*Shareholders/Management.*   Pinnacle co-founders and shareholders Douglas Long and Jeffrey Vratanina became executive vice presidents and officers of Impac, Ans. to FAC (Impac ECF 66) ¶ 39; Tr. 155:10-156:5, and ran Impac Home Lending, a new division of Impac, Nesser Decl. Ex. D, at IMP006241. Moreover, Impac planned for them to serve on the Executive Committee and for at least one of them to serve on the "Asset/Liability Committee" that would "manage and monitor [Impac's] interest rate risk and cash management." Tr. 155:10-156:5. Impac promised them compensation of up to $▬▬▬▬ for their shareholder interests. *See* S.P. Aff. Ex. 18, at IMP010791-93. And, as Impac itself admits, Impac's own Craig Berardi was sent in to manage Pinnacle for Impac's benefit (under the Management Services Agreement) following the transaction. *See* Mot. 30.

*Assets.*   Impac's corporate representative described the transaction as a purchase of "everything and anything we use in the business of originating loans." Tr. 424:19-20. Indeed, Impac purchased "substantially all the assets" of Pinnacle. S.P. Aff. Ex. 23, at

---

[17]   Impac suggests that "most of Pinnacle Financial's sales employees could not be transferred over until Impac obtained the additional licenses." Mot. 8-9 (citing Tr. 306:10-308:3; 426:16-427:6). But it does not argue that those employees never came over to Impac. Nor could it, because its corporate representative admitted that he "d[id]n't know." Tr. 307:12-308:3; *see Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 685 (D. Md. 2012) ("[T]he testimony given by [a] nonresponsive deponent (e.g., 'I don't know') may be deemed binding on the corporation so as to prohibit it from offering contrary evidence at trial."). In any event, Long and Vratanina made clear to Pinnacle's employees that Pinnacle would "operationally merge with Impac" upon acquisition. Nesser Decl. Ex. P, at Foley0005835-36.

IMP000001; Nesser Decl. Ex. E, at IMP005947.  Impac's Berardi was responsible for "integrating the purchased assets from Pinnacle Financial into Impac."  Mot. 9-10.  That included fixed assets such as computers, Nesser Decl. Ex. J, at IMP00081 (APA Sched. B), and intangible assets such as goodwill, intellectual property, and software, Nesser Decl. Ex. N, at IMP000139 (APA Sched. C); *see also id.* at IMP000141 (purchased software included, among others, the "GMAC [RFC] Program Manager" "used to map GMAC programs to [Pinnacle] loan programs").

*Physical Locations*.  Impac's corporate representative testified that Impac assumed "a lot of" of Pinnacle's lease liabilities.  Tr. 89:12-15, 296:6-7.  That included, among others, the lease of the Pinnacle corporate headquarters.  Nesser Decl. Ex. O, at IMP000162 (APA Sched. F); S.P. Aff. Ex. 6, at IMP005892.

*Dissolution*.  As Impac's corporate representative explained:  "You have an organization that just sold off all their assets."  Tr. 371:24-372:1.  "It's not an operating entity as before."  *Id*. 372:21-22.  With its assets sold and employees transferred to Impac, Pinnacle ceased its usual business operations after the sale, except under the Management Services Agreement, which allowed Impac to "███████████████████ ████████████████████████████████████████████████ ████████████████████████"  Nesser Decl. Ex. E, at IMP005947.  Impac planned for the dissolution of Pinnacle Financial at least as of July 2007, Tr. 413:12-13, 15-16, and Pinnacle Financial was formally dissolved as of September 24, 2010.  *See* S.P. Aff. Ex. 47; *see also* Fl. Stat. §§ 607.1420-1421 (providing for administrative dissolution of Florida businesses).

For all of the foregoing reasons, a reasonable factfinder could conclude that Impac de facto merged with Pinnacle and assumed Pinnacle's liabilities as its common law successor.

### 3.     Under Florida Law, Impac Is Pinnacle's Mere Continuation

Separate from the de facto merger analysis, a reasonable trier of fact could find, under Florida law, that Impac is Pinnacle's common law successor under a mere continuation theory.  Although distinct from the de facto merger analysis, the mere continuation standard similarly focuses on whether the "purchasing corporation is merely a new hat for the seller, with the same or similar entity or ownership."  *Amjad Munim*, 648 So. 2d at 154; *see also id.* at 153-54 ("continuity of the selling corporation evidenced by the same management, personnel, assets and physical location; a continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and assumption of the liabilities").  "All of the events, such as dissolution, need not occur at the same time."  *Id.* at 154.

Courts interpreting Florida law have held a successor liable where the successor entity was "merely a continuation or reincarnation of the predecessor corporation under a different name," with "unmistakable identity of officers, directors, shareholders, and location," and the successor "market[ed] the same type of product out of the same address … assum[ing the predecessor's] modus operandi."  *Sculptchair v. Century Arts, Ltd.*, 94 F.3d 623, 630 (11th Cir. 1996).  Courts have also found mere continuation based on "similar principals and similar nature of the business."  *Centimark Corp. v. A to Z*

*Coatings & Sons, Inc*., No. 6:05-CV-136, 2007 WL 4557247, at *6 (M.D. Fla. Dec. 21, 2007), *aff'd*, 288 F. App'x 610 (11th Cir. 2008).

Here, Impac's corporate representative admitted that Impac intended to make "Pinnacle … a dba of Impac." Tr. 412:3-6. That is what occurred. Because Impac continued Pinnacle's business in a division of Impac, using the same employees, shareholders/management, assets, and physical locations, and held itself out to the world as a continuation of Pinnacle's business, a reasonable trier of fact could find that Impac merely continued the business of Pinnacle and is therefore its common law successor. Among other things: (1) Impac planned for "[t]he integration of the [Pinnacle] origination platform into Impac [as] part of the transition," Tr. 320:11-13, and specifically for the integration of various Pinnacle departments into Impac, *id*. 321:21-24, 322:1, including the "Secondary [Marketing]" Department, Nesser Decl. Ex. M, at IMP007754-56, which "shipp[ed] loans to the investors," Tr. 323:23-324:3; (2) under the Management Services Agreement, Impac was "responsible for the operational expenses of the entire Retail and Wholesale Divisions" of Pinnacle post-closing, *id*. 289:5-12; Impac "received 100% of the revenue … and covered 100% of the expenses," Nesser Decl. Ex. D, at IMP006213; and (3) in announcing the transaction, Long and Vratanina represented to Pinnacle employees that Pinnacle "operationally merge[d] with Impac," and that, "[u]pon completion of licensing … Pinnacle Financial retail sales will be known as Impac Home Loans," Nesser Decl. Ex. P, at Foley0005835-36.

Impac also represented to the world that it was continuing Pinnacle's business. For example, a press article quotes Doug Long as stating that "Pinnacle's chapter is

simply ending in order for a new one to begin." Nesser Decl. Ex. R, at IFC1207315-16; *compare Amjad Munim*, 648 So. 2d at 154 ("bottom-line question is whether … there has been a relay-style passing of the baton …."). Impac's corporate representative agreed that was a correct description of the transaction. Tr. 400:18-21. Based on Impac's press release, *id.* 395:14-17, another article reported on the "merger" between Pinnacle and Impac. *See* Nesser Decl. Ex. S, at IFC1207312.[18]

Similarly, Impac held itself out as the continuation of Pinnacle to investors, *i.e.*, those who purchased Pinnacle's loans, like RFC. Tr. 355:16-24. Although Impac argues in its motion that Impac decided "to put itself in a position to sell loans to investors" only *after* the Pinnacle-Impac transaction closed, Mot. 10, that is irrelevant. What matters is that Impac continued Pinnacle's business by selling loans to investors. Impac is also wrong as a matter of fact because it was working on "secur[ing] investor commitments" with "Wells, Countrywide, Chase and Citi," Tr. 216:4-6, 217:16-17, at least as of May 17, 2007, S.P. Aff. Ex. 20, at LW_RFC0001210-11, *before* the transaction closed. Impac's attempt at framing RFC as a "competitor[]," Mot. 3, to which it had no reason to sell loans, Tr. 457:19-23, should also be disregarded—Wells, Countrywide, Chase, and Citi fall into the same bucket, *see* S.P. Aff. Ex. 39, at IMP007464.

Moreover, "[b]ecause Pinnacle reneged on their repurchase liability," Impac paid huge amounts to settle that liability. Tr. 330:24-331:1. For example, Impac paid

---

[18]   Also, in a filing with the Securities and Exchange Commission, Impac described the transaction as "a business combination for accounting purposes." Nesser Decl. Ex. T, at 9. This Court "may take judicial notice of … public SEC filings." *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009).

██████████████████████████████████████████████████████████████ S.P.

Aff. Ex. 39, at IMP007462; *see also* Mot. 11.  Impac describes such transactions as a

"███████████████████████████████████████████████████████████████████

███████████████████████."  Mot. 11 (citing S.P. Aff. Ex. 39 at IMP007463).  It also

argues that its "██████████████████████████████████████████████████████

██████████"  Mot. 10 (Impac's emphasis).  But a reasonable trier of fact may still

conclude that Impac paid on Pinnacle's repurchase liabilities in its role as █████████

██████████  S.P. Aff. Ex. 39, at IMP007463, and thus that Impac continued the

business of Pinnacle.

Long and Vratanina also suggested to RFC at the time of the transaction that

Impac was the continuation of Pinnacle.  In an internal document titled "Pinnacle

History," Nesser Decl. Ex. U, at RFCCORR-COM00388092, RFC referenced a "5/24/07

conference call with GMAC-RFC and Jeff V."—*i.e.*, after the May 21, 2007, execution

date of the APA, S.P. Aff. Ex. 23, at IMP000003—in which Vratanina conveyed that as a

result of the Impac-Pinnacle transaction, "[Pinnacle Financial] has no assets left or

minimal assets left per Jeff.  Small servicing portfolio, cash of about $100-200K," Nesser

Decl. Ex. U, at RFCCORR-COM00388092.  As a result, RFC employees indicated that

"[i]t appears that reps and warrants are being assumed by IMPAC."  *Id*.

Finally, just a month after the transaction, Impac conducted diligence on Pinnacle

Direct's and Pinnacle Financial's repurchase liabilities to RFC.  *See* Nesser Decl. Ex. V,

at IFC1207328.  Nitin Dave—Impac's Senior Vice President for Capital Markets, and

Pinnacle's Executive Vice President for Capital Markets—told RFC that "████████████

35

███████████████████████████████████████████

███████████████████████████████████████████

████████   *Id*.   Mr. Dave continued:   █████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████   *Id*.  Impac's corporate representative acknowledged that this diligence was done on behalf of Impac, Tr. 376:6-10, specifically because "Impac was trying to assess any potential contingent liability they may have," "[f]or financial reporting purposes," *id*. 378:4-7, 9-11.  Thus, Impac merely continued Pinnacle's business and is liable on the Client Contract as Pinnacle's successor.

### 4.   *Impac's Arguments Regarding Florida Law Are Mistaken*

Impac's arguments on common law successor liability under Florida law (Mot. 28-31), are unavailing.  Although Long and Vratanina did not become directors of Impac (Mot. 30), they became Impac officers and members of the Executive Committee.  *See supra*, 8.  Moreover, it is immaterial that Long and Vratanina were not granted shares in Impac under the APA (Mot. 30), as was originally planned, *see* S.P. Aff. Ex. 7, at IMP011065.  Where state law does not require an exchange of stock for a formal, statutory merger, continuity of ownership is also not required for a de facto merger.  *See, e.g.*, *Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc*., 42 A.3d 951, 967-69 (Pa. 2012); *Woodrick v. Jack J. Burke Real Estate, Inc.*, 703 A.2d 306, 313 (N.J. Super. Ct. App. Div. 1997) ("more modern view of New Jersey law [is that it] no longer requir[es] continuity of shareholder interest" for a de facto merger).   Rather, receipt of

36

"obligations," or "cash, property, or rights" in exchange for the shareholder interests is sufficient.  *Fizzano*, 42 A.3d at 967; *see also Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortg. Servs*., L.P., 942 F. Supp. 2d 516, 527-28 (E.D. Pa. 2013) (special cash payments to predecessor owners were "obligations" in lieu of shares and created a genuine dispute of material fact as to de facto merger).  "[T]he continuity of ownership prong of the *de facto* merger analysis certainly may not be more restrictive than the relevant elements of a statutory merger as contemplated by [the] legislature." *Fizzano*, 42 A.3d at 968.  Under Florida law, a formal merger may be effected by, among others, converting the shares of the predecessor corporation into "obligations" of the surviving corporation or "cash or other property."  Fla. Stat. § 607.1101(2)(c) (2015). Here, Long and Vratanina, the founders and owners of Pinnacle, ███████████████

████████████████████████████████████████████████████████

███████████████████████      *See* S.P. Aff. Ex. 18, at IMP010791-93; *see also* Nesser Decl. Ex. F, at IMP000418; Ex. G, at IMP000472.  Those obligations were given to the founders alone as "compensation for [their] ownership shares."  *Lehman*, 942 F. Supp. 2d at 526-27.  That is sufficient under Florida law to create a genuine dispute of material fact as to continuity of ownership.

Moreover, although Impac argues that Pinnacle Financial continued to file annual reports with the Florida Department of State through 2010 (Mot. 11), dissolution need not happen immediately after the merger.  *See Amjad Munim*, 648 So. 2d at 154.  In any event, Impac planned the dissolution in, at the latest, July 2007, Tr. 413:12-13, 15-16, just two months after the transaction.  Impac also argues that "if Pinnacle Financial and

Impac had simply merged, there would have been no reason for the parties to enter a [Management] Services Agreement."  Mot. 30.  Yet it is precisely *because* Impac structured a merger in fact but not in law that the Management Services Agreement was necessary.  *See* Nesser Decl. Ex. D, at IMP006215 ("[███████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████]").

Impac's cases are inapposite because none involved a transfer of assets, employees, and principals evidencing de facto merger or mere continuation.  For example, in *Florio v. Manitex Skycrane, LLC*, No. 6:07-CV-1700, 2010 WL 5137626, at *1 (M.D. Fla. Dec. 10, 2010), *Viking Acoustical Corp. v. Monco Sales Corp.*, 767 So. 2d 632, 636 (Fla. Dist. Ct. App. 2000), and *Krogen Express Yachts, LLC v. Nobili*, 947 So. 2d 581, 583-84 (Fla. Dist. Ct. App. 2007), the predecessors' principals were not involved in any significant manner in operations of the successor.  *Bud Antle, Inc. v. Eastern Foods, Inc*., 758 F.2d 1451, 1458-59 (11th Cir. 1985), under Georgia law, involved no transfer of assets at all.  And in *Mitutoyo America Corp. v. Suncoast Precision, Inc*., No. 8:08-MC-36-T-TBM, 2011 WL 2802938 (M.D. Fla. July 18, 2011), the predecessor and the successor had a "different business focus": the successor principally engaged in "service and contract inspection" of certain equipment, *id*. at *2, whereas the predecessor was a distributor of that kind of equipment, *id*. at *1.[19]

---

[19]    Finally, unlike in *Coral Windows Bahamas, Ltd. v. Pande Pane, LLC*, No. 11-22128, 2013 WL 321584, at *5 (S.D. Fla. Jan. 28, 2013), here, the predecessor owners ran the *entire* newly-formed division of the successor.  Nesser Decl. Ex. D, at IMP006214.  Moreover, *Coral Windows* actually denied summary judgment, finding

5.    *Impac Would Also Be Liable Under California Law*

Although neither RFC nor Impac contend California law should apply here (*see* Mot. 25), disputed issues of material fact would also preclude summary judgment on the issue of successor liability were California law held to apply.  Generally, "California law recognizes that a transaction cast in the form of an asset sale which actually achieves the same practical result as a merger will be treated as a merger."  *United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1041 (E.D. Cal. 2013).[20]  Under California law, and as Impac admits (Mot. 25), "[t]he crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets," *i.e.*, whether "there are adequate means to satisfy any claims made against the predecessor."  *Franklin v. USX Corp.*, 105 Cal. Rptr. 2d 11, 19 (Ct. App. 2001).  Contrary to Impac's suggestion (Mot. 27), post-sale insolvency is not required.

Here, a reasonable trier of fact could conclude that Impac's $17.2 million payment in the APA transaction was inadequate consideration because it was dwarfed by Impac's

---

genuine issues of disputed fact as to whether the asset purchase transaction constituted a de facto merger where the successor corporation ran a similar business with many of the predecessor's employees and the predecessor dissolved thereafter.  *See* 2013 WL 321584, at *5.

[20]   Contrary to Impac's suggestion, Mot. 25 & n.13, California's successor liability law recognizes the de facto merger and mere continuation exceptions in addition to the product line exception.  *See Franklin v. USX Corp.*, 105 Cal. Rptr. 2d 11, 14 (Ct. App. 2001).

liabilities.  S.P. Aff. Ex. 29, at IMP055890.[21]   Undisputed evidence confirms that of the

$17.2 million purchase price, (a) $███████ went directly to Pinnacle's payroll and a

lender bank, and to pay off transaction costs, and (b) $5.7 million went to Pinnacle's

unsecured creditors.  S.P. Aff. Ex. 29 at IMP055890; *see also* Tr. 439:9-10.  That left

only $████ of consideration, during a period in which Impac had estimated that

Pinnacle faced $13 million in repurchase liabilities alone, to say nothing of other forms of

liability.  S.P. Aff. Ex. 39, at IMP007463 (estimate as of July 2007)[22]; Tr. 443:24-444:4;

*see also* Nesser Aff. Ex. C, at IMP000320-34 (APA Section 3.20(b), stating that from

January 2006, Pinnacle had repurchased over $37 million worth of loans and faced

approximately $57 million in additional repurchase demands); S.P. Aff. Ex. 23, at

IMP000042.  Impac's corporate representative admitted that Pinnacle had an "inability to

satisfy [its] liability," Tr. 346:3-4, and that he did not believe "[Pinnacle] repaid their

repurchase liability."  *Id.* 352:5-6.  This is more than enough evidence upon which for a

jury to conclude that the purchase price was insufficient.[23]

---

[21]   This Court should ignore Long's self-serving testimony that "[t]his amount was a fair price for the purchased assets."  Long Aff. ¶ 15.  *See Argenyi*, 703 F.3d at 446 ("To establish a genuine issue of material fact, [movant] may not merely point to self-serving allegations ….").

[22]   Impac's corporate representative explained that either accounting, Tr. 344:3-4, or secondary marketing, Tr. 344:14-22, estimated $13 million as the "loss" on "future repurchase requests," *id.* 343:1-13, 21-344:1.

[23]   The cases cited by Impac (Mot. 26-27) are inapposite because the parties there did not dispute the adequacy of consideration.  *See, e.g., Maloney v. Am. Pharm. Co*., 255 Cal. Rptr. 1, 4 (Ct. App. 1988); *Moses v. Innoprise Software*, No. C-12-05271, 2014 WL 691587, at *4 (N.D. Cal. Feb. 21, 2014); *Ibanez v. S&S Worldwide, Inc*., No. B238269, 2013 WL 2243841, at *4-5 (Cal. Ct. App. May 20, 2013); *see also Chularee v. Cookson Co*., No. B242764, 2014 WL 726778, at *5-7 & n.4 (Cal. Ct. App. Feb. 26, 2014)

Moreover, Impac undermines its own argument in insisting on "predictability" in the corporate field (Mot. 26). Impac actually did "predict" the possibility of having to pay for Pinnacle's contingent liabilities, including by diligencing those liabilities, *see supra* 6-7, 35-36; Nesser Aff. Ex. V, at IFC1207328, and then paying some of them, *see supra* 9, 35; S.P. Aff. Ex. 39, at IMP007463.[24] Separately, Impac's insistence that cash payment of consideration "weighs heavily against a finding of de factor merger," Mot. 26 (quoting *Leve v. Patient Safety Techs., Inc*., No. BC 336543, 2009 WL 6889886 (Cal. Super. Ct. Aug. 5, 2009)), fails to recognize that "the critical issue is not cash per se but consideration made available to creditors," *Phoenix Am. Inc. v.* West, No. A115400, 2008 WL 4147553, at *10 (Cal. Ct. App. Sept. 9, 2008). There is thus a genuine issue of material fact as to whether Impac paid Pinnacle adequate consideration, such that Impac is Pinnacle's common law successor under California law, and Impac's motion for summary judgment on that issue should be denied.

## CONCLUSION

The Court should deny Impac's motion for summary judgment, and instead grant summary judgment against Impac on the issue of Impac's successor liability.

---

(consideration sufficient to meet creditors' claims and creditors had other recourse, including insurance).

[24]   Impac also may have taken reserves for Pinnacle's repurchase liability, and Impac now cannot contend otherwise because its corporate representative testified that he "d[id]n't know." Tr. 382:9-12; *see Dorsey*, 888 F. Supp. 2d at 685.

FELHABER LARSON

By:   *s/ Donald G. Heeman*
  Donald G. Heeman, #286023
  Jessica J. Nelson, #347358
  220 South Sixth Street, Suite 2200
  Minneapolis, MN  55402-4504
  Telephone:  (612) 339-6321
  Facsimile:  (612) 338-0535
  dheeman@felhaber.com
  jnelson@felhaber.com


CARPENTER LIPPS & LELAND
LLP
  Jeffrey A. Lipps (*pro hac vice*)
  Jennifer A.L. Battle (*pro hac vice*)
  280 Plaza, Suite 1300
  280 North High Street
  Columbus, Ohio 43215
  Telephone:  (614) 365-4100
  Facsimile:  (614) 365-9145
  lipps@CarpenterLipps.com
  battle@CarpenterLipps.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
  Peter E. Calamari (*pro hac vice*)
  Isaac Nesser (*pro hac vice*)
  David Elsberg (*pro hac vice*)
  Yelena Konanova (*pro hac vice*)
  51 Madison Avenue, 22nd Floor
  New York, NY 10010
  Telephone:  (212) 849-7000
  Facsimile:  (212) 849-7100
  PeterCalamari@quinnemanuel.com
  IsaacNesser@quinnemanuel.com
  DavidElsberg@quinnemanuel.com
  YelenaKonanova@quinnemanuel.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
  Anthony P. Alden (*pro hac vice*)
  Johanna Ong (*pro hac vice*)
  865 Figueroa Street, 10th Floor
  Los Angeles, CA 90017
  Telephone:  (213) 443-3000
  Facsimile:  (213) 443-3100
  AnthonyAlden@quinnemanuel.com
  JohannaOng@quinnemanuel.com

*Attorneys for Plaintiff Residential Funding Company, LLC*