## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| In Re: RFC and RESCAP Liquidating Trust Litigation | Civil File No. 13-3451(SRN/JJK/HB) |
| | **MEMORANDUM OPINION AND ORDER** |
| This document relates to Residential Funding Company, LLC v. Impac Funding Corporation, No. 13-CV-3506 | **[Filed Under Seal]** |

_____

Isaac Nesser, Quinn, Emanuel, Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, for Plaintiffs

Erin Sindberg Porter, Greene Espel PLLP, 222 South 9th Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant Impac Funding Corporation

_____

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Motion for Summary Judgment filed by Defendant Impac Funding Corporation ("Impac") [Doc. No. 943]. For the reasons stated herein, Impac's motion is denied.

## I.      BACKGROUND

The general facts pertaining to this consolidated matter are set forth in previous rulings from this Court (see, e.g., Residential Funding Co., LLC v. Academy Mortg. Corp., 59 F. Supp. 3d 935, 938-41 (D. Minn. 2014); Residential Funding Co. v. Terrace Mortg. Co., 850 F. Supp. 2d 961, 962-64 (D. Minn. 2012)) and are incorporated herein by

reference.  In brief, RFC purchased loans from "correspondent lenders" and distributed them by either pooling them together with other similar mortgage loans and selling them as residential mortgage-backed securitization trusts, or selling them to whole loan purchasers.  (<u>RFC v. Impac</u>, No. 13-CV-3506, Compl. ¶ 3 [Doc. No. 34].)

To effectuate its business, RFC contracted with numerous correspondent lenders to purchase loans; the contracts required the lenders to abide by certain representations and warranties regarding the loans.  (<u>Id.</u> ¶ 5.)  RFC contends that these contracts incorporated the terms and conditions of the RFC Client Guide.  (<u>Id.</u> ¶ 18.)  Among other things, RFC contends that the correspondent lenders were responsible for collecting information from the borrowers, verifying the accuracy of the borrowers' information and underwriting the loans.  (<u>Id.</u> ¶ 20.)

RFC asserts that Defendant Impac's alleged predecessor in interest, "Pinnacle," was one of the correspondent lenders with which it contracted.[1]  (<u>Id.</u> ¶¶ 17-20.)  According to RFC, Pinnacle made many representations and warranties regarding the loans, including that: (1) Defendant's origination and servicing of the loans was "legal, proper, prudent and customary"; (2) Defendant would "promptly notify" RFC of any material acts or omissions regarding the loans; (3) all loan-related information that Defendant provided to RFC was "true, complete and accurate"; (4) all loan documents

---

[1]  RFC refers to "Pinnacle" in the Complaint.  In its opposition memorandum, it explains that it uses "Pinnacle" to refer to the combined Pinnacle entities.  (Pls.' Opp'n Mem. at 3 n.1 [Doc. No. 1059].)

were "genuine" and "in recordable form"; (5) all loan documents were in compliance with local and state laws; (6) there was "no default, breach, violation or event of acceleration" under any note transferred to RFC; (7) each loan was "originated, closed, and transferred" in compliance with all applicable laws; (8) none of the loans were "high-cost" or "high-risk"; (9) there were no existing circumstances that could render the loans an "unacceptable investment," cause the loans to become "delinquent," or "adversely affect" the value of the loans; (10) the loans were underwritten in compliance with the Client Guide; (11) appropriate appraisals were conducted when necessary; (12) the market value of the premises was at least equal to the appraised value stated on the loan appraisals; and (13) there was no fraud or misrepresentation by the borrower or Defendant regarding the origination or underwriting of the loans.  (Id. ¶ 24.)  RFC considered these representations and warranties to be material, and any failure to comply constituted an "Event of Default" under the agreements with correspondent lenders.  (Id. ¶¶ 25-26.)  RFC retained sole discretion to declare an Event of Default, and the available remedies include repurchase of the defective loan, substitution of another loan, or indemnification against liabilities resulting from the breach.  (Id. ¶¶ 29-33.)

RFC contends that over the course of the parties' relationship, Pinnacle sold over 4,100 mortgage loans to RFC.  (Id. ¶ 4, 17.)   In addition, RFC asserts that in passing on its own warranties and representations to its buyers, RFC relied on the information provided to it by Pinnacle.  (Id. ¶ 37.)  However, RFC alleges that, in many instances, Pinnacle violated its representations and warranties.  (Id.)  After conducting an internal

review, RFC determined that many of the loans sold by Pinnacle violated the parties'

agreement and contained numerous defects, particularly with respect to appraisal

representations.  (Id. ¶ 42.)  According to RFC, the defects in these loans constituted

material breaches of Pinnacle's representations and warranties, contributing to RFC's

exposure to liability and legal expenses.  (Id. ¶ 54.)

RFC contends that beginning in 2008, it faced claims and lawsuits resulting from

defective loans it purchased from correspondent lenders, including those sold to it by

Pinnacle.  (Id. ¶ 69.)  RFC filed for bankruptcy in 2012.  (Id. ¶ 8.)  Its assets were

transferred to the ResCap Liquidating Trust.  (Id. ¶ 13.)

In this lawsuit, RFC contends that Impac is Pinnacle's corporate successor and is

liable under the terms of the parties' agreements to compensate RFC for its losses related

to the breaches of representations and warranties.  (Id. ¶¶ 55-87.)  RFC asserts four causes

of action against Impac.  In Count One, it alleges that Impac succeeded to Pinnacle's

liabilities and obligations under the parties' agreement and that Pinnacle and/or Impac

materially breached the representations and warranties concerning the mortgage loans

sold to RFC, causing RFC to sustain significant losses and incur liabilities.  (Id. ¶¶ 88-

96.)  In Count Two, RFC contends that it is entitled to indemnification from Impac for

RFC's losses and liabilities.  (Id. ¶¶ 97-101.)  In Count Three, RFC seeks a determination

that Impac is liable as its successor for Pinnacle's liabilities for breach of contract and

indemnification under the theory of de facto merger.  (Id. ¶¶ 102-06.)  Finally, in Count

Four, RFC seeks a determination that Impac assumed Pinnacle's liabilities for breach of

4

contract and indemnification.  (Id. ¶¶ 107-10.)

### A.   RFC and Pinnacle Direct 2001 Contract

On June 5, 2001, RFC entered into a mortgage loan sales contract ("the Client Contract") with Pinnacle Direct Corporation ("Pinnacle Direct").  (Client Contract, Ex. 3 to Sindberg Porter Aff.)  Pinnacle Direct was a Florida corporation that originated mortgage loans.  (Pinnacle Update, Ex. 5 to Sindberg Porter Aff. at IMP005860, IMP005864.)  Pinnacle Direct sold the loans at issue in this case between November 30, 2001, and February 12, 2007.  (Sindberg Porter Aff. ¶ 3; Loan List, Ex. 54 to Sindberg Porter Aff.)  Under the Client Contract, Pinnacle Direct sold RFC more than 1,920 loans with an original principle balance of over $325 million.  (Id.)

Certain terms in the 2001 RFC-Pinnacle Direct Client Contract are pertinent to this motion.  In terms of the right of assignment, the contract states,

> Client [Pinnacle Direct] may not assign or transfer this Contract, in whole or in part, without GMAC-RFC's prior written consent.  GMAC-RFC may sell, assign, convey, hypothecate, pledge, or in any other way transfer, in whole or in part, without restriction, its rights under this Contract and the applicable [Client] Guides with respect to any Commitment or Loan.

(Client Contract § 10, Ex. 3 to Sindberg Porter Aff.)

In the event of the merger or consolidation of Pinnacle Direct, the RFC Client Guide, which is incorporated by reference into the Client Contract, (id. § 1), provides as follows:

> Any person or entity into which the Client [Pinnacle Direct] may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Client shall be a party shall be the successor

of the Client under the Client Contract.  This does not require the execution or filing of any paper or any further act on the part of any of the parties to the Client Contract.

However, the Client's successor must satisfy the [RFC] Client Eligibility Standards, as described in this Client Guide.

The Client's successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Client as if it were originally named a party to the Client Contract.

(12/11/06 RFC Client Guide § A214, Ex. H to Nesser Decl. [Doc. No. 1060].)

The Client Contract notes that "[i]n the case of any inconsistency between this Contract and the applicable [Client] Guide, this Contract's terms and conditions shall control."  (Client Contract § 3, Ex. 3 to Sindberg Porter Aff.)  Finally, the Client Contract states that it shall be "governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota."  (Id. § 13.)

In addition to the Client Contract, Pinnacle Direct also had a warehouse line of credit agreement ("Warehousing Credit Agreement") with RFC that was used to fund loans that Pinnacle Direct originated and sold to RFC.  (Okaty Aff. ¶ 7.)

Pinnacle Financial Corporation ("Pinnacle Financial"), which operated under shared ownership with Pinnacle Direct, had a separate loan sales agreement with RFC. (PF Contract, Ex. 2 to Sindberg Porter Aff.)

## B.    Pinnacle Direct and Pinnacle Financial March 2007 Reorganization Agreement

The Florida-based "Pinnacle Companies" or "Company" proclaimed itself to be "a leading independent mortgage banking company originating residential mortgage loans

6

through retail and wholesale channels." (6/22/06 Pinnacle Update at IMP005860, Ex. 5

to Sindberg Porter Aff.) Douglas Long and Jeffrey Vratanina co-founded and co-owned

Pinnacle Direct and Pinnacle Financial. (Impac 30(b)(6) Dep. at 55, 58, Ex. A to Nesser

Decl.; Long Aff. ¶ 1; Reorg. Agmt. at IMP000678, Ex. A to Okaty Aff.; Long Aff. ¶ 2;

PF Joint Consent at 1, 3 [Doc. No. 950-1 at 20, 22].)

In March 2007, Pinnacle Direct entered into a reorganization agreement

("Reorganization Agreement") with Pinnacle Financial. (Okaty Aff. ¶ 2; Reorg. Agmt. at

IMP000678, Ex. A to Okaty Aff.) The parties' agreement calls for the application of

Florida law. (Reorg. Agmt. § 8, Ex. A to Okaty Aff.) The Reorganization Agreement

provides that: (1) both Pinnacle Direct and Pinnacle Financial are Florida corporations;

(2) all of the outstanding stock of the corporations is owned by the same shareholders in

the same proportions; and (3) both corporations had engaged in the business of mortgage

lending for a number of years. (Id. at IMP000678.) The companies began the

reorganization process in October 2006, at which point "[Pinnacle Financial] began to

carry on [Pinnacle Direct's] mortgage lending business," with all of the employees of

Pinnacle Direct transferring to Pinnacle Financial as of October 16, 2006." (Id.)

The Reorganization Agreement states that the shareholders and directors of the

corporations found it advisable that the corporations "be reorganized by transferring to

[Pinnacle Financial] most of the business rights, claims, and assets of [Pinnacle Direct]."

(Id.) Pinnacle Direct agreed to continue to maintain certain state licenses and to own

assets with an aggregate value of approximately $250,000, "as needed to maintain such

7

licenses and as a reserve against liabilities of [Pinnacle Direct] which are not assumed by

[Pinnacle Financial]."  (Id.)

 In the Reorganization Agreement, Pinnacle Direct's transferred assets include "all

[Pinnacle Direct's] rights in, to and under all contracts, agreements, and understandings,"

subject to certain limitations involving assignments.  (Id. § 1(h).)  To the extent that any

lease or contract is not assignable without the consent of a third party, the Reorganization

Agreement provides that it

> shall not constitute an assignment or an attempted assignment thereof if
> such assignment or attempted assignment would constitute a breach thereof.
> [Pinnacle Financial] and [Pinnacle Direct] agree to use their best efforts to
> obtain the consent of such other party to the assignment of any such
> Contract to [Pinnacle Financial] in all cases in which such consent is or may
> be required for such assignment.

(Id. § 3.)

 As to the assumption of Pinnacle Direct's liabilities, Pinnacle Financial assumed

Pinnacle Direct's contractual liabilities arising after the execution date of the contract,

"pursuant to all Contracts . . . , except any Liability of [Pinnacle Direct] for breach or

failure to perform any Contract . . . arising prior to the Execution."  (Id. § 4(b).)

However, Pinnacle Financial also disclaimed any liabilities of Pinnacle Direct "for any

breach or failure to perform any contract, whether or not assumed hereunder, including

breach arising from assignment of contracts hereunder without consent of third parties."

(Id. § 5(f).)

 Attorney Michael Okaty represented Pinnacle Direct and Pinnacle Financial and

was the primary author of the Reorganization Agreement.  (Okaty Aff. ¶¶ 1-2.)  In an

affidavit submitted in support of Impac's motion, Attorney Okaty attests that Pinnacle

Financial did not assume liability for any breach or alleged breach of any Pinnacle Direct

contract, including Pinnacle Direct's Client Contract with RFC (id. ¶ 13), noting the

language in Sections 4(b) and 5(f) regarding timing and failure to obtain consent.  (Id. ¶¶

10-12.)

     Referring to the separate Warehousing Credit Agreement between RFC and

Pinnacle Direct, Okaty states that prior to the Pinnacle corporations' reorganization, he

sought RFC's agreement for the assignment of this agreement from Pinnacle Direct to

Pinnacle Financial.  (Id. ¶ 7.)  Counsel for RFC did not grant consent for any assignment

of the Warehousing Credit Agreement, (id.), objected to the reorganization of Pinnacle

Direct and Pinnacle Financial, and stated that the transfer of assets between Pinnacle

Direct and Pinnacle Financial constituted an event of default under the Warehousing

Credit Agreement.  (Letter of 4/10/07 from S. Heim to M. Okaty, Ex. B to Okaty Aff.)

     A June 22, 2006 "Pinnacle Company Update" was prepared for Defendant Impac,

a California corporation that originated and acquired loans.  (RFC v. Impac, 13-CV-3506,

Def.'s Answer ¶ 23 [Doc. No. 66].)  At that time, Impac was considering a stock

transaction through which Pinnacle Co-Owners Long and Vratanina would sell Pinnacle

Financial and Pinnacle Direct to Impac.  (Impac R. 30(b)(6) Dep. at 160-61, Ex. A to

Nesser Decl.)  The June 2006 Pinnacle Company Update states that in January 2006,

Pinnacle Direct and Pinnacle Financial implemented an integration of their businesses,

with "the legal merger of the two companies [ ] likely to take place at the end of 2006 for tax purposes."  (6/22/06 Pinnacle Update at IMP005865, Ex. 5 to Sindberg Porter Aff.)

In an October 16, 2006 email from Okaty to several recipients, including Pinnacle Co-Owner Long, Okaty provided background information regarding "the general liquidation and winding-up of the operations of [Pinnacle Direct] and consolidation thereof into [Pinnacle Financial]."  (10/16/06 Email from M. Okaty to W. Cernius at IMP005841, Ex. 9 to Sindberg Porter Aff.)   He also noted that any loans still owned by Pinnacle Direct on December 31, 2006 would be sold to Pinnacle Financial at fair market value.  (Id.)  Okaty further stated that Pinnacle Direct would "discontinue all business operations on December 31, 2006.  (Id.)

In November 2006, Richard Johnson, Impac's Executive Vice President and Chief Operating Officer, emailed Pinnacle owners Vratanina and Long about the Pinnacle Direct-Pinnacle Financial transaction, and Impac's subsequent plans to acquire the joint Pinnacle Entity, stating,

> As promised, we are recommending that Pinnacle do the legal merger of [Pinnacle Financial] and [Pinnacle Direct] prior to any transaction. Thereafter, our transaction documents will reflect the acquisition of [Pinnacle Financial] and a combined entity of [Pinnacle Direct] and [Pinnacle Financial].  The survivor entity will have one set of licenses that we anticipate to use for retail operations.

(Email of 11/29/06 from R. Johnson to J. Vratanina, Ex. B to Nesser Decl.)

As Impac's Rule 30(b)(6) witness, Johnson testified that Pinnacle Direct and Pinnacle Financial "finally did merge the two entities as of March 16, 2007."  (Impac R.

10

30(b)(6) Dep. at 96, Ex. A to Nesser Decl.)   However, in approximately April 2007, Impac proposed that its contemplated acquisition of Pinnacle Financial and Pinnacle Direct switch from a stock acquisition to an asset acquisition.  (Id. at 166-70.)  Impac contends that it was unable to "quantify the contingent liabilities and potential future losses of Pinnacle Financial and Pinnacle Direct (Def.'s Mem. Supp. Mot. for Summ. J. at 5 [Doc. No. 945]), and an asset acquisition involved fewer legal and accounting complexities for Impac.  (Impac R. 30(b)(6) Dep. at 167-69, Ex. A to Nesser Decl.)

The Reorganization Agreement provides that the Pinnacle Direct-Pinnacle Financial transaction was to be treated as a tax-free reorganization plan under the IRS Code, 26 U.S.C. § 368(a)(1)(D), which applies to

> a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356.

26 U.S.C. § 368.

RFC also contemporaneously referenced the Pinnacle Direct and Pinnacle Financial organizational changes in RFC's internal documents.  (Pinnacle History, Ex. U to Nesser Decl.)  A May 2007 RFC document addresses a telephone conversation between RFC and Pinnacle Co-Owner Vratanina in which Vratanina reported that Pinnacle Direct had no assets – all of its assets were moved to Pinnacle Financial.  (Id. at RFCCORR-COM00388092.)

11

### C.    Pinnacle Financial and Impac May 2007 Agreement

As contemplated by management at Pinnacle Financial and Impac, on May 21, 2007, the two corporations entered into an Asset Purchase Agreement ("APA") in which Impac agreed to purchase certain assets used in Pinnacle Financial's "business of retail and wholesale mortgage lending and construction lending in the United States."  (APA, "Recitals" at IMP000010, Ex. 23 to Sindberg Porter Aff.)   The APA defines "assets" as "the assets used or held for use in connection with the Loan Origination Platform," unless otherwise excluded, (id. § 1.1), including "all Contracts and Contract Rights."  (Id. § 1.1(e).)  "Contract" means "any written contract."  (Id. § 1.1 at IMP000012.)  "Loan Origination Platform" is defined as "the assets used or held for use in connection with [Pinnacle Financial's] mortgage and construction loan origination business."  (Id. at IMP000014.)   The APA calls for the application of California law in construing the agreement and resolving any claims related to it, "without regard to conflict of law principles that would result in the application of any law other than the law of the State of California."  (Id. § 9.11.)

Pursuant to the APA, Impac agreed to assume certain specific liabilities of Pinnacle Financial ("Assumed Liabilities"), including "[l]iabilities arising in connection with the ownership and use of the Loan Origination Platform and the Assets . . . that arise after the Closing."  (Id. § 2.6(d).)

However, except for the Assumed Liabilities in Section 2.6, quoted above, Impac generally excluded the assumption of Pinnacle Financial's liabilities "whether liquidated

or unliquidated, or known or unknown, whether arising out of occurrences prior to, at or after the date [of closing]," (id. § 2.7 at IMP000023), including "[a]ny liability of [Pinnacle Financial] arising out of or related to any Action against [Pinnacle Financial] which adversely affects the Assets or the Loan Origination Platform and which shall have been asserted on or prior to the Closing Date or to the extent the basis of which shall have arisen on or prior to the Closing Date." (Id. § 2.7(c).) The APA also excluded the assumption of "Any Liability related to or arising from the Loan Origination Platform and its operation prior to the Closing Date." (Id. § 2.7 (f).)

The APA provides that no consent or approval is "required to be made or obtained by [Pinnacle Financial], any [Pinnacle Financial] Subsidiary or Stockholders of this Agreement . . . except where the failure to obtain such consent . . . would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of [Pinnacle Financial] and the Stockholders to perform their obligations under this Agreement or consummate the transactions contemplated hereby . . . ." (Id. § 3.7.)

The APA further requires the listing, or scheduling, of all "Contracts . . . which are material to Seller, any Seller's Subsidiary or the operation of the Loan Origination Platform. . . ." (Id. § 3.15(a)(xiii).) Schedule 3.15(a) lists the "Mortgage Loan Purchase and Sale Agreements . . . with the investors listed in Schedule 3.7." (Sched. 3.15(a) at IMP000272, Ex. 26 to Sindberg Porter Aff.) In turn, Schedule 3.7, identifies "GMAC-RFC" as one of the "investors" with which Impac had a Mortgage Loan Purchase and

Sale Agreement.[2]  (Sched. 3.7 at IMP000204, Ex. 25 to Sindberg Porter Aff.)  In earlier

briefing submitted to this Court, pre-consolidation, Impac acknowledged that the 2001

Client Contract between RFC and Pinnacle was included on Schedule 3.15(a).  (RFC v.

Impac, No. 13-CV-3506, Impac's Reply at 9 [Doc. No. 49].)  However, Impac now takes

the position that the Client Contract "was not specifically identified on Schedule 3.15(a)

as one of the "Mortgage Loan Purchase and Sale Agreements with the investors listed in

Schedule 3.7."  (Def.'s Mem. Supp. Mot. for Summ. J. at 18 [Doc. No. 945].)

Attorney Michael Okaty again represented Pinnacle Financial in its negotiations

with Impac and claims primary authorship of the APA on its behalf.  (Okaty Aff. ¶ 14.)

In his affidavit, Okaty states that, under the APA, Pinnacle Financial did not intend or

seek to have Impac assume Pinnacle Direct's Client Contract with RFC.  (Id. ¶ 17.)  He

contends that Impac did not assume the Client Contract, nor was it assigned to Impac

under the APA.  (Id.)

Relevant to both the Pinnacle Direct-Pinnacle Financial transaction and the

Pinnacle Financial-Impac transaction, Okaty commented on an initial APA draft that

listed the parties to the APA as Impac, Pinnacle Financial, and Pinnacle Direct.  (Email of

4/12/07 from M. Okaty to S. Siamas at IMP005437.)  Okaty recommended that "[g]iven

the fact that the [Pinnacle Direct-Pinnacle Financial] reorganization has occurred and

---

[2]  Schedule 3.7 further indicates that no consents will be requested or required by reason of the Pinnacle Financial-Impac transaction for the listed investors," including GMAC-RFC.  (Sched. 3.7 at IMP000204, Ex. 25 to Sindberg Porter Aff.)

[Pinnacle Direct] retains only nominal assets, consider excluding [Pinnacle Direct] from the agreement from a simplicity standpoint." (Id.)

In addition to the APA and the Okaty Affidavit and Okaty email, the parties have submitted other evidence concerning various aspects of the Pinnacle Financial-Impac transaction including post-transaction management and staffing, transferred assets, physical locations, and the status of the entities following the transaction.

### 1.    Post-Transaction Management and Staffing

In a May 21, 2007 email to Pinnacle Financial employees, Pinnacle Co-Owners Vratanina and Long announced the Pinnacle Financial-Impac deal, describing it as an operational merger: "Doug, Jeff and the senior management team are extremely excited to announce that today we have entered into a definitive agreement to operationally merge with Impac . . . ." (Email of 5/21/07 attaching Mem. from J. Vratanina to All Staff, Ex. P to Nesser Decl.) Further, Vratanina and Long indicated that it would be "business as usual," with Pinnacle Financial's Tri-Star Lending "promptly migrat[ing]" to Impac Lending Group. (Id. at Foley0005836.) Upon closing of the transaction, "Pinnacle Financial retail sales will be known as Impac Home Loans." (Id.)

Vratanina and Long were to run the national retail operation for Impac Home Loans, production centers would remain the same, and "substantially all non-sales personnel [would] be rolled into Impac's organizational structure." (Id.) (See also Anjali Fluker, Pinnacle begins new chapter as Impac, Orlando Bus. J., June 4, 2007, http://www.bizjournals.com/orlando/ stories/ 2007/06/04/story7.html, Ex. R to Nesser

Decl.) (discussing "acquisition" of Pinnacle Financial and roles of Vratanina and Long as managing directors at Impac).  Impac named Vratanina and Long as executive vice presidents and officers at Impac and planned for them to serve on Impac's Executive Committee and for at least one of them to serve on Impac's Asset/Liability Committee to "monitor Impac's interest rate risk and cash management."  (Impac 30(b)(6) Dep. at 155-56, Ex. A to Nesser Decl.)

Impac agreed to pay Vratanina and Long up to $18 million for their shareholder interests.  (Project New Horizons Final Term Sheet at IMP010793, Ex. 18 to Sindberg Porter Aff.)  Impac's Executive Vice President and COO Johnson attests that Vratanina and Long did not receive stock or shares from Impac, nor did they ever become members of the Board of Directors for any Impac-related entity.  (Johnson Aff. ¶ 5 [Doc. No. 949].)

After the execution of the APA, Craig Berardi, an Impac consultant, worked to integrate the Pinnacle assets that Impac had purchased, especially accounting and payroll, and served as the liaison between Impac and the purchased assets during a transition period.  (Berardi Aff. ¶¶ 2-3.)  Berardi worked out of a former Pinnacle office that Impac had assumed under the APA, although Impac did not assume all of Pinnacle Financial's branches and offices.  (Id. ¶ 4.)

Vratanina and Long attached an information sheet to their employee memo announcing the Pinnacle Financial-Impac transaction.  (Email of 5/21/07 attaching Mem. from J. Vratanina to All Staff, Ex. P to Nesser Decl.)  The information sheet, entitled "Questions & Answers: PFC-IMPAC Merger," described the transaction as a merger and

addressed the roles of management and staff:

Q:    Is this a sale or a merger?

A:    Impac will be purchasing the assets of Pinnacle Financial
      Corporation.  The two organizations will be merging their
      operations.

* * *

Q:    What will Jeff Vratanina and Doug Long's roles be in the new
      organization?

A:    Jeff and Doug will manage the national retail sales organization.  All
      other departments will be integrated into Impac's organizational
      structure.

* * *

Q:    How will this affect Pinnacle Financial Corporation (PFC) sales
      staff?

A:    All PFC branch managers and loan officers will transition to Impac
      Home Loans once all licensing has been completed, approximately
      three to six months after the closure of the transaction.
      Operationally, there will be no change.  Our operations centers will
      continue to run as they currently do.

* * *

Q:    Will all [Pinnacle Financial] and [Tri-Star Lending] be offered jobs
      with Impac?

A:    We anticipate that substantially all staff will be offered employment
      with Impac.

(Id.  at Foley0005837.)

Regarding Pinnacle Financial's sales employees, Impac contends that Pinnacle

Financial planned to continue doing such work as an interim measure until Impac

17

obtained its own state licenses.  (Def.'s Mem. Supp. Mot. for Summ. J. at 30 [Doc. No. 945].)  Impac's corporate representative testified that he did not know whether Pinnacle Financial's sales employees ultimately transferred to Impac because Impac decided, during the summer of 2007, to shut down the mortgage lending business due to a liquidity crisis.  (Impac 30(b)(6) Dep. at 307-08, Ex. A to Nesser Decl.)

While Pinnacle Co-Owner Long characterized the Pinnacle Financial-Impac transaction as a merger at the time of the event, in an affidavit submitted in support of the instant motion, Pinnacle Co-Founder Long attests that "it was an asset sale only; it was not a merger."  (Long Aff. ¶ 18 [Doc. No. 950].)

### 2.    Transferred Assets and Liabilities

The cover page of the APA is entitled the "Purchase of Substantially All of the Assets of Pinnacle Financial Corp."  (APA at IMP000001, Ex. 23 to Sindberg Porter Aff.) As to the Section 1.1 definition of "assets" transferred under the APA, including the "assets used or held for use in connection with the loan origination program," Impac's Rule 30(b)(6) designee testified that such assets referred to "everything and anything we use in the business of originating loans."  (Impac 30(b)(6) Dep. at 424, Ex. A to Nesser Decl.)

In addition to documents from the Pinnacle entities and Impac, RFC also submitted its own documents that contemporaneously discuss the transaction.  In an internal RFC document entitled "Pinnacle History," RFC referred to a May 24, 2007 conference call with "GMAC-RFC and Jeff V." – a call that occurred three days after the execution of the

APA.  (Pinnacle History, Ex. U to Nesser Decl.)  During the phone call with Pinnacle's co-founder Jeff Vratanina, Vratanina stated that Pinnacle Financial had been "acquired by IMPAC," and that Pinnacle Financial "has no assets left or minimal assets per Jeff." (Id. at RFCCORR-COM00388092.)

Impac's Form 10-Q filing with the Securities and Exchange Commission for the quarterly period ending June 30, 2007 reported that "[i]n May 2007, the Company completed the acquisition of certain production facilities from Pinnacle Financial Corporation (PFC) . . . .  The PFC retail platform originates prime and agency loans.  This transaction was recorded as a business combination for accounting purposes . . . ." (Impac Form 10-Q, ending 6/30/07 at 4, Ex. T to Nesser Decl.).

In addition to the acquisition of production facilities, Impac's Rule 30(b)(6) witness testified that, through the APA, Impac assumed "a lot of" Pinnacle's lease liabilities. (Impac R. 30(b)(6) Dep. at 89; 296, Ex. A to Nesser Decl.)

### 3.  Resulting Entities Following the Pinnacle Financial-Impac Transaction

Referring to Pinnacle Financial, Impac's corporate representative testified , "You have an organization that just sold off all their assets," (Id. at 371-72); "It's not an operating entity as before."  (Id. at 372.)   Documents submitted to the Florida Department of State, Division of Corporations, show that Pinnacle Financial dissolved in 2010.  (Florida Filing Detail, Ex. 47 to Sindberg Porter Aff.)

### D.  Impac's Motion

Impac disputes any liability to RFC.  It argues that Pinnacle Direct did not transfer to Pinnacle Financial any liabilities under the 2001 Contract with RFC.  (Def.'s Mem. Supp. Mot. for Summ. J. at 12-13 [Doc. No. 945].)   Impac contends that Pinnacle Financial could not have assumed liabilities to RFC from Pinnacle Direct without RFC's written consent, which was never given.  (Id. at 13-14.)  It further contends that Impac did not agree in the APA to assume the liabilities at issue in this lawsuit.  (Id. at 17-20.) Moreover, Impac asserts that RFC's common law theories of de facto merger and mere continuation fail under Minnesota, Florida, and California law, although Impac argues that Minnesota law applies.  (Id. at 23-31.)  Consequently, Impac argues that it is entitled to summary judgment.

In opposition to Impac's motion, RFC contends that Pinnacle Financial expressly assumed Pinnacle Direct's liability and that Impac likewise expressly assumed Pinnacle Financial's liability.  (Pls.' Opp'n Mem. at 11-14; 20-22 [Doc. No. 1059].)  Alternatively, applying Florida law, RFC contends that Pinnacle Financial de facto merged with and continued Pinnacle Direct's business.  (Id. at 15-16.)  At a minimum, RFC argues that de facto merger and mere continuation implicate genuine disputes of fact that cannot be resolved on summary judgment.  (Id. at 16.)  RFC contends that RFC's consent to transfer the Client Contract was not required.  (Id.)

Also under Florida law, RFC argues that if Impac did not assume Pinnacle Financial's liabilities in the APA, it is alternatively liable as Pinnacle Financial's common law successor under the theory of de facto merger.  (Id. at 23.)

20

## II.      DISCUSSION

### A.      Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp., 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Id. at 323.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.  Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

B.     **Choice of Law**

While Impac argues that Minnesota law applies to the resolution of this motion,

RFC contends that Florida law applies to its common law successor liability arguments.

The Client Contract between RFC and Pinnacle Direct calls for the application of

Minnesota law, the Pinnacle Direct and Pinnacle Financial Reorganization Agreement

calls for the application of Florida law, and the Pinnacle Financial-Impac APA calls for

the application of California law.  While the facts underlying this motion concern these

three contracts, the only relevant contracts for purposes of determining successor liability

are the Pinnacle Direct-Pinnacle Reorganization Agreement and the Pinnacle Financial-

Impac APA.

In deciding conflict of law questions, a federal district court sitting in diversity

applies the conflict of law rules of the forum state.  See Klaxon  Co. v. Stentor Elec. Mfg.

Co., 313 U.S. 487, 496 (1941);  Superior Edge, Inc. v. Monsanto Co., 964 F. Supp. 2d

1017, 1031 (D. Minn. 2013) (citing Fla. State Bd. of Admin. v. Law Eng'g & Envtl.

Servs., Inc., 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003) ("In determining whether a

choice of law provision in the parties' agreement will be given effect, a federal court

sitting in diversity looks to the choice of law principles of the forum state, in this case

Minnesota.")  In the Eighth Circuit, the same is true when jurisdiction is based on

bankruptcy and the matter involves a contract dispute.  In re Payless Cashways, 203 F.3d

1081, 1084 (8th Cir. 2000) (applying the forum state's choice of law rules in a Chapter 11

proceeding involving a contract dispute); In re NWFX, Inc., 881 F.2d 530 (8th Cir. 1989)

(determining choice of law based on the forum's choice of law regime in case involving

contracts).

But before applying the forum's choice of law rules, the Court must determine

whether a conflict exists.  Prudential Ins. Co. of Am. v. Kamrath, 475 F.3d 920, 924 (8th

Cir. 2007).   "The threshold inquiry then is whether the forum's law and the law of

another interested state would produce conflicting results."  Cargill, Inc. v. Products

Eng'g Co., 627 F. Supp. 1492, 1495 (D. Minn. 1986).

RFC presents two arguments as its bases for successor liability: (1) assumption of

liability in the respective underlying contracts; and (2) common law successor liability

based on theories of de facto merger and mere continuation.  (Pls.' Opp'n Mem. at 11-41

[Doc. No. 1059].)   All three states at issue, Minnesota, Florida, and California, follow the

traditional corporate law rule that a purchaser-successor does not ordinarily assume the

seller-predecessor's liabilities simply by purchasing the predecessor's assets.  See, e.g.,

Knott v. AMFEC, Inc., No. 09-CV-1098 (PJS/AJB), 2010 WL 1528393, at *2 (D. Minn.

April 15, 2010) (citing J.F. Anderson Lumber Co. v. Myers, 206 N.W.2d 365, 368 (Minn.

1973)); Ray v. Alad Corp., 560 P.2d 3, 7 (Cal. 1977); Bernard v. Kee Mfg. Co., Inc., 409

So.2d 1047, 1049 (Fla. 1982).  However, under a common exception to the general rule,

recognized in the laws of Minnesota, Florida, and California, if the successor agrees to

assume liability, then successor liability attaches to the successor.  Minn. Stat. §

302A.661, subd. 4 ("The transferee is liable for the debts, obligations, and liabilities of

the transferor only to the extent provided in the contract or agreement between the

transferee and the transferor . . . ."); <u>Bernard</u>, 409 So.2d at 1049 (stating that a corporate

successor "is not liable, unless successor expressly and impliedly agreed to assume debts

of predecessor . . . ."); <u>Gerritsen v. Warner Bros. Entertainment Inc.</u>, No. CV 14-03305

MMM (CWx), 116 F. Supp. 3d 1104, 1127 (C.D. Cal. 2015) (citation omitted) ("Under

California law, a successor company has liability for a predecessor's actions if . . . the

successor expressly or impliedly agrees to assume the subject liabilities . . . ."). Thus, as

to Plaintiffs' first basis for successor liability, contractual assumption of liability as a

form of successor liability is available in Minnesota, Florida, and California.

Accordingly, if the contracts at issue establish that the transferee assumed the

transferor's liability, there is no conflict of law, because all three states recognize

contractual assumption of liability.

The Court therefore first examines the language of the two contracts to determine

if the transferees assumed liability. Where there is no conflict of law, as with express

assumption of liability as a means of successor liability in Minnesota, Florida, and

California, the law of the forum is applied. <u>Med. Graphics Corp. v. Hartford Fire Ins.</u>

<u>Co.</u>, 171 F.R.D. 254, 260, n.3 (D. Minn. 1997) (citing <u>Davis v. Outboard Marine Corp.</u>,

415 N.W.2d 719, 723 (Minn. Ct. App. 1987)). Under Minnesota law, where parties to a

contract have agreed upon the application of another state's laws to the interpretation of a

contract, this Court will honor that agreement. <u>Matson Logistics, LLC v. Smiens</u>, No. 12-

CV-400 (ADM/JJK), 2012 WL 2005607, at *2 (D. Minn. June 5, 2012) (citing <u>Milliken</u>

<u>& Co. v. Eagle Packaging Co., Inc.</u>, 295 N.W.2d 377, 380 n.1 (Minn. 1980)). As the

Reorganization Agreement calls for the application of Florida law, this Court applies Florida law to interpret it.  Likewise, because the APA calls for the application of California law, this Court applies California law to interpret it.  As a practical matter, since the basic principles of contract construction are generally the same in most jurisdictions, there is little difference, if any, between the laws of Minnesota, Florida, and California with respect to contract interpretation.

Pursuant to general contract law, "interpretation of a contract begins with its plain language."  Duval Motors Cov. v. Rogers, 73 So. 3d 261, 265 (Fla. Dist. Ct. App. 2011); accord George v. Automobile Club of S. Cal., 135 Cal. Rptr. 3d 480, 484 (Cal. Ct. App. 2011) (observing that the parties' mutual intent, which is to be inferred solely from the written contract, if possible, governs interpretation); Mollico v. Mollico, 628 N.W.2d 637, 640-41 (Minn. Ct. App. 2001) (citation omitted) (noting that courts first look to the language of the contract to determine the parties' intent).  Generally, courts only consider evidence extrinsic to the contract, or parol evidence, when the contract language is ambiguous.  Duval Motors, 73 So.3d at 265; accord George, 135 Cal. Rptr. 3d at 484.  A writing is ambiguous only when it is of uncertain meaning and may be fairly understood in more ways than one.  Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So.2d 1000, 1002 (Fla. Dist. Ct. App. 1995); accord Winet v. Price, 6 Cal. Rptr. 2d 554, 557 (Cal. Ct. App. 1992) (ambiguous language is reasonably susceptible to more than one meaning); Mollico, 628 N.W.2d at 641 (stating that language is ambiguous  if it is reasonably susceptible to more than one meaning).

25

### C.      Successor Liability

#### 1.      Pinnacle Direct-Pinnacle Financial Reorganization Agreement

##### a.      Consent

Impac's first argument against the transfer of liability in the Pinnacle Direct-Pinnacle Financial Reorganization Agreement is that Pinnacle Financial could not have assumed Pinnacle Direct's liabilities without RFC's consent.  (Def.'s Mem. Supp. Mot. for Summ. J. at 13-16 [Doc. No. 945].)  As to the assignment of contracts, the Reorganization Agreement provides, in full,

> To the extent that any . . . Contract is not assignable without the consent of another party, this Plan shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof.  [Pinnacle Financial] and [Pinnacle Direct] agree to use their best efforts to obtain the consent of such other party to the assignment of any such Contract to [Pinnacle Financial] in all cases in which such consent is or may be required for such assignment.  If any such consent shall not be obtained, [Pinnacle Direct] agrees to cooperate with [Pinnacle Financial] in any reasonable arrangement designed to provide for [Pinnacle Financial] the benefits intended to be assigned to [Pinnacle Financial] under the relevant Contract, including enforcement at the cost and for the account of [Pinnacle Financial] of any and all rights of [Pinnacle Direct] against the other party thereto arising out of the breach or cancellation thereof by such other party or otherwise.

(Reorg. Amt. § 3, Ex. A to Okaty Aff.)   Because consent was never requested or given, Impac argues, Pinnacle Financial could not succeed to any of the rights or liabilities under the Client Contract between RFC and Pinnacle Direct. (Def.'s Mem. Supp. Mot. for Summ. J. at 13-16 [Doc. No. 945].)

In support of this argument, Impac points to the following language in the

26

underlying RFC-Pinnacle Direct Client Contract that requires Pinnacle Direct to obtain

RFC's consent prior to any assignment of the contract: "Client [Pinnacle Direct] may not

assign or transfer this Contract, in whole or in part, without GMAC-RFC's prior written

consent." (Client Contract §10, Ex. 3 to Sindberg Porter Aff.)

Next, citing the Reorganization Agreement between the two Pinnacle entities,

Impac identifies language providing that, to the extent an underlying contract is not

assignable without the consent of a third party, the Reorganization Agreement

> shall not constitute an assignment or an attempted assignment thereof if
> such assignment or attempted assignment would constitute a breach thereof.
> [Pinnacle Financial] and [Pinnacle Direct] agree to use their best efforts to
> obtain the consent of such other party to the assignment of any such
> Contract to [Pinnacle Financial] in all cases in which such consent is or may
> be required for such assignment.

(Reorg. Agmt. § 3, Ex. A to Okaty Aff.)  Impac contends that there is no evidence that

either Pinnacle Direct or Pinnacle Financial sought or received RFC's consent to assign

the Client Contract to Pinnacle Financial.  (Def.'s Mem. Supp. Mot. for Summ. J. at 14

[Doc. No. 945].)  Accordingly, it maintains that Pinnacle Financial did not assume any of

Pinnacle Direct's liabilities pursuant to the Client Contract.

RFC argues that this lack of consent is not surprising.  Under the terms of the

parties' agreements, RFC posits, no consent was necessary.  (Pls.' Opp'n Mem. at 16-19

[Doc. No. 1059].)  Rather, pursuant to Section A214 of the underlying Client Guide,

which RFC contends was incorporated into the Client Contract, if Pinnacle Direct merged

or consolidated, the new entity automatically succeeded Pinnacle Direct under the Client

27

Contract.  (12/11/06 RFC Client Guide § A214, Ex. H to Nesser Decl. [Doc. No. 1060].)

Specifically, the Client Guide provides that

> [a]ny . . . entity into which the Client [Pinnacle Direct] may be merged or
> consolidated, or any corporation resulting from any merger, conversion or
> consolidation to which the Client shall be a party shall be the successor of
> the Client under the Client Contract.  This does not require the execution or
> filing of any paper or any further act on the part of any of the parties to the
> Client Contract.

(Id.)

Impac argues that the language of Section A214 is inconsistent with Section 10 of

the Client Contract, which requires consent for assignment.  (Def.'s Mem. Supp. Mot. for

Summ. J. at 14, n.7 [Doc. No. 945].)  Moreover, Impac cites a provision in the Client

Contract stating that if language in the Client Contract is inconsistent with the Client

Guide, the language of the Client Contract controls.  (Id.)  Accordingly, Impac asserts that

the Client Contract's requirement of consent in Section 10 trumps the Client Guide's

language in Section A214 regarding automatic successorship and no requirement of

consent.  (Id.)

RFC disagrees.  It contends that the Client Contract and Section A214 of the Client

Guide do not conflict; rather, they address two fundamentally different scenarios:

assignment by Pinnacle Direct of the RFC-Pinnacle Direct Client Contract to a third

party, for which RFC's consent was required, versus merger or consolidation of Pinnacle

Direct with another entity to which the RFC-Pinnacle Direct Client Contract would flow,

and for which RFC's consent was not required.  (Def.'s Opp'n Mem. at 17-18 [Doc. No.

28

1059].)  RFC thus argues that because Pinnacle Direct and Pinnacle Financial merged, and Section A214 states that RFC's consent is not required for a successor entity to be liable under the Client Contract in a merger, RFC is entitled to judgment as a matter of law that its consent was not required.  (Id. at 18.)  At a minimum, RFC contends, Impac is not entitled to summary judgment on this issue in light of genuine disputes concerning the relationship of the contracts to one another and their intended meaning.  (Id.)

The Court agrees with RFC that the language of the Client Contract and the Client Guide does not appear to be in conflict.  Black's Law Dictionary defines "assignment" as "the transfer of rights or property."  Black's Law Dictionary (10th ed. 2014), available at Westlaw BLACKS.  It defines "merger" as "the combination of two or more . . . entities into a single . . . entity."  Id.  And it defines "consolidation" as to corporations as "[t]he unification of two or more corporations or other organizations by dissolving the existing ones and creating a single new corporation or organization."  Id.  RFC did not require consent for merger or consolidation, (12/11/06 RFC Client Guide § A214, Ex. H to Nesser Decl.), but did require consent for an assignment or transfer,  (Client Contract ¶ 10, Ex. 3 to Sindberg Porter Aff.).  "Assignment" is different from "merger" or "consolidation."  As there is no conflict between the language of the Client Contract and the Client Guide, the language of the Client Contract providing that assignments require consent, does not, by itself, determine whether consent was required here.

The Court therefore turns back to construing the assignment and consent language in Section 3 of the Reorganization Agreement.  On the one hand, it states that, to the

extent that any contract requires consent of another party prior to assignment, the Reorganization Agreement shall not effectuate such an assignment if doing so would constitute a breach of an underlying contract. (Reorg. Amt. ¶ 3, Ex. A to Okaty Aff.) But it goes on to say that Pinnacle Direct and Pinnacle Financial will use their best efforts to obtain the consent of the other party "in all cases in which such consent is or may be required for such assignment." (Id.) (emphasis added). This language imposes an affirmative duty on Pinnacle Direct and Pinnacle Financial to obtain such consent, vesting them with the authority to determine whether the transfer of the Client Contract would constitute a breach of the underlying contract, absent the other party's consent. As Impac acknowledges, "[t]here is no evidence that either Pinnacle Direct or Pinnacle Financial sought or received RFC's consent to assign the 2001 Contract to Pinnacle Financial." (Def.'s Mem. Supp. Mot. for Summ. J. at 14 [Doc. No. 945].) This inaction could mean one of two things: (1) that Pinnacle Direct and Pinnacle Financial determined that no consent was necessary because their "reorganization" constituted a merger or consolidation; or (2) that the Client Contract was never intended to transfer from Pinnacle Direct to Pinnacle Financial as part of the reorganization.

The Court therefore looks elsewhere in the Reorganization Agreement to determine whether it expresses an intent concerning merger and whether, under the terms of the Reorganization Agreement, the Client Contract passed to Pinnacle Financial in the reorganization. By its own terms, the Reorganization Agreement "reorganizes" Pinnacle Direct and Pinnacle Financial. (Reorg. Agmt. at IMP000678, Ex. A to Okaty Aff.) It

states that all of the outstanding stock of Pinnacle Direct and Pinnacle Financial is owned
by the same shareholders in the same proportions and that the two companies have been
engaged in the business of mortgage lending for a number of years.  (Id.)  It states that the
shareholders and directors of both Pinnacle entities determined that reorganization was
advisable and in their best interest "by transferring to [Pinnacle Financial] most of the
business rights, claims, and assets of [Pinnacle Direct]."  (Id.)  Further, it expresses the
parties' desire that the reorganization be treated for tax purposes as a reorganization under
26 U.S.C. § 368(a)(1)(D) of the IRS Code.  (Id.)  As noted, that provision of the IRS
Code applies to the following corporate reorganizations: "a transfer by a corporation of
all or a part of its assets to another corporation if immediately after the transfer the
transferor, or one or more of its shareholders (including persons who were shareholders
immediately before the transfer), or any combination thereof, is in control of the
corporation to which the assets are transferred."  26 U.S.C. § 368(a)(1)(D).

The Reorganization Agreement further provides that following the reorganization,
Pinnacle Financial will continue the mortgage lending business previously carried on by
Pinnacle Direct.  (Reorg. Agmt. at IMP000678, Ex. A to Okaty Aff.)  While the
Reorganization Agreement was executed on March 16, 2007, it observes that Pinnacle
Direct and Pinnacle Financial began implementing the reorganization, and Pinnacle
Financial began to carry on Pinnacle Direct's mortgage lending business, in October of
2006.  (Id.)  The reorganization was announced internally with a beginning date of
October 15, 2006, "and all the employees of Pinnacle Direct were transferred to Pinnacle

Financial effective October 16, 2006."  (Id.)  Following reorganization, the agreement

provides that Pinnacle Direct will continue to maintain certain state licenses and have its

own assets totaling approximately $250,000, as needed to maintain such licenses, and as a

reserve against any non-transferred liabilities of Pinnacle Direct.  (Id.)

While Impac argues that RFC's objection to the transmittal of a different contract

– the Warehousing Credit Agreement –  from Pinnacle Direct to Pinnacle Financial

somehow demonstrates that RFC objected to the transfer of the Client Contract, the Court

disagrees.  RFC's refusal to consent to the transfer of a credit line is not relevant to

whether the Client Contract, an entirely different contract involving the sale of loans, with

its attendant obligations, transferred from Pinnacle Direct to Pinnacle Financial.

The Court next examines the terms of the agreement regarding transfer of assets

and assumption of liability to determine if these terms shed light on the nature of the

Pinnacle reorganization.

### b.      Transfer of Assets and Assumption of Liability

The Reorganization Agreement provides that as of the March 16, 2007 execution

date, Pinnacle Direct conveys to Pinnacle Financial, which, in turn, accepts:

> all of the business, rights, claims and assets (of every kind, nature, character
> and description, whether real, personal or mixed, whether tangible or
> intangible, whether accrued, contingent or otherwise, and wherever
> situated) of [Pinnacle Direct], together with all rights and privileges
> associated with such assets and with the business of [Pinnacle Direct], other
> than the Excluded Assets (as hereinafter defined) (collectively the
> "Transferred Assets.").

(Reorg. Agmt. at IMP000678, Ex. A to Okaty Aff.)  The Transferred Assets include the

following: (a) all cash and cash equivalents; (b) all of Pinnacle Direct's notes, drafts and accounts; (c) all of Pinnacle Direct's interests in its real property; (d) Pinnacle Direct's real property leases; (e) Pinnacle Direct's personal property; (f) Pinnacle Direct's personal property leases; (g) all inventories of mortgage loans on the books of Pinnacle Direct; (h) contracts; (i) computer software; (j) trade rights; (k) literature; (l) records and files; (m) the corporate name; and (n) general intangibles.  (Id. § 1(a)-(n).)  Specifically, as to contracts, the transferred assets include "all [Pinnacle Direct's] rights in, to and under all contracts, agreements, and understandings, including all investor agreements . . . ."  (Id. § 1(h)) (emphasis added).

The Reorganization Agreement lists the following Excluded Assets: (a) Pinnacle Direct's "franchise to be a corporation, its certificate of incorporation, corporate seal, stock books, minute books and other corporate records having exclusively to do with the corporate organization and capitalization of [Pinnacle Direct]"; (b) tax credits and records; (c) all of Pinnacle Direct's licenses, permits, and approvals; (d) interests in real property with an aggregate book value of less then $250,000.00; (e) if the real property is less then $250,000, then personal property with an aggregate book value of less than $250,000.00, may make up the shortfall, if any; (f) if the aggregate book value of the property in (d)-(e) is valued at less than $250,000.00, then personal property leases may make up any shortfall; (g) if the aggregate book value of the items in (d)-(f) is less then $250,000.00, then computer software may make up any shortfall; (h) if the aggregate book value of items in (d)-(g) is less than $250,000.00, then general intangibles may

make up any shortfall; (i) if the aggregate book value of items in (d)-(h) is less than $250,000.00, then notes and accounts receivable may make up any shortfall; and (j) if the aggregate book value of items in (d)-(i) is less than $250,000.00, then cash and cash equivalents may make up any shortfall. (Id. § 2(a)-(j).)  Comparing the Transferred Assets with the Excluded Assets, it is clear that anything of value is transferred in the reorganization.  Notably, "all contracts," subject to certain limitations, are Transferred Assets.  (Id. § 1(h).)

In terms of contractual liabilities, Section 4 of the Reorganization Agreement provides:

> 4.  **Liabilities to be Assumed**.  As used in this Plan, the term "Liability" shall mean and include any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured.  Effective as of the [March 16, 2007] Execution Date, [Pinnacle Financial] shall assume and agree to perform and discharge the following, and only the following Liabilities of [Pinnacle Direct] (collectively the "Assumed Liabilities"):
>
> * * *
>
> (b) Contractual Liabilities. [Pinnacle Direct's] Liabilities arising from and after the [March 16, 2007] Execution Date under and pursuant to all Contracts and Leases, except any Liability of [Pinnacle Direct] for breach or failure to perform any Contract . . . arising prior to the [March 16, 2007] Execution.

(Id. § 4(b) (emphasis added).)  Based on this language, the Reorganization Agreement appears to transfer contractual liabilities that arise on and after the March 16, 2007 execution date to Pinnacle Financial.

However, the following section on non-assumed liabilities, Section 5, contains

conflicting language:

> 5.  **Liabilities Not to be Assumed**.  Except as and to the extent specifically
> set forth in Section 4, [Pinnacle Financial] is not assuming any Liabilities of
> [Pinnacle Direct] and all such Liabilities shall be and remain the
> responsibility of [Pinnacle Direct].  Notwithstanding the provisions of
> Section 4, [Pinnacle Financial] is not assuming and [Pinnacle Direct] shall
> not be deemed to have transferred to [Pinnacle Financial] the following
> Liabilities of [Pinnacle Direct]:

> \* \* \*

> (f) <u>Liability for Breach</u>.  Liabilities of [Pinnacle Direct] for any
> breach or failure to perform any contract, whether or not assumed
> hereunder, including breach arising from assignment of contracts hereunder
> without consent of third parties.

(<u>Id.</u> § 5(f).)

The muddled lead-in language of Section 5 appears to both restate the primacy of

Section 4 and disregard it altogether.  But setting aside this prefatory language, the more

substantively contradictory language appears in Section 5(f).  This section could be read

to broadly vitiate the assumption of any liability based on breach or failure to perform a

contract, whether or not assumed under the Reorganization Agreement, without relation

to the execution date of the Reorganization Agreement.  Under such a reading, Section

5(f) directly conflicts with the language in Section 4, in which Pinnacle Financial assumes

Pinnacle Direct's contractual liabilities, except for liabilities for breach or failure to

perform any contract arising prior to the March 16, 2007 execution date.

Although contract terms are to be construed consistently with their plain and

35

ordinary meaning, "the meaning is not to be gathered from any one phrase, but from a general view of the whole writing, with all of its parts being compared, used, and construed, each with reference to the others."  Specialized Mach. Transp., Inc. v. Westphal, 872 So. 2d 424, 426 (Fla. Dist. Ct. App. 2004); see also Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 959 P.2d 265, 271-72 (Cal. 1998) ("[L]anguage in a contract must be construed in the context of that instrument as a whole . . ."); Quade v. Secura Ins., 814 N.W.2d 703, 705 (Minn. 2012) ("The terms of a contract must be read in the context of the entire contract.").  Where contractual language appears to conflict, a specific provision controls over a provision dealing only generally with that same subject. Idearc Media Corp. v. M.R. Friedman & G.A. Friedman, P.A., 985 So.2d 1159, 1161 (Fla. Dist. Ct. App. 2008);  Nat'l Ins. Underwriters v. Carter, 17 Cal. 3d 380, 386 (1976) (same); Cement, Sand & Gravel Co. v. Agric. Ins. Co. of Watertown, 30 N.W.2d 341, 348 (Minn. 1947).  Here, the more particular language is found in Section 4(b), in which liability is assumed for all contracts, except any liability for breach or failure to perform any contract arising prior to the execution of the Reorganization Agreement.  The Court finds that this more particular language controls over the general language of Section 5(f). This construction makes sense in the context of the entire contract.  There would be no reason for the specific language of Section 4(b) if the language of Section 5(f) were read to broadly dispense with liability for any breach of contract.

Moreover, in any event, the language in Sections 4(b) and 5(f) is inapplicable to RFC's indemnification claim, as the language refers to liabilities for breach of contract or

failure to perform a contract.  Accordingly any exceptions or limitations found in Sections 4(b) and 5(f) have no bearing on RFC's claim for indemnification.

Thus, under the Reorganization Agreement, Pinnacle Financial assumed all of Pinnacle Financial's contractual assets (unless listed as excluded assets), and Pinnacle Financial assumed Pinnacle Direct's contractual liabilities if the liabilities for breach of contract or failure to perform any contract arose on or after March 16, 2007.  There is no dispute that the Client Contract was one of Pinnacle Direct's contracts.   The Court finds that all of the language noted above supports a finding that Pinnacle Direct did not simply "assign" the Client Contract to Pinnacle Direct, which would have required RFC's consent.  Rather, in light of the nature of the reorganization, no consent was required.

Furthermore, while the Court need not consult the subsequent agreement between Pinnacle Financial and Impac in order to resolve whether the Client Contract transferred to Pinnacle Financial, the Court finds the APA, and schedules thereto, instructive on this issue.  The APA identifies the 2001 RFC-Pinnacle Direct Client Contract as one of Pinnacle Financial's Scheduled Contracts.  (Sched. 3.15(a) at IMP000272, Ex. 26 to Sindberg Porter Aff.; Sched. 3.7 at IMP000204, Ex. 25 to Sindberg Porter Aff.)  The Client Contract could only be one of Pinnacle Financial's Scheduled Contracts if Pinnacle Financial assumed it pursuant to Pinnacle's reorganization.  Thus, in addition to the language of the Reorganization Agreement, through the schedules to the APA, Impac and Pinnacle Financial effectively concede that Pinnacle Financial acquired the Client Contract under the Reorganization Agreement with Pinnacle Direct.

The next question is whether the specific liabilities at issue, namely, RFC's indemnification and breach of contract claims, arose before or after the March 16, 2007 execution date of the Reorganization Agreement.  If these liabilities arose before March 16, 2007, Pinnacle Financial did not assume them; but if they arose on or after March 16, 2007, Pinnacle Financial assumed them.  Impac argues that because Pinnacle Direct sold the allegedly defective loans to RFC between November 30, 2001 and February 12, 2007 – i.e, before March 16, 2007 – Pinnacle Financial did not assume any liability.  (Sindberg Porter Aff. ¶ 3; Ex. 54 thereto.)   The Court disagrees with Impac's characterization of when the liabilities arose.

First, as to RFC's indemnification claim, this Court has previously determined that RFC's claim for indemnification did not arise until at least 2008.  Residential Funding Co., LLC v. Academy Mortg. Corp., 59 F. Supp. 3d 935, 953 (D. Minn. 2014) (citing Metro. Prop. & Cas. Ins. Co.  v. Metro. Transit Comm'n, 538 N.W.2d 692, 695 (Minn. 1995) ("Under the common law, the right of indemnity does not accrue until the liability of the party seeking indemnity has become finally fixed and ascertained, or until after the claimant has settled or has paid the judgment or more than a commensurate share of it."). Like Minnesota, under Florida and California law, an indemnification claim accrues on the date of payment by the party seeking indemnification, rather than the date of injury. See, e.g., Fireman's Fund Ins. Co. v. Rojas, 409 So. 2d 1166, 1167 (Fla. Dist. Ct. App. 1982) (finding that insurer's indemnity claim accrued and statute of limitations began to run when indemnity liability was satisfied); U.S. Cold Storage v. Matson Navigation Co.,

38

209 Cal Rptr. 144, 148 (Cal. Ct. App. 1984) (holding that right of indemnity accrues when indemnitee has incurred a loss by paying the underlying claim or judgment). Accordingly, liability, if any, for RFC's indemnification claim arose on or after the March 16, 2007 execution date of the Reorganization Agreement.  Consequently, under the terms of the Reorganization Agreement, the Court finds that Pinnacle Financial expressly or impliedly assumed liability for RFC's claims based on indemnification.  See Bernard, 409 So.2d at 1049 (holding that successor liability attaches where the successor expressly or impliedly assumes obligations of the predecessor); see also Minn. Stat. § 302A.661, subd. 4 (stating that successor liability attaches to the extent provided in the contract or agreement between the transferee and the transferor); Gerritsen, 116 F. Supp. 3d at 1127 (noting that successor liability applies where the successor expressly or impliedly agrees to assume the subject liabilities).

As to the timing of liability for breach of contract, this Court has previously held that Section A201(M) of the Client Guide creates a continuing obligation on the part of a Seller to "promptly notify [RFC] of any occurrence, act, or omission . . . of which [Seller] had knowledge, which . . . may materially affect" the loans.  See In re RFC, No. 13-CV-3451, 2015 WL 3756476, at * 11 (D. Minn. June 16, 2015).   Furthermore, the Court has held that the date on which any Defendant in this action allegedly breached Section A201(M) is a question of fact.  Id.  Here, Impac presents no evidence showing that it, Pinnacle Direct, or Pinnacle Financial lacked knowledge of the breaches.  As RFC notes, neither has Impac introduced evidence to overcome the presumption of knowledge on the

part of a Client/Seller under Section 113 of the Client Guide.[3]  That provision states, "Any representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of Client, unless Client demonstrates otherwise." (12/11/06 RFC Client Guide § 113, Ex. H to Nesser Decl.)  Because the existing record does not sufficiently prove that RFC's claim for breach of contract arose before the March 17, 2007 execution date, genuine issues of material fact remain in dispute with respect to this claim, precluding summary judgment.  However, once it is determined whether or not such breaches occurred and when, then the language of the Reorganization Agreement controls this first step in determining successor liability.  Accordingly, as to the Pinnacle Direct-Pinnacle Financial transaction – the first step in Plaintiffs' successor liability theory – the Court finds no need to consider Plaintiffs' alternative common law arguments for successor liability.

Next, the Court addresses the second step in Plaintiffs' successor liability theory – whether the language of the Pinnacle Financial-Impac APA provides a basis for such liability.

### 2. Pinnacle Financial-Impac APA

Impac contends that it did not assume the RFC-Pinnacle Direct Client Contract

---

[3] As noted, the Client Guide provides that any entity in which the Client merges or consolidates is considered the Client's successor under the Client Contract.  (12/11/06 RFC Client Guide § A214, Ex. H to Nesser Decl.)  The successor "is fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Client as if it were originally named a party to the Client Contract." (Id.)

40

under the express language of the APA and is therefore entitled to summary judgment.

(Def.'s Mem. Supp. Mot. for Summ. J. at 17 [Doc. No. 945].)  Although RFC has not

moved for summary judgment, it nonetheless argues that it is entitled to summary

judgment in its favor holding that Impac expressly assumed Pinnacle's relevant liabilities

to RFC.  (Pls.' Opp'n Mem. at 20 [Doc. No. 1059].)

     As noted, the APA is to be construed under California law. (APA § 9.11, Ex. 23 to

Sindberg Porter Aff.; See supra Part II.B.)  Under the APA, Impac agreed to acquire "all

of [Pinnacle Financial's] right, title and interest in and to the Assets."  (Id. § 2.1.)  The

term "Assets" includes "without limitation all of [Pinnacle Financial's] right, title and

interest in the following (except for Excluded Assets) to the extent used or held for use in

the Loan Origination Platform: . . . all Contracts and Contract Rights (to the extent

assumed under Section 2.6 . . . .)."  (Id. §§ 1.1; 1.1(e).)  The "Loan Origination Platform"

means the "assets used or held for use in connection with [Pinnacle Financial's] mortgage

. . . loan origination business."  (Id. at IMP000014.)

     Pointing to Schedule 3.7 to the APA, RFC argues that the inclusion of "GMAC-

RFC" as an investor with which Pinnacle Financial contracted under a Mortgage Loan

Purchase and Sale Agreement demonstrates that Impac expressly assumed the Client

Contract under the APA.  (Pls.' Opp'n Mem. at 20-21 [Doc. No. 1059].)  Impac, however,

contends that Section 3.15 of the APA merely required Pinnacle Financial to disclose to

Impac a list of its contracts; the mere inclusion of RFC on the list of investors/contracting

parties did not signify that Impac necessarily assumed the Client Contract.  (Def.'s Mem.

41

Supp. Mot. for Summ. J. at 18 [Doc. No. 945].)  The Court agrees that the language in Section 3.15 and the related schedules, by themselves, are not determinative of whether Impac assumed the Client Contract.[4]

        The Court disagrees, however, with Impac's secondary argument, i.e., that even assuming the Client Contract transferred to Pinnacle Financial, because no consent was sought or obtained to transfer the Client Contract to Impac, the contract could not have transferred to Impac.  (Id. at 18, n.8.)  While that is a plausible interpretation, a more plausible interpretation is that no consent was required for the contract to transfer to Impac.  The APA provides that Pinnacle Financial is not required to obtain the consent of any third party, except where the failure to do so "would not . . . reasonably be expected to have a material adverse effect on the ability of [Pinnacle Financial] and the Stockholders to perform their obligations under [the APA] or consummate the transactions contemplated [by the APA]."

        The APA makes clear that Impac acquired Pinnacle Financial's "Assets" (APA, § 2.1, Ex. 23 to Sindberg Porter Aff.), and that "Assets" include all of Pinnacle Financial's right, title, and interest in "all Contracts and Contract Rights (to the extent assumed under

---

        [4]  But, as noted earlier, the inclusion of the Client Contract in Schedule 3.7 is probative of whether Pinnacle Financial assumed the Client Contract in the Pinnacle reorganization process.  In the APA, Pinnacle Financial would not have listed GMAC-RFC as an investor with which it contracted for Mortgage Loan Purchase and Sale Agreements if Pinnacle Financial had not acquired the Client Contract in the Reorganization Agreement.  (Sched. 3.15 at IMP000272, Ex. 26 to Sindberg Porter Aff.; Sched. 3.7 at IMP000204, Ex. 25 to Sindberg Porter Aff.)

Section 2.6)." (Id. § 1.1 at IMP000011.)  "Contracts" means "any written contract." (Id. at IMP000012.)  Under these definitions, the Client Contract is a written contract and is therefore an "Asset," unless it is not assumed under Section 2.6.  The Excluded Assets are those "assets listed on Schedule E." (Id. at IMP000013.)  The Client Contract does not appear as an Excluded Asset on Schedule E.  (Schedule E, Ex. 24 to Sindberg Porter Aff.)

Section 2.6 addresses Impac's assumption of certain liabilities, stating that Impac will assume "those Liabilities arising in connection with the ownership and use of the Loan Origination Platform and the Assets, other than Excluded Liabilities, that arise after the Closing[.]" (APA, § 2.6(d), Ex. 23 to Sindberg Porter Aff.) (emphasis added).  The "Loan Origination Platform" consists of "the assets used or held for use in connection with [Pinnacle Financial's] mortgage and construction loan origination business." (Id. § 1.1 at IMP000014.)  The liabilities at issue here arose in connection with the ownership and use of the Loan Origination Platform and the Assets, as the Client Contract is an "Asset." (See id. § 1.1(e).)  For the same reasons discussed earlier in connection with the Reorganization Agreement, the liabilities for indemnification arose after the May 21, 2007 closing date of the APA.  And because of RFC's continuing obligation theory for its breach of contract claim, the arising date of this claim is not yet determinable, as discussed earlier in connection with the Pinnacle Direct-Pinnacle Financial Reorganization Agreement.

Impac, however, argues that the Client Contract falls under the APA's Excluded Liabilities.  (Def.'s Mem. Supp. Mot. for Summ. J. at 19-20 [Doc. No. 945].)  Section 2.7

43

identifies the excluded liabilities, in pertinent part, as follows:

> 2.7 Excluded Liabilities.  Notwithstanding any other provision of this Agreement, except for the Assumed Liabilities specified in Section 2.6, [Impac] shall not assume, or otherwise be responsible for, any Liabilities of [Pinnacle Financial], whether liquidated or unliquidated, or known or unknown, whether arising out of occurrences <u>prior to, at or after </u>the date hereof ("Excluded Liabilities"), which Excluded Liabilities include, without limitation:
>
> * * *
>
> (c) Any Liability of [Pinnacle Financial] arising out of or related to any Action against [Pinnacle Financial] or any Action which adversely affects the Assets or the Loan Origination Platform and which shall have been asserted <u>on or prior to</u> the Closing Date or to the extent the basis of which shall have arisen <u>on or prior to</u> the Closing Date;
>
> * * *
>
> (f) Any Liability related to or arising from the Loan Origination Platform and its operation <u>prior to</u> the Closing Date[.]

(APA § 2.7, Ex. 23 to Sindberg Porter Aff.) (emphasis added).  An "Action" is defined as "any claim, action, suit, . . . as to which written notice has been provided to the applicable party."  (<u>Id.</u> § 1.1 at IMP000010.)

The Court finds that the exclusions in Section 2.7(c) of the APA do not apply to the Client Contract.  RFC's claims are not an "Action" that had been noticed prior to the May 21, 2007 closing date.  Moreover, its claims are asserted against Impac, not Pinnacle Financial.  Third, RFC's claims, filed in December 2013, do not "adversely affect the Assets or the Loan Origination Platform" because, as RFC notes, they have not been in existence for several years.

Impac also argues that the language in Section 2.7(f) excludes liability here. (Def.'s Mem. Supp. Mot. for Summ. J. at 19 [Doc. No. 945].)  Section 2.7(f), however,

44

makes no mention of "Assets," i.e., the Client Contract, unlike Sections 2.6(d) and 2.7(c).

Rather, it excludes liability "related to or arising from the Loan Origination Platform and

its operation prior to the Closing Date." (APA § 2.7(f), Ex. 23 to Sindberg Porter Aff.)

While the Loan Origination Platform is defined as "the assets used or held for use in

connection with the Seller's mortgage and construction loan origination business," (id. §

1.1 at IMP000014), "assets" used in this context, with a lowercase "a," are not the same

as "Assets," as defined with an uppercase "A."  The Court agrees with RFC that the

drafters of the APA knew how to reference the Client Contract as an Asset in Sections

2.6(d) and 2.7(c).  Accordingly, the exclusion of liability in Section 2.7(f) for "[a]ny

Liability related to or arising from the Loan Origination Platform and its operation prior

to the Closing Date" does not encompass the Assets, including the Client Contract.

Moreover, as discussed, the liability at issue here arose after the May 21, 2007 closing

date, as to RFC's indemnification claim, and it is not yet certain when the liability arose

as to RFC's breach of contract claim.  Accordingly, Impac is not entitled to summary

judgment based on the language of the APA.

   Because the Court's ruling is based on the contractual language of the

Reorganization Agreement and the APA, the Court does not address Plaintiffs' alternative

common law theories of successor liability.  As to whether summary judgment may be

entered in RFC's favor on successor liability, no motion is pending before the Court.

Moreover, any such motion would be premature because fact issues preclude summary

judgment as to RFC's breach of contract claim.

**D.      ORDER TO SHOW CAUSE**

Various submissions related to this motion were filed under seal.  If the parties

believe that any portion of this Order warrants redaction, the Court orders the parties to

show cause ten days from the date of this Order, stating why the Order should not be

unsealed and specifying any portion warranting redaction.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Impac Funding Corporation's Motion for Summary Judgment [Doc.

No. 943] is **DENIED**; and

2.      The parties are ordered to show cause ten days from the date of this Order

why the Order should not be unsealed, and to specify any portion

warranting redaction.


Dated: April 27, 2016

                                        s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Court Judge