| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Litigation, | Case No. 13-cv-3451 (SRN/HB) |
| *This document relates to:* | |
| Residential Funding Company, LLC, and ResCAP Liquidating Trust v. InterLinc Mortgage Services, LLC, in its own capacity, and as successor to Hometown Mortgage Services, Inc., Douglas Rohm, and Edward Danielczyk, Case No. 16-cv-3024 (SRN/HB) | **MEMORANDUM OPINION AND ORDER** |

Peter E. Calamari, Isaac Nesser, David Elsberg, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010, Anthony P. Alden, Johanna Ong, Matthew Scheck, Quinn Emanuel Urquhart & Sullivan, LLP, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017, Jeffrey A. Lipps, Jennifer A.L. Battle, Carpenter Lipps & Leland LLP, 280 North High Street, Suite 1300, Columbus, Ohio 43215, Donald G. Heeman, and Jessica J. Nelson, Felhaber, Larson, Fenlon & Vogt P.A., 220 South Sixth Street, Suite 2200, Minneapolis, Minnesota 55402, for Plaintiffs.

Mark G. Schroeder, Jason R. Asmus, Daniel J. Supalla, Michael M. Sawers, Briggs & Morgan, P.A., 80 South Eighth Street, Suite 2200, Minneapolis, Minnesota 55402, Steven M. Pincus, Brooke D. Anthony, and Steven C. Kerbaugh, Anthony Ostlund Baer & Louwagie, P.A., 90 South Seventh Street, Suite 3600, Minneapolis, Minnesota 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter comes before the Court on Defendants' separate motions to dismiss the Complaint. Defendant InterLinc Mortgage Services, LLC ("InterLinc"), a Texas company, moves to dismiss for lack of personal jurisdiction, improper venue, and failure

to state a claim upon which relief can be granted. (*See generally* InterLinc Mot. to Dismiss [Doc. No. 1853].) *See* Fed. R. Civ. P. 12(b)(2), (3), and (6). Defendants Douglas Rohm and Edward Danielczyk (the "Individual Defendants"), both of Birmingham, Alabama, move to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. In the alternative, they urge the Court to transfer this action to the Northern District of Alabama, pursuant to 28 U.S.C. §§ 1404 or 1406. (*See generally* Individual Defs.' Mot. to Dismiss [Doc. No. 1846].)

For the reasons set forth below, the Court finds that it has jurisdiction over all defendants, that venue is proper in this district, and that transfer is unwarranted. Accordingly, Defendants' motions are denied as to those issues. However, the Court agrees that as the Complaint is currently pleaded, Plaintiffs Residential Funding Company, LLC and ResCap Liquidating Trust (collectively, "RFC") have failed to properly state claims for breach of contract and indemnification against InterLinc, and constructive fraudulent transfer against all defendants. In keeping with that determination, Defendants' Rule 12(b)(6) motions are granted in part, and denied in part, although RFC will be given the opportunity to replead if it so chooses.

## II. BACKGROUND

The general facts pertaining to this consolidated matter are set forth in previous rulings from this court, and are incorporated herein by reference. *See, e.g.*, *Residential Funding Co. v. Impac Funding Corp.*, No. 13-cv-3506 (SRN/HB), 2016 WL 6953484, at *1-2 (D. Minn. Apr. 27, 2016); *Residential Funding Co. v. Academy Mortg. Corp.*, 59 F. Supp. 3d 935, 938-41 (D. Minn. 2014); *Residential Funding Co. v. Terrace Mortg. Co.*,

850 F. Supp. 2d 961, 962-64 (D. Minn. 2012). Stated briefly, prior to its bankruptcy in May 2012, RFC was in the business of acquiring and securitizing residential mortgage loans. (*See* Compl. ¶ 15 [Case No. 13-cv-3024, Doc. No. 1].) Its business model was built on acquiring loans from "correspondent lenders," and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers. (*Id.* ¶ 16.) To ensure loan-quality, RFC required its correspondent lenders to abide by certain representation and warranties regarding the loans. (*Id.* ¶ 18.) Among other things, RFC contends that lenders were responsible for collecting information from the borrowers, verifying the accuracy of that information, and properly underwriting the loans. (*Id.* ¶ 30.)

One of the correspondent lenders with whom RFC did business was Hometown Mortgage Services, Inc. ("Hometown"), an Alabama corporation. (*Id.* ¶¶ 9, 18.) At all times relevant to this suit, Individual Defendants were Hometown's sole shareholders, officers, and directors. (*Id.* ¶¶ 1, 88.) According to RFC, Hometown sold over 2,000 mortgages to it over the course of the parties' relationship, many of which it now alleges were defective and violated Hometown's representations and warranties. (*Id.* ¶ 5.) RFC alleges that these defects—compounded with those of other lenders—contributed materially to its Chapter 11 bankruptcy in May 2012. (*Id.* ¶ 20.) Due to Hometown's allegedly faulty origination, underwriting, and quality control practices, RFC commenced suit against it in this Court in December 2013, asserting claims for indemnification and breach of contract. *See Residential Funding Co. v. Hometown Mortg. Servs., Inc.*, No.

13-cv-3509 (SRN/HB) (D. Minn. 2013) (the "Hometown Action"). All told, RFC claims to have suffered $44 million in damages as a result of Hometown's malfeasance.

A few months after RFC filed its complaint in the Hometown Action, Hometown entered into an Asset Purchase Agreement (the "APA") with InterLinc. (*Id.* ¶¶ 90-92.) Ostensibly, InterLinc agreed to purchase only Hometown's office furniture and other equipment, paying the "Net Book Value" of those assets, which was $124,806.70. (*See* Compl., Ex. G.) It also agreed to the assignment of certain leases applicable to Hometown's offices. (*See id.*) These were the only liabilities InterLinc expressly assumed, and the APA expressly disclaimed all other liabilities. (*See id.* at §§ 1.01, 1.04.) Of note, however, the APA was subject to a condition precedent mandating that certain key employees of Hometown, including Individual Defendants, "must have accepted an offer of employment with [InterLinc] prior to the Closing of the employee's branch Transaction." (*Id.* at §5.04.)

RFC alleges that the purpose of the InterLinc-Hometown transaction was clear— after the APA was executed on March 3, 2014, InterLinc continued to operate Hometown's business from the former Hometown office, with former Hometown employees, just under the InterLinc name. (*See* Pls.' Omnibus Mem. in Opp'n to Defs.' Mots. to Dismiss [Doc. No. 1961] ("Pls.' Mem.") at 7-8.) To support its assertion that InterLinc essentially subsumed Hometown, RFC alleges that the new InterLinc Alabama division holds itself out to the public as "formerly" or "previously known" as Hometown. (*See* Compl. ¶ 91.) RFC also highlights various press releases issued by InterLinc and Hometown trumpeting the seeming merger of the two companies. (*See* Scheck Decl.

[Doc. No. 1962], Exs. B, E.)  In RFC's view, InterLinc essentially acquired a fully-functioning mortgage company—including its equipment, office, employees, good will and ongoing business—for only $124,806.70.  (*See* Compl. ¶¶ 89-95.)  In turn, RFC contends that the Individual Defendants secured employment with InterLinc and continued to manage the new Alabama office, essentially as if nothing had happened. (*See id.* ¶¶ 89, 91.)

On September 1, 2015—approximately eighteen months after the APA was executed—Hometown filed for Chapter 7 bankruptcy.  (*See* Scheck Decl., Ex. A.)  The bankruptcy petition showed Hometown to be insolvent, with total listed assets of $140,930.93, and total liabilities of $285,999.39.  (*See id.* at 5.)  Hometown's only assets were a checking account containing $135, two defaulted residential mortgage loans, various files held in storage, and one computer server valued at $200.  (*See id.* at 8-10.) In an attempt to hide from Hometown's creditor the fact that "hometown's business was continuing under the InterLinc name," RFC alleges that the Individual Defendants "caused Hometown's bankruptcy petition to disclose only that InterLinc had paid $124,806.70 for Hometown's 'office furniture and equipment.'  Hometown did not disclose that InterLinc . . . was continuing Hometown's business under a new name." (Compl. ¶ 95.)

RFC filed a proof of claim in Hometown's Chapter 7 case on December 23, 2015, based on the Hometown Action and asserted damages arising out of Hometown's sale to RFC of defective mortgages.  (*Id.* ¶ 99.)  In lieu of the *de minimis* distribution to which it would otherwise have been entitled, RFC negotiated an agreement with the trustee

allowing RFC's full claim against Hometown in the amount of $44 million, and assigning any causes of action available to the bankruptcy estate to RFC. (Id. ¶ 100.) The bankruptcy court approved the agreement between RFC and the trustee, and the Hometown estate was closed on October 18, 2016—a little more than a month after the present Complaint was filed. (Id. ¶ 101; Pls.' Mem. at 10.)

The Complaint in this suit raises four causes of action—two against InterLinc solely, and two against all defendants generally. In Count I, RFC alleges that InterLinc is liable for Hometown's breach of contract regarding the defective mortgages because InterLinc is a "mere continuation of, or de facto merged with," Hometown. Accordingly RFC contends that InterLinc is subject to successor liability under applicable statutory or common law. Count II states a claim for indemnification against InterLinc, again on a theory of successor liability. Finally, Counts III and IV state claims for constructive fraudulent transfer and actual fraudulent transfer against InterLinc and the Individual Defendants, pursuant to both state and federal law.

Defendants have now moved to dismiss on several grounds. First, both the Individual Defendants and InterLinc contend that they have no contacts with Minnesota, and thus that this Court cannot assert personal jurisdiction over them. Second, InterLinc asserts a motion to dismiss for improper venue. Third, InterLinc argues that Counts I and II of the Complaint should be dismissed for failure to state a claim because it argues that it is not subject to successor liability. Fourth, all defendants argue that the fraudulent transfer claims should be dismissed for failure to state a claim. Finally, the Individual Defendants argue that, in the alternative, this matter should be transferred to the Northern

District of Alabama, pursuant to 28 U.S.C. §§ 1404 or 1406.

In addressing these issues, the Court will attempt to proceed in order. For reasons that will become clear, however, the personal jurisdiction analysis necessarily encompasses elements of the successor liability and fraudulent transfer analyses, as well.

## III.  DISCUSSION

### A.  Personal Jurisdiction

#### 1.  Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must make a prima facie showing that the court's exercise of jurisdiction is proper. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). The plaintiff may meet this burden by pleading facts sufficient to "support a reasonable inference that the defendant[] can be subjected to jurisdiction within the [forum] state." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004). This inference is subject to testing not solely on the pleadings alone, however, but "by the affidavits and exhibits presented with the motions and in opposition thereto." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citation omitted). Where—as is the case here—the Court has not conducted an evidentiary hearing, it must view the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in that party's favor. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011). However, "the party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Fastpath*, 760 F.3f at 820.

In order to make a determination that an exercise of personal jurisdiction over a defendant is proper, a federal court sitting in diversity must first determine that certain state and constitutional prerequisites have been met. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995). First, the court must consider whether the requirements of Minnesota's long-arm statute have been satisfied. Second, the court must ask whether exercising jurisdiction over the defendant would comport with the Due Process Clause of the Fourteenth Amendment. In Minnesota, however, these two inquiries combine into a single due process examination, because the state long-arm statute has been held to be co-extensive with the constitutional bounds of jurisdiction. See *Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.*, 950 F.2d 526, 528 (8th Cir. 1991) (citing *Rostad v. On-Deck, Inc.*, 372 N.W.2d 717, 719 (Minn. 1985)).

The Due Process Clause permits a court to exercise personal jurisdiction over a non-resident defendant when that defendant has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Underlying this standard is the conviction that "those who live or operate primarily outside a State have a . . . right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011). Thus, the Supreme Court has made clear that there must be some showing that the defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The defendant himself must create these

connections—unilateral activity by the plaintiff within the forum, even if directly related to the defendant, is not sufficient to satisfy this requirement. *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Importantly for purposes of this case, however, the Supreme Court has also stated that a plaintiff may establish that personal jurisdiction is appropriate even over defendants who have never set foot in the forum state so long as their intentional, out-of-state acts were "expressly aimed" at the forum. *Calder v. Jones*, 465 U.S. 783 (1984). Thus, if the non-resident defendant's acts were performed "for the very purpose of having their consequences felt in the forum state," there may be personal jurisdiction over that defendant. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390-91 (8th Cir. 1991).

### 2. InterLinc

As an initial matter, it is plain that if this Court has personal jurisdiction over InterLinc, it must be in the form of specific, rather than general, jurisdiction. As the Eighth Circuit has explained "general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose, while specific jurisdiction requires that the cause of action arise from or relate to a defendant's actions within the forum state." *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010) (internal quotation and citation omitted). In order to assert general jurisdiction over a foreign corporation, a court must first determine that the corporation's affiliations with the forum are so "continuous and systematic" as to "render [it] essentially at home in the forum State." *Goodyear Dunlop*

*Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Here, the Complaint raises no facts suggestive of any direct contacts between InterLinc and Minnesota—let alone "continuous and systematic" contacts.

In contrast to InterLinc's relative dearth of contacts with Minnesota, the Complaint makes clear that Hometown is and would be subject to personal jurisdiction in this state.  Most notably, for purposes of this litigation, Hometown is subject to a forum selection clause contained in the Client Contract between it and RFC that provides as follows:

> Each of the parties *irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota*, over any action, suit or proceeding to enforce or defend any right under this Contract or otherwise arising from any loan sale or servicing relationship existing in connection with this Contract . . . .  Each of the parties irrevocably waives the defense of an inconvenient forum to the maintenance of any such action or proceeding and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in any such forum . . . .  Each of the parties further agrees not to institute any legal action or proceedings against the other party or any director, officer, employee, attorney, agent, or property of the other party, arising out of or relating to this Contract in any court other than as hereinabove specified in this paragraph 9.

(Compl., Ex. A § 9 (emphasis added).)  It is well established that such a forum selection clause, obtained through free negotiation between the parties and not manifestly unjust, constitutes an enforceable waiver of the right to object to the exercise of personal jurisdiction in the chosen forum.  *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *St. Paul Fire and Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir. 2001) ("Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection

clause.") (citation omitted).

Here, no party disputes that the forum selection clause is valid and enforceable as to Hometown. Where they disagree, however, is whether InterLinc may also be bound—by virtue of its alleged absorption of Hometown—to the terms of that clause. RFC contends that because InterLinc is the legal successor to Hometown's liabilities under the Client Contract, it is also subject to the contract's personal jurisdiction provisions. *See, e.g.*, *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) ("[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.") (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002); *Massi v. Holden*, No. 09-cv-1821 (MJD/JJG), 2011 WL 6181258, at *5 (D. Minn. Dec. 13, 2011) ("[P]ersonal jurisdiction over a corporate successor may be based on its predecessor's contacts with the forum . . . .") (citation omitted). In contrast, while InterLinc does not dispute that a successor may be subjected to personal jurisdiction based on a predecessor's actions, it contends that such reasoning does not apply to it because it is not Hometown's successor.

In solving this dispute, an initial step confronting the Court is the determination of which state's law to apply to the successor liability analysis. In its briefing on the matter, InterLinc argues that the Court should apply either forum law—Minnesota's—or the law provided for by the choice-of-law provision in the APA, which calls for the application of

Texas law. (*See* InterLinc Mem. in Supp. of Mot. to Dismiss [Doc. No. 1855] ("InterLinc Mem. in Supp.") at 10-14.) In contrast, RFC posits that either Minnesota or Alabama law should be applied to this case, although it advocates most strenuously for Alabama law. (*See* Pls.' Mem. at 12-14.)

Although the race is thus seemingly among three states, the Court notes at the outset that Texas is not really a proper contender. In essence, InterLinc's argument in favor of the application of Texas law is that InterLinc and Hometown agreed that, in disputes relating to the interpretation or application of the APA, that state's laws should be applied. (*See* InterLinc Mem. in Supp. at 13-14.) But that logic is flawed as applied to the facts of this case. First, RFC does not argue that InterLinc's successor liability is based on the terms of the APA. Indeed, RFC contends that *despite* InterLinc's best efforts to structure its acquisition of Hometown as merely a limited asset purchase, its actions gave rise to *implied* successor liability under statutory or common law. Thus, interpretation of the APA is not relevant to this dispute. Second, it is well settled that parties to a contract cannot control a non-party's rights when those rights are based on implied—rather than express or contractual—assumption of liability. *See, e.g.*, *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465-67 (3d Cir. 2006) (Alito, J.) (rejecting argument that APA's choice-of-law provision should govern third party's implied successor liability claim); *Matson Logistics, LLC v. Smiens*, No. 12-400 (ADM/JJK), 2012 WL 2005607, at *7 (D. Minn. June 5, 2012) ("Choice of law provisions do not govern successor liability premised upon implied assumption of liability."); *Knott v. Amfec, Inc.*, No. 09-cv-1098 (PJS/AJB), 2010 WL 1528393, at *4 (D. Minn. Apr. 15,

2010); *T.H.S. Northstar Assocs. v. W.R. Grace & Co.*, 840 F. Supp. 676, 655-78 (D. Minn. 1993). Thus, because RFC's successor liability argument hinges not on "interpretation of the provisions of the contract," but on "their real-world effect," *Berg*, 435 F.3d at 467, the APA's choice-of-law provision is inapplicable to this Court's choice of law analysis. Because the parties present no other cogent reason why Texas law should govern this dispute, the Court need not consider that state's law further here.

Whether Alabama or Minnesota law should apply seemingly presents a much trickier question. On the surface, the laws of these states differ greatly as to successor liability: Alabama continues to apply the four traditional common law bases of successor liability, while Minnesota has limited successor liability by statute to only two narrow instances. *See Matrix-Churchill v. Springsteen*, 461 So. 2d 782, 786 (Ala. 1984) (listing common law forms of successor liability); Minn. Stat. § 302A.661, subd. 4. Thus, applying Alabama law would allow RFC to pursue successor liability in four ways: (1) where there has been an express agreement by the transferee to assume the obligations of the transferor; (2) where a de facto merger or consolidation between the two companies has occurred; (3) where the transferee company is a mere continuation of the transferor; and (4) where the transaction is a fraudulent attempt to escape liability. *Matrix-Churchill*, 461 So. 2d at 786. In contrast, Minnesota now permits successor liability only where there has been a contractual assumption of liability, or where liability is otherwise permitted by statute. *See Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 381 (D. Minn. 2016). The latter situation has been held to encompass fraudulent transfers under

the Minnesota Uniform Fraudulent Transfer Act ("MUFTA").[1]  *See Matson Logistics, LLC*, 2012 WL 2005607, at *9; *Schwartz v. Virtucom, Inc.*, No. A08-1049, 2009 WL 1311816, at *2 n.2 (Minn. Ct. App. May 12, 2009).

Thus, nominally, Alabama offers three bases for finding successor liability in the present case, while Minnesota only offers one—the fraudulent transfer exception.[2]  In practice however, this substantial difference in the scope of the two states' laws is illusory as applied to the present case.  This is so because RFC cannot plead a prima facie case of de facto merger or mere continuation under Alabama law for the simple reason that an essential element of both is that the predecessor corporation have dissolved.  *See Asher v. KCS Int'l, Inc.*, 659 So. 2d 598, 599 (Ala. 1995) (requiring that a mere continuation plaintiff plead each of four elements, including that the "seller corporation ceased ordinary business operations, liquidated, and *dissolved* soon after distribution of consideration received from the buying corporation") (emphasis added); *In re 331 Partners, LLC*, No. 11-0049, 2011 WL 3440099, at *5 (S.D. Ala. Aug. 8, 2011) (listing one of the elements of de facto merger as "a dissolution of the selling corporation") (citing *Matrix-Churchill*, 461 So. 2d at 787).  Here, it is undisputed that although Hometown has ceased business operations and liquidated, it has not dissolved.  (*See*

---

[1]  Although the MUFTA has been amended to the Minnesota Uniform Voidable Transactions Act, the amended statute does not apply to this litigation because the effective date and application of the amendments do not apply to transfers made before August 1, 2015.  *See Landmark Cmty. Bank, N.A. v. Klingelhutz*, 874 N.W.2d 446, 448 n.1 (Minn. Ct. App. 2016).  All references to Chapter 513 of the Minnesota Statutes in this Opinion are accordingly to the text of the pre-2015 version of that chapter.

[2]  As has been noted, RFC does not assert that InterLinc contractually assumed Hometown's liabilities as they relate to RFC.

Schroeder Decl. [Doc. No. 2020], Ex. 4.)

Thus, even if the Court were to apply Alabama law to the facts of this case, RFC would still be limited to the same basis of successor liability as in Minnesota—fraudulent transfer. Since the laws of both states would produce the same result, there is no real conflict of laws, and the Court can apply forum law. *See Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 30 (Minn. 1996); *Davis by Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. Ct. App. 1987).

The jurisdictional question now becomes whether RFC has adequately pleaded fraudulent transfer—the sole basis for successor liability available to it. Because RFC alleges both constructive and actual fraudulent transfer, the Court will separately assess the adequacy of both below.

### a. Constructive Fraudulent Transfer

Under Minnesota law, a present creditor can plead constructive fraudulent transfer in two ways. First, under Minn. Stat. § 513.44(a)(2), the plaintiff can plead that the debtor made the allegedly fraudulent transfer without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: "(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" or "(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Second, under Minn. Stat. § 513.45(a), a transfer is constructively fraudulent if "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for

the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Although the two constructive fraudulent transfer statutes thus contain slightly different elements, the Minnesota Supreme Court has summarized their requirements as follows: "a claim for constructive fraud turns on a creditor's ability to show that the debtor made the transfer 'without receiving reasonably equivalent value,' and the debtor was insolvent, or the transfer made the debtor insolvent or unable to pay its debts." *Finn v. Alliance Bank*, 860 N.W.2d 638, 645 (Minn. 2015). Because constructive fraudulent transfer claims—unlike actual fraud—do not rely on proving intent or a materially false representation, the Court applies the more relaxed pleading standards of Federal Rule of Civil Procedure 8(a) in assessing the adequacy of RFC's allegations. *See In re Petters Co.*, 495 B.R. 887, 916 (Bankr. D. Minn. 2013) (holding that Rule 8(a), rather than Rule 9(b), applies to constructive fraudulent transfer claims, and collecting cases in support).

Comparing the elements of constructive fraudulent transfer to the allegations contained in the Complaint, the Court concludes, at the outset, that RFC has met its burden of pleading lack of reasonably equivalent value. Succinctly summarized, RFC contends that at the time the APA was executed, Hometown was a going concern with millions of dollars in annual revenue; that InterLinc continued to operate Hometown as a business after acquiring it; and that the only amount it paid for this viable business was the net book value of its office furniture. (*See* Compl. ¶¶ 89, 90, 93, 95-97, 120, 121.) The Court finds that RFC has sufficiently put InterLinc on notice that the basis of its claim is that InterLinc ostensibly paid for office furniture, but received much more than

that in return. *See, e.g.*, *In re Heilig-Meyers Co.*, 328 B.R. 471, 480 (E.D. Va. 2005) ("The bankruptcy court properly rejected any reliance on liquidation values in its analysis into the debtors' going concern value. The parties do not dispute that the debtors were operating as a going concern at the time of the transfers."). At this early stage, such allegations are sufficient to meet RFC's Rule 8(a) burden.

A bigger issue is whether RFC has properly pleaded that Hometown was insolvent (whether actually insolvent or equitably so), or that it was left with unreasonably small capital, at the time of the APA transaction. Turning first to the matter of actual insolvency, RFC argues that when InterLinc declared bankruptcy on September 1, 2015, it listed its assets as $140,930.93, and its liabilities as $286,999.39, making it plainly insolvent as a matter of law. *See, e.g.*, Minn. Stat. § 513.42(a) ("A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."). In RFC's view, because Hometown ceased business operations at the time of the InterLinc APA transaction on March 3, 2014, it is "more than plausible that Hometown was also insolvent on the date of the transaction . . . ."

On the face of the Complaint as currently pleaded, the Court is forced to disagree. While allegations of actual insolvency do not need to be supported by the sort of detailed facts expected to be uncovered at discovery, conclusory allegations alone are not sufficient to meet the plaintiff's Rule 8(a) burden. *See, e.g.*, *Stoebner*, 562 B.R. at 390, *In re THQ Inc.*, No. 2-13398 (MWF), 2016 WL 1599798, at *4 (Bankr. D. Del. Apr. 18, 2016); *In re Tropicana Entm't, LLC*, 520 B.R. 455, 472 (Bankr. D. Del. 2014). Here, the touchstone is whether the Complaint sufficiently demonstrates actual insolvency *at the*

*time of the allegedly fraudulent transfer.  Innovative Custom Brands, Inc. v. Minor*, No. 15-cv-2955 (AJN), 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016).  In the Court's view, relying on Hometown's balance sheet as of September 1, 2015 to establish its insolvency eighteen months earlier simply requires that too much related to the interim be taken on faith.  *Cf. id.* (finding allegations of insolvency in August 2014 insufficient to substantiate insolvency in late 2013 and early 2014).  Although RFC attempts to bolster its claim by arguing, *in its brief*, that at the time of the APA transaction Hometown was facing "tens of millions of dollars of liability in the Hometown Action," and that this liability "must be accounted for in determining Hometown's solvency," the Court observes that at no point *in the Complaint* does RFC plead the amount of this claim.  (*See* Pls.' Mem. at 21; Compl. ¶¶ 87, 100 (discussing Hometown Action and RFC's allowed claim in Hometown bankruptcy, but not alleging the amount of the claim).)  While such matters may be easy for RFC to fix in an amended complaint, the Court can only conclude that the current pleading is insufficient to establish actual insolvency as of March 3, 2014.  If RFC can cure its pleading, it will be permitted to do so.

As an alternative to pleading actual insolvency at the time of the APA, RFC can also establish constructive fraudulent transfer by pleading that, at the time of the transaction, Hometown was "engaged or was about to engage" in a business for which its remaining assets were "unreasonably small in relation to the business," or, that it intended to incur or reasonably should have believed it would incur debts beyond its ability to pay as they became due.  *See* Minn. Stat. § 513.44(a)(2).  Here, RFC contends that "because the InterLinc Transaction left Hometown with *de minimis* assets and no

business operations, by definition, Hometown did not have sufficient capital to satisfy its liabilities." (Pls.' Mem. at 23.) It also argues that, at the time of the transaction, "Hometown reasonably should have believed that it would incur more debts (including the substantial liability to Plaintiffs in the Hometown Action and the unsatisfied IRS tax claim) than it would be able to pay given that it was stripping itself of its entire business operations for nominal consideration." (*Id.* at 23-24.)

InterLinc responds that RFC's own allegations make clear that the APA transaction neither rendered Hometown equitably insolvent nor left it with unreasonably small capital for its ongoing business. In particular, InterLinc highlights the fact that the Complaint alleges that, upon execution of the APA, Hometown "ceased all business operations." *(See* InterLinc Reply Br. [Doc. No. 2019] at 12 (quoting Compl. ¶ 94.).) In InterLinc's view, because Hometown ceased all business operations, the business it was engaged in for purposes of Minn. Stat. § 514.44(a)(2) was, effectively, the business of doing nothing. (*See id.*) It argues that since Hometown was inactive after the APA, it is illogical to conclude that the transaction left Hometown with "unreasonably small" assets for that business. For similar reasons, InterLinc contends that it is essentially impossible to see how Hometown could have reasonably believed it might incur new debts beyond its ability to pay if it was no longer conducting operations. (*See id.*) Accordingly, InterLinc argues that RFC's own allegations render any claim of equitable insolvency or unreasonably small capital untenable.

Looking to the plain language of Minn. Stat. § 513.44(a)(2), the Court finds itself in agreement with InterLinc. The text of that statute is prospective in nature, rather than

retrospective. That is to say, what matters is the state of affairs going forward from the allegedly fraudulent transfer, not events occurring prior to that time. Thus, the question before the Court is whether, *after* the APA was executed, Hometown "was engaged or was about to engage in a business" for which its remaining assets were unreasonably small, or "intended to incur, or believed or reasonably should have believed" it would incur, debts beyond its ability to pay. *See* Minn. Stat. § 513.44(a)(2). Here, RFC presents no allegations to show how a company that had "ceased all business operations" at the time of the APA was left with insufficient assets or was equitably insolvent for its ongoing business. Although RFC argues that Hometown should have taken into account its substantial potential liability to RFC arising from the Hometown Action,[3] it fails to adequately plead facts suggesting that Hometown "believed or reasonably should have believed" that it would actually lose that suit and thus become liable for RFC's alleged damages. *Cf. Glenwood Farms, Inc. v. Ivey*, No. 03-cv-217-P-S, 2005 WL 2716497, at *11 (D. Me. Dec. 20, 2005) (holding, at summary judgment, that defendant's knowledge at time of fraudulent transfer that he had been sued and that "millions of dollars were at stake" was insufficient without more to establish that he should have believed that he would incur debts beyond his ability to pay). Without such allegations, the Court concludes that the Complaint insufficiently pleads equitable insolvency or unreasonably small capital.

---

[3] RFC also contends in its brief that Hometown should have known that it was facing substantial unsatisfied IRS tax claims. (*See* Pls.' Mem. at 23.) However, because this allegation is not contained in the Complaint itself, it cannot affect this Court's analysis of the adequacy of the pleadings.

### b.    Actual Fraudulent Transfer

Pursuant to Minn. Stat. § 513.44(a)(1), a transfer is fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."    While plaintiffs must plead actual fraudulent transfer claims with particularity, *see Bartholomew v. Avalon Capital Grp., Inc.*, 828 F. Supp. 2d 1019, 1027 (D. Minn. 2009), "[b]ecause the intent to defraud creditors is rarely susceptible of direct proof, courts continue to rely on 'badges of fraud' to determine whether a transfer is fraudulent."    *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014).    The MUFTA lays out eleven non-exclusive badges of fraud that may be considered in determining intent,[4] and the Eighth Circuit has indicated that "the presence of three badges of fraud is sufficient" to state a claim for actual fraudulent transfer.    *In re Sherman*, 67 F.3d 1349, 1357 (8th Cir. 1995).

Here, the Court finds, based on a fair reading of the Complaint, that RFC has adequately pleaded at least the following badges of fraud: (1) that before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (2)

---

[4] These eleven badges are: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.    Minn. Stat. § 513.44(b).

that the transfer was of substantially all the debtor's assets; and (3) that the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred. *See* Minn. Stat. § 513.44(b)(4), (5), (8). With regard to the first of these badges of fraud, the Complaint states that RFC had sued Hometown in 2013, and that Hometown responded shortly thereafter by transferring its assets to InterLinc. (*See* Compl. ¶¶ 87, 89, 126.) As to the second, RFC alleges that Hometown transferred not only its office equipment and its leases, but its employees and on-going business to InterLinc—in other words, substantially all of its assets. (*See id.* ¶¶ 89-94.) Indeed, RFC alleges that the only assets remaining to Hometown after the InterLinc transaction were "a single checking account containing $135; two accounts receivable in the form of one performing and one non-performing residential mortgage loan; mortgage files held in storage; and one computer server." (*Id.* ¶ 94.) Finally, for reasons previously discussed, the Complaint adequately alleges that Hometown failed to receive reasonably equivalent value for the transfer.

As RFC has successfully met its burden of alleging actual fraudulent transfer, it follows that RFC has also set forth a prima facie case of personal jurisdiction based on the fraudulent transfer exception to Minnesota's successor liability statute. *See Matson Logistics, LLC*, 2012 WL 2005607, at *9. Thus, InterLinc's Rule 12(b)(2) motion is denied.

### 3.    Individual Defendants

The Court now turns to consider Individual Defendants' related Rule 12(b)(2) motion. Like InterLinc, the Individual Defendants argue that this Court lacks personal

jurisdiction over them because they lack constitutionally-sufficient minimum contacts with the forum. (*See* Individual Defs.' Mem. in Supp. of Mot. to Dismiss [Doc. No. 1848] ("Individual Defs.' Mem. in Supp.") at 6-11.) In support of their argument, the Individual Defendants note that they do not own property in Minnesota, have had no recent contacts with anyone in Minnesota (aside from counsel for this litigation), and have not visited Minnesota since the 1980s, when both individuals visited for work purposes apparently unrelated to this case. (*See id.* at 3-4.) They further argue that the allegedly fraudulent transfer RFC contends the Individual Defendants orchestrated was based solely on conduct occurring in Alabama or Texas. (*See id.* at 9.) Although the Individual Defendants apparently concede that they engaged in dealings with a forum resident (RFC) in their capacities as officers of Hometown, and that these dealings in some respect underpin the present litigation, they argue that, under the "fiduciary shield doctrine," these corporate contacts cannot be imputed to the defendants in their individual capacities. (*See id.* at 10.) Accordingly, they contend that this Court must dismiss them from this case for lack of personal jurisdiction.

RFC counters these arguments on three main fronts. First, it argues that although the Individual Defendants may not have entered the forum, their actions in setting into motion a fraudulent transfer designed to prevent a Minnesota company from recovering debts due to it were expressly aimed at the forum. (*See* Pls.' Mem. at 28-29.) In this regard, RFC seeks to base personal jurisdiction on the "*Calder* effects test" set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. at 783. Second, RFC argues that the Individual Defendants misapply the fiduciary shield doctrine, which it contends is

inapplicable to this case. (*See id.* at 31.) Finally, RFC argues that even though the Individual Defendants are not technically signatories to the RFC-Hometown Client Contract (at least in their individual capacities), and thus are not directly bound by its forum selection clause, this Court may bind them to that clause because they are sufficiently "closely related" to the dispute that it is foreseeable that they would be so bound. (*See id.* at 32-33.)

In addressing these competing arguments, the Court will begin by considering what effect, if any, the fiduciary shield doctrine has on this Court's ability to exercise personal jurisdiction over the Individual Defendants. As generally stated, under that doctrine, "a corporate officer's actions made in an official capacity do not create personal jurisdiction over that officer as an individual but may be used to subject the corporation to jurisdiction." *Jacobs Trading, LLC v. Am. Eagle Trading Grp., LLC*, No. 16-cv-406 (SRN/KMM), 2016 WL 5508805, at *5 (D. Minn. Sept. 28, 2016) (quotation and citation omitted). Thus, as the Eighth Circuit has noted, "a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity." *Ark. Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 574 (8th Cir. 1986). In line with these statements, the Individual Defendants argue that any actions they may have taken in connection with the RFC-Hometown Client Contract, or the APA transaction, were taken in their capacities as corporate officers, and thus cannot be imputed to them personally.

In the context of this case, however, the Individual Defendants' argument stretches

the fiduciary shield doctrine outside its proper boundaries. While the scope of the doctrine is often painted with broad strokes, it is clear as a conceptual matter that merely cloaking oneself in the garb of a corporate officer cannot deflect the exercise of individual personal jurisdiction in all instances. As an obvious example, no one would seriously argue that a Minnesota court would be barred from exercising personal jurisdiction over a corporate officer in his individual capacity where that officer was in Minnesota solely to attend a business meeting, but hit a pedestrian while driving to that meeting. Of more immediate relevance to the facts of this case, several courts have recognized an exception to the fiduciary shield doctrine where the officer or director is alleged to have committed fraud or another intentional tort on behalf of the corporation, or to have acted for his or her own benefit instead of the corporation's. *See, e.g.*, *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) ("The [fiduciary] shield is withdrawn if the agent was acting also or instead on his own behalf—to 'serve personal interests.'"); *GEC US 1 LLC v. Frontier Renewables, LLC*, No. 16-cv-1276 (YGR), 2017 WL 605070, at *4-5 (N.D. Cal. Feb. 15, 2017) (holding that individual officer who proposed allegedly fraudulent transfer could not invoke fiduciary shield doctrine, because that doctrine does not apply where officer is a "primary participant" in the alleged wrongdoing); *S&M Representatives, Inc. v. Hrga*, No. 396-cv-1863G, 1997 WL 328004, at *8 (N.D. Tex. June 10, 1997) (holding that if "a corporate officer engages in tortious conduct in his corporate capacity in a forum, that conduct is sufficient to support a court's *in personam* jurisdiction over that officer in his individual capacity"); *see also Calder*, 465 U.S. at 790 (observing that defendants' "status as employees does not somehow

insulate them from jurisdiction"). The reasoning behind these exceptions is plain—a corporate officer who engages in intentional wrongdoing on behalf of the company is not acting as a true fiduciary, and thus is not entitled to the protections of a "fiduciary shield." *See Black's Law Dictionary* (10th ed. 2014), available at Westlaw BLACKS (defining a "fiduciary" as "[s]omeone who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, loyalty, due care, and disclosure").

Here, the allegations in the Complaint, taken as true, make plain that the Individual Defendants are alleged to have orchestrated a fraudulent transfer—not the sort of thing a "true fiduciary" would do—and to have done so in large part to secure benefits to themselves as individuals, such as continuing employment. In light of the generally recognized exception to the fiduciary shield doctrine for such conduct, the Court concludes that the doctrine does not stand in the way of its exercise of personal jurisdiction over Individual Defendants.

The Court thus turns to consider whether RFC has made a prima facie showing of jurisdiction based on the *Calder* effects test. To do so, it is helpful to begin with a brief recitation of the Supreme Court's holding in the test's namesake case. There, the Supreme Court upheld the assertion of jurisdiction over an editor and reporter of the *National Enquirer*, a Florida-based weekly newspaper with a nationwide circulation. *Calder*, 465 U.S. at 785. The plaintiff, an actress who resided in California, sued the defendants for libel based on an article they had produced. *Id.* Although the defendants had insignificant physical contacts with the forum, and no control over the marketing of

the publication in California, the Court concluded that a California court could nonetheless assert personal jurisdiction over them. In so holding, the Court primarily relied on the fact that defendants intentionally aimed their allegedly tortious actions at California, that they knew the article would have a "potentially devastating impact" on the plaintiff, and they knew that the brunt of the injury would be suffered in California, where the plaintiff resided and where the *National Enquirer* had its largest circulation. *Id.* at 789-90. Under these circumstances, the Court concluded that the defendants must "reasonably anticipate being haled into court" in California, despite taking their actions in Florida. *Id.* at 790.

The Eighth Circuit has addressed *Calder*'s scope and application at length in only a handful of cases, the most recent being *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010). In that case, the court announced that the *Calder* effects test was to be construed "narrowly," such that it applies only where the defendant's allegedly tortious acts "are performed for the very purpose of having their consequences felt in the forum state." 614 F.3d at 796-97 (citation omitted). Mere effects in the forum state, the court emphasized, are insufficient. *Id.* at 797. Further, the court stated that *Calder* effects alone were insufficient to establish jurisdiction—the defendant must still have other relevant contacts with the forum. *Id.* Applying this holding to the facts of the case before it, the *Johnson* court determined that allegedly defamatory language about plaintiff and plaintiff's business posted to a chatroom discussion board—even though the postings mentioned that plaintiff was a resident of Missouri—was insufficient to give rise to *Calder* jurisdiction. *Id.* at 796-97. In the court's view, there was insufficient basis upon which

to conclude that the postings were "performed for the very purpose of having their consequences felt in Missouri." *Id.* at 796 (internal quotation omitted).

In light of the Eighth Circuit's narrow interpretation of *Calder*, the Court concludes that the facts alleged in the Complaint provide an insufficient basis upon which to ground personal jurisdiction over the Individual Defendants. Although the Complaint certainly suggests that the Individual Defendants acted as they did to harm a Minnesota company, it is bereft of allegations from which the Court could conclude that the effects of those actions were meant to be felt in this forum *specifically*. Moreover, since *Calder* effects alone are insufficient to establish jurisdiction, RFC must allege other relevant contacts with the forum, which it has not done. Taken as a whole, its allegations suggest nothing more than the sort of "forum state effects" that the *Johnson* court made clear are insufficient to establish jurisdiction. *Id.* at 797. Accordingly, if jurisdiction exists over Individual Defendants, it must be found in some other form.

RFC, however, asserts an alternative and ultimately more compelling argument in favor of personal jurisdiction—that the Individual Defendants are bound by the forum selection clause in the RFC-Hometown Client Contract. As several courts, including this one, have recognized, a party need not have signed a contract to be bound by its forum selection clause so long as two primary prerequisites are met: (1) the non-signatory must be "closely related" to the dispute; and (2) it must be foreseeable that it will be bound by the contract. *See ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-cv-3580 (JNE/SRN), 2007 WL 892517, at *6 (D. Minn. Mar 21, 2007); *see also Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *C.H. Robinson Worldwide,*

*Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 533-36 (Minn. Ct. App. 2009).

Here, RFC argues that the Individual Defendants were the sole owners, officers, and directors of Hometown. They signed the RFC-Hometown Client Contract, containing the relevant forum selection clause, and were thus aware of its contents. Indeed, they must have been aware that it might be applied to them personally, as the clause covers, among other things, proceedings against "any party *or any director, officer, [or] . . . agent*" of a party. (Compl., Ex. A § 9 (emphasis added).)[5] Further, RFC alleges that the Individual Defendants were instrumental in orchestrating the fraudulent transfers designed to avoid Hometown's liability under the Client Contract. Faced with similar facts, several other courts have concluded that similar defendants can and should be bound by similar forum selection clauses. *See, e.g.*, *Comerica Bank v. Whitehall Specialties, Inc.*, 352 F. Supp. 2d 1077, 1082 n.6 (C.D. Cal. 2004) (holding individual defendants to a forum selection clause in the context of a fraudulent transfer, where "the individual defendants are closely related to the contractual relationship because they are the owners and directors of Whitehall, one of the parties to the contract"); *MainStreet Bank v. Nat'l Excavating Corp.*, No. 10-cv-2116-AW, 2010 WL 4295978, at *4 (D. Md. Oct. 28, 2010); *Citimortgage, Inc. v. First Preference Mortg. Corp.*, No. 4:06-cv-1296 (ERW), 2007 WL 2684272, at *6 (E.D. Mo. Sept. 7, 2007). The Court thus concludes that Individual Defendants are closely related to the relevant contract and this dispute,

---

[5] Although the Individual Defendants point out that they are not being sued in their capacities as directors or officers of Hometown, this language remains relevant because it puts them on notice of the possibility that they would be subject to jurisdiction in Minnesota.

and that it is sufficiently foreseeable that they would be bound by the relevant forum selection clause. Accordingly, the Court may exercise personal jurisdiction over Individual Defendants.

## B.    Failure to State a Claim: Fraudulent Transfer Claims

### 1.    InterLinc

Counts III and IV of the Complaint state claims for constructive and actual fraudulent transfer against all defendants, including InterLinc. The Court having addressed the adequacy of RFC's allegations relating to these two counts in its discussion of personal jurisdiction, it will not repeat the analysis here. As to InterLinc, the Court concludes that the Complaint properly states a claim for actual fraudulent transfer, but not, as currently pleaded, for constructive fraudulent transfer. InterLinc's motion to dismiss for failure to state a claim as to these counts is accordingly granted in part, and denied in part.[6]

### 2.    Individual Defendants

The general analysis of the sufficiency of RFC's allegations relating to actual and

_____

[6] In addition to state law claims for fraudulent transfer, RFC also asserts claims under the bankruptcy code. *See* 11 U.S.C. §§ 544, 548. The parties apparently concede that the analysis under § 548 is not materially different than that set forth under the MUFTA. (*See* InterLinc Mem. in Supp. at 31 ("Thus, § 548(a)(1) essentially mirrors the requirements for actual and constructive fraudulent transfer claims under state-law fraudulent transfer statutes.").) *See Zayed v. Allen*, No. 13-cv-1896 (SRN/SER), 2016 WL 1038277, at *7 n.6 (D. Minn. Mar. 10, 2015) (discussing the similarity between the MUFTA and § 548). Likewise, § 544(b)(1) allows a trustee to avoid a transfer if that transfer is "voidable under applicable law . . . ." Here, that applicable law includes the MUFTA. *See, e.g.*, *In re Goodspeed*, 535 B.R. 302, 307 (Bankr. D. Minn. 2015). Thus, the Court concludes that RFC has properly pleaded actual fraud claims under the bankruptcy code, as well.

constructive fraudulent transfer does not differ, in the context of the Individual

Defendants, from that discussed in relation to InterLinc. The parties dispute, however,

whether the Individual Defendants constitute "transferees" under the MUFTA. (*See*

Individual Defs.' Mem. in Supp. at 13-15.) Ultimately, RFC seeks to obviate the need for

this inquiry by arguing that the Individual Defendants are beneficiaries of the transfers

from Hometown to InterLinc, and thus subject to fraudulent transfer liability on that

basis. (*See* Pls.' Mem. at 26.) *See* Minn. Stat. § 513.48(b)(1) ("[T]he creditor may

recover judgment for the value of the asset transferred . . . against . . . the first transferee

of the asset or *the person for whose benefit the transfer was made . . . .*") (emphasis

added); 11 U.S.C. § 550(a)(1) (Plaintiff "may recover . . . the property transferred, or if

the court so orders, the value of such property, from . . . the initial transferee of such

transfer or *the entity for whose benefit such transfer was made*.") (emphasis added). On

this point, RFC notes—correctly—that the Complaint repeatedly alleges that the

Individual Defendants are beneficiaries of the fraudulent transfer. (*See, e.g.*, Compl. ¶¶

1, 6, 89, 97, 123, 128.)

In reply, the Individual Defendants do not directly attack the sufficiency of RFC's

pleading of beneficiary liability. Rather, they contend that the "for whose benefit"

language of the relevant statute was never meant to apply to individuals, such as

Individual Defendants, who merely received employment. (*See* Individual Defs.' Reply

Br. [Doc. No. 2021] at 8.) Relying on *In re Dreier LLP*, 452 B.R. 451 (Bankr. S.D.N.Y.

2011), Individual Defendants contend that the "quintessential example of an entity for

whose benefit a transfer is made is a guarantor." *See* 452 B.R. at 466. They further argue

that beneficiary liability will only lie where the benefit is "direct, ascertainable and quantifiable . . . ." *Id.* (citation omitted). In this instance, the Individual Defendants argue that the alleged benefit they obtained was too amorphous and dissimilar from the "quintessential example" provided by *Dreier* to allow for the imposition of liability.

Having reviewed *Dreier* and other cases provided by counsel, the Court disagrees. The court in *Dreier* did not purport to limit the application of beneficiary liability to instances involving guarantors—more pertinently, nothing in the relevant statutory language suggests any such limitation. *See* Minn. Stat. § 513.48(b)(1); 11 U.S.C. § 550(a)(1). Likewise, while the Court does not disagree that a properly pleaded benefit must be "direct, ascertainable, and quantifiable," it sees no reason to conclude that RFC has not properly alleged as much with regard to Individual Defendants. Although RFC has not yet quantified that benefit, the value of Individual Defendants' employment is hardly so nebulous so as to defeat the analytical powers of a properly instructed jury. The Court also notes that at least one court, faced with very similar facts, concluded that beneficiary liability was properly stated. *See In re B.S. Livingston & Co., Inc.*, 186 B.R. 841 (D.N.J. 1995). In that case, the principals of B.S. Livingston sold the core of their business to "Stemcor" in return for $800,000 for inventory, and "lucrative positions" of employment for key B.S. Livingston employees (including the principals themselves). *See* 186 B.R. at 847. On these facts, the district court had no trouble concluding that the B.S. Livingston principals were, at least in part, "entities for whose benefit the Stemcor transaction was consummated." *Id.* at 865 (quotation omitted). Accordingly, the court agreed that the bankruptcy court had correctly declined to dismiss counts against those

principals based on a theory of beneficiary liability.

Taken as a whole, the Court finds that RFC has properly alleged that the Individual Defendants are "person[s] for whose benefit the [fraudulent] transfer was made." Minn. Stat. § 513.48(b)(1). Accordingly, and for reasons previously stated, the Court concludes that Individual Defendants' Rule 12(b)(6) motion should be granted as to constructive fraudulent transfer, and denied as to actual fraudulent transfer.

### C. Failure to State a Claim: Successor Liability Claims

In addition to the fraudulent transfer claims, the Complaint raises two counts against InterLinc—for breach of contract and indemnification—that depend upon a finding of successor liability. As discussed previously, this Court has concluded that personal jurisdiction exists over InterLinc because RFC has properly made a prima facie showing of fraudulent transfer-based successor liability. Nonetheless, InterLinc argues that fraudulent transfer cannot, as the Complaint is currently pleaded, underpin RFC's successor liability-based claims. This is so because, while the Complaint as a whole presents a case that InterLinc is Hometown's successor based on fraudulent transfer, Counts I and II do not mention that basis for liability. Rather, they allege only that "InterLinc succeeded to Hometown's liabilities and obligations under the Agreement" because "InterLinc is a *mere continuation of, or de facto merged with*, Hometown . . . ." (*See* Compl. at ¶¶ 105, 114 (emphasis added).) In InterLinc's view, therefore, RFC has not properly stated claims based on successor liability.

The Court agrees. While an analysis of the whole Complaint reveals that RFC has alleged fraud-based successor liability, crucially, it fails to do so *in these counts*. Instead,

it alleges only successor liability based on mere continuation or de facto merger, which, for reasons previously discussed, are not viable under either Minnesota or Alabama law. Nonetheless, the Court will permit RFC to amend its complaint to so allege. Accordingly, InterLinc's motion to dismiss these counts is granted without prejudice to RFC to amend its complaint.

### D.    Improper Venue and Motion to Transfer

In addition to their other bases for dismissal, InterLinc and the Individual Defendants argue that venue in this District is improper, or at least inconvenient. Thus, InterLinc moves to dismiss the Complaint for improper venue, under 28 U.S.C. § 1391, and Individual Defendants contend that this matter should be transferred to the Northern District of Alabama, under either 28 U.S.C. 1404(a) or 28 U.S.C. § 1406.

Because the Court has already found that RFC has adequately pleaded that the Individual Defendants are bound by the terms of the forum selection clause contained in the RFC-Hometown Client Contract, the motion to transfer is easily resolved. As the Eighth Circuit has observed, "a forum selection clause may be viewed as a waiver of a defendant's right to object to venue." *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 727 (8th Cir. 2001). In the specific context of motions to transfer, "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 581 (2013) (citation omitted). The present matter is not one of those exceptional cases. Thus, the forum selection clause decisively outweighs any countervailing considerations in favor of transfer, and Individual Defendants' motion is

denied.

The Court likewise concludes that venue in this district is proper as to InterLinc. Pursuant to 28 U.S.C. § 1391(b)(2), suit may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." To survive a Rule 12(b)(3) motion, a plaintiff need only make a prima facie showing that venue is properly laid. *See Doula v. United Techs. Corp.*, 759 F. Supp. 1377 (D. Minn. 1991). That showing need not be that the chosen venue is the "best" possible option—merely that it is an appropriate one in accordance with statute. *See Setco. Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994).

Here, RFC has adequately alleged that a "substantial part" of the events underpinning this litigation are tied to Minnesota. Specifically, the Complaint plainly alleges that Hometown is liable for damages arising from breach of its obligations under a Minnesota contract, and that InterLinc—as Hometown's successor—has assumed both Hometown's contractual responsibilities and its potential liability to RFC. The Complaint further alleges that the APA between InterLinc and Hometown was executed with the express purpose of evading these obligations to a Minnesota company. Whether or not these facts make Minnesota the "best" forum, they are sufficient to discharge RFC's prima facie burden under 28 U.S.C. § 1391(b)(2). Accordingly, InterLinc's motion is denied.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant InterLinc Mortgage Services, LLC's Motion to Dismiss for Lack of Personal Jurisdiction [Doc. No. 1853] is **DENIED**;

2. Defendant InterLinc Mortgage Services, LLC's Motion to Dismiss for Failure to State a Claim [Doc. No. 1853] is **GRANTED in part** and **DENIED in part**;

3. Defendant InterLinc Mortgage Services, LLC's Motion to Dismiss for Improper Venue [Doc. No. 1853] is **DENIED**;

4. Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [Doc. No. 1846] is **DENIED**;

5. Individual Defendants' Motion to Dismiss for Failure to State a Claim [Doc. No. 1846] is **GRANTED in part** and **DENIED in part**;

6. Individual Defendants' Motion to Transfer Venue [Doc. No. 1846] is **DENIED**;

7. All dismissed claims are dismissed **WITHOUT PREJUDICE**; and

8. RFC must file an amended complaint, if it so chooses, within **THIRTY DAYS** of the date of this Order.


Dated: April 25, 2017                    s/Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States District Judge