## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Litigation | Court File No. 13-cv-3451 (SRN/HB) |

*This document relates to:*

Residential Funding Company, LLC, and
ResCap Liquidating Trust, v. InterLinc
Mortgage Services, LLC, in its own capacity,
and as successor to Hometown Mortgage
Services, Inc., Douglas Rohm, and Edward
Danielczyk, No. 16-cv-3024

**AMENDED COMPLAINT**

Plaintiffs Residential Funding Company, LLC ("RFC") and ResCap Liquidating Trust (the "Trust") (collectively, "Plaintiffs"), by and through their attorneys, for their Complaint against Douglas Rohm ("Rohm"), Edward Danielczyk ("Danielczyk," and together with Rohm, the "Individual Defendants"), and InterLinc Mortgage Services, LLC ("InterLinc," and together with the Individual Defendants, the "Defendants"), in its own capacity and as successor to Hometown Mortgage Services, Inc. ("Hometown"), allege as follows:

### NATURE OF ACTION

1.     In December 2013, Plaintiffs filed a Complaint in this Court against InterLinc's predecessor, Hometown.  The Complaint asserted claims for indemnity and breach of contract arising out of Hometown's sale of defective mortgages to RFC. Unbeknownst to Plaintiffs, just a few months after the Complaint was filed against it, Hometown's principals, Rohm and Danielczyk, transferred Hometown's assets to

InterLinc.  Rohm and Danielczyk continued running Hometown's mortgage loan business from the same location, but now under the InterLinc name.  Hometown ceased doing business altogether.  Plaintiffs were left with a lawsuit against Hometown, a now empty shell, while InterLinc and Rohm and Danielczyk enjoyed the benefits of the acquisition.  InterLinc enjoyed its acquisition of Hometown's business for nominal consideration, including its former assets, offices, and employees, while Rohm and Danielczyk enjoyed, among other consideration, lucrative employment with InterLinc.

2.      Plaintiffs, unaware of the transaction, engaged in the discovery process with Hometown over several months, during which Hometown produced approximately 7,600 pages of documents.  Plaintiffs filed a Second Amended Complaint on September 29, 2014.  Hometown moved to dismiss Count One of that Complaint, which the Court denied on July 28, 2015.

3.      Having failed to defeat Plaintiffs' claims at the motion to dismiss stage, Hometown filed for chapter 7 bankruptcy in the Bankruptcy Court for the Northern District of Alabama on September 1, 2015.  In its bankruptcy petition, Hometown (through Rohm and Danielczyk as its principals) disclosed only that in March 2014 it had transferred "office furniture and equipment" to InterLinc for $124,806.70.  Hometown did not disclose that InterLinc continued to run Hometown's mortgage business operations from Hometown's former offices, using Hometown's former employees, and run by Hometown's two principals, Rohm and Danielczyk.

4.      Hometown's bankruptcy estate was left with virtually nothing to pay its creditors, including Plaintiffs.

5.      As Hometown's successor, InterLinc is liable for Hometown's sale of defective mortgages to RFC.  The nature of that liability was set forth at length in Plaintiffs' prior Complaint against Hometown and is recounted below.  In brief, Hometown sold over 2,000 residential mortgage loans to RFC with a principal balance in excess of $200 million, in the course of which it made extensive representations and warranties to RFC concerning the characteristics and quality of the loans.  Those representations and warranties were false to an astonishing degree—a preliminary review indicated that approximately 95% of the loans had at least one breach.  By this lawsuit, the Trust asserts contract and indemnity claims seeking to recover RFC's resultant liabilities and losses.

6.      The sale of Hometown's assets to InterLinc was also a fraudulent transfer intended to avoid Hometown's liability to Plaintiffs, and for which Hometown did not receive reasonably equivalent value.  Hometown was insolvent at the time of the sale of assets to InterLinc or was rendered insolvent by that sale.  Accordingly, the sale should be avoided to the extent necessary to satisfy Plaintiffs' claims.  InterLinc was the recipient of the fraudulent transfer, and the Individual Defendants were individuals for whose benefit the transfer was made.  As such, InterLinc and the Individual Defendants are liable to Plaintiffs for the fraudulent transfer.

7.      Plaintiffs filed their initial Complaint in advance of a hearing in Hometown's bankruptcy case on the Hometown Trustee's final report.

## PARTIES

8.    The Trust is an express trust and a Delaware Statutory Trust.  When its chapter 11 case was commenced, RFC, formerly known as Residential Funding Corporation, was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  At the time it filed for bankruptcy, RFC was a wholly-owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly-owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly-owned subsidiary of GMAC Mortgage Group, LLC, a Delaware limited liability company, which in turn was a wholly-owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan.  Pursuant to ResCap's chapter 11 plan, on December 17, 2013, GMAC Mortgage Group LLC's  interest in RFC was cancelled and, in accordance with the Plan's terms, the Trust has now succeeded to all of RFC's rights and interests under RFC's agreement with Hometown.

9.    Non-party Hometown Mortgage Services, Inc., is an Alabama corporation with its principal place of business at 1014 Oak Meadows Road, Birmingham, Alabama 35242.  On or about September 1, 2015, Hometown filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama Southern Division.

10.    Defendant InterLinc is a Texas limited liability company with its principal place of business at 10613 W. Sam Houston Parkway North, Suite 200, Houston, Texas

77064.  On information and belief, InterLinc's sole member is James Van Steenhouse, a citizen of Texas.  On further information and belief, in March 2014, InterLinc purchased the majority of Hometown's assets under a non-public asset purchase agreement.  InterLinc's press release and contemporaneous news reports announcing the transaction describe Hometown as having been acquired by InterLinc and indicate it would be operated under the InterLinc name with combined resources and employees, and highly projected growth.  InterLinc is liable to Plaintiffs as, among other things, a successor-in-interest to Hometown.

11.     Defendant Douglas Rohm is an individual who, on information and belief, is and has been a resident of Birmingham, Alabama at all times relevant to this Complaint.

12.     Defendant Edward Danielczyk is an individual who, on information and belief, is and has been a resident of Birmingham, Alabama at all times relevant to this Complaint.

### **JURISDICTION AND VENUE**

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to RFC's bankruptcy proceedings and Hometown's bankruptcy proceedings.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

14.     Venue is proper in this Court because the cause of action arose, in part, in Minnesota; the agreements at issue were to be performed in part or entirely in Minnesota;

and RFC and InterLinc's predecessor, Hometown, contractually agreed that Minnesota is an appropriate venue.

## FACTUAL BACKGROUND

### Introduction

15.     RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

16.     RFC's business model was built on acquiring loans from "correspondent lenders," such as Hometown, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts or selling them to whole loan purchasers.

17.     Over the course of the parties' relationship, Hometown sold over 2,000 mortgage loans, with an original principal balance in excess of $200 million, to RFC.

18.     Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including Hometown, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

19.     Over the course of RFC's business relationship with Hometown, RFC routinely identified loans that contained material defects violating one or more of Hometown's contractual representations and warranties, and Hometown routinely acknowledged those material defects by repurchasing the loans or otherwise

compensating RFC for the defects.   To the extent Hometown repurchased certain individual loans from RFC, Plaintiffs are not seeking to again recover the repurchase price as to those loans.   However, many defective loans sold to RFC by Hometown remain unresolved.   Moreover, Hometown's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to Hometown's sale of defective loans to RFC.  The agreement pursuant to which RFC purchased loans from Hometown entitles Plaintiffs to recovery of the additional liabilities and losses they have incurred due to Hometown's breaches.

20.      Ultimately, due in significant part to the failure of correspondent lenders, including Hometown, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.  In May 2012, RFC was forced to file a chapter 11 bankruptcy case which is part of the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption In re Residential Capital, LLC, et al., Case No. 12-12020 (MG).

21.      By the time RFC and certain of its affiliates (collectively, the "Debtors") filed their bankruptcy cases, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

22.     During the bankruptcy cases, hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by Hometown.

23.     Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims.  This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors.   On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan").  Under paragraphs 24 and 48 of the Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065], and Article IV of the Plan, the Trust is responsible for monetizing many of the Debtors' remaining assets and pursuing

litigation claims and distributing the proceeds to the Debtors' creditors, including RFC's rights against Hometown and other parties who sold mortgages to RFC.

24.     Hometown was contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Hometown's representations and warranties.  InterLinc is now legally and contractually liable to RFC as Hometown's successor-in-interest.

25.     Accordingly, Plaintiffs bring this action against InterLinc, as successor-in-liability to Hometown, for breach of contract and indemnification of all liabilities and losses RFC has incurred due to Hometown's breaches of its representations and warranties.

26.     In addition to being liable as Hometown's successor, InterLinc is also liable to Plaintiffs because: (1) Hometown's transfer of its business to InterLinc was done with an intent to hinder, delay, or defraud Plaintiffs; and/or (2) occurred when Hometown was insolvent or rendered insolvent, and Hometown received less than reasonably equivalent value for the transfer.

**The Agreement Between RFC and Hometown**

27.     Over the course of the parties' relationship, Hometown sold over 2,000 mortgage loans to RFC pursuant to the Client Contract attached as Exhibit A (the "Contract").

28.     The Contract incorporates into its terms and conditions RFC's standard terms and conditions for purchasing loans, referred to as the Consumer Finance Acquisition Guide and, later, the Client Guide.  A complete copy of the June 1, 2000

edition of the Consumer Finance Acquisition Guide is attached as Exhibit F (the "CFA Guide").  A complete copy of the March 13, 2006 edition of the Client Guide and exemplary excerpts of other editions of the Client Guide are also attached as Exhibits B-1 and B-4 through B-31 (the "Client Guide").  The complete versions of other editions are known to the parties and too voluminous to attach in their entirety.  The provisions of the CFA Guide and the Client Guide relevant to Plaintiffs' claims were substantially similar during all periods relevant to this Complaint.  The Contract incorporated the CFA Guide, and later the Client Guide, and the Contract together with the CFA Guide and/or Client Guide collectively form the parties' "Agreement," and set the standards to which Hometown's loans sold to RFC were expected to adhere.

29.      A preliminary list of loans sold by Hometown to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit C.  The original principal balance of these loans in aggregate exceeds $200 million.

30.      As a correspondent lender, Hometown had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Hometown had primary responsibility for all aspects of the underwriting of the loan and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was Hometown, or others from whom Hometown purchased mortgages, that actually closed the loans with the borrowers.  Accordingly, Hometown knew or should have known of the defects in the loans it sold to RFC.  Hometown has a continuing obligation under Section A201(M) of the Client Guide to promptly notify RFC of any act or omission which might impact the Loan, the Mortgaged Property, or the

Mortgagor (as such terms are defined in the Client Guide).  Hometown and InterLinc, as Hometown's successor-in-interest, continually breached this obligation by failing to inform RFC of the loan defects.

31.     As Hometown was well aware, once the loans were sold to RFC, RFC in many instances pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization trust.  The pool of loans formed the collateral underlying the trust's mortgage-backed securities, which were in turn sold to investors.

32.     Hometown knew of RFC's intention to securitize the loans.  Specifically, Hometown acknowledged, in both the CFA Guide and the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization."  (See CFA Guide 251-1(MM) and Client Guide A202(II); 206(D).)

33.     Pursuant to the Agreement, Hometown made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

  a. Hometown's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (Client Guide A201(K).)

  b. Hometown "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Hometown], the Loan, the Mortgaged Property or the Mortgagor of which [Hometown] has

knowledge, which … may materially affect [Hometown], the Loan, the Mortgaged Property or the Mortgagor." (Client Guide A201(M).)

c.    "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts.  All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file."  (CFA Guide 251-1(A); Client Guide A202(A).)

d.    "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate."  (Client Guide A202(D).)

e.    "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (Client Guide A202(D).)

f.    All Loan Documents, Funding Documents and Final Documents have been completed, duly and properly executed and delivered in the form and manner specified in this Guide, and all originals and copies of such documents and all other documents, materials and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate and remain complete and accurate through the Funding Date.  All Loan Documents, Funding Documents, Final Documents and all other documents describing or otherwise relating thereto are in compliance with all applicable local and State laws, regulations and orders. (CFA Guide 251-1(D).)

g.    "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Hometown] or any other entity involved in originating or servicing the Loan."  (CFA Guide 251-1(G); Client Guide A202(G).)

h.  "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations, including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act.  This warranty is made by [Hometown] with respect to each GMAC-RFC Loan Application taken and processed for each Loan and with respect to each Loan made by [Hometown] or any other entity."  (CFA Guide 251-1(I); Client Guide A202(I).)

i.  "No Loan is a … loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees."   (Client Guide A202(J)(1)(d).)

j.  "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could:  (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan."  (CFA Guide 251-1(Q); Client Guide A202(Q).)

k.  "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide."  (CFA Guide 251-1(T); Client Guide A202(T).)

l.  "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (CFA Guide 251-1(T); Client Guide A202(T).)

m.  "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the AVM, except to the extent that the market Value of the Mortgaged Premises is lower … due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor [Hometown] has actual knowledge of reasonable grounds to suspect."  (Client Guide A202(T).)

n.  "No fraud or misrepresentation by the Borrower or by [Hometown], broker, correspondent, appraiser or any independent contractor retained

by [Hometown], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to GMAC-RFC in connection with the Loan are complete and accurate."   (CFA Guide 251-2(K); Client Guide A202(KK).)

34.     These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from Hometown.   Hometown's contractual warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors.   If any of Hometown's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from Hometown under which RFC would have recourse for its liabilities and losses on account of defective loans.

35.     Pursuant to the CFA Guide and the Client Guide, Hometown's failure to comply with its representations and warranties, or <u>any</u> of the other requirements, terms or conditions of the CFA Guide and Client Guide, respectively, constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner.   (<u>See</u> CFA Guide 260; Client Guide A208.)

36.     Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction,

regardless of whether Hometown knew of the misrepresentation or incorrect information. (See CFA Guide 260; Client Guide A208.)

37.     Hometown expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default.  (See Client Guide A209.)  Moreover, the Client Guide specified that RFC's exercise of one or more remedies in connection with a particular Event of Default "will not prevent it from exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity."  (Id.)  RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Hometown.  (See CFA Guide 274; Client Guide A209(C).)  Hometown also agreed that it was liable for "any misrepresentation or breach of warranty regardless of whether it or [RFC] actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty."  (See CFA Guide 250; Client Guide A200.)

38.     The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty.  The available remedies included, but expressly were not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches.  (See CFA Guide 271; Client Guide A210.)  The Client Guide expressly stated that RFC was "not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase."  (See Client Guide A210.)  Further indemnification remedies are set forth in

Sections 270 and 274 of the CFA Guide and Sections A202 and A212 of the Client Guide.  Section A209 of the Client Guide, in turn, makes clear that all of these remedies are non-exclusive and cumulative and that the remedies continue in existence for the remaining life of the purchased loans.

39.     Moreover, RFC alone retained the sole discretion to declare an Event of Default and to choose what remedy or remedies to pursue.  Nothing in the Agreement required RFC to provide Hometown with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing recovery for materially defective loans at any time.  In fact, the United States Court of Appeals for the Eighth Circuit has confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and correspondent lenders such as Hometown have contractually bargained away any right to challenge RFC's determination regarding such an Event of Default.  See Residential Funding Co., LLC v. Terrace Mortg. Co., 725 F.3d 910 (8th Cir. 2013).

40.     One nonexclusive provision of the Client Guide required Hometown to compensate RFC for defective loans according to a formula that is based on the original principal balance of the loan.  If RFC determined that repurchase was not appropriate, Hometown would nonetheless be contractually obligated to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the loan's servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken."  (See CFA Guide 271; Client Guide A210.)

41.     Under the terms of the Agreement, Hometown and its successor-in-interest, InterLinc, are obligated to repurchase loans and/or pay RFC the repurchase price even if the loan has already been foreclosed upon.   (See CFA Guide 271(D); Client Guide A210(B).)

42.     Hometown also expressly agreed to broad indemnification provisions, including the following:

> [Hometown] shall indemnify GMAC-RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses … includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Guide, (iii) any claim, demand, defense or assertion against or involving GMAC-RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon any warranty, obligation or representation made by [Hometown] contained by the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the [Hometown] in information required under Regulation AB or any successor regulation.
>
> In addition, [Hometown] shall indemnify GMAC-RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by GMAC-RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [Hometown], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)  Hometown further agreed:

> to indemnify and hold GMAC-RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by GMAC-RFC as a result of any material misstatement in or omission

> from any information provided by [Hometown] to GMAC-RFC; or from any claim, demand, defense or assertion against or involving GMAC-RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon such misstatement or omission.

(Client Guide A202.)   The Client Guide also entitles RFC to recover all court costs, attorneys' fees and any other costs, fees and expenses incurred by RFC in enforcing the Agreement or Client Guide.  Similar indemnification provisions are also included within the CFA Guide.  (See CFA Guide 274.)

43.     Additionally, prior to the commencement of this lawsuit, Hometown conceded that certain of its loans sold to RFC were materially defective.  In that regard, Hometown has already paid substantial sums to RFC to cover those defects.  In this action, RFC is not seeking to recover again on those sums.

44.     RFC at all times performed all of its obligations to Hometown, if any, under the Agreement and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**Hometown Materially Breached Numerous Loan-Level Representations and Warranties.**

45.     As noted above, the loans RFC acquired from Hometown and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

46.     Some of the loans Hometown sold RFC were eventually deposited in over 125 RMBS trusts.   When RFC sold the loans, it passed on a more limited set of representations and warranties to the trusts, and, as required by SEC regulations,

disclosed pertinent information about the loans to investors in the RMBS. In making those representations and warranties, RFC relied on information provided to it by Hometown and other correspondent lenders. That information in many cases violated Hometown's representations and warranties to RFC.

47.     Hometown materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

48.     Approximately two years ago, in connection with its First Amended and Second Amended Complaints against Hometown, the Trust investigated whether Hometown breached representations and warranties by drawing a random sample of 150 loans from among those loans purchased from Hometown and subsequently securitized by RFC. This sample of loans was then reunderwritten by conducting an actual review of the contents of the loan file. The reunderwriting analysis demonstrated that 95% of the loans in the sample were defective and violated Hometown's representations and warranties under the Agreement. An exhibit listing the defective loans identified in the sample is attached as Exhibit D. Examples of the defects found in the reunderwriting of the 150-loan sample include the following:

>   a.  Loan ID # 10349801 in the amount of $117,000 with a fund date of January 13, 2006 (included in securitization 2006-KS1) – Amongst other breaches, the loan file contained no evidence that the lender requested or obtained any verification of the required $2,293.10 assets to close the subject loan. The lender also improperly failed to verify that the borrower satisfied pre-existing debts totaling $2,859.00. The combination of failures to verify meant that the borrower had fewer

assets than represented, which made the loan riskier than represented by Hometown. The failures to verify breached the Client Guide including, without limitation, section 6E.13 of the November 21, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Cash to Close and sections 6E.9 and 6E.10 of the November 21, 2005 GMAC RFC Client Guide, AlterNet/Credit Cap Program, Major Adverse Credit.

b.    Loan ID # 10433727 in the amount of $166,250 with a fund date of February 15, 2006 (included in securitization 2006-KS3) – Amongst other breaches, the borrowers failed to disclose two existing liens on their rental property. The borrowers' recalculated debt-to-income ratio (the "DTI" ratio) of 63.93% exceeded the applicable DTI maximum of 55.00%. The higher DTI meant the loan was materially more risky than represented by Hometown. The nondisclosure by the borrower and the erroneous calculation of DTI breached the Client Guide including, without limitation, section 6E.11 of the November 21, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios and AlterNet/Credit Gap Program, Credit Guidelines and Debt-to-Income Ratios. Under section A202(KK) of the Client Guide, Hometown was responsible for borrower misrepresentations such as were present with this loan.

c.    Loan ID #10434747 in the amount of $175,338 with a fund date of February 15, 2006 (included in securitization 2006-RS4) – Amongst other breaches, the loan-to-value ratio (the "LTV" ratio)[1] of the subject transaction was 83.99% which exceeded the applicable maximum LTV of 65.00% for a stated income loan with a credit score of 545. The higher LTV meant there was less collateral value available to secure the debt in the event of a default, which made the loan far riskier than represented. This default breached the Client Guide including, without limitation, section 6E.17 of the GMAC RFC Client Guide,

---

[1] The LTV ratio is a key measure of a borrower's likelihood to default. The LTV ratio expresses the amount of the mortgage loan as a percentage of the total appraised value of the property. For example, if a borrower borrows $80,000 to buy a house worth $100,000, then the LTV ratio is $80,000/$100,000, or 80%—the remaining $20,000 of the house's value reflect the borrower's 20% equity stake in the house. A combined loan-to-value ratio (or "CLTV" ratio) expresses the amount of all of the loans secured by a property as a percentage of that property's appraised value; that is, it accounts for any additional liens. A borrower with a sizable equity stake in a property has more to lose than a borrower with a small stake; thus, a borrower with a large equity position has financial incentives not to default and lose his or her equity. Conversely, a borrower with little or no equity stake in a property has little financial incentive to avoid default.

AlterNet/Credit Gap, Credit Grades, Maximum Loan Amounts, LTVs and CLTVs.

d.   Loan ID # 10528719 in the amount of $66,900 with a fund date of April 12, 2006 (included in securitization 2006-RZ3) – Amongst other breaches, the borrower failed to disclose two properties on the loan application and the loan file contains no evidence that the lender investigated the mortgage-related credit inquiries reflected on the borrower's credit report.  The undisclosed properties and the mortgage-related credit inquiries meant the borrower was potentially servicing significantly more mortgage debt than represented, which made the loan significantly riskier.   These defaults breached the Client Guide including, without limitation, sections 2A.20 and 4A.3 of the March 13, 2006 GMAC RFC Client Guide, Events of Default and Credit Evaluation Overview.

e.   Loan ID # 10538817 in the amount of $62,500 with a fund date of April 13, 2006 (included in securitization 2006-RZ3) – Amongst other breaches, the LTV of the subject transaction was 100.00%, which exceeded the applicable maximum LTV of 95.00%.  The lender cited a DTI of 26.00% as one compensating factor for the LTV exception; however, the borrower's DTI was actually 37.76%.  The higher LTV without the represented compensating factor meant that the loan was riskier than represented by Hometown.  The excessive LTV breached the Client Guide including, without limitation, section 1 of the March 13, 2006 GMAC RFC Client Guide, Home Solution At-A-Glance, LTV/CLTV.

f.   Loan ID # 10542238 in the amount of $137,662 with a fund date of July 12, 2006 (included in securitization 2006-KS7) – Amongst other breaches, the lender improperly failed to account for the borrower's monthly debt of $130.00 in calculating DTI.  A recalculation of DTI yields 55.82%, which exceeds the applicable DTI maximum of 50.00%.  The DTI in excess of the maximum under this program meant the loan was materially riskier than represented by Hometown.  These defaults breached the Client Guide including, without limitation, sections 4B.2 and 6E.6 of the June 12, 2006 GMAC RFC Client Guide, Stated Income Documentation Requirements and AlterNet Program, Credit Guidelines and Debt-to-Income Ratios.

g.   Loan ID # 10665431 in the amount of $76,500 with a fund date of June 6, 2006 (included in securitization 2006-KS6) – Amongst other breaches, the lender was the borrower's employer at the time of the transaction.  The applicable guidelines do not permit the existence of a

direct relationship between lender and borrower, which made this a non-arm's length transaction. The non-arm's length relationship of the lender and the borrower meant that the lender would not necessarily be as diligent in underwriting the loan, which increases the risks posed to RFC. This default breached the Client Guide including, without limitation, sections 3B.1 and 6E.2 of the March 13, 2006 GMAC RFC Client Guide, Non-Arm's Length Transaction and AlterNet Program, Transaction Types.

h.  Loan ID # 10692082 in the amount of $256,500 with a fund date of October 5, 2006 (included in securitization 2007-KS2) – Amongst other breaches, the borrower misrepresented his or her stated income. The borrower represented monthly income of $8,500.00 for employment as an attorney. The borrower's Chapter 13 bankruptcy petition reflected monthly income of $4,512.50. Based on that income, the borrower's recalculated DTI was 78.83%, which exceeds the applicable DTI maximum of 45.00%. The greatly reduced income from what was represented meant the borrower had substantially less capacity to repay the loan than represented by Hometown. This misrepresentation of income and incorrect DTI breached the Client Guide including, without limitation, sections 2A.20 and 6E.14 of the September 11, 2006 GMAC RFC Client Guide, Events of Default and AlterNet/Credit Gap/Interest Only Program, Debt-to-Income Ratio-Qualifying Ratios. Under section A202(KK) of the Client Guide, Hometown is responsible for borrower misrepresentations such as occurred with this loan.

i.  Loan ID # 5681437 in the amount of $43,200 with a fund date of October 19, 2001 (included in securitization 2002-KS1) – Amongst other breaches, the lender improperly approved the subject loan under the AlterNet program to a borrower with a credit score of 569 which did not meet the requisite credit score of 580. The lower credit score meant the borrower was less credit-worthy than required under the AlterNet program and hence was a riskier borrower than the program was intended for. This improper approval breached the Client Guide including, without limitation, section 4.4 of the October 1, 2001 GMAC RFC Client Guide, Credit Evaluation Overview.

j.  Loan ID # 5740988 in the amount of $59,925 with a fund date of December 7, 2001 (included in securitization 2002-KS1) – Amongst other breaches, the lender improperly qualified the borrower with a credit score of 582 for Ax credit grade when that credit grade required a credit score of 600. This improper qualification breached the Client

Guide including, without limitation, section 4.4 of the October 1, 2001 GMAC RFC Client Guide, Credit Evaluation Overview.

k.    Loan ID # 6795794 in the amount of $105,312 with a fund date of December 27, 2001 (included in securitization 2002-KS1) – Amongst other breaches, the lender improperly qualified the borrower with a credit score of 580 for Ax credit grade when that credit grade required a credit score of 600.  This improper qualification breached the Client Guide including, without limitation, section 408 of the October 1, 2001 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

l.    Loan ID # 6919694 in the amount of $55,200 with a fund date of January 24, 2002 (included in securitization 2002-KS8) – Amongst other breaches, the lender improperly qualified the borrower with a credit score of 544 for B credit grade, which required a credit score of 560.  This improper qualification breached the Client Guide including, without limitation, section 4.11 of the October 1, 2002 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

m.    Loan ID # 7859062 in the amount of $52,158 with a fund date of March 25, 2002 (included in securitization 2002-KS4) – Amongst other breaches, the lender improperly qualified the borrower with a credit score of 541 for B credit grade under the AlterNet Program, which required a credit score of 560.  This improper qualification breached the Client Guide including, without limitation, section 4.11 of the October 1, 2002 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

n.    Loan ID # 8023283 in the amount of $196,000 with a fund date of September 24, 2002 (included in securitization 2002-KS8) – Amongst other breaches, the lender improperly failed to verify the required $3,646.86 cash reserves prior to closing the subject loan.  If the cash reserves were missing, the borrower would not have reserves in the case of possible job-loss or other negative life events, which would make the loan far riskier than represented.  Furthermore, the borrower's loan application failed to disclose a bank account.  Hometown's failure to verify reserves and the borrowers nondisclosures breached the Client Guide including, without limitation, section 6D.10 of the July 1, 2002 GMAC RFC Client Guide, Maximum Loan Amounts, LTVs and CLTVs for Credit Gap, Reserve Requirement.

o.    Loan ID # 8239659 in the amount of $55,250 with a fund date of December 13, 2002 (included in securitization 2003-KS2) – Amongst other breaches, the lender improperly calculated the borrower's income.

A recalculation of DTI based on the income reflected on borrower's paystubs yields a DTI of 69.38%, which significantly exceeded the applicable maximum DTI of 50.00%. This elevated DTI meant a borrower had significantly less ability to repay the loan than was required under the program under which the loan was approved. This failure to calculate DTI correctly breached the Client Guide including, without limitation, section 6E.12 of the October 1, 2002 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios.

p.  Loan ID # 8240267 in the amount of $41,400 with a fund date of December 13, 2002 (included in securitization 2003-KS2) – Amongst other breaches, the subject property was not an owner-occupied property. A Data Verify report reflects that the borrower resided in a different property before and after closing the subject transaction. The Data Verify report lists the telephone number of the non-subject property as borrower's telephone number and the borrower's driver's license lists the non-subject property as the borrower's current address. It is commonly understood in the mortgage industry that non-owner occupied properties are riskier than owner-occupied properties. The misrepresentation regarding the occupancy of the property meant the loan was materially riskier than represented by Hometown. This occupancy misrepresentation breached the Client Guide including, without limitation, section 2A.20 of the October 1, 2002 GMAC RFC Client Guide, Events of Default.

q.  Loan ID # 8408040 in the amount of $77,400 with a fund date of July 15, 2003 (included in securitization 2002-KS7) – Amongst other breaches, the lender closed the subject transaction with the borrower's DTI listed as 54.27%, which exceeded the applicable maximum DTI of 50.00%. Compounding the problem, the 54.27% DTI was calculated improperly. A recalculation of the DTI based on the borrower's tax returns yields a DTI of 77.08%, which was far in excess of the maximum DTI of 50.00% for the loan program this loan was approved under. The serious discrepancy in DTI meant this borrower had far less capacity to repay the loan than required under the program in question. The lender also failed to verify $12,778.72 of the borrower's assets, which were required to close the subject transaction. If the borrower was missing these assets, the borrower would have less ability to deal with unexpected life events, such as job loss, than required under the program which meant the loan was significantly more risky than represented by Hometown. These underwriting problems breached the Client Guide including, without limitation, sections 4.31, 6E.12, and

6E.8 of the July 1, 2003 GMAC RFC Client Guide, Self-Employed Income Earners, Sole Proprietorship, AlterNet/Credit Gap Program, Debt-to-Income Ratio, and AlterNet/Credit Gap Program, Down Payment.

r.     Loan ID # 8465990 in the amount of $55,300 with a fund date of July 30, 2003 (included in securitization 2003-KS7) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 551 for Am Credit grade which required a minimum credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.13 of the July 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

s.     Loan ID # 8466258 in the amount of $87,241 with a fund date of July 30, 2003 (included in securitization 2003-KS7) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 591 for Ax Credit grade, which required a minimum credit score of 600. The lender also improperly failed to verify $13,552.26 of the borrower's assets, which were required to close the subject transaction. If the borrower was missing these assets, the borrower would have less ability to deal with unexpected life events, such as job loss, than required under the program which meant the loan was significantly more risky than represented by Hometown. These underwriting errors breached the Client Guide including, without limitation, sections 4.13 and 4.47 of the April 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score and Cash to Close.

t.     Loan ID # 8510146 in the amount of $53,400 with a fund date of August 14, 2003 (included in securitization 2003-KS8) – Amongst other breaches, the borrower misrepresented occupancy and income on the loan application. A recalculation of DTI based on income reflected on the borrower's paystubs and W2s yields a DTI of 71.75%, which greatly exceeds the applicable maximum DTI of 50.00%. The serious discrepancy in DTI meant this borrower had far less capacity to repay the loan than required under the mortgage program this loan was approved under. The lender also improperly approved the loan where the LTV of 94.93% exceeded the applicable maximum LTV of 90.00%. These underwriting problems breached the Client Guide including, without limitation, sections 6E.12 and 6E.14 of the GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios and AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVS.

u.   Loan ID # 8510428 in the amount of $58,500 with a fund date of August 14, 2003 (included in securitization 2003-KS8) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 583 for Am Credit grade under the AlterNet/Credit Grade Program, which required a minimum credit score of 600.  This underwriting error breached the Client Guide including, without limitation, section 4.13 of the July 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

v.   Loan ID # 8556171 in the amount of $52,000 with a fund date of April 9, 2003 (included in securitization 2003-KS4) – Amongst other breaches, the lender failed to obtain the final Truth In Lending Act disclosure statement and the subject mortgage or deed of trust.  The missing documents could make it more difficult to enforce remedies if the loan went into default.  These underwriting problems breached applicable law and the Client Guide including, without limitation, sections 2A.22 and 2A.14 of the April 1, 2003 GMAC RFC Client Guide, Proof of Compliance and Enforceability; Enforcement Provisions.

w.   Loan ID # 8564818 in the amount of $45,000 with a fund date of August 28, 2003 (included in securitization 2003-KS8) – Amongst other breaches, the borrower misrepresented income on the loan application. A recalculation of DTI based on income reflected on the borrower's paystubs yields a DTI of 63.59%, which exceeds the applicable maximum DTI of 50.00%.  The serious discrepancy in DTI meant this borrower had far less capacity to repay the loan than required under the program in question.  The lender also improperly approved the loan where the LTV of 80.00% exceeded the applicable maximum LTV of 75.00%.  These underwriting problems breached the Client Guide including, without limitation, sections 6E.12 and 6E.14 of the GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios and AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVS.

x.   Loan ID # 8654498 in the amount of $66,300 with a fund date of September 29, 2003 (included in securitization 2003-KS9) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 548 for a B Credit grade under the AlterNet/Credit Grade Program which required a minimum credit score of 560.  This underwriting error breached the Client Guide including, without limitation, section 4.13 of the July 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

y.   Loan ID # 8658538 in the amount of $52,500 with a fund date of September 29, 2003 (included in securitization 2003-KS9) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 549 for a B Credit grade under the AlterNet/ Credit Grade Program which required a minimum credit score of 560.   This underwriting error breached the Client Guide including, without limitation, section 4.13 of the July 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

z.   Loan ID # 8763444 in the amount of $45,050 with a fund date of October 29, 2003 (included in securitization 2003-KS10) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 547 for a B Credit grade under the AlterNet/Credit Grade Program, which required a minimum credit score of 560.  The lender also improperly failed to verify $9,447.98 of the borrower's assets, which were required to close the subject transaction.   These underwriting problems breached the Client Guide including, without limitation, sections 4.12 and 6E.8 of the October 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score and AlterNet/Credit Gap Program, Down Payment.

aa.   Loan ID # 8842880 in the amount of $96,000 with a fund date of November 21, 2003 (included in securitization 2003-KS11) – Amongst other breaches, the lender improperly approved the subject loan where the LTV of 80.00% exceeded the applicable maximum LTV of 75.00%. This underwriting error breached the Client Guide including, without limitation, section 6E.15 of the October 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

bb.   Loan ID # 8904508 in the amount of $187,500 with a fund date of December 12, 2003 (included in securitization 2004-KS1) – Amongst other breaches, the lender failed to calculate the borrower's income properly.  A recalculation of DTI based on a correct calculation yields 59.33%, which exceeds the applicable DTI maximum of 50.00%.  The higher DTI meant the borrower would have more difficulty in making payments under the loan than was represented by Hometown.   The failure to properly calculate DTI breached the Client Guide including, without limitation, section 6E.12 of the October 1, 2003 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios.

cc.   Loan ID # 8932821 in the amount of $60,316 with a fund date of April 28, 2004 (included in securitization 2004-KS5) – Amongst other

breaches, the lender improperly approved the subject loan where the LTV of 80.00% exceeded the applicable maximum LTV of 75.00%. The improper approval breached the Client Guide including, without limitation, section 6E.12 of the April 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

dd.   Loan ID# 8976605 in the amount of $54,000 with a fund date of May 10, 2004 (included in securitization 2004-KS6) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 570 for an Am Credit grade under the AlterNet Program which required a minimum credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the April 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

ee.   Loan ID # 8999876 in the amount of $59,500 with a fund date of January 14, 2004 (included in securitization 2004-KS2) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 547 for a B Credit grade under the AlterNet/Credit Grade Program which required a minimum credit score of 560. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the January 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

ff.   Loan ID # 9000364 in the amount of $104,000 with a fund date of January 14, 2004 (included in securitization 2004-KS2) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 572 for an Am Credit grade under the AlterNet Program which required a minimum credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the January 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

gg.   Loan ID # 9015999 in the amount of $106,400 with a fund date of May 26, 2004 (included in securitization 2004-RS6) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 584 for an Ax Credit grade, which required a minimum credit score of 600. The lender also improperly approved the subject loan even though the LTV of 95.00% exceeded the applicable maximum LTV of 90.00%. The fact that the loan departed from underwriting guidelines in multiple aspects meant it was riskier than loans in this particular program were supposed to be. These multiple departures from underwriting guidelines breached the Client Guide including, without limitation, sections 4.13 and 4.47 of the April 1, 2003 GMAC RFC

Client Guide, AlterNet/Credit Gap Program, Credit Score and Cash to Close.

hh.   Loan ID # 9032454 in the amount of $91,200 with a fund date of January 27, 2004 (included in securitization 2004-KS2) – Amongst other breaches, the borrower misrepresented debt and occupancy. A recalculation of DTI, based on the borrower's income reflected on paystubs and based on the borrower's debts related to undisclosed properties, yields a DTI of 77.46% which greatly exceeds the applicable DTI maximum of 50.00%. The higher DTI meant the borrower would have more difficulty in making payments under the loan than was represented by Hometown. The lender also improperly approved the subject loan even though the LTV of 95.00% exceeded the applicable maximum LTV of 85.00%. The higher LTV made the loan riskier because it reduced the chance that there would be enough collateral available to secure the loan in the event of a default. These multiple departures from underwriting guidelines breached the Client Guide including, without limitation, sections 6E.12 and 6E.14 of the January 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratio and AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVS.

ii.   Loan ID # 9093442 in the amount of $72,000 with a fund date of February 17, 2004 (included in securitization 2004-RZ1) – Amongst other breaches, the loan file contains no evidence that the borrower's existing debts were satisfied before or at the time of closing. A recalculation of DTI, which accounts for unsatisfied debt obligations, yields a DTI of 52.32%, which exceeds the applicable DTI maximum of 45.00%. The higher DTI meant the borrower would have more difficulty in making payments under the loan than was represented by Hometown. This failure to properly calculate DTI breached the Client Guide including, without limitation, sections 6C.5 and 4.44 of the January 1, 2004 GMAC RFC Client Guide, Definition of Cash and Home Solution Program, Debt-to-Income Ratio-Qualifying Ratios.

jj.   Loan ID # 9096729 in the amount of $125,270 with a fund date of June 25, 2004 (included in securitization 2004-KS7) – Amongst other breaches, the lender failed to properly calculate the borrower's debt. A recalculation of DTI yields 60.52% which exceeds the applicable DTI maximum of 50.00%. The higher DTI meant the borrower would have more difficulty in making payments under the loan than was represented by Hometown. The lender also improperly qualified the borrower with a credit score of 561 for an Am Credit grade under the AlterNet

Program, which required a minimum credit score of 580. These multiple departures from underwriting guidelines breached the Client Guide including, without limitation, sections 6E.7 and 4.12 of the April 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios and AlterNet/Credit Gap Program, Credit Score.

kk.     Loan ID # 9106676 in the amount of $54,400 with a fund date of February 26, 2004 (included in securitization 2004-KS3) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 545 for a B Credit grade under the AlterNet/ Credit Grade Program which required a minimum credit score of 560. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

ll.     Loan ID # 9106812 in the amount of $80,900 with a fund date of February 26, 2004 (included in securitization 2004-KR1) – Amongst other breaches, the lender failed to properly calculate the borrower's debt. The lender qualified the borrower using a monthly debt of $400.00. However, accounting for other debts, including the borrower's child support payments as reflected on borrower's paystubs, yields a monthly debt of $813.82. A recalculation of DTI yields 66.35%, which exceeds the applicable DTI maximum of 50.00%. The higher DTI meant the borrower would have more difficulty in making payments under the loan than was represented by Hometown. The failure to correctly calculate DTI breached the Client Guide including, without limitation, sections 4.19 and 6E.12 of the GMAC RFC Client Guide, Total Debt-to-Income Ratios and AlterNet/Credit Gap Program, Debt-to-Income Ratio-Qualifying Ratios.

mm.     Loan ID # 9194766 in the amount of $76,500 with a fund date of March 29, 2004 (included in securitization 2004-KS4) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 570 for an Am Credit grade under the AlterNet Program which required a minimum credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the January 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

nn.     Loan ID # 9194856 in the amount of $76,500 with a fund date of March 29, 2004 (included in securitization 2004-KS4) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 562 for an Am Credit grade under the AlterNet Program which

required a minimum credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.12 of the January 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Score.

oo.  Loan ID # 9194866 in the amount of $81,015 with a fund date of March 29, 2004 (included in securitization 2004-KS4) – Amongst other breaches, the lender improperly closed the subject transaction where the borrower's credit score of 563 failed to meet the minimum allowable credit score of 580. This improper qualification breached the Client Guide including, without limitation, section 4.9 of the July 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Grade Summary.

pp.  Loan ID # 9247529 in the amount of $144,900 with a fund date of August 12, 2004 (included in securitization 2004-KS9) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 580 for an Ax Credit grade which required a minimum credit score of 600. This improper qualification breached the Client Guide including, without limitation, section 4.9 of the July 1, 2004 GMAC RFC Client Guide, Credit Evaluation Overview.

qq.  Loan ID # 9469227 in the amount of $123,900 with a fund date of August 25, 2004 (included in securitization 2004-RS9) – Amongst other breaches, the lender improperly approved the subject loan where the LTV of 100.00% exceeded the applicable maximum LTV of 95.00%. This higher LTV meant it was less likely the outstanding amount on the loan could be recovered if it went into default. This breached the Client Guide including, without limitation, section 6E.12 of the July 1, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

rr.  Loan ID # 9675593 in the amount of $52,400 with a fund date of November 30, 2004 (included in securitization 2005-KS1) – Amongst other breaches, the lender improperly approved the subject loan where the LTV of 80.00% exceeded the applicable maximum LTV of 70.00%. This higher LTV meant it was less likely the value of the loan could be recovered if it went into default. This departure from underwriting guidelines breached the Client Guide including, without limitation, section 6E.17 of the October 18, 2004 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

ss.  Loan ID # 978587 in the amount of $68,900 with a fund date of February 10, 2005 (included in securitization 2005-KS3) – Amongst

other breaches, the lender improperly approved the subject loan where the LTV of 100.00% exceeded the applicable maximum LTV of 95.00%. This higher LTV meant it was less likely the outstanding amount on the loan could be recovered if it went into default. This departure from underwriting guidelines breached the Client Guide including, without limitation, section 6E.15 of the January 1, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

tt.  Loan ID # 9811789 in the amount of $131,100 with a fund date of February 28, 2005 (included in securitization 2005-KS3) – Amongst other breaches, the lender improperly approved the subject loan where the LTV of 95.00% exceeded the applicable maximum LTV of 90.00%. This higher LTV meant it was less likely the value of the loan could be recovered if it went into default. This departure from underwriting guidelines breached the Client Guide including, without limitation, section 6E.15 of the January 1, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

uu.  Loan ID # 9964365 in the amount of $139,500 with a fund date of June 16, 2005 (included in securitization 2005-KS7) – Amongst other breaches, the lender improperly qualified a borrower with a credit score of 571 for an Am Credit grade under the AlterNet Program which required a minimum credit score of 580. This breached the Client Guide including, without limitation, section 6E.7 of the April 1, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap Program, Credit Grade Summary, Credit Score.

vv.  Loan ID # 9965293 in the amount of $76,500 with a fund date of June 16, 2005 (included in securitization 2005-RZ2) – Amongst other breaches, the lender improperly approved the subject loan where the LTV of 100.00% exceeded the applicable maximum LTV of 95.00%. This breached the Client Guide including, without limitation, section 6E.15 of the April 1, 2005 GMAC RFC Client Guide, AlterNet/Credit Gap, Maximum Loan Amounts, LTVs and CLTVs.

49.  The results of the reunderwriting of the 150 sampled loans reflected an expected defect rate of the loans purchased by RFC from Hometown of 95% with a margin of error of less than +/- 8% at a 95% level of confidence.

50.     Hometown sold over 2,000 loans to RFC.  As a consequence, in 2014, in addition to reunderwriting a statistically representative sample to determine the number of loans with warranty breaches, the Trust also investigated Hometown's representations and warranties about the appraised values and owner-occupancy status of properties backing the loans, using an automated-valuation model ("AVM") and borrowers' tax records (together, the "Forensic Review").   Sufficient data existed to conduct this Forensic Review as to more than 300 loans that were subsequently securitized.  Because the Forensic Review examines information outside of a loan file, it can sometimes identify breaches that are not identified in a loan reunderwriting (likewise, for the reasons discussed below, reunderwriting can sometimes identify breaches that are not identified via Forensic Review).

51.     AVM is a tool in the mortgage industry that considers objective criteria such as the sale prices of comparable properties, previous surveyor valuations, historical house price movements and user inputs (number of bedrooms, property improvements, etc.) in the same locale as the subject property to determine the true market value of the property in question at a specific point in time.

52.     Using the same comparable sales data that would have been available to Hometown at the time of origination, the AVM review first conducted retroactive appraisals of the properties backing over 300 loans Hometown sold to RFC that were subsequently securitized and for which comparable sales data was available.  The AVM review centered on three of Hometown's core appraisal representations: (i) the market value of the mortgaged premises is at least equal to the appraised value stated in the loan

appraisal (CFA Guide 251-1(T); Client Guide A202(T)); (ii) no fraud or misrepresentation by the appraiser occurred in the origination of the loans and all information and documents provided to RFC in connection with the loans are complete and accurate (Client Guide A202(KK)); and (iii) all data provided by Hometown to RFC relating to any loan is true and complete (CFA Guide 251-1(A); Client Guide A202(A)).

53.     Among other findings, the AVM review concluded that, for loans where sufficient comparison data was available:

- 60% had reported property values overrepresented by more than 10%;

- 54% had reported property values overrepresented by more than 15%;

- 58% had reported LTV[2] ratios underrepresented by more than 10%;

- 50% had reported LTV ratios underrepresented by more than 15%;

- 38% had reported LTV ratios underrepresented by more than 25%; and

- 56% of the loans had actual LTV ratios greater than 100% (i.e., the loans were "underwater" at origination).

54.     All of these findings establish breaches of at least the following representations: (A) and (T) of Section 251-1 of the CFA Guide and (A), (T), and (KK) of Section A202 of the Client Guide, which provide that all information delivered with respect to each loan was true correct and accurate, that the fair market value of the property was greater than the appraisal, and that there was no fraud or misrepresentation on the part of any appraiser. The AVM review demonstrates that defects are pervasive throughout the pool of loans Hometown sold to RFC.

---

[2] The AVM review used CLTV in analyzing second-lien loans.

55.     The Forensic Review also investigated Hometown's representation that over 300 of the loans Hometown sold to RFC were backed by owner-occupied properties. A property is said to be "owner-occupied" when the borrower has made the property his primary residence, as opposed to a vacation home or investment property.   When a property is not in fact owner-occupied, the borrower is more likely to default, which in turn increases the riskiness of the mortgage loan.   Borrowers who live in mortgaged properties are known to be less likely to "walk away" from those properties and default on their mortgage obligations than borrowers who buy residential properties as investments or as vacation homes.

56.     The owner-occupancy review centered on Hometown's representations that: (i) all information provided to RFC relating to each loan is true, complete, and accurate, and there are no omissions of material facts (CFA Guide 251-1(A); Client Guide A202(A)); (ii) there is no default, breach, violation, or event of acceleration existing under any mortgage note (CFA Guide 251-1(G); Client Guide A202(G)); and (iii) there was no fraud or misrepresentation by the borrower, broker, or Hometown in the origination of the loan (Client Guide A202(KK)).

57.     The owner-occupancy review ran two tests to determine the accuracy of Hometown's representations as to the owner-occupancy of the properties collateralizing the loans sold to RFC.   The first test investigated where the borrower had their tax bills sent.   It is reasonable to expect that a borrower residing at a property would have their tax bills sent to that address.   If a borrower had his or her tax records sent to another address, the owner-occupancy review regarded that as evidence that the borrower did not actually

reside at the mortgaged property.  The second test assessed whether the borrower made certain tax exemptions based on the property.  If a borrower declined to make these tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere.  If a loan failed both of these tests, the owner-occupancy review identified a breach of representations (A) and (G) of Section 251-1 of the CFA Guide or (A), (G), and (KK) of Section A202 of the Client Guide, which provide that all information provided to RFC relating to each loan is true, complete and accurate, there is no default, breach, violation or acceleration existing under any mortgage note, and there was no fraud on the part of the borrower, broker or Hometown in the origination of the loan.  Of the analyzed loans, 10% failed the owner-occupancy tests and therefore breached representations (A) and (G) of Section 251-1 of the CFA Guide and/or (A), (G), and (KK) of Section A202 of the Client Guide.

58.      In total, the Forensic Review indicated that 67% of the loans on which an AVM was run contained at least one defect.  A schedule identifying the defective loans detected by the Forensic Review and the findings connected with those loans is attached as Exhibit E.

59.      Because an AVM analysis only examines the property value and owner-occupancy representations for a given loan, it is not uncommon for an AVM analysis to provide a lower breach rate for a group of loans than a reunderwriting review of a sample of loans from that population.  The reason for this is that the reunderwriting review covers the full scope of loan representations and warranties, such as those dealing with income, employment status and credit history, instead of just the property value and

occupancy representations examined in an AVM review. In certain cases an AVM analysis may find a higher defect rate than a reunderwriting review because an AVM uses external information to detect misrepresentations regarding value and owner-occupancy representations which may not be detectable from just reviewing the materials in a loan file.

60.     On the basis of the foregoing, and pursuant to sections 270 of the CFA Guide and A209 of the Client Guide, Plaintiffs have determined that at least the following loans contain defects and were sold in violation of the Agreement: (a) the indicated loans listed on Exhibit D, and (b) the indicated loans listed on Exhibit E. Plaintiffs hereby declare an Event of Default under the CFA Guide and Client Guide based on those breaches for any loan that has not been repurchased or satisfied. Additional material defects are likely contained throughout the loan population sold to RFC by Hometown.

**<u>Plaintiffs' Liabilities and Losses Stemming from Hometown's Breaches</u>**

61.     As a direct result of Hometown's failure to abide by its contractual representations and warranties, Plaintiffs have suffered extensive legal and financial exposure, and incurred obligations, liabilities, damages, and losses for which they are entitled to recover from Hometown's successor-in-interest, InterLinc.

62.     First, Plaintiffs have incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by Hometown.

63.     In addition, Plaintiffs have expended tens of millions of dollars litigating the quality of the loans sold to RFC by Hometown and others in extensive federal and

state court litigation in which Plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

64.    Beginning in 2008 and continuing until RFC filed for bankruptcy protection with the Bankruptcy Court on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Hometown and others.

65.    For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by Hometown became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective in one or more ways.

66.    RFC ordinarily received a limited number of repurchase demands, primarily from whole loan investors.

67.    A number of purchasers, investors or monoline insurers demanded RFC repurchase loans which had been sold to it by Hometown, including Credit Suisse, MBIA, Carrington Capital Management, and MGC.

68.    Beginning in October 2008, RFC was sued in dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by Hometown.

69.    The first of these lawsuits was filed by bond insurer MBIA in October 2008.  The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans.  For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

70.     The MBIA lawsuit specifically attacked RFC's RMBS offerings 2006-HSA4, 2006-HSA5, and 2007-HSA1, HSA2 and HSA3.  One of these pools (as shown in

Exhibit C) included a loan sold by Hometown, which MBIA had demanded repurchase of shortly before the lawsuit was filed.

71.     The MBIA lawsuit was followed shortly by a class action suit filed by the New Jersey Carpenters pension funds.

72.      The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  As shown in Exhibit C, Hometown loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

73.     The New Jersey Carpenters complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the complaint.  NJ Carpenters' First Am. Compl. ¶¶ 9, 110, N.J. Carpenters v. Residential Capital, LLC, No. 08-cv-08781 (S.D.N.Y.).  Of course, that data was provided to RFC—and represented and warranted to be accurate— by Hometown and other correspondent lenders.

74.     Similarly, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit against RFC in 2011, seeking hundreds of millions of dollars in losses stemming from loan defects in numerous RMBS offerings

that contained in total over 110 loans sold by Hometown to RFC, including RASC 2005-KS10, RASC 2005-KS11, RAMP 2005-RS9, RASC 2006-KS3, RALI 2006-QO9, RAMP 2006-RS1, RASC 2007-KS2, RASC 2007-KS3.  FHFA supported its allegations in the complaint with its own forensic review using an AVM of thousands of loans in the various offerings at issue.  FHFA alleged that its review of these loans showed significant misstatements concerning owner-occupancy and loan-to-value ratios, both of which Hometown was responsible for reviewing under the Client Guide.

75.     On February 18, 2011, the Allstate Insurance Company and its various subsidiaries and affiliates sued RFC and numerous other defendants in Hennepin County District Court, Minnesota.  Allstate sued RFC about its role in some 23 securitizations. No fewer than seven of these securitizations contained loans sold to RFC by Hometown, which was the source of approximately 80 of the loans in these securitizations.  Allstate supported its allegations in this complaint with a loan-level review of over 30,000 loans. For each of the securitizations Hometown sold loans into, Allstate reviewed a sample of 800 defaulted loans and 800 loans tested at random.  Allstate alleged that its review of these loans showed significant misstatements concerning owner-occupancy and loan-to-value ratios, both of which Hometown was responsible for reviewing under the CFA Guide and the Client Guide.

76.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over 15 lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

77.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

78.     Collectively, these lawsuits involved more than a hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

79.     Across the dozens of securitizations involved in these lawsuits, Hometown was responsible for over 300 of the loans.

80.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by Hometown.

81.     In May 2012, the Debtors—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

82.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly

defective mortgage loans, including those sold to RFC by Hometown.  By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

    a.    The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors.  The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by Hometown and securitized) were responsible for more than $19.5 billion in repurchase obligations.

    b.    AIG, an investor in 35 Debtor-sponsored securitizations (a number of which included Hometown loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    c.    Allstate, an investor in 25 Debtor-sponsored securitizations (a number of which included Hometown loans), filed 20 proofs of claim, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    d.    John Hancock, an investor in 12 Debtor-sponsored securitizations (a number of which included Hometown loans), filed 59 proofs of claim asserting similar allegations.

    e.    FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included Hometown loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had individually reviewed.

    f.    IKB, an investor in 20 Debtor-sponsored securitizations (a number of which included Hometown loans), filed four proofs of claim seeking approximately $122.6 million in damages.

83.    These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten,

and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from Hometown, and on which RFC had relied. In many instances, creditors asserted claims against both RFC and against other Debtors based on the same losses.

84.     The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy cases. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of *all* of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, FHFA, securities law claimants, and others. Each of these settlements involved claims being asserted against RFC based on defective loans sold to it by Hometown and other correspondents.

85.     The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement—including the $10 billion-plus settlement of RMBS-related liabilities, finding the settlements to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the plan. See Findings of Fact ¶¶ 98-176,

Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6066].  The Plan became effective on December 17, 2013.

86.     Pursuant to Hometown's express contractual obligations, Hometown was and remains obligated to compensate RFC for the global settlement associated with its breaches of representations and warranties, as well as for RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.  InterLinc, as Hometown's successor-in-liability, also is obligated to compensate RFC for the global settlement associated with its breaches of representations and warranties, as well as for RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

87.     The Uniform Fraudulent Transfer Act defines a "creditor" as "a person who has a claim," and it defines a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  RFC is and at all relevant times was a creditor of Hometown, including at all times following the Bankruptcy Court's approval of the global settlement.

**InterLinc's Continuation of Hometown's Business**

88.     In December 2013, RFC commenced an action against Hometown based on the same underlying allegations set forth in this Complaint, challenging Hometown's

origination, underwriting, and quality control practices, and seeking damages and indemnification for Hometown's breaches of representations and warranties related to the nature and quality of loans it sold RFC.  See Compl., Residential Funding Co., LLC v. Hometown Mortg. Servs., Inc., No. 13-cv-3509 (D. Minn. filed Dec. 14, 2013), ECF No. 1 (the "Hometown Action").

89.     At the time RFC commenced the Hometown Action, Hometown was a mortgage originator owned equally by the Individual Defendants, Rohm and Danielczyk. Rohm was Hometown's CEO and Danielczyk was Hometown's CFO.

90.     Facing substantial potential liability to Plaintiffs and other creditors, the Individual Defendants devised a plan to transfer Hometown's business to InterLinc. InterLinc and the Individual Defendants were to be the prime beneficiaries of this plan, pursuant to which InterLinc would acquire Hometown for nominal consideration, and the Individual Defendants would receive, among other consideration, lucrative employment with InterLinc and continue to run Hometown's business under the InterLinc name. InterLinc and the Individual Defendants would purport to leave behind Hometown's liabilities, including Hometown's substantial liability to Plaintiffs for selling defective mortgage loans.  Plaintiffs would, under this plan, be left with claims against an empty shell.

91.     Just a few months after RFC filed the Hometown Action, the Individual Defendants and InterLinc executed on their plan.  InterLinc continued Hometown's business operations under the InterLinc name.  To do so, InterLinc used Hometown's

former offices in Birmingham, Alabama as the offices for its new InterLinc Alabama division.  InterLinc even took virtually all of Hometown's office furniture and equipment.

92.     The Individual Defendants continued (and continue to this day) to run Hometown's former business operations as "branch managers" of InterLinc's Alabama division.   They also took Hometown's former employees with them.   InterLinc's Alabama division and its employees hold themselves out to be a continuation of Hometown by publicly referring to InterLinc Alabama as "formerly" or "previously known as" Hometown.

93.     The Individual Defendants and InterLinc purported to leave Hometown's liabilities behind by structuring the transaction as an asset purchase pursuant to an Asset Purchase Agreement (the "APA") effective as of on March 3, 2014.  (See Exhibit G.) But the APA reveals the true nature of the transaction.   Under the APA, InterLinc assumed Hometown's leases that were necessary to continue the business from the same location.  (See id. § 1.03, Schedule 1.01D.)  Moreover, under the APA, the entire transaction was subject to a condition precedent that certain of Hometown's employees "must have accepted an offer of employment with Buyer prior to the Closing of the employee's branch Transaction."  (See id. § 5.04; see also id. Schedule 1.01C.)

94.     That Hometown was effectively merged into InterLinc is apparent from a 2014 press release about the transaction.   In that press release, Rohm stated that "[t]ogether with InterLinc, we will be well positioned to capitalize future growth within the Southeast footprint.  Our team of professionals are the perfect fit to join the InterLinc platform and we will bring an array of new products and services to the communities we

serve."  In that same press release, Danielczyk added that "InterLinc is certainly the team we wanted to align with."

95.    With InterLinc having continued Hometown's business, Hometown ceased all business operations at the time of the transaction, and became an empty shell purportedly still subject to Plaintiffs' and certain other creditors' claims, but now with no assets or business to satisfy those claims.  The only consideration that Hometown received for the sale of substantially all of its assets to InterLinc was $124,806.70, which was attributable to "office furniture and equipment."

96.    Hometown was insolvent at the time it closed the sale to InterLinc, or was rendered insolvent thereby.  Hometown received only $124,806.70 in exchange for substantially all of its assets.  At the same time, Hometown owed Plaintiffs at least $44 million on account of its obligations under the Agreement, including its obligation to indemnify Plaintiffs for the global settlement in RFC's bankruptcy, which had been consummated in December 2013.  In addition, as reflected in proofs of claim filed in Hometown's subsequent Chapter 7 bankruptcy case, Hometown owed the Internal Revenue Service nearly $36,000 for taxes incurred during the same quarter as the InterLinc sale, and Lehman Brothers Holdings, Inc. more than $190,000 based upon a loan it purchased from Hometown in 2004, and that was liquidated in 2011.

97.    Hometown conducted no business after March 2014.  Hometown surrendered all of its state licenses to originate mortgages by June 2014.  The Individual Defendants caused Hometown to file for bankruptcy in the United States Bankruptcy Court for the Northern District of Alabama on September 1, 2015.

98.  Rohm signed Hometown's bankruptcy petition, and both Individual Defendants signed a Written Resolution And Consent Of The Board Of Directors And All Shareholders approving Hometown's bankruptcy filing.  The Schedules attached to the petition (which also were signed by Rohm) admitted that Hometown was insolvent, with $140,930.93 in total assets, and $286,999.39 in total liabilities.  Hometown's only assets were:

i)  a single checking account containing $135;

ii)  two accounts receivable in the form of one performing and one nonperforming residential mortgage loan, which mortgages had an aggregate face amount of $149,595.93, and which the Chapter 7 trustee in Hometown's bankruptcy, Thomas E. Reynolds ("Trustee"), sold to the Individual Defendants for $57,500;

iii)  mortgage files held in storage; and

iv)  one computer server, which the Chapter 7 Trustee valued at $200.

99.  In fact, Hometown's bankruptcy Schedules grossly understated the extent of Hometown's insolvency.  The Schedules listed Plaintiffs as being owed only $75,000, notwithstanding Hometown's substantially greater liability under the Agreement, including to indemnify Plaintiffs on account of the global settlement in RFC's bankruptcy case.  Indeed, Hometown's Chapter 7 Trustee stipulated that Plaintiffs were owed $44 million by Hometown.  Likewise, the Schedules showed $140,930.93 in total assets, but the Chapter 7 Trustee realized only $57,500 on account of those assets.

100.    Not wanting to reveal to Hometown's creditors that Hometown's business was continuing under the InterLinc name, the Individual Defendants caused Hometown's bankruptcy petition to disclose only that InterLinc had paid $124,806.70 for Hometown's "office furniture and equipment." Hometown did not disclose that InterLinc had taken over Hometown's offices, taken Hometown's management, and taken Hometown's employees. Creditors, including Plaintiffs, were kept in the dark that InterLinc was continuing Hometown's business under a new name.

101.    Because InterLinc holds itself out as a continuation of Hometown, and because it is continuing Hometown's operations, using Hometown's assets and former offices, and employing Hometown's former employees, InterLinc is merely a continuation of Hometown, and/or Hometown was *de facto* merged into InterLinc.

102.    The sale of Hometown's assets to InterLinc also was an actual fraudulent transfer intended to avoid Hometown's liability to Plaintiffs and to benefit (1) InterLinc, by allowing it to acquire Hometown's business for nominal consideration and (2) the Individual Defendants, by ensuring they would have, among other things, lucrative employment with InterLinc. As such, the sale should be avoided to the extent necessary to satisfy Plaintiffs' claims. InterLinc and the Individual Defendants collaborated to strip Hometown of its assets and eliminate exposure to significant and mounting liabilities, including Plaintiffs' claims. Hometown plainly did not receive reasonably equivalent value in exchange for selling its business operations and assets to InterLinc. Hometown was paid only for "office furniture and equipment," and nothing for its valuable, ongoing business operations. Moreover, Hometown was insolvent at the time of the transaction,

or else became insolvent as a result of it, as demonstrated by its filing for bankruptcy shortly thereafter and by the fact that Hometown's liabilities exceeded its assets by more than $44 million.  In short, Hometown (through the Individual Defendants) and InterLinc executed this transaction with the intent to hinder, delay, or defraud creditors of Hometown, including Plaintiffs.

103.     The sale of Hometown's assets to InterLinc also was a constructive fraudulent transfer because (1) Hometown did not receive a reasonably equivalent value in exchange for the transfer of its assets, and (2) Hometown was insolvent at the time of the transfer of its assets, or became insolvent as a result thereof.  Hometown also was left with insufficient assets for transactions it was then engaged in or planned to engage in, or to cover debts it intended to incur or reasonably should have believed it would incur.

**Hometown's Chapter 7 Bankruptcy**

104.     As noted, Hometown filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama Southern Division on or about September 1, 2015.  Thomas E. Reynolds was appointed as the Chapter 7 Trustee.

105.     The Trust filed a proof of claim in Hometown's Chapter 7 case on December 23, 2015, which proof of claim was amended on March 25, 2016 (the "ResCap Claim").  The ResCap Claim was based on the Hometown Action and asserted damages arising out of Hometown's sale of mortgages to RFC.

106.     The Trustee subsequently entered into an agreement with Plaintiffs, pursuant to which (1) the Trustee stipulated to the allowance of Plaintiffs' claim against

Hometown in the amount of $44 million, and (2) the Trustee agreed to assign to Plaintiffs certain of Hometown's remaining assets, including "any and all claims, suits, and causes of action, whether arising under law or equity, that belong to Hometown or its bankruptcy estate, or that may be commenced or pursued by the Trustee on behalf of or for the benefit of Hometown's estate, including any causes of action under chapter 5 of the Bankruptcy Code."  In return, Plaintiffs agreed to forego a distribution from Hometown's Chapter 7 estate, "without prejudice to ResCap's rights to seek recovery from any entity other than Hometown's bankruptcy estate."  In light of Hometown's insolvency, however, such distribution would have been less than $25,000.

## COUNT ONE
## (BREACH OF CONTRACT AGAINST INTERLINC)

107.    Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 106 above as if fully set forth herein.

108.    RFC and Hometown entered into a valid and enforceable Agreement pursuant to which RFC acquired over 2,000 mortgage loans from Hometown.

109.    Pursuant to the parties' Agreement, Hometown made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans it sold to RFC.

110.    InterLinc succeeded to Hometown's liabilities and obligations under the Agreement when it acquired Hometown's residential mortgage operation and substantially all of Hometown's assets in March 2014.  InterLinc is a mere continuation of, or *de facto* merged with, Hometown because it took on and absorbed Hometown's

business operations as Hometown ceased them, including the liabilities and obligations ordinarily necessary for the uninterrupted continuation of those operations, and the continued use of the beneficial assets and operation of the viable business that Hometown transferred to it, including by retaining Hometown's office, virtually all of Hometown's employees, and making the Individual Defendants branch managers of a newly-formed division of InterLinc, InterLinc Alabama.

111.    InterLinc also succeeded to Hometown's liabilities and obligations because the transfer of assets from Hometown to InterLinc was a constructive fraudulent transfer and also an actual fraudulent transfer, as alleged in paragraphs 87 through 106 hereof, which paragraphs are realleged as if fully set forth herein.

112.    RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

113.    Hometown materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

114.    Hometown's material breaches constitute Events of Default under the Agreement.

115.    Plaintiffs have suffered loss, harm, and financial exposure directly attributable to Hometown's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against

RFC stemming in part from materially defective loans sold to RFC by Hometown and fees and costs incurred in prosecuting this action.

116.     Accordingly, Plaintiffs are entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION AGAINST INTERLINC)

117.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 116 above as if fully set forth herein.

118.     Plaintiffs have incurred substantial liabilities, losses, and damages arising from and relating to material defects in the mortgage loans Hometown sold to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Hometown.

119.     Hometown expressly agreed to indemnify RFC for the liabilities, losses, and damages, including attorneys' fees and costs, which RFC has incurred.

120.     InterLinc succeeded to Hometown's liabilities and obligations under the Agreement when it acquired Hometown's residential mortgage operation in March 2014. InterLinc is a mere continuation of, or *de facto* merged with, Hometown, as set forth above.

121.     InterLinc also succeeded to Hometown's liabilities and obligations because the transfer of assets from Hometown to InterLinc was a constructive fraudulent transfer and also an actual fraudulent transfer, as alleged in paragraphs 87 through 106 hereof, which paragraphs are realleged as if fully set forth herein.

122.     Accordingly, Plaintiffs are entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

## COUNT THREE
### (CONSTRUCTIVE FRAUDULENT TRANSFER
### AGAINST ALL DEFENDANTS)

123.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 122 above as if fully set forth herein.

124.     Plaintiffs are creditors of Hometown based on Plaintiffs' allowed claims in Hometown's Chapter 7 case for, among other things, Hometown's breaches of representations and warranties with respect to mortgage loans Hometown sold to RFC. Plaintiffs also were creditors of Hometown on and prior to March 3, 2014, because the Agreement was executed prior to that date, Hometown breached the Agreement prior to that date, the bankruptcy court in RFC's bankruptcy case approved the global settlement prior to that date, and Plaintiffs commenced their Hometown Action prior to that date. As noted above, the Uniform Fraudulent Transfer Act defines a "creditor" as "a person who has a claim," and it defines a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  On or prior to March 3,

2014, RFC had a right to payment from Hometown as provided in the Uniform Fraudulent Transfer Act, and thus was a creditor of Hometown.

125.     Hometown ceased its ordinary business operations around March 3, 2014, when it sold its valuable operating assets to InterLinc while Plaintiffs' Hometown Action was pending.

126.     Hometown received less than reasonably equivalent value for the valuable assets it sold to InterLinc.

127.     Hometown was insolvent at the time it transferred its assets to InterLinc or was rendered insolvent by that transfer.  Indeed, at the time of the transaction, Hometown faced at least $44 million of liability to Plaintiffs in the Hometown Action, which claim was later allowed in that amount in Hometown's bankruptcy.  As a result of the transfer to InterLinc, Hometown was left with at most de minimis assets that were less than Hometown's liabilities at a fair valuation.

128.     Moreover, Hometown was admittedly insolvent when it filed its Chapter 7 bankruptcy petition because it listed $140,930.93 in assets and $286,999.39 in liabilities (which liabilities grossly understated the $44 million that Hometown owed to RFC). Hometown ceased doing business immediately after the transaction—which it had to do, since it did not have any assets with which to carry on a business.  Thus, between the transaction with InterLinc and Hometown's Chapter 7 bankruptcy petition, Hometown was not engaged in any activities that changed its financial condition.  Accordingly, Hometown's insolvency as of its bankruptcy petition is further evidence of its insolvency at the time of the transfer under the doctrine of retrojection.

129.     Despite having originated $300 million in residential mortgage loans as recently as 2012 and generating millions of dollars in annual revenue, on September 1, 2015, Hometown filed a voluntary petition for Chapter 7 relief under the United States Bankruptcy Code, declaring less than $150,000 in assets.

130.     The InterLinc transaction also left Hometown with unreasonably small assets for the business in which it was engaged, including satisfying its obligations under the Agreement.  Hometown knew or reasonably should have known that it had continuing obligations to Plaintiffs under the Agreement.  Through the InterLinc transaction, Hometown thus also intended to incur, or believed or reasonably should have believed that it would incur, more debts than it would be able to pay.

131.     InterLinc is therefore a recipient of a constructive fraudulent transfer.

132.     The Individual Defendants, together with InterLinc, implemented the transfer of Hometown's assets to InterLinc for the purpose of benefitting themselves by ensuring, among other things, lucrative employment with InterLinc.  Thus, the Individual Defendants are individuals for whose benefit the constructive fraudulent transfer was made, and are actual and intended beneficiaries of the constructive fraudulent transfer.

133.     Plaintiffs were creditors of Hometown at the time of the InterLinc transaction.  As creditors of Hometown, Plaintiffs have standing to assert and recover on account of constructive fraudulent transfer claims in accordance with applicable state laws, including but not limited to the Uniform Fraudulent Transfer Act.  In addition, as assignees of Hometown's Chapter 7 estate and Trustee pursuant to Plaintiffs' agreement with the Trustee, Plaintiffs have standing to assert and recover on account of constructive

fraudulent transfer claims in accordance with the Bankruptcy Code, including 11 U.S.C.

§§ 544 and 548.

### COUNT FOUR
### (ACTUAL FRAUDULENT TRANSFER
### AGAINST ALL DEFENDANTS)

134.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1

through 133 above as if fully set forth herein.

135.     The transaction between Hometown and InterLinc was made with the

actual intent to hinder, delay, or defraud Hometown's creditors, including Plaintiffs.  The

transaction evidences numerous badges of fraud, including: (1) it benefitted insiders of

Hometown, the Individual Defendants, who, among other things, both received

management positions with InterLinc; (2) the true nature of the transaction was

concealed, namely that InterLinc did not purport to acquire Hometown's business, but

rather purported only to acquire Hometown's office furniture and equipment; (3) before

the transfer occurred, Plaintiffs had commenced their Hometown Action; (4) the transfer

was of substantially all of Hometown's assets; (5) Hometown did not receive reasonably

equivalent value for the assets; and (6) Hometown was rendered insolvent by the

transaction.

136.     InterLinc is therefore a recipient of an actual fraudulent transfer.

137.     The Individual Defendants, together with InterLinc, implemented the

transfer of Hometown's assets to InterLinc to benefit themselves by ensuring, among

other things, lucrative employment with InterLinc.  Thus, the Individual Defendants are

individuals for whose benefit the actual fraudulent transfer was made, and are actual and intended beneficiaries of the actual fraudulent transfer.

138.     As creditors of Hometown, Plaintiffs have standing to assert and recover on account of actual fraudulent transfer claims in accordance with applicable state laws, including, but not limited to, the Uniform Fraudulent Transfer Act.  In addition, as assignees of Hometown's Chapter 7 estate and Trustee pursuant to Plaintiffs' agreement with the Trustee, Plaintiffs have standing to assert and recover on account of actual fraudulent transfer claims in accordance with the Bankruptcy Code, including 11 U.S.C. §§ 544 and 548.

139.     Accordingly, Plaintiffs are entitled to a determination that InterLinc is liable as a successor for Hometown's liabilities for breach of contract and indemnification to Plaintiffs, avoidance of InterLinc's transaction with Hometown to the extent necessary to satisfy Plaintiffs' claims, and payment of damages sufficient to satisfy Plaintiffs' claims.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants as follows:

(A)     Contractual repurchase compensation and/or damages from InterLinc in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs;

(B)     A declaratory judgment that InterLinc is responsible to indemnify Plaintiffs against liabilities, losses, expenses, and/or other damages paid or to be paid in settlements or otherwise stemming from Hometown's conduct;

(C)     An order for damages sufficient to reimburse Plaintiffs for RFC's liabilities, losses, costs, and expenses caused by Hometown's actions in excess of $75,000 and in an amount to be proven at trial;

(D)     Avoidance of Hometown's transfers of assets to InterLinc to the extent necessary to satisfy Plaintiffs' claims, and payment of damages by Defendants in an amount sufficient to satisfy Plaintiffs' claims;

(E)     An award of attorneys' fees, interest, and costs; and

(F)     All such further relief as the Court deems necessary or proper.

Dated:  May 25, 2017

<table>
<tr><td>

FELHABER LARSON

By:   <u>*s/Jessica J. Nelson*</u>
    Donald G. Heeman, #286023
    Jessica J. Nelson, #347358
    220 South Sixth Street, Suite 2200
    Minneapolis, MN  55402-4504
    Telephone:  (612) 339-6321
    Facsimile:  (612) 338-0535
    dheeman@felhaber.com
    jnelson@felhaber.com

</td><td>

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
    Peter E. Calamari (admitted *pro hac vice*)
    David Elsberg (admitted *pro hac vice*)
    Isaac Nesser (admitted *pro hac vice*)
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    Telephone:  (212) 849-7000
    Facsimile:  (212) 849-7100
    PeterCalamari@quinnemanuel.com
    DavidElsberg@quinnemanuel.com
    IsaacNesser@quinnemanuel.com

</td></tr>
<tr><td>

CARPENTER LIPPS & LELAND LLP
 Jeffrey A. Lipps (admitted *pro hac vice*)
 Jennifer A.L. Battle (admitted *pro hac vice*)
 280 Plaza, Suite 1300
 280 North High Street
 Columbus, Ohio 43215
 Telephone:  (614) 365-4100
 Facsimile:  (614) 365-9145
 lipps@CarpenterLipps.com
 battle@CarpenterLipps.com

</td><td>

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
   Anthony P. Alden (admitted *pro hac vice*)
   Johanna Ong (admitted *pro hac vice*)
   865 S. Figueroa Street, 10th Floor
   Los Angeles, CA 90017
   Telephone:  (213) 443-3000
   Facsimile:  (213) 443-3100
   AnthonyAlden@quinnemanuel.com
   JohannaOng@quinnemanuel.com

</td></tr>
</table>

*Attorneys for Plaintiffs Residential Funding Company, LLC*
*and ResCap Liquidating Trust*