# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and RESCAP Liquidating Trust Action | Case No. 13-cv-3351 (SRN/HB) |

# MEMORANDUM OPINION AND ORDER
# ON COMMON-ISSUE MOTIONS
# FOR SUMMARY JUDGMENT

# Table of Contents

I.   Introduction ........................................................................................ 1
II.  Background ......................................................................................... 1
     A. Securitization ............................................................................... 1
     B. Historical Background .................................................................. 2
     C. The Client Contract and the Client Guide .................................... 3
        1. Section 113: General Rules of Interpretation ......................... 6
        2. Section A200: Knowledge, Reliance and Waiver ................... 7
        3. Section A202: Representations and Warranties ...................... 8
        4. Sections A208 and A209: Events of Default and Non-Exclusive,
           Cumulative Remedies ............................................................ 8
        5. Section A210: Repurchase ..................................................... 9
        6. Section A212: Indemnification ............................................ 11
     D. Bankruptcy ................................................................................ 12
     E. Procedural History ..................................................................... 20
III. Discussion ........................................................................................ 22
     A. Standard of Review .................................................................... 22
     B. Summary Judgment Motions ...................................................... 22
     C. Principles of the Law of Contractual Indemnity ........................ 24
     D. Principles of Contract Interpretation ......................................... 28
     E. Cross Motions for Summary Judgment ....................................... 31
        1. Misconduct Defense against Indemnification ...................... 31
        2. Whether Plaintiffs Can Recover Losses and Liabilities Incurred from
           "Expired" Loans ................................................................... 42
        3. Recovery for Claims Released in Bankruptcy ...................... 50
        4. Sampling ............................................................................... 57
     F. Plaintiffs' Motions for Summary Judgment ................................ 69
        1. The Scope of Plaintiffs' Sole Discretion under the Client Guide .......... 69
           a. The Scope of Plaintiffs' Sole Discretion to Determine Breaches
              ........................................................................................ 69
           b. The Scope of Plaintiffs' Sole Discretion to Make All Settlement
              Decisions ......................................................................... 74
        2. The Scope of Plaintiffs' Potential Recovery in Indemnity ................... 81
           a. Recovery in Indemnity for RFC's Losses and Liabilities (the
              Allowed Claims), Not Just Actual Losses Incurred .................. 81
           b. Recovery for All Losses ................................................. 90
        3. Causation ............................................................................. 91
           a. Applicable Legal Standard .............................................. 92
           b. Genuine Issues of Material Fact Preclude a Finding of Causation
              as a Matter of Law ......................................................... 98
           c. Causation Defenses ....................................................... 104

i

     4. Affirmative Defenses ............................................................ 109
        a. Estoppel ..................................................................... 110
           i. HLC ................................................................ 111
           ii. Standard Pacific and CTX ............................. 113
           iii. Analysis ........................................................ 115
        b. Waiver Defense Based on "Assetwise" .................................... 116
        c. Knowledge- and Reliance-Based Defenses ............................ 124
           i. Breach of Contract Claim ............................... 126
           ii. Indemnity Claim .......................................... 128
        d. Good Faith and Fair Dealing .................................... 134
   G. Defendants' Motions for Summary Judgment ......................... 138
     1. Statute of Limitations for Loans Sold Before May 14, 2006 ............. 139
     2. Whether RFC's Expert Opinions Foreclose Relief ........................... 147
     3. Plaintiffs' Damages Models ......................................... 149
        a. Breaching Loss Approach.......................................... 151
           i. Whether RFC May Recover Repurchase Damages under
               Section A210 ................................................ 151
           ii. Whether RFC May Recover Repurchase Damages under
               the Indemnification Provisions in Section A212........... 158
           iii. Analysis ........................................................ 162
        b. Allocated Breaching Loss Approach ........................................ 163
           i. Whether the Allocated Breaching Loss Approach Offers
               Non-Speculative Bases to Allocate the Trust Settlement
               ...................................................................... 164
               (1) Allocation under *UnitedHealth* ...................... 164
               (2) Defendants' Criticisms of the Methodology of the
                    Allocated Breaching Loss Approach............... 168
           ii. Analysis ........................................................ 173
        c. Allocated Loss Approach ........................................ 176
           i. Whether the Allocated Loss Approach Offers Non-
               Speculative Bases to Allocate the Settlements............. 177
           ii. Analysis ........................................................ 178
IV.    Conclusion .................................................................... 179

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Before the Court are the parties' cross motions for summary judgment on common issues in the first-wave actions.[1]  On June 19 and 20, 2018, the Court heard oral argument on the parties' motions. For the reasons set forth below, Plaintiffs' Motion for Summary Judgment on Common Issues [Doc. No. 3241] is granted in part, denied in part, and denied without prejudice in part, and Defendants' Motion for Summary Judgment on Common Issues [Doc. No. 3247] is granted in part and denied in part.

## II.    BACKGROUND

### A.    Securitization

The majority of U.S. mortgages are financed through the securitization process. Adam J. Levitin & Susan M. Wachter, *Explaining the Housing Bubble*, 100 GEO. L.J. 1177, 1182, 1187 (2012).  "Securitization" involves pooling large numbers of housing loans, then selling them to a trust.  *Baker v. Citimortgage, Inc.*, No. 17-cv-2271 (SRN/KMM), 2017 WL 6886712, at *4 (D. Minn. Dec. 21, 2017) (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 648 (8th Cir. 2001)).   A mortgage lender raises funds for new mortgages through this process.  *Id.* (citing *BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.,* 673 F.3d 169, 173 (2d Cir. 2012)).  The trust pays for the loans by issuing securities for which the loans serve as collateral.  *Id.*   "The right to receive

---

[1] Individual Defendants' summary judgment motions on Defendant-specific issues will be addressed in separate orders.   Likewise, the parties' *Daubert* motions will be addressed separately.

trust income is parceled into certificates and sold to investors, called certificateholders." *Id.*

Purchasers of the securities often require that they be insured by monoline insurers as a

hedge against investment risk. *In re Barclays Bank PLC Securities Litig.*, No. 09 Civ. 1989

(PAC), 2017 WL 4082305, at *4 (S.D.N.Y. Sept. 13, 2017), *appeal docketed*, No. 17-3293

(2d Cir. Oct. 16, 2017).

## B. Historical Background

In the early- to mid-2000s, a rise in home prices in the U.S. was "driven by increased

demand, low interest rates, and easy credit access." *Id.* While an initial mortgage

refinancing boom from 2001 to 2003 led to increased earnings for mortgage originators and

securitizers, when long-term interest rates began to rise, the mortgage industry sought other

ways to maintain origination volumes. Levitin & Wachter, *supra,* at 1193–94). The

solution required industry players "to find more product to move in order to maintain

origination volumes and, hence, earnings." *Id.* at 1194.

A second mortgage boom ensued after 2003, but "[b]ecause the prime borrowing

pool was exhausted, it was necessary to lower underwriting standards and look more to

marginal borrowers to support origination volume levels." *Id.* During this time period,

"[l]enders provided mortgage loans to many high-risk borrowers with questionable ability to

repay, fueled in large part by the opportunity to package and sell those mortgages into the

growing market for [residential] mortgage-backed securities ("[R]MBSs"). " *In re Barclays*

*Bank,* 2017 WL 4082305, at *4.

In the mid-2000s, the "explosion in the market for [RMBS]" resulted in a securitization market frenzy. *Fed. Hous. Fin. Agency for Fed. Nat'l Mortgage Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 96 (2d Cir. 2017) (citing Levitin & Wachter, *supra*, at 1192–202). It was not to last. Among other things, housing prices fell and

> [l]ate 2006 and 2007 saw a dramatic rise in mortgage loan defaults, causing the value of the related securities, whose income depended on borrower payments, to deteriorate. Banks and other investors began to experience substantial losses; and many monoline insurers could not accommodate such loss, given its quick pace and dramatic size.

*In re Barclays Bank,* 2017 WL 4082305, at *4. The global economy experienced an unprecedented downturn in 2008 "that had a profoundly negative effect on the real estate and credit markets." *S.E.C. v. True North Fin. Corp.*, 909 F. Supp. 2d 1073, 1083) (D. Minn. Nov. 9, 2012) (citations omitted).

## C. The Client Contract and the Client Guide

Plaintiffs[2] and Defendants here were all participants in the RMBS market frenzy and its ultimate collapse. Prior to RFC's May 2012 bankruptcy, it served as a middleman in the RMBS industry, both acquiring and securitizing residential mortgage loans. First,

---

[2] RFC, which had its principal place of business in Minneapolis, Minnesota, was an affiliate in a chain of multiple corporate entities. (*See, e.g., Residential Funding Co., LLC v. Home Loan Center, Inc.*, 14-cv-1716 (SRN/HB), First Am. Compl. ¶ 13 [Doc. No. 1-2].) It was a wholly owned subsidiary of GMAC Residential Holding Company, LLC, which was in turn a wholly owned subsidiary of Residential Capital, LLC. (*Id.*) Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group, LLC, which was in turn a wholly owned subsidiary of Ally Financial, Inc. (*Id.*) Upon the approval of RFC's Chapter 11 bankruptcy plan, discussed in greater detail below, GMAC Residential Holding Company, LLC's interest in RFC was canceled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights and interests and now controls RFC. (*Id.*) The Court collectively refers to RFC and the Trust as "Plaintiffs" or simply as "RFC."

RFC purchased residential mortgage loans from numerous originating financial lenders,[3] including Defendants Home Loan Center, Inc., CTX Mortgage Co., LLC, Standard Pacific Mortgage, Inc., Impac Funding Corp., iServe Residential Lending, LLC, and Freedom Mortgage Corporation (collectively, "Defendants"), and bundled them into securitization pools of thousands of loans. (*See* Decl. of Matthew R. Scheck ("Scheck Decl.") [Doc. No. 3258], Ex. 10 (Horst Dep. at 620–23; *id.*, Ex. 36 (Ruckdaschel Dep. at 40–41); *id.*, Ex. 19 (Corr. Hawthorne Rpt. ¶ 17).)[4] RFC did not underwrite the loans; rather, it understood that the originating lenders "[were] responsible for . . . underwriting prudently [and] ensuring that the loan met all of [RFC's contractual and underwriting] requirements . . . ." (*Id.*, Ex. 10 (Horst Dep. at 620–21).)

Second, in its middleman role, RFC then sold the pooled loans into residential mortgage-backed securitization ("RMBS") trusts ("the Trusts"). (*See id.*, Ex. 19 (Corr. Hawthorne Rpt. ¶ 17).) In the contracts that governed the relationships between RFC and the Trusts, RFC made representations and warranties ("R&Ws") concerning the underwriting quality and credit characteristics of the mortgage loans. (*Id.*) The Trusts issued notes or certificates, supported by the loans' performance, which investors

---

[3] The originating lenders are sometimes also referred to as "correspondent lenders" or "Clients."

[4] Numerous exhibits submitted in support of Plaintiffs' summary judgment arguments are attached to the First and Second Declarations of Matthew R. Scheck [Doc. No. 3258 (App. 1 & Exs. 10–52)] & [Doc. No. 3727 (Exs. 53–76)] (collectively, "Scheck Decl."). The Court's docket citations to the parties' exhibits are to the corresponding declaration to which they are attached.

purchased. (*Id.*) RFC additionally functioned as a "master servicer" for many of the securitizations, overseeing the work of the primary servicers. (*Id.* ¶ 18.)

While both parts of RFC's business model are factually relevant in this consolidated action, the legal focus of this litigation concerns Defendants' potential liability at the first step of selling residential mortgage loans to RFC. To sell their loans, Defendants each separately entered into a "Client Contract" with RFC. (Decl. of Deanna Horst ("Horst Decl.") [Doc. No. 3244], Exs. 2–9 (Defs.' Client Contracts).) Along with the Client Contract, a longer, more detailed document called "the Client Guide" governed the business relationship between RFC and Defendants.[5] (*Id.*, Ex. 1 (Client Guide § 100, Version 1-06-G01, Effective Mar. 13, 2006).)[6] The Client Guide "set[] forth the terms and conditions for selling Loans to []RFC." (*Id.*) Specifically, it provided that the originating lender, or "Client," was "bound by all provisions" of the Client Guide,

---

[5] The face of the Client Contract generally shows that the Client Guide was incorporated into the parties' Client Contract as indicated by a check-off box labeled "Client Guide" or "Seller Guide," indicating its incorporation into the Client Contract by reference, (*see* Horst Decl., Exs. 2-1, 5-1, 6-1, 7, 9 (Defs.' Client Contracts at 1), or through express language to this effect. (*See id.*, Ex. 4 (First Mortg. Client Contract at 1) ("All provisions of the Guides are incorporated by reference into and made a part of this Contract, and shall be binding upon the parties[.]"); *id.*, Ex. 7 (United Residential Lending Client Contract at 1) ("The []RFC Client Guide, as amended, . . . applies to the Loans and to the sale of the Loans to RFC. . . . Client agrees to all of the terms and conditions of the applicable Guides, including the representations, warranties and covenants.").) Defendants dispute whether the Client Guide applies to some or all of their loans. This is a fact issue to be resolved by the jury.

[6] Unless otherwise indicated, all references to the Client Guide are to the Horst Decl., Ex. 1 [Doc. No. 3244-2].

"including but not limited to the [R&Ws] of Client and Remedies of []RFC Sections of this Client Guide [*sic*]." (*Id.* § 101.)

The contractual language most relevant to the parties' summary judgment motions —and discussed in further detail throughout this opinion—is found in Sections 113(A) & (B), A200, A202, A208, A209, A210, and A212 of the Client Guide.

### 1. Section 113: General Rules of Interpretation

Section 113 provides "General Rules of Interpretation" applicable to all provisions of the Client Guide. Two subsections are most pertinent here—the first, Section 113(A) addresses the word "knowledge," as used in the Client Guide, and the second, Section 113(B) addresses RFC's "sole discretion." (*Id.* § 113(A) & (B).) In Section 113(A), "knowledge," as used throughout the Client Guide, holds an originating lender/Client to a strict standard of both actual and constructive knowledge:

(A) "Knowledge" Standard

Whenever any representation, warranty, or other statement contained in this Client Guide is qualified by reference to a Client's "knowledge" or "to the best of" a party's "knowledge", such "knowledge" shall be deemed to include knowledge of facts or conditions of which Client, including (without limitation) any of its directors, officers, agents, or employees, either is actually aware or should have been aware under the circumstances with the exercise of reasonable care, due diligence, and competence in discharging its duties under this Client Guide and the Program Documents. All matters of public record shall be deemed to be known by the Client. Any representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of Client, unless Client demonstrates otherwise. "Due diligence" means that care which Client would exercise in obtaining and verifying information for a Loan in which Client would be entirely dependent on the Mortgaged Property or Mortgagor's credit as security to protect its investment.

(*Id.* § 113(A).)

The other relevant interpretative language in Section 113(B) vests RFC with broad

authority to make determinations of fact and decisions to act, stating:

> Whenever any provision of this Client Guide contract requires []RFC to make a determination of fact or a decision to act, or to permit, approve or deny another party's action such determination or decision shall be made in []RFC's sole discretion.

(*Id.* § 113(B).)

## 2. Section A200: Knowledge, Reliance and Waiver

The originating lenders' general R&Ws and covenants are set forth in Section

A200. In that provision, the originating lenders acknowledge that RFC purchases the

loans in reliance on the originating lenders' R&Ws, and the originating lenders agree to

assume liability for any misrepresentations for breaches, regardless of their knowledge or

RFC's knowledge. (*Id.* § A200).) Moreover, it explicitly provides that there can be no

waiver of the provisions of the Client Guide unless RFC expressly makes such a waiver

in writing:

> The Client acknowledges that []RFC purchases Loans in reliance upon the accuracy and truth of the Client's warranties and representations and upon the Client's compliance with the agreements, requirements, terms and conditions set forth in the Client Contract and this Client Guide.
>
> All such representations and warranties are absolute, and the Client is fully liable for any misrepresentation or breach of warranty regardless of whether it or []RFC actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty.
>
> The representations and warranties pertaining to each Loan purchased by []RFC survive the Funding Date, any simultaneous or post-purchase sale of

serving with respect to the Loan and any termination of the Client Contract, and are not affected by any investigation or review made by, or on behalf of, []RFC except when expressly waived in writing by []RFC.

(*Id.*)

### 3.     Section A202:  Representations and Warranties

Section A202 requires originating lenders to make certain R&Ws to RFC regarding "individual loans," including information about the loans' eligibility and accuracy.   (Decl. of Jesse T. Smallwood ("Smallwood Decl.") [Doc. No. 3257], Ex. 4 (Client Guide § A202, Version 1-06-G01, Effective Mar. 13, 2006) [Doc. No. 3260].)[7] Among other things, the originating lenders represent that they have:   verified the accuracy of information used by borrowers to obtain the loans, (*id.* § A202(A)); ensured the proper completion and execution of loan forms, (*id.* § A202(D)); complied with applicable laws, (*id.*); ensured that no default or other breach of loan terms existed in any loan, (*id* § A202(G)); confirmed the market value of the mortgaged property, (*id.* § A202(T)); and not sold any "high risk" loans to RFC.  (*Id.* § A202(J)(1)(d).)

### 4.     Sections A208 and A209:  Events of Default and Non-Exclusive, Cumulative Remedies

Should any of the originating lenders breach these R&Ws by committing an "Event of Default," the Client Guide grants RFC wide-ranging discretion and recourse. (*See id.* § A208) (listing the types of "Events of Default").  Under Section A209, "Non-

---

[7] Numerous exhibits submitted by Defendants in support of their summary judgment arguments are attached to the First, Second, and Third Declarations of Jesse T. Smallwood [Doc. Nos. 3257 (Exs. 1–83), 3604 (Exs. 84–93), and 3896 (Exs. 94–107)] (collectively, "Smallwood Decl.")  The Court's docket citations to the parties' exhibits are to the corresponding declaration to which they are attached.

Exclusive, Cumulative Remedies," the Client Guide broadly provides that "RFC may exercise any remedy outlined in the Client Guide or as allowed by law or in equity." (*Id.* § A209.) Moreover, it states that RFC's exercise of its remedies resulting from an originating lender's default "will not prevent []RFC from exercising: [o]ne or more other remedies in connection with the same Event of Default " or "[a]ny other rights which it may have at law or in equity." (*Id.*)

### 5. Section A210: Repurchase

The Client Guide remedies most relevant here are "Repurchase," in Section A210, and "Indemnification," in Section A212. Under the repurchase provision, if RFC determines that an Event of Default has occurred with respect to a particular loan, the originating lender can be required to repurchase a loan within 30 days of receiving notification from RFC.[8] (*Id.* § A210(A).) The repurchase provision sets forth a specific

---

[8] Section A210 provides in relevant part as follows:

> If []RFC determines that an Event of Default has occurred with respect to a specific Loan, the Client agrees to repurchase the Loan and its servicing (if the Loan was old servicing released) within 30 days of receiving a repurchase letter or other written notification from []RFC.

> If the Client discovers an Event of Default, it should give []RFC prompt written notice. Such notice should include a written description of the Event of Default. Upon receipt of this notice, []RFC will review these materials and any additional information or documentation that the Client believes may influence []RFC'S decision to require repurchase. If []RFC decides to require repurchase, the Client shall repurchase the Loan and the servicing (if the Loan was sold servicing released) within 30 days after []RFC'S decision is communicated to Client in writing.

procedure and formula for determining the repurchase price of a loan.  (*See id.* § A210 (A)-(H).)   In addition, it states, "[]RFC is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase.  However, any delay in making this demand does not constitute a waiver by []RFC of any of its rights or remedies."  (*Id.* § A210 (A).)  Even if RFC determines that repurchase is not the appropriate remedy, the originating lender is nevertheless obliged to pay RFC "all losses, costs and expenses incurred by []RFC and/or the Loan's Servicer as a result of an Event of Default," including reasonable attorneys' fees and related costs incurred in connection with any enforcement efforts.  (*Id.*)

---

[]RFC is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase.  However, any delay in making this demand does not constitute a waiver by []RFC of any of its rights or remedies.

Where []RFC determines that repurchase of a Loan and/or servicing is not appropriate, the Client shall pay []RFC all losses, costs and expenses incurred by []RFC and/or the Loan's Servicer as a result of an Event of Default.  This includes all reasonable attorneys' fees and other costs and expense incurred in connection with enforcement efforts undertaken.

Upon the Client's satisfaction of its repurchase obligation, []RFC will endorse the Note evidencing the Loan in blank and will deliver it and other pertinent Loan Documents to the Client.  If []RFC acquired title to any of the real property securing the Loan pursuant to a foreclosure sale and has not disposed of such property, it will transfer such property to the Client "quit claim" basis or, if required by State law, a "warranty deed" basis.  However, if []RFC has disposed of the real property securing the Loan, the Loan Documents will not be returned to the Client unless requested.

(Client Guide § A210.)

## 6.     Section A212:  Indemnification

The Client Guide's provision for the remedy of indemnification, Section A212, also provides RFC with wide-ranging indemnification in the event of an originating lender's default.   The indemnification provision requires the originating lender to indemnify RFC from

> all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other coasts, fees, and expenses resulting from any Event of Default.  This includes, without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract, (iii) any claim, demand, defense or assertion against or involving []RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by []RFC in reliance upon any warranty, obligation or representation made by the Client contained in the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the Client in information required under Regulation AB or any successor regulation.

(*Id.* § A212.)[9]

Versions of the Client Guide from July 1, 2002 forward contain additional language regarding the loan originators' broad indemnification obligations to RFC:

> In addition, Client shall indemnify []RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by []RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by Client, or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.  With regard to legal fees or other expenses incurred by or on behalf of []RFC in connection with any such litigation or governmental proceeding, Client shall reimburse []RFC for such fees and

---

[9] Differences in the language of earlier versions of this paragraph are addressed *infra,* Section III.F.2.a.

expenses. . . . Except for notices for reimbursement, []RFC is not required to give Client notice of any litigation or governmental proceeding that may trigger indemnification obligations. Client shall instruct its officers, directors and agents (including legal counsel) to cooperate with []RFC in connection with the defense of any litigation or governmental proceeding involving a Loan. []RFC has the right to control any litigation or governmental proceeding related to a Loan, including but not limited to choosing defense counsel and making settlement decisions.

(Scheck Decl., App. 1 (Evolution of Client Guide § A212).)

## D. Bankruptcy

As this Court previously noted, Plaintiffs and the originating-lender Defendants were active participants in the RMBS market frenzy. During its heyday, they undoubtedly reaped considerable financial benefits from their relationships with each other. But beginning in 2007, and consistent with events throughout the RMBS industry, the loans in the RFC-sponsored and serviced securitizations experienced a high rate of default. (*Id.,* Ex. 19 (Corr. Hawthorne Rpt. ¶ 19).) The Trusts consequently sustained significant financial losses. (*Id.*) Multiple entities, including the RMBS Trustees, demanded repurchase and/or filed lawsuits against RFC, alleging that their losses were caused by the poor quality of the loans in RFC's securitizations. (*Id.* ¶ 20.)

Each RMBS securitization that RFC sponsored or serviced was administered by a Trustee. (*Id.*) The Trustee was authorized to seek remedies against RFC to recover losses experienced by the securitization due to contractual breaches by RFC. (*Id.*) Any recoveries that the Trustees obtained would be paid to the Trusts, and ultimately benefit the investors. (*Id.*) The following Trustees sought relief against Plaintiffs and participated in a settlement with them ("the RMBS Trustee Settlement"): Deutsche Bank

National Trust Company and Deutsche Bank Trust Company Americas ("Deutsche Bank"), Bank of New York Mellon ("BNYM"), U.S. Bank N.A. ("US Bank"), HSBC Bank USA, N.A. ("HSBC"), and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, the "RMBS Trustees"). (*Id.*)

Other securitizations that RFC sponsored or serviced, or securitizations into which it sold loans, carried financial guaranty insurance furnished by monoline insurers.[10] (*Id.*) The monoline insurers included MBIA Insurance Corporation ("MBIA"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Municipal Corporation (formerly known as Financial Security Assurance, Inc.) ("Assured"), Ambac Assurance Corporation ("Ambac"), and Syncora Guarantee Inc. ("Syncora") (collectively, the "Monolines"). (*Id.* ¶ 21.) Under the insurance policies, the Monolines generally guaranteed that investors would receive timely payments of principal and interest on their notes or certificates. (*Id.* ¶ 20.) If a defaulted loan caused a trust to be unable to timely pay its investors, the Monolines were to compensate the trust for the shortfall. (*Id.*) Due to the high rate of default in the RFC-sponsored and serviced securitizations in 2007, the Monolines made "substantial payments" to their insureds under their policies, and were likely to incur future payments as well. (*Id.*)

Beginning in approximately 2008, the RMBS Trustees and Monolines filed lawsuits against Plaintiffs alleging claims for breach of representation and warranty,

---

[10] A monoline insurer undertakes to pay the principal and interest on a bond in the event of a default. *Monoline Insurer, Collins English Dictionary*, https://www. collinsdictionary.com/us/dictionary/english/monoline-insurer (last visited Aug. 15, 2018).

fraud, and servicing-related claims arising from Plaintiffs' sale of the allegedly defective mortgage loans. (*Id.* ¶¶ 21–22; Scheck Decl., Ex. 28 (Bankr. Findings of Fact ¶¶ 98–108, 124–25).)

On May 13, 2012, Plaintiffs entered into a proposed $8.7 billion settlement ("Original RMBS Settlement") with two groups of RMBS Trust investors that had holdings in approximately 392 securitization trusts. (Scheck Decl., Ex. 19 (Corr. Hawthorne Rpt. ¶ 23); *id.*, Ex. 20 (Debtors' 9019 Mot. ¶¶ 17–20).) Absent settlement, Plaintiffs' then-expert Frank Sillman estimated that lifetime losses for these trusts could have ranged between $45.6 billion to $49.8 billion. (*Id.*, Ex. 28 (Bankr. Findings of Fact ¶ 101).)

The following day, and as contemplated by the Original RMBS Settlement, Plaintiffs filed for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").[11] (*Id.*, Ex. 19 (Corr. Hawthorne Rpt. ¶ 20); *id.*, Ex. 21 (Debtor's Voluntary Pet.).) Shortly thereafter, the Bankruptcy Court appointed an examiner to investigate the Plaintiffs' pre-petition activities. (*Id.*, Ex. 28 (Bankr. Findings of Fact ¶ 3).)

Multiple entities filed RMBS-related proofs of claim with the Bankruptcy Court in order to obtain damages. (*See id.*, Exs. 22 to 26 (Proofs of Claim 6767, 6605, 6656, 6451, 5130).) This included six RMBS Trustees with proofs of claim covering 1,000

---

[11] Specifically, Residential Capital LLC and certain of its subsidiaries, including RFC, filed for bankruptcy. While they are properly referred to as "Debtors" in Bankruptcy Court, for consistency and ease of understanding, the Court continues to use the collective term "Plaintiffs" here in discussing their conduct in the bankruptcy proceeding.

trusts with a combined original principal balance of over $226 billion. (*Id.*, Ex. 19 (Corr. Hawthorne Rpt. ¶ 97).) Their most significant claims concerned alleged breaches of the R&Ws that Plaintiffs had made in the Governing Agreements for the securitizations. (*Id.* ¶ 98.) Among their other claims, RMBS Trustees also asserted common-law fraud or negligent misrepresentation claims against Plaintiffs to the extent that they had actual or imputed knowledge that the mortgage loans failed to comply with Plaintiffs' R&Ws. (*Id.* ¶ 101.)

Additionally, several Monolines filed 32 proofs of claim with the Bankruptcy Court, asserting claims for tens of billions of dollars in actual and potential losses. (*Id.* ¶ 104.) Like the RMBS Trustees' claims, the Monolines' claims generally alleged breaches of R&Ws. (*See id.* ¶¶ 105–13.)

Upon filing for bankruptcy, Plaintiffs sought the approval of the Original RMBS Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. (Scheck Decl., Ex. 20 (Debtors' 9019 Mot. ¶ 57).) However, some stakeholders opposed the Original RMBS Settlement, including the Official Committee of Unsecured Creditors, a committee appointed to represent all general unsecured creditors. (*Id.,* Ex. 19 (Corr. Hawthorne Rpt. ¶ 24); *id.*, Ex. 28 (Bankr. Findings of Fact ¶ 102); *id.*, Ex. 29 (Comm. Obj. at 10–11).) Some objectors found the proposed settlement amount unreasonably high, (*id.,* Ex. 19 (Corr. Hawthorne Rpt. ¶ 124), while others found it too low. (*Id.* ¶ 125.) The parties engaged in substantial discovery and extensively litigated issues concerning the approval of the Original RMBS Settlement. (*Id.* ¶¶ 115–30.)

In light of the objections, the Bankruptcy Court encouraged a new round of comprehensive settlement negotiations. (Scheck Decl., Ex. 28 (Bankr. Findings of Fact ¶ 102).) Bankruptcy Judge Martin Glenn, who oversaw the bankruptcy proceedings, appointed another sitting federal bankruptcy judge, Judge James Peck, as mediator, and additionally authorized Lewis Kruger as the Chief Restructuring Officer to negotiate a settlement of the claims against Plaintiffs. (*Id.,* Ex. 30 (Mediator Order); *id.*, Ex. 31 (Kruger Direct Testimony ¶¶ 11–12).)

On May 13, 2013, Plaintiffs entered into settlement agreements with the RMBS Trustees and Monolines MBIA, FGIC, Ambac, and Syncora, which were incorporated into the parties' proposed Chapter 11 Bankruptcy Plan ("the Plan").[12] (*Id.,* Ex. 19 (Corr. Hawthorne Rpt. ¶ 139).) Almost all of the creditors that voted on the Plan (95.7%) voted to accept it. (*Id.,* Ex. 28 (Bankr. Findings of Fact ¶¶ 1, 265).) The Plan reflected that the parties had resolved the RMBS Trustees' claims against RFC for $7.091 billion (the "RMBS Settlement"), and the Monolines' claims against RFC as follows: MBIA ($1.45 billion), FGIC ($415 million), Ambac ($22.8 million), and Syncora ($7 million) (collectively, the "Monoline Settlements," and collectively with the RMBS Settlement, the "Settlements"). (*Id.,* Ex. 19 (Corr. Hawthorne Rpt. ¶ 26.); *id.*, Ex. 32, App. 1 (Bankr. Plan, Art. IV(C), (D)); *id.*, Ex. 33 (Order Granting § 365 Mot. at 12 ¶ 6).)

In December 2013, Judge Glenn issued his 134-page Findings of Fact regarding the confirmation of the proposed Chapter 11 Plan. (*See id.,* Ex. 28 (Bankr. Findings of

---

[12] While Plaintiffs also settled with another Monoline, Assured, they do not seek indemnity for that settlement. (*See* Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶ 26).)

Fact at 1, ¶¶ 18–50).)   Among the Plan's release-related provisions negotiated as part of

the Settlements, Judge Glenn noted the parties' respective risks and their time-consuming

efforts to reach an informed resolution:

> The settlement reflects a reasonable balance between the litigation's possibility of success and the settlement's future benefits.  Each party to the negotiations that led to the settlement had access to a wealth of information gathered over the course of months-long investigations conducted by the Committee and the voluminous materials made available from the Examiner's investigation.  To facilitate settlement negotiations, the parties reviewed extensive document discovery, briefed the merits of the claims, and exchanged written and oral presentations regarding their legal positions.

(*Id.* ¶ 239) (citations omitted).

He further noted that the parties found the Settlements reasonable, stating, "With

the knowledge accumulated in this process, each party independently determined that the

settlement of the Estates' claims against the Ally Released Parties reflected a reasonable

resolution of the claims." (*Id.*) Moreover, Judge Glenn found that "each [individual]

settlement was reasonable, (*id.* ¶ 178), that the Plan proponents had exercised reasonable

business judgment in entering into the Plan Documents, which he also deemed "fair and

reasonable," (*id.* ¶ 51 & n.11), and that the agreed-upon allocations embodied in the Plan

were likewise "reasonable and appropriate."  (*Id.* ¶ 201.)

As to the individual settlements comprising the global Settlements, he found that

the new RMBS Settlement resolved:  "(1) alleged and potential claims for breaches of

R&Ws held by all RMBS Trusts; (2) all alleged and potential claims for damages arising

from servicing; and (3) any cure claims . . . ." (*Id.* ¶ 103).)   Absent settlement, Judge

Glenn recognized the significant financial risks in litigating the parties' claims:

> The potential losses for RMBS Trusts asserting breaches of representations and warranties range from $42.4 billion to $43.2 billion, excluding losses that are insured by a Monoline.  Of that amount, $32.9 billion are historical losses to Debtor-sponsored trusts, and $1.45 billion represent historical losses in non-Debtor sponsored trusts that correspond to the percentage of loans in those trusts sold by the Debtors. The additional forecasted losses range from $7.76 billion to $8.4 billion for the Debtor-sponsored RMBS Trusts, and $300 to $400 million for the portion of non-Debtor-sponsored RMBS Trusts corresponding to the portion of loans sold by the Debtors. Absent settlement, the likely amount of recoverable damages for the RMBS Trusts' representation and warranty claims, after consideration of legal defenses and litigation costs, ranges from $7.38 billion to $8.6 billion. This range does not account for servicing claims and cure claims.

(*Id.* ¶ 106) (internal citations omitted).   Judge Glenn further stated that but for the

approval of the RMBS Settlement, the R&W claims "would have to be asserted, litigated

and liquidated on an individual basis." (*Id.* ¶ 118.)   And if these claims were litigated

individually, Judge Glenn found that they "would be subject to significant litigation risks

and factual and legal defenses." (*Id.*)  Additionally, because litigating these claims would

be an expensive and time-consuming undertaking, he concluded that doing so "would

deplete the Debtors' estates, and might result in diminished recoveries to all creditor

constituencies, including the RMBS Trusts." (*Id.*)

    In addition to the RMBS Trusts' R&W claims, the mediation also included the

RMBS Trusts' Servicing Claims.  (*Id.* ¶ 119.)   Certain RMBS Trustees retained the

financial advisory firm of Duff & Phelps, LLC ("Duff & Phelps") to identify and

quantify their claims.  (*Id.* ¶¶ 113–14).)  Duff & Phelps sought to quantify Plaintiffs'

liability as a servicer with respect to: (1) misapplied and miscalculated payments; (2) wrongful foreclosure and improper loss mitigation practices; and (3) extended foreclosure timing issues caused by improper or inefficient servicing conduct such as falsified affidavits, improper documentation, and improper collection practices. (*Id.* ¶ 119.) Judge Glenn noted Duff & Phelps' finding that Plaintiffs' potential liability as a servicer under these three bases could be as high as $1.1 billion, but that asserting such claims would involve "significant risk and uncertainty." (*Id.*) Under the Plan, the servicing-related claims, settled as "RMBS Cure Claims," were allowed in an aggregate amount of $96 million. (*Id.*)

Judge Glenn made similar findings regarding Plaintiffs' financial exposure for the Monolines' claims. (*Id.* ¶¶ 126–37, 143–54, 213–15.) He stated that absent a settlement, Plaintiffs were "almost certain to become embroiled in additional, complex litigation with the Monolines over the validity, amount and possible subordination of their asserted claims." (*Id.* ¶ 213.)

Judge Glenn found that the Settlements resulted from good faith, arms-length negotiations, were in the best interests of the parties and claimholders, (*id.* ¶¶ 51), were proposed in good faith and in conformity with the Bankruptcy Code, (*id.* ¶¶ 18–26, 27, 51, 121–22), and, as noted, were reasonable. (*Id.* ¶¶ 51, 178, 201, 239.) The Bankruptcy Settlements also contemplated further recovery for the investors who acquired RFC's rights against the correspondent lenders. (*See* Scheck Decl., Ex. 32 (Bankr. Confirm. Order ¶ 48) (authorizing the creation of a "Liquidating Trust," into which RFC was to

transfer and assign its assets, and preserving the Liquidating Trust's (and Estates') causes of action); *id.*, App. 1 (Bankr. Plan at 75).)

In light of his findings, in December 2013, Judge Glenn approved the Plan. (*Id.,* Ex. 28 (Bankr. Findings of Fact at 1).)

### E. Procedural History

Beginning in December 2013, Plaintiffs commenced this litigation, filing numerous individual lawsuits against Defendants, asserting claims of breach of contract and indemnification. (*See, e.g., Residential Funding Co., LLC v. Home Loan Center, Inc.*, 14-cv-1716 (SRN/HB), First Am. Compl. ¶¶ 78–85; 86–89; *Rescap Liquidating Trust v. Freedom Mortg. Corp.*, 14-cv-5101 (SRN/HB), Compl. ¶¶ 87–95; 96–100 [Doc. No. 1]; *Residential Funding Co., LLC v. CTX Mortg. Co., LLC*, 14-cv-1710 (SRN/HB) Am. Compl. ¶¶ 84–91; 92–95 [Doc. No. 30]; *Residential Funding Co., LLC v. iServe Residential Lending, LLC*, 13-cv-3531 (SRN/HB), First Am. Compl. ¶¶ 71–78; 79–82 [Doc. No. 39]; *Residential Funding Co., LLC v. Standard Pacific Mortg., Inc.*, 13-cv-3526 (SRN/HB), Am. Compl. ¶¶ 78–85; 86–89 [Doc. No. 35]; *Residential Funding Co., LLC v. Impac Funding Corp.*, 13-cv-3506 (SRN/HB), First Am. Compl. ¶¶ 88–96; 97–101 [Doc. No. 34].)

In its breach of contract claims, RFC alleges that Defendants breached their R&Ws regarding the quality and characteristics of the residential mortgage loans that they sold to RFC. (*See, e.g., Residential Funding Co., LLC v. Home Loan Center, Inc.,* 14-cv-1716 (SRN/HB), First Am. Compl. ¶¶ 24–26; 82.) RFC contends that Defendants

20

well understood RFC's business model, whereby once the loans were sold to RFC, RFC would pool the loans, eventually selling them into securitization trusts. (*Id.* ¶ 23.) RFC also alleges that Defendants knew or should have known of the defects in the loans that they sold RFC, but failed to inform RFC. (*Id.*) RFC contends that Defendants therefore breached their R&Ws, as the loans failed to materially comply with the terms of their agreements and the Client Guide. (*Id.* ¶¶ 82–83.) As a result of Defendants' alleged breaches, RFC asserts that it has suffered damages. (*Id.* ¶¶ 84–85.)

Similarly, with respect to indemnification, RFC alleges that under the parties' agreements and the Client Guide, Defendants expressly agreed to indemnify RFC for all liabilities, losses, and damages, including attorneys' fees and costs incurred by RFC. (*Id.* ¶ 88.) It contends that it has incurred such liabilities, losses, and damages arising from the alleged material defects in Defendants' loans. (*Id.* ¶ 87.) Specifically, RFC points to over $10 billion in allowed claims approved by the Bankruptcy Court, as well attorneys' fees, litigation-related expenses, and other costs associated with defending numerous lawsuits and proofs of claim against RFC stemming from the Defendants' allegedly defective loans. (*Id.*)

In January 2015, to promote the just and efficient conduct of the litigation, this Court consolidated for pretrial purposes 68 of the then-pending first-wave suits. (*See* Jan. 29, 2015 Am. Admin. Order at 3 [Doc. No. 100].) Throughout the discovery period, many of the lawsuits were resolved through mediation. After extensive discovery, Plaintiffs and Defendants now move for dispositive relief. The first of the individual

trials between Plaintiffs and Defendants is set to begin on October 15, 2018. (*See* Apr. 19, 2018 Minutes at 2 [Doc. No. 3486].)

## III.     DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material'" only if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In responding to a motion for summary judgment, however, the nonmoving party may not "'rest on mere allegations or denials,' but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

### B.     Summary Judgment Motions

Plaintiffs seek summary judgment on the following issues: (1) the Client Guide confers Plaintiffs with sole discretion to (a) determine breaches of Defendants' R&Ws,

and (b) enter into, and determine the amounts of, the Settlements, such that Defendants may not challenge the Settlements as unreasonable; (2) the Client Guide should be broadly interpreted to permit recovery for (a) all liabilities, not just losses, or, alternatively, (b) all losses on breaching loans; (3) Defendants' breaches caused RFC's origination-related losses and liabilities; (4) Defendants' affirmative defenses that contradict the Client Guide fail, as do any defenses that RFC's actions or other "superseding and intervening factors" may have contributed to RFC's liabilities; (5) Defendants' liability for indemnity is not extinguished by (a) RFC's bankruptcy or (b) RFC's alleged wrongdoing; (6) Plaintiffs may use statistical sampling to prove their claims and need not re-underwrite each at-issue loan; and (7) Plaintiffs' right to assert claims for remedies extends to losses and liabilities on foreclosed and liquidated loans.[14] (*See generally* Pls.' Mem. Supp. Mot. for Summ. J. ("Pls.' Mem.") [Doc. No. 3243]; Pls.' Mem. in Opp'n to Defs.' Summ. J. Motion ("Pls.' Opp'n") at 55 [Doc. No. 3720] (citing March 21, 2018 Order [Doc. No. 3171]) (permitting Plaintiffs to move for partial summary judgment on this issue).

Defendants move for summary judgment on the following issues, some of which overlap with Plaintiffs' affirmative motions: (1) RFC cannot recover damages under its Breaching Loss damages methodology because (a) *Residential Funding Co., LLC v. Quicken Loans, Inc.*, 2017 WL 5571222 (Minn. Dist. Ct. Feb. 1, 2017), precludes such

---

[14] For purposes of Plaintiffs' motion, they define "liquidated loans" as "loans that have been foreclosed upon or otherwise transferred into the servicer's possession and then sold." (Pls.' Mem. in Opp'n to Defs.' Summ. J. Motion ("Pls.' Opp'n") [Doc. No. 3720] at 55 n.37.)

damages, (b) repurchase damages are unavailable under RFC's "guise" of seeking indemnity for losses or liabilities under Section A212 of the Client Guide, and (c) RFC fails to prove that Defendants' alleged R&W breaches caused loan-level losses; (2) RFC cannot recover damages under its Allocated Breaching Loss damages approach because it fails to provide a non-speculative basis for allocating the RMBS Trust Settlements and Monoline Settlements; (3) RFC's Allocated Loss approach to calculating damages fails; (4) RFC is not entitled to indemnity for its own misconduct (a) as evidenced by allegations of fraud and negligence against RFC, (b) because the Client Guide does not permit indemnity for RFC's own misconduct, and (c) because even if the Client Guide permitted such recovery, it would be unenforceable; (5) RFC's claims for loans sold before May 14, 2006 are time-barred; (6) RFC is barred from recovering damages on "expired" loans; (7) RFC cannot recover damages resulting from alleged breaches of pool-wide representations; (8) RFC's indemnity claim related to the MBIA Settlement fails; (9) RFC cannot use sampling to establish liability for loans outside its samples; (10) damages for indemnity are limited to RFC's actual losses; and (11) RFC's expert opinions are inadmissible and foreclose its claims. (*See generally* Defs.' Mem. Supp. Mot. for Summ. J. ("Defs.' Mem.") at 1–2, 10–11 [Doc. No. 3251].)

### C. Principles of the Law of Contractual Indemnity

Under the common law indemnity doctrine, "[a] right of indemnity arises when a party seeking indemnity has incurred liability due to a breach of a duty owed to it by the one sought to be charged, and such duty may arise by reason of a contractual obligation." *Rice*

*Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc.*, 616 N.W.2d 288, 291 (Minn. Ct. App. 2000).[15]  As such, common law  indemnity is considered an equitable remedy. *See Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 755 (Minn. 1985) ("Indemnity is, however, an equitable doctrine that does not lend itself to hard-and-fast rules, and its application depends upon the particular facts of each case."); *see also Lambertson v. Cincinnati Welding Corp.*, 257 N.W.2d 679, 685 (Minn. 1977) ("Contribution and indemnity are variant common-law remedies used to secure restitution and fair apportionment of loss among those whose activities combine to produce injury."); *Hendrickson v. Minn. Power & Light Co.*, 104 N.W.2d 843, 846–47 (Minn. 1960), ("Indemnity is the remedy securing the right of a person to recover reimbursement from another for the discharge of a liability which, as between himself and the other, should have been discharged by the other. . . . In the modern view, principles of equity furnish a more satisfactory basis for indemnity."), *overruled in part on other grounds by Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362 (Minn. 1977); *Shore v. Minneapolis Auto Auction, Inc.*, 410 N.W.2d 862, 866 (Minn. Ct. App. 1987) ("Indemnification is a flexible, equitable remedy designed to accomplish a fair allocation of loss among parties. Such a remedy should be used to achieve fairness as applied to a particular set of facts.").

---

[15] The Minnesota Supreme Court draws no distinction between common law indemnity claims whether the underlying duty is established under tort principles or express contract terms. *Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 755 n.6 (Minn. 1985), (citing Restatement of Restitution § 85 (1937)) ("Although we have previously recognized indemnity to reimburse a party only for a liability arising from a tort, the principles underlying the rules are the same for a liability arising out of a contract.").

"In the contractual context," however, "a claim based on an express indemnification provision is a legal, rather than equitable, claim." *Johnson v. Johnson*, 902 N.W.2d 79, 85 (Minn. Ct. App. 2017); *see also Hendrickson*, 104 N.W.2d at 848 (expressly recognizing that a duty to indemnify can arise "[w]here there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved"). "Indeed, when the duty to indemnify arises from contractual language, it generally is not subject to equitable considerations; rather, it is enforced in accordance with the terms of the contracting parties' agreement." 41 Am. Jur. 2d Indemnity § 13.

Under Minnesota law, and as more specifically described throughout this Order, "[a]n indemnity agreement is a contract, which is to be construed according to the principles generally applied in the construction or interpretation of other contracts." *Buchwald v. Univ. of Minn.*, 573 N.W.2d 723, 726 (Minn. Ct. App. 1998); *see also Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 761 (Mich. Ct. App. 2004) ("Contractual indemnity is an area of law guided by well-settled general principles. Nonetheless, each case must ultimately be determined by the contract terms to which the parties have agreed."). An indemnity contract is "to be given 'a fair construction that will accomplish its stated purpose.'" *Sorenson v. Safety Flate, Inc.*, 235 N.W.2d 848, 852 (Minn. 1975) (*quoting N.P. Ry. Co. v. Thornton Bros. Co.*, 288 N.W. 226, 227 (Minn. 1939)).

In these claims of contractual indemnity, which Plaintiffs assert here, the threshold question is whether that for which the indemnitee seeks indemnification—whether it be

losses, damages, or liabilities—falls within the language of the contract. This initial inquiry involves not only interpreting the indemnity contract to determine its scope, but also evaluating whether the facts of the case fit within that scope. *See Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) (holding that unambiguous contract language required three conditions to be met before one party would indemnify another, that one of those conditions was not met, and hence that there was no duty to indemnify); *see also* 41 Am. Jur. 2d Indemnity § 13 (describing the "threshold question [of] whether the fact situation is covered by the indemnity contract" as requiring "only a straightforward analysis of the facts and the contract terms").

Assuming that the facts fall within the indemnity contract, particular issues arise when a party seeks indemnity for a settlement, as is the case here.[16]  Although "the right to recover indemnity is not lost by reason of any settlement with the claimant," *Altermatt v. Arlan's Dep't Stores*, 169 N.W.2d 231, 232 (Minn. 1969) (per curiam), where one party seeks to recover from another "for a settlement 'entered into *before* trial . . . , the party seeking indemnification must show the settlement was reasonable and prudent.'" *Jackson Nat'l Life Ins. Co. v. Workman Sec. Corp.*, 803 F. Supp. 2d 1006, 1012 (D. Minn. 2011) (emphasis added) (quoting *Osgood v. Med., Inc.*, 415 N.W.2d 896, 903 (Minn. Ct. App. 1987)). "The test as to whether the settlement is reasonable and prudent

---

[16] As noted by the Eighth Circuit, indemnity cases involving pre-trial settlements can be particularly challenging to analyze. *See Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 n.4 (8th Cir. 2004) ("If indemnity is based on a settlement, then indemnity can be more difficult to analyze") (quoting 22 Britton D. Weimer, et al., *Minn. Prac., Insurance Law & Practice* § 3:2 (2013)).

is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982). As more thoroughly explained below, what is reasonable and prudent "involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.* With respect to the considerations of the underlying liability, "[t]he party seeking indemnification need only show it *could have* been liable under the facts shown at trial not whether they *would* have been liable." *Jackson*, 803 F. Supp. 2d at 1012 (quoting *Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1083 (D. Minn. 1991)). Indeed, "[r]easonableness . . . is not determined by conducting the very trial obviated by the settlement." *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990).

### D.   Principles of Contract Interpretation

There is no dispute that Minnesota law applies to the interpretation of the Client Guide, as well as to RFC's breach of contract and indemnity claims.[17]   When construing a contract under Minnesota law, a court's "primary goal . . . is to determine and enforce the intent of the parties." *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818

---

[17] The parties' contracts provide that Minnesota law applies. (*See, e.g.,* Horst Decl., Ex. 2-1 (CTX Client Contract ¶ 10)); *id.*, Ex. 4 (First Mortgage Seller/Servicer Contract ¶ 10); *id.*, Ex. 5 (Freedom Mortgage Seller/Servicer Contract ¶ 10); *id.*, Ex. 6-1 (Home Loan Center Client Contract ¶ 13); *id.*, Ex. 7 (Pinnacle [Impac] Client Contract ¶ 13); *id.*, Ex. 8 (United Residential Mortg. [iServe] Client Contract ¶ 12); *id.*, Ex. 9 (Family Lending Services, Inc. [Standard Pacific] Client Contract ¶ 10).)   While the contracts with Impac, iServe, and Standard Pacific were made between RFC and a corporate predecessor, or alleged corporate predecessor, the Client Guide states that any entity in which the Client merges or consolidates is considered the Client's successor. (Client Guide § A214.)

F.3d 356, 361 (8th Cir. 2016) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)). Where the contracting parties' intention is ascertainable from the language of a written contract, the construction of the contract is for the court. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990). If the parties' intent is unambiguously expressed, "[t]he language found in a contract is to be given its plain and ordinary meaning." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d at 63, 67 (Minn. 1979); *Bass v. Ring*, 9 N.W.2d 234, 236 (1943)). While courts apply the plain and ordinary meaning of contractual terms to the interpretation of a contract, those terms are construed in the context of the entire contract. *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012) (citing *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 165 N.W.2d 554, 556 (1969)).

In construing a contract, courts attempt to harmonize all of the contract's provisions. *Chergosky*, 463 N.W.2d at 525. Also, "[b]ecause of the presumption that the parties intended the language used to have effect," courts "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Id.* at 526.

"A contract is ambiguous if, based on the language alone, it is reasonably susceptible of more than one interpretation." *Art Goebel,* 567 N.W.2d at 515. "If there is ambiguity, extrinsic evidence may be used, and construction of the contract is a question of fact for the jury unless such evidence is conclusive." *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005) (citing *Donnay v. Boulware*, 144 N.W.2d 711, 716 (1966)). While ambiguity in a contract can be construed against the drafter, *see, e.g.*,

*Premier Bank v. Becker Dev., LLC*, 767 N.W.2d 691, 698 (Minn. App. 2009), courts should do so only after attempting to "determine the parties' intent behind an ambiguous term, using extrinsic evidence if available." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs.*, 913 N.W.2d 687, 694 (Minn. 2018). Moreover, "this rule has less application as between parties of equal bargaining power or sophistication," *Re-Sols. Intermediaries, LLC v. Heartland Fin. Grp., Inc.*, No. A09-1440, 2010 WL 1192030, at *3 (Minn. Ct. App. Mar. 30, 2010), and where both parties are represented by sophisticated legal counsel during the formation of the contract. *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960 (8th Cir. 2000).

As a general matter, Minnesota upholds principles of freedom of contract, in which "parties are generally free to allocate rights, duties, and risks," *Lyon Fin. Servs. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014), and "[c]ourts are not warranted in interfering with the contract rights of parties as evidenced by their writings which purport to express their full agreement," *Cady v. Bush*, 166 N.W.2d 358, 362 (Minn. 1969). Indeed, "[w]here the parties have contracted to create duties that differ or extend beyond those established by general principles of law, and the terms of the contract are not otherwise unenforceable, the parties must abide by the contractual duties created." *Grand Trunk W. R.R.*, 686 N.W.2d at 761. Terms of those contract provisions must "be given their ordinary meaning, as well as the interpretations adopted in prior cases." *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, 796 F.3d 962, 969 (8th Cir. 2015) (quoting *Boedigheimer v. Taylor*, 178 N.W.2d 610, 613 (Minn. 1970)).

### E.    Cross Motions for Summary Judgment

Respectively, the parties move for summary judgment on several identical bases. These include whether RFC's alleged "misconduct" precludes recovery on its claims for indemnification, whether RFC can recover losses and liabilities incurred from "expired" loans, whether RFC's liabilities were extinguished in bankruptcy, and whether RFC may use statistical sampling as a means of establishing liability and damages.[18]  The Court addresses the parties' arguments on these overlapping issues below.

### 1.    Misconduct Defense Against Indemnification

Defendants contend that underlying claims of fraud and negligent misrepresentation are non-indemnifiable under Minnesota law.  (Defs.' Mem. at 57–59.)  Because the Settlements resolved underlying claims asserting RFC's misconduct, Defendants assert that Plaintiffs may not allocate any value to these claims.  In addition, Defendants argue that the Client Guide does not provide for indemnification for RFC's own misconduct, (*id.* at 59–61), and permitting indemnification under these circumstances would violate public policy. (*Id.* at 61–62.)  Defendants therefore argue, "Summary judgment on RFC's allocation approaches is warranted because RFC has failed to account for the value of these non-indemnifiable claims based on its own alleged misconduct."  (*Id.* at 57.)

---

[18] Because Defendants' motion on the question of whether RFC may recover for pool-wide representations overlaps with Plaintiffs' causation argument, the Court addresses these arguments jointly in its discussion of causation.  (*See infra*, Section III.F.3.b.)  The parties also move for summary judgment on the question of whether RFC's recovery is limited to the Allowed Claims or whether it can seek recovery for all losses.  The Court addresses these arguments in its discussion of Plaintiffs' damages models.  (*See infra*, Section III.G.3.)

Plaintiffs also move for summary judgment on this issue, arguing that Defendants cannot avoid liability based on unproven underlying allegations of "negligence" and "fraud" against RFC. (Pls.' Mem. at 44–46.) They assert that there has never been a finding that RFC engaged in wrongdoing with respect to the settled claims. (*Id.* at 45; Pls.' Opp'n at 40.) While Plaintiffs find this lack of evidence dispositive, they also assert that the Client Guide's plain language required Defendants to indemnify RFC for its own alleged misconduct and negligence, (Pls.' Opp'n at 37–39), and that those Client Guide provisions are enforceable and not violative of public policy. (*Id.* at 40–41.)

Defendants identify underlying claims of fraud and negligent misrepresentation against RFC, grouping them together under the general label of "misconduct." (Defs.' Mem. at 57–58.) Under Minnesota law, "negligent misrepresentation constitutes fraud." *Hardin Cty. Sav. Bank v. Housing & Redevelopment Auth. of Brainerd*, 821 N.W.2d 184, 191 (Minn. 2012). Under New York law, however, where many of the underlying claims were filed, negligent misrepresentation is considered a form of negligence, *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017) (finding negligent misrepresentation claim duplicative of negligence claim), for which intent is not a required element.[19] *Abu Dhabi Commercial Bank v. Morgan Stanley*

---

[19] The overall question of whether the Client Guide requires indemnification for Plaintiffs' liabilities and losses requires the application of Minnesota law. As discussed more fully in this section of the Order, Minnesota law appears to distinguish between indemnification for an indemnitee's own negligent acts versus indemnification for an indemnitee's own intentional acts. The Court cites New York authority only to ascertain whether the underlying allegations concerned negligent or intentional conduct, as this informs the standard for indemnification under Minnesota law.

& *Co.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) ("[U]nder New York negligent misrepresentation law, the question is not whether an affirmative misrepresentation can be attributed to a defendant, but whether a defendant breached a duty to provide a plaintiff with accurate information.") Because the enforceability of an indemnification provision for underlying claims of negligence versus underlying claims of intentional conduct is slightly different, the Court addresses the two theories of underlying liability separately.

As to claims of negligence, Minnesota law generally disfavors agreements that seek to indemnify the indemnitee for its own negligence. *Dewitt v. London Rd. Rental Ctr., Inc.*, 910 N.W.2d 412, 416 (Minn. 2018). Such provisions are therefore strictly construed against the indemnitee. *Id.* The word "negligence" is not required in the indemnification provision, but the clause must contain "specific, express language that 'clearly and unequivocally' states the contracting parties' intent for the indemnitor to indemnify the indemnitee for the indemnitee's own negligence." *Id.* at 417 (quoting *Johnson v. McGough Constr. Co.*, 294 N.W.2d 286, 288 (Minn. 1980), *superseded by statute on other grounds*, Minn. Stat. § 337.02, *as recognized in Katzner v. Kelleher Constr.*, 545 N.W.2d 378, 381 (Minn. 1996)). In short, such clauses must "fairly apprise" the indemnitor of the transfer of liability for the indemnitee's acts of negligence. *Id.* (citing *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791 n.5 (Minn. 2005)).

As the Court will explain later in this Order, the Client Guide allows RFC to seek indemnification of its actual losses and liabilities incurred in the Settlements under Section A212 and A202(II). Section A212 requires Defendants to indemnify RFC for "all losses

. . . resulting from any Event of Default." (Client Guide § A212.) Defendants argue that the phrase "resulting from any Event of Default" limits the scope of this indemnification provision to breaches caused by the Client or third parties. (Defs.' Mem. at 59.) Because "Event of Default" is a specifically defined term that does not include the actions of RFC, they contend that any obligations to indemnify arising from an "Event of Default" do not extend to RFC's *own* underlying actions. (*Id.*)

The Court does not read the Client Guide so narrowly. While it does not use the specific word "negligence," it nevertheless makes clear the parties' intent to indemnify RFC for its own negligent acts. Under Section A202(II), Defendants agreed to indemnify RFC from "any claim, demand, defense or assertion against or involving []RFC based on or grounded upon, or resulting from such misstatement or omission [by Defendants] or a breach of any representation, warranty or obligation *made by []RFC* in reliance upon such misstatement or omission." (Client Guide § A202(II)) (emphasis added). Similarly, Section A212 requires indemnification for liabilities resulting from "any breach of any representation, warranty or obligation *made by []RFC* in reliance upon any warranty, obligation or representation made by the Client contained in the Client Contract[.]" (*Id.* § A212) (emphasis added). These provisions expressly apprised Defendants of their indemnification obligations for RFC's own negligent conduct. *See McGough Constr. Co.*, 294 N.W.2d at 288 (finding coverage for claims of indemnitee's negligence based on coverage for "claims for which the [indemnitee] may be, or may be claimed to be, liable").

Moreover, the Client Guide provisions are unlike those in *National Hydro Systems v. M.A. Mortenson Co.*, 529 N.W.2d 690 (Minn. 1995), and *Servais v. T.J. Management of Minneapolis, Inc.*, 973 F. Supp. 885 (D. Minn. 1995), cited by Defendants. The indemnification provisions in those cases required indemnification for claims related to the indemnitor's conduct. *Nat'l Hydro*, 529 N.W.2d at 692 (requiring a contractor to indemnify for claims arising out of his own work); *Servais*, 973 F. Supp. at 892 (finding that while a broad indemnification clause conceivably covered the indemnitee's own negligence, it was instead limited to the indemnitor's actions by additional language requiring indemnification for "any liabilities . . . resulting from injury . . . to employees injured while utilizing the services of [the indemnitor]"). Likewise, the provisions here are unlike those in *DeWitt*, in which the Minnesota Supreme Court found that broad indemnification language for "any and all liabilities" was not unequivocally linked to the indemnitee's own negligence. 910 N.W.2d at 418–20. The indemnitee had argued that because the provision included an exception for the indemnitee's own *intentional* misconduct, the provision must be construed to cover all other acts of the indemnitee, including torts. *Id.* The court rejected this argument, finding that the language failed to expressly inform the indemnitor of its obligation for such coverage. *Id.* In contrast, the language here specifically provides for indemnification based on RFC's own representations, warranties, or obligations, as discussed above.

Defendants further argue that the indemnification provisions are limited to underlying claims for breach of contract, but not for claims for negligence, because the

Client Guide refers to indemnity for RFC's "breaches." The Court disagrees, finding that the obligations in Sections A202(II) and A212 to indemnify for "any breach of any representation, warranty or obligation made by []RFC," (Client Guide § A212), and for "any" claim against RFC "based on or grounded upon, or resulting from [Defendants'] misstatement or omission or a breach of any representation, warranty or obligation made by []RFC in reliance upon such misstatement or omission," (*id.* § A202(II)), extend to claims for negligent representation. *See Abu Dhabi Commercial Bank.*, 910 F. Supp. 2d at 547 (stating that under New York law, claims for negligent misrepresentation may be based on a breach of the defendant's duty to provide a plaintiff with accurate information). The Court thus finds that Sections A202(II) and A212 clearly and unequivocally express the parties' intent to transfer liability to Defendants for RFC's own acts of negligence. Moreover, because RFC and Defendants were sophisticated business parties, there can be no claim that Defendants lacked either understanding or notice of their obligation to indemnify RFC for such claims. *Harleysville Ins. Co. v. Physical Distrib. Servs., Inc.*, 716 F.3d 451, 457–58 (8th Cir. 2013) (finding, under Minnesota law, no public policy violation rendering indemnification provision unenforceable where parties to the agreement were sophisticated businesses who fully understood the agreement's terms and had clear notice of the obligation to indemnify for the indemnitee's negligence).

Turning to the allegations of Plaintiffs' intentional underlying conduct, courts may void an indemnification provision on public policy grounds where the indemnitor shows that the indemnitee's underlying conduct was intentional, willful, or wanton. *ACLU of*

*Minn. v. Tarek ibn Ziyad Acad.*, 788 F. Supp. 2d 950, 967–68 (D. Minn. 2011) (stating that an indemnification provision is enforceable if it is "(1) not ambiguous; (2) does not release intentional, willful, and wanton acts; and (3) does not violate public policy"). However, in order to avoid the enforcement of an indemnification provision on these grounds, the misconduct must be proven, and not merely alleged, as Judge Glenn observed when ruling on the same issue under Minnesota law: "[W]here there has not been a threshold finding of illegal or even intentional misconduct," indemnification is not precluded. *In re Residential Capital, LLC*, 524 B.R. 563, 597 (Bankr. S.D.N.Y. 2015) (citation omitted); *see also Feed Mgmt. Sys., Inc. v. Comco Sys., Inc.*, 823 F.3d 488, 495 n.6 & 7 (8th Cir. 2016) (rejecting indemnitor's argument that the indemnification provision was void as it would require coverage for intentional acts, where the record did not support a "finding that [the indemnitee] actually engaged in the alleged misconduct."); *Gibbs-Alfano v. Burton,* 281 F.3d 12, 21 (2d Cir. 2002) (observing that no New York courts have "declined to enforce an otherwise valid indemnification agreement between parties where the party seeking indemnification settled, without admitting liability, claims against it alleging intentional wrongdoing. Thus, in the absence of a judgment of intentional conduct on the part of the [indemnitees], we do not find any reason under New York public policy to hold the Indemnification Clause unenforceable."); *St. Paul Fire & Marine Ins. Co. v. Perl*, 415 N.W.2d 663, 667 (Minn. 1987) (finding that because "there has never been a finding of illegal or even intentional misconduct," public policy exception to enforcement of indemnification agreement was inapplicable).

The parties apparently disagree about who bears the evidentiary burden of establishing the finding of intentional misconduct. (*Compare* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") [Doc. No. 3602] at 48 (stating that RFC must show that its losses did not result from its own intentional torts or deliberate acts) *with* Pls.' Mem. at 34 ("Defendants fail to offer any evidence that any of the settlements resulted from RFC's alleged misconduct").) The question is essentially moot, however, because there is no fact question as to whether Plaintiffs were found liable for intentional misconduct with respect to the underlying claims. As discussed below, the claims were settled without adjudication on the merits. Defendants do not argue to the contrary.

Defendants instead highlight allegations of RFC's intentional misconduct. (Defs.' Mem. at 57–58.) Specifically, they refer to fraud and negligent misrepresentation claims filed by Allstate, MBIA, BNYM, and U.S. Bank as illustrative examples, and cite testimony of Plaintiff's expert Donald Hawthorne in support of their position. (*Id.*)

As to the underlying Allstate claims, Defendants state that Allstate sued RFC for defrauding investors into accepting risks based on RFC's "shoddy lending and underwriting practices." (*Id.* at 57) (citing Smallwood Decl., Ex. 50 (Ex. A to Allstate PoC #4499 ¶ 57).) But Plaintiffs do not seek indemnity for the Allstate claims, (Pls.' Opp'n at 36), making any allegations of fraud in Allstate's proof of claim irrelevant.

Regarding the RMBS Trustees for BNYM and U.S. Bank, Defendants assert that these Trustees filed underlying misrepresentation claims against RFC. (Defs.' Mem. at 58) (citing Smallwood Decl., Ex. 15 (BNYM PoC #6773 ¶ 49); *id.*, Ex. 52 (U.S. Bank PoC

#6655 ¶ 50).)  However, the allegations of misrepresentation in the BNYM and U.S. Bank

proofs of claim were merely allegations—and conditional allegations, at that:

> The Claimant alleges that, *to the extent* a Seller of mortgage loans to the
> RMBS Trusts . . . knew or should have known of certain breaches of
> [R&Ws], including that, at the time the Seller transferred the mortgage loans
> to certain of the RMBS Trusts . . . , it knew that the mortgage loans did not
> comply with the [R&Ws], the Claimant has a claim for common law fraud
> and/or negligent misrepresentation. . . .

(Smallwood Decl., Ex. 15 (BNYM PoC #6773 ¶ 49) (emphasis added); *id.*, Ex. 52 (U.S.

Bank PoC #6655 ¶ 50).)  These allegations do not constitute a finding of misrepresentation,

*In re Residential Capital*, 524 B.R. at 597, and may not even satisfy the heightened pleading

standard for such a claim.

As to the MBIA claims, Defendants cite one legal decision, *MBIA Ins. Co. v.

Residential Funding Co., LLC*, No. 603552/08, 2009 WL 5178337, at *1 (N.Y. Sup. Ct.

Dec. 22, 2009), noting that the court there denied RFC's motion to dismiss the plaintiff's

fraud claims.[20]  (Defs.' Mem. at 58.)  But on a motion to dismiss, the court must take the

plaintiff's allegations as true and view them in the light most favorable to the plaintiff.  *See

Kolchins v. Evolution Markets, Inc.*, 96 N.E.3d 784, 787 (2018) (applying New York

procedural law).  Thus, a determination that MBIA's fraud allegations survived a motion to

dismiss does not constitute a finding of liability for fraud.

Defendants also cite MBIA's fraud and negligent misrepresentation pleadings, which

alleged that RFC engaged in three improper underwriting practices not permitted under the

---

[20] In that same decision, MBIA's negligent misrepresentation claims were dismissed
because MBIA and RFC did not have a "special relationship" giving rise to a duty to
impart correct information. *MBIA*, 2009 WL 5178337, at *5.

Client Guide, making its representations false by: (1) agreeing that loan originators could originate mortgage loans that failed to comply with the Client Guide; (2) knowingly purchasing loans in bulk whether or not they complied with the Client Guide; and (3) buying loans using RFC's automated electronic loan underwriting program Assetwise, even if the loans did not comply with the Client Guide. (Defs.' Mem. at 57–58) (citing Smallwood Decl., Ex. 51 (*MBIA* Second Am. Compl. ¶¶ 40, 59–60, 62, 64, 78).) Again, there is no evidence that Plaintiffs were adjudged liable for this alleged conduct.

While Defendants do not point to any such findings, they assert that MBIA's allegations of fraud are supported by evidence in the record. (Defs.' Mem. at 58.) They cite RFC employee testimony about RFC's exception agreements that allowed clients to deliver a loan to RFC outside of the normal program guidelines, (*id.*) (citing Smallwood Decl., Ex. 53 (Jackman Dep. at 55); *id.*, Ex. 54 (Ex. 108-004 to Jackman Dep.)), and testimony that it was "common" for RFC to buy bulk loans that were "not originated to RFC's guidelines. (*Id.*) (citing Smallwood Decl., Ex. 55 (Forget Dep. at 52–53, 95–100); *id.*, Ex. 56 (Ex. 262-0002 to Forget Dep.); *id.*, Ex. 57 (Ex. 262-0013 to Forget Dep.).) They further cite deposition testimony for the proposition that RFC used Assetwise to buy loans that were not in compliance with the Client Guide, (*id.*) (citing Smallwood Decl., Ex. 58 (Ex. 145-0011 to Maki Dep. at 3); *id*, Ex. 59 (Maki Dep. at 154–55)), and that the purchases of such loans represented RFC's "business decision[s]." (*Id.*) (citing Smallwood Decl., Ex. 60 (1/10/18 Payne Dep. at 38–41, 59, 83–84, 117–20).)

But the RFC employee testimony regarding the *MBIA* Settlement neither supports a finding of intentional misconduct nor connects MBIA's allegations to any at-issue loans. RFC does not contest that it sometimes bought loans outside of the normal program guidelines, observing that the Client Guide permitted it to do so. (Pls.' Opp'n at 36) (citing Client Guide § J600.) With respect to Plaintiffs' purported policy of using Assetwise to buy loans that failed to comply with the Client Guide, the first page of RFC's internal policy, which Defendants cite, provides for various circumstances in which "An Assetwise approval is <u>NOT</u> valid," and further states, "The Client is still responsible to ensure the loan conforms to RFC guidelines." (Smallwood Decl., Ex. 58 (Ex. 145-0011 to Maki Dep.) (transmitting Revised Credit Policy Issue # 10)) (emphasis in original).

Finally, as their last evidence of RFC's misconduct, Defendants point to statements of Plaintiffs' expert Donald Hawthorne, in which he admitted that it was reasonable for RFC to consider the significant risk that a Monoline's fraud claim could expose it to damages. (Defs.' Mem. at 58) (citing Smallwood Decl., Ex. 39 (Corr. Hawthorne Rpt. ¶ 237).) But an acknowledgement of potential risk is hardly evidence of fraud, nor is it even an admission of liability. *Fireman's Fund Ins. Co. v. W. Nat'l Mut. Grp.*, 851 F. Supp. 1361, 1368–69 (D. Minn. 1994) (noting that even if "fear of an adverse judgment was a factor in the antitrust defendants' decision settle, that would not be enough to fit within the willful misconduct exception," as "it ha[d] never been adjudged that the antitrust plaintiffs were liable by reason of willful misconduct."). Because RFC settled its claims with the

Monolines without admitting liability for alleged fraud or misrepresentation claims, the indemnification provisions between RFC and Defendants remain enforceable.

In sum, there has not been a threshold finding that RFC engaged in fraud or other misconduct with respect to the claims underlying the Settlements, and the Client Guide expressly permitted RFC to seek indemnification for its own negligence. Given the lack of any evidence of intentional wrongdoing, the Court finds no public policy violation in permitting Plaintiffs to seek indemnification for these claims. While the indemnification provisions remain enforceable, Plaintiffs still bear the burden of establishing causation and damages. As to Defendants' misconduct defenses, however, Plaintiffs are entitled to summary judgment on this ground, and Defendants' summary judgment motion on this ground is denied.

### 2. Whether Plaintiffs Can Recover Losses and Liabilities Incurred from "Expired" Loans

Another common basis on which the parties move for relief concerns whether Plaintiffs may recover for certain foreclosed upon and liquidated loans. Defendants seek partial summary judgment as to Plaintiffs' claims for loans sold to RFC that were subsequently foreclosed upon, or as Defendants call them, "expired" loans. (Defs.' Mem. at 65–71.) They point to the provision for the survival of remedies in Section A209(C) of the Client Guide, which states:

> []RFC's remedies for breach of the [R&Ws] and covenants shall survive the sale and delivery of the Loan to []RFC and funding of the related purchase price by []RFC, and will continue in full force and effect *for the remaining life of the Loans*, notwithstanding any termination of this Client Guide and the related Funding Documents, or any restrictive or qualified

endorsement on any mortgage Note or assignment of mortgage or Loan approval or other examination of or failure to examine any related mortgage Loan file by []RFC.

(Client Guide § A209(C)) (emphasis added).

Defendants argue that this provision controls the time period in which RFC could file lawsuits arising from a breach of the R&Ws. (Defs.' Mem. at 66.) They claim that it provided a "discrete survival period" for RFC to assert a remedy beyond the date of sale, at which point, they argue, RFC's right to seek recovery would have otherwise "expire[d] as a matter of law." (*Id.* at 66–70.) Defendants contend that once the "life of the Loans" ceased to exist, which Defendants argue was upon foreclosure, RFC's right to assert a claim related to these loans also ceased to exist. (*Id.* at 67–70.)

Plaintiffs argue that Defendants completely misconstrue the meaning of Section A209(C). In fact, they maintain that the Court should not only deny Defendants' motion for partial summary judgment, but grant summary judgment to Plaintiffs and rule that their right to assert claims for remedies extends to losses and liabilities on foreclosed and liquidated loans. (Pls.' Opp'n at 55) (citing March 21, 2018 Order) (permitting Plaintiffs to move for partial summary judgment on this issue). Plaintiffs do not interpret "for the remaining life of the loans" as a limitations period, and assert that the Court "need not even reach the meaning of the phrase." (*Id.* at 60.) In addition, they assert that Defendants' interpretation of Section 209(C) cannot be reconciled with other provisions of the Client Guide that expressly preserve RFC's remedies with respect to foreclosed and liquidated loans. (*Id.* at 55.) Further, they assert that Defendants' interpretation

would produce absurd results, as it would permit Defendants to avoid liability merely by waiting for the liquidation of breaching loans, and would effectively nullify Defendants' contractual duty, in Section A210, to notify RFC of breaches.  (*Id.* at 59.)

As noted, where the parties' intention is ascertainable from the written contract, construction is for the court.  *Chergosky*, 463 N.W.2d at 525.  Courts are to construe a contract as a whole and attempt to harmonize all of the contract's provisions.  *Id.* at 525– 26.  In addition, "[b]ecause of the presumption that the parties intended the language used to have effect," courts "attempt to avoid an interpretation of the contract that would render a provision meaningless."  *Id.* at 526.

The crux of this particular dispute concerns Defendants' misunderstanding about the operative effect of Section A209(C).  Defendants are correct that as a general matter, under Minnesota law, the life of a loan typically ends upon foreclosure.  (Defs.' Mem. at 69) (citing *Bestrom v. Bankers Tr. Co.*, 114 F.3d 741, 744 (8th Cir. 1997) (noting "long-settled" Minnesota law that "foreclosure extinguishes the mortgage); *In re Stacy*, 9 F. Supp. 61, 64 (D. Minn. 1934) (stating that upon foreclosure, a mortgage becomes "*functus officio*," or, without further legal effect)).

Fully consistent with that authority, Section A209(C) provides that for the entire "life of the loan"—from the date of sale to, generally, foreclosure—RFC is entitled to remedies for any related losses and liabilities it incurs during that period.  But Section A209(C) merely addresses the *scope* of Plaintiffs' remedies—it does not impose on RFC any limitations period different than the six-year statutory period for making a claim.  It

does not vitiate RFC's right to seek relief simply because a loan ended in foreclosure prior to the Settlements.[22]  While any action to enforce RFC's remedies is of course subject to the applicable statute of limitations, the plain language of Section A209(C) does not implicate the time in which RFC must file a claim for relief, nor does it eliminate, wholesale, RFC's right to make a claim related to foreclosed or liquidated loans.  *But cf. Eckert v. Titan Tire Corp.*, 514 F.3d 801, 803 (8th Cir. 2008) (holding that contract's plain language required that claims for breaches of R&Ws be brought within one year where the contract provided that "[t]he representations of the parties . . . *and the right to make a claim* for indemnification hereunder for breaches of [R&Ws] . . . shall survive only for a period of one (1) year after the Closing Date.") (emphasis added).

Defendants' cited legal authority does not dictate a different result, nor is it persuasive.  Defendants cite *MASTR Asset Backed Sec. Tr. 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.,* No. 11-cv-2542 JRT/TNL, 2012 WL 4511065, at *4 (D. Minn. Oct. 1, 2012), for the proposition that this Court has rejected any argument that loans survive beyond foreclosure. (Defs.' Mem. at 69–70.)  The Court does not disagree with this generally applicable principle, although Defendants correctly note that even in *MASTR Asset,* the Court observed that some states provide deficiency periods that permit

---

[22] Analogously, for example, the express expiration of a lease does not terminate the lessor's right to seek recovery for missed lease payments or liabilities related to the missed payments, simply because the lease period has "expired."  The limitations period begins to run when the lessee breaches the lease, and an otherwise timely lawsuit does not become untimely because the lease period ends.  Or, in a different context, a patent holder's right to seek recovery for patent infringement damages during the time in which a viable patent is infringed is not cut off simply because the patent subsequently expires.

a mortgagee to sue a borrower if the foreclosure proceeds fail to satisfy the underlying debt. *Id.* at *5 n.7. In any event, unlike the Client Guide, the contract in *MASTR Asset* designated repurchase as the sole contractual remedy for breaches—in other words, the contract only permitted the remedy of specific performance. *Id.* at *5–6. Because foreclosed loans could not be repurchased, the sole remedy was unavailable, so the Court granted summary judgment to the defendant. Similarly, in *Nationwide Advantage Mortgage Co. v. Mortgage Services III, LLC*, No. 13 C 83, 2013 WL 1787551, at *2 (N.D. Ill. April 25, 2013), the court dismissed the plaintiff's claims for breach of contract predicated on a repurchase provision where the loans had been foreclosed upon, but denied the motion to dismiss as to indemnification, noting the language of that provision obliged the defendant to indemnify the plaintiff.

Defendants rely on other non-Minnesota authority, arguing that "for the remaining life of the Loans" is similar to language in *Capstead Mortgage Corp. v. Sun America Mortgage Corp.*, 45 S.W.3d 233, 237 (Tex. Ct. App. 2001), where the R&Ws were to continue "for the full remaining life of each Mortgage Loan." The court in *Capstead* granted summary judgment as to loans foreclosed upon before the suit was filed, finding that "the mortgage loan ceased to exist upon foreclosure." *Id.* at 238. But *Capstead* is inapposite because the basis for that court's decision was the plaintiff's own admission that the mortgage note was extinguished upon foreclosure, since the plaintiff itself had initiated foreclosure proceedings. *Id.* In essence, the plaintiff had elected a different remedy. *Id.* That is not the case here.

Defendants' other authorities are similarly distinguishable because unlike here, the contractual language expressly limited the period for the survival of remedies and/or representations to a certain number of months. *See Union Carbide Corp. v. Thiokol Corp.,* 890 F. Supp. 1035, 1049 (S.D. Ga. 1994) (stating that the R&Ws would survive the closing for 18 months); *Pierson Sand & Gravel, Inc. v. Pierson Township*, 851 F. Supp. 850, 858–59 (W.D. Mich. 1994) (stating that the R&Ws would survive the closing date and remain in full force and effect thereafter for three years); *GRT, Inc. v. Marathon GFT Tech., Ltd.*, Civ. No. 5571-CS, 2011 WL 2682898, at *1 (Del. Ch. July 11, 2011) (stating that the parties' representations and remedies would survive for one year and thereafter terminate). The language here, however, is not a temporal limitation on Plaintiffs' right to bring a cause of action. Rather, it defines the period during which RFC possesses remedies for liabilities and losses incurred resulting from the loans. That period exists for "the life of the loan."

Defendants' interpretation of Section A209(C) is also inconsistent with other provisions of the Client Guide that suggest the availability of remedies for as long as a loan exists. As such, Defendants' interpretation conflicts with the principle that contracts are to be construed as a whole, and with harmonization of all of the provisions in mind. *See Chergosky*, 463 N.W.2d at 525–26. While a loan's existence typically ends upon foreclosure, RFC's remedies are not so strictly limited. For example, with respect to the right to repurchase, Section A210(B) states, "[]RFC may demand that a Client repurchase, and Client must repurchase, a Loan *after foreclosure*. . . ." (Client

Guide § A201(B)) (emphasis added). In addition, liquidation proceeds are one element factored into the calculation of a repurchase price, which is equal to the sum of: (1) the actual principal balance of the loan at the time of repurchase; (2) all interest and fees incurred in recovering on the loan; (3) a buy-out fee; (4) RFC's potential additional purchase amounts; (5) minus the amount of any proceeds realized by the owner of the loan *upon the final liquidation* of the loan. (*Id.* § A210(B)) (emphasis added).

Other language extends remedies to the latest of several events, including the date on which the loans are "paid in full." Pursuant to Section 205(C) ("Survival of Representations, Warranties, Covenants and Remedies"), RFC's remedies survive under the following circumstances:

> Client's representations, warranties and covenants with respect to each Loan, and []RFC's remedies for Client's breach of such representations, warranties and covenants with respect to each Loan will continue in full force and effect until the latest of: (i) the date such Loan *has been irrevocably paid in full*, (ii) the date the last limitations period for bringing claims against []RFC or its successors or assigns concerning the subject matter of Client's representations and warranties with respect to such Loan expire under all applicable law, and (iii) the date any claim, suit or other proceeding against []RFC or its successors or assigns concerning the subject matter of Client's representations, warranties and covenants with respect to such Loan have been conclusively determined or settled and all applicable appeals have been exhausted.

(*Id.* § 205(C)) (emphasis added). Plaintiffs contend that because foreclosed loans have not been paid in full, RFC's remedies for losses related to these loans are not precluded. (Pls.' Opp'n at 55) (citing Client Guide § 205(C).) While Defendants assert that Section 205(C) is not uniformly applicable, and only addresses the consequences of a client's

disqualification, suspension, or inactivation, (Defs.' Mem. at 70–71), even so, the provision contemplates RFC's available remedies in different ways.

In advocating their "life of the loans" construction, Defendants point to a section in the Client Guide which requires Clients to "keep the mortgage insurance coverage in effect for the entire life of the Loan." (*Id.; see* Client Guide § F302(3).) Defendants contend that this language is synonymous with "before a loan is extinguished." (*Id.*) The Court does not take issue with that interpretation. But again, the question is not the meaning of the "life of the loans," but whether the plain language of Section A209(C) prohibits Plaintiffs from filing claims to effectuate their remedies only up to the date of foreclosure. It does not, which is entirely consistent with the other provisions of the Client Guide.

Finally, the Court agrees with Plaintiffs that Defendants' interpretation of Section A209(C) would be nonsensical, as it would require RFC to anticipate breaches, and could potentially allow Defendants to escape liability for the most defective loans. In response, Defendants argue that RFC could simply give notice of a potential breach during "a loan's life" and if the originator did not repurchase the loan, RFC could pursue its remedies after foreclosure. (Defs.' Reply at 32 [Doc. No. 3894].) The Court rejects this argument, which is at variance with Defendants' position that Plaintiffs' right to seek relief is precluded upon foreclosure. Furthermore, the Client Guide does not require RFC to anticipate breaches or, as discussed earlier, demand repurchase within any particular time period, if at all. (Client Guide § A210.) Instead, the Client Guide requires

49

Defendants to notify RFC of breaches, (*id.*)—a provision that would be nullified under Defendants' reading of Section A209(C). Again, courts are to avoid any contract interpretation that would render a provision meaningless. *Chergosky*, 463 N.W.2d at 526.

The Court therefore finds that Section A209(C) provides that Plaintiffs' remedies, and their right to damages, extend to liquidated or foreclosed loans, subject to the applicable statutory limitations periods. Section A209(C) does not function as a contractually-agreed upon limitations period, nor does it preclude recovery for RFC's losses and liabilities on foreclosed or liquidated loans. The Court therefore denies Defendants' motion for summary judgment on this issue and grants summary judgment to Plaintiffs that their remedies extend to foreclosed and liquidated loans.

### 3. Recovery for Claims Released in Bankruptcy

Both parties move for summary judgment regarding whether Plaintiffs may recover for claims that RFC released in bankruptcy. Defendants argue that RFC's indemnity claim is barred to the extent that it seeks recovery for more than its actual losses, claiming that RFC and its bankruptcy estate were released from all liabilities through bankruptcy. (Defs.' Mem. at 87; Defs.' Opp'n at 14–16.) They acknowledge that certain Defendants previously raised this argument in a motion to dismiss, which the Court denied. (Defs.' Mem. at 87–88.) But, they contend that (1) this Court was wrong, and (2) new evidence further supports their position. (*Id.* at 88.)

Plaintiffs argue that this Court has already rejected Defendants' argument, finding instead that "'the plain language of the Bankruptcy Court's Confirmation Order and the Chapter 11 Plan demonstrates that the claims at issue were not extinguished upon confirmation of the Plan.'" (Pls.' Opp'n at 50) (quoting June 16, 2015 Am. Order at 18 [Doc. No. 537]). They contend that there is no "new evidence" warranting a departure from the prior ruling, (*id.* at 51–52), and that Defendants would receive a windfall if RFC's bankruptcy insulated them from liability. (Pls.' Mem. at 43.)

As the parties correctly observe, in June 2015, the Court ruled on this very issue, in response to a motion to dismiss filed by Home Loan Center, one of the remaining Defendants, and Decision One Mortgage, which is no longer a party. (*See* June 16, 2015 Am. Order at 16–22.) The Court incorporates that ruling herein by reference. In the June 2015 Order, the Court noted that although the estate of a debtor normally ceases to exist once a Chapter 11 plan is confirmed, this is not always true. (*Id.* at 18–19) (citing *United States v. Unger*, 949 F.2d 231, 233 (8th Cir. 1991)). Courts have recognized that termination of a bankruptcy estate "'is expressly subject to the terms and provisions of the confirmed plan, and that the confirmed plan need not state in explicit terms that the bankruptcy estate is to continue in existence.'" (*Id.*) (quoting *In re Canton Jubilee, Inc.*, 253 B.R. 770, 776 (Bankr. E.D. Tex. 2000) (internal citations omitted); *also citing Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 587 (9th Cir. 1993) ("The reversion of property from the estate to the debtor upon confirmation contained in 11 U.S.C. § 1141(b) is explicitly subject to the provisions of the plan."); *In re Ernst*, 45 B.R.

700, 702 (Bankr. D. Minn. 1985) ("All estate property is vested in the debtor at confirmation, except as the plan specifically provides otherwise. Accordingly, in the absence of a plan provision retaining property in an estate, the estate ceases to exist.")).)

In the June 2015 Order, this Court found that the express language of the Bankruptcy Court's Confirmation Order and Chapter 11 Plan demonstrated that the claims at issue were not extinguished upon confirmation of the Plan. (*Id.* at 16–22.) Because "[p]rinciples of contract interpretation apply to the interpretation of a reorganization plan," courts consider the legal implications from the face of the plan. *OneBeacon Am. Ins. Co. v. A.P.I., Inc.,* No. 06-cv-167 (JNE), 2006 WL 1473004, at *5 (D. Minn. May 25, 2006) (citation omitted). Here, the Confirmation Order and the Plan contemplated the very relief that Plaintiffs seek in this consolidated action. It authorized the creation of a "Liquidating Trust," i.e., the Rescap Liquidating Trust, into which RFC was to transfer and assign its assets, and they preserved the Liquidating Trust's (and Estates') causes of action[23]:

> 48. Preservation of Causes of Action. *Unless any Causes of Action against an Entity are expressly waived*, relinquished, exculpated, released, compromised, or settled *in the Plan* . . . the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and *the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates . . . . The Liquidating Trustees* and the Borrower Claims Trustee, as applicable, *are deemed*

---

[23]According to the Plan, "Causes of Action" include "all Claims, actions, causes of action, . . . liabilities, . . . [and] indemnity claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases)." (Scheck Decl., Ex. 32, App. 1 (Bankr. Plan at 7–8).)

> *representatives of the Estates for the purpose of prosecuting, as applicable,*
> *the Liquidating Trust Causes of Action*, Borrower-Related Causes of Action
> and any objections to Claims pursuant to section 1123(b)(3)(B) of the
> Bankruptcy Code.

(Scheck Decl., Ex. 32 (Bankr. Confirm. Order ¶ 48); *id.*, App. 1 (Bankr. Plan at 74–75))

(emphases added).

Although cited, but not quoted, in the June 2015 Order, the language of the Plan

contains additional language—in bold-face type—that unequivocally preserves Rescap's

right to indemnification for the claims at issue here:

> The Liquidating Trust and the Borrower Claims Trust may pursue their
> respective Causes of Action, as appropriate, in accordance with the best
> interests of the respective Trust. **No Entity may rely on the absence of a**
> **specific reference in the Plan or the Disclosure Statement to any Cause**
> **of Action against such Entity as any indication that the Liquidating**
> **Trust or Borrower Claims Trust, as the case may be, will not pursue**
> **any and all available Causes of Action against such Entity. The**
> **Liquidating Trust and the Borrower Claims Trust expressly reserve all**
> **rights to prosecute any and all Causes of Action against any Entity,**
> **except as otherwise expressly provided in the Plan.** Unless any Causes of
> Action against an Entity are expressly waived, relinquished, exculpated,
> released, compromised, or settled in the Plan or a Bankruptcy Court order,
> the Liquidating Trust expressly reserves all Causes of Action other than
> Borrower-Related Causes of Action, and the Borrower Claims Trust
> expressly reserves all Borrower-Related Causes of Action, for later
> adjudication, and, therefore, no preclusion doctrine, including the doctrines
> of res judicata, collateral estoppel, issue preclusion, claim preclusion,
> estoppel (judicial, equitable, or otherwise), or laches, shall apply to such
> Causes of Action upon, after, or as a consequence of the Confirmation or
> Consummation. For the avoidance of doubt, the Plan does not release any
> Causes of Action that the Plan Proponents or the Liquidating Trust or
> Borrower Claims Trust have or may have now or in the future against any
> Entity other than the Released Parties (and only in their capacity as
> Released Parties). The Liquidating Trustees and the Borrower Claims
> Trustee, as applicable, are deemed representatives of the Estates for the
> purpose of prosecuting, as applicable, the Liquidating Trust Causes of
> Action, Borrower-Related Causes of Action and any objections to Claims
> pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(*Id.*, App. 1 (Bankr. Plan at 75)) (emphases in original). Claims against the originating lenders were not waived or otherwise excepted from these provisions of the Confirmation Order and Plan.

In the Court's prior decision, it found that only *the debtors'* personal liability was discharged, citing the Confirmation Order's discharge provision:

42. Discharge. Except as expressly provided in the Plan or the Confirmation Order, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged *the Debtors*, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities

that arose prior to the Effective Date and (b) all such holders shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Equity Interest in *the Debtors*.

(June 16, 2015 Am. Order at 19) (quoting Bankr. Confirm. Order ¶ 42) (emphases added).

While Defendants argued then, as now, that the Allowed Claims were discharged, the creditors received "Units" in exchange for the allowed claims, which entitle them to receive a pro rata share of recoveries that the Liquidating Trust obtains on their claims, and the Liquidating Trust is obligated to maximize those recoveries. (*Id.* at 20) (referring to the Plan and the Liquidating Trust Agreement). Thus, the Court concluded in its prior decision that the liabilities underlying RFC's indemnity claims were not extinguished by virtue of RFC's bankruptcy. (*Id.*)

Now, three years later, Defendants seek to "revisit" this ruling, arguing that the Court was "in error." (Defs.' Mem. at 88.) Defendants refer to "new evidence," and invoke previously cited legal authority in support of their position. (*Id.* at 87–89.) The Court finds no basis to alter its prior decision. Given the clear language of the Confirmation Order and Plan, there is no need to consult extrinsic evidence.[24] The plain

---

[24] Even if the evidence were considered, it would not lead to a different conclusion, particularly when considered in concert with the language of the Confirmation Order and Plan. Defendants cite a provision of the Liquidating Trust agreement, which states that the creditors' Units were given in "'full and final satisfaction . . . of such Allowed Claim[s].'" (Defs.' Mem. at 88) (citing Smallwood Decl., Ex. 23 (Liquidating Trust Agmt. ¶ 4.3(a)).) But that language simply confirms that RFC's creditors received Units in satisfaction of their Allowed Claims. It does not conflict with nor extinguish the underlying liability, nor does it change the express preservation of causes of action set forth in the Confirmation Order and Plan. (Scheck Decl., Ex. 32 (Bankr. Confirm. Order

language of the provisions for "Preservation of Causes of Action" found in the Confirmation Order and Plan expressly grant the Liquidating Trust the right to bring causes of action such as the instant cases. (Scheck Decl., Ex. 32 (Bankr. Confirm. Order ¶ 48); *id.*, App. 1 (Bankr. Plan at 74–75).)

As to legal authority, Defendants again rely on some of the same cases that this Court distinguished in its earlier ruling. (*See* Defs.' Mem. at 89) (citing *Trapp v. R-Vec Corp*, 359 N.W.2d 323, 328 (Minn. Ct. App. 1984); *Bank of India v. Trendi Sportswear, Inc.*, No. 89 CIV.5996 JSM, 2002 WL 84631, at *1–4 (S.D.N.Y. Jan. 18, 2002)). The Court previously found *Trapp* distinguishable because the claims in that case were not discharged by the Bankruptcy Court's Confirmation Order. (June 16, 2015 Am. Order at 19–20) (citing 359 N.W.2d at 328). And the Court distinguished *Bank of India* because, unlike here, there was no contractual indemnification agreement. (*Id.* at 20) (citing 2002 WL 84631, at *1–4). Defendants now also cite *Mid-Hudson Catskill Rural Migrant*

---

¶ 48); *id.*, App. 1 (Bankr. Plan at 74–75).) Defendants also point to the Liquidating Trust's financial statements which list no liabilities to RFC's former creditors and indicate that distributions were paid to the current Unitholders, as opposed to RFC's former creditors. (Defs.' Mem. at 88) (citing Smallwood Decl., Ex. 82 (Q4 2017 Trust Fin. Stmt. at 3).) As Plaintiffs explain, however, the financial statements do not list liabilities to RFC's former creditors because they became Unitholders of the Trust, which is obligated to recover for the Unitholders' benefit. (Pls.' Opp'n at 51.) Defendants also cite the testimony of Plaintiffs' bankruptcy expert, stating that he conceded that the RMBS Trusts which filed proofs of claim against ResCap and RFC, have no right to sue the Liquidating Trust for liabilities that now reside with the Trust. (Defs.' Mem. at 88) (citing Smallwood Decl., Ex. 81 (Kirschner Dep. at 162).) But Plaintiffs note that their expert, Marc Kirschner, opined that although he believes this is a question of law for the Court to decide, (Declaration of Sascha Rand ("Rand Decl.") [Doc. No. 3256], Ex. 48 (Kirschner Rpt. ¶ 83)), the liabilities in question were "never extinguished." (Scheck Decl., Ex. 69 (Kirschner Dep. at 163).)

*Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 179–80 (2d Cir. 2005), but there, the court found against the plaintiff because it had not incurred the fees for which it claimed indemnification.

Again, while the estate of a debtor typically ceases to exist once a Chapter 11 plan is confirmed, the termination of a bankruptcy estate is subject to the terms and provisions of the confirmed plan. The language of confirmation orders and bankruptcy plans will obviously differ from case to case. As this Court has again explained, the applicable language in this case did not extinguish the Allowed Claims themselves or Defendants' obligation to indemnify Plaintiffs for them. Accordingly, the Court reaffirms its June 2015 decision and grants summary judgment to Plaintiffs and denies summary judgment to Defendants.

### 4. Sampling

Earlier in this consolidated action, the Court issued a preliminary ruling on the use of loan sampling as a means for Plaintiff to initially make their case for liability and damages. (April 16, 2015 Order [Doc. No. 374].) Plaintiffs had sought an order *in limine* approving their proposed sampling methodology to determine a breach rate for a group of loans sold by Defendants in 23 cases where the total number of loans exceeded 500 in an individual case. (*Id.* at 3.) Plaintiffs described the sampling protocol that their expert, Dr. Karl Snow, proposed to utilize in order to extrapolate breach rates to the population from which a given sample was drawn. (*Id.*) (citing Snow Decl. ¶¶ 37-41 [Doc. No. 157-11]).)

Because the Court found that early decisions on sampling issues would streamline the administration of these complex cases, it granted the motion in part and denied it without prejudice in part, holding that: (1) Dr. Snow was a qualified expert witness with respect to the selection and construction of RFC's proposed samples, and the extrapolation of a breach rate from those samples to the populations from which they were drawn; (2) subject to the reservation of Defendants' rights, the sampling protocol set forth in Dr. Snow's declaration was scientifically valid and admissible for the purpose of identifying a random sample of loans from the population of loans at issue in each case; and (3) Defendants agreed that they would not challenge the proposition that a 150-loan sample is sufficiently large to identify a breach rate with a margin of error at the 95% confidence level of no more than +/-8 percentage points for binary questions. (*Id.* at 11.) To the extent that Plaintiffs sought further early *Daubert* or admissibility rulings, the Court denied the motion without prejudice. (*Id.*) Dr. Snow has since completed his sampling protocol and issued an opinion. Defendants seek to preclude that opinion in a *Daubert* motion that the Court will address in a separate ruling.

Plaintiffs and Defendants have also filed cross summary judgment motions on the question of whether Plaintiffs may use loan sampling as a method of proof. Defendants seek to preclude the use of statistical sampling to establish liability for loans outside of the sample population. (Defs.' Mem. at 85.) They assert that Client Guide Sections A202 and A212 require RFC to establish liability on a loan-by-loan basis, (*id.*), consistent with a "judicial tide" of RMBS case law against the use of sampling, (*id.* at 86–87;

Defs.' Reply at 39).  In addition, Defendants take issue with the methodology of Plaintiffs' expert Dr. Karl Snow, arguing that his opinion is impermissibly speculative. (*Id.* at 86–87.)

Plaintiffs disagree.  In their affirmative motion, they ask that the Court enter summary judgment holding that RFC may prove its breach of contract and indemnification claims using statistical sampling and need not re-underwrite each at-issue loan.  (Pls.' Mem. at 46.)  They argue that the Client Guide does not limit how they may prove breaches.  (Pls.' Opp'n at 63.)  Rather, they argue, it permits them to exercise any remedy outlined in the Client Guide or permitted by law.  (*Id.*) (citing Client Guide § A209(A).)  Plaintiffs also cite legal authority approving the use of sampling as a means of establishing liability in RMBS litigation.  (*Id.*)  Furthermore, they argue that as a practical matter, sampling is necessary, because re-underwriting each at-issue loan and offering loan-by-loan proof would be unmanageable, if not impossible, for the parties, the jury, and the Court.  (Pls.' Mem. at 49–51.)

As a general matter, statistical sampling is a commonly used and accepted means of assembling and analyzing data, particularly in complex litigation.  The U.S. Supreme Court has noted, "A representative or statistical sample, like all evidence, is a means to establish or defend against liability," and "is used in various substantive realms of the law."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016). The Eighth Circuit has likewise approved the use of sampling methodology as a means of establishing breach and causation in breach of contract litigation.  *See Marvin Lumber &*

*Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005). In litigation involving excess insurance indemnification, this Court has stated that the question of the reasonableness of underlying settlements could also be demonstrated by expert sampling of a statistically significant number of claims files. *UnitedHealth Group Inc. v. Columbia Cas. Co.,* No. 05-cv-1289 (PJS/SRN), 2010 WL 11537514, at *25 (D. Minn. Aug. 10, 2010).

Defendants cite legal authority for the proposition that there is a "clear trend" against permitting the use of statistical sampling in RMBS cases. (Defs.' Opp'n at 51–52.) The Court disagrees with the notion that there is any such "trend." Rather, the question of whether sampling is permitted frequently turns on the scope of remedies available under the parties' governing agreement. For instance, several of Defendants' cases involve the more limited question of whether statistical sampling is an acceptable method of proof where the parties' agreements provide for a sole remedy. *See Homeward Residential, Inc. v. Sand Canyon Corp*., No. 12 Civ. 5067 (JFK), 2017 WL 5256760, at *7 (S.D.N.Y. Nov. 13, 2017) (denying pre-discovery sampling motion because sole remedy provision required proof of notice or discovery of breaches); *Royal Park Invs. v. HSBC Bank USA, Nat'l Ass'n*, No. 14-CV-08175 (LGS) (SN), 2017 WL 945099, at *5 (S.D.N.Y. Mar. 10, 2017) (involving sole remedies of cure and repurchase); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("[M]ost significant, the PSAs expressly provide[] that cure or repurchase are the 'sole remedies,'

and thus, they foreclose the 'pervasive breach' theory."); *W & S Life Ins. Co. v. Bank of N.Y. Mellon,* No. A1302490, 2017 WL 3392855 (Ohio Ct. C.P. Aug. 4, 2017) (finding that sampling could not establish the discovery of breaches, which was required by the sole remedy provisions of the controlling agreement). Given that the Client Guide does not limit Plaintiffs to a sole remedy, these cases are not persuasive.

Moreover, as Plaintiffs observe, statistical sampling has been approved in numerous cases involving large numbers of mortgage loans. *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 504 (S.D.N.Y. 2018) ("Here, Deutsche Bank is permitted to seek damages on both the R&W and Notice Claims, and statistical sampling is an entirely appropriate method of attempting to prove both liability and damages."); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) ("Sampling is a widely accepted method of proof in cases brought under New York law, including cases relating to RMBS and involving repurchase claims"); Order Granting Pls.' Mot. *in Limine* Permitting Use of Statistical Sampling, *In re Residential Capital, LLC*, No. 14-07900-mg. [Bankr. Doc. No. 56 at 3–4] (Bankr. S.D.N.Y. Jan. 13, 2015) (Glenn, B.J.) (stating that statistical sampling and calculation of breach rates are commonly used methodologies in RMBS litigation, as sampling followed by extrapolation "permits cases like these to be efficiently litigated in a cost-effective manner without compromising the fairness of the results"); *Nat'l Credit Union Admin Bd. v. RBS Sec. Inc.*, No. 11-2340-JWL, 2014 WL 1745448, at *5 (D. Kan. Apr. 30, 2014) (approving the use of expert sampling

methodology); *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 Civ. 3106 (PAC), 2011 WL 1135007, at *1, *6 n.4 (S.D.N.Y. Mar. 25, 2011) (permitting plaintiff to seek pool-wide remedy using sampling and extrapolation for repurchase claims); *see also Nomura Holding*, 873 F.3d 85 (upholding an $806 million bench trial judgment involving use of statistical sampling in RMBS case); *Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC*, No. 3:12-cv-933 (CSH), 2014 WL 3824333, at *9 (D. Conn. Aug. 4, 2014) (stating that statistical sampling, in principle, "is an acceptable way of proving liability and damages in an RMBS case").

Even in one of Defendants' cited cases, *BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A*, No. 14-cv-9371 (KPF) (SN), 2017 WL 953550, at *5 (S.D.N.Y. Mar. 10, 2017), although the court decided that the expense and burden of sampling was not proportional to the needs of that case,[25] it nonetheless observed that "statistical sampling is an accepted method of proving liability in this District, 'including in cases relating to RMBS and involving repurchase claims.'"[26] *Id.* (citations omitted).

---

[25] *See also BlackRock Balanced Capital Portfolio (FI)*, No. 14-cv-9367 (JMF), 2018 WL 3120971, at *2 (S.D.N.Y. May 17, 2018) (denying plaintiffs' motion to use statistical sampling to establish liability and damages on grounds of proportionality, without any additional analysis).

[26] In some of Defendants' cited cases, or excerpts from hearing transcripts, the courts did not actually rule on sampling. (*See* Defs.' Mem. at 86–87) (citing *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 n.6 (2d Cir. 2014) (noting, in putative class action, that plaintiffs' proposal to demonstrate liability via sampling did not address the class standing inquiry pending before the court, but even so, acknowledging in dicta that district courts "have sometimes permitted plaintiffs to use statistical sampling to prove the incidence of defects within individual trusts"); *Phx. Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14-CV-10104 (VEC), 2017 WL 3973951, at *8–9 (S.D.N.Y. Sept. 7, 2017) (finding that sole remedy provision required

Defendants criticize Plaintiffs' legal authority as "easily distinguished"—referring simply to "certain RMBS cases in which sampling was allowed," without actually identifying the purportedly inapposite cases by name. (Defs.' Opp'n at 51.) They contend that unlike the facts here, certain of Plaintiffs' cited cases concerned pool-wide claims against aggregators and sponsors of RMBS, in which the plaintiffs asserted misrepresentations of the overall characteristics of entire pools. (*Id.*) Defendants appear to argue this case does not involve such broad claims, therefore, statistical sampling is ill-suited and improper. (*See id.*)

But Plaintiffs assert that many of their cited cases approved the use of sampling where the claims were *not* pool-wide claims against RMBS aggregators or sponsors.[27] (Pls.' Reply at 26 [Doc. No. 3909].)

---

discovery, but otherwise not addressing sampling); Smallwood Decl., Ex. 80 (Hr'g Tr. *In re Lehman Brothers Holding, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 10, 2014) at 70–71, 93–95, 350–51, 354–55) (discussing proposed protocol, but not ruling on sampling).

And two of Defendants' cases are unrelated to RMBS cases. *U.S. ex. rel. Michaels v. Agape Senior Cmty., Inc.*, No. No. 0:12-3466-JFA, 2015 WL 3903675, at *9–11 (D. S.C. June 25, 2015) (precluding use of statistical sampling as a means of establishing damages in *qui tam* action against nursing homes, but acknowledging that "some cases are suited for statistical sampling, and indeed, in many cases that method is the only way that damages may be proved."); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 536 (C.D. Cal. 2011) (finding, in a putative class action employment lawsuit, that employer's liability turned on comparison of individual employees' recorded hours)).

[27] Plaintiffs identify the following such cases involving claims brought by RMBS trusts: *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Capital Holdings LLC*, 2018 WL 583116, at *6 (S.D.N.Y. Jan. 25, 2018); Order Granting Pls.' Mot. *in Limine* Permitting Use of Statistical Sampling, *In re Residential Capital, LLC*, No. 14-07900-mg. [Bankr. Doc. No. 56 at 2, 4] (Bankr. S.D.N.Y. Jan. 13, 2015) (Glenn, B.J.); Scheck Decl., Ex. 45 (*ACE Sec. Corp. Home*

Moreover, the Court agrees with Plaintiffs that the relevant distinction in the case law is not between pool-wide and loan-by-loan cases, but between cases in which the governing agreement includes a sole remedy provision and those that do not, as discussed above.  As noted, in cases involving sole remedy provisions, such as repurchase, courts have found a pervasive breach theory foreclosed, often due to repurchase notice and demand provisions.  *See, e.g., Homeward Residential*, 2017 WL 5256760, at *7.  But here, the Client Guide's repurchase provision does not require RFC to even make a repurchase demand, (Client Guide § A210), nor does it require RFC to give notice of litigation that might trigger an originating lender's indemnification obligations.  (*Id.* § A212.)  And, perhaps most importantly, the Client Guide does not limit Plaintiffs' remedies to a single type.  To the contrary, it contemplates wide-ranging relief:

> []RFC may exercise any remedy outlined in this Client Guide or as allowed by law or in equity.  []RFC's exercise of one or more remedies in connection with a particular Event of Default will not prevent it from exercising:

*Equity Loan Tr., Series 2007-HE1 v. DB Structured Prods., Inc.*, No. 650327/2013, NYSCEF [Doc. No. 59 at 3] (N.Y. Sup. Ct. Jan. 8, 2015)); *Deutsche Bank Nat'l Tr. Co.*, 2014 WL 3824333, at *9; *Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Capital, Inc.*, No. 156016/2012, NYSCEF [Doc. No. 236 at 1] (N.Y. Sup. Ct., Nov. 19, 2013). (Pls.' Reply at 26–27 n.24 [Doc. No. 3909].)

And Plaintiffs claim that monoline insurers asserted non-pool-wide claims in the following cases: *MBIA Ins. Corp v. Credit Suisse Sec. (USA) LLC*, No. 603751/2009, 2017 WL 1201868, at *3 (N.Y. Sup. Ct. Mar. 31, 2017); *Assured Guar. Mun. Corp. v. DB Structured Prods., Inc.*, No. 650705/2010, 2014 WL 3282310, at *17 (N.Y. Sup. Ct. July 3, 2014); Scheck Decl., Ex. 52 (*MBIA Ins. Corp v. Credit Suisse Sec. (USA) LLC*, No. 603751/2009, NYSCEF [Doc. No. 655 at 1] (N.Y. Sup. Ct. June 24, 2014)); *Assured Guar.*, 920 F. Supp. 2d at 512; *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010).  (Pls.' Reply at 26–27 n.24.)

• One or more other remedies in connection with the same Event of
　　Default
　　　　• Any other rights which it may have at law or in equity.

*(Id.* § A209.)

　　Defendants highlight certain singular nouns in Sections A202 and A212 as

evidence that the Client Guide requires loan-by-loan proof to establish liability. (Defs.'

Mem. at 85–86.)　For example, they point to references to "each Loan" in A202:

　　　　*Each* of the Loans delivered and sold to []RFC meets the applicable
　　　　program terms and criteria set forth in this Client Guide.　All information
　　　　relating to *each Loan* delivered and sold to []RFC is true, complete and
　　　　accurate . . . .　The Client is in compliance with, and has taken all necessary
　　　　actions to ensure that *each Loan* is in compliance with all representations,
　　　　warranties and requirements contained in this Client Guide.

(Client Guide § A202) (emphases added).　Although other Courts have found that the

usage of singular nouns requires loan-by-loan proof, *see, e.g., Homeward Residential,*,

2017 WL 5256760, at *7, this Court is not persuaded.　The "each Loan" language in the

Client Guide does not state that Plaintiffs must prove breaches loan by loan.　Rather, the

Section A202 language quoted above, for example, requires *Defendants* to make their

representations loan by loan.　Defendants identify no Client Guide provisions that

expressly require Plaintiffs to prove liability loan by loan.

　　The Court in *Deutsche Bank*, 289 F. Supp. 3d at 506, rejected this same argument

based on the use of singular nouns in the parties' contract.　There, as here, the governing

contract contained no language requiring the party providing notice to specifically

identify or offer proof as to each and every loan subject to repurchase.　*Id.*　Moreover,

here, Defendants' actual knowledge of breaches is irrelevant because the Client Guide

obliged originating lenders to assume liability for any misrepresentations or breaches, regardless of their knowledge or RFC's knowledge. (Client Guide § A200.)

Moreover, as Plaintiffs note, even if Plaintiffs were required to prove liability on a loan-by-loan basis, two courts have recently suggested that sampling is one means by which to do so. (*See* Scheck Decl., Ex. 64 (Mar. 8, 2018 *Lehman* Hr'g Tr. at 78) (stating that loan-by-loan proof is required, "either directly or through a sound extrapolation methodology"); *Deutsche Bank*, 289 F. Supp. 3d at 505 (finding statistical sampling consistent with the plaintiff's repurchase obligations under the parties' agreement, as it "is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many individual loans in the pool contain material breaches"). The Court in *Assured Guaranty* similarly stated:

> The very purpose of creating a representative sample of sufficient size is so that, despite the unique characteristics of the individual members populating the underlying pool, the sample is nonetheless reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic.

920 F. Supp. 2d at 512.

The use of sampling evidence here is particularly important for another reason. Establishing liability and damages in this case without the use of sampling would be unmanageable. As noted in *Tyson Foods*, "[i]n many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability." 136 S. Ct. at 1046 (quoting *Complex Litigation* § 11.493, p. 102

(4th ed. 2004)). Discussing the repurchase protocol and whether individualized proof was required in a case involving numerous loans, the court in *Syncora* stated:

> The repurchase protocol is a low-powered sanction for bad mortgages that slip through the cracks. It is a narrow remedy ("onesies and twosies") that is appropriate for individualized breaches and designed to facilitate an ongoing information exchange among the parties. This is not what is alleged here. Here, Syncora alleges massive misleading and disruption of any meaningful change by distorting the truth. The futility of applying an individualized remedy to allegedly widespread misrepresentations is evident in the fact that, of the 1,300 loans actually submitted under the repurchase protocol, EMC has remedied only 20. This .015% success rate does not bode well for the efficiency of employing the repurchase protocol for a generalized claim of breach. Accordingly, EMC cannot reasonably expect the Court to examine each of the 9,871 transactions to determine whether there has been a breach, with the sole remedy of putting them back one by one. This transaction was put together in days and months. It is now in its second year of litigation.

2011 WL 1135007, at *6 n.4.

Plaintiffs note that when they initially moved to approve the use of statistical sampling in February 2015, the at-issue loan population consisted of nearly 90,000 loans. (Pls.' Reply at 28.) Although sampling reduced that number by almost 85%, Plaintiffs claim that re-underwriting the remaining 14,000 loans "required multiple vendors, experts, and attorneys, and hundreds of subpoenas, over a period of years." (*Id.*) Defendants minimize the proof required for the approximately 7,000 loans pending as of June 2018, claiming that Plaintiffs "exaggerate[]" the difficulties of re-underwriting them. (Defs.' Opp'n at 52.) They argue that the sample sizes here "pale in comparison" to sample sizes in some RMBS cases. (*Id.*) (citing *Fed. Hous. Fin. Agency v. JPMorgan Chase*, No. 11-cv-6188(DLC), 2012 WL 6000885, at *5 (S.D.N.Y. Dec. 3, 2012) (sample

size included more than 40,000 loans, with 100 loans from each of 427 securitizations across 15 cases); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010) (sample of 6,000 loans, with 400 loans from each of 15 securitizations); *Nat'l Credit Union*, 2014 WL 1745448, at *1 (9,700 loans, with 100 loans from each of 97 loan groups)).  But even counsel for Home Loan Center acknowledged that the process of producing rebuttal re-underwriting disclosures for 150 loan samples was an "incredibly expensive and time-consuming task."  (July 21, 2016 CMC Tr. at 75 [Doc. No. 1699].)  If Plaintiffs were required to submit loan-by-loan re-underwriting evidence, Defendants would obviously be required to respond in kind. Such a process is not practicable for the parties, the jury, or the Court and is another reason why sampling evidence will be permitted.

Finally, Defendants argue that they are entitled to summary judgment because Dr. Snow's sampling methodology is merely speculative.  (Defs.' Mem. at 85; Defs.' Opp'n at 49.)  But "statistical sampling is not guesswork," and it is "not a shot in the dark." *Deutsche Bank*, 289 F. Supp. 3d at 496, 505.  Rather, "it is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many *individual* loans in the pool contain material breaches."  *Id.*  In their opposition to Plaintiffs' motion, Defendants point out alleged "flaws" in Dr. Snow's methodology which, they assert, render his opinion unreliable.  (Defs.' Opp'n at 51.)  Whether Dr. Snow's opinion is sufficiently reliable under *Daubert* is a different question, which will be addressed in the Court's separate ruling on *Daubert* motions.

For the reasons set forth above, Plaintiffs' motion for summary judgment on the issue of sampling is granted and Defendants' motion is denied.

## F.     Plaintiffs' Motions for Summary Judgment

Having addressed several of the common bases on which the parties seek dispositive relief, the Court now turns to Plaintiffs' remaining arguments for summary judgment, which include that (1) under the Client Guide, (a) they have sole discretion to determine breaches of Defendants' R&Ws, and (b) RFC has sole discretion to enter into, and determine the amounts of, the Settlements, such that Defendants may not challenge the Settlements as unreasonable; (2) Plaintiffs can recover RFC's liabilities, not just its actual losses; (3) Defendants' breaches caused RFC's origination-based losses and liabilities; and (4) Defendants' affirmative defenses, as well as their claim that RFC's actions or other "superseding and intervening factors" may have contributed to RFC's liabilities, fail.

### 1.     The Scope of Plaintiffs' Sole Discretion under the Client Guide

#### a.     The Scope of Plaintiffs' Sole Discretion to Determine Breaches

Plaintiffs argue that, as a matter of law, the plain language of the Client Guide grants them the power to determine, in their sole discretion, whether any of the loans that Defendants sold to RFC breached the R&Ws of the Client Guide. (Pls.' Mem. at 9.) Plaintiffs argue that Defendants, as sophisticated business entities, well understood that they were bound by these determinations. (*Id.*) Plaintiffs primarily ground their arguments in the plain language of several provisions of the Client Guide. Most importantly, they point to Section 113(B), a provision that governs every section of the Client Guide:

> Whenever any provision of this Client Guide contract *requires []RFC to make a determination of fact or a decision to act*, or to permit, approve or deny another party's action *such determination or decision shall be made in []RFC's sole discretion.*

(Client Guide § 113(B) (emphasis added).) Plaintiffs next point to Section A210, which envisions RFC's exercise of its sole discretion and provides *inter alia*, that

> If []RFC *determines that an Event of Default has occurred* with respect to a specific Loan, the *Client agrees to repurchase the Loan* and its servicing (if the Loan was sold servicing released) within 30 days of receiving a repurchase letter or other written notification from []RFC.
> . . .
> Where []RFC determines that repurchase of a Loan and/or the servicing is not appropriate, *the Client shall pay []RFC all losses, costs, and expenses incurred by []RFC and/or the Loan's Servicer as a result of an Event of Default.* This includes all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken.

(*Id.* § A210(A) (emphasis added).) Section A208, in turn, provides that an "Event of Default" occurs, for instance, when

> (2) The Client has *breached any agreement* outlined or incorporated by reference in the Client Contract or any other agreement between the Client and []RFC.

> (3) The Client *breaches any of the representations, warranties or covenants set forth in this Client Guide*, fails to perform its obligations under this Client Guide or the Program Documents, makes one or more misleading representations, warranties or covenants to []RFC, or has failed to provide [RFC] with information in a timely manner, including information required under Regulation AB or any successor regulation, that is true, complete and accurate.

(*Id.* § A208) (emphasis added). Finally, Plaintiffs point to Section A212, which provides that

The Client *shall indemnify* []RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses *resulting from any Event of Default*. This includes, without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract; [and] (iii) any claim, demand, defense or assertion against or involving []RFC based on or resulting from such breach . . . .

*(Id.* § A212 (emphasis added).)[28]

Plaintiffs argue that the plain meaning of these provisions grants them sole discretion to determine whether Events of Default, i.e., breaches, have occurred. More specifically, Plaintiffs argue that Section 113(B), titled "[]RFC's Sole Discretion," plainly grants them sole discretion to make a determination of fact, and that "Events of Default" are such determination of facts. Sections A210 and A212, Plaintiffs argue, then speak simply to the remedies that RFC is entitled to exercise once it makes a determination that an Event of Default has occurred. Plaintiffs acknowledge that such discretion cannot be exercised in bad faith. (*See* June 19, 2018 Hr'g Tr. ("June 19 Hr'g Tr.") at 15 [Doc. No. 3940].)

Plaintiffs buttress their plain language argument with this Court's opinion in *Residential Funding Co. v. Terrace Mortgage Co.* (*Terrace*), 850 F. Supp. 2d 961 (D. Minn. 212), *aff'd*, 725 F.3d 910 (*Terrace II*) (8th Cir. 2013), as affirmed by the Eighth Circuit. In *Terrace*, this Court held that the plain language of the Client Guide—which had identical language to the relevant provisions here—gave RFC "the sole and essentially unreviewable authority to determine if a particular loan must be repurchased because it failed to meet the underwriting criteria in the Client Guide[]." 850 F. Supp. 2d at 969. The Eighth Circuit

---

[28] As discussed below in later sections, previous versions of Section A212 had different language. For the purposes of the Court's analysis here, however, such differences are not material.

affirmed. *Terrace II,* 725 F.3d at 916–18. Thus, Plaintiffs argue, the plain language of the Client Guide, as already interpreted by this Court in *Terrace*, compels summary judgment in their favor on this issue.

Defendants disagree. They contend that the Client Guide only grants RFC the sole discretion to determine breaches when exercising a particular remedy—repurchase under Section A210. According to Defendants, "*Terrace* makes clear that Section A210 grants RFC discretion for a particular purpose: namely, 'to determine *if a particular loan must be repurchased* because it failed to meet the underwriting criteria provided in the Client Guides.'" (Defs.' Opp'n at 3) (quoting *Terrace,* 850 F. Supp. 2d at 969). In other words, they concede that RFC has the power to determine, in its sole discretion, if a loan is in breach of a R&W, but *only* insofar as RFC seeks to have the originating bank repurchase that loan. (*See* Defs.' Mem. at 2 ("*Terrace* affirmed RFC's discretion *in a specific context* (applying the Client Guide's repurchase protocol) to make *a specific determination* (whether loans breached the Guide) in connection with *a specific remedy* (repurchase).").) In all other circumstances, Defendants contend, RFC does not have sole discretion to determine breaches. (Defs.' Opp'n at 2–8.)

This Court disagrees with Defendants' strained reading of the Client Guide and the *Terrace* decisions. Based on the plain language of the contract the parties willingly signed, the Court concludes that the Client Guide grants RFC sole discretion to determine Events of Default in all circumstances, and that that discretion is derived from Section 113(B). In clear, unambiguous language, Section 113(B) grants RFC sole, unreviewable discretion to

make determinations of fact. And as this Court held in *Terrace*, one such determination of fact involves declaring Events of Default. Indeed, in affirming this Court's *Terrace* decision, the Eighth Circuit held that "[t]he Client Guide gives [RFC] 'sole discretion' to determine whether an Event of Default has occurred." *Terrace II*, 725 F.3d at 916.

Once that determination of fact has occurred, i.e., once RFC determines that an Event of Default has occurred, Sections A210 and A212 simply speak of *remedies* that RFC may exercise under the contract. For instance, Section A210 simply states that "*If []RFC determines that an Event of Default has occurred* with respect to a specific Loan, the *Client agrees to repurchase the Loan*. . . ." (Client Guide § A210 (emphasis added).) Contrary to Defendants' contention, this section does not empower RFC with sole discretion. Rather, Section A210 *presupposes* that RFC has such power and then simply sets forth the clients' obligations once that discretion has been exercised. The source of the power is Section 113(B). Similarly, Section A212 speaks of a remedy that RFC may utilize after it has determined that an Event of Default has occurred. It provides that Defendants "*shall indemnify* []RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses *resulting from any Event of Default*." (*Id.* § A212) (emphasis added). Like Section A210, this provision does not empower RFC with sole discretion to make a determination of fact—it presupposes that RFC has that authority—an authority again derived from Section 113(B).

Dispelling any doubt about this interpretation, the Eighth Circuit essentially held as much in *Terrace II*. In a particularly relevant passage, the Eighth Circuit noted:

73

The Client Guide gives Residential "sole discretion" to determine whether an Event of Default has occurred, and Terrace agreed to buy back the loan if Residential determined as much. There is nothing ambiguous about this language.

*Terrace II*, 725 F.3d at 916 (internal citations omitted). In other words, as just described, Section 113(B) gives RFC sole discretion to determine breaches, and Defendants contractually agreed to certain remedies in the event that RFC made such determinations.

Admittedly, the Client Guide gives RFC considerable discretion to act and wide-ranging remedies. But as the Eighth Circuit has stated, Defendants here have "identifie[d] no ambiguity in the language of the contract which would permit us to look beyond its plain language." *Id.* The court in *Syncora*, 2011 WL 1135007, at *5, addressed a similarly expansive contract, explaining that "[t]he Operative Documents grant especially broad rights and remedies to Syncora because, as the financial guarantor under an unconditional and irrevocable insurance policy, it bears the greatest loss if the loans underperform and the other parties break their contractual obligations." The contract here was one that several sophisticated entities willingly signed. And as poignantly stated by the Second Circuit, "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros.*, 64 F.2d 344, 346 (2d Cir. 1933).

> ### b. The Scope of Plaintiffs' Sole Discretion to Make All Settlement Decisions

Plaintiffs next urge this Court to hold, as a matter of law, that the Client Guide "confer[s] upon RFC sole discretion to enter into the Settlements," such that "RFC's

exercise of that discretion is not reviewable absent a showing [of] fraud, bad faith, or a grossly mistaken exercise of judgment," which they argue Defendants have failed to show. (Pls.' Mem. at 11.)  They point out that Section A212 of the Client Guide provides that RFC "has the right to control any litigation or governmental proceeding related to a Loan, including but not limited to . . . . *making settlement decisions*." (Client Guide § A212 (emphasis added).)   And "making settlement decisions," according to Plaintiffs, is a "determination of fact or a decision to act" that Section 113(B) of the Client Guide empowers RFC to make in its "sole discretion."  (Pls.' Mem. at 12.)  Thus, Plaintiffs argue, Defendants may not challenge RFC's settlement decisions at all and Plaintiffs need not show that the Settlements were reasonable.  (*Id.*)

Defendants disagree. They contend that Plaintiffs misread the Client Guide, as the language of Section A212 merely "gives RFC 'the right to control' the litigation, including 'choosing defense counsel and making settlement decisions,'" (Defs.' Opp'n at 9), but in no way precludes Defendants from later challenging the reasonableness of a settlement pursuant to the principle of Minnesota law that "a party seeking indemnity for a pre-trial settlement must prove not only the existence of indemnifiable claims, but also the reasonableness of the settlement." (*Id.* at 8).

This Court agrees with Defendants. The issue Plaintiffs present is again one of contract interpretation—a question of law—unless ambiguity exists. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn. 1990).  The contract language on which Plaintiffs rely provides that

> Except for notices for reimbursement, []RFC is *not* required to give Client notice of any litigation . . . that may trigger indemnification obligations. . . . []RFC has the *right to control any litigation* . . . related to a Loan, *including* but not limited to choosing defense counsel and *making settlement decisions*.

(Client Guide § A212 (emphasis added)). As relevant here, the import of this language is twofold. First, as Plaintiffs point out, (*see* Pls.' Reply at 8–9), Defendants waived notice of any litigation that could trigger indemnification obligations of the type asserted here. Although no Minnesota precedent addressing notice in these precise circumstances has been called to this Court's attention, the general rule is that an indemnitee's duty, if any, to provide notice to an indemnitor is discerned from the express language of the indemnity provision. *See United States v. Schwartz*, 90 F.3d 1388, 1392–93 (8th Cir. 1996) (applying Minnesota law and holding that indemnitee did not need to provide notice where contract language did not unambiguously require it); *see also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1221 (5th Cir. 1986) ("Where the indemnity agreement does not require notice, the courts will not infer a notice requirement as a condition precedent to a right to recover on the indemnity contract."); *Premier Corp. v. Econ. Research Analysts, Inc.*, 578 F.2d 551, 554 (4th Cir. 1978) (applying "the general rule that notice is unnecessary unless the contract of indemnity requires it"); *Smithson v. Wolfe*, No. C94-1015 MJM, 1999 WL 33656866, at *4 (N.D. Iowa July 19, 1999) ("[T]he general rule is that an indemnitee is not required to provide notice . . . to the indemnitor under an indemnification contract, unless the contract itself requires notification . . . ."). Here, the unambiguous terms of the indemnity contract provide that RFC did not need to notify Defendants of any litigation or proceeding that may trigger indemnification.

Second, the indemnity provision on which RFC relies gives RFC the sole discretion to *enter* into settlements that would trigger Defendants' duty to indemnify. The relevant language of Section A212 gave RFC the "right to control any litigation . . . related to a Loan, including . . . making settlement decisions." Interpreted in tandem with Section 113(B), this clause unambiguously gives RFC the power, and discretion, to control litigation, such that RFC need not consult with Defendants when making any litigation-related decisions, including whether to settle or actually litigate any claims related to a loan.

It is well-established in Minnesota, however, that a party seeking indemnity for a settlement must show that the settlement was reasonable. *See, e.g.*, *Brownsdale Coop. Ass'n v. Home Ins. Co.*, 473 N.W.2d 339, 342 (Minn. Ct. App. 1991) ("Although notice was not required, the settlement must be reasonable and entered in good faith to be enforceable."). Nothing in the Client Guide—and certainly nothing in the provision on which Plaintiffs rely—overrides this principle. While this Court finds that the Client Guide grants RFC sole discretion to settle without notice to the indemnitor, the Client Guide does not grant RFC sole discretion to determine the reasonableness of the Settlements. Accordingly, as the party seeking indemnity, RFC has the burden of proving that the Settlements were reasonable.

Plaintiffs argue that, even if they do not have sole discretion to determine the reasonableness of the Settlements, this Court should hold that no reasonable juror could find otherwise and that, therefore, the Settlements were reasonable as a matter of law. (*See* Pls.' Mem. at 15.) Plaintiffs argue that the Settlements "meet the standard for approval under

Minnesota law, which asks whether a reasonably prudent person would have entered into the settlements based upon the strengths and weaknesses of the underlying merits." (*Id.*) Defendants disagree, contending that their rebuttal of Plaintiffs' experts "raise triable issues of fact as to whether RFC can meet its burden of proving reasonableness." (Defs.' Opp'n at 11.)

In his opinion on the reasonableness of RFC's Settlements, Plaintiffs' expert Donald Hawthorne describes RFC's business model, the underlying litigation, the Settlements, and RFC's bankruptcy. (Scheck Decl., Ex. 19 (Corr. Hawthorne Rpt. ¶¶ 16–29, 463).) Among other things, in formulating his opinion, Hawthorne evaluates RFC's representations that gave rise to liability, the relative strengths and weaknesses of the underlying claims and defenses, the cost of litigating the underlying claims, various settlement benchmarks in similar cases, and the settling parties' good faith in reaching the Settlements. (*See id.* ¶¶ 164–462.) Hawthorne notes that the Settlements for which RFC seeks recovery here were "the product of arms-length negotiation and mediation," and were "approved as reasonable by the Bankruptcy Court." (*Id.* ¶ 463.) Ultimately, he concludes at the end of his 236-page report that the Settlements were reasonable. (*Id.*)

Defendants disagree. They dispute Hawthorne's opinion on reasonableness, pointing in particular to RFC's settlement with MBIA. This settlement was "facially unreasonable," Defendants contend, because RFC settled with MBIA for allowed claims that exceeded MBIA's losses by over one billion dollars. (Defs.' Opp'n at 10–11; *see also* Defs.' Mem. at 78–85.) In addition to singling out the MBIA Settlement as one basis for denying summary

judgment to Plaintiffs, Defendants affirmatively seek summary judgment that the MBIA Settlement was unreasonable and therefore not indemnifiable. (Defs.' Mem. at 78–85.)

In making their calculations challenging the reasonableness of the MBIA Settlement, Defendants include MBIA's separate settlements with GMAC Mortgage and ResCap LLC, in the total amount, arguing that they are related to MBIA's claims on the RFC-sponsored trusts. (*Id.* at 80.) Asserting that Plaintiffs' experts "ignore that the MBIA [S]ettlement provided MBIA with allowed claims against ResCap and GMACM on the same RFC-sponsored trusts," Defendants contend that the total amount of allowed claims that MBIA obtained for RFC-sponsored trusts exceeded MBIA's total losses on those trusts. (*Id.* at 81.) They maintain that MBIA essentially obtained a double recovery, rendering the MBIA Settlement facially unreasonable. (*Id.*at 82) (citing *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379 (Minn. 1990); *Gronquist v. Olson*, 64 N.W.2d 159, 164 (Minn. 1954); *Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 696 (Minn. Ct. App. 2015)).

But Plaintiffs argue that MBIA's separate settlements with GMAC Mortgage and ResCap LLC are irrelevant to the reasonableness of the settlement between RFC and MBIA. (Pls.' Opp'n at 48–49.) And while Plaintiffs agree with the general principle that a party may not obtain a double recovery, they contend that Defendants' argument "ignore[s] that a bankruptcy creditor may recover from multiple entities (including debtors) for the same loss, provided that the creditor does not actually *receive* more than it is owed in total. (*Id.* at

48) (citing *Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935); *Bd. of Comm'rs v. Hurley*, 169 F. 92, 97 (8th Cir. 1909)).

Defendants' critique of the reasonableness of the Settlements is not limited to the MBIA Settlement. They further contend that their experts raise several issues of fact as to whether the rest of the Settlements were reasonable. (Defs.' Opp'n at 11.)

"The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." *Miller*, 316 N.W.2d at 735. This inquiry "involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.*; *see also Glass*, 778 F. Supp. at 1084 (citing *Miller*, 316 N.W.2d at 735). Moreover, "[t]he party seeking indemnification need only show it could have been liable under the facts shown at trial not whether they would have been." *Jackson*, 803 F. Supp. 2d at 1012 (emphasis removed) (citing *Glass*, 778 F. Supp. at 1083). Further, "in the context of a contractual duty to indemnify, . . . when the parties have a written indemnity contract, 'the actual liability requirement [is] superfluous.'" *Id.* (quoting *Glass*, 778 F. Supp. at 1084 n.88) (granting summary judgment to party seeking indemnity, finding that the settlement was reasonable where facts "could have triggered" party's liability (emphasis removed)).

On this record, the Court is unable to rule that the Settlements were reasonable as a matter of law. At oral argument, counsel for Defendants suggested that the parties could, before trial, submit evidence to the Court on the issue of reasonableness such that the question would not need to be decided by a jury. (*See* June 19 Hr'g Tr. at 55–56 ("There is

Minnesota authority saying that that factual decision can be made by the Court rather than by the jury. So I don't necessarily think it will be made by the jury, but we can brief that issue at a later time.").) While Plaintiffs' counsel expressed a willingness to "explore [that]," she raised potential Seventh Amendment issues with "having a sudden bench trial where we siphon off an issue that affects damages." (*Id.* at 68.) The Court has asked for supplemental briefing on this issue. (*See* Order for Suppl. Briefing [Doc. No. 4128].) Accordingly, the Court denies Plaintiffs' summary judgment motion on the reasonableness of the Settlements and denies Defendants' motion for summary judgment as to indemnification for the MBIA Settlement. The reasonableness of the MBIA Settlement and the Settlements generally is a fact issue and genuine issues of material fact remain in dispute.

### 2. The Scope of Plaintiffs' Potential Recovery in Indemnity

Plaintiffs next argue that this Court should grant summary judgment interpreting the Client Guide, as a matter of law, to provide that Plaintiffs may recover "(a) indemnity for RFC's liabilities, not just [its out-of-pocket] losses," or, in the alternative, "(b) all losses on breaching loans." (Pls.' Mem. at 15; *see also* Pls.' Reply at 9–15.) Each issue is addressed in turn.

#### a. Recovery in Indemnity for RFC's Losses and Liabilities (the Allowed Claims), Not Just Actual Losses Incurred

Plaintiffs first urge this Court to interpret the Client Guide to require Defendants to indemnify RFC for its "liabilities," which Plaintiffs define as "the claims agreed upon in the Settlements and allowed by the Bankruptcy Court," or the so-called "Allowed Claims,"

rather than only its out-of-pocket losses, i.e., what RFC distributed to its creditors. (Pls.' Mem. at 16.) Specifically, Plaintiffs contend that Section A212 expressly provides for indemnification from all "judgments," "liabilities," and "claim[s]" against or involving RFC—terms that all encompass the Allowed Claims. (*Id.* at 16–18; *see* Pls.' Reply at 10–12.)

Defendants concede that the version of Section A212 that took effect in December of 2005 would require them to indemnify RFC for liabilities.[29] (Defs.' Opp'n at 12.) They argue, however, that the language in the pre-December 2005 Client Guide does *not* require them to indemnify for liabilities, as the earlier version of Section A212 provided for indemnity for only actual, out-of-pocket losses. (*Id.*)

At the outset, this Court concludes, as a matter of law, that the post-December 2005 Client Guide requires Defendants to indemnify RFC for the liabilities as well as for out-of-pocket losses. In Minnesota, parties may contract for indemnity against losses suffered as well as for indemnity against liabilities incurred. *See Johnson*, 902 N.W.2d at 85 ("[C]aselaw distinguishes between a 'strict contract of indemnity against loss or damage' and indemnity 'against mere liability.'" (quoting *Trapp*, 359 N.W.2d at 327)). "A party's use of certain terms can aid the determination of what type of indemnity was considered by

---

[29] As noted earlier, Defendants argue, however, that RFC presently has no liabilities for which it may seek indemnity, as all its liabilities were extinguished by the Settlements. (*See* Defs.' Opp'n at 14–16.) The Court disagrees with Defendants and has addressed that argument as a standalone issue in its discussion of the effect of RFC's bankruptcy on Plaintiffs' ability to recover. (*See supra*, Section III.E.3.)

the parties." *Lindsey v. Jewels by Park Lane, Inc.*, 205 F.3d 1087, 1093 (8th Cir. 2000).

Here, the post-December 2005 Client Guide states that:

> The Client *shall indemnify []RFC* from all *losses*, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, *judgments*, and any other costs, fees and expenses resulting from any Event of Default. *This includes*, without limitation, *liabilities* arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract; [and] (iii) *any claim, demand, defense or assertion against or involving* []RFC based on or resulting from such breach . . . . .

(Client Guide § A212 (emphasis added).)

This language provides for indemnification for the Allowed Claims in at least three ways. First, it expressly provides for indemnification "from all . . . judgments."[30] Notably, the term "judgments" is utilized *in addition* to the term "losses." And as Plaintiffs point out, (*see* Pls.' Reply at 11–12), the Confirmation Order approving the Second Amended Plan, (*see* Scheck Decl., Ex. 32 (Bankr. Confirm. Order)), constitutes a final judgment. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010) (holding, in a Chapter 13 case, that the Bankruptcy Court's order confirming debtor's proposed plan was a final judgment for the purposes of appeal); *see also In re Laing*, 31 F.3d 1050, 1051 (10th Cir. 1994) (holding that, for *res judicata* purposes, the debtor's "earlier confirmed Chapter 11

---

[30] At oral argument, Defendants suggested that Plaintiffs had waived any argument based on the term "judgments" because it was raised for the first time in a reply brief. (*See* June 19 Hr'g Tr. at 157–58.) Although Courts "retain the authority to decline consideration of an issue raised for the first time in a reply brief, [they] are not precluded from considering the issue." *United States v. Head*, 340 F.3d 628, 630 n.4 (8th Cir. 2003) (citations omitted); *see also Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 313 F.3d 1087, 1092 (8th Cir. 2002) (considering merits of argument raised for the first time in reply brief). The Court will consider this argument, as it is integral to the larger issue of the scope of indemnification in this case.

plan b[ound] him as a final judgment on the merits" even though the Chapter 11 bankruptcy was later converted to Chapter 7); *Paul v. Monts*, 906 F.2d 1468, 1471 n.3 (10th Cir. 1990) ("[A] confirmed plan functions as a judgment with regard to those bound by the plan . . . ."). And, significantly, this final judgment set forth the Allowed Claims, which are, by definition, liabilities. *See* 11 U.S.C. § 101(5)(A), (12); *In re Tribune Media Co.*, 552 B.R. 282, 292 (Bankr. D. Del. 2016); *In re Palisades at W. Paces Imaging Ctr., LLC*, 501 B.R. 896, 906 (Bankr. N.D. Ga. 2013). Accordingly, the plain language of the Client Guide requires Defendants to indemnify Plaintiffs for the Allowed Claims set out in the Plan.

Second, eliminating any doubt as to whether the post-December 2005 Client Guide provided for indemnity against liabilities, it expressly states that Defendants' obligation to indemnify RFC from "all losses, . . . [and] judgments" includes, "without limitation, *liabilities* arising from . . . (ii) any breach of warranty, obligation or representation contained the Client Contract Guide." (Client Guide § A212.) As described above, the Allowed Claims include, by definition, liabilities incurred.

And finally, the Client Guide provides that Defendants' indemnity obligations also extend to "liabilities arising from . . . (iii) any *claim*, demand, defense or assertion against or involving []RFC based on or resulting from such breach." (*Id.*) Under Minnesota law, where a contract provides for indemnification from a "claim" rather than just "loss" or "damage," it is one for indemnification against liabilities rather than simply losses. *See Trapp*, 359 N.W.2d at 327; *see also Christy v. Menasha Corp.*, 211 N.W.2d 773, 777 (Minn. 1973), *overruled on other grounds by Farmington Plumbing & Heating Co. v.*

84

*Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838, 842 n. 4 (Minn. 1979) ("[An] agreement . . . to indemnify not just against loss or damage but also against mere claims, . . . a fortiori must be construed to be an indemnity agreement against accrued liability as well as against loss or damage."); *Burns & McDonnell Eng'g Co. v. Torson Constr. Co.*, 834 S.W.2d 755, 758 (Mo. Ct. App. 1992) (holding contract provided for indemnity against liability where indemnitor agreed to indemnify against "claims," but also provided for indemnity against loss where indemnitor agreed to indemnify against "losses").

The Court reaches the same conclusion as to the pre-December 2005 Client Guide. In relevant part, Section A212 read as follows before the December 2005 amendment:

> The Client *shall indemnify* []*RFC from all* losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, *judgments*, and any other costs, fees and expenses resulting from any Event of Default. *This includes* any act or failure to act or any breach of warranty, obligation or representation contained in the Client Contract; *or from any claim*, demand, defense or assertion against or involving []RFC based on or resulting from such breach or a breach of any representation, warranty or obligation made by []RFC in reliance upon any warranty, obligation or representation made by the Client contained in the Client Contract.

(Scheck Decl., App. 1 (Evolution of Client Guide § A212).)

Plaintiffs argue that the above language covers indemnification for liabilities in two ways. (Pls.' Reply at 10–12.)  First, they contend that the only grammatical reading of the clause is that Defendants would indemnify RFC "*from all losses*, damages . . . , judgments . . . ; *or from any claim*." (*Id.* at 10–11.)  And this reading, Plaintiffs contend, clearly distinguishes "losses" from "claims," i.e., liabilities. (*Id.*)  Second, they argue, even the pre-

December 2005 language included indemnification for "judgments," a term, as described above, that includes liabilities. (*Id.* at 11–12.)

Defendants take a contrary view. First, they disagree with Plaintiffs' contention that the term "any claim" is distinct from the term "losses." (Defs.' Opp'n at 13.) Rather, they argue, "any claim" is merely a subset of "losses." (*Id.*) Second, and relatedly, they contend that Section A212 was amended in December of 2005 precisely to *add* indemnity for "liabilities," a term that is notably absent from the pre-December 2005 Client Guide, although they cite no factual evidence to support that contention. (*Id.* at 12–14.)

In the beginning of this case, the Court considered the same arguments that the parties advance now, but in the context of a motion to dismiss. (*See* June 16, 2015 Am. Order at 17.) At that juncture, the Court found the pre-December 2005 language to be "sufficiently ambiguous to prevent resolution of th[e] issue on a motion to dismiss" and thus permitted the parties to conduct discovery. (*See id.* at 18.) Now, at the summary judgment stage, the parties again raise the issue, but alert the Court that they have no extrinsic evidence to present. (*See* June 19 Hr'g Tr. at 156 (counsel for Defendants indicating that there was no extrinsic evidence); *id.* at 186 (same)). Accordingly, the issue is one for the Court to determine as a matter of law. *See Mervin v. Magney Const. Co.*, 416 N.W.2d 121, 123–24 (Minn. 1987) (holding that where there is no extrinsic evidence to aid in the interpretation of an ambiguous contract, the trial court "properly treated the construction and application of [the contract] as a question of law"); *Turner*, 276 N.W.2d at 66 (same).

The Court now concludes, as a matter of law, that the pre-December 2005 language includes indemnity for liabilities as well as for actual losses. First, Section A212 has always included indemnity for judgments as well as actual losses. As described above, indemnity for judgments necessarily encompasses the Allowed Claims in this case. Second, the language "the Client shall indemnify . . . *from all losses* . . . ; *or from any claim*" seems clearly to distinguish losses from claims. Defendants' contrary interpretation—that "claim" is a subset of "losses"—is simply an ungrammatical construction, which this Court declines to adopt. *See Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) (courts "will not construe the terms so as to lead to a harsh and absurd result").

This Court is similarly unpersuaded by Defendants' contention that the pre-December 2005 Guide did not cover liabilities because it did not expressly include that term. As described, the pre-December 2005 Guide included *claims*, which denote liability. To be sure, the contract was later amended to expressly include "liabilities," but this Court is persuaded this change only served to *clarify* the language rather than to materially alter the terms of the contract.

Likewise, this Court is unpersuaded by Defendants' argument that it must construe the provision against Plaintiffs because RFC drafted the contract. "[T]his rule has less application as between parties of equal bargaining power or sophistication." *Re-Sols. Intermediaries,* 2010 WL 1192030, at *3. In fact, the Eighth Circuit has "refused to give a *contra proferentem* instruction even where one party supplied the form 'due to the relatively equal bargaining strengths of both parties and the fact that [the appellant] was represented

by sophisticated legal counsel during the [contract formation]." *Porous Media*, 220 F.3d at 960 (quoting *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997). Although Defendants claim that the Client Guide was not a product of negotiation, (*see* June 19 Hr'g Tr. at 160), "[a]n agreement between parties with business experience is not the product of unequal bargaining power." *Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.*, 646 N.W.2d 904, 910 (Minn. Ct. App. 2002) (discussing claim of a contract of adhesion).

Here, it is beyond dispute that Plaintiffs and Defendants are sophisticated parties that enjoyed the benefit of counsel. *See Terrace II*, 725 F.3d at 917 (emphasizing, in similar case, that the contract "was a freely negotiated agreement between two sophisticated parties" and that Terrace "acknowledged that it is experienced regarding the transactions described in the Client Guide, had the opportunity to obtain advice from able counsel, and made its own independent decision to enter into the contract.").

Accordingly, this Court concludes, as a matter of law, that Section A212 of the Client Guide, both before and after the December 2005 amendment, covered indemnity from liabilities. Accordingly, it grants Plaintiffs' Motion for Summary Judgment on this issue.

Alternatively, this Court also holds that Plaintiffs are entitled to indemnity for liabilities under Section A202(II) of the Client Guide. Section A202(II), titled "Loan Securitization," provides that Defendants "recognize[d] that it [wa]s []RFC's intent to securitize some or all of the Loans sold to []RFC by [Defendants]," and "agree[d] to provide

88

[]RFC with all such information concerning the [Defendants] generally . . . as may be reasonably requested by []RFC for inclusion in a prospectus or private placement memorandum published in connection with such securitization." (Client Guide § A202(II).) This provision further states that Defendants would "cooperate in a similar manner with []RFC in connection with any whole Loan sale or other disposition of any Loan sold to []RFC by [Defendants]." (*Id.*) Immediately after these provisions, Section A202(II) provides that Defendants "agree[d]" to

> indemnify and hold []RFC harmless from and against any loss, damage, . . . reasonable attorneys' fees, judgment, . . . or *liability incurred* by []RFC as a result of any material misstatement in or omission from any information provided by the Client to []RFC; or from any *claim, demand, defense or assertion* against or involving []RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by []RFC in reliance upon such misstatement or omission.

(*Id.* (emphases added).)

Plaintiffs argue that this provision has two separate clauses obligating Defendants to indemnify RFC for its liabilities. (Pls.' Mem. at 17.) First, Plaintiffs contend, Section A202(II) includes indemnification for "liability incurred," which encompasses the Allowed Claims. (*Id.*) Second, they again point to the words "claim," "demand," and "assertion," all which "denote[] indemnification of liability." (*Id.* (citing *Trapp*, 359 N.W. 2d at 327).)

Defendants do not dispute Plaintiffs' textual arguments. They dispute, however, that Section A202(II) applies to the facts of this case. (Defs.' Opp'n at 14.) Defendants contend that Plaintiffs' reliance on Section A202(II) is altogether misplaced, as that clause does not

apply to indemnity for alleged breaches of loan-level R&Ws, but rather deals exclusively with Defendants' obligation to indemnify RFC for losses or liabilities associated with any misrepresentation/omission of information that Defendants were required to provide to RFC about *themselves*. (*Id.*)

Defendants read Section A202(II) too narrowly. Here, the unambiguous language of Section A202(II) states that Defendants agreed to indemnify RFC for "*any . . . liability incurred* by []RFC as a result of any material misstatement in or omission from *any information* provided by [Defendants] to []RFC." (Client Guide § A202(II).) Simply, the limitation Defendants advocate for is not present in the language of the contract. As Plaintiffs contend, "'[a]ny' is the broadest possible term." (Pls.' Reply at 10.) Indeed, as the Eighth Circuit has reasoned, "[u]nless 'any' does not mean *any* . . . we see nothing equivocal about this provision." *Harleysville*, 716 F.3d at 458 (citing *Webster's Third New International Dictionary* 97 (1993) (defining "any" as "one, no matter what one").) Section A202(II) provides that Defendants would indemnify RFC for any claims or liabilities "incurred by []RFC as a result of any material misstatement in or omission from any information provided by the Client to []RFC," and thus presents an alternative avenue through which RFC may seek indemnity.

### b. Recovery for All Losses

To avoid redundancy, the Court addresses this issue in the context of its discussion of Dr. Snow's proposed Breaching Loss Approach, *infra*, Section III.G.3. In accordance

with that reasoning, Plaintiffs' summary judgment motion as to recovery of all losses resulting from Defendants' breaches is denied.

### 3. Causation

Plaintiffs next move for summary judgment on three issues related to causation. First, they ask this Court to "grant summary judgment *interpreting the [Client] Guide*, as a matter of law, to provide that Plaintiffs need only establish 'a causal connection' between Defendants' breaches and the liabilities and losses that RFC incurred in the Settlements"— or, in other words, that the legal standard for causation for indemnification under the Client Guide is "but for" cause rather than "proximate cause." (Pls.' Mem. at 27 (emphasis added).) Second, they ask this Court to hold, as a matter of law, that they have met their burden of proving "but for" causation, as "there is no genuine dispute that RFC's potential liability to the RMBS Trusts and Monolines, and thus the resulting Settlements, were caused by Defendants' underwriting breaches."[31] (*Id.*) Finally, they ask this Court to dismiss Defendants' "affirmative defenses that RFC's actions or other 'superseding and intervening factors' may have contributed to RFC's liabilities, because RFC need show only that Defendants' breaches were a 'but for' cause of those liabilities." (*Id.* at 27–28.) Each issue is discussed below.

---

[31] As described below, this issue is one on which Defendants also move for summary judgment with respect to certain pool-wide representations, so the Court addresses both parties' affirmative motions at the same time. (*See infra*, Section III.F.3.b.)

### a.  Applicable Legal Standard

As described, the Client Guide requires Defendants to indemnify RFC against, *inter alia*, losses and liabilities: "*resulting from* any Event of Default" or "*arising from* . . . any breach of [R&Ws]," (*see* Client Guide § A212 (emphasis added)), or "incurred . . . *as a result* of any material misstatement in or omission from any information provided by [Defendants] to []RFC," (*id.*, § A202(II)).  Plaintiffs argue that under Minnesota law, "each of these formulations—'as a result of,' 'resulting from,' and 'arising from'—is synonymous," and denotes a "but-for causal connection, not a proximate cause." (Pls.' Mem. at 28.)  Accordingly, Plaintiffs argue, they need not prove that Defendants' breaches were the *sole* cause of RFC's losses and liabilities; rather, they need only prove that "Defendants' breaches were a contributing cause." (*Id.* at 29.)

Defendants contend that "[i]n Minnesota, as elsewhere, it is black-letter law that a contract plaintiff must prove the defendant's breach *proximately caused* its damages," and that "nothing in the Client Guide displaces this bedrock rule." (Defs.' Opp'n at 31.)  In the alternative, they contend that even if only a "causal connection" is needed under the contract, "something more than *literal* but-for causation is necessary to find that an injury 'arose out of' a particular event." (*Id.* (quoting *Capitol Indem. Corp. v. Ashanti*, 28 F. Supp. 3d 877, 883 (D. Minn. 2014).)  In any event, Defendants contend, "[t]he Court need not decide the precise test for causation, . . . as RFC's motion fails under any conceivable standard." (*Id.* at 32.)

At the outset, the Court underscores that its focus is on the narrow issue on which Plaintiffs moved for summary judgment—the causation standard *under the Client Guide's indemnity provisions*. Accordingly, as a preliminary matter, the Court rejects Defendants' contention that the common law breach of contract standard of proximate cause applies. Defendants generally conflate the causation requirement required for a breach of contract claim with the causation standard under the Client Guide's indemnity provisions.[32] "In contractual indemnity, liability is controlled by the provisions of the contract." *N. Nat. Gas Co. v. Roth Packing Co.*, 323 F.2d 922, 929 (8th Cir. 1963). Indeed, "[w]here the parties have contracted to create duties that differ or extend beyond those established by general principles of law, and the terms of the contract are not otherwise unenforceable, the parties must abide by the contractual duties created." *Grand Trunk W. R.R.*, 686 N.W.2d at 761. Terms of those contract provisions must "be given their ordinary meaning, as well as the interpretations adopted in prior cases." *Ritrama*, 796 F.3d at 969 (quoting *Boedigheimer,* 178 N.W.2d at 613).

Here, the Client Guide provides that Defendants agreed to indemnify RFC for losses and liabilities "resulting from," "arising from," or that were "a result of" Events of Default

---

[32] For this reason, Defendants' reliance on, *inter alia*, *D.H. Blattner & Sons, Inc. v. Fireman's Ins. Co.*, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995), which involved a common law breach of contract claim, and not the interpretation of a contractual indemnification provision, is misplaced. (*See* Defs.' Opp'n at 31.) In reversing a jury verdict in favor of a breach-of-contract plaintiff, *D.H. Blattner* simply held that the plaintiff had failed to prove that the defendant's "alleged breach of contract proximately caused th[e] damages." 535 N.W.2d at 675. Here, Plaintiffs move for summary judgment on the causation standard under the Client Guide's indemnification language, not for a breach of contract claim at common law.

or breaches of R&Ws. In Minnesota, all of these phrases have been construed to be synonymous. In *Mork Clinic v. Fireman's Fund Ins. Co.*, the Minnesota Court of Appeals held that "'[r]esulting from' has the same ordinary and plain meaning as 'arising out of.'" 575 N.W.2d 598, 602 (Minn. 1998) (citing *American Heritage College Dictionary* 73 (3d ed. 1997)); *see also SECURA Supreme Ins. Co. v. M.S.M.*, 755 N.W.2d 320, 326 (Minn. Ct. App. 2008) (holding that the court could "derive no principled basis on which to treat the[] two phrases differently"). The Eighth Circuit, although it did not hold so explicitly, has reached a similar conclusion. In *Allstate Insurance Co. v. Steele*, the Eighth Circuit interpreted the phrase "resulting from" contained in an insurance policy by relying on Minnesota case law construing the phrase "arising out of." 74 F.3d 878, 881 (8th Cir. 1996).

The phrase "arising out of," in turn, has been broadly construed by Minnesota courts to "mean causally connected with, not 'proximately caused by.'" *Faber v. Roelofs*, 250 N.W.2d 817, 822 (Minn. 1977); *see also Capitol Indem. Corp.*, 28 F. Supp. 3d at 883. Indeed, the phrase "'[a]rising out of' generally means 'originating from,' 'growing out of,' or 'flowing from.'" *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 744 (Minn. 2005). Although the Court notes that most of the cases interpreting these phrases examine insurance policies, it can glean no principled reason why this contractual indemnification language would be subject to a different interpretation. In fact, as some

courts have noted, "the rules of contractual indemnity are derived primarily from insurance and construction cases." *Grand Trunk W. R.R.*, 686 N.W.2d at 762.[33]

Turning to the contract terms, the Court holds, as a matter of law, that to prevail on its *contractual* indemnity claim, Plaintiffs must show that the losses and liabilities for which they seek indemnity have a "cause and result relationship" with, *Faber*, 250 N.W.2d at 822, or a "causal connection" to, *Ross v. City of Minneapolis*, 408 N.W.2d 910, 912 (Minn. Ct. App. 1987), Defendants' breaches of R&Ws or Events of Default. This does not require that Plaintiffs show that any individual Defendant's breaches were the *sole* cause of Plaintiffs' liabilities and losses—it merely requires that Plaintiffs show that an individual Defendant's breaches were a *contributing* cause of those liabilities and losses. *See, e.g.*, *Bolin v. Hartford Life & Accident Ins. Co.*, 28 F. Supp. 3d 915, 918 (D. Minn. 2014) (interpreting Minnesota law and rejecting party's argument that "if anything other than medical treatment contributes to a death," then that death did not "result[] from . . . medical . . . treatment").

Although Defendants concede that this standard "does not require a plaintiff to show the defendant's conduct was the 'sole cause' of its losses, it necessitates proof that such conduct was a 'necessary condition,'" meaning that "the harm would not have occurred in the absence of—that is, but for—defendant's conduct." (Defs.' Opp'n at 32 (citations omitted).) Accordingly, Defendants argue, under this standard, a factfinder could conclude that "no individual Defendant here was a 'but for' cause of the settlement as a whole," as

---

[33] And in this case, Defendants rely heavily on insurance cases such as *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 859 (8th Cir. 2017).

"RFC would have settled, regardless of whether an individual Defendant committed breaches." (*Id.* at 34.)

In essence, Defendants argue that, even if they breached, no single breach was material. Defendants rely on *Burrage v. United States*, 571 U.S. 204 (2014), where the Supreme Court considered whether someone's death could be said to have "resulted from" the use of heroin, where experts merely testified that the heroin "'was a contributing factor' in [the decedent's] death, since it interacted with other drugs to cause 'respiratory and/or central nervous system depression.'" *Id.* at 207. Utilizing the "ordinary meaning" of the phrase "results from," as well as its use "[i]n the usual course," the Supreme Court held that the phrase required proof "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Id.* at 210–11 (citation omitted). By way of analogy, the Court explained that "if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.* at 211 (citation omitted); *but see id.* at 215 (noting a "less demanding (but also less well established) line of authority, under which an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result").

Defendants' reliance on *Burrage* is misplaced in this case of contractual indemnity. As Plaintiffs succinctly point out, under the terms of the Client Guide, Defendants "cannot argue that their loans caused *no* harm because other loans *also* caused harm." (Pls.' Reply at 20.) A contrary conclusion would, in effect, entirely absolve Defendants of their

contracted-for obligation to indemnify Plaintiffs for losses and liabilities that resulted from *their* breaches because no breach allegedly would be material. Defendants understood and expressly acknowledged that their loans would be bundled with other originators' loans, so they may not now claim that they could breach the contract with impunity, with no consequence, because any given loan is not material, rendering this important remedy under the Client Guide superfluous and meaningless.

Nevertheless, Defendants do highlight a potential issue with *allocation* and *calculation* of damages. To be sure, an individual Defendant may only be held liable for the portion of the Settlements reasonably calculated as "flowing from" or "originating from" its own breaches. But this inquiry is analytically distinct from causation. *See Mastercraft Furniture, Inc. v. Saba N. Am., LLC*, Civ. No. 6:14-01303-AA, 2015 WL 1478443, at *3 (D. Or. Mar. 31, 2015) ("Defendant conflates proving causation of damages with proving the amount of damages; plaintiff need only show that defendant caused some amount of damages for purposes of this [summary judgment] motion and does not need to show the exact amount of damages caused."). This Court will address allocation of damages at great length, *see infra*, Section III.G.3—an entirely separate inquiry than that of causation under Section A212 of the Client Guide.

Accordingly, this court grants Plaintiffs' Summary Judgment Motion interpreting the Client Guide's indemnity provisions, as a matter of law, as imposing a "contributing cause" causation standard consistent with Minnesota law interpreting the relevant contract

language.  But, as described below, the Court finds that causation is a fact issue and therefore denies Plaintiffs' Motion to find causation as a matter of law.

> **b.   Genuine Issues of Material Fact Preclude a Finding of Causation as a Matter of Law**

Plaintiffs urge this Court to hold, as a matter of law, that Defendants' underwriting breaches were a contributing cause of RFC's potential liability to the RMBS Trusts and Monolines, and thus of the resulting Settlements. (Pls.' Mem. at 27.)  They contend that the undisputed evidence confirms that the claims that the RMBS Trusts and Monolines asserted against RFC were all "based on defects in the loans that Defendants originated and sold to RFC." (*Id.* at 30–31.)  In support of that assertion, Plaintiffs point to:

(1) the re-underwriting analysis that the RMBS Trustees' financial advisor, Duff & Phelps, conducted to "determine" the "RMBS R+W Claims,"[34] and which was intended to "identify breaches of representations and warranties made by the Debtors," (Scheck Decl., Ex. 46 (Pfeiffer Decl. ¶ 18));

(2) the testimony of Lewis Kruger, RFC's Chief Restructuring Officer who bound RFC to the Settlements, that his "impression"—based on "extensive review of the claims asserted in RFC's bankruptcy case, the litigation over the Original RMBS Settlement, and RFC's own expert's analysis of the claims," (Pls.' Mem. at 31–32)—was that "the claims [of the RMBS Trusts] were primarily related to breach of contract claims for [R&Ws]," (Scheck Decl., Ex. 47 (Kruger Dep. at 160, 225–26));

(3) the testimony of the Debtors' lead bankruptcy counsel, Gary Lee, who purportedly shared Kruger's view that the R&W claims "were primarily at

---

[34] "RMBS R+W Claims" are defined in the Bankruptcy Plan as "claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts."  (Scheck Decl., Ex. 32, App. 1 (Bankr. Plan ¶ 264).)

issue," (Pls.' Mem. at 32); (*see* Scheck Decl., Ex. 49 (Lee Dep. at 145)); and

(4) the bankruptcy court's assessing the reasonableness of the bankruptcy settlement by "comparing it to 'the likely amount of recoverable damages for the RMBS Trusts' representation and warranty claims, after consideration of legal defenses and litigation costs.'" (Pls.' Mem. at 32) (quoting Scheck Decl., Ex. 28 (Bankr. Findings of Fact ¶ 106).)

Defendants counter that genuine issues of material fact preclude a ruling on summary judgment on causation. First, they argue that RFC's causation theory is fundamentally flawed, as it "improperly treats unaffiliated 'Defendants' as if they were joint actors and implies that each should be held liable if, as a group, they collectively caused RFC's aggregate losses or liabilities." (Defs.' Opp'n at 28.)

Here, as a preliminary matter, the Court disagrees with Defendants' contention that RFC impermissibly "lumps" all Defendants together under a joint liability theory, warranting denial of summary judgment on causation for that reason alone. The Court does not understand Plaintiffs to be attempting to hold Defendants "jointly liable." (*See id.* at 29.) As the Court discussed in the context of the applicable causation standard under the Client Guide, (*see supra*, Section III.F.3.a), each Defendant agreed to indemnify RFC for losses and liabilities that have a "causal connection" to its particular breaches. The amount of damages for which each Defendant may ultimately be held liable is properly considered an allocation issue.

Nevertheless, this Court agrees with Defendants that the parties' experts raise genuine issues of material fact precluding summary judgment on causation. *See Ingram v.*

*Syverson*, 674 N.W.2d 233, 237 (Minn. Ct. App. 2004) ("Where reasonable minds can differ on the issue of causation, the [factfinder] should resolve the issue, and it would be error to grant summary judgment."). For example, one such disputed factual issue that Defendants raise in opposition to Plaintiffs' causation argument concerns liability as to RFC's underlying pool-wide representations. (*See* Defs.' Opp'n at 36.) Defendants also raise this issue affirmatively in their summary judgment motion, in the context of whether Plaintiffs may obtain damages for claims based on underlying breaches of pool-wide representations. (*See* Defs.' Mem. at 71–78.) In either context, the analysis is essentially the same, as discussed below.

Plaintiffs contend that the claims that the RMBS Trusts and Monolines asserted against RFC were *all* based on Defendants' breaches of underwriting guidelines. (Pls.' Mem. at 30–31.) Defendants counter, however, that an originator could breach a representation to RFC without that breach resulting in any breach of RFC's separate trust representations. (*See, e.g.*, Defs.' Opp'n at 35.) As a result of this "gap," Defendants argue, they cannot be found to be a contributing cause of some of the claims asserted against RFC. (*See id.*)

Moreover, Defendant Home Loan Center's expert, Steven Schwarcz, opines that RFC gave "trust-level underwriting representations," i.e., represented that the loans were underwritten in substantial compliance with the Client Guide, to only 17 out of the more than 500 Trusts. (Decl. of Sascha N. Rand ("Rand Decl.") [Doc. No. 3256], Ex. 22

(Schwarcz Rpt. ¶ 63).) [35] Accordingly, Defendants argue, their breaches of underwriting guidelines have no causal connection to the claims asserted against RFC by the Trusts that did not receive trust-level underwriting representations. (Defs.' Opp'n at 35.)

RFC responds that although only 17 Trusts may have received "explicit" underwriting representations, "there were other important representations that were dependent on Defendants' compliance with the Guide," including the pool-wide representations. (*See* Pls.' Reply at 22.) In such instances, instead of giving explicit underwriting representations, RFC represented to settling Trusts that RFC's pooled loans met particular "Credit Grade" requirements, and classified these loans, by percentages of the pool, into specific Credit Grades ("Credit Grade R&Ws").[36] (Pls.' Opp'n. at 41; Defs.'

---

[35] For example, Schwarcz states that an explicit underwriting guidelines representation would assert that "[a]ll of the Group I . . . Loans have been underwritten in substantial compliance with the criteria set forth in the Program Guide." (Rand Decl., Ex. 22 (Schwarcz Rpt., ¶ 63)) (citation omitted). Defendants concede that for Trusts to which RFC made these explicit representations, RFC may seek damages for breaches of those representations that resulted, in turn, from Defendants' breached R&Ws. (Defs.' Mem. at 72.)

[36] An exemplar RFC pool-wide Credit Grade R&W stated:

No more than 60.29% of the Mortgage Loans have been classified by RFC as Credit Grade A4 Mortgage Loans, no more than 27.70% of the Mortgage Loans have been classified by RFC as Credit Grade AX Mortgage Loans, no more than 10.84% of the Mortgage Loans have been classified by RFC as Credit Grade AM Mortgage Loans, no more than 1.17% of the Mortgage Loans have been classified by RFC as Credit Grade B Mortgage Loans, none of the Mortgage Loans have been classified by RFC as Credit Grade C Mortgage Loans and none of the Mortgage Loans have been classified by RFC as Credit Grade CM Mortgage Loans, in each case as described generally in the Prospectus Supplement.

Mem. at 72.) Additionally, in some instances, RFC represented that its pooled loans were underwritten to either a full documentation program or a reduced documentation program, ("Documentation Program R&Ws"), and that no more than a certain percentage of loans were underwritten to the reduced documentation program.[37] (Pls.' Opp'n. at 41; Defs.' Mem. at 72.) Defendants assert that RFC made pool-wide Credit Grade R&Ws to 70 of the 506 Settling Trusts, and pool-wide Documentation Program R&Ws to 244 of 506 settling trusts. (Defs.' Mem. at 73 (citing Smallwood Decl., Ex. 34 (Schwarcz Rpt. ¶¶ 68, 75)).)

As noted, Section A212 provides for indemnification for RFC's breaches if they are "based on or resulting from" Defendants' breaches. (Client Guide § A212.) The Client Guide required that Defendants' loans meet RFC's quality standards, which required the "credit, character, capacity and collateral" to be "consistent with the Loan Program and credit grade" under which the loan was sold to RFC. (*Id.* at Ch. 4, p. 4.1) In addition, the Client Guide included detailed tables containing the criteria necessary to meet each credit grade and documentation program. (*See id.* §§ B601(H)(i), (2), 700.)

RFC's experts opine that each breach by a Defendant of the applicable underwriting guidelines constitutes or could be construed to constitute a breach of the pool-wide Documentation Program R&W. (Smallwood Decl., Ex. 43 (Butler Rpt. at 132–33); *id.*, Ex. 65 (Payne Rpt. at 109–10); *id.*, Ex. 66 (Hunter Rpt. at 101–03).) They note that the

_____

(Smallwood Decl., Ex. 5 (RASC 2006-EMX1Assignment & Assumption Agmt. at 6).)

[37] And an exemplar pool-wide Documentation Program R&W stated, "No more than 45.00% of the Mortgage Loans by aggregate Cut-off Date Principal Balance were underwritten under a reduced loan documentation program." (Smallwood Decl., Ex. 70 (RFMSI 2007-S5 Pooling & Servicing Agmt. at 18).)

Credit Grade R&Ws state that credit grades are "as described generally" in the Prospectus Supplement. (Smallwood Decl., Ex. 43 (Butler Rpt. at 130, n.313); *id.*, Ex. 65 (Payne Rpt. at 109 n.247); *id.*, Ex. 66 (Hunter Rpt. at 100 n.218).)) They further contend that the Prospectus Supplements discussed the relevant underwriting standards. (Smallwood Decl., Ex. 43 (Butler Rpt. at 130 n.313); *id.*, Ex. 65 (Payne Rpt. at 109 n.247); *id.*, Ex. 66 (Hunter Rpt. at 100 n.218).) But Defendants' expert opines that (1) neither type of pool-wide representation nor the Prospectus Supplements asserts that all trust loans were underwritten in substantial compliance with underwriting guidelines, (Rand Decl., Ex. 22 (Schwarcz Rpt. ¶¶ 70, 80)); and (2) pool-wide Credit Grade and Documentation Program R&Ws are not representations about specific loans (i.e., "loan level" representations). (*See id.* ¶¶ 71–81.)

The parties present a classic battle of the experts that cannot be resolved on summary judgment. *See ADC Telecomms., Inc. v. Panduit Corp.*, No. CIV. 01-477 (ADM/JGL), 2002 WL 31789473, at *3 (D. Minn. Dec. 11, 2002) ("In the context of a head to head battle of expert opinion, summary judgment is inappropriate."). Whether pool-wide Credit Grade and Documentation Program R&Ws are functionally equivalent to underwriting representations, and whether Plaintiffs are entitled to damages resulting from alleged breaches of these pool-wide representations, is a question of fact for the jury. Because these issues must be resolved at trial, this Court denies Plaintiffs' motion for summary judgment on causation and denies Defendants' motion for summary judgment as to damages related to underlying pool-wide representations.

### c.  Causation Defenses

Finally, Plaintiffs move for summary judgment on Defendants' causation-related defenses. Specifically, they urge this Court to dismiss any defense arguing that RFC's actions or other "superseding and intervening factors" were the proximate cause of RFC's liabilities, because RFC need only show that Defendants' breaches were a "but for" cause of those liabilities. (Pls.' Mem. at 27–28.)  The defenses RFC identifies, (*see* Pls.' Mem. at 28 n.8), are:

(1)  Defendant CTX Mortgage Co., LLC ("CTX"): Affirmative Defenses 4 (Plaintiffs' claims are barred because "RFC has not sustained any . . . damages as a consequence of CTX's alleged breaches. To the extent RFC suffered any losses, such losses were caused by RFC's own acts or omissions . . . ."), and 6 ("To the extent RFC suffered any losses, such losses were caused by unforeseen circumstances and intervening factors, including market forces, over which CTX has no control"), (CTX Ans. at 11 [Doc. No. 141]);

(2)  Freedom Mortgage Corp. ("Freedom"): Affirmative Defense 6 (Plaintiffs' claims are barred "because RFC has not suffered any injury proximately caused by any conduct of [Defendant] because any injury complained of was the direct and proximate result of the actions or omissions of RFC . . . ."), (Freedom Ans. at 20, Case No. 14-cv-5101 [Doc. No. 18]);

(3)  Home Loan Center, Inc. ("HLC"): Affirmative Defenses 11 (Plaintiffs' claims are barred "on the grounds or to the extent that the harm or damages Plaintiff complains of or seeks were caused by Plaintiff's own acts or omissions . . ."), and 13 (Plaintiffs' claims are barred on the grounds or to the extent that its damages "were caused by unforeseen circumstances, and/or superseding and intervening factors, including market forces, over which

Defendant has no control"), (HLC Ans. at 20–21 [Doc. No. 601]);

(4) iServe Residential Lending, LLC ("iServe"): Affirmative Defenses 6 ("RFC has not suffered any injury proximately caused by any conduct of iServe because any injury complained of is the direct and proximate result of the actions or omissions of RFC . . . "), 16 ("[A]ny alleged damages were the result of alternative, superseding, or intervening causes over which iServe had no control, such as the actions or omissions of third parties and/or RFC's own agents, employees, or affiliates; market forces; and RFC's pursuit of high-risk mortgage loans from originators other than iServe"), and 23 (Plaintiffs' claims are barred "to the extent they seek recovery for losses stemming from Plaintiffs' own fraud, misrepresentations, or fraud-in-the-inducement"), (iServe Ans. at 19, 21, 22 [Doc. No. 1188]); and

(5) Standard Pacific Mortgage, Inc. ("Standard Pacific"): Affirmative Defense 6 (Plaintiffs' claims are barred "because any injury complained of was the direct and proximate result of the actions or omissions of RFC . . ."), (Standard Pacific Ans. at 12 [Doc. No. 1191]).

Defendants' causation-related defenses, then, generally fit into two categories: (1) that Plaintiffs may not recover because their losses and liabilities were proximately or solely caused by "unforeseen circumstances and intervening factors, including market forces," over which Defendants had no control, (CTX Affirmative Defense 6, HLC Affirmative Defense 13, and iServe Affirmative Defense 16); and (2) that Plaintiffs' claims are barred because their losses and liabilities "were caused by RFC's own acts or omissions," (CTX Affirmative Defense 4, Freedom Affirmative Defense 6, HLC

Affirmative Defense 11, iServe Affirmative Defenses 6 and 23, and Standard Pacific Affirmative Defense 6).

Here, the Court concludes that several of Defendants' causation-related defenses should be dismissed. At the outset, the Court underscores that it reads Plaintiffs' motion for summary judgment on this issue as necessarily pertaining only to its indemnity claim. (*See* Pls.' Mem. at 27–28) (discussing RFC's "liabilities" and the "but-for" causation standard under the Guide's indemnity provisions). Accordingly, the Court's rulings do not apply to Plaintiffs' breach of contract claim.[38]

As to the first category of defenses—that unforeseen circumstances and intervening factors proximately caused RFC's losses and liabilities—Defendants argue that they must be allowed to present evidence that RFC's losses were caused by other factors, such as "the broader collapse of the housing market." (Defs.' Opp'n at 37.) Relying on breach-of-warranty cases, Defendants argue that "[w]here the record shows that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of the latter, the plaintiff may not recover." (Defs.' Mem. at 24 (quoting *Heil v. Standard Chem. Mfg. Co.*, 223 N.W.2d 37, 42 (Minn. 1974) (involving the sale of goods, analyzing breach-of-warranty claim under a proximate causation standard)).)

_____

[38] Although the parties did not brief this issue, Defendants cite authority that the causation standard for an ordinary breach of contract claim is proximate cause, and not the contributing cause standard under the Client Guide's indemnity provisions. *See D.H. Blattner*, 535 N.W.2d at 675 ("In [this] *breach of contract action* . . . [a]lthough Blattner claims and proves damages, it has failed to prove that Firemen's alleged breach of contract *proximately* caused those damages." (emphasis added) (citations omitted)).

This Court disagrees. As this Court has explained, proximate cause is not the causation standard agreed to by the parties in Section A212 of the Client Guide. The standard agreed to by the parties is whether Defendants' breaches were a contributing cause of RFC's losses and liabilities. In that inquiry, whether other causes—such as macroeconomic factors—were also a contributing cause is irrelevant. In essence, Defendants seek to argue that they should be absolved of their duty to indemnify, despite their breaches, because other factors, including unforeseeable circumstances and market forces over which they have no control, were superseding, intervening causes of the losses and liabilities incurred by RFC. These arguments are barred as a matter of law, because, as Plaintiffs point out, "intervening cause is a proximate cause concept," *Strobel v. Chicago, Rock Island & Pac. R.R. Co.*, 96 N.W.2d 195, 201 (Minn. 1959)—one that has no application in this contractual indemnity claim governed by a "contributing cause" standard. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 836 (1996) (describing the doctrine of "superseding cause" as related to "proximate causation"); *cf. Henkel v. Holm*, 411 N.W.2d 1, 4 (Minn. Ct. App. 1987) ("Generally, a superseding intervening cause is an act of a plaintiff, third person, or force of nature which could not have been reasonably foreseen, occurring after the defendant's negligence, and operating as an independent force to produce the plaintiff's injury."). Accordingly, the Court grants Plaintiffs' summary judgment motion dismissing any defenses that allege that superseding, intervening causes absolve Defendants from their duty to indemnify.

Next, Defendants argue that the second category of defenses—that RFC's claims are barred because their losses and damages "were caused by RFC's own acts or omissions"—should not be dismissed because Defendants have identified "claims based on breaches of RFC's representations to [T]rusts for which RFC was solely responsible." (Defs.' Mem. at 32; *see also* Defs.' Opp'n at 37.)[39] According to Defendants' expert Steven Schwarcz, some of RFC's breaches of the R&Ws it made to the Trusts and Monolines do not overlap with Defendants' breaches of the R&Ws they made to RFC. (*See* Smallwood Decl., Ex. 34 (Schwarcz Rpt., ¶¶ 114–27).) In those circumstances, Defendants argue, their breaches are not even a contributing cause of RFC's losses and liabilities. (Defs.' Mem. at 32.) The three areas of non-overlap that Schwarcz identifies are (1) any breach of RFC's R&Ws concerning RFC's own legal status, i.e. authorization or corporate capacity, rather than the characteristics of the loans; (2) any breach of RFC's representation that loans were underwritten pursuant to the standards in the Client Guide, when applied to loans for which RFC had granted originating banks an exception to the Client Guide's underwriting standards; and (3) any loss due to events that occurred (e.g., borrower loses his job) after the effective date of the originating bank's R&Ws (i.e., after RFC's purchase of the loan).

---

[39] Defendants also claim that these defenses cannot be dismissed because they bear on RFC's allocation theories, which they claim improperly fail to account for RFC's servicing breaches and RFC's own fraud. (Defs.' Opp'n at 37.) Issues regarding servicing breaches pertain exclusively to the reasonableness of the settlement: Did the parties in settling these claims reasonably identify the value and litigation risk of indemnifiable versus non-indemnifiable claims? As to arguments regarding RFC's own fraud and misrepresentations, Defendants' argument is moot, as this Court has held that Defendants must indemnify RFC for its own *alleged*, but unproven, misconduct. (*See supra*, Section III.E.1.)

(Smallwood Decl., Ex. 34 (Schwarz Rpt. §§ 114–27).)  As to this third area of nonoverlap, Defendants explain that "[t]o the extent an event that occurred between RFC's loan purchase and a securitization's closing caused a breach of RFC's representations to the Trusts (e.g., borrowers defaulting), that breach could not have resulted from an originator breach." (Defs.' Mem. at 33.)  Plaintiffs respond that Schwarcz speculates as to these RFC "sole cause" hypotheses without citing any evidence from the record to support his arguments.

On this record, the Court finds that summary judgment as to Defendants' "sole cause" defense at this stage would be premature.  The Court will defer ruling as to the admissibility of Schwarcz's testimony on these issues, pending the development of the factual record, to evaluate whether there is evidence in the record, presumably supplied by fact witnesses to support his hypothetical argument.  Accordingly, at this time, the Court denies Plaintiffs' summary judgment motion as to the sole cause defense without prejudice.

### 4.  Affirmative Defenses

Plaintiffs next move for summary judgment on certain "affirmative" defenses. They argue that this Court should interpret the Client Guide, as a matter of law, as requiring dismissal of Defendants': (1) defense of estoppel; (2) "knowledge- and reliance-based defenses"; (3) waiver defenses based on RFC's "Assetwise" system; and (4) defense of good faith and fair dealing. (Pls.' Mem. at 33.)[40]

---

[40] In their moving papers, Plaintiffs also moved for dismissal of Defendants' accord and satisfaction defense, but Defendants responded that they are no longer pursuing that defense.  (Standard Pac.-CTX Opp'n to Pls.' Mot. Summ. J. ("Standard Pac.-CTX Opp'n")

### a. Estoppel

Plaintiffs contend that the defense of equitable estoppel fails as a matter of law because their "actions and statements have always complied with their rights under the Guide," and that Defendants have never articulated a basis for an equitable estoppel defense.[43] (Pls.' Mem. at 39.) Defendants disagree, and in their Defendant-specific responses, assert that RFC should, *inter alia*, be "estopped from arguing that the Client Guide underwriting criteria governed [Defendants'] sale of loans to RFC." (HLC Opp'n to Pls.' Mot. Summ. J. ("HLC Opp'n") at 12 [Doc. No. 3617]; *see* Standard Pac.-CTX Opp'n to Pls.' Mot. for Summ. J. ("Standard Pac.-CTX Opp'n") at 2 [Doc. No. 3580] ("Defendants will show that RFC knew the loans it purchased were not underwritten to the Client Guide and it cannot now claim that alleged failures to conform to the Guide's underwriting guidelines mark those loans as 'defective' or 'breaching.'"); *see also* Defs.' Opp'n at 45 ("RFC's conduct evinces its clear intent—in an effort to compete with other securitizers and maintain market share—to induce Defendants to sell it loans that RFC understood did not comply with the Client Guide.").) This Court, accordingly, understands Defendants' estoppel defense as pertaining to whether the Client Guide governed Defendants' sale of loans to RFC in the first instance.

---

at 2 n.1 [Doc. No. 3580]; *see also* June 19 Hr'g Tr. at 220 (Defendants' counsel asserting that that defense is "off the table").) Thus, that defense is dismissed.

[43] In their opening memorandum, Plaintiffs argue that were Defendants to assert the defense of judicial estoppel, it should also be dismissed. (Pls.' Mem. at 39.) Defendants, however, are pursuing only the defense of equitable estoppel. (*See* Defs.' Opp'n at 45.)

Defendants HLC, Standard Pacific, and CTX filed Defendant-specific briefing in opposition to Plaintiffs' motion for summary judgment. For ease of analysis, the Court addresses these Defendants' arguments separately.

### i.   HLC

HLC argues that RFC, in order to effectuate its goal of buying an increasing number of HLC loans, sidestepped the requirements of the Client Guide using "three principal strategies." (HLC Opp'n at 1.)  First, HLC argues, RFC agreed to purchase loans approved by Assetwise, RFC's "'black box' automated underwriting system, . . . which offered advantageous variations from the Client Guide." (*Id.*)   According to HLC, although its initial "Client Contracts" with RFC required it to sell loans to RFC underwritten to the Client Guide, a subsequent agreement—the Assetwise Direct Criteria Agreement ("AW Agreement")—allowed and encouraged HLC to sell RFC more loans by underwriting them utilizing RFC's automated underwriting program, Assetwise. (*Id.* at 2.) This agreement, according to HLC, specified certain representations that continued to be HLC's responsibility, but that "absent . . . was any representation that a loan complied with all Client Guide requirements." (*Id.*) In essence, HLC argues that RFC and HLC entered into a "pact" whereby RFC would "buy HLC loans pursuant to Assetwise approvals whether or not they complied with the Client Guide." (*Id.* at 4.) HLC cites to RFC repurchase personnel testifying that if Assetwise approved a loan, it "meant RFC would purchase [it]" so long as "all the information that was input was correct." (*Id.*) (citing Smallwood HLC Decl. [Doc. No. 3620], Ex. 14 (Whealdon Dep. at  161).)

Second, according to HLC, RFC bought loans that HLC originated for RFC competitors in "bulk" packages that RFC knew were prepared for other buyers and per those buyers' underwriting guidelines. (*Id.* at 5.) As just one example, HLC asserts that after RFC bought its first "bulk" pool from HLC, RFC asked: "Can you send me the current underwriting guidelines that were used for the Home Equity deal we just purchased?" (*Id.*) (citing Smallwood HLC Decl., Ex. 16 (Dep. Ex. 262-0014 to Forget Dep.).) HLC contends that it did not send the Client Guide, but rather sent the Countrywide-based guidelines. (*Id.*) (citing Smallwood HLC Decl., Ex. 18 (Weiler Dep. at 364).)

And finally, HLC argues, RFC bought loans that HLC originated through "Clues," the automated underwriting system of RFC's competitor, Countrywide. (*See id.* at 7–8.) As just one example of this practice, HLC asserts that "[a]n RFC trader e-mailed that RFC 'will stand behind buying the Clues approval'" when buying loans. (*Id.* at 8) (citing Smallwood Decl., Ex. 35 (Dep. Ex. 262-0026 to Forget Dep.).)

Plaintiffs argue that HLC's evidence is insufficient to create a triable issue of fact on equitable estoppel, which requires a showing that RFC "'misrepresented a material fact or was silent when it had a duty to speak,'" and that "Defendants 'reasonably relied' on it." (Pls.' Reply at 43–45) (quoting *Slidell, Inc. v. Millenium Inorganic Chems., Inc.*, 460 F.3d 1047, 1053 (8th Cir. 2006)). At most, RFC argues, HLC's evidence shows RFC's "knowledge" or "acknowledgement" that the Client Guide did not apply to certain loans. (*Id.*) Specifically, as to the evidence related to Assetwise approvals and loans underwritten to third-party loan parameters, RFC argues that it "at most suggests that RFC sometimes

made internal business decisions to buy loans outside the Guide," but that "[n]one of the evidence shows an agreement by RFC that HLC did not have to comply with the Guide." (*Id.* at 46.) And with respect to evidence relating to bulk purchases, RFC contends that it at most shows "RFC's awareness that other loan parameters may have been used to underwrite certain loans," but that it does not suggest that RFC would refrain from exercising its rights under the Client Guide. (*Id.*) In fact, RFC argues, although HLC's highlights two internal RFC emails stating that some bulk purchases included loans underwritten to third-party parameters, the contracts governing those transactions "state that the variances RFC granted to HLC" were still subject to the Client Guide's terms and conditions. (*Id.*)

### ii.    Standard Pacific and CTX

For their part, Standard Pacific and CTX jointly argue that RFC should not be permitted to hold them to the requirements of the Client Guide "when the parties' course of business dealings makes crystal clear that the Client Guide does not apply to the at-issue loans." (Standard Pac.-CTX Opp'n at 1.) As to the parties' course of business dealings, Standard Pacific and CTX point to, *inter alia*, RFC's practice of buying loans *en masse* through a "bulk" online auction process. (*Id.* at 4.) Through this auction process, RFC would obtain "bid tapes" that, according to these Defendants, plainly disclosed that some of the loans were not underwritten to the Client Guide. (*Id.*) (citing Decl. of Enza Boderone ("Boderone Decl.") [Doc. No. 3589], Ex. 2 (Siats Dep. at 58) (agreeing that a seller "would disclose which underwriting guidelines the loans were underwritten to when it was offering the pool for sale").) And after placing a winning bid, Defendants argue, RFC would

perform "additional, independent due diligence on the loans," which revealed not only the applicable guidelines, but also the specific characteristics of the loans. (*Id.*)

Moreover, Standard Pacific and CTX argue, "the loan files in RFC's possession contained loan approvals that often underscored again the guidelines used to underwrite the loan." (*Id.* at 6.) These loan approvals included "Automated Underwriting System" ("AUS") approvals "showing that a loan had been approved under another company's AUS after that loan's characteristics had been entered into the system." (*Id.*) In sum, Standard Pacific and CTX argue that "[RFC] is now seeking to enforce remedies under the Client Guide despite years of acknowledgment—in deposition testimony, in AUS approvals in the loan files, and in RFC worksheets in the loan files—that Client Guide guidelines did not apply." (*Id.* at 7.)

Plaintiffs argue that, at most, Standard Pacific and CTX's evidence—evidence that Plaintiffs argue is inadmissible and mischaracterized—shows RFC's knowledge or acknowledgement that the loans were not underwritten to the Client Guide, but that knowledge or acknowledgment are insufficient for equitable estoppel. (Pls.' Reply at 43–44.) For instance, RFC argues that the "bid tapes" and "AUS approvals" that Standard Pacific and CTX reference were contained in RFC's *internal* deliberations that Defendants have not shown RFC communicated to them. (*Id.* at 44.) Moreover, Plaintiffs offer evidence to refute Standard Pacific and CTX's contention that RFC knew the Client Guide did not apply to bulk loans. (*See id.* at 45) (citing Boderone Decl., Ex. 2 (Siats Dep. at 58) (stating that "in agreeing to submit a bid for [bulk] loans," RFC was "[n]*ot necessarily*"

"agreeing to purchase the loans pursuant to the underwriting guidelines to which those loans had been underwritten.")) (emphasis added).

### iii.    Analysis

"A party seeking to invoke the doctrine of equitable estoppel has the burden of proving three elements: (1) that promises or inducements were made; (2) that it reasonably relied upon the promises; and, (3) that it will be harmed if estoppel is not applied." *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1990). "Estoppel is an equitable doctrine addressed to the discretion of the court and is intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights." *N. Petrochemical Co. v. U. S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979). "Equitable estoppel" depends on the facts of each case and is ordinarily a fact question for the jury to decide." *Id.*; *see also Slidell*, 460 F.3d at 1057.

On this record, and viewing the evidence in the light most favorable to Defendants, *see Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018), the Court agrees with Defendants that triable issues of fact preclude summary judgment on their defense of equitable estoppel.  Although, as will be discussed *infra*, Section III.F.4.b, there was no blanket waiver of RFC's rights to enforce the Client Guide while utilizing Assetwise, RFC may, on occasion, have acted in a way so as to estop it now from enforcing the Client Guide.  HLC, Standard Pacific, and CTX have raised several triable issues of fact regarding whether certain instances in which RFC used Assetwise and purchased individual and bulk loans allegedly fell outside of the Client Guide parameters.  Although RFC

disputes Defendants' evidence with some of its own, when ruling on a motion for summary judgment, "a court 'should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter.'" *Id.* (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996)). Moreover, the Court is not persuaded that no reasonable factfinder could conclude that RFC induced Defendants to sell more loans with the implicit understanding that they need not be underwritten to the Client Guide. Similarly, there is a triable issue of fact as to whether Defendants reasonably relied on those promises or inducements. Accordingly, this Court denies Plaintiffs' motion for summary judgment on Defendants' defense of equitable estoppel.

### b.    Waiver Defense Based on "Assetwise"

Plaintiffs argue that this Court should enter summary judgment holding, as a matter of law, that RFC may recover on breaches that Defendants claim were "approved" by RFC's Assetwise system. (Pls.' Mem. at 35.) Plaintiffs point to Defendants' expert Robert Broeksmit, who opines that "RFC generated business by 'standing by' Assetwise approvals, even when the loans did not comply with the requirements of the Client Guide," (Rand Decl., Ex. 24 (Broeksmit Rpt. ¶ 104)), thus suggesting that RFC's use of Assetwise may have "waive[d] Defendants' obligation to comply with the Guide requirements." (Pls.' Mem. at 35.)

As Plaintiffs describe it, "Assetwise was a tool that [RFC's] seller clients used . . . to grade and slot their loans for eligibility to submit to RFC for sale." [46] (Scheck Decl., Ex. 50

---

[46] An RFC employee describes the "grade and slot" process as follows: "When a loan

(Edstrom Dep. at 137).)   The Client Guide itself states that "[b]y utilizing Assetwise, the Client can submit Loans electronically and receive a[n RFC] credit grade and program determination (slot) within a matter of minutes. Loans evaluated by Assetwise and approved by the Client may receive a streamlined review process when submitted to [RFC] for purchase." (Client Guide § G401(A).)

After clients entered particular loan data into Assetwise, the program would produce an "Assetwise Findings Report." (*See, e.g.*, Scheck Decl., Ex. 51 (Example Assetwise Findings Rpt. at 1).)   This report contained a "Recommendation" as to whether RFC should approve the loan.   (*See also id.*, Ex. 50 (Edstrom Dep. at 149) ("My understanding [is] that the word approve meant that . . . the loan that was run through the Assetwise for this particular finding report . . . could be approved to be submitted for consideration of purchase by RFC.").)   It also listed "Required Documentation" that the originating lender had to submit before the loan could be approved. *(Id.,* Ex. 51 (Example Assetwise Findings Rpt. at 2).)

Plaintiffs argue that "[t]o the extent Defendants rely on Assetwise reports as supposed evidence of a 'waiver,' that is belied by the Guide's plain language." (Pls.' Mem. at 36.)   First, Plaintiffs point to the Client Guide's clause expressly requiring that any waivers be documented in writing. (*Id.*)   Client Guide Section A209(B) provides that

was input into Assetwise, . . . the first thing that it would do . . . is that it would actually create a . . . grade for the loan generally driven off of credit, and then based off the grade that was assigned to that particular Assetwise submission, it would look for loan programs that matched up with that credit as well as the other criteria on the loan." (Scheck Decl., Ex. 50 (Edstrom Dep. at 141).)

"[RFC] may waive any default . . . only by a written waiver specifying the nature and terms of such waiver." Second, they contend that the Client Guide expressly contemplated the use of Assetwise, and, in fact, in unambiguous, express language, provided that: (1) "Clients who use Assetwise *are still bound by the representations and warranties as set forth in this Client Guide*;" (2) the "use of Assetwise *does not relieve Clients* of Loan eligibility and *underwriting requirements* set forth in th[e] Client Guide;" and (3) each "Loan must conform to Program Criteria . . . [and] Clients are responsible to ensure the Loan conforms to [RFC]'s guidelines." (Client Guide § G401(B)–(C)) (emphasis added). Faced with these provisions, Plaintiffs argue, "[n]o reasonable factfinder could conclude that Assetwise constituted or granted a written waiver of breaches." (Pls.' Mem. at 36.)

Plaintiffs further contend that these Client Guide provisions "were reinforced" by the fact that the Assetwise Findings Reports indicated only a "recommendation" as to whether the loan would be approved, rather than an express waiver of Client Guide requirements or a promise to purchase. (*Id.* at 37.) Moreover, they contend that in *Terrace II*, the Eighth Circuit "affirmed enforcement of the Guide provision stating that breaches may be waived only in writing, and rejected a course of conduct argument to the contrary." (*Id.*) They urge this Court to reach the same conclusion as to Defendants' Assetwise waiver defense.

Defendants argue that RFC is not entitled to judgment as a matter of law on this defense because its use of Assetwise constitutes a waiver of enforcing the Client Guide as to certain loans. Defendants first argue that the Client Guide's requirement that all waivers be in writing is not dispositive, because, as recognized by the Eighth Circuit, "Minnesota

courts have held that despite a contract's requirement that a waiver be in writing, certain provisions of the contract may be waived even if they are not in writing." (Defs.' Opp'n at 41) (quoting *Slidell*, 460 F.3d at 1055). And here, Defendants argue, RFC's "documented practice of accepting Assetwise-approved loans even where the loans did not comply with certain Client Guide requirements" constitutes waiver of the Client Guide provision expressly stating that clients who use Assetwise are still bound by the representations and warranties set forth in the Client Guide. (*Id.* at 42.)

HLC filed a Defendant-specific response addressing Assetwise.[47] HLC raises two distinct arguments in opposition. First, it argues that it sold Assetwise-approved loans to RFC not pursuant to the Client Guide, but pursuant to the Assetwise Direct Criteria Agreement ("AW Agreement") that the parties entered into in June of 2002. (HLC Opp'n at 2.) According to HLC, although its initial "Client Contracts" with RFC permitted it to sell loans to RFC underwritten to the Client Guide, the AW Agreement allowed and encouraged HLC to sell RFC more loans by underwriting them using Assetwise. (*Id.* at 2.) This AW Agreement, according to HLC, specified certain representations that continued to be HLC's responsibility, but that absent from the requirements "was any representation that a loan complied with all Client Guide requirements." (*Id.*) In essence, HLC argues that the AW Agreement supersedes the Client Guide's requirements with respect to representations and warranties.

---

[47] Defendants Standard Pacific and CTX did not address Assetwise in their Defendant-specific memorandum.

Second, HLC argues that even assuming, *arguendo*, that the parties had not entered into the AW Agreement, the parties' course of conduct, i.e., RFC's "acceptance of Assetwise approvals," was inconsistent with the Client Guide and therefore constitutes waiver of breaches. (*Id.* at 10.) In support of this argument, HLC claims that: (1) RFC represented to HLC that it could rely on Assetwise approvals, which HLC characterizes as wholly synonymous with RFC's agreement to buy a loan; (2) RFC's policy was that Assetwise approvals were valid even though certain loan parameters contained in the Client Guide were not met; and (3) RFC's own loan-level "due diligence" shows that it manually approved loans that deviated from the Client Guide if those loans were approved by Assetwise. (*Id.* at 3–4.)

On this record, the Court denies in part and grants in part Plaintiffs' motion for summary judgment on Defendants' waiver defense based on Assetwise. Although the Court notes that it does not view it as an issue of "waiver" per se, but rather estoppel, it concludes that HLC has raised a triable issue of fact as to whether the AW Agreement superseded the Client Guide. While HLC contends that the AW Agreement controls with respect to the representations and warranties for which HLC was responsible, RFC's expert Richard Payne opines that the AW Agreement was "purely a licensing agreement" that in no way "waive[d] RFC's rights under the Client Guide." (Smallwood HLC Decl., Ex. 43 (Payne Dep. at 108–09).) The Court cannot resolve that dispute on summary judgment. Accordingly, it will be a fact question for the jury whether the AW Agreement between HLC and RFC superseded the Client Guide.

The Court, however, finds that HLC has failed to raise a triable issue of fact that Plaintiffs' use of Assetwise constitutes a blanket waiver of the requirements of the Client Guide. As the parties point out, under Minnesota law, "[w]aiver is the intentional relinquishment of a known right." *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011). The burden of proving waiver rests on the party asserting waiver. *Id.* To show a valid waiver, that party must prove two elements: "(1) knowledge of the right, and (2) an intent to waive the right." *Id.* "Waiver may be express or implied—'knowledge may be actual or constructive and the intent to waive may be inferred from conduct.'" *Id.* (quoting *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn. 2009)). However, "[a]lthough waiver can be express or implied, both types of waiver require an expression of intent to relinquish the right at issue." *Id.* Accordingly, mere inaction is insufficient to establish waiver. *Id.*

Here, HLC points to evidence it claims shows that RFC waived the right to enforce the Client Guide by accepting Assetwise-approved loans. First, it relies heavily on a document labeled "Revised Credit Policy Issue #10" that describes RFC's internal practice of accepting loans approved by Assetwise. (Smallwood HLC Decl., Ex. 9 (Ex. 145-0011 to Maki Dep.).) This document states, for instance, that "[a]n Assetwise approval IS valid even though certain loan parameters outlined in the Client Guide are not met." (*Id.* at 2.) Second, it relies on the testimony of Sharon Maki, a former RFC Credit Risk Associate. Maki testified that if Assetwise "produced . . . an approval, then that would constitute an automated loan decision." (Smallwood HLC Decl., Ex. 7 (Maki Dep. at 49).) However, if

it did not, and the client "still wanted to sell [RFC] that loan, then that became a manual decision." (*Id.*) When asked about the "Revised Credit Policy Issue #10," Maki agreed that she understood this policy to mean that if Assetwise recommended a loan for approval, it would be acceptable to RFC notwithstanding any discrepancies with the Client Guide. (*Id.* at 154–55.) Maki, however, also testified that regardless of whether or not a particular client used Assetwise, it was still bound by the representations and warranties of the Client Guide. (*Id.* at 244.)

HLC also points to the testimony of Julie Hessel, a former RFC underwriter. When asked about the "Revised Credit Policy Issue #10," and if "it [wa]s fair to say that an Assetwise approval was valid even though certain loan parameters outlined in the Client Guide were not met," Hessel testified that that would be "depending on which loan parameters we're talking about," as it was "not a blanket statement that all loan parameters would be acceptable." (Smallwood HLC Decl., Ex. 10 (Hessel Dep. at 245–46).) Hessel, however, also testified that an Assetwise Findings Report included certain pre-closing conditions and requirements "[t]o remind the seller that the loan had to be in compliance with our Client Guide." (Scheck Decl., Ex. 81 (Hessel Dep. at 224).)

HLC also identifies evidence surrounding RFC's "loan level diligence" that it argues "reflects [RFC's] pact to buy HLC loans pursuant to Assetwise approvals whether or not they complied with the Client Guide." (HLC Opp'n at 4.) It relies on RFC's process of utilizing an internal loan boarding and funding system—Café 2.2—that HLC claims RFC used to evaluate whether loans met the Client Guide. (*Id.*) Christine Trenholm, a former

RFC employee, testified that she would enter loan data into Café 2.2, and that it would sometimes generate a "pend" for the loan if certain criteria were not met. (Smallwood HLC Decl., Ex. 11 (Trenholm Dep. at 39–41).) Trenholm indicated that she could clear "pends" if the information on the Assetwise report matched up with the documents in the loan file and there was an Assetwise approval. (*Id.* at 55.) According to HLC, "[f]or at-issue HLC loans, Café 2.2 reflects *hundreds* of 'pended' loans that failed to meet Client Guide requirements but were cleared based on Assetwise approvals." (HLC Opp'n at 4.)

This anecdotal evidence is insufficient to raise a triable issue as to whether RFC intended a blanket waiver of its remedies or the provisions of the Client Guide when utilizing Assetwise. And nor could it, as Section G401 of the Client Guide *expressly anticipates* RFC's use of Assetwise and gives notice to Defendants that they would still be "bound by the representations and warranties as set forth in th[e] Client Guide," even if the parties used Assetwise. (Client Guide § G401(B).) In no uncertain terms, this provision states that "use of Assetwise does not relieve Clients of Loan eligibility and underwriting requirements set forth in this Client Guide." (*Id.*) As such, as Plaintiffs point out, "RFC's purported knowing purchase of Assetwise-approved loans that deviate from the Guide is not inconsistent with RFC's rights—it is what RFC bargained for." (Pls.' Reply at 35.) Accordingly, Defendants are barred—by the contract that the parties signed—from arguing that RFC's purchase of Assetwise-approved loans constitutes a blanket waiver of RFC's rights to enforce the Client Guide and its remedies.

### c.    Knowledge- and Reliance-Based Defenses

Plaintiffs next argue that they are entitled to summary judgment on the following defenses: (1) that "RFC did not rely on the R&Ws on which Plaintiffs are suing"; (2) that RFC's "reliance on Defendants' R&Ws was not reasonable or justified"; (3) that "RFC would have purchased loans from Defendants even if it had known about defects"; and (4) that "RFC knew of defects prior to sale and purchased loans anyway."  (Pls.' Mem. at 33–34.)[48]

At the motion to strike stage, this Court denied without prejudice Plaintiffs' motion to strike, or in the alternative, for judgment on the pleadings as to some of the same knowledge- and reliance-base defenses that are at issue here.  (*See* May 21, 2015 Am. Mem. & Order [Doc. No. 469] at 15.)  Specifically, the Court denied without prejudice Plaintiffs' motion with respect to the following defenses: "(1) because [RFC] would have purchased the loans . . . even if it knew the alleged deficiencies in the loan documents, and any alleged deficiencies were not material; (2) because [RFC] did not rely on the representations and warranties on which Plaintiff[s] [are] suing, and to the extent [RFC] did rely on such representations and warranties, [RFC]'s reliance was not reasonable or justified."  (*Id.* at 14–15 n.5 (alterations in original) (internal quotation marks and citations omitted).)

---

[48]  Both parties seem to agree that these so-called "knowledge- and reliance-based defenses" are not affirmative defenses *per se*, but rather are defenses that may negate elements of Plaintiffs' claims.  (June 19 Hr'g Tr. at 201, 220); *see Masuen v. E.L. Lien & Sons, Inc.*, 714 F.2d 55, 57 (8th Cir. 1983) ("If the defense involved is one that merely negates an element of the plaintiff's prima facie case . . . it is not truly an affirmative defense and need not be pleaded despite rule 8(c)." (quoting *Sanden v. Mayo Clinic*, 495 F.2d 221, 224 (8th Cir.1974)).

Although the Court did not expressly consider the fourth defense now at issue—that RFC knew of defects prior to sale and purchased loans anyway—the Court did consider and denied without prejudice Plaintiffs' motion to strike three defenses that each generally require "the element of full knowledge of the party against whom the doctrines are to be applied": consent, acquiescence, and ratification. (*See id.* at 17–20.)

Plaintiffs argued that the Court should strike these defenses because they were precluded by Section A200 of the Client Guide. In that section, Plaintiffs argued, Defendants agreed to be fully liable for any misrepresentation or breach of warranty regardless of whether RFC actually had, or reasonably could have been expected to have, knowledge of the facts giving rise to misrepresentations or breaches of warranty, and further acknowledged that RFC purchased loans in reliance of the accuracy and truth of Defendant's R&Ws. (*Id.* at 13 (quoting Client Guide § A200).)

This Court found, however, that questions of fact precluded relief on a motion to strike under Federal Rule of Civil Procedure 12(f). (*Id.* at 14.) The Court reasoned that not all of the relevant contracts were before the Court, and that due to the limited record, it could not rule out, for instance, whether the terms of the Client Guide had been altered or superseded by any conflicting terms in the parties' seller contracts or commitment letters, as Defendants asserted. (*Id.* at 15.) With respect to the knowledge-based defenses of consent, acquiescence, and ratification, the Court similarly found that "[g]iven the limited development of the record at this point, particularly with respect to the applicable versions of the Client Guide and any other documents that might impact the Client Guide, the Court

is unable to rule that no genuine issues of fact remain in dispute" as to those defenses.  (*Id.* at 20.)  Plaintiffs now renew their arguments at the summary judgment stage.

### i. Breach of Contract Claim

Plaintiffs first argue that knowledge and reliance are not defenses to their breach of contract claims as a matter of law and should be dismissed. (Pls.' Mem. at 34; Pls.' Reply at 29.)  They point to the unpublished decision in *Krause v. City of Elk River*, No. A14-1575, 2015 WL 3823093 (Minn. Ct. App. June 22, 2015), *rev. denied* (Minn. Sept. 15, 2015), issued after this Court's denial of their motion to strike, where the Minnesota Court of Appeals declined to require proof of reliance as an element in a breach of warranty claim. *Id.* at *3.  Although *Krause* acknowledged a 1944 decision of the Minnesota Supreme Court, *Midland Loan Finance Co. v. Madsen*, 14 N.W.2d 475 (Minn. 1944), that purportedly required proof of reliance, the *Krause* court noted that since *Midland*, "the Minnesota Supreme Court has stated that, to establish a warranty claim, a party need only allege (1) the existence of warranty; (2) a breach of the warranty; and (3) causation of damages." *Id.* (citing *Peterson v. Bendix Home Sys. Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982)).  Accordingly, Plaintiffs argue, reliance and knowledge are irrelevant to their breach of contract claim.

In their memorandum opposing Plaintiffs' summary judgment motion, Defendants do not explicitly address *Krause*, *Midland*, or *Peterson*.  They do, however, state that "[u]nlike a warranty claim, the Guide's indemnity provision expressly requires proof of reliance." (Defs.' Opp'n at 52.)  At oral argument, Plaintiffs' counsel suggested that it

"appear[ed] to be conceded that knowledge[-] and reliance-based defenses are not defenses to breach of contract," requiring dismissal. (June 19 Hr'g Tr. at 202.) Defendants' counsel, however, responded that although Defendants "agree that [they] have the strongest argument with respect to [Plaintiffs'] indemnification claims," reliance and knowledge may still be relevant to Plaintiffs' ability to prove the elements of their breach of contract claim. (*Id.* at 220–21.)

The Court agrees with Plaintiffs that the knowledge- and reliance-based defenses on which they move for summary judgment are not applicable to their breach of contract claim, and therefore it grants their motion for summary judgment in that respect. The Court notes, however, that it need not opine at this time whether reliance is a required element of a breach of warranty claim. Although Plaintiffs point to *Krause*, an unpublished and therefore nonprecedential decision, the Minnesota Supreme Court has not definitively addressed whether reliance is required in a breach of warranty claim. In *Lyon Financial Services, Inc. v. Illinois Paper & Copier Co.*, the Minnesota Supreme Court acknowledged the disagreement between its decisions regarding reliance, but declined to resolve it. 848 N.W.2d at 543–44 & n.6 . Moreover, in *Hendricks v. Callahan*, the Eighth Circuit "was not persuaded" that "Minnesota would adopt the 'modern view' which provides that the buyer's reliance on the warranty is 'wholly irrelevant.'" 972 F.2d 190, 194 (8th Cir. 1992).

Resolving this apparent conflict now is unnecessary because, as described below in the context of Plaintiffs' indemnity claim, even if proof of reliance were required generally, Section A200 precludes any arguments regarding knowledge and reliance.

### ii. Indemnity Claim

Plaintiffs argue that Section A200 of the Client Guide precludes the reliance- and knowledge-based defenses as a matter of law because it sets forth "what is essentially a strict liability regime under which RFC's knowledge and reliance are irrelevant." (Pls.' Mem. at 34.) In pertinent part, Section A200 provides

> The Client acknowledges that []RFC purchases Loans in *reliance upon the accuracy and truth of the Client's warranties and representations* and *upon* the Client's *compliance with the agreements, requirements, terms and conditions set forth in the Client Contract and this Client Guide.*
>
> All such representations and warranties are absolute, and *the Client is fully liable for any misrepresentation or breach of warranty regardless of whether* it or []*RFC actually had*, or reasonably could have been expected to obtain, *knowledge* of the facts giving rise to such misrepresentation or breach of warranty.
>
> The *representations and warranties* pertaining to each Loan purchased by []RFC . . . *are not affected by any investigation or review made by, or on behalf of,* []*RFC* except when expressly waived in writing by []RFC.

(Client Guide § A200) (emphasis added). According to Plaintiffs, Section A200 was a critical component of the parties' contract, which shifted the risk of liability for defective loans to correspondent lenders. Such risk-shifting scheme, Plaintiffs contend, was previously recognized by this Court in *Terrace I*, 850 F. Supp. 2d at 970, where the Court emphasized that RFC "paid Terrace a premium for the loans it purchased from Terrace under this agreement. . . . In exchange, Terrace took the risk of [RFC] determining that particular loans did not meet the stated criteria." (*See* Pls.' Reply at 30.)

Defendants disagree, and argue that Section A200 does not preclude their reliance- and knowledge-based defenses for two primary reasons. First, they argue that although

Section A200 states that RFC *purchased* loans in reliance on Defendants' R&Ws, it does not provide that RFC in turn made representations to the Trusts in reliance on Defendants' R&Ws. (Defs.' Opp'n at 39.) In fact, Defendants argue, Section A212 expressly requires reliance, as it provides that "Defendants will indemnify RFC for liabilities arising from, *inter alia*, 'any breach of any representation . . . or representation made by []RFC *in reliance upon* any . . . representation made by the Client contained in the Client Contract.'" (*Id.* at 40 (quoting the Client Guide § A212); *id.* at n.27 (arguing the same as to Section A202(II)).) Second, they argue that even if Section A200 facially precluded reliance- and knowledge-based defenses, they are nevertheless "entitled to present evidence that RFC waived or is estopped by its words and deeds from enforcing these Guide provisions, including the non-waiver language." (*Id.* at 39.)

This Court agrees with Plaintiffs that the plain language of Section A200, especially when read in context of the entire contract, precludes Defendants' knowledge- and reliance-based defenses. Furthermore, the Court concludes that Defendants have not raised a triable issue of fact that RFC waived or is estopped from enforcing this particular provision. If the threshold determination is made that the Client Guide applies, Defendants are precluded, as a matter of law, from asserting the reliance- and knowledge-based defenses at issue here.

First, this Court finds that the unambiguous language of the Client Guide allocated certain risks to Defendants that they may not now dispute. "Under freedom of contract principles, parties are generally free to allocate rights, duties, and risks," *Lyon Fin. Servs.,* 848 N.W.2d at 545, and "[c]ourts are not warranted in interfering with the contract rights of

parties as evidenced by their writings which purport to express their full agreement," *Cady*, 166 N.W.2d at 362. In Section A200, Defendants expressly acknowledged the following: (1) that Plaintiffs were buying loans in reliance upon the accuracy of their R&Ws; (2) that Defendants were fully liable for any misrepresentation of or breach of warranty *regardless* of whether RFC had any knowledge of the misrepresentation or breach; and (3) that Defendants' R&Ws were not affected by any investigation or review made by RFC unless expressly waived in writing. The plain language of these provisions is clear: under the parties' bargain, whether RFC actually relied on the R&Ws or had knowledge of any potential defects is wholly irrelevant.

Furthermore, the Court is unpersuaded by Defendants' contention that, even if they stipulated that RFC purchased loans in reliance on the accuracy and truth of Defendants' R&Ws, they did not stipulate that RFC necessarily relied on that same accuracy and truth of Defendants' R&Ws when making its *own* R&Ws to the Trusts. Defendants' interpretation would run afoul of several provisions of the Client Guide and its structure as a whole. First, it would contradict the explicit risk-shifting scheme of Section A200 if Defendants could dispute RFC's securitization-related reliance on Defendants' R&Ws, *especially* because the Client Guide alerted Defendants at various turns that RFC intended to securitize the loans it bought from them. (*See, e.g.*, Client Guide § A202(II) ("Client recognizes that it is []RFC's intent to securitize some or all of the Loans . . . .").) Additionally, Defendants' interpretation would render Section A200 superfluous, as it would require RFC to prove the

same reliance that Section A200 presumes. Finally, Defendants' interpretation of Section A200 ignores some of that same section's provisions. As Plaintiffs point out,

> To prove a reliance defense to indemnification, Defendants would have to prove that RFC learned of Defendants' R&W breaches after RFC bought the loans but before it made R&Ws to Trusts. But Section A200 forecloses that defense by stating that Defendants' R&Ws "are not affected by any investigation or review made by, or on behalf of, [RFC] except when expressly waived in writing by [RFC]."

(Pls.' Reply at 30) (quoting Client Guide § A200).)

Moreover, Defendants may not repackage what is essentially a causation argument as one of reliance. Standard Pacific and CTX argue that "RFC could never rely *only* on Defendants' alleged representations because there was always a time lag (often a substantial one) between the purported representations made by Defendants to RFC and the very different, subsequent representations made by RFC to other parties." (Standard Pac.-CTX Opp'n at 9–10.) They also argue that "RFC could not rely upon Defendants' alleged representations in making its own subsequent representations because the substance of the two types of representations differed fundamentally." (*Id.* at 10.) As this Court explained in its discussion of causation, Defendants are free to argue that RFC is *solely* responsible for some Trust-level breaches. But these arguments have no bearing on whether Section A200, a contractual provision to which the parties willingly agreed, forecloses the reliance- and knowledge-based defenses on which Plaintiffs move for summary judgment. (*See supra*, Section III.F.4.c.)

Finally, the Court finds that Defendants have failed to raise a triable issue of fact as to whether "RFC waived or is estopped by its words and deeds" from enforcing Section

131

A200. (*See* Defs.' Opp'n at 39.) Under Minnesota law, "[w]aiver is the intentional relinquishment of a known right." *Frandsen*, 801 N.W.2d at 182. To show a valid waiver, the party asserting waiver must prove two elements: "(1) knowledge of the right, and (2) an intent to waive the right." *Id.* "Waiver may be express or implied—'knowledge may be actual or constructive and the intent to waive may be inferred from conduct.'" *Id.* (quoting *Valspar*, 764 N.W.2d at 367). However, mere inaction is insufficient to establish waiver. *Id.* As applied here, the issue is thus whether Defendants have adduced evidence creating a triable issue of fact that Plaintiffs intended to waive the reliance and knowledge provisions of Section A200.

Here, Defendants do not cite to any evidence indicating that RFC waived or should be estopped from enforcing Section A200. (Defs.' Opp'n at 40–42.) Rather, Defendants rely on the same generalized arguments they made in support of their general estoppel defense, described *supra,* Section III.F.4.a. In their common memorandum in opposition, Defendants make the cursory assertion that "RFC's repeated, intentional conduct over many years—where it deliberately sought to acquire loans from Defendants in greater volume knowing they were not underwritten to the Client Guide—creates a triable issue on whether RFC waived or is estopped from enforcing" Section A200. (*Id.* at 39–40.)

Their Defendant-specific memorandums fare no better. HLC simply alleges that there is "voluminous record evidence that RFC deliberately chose to buy HLC loans that did not comply with the Client Guide through Assetwise approvals, bulk purchases, and buying loans to competitor guidelines." (HLC Opp'n at 9.) Standard Pacific and CTX similarly

132

point to no evidence indicating that RFC expressed the intent to waive Section A200, or that it made any promises or inducements indicating that it was specifically abandoning or modifying that clause. Rather, the section of their brief devoted to waiver and estoppel seems only to address their general estoppel argument that the Client Guide did not apply in the first instance. (*See* Standard Pac.-CTX Opp'n at 2) (as to waiver and estoppel, arguing that RFC "knew the loans it purchased were not underwritten to the Client Guide and it cannot now claim that alleged failures to conform to the Guide's underwriting guidelines mark those loans as 'defective' or 'breaching'").) Tellingly, both Defendant-specific responses opposing summary judgment do not mention or cite to Section A200.

As Plaintiffs argue, these generalized assertions are simply insufficient to survive summary judgment as to whether RFC waived or should be estopped from enforcing Section A200. In fact, it would render Section A200 entirely meaningless if Defendants could claim that RFC waived that provision, or should be estopped from enforcing it, because it purchased loans it knew were defective or without relying on R&Ws. As Plaintiffs point out, "[e]ven if RFC bought loans knowing they did not comply with the Guide and without relying on Defendants' R&Ws, doing so would not waive A200 or estop RFC from enforcing it. Indeed, the very *purpose* of A200 was to enable RFC to buy loans under those circumstances." (Pls.' Reply at 34.) In sum, for loans governed by the Client Guide, Section A200 is unambiguous in rendering RFC's knowledge and reliance irrelevant, and Defendants have not produced sufficient evidence to raise a triable issue of fact that RFC waived or is estopped from enforcing this particular provision. Accordingly,

this Court grants Plaintiffs' summary judgment motion as to these reliance- and knowledge-based defenses.

### d.    Good Faith and Fair Dealing

Plaintiffs next argue that this Court should enter summary judgment dismissing defenses based on the covenant of good faith and fair dealing. (*See* Pls.' Mem. at 37–39.) They argue that Defendants cannot demonstrate RFC has acted in bad faith, as it has only ever asserted its legal and contractual rights. (*Id.*) Defendants disagree, and argue that they must be permitted to present to the jury evidence that RFC has breached the covenant of good faith and fair dealing. In a general sense, all Defendants argue that the covenant of good faith and fair dealing operates here to limit the "sole discretion" that the Client Guide grants to RFC. (Defs.' Opp'n at 43.)   They argue that, "[i]mportantly, '[t]he implied covenant of good faith and fair dealing applies when one party exercises discretion, thereby controlling the other party's benefit.'"  (*Id.*  (second alteration in original) (quoting *Cardot v. Synesi Grp., Inc.*, No. A07-1868, 2008 WL 4300955, at *8 (Minn. Ct. App. Sept. 23, 2008).)

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (citations omitted).  "Actions are done in 'good faith when done honestly, whether it be negligently or not.'" *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (quoting Minn. Stat. § 520.01, subd. 6 (1996)).  On

the other hand, actions are done in bad faith when "a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Id.* (citing *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn. Ct. App. 1994). Indeed, "the substantial weight of authority is that the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith." *BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 965 (D. Minn. 2007).

In contracts where one party bargains for contractual discretion, "[t]he implied covenant of good faith and fair dealing prevents the party with control from abusing its discretion in a manner that would inflict harm on the vulnerable party and undermine the purpose of the contract." *Id.* "This speaks not of objective reasonableness, but of subjective motivation." *Id.* Accordingly, courts have held that a party does not breach the covenant of good faith and fair dealing simply because its exercise of discretion is unreasonable, so long as that party acted honestly in exercising such discretion. *Id.* at 967 ("[A]lthough a party to a contract must exercise its discretion honestly, it need not necessarily exercise it reasonably."); *see also White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 882–84 (D. Minn. 1997). Indeed, as this Court has explained in the past, it is only "where contractual discretion is being enforced or construed to deny a party the benefit of the bargain or render the contract illusory, that courts will, as a gap filler, require that the discretion be exercised reasonably." *RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*, No. 03-cv-2609 (DSD/SRN), 2003 WL 25836278, at *9 (D. Minn. Dec. 2, 2003).

Applying these principles to the case at hand, this Court concludes that Defendants have not raised a triable issue of fact as to whether Plaintiffs have breached the covenant of good faith and fair dealing.  Defendants primarily take issue with what they term RFC's "*en masse*" declaration of Events of Default.  (*See* Defs.' Opp'n at 44 ("[A] triable issue exists . . . as to whether RFC's litigation-driven declaration of Events of Default is a 'good faith' exercise of discretion.").)  They argue that the contract envisioned, and they reasonably expected, a loan-by-loan protocol by which RFC would "identify a specific 'Event of Default' for *each* Loan, afford a loan seller with a right to appeal and, if repurchase ensue[d], return the loan to the seller in exchange for a repurchase price."  (*Id.*)  Instead of following this loan-by-loan protocol, however, they argue that RFC "used its pleadings to declare *en masse* unspecified 'Events of Default,'" "provided no accompanying loan-level notice," and "broadly attempted to impugn loans without any discretion." (*Id.*)

This Court is unpersuaded.  Stated simply, Defendants present no evidence that in bringing this lawsuit, exercising its sole discretion, and engaging in extensive re-underwriting of the at-issue loans, RFC acted "dishonestly, maliciously, or otherwise in subjective bad faith."  *BP Prods. N. Am.*, 534 F. Supp. 2d at 968.  Indeed, as Plaintiffs point out, the record reflects that its only "motive" "is a fiduciary duty to pursue remedies on breaching loans, for unitholders' benefit." (Pls.' Reply at 41.)  Importantly, here, RFC "did exactly what the contract allow[s] it to do—determine [that] Event[s] of Default had occurred and demand [remedies]."  *Terrace II*, 725 F.3d at 918.  And fatal to Defendants' claims, as this Court has explained, the implied covenant of good faith and fair dealing

136

simply cannot preclude enforcement of the terms of the contract. *RBC Dain Rauscher*, 2003 WL 25836278, at *8. Although Defendants make much of the fact that RFC purportedly declared Events of Default "*en masse*" for the purposes of litigation, it can point to no contractual language prohibiting RFC from doing so, and, most critically, cannot point to any evidence that RFC did so for improper or ulterior motives or in bad faith. In sum, "[a] party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" *Herzog*, 575 N.W.2d at 125 (quoting *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43, 50 (Minn. Ct. App. 1993)).

Defendants' case-specific arguments fare no better. HLC argues that it was not "reasonably understood" that RFC "would induce HLC to sell it loans pursuant to Assetwise approval, bulk bid tapes, and other loan purchasers' underwriting guidelines—which RFC and HLC knew were not intended to meet the Client Guide—but that RFC could put loans back to HLC at any time based on the loans' known non-compliance with the Client Guide." (HLC Opp'n at 11.) Similarly, Standard Pacific and CTX contend that it was not "reasonably understood" that RFC would agree to purchase their loans "in bulk at auctions—loans openly and notoriously underwritten to third party guidelines—and then, many years later, fault these Defendants for not having underwritten them to the RFC Client Guide." (Standard Pac.-CTX Opp'n at 11.) These two Defendants also argue that, even if the Client Guide applied, it was not reasonably understood that "RFC could demand that Defendants indemnify them for 'failures' to do things not called for even under the Client Guide." (*Id.*)

As explained above, Defendants have raised triable issues of fact as to whether the Client Guide governed their sale of loans to RFC. However, if the Guide applies, to the extent they argue that Plaintiffs have breached the covenant of good faith and fair dealing by holding them to the requirements of the Guide, the argument fails. As Plaintiffs point out, the covenant of good faith and fair dealing is implied in every *contract*. This Court agrees with Plaintiffs that, definitionally, then, the covenant presupposes an applicable contract. It is therefore difficult to discern how Plaintiffs could be held to have breached a covenant implied in a contract that Defendants argue does not apply in the first instance. With respect to Standard Pacific and CTX's argument that Plaintiffs have breached the covenant by "demand[ing] that Defendants indemnify [RFC] for 'failures' to do things not called for even under the Client Guide," (*id.* at 11), this Court refers to its prior discussion on RFC's sole discretion and its ruling that Defendants remain free to argue that the Client Guide does not apply to their loans, *supra*, Section III.F.1.

Therefore, this Court grants Plaintiffs' motion for summary judgment on the defense of good faith and fair dealing.

### G.     Defendants' Motions for Summary Judgment

Earlier in this ruling, the Court addressed certain of Defendants' bases for summary judgment that are identical to the grounds asserted by Plaintiffs in their affirmative motion.[49]  As noted, Defendants also move for summary judgment on additional grounds,

---

[49] Specifically, the Court addressed Defendants' arguments regarding whether RFC's alleged misconduct precludes recovery, whether RFC is barred from recovering damages on "expired" loans, whether its bankruptcy precludes recovery, and whether RFC may

which include:  (1) RFC's claims for loans sold before May 14, 2006 are time-barred; and

(2) RFC's expert opinions are inadmissible and foreclose its claims.  Furthermore,

Defendants assert the following summary judgment arguments related to Plaintiffs'

damages models:  (1) RFC cannot recover damages under its Breaching Loss damages

methodology because (a) *Quicken Loans*, 2017 WL 5571222, precludes such damages,

(b) repurchase damages are unavailable under RFC's "guise" of seeking indemnity for

losses or liabilities under Section A212 of the Client Guide, (c) RFC fails to prove that

Defendants' alleged R&W breaches caused loan-level losses,  (d) damages for indemnity

are limited to RFC's actual losses and liabilities incurred and do not encompass losses not

incurred by RFC in the Settlements; (2) RFC cannot recover damages under its Allocated

Breaching Loss damages approach because it fails to provide a non-speculative basis for

allocating the RMBS Trust Settlements and Monoline Settlements; and (3) RFC's Allocated

Loss approach to calculating damages fails.

### 1.       Statute of Limitations for Loans Sold Before May 14, 2006

Defendants argue that Plaintiffs' claims for breach of contract and indemnification

for loans sold before May 14, 2006 are time-barred, and accordingly, they are entitled to

summary judgment for all such loans.  (Defs.' Mem. at 62–65.)

---

use statistical sampling as a method of establishing liability and damages.  (*See supra*, Section III.E.1–4.)  In addition, in the Court's discussion regarding the determination of reasonableness, the Court addressed Defendants' related argument that RFC's indemnity claim related to the MBIA Settlement fails.  (*Supra*, Section III.F.1.b.)  Finally, in the Court's discussion of Plaintiffs' motion regarding causation, and specifically, recovery for all losses, the Court addressed Defendants' related motion regarding whether Plaintiffs could recover damages from alleged breaches of pool-wide representation.  (*Id.*, Section III.F.3.b.)

Under Minnesota law, a statute of limitations begins to run when "the cause of action accrues." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 832 (Minn. 2011) (citations omitted). A cause of action is deemed to have accrued "when all of the elements of the action have occurred, such that the cause of action could be brought and would survive a motion to dismiss for failure to state a claim." *Id.* (citing *Dalton v. Dow Chem. Co.,* 158 N.W.2d 580, 584 (Minn. 1968)). The parties agree that Minnesota has a six-year statute of limitations for breach of contract claims. *See* Minn. Stat. § 541.05, subd. 1(1). A breach of contract claim accrues at the time of the alleged breach, regardless of whether the plaintiff was aware of the breach. *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989). Claims for common law indemnification accrue when "the liability of the party seeking indemnity has become finally fixed and ascertained, or until after the claimant has settled or has paid the judgment or more than a commensurate share of it." *Metro. Prop. & Cas. Ins. Co. v. Metro Transit Comm'n*, 538 N.W.2d 692, 695 (Minn. 1995) (citation omitted).

Under Section 108(a) of the Bankruptcy Code, if the statute of limitations governing a debtor's claim has not expired prior to the filing of the bankruptcy petition, the trustee may commence an action on that claim before the later of the end of the statutory limitations period or "two years after the order for relief." 11 U.S.C. § 108(a). RFC's May 14, 2012 voluntary bankruptcy filing constituted "the order for relief" and extended the limitations period for all claims that were still timely as of that date. 11 U.S.C. § 301(b). Applying the six-year statute of limitations to Plaintiffs' claims, Defendants argue that RFC's claims are time barred for loans sold before May 14, 2006. (Defs.' Mem. at 62–63.)

Defendants previously asserted this argument at the outset of these cases in their motions to dismiss. At that early stage of litigation, this Court found that the breach of contract claims were not time barred as to loans sold to RFC on or *after* May 14, 2006, because, at the time RFC filed its bankruptcy petition on May 14, 2012, the claims had not expired. *See, e.g., Residential Funding Co., LLC v. Acad. Mortg. Corp.*, 59 F. Supp. 3d 935, 952 (D. Minn. 2014).

As to loans sold to RFC *before* May 14, 2006, the Court also denied Defendants' motions. *Id.* The Court noted that where a warranty concerns a future event that will determine the existence of a breach, the statute of limitations does not run until the future event occurs. *Id.* (citing *City of Pipestone v. Wolverine Ins. Co.*, Civ. No. 4-84-634, 1985 U.S. Dist. LEXIS, 18375 (D. Minn. June 28, 1985)). Plaintiffs had argued that one of the R&Ws on which Plaintiffs' contract claims relied was a Client Guide provision, Section A201(M), requiring Defendants to notify RFC of any material facts or omissions regarding the loans. *Id.* The Court found it plausible from the face of the complaints that one of the allegedly breached R&Ws related to an event that occurred, if at all, *after* the sale of the loan. *Id.* Because the Court found that the date on which any Defendant allegedly breached that R&W went beyond the pleadings and could not be resolved on a motion to dismiss, it denied Defendants' motion with respect to these breach of contract claims. *Id.*

Regarding Plaintiffs' indemnification claims, the Court determined that they did not accrue until the underlying liability was fixed, *id.* (citing *Metro. Prop.*, 538 N.W.2d at 695), which, from the face of pleadings, appeared to be at least sometime after 2008, when RFC

began to face claims and lawsuits stemming from the loans. *Id.* Because the instant lawsuits were all filed within six years of that date, the Court denied Defendants' motions to dismiss the indemnification claims as well. *Id.*

As noted, the six-year limitations period for breach of contract claims begins to run at the time of the alleged breach. *Levin*, 441 N.W.2d at 803. Barring any tolling or continuing obligation of Defendants, the statute would bar Plaintiffs' claims for loans sold before May 14, 2006, as any such sales would have occurred more than six years prior to RFC's May 14, 2012 bankruptcy filing. 11 U.S.C. § 108(a).

Now, at summary judgment, Defendants argue that "there is no evidence that [they] learned of any information that would trigger a 'continuing obligation' to notify []RFC," particularly as they did not service the loans. (Defs.' Mem. at 63) (citing Smallwood Decl., Ex. 61 (HLC-RFC Client Strategy Memo at RFCCORR-COM00907489) (stating that HLC does not service loans).)

In response, Plaintiffs contend that Defendants have failed to carry their evidentiary burden to establish this affirmative defense. (Pls.' Opp'n at 52–53.) They assert that it is not RFC's burden to establish that its claims are timely. (*Id.*) Again, Plaintiffs point to Section A201(M) of the Client Guide which states that the Client will "promptly notify []RFC of any occurrence, act, or omission regarding Client, the Loan, the Mortgaged Property or the Mortgagor of which the Client has knowledge, which occurrence, act, or omission may materially affect Client, the Loan, the Mortgaged Property, or the Mortgagor." (Client Guide § A201(M).) They note that Defendants fail to provide a

142

citation or support for their statement that "there is no evidence" that Defendants learned information that would trigger a continuing obligation. (Pls.' Opp'n at 53.) Also, Plaintiffs assert that this Court has already held that Defendants' obligations under Section A201(M) provided a basis for timely breach of contract claims as to loans purchased before May 14, 2006, and that the Client Guide establishes a presumption of Defendants' knowledge as to materially inaccurate or incomplete representations regarding the loans. (*Id.* at 52.)

As noted earlier, Section 113(A) of the Client Guide provides that whenever any R&W in the Client Guide is qualified by reference to the Client's "knowledge," "such knowledge will be deemed to include knowledge of facts or conditions of which Client . . . either is actually aware or should have been aware under the circumstances with the exercise of reasonable care, due diligence and competence. . . ." (Client Guide § 113(A).) It further states that "[a]ny representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of the Client, unless Client demonstrates otherwise." (*Id.*) Because of this presumptive knowledge, Plaintiffs contend that Defendants bear the burden on this summary judgment motion to "demonstrate otherwise," by presenting sufficient evidence that none of their employees ever had actual or constructive notice of the breaches in question. (Pls.' Opp'n at 52-53.)

In their Reply, Defendants counter that: (1) Plaintiffs bear the burden of establishing breaches of the Client Guide, which requires them to submit evidence that Defendants learned and failed to notify RFC of information under Section A201(M) after May 14, 2006 concerning a loan sold prior to that date; (2) Plaintiffs' re-underwriting

143

experts do not opine that Defendants' failures to notify RFC of a defect under Section A201(A) caused a corresponding breach to the Trusts or Monolines; and (3) the requirements of Section A201 are limited to the date of sale and do not create an indefinite "continuing obligation." (Defs.' Reply at 29 n.25 & n.26.)

The Court agrees with certain of the arguments advanced by Defendants regarding the breach of contract claims sold before May 14, 2006. While Defendants seek summary judgment on this affirmative defense, Plaintiffs bear the burden of establishing the elements of their breach claims. *See Park Nicollet Clinic*, 808 N.W.2d at 833 (stating elements that a plaintiff must show for breach of contract claim); *see also Hendricks*, 972 F.2d at 192–94 (citations omitted) (stating elements that a plaintiff must establish for a breach of warranty claim). This Court issued its earlier rulings on Defendants' statute of limitations arguments prior to any significant discovery, with reference only to the allegations in the pleadings, and a standard of review deferential to any plausible allegations. *See Residential Funding Co.*, 59 F. Supp. 3d at 952.

The Court also referred to Sections A201(M) and 113 of the Client Guide in the context of Impac's Motion for Summary Judgment.[50] (April 27, 2016 Order at 38–39 [Doc. No. 1523].) But that motion, filed at Impac's request in October 2015 in light of

---

[50] The Impac motion referenced Sections A201(M) and 113 in the successor liability context, with the focus on whether breach of contract liabilities arose before or after the execution date of a corporate reorganization agreement. (April 27, 2016 Order at 38–39 [Doc. No. 1523].) RFC and Impac had engaged in some discovery limited to the successor liability issue, but overall, the record regarding pre-2006 loans was not well developed at that time.

the defendant-specific successor liability argument, also occurred prior to the opportunity for fulsome general discovery. (*Id.*)

The Court also understands Plaintiffs' argument concerning Defendants' presumptive knowledge and their burden to rebut such knowledge pursuant to the language of Section 113.[51] But even so, two to four years after those early motions to dismiss and after substantial discovery, in order for Plaintiffs to establish liability for any pre-May 14, 2006 breach of contract claims for failure to notify, Plaintiffs must point to some evidence demonstrating that after May 14, 2006, a Defendant failed to notify RFC of information that might trigger the Section A201(M) obligation as to a loan sold before May 14, 2006, and that this failure to notify under Section A201(M) was a breach and caused damages in this case. That information would then trigger Defendants' obligation under Section 113 to demonstrate otherwise. However, as no threshold evidence has been identified by Plaintiffs, the six-year statute of limitations applies. These breach of contract claims are time barred and dismissed with prejudice.

As to Plaintiffs' indemnification claims for loans sold prior to May 14, 2006, Defendants argue that they are merely breach of contract claims—to which the six-year limitations period applies—"repackaged" as stand-alone indemnification claims in order

---

[51] The Court disagrees with Defendants' interpretation that Section A200 limits their notification obligations under Section A201(M) to the date of sale. Section A200 merely speaks to when the R&Ws commence, stating, "The [R&Ws] contained herein are made as of each Funding Date . . . , unless the specific [R&W] provides to the contrary. Making these [R&Ws] does not release the Client from its obligations under the [R&Ws] contained in other Sections of this Client Guide." (Client Guide § A200.) It does not clearly address when those obligations end, nor does it indicate that Defendants' imputed knowledge, in Section 113(A), is limited to the date of sale.

to circumvent the statute of limitations.  (Defs.' Mem. at 63–64.)  Plaintiffs, however, note that this Court has already rejected this argument on Defendants' motions to dismiss, along with every other judge in the District to have considered it, finding instead that Plaintiffs' indemnity claims did not accrue until RFC's liability was fully fixed or ascertained.  (Pls.' Opp'n at 38) (citing *Residential Funding Co.*, 59 F. Supp. 3d at 953; *Residential Funding Co., LLC v. Embrace Home Loans, Inc.*, 27  F. Supp. 3d 980, 987 (D. Minn. 2014) (Magnuson, J.); *Residential Funding Co., LLC v. Mortg. Outlet, Inc.,* No. 13-cv-3447, 2014 WL 4954645, at *6–7 (D. Minn. Oct. 1, 2014) (Schiltz, J.); *Residential Funding Co., LLC v. Broadview Mortg. Corp.*, No. 13-cv-3463, 2014 WL 4104819, at *7 (D. Minn. Aug. 19, 2014) (Montgomery, J.)).  Plaintiffs assert that the ascertainment of liability occurred in 2013 when the allowed claims were settled and approved.  (*Id.*)  Thus, they argue the indemnification claims for loans sold prior to May 14, 2006 are not time barred.  (*Id.*)

Under Minnesota law, final and actual liability is required for the accrual of an indemnification claim.  *Metro. Prop.*, 538 N.W.2d at 695.  The Court notes that while *Metropolitan Property* involved a statutory, as opposed to a contractual right to indemnity, "the Court sees no reason why the same principle should not apply to this case."  *Residential Funding Co.,* 2014 WL 4954645, at *6–7.

In support of their position that the indemnification claims here accrued at the time of the sale of the loans, Defendants primarily rely on two cases applying New York and Delaware law, *Lehman Brothers Holdings v. Universal American Mortgage Co., LLC,*

146

660 F. App'x 554 (10th Cir. 2016), and *Lehman XS Trust v. Greenpoint Mortgage Funding, Inc.*, No. 12 Civ. 7935, 2017 WL 1293773, at *9 (S.D.N.Y. Mar. 29, 2017. (Defs.' Mem. at 65.) These cases are distinguishable. In *Lehman Brothers*, the plaintiff presented its claim as one for breach of contract, alleging harm based on breaches of various R&Ws and the defendant's refusal to repurchase the loans in question. 660 Fed. App'x. at 567. The complaint did not include a claim for indemnification, nor any allegations regarding third parties Freddie Mac and Fannie Mae, nor any allegations regarding payments by Lehman Holdings to a third party. *Id.* The Tenth Circuit found that the statute of limitations accrued on the date of the breaches, citing the plaintiff's failure to allege a stand-alone indemnity claim. *Id.* at 567–68. In reaching its ruling, the court also relied on New York precedent involving the implied right of indemnity, which requires allegations that the defendant owes a duty of care to a third party rather than to the plaintiff itself. *Id.* at 568 (citing *City of New York v. Lead Indus. Ass'n, Inc.,* 644 N.Y.S.2d 919, 923 (N.Y. App. Div. 1996); *People's Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346 (2d Cir. 1986)).

*Lehman XS Trust* also involved the refusal of the defendant to repurchase the allegedly defective loans, and the court relied on similar authority in the context of implied or equitable indemnity. *Lehman XS Trust*, 2017 WL 1293773, at *9. Defendants also cite *L.E. Talcott & Sons, Inc. v. Aurora Corp.*, 176 F. Supp. 783, 786 (D. Del. 1959), but the court there found that the complaint lacked information regarding the terms of any agreement to indemnify, among other things.

Here, however, Plaintiffs expressly assert a stand-alone cause of action for *contractual* indemnity that does not allege a refusal to indemnify or breach of the indemnification provision. Unlike *Lehman Brothers*, the pleadings here reference Plaintiffs' liabilities to third parties, (*see, e.g., Acad. Mortg.*, 13-cv-3451, Compl. [Doc. No. 1] ¶¶ 36-61), and the payments made by Plaintiffs pursuant to the Settlements. (*Id.* ¶¶ 56-61). And unlike *L.E. Talcott*, the pleadings contain sufficient information regarding the Client Guide's indemnity provision. (*Id.* ¶¶ 27-29.)

Defendants do not identify any controlling Minnesota precedent that dictates a different outcome. Rather, pursuant to *Metropolitan Property*, 538 N.W.2d at 695, the Court finds that the accrual date for indemnification claims based on loans sold to RFC prior to May 14, 2006 is not the date of sale, but rather, the date on which RFC's liability became finally fixed and ascertained. S*ee Discovery Grp., LLC v. Chapel Dev., LLC*, 574 F.3d 986, 990 (8th Cir. 2009) (finding, under Missouri law, indemnity claim timely although contract claim was untimely); *U.S. Cold Storage v. Matson Navigation Co.*, 162 Cal App. 3d 1228, 1234 (Cal. Ct. App. 1984) (holding that indemnity claim was not time-barred, even though statute of limitations had extinguished underlying cause of action). Plaintiffs state their liability became fixed in December 2013 when the Settlements were approved by the Bankruptcy Court. (Scheck Decl., Ex. 32 (Bankr. Confirm. Order ¶ 7).) Accordingly, the statute of limitations for loans sold to RFC before May 14, 2006 accrued as of December 2013 and its indemnification claims for these loans are therefore timely.

148

## 2.    Whether RFC's Expert Opinions Foreclose Relief

Defendants further seek summary judgment on the grounds that RFC's inadmissible expert opinions foreclose its claims.  As explained in the Court's forthcoming opinion on the parties' cross motions to exclude expert opinions, this Court has not wholly excluded Plaintiffs' expert opinions such that Plaintiffs' claims entirely fail.  Accordingly, Defendants' motion for summary judgment in this regard is denied.

## 3.    Plaintiffs' Damages Models

Defendants argue that summary judgment should be granted precluding Plaintiffs from introducing expert testimony regarding each of Plaintiffs' three approaches to assessing and allocating damages on the grounds that they either advance non-viable theories of recovery or offer speculative bases for measuring damages.

A plaintiff in a breach of contract action bears the burden of proving damages to a reasonable degree of certainty.  *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001) (citing *N. Cent. Co. v. Phelps Aero, Inc*., 139 N.W.2d 258, 263 (Minn. 1965)); *see also Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc*., 265 N.W.2d 655, 663 (Minn. 1978) ("A buyer who seeks damages for breach of contract has the burden of proving the extent of his damages.").  "[T]he appropriate measure of damages for breach of contract is that amount which will place the plaintiff in the same situation as if the contract had been performed."  *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 915 (Minn. Ct. App. 1988).  In a breach of contract case, the plaintiff "is limited to damages flowing only from such breach," *Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 379 (Minn. Ct. App.

1984), and "damages which are speculative, remote, or conjectural are not recoverable." *Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 910 (8th Cir. 2015) (citing *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977)). However, "[t]he law does not require mathematical precision in proving lost profits." *Poppler v. Wright Hennepin Coop. Elec. Ass'n*, 834 N.W.2d 527, 546 (Minn. Ct. App. 2013), *aff'd sub nom. Poppler v. Wright Hennepin Coop. Elec. Ass'n*, 845 N.W.2d 168 (Minn. 2014). "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." *Id.* (citing *Leoni*, 255 N.W.2d at 826)).

In its first model for measuring and allocating damages, RFC offers a "Breaching Loss Approach" that attempts to quantify the economic harm to the RMBS Trusts caused by loans sold to RFC by each individual defendant. (Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶¶ 69-78).) In its second model for measuring damages, RFC offers an "Allocated Breaching Loss Approach" that attempts to assess and allocate damages by measuring each defendant's share of the liabilities RFC incurred in the Settlements rather than the economic harm caused by breaching mortgages. (*Id.* ¶¶ 79-86.) In the third model for measuring damages, RFC offers an "Allocated Loss Approach" that again measures damages in relation to the liabilities RFC incurred in the Settlements, but this time assesses damages based on each Defendant's share of total losses on all at-issue loans,[52]

---

[52] At-issue loans are loans sold to RFC by Defendants or non-defendants that realized actual losses or expected losses, and underlie the claims against RFC by investors or insurers in the bankruptcy settlement. (Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶ 49).)

not just breaching loans.  (*Id.* ¶ 3.)  Defendants contend that each approach fails to supply a legally supportable or non-speculative basis to assess and allocate damages among the parties, and therefore argue the Court should enter summary judgment.

### a.     Breaching Loss Approach

As previously stated, the Breaching Loss Approach measures damages based on the economic losses incurred from breaching loans that Defendants sold to RFC that were later securitized into the RMBS Trusts.  (*See* Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶¶ 69-78).)  To do so, the Breaching Loss Approach calculates the total losses from a defendant's at-issue loans based on monthly loan-level data.  (*Id.* ¶ 50.)  The model then multiplies the total losses by a defendant's Trust Breach Rate, which is the rate at which the loans a Defendant sold to RFC are estimated to have breached the representations and warranties in both the Client Guide and Trust Agreements based on a sampling protocol.  (*Id.* ¶ 72.)  The resulting number, *i.e.* the Trust Breaching Loss, is the total measure of economic loss attributable to a particular defendant.

### i.     Whether RFC May Recover Repurchase Damages Under Section A210

Defendants argue that the Breaching Loss Approach advances a non-viable theory of recovery because RFC may not recover damages for loan-level losses it did not actually incur.  (Defs.' Mem. at 12–24.)  More specifically, Defendants contend that the Breaching Loss Approach seeks to improperly recover the entirety of "repurchase damages" as

---

Expected losses are losses anticipated from loans that were (1) 90 days delinquent, in foreclosure, or real-estate owned as of May 2013 or (2) active but had incurred at least $500 of modification losses as of this date.  (*Id.*)

provided by Section A210 of the Client Guide. (*Id.*) That provision enables RFC to demand that an originating bank repurchase a mortgage it sold to RFC whenever RFC determines the originating bank breached the representations and warranties it made with respect to that particular mortgage. Again, in relevant part, Section A210(A) provides that:

> If []RFC determines that an Event of Default has occurred with respect to a specific Loan, the Client agrees to repurchase the Loan and its servicing (if the Loan was sold servicing released) within 30 days of receiving a repurchase letter or other written notification from []RFC.

> If the Client discovers an Event of Default, it should give []RFC prompt written notice. . . If []RFC decides to require repurchase, the Client shall repurchase the loan . . . within 30 days after []RFC's decision is communicated to the Client in writing.

> . . . []RFC is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase. However, any delay in making this demand does not constitute a waiver by []RFC of any of its right or remedies . . .

> Where []RFC determines that repurchase of a Loan . . . is not appropriate, the Client shall pay []RFC all losses, costs and expenses incurred . . . as a result of an Event of Default.

(Client Guide § A210(A).)

Section A210(B) of the Client Guide then sets the repurchase price as equal to the sum of the unpaid principal, unpaid interest, and related expenses for a particular loan while subtracting any proceeds realized by the liquidation of that loan. (*Id.* § A210(B).) In other words, the repurchase remedy, like the Breaching Loss Approach, calculates damages based on the deficient performance of individual loans.

Here, Defendants argue that RFC cannot recover repurchase damages under the Client Guide because RFC never suffered the losses that the repurchase remedy is intended

to address—outside investors did.[53]  (Defs.' Mem. at 12–15.)  RFC sold the loans it purchased from originating banks at a profit to third-party trusts, and those third-party trusts ultimately experienced whatever losses may be attributed to the breaching loans.  Thus, Defendants contend that there is no basis in the Client Guide or contract law to award RFC any damages it did not incur in the Settlements—that is, the entirety of repurchase damages—and therefore, this Court should rule, as a matter of law, that the entirety of these damages are not recoverable.

As support, Defendants point to a recent decision in a similar RMBS action, *Quicken Loans,* where the state court granted partial summary judgment to originating banks and dismissed RFC's claims for repurchase damages under the Client Guide.  2017 WL 5571222, at *8.  There, the court analyzed contractual language that mirrors the language at issue in the instant case, and concluded the repurchase remedy is unavailable where the subject loan is no longer in the possession of the buyer because "repurchase" requires "buying something back or again."  *Id.* at *5 (citing *Repurchase, Black's Law Dictionary* (10th ed. 2014)).

The court additionally noted that, in circumstances where a loan was sold prior to RFC exercising the repurchase remedy, the contract provides an alternative remedy to repurchase.  Specifically, the contract provides that where "repurchase of a Loan . . . is

---

[53] This issue—whether RFC can recover losses it did not incur in the Settlements—was raised affirmatively by Plaintiffs in their Motion for Summary Judgment.  (*See supra*, Section III.F.2.)  Because the viability of the Breaching Loss Approach depends upon the recoverability of these losses, that issue is addressed, for purposes of both motions, in this section of the Order.

not appropriate, the Client shall pay []RFC all losses, costs and expenses *incurred by RFC . . . as a result of an* Event of Default." *Id.* (emphasis in original). Based on that language, the court concluded that RFC's recovery for an originating bank's breaches on loans it later sold into RMBS trusts is limited to the actual losses it incurred and therefore the repurchase formula, which calculates damages based on the performance of the loan, "has no bearing on the assessment of damages that RFC may have suffered." *Id.* at *5, 8.

Here, Defendants argue RFC is barred from recovering Breaching Loss damages under Section A210's repurchase price formula in light of *Quicken Loans*' preclusive effect, or alternatively that RFC should be barred from doing so under the same reasoning applied in *Quicken Loans*. (Defs.' Mem. at 16–17.) As was the case in *Quicken Loans,* RFC does not own the loans upon which its claims are premised. Consequently, Defendants assert that RFC is unable to demand repurchase and Section A210(A) only allows RFC to recover the losses, costs, and expenses it actually incurred as a result of the allegedly breaching mortgages. The Breaching Loss Approach is insufficient to that task, according to Defendants, because it measures damages based on loan-level losses incurred by the RMBS Trusts, not by RFC. Therefore, Defendants assert that the Court should grant summary judgment as to loan-level damages measured by the Breaching Loss Approach.

RFC counters that Section A210 allows it to recover under the repurchase remedy, regardless of whether RFC maintains possession of the loans or experienced actual losses on them. (Pls.' Mem. at 18–25.) According to RFC, the plain terms of the contract

demonstrate that the repurchase remedy in Section A210 is a liquidated damages provision that enables it to recover a fixed formulaic amount from an originating bank. Thus, RFC asserts the word "repurchase" is actually a term of art that describes the manner in which liquidated damages are assessed under the contract, not an actual requirement that originating banks repurchase a loan if the remedy is exercised. As support, RFC points to a number of different portions of Section A210.

First, RFC notes that Section A210(A) provides that if RFC determines that an Event of Default has occurred, "the Client agrees to repurchase the loan." (Client Guide § A210.) Section A210 also provides that "[i]f the Client discovers an Event of Default," it must notify RFC of the breach and "[i]f []RFC decides to require repurchase, the Client shall repurchase the Loan." (*Id.*) Under either scenario, the Client's obligation to repurchase is not contingent upon whether RFC incurred a loss or even owns the loan. Rather, the Client's obligation to "repurchase" is triggered solely by the determination that an Event of Default has occurred, for instance, by an originating bank's material breach of a representation or warranty contained in the Client Guide. (*Id.* § A208.)

Second, RFC highlights that Section A210(A) supplies it with the alternative option to demand payment for actual losses it incurred from a breaching mortgage in lieu of the fixed formula repurchase amount, which indicates that actual losses are relevant only when the alternative option is exercised by RFC. (Pls.' Mem. at 21.) Specifically, Section A210(A) provides that "[w]here []RFC determines that repurchase of a Loan . . . is not appropriate, the Client shall pay []RFC all losses, costs and expenses incurred by

[]RFC . . . as a result of an Event of Default." (Client Guide § A210.) Thus, under the default scenario, an originating bank owes the repurchase amount for an Event of Default under the formula set out in Section A210(B). If RFC determines that recovering actual losses from a breaching mortgage is the better option, it may elect to recover them instead of a repurchase formula payment by notifying the originating bank. As such, RFC asserts the question of actual losses, *i.e.* losses, costs and expenses incurred as a result of an event of default, is irrelevant to the standard repurchase remedy and only comes into play when RFC exercises its alternative option to recover. Therefore, RFC argues it need not demonstrate actual losses on a loan to recover under the standard repurchase remedy.

Third, RFC argues that its own obligations under Section A210 illustrate that the availability of the repurchase remedy is not contingent upon it possessing the breaching loan. (Pls.' Mem. at 21–22.) Section A210(A) provides that:

> Upon the Client's satisfaction of its repurchase obligation, []RFC will endorse the Note evidencing the Loan in blank and will deliver it and other Loan Documents to the Client. If []RFC acquired title to any of the real property securing the Loan pursuant to a foreclosure sale and has not disposed of such property, it will transfer such property to the Client on a "quit claim" basis or . . . a "warranty deed" basis. However, if []RFC has disposed of the real property securing the Loan, the Loan Documents will not be returned to the Client unless requested.

(Client Guide § A210.) In other words, Plaintiffs contend, Section A210(A) provides that after RFC receives a repurchase payment from an originating bank, RFC is required to either sign over the loan to the originating bank or transfer title to it for property that collateralized the loan. If RFC has neither, it is required to do nothing unless the originating bank requests the loan documents, at which point RFC is required to provide them with the

loan documents and nothing more. Hence, because Section A210 specifically envisions repurchase payments being made if a loan has been liquidated and a subject property has been foreclosed upon, RFC argues the Client Guide's own terms indicate that RFC need not possess a loan in order for the repurchase remedy to be available to it.

Fourth, RFC contends that the formula for calculating the repurchase price explicitly provides that the repurchase remedy is available even if the loan no longer exists. (Pls.' Mem. at 22–23.) Section A210(B) provides that "in the event the Client is obligated to repurchase a Loan, the Client must pay to []RFC a repurchase price equal to" the borrower's outstanding principal and interest plus certain expenses incurred by RFC or its affiliates in connection with the loan. (Client Guide § A210(B).) From that sum, the formula then subtracts any liquidation proceeds realized by the "owner of the loan" to arrive at the repurchase price. (*Id.*)

RFC argues the repurchase price formula is illuminating for two reasons. First, RFC notes that the repurchase price is based on the loan's losses, not RFC's losses, which demonstrates that the repurchase remedy is available regardless of whether RFC actually experienced losses on the loan. Second, RFC highlights that the repurchase formula specifically envisions repurchase payments will be made after a loan is liquidated, either by RFC itself or by a third-party, because liquidation proceeds realized by the "owner of the loan" are subtracted from the repurchase price. Therefore, RFC argues it need not possess a loan in order to exercise its repurchase remedy related to it.

ii.     **Whether RFC May Recover Repurchase Damages Under the Indemnification Provisions in Section A212**

Defendants argue that RFC may not recover Breaching Loss damages under the indemnification provisions in Section A212 for three reasons. (Defs.' Mem. at 17–19.) First, Defendants argue that RFC cannot seek indemnification for losses it never incurred. Defendants note that Section A212 provides that "[t]he Client shall indemnify []RFC from all losses . . . resulting from any Event of Default." (Client Guide § A212.) However, Defendants argue that this provision can only relate to losses RFC actually incurred, because to indemnify means to "reimburse" or "hold harmless." (Defs.' Mem. at 17) (quoting *Indemnify, Black's Law Dictionary* (10th ed. 2014)); *see also, Feed Mgmt.,* 823 F.3d 488 (holding that an indemnitor was not required to pay an indemnitee's claim for attorney's fees paid by a third party because those fees were not damages that the indemnitee suffered).

Here, Defendants argue that RFC did not suffer loan-level losses on the allegedly breaching mortgages that Defendants securitized because those losses were borne by the RMBS trust investors. Consequently, Defendants assert that their indemnification responsibilities do not extend to loan-level losses incurred by the third-party RMBS Trusts because, under the basic principles of indemnity law, they are only required to indemnify RFC for losses it incurred as a result of alleged breaches in the Client Guide. Therefore, Defendants argue that the Breaching Loss Approach, which measures loan level losses in

the RMBS Trusts, cannot be used to measure the extent to which Defendants are responsible for indemnifying RFC for its own losses.

Next, Defendants argue that RFC may not rely on the Breaching Loss Approach to measure the extent to which Defendants must indemnify RFC for liabilities it incurred when settling the Trusts' claims in bankruptcy, because doing so would result in a windfall to RFC. (Defs.' Mem. at 20–22.) Defendants note that RFC settled the Trusts' claims for unsecured Allowed Claims in the bankruptcy estate that were a fraction of the losses on allegedly breaching loans. (*See* Smallwood Decl., Ex. 30 (Corr. Snow Rpt. ¶ 80).)

In particular, Defendants note that RFC's own expert concluded that RFC faced claims by trusts for $23.7 billion in breaching losses, and that RFC settled those claims for $6.749 billion, *i.e.* roughly 29 cents on the dollar. (*See id.* ¶ 91.) Nevertheless, Defendants argue that RFC would use the Breaching Loss Approach to measure each Defendant's share of the indemnification liability as equal to 100% of the losses on the Defendant's allegedly breaching loans, despite the steep discount agreed to in the Settlements. Therefore, Defendants assert that applying the Breaching Loss Approach to measure indemnification damages for liabilities incurred in bankruptcy would produce a manifestly unfair result in violation of basic contract law principles.

Defendants additionally argue the Breaching Loss Approach is flawed with respect to measuring indemnification liability for a different reason—it assigns individual Defendants with more than their proportional share of RFC's alleged liabilities. (Defs.' Mem. at 22.) The Client Guide requires a Client to indemnify RFC for "liabilities . . .

159

resulting from any Event of Default." (Client Guide § A212.) Furthermore the Client Guide specifies that an Event of Default occurs where "[t]he *Client breaches* any of the representation, warranties, or covenants set forth in this Client Guide." (*Id.* § A208(3).) Thus, under the plain terms of the Client Guide, Defendants assert that a Client may only be held accountable for the liabilities resulting from its own breaches, not the breaches of other originating banks selling loans to RFC. Yet Defendants contend that RFC aims to do just that by saddling Defendants with liability owed by other originating banks that RFC never sued. As support, Defendants point to Dr. Snow's testimony in which he estimated that Defendants would have accounted for about 20 percent of the breaching loss damages across all originators. (Smallwood Decl., Ex. 27 (Snow Dep. at 114).) However, under the Breaching Loss Approach, Dr. Snow estimates that Defendants would bear 65% of RFC's purported liabilities to trusts, or $4.382 billion. (*Id.* at 122-123.) In other words, Defendants contend they would be required under the Breaching Loss Approach to pay for a large portion of RFC's liabilities attributable to non-defendants.

Finally, Defendants argue that the Breaching Loss Approach fails to demonstrate that loan-level losses were proximately caused by Defendants' alleged breaches of representations. (Defs.' Mem. 23–24.) Here, Defendants contend that no facts have been submitted to show that loan-level losses were more probably caused by material breaches in the Client Guide rather than other factors such as poor servicing practices, after-the-fact changes in the economic circumstances of borrowers, or macroeconomic factors attendant to the housing market collapse. Therefore, Defendants assert summary judgment is

appropriate to preclude RFC from offering the Breaching Loss Approach on the issue of indemnification, because the Breaching Loss Approach fails to supply a basis for concluding that the losses were proximately caused by the breaches.

RFC argues that Defendants err in arguing that Section A212 prevents RFC from seeking indemnification for losses it never incurred. (Pls.' Opp'n at 7.) RFC notes that Section A212's first sentence requires Defendants to "indemnify all losses" resulting from any breach, with no limitation that indemnifiable losses are limited to those actually borne by RFC. RFC concedes that indemnity language later in Section A212 explicitly applies losses "incurred by . . . RFC," but argues that language does not negate the overall principle stated at the outset of the section. At most, RFC contends that the conflicting language creates an ambiguity that precludes summary judgment.

RFC additionally argues that Defendants err in arguing that breaching losses are unavailable as an indemnity remedy because they may exceed the liability that RFC incurred to the trusts, because disputed issues of fact concerning the amount of RFC's losses do not supply a basis for summary judgment. For instance, RFC argues that Defendants do not account for the fact that RFC is also entitled to indemnification for the Monoline Settlements and fees and expenses before, during, and after the bankruptcy case in addition to the payments made to the Trusts. Altogether, RFC contends that amount might exceed loan-level losses. Furthermore, RFC argues that no Defendant has demonstrated that RFC incurred liability that was less than loan losses on the specific at-issue loans. And although RFC concedes that RFC settled claims in its bankruptcy at a discount, RFC contends that

fact does not establish that RFC settled claims at a discount with respect to any specific loan.

### iii. Analysis

The material flaw in the Breaching Loss Approach is that it results in a windfall for RFC because RFC's damages ultimately sound in indemnity—they are fixed by the Allowed Claims—for the losses and liabilities RFC actually incurred in the Settlements. When a party seeks "compensat[ion] for loss or damage sustained," it seeks indemnification. *State Farm Mut. Auto. Ins. Co. v. Lennartson*, 872 N.W.2d 524, 530 (Minn. 2015). The Breaching Loss Approach employs a model that assesses each Defendant's share of the total economic losses experienced by the loans it sold into the RMBS Trusts. To do so, it measures loan-level losses based on the performance of at-issue loans. Such a measurement does not take into account the discount that RFC bargained for in the Settlements.

Although perhaps academic, given the Court's ruling limiting RFC's damages to its losses and liabilities incurred in the Settlements, the Court does nonetheless respectfully take exception with the holding in *Quicken Loans*, 2017 WL 5571222. The Court finds that, as a matter of contract interpretation, the repurchase remedy in Section A210 remains available to RFC, regardless of whether it retained possession of a loan or experienced an actual loss on a loan.[54] The language of Section A210 and related provisions in the

---

[54] Defendants contend that RFC is collaterally estopped from seeking repurchase damages because of *Quicken Loans*' preclusive effect. 2017 WL 5571222. Under Minnesota law, collateral estoppel applies only when there was a final judgment on the merits in the prior adjudication, *Lennartson*, 872 N.W.2d at 534, and the Minnesota

162

Client Guide provide that RFC is able to exercise the repurchase remedy whenever it determines an Event of Default has occurred, even if the loan for which the Event of Default relates is no longer in its possession. All that RFC is required to do to exercise the repurchase remedy is notify a selling originating bank of an Event of Default, at which point the selling originating bank has the option to appeal that determination. Furthermore, Section A210 does not impose a duty upon to RFC to demonstrate that it experienced losses on a breaching loan before it can demand repurchase. To the contrary, the contract language enables RFC to demand repurchase of a loan before it or a third party trust experiences any losses, and in so doing head off any potential consequences for having purchased a loan that does not meet the standards set forth in the Client Guide.

Here, however, those potential consequences are realized. RFC's exposure is fixed and hence its damages are likewise limited to the losses and liabilities it actually incurred.

### b.    Allocated Breaching Loss Approach

In its second model for measuring damages, RFC offers an "Allocated Breaching Loss Approach" that measures damages in relation to the liabilities RFC incurred in the Settlements rather than the economic harm caused by breaching mortgages. (Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶¶ 79-86).) To do so, RFC attempts to divide and allocate

---

Supreme Court has held that partial summary judgment does not constitute a final judgment. *Gen. Ins. Co. of Am. v. Lebowsky*, 252 N.W.2d 252, 255 (Minn. 1977). Therefore, because the court in *Quicken Loans* only entered partial summary judgment as to the issue of repurchase damages and not a final judgment on the merits, there is no preclusive effect.

RFC's bankruptcy liabilities associated with the Trust Claims and Monoline Claims among the loans that Defendants and non-defendants sold to RFC.[55]  (*Id.* ¶ 79.)   RFC also introduces a "Settlement Factor" to reflect the discount from the bankruptcy settlement relative to the overall value of claims by investors and insurers.  (*Id.* ¶¶ 80-83.) RFC then multiplies the Settlement Factor by the defendant's Trust Breaching Losses to determine the Defendant's share of the allowed claims in favor of investors.  RFC then repeats this process for the Monoline Breaching Losses to determine the Defendant's share of the allowed claims in favor of each insurer.  The resulting number is a Defendant's purported measure of damages.

### i.     Whether the Allocated Breaching Loss Approach Offers Non-Speculative Bases to Allocate the Trust Settlement

#### (1)     Allocation under *UnitedHealth*

Defendants argue that the Allocated Breaching Loss Approach offers a speculative basis for measuring damages under *UnitedHealth Group Inc., v. Executive Risk Specialty Insurance Co.,* 870 F.3d 856 (8th Cir. 2017).  Thus, they argue that the Court should enter summary judgment excluding this damages model as a matter of law.

In *UnitedHealth*, the court considered a settlement that UnitedHealth Group ("UHG") had entered into to resolve claims from two previous lawsuits under a single agreement.  *Id.* at 859.  One of the settled lawsuits involved antitrust claims that were

---

[55] A "Trust Claim" is a claim awarded to an RMBS trust investor in the Settlements for alleged breaches made by RFC with respect to the representations and warranties in the Trust Agreement.  A "Monoline Claim" is a claim awarded to a monoline insurer in the Settlements for alleged breaches made by RFC with respect to the representations and warranties in insurance contracts.

potentially covered by UHG's liability insurance policy. *Id.* The other lawsuit asserted ERISA claims that were not covered. *Id.* When UHG sought to collect on its liability insurance policy, its insurers refused to pay and UHG then sued them. *Id.* at 860.

The District Court granted summary judgment in the insurers' favor and the Eighth Circuit affirmed, finding, *inter alia*, that UHG did not meet its burden to show how the settlement was allocated between the claims potentially covered by its insurance policy and those that were not. *Id.* at 863, 865–66. Thus, the court concluded, UHG was not able to prove its claim under the insurance policy because it was not able to identify a non-speculative basis upon which to allocate which portion of the settlement applied to the potentially insurable antitrust claims. *Id.* at 865–66. The court explained that the "allocation inquiry examines how a reasonable party in [the plaintiff's] position would have valued the covered and non-covered claims . . . at the time of the settlement" and that in "complex lawsuits involving different legal claims and theories" a plaintiff must provide evidence about the relative value of claims in order to properly allocate them. *Id.* at 863–64. The court additionally noted that an insured "need not prove allocation with precision, but it must present a non-speculative basis to allocate a settlement between covered and non-covered claims." *Id.* at 863.

Here, Defendants argue that *UnitedHealth* is binding because RFC, like UHG, seeks indemnity for a settlement covering both indemnifiable and non-indemnifiable claims. (Defs.' Mem. at 25–30.) Similarly, in the instant action, Defendants argue that RFC may seek indemnity only for the portion of the bankruptcy settlement attributable to

RFC's breaches of representations to the RMBS Trusts that stem from its reliance on Defendants' allegedly faulty Client Guide representations. They argue that RFC may not seek indemnity for settled claims for which Defendants bear no responsibility. Those non-indemnifiable claims, according to Defendants, include breaches by non-defendant originating banks, breaches that RFC is solely responsible for, fraud and negligence claims against RFC, defective servicing claims against RFC, and claims based on RFC's sale of loans to Non-Defendant Sponsored ("NDS") Trusts.[56] Thus, Defendants argue that RFC's attempts to allocate the settlement liability among parties to the bankruptcy case must conform to the standard announced in *UnitedHealth* and provide a non-speculative way to allocate indemnification liability based on the relative strength and value of the claims at issue in the settlement.

Plaintiffs counter that *UnitedHealth* arises under insurance law and that Defendants have incorrectly construed the case as having imposed enhanced requirements under Minnesota law for proving contract damages. (Pls.' Opp'n at 11–16.) "Under Minnesota law, damages for breach of contract must be proved to a reasonable certainty, and a party cannot recover speculative, remote, or conjectural damages." *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1016 (8th Cir. 2001). However, "'[o]nce the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to

---

[56] NDS Trusts are RMBS Trusts sponsored by third parties that asserted claims in the bankruptcy against RFC premised on the allegedly breaching loans that RFC sold to those trusts. (Smallwood Decl., Ex. 30 (Corr. Snow Report ¶¶ 17-22).)

approximate the amount.'" *Poppler,* 834 N.W.2d at 546 (quoting *Leoni*, 255 N.W.2d at 826); *see also Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 653 (Minn. 1986).  Thus, RFC asserts its only burden is to provide a reasonable basis to approximate and allocate damages and argues that, unlike the parties in *UnitedHealth*, it has done so via the Allocated Breaching Loss Approach and related expert testimony.  RFC further contends that mathematical precision is not required by Minnesota law.

To the extent that *UnitedHealth* does impose additional requirements for allocating responsibility for sums awarded in a settlement, Plaintiffs further argue that those requirements do not apply here.  (Pls.' Opp'n at 15–16.)  Unlike *UnitedHealth,* Plaintiffs assert that their allocation of damages is supported by substantial fact and expert evidence to allow the factfinder to make a non-speculative allocation.  (*Id.* at 15.) Furthermore, Plaintiffs point out that *UnitedHealth* was not decided in the context of allocating damages among culpable defendants, as is the case here.  Instead, that case involved allocating the portion of a settlement potentially covered by an insurer who was innocent of the wrongdoing that gave rise to the liability. Furthermore, the court's reasoning in *UnitedHealth* turned on insurance law as opposed to the law of contractual indemnity.  Given these significant differences, Plaintiffs argue *UnitedHealth* does not support the exclusion of Dr. Snow's opinion.

### (2) Defendants' Criticisms of the Methodology of the Allocated Breaching Loss Approach

Defendants argue that RFC's Allocated Breaching Loss Approach fails for six reasons. In essence, Defendants argue that each of these alleged shortcomings fail in one way or another to measure the relative strength or value of the claims that were settled in bankruptcy, which makes it impossible to assess their indemnification damages on a non-speculative basis. RFC responds to each of Defendants' six arguments in turn, and argues that, at most, Defendants raise triable issues of fact not appropriate for summary judgment.

First, Defendants assert that the Allocated Breaching Loss Approach is speculative because it does not value the indemnifiable claims and should therefore be excluded. (Defs.' Mem. at 30–32.) Instead, Defendants assert that RFC expert Dr. Snow simply deducts values attributed to certain non-indemnifiable claims from the overall settlement amount to arrive at "Net Trust Allowed Claims." Using that figure, he then parses out each Defendant's share of damages based on the remaining indemnifiable claims.

RFC counters that neither Minnesota law nor *UnitedHealth* require such mathematical precision because proving damages only requires "'a reasonable basis upon which to approximate the amount [of damages].'" *Poppler*, 834 N.W.2d at 546 (quoting *Leoni*, 255 N.W.2d at 826). Furthermore, RFC suggests there is no reasonable way to isolate and value claims based on loan-by-loan distinctions. *See id.* ("Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery").

Second, Defendants assert that the Allocated Breaching Loss Approach is speculative because it fails to analyze the value of claims based on breaches of representations for which RFC is solely responsible. (Defs.' Mem. at 32–36.) These include circumstances where, Defendants argue, RFC agreed to purchase loans pursuant to an originator's own underwriting guidelines, or made exceptions to purchase loans that did not comply with the Client Guide. (*Id.*) These also include circumstances where changes in a borrower's circumstances occurred between the sale of the mortgage and the closing of the securitization, whereby representations made in the Client Guide were true at the time originators sold the loans, but were no longer true by the time that RFC entered into the Trust Agreements. (*See* Smallwood Decl., Ex. 34 (Schwarcz Rpt. ¶ 124).)

But RFC responds that it has presented strong evidence that defects in the loans Defendants sold to them were the primary driver of the settlements. (Pls.' Opp'n at 21–24, 34–40.) RFC argues that Defendants, on the other hand, have presented no evidence to show that the Settlements were based "on breaches for which RFC is solely responsible." Instead, RFC contends that Defendants merely posit that RFC's own actions could have incurred liability to RMBS investors, and therefore the Settlements must have accounted for that possibility. Moreover, Plaintiffs assert, the model targets its assessment of damages toward only those loans that it estimates contained material breaches by the Defendants.

Third, Defendants argue that the Allocated Breaching Loss Approach is speculative because it fails to analyze the value of the Trusts' fraud claims. (Defs.' Mem.

at 36–39.)  Even though the fraud claims alleged against RFC were explicitly settled for value in the bankruptcy, Defendants note that RFC expert Dr. Snow treated those claims as if they had effectively no value.  (Smallwood Decl., Ex. 27 (Snow Dep. at 212).) Without assessing the weight assigned to those fraud claims, Defendants contend it is impossible to know what portion of the settlement can be attributed to their own alleged wrongdoing.

RFC rejoins that Dr. Snow did properly consider the value of the fraud claims when crafting the Allocated Breaching Loss Approach and, based on an RMBS litigation expert's conclusions, determined the fraud claims had no particular value.  (Pls.' Mem. at 21–23; Smallwood Decl., Ex. 31 (Hawthorne Dep. at 158).)  At oral argument, RFC further contended that assigning little value to the fraud claims made good sense given that the fraud claims overlapped the breach of contract claims, yet are significantly more difficult to prove—a plaintiff must show scienter and justifiable reliance, which are not elements of a breach of contract claim.  (June 19 Hr'g Tr. at 123.)

Fourth, Defendants argue that RFC expert Dr. Snow improperly relies on post-settlement evidence in order to value servicing claims, and his opinion is therefore unreliable.  (Defs.' Mem. at 39–42.)  *UnitedHealth* provides that, when allocating a settlement, the parties must rely on what the parties knew at the time of the settlement. 870 F.3d at 863.  Yet here, Defendants argue, Dr. Snow deducts $73 million from the aggregate amount in allowed claims based on two schedules attached to the bankruptcy

court's confirmation order which was entered after the parties had agreed to settle. (Smallwood Decl., Ex. 30 (Corr. Snow Rpt. ¶¶ 20-21).)

RFC counters that the Settlements did establish the value of the servicing claims, and thus no post-settlement allocation is necessary. (Pls.' Opp'n at 21–24; Scheck Decl., Ex. 28 (Bankr. Findings of Fact ¶ 119).) Furthermore, *UnitedHealth* provides guidance only when "the settlement did not allocate the amount paid among the various claims." 870 F.3d at 862. Here, the settlement did definitively allocate the amount paid for servicing claims and thus does not raise the same doubts or uncertainties that were present in *UnitedHealth*.

Fifth, Defendants argue the Allocated Breaching Loss Approach is speculative because it offers no valid basis for valuing claims by NDS Trusts. (Defs.' Mem. at 42–43.) In particular, Defendants note that Dr. Snow allocates only $269 million to the NDS Trust claims out of the total $7.091 billion in aggregate allowed claims. (Smallwood Decl., Ex. 30 (Corr. Snow Rpt. ¶ 21).) To reach that figure, Dr. Snow multiplies the "Trust Allowed Claim by the ratio of Total Losses in the 33 NDS Trusts relative to the combined Total Losses of the RFC and NDS Trusts." (*Id.*) According to Defendants, such an approach neither accounts for the full value of the NDS claims nor the likelihood they would prevail in violation of the *UnitedHealth* standard. Furthermore, Defendants assert that Dr. Snow's method for deducting the NDS Trust claims is arbitrary, because he did not sample the breach rates for NDS Trusts. Instead, he assumed without basis that the NDS Trusts have the same global breach rate as RFC-sponsored trusts.

RFC agrees that Dr. Snow relied on the global breach rate to assess the value of the NDS Trusts, but argues that his methodological approach was entirely appropriate because, again, mathematical precision is not required.  (Pls.' Opp'n at 27–28); *see also Poppler*, 834 N.W.2d at 546.  Furthermore, RFC contends that utilizing the global breach rate was a reasonable basis upon which to approximate the rate at which breaches likely occurred in NDS Trusts based on the similar circumstances of the indemnifiable trusts.

Sixth, Defendants contend that the Allocated Breaching Loss Approach is speculative because it does not value the relative strength of any of the claims, *i.e.*, the relative likelihood that claims would prevail at trial.  (Defs.' Mem. at 43–46.)  In particular, Defendants note the Allocated Breaching Loss Approach deducts non-indemnifiable claims from the total amount of allowed claims in the bankruptcy settlement to arrive at the Net Trust Allowed Claim of $6.748 billion.  (*See* Smallwood Decl., Ex. 30 (Corr. Snow Rpt. ¶ 79).)  The Allocated Breaching Loss Approach then calculates a settlement factor to reflect the discount at which RFC settled claims relative to its potential exposure.  (*Id.* ¶¶ 93-94.)  Then, it multiplies the settlement factor by the losses on each Defendant's allegedly breaching loans.  (*Id.* ¶ 95.)  At no point in that process, Defendants argue, does RFC take into account the strength of one Defendant's claims relative to another.  Thus, Defendants contend the Allocated Breaching Loss Approach is speculative as a matter of law under *UnitedHealth*, because it provides no way of assessing the relative strength of the claims in allocating damages related to them.

RFC again avers that Defendants seek to impose requirements for proving contractual damages beyond those imposed by Minnesota law. (Pls.' Opp'n at 28–30.) Assessing the relative strength of claims among individual Defendants would require RFC to conduct a loan-by-loan and trust-by-trust analysis that, according to RFC, is simply not necessary to supply a "reasonable basis" to "approximate" the amount of damages. *Poppler*, 834 N.W.2d at 546. Furthermore, RFC contends that Defendants merely raise questions of fact by claiming that the Allocated Loss Approaches paid insufficient attention to the differences in the strength of the individual claims for the Trusts and Monolines. On the one side, Defendants' expert asserts that there are material differences in the strength of certain representations that RFC made to the RMBS Trusts or Monolines. (Smallwood Decl., Ex. 34 (Schwarcz Rpt. ¶¶ 63-65).) On the other side, RFC's experts have opposing views. (Scheck Decl., Ex. 61 (Butler Rpt. at 131-36); *id.*, Ex. 19 (Corr. Hawthorne Rpt. ¶¶ 265-71*); id.*, Ex. 62 (Payne Rpt. at 108-11).) Therefore, RFC asserts that summary judgment may not be granted with respect to the Allocated Breaching Loss Approach on the basis that it fails to assess the relative strength of claims because genuine issues of material fact remain in dispute.

### ii.    Analysis

*UnitedHealth* does not impose as rigid a standard for assessing contract damages or mandate that a specific formula be applied to allocate them among multiple parties, as Defendants argue. Rather, *UnitedHealth* stands for the proposition that an "insured . . . must present a non-speculative basis to allocate a settlement between covered and non-

173

covered claims," but "need not prove allocation with precision."  870 F.3d at 863.  Thus, *UnitedHealth's* holding regarding an insured's responsibility to sort covered claims from non-covered claims in a multi-party settlement is entirely consistent with the long standing requirements of Minnesota law of contract damages.  To prove damages, a plaintiff must offer a reasonably certain, though not necessarily mathematically precise, basis to demonstrate who owes what for its claims. *See Eklund*, 351 N.W.2d at 379; *Poppler*, 834 N.W.2d at 546-47; *Hydra-Mac*, 450 N.W.2d at 921; *Leoni*, 255 N.W.2d at 826.  With that standard in mind, the court in *UnitedHealth* then considered the factual circumstances of the settlement and determined that in order for UHG to provide a non-speculative basis for its damages, it needed to demonstrate how the covered antitrust claims were weighted against non-covered ERISA claims.  To do so, the court determined that some assessment of the strength and value of the ERISA claims relative to the antitrust claims was necessary in order to determine the potential damages owed by the insurers.

After consideration of the arguments and careful review of the record, the Court finds the Allocated Breaching Loss Approach offers a reasonably certain basis for assessing and allocating damages that is not "speculative, remote, or conjectural." *Poppler*, 834 N.W.2d at 546 (citing *Cardinal Consulting Co. v. Circo Resorts, Inc*., 297 N.W.2d 260, 267 (Minn. 1980)).  The instant case does not present the same uncertainty with respect to the relative strength and value of indemnifiable and non-indemnifiable claims as were present in *UnitedHealth*.  First, the Settlements at issue here involved

related claims in a single action whereas *UnitedHealth* predominantly involved unrelated ERISA and antitrust claims from two separate cases from different jurisdictions. Second, the claims at issue here are premised on very similar or even identical Trust Agreement contracts and, as one would expect given that commonality, investors raised similar types of arguments against RFC. Third, RFC has offered competent expert testimony to assess the relative value of the settled claims. In particular, Donald Hawthorne, a seasoned RMBS litigator with experience settling RMBS cases, offers his opinion as to the weight a reasonable party would assign to the different categories of claims that were asserted in the bankruptcy based on his assessment of RFC's exposure to those claims and their likelihood of succeeding. (Scheck Decl., Ex. 19 (Corr. Hawthorne Rpt. ¶ 31).) His opinions were subsequently incorporated into the Allocated Breaching Loss Approach developed by Dr. Snow. Therefore, RFC provides the factfinder with a non-speculative basis to assess the value of the claims that are indemnifiable by Defendants.

To arrive at the measure of damages under the Allocated Breaching Loss Approach, Dr. Snow builds upon his Breaching Loss Approach by incorporating a Settlement Factor to account for the discount the settling parties agreed to in bankruptcy. (*Id.,* Ex. 38 (Corr. Snow Rpt. ¶ 80).) As such, the Allocated Breaching Loss Approach cures the windfall issue that was presented by the initial approach. Furthermore, the Allocated Breaching Loss Approach offers a highly sophisticated methodology to provide a basis for the factfinder to determine a Defendant's damages, if any. The model assigns damages to a Defendant based on the number of loans it sold to RFC, which is a concrete and

verifiable number. The model also assesses economic losses to at-issue mortgages based on reliable loan data. Further, the model targets its assessment of damages toward only those loans that it estimates contained breaches of the Client Guide and Trust Agreement based on a sampling protocol. Given these features, the Court finds that the Allocated Breaching Loss Approach provides a reliable, non-speculative basis for calculating damages in this case. *Staffing Specifix*, 896 N.W.2d at 125 (citing *Wild v. Rarig*, 234 N.W.2d 775, 789 (1975)) (requiring breach of contract damages to flow only from the breach). Accordingly, the Court denies Defendants' Motion for Summary Judgment and will permit the Allocated Breaching Loss Approach to be presented to the jury.[58]

### c.     Allocated Loss Approach

In its third method of measuring damages, RFC offers an "Allocated Loss Approach" which, like the Allocated Breaching Loss Approach, measures damages in relation to the liabilities RFC incurred in the bankruptcy settlement. Under this approach, however, Dr. Snow attempts to assign each Defendant a share of RFC's bankruptcy liabilities that is proportional to the Defendant's share of total losses on all At-Issue Loans, not just breaching loans. (Scheck Decl., Ex. 38 (Corr. Snow Rpt. ¶¶ 3, 113).) Further, RFC caps each Defendant's allocated liability at the amount of its Total Breaching Losses. (*Id.*) By adopting this approach, RFC asserts it is able to identify

---

[58] In their memorandum of law in support of summary judgment, Defendants challenge the specific sampling methodology that Dr. Snow employed to assess and allocate the Monoline Settlements under the Allocated Breaching Loss Approach. Those arguments are more appropriately considered in connection with Defendants' Motion to Exclude Expert Testimony and the Court will address those arguments in its Order and Opinion responding to that motion.

each originating bank's share of the liability incurred from the bankruptcy settlement, albeit from a different angle than provided by the Allocated Breaching Loss Approach.

> ### i. Whether the Allocated Loss Approach Offers Non-Speculative Bases to Allocate the Settlements

Defendants argue that the Allocated Loss Approach offers a speculative basis to measure damages because it fails to consider whether, and to what extent, a Defendant's loans breached representations and warranties contained in the Client Guide. Indemnification damages may only be appropriately attributed to breaching loans, according to Defendants, because Section A212 of the Client Guide provides that "[t]he Client shall indemnify []RFC from all losses . . . resulting from any Event of Default." (Client Guide § A212.)  The Allocated Loss Approach thus conflicts with Section A212, Defendants argue, by assigning damages based on *all loans that incurred losses*, rather than breaching loans that incurred losses.

RFC counters that the Allocated Loss Approach provides an alternative, non-speculative method for allocating damages, and thus satisfies the requirements of Minnesota law.  According to RFC, the Allocated Loss Approach's design to allocate damages *pro rata* based on the total losses experienced by the loans provides an objective, measurable standard that justifiably approximates each Defendant's share of the settlement liability. The resulting number, *i.e.* the net loss, is reliable because it correlates with a Defendant's breaches.  (*See* Smallwood Decl., Ex. 27 (Snow Dep. at 119-120, 122); Scheck Decl., Ex. 66 (Pendley, Costello, & Kelsch Rpt.); *id.*, Ex. 67 (Piskorski, Seru, & Witkin Article); *id.*, Ex. 68 (Griffin & Maturana Paper).)

As support, RFC notes that large settlements of RMBS cases have allocated claims among RMBS trusts by net losses. (*See* Scheck Decl., Ex. 71 (Countrywide Agmt. § 3(c)); *id.*, Ex. 73 (Citigroup Agmt. § 3.04); *id.*, Ex. 74 (JP Morgan Agmt. § 3.05); *id.*, Ex. 75 (Wash. Mut. Verified Pet. ¶ 67); *id.*, Ex. 76 (Wash. Mut. Allocation Order).)

Furthermore, RFC contends that, contrary to Defendants' assertions, the Allocated Loss Approach *does* account for Defendants' breaches because it caps damages at Breaching Losses. In other words, the methodology is designed such that damages attributable to a Defendant will not exceed the amount of economic losses the trusts incurred from a Defendant's breaching loans.

### ii.     Analysis

The Court grants Defendants' motion for summary judgment as to the Allocated Loss Approach. First, for the same reasons as the Court articulated with respect to the Breaching Loss Approach, the Allocated Loss Approach could allow RFC to recover a windfall. By setting the cap on damages at Breaching Losses, the Allocated Loss Approach does not account for the discount that the parties agreed to in the bankruptcy settlement. Thus, the approach would allow certain defendants to be charged with a greater share of indemnification liability than provided by the Settlements. Second, the Court finds that assessing damages without accounting for a Defendant's breach rate results in an inaccurate measure of damages. Therefore, the Court will enter summary judgment precluding admission of the Allocated Loss Approach.

**IV.    CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT**:

1.    Plaintiffs' Motion for Summary Judgment on Common Issues [Doc. No. 3241] is **GRANTED in part, DENIED in part, and DENIED WITHOUT PREJUDICE in part**; and

2.    Defendants' Motion for Summary Judgment on Common Issues [Doc. No. 3247] is **GRANTED in part and DENIED in part**.


Dated:  August 15, 2018                              s/Susan Richard Nelson
                                                     SUSAN RICHARD NELSON
                                                     United States District Judge