# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

In Re: RFC and ResCap Liquidating
Trust Litigation

Case No. 13-cv-3451 (SRN/HB)

**MEMORANDUM OPINION
AND ORDER**

*This document relates to:*

ResCap Liquidating Trust v. Home Loan
Center, Inc., Case No. 14-cv-1716 (SRN/HB)

_____

SUSAN RICHARD NELSON, United States District Judge

## I.   INTRODUCTION

Before the Court are the parties' cross motions to exclude certain expert opinions

and testimony.  On June 20, 2018, the Court heard oral argument on the parties' motions.

For the reasons set forth below, Defendants' Motion to Exclude Certain Opinions of

Plaintiff's[1] Experts [Doc. No. 3192] is granted in part, denied in part, and denied as moot

in part, and Plaintiff's Motion to Exclude Expert Testimony and Opinions of Defendants'

Experts [Doc. No. 3245] is granted in part, denied in part, and denied as moot in part.

_____

[1] After the filing of the instant motions, Residential Funding Company, LLC ("RFC"),
ResCap Liquidating Trust ("ResCap"), Home Loan Center, Inc. ("Home Loan Center"),
Standard Pacific Mortgage, Inc. ("Standard Pacific"), and CTX Mortgage Company
("CTX") stipulated that ResCap would be substituted as the sole plaintiff in this action.
(Stip. & Jt. Mot. to Substitute at 1–2 [Doc. No. 4344].)  The Court granted the parties'
joint motion.  (Sept. 6, 2018 Order [Doc. No. 4350].)  Therefore, as applicable, the Court
refers to Rescap as "Plaintiff" throughout this Order and refers to RFC only when
discussing its underlying actions.

## II. BACKGROUND

The factual and procedural background of this litigation is thoroughly set forth in the Court's August 15, 2018 Memorandum Opinion and Order on Common-Issue Motions for Summary Judgment ("Aug. 15 Order") [Doc. No. 4307], which is incorporated by reference here.

Defendants Home Loan Center, CTX, Standard Pacific, Impac Funding Corp., iServe Residential Lending, LLC, and Freedom Mortgage Corporation (collectively, "Defendants") do not uniformly share all of the same expert witnesses. As to Plaintiff's Motion to Exclude Expert Testimony, this Order rules only on those experts used by Home Loan Center, as it is the first Defendant in the trial queue. To the extent that other Defendants use the same experts, this ruling applies with equal force to them. However, Plaintiff's motions as to other experts, not also used by Home Loan Center, remain under advisement.

## III. DISCUSSION

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, proposed expert testimony must satisfy three prerequisites to be admitted. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citation and internal quotation marks omitted).

These requirements reflect the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Court emphasized the district court's "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 146 (1999) (extending *Daubert* to technical and other specialized expert testimony). The party calling an expert must demonstrate the reliability of the expert's opinion by a preponderance of the evidence. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 915 (8th Cir. 2017) (citing *Daubert*, 509 U.S. at 592 n.10).

"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Lauzon*, 270 F.3d at 686 (citation and internal quotation marks omitted); *Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of his testimony and not its admissibility, *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)). Likewise, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Finch*, 630 F.3d at 1062 (citation and internal quotation marks omitted).

The court should focus on "principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, but may conclude "that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be useful to the jury, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The touchstone for admissibility of expert testimony is assistance to the trier of fact. *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (internal citations and quotations omitted).

## B. Defendants' Motion to Exclude Expert Testimony

Defendants seek to exclude the expert opinions, or portions thereof, of certain expert witnesses that ResCap intends to offer at trial.[2]

Dr. Karl Snow, an economist, uses a sampling model to opine on the damages Plaintiff incurred as a result of its purchases of Defendants' allegedly breaching mortgages, as well as how the responsibility for those damages should be allocated among the individual Defendants. (*See* Smallwood Decl., Ex. 1 (Snow Rpt. [Doc. No. 3201]).) Judge Richard Solum, a mediator and former Minnesota state court judge, opines on the reasonableness of Plaintiff's damages approach. (*Id.*, Ex. 11 (Solum Rpt. [Doc. No. 3211].) Dr. John Kilpatrick, an expert in real estate finance, opines on the values of homes that collateralized the allegedly breaching mortgages at the time of their appraisals. (*Id.*, Ex. 28 (Kilpatrick Global Rpt. [Doc. No. 3228]).) Donald Hawthorne, a litigator specializing in complex financial instruments, opines on the reasonableness of RFC's bankruptcy settlements (the "Settlements"). (*Id.*, Ex. 6 (Hawthorne Rpt. [Doc. No. 3206]).) Louis Dudney, a finance and operations consultant offers an opinion on the mortgage loan schedules. (*Id.*, Ex. 39 (Dudney Rpt. [Doc. No. 3233].) Defendants argue that all or part of each of these opinions should be excluded.

---

[2] Since the time that Defendants initially filed their *Daubert* motions, the parties have resolved their differences with respect to the portion of Defendants' motion seeking to exclude the opinions and testimony of Plaintiff's expert, Steven Albert, a professional real estate appraiser. (*See* Aug. 7, 2018 Letter at 1 [Doc. No. 4146].)

### 1. Dr. Karl Snow

#### a. Qualifications and Opinion

Dr. Karl Snow is a PhD economist and partner at the Bates White economic consulting firm. (*Id.*, Ex. 1 (Snow Rpt. ¶ 5).) ResCap retained Dr. Snow to provide expert analysis regarding the measure and allocation of damages, (*see id.* at 3), and he crafted three different approaches for doing so: (1) the Breaching Loss Approach; (2) the Allocated Breaching Loss Approach; and (3) the Allocated Loss approach. (*See id.* ¶¶ 37–41.)

In the August 15 Order, this Court held that only the Allocated Breach Loss model will be submitted to the jury. (Aug. 15 Order at 149–79.) Accordingly, Defendants' motion to exclude Dr. Snow's testimony regarding the other two damages models is denied as moot.

The Allocated Breaching Loss model measures damages in relation to the liabilities that RFC incurred in the Settlements, rather than the economic harm caused by breaching mortgages. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 79–86).) Under this approach, Dr. Snow attempts to divide and allocate RFC's bankruptcy liabilities associated with the Trust Claims and Monoline Claims among the loans that Defendants and non-defendants sold to RFC.[3] (*Id.* ¶ 79.) To do so, Dr. Snow introduces a

---

[3] A "Trust Claim" is a claim awarded in the Bankruptcy Settlements to an RMBS trust investor for alleged breaches made by RFC with respect to the representations and warranties in the Trust Agreement. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 60–63).) A "Monoline Claim" is a claim awarded to a monoline insurer (or "Monoline") in the Bankruptcy Settlements for alleged breaches made by RFC with respect to the representations and warranties in insurance contracts. (*Id.* ¶¶ 64–65.)

"settlement factor" which reflects the discount claimants agreed to in the Settlements relative to the overall potential value of the claims asserted. (*Id.* ¶¶ 80–83.) Dr. Snow then multiplies the settlement factor by the Defendant's Trust Breaching Losses[4] to determine the Defendant's share of the allowed claims in favor of investors. (*Id.*) Dr. Snow then repeats this process for the Monoline Breaching Losses[5] to determine the Defendant's share of the allowed claims in favor of each insurer. (*Id.* ¶¶ 97–110.) By adopting this approach, Dr. Snow asserts he is able to identify each correspondent lender's share of the liability incurred from the Settlements, regardless of whether they remain a defendant to the action or are no longer a party.

### b. Objection and Analysis

#### i. Whether Dr. Snow's Allocated Breaching Loss Approach Offers Non-Speculative Bases for Measuring Damages and Advances a Viable Theory of Recovery

In its August 15 Order, this Court ruled that Dr. Snow's Allocated Breaching Loss model offers a non-speculative basis for measuring damages and advances a viable theory of recovery. Accordingly, with respect to this damages model, Defendants' Motion to Exclude on this ground is denied.

---

[4] Trust Breaching Losses are total losses on a Defendant's loans that breached representations and warranties in the Client Guide which correspondingly caused the loans to breach the representations and warranties in a Trust Agreement.

[5] Monoline Breaching Losses are total losses on a Defendant's loans that breached representations and warranties in the Client Guide that, Plaintiff asserts, correspondingly caused the loans to breach the representations and warranties in a Monoline Insurance Agreement.

### ii. Whether Dr. Snow's Opinion is Unreliable Because He Uses Statistical Sampling and Samples from "the Wrong Population"

Defendants argue that the Court should categorically reject Dr. Snow's opinion because it relies on statistical sampling. (Def.'s Mem. at 4–5 [Doc. No. 3194]) (cross-referencing Defs.' Summ. J. Mem. § X). For the reasons set forth in this Court's August 15 Order, no such categorical bar applies to the use of statistical sampling here. (*See* Aug. 15 Order at 57–69.)

Defendants further argue that Dr. Snow's Allocated Breaching Loss Approach employs a statistical model that is fundamentally flawed because Dr. Snow failed to sample from the entire population of mortgages that were the subject of the Settlements. (Defs.' Mem. at 5; 6–12.)

Expert testimony must be based on reliable methods to be admissible. Fed. R. Evid. 702. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Bonner,* 259 F.3d R 929 (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995). "To assess the admissibility of survey evidence, the court should consider . . . whether [] the proper universe was examined and the representative sample was drawn from that universe." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007). However, that a survey does not "perfectly represent" the examined population "does not make it irrelevant or unhelpful" because sample surveys "by their very nature, are sketches, not exact replicas, of the examined population." *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) (citation omitted).

Here, Defendants argue in particular that Dr. Snow's Allocated Breaching Loss Approach is flawed because it estimates breach rates based on samples drawn from roughly 500,000 At-Issue Loans.[6]  (Defs.' Mem. at 8–12.)  By taking this approach, Defendants stress that Dr. Snow excluded approximately 1.5 million fully performing mortgage loans from his sample as well as every loan RFC sold by non-debtor sponsored trusts.  (*Id.* at 9–10.)  Thus, Defendants contend that the sampling protocol violates the statistical principle that samples must be drawn from the appropriate population, which, in this case, is all of the loans that were subject to the Settlements.  (*Id.* at 10.)  Because Dr. Snow supposedly failed to abide by that rule, Defendants argue the sampling protocol produces biased results and is unreliable because its conclusions are based on an inaccurate picture of the Settlements. (*Id.* at 10–11.)    Therefore, Defendants contend that the Allocated Breaching Loss Approach is not the product of reliable methods and should be excluded.  (*Id.* at 10–12.)

ResCap counters that Dr. Snow sampled precisely from the correct population because the At-Issue Loans provided the predominant basis for the claims that were settled in the bankruptcy.  As support, Plaintiff notes that At-Issue Loans accounted for approximately 98% of the losses in the RMBS Trusts.  (Snow Decl. ¶ 16 [Doc. No. 3755].)  Plaintiff also notes that the 1.3 million fully paid loans that Defendants contend

---

[6] At-Issue Loans are loans sold to RFC by Defendants or non-defendants that realized actual or expected losses and formed the basis for the claims against RFC by investors or insurers in the Bankruptcy Settlements.  Expected losses are losses anticipated from loans that were (1) 90 days delinquent, in foreclosure, or real-estate owned as of May 2013 or (2) active but had incurred at least $500 of modification losses as of this date. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶ 49).)

should have been included in the sample population account for zero losses. (*Id.* ¶ 18.) With respect to the remaining 238,000 loans that were excluded from the sample population, Plaintiff asserts they only accounted for around 2% of the overall bankruptcy losses because they performed well and, to the extent a loan in that category did experience losses, it amounted to less than $500. (*Id.* ¶ 17.) And even if he had drawn samples from all of the loans in the bankruptcy, Dr. Snow contends it would not have made an appreciable difference in the breach rates and could have possibly even resulted in a higher measure of damages for Defendants. (Smallwood Decl., Ex. 9 (Snow Supp'l Rpt. ¶ 5 [Doc. No. 3209]); Snow Decl. ¶¶ 20–24.) Therefore, Plaintiff argues that Defendants' criticism of Dr. Snow's sampling approach has no legitimate basis and should be rejected by the Court.

The Court finds that Dr. Snow's breach rate methodology does not warrant the exclusion of the Allocated Breaching Loss Approach. An expert's opinion should be excluded "only if [it] is so fundamentally unsupported that it can offer no assistance to the jury." *Hose*, 70 F.3d at 974 (internal quotation marks omitted). Furthermore, "attacks regarding the completeness of [an expert's] methodology go to the weight and not the admissibility of his testimony." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003).

First, Defendants fail to show that the supposed flaws in Dr. Snow's methodology are so significant that they practically negate the value of the Allocated Breaching Loss Approach to the fact finder. Second, the Court is persuaded that Dr. Snow's decision to sample from the At-Issue Loans makes good sense given that the purpose of his study is

to allocate the bankruptcy claims among Defendants, and those claims are premised on losses to loans sold by RFC. Thus, conceptually, those damages would necessarily have flowed from the loans that actually experienced economic losses, *i.e.* the At-Issue Loans. Third, these arguments go to weight of the evidence and Defendants' "remedy is not exclusion, but instead cross-examination, the presentation of contrary evidence, and careful instruction on the burden of proof." *Gilliland v. Novartis Pharm. Corp.*, 34 F. Supp. 3d 960, 968 (S.D. Iowa 2014). Accordingly, the Court denies Defendants' motion to exclude Dr. Snow's testimony on the Allocated Breaching Loss Approach on the basis that he sampled from the wrong population.

### iii. Whether Dr. Snow's Opinions are Unreliable Because He Extrapolates Breach Rates from Samples Drawn Across Insurance Pools

Dr. Snow utilizes the same general framework for allocating Monoline Claims as he does for Trust Claims in that he measures each Defendant's share of Monoline Claims as a product of a settlement factor and the total losses on a Defendant's monoline breaching loans. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶ 109).) However, he employs a different methodology for assessing breach rates to account for the fact that each monoline insurer settled with RFC for different amounts and paid out different amounts on insurance claims. (*Id.*, Ex. 10 (Snow Dep. 326 [Doc. No. 3210]).) Specifically, Dr. Snow focuses his analysis on the specific insurance pools that were the subject of claims in the bankruptcy as opposed to the aggregate amount of claims by the monoline insurers. (*Id.* at 324.) In so doing, he attempts to allocate Monoline Claims on a pool by pool basis by calculating each Defendant's overall monoline breach rate and multiplying it by the

losses experienced within each individual insurance pool. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 67, 97–111).)

Defendants argue that Dr. Snow's method for allocating the Monoline Settlements is unreliable because it violates basic statistical principles. To be reliable, "sampling methods [] must conform to generally recognized statistical standards" and choosing a properly defined population that is "representative of that population" is one such standard. Man. Complex Litig. § 11.493 (4th ed. 2004). As gatekeeper of expert opinion evidence, the Court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Here, to allocate the Monoline Settlements covering many thousands of insured loans, Defendants note that Dr. Snow only drew a single global sample of 400 insured loans and four different Defendant-specific samples of 150 insured loans. All of the samples mixed loans from different insurance pools, and therefore the sample populations contained relatively few loans from any single insurance pool. (Smallwood Decl., Ex. 10 (Snow Dep. at 329).) Defendants note that over half of the insurance pools are not represented at all in his global sample. (*Id.*) Defendants argue that because Dr. Snow did not gather enough loans to calculate breach rates for each insurance pool, he was forced to calculate a global monoline breach rate for all insured loans and individual monoline breach rates for each Defendant based on all of their insured loans. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 97–111).) He then used those figures to determine a Defendant's responsibility for claims on a pool specific basis. (*Id.*)

Defendants contend that Dr. Snow improperly extrapolated breach rates from samples drawn across pools and across insurers to assign monoline breach rates to specific pools insured by specific insurers. Thus, they argue that his methodology violated the basic statistical principal that a sampling protocol must draw from representative samples of the population it intends to study. As a result, Defendants contend that Dr. Snow's monoline breach rates suffer from unreasonably high margins of error that exceed 10 percent in all but one case. (*Id.*, Ex. 4 (Snow Dep. II at 245 [Doc. No. 3204]).) Therefore, Defendants argue that Dr. Snow's monoline breach rates are unreliable and should be excluded.

ResCap contends that Defendants mischaracterize the design of the Allocated Breaching Loss Approach because, contrary to Defendants' assertions, Dr. Snow does not extrapolate breach rates to specific loan pools. Instead, Plaintiff asserts that Dr. Snow measured each Defendant's share of the overall Monoline Settlement, and then used that measure as a basis for determining what each Defendant is responsible for indemnifying within individual insurance pools. In other words, Dr. Snow works around his small sample size by assuming that a Defendant's overall breach rate would be similar if not the same as the Defendant's breach rate in a particular insurance pool. Although Dr. Snow's monoline allocation comes with higher margins of error than other portions of his study, Plaintiff asserts that these rates are reasonable and at most raise questions of weight that should be evaluated by the jury.

In light of the foregoing arguments, the Court finds that Dr. Snow has provided a sufficiently reliable basis to allocate the Monoline Settlements, and denies the motion to

exclude his Allocated Breaching Loss Approach with respect to the Monoline Settlements. The Court is not persuaded that Dr. Snow violated statistical principles in choosing to use Defendants' breach rates on all insured mortgages as a proxy for the breach rates he expected would exist in specific insurance pools. Dr. Snow utilized a reasonable assumption in his model, *i.e.* that settlement-wide breach rates and pool specific breach rates would be similar. Experts are allowed that leeway. *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (noting that "disagreement with the assumptions [of an expert] does not warrant exclusion of expert testimony").

In their remaining arguments, Defendants point out a number of supposed flaws in Dr. Snow's monoline allocation opinions that they contend undermine his credibility. They assert that the underlying data Dr. Snow uses is relatively sparse with respect to a number of individual insurers. They further contend that Dr. Snow's sample population from which he derives the global monoline breach rate and Defendant-specific monoline breach rates do not incorporate loans from some of the insurance pools that Dr. Snow opines about. Each of these contentions, however, relate to the precision of Dr. Snow's results. But doubts about precision "goes to the weight and not admissibility" of an expert's opinion. *Ergotron, Inc. v. Rubbermaid Commercial Prod., LLC*, No. CIV. 10-2010 ADM/JJG, 2012 WL 3733578, at *15 (D. Minn. Aug. 28, 2012). Accordingly, the Court denies Defendants' motion to exclude Dr. Snow's Allocated Breaching Loss Approach on the basis that his monoline allocations are unreliable.

### 2. Judge Richard Solum

#### a. Qualifications and Opinion

Judge Solum is a professional mediator, highly regarded former Hennepin County judge, and former commercial litigator. (Smallwood Decl., Ex. 11 (Solum Rpt. ¶¶ 2–4).) Plaintiff retained Judge Solum to provide expert analysis regarding whether the approaches set forth in Dr. Snow's expert report are a fair and reasonable means of assessing or allocating damages against or among multiple defendants in those lawsuits. (*Id.* ¶ 1.) In reaching his opinion, Judge Solum provides observations about Dr. Snow's expert report based on years of experience in assessing, resolving and mediating settlement in multi-defendant cases.

Judge Solum opines in his report that the primary principal that drives the determination of damages in a settlement is the relationship between a given defendant's wrongful acts and a plaintiff's losses or harm. (*Id.* ¶ 25.) He additionally opines that, in his experience, once a plaintiff shows the relationship between a defendant's wrongdoing and a plaintiff's losses or harm, there is flexibility regarding how damages are assessed or allocated among multiple parties. (*Id.* ¶ 26.) Reasonable parties understand that an assessment or allocation of damages need not be perfect or mathematically precise, according to Judge Solum, and parties typically consider a number of factors in deciding whether the amount and distribution of damages from a settlement is reasonable. These factors include: (1) how the harmed party is fully compensated; (2) whether the harmed party is awarded excessive or duplicative damages and, in multi-defendant contexts, whether one defendant is being charged with liability for harm caused by another; (3)

how the damages align with doctrines associated with the subject cause of action; (4) how a particular damages' approach may be necessary to overcome practical obstacles to assessing or allocating damages among defendants; and (5) how contractual indemnity agreements between the parties are fulfilled.  (*Id.* ¶ 27.)

Applying these factors to Dr. Snow's opinion, Judge Solum opines that his three approaches to assessing and allocating damages are "objectively reasonable."  (*Id.* ¶ 24.) Judge Solum notes in particular that each approach satisfies the primary principle in sorting out damages among multiple defendants because they allocate damages to reflect a defendant's measure of culpability.  More specifically, Judge Solum asserts that each of Dr. Snow's approaches "is underpinned by a relationship between each Defendant's wrongful acts and Plaintiffs' harm or loss," meaning a reasonable defendant would be satisfied that damages allocated under Dr. Snow's approaches bear directly on its level of responsibility.  (*Id.* ¶¶ 30, 35, 39.)  He additionally explains that each of Dr. Snow's three approaches meets some or all of the additional factors relevant to the reasonable assessment and allocation of damages.  (*Id.* ¶¶ 31, 40, 49.)  Therefore, Judge Solum concludes that each of Dr. Snow's approaches for assessing or allocating damages against or among the multiple defendants satisfies the factors that reasonable parties find important in multi-defendant cases.  (*Id.* ¶ 51.)

### b.    Objection and Analysis

Defendants contend that Judge Solum is not qualified to offer an expert opinion on the reasonableness of Plaintiff's models of assessing and allocating damages, because Judge Solum has never been involved in an RMBS case and lacks expertise in bankruptcy

law.  To satisfy *Daubert*'s reliability requirement, "the proponent of the expert testimony must show by a preponderance of the evidence [ ] that the expert is qualified to render the opinion."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). Here, Defendants argue that because Judge Solum has never been involved in an RMBS case involving breaches of representations in sales contracts and trust agreements, (Smallwood Decl., Ex. 12 (Solum Dep. at 40–41 [Doc. No. 3212])), he cannot opine from experience about the value of the bankruptcy claims for which Plaintiff seeks indemnification.

Defendants additionally argue that Judge Solum's opinion should be excluded because his opinions principally consist of legal conclusions about Dr. Snow's allocation approaches.  "Legal conclusions do not qualify as expert opinions."  *Estes v. Moore*, 993 F.2d 161, 163–64 (8th Cir. 1993).  An expert witness may not give an opinion regarding the law's meaning because "[m]atters of law are for the trial judge, and it is the judge's role to instruct the jury on them."  *S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).  Here, Defendants highlight topics covered in Judge Solum's report that they contend are for the Court, and the Court alone, to instruct the jury on.  First, Defendants contend that Judge Solum opines on how Dr. Snow's allocation approaches are "fair and reasonable," which steps into the Court's role to instruct the jury on damages.  Second, Judge Solum opines about how damages should be measured based on the relationship between a defendant's wrongdoing and a plaintiff's losses.  Third, Judge Solum opines about Defendant's indemnity and contractual

obligations. Because these are legal conclusions for the Court to decide, Defendants assert that Judge Solum's testimony should be entirely excluded.

Defendants lastly argue that Judge Solum's opinion should be excluded because it does not satisfy the requirement of *UnitedHealth Group Inc. v. Executive Risk Specialty Insurance Co.*, 870 F.3d 856 (8th Cir. 2017), that an allocation of claims in settlement must account for the relative strength and value of indemnifiable claims compared to non-indemnifiable claims. Defendants note in particular that Judge Solum's report includes no analysis of the value of the claims settled in the RFC bankruptcy and no assessment regarding the likelihood that the Trusts or Monolines would have prevailed against RFC. Therefore, Defendants argue that Judge Solum's opinion should be excluded because it is based on erroneous legal premises and would not assist the jury.

Plaintiff contends, on the other hand, that Judge Solum's opinions are admissible and offer no legal conclusions. Rather, it argues that Judge Solum offers his industry opinion as a mediation expert regarding what neutrals consider when allocating a settlement among a group of defendants. Although Plaintiff agrees that Judge Solum's opinion is grounded in legal concepts, it asserts that he does not opine as to their meaning or application. Rather, Plaintiff asserts that his opinions provide helpful context to fact finders regarding the reasonableness of Dr. Snow's allocation approaches.

Plaintiff additionally argues that *UnitedHealth* does not apply to Judge Solum's testimony, because Judge Solum does not opine about how to allocate damages. Instead, Judge Solum opines about industry custom regarding what a reasonable indemnitee in RFC's position at the time of settlement would have expected an objective third-party to

consider a fair and reasonable allocation under the circumstances. Therefore, Plaintiff asserts that *UnitedHealth* is inapposite and Defendants provide no legitimate basis to undermine the reliability of Judge Solum's opinion and warrant its exclusion.

The Court grants Defendants' motion to exclude Judge Solum as an expert witness. Judge Solum is a highly accomplished former litigator and judge, as well as a very respected professional neutral, who could no doubt provide valuable assistance to Plaintiff if relied upon in a different capacity. However, he is not helpful to them, or a jury, as an expert on the reasonableness of a highly complex bankruptcy settlement that involved claims arising out of the bulk securitization of loans in the secondary market for mortgages. His skill and experience simply do not relate to the unique circumstances of the instant case. Furthermore, the Court finds that Judge Solum's opinions encroach upon topics for which the Court may only instruct the jury. For these reasons, the Court grants Defendants' motion with respect to Judge Solum and excludes his opinion.

### 3. Dr. John Kilpatrick

#### a. Qualifications and Opinion

Dr. Kilpatrick is a former academic who holds a PhD in Finance and is a real estate market expert. He is the current Chairman and Co-Managing Director of Greenfield Advisors economic consulting firm. Plaintiff retained Dr. Kilpatrick to evaluate whether the original appraisals of the residential properties that collateralized the subject loans were inflated and if so, what impact accurate appraisals would have had on

the loan-to-value ratios ("LTV ratios").[7] (Smallwood Decl., Ex. 28 (Kilpatrick Global Rpt. at 1).) This determination was initially relevant because one of Plaintiff's principal allegations is that Defendants breached their contractual obligations to provide accurate and credible appraisals for the properties that collateralized the mortgages they originated and sold to RFC. Here, Dr. Kilpatrick uses the Greenfield Automated Valuation Model ("GAVM") to identify Inflated Appraisals, defined as appraisals that exceeded the GAVM's value prediction by 15% or more. GAVM is a computer program that retroactively assesses what an accurate appraisal would have been at the time the subject loans were issued and predicts the value of individual properties based on a regression analysis of large aggregations of housing market data as well as specific inputs.

### b.    Objection and Analysis

Defendants argue that Dr. Kilpatrick's opinion should be excluded because his GAVM model relies on post-settlement data and is thus inadmissible for the purpose of allocating RFC's indemnity claims. "The allocation inquiry examines how a reasonable party in [the indemnitee's] position would have valued the covered and non-covered claims." *UnitedHealth*, 870 F.3d at 863. "In evaluating the claims, we look to what the parties knew at the time of settlement." *Id.* Here, Defendants argue that the GAVM model itself post-dates the RFC Bankruptcy Settlements and thus could not possibly have informed the parties' decision to settle. Further, Defendants note that one of the key

---

[7] Dr. Kilpatrick conducts his reappraisal analysis on the mortgage loans contained in the Global Sample, which is the randomized sample of the At-Issue Loans gathered by Dr. Snow using generally accepted statistical methods.

inputs in Dr. Kilpatrick's GAVM model—tax assessment values ("TAVs") for the subject properties—almost entirely post-dates the 2013 Settlements. Therefore, Defendants assert that Dr. Kilpatrick's GAVM model does not comport with the demands of *UnitedHealth* and should be excluded.

Defendants additionally argue the GAVM model should be excluded because it is unreliable. In determining whether an expert opinion is sufficiently reliable, courts consider, among other things, whether the opinion has been tested, whether it has been subjected to peer review or publication, whether it offers a known or potential rate of error, and whether it comports with generally accepted theory. *Daubert*, 509 U.S. at 593–94. Defendants argue that the GAVM model fails under all four factors. First, Defendants assert that the GAVM has not been meaningfully tested, because no independent third party has evaluated it. Second, Defendants note the GAVM model has not been peer-reviewed by appraisal experts other than those employed by Defendants who are critical of the GAVM. Third, Defendants contend the GAVM model's error rate is significant because its confidence intervals are wide and its results are rarely statistically significant. Fourth, Defendants assert that retrospective automated valuation models like GAVM are not generally accepted to establish individual property value. *See, e.g. U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc*., 205 F. Supp. 3d 386, 432–37 (S.D.N.Y. 2016). Therefore, Defendants argue that Dr. Kilpatrick's opinion should be excluded because it is unreliable according to each of the four reliability criteria in *Daubert*.

Plaintiff contends that Dr. Kilpatrick's opinion and GAVM model are reliable and that Defendants' attacks on the GAVM mischaracterize the inputs in the model. Plaintiff notes at the outset that Dr. Kilpatrick's GAVM model has been accepted by multiple other federal courts. *See, e.g. Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,* 104 F. Supp. 3d 441, 501 (S.D.N.Y. 2015), *aff'd* 873 F.3d 85 (2d Cir. 2017) ("The GAVM served as a reliable gating mechanism to identify a set of materially inflated appraisals" and its "reliability as a screening tool and its accuracy were confirmed through a series of tests"); *Mass. Mut. Life Ins. Co. v. DB Structured Prod., Inc.*, No. 11-cv-30039-MGM, 2015 WL 2130060, at *9 (D. Mass. May 7, 2015) ("As for Dr. Kilpatrick's testimony regarding GAVM, the court finds his opinion is relevant and rests upon sufficiently reliable grounds for admissibility purposes").

Plaintiff additionally asserts that *UnitedHealth* does not preclude it from relying on the GAVM model, because the model principally relies upon information that the parties had access to when agreeing to the Settlements—namely, the sales prices for comparable homes that were sold within a year after the date of original appraisals. Therefore, because the GAVM is retrospective, there is nothing *ex post* about it that would preclude Plaintiff from relying on it. Plaintiff also contends that Defendants mischaracterize how TAVs for the subject properties are used by the model. Plaintiff explains that tax assessment values are not directly utilized in the model.[8] Instead, the

---

[8] Dr. Albert Lee explains that "[d]ue to recent licensing restrictions, the only TAV data that Dr. Kilpatrick could obtain in these cases were limited to the 2013 to 2016 tax years. In prior cases, I secured and conducted testing on some limited TAV data from 2005 to 2007. When I did so, I concluded that recent data does not materially impact the

model relies on the *relationship* between post-2013 tax assessed values and the sales price of related properties. (Lee Decl. ¶ 10 [Doc. No. 3756].) Plaintiff asserts this relationship demonstrates how the sales price increases as TAV increases, and thus provides an additional input to improve the accuracy of the model. (*Id.*) According to Plaintiff, TAV was a statistically significant regression variable for 98% of the subject properties. (*Id.*) Thus, Plaintiff asserts that Defendant's contention that the model improperly relies on *ex post* data is unfounded.

With respect to Defendants' remaining arguments, Plaintiff notes that, contrary to Defendants' assertions, the GAVM has been subject to extensive testing, albeit in connection with different lawsuits, and that Defendants cite to no legal authority which calls for third-party testing in order to meet the admissibility requirements of *Daubert*. *See Nomura*, 104 F. Supp. 3d at 503; *DB Structured Prod.*, 2015 WL 2130060, at *9; Order, *Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc.*, No. 3:11-CV-30047-MGM (D. Mass. Apr. 18 2017) (Doc. No. 514). Plaintiff also asserts that its GAVM model is reliable because it is premised on widely accepted real estate and econometrics literature, and that a lack of peer-review standing alone is not sufficient to warrant exclusion of an expert's testimony. *See Nomura*, 104 F. Supp. 3d at 503 ("At base, the GAVM meets the *Daubert* standard even though it has not been peer reviewed"). Plaintiff lastly contends that Defendants' claims about error rate go to weight rather than admissibility, because

---

GAVM's output compared to TAV data from 2005 to 2007, thereby demonstrating a consistent and meaningful structural relationship suitable for use by the GAVM." (Lee Decl. ¶ 11 [Doc. No. 3756]; Smallwood Decl., Ex. 15 (Lee Dep. at 205–08 [Doc. No. 3215]).)

Defendants' disagreement about the appropriate confidence intervals for the model amounts to an expert-versus-expert debate. Therefore, Plaintiff argues that Dr. Kilpatrick should be permitted to testify because his GAVM is reliable and consistent with *UnitedHealth*.

After careful review of the record and arguments, the Court denies Defendants' motion to exclude Dr. Kilpatrick's opinion. Defendants' arguments about the reliability of Dr. Kilpatrick's GAVM go to weight rather than admissibility, and Defendants are unable to show that his model is so fundamentally flawed that it would provide no assistance to the jury. Furthermore, although Defendants correctly point out that certain TAVs relied upon as inputs to the GAVM model post-date the Settlements, the Court finds that their use does not offend the requirements of *UnitedHealth*. There, the court specifically noted that "[e]vents and circumstances happening after settlement are relevant only insofar as they inform how a reasonable party would have valued and allocated the claims at the time of settlement." *UnitedHealth*, 870 F.3d at 864. Here, Dr. Kilpatrick uses post-settlement values as a method to assess information that *was available* to the parties at the time of settlement—contemporaneous TAV values. In particular, Dr. Kilpatrick asserts that post-settlement TAVs correlate to the TAVs of properties at the time of the Settlements. Further, he cabins the use of post-settlement TAVs as a proxy for TAVs at the time of the Settlements. Thus, the Court finds that the use of post-settlement TAVs as a proxy input in the GAVM model does not violate the requirement that "we look to what the parties knew at the time of settlement." *UnitedHealth*, 870 F.3d at 863. Furthermore, whether the correlation between post-

settlement TAVs and contemporaneous TAVs is strong enough to accurately measure property values at the time of the Settlements is an issue regarding the "factual basis of an expert opinion" which "goes to the credibility of the testimony, not the admissibility." *Finch*, 630 F.3d at 1062. Therefore, the Court denies Defendants' motion to exclude Dr. Kilpatrick's opinion.

### 4. Donald Hawthorne

#### a. Qualifications and Opinion

Donald Hawthorne is a career litigator with extensive experience in post-financial collapse RMBS cases, including as lead counsel for an institutional investor that challenged the sufficiency of a settlement in one such case. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 4–9).) Plaintiff retained Hawthorne to offer his expert opinion on the good faith and reasonableness of the RFC Bankruptcy Settlements. (*Id.* ¶ 1.) Plaintiff also relies upon Hawthorne's opinion to assess the strengths and weaknesses of claims against RFC in the bankruptcy case as part of its attempt to measure and allocate damages among the parties. (Pl.'s Mem. Opp'n Mot. Summ. J. § I.B.2. [Doc. No. 3720.) To formulate his opinion, Hawthorne reviewed public documents that would have been available to a litigant in RFC's position, the opinions of other experts, and documents and deposition testimony in the record. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 11–13).) Relying on his experience with RMBS related litigation, Hawthorne assessed the strengths and weaknesses of the claims premised on allegations of breach of contract, fraud, and defective servicing. (*Id.* ¶ 51–56.) Hawthorne also assessed RFC's defenses premised on causation, election of remedies, and the statute of limitations. (*Id.*) Based

on those assessments, Hawthorne concluded that the Trustee and Monoline Settlements were entered into in good faith and were reasonable. (*Id.* ¶¶ 57–59.)

### b. Objection and Analysis

Defendants argue that certain of Hawthorne's opinions are inadmissible for six different reasons. The Court will respond to each argument in turn.

### i. Whether Hawthorne's Opinions Regarding Certain Representations and Disclaimers are Beyond his Expertise

Defendants argue that Hawthorne's opinions regarding certain representations and disclaimers in RFC's contracts should be excluded because he has no specialized knowledge or expertise regarding those provisions. Expert witnesses have "testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his [or her] discipline." *Kumho Tire*, 526 U.S. at 148. However, an expert "may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology." *Teska v. Potlatch Corp.*, 184 F. Supp. 2d 913, 919 (D. Minn. 2002) (internal citations omitted.) As such, the court as gatekeeper must "ensure that an expert witness does not opine on subjects beyond his expertise." *Hale Cnty. A & M Transp. v. City of Kansas City*, 998 F. Supp. 2d 838, 843 (W.D. Mo. 2014).

Here, Defendants argue that Hawthorne's opinions stray beyond his areas of expertise for a number of reasons. First, Defendants assert that Hawthorne has no

specialized knowledge or expertise in pool-wide credit grade representations[9] or documentation-type representations.[10]  In his report, Hawthorne opines that the Trusts and Monolines had strong arguments that RFC breached its representation that the loans it securitized conformed to underwriting guidelines. Where RFC did not make guideline representations, Hawthorne opines that the trusts had strong arguments that pool-wide credit grade representations and documentation-type representations were equivalent to guideline representations.  (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 266–71).)  As such, Hawthorne asserts that the trusts could recover from RFC for guideline breaches even for securitizations where RFC did not make representations that the subject loans conformed to the guideline requirements.  (*Id.*)  Here, Defendants argue that Hawthorne is not competent to testify on credit grade or documentation-type representations because he has never participated in an RMBS securitization and had no RMBS experience during the period that the alleged breaches took place.  Defendants additionally assert that Hawthorne's significant legal experience has not touched on the contract provisions at issue because, as he admits, he is not aware of any party claiming breach of a credit grade or document type representation.  (Smallwood Decl., Ex. 31 (Hawthorne Dep. at 67 [Doc. No. 3229]).)  In other words, Defendants argue that credit grade or documentation-type

---

[9] Pool-wide credit grade representations are guarantees about the percentages of loans in an RMBS trust that qualify for certain credit grades.  (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 266–71).)

[10] Documentation-type representations are guarantees concerning the percentage of loans in an RMBS Trust were underwritten under certain document types. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 266–71).)

representation claims are novel and untested theories of recovery, and therefore Hawthorne could not have obtained specialized expertise on those claims sufficient to opine on their strength.

Second, Defendants argue that Hawthorne has no specialized knowledge or expertise in origination fraud disclaimers.[11] Hawthorne opines that the Trusts and Monolines had strong arguments that RFC breached representations about the lack of fraud in the origination of loans, even though RFC disclaimed liability for fraud in the origination of loans in many of its Trust Agreements. (*Id.*, Ex. 6 (Hawthorne Rpt. ¶ 276).) By taking this position, Hawthorne argues that the origination fraud liability disclaimers would not have held up to a challenge from the Trusts or Monolines. Defendants argue that Hawthorne is not competent to testify about whether the fraud disclaimers were durable enough to protect RFC from claims, because he has never previously encountered them in his practice and is not aware of any case where a court has interpreted a fraud disclaimer provision in an RMBS case. (*Id.*, Ex. 31 (Hawthorne Dep. at 122–23).)

Plaintiff counters that Hawthorne's opinions regarding RFC's representations and disclaimers are well within his expertise as one of the country's most prominent RMBS litigators. As an initial matter, Plaintiff notes that, contrary to Defendants' assertions, Hawthorne is neither opining as an RMBS industry expert nor as to how industry participants would have interpreted relevant contractual provisions prior to 2008. Rather,

---

[11] Some of the Trust Agreements contained provisions disclaiming RFC's liability for fraud in the origination of the mortgages securitized into the RMBS Trusts.

Hawthorne opines as to how a party in RFC's position would have viewed the risks of liability in the bankruptcy proceedings at the time of the Settlements. According to Plaintiff, Hawthorne is eminently qualified to make those assessments because he has been in RFC's shoes before—he has analyzed, litigated, and settled multiple disputes involving RMBS representations, warranties, and disclaimers for hundreds of securitizations.

Furthermore, Plaintiff contends that Defendants' assertion that Hawthorne had no experience with the contract provisions at issue is simply false. Hawthorne testified at his deposition that he had reviewed credit grade representations and documentation-type representations, as well as fraud disclaimers, in the course of his career as a litigator focusing on complex financial instruments and credit crisis litigation. (Smallwood Decl., Ex. 31 (Hawthorne Dep. at 57, 80, 122–23).) Plaintiff also notes that Hawthorne's opinions on credit grade and documentation-type representations are supported by RMBS industry experts. (*Id.*, Ex. 33 (Hayssen Rpt. ¶ 70 n.55 [Doc. No. 3231]); Smallwood Decl. [3257], Ex. 43 (Butler Rpt. at 129–33 [Doc. No. 3369]); *Id.*, Ex. 60 (Payne Dep. 168–71 [Doc. No. 3743]).) Therefore, Plaintiff argues that Hawthorne's opinions regarding RFC's representations and disclaimers are well within his expertise and should be admitted.

Based on the foregoing arguments, the Court denies Defendants' motion to exclude Hawthorne's opinion on the basis that he provides opinions beyond the scope of his expertise. First, Hawthorne is an experienced RMBS litigator with expertise in the legal issues that animated RFC's decision to settle. Thus, Hawthorne has experience that

qualifies him to opine as an expert on RFC's litigation risks in the Bankruptcy Settlements. Second, Defendants' principal objection to Hawthorne's opinion is that his assessment involves legal theories of recovery not asserted in prior litigation. That fact is not disqualifying but is instead a matter for cross-examination. Third, Defendants' contention that Hawthorne is not qualified because he has no specialized knowledge of certain contractual representations is unavailing. Hawthorne is intimately familiar with the types of contracts at issue in the instant litigation, and trained by experience to assess the risk of liability premised on breaches to those contracts. That he has never written a representation clause or liability disclaimer in the RMBS context does not disqualify him or take away from his depth of experience. Therefore, Hawthorne is qualified to give an expert opinion on the strength of claims against RFC premised on pool-wide and documentation type representations as well as the strength of RFC's defenses stemming from origination fraud disclaimers.

> ### ii. Whether Hawthorne Impermissibly Speculates Regarding Certain Assumptions Made by the Re-Underwriting Experts in the Bankruptcy Settlements

Defendants argue that Hawthorne offers opinions regarding the "states of mind" of the re-underwriting experts in the Bankruptcy Settlements that are speculative and should be excluded. "Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000)).

In deposition testimony, Hawthorne concludes that the re-underwriting experts interpreted RFC's credit grade and documentation-type representations to be equivalent to underwriting guideline representations. In particular, Hawthorne testified that because the Creditor's Committee expert used the Client Guide to re-underwrite subject loans for which no Client Guide representations had been made, that expert must have interpreted the credit grade and documentation-type representations to be the same as those contained in the Client Guide. (Smallwood Decl., Ex. 31 (Hawthorne Dep. at 60–61).) He draws the same conclusion about the opinion of the trusts' re-underwriting expert. (*Id.*, Ex. 34 (Hawthorne Dep. II at 600 [Doc. No. 3232]).) Defendants contend that Hawthorne has no reliable basis to reach these conclusions, and that the methodological decisions of the re-underwriting experts could just as easily have been grounded on a different rationale. Therefore, Defendants argue that Hawthorne's claims regarding the thought processes of the re-underwriting experts are speculative and should be excluded.

Plaintiff responds that Hawthorne's opinion that the re-underwriting in the bankruptcy proceedings may have undercounted breaches is not speculative because it is informed by the sworn testimony of the reviewing experts. (Second Rand Decl., Ex. 97 (Morrow Dep. at 83 [Doc. No. 3742]); Scheck Decl., Ex. 37 (Pfeiffer Dep. at 328–29 [Doc. No. 3258]).) Therefore, Plaintiff asserts that Hawthorne should be allowed to testify regarding other experts' re-underwriting analyses.

The Court will allow Hawthorne to opine that certain decisions made by re-underwriters in the bankruptcy proceedings are consistent with the belief that credit grade and documentation-type representations are equivalent to Client Guide breaches so long

as his opinions are informed by objective indicators. Defendants are free to cross-examine Hawthorne on that opinion. Accordingly, Defendants' motion to exclude this portion of Hawthorne's opinion is denied.

### iii. Whether Hawthorne's Opinions About Other Experts' Re-Underwriting Analyses are Inadmissible

Defendants argue that Hawthorne's opinions concerning the quality of re-underwriting analyses performed by other experts also should be excluded, because Hawthorne has no expertise in re-underwriting and has performed no analysis to support his opinions. In particular, Hawthorne opines that the Duff & Phelps financial consultancy calculated implausibly low breach rates, as did underwriting experts J.F. Morrow and Robert Broeksmit.[12] In particular, Hawthorne notes that Morrow departed from methodologies used by Plaintiff's experts in other RMBS cases when, among other things, he declined to account for breaches of MLS accuracy representations or "no material default" representations. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 390–92).) Hawthorne additionally characterizes Broeksmit's breach rate as highly implausible given the other benchmarks for breach rates in this case. (*Id.*, Ex. 34 (Hawthorne Dep. II at 516).) With respect to the Duff & Phelps opinion, Hawthorne opines that they likely would have found higher breach rates had they considered information outside of the loan file. (*Id.*, Ex. 6 (Hawthorne Rpt. ¶ 398).) According to Defendants, all of these opinions

---

[12] Duff & Phelps was the re-underwriting expert for the RMBS Trustees. J.F. Morrow was the re-underwriting expert for Creditors Committee. Robert Broeksmit was the re-underwriting expert for certain defendants.

are inadmissible because Hawthorne is not qualified to make them and, even if he were, he failed to perform any supporting analysis.

Plaintiff argues that Hawthorne's statements regarding other experts' re-underwriting analyses are admissible. Plaintiff asserts that Hawthorne has developed expert-level knowledge of loan underwriting from his experiences litigating RMBS cases, and thus is competent to offer high-level opinions on the scope of the re-underwriting reviews conducted in the bankruptcy proceedings.

The Court denies Defendants' motion to exclude on the basis that Hawthorne's opinions regarding the re-underwriters' actions are speculative. Hawthorne's opinions are informed by tactics employed by underwriters in other RMBS cases that he litigated, and thus are anchored in his RMBS litigation expertise. He does not opine on statistical principles or how loans should be underwritten. Instead, he opines on how re-underwriters adopted methodologies that departed from those employed by experts in other RMBS cases and had the effect of lowering the assessed breach rates in this litigation. Thus his testimony is within his expertise and will be allowed.

### iv. Whether Hawthorne's Testimony Impermissibly Relies on Financial Analysts' Unverified Opinions

Defendants argue the Court should exclude Hawthorne's testimony about the reasonableness of RFC's Monoline Settlements premised on financial analysts' reports. In assessing the reasonableness of RFC's Monoline Settlements, Hawthorne compares how the Monolines fared in the RFC Bankruptcy Settlements relative to monoline insurers in other similar RMBS cases. To do so, he relies on financial analysts' estimates

regarding what percentage of monoline insurers' losses were covered by those settlements. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 424–36).) Hawthorne concedes that analyst estimates of monoline settlements can vary widely and "should be approached with some caution." (*Id.* ¶ 427.) Nevertheless, Hawthorne relies on financial analysts' opinions of monoline settlements throughout his expert report. (*Id.* at App'x C; Smallwood Decl., Ex. 34 (Hawthorne Dep. II at 540, 546).) Given that a financial analyst's opinion is more or less an educated guess about settlement value, Defendants argue they are inherently unreliable and that Hawthorne's testimony based on them should be excluded.

Plaintiff asserts that Hawthorne's reliance on financial analysts' reports to assess the reasonableness of the Monoline Settlements is entirely appropriate, because experts may rely upon information "of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) (citing Fed. R. Evid. 703). At the time RFC and interested parties were considering settlement of the bankruptcy claims, Plaintiff contends that financial analysts' reports regarding monoline settlements in other lawsuits were part of the mix of information that litigants took into account to assess their own settlement positions. Furthermore, Hawthorne explains that reliance on those reports was necessary for interested parties, because monoline settlements are subject to very limited disclosure and the terms of those settlements are generally not public. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 427).) Thus, although imperfect, Plaintiff contends that the financial analysts' reports provided useful benchmarks for assessing industry participants' views of monoline claims at the

time. Therefore, Plaintiff contends that Hawthorne's testimony based on financial analysts' reports should be admitted.

Given the limited purpose for which Hawthorne uses the financial analysts' reports, the Court denies the motion to exclude Hawthorne's opinions that are premised on them. Hawthorne does not rely on the financial analysts' reports as evidence to show what other monoline claims actually settled for. Rather, he refers to them to describe to the jury the information that the parties had at the time to weigh their odds of prevailing in the RFC bankruptcy litigation. Furthermore, it appears that litigators in the field did in fact rely on them when assessing the value of RMBS cases with the Monolines. Thus, Hawthorne's reliance on the financial analysts' reports to assess the litigation risks at the time of the settlement is appropriate because, regardless of whether those reports are accurate, they were likely considered by the parties when assessing the value of the Monolines' claims against RFC. Furthermore, the extent to which those reports informed the parties' measure of RFC's litigation risks in the bankruptcy is a matter for cross examination, not a basis to exclude his opinion informed by the reports.

> ### v. Whether Hawthorne's Opinion that the Bankruptcy Settlements Were Reached in Good Faith is Inadmissible

Hawthorne opines that the Trust and Monoline Settlements were negotiated in good faith by all parties. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 170–86).) As support, Hawthorne points to dozens of disputes in the bankruptcy proceedings regarding the appropriate course for settlement as evidence of the arms' length posture of the parties. (*Id.*) Notwithstanding, Defendants argue that, for multiple reasons, the Court

should exclude Hawthorne's opinion that the Trust and Monoline Settlements were reached in good faith.

First, Defendants argue that Hawthorne's opinion on the good faith of the parties is really an opinion about the subjective mindset of the parties that is not a permissible subject for expert testimony. Experts may offer their opinions on relevant issues based on specialized knowledge or expertise. *Daubert*, 509 U.S. 579, 592 (1993). "No expert, however, knows a party's state of mind." *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio 2013). Accordingly, an expert's speculation regarding an individual's "motive, intent, or state of mind" should be excluded from evidence. *In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007).

Defendants argue in particular that the parties' intentions or motivations in the Settlements are outside the scope of Hawthorne's expertise and that Hawthorne's opinion that the parties engaged in the mediation in good faith is conjecture. The Trust and Monoline Settlements were reached in mediation and the Bankruptcy Court upheld the mediation privilege and prohibited disclosure of any mediation communications. Given the lack of discovery of the mediation process, Defendants assert that Hawthorne cannot supply a reliable opinion on the parties' good faith in settling the bankruptcy claims.

Second, Defendants argue that Hawthorne's opinions on good faith are really a conduit to admit hearsay from the bankruptcy court's ruling. "[I]f experts rely on otherwise inadmissible hearsay, that expert's opinion may be admitted only to the extent that the facts or data 'are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *United States v. Martinez*, 3

F.3d 1191, 1197 (8th Cir. 1993) (quoting Fed. R. Evid. 703). However, experts "who would act as mere conduits for hearsay" should be excluded. *Williams v. Illinois*, 567 U.S. 50, 80 (2012). Here, Defendants specifically argue that Hawthorne's opinion simply parrots the Bankruptcy Court's approval of the Settlements. They stress that a "court's prior judgment or ruling is inadmissible hearsay if it is offered to prove the truth of the matter asserted." *UnitedHealth,* 870 F.3d at 864.

Third, Defendants argue that even if Hawthorne's good-faith-settlement opinion were admissible, his invocation of mediation to support his opinion is fundamentally unfair given that Plaintiff successfully sought to deny discovery into the mediation in the instant lawsuit. A litigant cannot invoke privilege as a shield to prevent discovery into a subject, and then as a sword to use the precluded subject matter to support a claim or defense. *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) (privilege "cannot be used as both a shield and a sword"); *UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 876 (D. Minn. 2014).

Plaintiff responds to each of Defendants' arguments in turn. First, Plaintiff asserts that Hawthorne does not opine about the subjective mindset of the parties. Rather, he opines about the objective indicia of good-faith in the Bankruptcy Settlements, namely the amounts the parties settled for, the parties' ability to access relevant information to inform the Settlements, and the parties' behavior in aggressively pursuing their interests. Testimony regarding the objective good faith of parties in agreeing to settle claims is admissible. *In re Residential Capital, LLC*, 536 B.R. 132, 148 (Bankr. S.D.N.Y. 2015) ("courts in Minnesota . . . apply an objective test to determine . . . the indemnitee's good

faith in settling."); *See also, Burlington N. Inc. v. Hughes Bros*, 671 F.2d 279, 282–83 (8th Cir. 1982). Furthermore, Hawthorne need not have access to confidential mediation communications in order to make a non-speculative assessment of the good faith of the parties, because his opinion is based on the objective evidence that the parties meaningfully and earnestly engaged in the settlement process. According to Plaintiff, that is enough to make a reliable assessment regarding good faith.

Second, Plaintiff asserts that Hawthorne's opinion is not a conduit for hearsay. Plaintiff agrees that his opinion relies in part on the Bankruptcy Court's opinion, but it asserts that Hawthorne properly considers it in the context of a variety of sources including the bankruptcy record as a whole, the briefs filed for and against the Settlements, expert reports, and the testimony of RFC's Chief Restructuring Officer. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 170–86).) Therefore, Plaintiff argues that Hawthorne's opinion on the good faith of the parties is admissible because it consists of his own opinions on the reasonableness of the Settlements in light of his experience as an RMBS expert and his review of the broader record.

Finally, Plaintiff asserts there is nothing unfair about the admission of opinions in this case regarding the objective good faith that existed among the parties in the Settlements, even in light of Judge Glenn's order that barred Defendants from taking discovery of those confidential mediation communications. After all, neither party had access to the confidential mediation communications. Instead, both sides' experts relied upon non-confidential information that they both had access to. Therefore, Plaintiff contends that Defendants' claims regarding unfair treatment are without basis.

After a careful review of Hawthorne's expert opinion and the arguments presented, the Court denies the motion to exclude Hawthorne's opinion regarding the good faith of the parties in settling the RFC bankruptcy. Hawthorne's opinion relies on objective facts indicating good faith and is not an attempt to speculate about the subjective mindset of the parties. Further, Hawthorne's opinion is not an effort to admit hearsay in the form of the approval of the Bankruptcy Settlements. Although the court's conclusions helped inform his own opinion, he offers his opinion based on his experience in trying and settling RMBS cases. Hawthorne's opinion is also not speculative because he was unable to access confidential settlement communications. There is a sufficiently strong objective record for both sides to render assessments about the factors that would influence a reasonable party in the bankruptcy proceedings. Lastly, Defendants' claimed prejudice regarding the lack of mediation discovery is unavailing, because Hawthorne does not rely on such information to inform his opinion. For these reasons, the Court denies the motion to exclude Hawthorne's opinions regarding good faith.

### vi. Whether Hawthorne's Opinions on RMBS Industry Practices Are Inadmissible

Defendants argue that Hawthorne's opinions concerning practices in the RMBS industry generally should also be excluded, as he has no specialized knowledge or experience in that industry. The Court denies Defendants' motion to exclude Hawthorne's testimony on RMBS industry practices. Hawthorne has demonstrated an extensive knowledge of the industry based on his significant experience representing parties on all sides of RMBS disputes, including insurers and institutional investors.

### 5. Louis Dudney

#### a. Qualifications and Opinion

Louis Dudney is a CPA with a Certification in Financial Forensics and a Managing Partner with AlixPartners, a financial and operational consulting firm. (Smallwood Decl., Ex. 39 (Dudney Rpt. ¶¶ 5–10).) Plaintiff retained Dudney to create "proxy schedules" for the original Mortgage Loan Schedules ("MLS") that were originally attached to RFC's securitization documents. According to Defendants, such an effort was necessary because Plaintiff is unable to locate MLS datasets for 67 of the RMBS trusts at issue in this lawsuit. MLS data is important to the case, Defendants argue, because a number of Plaintiff's claims against the Defendants are premised on their failure to provide accurate MLS data for the loans that RFC purchased from them and later securitized.

To create proxy schedules mirroring the missing MLS schedules, Dudney gathered information from publically available RFC Pooling and Servicing Agreements, loan-level data from MBSData,[13] and loan-level data obtained from Plaintiff related to 12 private securitizations. (*Id.* ¶ 12.) He then compiled the data into two datasets. The first dataset covered a total of 3,736 loans and contained the following data points: (1) RFC loan number; (2) RFC securitization name; (3) defendant name; (4) sample type (*i.e.* global sample or defendant-specific sample); (5) loan group; (6) occupancy status; (7) loan-to-value ratio; (8) combined loan-to-value ratio; and (9) debt-to-income ratio. (*Id.* ¶ 2.)

---

[13] MBSData is a data provider for the RMBS industry that obtains loan-level data from a combination of RMBS trustees, loan servicers, and the SEC. (Smallwood Decl., Ex. 39 (Dudney Rpt. ¶ 12 n.7).)

The second dataset covered 410 loans from the Global Sample and contained the nine data points compiled in the first dataset as well as the following additional metrics: (1) original balance; (2) appraisal value; (3) lien position; (4) note date; (5) property city; (6) property state; (7) property zip code; (8) property type; (9) documentation type; and (10) loan purpose. (*Id.* ¶ 3.) Dudney opines that the first dataset accurately reflects the data represented to be in the MLS in the securitization documents. (*Id.* ¶ 4.) Dudney additionally opines that the second dataset accurately conveys the information contained in the documents used to construct it. (*Id.*)

In assessing breach rates for the mortgages at issue, Plaintiff's re-underwriting experts relied upon Dudney's proxy schedules as substitutes for missing MLS data to determine whether a Defendant failed to provide accurate MLS data for the loans that RFC purchased and later securitized.

### b.       Objection and Analysis

Defendants argue that the Court should exclude Plaintiff's re-underwriting expert opinions that rely on the MLS substitutes created by Dudney. First, Defendants assert that Dudney is unable to confirm that his MLS substitutes are proxies for the original MLS schedules. At most, Defendants argue, he is only able to confirm that the data in his MLS substitute proxy schedule is an accurate reflection of the data contained in the documents he relied upon. Thus, according to Defendants, Dudney's MLS substitutes may not be relied upon to draw opinions about the original MLS schedules that were attached to RFC's securitizations because Dudney himself does not opine that they are the same as the original MLS schedules.

Second, Defendants argue that Plaintiff's re-underwriting experts' reliance on the Dudney datasets as substitutes for missing MLS schedules undermines the reliability of their opinions because (1) the re-underwriting experts conducted no independent analysis of this exhibit and (2) Plaintiff fails to meet its burden to establish that its re-underwriting experts relied on an independent, objective standard. Therefore, Defendants argue the Court should exclude the re-underwriting expert opinions that rely on Dudney's MLS substitution datasets.

Plaintiff responds that Defendants are elevating semantics over substance in their argument, and that the re-underwriters should be allowed to rely on Dudney's expert opinions. Plaintiff asserts that Defendants improperly focus on Dudney's reticence to characterize his datasets as "proxies" for the original MLS schedules in the RFC securitizations. According to Plaintiff, Dudney will not declare that his datasets are proxies for the original MLS schedules because they are not within his knowledge. Rather, such knowledge lies with the re-underwriting experts who were more familiar with the original MLS schedules. Thus, in collecting his datasets, Dudney relies upon the re-underwriting experts to identify the information that was missing from the original MLS schedules, and he follows their instructions to gather that data. Further, Dudney explains in his report that his first dataset "accurately reflects the data that I understand was represented to be in mortgage loan schedules in the Securitization Documents," (Smallwood Decl., Ex. 39 (Dudney Rpt. ¶ 4)), and confirms that his work product "certainly includes and was designed to include the information that was defined as being in the mortgage schedule loans." (*Id.*, Ex. 40 (Dudney Dep. at 102 [Doc. No. 3234]).)

Furthermore, other experts confirm that Dudney's data sets allow them to identify and replace the missing information in a number of the original MLS schedules. (*Id.*, Ex. 14 (Payne Rpt. at 134–35 [Doc. No. 3214]) ("To complete the Mortgage Loan Schedule data, AlixPartners used MBSData to fill in the missing data fields"); *see also* Rand Decl., Ex. 31 (Butler Rpt. at 160–61[Doc. No. 3369]); Smallwood Decl., Ex. 43 (Hunter Rpt. at 137–38[Doc. No. 3237]).) Thus, Plaintiff contends that the lack of a statement from Dudney that his datasets were "proxies" for the original MLS schedules is of no consequence.

Plaintiff additionally asserts that, contrary to Defendants' assertions, the re-underwriting experts were not required to conduct an independent review of Dudney's work. Rather, it is appropriate for an expert in one particular field (*i.e.* mortgage re-underwriting) to rely on the opinion of an expert in another field (*i.e.* financial forensics) to formulate an opinion. *Am. Med. Sys., Inc. v. Laser Peripherals*, LLC, 712 F. Supp. 2d 885, 896–97 (D. Minn. 2010). Furthermore, any challenges to the factual basis for expert opinions bear on credibility, not admissibility. *See In re St. Jude Med., Inc. Silzone Heart Valves Prod. Liab. Litig.*, 493 F. Supp. 2d 1082, 1089 (D. Minn. 2007) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") Plaintiff contends that both the re-underwriting experts and Dudney are available for cross-examination, and thus there is no basis to exclude the re-underwriter's opinions that rely on the MLS substitutes.

After careful consideration, the Court denies the motion to exclude re-underwriting expert opinions that rely on Dudney's MLS substitute data. Dudney's principal task here was to track down the information that went missing from the original MLS schedules that were part of the RFC's RMBS securitizations. It appears he was able to competently do so by collecting information from reliable sources, namely the SEC EDGAR database[14] and two different private companies that collect and sell information pertaining to RMBS securities—MBSData, Inc. and Vision Co. These sources supply the exact same data that was included in the original MLS schedules for the RFC securitizations. Dudney also tested the MBSData and Vision data to confirm its reliability. (Smallwood Decl., Ex. 40 (Dudney Dep. 172–75).) To do so, he compared overlapping data from all of the different sources he relied upon. In one analysis, he observed that they matched on 14,903 out of 14,904 data points. (Smallwood Decl., Ex. 39 (Dudney Rpt. ¶ 20).) In another, he observed a perfect match for all 53,217 data points. (*Id.* ¶ 22.) Therefore, Dudney demonstrates that his methods of obtaining the missing information were reliable by corroborating it among multiple different sources.

Furthermore, Defendants fall significantly short of demonstrating that the underwriter's opinions are so undermined by their incorporation of the data collected by Dudney that they should be excluded. Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and "[g]aps in an expert witness's qualifications or

_____

[14] MBSData obtains its loan-level data from a combination of RMBS trustees, loan servicers, and the SEC's EDGAR database. (Smallwood Decl., Ex. 39 (Dudney Rpt. ¶12 n.7).)

knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100. Thus, the Court denies the motion to exclude underwriter opinions that rely on Dudney's data sets.

### C. Plaintiff's Motion to Exclude Expert Testimony

ResCap originally moved to exclude the opinions of ten experts in their entirety, and to exclude the opinions of three other experts on particular topics.[15] In this Order, the Court considers Plaintiff's motion only as it relates to the rebuttal experts that Home Loan Center relies upon.[16] Home Loan Center's expert Phillip Burnaman opines on several subjects including the interpretation of various representations and warranties in RMBS transactions, the value of servicing claims, and Plaintiff's damages models. (Rand Decl., Ex. 3 (Burnaman Rpt. ¶ 12).) Also through Dr. Walter Torous, Home Loan Center seeks to rebut Plaintiff's damages expert. (*Id.*, Ex. 14 (Torous Rpt. ¶ 16) [Doc. No. 3344].) Economist Dr. Ethan Cohen-Cole opines regarding whether RFC's loan-servicing work contributed to the losses suffered by its RMBS loans. (*Id.*, Ex. 16 (Cohen-Cole Rpt. ¶ 17) [Doc. No. 3349].) Home Loan Center also seeks to offer the opinion of Attorney Steven Schwarcz regarding certain representations and warranties that RFC made to the Trusts, and also rebuts aspects of Plaintiff's damages methodologies. (*Id.*, Ex. 22 (Schwarcz Rpt. ¶ 6) [Doc. No. 3358].) Thomas Kaufman

---

[15] Plaintiff's objection to the admission of certain testimony and opinions by Frank Lucco has since been withdrawn, and the Court does not consider it herein. (*See* Aug. 7, 2018 Letter at 1.)

[16] However, to the extent that the other Defendants rely upon the same experts as Home Loan Center, this ruling applies with equal force to them.

opines on "how a person experienced in the real estate finance market would understand the phrase 'remaining life of the Loans,' as it is used in the Client Guide." (*Id.*, Ex. 35 (Kaufman Rpt. at 2) [Doc. No. 3375].) Home Loan Center seeks to offer the opinion of Law Professor George Triantis regarding "the nature of certain settlements reached in the ResCap bankruptcy and the incentives of the parties thereto." (*Id.*, Ex. 45 (Triantis Rpt. ¶ 5) [Doc. No. 3385].) Justice Anthony Carpinello opines regarding the likelihood of success of certain aspects of the underlying, settled claims, including a statute of limitations defense, the fraud claims, and the use of sampling. (*Id.*, Ex. 51 (Carpinello Rpt. ¶ 1, App. A) [Doc. No. 3391].)

### 1. Phillip Burnaman

#### a. Qualifications and Opinion

Home Loan Center offers the testimony of Phillip Burnaman to rebut "certain statements and opinions contained in the expert reports of Donald Hawthorne, Henry Hayssen, Judge Richard Solum, Steven Butler, Dr. Karl Snow, and Louis Dudney."[17] (*Id.*, Ex. 3 (Burnaman Rpt. ¶ 12).) Burnaman holds an MBA in finance and has worked in the mortgage finance industry for over 33 years. (*Id.* ¶¶ 2, 10.) As support for his "expertise in all aspects of RMBS and commercial mortgage-backed securities," Burnaman cites his work at Citigroup between 1990 and 1994, where he "performed all the tasks related to the acquisition of whole loan portfolios, including extensive loan-level due diligence, underwriting reviews, and valuation of mortgage portfolios in excess of $4 billion," and later at ING Bank between 1994 and 2004, where he managed a

---

[17] Defendant Impac also relies upon the testimony of Phillip Burnaman.

portfolio including RMBS and "reviewed mortgage securitization transactions for their suitability as investments." (*Id.* ¶¶ 1, 3–5.) Burnaman is also a member or former member of several industry organizations and has provided consulting or expert testimony in several cases since the mortgage crisis. (*Id.* ¶ 9, page A-3.)

Burnaman criticizes the opinion of Plaintiff's expert Hawthorne, who opines generally that RFC's Settlements were reasonable and reached in good faith. (*See* Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 164–69).) Burnaman opines, *inter alia*, that Hawthorne's comparison to other RMBS settlements is flawed, and that Hawthorne improperly undervalues the non-indemnifiable servicing claims settled in the bankruptcy. (Rand Decl., Ex. 3 (Burnaman Rpt. ¶¶ 116–59).)

In support of his opinion, Burnaman illustrates that the servicing claims are undervalued by assessing the "potential size of one type of potential servicing claim against RFC, related to the foreclosure timeline requirements detailed in the Servicer Guide." (*Id.* ¶ 128.) Explaining his methodology, Burnaman states that he identified foreclosure timeliness requirements in RFC's servicing contract documents and determined how many RFC-serviced loans in foreclosure exceeded that timeline. (*Id.* ¶¶ 129–31.) Then, he applied the penalty rate from the Servicer Guide to calculate "the cost of foreclosure timeline breach," and reduced each loan's penalty by 30 days to account for permitted exceptions to the foreclosure timeline. (*Id.* ¶¶ 132–35.) After describing this analysis, Burnaman opines that, although evaluating this servicing claim "could require a loan-by-loan review in order to account for the specific allowable exclusions and permitted interruptions to the foreclosure timeline," his estimation of the

potential value of this particular servicing claim "was in the range of some $1.4 billion." (*Id.* ¶ 136.) After applying some adjustments in response to Hawthorne's rebuttal, Burnaman amended this estimate to $1.1 billion. (*See* Rand Decl., Ex. 4 (Burnaman Surreply ¶¶ 32–39 [Doc. No. 3299]).)

Burnaman also opines that Plaintiff's experts err by attributing loan defaults that occurred after two or three years of good payment history to breaches by loan originators, because "[i]ndustry sources support the understanding that defaults after two or three years of good payment history are unlikely to be attributable to origination defects." (*Id.* ¶ 101.)

### b.    Objection and Analysis

Plaintiff moves the Court to exclude Burnaman's opinions about the reasonableness of the Settlements, the parameters of servicing claims against RFC, and loss causation. (Pl.'s Mem. at 12–23 [Doc. No. 3253].) Plaintiff argues that Burnaman's opinion about the reasonableness of the Settlements is irrelevant because Plaintiff need not prove that the Settlements were reasonable, referring to their summary judgment argument to that effect. (*Id.* at 13.) In its order on summary judgment, however, the Court found that the reasonableness of the Settlements is a fact issue remaining in this case. (Aug. 15 Order at 75–80.) Plaintiff's argument that Burnaman's testimony on reasonableness is irrelevant thus fails for the same reasons.

Plaintiff further argues that Burnaman is not qualified to opine about the reasonableness of a settlement because he is not a lawyer and lacks the settlement or litigation experience to analyze the merits of the legal claims underlying the Settlements.

48

(Pl.'s Mem. at 12–14.)  Plaintiff also asserts that Burnaman is not qualified to opine on the value of servicing claims because he "has never serviced a mortgage loan, worked at a servicer, or developed or implemented policies or procedures for servicing residential mortgage loans." (*Id.* at 14 n.7.)

The Court finds that Burnaman is qualified to opine on these issues.  Burnaman has extensive experience with the purchase and management of RMBS, and his experience gives him the expertise to opine on the expectations and norms of the RMBS industry and their effect on the strengths and weaknesses of the claims in the Settlements. (*See* Rand Decl., Ex. 3 (Burnaman Rpt. ¶¶ 1–10).)  Plaintiff's additional argument that Burnaman lacks the requisite experience to opine on loan servicing is belied by the fact that, while at ING Bank, he "worked to form ING's special servicing unit . . . and participated in the development of that unit's policies and procedures." (*Id.* ¶ 4.) Further, Burnaman's opinion is, by and large, a rebuttal, addressing certain issues that Burnaman asserts Plaintiff's experts have overlooked.  Based upon his experience, Burnaman is qualified to render an expert opinion.

Plaintiff next argues that Burnaman's opinions about servicing claims are irrelevant because Plaintiff does not seek indemnification for servicing claims, and that the methodology underlying those opinions is flawed.  (Pl.'s Mem. at 14–20.)  First, Plaintiff asserts that because it does not seek indemnification for servicing claims settled in bankruptcy, the reasonableness of the settlement of those claims is not relevant, because Burnaman cites no evidence that a higher value attributed to the servicing claims would have had any effect on the value of the indemnifiable claims.  (*Id.* at 14–15.)

Defendants note that Plaintiff's expert Hawthorne does not ignore the settlement of servicing claims, however, and devotes several pages to considering the value and viability of servicing claims in his overall analysis of the Settlements. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶¶ 252–63).) Hawthorne opines that "the potential value of servicing claims was not a significant driver of the overall settlement amounts for either the RMBS Trustee Settlement or the Monoline Settlements." (*Id.* ¶ 254.) It is fair game then to permit Defendants to rebut that opinion.

The Court finds, however, that Burnaman's opinion on the potential value of foreclosure-timeline based servicing claims threatens to exceed its relevant scope as a rebuttal to Hawthorne's opinions. What is relevant to the reasonableness of the Settlements is the parties' expectation of possible recovery on available claims, as discounted by the litigation risk. And as Plaintiff points out, Burnaman makes no attempt to account for litigation risk, attempting instead to approximate the maximum possible recovery on this claim. (Pl.'s Mem. at 15.) Even if Burnaman is correct that the Trusts and Monolines might have recovered in a hypothetical trial, at maximum, $1.1 billion for violations of the Servicer Guide's foreclosure timeline, it is misleading without considering all of the factors that bear on litigation risk and the likelihood of recovering that amount. Thus, having entirely failed to engage in that analysis, Burnaman's testimony is misleading and its probative value is outweighed by unfair prejudice. Therefore, it is excluded.

Finally, Plaintiff asks the Court to exclude Burnaman's opinion that the RMBS industry generally understood that loan defaults after two or three years of good payment

history are "unlikely to be attributable to origination defects." (Rand Decl., Ex. 3 (Burnaman Rpt. ¶ 101).) Plaintiff argues that this opinion is unreliable because Burnaman can cite no academic study supporting it, and because Burnaman failed to conduct an econometric regression analysis to isolate the connection between early payment history and origination defects. (Pl.'s Mem. at 20–22.)

Burnaman cites only general sources for this statement in his report, and relies primarily on his own career experience and the deposition testimony of certain of RFC's repurchase personnel. (*See* Rand Decl., Ex. 3 (Burnaman Rpt. ¶¶ 98–103).) Without competent evidence in this case establishing that break in causation, this testimony is unreliable and will be excluded at trial.

### 2. Dr. Walter Torous

#### a. Qualifications and Opinion

Defendant Home Loan Center offers the testimony of Dr. Walter Torous to rebut Plaintiff's damages expert Dr. Karl Snow. (Rand Decl., Ex. 14 (Torous Rpt. ¶ 16).) As noted, Snow developed three alternative methodologies for allocating Plaintiff's damages among the remaining Defendants—the Breaching Loss Approach, the Allocated Breaching Loss Approach, and the Allocated Loss Approach—and completed calculations to assign damages to each defendant under each methodology. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 1–4).) The Court has excluded all but the Allocated Breaching Loss Approach for trial.

Torous criticizes each of Snow's three allocation approaches. With regard to the Breaching Loss Approach, he opines that it "fails as a damages approach because it does

not account for factors unrelated to the alleged breaches that could have caused some or all of the loan-level losses." (Rand Decl., Ex. 14 (Torous Rpt. ¶ 21).) Specifically, Torous cites "macroeconomic conditions, including the massive and well documented real estate decline, financial crisis, and U.S. recession," as well as losses associated with RFC's servicing. (*Id.* ¶¶ 21–22.)

### b. Objection and Analysis

Plaintiff moves to exclude Torous's opinions regarding loss causation, arguing that loss causation is not relevant in this case. (Pl.'s Mem. at 23.) Plaintiff further argues that Torous's opinion that Snow's Breaching Loss Approach fails to account for the effect of macroeconomic conditions is unsupported, because Torous has performed no empirical analysis to determine the effect of macroeconomic factors on defaulting loans. (*Id.* at 23–24.) In light of the Court's ruling on summary judgment excluding Snow's Breaching Loss Approach, Plaintiff's motion to exclude this part of his testimony appears to be moot. The Court cautions that, because Torous has limited his loss-causation criticism to the Breaching Loss Approach in his report and because of this Court's analysis as to the relevant causation standard in this case, Torous will not be permitted to testify about loss causation in rebuttal to the Allocated Breaching Loss Approach at trial.

### 3. Dr. Ethan Cohen-Cole

### a. Qualifications and Opinion

Defendant Home Loan Center offers the testimony of Dr. Ethan Cohen-Cole to rebut Plaintiff's damages expert Dr. Karl Snow. (Rand Decl., Ex. 16 (Cohen-Cole Rpt. ¶ 17).) Cohen-Cole holds a Ph.D. in economics and has 17 years of experience "in

financial services, litigation consulting and bank supervision, including experience with the Federal Reserve System as a bank regulator, and as a policy and regulation expert." (*Id.* at A-1-2.) Plaintiff does not challenge Cohen-Cole's qualifications as an expert here.

Cohen-Cole opines that Snow's damages analysis is flawed because it fails to consider whether RFC's performance of servicing obligations contributed to the losses suffered by its RMBS loans. (*Id.* ¶ 16.) He describes an empirical analysis he conducted of the frequency of loan delinquency and loss severity for loans that were serviced by RFC, compared to loans not serviced by RFC. (*Id.* ¶¶ 18–22.) Cohen-Cole concludes that $4.1 billion of the losses on RFC's RMBS loans "can be attributed to the expected differences between RFC's servicing and others' servicing." (*Id.*)

### b. Objection and Analysis

Plaintiff seeks to exclude Cohen-Cole's testimony in its entirety. Plaintiff argues that Cohen-Cole's opinions are prejudicial because he purports to opine on losses caused by RFC's servicing without examining any alleged servicing breaches by RFC or how they caused such losses. (Pl.'s Mem. at 25.) Thus, Plaintiff argues that Cohen-Cole's analysis "fails to establish any relationship between RFC's breach of any servicing obligation and any delinquencies or loss severity on the at-issue loans." (*Id.*)

Defendants respond that they need not show the servicing-linked losses were caused by specific breaches of RFC's servicing obligations, because Cohen-Cole's analysis simply rebuts Snow's conclusion that such losses "resulted from" Defendants' breach. (Defs.' Opp'n at 13 [Doc. No. 3518].) This rebuttal, Defendants argue, need

only show that a significant portion of the losses resulted from something else, and that something else need not be a breach of RFC's servicing obligations.

Plaintiff's argument here has merit. Cohen-Cole's criticism of Snow's allocation analysis is that it fails to consider that RFC may have contributed to the loan-level losses. Based upon his regression analysis, he opines that loans serviced by RFC lost $4 billion more than the average loan. (Rand Decl., Ex. 16 (Cohen-Cole Rpt. ¶ 22).) But Cohen-Cole's analysis merely identifies this disparity between RFC-serviced loans and other loans. It does not link that disparity to any particular practices of RFC, or to any breaches of RFC's contractual servicing obligations. And because the Court has excluded Snow's Breaching Loss Approach and Allocated Loss Approach, Snow's remaining Allocated Breaching Loss Approach purports to allocate liabilities incurred in the Settlements, based on the understanding that Defendants' breaching loans "were the precipitating source of harm that resulted in the allowed claims." (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 39–40).) Thus, Cohen-Cole's opinion that RFC's actions caused loan-level losses is only relevant to whether the Settlements were reasonable. Because the Settlements, and the claims underlying them, form the basis for Plaintiff's indemnification claims in this suit, Defendants' rebuttal of Plaintiff's damages argument must operate within that framework.

Cohen-Cole does little to link the results of his regression analysis to any breaches of RFC's servicing obligations that could have been settled in the bankruptcy. He admits that he did not evaluate RFC's servicing practices or the contracts governing its role as a servicer. (Rand Decl., Ex 18 (Cohen-Cole Dep. at 146–47) [Doc. No. 3352].) He

speculates in his deposition that "the analysis does indicate that there must have been something relatively defective at RFC to have generated that quantity of additional losses vis-à-vis other servicers." (*Id.* at 146.) The Court finds that the risk of unfair prejudice or of confusing the jury substantially outweighs the probative value of Cohen-Cole's testimony, so it excludes Cohen-Cole's opinion on that basis. *See* Fed. R. Evid. 403. Therefore, the Court does not need to reach Plaintiff's further arguments that Cohen-Cole's methodology was unreliable and based on incomplete data.

### 4.     Steven Schwarcz

#### a.     Qualifications and Opinion

Defendant Home Loan Center offers the testimony of Steven Schwarcz to "respond to Plaintiffs' experts' interpretations of a number of representations and warranties that RFC made to the at-issue trusts, as well as certain damages methodologies presented by Plaintiffs' experts." (Rand Decl., Ex. 22 (Schwarcz Rpt. ¶ 6).) Schwarcz is an attorney with 12 years of experience in securitization practice, where he "helped to pioneer the development of securitization as a discipline." (*Id.* ¶ 2.) He has also taught law school courses and published in the area of securitization, structured finance, and capital markets. (*Id.* ¶ 3.) Plaintiff makes no argument that Schwarcz is unqualified.

Schwarcz opines, *inter alia*, that the allocation methodology used by Plaintiff's damages expert Snow is flawed because it assumes that all breaches of RFC's representations and warranties to Trusts and Monolines also constituted breaches of originating banks' representations and warranties to RFC. (*Id.* ¶¶ 114–27.) Schwarcz speculates that there were areas where RFC's representations and warranties did not

overlap with originator representations and warranties, and that the portion of the Settlements attributable to breaches of those representations and warranties are not indemnifiable. (*Id.*) The three areas of non-overlap that Schwarcz identifies are: (1) breaches of RFC's representation that loans were underwritten pursuant to the standards in the Client Guide, when applied to loans for which RFC had granted originating banks an exception to the Client Guide's underwriting standards; (2) any breach of RFC's representations and warranties that occurred *after* the effective date of the originating bank's representations and warranties (that is, after RFC's purchase of the loan); and (3) any breach of RFC's representations and warranties concerning RFC's own conduct or status, rather than the characteristics of the loans. (*Id.*)

### b.  Objection and Analysis

Plaintiff does not seek exclusion of Schwarcz's opinion in its entirety, but it asks the Court to preclude Schwarcz from testifying that some representations and warranties to Trusts gave rise to RFC-only liability. (Pl.'s Mem. at 32–37.) Plaintiff argues that Schwarcz's opinion is unreliable and prejudicial because he fails to identify a single real-life circumstance where RFC breached a representation and warranty that was not also a breach of originator banks' representations and warranties. (*Id.*) Further, Plaintiff argues that Schwarcz's opinion that Snow overlooked a "significant potential source of non-indemnifiable liability" is unreliable because he does nothing to quantify the value of such "significant" liability. (*Id.* at 37.)

The Court agrees that Schwarcz's testimony on this issue lacks support. He identifies no actual loans for which RFC breached representations and warranties and

originating banks did not. (Rand Decl., Ex. Ex. 22 (Schwarcz Rpt. ¶¶ 114–27).)
Schwarcz makes reference to some allegations before, and proofs of claim during, the
bankruptcy proceedings, but identifies no evidence to support his opinion. (*See id.*
¶¶ 120, 127.) And a purely hypothetical opinion does little to assist the finder of fact.
Although Schwarcz's opinion on this matter is largely unsupported, the Court will defer
ruling on Plaintiff's motion to exclude it until trial. Schwarcz may not supplement his
report with additional support for these opinions, but the Court recognizes that competent
fact evidence may be introduced at trial to support this opinion. The Court will entertain
a proffer at the appropriate time to reconsider whether Schwarcz's testimony is
admissible.

### 5. Thomas Kaufman

Defendant Home Loan Center offers the testimony of Thomas Kaufman to opine
on "how a person experienced in the real estate finance market would understand the
phrase 'remaining life of the Loans,' as it is used in the Client Guide." (Rand Decl., Ex.
35 (Kaufman Rpt. at 2).) Home Loan Center offers this testimony to assist the trier of
fact should the Court find that the contract term "life of the loan" is ambiguous. (Defs.'
Opp'n at 25 n.24.) In its August 15 Order, the Court granted summary judgment to
Plaintiff on this issue, construing the relevant contract provision to provide "that
Plaintiff's remedies, and their right to damages, extend to liquidated or foreclosed loans,
subject to the applicable statutory limitations periods." (Aug. 15 Order at 42–50.) In
fact, the Court adopted the same definition of "life of the loan" in that analysis as
Kaufman does in his opinion, but reached a different conclusion than Defendants about

the effect of the provision as a whole. (*Compare* Aug. 15 Order at 44–50 *with* Rand Decl., Ex. 35 (Kaufman Rpt. at 4).) In light of this decision, Kaufman's opinion has no continuing relevance and cannot assist the trier of fact. Plaintiff's motion to exclude his testimony and opinions is granted.

### 6. George Triantis

#### a. Qualifications and Opinion

Defendant Home Loan Center offers the testimony of George Triantis to rebut portions of the reports of Plaintiff's experts Snow and Hawthorne. (Rand Decl., Ex. 45 (Triantis Rpt. ¶ 5).) He purports to opine on "the nature of certain settlements reached in the ResCap bankruptcy and the incentives of the parties thereto." (*Id.*) Triantis is a law professor who teaches and publishes in bankruptcy, contracts, commercial law, and corporate finance, and has taught since 1989. (*Id.* ¶¶ 1–4, App. A.) He focuses on the intersection of law and economics in these areas, paying "special attention to issues of incentives and information." (*Id.* ¶ 2.) Triantis is an elected member of the American Law Institute and serves on the Board of the American Law & Economics Association. (*Id.* ¶ 3.) He represents that he has been invited to speak at numerous bankruptcy conferences, and that "many" of his published works "have analyzed the structure, process, and incentives of the bankruptcy process." (*Id.* ¶ 4.)

Triantis opines that the allowed claims in the Settlements are not reliable indicators of what RFC's liability would have been outside the context of bankruptcy, because the negotiating creditors knew that they would not receive the full amount of the claims, but only a subset based on the size of their allowed claims relative to other

creditors' allowed claims. (*Id.* ¶¶ 9, 94–111.) Further, he opines that settlement negotiations would have included trade-offs for unrelated issues that would have affected the accuracy of the value of the allowed claim values. (*Id.* ¶¶ 10, 112–29.) Triantis also opines that the Settlements fail to distinguish between indemnifiable and non-indemnifiable claims, and that Plaintiff's expert Snow fails to account for the settlement of non-indemnifiable claims in his damages analysis. (*Id.* ¶¶ 11, 130–60.)

Triantis opines that the RMBS Trusts and Monolines agreed to settle all claims against RFC in exchange for the $635.5 million and $174.4 million that RFC paid on those claims, respectively, and that "any further liability" of RFC to the Trusts and Monolines "was permanently extinguished upon confirmation of the bankruptcy plan." (*Id.* ¶ 12.) Finally, Triantis describes various disclosures and documents from the bankruptcy that demonstrate, in his opinion, that the parties ascribed little value to RFC's potential recovery in lawsuits against originator banks. (*Id.* ¶¶ 13, 168–78.)

### b.    Objection and Analysis

Plaintiff seeks to exclude Triantis's testimony and opinions in their entirety. First, Plaintiff argues that Triantis is not qualified to opine on the reasonableness of the Settlements because he lacks any experience in RMBS litigation or settlement, and further that he lacks practical experience even in bankruptcy, his purported area of expertise. (Pl.'s Mem. at 46–47.) Second, Plaintiff argues that Triantis's opinions relating to the reasonableness of the Settlements are irrelevant because Plaintiff need not prove the Settlements were reasonable, (*id.* at 47–51),—a basis now foreclosed by this Court's August 15 Order. (*See* Aug. 15 Order at 75–81.) Third, Plaintiff argues that

Triantis's opinions are unreliable because he improperly speculates about the intent and motivations of the negotiating parties. (Pl.'s Mem. at 47–48.) Fourth, Plaintiff argues that Triantis's opinions are unhelpful because he does not quantify the non-indemnifiable claims that he asserts Snow overlooked in his allocation analysis. (*Id.* at 47–51.) Finally, Plaintiff argues that Triantis mischaracterizes the treatment of cure claims in bankruptcy by implying that servicing claims were stronger because they were cure claims, when cure claims are simply entitled to priority in bankruptcy distributions. (*Id.* at 53.)

The Court agrees that Triantis is simply not qualified to opine about the reasonableness of the Settlements and to rebut Hawthorne's opinion. As the Court has previously determined, Plaintiffs must demonstrate that the Settlements are reasonable to obtain indemnification from Defendants. (*See* Aug. 15 Order at 75–80.) This proof requires consideration of "what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim," and should take into account "facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982). Defendants admit that Triantis does not assess the strengths and weaknesses of the underlying claims and defenses in the Settlement. (Defs.' Opp'n at 38.) Triantis admits that he has no experience in the RMBS context. (*See* Rand Decl., Ex. 47 (Triantis Dep. at 77, 84–85, 91) [Doc. No. 3387].) Without relevant experience, Triantis's opinions about the Settlements cannot assist the jury in determining whether the Settlements were a reasonable resolution of the RMBS claims against RFC. Triantis's opinions that the allowed claims are not reliable indicators of what RFC's liability would have been

outside of bankruptcy and that trade-offs inherent in the bankruptcy process warped the accuracy of the allowed claims are entirely speculative and will therefore be excluded. In essence, Triantis takes the untenable position that no settlement reached in bankruptcy court can be reasonable.

Several of Triantis's criticisms are directed at Snow's allocation methods, but in reality, he criticizes Snow's reliance on Hawthorne's opinion that the Settlements were reasonable. Triantis opines that Snow's allocation approach is flawed because he fails to account for non-indemnifiable claims settled in the bankruptcy. (*Id.*, Ex. 45 (Triantis Rpt. ¶¶ 130–60).) Triantis criticizes Snow's decision to allocate only $73 million of the Trusts' allowed claims to servicing, explaining that this measure was a cap set by the Trusts' financial advisor, Duff & Phelps, for re-allocation of the settlement distributions, and not a separate allowed claim. (*Id.* ¶¶ 136–38.) Further, Triantis explains that most of the Trusts' servicing claims were cure claims, claims which are ordinarily entitled to priority payment in bankruptcy. (*Id.* ¶ 139.) Triantis opines that "[t]his may explain why Duff and the trustees imposed a significantly lower cap on the trusts' servicing claims for purposes of Duff's allocation methodology" than the $783 million than Duff had originally estimated as the potential value of servicing claims. (*Id.* ¶ 143.) Triantis also criticizes Snow for failing to account for an 11% portion of the Trusts' recovery under their claims against RFC that was re-allocated to trusts with claims against GMAC Mortgage, RFC's sister subsidiary. (*Id.* ¶¶ 148–51.) But Snow's decision to exclude $73 million from the Trusts' allowed claims as non-indemnifiable stems from his reliance on Hawthorne's opinion that the Settlements, and their identification of the value of non-

indemnifiable claims, are reasonable. (Smallwood Decl., Ex. 1 (Snow Rpt. ¶¶ 16–21).) Triantis's criticisms of Snow's allocation methods are functionally an opinion about the reasonableness of the Settlements, and hence a rebuttal of Hawthorne's opinion, which the Court has determined Triantis is not qualified to give.

Triantis's opinion that Plaintiff cannot seek indemnification for liabilities extinguished in the Settlements is foreclosed by the Court's summary judgment decision. (*See* Aug. 15 Order at 81–90.) Thus, the Court finds that these opinions will not assist the trier of fact, and therefore grants Plaintiff's motion to exclude Triantis's testimony and opinions in their entirety.

### 7. Justice Anthony Carpinello

#### a. Qualifications and Opinion

Defendant Home Loan Center offers the testimony of Justice Anthony Carpinello to rebut certain opinions of Plaintiff's experts Hawthorne and Snow. (Rand Decl., Ex. 51 (Carpinello Rpt. ¶ 1, App. A).) Justice Carpinello practiced for 20 years in New York, including as a partner at a firm that specialized in commercial litigation. (*Id.* ¶ 4.) He litigated "issues involving commercial paper, residential and commercial loan foreclosure, and indenture trustee rights and obligations." (*Id.*) He was subsequently elected to the New York State Supreme Court and served on the New York State bench for 14 years. (*Id.*) "Breach of contract claims and issues relating to statute of limitations were regularly included" among the cases he heard. (*Id.*) In addition, he has "often dealt with fraud claims" over the course of his career, and as a judge he "addressed issues

concerning the approval of settlements where it was necessary for parties to allocate between different types of claims." (*Id.* ¶ 33.)

Justice Carpinello opines on three issues relevant to Hawthorne's and Snow's analyses. While evaluating the merits of claims and defenses, Hawthorne opines that RFC "could have had no confidence" that a statute of limitations argument based on the date of accrual for breaches of representations and warranties would be successful, given the state of New York caselaw on the issue. (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 328).) Justice Carpinello agrees that the issue was "technically" unresolved at the time the parties entered settlement, but opines that Hawthorne overstates the Trusts' likelihood of success on the issue and concludes that "informed litigants" would have found it "highly likely" that the New York Court of Appeals "ultimately would rule that the six-year statute of limitations for breaches of representations and warranties would accrue as of the date of the closing of the RMBS trusts." (Rand Decl., Ex. 51 (Carpinello Rpt. ¶¶ 27–29).) The effect of this statute of limitations defense, Justice Carpinello opines, would have been to exclude the claims of 374 of the 506 settling trusts. (*Id.* ¶ 31.)

Justice Carpinello agrees with Hawthorne's opinion that it was reasonable for RFC "to give serious consideration to the risk that a fraud claim brought by a monoline could expose RFC to damages in excess of a repurchase measure." (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 237).) Justice Carpinello criticizes Snow, therefore, for failing to account for those fraud claims and opines that, "insofar as the fraud claims are not indemnifiable, Dr. Snow's allocation methodology is fundamentally flawed." (Rand

Decl., Ex. 51 (Carpinello Rpt. ¶ 37).)  The Court's August 15 Order on summary judgment forecloses the rendering of this opinion.  (*See* Aug. 15 Order at 36–42.)

Finally, Justice Carpinello criticizes Hawthorne's conclusion that, from the perspective of a potential defendant at the time RFC reached its Settlements, "it would have been very likely that courts would allow sampling as proof of liability and damages."  (Smallwood Decl., Ex. 6 (Hawthorne Rpt. ¶ 352).)  Justice Carpinello opines that Hawthorne "significantly overstates" this likelihood.   (Rand Decl., Ex. 51 (Carpinello Rpt. ¶ 38).)

### b.    Objection and Analysis

Plaintiff moves to exclude Justice Carpinello's testimony and opinions in their entirety.  Plaintiff argues that Justice Carpinello is not qualified to opine on how RMBS litigants would have valued claims during settlement, because he has not encountered RMBS claims as a litigant, mediator, or judge.  (Pl.'s Mem. at 56.)  Plaintiff further argues that because his opinions are based on so little experience, there is a significant danger that his prior service as a judge and the perception of authority surrounding that service will prejudice the jury hearing his testimony.  (*Id.* at 58; June 20, 2018 Hr'g Tr. at 70–71.)

For similar reasons supporting this Court's exclusion of Plaintiff's expert, Judge Solum, the Court grants Plaintiff's motion to exclude Justice Carpinello's opinions and testimony in their entirety.   Justice Carpinello purports to opine about the relative strength and litigation risk of the Monolines' fraud claims against RFC, but he cites no particular experience with fraud beyond his general experience on the bench.  (Rand

Decl., Ex. 51 (Carpinello Rpt. ¶ 33).) He has no experience at all to support his opinions about the perceived viability of sampling-based claims at the time of settlement. (*Id.* ¶¶ 38–41.) Much like Judge Solum, Justice Carpinello does not have the qualifications to assist the jury with his opinions on these issues. *See Lauzon*, 270 F.3d at 686.

Justice Carpinello bases his opinion about the viability of RFC's statute of limitations defense from the point-of-view of negotiating parties upon his 20 years of practice as a commercial litigator in New York and his 14 years as a judge applying New York law. (Rand Decl., Ex. 51 (Carpinello Rpt. ¶¶ 3–4).) He testified in his deposition that during his time as an appellate judge in New York, he would "regularly have cases involving not only mortgages but statutes of limitation." (*Id.*, Ex. 52 (Carpinello Dep. at 74) [Doc. No. 3392].) Justice Carpinello also stated that, aside from providing an expert report in connection with a 2014 case, he has not worked with RMBS litigation either as a practitioner or on the bench. (*Id.* at 11–13, 20–23.)

Although Justice Carpinello may be well-acquainted with the New York statute of limitations because of his work as a practitioner and jurist in New York, the Court finds that his opinion on this issue is inadmissible. Justice Carpinello opines that the parties negotiating the Settlements would have considered it "highly likely" that the New York Court of Appeals would, in the future, issue a decision favorable to RFC on the question of when a representation and warranty breach claim accrues. (Rand Decl., Ex. 51 (Carpinello Rpt. ¶ 29).) Such an opinion, even if supported by more experience than Justice Carpinello has, would carry a significant risk of prejudice. A retroactive

examination of the likelihood of predicting a court decision, in most cases, would be too speculative to justify its own probative force.  Justice Carpinello's opinions are excluded.

**IV.  ORDER**

1.  Defendants' Motion to Exclude Certain Opinions of Plaintiff's Experts [Doc. No. 3192] is **GRANTED IN PART, DENIED IN PART, and DENIED AS MOOT IN PART**; and

2.  Plaintiff's Motion to Exclude Expert Testimony and Opinions of Defendants' Experts [Doc. No. 3245] is **GRANTED IN PART, DENIED IN PART, and DENIED AS MOOT IN PART**.

Dated: September 19, 2018                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge