# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Litigation | No. 13-cv-3451 (SRN/HB) |
| This document relates to:<br><br>Residential Funding Company, LLC, Plaintiff<br><br>v.<br><br>Home Loan Center, Inc., Defendant | No. 14-cv-01716 (SRN/HB) |

## DEFENDANT HOME LOAN CENTER'S OPPOSITION TO PLAINTIFF'S <u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

## PRELIMINARY STATEMENT

Defendant Home Loan Center respectfully submits the following outline of arguments in opposition to Plaintiff's motion for judgment as a matter of law.  Home Loan Center makes this submission based on the grounds on which it anticipates that Plaintiff will move and reserves the right to submit additional evidence or argument based on the arguments, if any, that Plaintiff advances.

\* \* \* \* \*

I.    Rule 50(a) sets forth a demanding standard for judgment as a matter of law.

    A.    A court may not grant judgment as a matter of law unless "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

    B.    The Court may not grant a party's motion for judgment as a matter of law unless "no reasonable juror, taking all reasonable inferences in the light most favorable to the opposing party, could find against the movant." *Estate of Snyder v. Julian*, 789 F.3d 883, 887 (8th Cir. 2015) (rejecting defendant's claim that district court should have granted motion for judgment as a matter of law).

        1.    The Eighth Circuit places an exacting burden on parties moving for judgment as a matter of law due to "the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002) (citation omitted) (reversing in part district court's grant of judgment as a matter of law).

            a.    A court may not grant judgment as a matter of law unless "[t]he evidence [] point[s] unswervingly to only one reasonable conclusion." *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996) (citation omitted) (reversing district court's grant of judgment as a matter of law).

            b.    Judgment as a matter of law is only appropriate when "all the evidence points in one direction and is susceptible to no

1

reasonable interpretation" supporting the nonmoving party. *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir. 1997) (reversing district court's grant of judgment as a matter of law).

2.    In evaluating a motion for judgment as a matter of law, "the court must draw all reasonable inference[s] in favor of the nonmoving party." *See Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001).

    a.    "In a jury case, where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn. It is only where the evidence is all one way, or so overwhelmingly one way as to leave no doubt what the fact is, that a court is justified in taking a case from a jury." *Anglen v. Braniff Airways, Inc.*, 237 F.2d 736, 740 (8th Cir. 1956) (citations omitted) (reversing trial court's grant of judgment as a matter of law at the close of evidence).

    b.    "[T]he inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury." *Richardson v. Buehre*, 153 F. Supp. 120, 123 (D. Minn. 1957).

3.    In determining whether to grant judgment as a matter of law, a court must "refrain from making credibility assessments." *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004) (rejecting defendant's claim that district erred in denying judgment as a matter of law). The "evaluation of witness credibility . . . remain[s] the province of the jury." *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (reversing district court's grant of judgment as a matter of law).

4.    The Eighth Circuit found in *Smiley v. Gary Crossley Ford, Inc.*, that "[w]here conflicting evidence is presented at trial," about whether a party assented to a contract, "it is the jury rather than this court which assesses the credibility of the witnesses and decides which version to believe." 859 F.3d 545, 554 (8th Cir. 2017) (internal quotations and citations omitted) (judgment as a matter of law inappropriate in determining whether party assented to settlement agreement).

    a.    In a breach of contract case, unless "the extrinsic evidence presented about the parties' intended meaning [of a contract] is so one-sided that no reasonable person could decide to the contrary," the meaning of an ambiguous contract is a question of "material fact" reserved for the jury. *Den Norske Bank AS*

> > *v. First Nat. Bank of Boston*, 75 F.3d 49, 53 (1st Cir. 1996) (citations omitted).

> > b. *Jet Asphalt & Rock Co. v. Angelo Iafrate Const., LLC*, 431 F.3d 613, 617 (8th Cir. 2005) (affirming denial of judgment as a matter of law on breach of contract claim where contract had a "latent ambiguity").

> > c. *Powell v. TPI Petroleum, Inc.*, 510 F.3d 818, 822 (8th Cir. 2007) (affirming denial of judgment as a matter of law as to whether tenant breached lease agreement because "issue would require weighing the evidence and assessing credibility").

> > d. *Wright v. Byron Fin., LLC*, 877 F.3d 369, 375 (8th Cir. 2017) (affirming denial of judgment as a matter of law in case involving an oral agreement, where "jury was free to reject [the moving party's] story" regarding his belief as to the terms of the contract).

> > e. *Rice's Lucky Clover Honey, LLC v. Hawley*, 700 F. App'x 852, 862–63 (10th Cir. 2017) ("Because the [relevant portion] of the contract is ambiguous, the district court should have allowed the jury to decide whether [the plaintiff] had breached the contract.").

II. A reasonable juror could conclude that Plaintiff has not met its burden to establish that all loans for which Plaintiff seeks indemnity were sold pursuant to RFC';s Client Guide.

> A. Legal Standard

> > 1. The party asserting breach of contract bears the burden of proving the applicability of the contract.

> > > a. "The party asserting the applicability of a contract bears the burden of proof." *Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.*, 646 N.W.2d 904, 907–08 (Minn. Ct. App. 2002) (citing 17B C.J.S. Contracts § 698 (2000)).

> > > b. This rule is consistent with the broader principle that the party alleging a claim for breach of contract has the burden of proving contract formation. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. 14CV03103SRNFLN, 2017 WL

1050077, at *3 (D. Minn. Feb. 27, 2017) (citing *Zinter v. Univ. of Minnesota*, 799 N.W.2d 243, 245 (Minn. Ct. App. 2011)) ("[A] party alleging breach of contract bears the burden of proving . . . the formation of a contract.").

2. The question of assent to an allegedly applicable contract is a question of fact for the jury.

   a. "Whether parties to an alleged contract mutually agreed on the contract or had a 'meeting of the minds' is generally a fact issue reserved for the jury." *Am. S.S. Co. v. Hallett Dock Co.*, 862 F. Supp. 2d 919, 948 (D. Minn. 2012) ( "in spite of [plaintiffs'] evidence to the contrary … a genuine issue of fact on the issue of mutual assent" remained).

   b. "The existence of the contract, when the facts surrounding its formation are in dispute, is [] an issue for the fact-finder." *Collins Electrical Systems, Inc. v Redflex Traffic Systems, Inc.*, No. 27-CV-06-16731, 2009 WL 7063048 (Minn. Dist. Ct. Mar. 25, 2009).

   c. *See, e.g.*, *Watkins Inc. v. Chilkoot Distrib., Inc.*, 655 F.3d 802, 805 (8th Cir. 2011) ("Ordinarily, the existence of a contract is a question of fact to be determined by the jury."); *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 532 (8th Cir. 2006) ("Under Minnesota law, the existence of a contract is a question of fact ordinarily decided by the jury.").

   d. *Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876 (8th Cir. 2014) is particularly instructive here.

      1) Grandoe, the plaintiff, had an oral contract with Gander Mountain, the defendant, to sell $3 million worth of gloves. *Id.* at 881. Gander Mountain subsequently sent Grandoe a written "Vendor Buying Agreement" or "VBA" that stated that any prior communications would "not be binding." *Id.* at 880. The VBA further stated that, by accepting a purchase order, Grandoe "acknowledges and agrees to be bound by the [VBA]." *Id.* It was undisputed that Grandoe subsequently accepted purchase orders from Gander Mountain. *Id.* at 888.

4

2) Gander Mountain declined to honor its earlier oral agreement to purchase a particular quantity of gloves from Grandoe. *Id.* at 880. Grandoe sued for damages for breach of the oral agreement. *Id.* at 881. Over Gander Mountain's objection, the court admitted evidence of both the oral contract and the VBA. *Id.* The jury found the oral contract was valid and binding, and awarded Grandoe damages. *Id.*

3) On appeal, Gander Mountain contended that the written VBA rendered the oral agreement void as a matter of law, and that the district court should have enforced the VBA. *Id.* The Eighth Circuit affirmed, holding that whether Grandoe had agreed to accept the terms of the VBA was a question for the jury. *Id.* at 882-84. The Court held that "[t]he relevance of the oral agreement . . . was conditioned upon whether Grandoe agreed to the VBA. In these circumstances, it is normally for the jury to decide the preliminary factual question."

3. Minnesota follows the objective theory of contract formation, under which an outward manifestation of assent is determinative, rather than a party's subjective intent.

a. *Asia Pac. Indust. Corp. v. Rainforest Cafe, Inc.*, 380 F.3d 383, 385–87 (8th Cir. 2004) (internal citation omitted) ("Minnesota follows the objective theory of contract formation, under which an outward manifestation of assent is determinative, rather than a party's subjective intent. The test for whether a contract has been formed is an objective one to be judged by the words and actions of the parties and not by their subjective mental intent.").

b. *Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 857 (Minn. 1986) ("Hunt's subjective impressions and assumptions are not relevant for purposes of ascertaining contractual terms. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions.").

5

c.   *Speckel by Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively. The trial court, therefore, correctly disregarded Wheat's protestations that the offer was unintended. The subjective intent of Wheat and his client is irrelevant.").

4.   Where there is evidence from which a reasonable jury could conclude that the defendant did not agree to the contractual terms under which the plaintiff asserts a breach, judgment as a matter of law is not appropriate.

a.   "[T]he jury must determine all factual questions related to contract formation including: (1) whether the employee handbook incorporates the disciplinary provisions outlined in the personnel policy manual; (2) whether respondent saw the employee handbook provisions on which she bases her claim; and (3) whether the personnel policy manual was communicated to respondent in a way that objectively manifested an offer to contract for employment." *Rybus v. ADC Telecommunications, Inc.*, No. C5-96-512, 1996 WL 689764, at *2 (Minn. Ct. App. Dec. 3, 1996) (reversing JNOV where trial court improperly determined contract formation rather than submitting it to the jury).

5.   Where there is evidence from which a reasonable jury could conclude that the parties' actions subsequent to signing the allegedly applicable agreement modified the contract, judgment as a matter of law is not appropriate.

a.   In *American Steamship Company v. Hallet Dock Company*, the court held that a party's conduct subsequent to signing a written agreement gave rise to an inference of modification of the written agreement. 862 F. Supp. 2d 919, 944 (D. Minn. 2012). The service purchase orders ("SPOs") that the plaintiffs sent to the defendant specified that the defendant "was to handle line and anchor handling, provide gangway access, and assist in connecting the ship to onshore electricity." *Id.* at 942. The court held that the defendant's "actions," including "learn[ing] where to park the boat," "indicated" that he "accepted" additional responsibilities, thereby "giv[ing] rise to an inference of modification" of the parties' written agreement. *Id.* at 945. The court held that

6

> "the law is well settled that assent to an offer to modify, to
> rescind, or to alter a written contract may be evinced by the
> conduct and acts of the offeree as well as by express verbal
> agreement." *Am. S.S. Co.*, 862 F. Supp. 2d at 944 (quoting
> (*Mitchell v. Rende*, 225 Minn. 145, 30 N.W.2d 27 (Minn.
> 1947)).

B.   Whether Plaintiff has established that HLC entered into an agreement with
RFC to sell bulk loans under the terms of the RFC Client Guide is a
question of fact for the jury.

    1.   "Defendants dispute whether the Client Guide applies to some or all
of their loans. This is a fact issue to be resolved by the jury." ECF
4307 (SJ Opinion) at 5 n. 5.

    2.   A reasonable juror could conclude that Plaintiff has not established
that Home Loan Center agreed to sell bulk bid loans under the
contract under which RFC seeks indemnity, the RFC Client Guide.

        a.   The testimony of Home Loan Center's former Senior Vice
President of Secondary Markets, Rian Furey, is sufficient to
allow a reasonable juror to conclude that Plaintiff has failed
to meet its burden to establish that Home Loan Center agreed
to sell bulk bid loans to RFC under the Client Guide.

            1)   Trial Trans. at 3102:22-3103:12 (Furey)

Q. Mr. Furey, did you ever represent to RFC that the
home equity loans Home Loan Center sold to RFC in
these bulk transactions we've talked about in '06 and
'07 would meet RFC's Client Guide?

A. No.

Q. And when you were selling loans to RFC back in
the '06, '07 period, did RFC ever tell you that the
home equity loans sold in these bulk transactions were
required to meet the requirements of the Client Guide?

A. No.

Q. If anyone from RFC told you that the home equity
loans that Home Loan Center sold to RFC in these

bulks in '06 and '07 were required to meet all the requirements of the Client Guide, even when the loan was originated to other investors'' guides, would you have continued to be willing to sell those loans to RFC?

A. No.

2)      Trial Trans. at 3078:20-3079:18 (Furey)

Q. So going back to the February 2006 meeting, are you confident in your opinion or your recollection that RFC had agreed to buy loan products that were originated for other investors?

A. Yes, they had agreed to bid on pools of loans originated for Countrywide at that meeting.

Q. And did you have an understanding that the Client Guide was going to apply to the bulk packages of loans that Home Loan Center was going to sell to RFC?

A. No.

Q. Yes, you do have an understanding or --

A. I did not understand that to be the case.

Q. Correct.  During the February 2006 meeting did RFC mention that it wanted to buy bulk pools of loans originated for other investors, but that portions of the Client Guide would still apply?

A. No.

Q. Is that something you would remember?

A. Yes.

Q. Why?

A. The Client Guide containing – we would have had to sit down and split, I guess, what did and didn't apply and that would have been quite a task.

3)      DX-46 & Trial Trans. at 3080:16-18 (Furey)

Q. Was it your understanding that these loans were being sold under the Client Guide?

A. No.

4)      Trial Trans. at 3081:17-3082:1, 3082:5-21 (Furey)

Q. After that first bulk pool of loans, did Home Loan Center continue to sell bulk pools of loans to RFC?

A. They did.

Q. How frequently did these sales occur?

A. I would estimate once to twice a month.

Q. And did they continue on through into 2007?

A. Yes.

Q. So about once or twice a month kind of continuing on into '07?

A. Yes.

*        *        *

Q. How were these bulk pool transactions documented?

A. We would send a bid tape with all the characteristics of the loans that RFC was bidding on or other bidders were bidding on and copies of the guidelines, similar to the documentation we just saw.

Q. And what type of response would you get back or documentation would you get back from RFC?

A. Yeah, from RFC we would just receive a bid on the pool or portions of the pool and the price they were willing to pay.

Q. After RFC agreed to buy these bulk pools of loans or agreed on putting a bid and a price, did it ever follow up with documentation like the purchase price and terms letter you were referencing earlier with respect to Countrywide?

A. They did not.

5)   Trial Trans. at 3083:24-3084:8 (Furey)

Q. Did you think that Home Loan Center was selling these bulk pools of loans to RFC without representations and warranties at all?

A. No.

Q. What was your understanding as to the representations you thought Home Loan Center was providing on this March deal?

A. The representations were that the loans met the data elements that were disclosed on the tape and the guidelines that were given to RFC.

6)   PX-189 and Trial Trans. at 3102:5-16 (Furey)

Q. When you sold loans to RFC based on bid tapes like this one, did you understand that RFC was buying the loans based upon the disclosed characteristics?

A. Yes.

Q. And what was that understanding based on?

A. Based on our discussions with RFC that they would buy the loans to the guide and to the tape – excuse me, our guidelines and the tape.

Q. And when you were selling loans to RFC based on bid tapes like this one, were you relying on RFC's agreement to purchase the loans based upon the disclosed characteristics?

A. Yes.

b.   A reasonable juror also could conclude from additional witness testimony that RFC has not established that the Client Guide applied to bulk loans sold by Home Loan Center to RFC because such loans were not intended to meet the requirements of the Client Guide.

1)   Trial Trans. At 3008:1-13 (Smith)

Q. And what was ultimately agreed to at that dinner and meeting?

A. That they would buy loans that met Countrywide guidelines.

Q. And was it just Countrywide guidelines?

A. No, it was in a sense they wanted to look at everything we were originating and put a price on it.

Q. And when you say "put a price on it," was there discussion about how these loans were to be sold?

A. Yeah, sorry.  Yeah, so we would aggregate up loans on the back end, which is commonly referred to as bulk, and we would send them the characteristics of that bulk, and they would bid on it and decide if they wanted to buy it.

2)   Trial Trans. at 3008:18-20 (Smith)

Q. Were there differences between Countrywide's and RFC's home equity products?

A. There was.

3)   Trial Trans. at 3009:7-18 (Smith)

11

Q. During that dinner did Ms. Forget or Mr. Joseph ever mention to you that these bulk pools of loans of other people's products were to be governed by the Client Guide?

A. No, the Client Guide didn't come up one way or another.

Q. Is that something that you would remembered if it was said?

A. Absolutely.

Q. Why?

A. Because it wouldn't make sense.

Q. Why wouldn't it make sense?

A. Well, the whole point of buying someone else's loans is that it doesn't meet your guides.

4)   Trial Trans. at 731:2-13 (Svinth)

Q. Would there be any form of agreement between the trader and -- would there be any form of documentation between the trader and H -- the RFC trader and HLC that would show that RFC had granted exception for that particular purchase?

A. Not to my knowledge. The way that process works is an HLC trader would send an RFC trader a spreadsheet that reflected a pool of loans with all the parameters of the loan. The RFC trader would look at that pool, decide which loans he or she wanted and didn't want. He or she would either keep them all or kick some out, and then he would put a price on that pool. And then it would just be agreed that he or she would accept those loans.

5)   Trial Trans. at 993:8-21 (Forget)

12

Q. And you understood that RFC's clients sent Bid Tapes to RFC with the expectation that RFC would look at the bid tapes and bid on the loans based upon those disclosed characteristics?

A. Correct.

Q. And if RFC won the bid, then your colleagues at RFC would have a chance to look at the loans before RFC actually purchased them?

A. Yes.

Q. And that's called the diligence process, correct?

A. Yes, it is.

Q. And after conducting diligence, RFC decided whether it wanted to buy the loans, correct?

A. Yes.

6) Trial Trans. at 1186:14-1187:6 (Weiler)

Q. And to your knowledge, did those reps and warrants cover all loans that HLC sold to RFC?

A. If the reps and warrants would have covered the loans that we underwrote for RFC's guidelines.

Q. And when you say that, you say the loans you underwrote for RFC's guidelines?

A. Um-hum.

Q. Are you saying that there were loans sold to RFC that, to your understanding or to your claim, were not underwritten for RFC's guidelines?

A. That would be correct.

Q. Okay. To whose guidelines were those loans underwritten?

13

A. I do not know the particulars of every investor file that RFC may have purchased from Home Loan Center. I do know that we had sold them loans that were underwritten for Countrywide guidelines, and we had what we considered to be a generic product that we under -- underwrote to a variety of investor guidelines that may or may not have included RFC specifically.

c.   A reasonable juror could conclude that bulk loans were not sold by Home Loan Center under the same agreement as certain flow loans, which were sold pursuant to the Client Guide's terms—and therefore that RFC has failed to establish that the RFC Client Guide applied to bulk loans.

1)   Trial Trans. at 3085:16-3086:1 (Furey)

Q. Now, Mr. Furey, when Home Loan Center was selling these bulk pools to RFC in '06 and '07, did you also continue to sell them flow loans?

A. We did.

Q. And, to your understanding, were Home Loan Center's flow loans intended to meet the Client Guide?

A. Yes.

Q. So is it fair to say that in this '06 to '07 time period Home Loan Center was selling RFC loans in two different ways?

A. That's correct.

2)   Trial Trans. at 3182:22-3183:5 (Furey)

Q. You said that – okay.  I think you said that it's your recollection still here today that the Client Guide – that the loans sold in these bulk transactions were sold outside the Client Guide, correct?

A. My belief, yes.

14

Q. And just explain to the jury again why.

A. Again, the Client Guide related to flow loans that we sold to RFC, not to them buying bulk loans of other people's product.

3)    DX-234 & Trial Trans. at 3015:15-3016:14 (Smith)

Q. Specifically it says "I am meeting with the trader of RFC today as well as having dinner with them tonight. I will update accordingly.  The goal is here to get some more up front variances.  They are buying loans in bulk underwrite to other guides, I would like to get expanded guides up front."  Did I read that correctly?

A. Yes.

Q. Who is the trader at RFC?

A. Alan Joseph.

Q. Did you have a dinner meeting with him?

A. I did.

Q. And what did you mean when you said that they are buying loans in bulk underwritten to other guides.

A. So secondary marketing may take loans after they are funded and put them into bulk for better execution or better distribution.  However, so they – what this line means is they were already buying these loans.

Q. Are these the types of bulks that were kind of discussed at the February dinner?

A. Yes.

Q. Okay.

A. They were buying these loans to other guides. We were trying to get those up front in a flow basis to the RFC product, 02.

4)   DX-235 & Trial Trans. at 3017:15-3018:13 (Smith)

Q. Mr. Smith, can you briefly describe for the jury what that e-mail is about, your e-mail with Mr. Joseph?

A. This e-mail is about our dinner and meeting that we had, and then subsequently what we talked about getting into our flow guidelines because they are already buying it in bulk.

Q. You write, "I can continue to work with Rian and his team to see that we will sell you the mix you are looking for. I believe that you are buying quite a bit of mix on the bulk side and we could start with the bullet points above on the flow and see how it does. Do you see that?"

A. I do.

Q. What does it mean that you believe that they are buying quite a bit of mix on the bulk side?

A. Well, so we would have had some of these bullet points with other investors, and so they were already buying them in bulk. And so they were already buying it and so we were trying to get those things through up front to a flow basis so that we could have guaranteed takeout and perhaps a lower price or a better price to the company or a lower price to the consumer.

5)   PX-277 & Trial Trans. at 3012:2-3013:14 (Home Loan Center seeking the "same or better" criteria for the sale of flow loans with a variance as compared to loans being sold in bulk purchases)

d.   A reasonable juror could conclude—based on the objective facts of the bulk bid transactions—that Home Loan Center did not agree that these bulk loans would be sold pursuant to

16

RFC's Client Guide.  Purchasers, like RFC, typically were responsible for securing representations and warranties they desired from the borrower after winning a bid on bulk transactions.  It was not understood that representations and warranties from a seller guide, such as RFC's Client Guide, would apply to bulk transactions.

1)      Trial Trans. at 3066:9-24 (Furey)

Q. During these meetings did you reach an agreement with RFC about a path forward?

A. Yes.  RFC, Alan agreed that he would start to buy or try to buy Countrywide's production in bulk, that we would take – we agreed that we would take pools of these Countrywide loans, send them to him, and he would attempt to buy them.

Q. You mentioned Countrywide.  Why the focus on Countrywide at that meeting?

A. Countrywide was really RFC's largest competitor. They were getting a large share of what we were selling and that was kind of the – so that was the biggest piece for them to look at to try and regain some share.

Q. Before that time had you been selling bulk pools loans to RFC before?

A. No.

2)      Trial Trans. at 3066:25-3067:16 (Furey)

Q. But before [the first pool with RFC] did you have experience selling bulk pools of loans to other investors?

A. Yes.

Q. Were the other investors to whom – you mentioned conduits before.  Were there other investors to whom

17

you had sold loans both in bulk and flow prior to this February 2006 dinner?

A. Yes.

Q. Who?

A. Countrywide.

Q. And when you sold flow loans to Countrywide, did you have an understanding of what governed the sale of those loans?

A. When we sold the flow loans to Countrywide, they were to meet their guidelines.

Q. Did they have like a seller guide kind of like RFC did?

A. Yes, kind of like RFC's.

3)      Trial Trans. at 3070:25-3071:8 (Furey)

Q. Have you reviewed the documents or were you aware of the documents that were used for the sale of these bulk loans to Countrywide?

A. Yes.

Q. Can you briefly describe them?

A. Sure.  In selling loans in bulk to Countrywide, they were not Countrywide's guidelines.  We would receive and purchase and price terms letter and we would sell the loans under a separate loan sale agreement.

4)      Trial Trans. at 3077:12-24 (Furey)

Q. So I think we were just at the question of:  Based on your experience in the industry more broadly, were bulk pools of loans generally sold to a seller guide?  And your answer was?

18

A. No.

Q. And why not?

A. Because generally the bulk pools that are sold are not originated to the conduit's programs.  They're buying someone else's product or proprietary product.

Q. Are you saying that the only way, in your experience, that loans could be sold under a seller guide like RFC's was on a flow basis?

A. Yes.

5)   Trial Trans. at 3078:13-19 (Furey)

Q. You mentioned that people like Countrywide would typically send you a purchase kind of agreement, correct?

A. Correct.

Q. Did Home Loan Center ever kind of – after the purchaser agreed to purchase this loan, did Home Loan Center ever send documentation back or was it the purchaser sending it?

A. No, the purchaser would prepare the documentation.

6)   3178:19-3179:13 (Furey)

Q. How would representations and warranties typically be agreed to on a bulk package sale in your experience?

A. The – after the bid was awarded, the buyer would send a separate documentation outlining purchase price and terms including representations and warranties.

Q. Did RFC ever follow up with a purchase price and terms letter for these bulk transactions?

A. No.

Q. When an investors does send you a purchase price and terms letter as you described, do you typically have discussions over the terms in that purchase price and terms letter?

A. You do.

Q. RFC never did that, correct?

A. Correct.

Q. Did your other investors do that?

A. They did.

e.      A reasonable juror could conclude that RFC has failed to establish that the Client Guide applied to bulk loan purchases because RFC never informed Home Loan Center that bulk loan purchases would be pursuant to the terms of the Client Guide.

1)      Trial Trans. at 983:21-984:4 (Forget)

Q. And you don't recall anything that Home Loan Center said to you at that dinner?

A. No.

Q. So you don't remember RFC talking about buying bulk pools of loans from Home Loan Center at that dinner?

A. I'm sure we talked about it. I don't remember the conversations. It was 13 years ago.

2)      Trial Trans. at 986:24-987:7 (Forget)

Q. Do you recall in any of those discussions, Ms. Forget, saying we are buying your Countrywide

product but still all of the reps and warranties in the Client Guide still apply?

A. They would know that.

Q. But you don't recall ever telling them that?

A. No, it would not be a conversation because we already had a contract in place. And if we weren't going to buy it to that contract, there would be a different contract or we wouldn't -- I mean, nobody sold loans without a contract.

3)    Trial Trans. at 985:12-986:2 (Forget)

Q. And so if I'm understanding correctly, to agree to buy to another -- to Home Loan Center's Countrywide guidelines, you don't need a contract that says that. Is that what you're saying?

A. On a bulk deal you do not need a separate contract that spells out that you're buying their underwriting guidelines and their program parameters.

Q. And so there is no such contract that you are aware of?

A. There is already a contract in place.

Q. But there was no separate amendment that you're aware of that says we're now agreeing to buy to Countrywide's criteria?

A. No. There would have been -- we wouldn't have put a bid on it. We would have said we're not interested in this pool if we couldn't do that. Just there would be no bid.

f.    The RFC Client Guide's provisions concerning the manner in which RFC purchased loans that did not conform to certain parameters of the Client Guide, but were required to comply with all other terms of the Client Guide, provide sufficient

evidence for a reasonable juror to conclude that Plaintiff has failed to meet its burden to show the Client Guide governed bulk loans sold by Home Loan Center to RFC.

1) The evidence demonstrates that, consistent with Plaintiff's prior contentions, the RFC Client Guide provided, at most, three ways that RFC could purchase loans that did not conform to the Client Guide's program parameters but that still were subject to the Client Guide's representations and warranties. Those three ways were negotiated commitments (variances), exceptions documented with a Form 1600, and Negotiated Conduit Asset loan products (sold under Client Guide Section 6J). None apply to the bulk loan transactions.

2) The first way in which the Client Guide permitted RFC to purchase loans that did not conform to certain parameters of the Client Guide, but that were required to comply with all other terms of the Client Guide, was through negotiated commitments (or variances).

    a) PX 15-17 (Client Guide Section 101)

        Client Contractual Obligations

        This Client Guide, the Client Contract, *and the applicable Negotiated Commitment Letter* govern the purchase of Loans under Commitments.

    b) PX 15-18 (Client Guide Section 106)

        All Loans purchased by GMAC-RFC under the terms of the Client Contract and this Client Guide, *as may be amended by a Negotiated Commitment Letter . . .*

    c) Trial Trans. 600:14-601:9 (Bangerter)

        Q. Ms. Bangerter, could you please turn to the page 11-16. The numbers are in the center of the bottom of each page. This is Chapter 1, Introduction?

A. Yes.

Q. And do you see where there's a section called 110, Client Contractual Obligations?

A. Yes.

Q. Could you read that for us?

A. By signing the Client Contract, the Client is bound by all provisions of this Guide, including but not limited to the Representations and Warranties of the Client and Remedies of GMAC sections of this Guide. This Guide, the Client Contract, and the applicable Negotiated Commitment Letter govern the purchase of Loans under Commitments.

Q. What is a Negotiated Commitment Letter?

A. A Negotiated Commitment Letter means that we have changed the guide for that specific client to -- maybe it could be -- change the guidelines a bit. So it wasn't very much. It might have been 5 percent on an LTV or a DTI or something like that, or what kind of documentation, the things that are contained in Section 6.

d)      Trial Trans. at 613:9-615:23 (Bangerter)

Q. Okay. Now, I believe you mentioned earlier that certain underwriting criteria could be changed; is that right?

A. That's right.

Q. So let's move forward to Chapter 6 of the Client Guide, and Chapter 6 starts on page 270.

A. Okay.

23

Q. And this chapter is titled Loan Programs. Do you see that?

A. Yes.

Q. Have you heard the term "variance" used before in connection with the Client Guide?

A. Yes.

Q. What is a "variance"?

A. "Variance" is a word that we use throughout the industry. It just means that you have changed something from what's written into the guideline for a specific client.

Q. And by "guideline," are you referring to the underwriting criteria in Chapter 6?

A. Yes.

Q. How was a variance documented at RFC?

A. It was always documented in a Master Commitment Letter.

Q. If you entered into a variance with a client, does that mean that the Client Guide, the entire Client Guide, did not apply to the loans that were sold under that variance?

A. No, that letter would actually become part of the Client Guide. If they had a variance on a Jumbo A Loan Program, and they had a commitment that allowed them to go 5 percent higher, that is just like putting it inside the book and it becomes their Guide.

e)    Trial Trans. 833:17-834:1 (Cleary)

Q. And when a client specified that the loans were underwritten to their guidelines or some

24

other non-RFC set of guidelines and RFC agreed to purchase those, was there a process to then enter into some negotiated document or did it purchase those in the normal course?

A. I mean, the typical process, as I described it previously, was that there would be an analysis and comparison of the client's loan program parameters with the RFC loan program parameters and some negotiated agreement around those.

3) The second way in which the Client Guide permitted RFC to purchase loans that did not conform to certain parameters of the Client Guide, but that were required to comply with all other terms of the Client Guide, was through the use of Form 1600 for loan-level exceptions.

a) Trial Trans. 615:11-23 (Bangerter)

Q. Have you heard the term "exceptions" used before in connection with the Client Guide?

A. Yes.

Q. What's an "exception"?

A. An "exception" is when we do some of those things but not on an ongoing basis. It's on a single solitary loan.

Q. And were exceptions documented?

A. Yes.

Q. And how were those documented?

A. There's a form in the back of the Guide called the Loan Exception Request Form. The client would put in all the relevant information and send it to us, and then we would evaluate whether we would be willing to do that loan.

25

4)   The third way in which the Client Guide permitted
     RFC to purchase loans that did not conform to certain
     parameters of the Client Guide, but that were required
     to comply with all other terms of the Client Guide, was
     through its Non-Standard Loan Program, also called
     the Negotiated Conduit Asset ("NCA") program.

     a)   PX-15.407 (Client Guide)

          Non-Standard Program

          GMAC-RFC's Negotiated Conduit Asset
          (NCA) Program is a non-standard mortgage
          program designed to purchase Loans that do not
          comply with one or more of the criteria stated in
          the standard Loan Program Chapters of this
          Client Guide.  Loans purchased under an NCA
          Commitment must meet the standards as
          published in Chapter 3, Loan Eligibility, and
          Chapter 4, Underwriting, and other Chapters of
          this Client Guide.

5)   A reasonable juror could conclude that the Client
     Guide does not govern Home Loan Center's sale of
     loans to RFC because RFC did not purchase bulk loans
     under any of the Client Guide's three  permitted
     methods for loans that do not comply with the Client
     Guide in certain respects.

     a)   Negotiated Commitments (Variances)

          (i)   Ms. Forget testified that there was no
                separate amendment to the Client Guide
                under which RFC agreed to buy loans
                from HLC to Countrywide's criteria.
                Trial Trans. 985:21-986:2 (Forget).

                Q. *But there was no separate
                amendment that you're aware of that
                says we're now agreeing to buy to
                Countrywide's criteria?*

26

A. *No.* There would have been – we wouldn't have put a bid on it.  We would have said we're not interested in this pool if we couldn't do that.  Just there would be no bid.

(ii)     Mr. Furey confirmed that there were no variances to the Client Guide for bulk sales of loans.  *See, e.g.*, Trial Trans. at 3183:8-11 (Furey)

Q. When you sold loans to RFC in that March 2006 pool that we looked at, did you have a variance that allowed you to do that?

A. No.

b)     Form 1600

(i)     The evidence establishes that the parties recognized that there were differences between the loan products that Home Loan Center sold to RFC in bulk and the Client Guide's loan products.  *See, e.g.*, Trial Tr. at 3008:18-20 (Smith) (Q. Were there differences between Countrywide's and RFC's home equity products? A. There was.); DX-48 (describing differences between Home Loan Center's product and the RFC Client Guide).

(ii)     However, there is no evidence from which a reasonable juror could conclude that Form 1600s were used to document these differences at a loan level for each bulk loan that did not meet the Client Guide's standards.

c)     NCA

(i)  Ms. Bangerter testified that the NCA program was not available for second-lien loans (such as those included in the bulk pools).  Trial Trans. 675:15-23 (Bangerter)

Q. NCA was a real specific kind of product, correct?

A. It -- not really. NCA was a product that was -- typically those loans had a defect to them and we called that the scratch and dent desk.

Q. And RFC's NCA product was not for second lien loans?

A. No.

Q. So NCA second lien loans were not something that RFC allowed you to do?

A. That's right.

g.  The parties' contemporaneous internal and external communications provide further evidence from which a reasonable juror could conclude that Plaintiff has failed to establish that bulk loans were sold under the RFC Client Guide.

1)  DX-46.0001:  Ms. Forget asked Ms. Furey for "the current underwriting guidelines that were used for the Home Equity deal we just purchased."  DX-47.0001-47.0005: Mr. Furey responded with Investor 15 guidelines, which are Countrywide-based guidelines. The exchange nowhere states that any provision of the Client Guide would apply.

2)  DX-48.0001:  Ms. Forget internally stated that RFC "purchased these loans to the Clients guidelines" and HLC's guidelines "deviated from our guidelines."

28

3)  DX-54.0001: Ms. Forget stated "Again, this bulk is their guidelines. :)"

4)  DX-56.0003: RFC client strategy memorandum, describing RFC's purchase of Home Equity loans from Home Loan Center, states "We have stepped up and matched the bids that would be received if the product went to CW."

5)  DX-64.0001:  Ms. Forget wrote, "We are buying the HLC POA and Home Equity product to the CW guidelines."  The Home Equity product were the bulk loans.

6)  DX-67.0001: HLC's Mr. Gitten wrote to Mr. Forget, "Attached are the most recent guidelines that are being used for the majority of equity loans will be included in the Equity bulks."  The attached guidelines were Investor 15 (Countrywide) guidelines.  DX-67.0002-67.0005.  This exchange reflects no expectation that RFC's Client Guide would apply to the transactions.

7)  DX-83: RFC memorandum concerning Home Loan Center states that RFC was "buying HE Loans two different ways from HLC.  First there are loans that are flagged by the call center agent to fit RFC guides and pricing.  This amount to about $5mm a month and up until June of 2006, the only way HLC sold RFC HE production.  The majority of our production since June is currently being carved out of the pool of production identified for sale to Countrywide."  DX-83.0004.  The latter pool was "approximately $50mm per month." *Id.* Ms. Forget testified that the first "way" referred to flow loans, and the second was the bulk purchase.  Trial Trans. at 1038:13-1040:23 (Forget).

8)  DX-240:  RFC asked which guidelines applied to loans being sold in October 2006, DX-240.0002, and Home Loan Center's Tim Weiler sent Investor 15 (CW) guidelines for the second-lien product, DX-240.0001.  The exchange nowhere stated that RFC's Client Guide applied to the sale of the loans.  Mr. Weiler explained, "A. So based on the e-mail exchange, secondary

marketing had provided them with information about Investor 01 MTA product and the Investor 15 second mortgage products. It looks to be that they were looking to purchase it and wanted to see which underwriting guidelines we -- what the underwriting guidelines were for those products.  Q. Were loans that were underwritten to Investor 15 guidelines intended to meet the RFC Client Guide? A. No." Trial Trans. 1209:9-1209:17 (Weiler).

3.  A reasonable juror could conclude that Plaintiff has not established that Home Loan Center agreed to sell payment option ARM loans that were originated as Countrywide loan products under RFC's Client Guide.

a.  The testimony of Mr. Furey is sufficient to allow a reasonable juror to conclude that Plaintiff has failed to meet its burden to establish that Home Loan Center agreed to sell payment option ARM loans to RFC under the Client Guide.

1)  Trial Trans. at 3091:4-3091:12 (Furey)

Q. I want to shift gears again a little bit with you, Mr. Furey.  Other than the bulk pools of these home equity loans that Home Loan Center sold to RFC, were there other categories of loans or types of loans that you recall selling to RFC that were not intended to meet the requirements of the Client Guide?

Q. Yes.  At some point after the March of 2006 pool, RFC also decided to buy pay-option ARM loans in bulk that were not originated to their guidelines.

2)  Trial Trans. at 3091:20-3092:8 (Furey)

Q. And how do you recall that coming about?

A. Again, conversations with Martha.  We were having success at that point on the equity product and the pay-option ARMs and the next area they were losing a lot of volume to Countrywide on.

Q. Did you talk to an RFC trader about these as well?

30

A. Yes, Michael Mand.

Q. Mr. Mand is a different RFC trader than we talked about earlier.  What was – what type of products did he trade at RFC to your understanding?

A. To my understanding, he traded pay-option ARM products.

Q. Were these pay option ARM loans that you were selling originated to Countrywide standards?

A. They were.

3)      DX-59 and Trial Trans. at 3092:20-3093:13 (Furey)

Q. Is this the forward?

A. Yes.

Q. What is a forward or forward commitment?

A. So RFC was buying Countrywide's pay-option ARMs.  They were not – we didn't have a pool of them available to sell, so they simply put a commitment out to buy 50 million dollars' worth of them and this document explains how they would give us a price for each of those loans.

Q. Did you have an understanding as to whether this forward commitment and the loans sold under this forward commitment would be sold under the RFC Client Guide?

A. That was not my understanding.

Q. Why not?

A. These were loans originated to Countrywide's guidelines, not RFC's product.

31

Q. Did Mr. Mand or Ms. Forget ever tell you that the Client Guide's representations and warranties or other portions of the Client Guide applied to these pay-option ARM loans?

A. No.

b.  Ms. Forget testified that RFC acquired payment option arm loans from Home Loan Center that were not intended to meet all requirements of the Client Guide, and which were underwritten to Countrywide guidelines.  A reasonable juror could conclude that the RFC Client Guide would not apply to loans originated to Countrywide's standards, including by using its automated underwriting system.  Moreover, there is no record evidence that anyone from RFC communicated to Home Loan Center that the Client Guide would apply to these sales.

1)  Trial Trans. at 1027:6-22 (Martha Forget)

Q.  So looking at the top -- this e-mail on the top of the second page, Mr. Mand states, and this is near the bottom of the paragraph right there, "We will stand behind buying the Clues approval, but I want them aware of our concern." Do you see that?

A. Yes.

Q. A Clues approval was an approval from Countrywide's automated underwriting system?

A. Correct.

Q. It's kind of like the equivalent of Assetwise, but it's Countrywide's program?

A. Yes.

Q. You understood Mr. Mand to be saying that RFC would stand behind an approval from Countrywide's automated system when buying these pay option ARM loans from Home Loan Center, correct?

32

A. On this loan I think that's what he's referring to.

2)      Trial Trans. at 1035:17-1036:4 (Martha Forget)

Q. And you state that, "We are buying the HLC POA and home equity product to the Countrywide guidelines."

A. Correct.

Q. Do you see that?

A. Yep.

Q. The POA product you are referring to here are the pay option ARM loans that Mr. Mand was buying, correct?

A. Correct.

Q. And so I think we talked a little while ago and you said that the first e-mail we looked at was referring to just one loan, but this seems to have been now a broader agreement, correct?

A. Yes.

c.      The RFC Client Guide's provisions concerning the manner in which RFC was permitted to purchase loans that did not conform to certain parameters of the Client Guide, but that were required to comply with all other terms of the Client Guide, provide sufficient evidence for a reasonable juror to conclude that Plaintiff has failed to meet its burden to show Client Guide governed POA loans sold by Home Loan Center to RFC.

1)      As set forth above, and incorporated fully herein, RFC's Client Guide provided, at most, three ways that RFC was permitted to purchase loans that did not conform to the Client Guide's program parameters but that remained subject to the Client Guide's representations and warranties. Those three ways were negotiated commitments (variances), exceptions

33

documented with Form 1600, and Negotiated Conduit Asset loan products (sold under Client Guide Section 6J). None applied to RFC's purchase of POA loans originated to Countrywide standards.

    a)    Negotiated Commitments (variances)

        (i)    Mr. Furey confirmed that there were no variances to the Client Guide for the sale of POA loans originated to Countrywide criteria. *See, e.g.*, Trial Trans. at 3185:7-10 (Furey)

            Q. And was there any variance in place relating to the pay option ARM loans that we talked about earlier today that you started selling them in May of 2006?

            A. No.

    b)    Form 1600

        (i)    The evidence shows establishes that the parties recognized that there were differences between the POA loans that Home Loan Center sold to RFC and the Client Guide's loan products. *See, e.g.*, DX-61, DX-65, DX-239.

        (ii)    However, there is no evidence from which a reasonable juror could conclude that Form 1600s were used to document each of these differences at a loan level for each POA loan that did not meet the standards of RFC's Client Guide.

    c)    NCA

        (i)    No witness testified that the POA product sold by RFC to Home Loan Center was negotiated as part of the NCA program.

34

d.  The parties' contemporaneous internal and external communications provide further evidence from which a reasonable juror could conclude that RFC has failed to establish mutual assent that HLC's payment option ARM loans would be sold under the Client Guide.

1)  DX-59:  RFC trader Michael Mand stated regarding a forward agreement regarding payment option arm loans, which did not mention the Client Guide, "Good work in locking them up and keeping them out of CW hands!"  DX-59.0001.  The attachment was a forward agreement to which Home Loan Center agreed, and it does not reference the RFC Client Guide.  Trial Trans. at 3092:20-3093:13 (Furey).

2)  DX-60:  Mr. Mand stated, "[w]e will stand behind buying the Clues approval."  DX-60.0002. Ms. Forget testified that a "Clues approval was an approval from Countrywide's automated underwriting system."  Trial Trans. at 1027:12-14.  Ms. Forget initially testified that this email applied to only one loan, Trial Trans. 1027:18-24, but later clarified that this communication was part of a "broader agreement," Trial Trans. 1035:25-1036:6.

3)  DX-61:  Ms. Forget wrote, "[W]e snagged $90 mm in POA away from CW (who is not very happy)."  DX-61.0001.

4)  DX-64:  Ms. Forget stated, "We are buying the HLC POA and Home Equity product to the CW guidelines." DX-64.0001.

5)  DX-65:  HLC's Stefan Gitten noted that he "sent Martha the guidelines for CHL regarding CO with MTA.  As we understand, all the MTA loans in the forwards are being purchased according to CHL guidelines."  DX-65.0001.  The forward refers to DX-59, "MTA" loans are payment-option loans, and "CHL" refers to  Countrywide.  Trial Trans. at 3094:17-3095:8 (Furey).

6)  DX-239:  "RFC's Jessica Zimmerman asked which guidelines applied to HLC's loans, and Tim Weiler of

35

HLC sent Investor 01 (HLC) guidelines for the MTA (POA product)." DX-239.0001-239.0002.  Mr. Weiler explained, "A. So based on the e-mail exchange, secondary marketing had provided them with information about Investor 01 MTA product and the Investor 15 second mortgage products. It looks to be that they were looking to purchase it and wanted to see which underwriting guidelines we -- what the underwriting guidelines were for those products." Trial Trans. 1209:9-1209:14 (Weiler).  He further testified that the Investor 01 matrix "did not" include RFC's product.  Trial Trans. 1208:7-15.

4.    A reasonable juror could conclude that Plaintiff has failed to establish that Home Loan Center sold loans submitted with Assetwise approvals subject to the representations and warranties or indemnity provisions in the Client Guide.

    a.    RFC and Home Loan Center entered into a separate agreement, outside the Client Guide – the Assetwise Direct Criteria Agreement – that governed loans HLC submitted to RFC for purchase using RFC's Assetwise computer model.  PX-115.

    b.    The Assetwise Direct Criteria Agreement contains its own representations and warranties in place of those in the Client Guide.  The Agreement expressly states that:  "Client represents and warrants all data provided on the approved AssetWise Findings Report accurately reflects the information in the related loan file submitted for purchase."  PX-115-1.  It then identifies additional representations and warranties that continue to be the Client's responsibility.  *Id.*  Home Loan Center employee Ms. Barton noted that the Assetwise Direct Criteria Agreement "limited" the representations and warranties made by Home Loan Canter as to loans submitted with Assetwise approvals.[1]

---

[1] Ms. Barton's testimony as a corporate designee is not conclusive as to any fact.  "A 30(b)(6) witness's legal conclusions are not binding on the party who designated him, and a designee's testimony likely does not bind [the designating party] in the sense of a judicial admission." *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d

c.    After the parties entered into the Assetwise Direct
Agreement, RFC inserted a provision into its Client Guide
purporting to impose obligations on its Clients who used
Assetwise.  PX-11.211.  That provision, however, did not
vitiate the terms of RFC's existing Assetwise Direct Criteria
Agreement with Home Loan Center, nor did RFC terminate
the Assetwise Direct Criteria Agreement.  Ms. Bangerter so
testified:

Q. And the January 2003 Client Guide that we looked at
earlier, that section that you looked at earlier with Ms. Brown
doesn't mention the Assetwise Direct Agreement between
Home Loan Center and RFC, correct?

A. No.

Q. In fact, it doesn't make any mention of an Assetwise Direct
Criteria Agreement at all, correct?

A. Correct.

Q. In January 2003 you did not send Mr. Hsieh a letter
terminating the Assetwise Direct Criteria Agreement, did
you?

A. No.

Q. And you're not aware of anyone at HLC -- at RFC doing
that?

---

799, 811–12 (8th Cir. 2013); *see also R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258
F.3d 783, 786 (8th Cir. 2001*)* (a corporate designee "is no more bound than any witness is
by his or her prior deposition testimony"). ; ).  "A witness is free to testify differently from
the way he or she testified in a deposition, albeit at the risk of having his or her credibility
impeached by introduction of the deposition." *R & B Appliance Parts*, 258 F.3d at 786;
*see also Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir.
2016) ("We agree with our sister circuits that the testimony of a Rule 30(b)(6) witness is
merely an evidentiary admission, rather than a judicial admission.").

37

A. I'm not aware of it.

Trial Trans. at 674:9-23 (Bangerter).

d.     Ms. Bangerter agreed that the Assetwise Direct Criteria
       Agreement contains no language specifying that the Client
       Guide's representations and warranties apply in addition to
       those set forth in the Agreement itself:

       Q. Are you saying that despite this agreement saying that
       certain specified representations continue to be the client's
       responsibility, that this agreement really meant that all the
       Client's Guide's representations plus these additional
       requirements remain the client's responsibility?

       A. That's correct.

       Q. You would agree, Ms. Bangerter, that this document
       doesn't say that on this page?

       A. No, but it relates specifically to Assetwise.

       Q. Right, but the language you're referring to about other
       representations is not here, correct?

       A. No, that's correct.

         Trial Trans. at 662:5-16 (Bangerter).

e.     Indeed, one of the Agreement's representations and
       warranties ("Appraisal Requirements") identifies and
       incorporates the definition of that term in RFC's Client
       Guide.  PX-115-1.  That reference would be unnecessary if
       the representations and warranties in the Agreement
       necessarily referred to and incorporated the representations
       and warranties in the Client Guide.  The Agreement's
       remaining representations and warranties make no reference
       to RFC's Client Guide.

f.     Accordingly, a reasonable juror could conclude that the
       Assetwise Direct Criteria Agreement continued to govern
       loans that HLC submitted to RFC for purchase using
       Assetwise.  *See Grandoe Corp. v. Gander Mountain Co.*, 761

F.3d 876, 888 (8th Cir. 2014) (not reasonable to infer assent from party's silence in response to notice from counterparty of revised contractual terms in vendor buying agreement).

g.    Communications from RFC employees provide corroborative evidence from which a reasonable jury could conclude that the Client Guide did not replace or modify the representations and warranties or remedies in the Assetwise Direct Criteria Agreement.

    1)    DX-3 Letter from Sales Director at RFC to Senior Vice President at Home Loan Center ("You may underwrite and close the loan in house or you may sing up to use our underwriting engine, AssetWise, available to you via DU or directly through the Internet, known as AssetWise Direct.").

    2)    DX-25:  Bangerter email to Home Loan Center ("You may use Assetwise or you may manually underwrite the file.  You take advantage of upgrades and streamlined documentation with Assetwise but you are welcome to manually underwrite a file provided it meets the guidelines.").

h.    A companion contract referenced in the Assetwise Direct Criteria Agreement, the Assetwise Direct License Agreement, provides evidence from which a reasonable juror could conclude that HLC's Assetwise loans were not sold pursuant to the representations and warranties of RFC's Client Guide.

    1)    The Assetwise Direct Agreement lists the "Assetwise Direct License Agreement" among the documents that "must be executed prior to the implementation of Assetwise Direct."  PX 115-2.

    2)    The Assetwise Direct License Agreement does not reference the Client Guide.  DX-6.

    3)    The Assetwise Direct License Agreement includes additional representations and warranties relating, not merely to software, but to loan origination.

        a)    For example, the Assetwise Direct License Agreement includes requirements that the

customer "assumes all responsibility for compliance with all applicable federal, state and local laws and regulations."  DX-6.0001.

4)    The Assetwise Direct License Agreement also includes an indemnity provision that a reasonable juror could conclude applied to loans submitted through Assetwise, rather than the Client Guide's indemnification provision under which RFC has brought suit.  The provision explicitly relates to indemnity for "lending decision[s]" made using Assetwise.

"Customer agrees to indemnify and hold Licensor harmless against any loss, cost (including attorney's fees) or damage related to a third party claim based upon.  Customer's use of the Licensed Software to make a credit or lending decision or to comply with applicable federal, state or local laws or regulations." DX-6.0002.

a)    Plaintiff has adduced no evidence that it terminated this indemnity provision.

b)    Moreover, the Assetwise Direct License Agreement states that "This Agreement may not be modified, altered or amended except by written instrument duly executed by both parties." DX-6.0003. A reasonable juror could conclude that the Assetwise Direct License Agreement was not modified in whole or in part.

i.    The Liquidating Trust has not stated a claim for breach of the representations and warranties in the Assetwise Direct Agreement or its companion License Agreement.  Its only claim is for breach of the Client Guide and recovery under its indemnification provisions.

j.    A reasonable juror could reject Plaintiff's claim that the Client Guide's representations and warranties and indemnity provisions apply, in light of the plain language of the Assetwise Direct Agreement and the Assetwise Direct

License Agreement, and the lack of any evidence that those contracts do not govern.

1) Don Russell, John Collins, and Bill Cleary offered no testimony about Assetwise at all, let alone about the agreement between RFC and Home Loan Center with respect to Assetwise Direct.

2) Ms. Forget testified that she "did not buy much flow business" and was "not as up to speed on Assertwise." Tr. 1009:4-9 (Forget). Ms. Forget offered no testimony regarding the Assetwise Direct Agreement between Home Loan Center and RFC.

5. A reasonable juror could disregard the testimony of individuals who did not communicate with Home Loan Center regarding the purchase of the relevant categories of loans.

   a. Plaintiff relies on testimony from individuals who had no direct role vis-à-vis Home Loan Center, and therefore did not speak to the communicated intent of the agreements between Home Loan Center and RFC regarding bulk bids or POA loans.

      1) Don Russell did not recall any conversations with Home Loan Center, and has no recollection of being at the meeting with Home Loan Center in February of 2006. Tr. 390:6-20 (Russell).

      2) Renee Bangerter left RFC in 2005, before Home Loan Center began selling bulk or POA loans to RFC pursuant to Countrywide guidelines. Tr. 652:10-12 (Bangerter); Trial Trans. at 679:20-24 (Bangerter) (confirming that "[a]t the time [she] left in 2005" "Home Loan Center was still selling loans away to RFC's competitors," including Countrywide); Trial Trans. at 680:3-17 (Bangerter) (confirming lack of knowledge of Home Loan Center's purchase of loans after she left RFC); Tr. 976:17-22 (Forget) (testifying that, in 2005, Home Loan Center was not selling bulk loans to RFC).

      3) Bill Cleary offered no testimony regarding any communication with Home Loan Center. And Martha

41

Forget clarified that Alan Joseph "was the trader" who "work[ed] to get to where we were doing more business with Home Loan Center." Trial Trans. at 942:21-943:1 (Forget).

    a)    Ms. Forget also confirmed that Michael Mand was the trader at RFC who purchased Home Loan Center's Payment Option Arms. Trial Trans. at 1024:10-12 (Forget).

    b)    A reasonable juror could discount Bill Cleary's testimony because he had no role in the purchase of loans from Home Loan Center.

4)    John Collins confirmed that he had no role in negotiating, drafting, or communicating contractual terms governing RFC's relationship with Home Loan Center, or governing the purchase of loans from Home Loan Center. Trial Trans. at 785:9-786:24 (Collins).

5)    Ms. Forget had limited recollection regarding the conversations in February 2006 between RFC and Home Loan Center. Trial Trans. at 982:5-984:21 (Forget) (testifying that she has no recollection as to what was said, and limited recollection as to who attended, the February 2006 meeting between RFC and HLC).

6.    RFC's reliance on the text of the Client Guide to prove that the disputed categories of loans were governed by the Client Guide is insufficient to warrant judgment as a matter of law. To the contrary, the text of the Client Guide creates a factual dispute from which a reasonable juror could conclude that the Client Guide does not apply to loans not intended to meet all of the criteria of the Client Guide.

    a.    Plaintiff relies on Section 100 of the Client Guide. Section 100 states, in relevant part, "Welcome to GMAC-RFC's Client Guide-the reference book governing our business relationship. This Guide sets forth the terms and conditions for selling *Loans* to GMAC-RFC." PX-11-16 (emphasis added). Plaintiff relies on this provision to argue that all loans that HLC subsequently sold RFC necessarily were governed by the Client Guide.

42

b. The Client Guide defines "Loans" as "A Loan sold or intended to be sold by the Client to GMAC-RFC and that *meets or is intended to meet all the requirements of this Guide*." PX-11-507 (emphasis added). Loans that are not "intended to be sold by the Client to GMAC-RFC" do not fall with the Client Guide's definition of "Loans." *See id.*

   1) As set forth above, the relevant bulk and POA loans were not "intended to meet all the requirements of [the] Guide."

c. Plaintiff argues that, even if RFC agreed to purchase HLC bulk and POA loans to underwriting guidelines other than the Client Guide, the Client Guide still applies. But the vast majority of the Client Guide consists of the underwriting guidelines for RFC's Client Guide loan products and programs. *See, e.g.*, PX-72-PX-137 (Chapter 3-Loan Eligibility); PX-11-138-PX-11-217 (Chapter 4-Underwriting); PX-11-218-PX-11-269 (Chapter 5-Client Guide Products); PX-11-270-PX-415 (Chapter 6-Client Guide Loan Programs); PX-11-416-11-443 (Chapter 7-At-A-Glances).

d. Plaintiff apparently contends that the section of the Client Guide that contains "representations and warranties" applies even to loans RFC purchased to other underwriting guidelines. The plain language of the Client Guide's representations and warranties does not support Plaintiff's position. Section A202 states "Each of the Loans delivered and sold to GMAC-RFC meets the applicable program terms and criteria set forth in this Client Guide." PX-11-38. Thus, a reasonable juror could conclude that the Client Guide was not intended to apply to loans that were not intended to "meet[] the applicable program terms and criteria set forth in this Client Guide."

e. A reasonable juror could reject Plaintiff's claim that the language of Section 100 supports Plaintiff's position. The definition of "Loans" is directly contrary to Plaintiff's position. At most, Section 100 renders the Client Guide ambiguous and creates an issue of fact. *See, e.g., Am. S.S. Co. v. Hallett Dock Co.*, 862 F. Supp. 2d 919, 944 (D. Minn. 2012) (A contract is ambiguous when "it is reasonably

susceptible of more than one interpretation.").  Any issue of
fact must be resolved in HLC's favor on Plaintiff's motion for
judgment as a matter of law.

III.    A reasonable juror could conclude that Plaintiff is equitably estopped from
enforcing the Client Guide.

    A.    Legal Standard

        1.    A party asserting equitable estoppel must demonstrate that it has
altered his position for the worse in good faith reliance upon the
conduct of the party seeking to enforce the contract.

            a.    "First, HLC must prove that RFC made promises or
inducements to HLC that it would not enforce the Client
Guide representations and warranties or indemnification
provisions as to certain loans or groups of loans;

Second, HLC must prove that it reasonably relied on RFC's
promises or inducements when it sold the at-issue loans to
RFC; and

Third, HLC must prove that it will be unfairly harmed if RFC
is not estopped from enforcing the Client Guide as to those
loans or groups of loans."  Preliminary Jury Instructions at
10.

            b.    *Multi-Tech Sys., Inc. v. Floreat, Inc.*, 2002 WL 432016, at *4
(D. Minn. Mar. 18, 2002) ("Minnesota also allows a party to
establish waiver or an equitable estoppel as a defense to
enforcement of a contract when that party has altered his
position for the worse in good faith reliance upon the conduct
of the party seeking to enforce the contract.").

            c.    *EEP Workers' Comp. Fund. v. Fun & Sun, Inc.*, 794 N.W.2d
126, 135 (Minn. Ct. App. 2011) ("[I]t is enough that, knowing
the truth, the party intentionally made the representations
under such circumstances as show that the party making them
intended, or might reasonably have anticipated, that the party
to whom they are made will rely and act on them as true.").

            d.    *Pollard v. Southdale Gardens of Edina Condo. Ass'n., Inc.*,
698 N.W.2d 449, 454 (Minn. Ct. App. 2005) ("Equitable
estoppel prevents the assertion of otherwise valid rights

44

where one has acted in such a way as to induce another party to detrimentally rely on those actions.").

e.   *Eng'g & Const. Innovations, Inc. v. W. Nat. Mut. Ins. Co.*, No. A12-1785, 2013 WL 2460400, at *4 (Minn. Ct. App. June 10, 2013) ("A party asserting equitable estoppel must demonstrate that (1) representations were made; (2) the party reasonably relied on such representations; and (3) the party will be harmed if estoppel is not applied.").

2.   Equitable estoppel is a fact question for the jury.

a.   "[E]quitable estoppel depends on the facts of a case and is ordinarily a fact question for the jury." *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, 460 F.3d 1047, 1057 (8th Cir. 2006).

b.   "Estoppel depends on the facts of each case and is ordinarily a fact question for the jury to decide." *N. Petrochemical Co. v. U. S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979).

3.   Where there is evidence from which a reasonable jury could conclude that a party altered its position for the worse in reliance on the conduct of the party seeking to enforce the contract, judgment as a matter of law is not appropriate.

a.   "Given the above testimony, the jury could have inferred that defendant conveyed to plaintiff through the general contractor the assurance that the claim need not be processed until the initial litigation determined the cause of the damage." *N. Petrochemical Co. v. U. S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979).

b.   "Affirmative promises or inducements are not required to establish misrepresentation for purposes of equitable estoppel; silence or omission may be sufficient, and fraud or intent to deceive is not required." *Ridge Creek I, Inc. v. City of Shakopee*, No. A09-178, 2010 WL 154632, at *6 (Minn. Ct. App. Jan. 19, 2010) (reversing court for barring equitable estoppel defense, citing parties' "course of conduct").

c.   "Based upon the law, as well as the evidence presented by appellants in support of their claim that their debt was forgiven, we conclude that district court erred in granting

summary judgment relative to respondent's claim for repayment of the principal owed on the promissory note. When viewed in the light most favorable to appellants, there was sufficient evidence that decedent forgave the balance of the promissory note to at least create a genuine issue of material fact." *Larson v. Caron*, No. A12-1822, 2013 WL 2302048, at *6 (Minn. Ct. App. May 28, 2013).

4. The existence of a non-waiver clause does not preclude an estoppel defense.

a. *Pollard v. Southdale Gardens of Edina Condo. Ass'n., Inc.*, 698 N.W.2d 449, 455 (Minn. Ct. App. 2005) ("The district court erred in holding that as a matter of law, the mere existence of a nonwaiver clause precludes estoppel claims. Moreover, the record creates a genuine issue of material fact as to the merits of appellants' estoppel claims. Therefore, we must reverse the district court's order of summary judgment with respect to all of appellants' estoppel claims.").

b. *Green v. Minnesota Farmers' Mut. Ins. Co.*, 190 Minn. 109, 117 (Minn. 1933) (acknowledging insurance contract's non-waiver clause, but holding that evidence of insurance agent's conduct supported finding that there was a waiver of contract's forfeiture provision).

B. Whether RFC induced Home Loan Center to sell more loans with the implicit understanding that they need not comply with the Client Guide is a question of fact for the jury.

1. "The Court is not persuaded that no reasonable factfinder could conclude that RFC induced Defendants to sell more loans with the implicit understanding that they need not be underwritten to the Client Guide. Similarly, there is a triable issue of fact as to whether Defendants reasonably relied on those promises or inducements. Accordingly, this Court denies Plaintiffs' motion for summary judgment on Defendants' defense of equitable estoppel." ECF 4307 (SJ Opinion) at 116.

2. A reasonable juror could conclude that RFC induced Home Loan Center to sell more loans with the implicit understanding that they need not comply with the Client Guide is a question of fact for the jury.

a.    A reasonable juror could conclude that RFC induced Home Loan Center to sell bulk loans that did not comply with the Client Guide that Home Loan Center otherwise would have sold to RFC's competitors, for which those products were originated.

1)    As set forth above, and fully incorporated herein, RFC induced Home Loan Center to sell bulk and POA loans that did not comply with the Client Guide to gain market share from its competitor, Countrywide.

a)    Trial Trans. at 3066:9-24 (Furey)

Q. During these meetings did you reach an agreement with RFC about a path forward?

A. Yes.  RFC, Alan agreed that he would start to buy or try to buy Countrywide's production in bulk, that we would take – we agreed that we would take pools of these Countrywide loans, send them to him, and he would attempt to buy them.

Q. You mentioned Countrywide.  Why the focus on Countrywide at that meeting?

A. Countrywide was really RFC's largest competitor.  They were getting a large share of what we were selling and that was kind of the – so that was the biggest piece for them to look at to try and regain some share.

Q. Before that time had you been selling bulk pools loans to RFC before?

A. No.

2)    Ms. Forget similarly testified that RFC understood and communicated that bulk loans need not comply with all requirements of the Client Guide.

a)    Trial Trans. at 998:21-999:5 (Forget).

47

Q. And here you state, and it's in the first sentence of the e-mail, "Please be aware that we purchased the loans to the client's guidelines." Do you see that?

A. Yes.

Q. And you understood the "client" here refers to Home Loan Center?

A. Correct.

Q. You're communicating that RFC agreed to buy these bulk loans to Home Loan Center's guidelines?

A. Correct.

b)      Trial Trans. at 1002:11-17 (Forget)

Q. So you understood that the loans that Home Loan Center were selling in this bulk transaction were not intended to meet all of the requirements of the Client Guide?

A. The underwriting requirements, yes.

Q. Okay. Thank you.

A. Because it's not all. So...

3)      Mr. Furey confirmed that he relied on RFC's agreement to buy bulk loans based upon loan characteristics disclosed on the bid tape, rather than Client Guide requirements.

PX-189 and Trial Trans. at 3102:5-16 (Furey)

Q. When you sold loans to RFC based on bid tapes like this one, did you understand that RFC was buying the loans based upon the disclosed characteristics?

A. Yes.

48

Q. And what was that understanding based on?

A. Based on our discussions with RFC that they would buy the loans to the guide and to the tape – excuse me, our guidelines and the tape.

Q. And when you were selling loans to RFC based on bid tapes like this one, were you relying on RFC's agreement to purchase the loans based upon the disclosed characteristics?

A. Yes.

b.     Similarly, for POA loans originated for Countrywide, Home Loan Center was induced to sell loans to RFC, even though such loans did not comply with Client Guide requirements.

1)     Trial Trans. at 3091:20-3092:8 (Furey)

Q. And how do you recall that coming about?

A. Again, conversations with Martha.  We were having success at that point on the equity product and the pay-option ARMs and the next area they were losing a lot of volume to Countrywide on.

Q. Did you talk to an RFC trader about these as well?

A. Yes, Michael Mand.

Q. Mr. Mand is a different RFC trader than we talked about earlier.  What was – what type of products did he trade at RFC to your understanding?

A. To my understanding, he traded pay-option ARM products.

Q. Were these pay option ARM loans that you were selling originated to Countrywide standards?

A. They were.

2)   RFC internal documents corroborate that RFC decided to "stand behind" Countrywide's automated underwriting system to induce Home Loan Center to sell more loans to RFC.  *See, e.g.*, DX-60.

c.   RFC also induced Home Loan Center to sell it more loans through the use of RFC's "black box" Assetwise program. Indeed, RFC explicitly advertised differences between Assetwise and the Client Guide as benefits.

Trial Trans. at 672:3-15 (Bangerter)

Q. But in this document you told Home Loan Center that it could take advantage of these upgrades, correct?

A. Yes.

Q. You never told Home Loan Center that it could not take advantage of these upgrades, correct?

A. Right.

Q. You also told Home Loan Center that it could take advantage of streamlined documentation by using Assetwise?

A. Yes.

Q. When you said "streamlined documentation," you meant that Assetwise offered to streamline some of the documentation listed in the Client Guide?

A. Right.

IV.   A reasonable juror could conclude that Plaintiff waived the right to enforce the Client Guide as to certain categories of loans.

A.   Legal standard

1.   The party asserting waiver must prove an intentional relinquishment of a known right.  *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 727 (Minn. Ct. App. 2011).

    a.    ECF 4656 at 19-20 (HLC's Proposed Jury Instructions) (citing legal standard for waiver applied to bulk loans.).

    b.    ECF 4656 at 15-16 (HLC's Proposed Jury Instructions) (citing legal standard for waiver applied to POA loans.).

    c.    ECF 4656 at 23-24 (HLC's Proposed Jury Instructions) (citing legal standard for waiver applied to Assetwise loans.).

2.    Waiver requires actual or constructive knowledge.

    a.    Although waiver requires knowledge and intent, "knowledge may be actual or constructive and the intent to waive may be inferred from conduct." *St. ex rel. Swanson v. 3M Co.*, 845 N.W.2d 808, 819 (Minn. 2014);

    b.    *Bros. Jurewicz, Inc. v. Atari, Inc.*, 296 N.W.2d 422, 429 (Minn. 1980) ("[T]he knowledge required for waiver may be constructive rather than actual knowledge; indeed, the record, explored at oral argument, clearly supports a finding that Atari had constructive knowledge of its right to arbitrate.").

3.    Waiver is ordinarily a question of fact.

    a.    *St. ex rel. Swanson v. 3M Co.*, 845 N.W.2d 808, 819 (Minn. 2014).

    b.    *Residential Funding Co., LLC. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013).

4.    "Ignoring a contractual provision or acting in a way that is inconsistent with the provision can constitute a waiver." *Exner v. Minneapolis Publ. Schs.*, 849 N.W.2d 437, 441 (Minn. Ct. App. 2014).

5.    Minnesota courts find waiver in a variety of circumstances, including where "with the assent of both parties a practice was established which was inconsistent with the quoted provision of the contract, and a waiver of the right to demand compliance with that provision resulted." *Standard Constr. Co. v. Nat'l Tea Co.*, 62 N.W.2d 201, 205 (Minn. 1953).

B. Home Loan Center understands that Plaintiff moved for summary judgment on waiver solely as to Assetwise.  ECF 3617 at 10, n. 9.

    1. The Court denied Plaintiff's motion, but limited the scope of Home Loan Center's waiver defense to the Assetwise Direct Criteria Agreement.  ECF 4307 at 109, 116-23

    2. The facts under which that defense should proceed are set forth above and incorporated by reference.

C. A reasonable juror could conclude that Home Loan Center has established its waiver defense as to bulk and POA loans, at least as to certain representations relating to compliance with program criteria.

    1. As set forth above and incorporated fully herein, "a practice was established which was inconsistent with the quoted provision of the [Client Guide]," at a minimum, with respect to whether bulk and POA loans would meet representations and warranties of the Client Guide that incorporate program criteria.

    2. RFC's acceptance of its competitors' loan products was inconsistent with the Client Guide's representations requiring compliance with RFC's own loan programs.

    3. For example, RFC knew that Home Loan Center was not selling it second-lien loans in bulk that were intended to comply with RFC's loan programs.  *See, e.g.*, Trial Tr. 997:3-10 (Forget) (admitting that loans purchased in bulk were not Goal Line or Goal Loan products).

                *          *          *          *

For the reasons set forth above, the Court should deny Plaintiff's motions, if any, for judgment as a matter of law.

Dated: November 6, 2018

ZELLE LLP

By: */s/ Elizabeth V. Kniffen*
     Daniel Millea, #0245963

Elizabeth V. Kniffen, #0346329
Rory Zamansky, #0330620
500 Washington Avenue South
Suite 4000
Minneapolis, MN 55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100
dmillea@zelle.com
ekniffen@zelle.com
rzamansky@zelle.com

WILLIAMS & CONNOLLY LLP
R. Hackney Wiegmann (*pro hac vice*)
Matthew V. Johnson #0324875
Jesse T. Smallwood (*pro hac vice*)
N. Mahmood Ahmad (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
hwiegmann@wc.com
mjohnson@wc.com
jsmallwood@wc.com
mahmad@wc.com

*Attorneys for Defendant Home Loan
Center, Inc.*