UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Litigation | Court File No. 13-cv-3451 (SRN/HB) |
| *This document relates to:*<br><br>ResCap Liquidating Trust v. Home Loan Center, Inc., No. 14-cv-1716 | |

**HAND-UP IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW THAT THE CLIENT GUIDE GOVERNS DEFENDANT HOME LOAN CENTER'S AT-ISSUE LOANS**

**JMOL THAT THE CLIENT GUIDE GOVERNS HLC'S AT-ISSUE LOANS**

I.     UNCONTROVERTED EVIDENCE DEMONSTRATES THAT THE GUIDE GOVERNS

    A.     **Client Contract:**

         1.     "[HLC] hereby makes to [RFC] all of Client's [R&Ws] set forth in the [Guide]."  Client Contract (PX 30) at ¶ 4.

         2.     "If an event of default shall occur, [RFC] may exercise, at its option, one or more of the remedies set forth in the applicable Guides."  *Id*. ¶ 6.

         3.     "Contract … may only be amended in writing signed by both parties.  The Guides may be amended only as set forth in the applicable Guide." *Id.* ¶ 3.

    B.     **Client Guide:**

         1.     "Welcome to [RFC's] Client Guide—the reference book governing our business relationship."  Client Guide (PX 15-17) at § 100.

         2.     "[RFC] maintains a single contractual relationship with each entity with which it does business as a Client…."  Client Guide (PX 15-17) at § 102.

    C.     **RFC witnesses:**

         1.     "Q. In your 21 years at RFC, did you personally acquire . . . any loans that you understood **not to be subject to the [R&Ws] in Section 2 of the Guide? A. I did not**." Tr. 368:16-21 (Russell).

         2.     "Q. [A]re you aware of RFC acquiring any loans from Home Loan that were not covered by this Client Contract?  A. **I'm not aware of any loans**." Tr. 599:14-17 (Bangerter); *see also id.* 592:22-593:7 ("[The Client Contract] was a standard form that we used with every client. And when they were approved by risk management, this is what I would send to the client to have them sign it; and it basically consummates our agreement to do business with them.").

         3.     The Guide "sets the terms for **how business would be conducted** between the two parties.  It set standards.  **It also provides for [R&Ws]** in the event that issues arise with assets purchased." Tr. 740:10-18 (Collins);

1

*see also id.* Tr. 813:15-20 ("Q. [T]he loans being purchased from HLC in this bulk pool remain subject to the Client Guide [R&Ws] and remedies that we previously discussed? A. Yes.").

4. **"[The Client Contract and Guide] always applie[d] … it's the only contract we have.** Is that contract that ties to the [Guide]. And that is part of the process that makes it simpler, is that you already know you have a contract in place when you're selling loans to a conduit." Tr. 896:21-25, 897:11-897:18 (Forget).

5. **The Guide "was a significant part of the contract** under which we [RFC] bought loans from originators. It outlined all the terms and conditions in order for an originator to be approved as a seller to our company and then **the terms under which they would sell loans to** [RFC] and also the types of requirements that the loans would have to meet the requirements of all the different programs." Tr. 1077:9-19 (Lundsten).

D. **HLC witnesses:**

1. **Barton (HLC corporate representative)**

    (a) **HLC understood "it was making [Guide] [R&Ws]"** at the time it signed the Client Contract. Tr. 450:1-9; *see also* Tr. 460:9–15 (HLC understood that R&Ws in the Guide "are [R&Ws] that HLC was making to RFC in connection with loans it was selling to it"). This includes R&Ws that:

        (i) RFC was "purchas[ing] loans in reliance upon the accuracy and truth of the client's [R&Ws]." Tr. 514:18-22.

        (ii) There was "[n]o fraud or misrepresentation … in connection with the origination or underwriting of any loan," and information and documents provided to RFC were "complete and accurate." Tr. 531:16-532:2.

        (iii) HLC was "liable for any misrepresentation or breach of warranty." Tr. 515:1-12.

        (iv) HLC had "taken all necessary action to ensure that each loan is in compliance with all R&Ws and requirements … in [the Guide]." Tr. 517:3-7.

2

    (v)    HLC had repurchase obligations as stated in the Guide.  Tr. 526:4-14.

    (vi)    HLC had to indemnify RFC for material misstatements or omissions in any information HLC provided to RFC.  Tr. 516:16-20.

    (vii)    HLC was "responsible for credit and property underwriting."  Tr. 523:13-17.

2. **Svinth:**

    (a)    Other than to the extent modified in a master commitment, for "loan[s] sold to RFC by HLC, **the Client Guide … controlled**."  Tr. 723:8-19.

    (b)    "Q. Did you have any understanding that in connection with the sale of loans by HLC to RFC that **HLC was making various [R&Ws] … contained in the [Guide]? A. Yes, generally.** That's common practice."  Tr. 716:1-5.

    (c)    Could not recall RFC waiving a R&W in Guide Section 2A.  Tr. 719:6-13 (as to prudent origination and underwriting); 719:14-23 (as to complete and accurate loan file requirement); 719:24-720:8 (as to borrower fraud and misrepresentation); 720:9-15 (as to appraiser misrepresentation); 720:16-23 (as to truth, accuracy and completeness of origination information).

3. **Weiler:**

    (a)    Never seen a document indicating the Guide R&Ws did not apply to loans underwritten to HLC's "investor 01" or Countrywide ("investor 15") guidelines.  Tr. 1191:17-24.

    (b)    **Never seen a document disavowing Guide R&Ws** regarding information accuracy, fraud or misrepresentation, "loan is of investment quality, has been prudently originated," compliance with Guide, or underwriting responsibility.  Tr. 1193:5-1199:19.

4. **Furey:**

   (a) HLC's "flow loans [were] intended to meet the [Guide]." Tr. 3085:20-22.

   (b) "[T]here was a standing [RFC-HLC] contract ... that's intended to cover ... transactions ... beyond that [date]." Tr. 3138:3-17.

   (c) At his deposition, Furey did not "have a position" "that the Client Contract ... never applied to bulk sales[.]" Tr. 3141:1-5.

   (d) "[T]he first time [Furey] recall[ed] ... ever looking at th[e] [Client Contract] between [HLC] and RFC was 2010." Tr. 3141:6-11.

5. **HOEPA Amendment**

   (a) The 11/10/2005 HOEPA Amendment changed the Guide R&W definition of Discontinued Loans to waive the required HOEPA testing on HLC's HELOCs. PX 32-1; PX 120-1. The HOEPA Amendment states, "All terms and conditions as set forth in the Client Contract and the [] Guide shall remain in full force and effect unless specifically changed, altered or modified by this Amendment." *Id.*

   (b) In a 4/24/2006 email, Furey wrote, "RFC has granted [HLC] a variance whereby [HLC is] the only customer for which [RFC] do[es] not apply HOEPA standards to HELOC production. This has caused [HLC] to begin selling HELOCS to [RFC] in small bulks to diversify [our] liquidity for Countrywide HELOCS." PX 335; PX 336.

   (c) The HOEPA Amendment did not impact any other aspect of the Section 2A R&Ws in the Guide. Tr. 386:18-22, 387:3-10, 421:16-423:4 (Russell).

   (d) RFC never amended any other R&Ws in the Guide. Tr. 948:2-6 (Forget) ("Q. Other than the amendment that [HLC] requested to the [] Guide on HOEPA, did [it] request that in order to earn the business, that RFC amend any of the other [R&Ws] in the [] Guide? A. No, [it] did not."). HLC's Svinth was not aware of and could not recall any instance of HLC asking for, or RFC granting, exceptions to various Guide R&Ws. Tr. 719:6-720:23 (Svinth).

## II. ALL PARTIES AGREE THAT HLC'S LOANS WERE GOVERNED BY R&WS AND REMEDIES, AND THE ONLY IDENTIFIED R&WS OR REMEDIES ARE THOSE IN THE GUIDE

### A. HLC witnesses conceded all loans were subject to R&Ws and remedies

1. HLC made R&Ws to RFC because that was "**standard operating procedure**," and "every investor in the mortgage industry world has [R&W] requirements." Tr. 1186:1-11 (Weiler).

2. It was "**common practice**" that HLC would make R&Ws to its investors, and even if a loan was underwritten to other investor guidelines, the investor still had the right to repurchase and require indemnification. Tr. 716:1-5, 728:21-729:19 (Svinth).

3. "**RFC would not buy a loan from [HLC] unless there were [R&Ws]** that the information was accurate, that there were no misrepresentations, that there was no fraud, that there was no borrower fraud." Tr. 3023:6-12 (Smith).

4. "Q. . . . [W]ith respect to any loan that was sold by [HLC] to an investor such as RFC or Countrywide or Wells Fargo or Citi … **there would be [R&Ws]** as to the accuracy of the information, and fraud and misrepresentation, correct? A. Yes ….. Q. [HLC] would make [R&Ws] with respect to any loan sold to RFC or any of these other investors … to accuracy, lack of fraud, and that there were no misrepresentations, correct? A. That's correct." Tr. 3021:6-20 (Smith); *see also* 3020:3-3021:5.

5. **Furey**

   (a) "Generally understood that with every loan HLC, Home Loan made, that it was making representations and warranties to the purchaser about the accuracy of data, lack of misrepresentation, lack of fraud." Tr. 3141:16-20.

   (b) The representations and warranties were in some form of documentation between HLC and the investor; it could be the client contract, the client guide or both. Tr. 3143:3-9.

   (c) Does not recall "ever selling a loan to an investor such as RFC without a written agreement covering that sale." Tr. 3143:10-13.

5

(d) Never thought "RFC is the only investor that buys loans from us that doesn't have written [R&Ws]… [and] remedies" Tr. 3145:3–3146:3.

(e) HLC's bulk sale R&Ws to RFC did not exist merely "in the air." Tr. 3187:3-13.

(f) "Q. So sitting here today, I mean, not while you were actually … at Home Loan working with RFC, during that time you never thought that [R&Ws], just that they are nowhere in writing. You never thought that while you were working there, did you? A. In the time we were selling the loans to RFC, that was not a thought. Q. Okay. And it's become a thought since this litigation was filed? A. It's become a question, yes." Tr. 3147:23-3148:8.

B. **RFC witnesses testified all loans were subject to R&Ws and remedies**

1. "[I]t was **critical to our business model** to have … those indemnifications, to have those [R&Ws] made to us. Our model simply wouldn't work without it. We wouldn't be able to sell the loans we were buying." Tr. 371:5-14 (Russell).

2. "Q. In the 13 years you worked at RFC, do you recall RFC ever acquiring any **loans without [R&Ws]? A. No**. Q. …[I]f you were to do that, what would have been the consequences? A. Well, we would have a loan that we didn't know was accurate, and then **I would probably get fired**." Tr. 598:23-599:17 (Bangerter).

1. "**[R&Ws] are a foundational part of how business was done**. … It's a well understood practice that loan assets are not traded amongst parties without reps and warrants. It's an industry standard." Tr. 754:22-756:1, 779:10-20 (Collins).

2. "Are you aware of any competitor in RFC's marketplace who didn't require [R&Ws] …? A. No. . . . **That would be shocking**. … **It would be irresponsible** to try to conduct business in the absence of those [Guide R&Ws]. . . [T]hat business model would not last very long, as well as it should be inundated with volumes of bid tapes for the fact that it's missing a central part of what protects the organization." Tr. 814:25-815:23 (Collins).

6

    3.     "[T]hat's how loans are originated and sold.  Whether you're on the buying end or the selling end, **there are [R&Ws] that are given** when you buy a package of loans."  Tr. 887:9-14 (Forget).

    C.     **The only R&Ws or remedies in the record are those in the Guide**

        1.     At deposition Furey testified he "understood th[e] [no fraud R&W] existed … in some form of the document that we had between us and the investor."  Tr. 3142:4-3143:2.

        2.     [T]he only document [Furey is] aware of … is th[e] Client Contract that incorporates [R&Ws]."  Tr. 3144:15-19.

        3.     Bid tape did not include R&Ws "that the data is accurate, that there's no fraud, that there's no borrower fraud, and that there's some sort[] of remedies…"  Tr. 3144:4-10 (Furey); *see also* Tr. 3146:14-16 ("there's nothing in that bid tape that has any [R&Ws]").

        4.     Smith:  Does not "know in what documents … R&Ws are found," could not recall seeing the Client Contract or Guide, and does not know whether Client Contract contained R&Ws or remedies.  Tr. 3021:21-3022:20; 3025:17-3027:1.

        5.     Product matrices and investor guidelines do not contain R&W's.  *See, e.g.*, DX 47.

**III.     MODIFICATIONS TO UNDERWRITING CRITERIA ARE IRRELEVANT**

    A.     **September 14, 2018:**  THE COURT:  "[N]one of these documents reference an actual communication … in which RFC says, [']Don't worry, the [Guide] does not apply to this [at-issue] loan,['] … It's [just been documents concerning] the underwriting guidelines with the small g.  **I haven't seen the document that says you are excused from the contract that you signed committing you to the [Guide].**  … I presume … you're going to call on cross an RFC employee who is going to testify … that, 'You bet, we routinely excused [HLC] on these at-issue loans from compliance with any piece of the Client Guide. ['] I mean, that's what it would take. …  MR. SMALLWOOD: We are planning to cross-examine a number of witnesses on that subject, and we are also planning to call witnesses of our own."  9/14/2018 H'rg Tr. 94-97.

    B.     **October 1, 2018:**  "[A]lthough the [Guide] expressly contemplated that RFC would purchase loans that did not comply with 'one or more of the criteria

7

stated in the standard Loan Program Chapters of this Guide,' **other provisions of the [Guide] would continue to apply to such purchases**. … HLC may not seek to introduce anecdotal, hearsay evidence that simply reflects generalized variances from RFC's underwriting criteria.  Rather, it must offer evidence of a stated departure from the provisions and remedies of the [Guide] as to specific HLC loans or specific bulk transactions, made by a person with authority at RFC."  10/1/18 Order at 5, 7 Doc. No. 4497].

C. **October 22, 2018**:  "THE COURT:  … **I haven't seen any evidence yet** … that when … RFC purchased loans, say, from [HLC] that were originated to different underwriting criteria, **that [RFC] also said to [HLC], [']Just give them to us, you will never be on the hook, no [R&Ws], no indemnification**.['] … [I]n the absence of seeing some evidence from your side that it was clear that when they exercised that right under the [G]uide that what they were really saying is they were going outside the [G]uide and HLC could be comfortable that they didn't have to make any [R&Ws] and that they would never be on the hook, I mean, it seems like an extreme way of looking at the evidence.  I don't know.  …  MR. AHMAD:  … [W]e do expect that you will hear fact testimony … from [HLC] witnesses … [that] RFC agreed to buy … many of the [at-issue] loans ... pursuant to an agreement that those loans would not be sold under the [Guide]."  Tr. 870:8-871:16.

D. **In any event, the evidence at trial was unequivocal and undisputed that the parties understood, during the relationship, that the Guide applied even when the parties agreed to non-RFC underwriting criteria:**

   1. HLC understood that **even for loans underwritten to other investor guidelines**, it was representing and warranting that the loan was of investment quality and prudently originated.  Tr. 526:23-527:18 (HLC corporate representative Barton).

   2. "Q. … [D]id you view Section 6 of the [Guide] differently than the Section 2 [R&W] section…? A. Well, in the normal course of our business we would make adjustments sometimes, amendments to those program criteria.  We basically very seldom did that in Section 2.  **Section 2 is sort of holy** … [it] really very, very seldom changes."  Tr. 367:21-368:9 (Russell).  Changing the Guide's R&Ws was "[s]ort of **like changing the Constitution**."  Tr. 369:20-371:14 (Russell).

   3. "Q. … [I]f RFC entered into an agreement with the client, a separate agreement, to vary the program guidelines or underwriting criteria that could be used to sell loans to RFC, how would that … impact this [Guide A203(H)] representation?  A. **It doesn't impact the representation to the**

8

          **[] Guide.** That would be things that are changeable, and that would be in Chapter 6." Tr. 612:8-16 (Bangerter).

4.     "Q. … [Did] the original underwriting guidelines, with a lower case g … have any impact on whether the Guide with the capital G applied to those particular loans? . . . A." **The [] Guide [R&Ws] apply.**" Tr. 755:19-756:1 (Collins).

5.     "Q. [D]id RFC sometimes agree with a client that it would purchase loans that were underwritten … to client's guidelines? A. From what I recall of what the typical process was is that the negotiation would center around the loan program parameters, but that **all of the other aspects of the [Guide] would apply** …." Tr. 827:24-829:1 (Cleary); *see also* Tr. 827:24-829:1 (Cleary).

9

Date:  November 6, 2018

| | |
|---|---|
| FELHABER LARSON<br><br>By:  */s/ Jessica J. Nelson*<br>Donald G. Heeman, #286023<br>Jessica J. Nelson, #347358<br>Randi J. Winter, #0391354<br>220 South Sixth Street, Suite 2200<br>Minneapolis, MN  55402-4504<br>Telephone:  (612) 339-6321<br>Facsimile:  (612) 338-0535<br>dheeman@felhaber.com<br>jnelson@felhaber.com<br>rwinter@felhaber.com | QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br><br>Peter E. Calamari (*pro hac vice*)<br>Jennifer J. Barrett (*pro hac vice*)<br>Sascha N. Rand (*pro hac vice*)<br>Isaac Nesser (*pro hac vice*)<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Telephone:  (212) 849-7000<br>Facsimile:  (212) 849-7100<br>petercalamari@quinnemanuel.com<br>jenniferbarrett@quinnemanuel.com<br>sascharand@quinnemanuel.com<br>isaacnesser@quinnemanuel.com<br><br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>William C. Price (*pro hac vice)*<br>Anthony P. Alden (*pro hac vice*)<br>Johanna Ong (*pro hac vice*)<br>K. John Shaffer (*pro hac vice*)<br>Matthew Scheck (*pro hac vice*)<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Telephone:  (213) 443-3000<br>Facsimile:  (213) 443-3100<br>williamprice@quinnemanuel.com<br>anthonyalden@quinnemanuel.com<br>johannaong@quinnemanuel.com<br>johnshaffer@quinnemanuel.com<br>matthewscheck@quinnemanuel.com |

*Attorneys for Plaintiff ResCap Liquidating Trust*