# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: RFC and ResCap Liquidating Trust Action<br><br>*This document relates to*:<br><br>*ResCap Liquidating Trust v. Home Loan Center, Inc.*, Case No. 14-cv-1716 (SRN/HB) | Case No. 13-cv-3451 (SRN/HB)<br><br><br>**OMNIBUS ORDER RE: RULE 50(a) JMOL MOTIONS** |

SUSAN RICHARD NELSON, United States District Judge

From October 15 to November 7, 2018, the parties tried this highly complex contractual indemnification case to a jury.[1] The jury heard the testimony of 29 witnesses (some live, others videotaped), including seven experts, and received over 75 exhibits; most of this evidence was introduced by Plaintiff, the ResCap Liquidating Trust (hereinafter "ResCap"). The Court entertained a multitude of oral arguments from counsel outside the presence of the jury, primarily concerning evidentiary disputes, and issued numerous written and oral decisions resolving those disputes. *See, e.g.*, *In re ResCap*, 2018 WL 5257641 (D. Minn. Oct. 22, 2018) (addressing "sole responsibility" causation argument and related evidence).[2] Ultimately, following approximately two-and-a-half hours of deliberation, the jury rendered a $28.7 million verdict in favor of ResCap.

---

[1]     For purposes of this Order, the Court assumes familiarity with this litigation's extensive factual and procedural background.

[2]     Moreover, between the issuance of the Court's 182-page summary judgment decision on August 15, 2018 and the commencement of trial, the Court held five HLC-specific, in-person pre-trial conferences, and issued several written orders following those

Following the presentation of evidence, but before closing arguments, both parties also moved for judgment as a matter of law on a number of issues. *See* Fed. R. Civ. P. 50(a). The Court heard argument on these motions, and received briefing from both sides.[3]

Specifically, Defendant Home Loan Center (hereinafter "HLC") moved for JMOL as to ResCap's "failure to prove a non-speculative allocation of the MBIA and FGIC settlements." (*See* HLC JMOL Br. [Doc. No. 4686]; ResCap Opp. Br. [Doc. No. 4699]; Trial Tr. at 3330-49.)[4]

For its part, ResCap moved for JMOL as to **(1)** "the reasonableness and good faith of RFC's bankruptcy settlements" (*see* ResCap Reasonableness & Servicing Br. ("R&S Br.") [Doc. No. 4673] at 1-14; HLC 1st Opp. Br. [Doc. No. 4675] at 3-26; Trial Tr. at 2912-43, 2947-59); **(2)** "the allowance and allocation of servicing claims" (*see* ResCap R&S Br. at 14-

---

conferences. *See, e.g.*, *In re ResCap*, 2018 WL 4469249 (D. Minn. Sept. 18, 2018) (Seventh Amendment issue); *In re ResCap*, 2018 WL 4489684 (D. Minn. Sept. 19, 2018) (*Daubert* ruling); *In re ResCap*, 2018 WL 4863597 (D. Minn. Oct. 8, 2018) (motions in limine); *In re ResCap*, 2018 WL 4929393 (D. Minn. Oct. 11, 2018) (admissibility of certain proofs of claim); *In re ResCap*, 2018 WL 4929394 (D. Minn. Oct. 11, 2018) (admissibility of certain evidence available to RFC at the time of settlement).

[3]    The Court pauses to note that, given the demanding deadlines inherent in a trial of this magnitude, counsel for both sides did an extraordinary job of briefing and arguing these motions. The Court commends counsels' diligence.

[4]    At the close of ResCap's case, on October 30, HLC also (orally) moved for JMOL on (i) ResCap's alleged failure to allocate any damages to the Ambac and Syncora settlements, and (ii) ResCap's alleged failure to prove damages to a reasonable degree of certainty. (*See* Trial Tr. at 2404-2422.) The Court denied those motions from the bench, and will not discuss them further, other than to confirm that HLC has preserved its appellate rights with respect to both motions. (*See id*. at 2422-23 (stating that "the Court does not plan to issue a written order in response to this motion, but rather will simply rule from the bench"); *id*. at 3260 (renewing motions at close of evidence); *see also* Minute Entry for Oct. 30, 2018 [Doc. No. 4665].)

19; HLC 1st Opp. Br. at 29-33; Trial Tr. at 2925-27, 2943-46); **(3)** "causation" (*see* ResCap Causation Br. [Doc. No. 4674]; HLC 1st Opp. Br. at 26-29; Trial Tr. at 2889-2912); **(4)** the applicability of "the Client Guide [to] HLC's at-issue loans" (*see* ResCap Client Guide Br. [Doc. No. 4689]; HLC 2d Opp. Br. [Doc. No. 4687] at 3-36, 41-43; Trial Tr. at 3264-74, 3289-3313, 3324-30); **(5)** the relationship of the Assetwise Direct Criteria Agreement to the Client Guide (*see* ResCap Assetwise Br. [Doc. No. 4690]; HLC 2d Opp. Br. at 36-41; Trial Tr. at 3280-86, 3313-17); and **(6)** "HLC's affirmative defense of equitable estoppel (and waiver)" (*see* ResCap Estoppel Br. [Doc. No. 4691]; HLC 2d Opp. Br. at 44-52; Trial Tr. at 3274-80, 3317-24).

After carefully considering the parties' arguments, the Court ruled from the bench, in part on Monday November 5 and in part on Tuesday November 6. Specifically, the Court denied HLC's motion, and granted five of ResCap's six motions; the Court only denied ResCap's motion "that the Client Guide governs HLC's at-issue loans." (*See generally* Minute Entry for Nov. 5, 2018 [Doc. No. 4685] and Minute Entry for Nov. 6, 2018 [Doc. No. 4695].) Because the Court explained its reasoning from the bench at some length, the Court does not feel compelled to issue an elaborate written decision at this juncture. However, for the sake of a clear record, the Court will reprint those remarks in this Order, with additional citations, edits, and footnoted addendums, as needed. The Court will address each motion in turn.

## I.    Legal Standard for a Rule 50(a) Motion

Fed. R. Civ. P. 50(a) provides that, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue," "the court may resolve the issue against the party . . . before the case is submitted to the jury." When considering such a motion, a court "must (1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts supporting the nonmovant which the evidence tended to prove; (3) give the nonmovant the benefit of all reasonable inferences; and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn." *Roberson v. AFC Enters., Inc.*, 602 F.3d 931, 933 (8th Cir. 2010) (quoting *Larson ex rel. Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (en banc)). However, because a court "may not accord a party the benefit of unreasonable inferences or those at war with the undisputed facts," and because a "reasonable inference" is only "one which may be drawn from the evidence *without resort to speculation*," a court may grant a party JMOL, and thereby remove an issue from the jury's province, if "the record contains no proof beyond speculation to support" a jury finding for the non-movant on that issue. *Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 830 (8th Cir. 1996) (cleaned up) (affirming grant of pre-verdict JMOL); *accord SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350 (8th Cir. 2007) (same); *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479 (8th Cir. 2002) (same); *Fought v. Hayes Wheels Intern., Inc.*, 101 F.3d 1275 (8th Cir. 1996) (same); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) (reversing a district court for failing to grant JMOL and noting that JMOL "*must* be granted when a non-movant's case rests solely upon speculation and conjecture lacking in probative evidentiary support") (emphasis added).

Moreover, although "[d]etermining the credibility of a witness is the jury's province, whether the witness is lay or expert," *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004), a jury may generally not "disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert witness where . . . the testimony bears on technical questions . . . beyond the competence of lay determination." *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76-77 (1st Cir. 2002) (quoting *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970)). "A jury in such a case must rely on expert testimony and cannot substitute its own experience." *Id.* at 77 (reversing district court for failing to grant JMOL and remanding for judgment in favor of the moving party); *see also Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003) (affirming grant of JMOL on similar reasoning).

Finally, a "court's prior decision on summary judgment [does] not control the outcome of a Rule 50 motion." *St. Louis Convention & Visitor Comm'n v. National Football League*, 154 F.3d 851, 861 (8th Cir. 1998). This is especially so where "[t]he Rule 50 motion was made and considered after the court had had the benefit of over four weeks of trial," alongside "extensive legal arguments by the parties." *Id.* (affirming grant of pre-verdict JMOL motion, on issue where district court had previously denied summary judgment).

## II.     HLC's Allocation Motion

In this motion, HLC argued that, because the Monoline Insurer MBIA "brought and settled claims against RFC for aiding and abetting GMAC Mortgage in fraudulently inducing MBIA . . . to insure GMAC-sponsored trusts" (as evidenced by MBIA's proof of claim), and because ResCap's "damages expert, Dr. Karl Snow, did not allocate any portion

of the MBIA . . . settlement to" this "non-indemnifiable claim," HLC was entitled to JMOL

as to ResCap's "failure to prove a non-speculative basis to allocate the MBIA . . . settlement

between indemnifiable and non-indemnifiable claims." (HLC JMOL Br. at 2, 4, 6.)[5]

In response, ResCap argued that, not only did HLC fail to raise this issue at any point

during trial or during its cross-examination of ResCap's relevant experts, but, under the

*UnitedHealth Group* allocation standard, RFC was under no obligation to allocate this

"immaterial" claim in order to articulate a "reasonably certain" measure of damages. (*See*

*generally* ResCap Opp. Br. (referencing *UnitedHealth Grp. Inc. v. Exec. Risk Spec. Ins.*, 870

F.3d 856, 862 (8th Cir. 2017)).)

The Court denied HLC's motion. (*See generally* Trial Tr. at 3356-57.) First, the only

support for HLC's argument was a handful of sentences in MBIA's proof of claim. (*See*

PX-79.) This evidence did not support HLC's argument, though, because the Court had

already instructed the jury that they could not consider that proof of claim for the truth of

the matter asserted therein. (*See, e.g.*, Trial Tr. at 1390.) Moreover, even if the proof of

claim was competent evidence upon which to base a JMOL motion, HLC's argument still

failed because no evidence adduced at trial demonstrated that MBIA's "aiding and abetting"

claim was material. Indeed, Mr. Donald Hawthorne (ResCap's expert on the bankruptcy

settlements) was the only witness to testify about the materiality of claims that were settled

---

[5]     HLC's brief advanced this argument with respect to both the MBIA and FGIC
settlements. However, because the FGIC proof of claim had not been introduced into
evidence at trial, and because HLC's motion had no evidentiary basis without that proof
of claim, at oral argument HLC withdrew its JMOL motion with respect to the allocation
of the FGIC settlement. (*See* Trial Tr. at 3330.)

between RFC and MBIA during the bankruptcy, and he did not mention this claim nor was there any cross examination of him asking why he did not mention this claim. (*See generally id.* at 1609-1750, 1788-89 (Hawthorne).) Rather, Mr. Hawthorne only testified about repurchase claims, recessionary claims (which encompassed both material breach claims and fraud claims), and servicing claims, and how those claims should be allocated in the context of this indemnification suit; Mr. Hawthorne was under no obligation to prove a negative. Finally, not only was there no competent evidence to suggest that MBIA's "aiding and abetting" claim had value (or was even considered at the time of settlement), this issue was not even raised with the Court *once* over the course of the four-week trial.

For these reasons, the Court denied HLC's JMOL motion with respect to allocation.

## III.     ResCap's Reasonableness Motion

In this motion, ResCap argued that no reasonable juror could find that the bankruptcy settlements were not entered into in good faith, and for a reasonable amount. This was so because (1) ResCap's reasonableness expert, Mr. Hawthorne, offered the only expert testimony directly on point, and he explained at great length why the relevant bankruptcy settlements were reasonable in light of RFC's exposure, the strengths and weaknesses of claims and defenses at the time, and comparative settlements; (2) all of the expert witnesses who considered the bankruptcy settlements at the time found the settlements reasonable; (3) the settlement negotiations took place under the auspices of a federal bankruptcy judge as mediator and with the guidance of an independent Chief Restructuring Officer; and (4) the settlement was only approved by the Bankruptcy Court (and all parties to the bankruptcy proceeding) after the Bankruptcy Court (among other

parties) had rejected an earlier proposed settlement. (*See generally* ResCap's R&S Br. at 3-14.)

By contrast, HLC argued that JMOL was inappropriate, primarily with respect to the MBIA settlement, because (1) Mr. Hawthorne did not adequately justify why the MBIA settlement, at a rate of 90% of expected future losses, was reasonable, when the companion RMBS Trust settlement only settled for 17% of such expected losses; (2) various reports suggested that RFC was not facing the high loan default rates required for a 90% settlement rate; (3) MBIA's material breach and fraud claims, which constituted at least part of the claims RFC settled in bankruptcy, may not have been successful at trial; and (4) a report from an expert not testifying in this case, Mr. Fischel, suggested that Mr. Hawthorne's touchstone settlement comparator (the *Assured v. Flagstar* case) was not a good comparator. (*See generally* HLC 1st Opp. Br. at 13-26.) With respect to the RMBS Trust settlement, HLC also argued that (1) its expert, Mr. Phillip Burnaman, called into question the reliability of the RMBS Trust comparator settlements used by Mr. Hawthorne, and (2) an April 2012 10-Q disclosure by RFC's parent company, Ally Financial, suggested that losses from lawsuits against RFC would be lower than what the settlement ultimately ended up being. (*See id.* at 8-13.)

In a (comparatively) lengthy oral ruling, the Court granted ResCap's motion. (*See* Trial Tr. at 2973-84.) To begin, Minnesota law requires that a party seeking indemnity for a settlement (here, ResCap) prove that the at-issue settlement was entered into in good faith, and was reasonable and prudent. *See Brownsdale Co-op Ass'n v. Home Ins. Co.*, 473 N.W. 2d 339, 342 (Minn. Ct. App. 1991). Minnesota jurisprudence on this question primarily

derives from the case of *Miller v. Shugart* and what is commonly known as a *Miller-Shugart* settlement. *See Miller v. Shugart*, 316 N.W.2d 729, 732-33 (Minn. 1982); *see also In re ResCap*, 332 F. Supp. 3d 1101, 1155-58 (D. Minn. 2018) (providing background). In such a case, a defendant settles a claim with a plaintiff for a stipulated sum, but conditions the settlement on the plaintiff's right to seek recovery only from the defendant's insurer. *Id*. Similarly here, RFC settled the RMBS Trust and Monoline Insurer claims against it for stipulated "Allowed Claims," on the condition that those Trusts and Monolines (by way of the newly-formed ResCap Liquidating Trust) be permitted to seek contractual indemnification from the mortgage lenders, or "insurers," who sold RFC the underlying defective loans, and whose breaches of the Client Guide's representations and warranties ("R&Ws") contributed to RFC facing such claims. *See generally In re ResCap*, 332 F. Supp. 3d at 1151-54 (describing the stringency of the Client Guide's indemnification provisions for breached R&Ws, which afforded RFC "considerable discretion" and "wide-ranging remedies" against the mortgage lenders that sold it loans).

As the Minnesota Supreme Court explained in *Jorgensen v. Knutson*, the *Miller-Shugart* "reasonableness requirement" exists "to discourage possible overreaching." 662 N.W.2d 893, 905 (Minn. 2003). In other words, the specter of "collusion and fraud" in such a setting triggers the requirement that the party seeking indemnification establish that the settlement was reached at arm's length, in good faith, and that the settlement was prudent and reasonable. *See Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 280 (Minn. 1990) (noting that, in a *Miller-Shugart* setting, "the exposed insured has no incentive to drive a

hard bargain"); *Miller*, 316 N.W.2d at 735 (similarly worrying that an insured may be "quite willing to agree to anything as long as plaintiff promise[s] them full immunity").

Given this policy concern, Minnesota law requires objective proof of good faith and reasonableness. *See Vetter v. Subotnik*, 844 F. Supp. 1352, 1355 (D. Minn. 1992).[6] An objective analysis of good faith and reasonableness, in turn, requires an analysis of what the parties knew or could have known at the time of the settlement; knowledge obtained years later, of new facts or new law, cannot inform the reasonableness of the settlement at the time it was made. *See Miller*, 316 N.W.2d at 735. Moreover, in evaluating objective indicia of good faith and reasonableness, the fact finder must consider whether a reasonable, prudent person would have entered into the settlement based upon (i) an analysis of the defendant's potential exposure at trial, (ii) the strengths and weaknesses of the claims and defenses, both factually and legally, (iii) the risks of proceeding to trial, and (iv) the costs and burdens of litigation. *See id.*; *accord Jorgensen*, 662 N.W.2d at 904-05 (listing these factors, among others, and emphasizing that "reasonableness" is a multi-factor inquiry). The issue is not whether there was a single correct or perfect settlement. Rather, Minnesota precedent makes clear that the issue is whether the settlement for which a party seeks indemnification fell within a reasonable range of potential recoveries. *See Nelson v. Am.*

---

[6]     HLC repeatedly argued that "reasonableness" is governed by an objective standard, whereas "good faith" is governed by a subjective standard. (*See, e.g.*, HLC 1st Opp. Br. at 25-26.) Although no court has directly addressed this question in the context of a *Miller-Shugart* settlement, a fair reading of the Minnesota case law on the subject suggests that "reasonableness" and "good faith" are of a piece, rather than distinct elements, and should both be governed by the objective standard articulated in *Miller*. *See, e.g.*, *Brownsdale Co-op*, 473 N.W.2d at 341-42 (treating "reasonableness" and "good faith" as part of the same, objective inquiry).

*Home Assur. Co.*, 824 F. Supp. 2d 909, 917 (D. Minn. 2011) ("[T]he stipulated $900,000

judgment amount would be recoverable as long as it fell without a reasonable range of

potential recoveries."); *cf. Jackson Nat. Life Ins. Co. v. Workman Sec. Corp.*, 803 F. Supp.

2d 1006, 1012 (D. Minn. 2011) (noting that "[t]he party seeking indemnification need only

show it *could have* been liable under the facts shown at trial, not whether [it] *would

have* been").

Now, at the summary judgment stage of this case, ResCap moved for summary

judgment on this very issue. This Court denied that motion, citing the need for a full record

on such a fact-intensive inquiry. *See In re ResCap*, 332 F. Supp. 3d at 1157.[7] At the close of

trial, however, the Court had before it a full factual record on which to consider ResCap's

Rule 50 motion. That record contained the following uncontroverted evidence: ***First***, the

bankruptcy settlements were entered into after a lengthy mediation conducted by a federal

bankruptcy judge, Judge James Peck. (*See, e.g.*, Trial Tr. at 1603-04 (Hawthorne).) ***Second***,

an independent Chief Restructuring Officer, Lewis Kruger, presided over the mediation and

ultimately approved the settlements. He testified at trial that his goal was to achieve "a

consensual deal that treated creditors fairly and established claims of creditors in a way that

was appropriate," and emphasized that his decision to enter into the settlements was

---

[7]     In denying ResCap's motion at summary judgment, the Court also relied on
evidence concerning "MBIA's separate settlements with GMAC Mortgage and ResCap
LLC," which purportedly supported the contention that "RFC settled with MBIA for
allowed claims that exceeded MBIA's losses by over one billion dollars," and were
accordingly "unreasonable." *Id*. at 1156. However, the Court later excluded this evidence
as irrelevant, in light of certain federal bankruptcy law principles. *See In re ResCap*, 2018
WL 4929393 (disallowing the GMAC Mortgage and ResCap LLC proofs of claim as
evidence).

informed by his discussions with his advisors and with all of RFC's principal creditor constituencies. (*See, e.g.*, *id*. at 1392-1407 (Kruger); *see also id*. at 1604 (Hawthorne) (describing Kruger as a "well-respected experienced lawyer," who "had been appointed by the [bankruptcy court] and was looking out for the interest of all creditors").) ***Third***, RFC's expert in the bankruptcy case, Mr. Frank Sillman, testified that the settlements reached were reasonable. (*See, e.g.*, *id*. at 1416 (Sillman).) ***Fourth***, the RMBS Trusts' expert, Mr. Allen Pfeiffer, testified that the settlements reached were reasonable. (*See, e.g.*, *id*. at 1466-67 (Pfeiffer).) ***Fifth***, all constituencies to RFC's bankruptcy supported the settlements, including parties such as the Creditors' Committee that opposed the original RMBS Trust settlement. (*See id*. at 1606-08 (Hawthorne)). For instance, Mr. John Dubel, the chairperson of the Creditor's Committee, testified that litigating these issues would have involved great uncertainty and "numerous complex and novel issues of fact and law." (*See, e.g.*, ResCap's R&S Br. at 14 (citing excerpts from Mr. Dubel's deposition, which were introduced into evidence but ultimately not played before the jury in light of the Court's oral decision on this issue); *see* Trial Tr. at 2990-91 (providing context).) ***Sixth***, the RMBS Trusts supported the settlements. (*See, e.g.*, *id*. at 1287 (Lipps).) ***Seventh***, ResCap's expert witness, Mr. Hawthorne, an experienced RMBS litigator and an expert on RMBS litigation, testified that the settlements were entered into in good faith and were reasonable. (*See, e.g.*, *id*. at 1541; *see also supra* at 13-15.) ***Eighth***, the bankruptcy judge presiding over the bankruptcy in the

Southern District of New York, Judge Martin Glenn, approved the settlements, after having rejected an earlier proposed settlement. (*See, e.g.*, *id.* at 1608-09 (Hawthorne).)[8]

It was further undisputed that the factual evidence arising out of the settled litigation was highly complex, involving analyses of over 100,000 loans and RFC's accordant exposure to many billions of dollars in damages. (*See, e.g*, *id*. at 1499, 1501-02, 1590-93 (Hawthorne).) As Ms. Tammy Hamzehpour, RFC's general counsel, testified, RFC faced "shockingly high" breach claims that exposed the company to tens of billions of dollars in potential damages, plus years of litigation and expenses. (*See, e.g.*, *id*. at 2849-51.) In fact, RFC's exposure – in excess of $42 billion – was also uncontroverted. (*Id*.)

Of all of these facts, Mr. Hawthorone's lengthy expert testimony was arguably the most important. Indeed, he was the only expert to testify at trial on reasonableness. As such, it is worth considering how, exactly, he reached his conclusion that these settlements were reasonable. In accordance with the multi-factor reasonableness framework detailed above, Mr. Hawthorne employed a three-step methodology for evaluating the reasonableness of the settlements – ranging from the MBIA settlement at 90% of expected losses to the RMBS Trust settlement at 17% of expected losses. He first considered the exposure RFC faced

---

[8]     As the Court noted in its omnibus motion in limine decision, Judge Glenn's order approving the bankruptcy settlements is distinct from Judge Glenn's finding that the settlements were reasonable; the former was admissible for its legal effect (and as an objective indicia of good faith), while the latter was inadmissible as hearsay. *See In re Rescap*, 2018 WL 4863597, at *15. In reaching its decision here, the Court solely relied on the fact that Judge Glenn approved the settlements, and that Mr. Hawthorne considered that approval indicative of reasonableness and good faith. *See also In re Rescap*, 2018 WL 4489685, at *16 (making similar point in the context of the Court's *Daubert* ruling).

were it to try these cases to verdict. (*See, e.g.*, *id*. at 1499-1502.) He then evaluated, both factually and legally, the strengths and weaknesses of the claims asserted against RFC by both the RMBS Trusts and the Monoline Insurers, alongside RFC's defenses to those claims. (*See, e.g.*, *id*. at 1511-62.) Finally, Mr. Hawthorne compared the at-issue settlements to other, contemporaneous RMBS settlements. (*See, e.g.*, *id*. at 1564-74.) Notably, Mr. Hawthorne testified at length about a decision by Judge Jed Rakoff of the District Court in the Southern District of New York, which Judge Rakoff issued only months prior to the at-issue settlements. (*See, e.g.*, *id*. at 1564-67 (describing *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013)).) That decision, *Assured v. Flagstar*, was a case brought by a monoline insurer much like MBIA. Following a bench trial, the monoline insurer in that case, Assured, obtained a judgment for *100 percent* of its losses, *plus interest*. (*Id*.) As Mr. Hawthorne testified, that an aggressive monoline insurer had just been awarded 100 percent of its damages in a similar case just months before the settlement would have been "very much on the minds" of counsel mediating the bankruptcy settlements. (*Id*. at 1564.)

Mr. Hawthorne further testified about the range of settlement rates as among the Monoline settlements and the RMBS Trust settlement in this case, and noted the differences in litigation risk RFC faced as between those cases. (*See, e.g.*, *id*. at 1575-82.) Importantly, it was uncontroverted that MBIA had sued RFC in 2008, five years before the settlements were reached. (*See, e.g.*, *id*. at 1217-24 (Lipps).) In the MBIA case, 130 depositions had been taken, more than a million pages of documents had been exchanged, and expert disclosures had been issued. (*See, e.g.*, *id*. at 1243-45 (Lipps).) Indeed, by 2012, MBIA was

actually out of pocket 98 percent of its damages, *i.e.*, well over $1.2 billion. (*See, e.g.*, *id.* at 1504 (Hawthorne).) Mr. Hawthorne compared that to the RMBS Trusts who, for varying legal reasons, did not organize themselves or hire counsel until October of 2011, years after MBIA commenced litigation. (*See, e.g.*, *id.* at 1578-80 (describing the failure of the RMBS Trusts to organize themselves for litigation as a "herding cats" problem); *accord id.* at 1250-52 (Lipps).) In fact, the RMBS Trusts never actually sued RFC. (*Id.*) Rather, the RMBS Trusts only filed proofs of claim *after* RFC filed for bankruptcy. (*Id.*) Moreover, Mr. Hawthorne testified, without serious rebuttal on cross-examination, that the Monolines had additional legal rights available to them under the law and by virtue of their contracts, including a contractual right of interest, all of which meaningfully changed the calculus of a reasonable settlement as between the RMBS Trust claims and the Monoline Insurer claims. (*See, e.g.*, *id.* at 1504-07, 1588-89.) Further, Mr. Sillman, RFC's expert in the bankruptcy proceeding, testified as to the unique strength of the Monoline claims, and observed that it was reasonable for Monoline claims to be settled for 80 to 100 percent of lifetime losses. (*See, e.g.*, *id.* at 1416.)

Mr. Hawthorne also provided uncontroverted, uncontested testimony about the importance and complexity of the law on the relevant statute of limitations applicable to such claims at the time of the settlements (*see, e.g.*, Trial Tr. at 1547-54), and the legal burden of proof on causation at the time of the settlements (*see, e.g.*, *id.* at 1530-34, 1545-47). Both of these legal issues were highly relevant to his determination that RFC faced potentially enormous liability from the Monoline claims, and arguably less significant liability when it came to the RMBS Trusts.

The only witness to attempt to challenge Mr. Hawthorne's testimony was Mr. Phillip Burnaman, and even Mr. Burnaman only challenged Mr. Hawthorne with respect to the RMBS Trust settlement (rather than the MBIA settlement, which made up the lion's share of HLC's liability in this case). (*See generally id.* at 2459-2625.) However, Mr. Burnaman expressly disqualified himself as an expert on reasonableness on at least three different occasions. First, he testified, "I'm not offering an opinion on the reasonableness of this settlement." (*Id.* at 2600.) Second, he testified, "I didn't fault Mr. Hawthorne on aspects of the litigation risk and I didn't undertake to review the litigation issues around this case because it's a very complicated subject." (*Id.* at 2601.) Such an analysis "requires a legal education," Mr. Burnaman added, which he did not have. (*Id.*) Third, in response to the question, "and you're not here to challenge any of that discussion," in reference to Mr. Hawthorne's discussion of the law relevant to the bankruptcy settlements, Mr. Burnaman answered, "No. It's a very complicated subject. I'm not a lawyer . . . there are different laws in different states in different jurisdictions and I'm not expert enough to undertake to discuss that." (*Id.* at 2605-06.)

However, the reasonableness of these settlements could only be evaluated by analyzing the exposure, the litigation risks, and the legal strength of the claims and defenses, *together*. *See Jorgensen*, 662 N.W.2d at 905 (reversing lower court for "focusing solely" on one factor when undertaking a reasonableness analysis). Mr. Burnaman expressly disavowed the expertise to engage in that analysis. The Court set aside entirely Mr. Burnaman's credibility on the testimony he did offer on other comparator settlements which, of course, Rule 50(a) required the Court to do. *See Stevenson*, 354 F.3d at 745.

Entirely setting aside his credibility nonetheless, the fact that Mr. Burnaman had so disqualified himself made it so that his testimony was simply not probative of reasonableness. *Cf. Concord Boat Corp.*, 207 F.3d at 1050 (noting that JMOL "must be granted when a non-movant's case rests solely upon speculation and conjecture lacking in probative evidentiary support"). If the other settlements to which Mr. Burnaman testified were considered in the context of the changing law at the time, such as the law on causation and the law on the statutes of limitations, one could then evaluate whether they were comparable. But because Mr. Burnaman expressly disavowed such analysis, no reasonable juror could conclude, one way or the other, whether those settlements were comparable or not and therefore whether they were probative of the reasonableness of the RMBS Trust settlement in this case.

The only other notable evidence to which HLC cited in opposition to ResCap's motion was evidence that more than a year prior to the settlements, Ally Financial, RFC's parent company, filed a disclosure with the SEC (a form 10-Q) that optimistically estimated the company's exposure at merely "zero to four billion dollars." (*See, e.g.*, HLC 1st Opp. Br. at 12-13 (pointing out various points in testimony where this 10-Q was discussed and observing that, only "two and a half weeks later," "ResCap and RFC agreed to an $8.7 billion allowed claim settlement just for RFC's liabilities").)[9] But such evidence in a

---

[9]    The Court notes that this $8.7 billion RMBS Trust settlement was rejected by the Bankruptcy Court and various creditors (*see* Trial Tr. at 1258-59 (Lipps)), and that the final RFC RMBS Trust settlement, which was one of the settlements RFC was actually seeking indemnification for in this trial (along with the Monoline settlements), set RFC's liability at approximately $7.1 billion (*id.* at 1278).

vacuum, without the benefit of expert testimony as to the meaning or requirements of that disclosure, was hardly sufficient to argue that, on that basis, a reasonable juror could conclude that the settlements were unreasonable. *See Larson*, 76 F.3d at 1452 (noting that "[a] mere scintilla of evidence is inadequate to support a verdict").

HLC also challenged the credibility of Mr. Hawthorne's explanations for the differences in settlement rates, as between the 17% RMBS trust settlement rate and the 90% MBIA settlement rate, but relied only on attorney argument that Mr. Hawthorne's opinion was not reliable.[10] Of course, HLC was certainly correct that ResCap bore the burden of proving good faith and reasonableness. And HLC was correct that, as a defendant, it had no obligation to present expert testimony on reasonableness. (*See, e.g.*, HLC 1st JMOL Opp. Br. at 7-8 (collecting cases).) But it was equally true that the arguments of counsel are not evidence and so counsel cannot testify as an expert and provide the analysis and the connections necessary that can only be presented through expert testimony. *See Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 838 (8th Cir. 2006) ("[A]rguments of counsel are not evidence."). And perhaps more importantly, counsel could not invite the

---

[10] For example, during cross-examination, HLC attempted to call into question Mr. Hawthorne's explanation for the difference between the high Monoline settlement rates and the (comparatively lower) RMBS Trust settlement rate on grounds that the so-called "herding cats problem" was not as much of a problem as Mr. Hawthorne and Mr. Lipps contended. (*See* HLC 1st JMOL Opp. Br. at 17-18.) Similarly, during its cross of Mr. Hawthorne, HLC asked questions about a report purportedly concluding that *Flagstar* did not settle for 100% of expected losses (*id*. at 23-24), as well as read into evidence documents suggesting that RFC's estimated loan breach rates were too low to support a 90% settlement rate (*id*. at 15-17.) HLC apparently believed that, by tying together this smorgasbord of (largely irrelevant) data points during its closing argument, a reasonable juror could entirely ignore Mr. Hawthorne's opinion and thereby find the bankruptcy settlements unreasonable.

jury to "speculate," particularly with regard to as complex an issue as the reasonableness of a multi-billion-dollar RMBS settlement achieved through the federal bankruptcy process. *See Sip-Top, Inc.*, 86 F.3d at 830 ("When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate.").

Indeed, as at least one federal circuit has recognized in recent years, the general rule that a jury verdict cannot be based solely on the jury's rejection of the other side's uncontradicted testimony applies with particular force to expert testimony on matters outside of lay competence. *See Quintana-Ruiz*, 303 F.3d 62; *Cruz-Vargas*, 348 F.3d 271. That is, although jurors may decide what weight to give to the testimony of expert witnesses, they may not "disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert witness where . . . the testimony bears on technical questions . . . beyond the competence of lay determination." *Quintana-Ruiz*, 303 F.3d at 76-77. There was no doubt that, given the role of the legal landscape in 2013 in determining the reasonableness of these settlements, *i.e.*, the need to evaluate the strength and weaknesses of these claims and defenses in the context of the law, this issue unquestionably required expert testimony. *Cf. Jorgensen*, 662 N.W.2d at 905 (noting that an important consideration in determining reasonableness is "*expert testimony* for *both parties* on issues of the likely size of a jury award"). And as to the law at the time of the settlements, Mr. Hawthorne's testimony was uncontradicted and unimpeached.

To be sure, Rule 50(a) sets forth a strict standard. The Court may not grant a party's motion for JMOL unless no reasonable juror, taking all reasonable inferences in the light most favorable to the opposing party, the nonmovant, could find against the moving party.

*See Roberson*, 602 F.3d at 933. Moreover, the Eighth Circuit is clear that this is an exacting burden due to "the danger that the jury's rightful province will be invaded when [JMOL] is misused." *Bavlsik v. General Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017). And, again, in determining whether to grant JMOL, a court must refrain from making credibility assessments. *See Stevenson*, 354 F.3d at 745. As is evident from this ruling, the Court made no credibility assessments in reaching its decision.

However, the Court found it noteworthy that this particular issue, *i.e.*, the good faith and reasonableness of a settlement in the context of an indemnity action, had almost always been decided by a court as a matter of law on summary judgment, or by a court after an evidentiary hearing. It had rarely, if ever, been considered by a jury.[11] Indeed, in the midst of this trial, in a related case involving the exact settlements at issue here, one of the Court's colleagues, Judge Paul Magnuson, ruled at summary judgment that the settlements were reasonable and entered into in good faith. *See Residential Funding Co., LLC v. Universal Am. Mortg. Co., LLC*, No. 13-cv-3519 (PAM/HB), 2018 WL 4955237, at *5-6 (D. Minn. Oct. 12, 2018).

Thus, the question before the Court was whether a reasonable juror, in the face of this overwhelming, uncontroverted evidence of good faith and reasonableness, could find

---

[11]     The Court acknowledges that, a month before trial, it ruled that the Seventh Amendment requires reasonableness to be tried before a *jury* in *federal* court, contra the Minnesota law requiring this issue to be tried before a *judge* in *state* court. *See In re ResCap*, 2018 WL 4469249. However, the fact that an issue is presented before a jury in no way limits a federal court's power to render JMOL under Rule 50(a), even if the issue is one on which the Court previously denied summary judgment. *See St. Louis Convention & Visitor Comm'n*, 154 F.3d at 861.

that these settlements approved by a United States Bankruptcy Judge were not entered into in good faith and were not reasonable. To do so, this jury would have had to disagree with: (1) every professional to consider the issue, (2) the experts on both sides of the bankruptcy, Mr. Sillman and Mr. Pfeiffer, and (3) every constituency with an interest in the settlements, including the Creditors' Committee, the RMBS Trusts, and the only expert to opine on the issue in this case, Mr. Hawthorne. In fact, no competent fact or expert witness has ever opined that these settlements were entered into in bad faith and/or were not reasonable.[12] The defense would have asked the jury to be the first to do so.

For these reasons, the Court granted ResCap's motion as to reasonableness and good faith.

## IV.    ResCap's Allocation of Servicing Claims Motion

In this motion, ResCap argued that no reasonable juror could find that it was unreasonable "for a party in RFC's position [in 2013] to settle [non-indemnifiable] servicing claims for $96 million (in the RMBS Trust settlement) and de minimis or no value (in the Monoline Settlement), after accounting for litigation risk." (ResCap R&S Br. at 18.) In

---

[12]    The Court acknowledges that HLC intended to offer the testimony of at least one expert, Professor George Triantis, in support of the conclusion that the bankruptcy settlements were unreasonable. Professor Triantis based his conclusion on the purportedly "skewed incentives" facing settling parties in a bankruptcy proceeding. However, the Court excluded Professor Triantis's testimony in its *Daubert* order. *See In re Rescap*, 2018 WL 4489685, at *24-26. In so ruling, the Court observed that Professor Triantis was "simply not qualified to opine about the reasonableness of the Settlements," in large part because he did not "assess the strengths and weaknesses of the underlying claims and defenses in the Settlement" and "ha[d] no experience in the RMBS context." *Id*. at *25.

advancing this argument, ResCap again pointed to the (virtually uncontradicted) testimony of Mr. Hawthorne, in which he explained why servicing claims lacked value, based on his experience as a plaintiff-side RMBS litigator during the relevant time period. (*See id.* at 14-16.) In particular, ResCap noted, Mr. Hawthorne focused on numerous legal difficulties with RMBS servicing claims, such as a high burden of proof and a general lack of legal support. (*Id.* at 15.) For instance, ResCap added, Mr. Hawthorne provided compelling testimony about the importance of a September 2012 *Assured v. Flagstar* (pre-trial) decision, in which Judge Rakoff allowed Assured's RMBS servicing claim past summary judgment but explicitly expressed "skepticism" that the claim could succeed at trial; Assured declined to pursue this claim at trial in light of Judge Rakoff's admonishment. (*Id.* at 15 (quoting *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 607 (S.D.N.Y. 2012)).)

For its part, HLC argued that a reasonable juror could find that ResCap failed to allocate at least some (unidentified) portion of the Monoline settlements to servicing claims. This was so, HLC contended, because the RMBS Trust settlement had allocated some value to servicing claims (albeit only 1% of the total claim)[13], because MBIA's servicing claim had survived a motion to dismiss, because MBIA had retained two expert witnesses on the issue, and because Mr. Burnaman's testimony showed why the RFC Servicer Guide set out

---

[13]     For a more thorough discussion of the allocation of servicing claims in the RMBS Trust settlement, see *In re ResCap*, 2018 WL 4863597, at *22-23 (denying HLC's motion in limine no. 5). Notably, in its opposition brief, HLC did not contest the reasonableness of the servicing allocation in the RMBS Trust settlement.

"objective criteria" that made a servicing claim against RFC more likely to succeed than analogous claims against other "master servicers." (*See* HLC's 1st Opp. Br. at 30-33.)

The Court granted ResCap's motion on this issue, too, for largely the same reasons that it granted ResCap's motion on reasonableness and good faith. (*See generally* Trial Tr. at 2984-87.) Again, the Court focused on Mr. Hawthorne's expert *legal* testimony as to why servicing claims would have been extremely difficult to prove in 2013. First, Mr. Hawthorne noted the prevailing law on loss causation at the time of the settlements and the difficulty in establishing that a servicer breach caused losses to an RMBS Trust. (*See, e.g.*, *id.* at 1530-32.) Second, he noted the discretion afforded to RFC as a "master servicer" under the governing pooling and servicing agreements. (*See, e.g.*, *id.* at 1781-82.) Third, he noted the express limitations on RFC's liability as a master servicer under those agreements. (*See, e.g.*, *id.* at 1529-30.) Finally, he noted that, under the pooling and servicing agreements, a plaintiff would have had to show that the servicer was "grossly negligent" in the performance of its duties in order to establish a servicing claim. (*See, e.g.*, *id.* at 1772-76.) Mr. Hawthorne also emphasized the aforementioned 2012 *Flagstar* ruling, as well as the fact that he knew of no case in which RMBS servicing claims had resulted in any "appreciable recovery" for a plaintiff. (*See, e.g.*, *id.* at 1534, 1564, 1776-78.)

In the face of this expert-driven evidence showing why it would have been reasonable at the time of the bankruptcy settlements to attribute little-to-no value to servicing claims, HLC offered effectively nothing in response. Again, Mr. Burnaman disqualified himself as an expert on the reasonableness of the servicing claims. He confirmed that he could not offer an opinion on the legal viability of the servicing claims

asserted by the RMBS Trusts and the Monolines because he was not a lawyer and was accordingly not qualified to testify about the law on loss causation and the heightened "gross negligence" burden of proof. (*See, e.g.*, *id*. at 2533, 2536-37, 2612-14.) Indeed, Mr. Burnaman conceded that he offered no opinion with respect to the litigation risk of defending against such claims. (*See, e.g.*, *id*. at 2600-01; *but cf. In re Rescap*, 2018 WL 4489685, at *21 (noting, in its *Daubert* Order, that "[w]hat is relevant to the reasonableness of the Settlements is the parties' expectation of possible recovery on available claims, as discounted by the litigation risk").)

As for the facts elicited by HLC on cross-examination, Mr. Kruger and Mr. Pfeiffer both acknowledged RFC's potential exposure on the servicing claims to be around $96 million after accounting for litigation risk, albeit solely in the context of the RMBS Trust litigation. (*See, e.g*., Trial Tr. at 2391-92 (Kruger), *id*. at 1461-63 (Pfeiffer).) Moreover, MBIA's expert (whose report was referenced during Mr. Hawthorne's cross but who did not testify at this trial) apparently believed MBIA's servicing claim was worth at least $76 million, albeit without connecting that amount to any alleged servicing defects. (*See, e.g.*, *id*. at 1645, 1657, 1662-63 (Hawthorne).) Finally, Mr. Burnaman testified that there were written objective servicing criteria in the servicing and pooling agreements that governed RFC's role as master servicer, and that these criteria may have potentially subjected RFC to a viable servicing claim. (*See, e.g.*, *id*. at 2533, 2536-37, 2612-14.)

However, on these minimal facts alone, no reasonable juror could find that Mr. Hawthorne's de minimis Monoline Insurer servicing allocation was unreasonable. This was especially so in light of the relevant inquiry, which was not, "is there any universe in which

MBIA potentially could have succeeded on its servicing claim against RFC?" But, rather, "was it reasonable for a party in RFC's position to settle servicing claims against it for de minimis value in light of the litigation risk, and in the context of the law that governed the claims at the time?" On this record, no reasonable juror could have answered the latter question in the negative.

For these reasons, the Court granted ResCap's motion as to the allocation of servicing claims.

## V.       ResCap's Causation Motion

In this motion, ResCap argued that unrebutted fact and expert testimony showed that it met its burden on causation, under the (fairly liberal) "contributing cause" standard articulated in the Court's summary judgment order. *See In re ResCap*, 332 F. Supp. 3d at 1164-65 (holding that, "to prevail on its contractual indemnity claim, [ResCap] must show that the losses and liabilities for which they seek indemnity [*i.e.*, the bankruptcy settlements] have a cause and result relationship with, or a causal connection to, [HLC's] breaches of R&Ws or Events of Default. . . . This does not require [ResCap] to show that [HLC's] breaches were the *sole* cause of [the claims settled in bankruptcy] – it merely requires that [ResCap] shows that [HLC's] breaches were a *contributing* cause of those liabilities and losses") (cleaned up). In proving this claim, ResCap relied largely on the expert testimony of its re-underwriting experts, Mr. Steven Butler and Mr. Richard Payne. According to ResCap, this testimony showed that specific HLC loans breached specific Client Guide R&Ws, which then caused RFC to breach specific R&Ws to the Trusts and Monolines,

which then caused the Trusts and Monolines to sue RFC for breach of contract. (*See generally* ResCap Causation Br.)

In response, HLC only argued that (1) ResCap did not meet its burden of proof as to two of the Monoline settlements (Ambac and Syncora), one of which (Ambac) ResCap was not even seeking indemnification for in this lawsuit, and (2) ResCap did not show that either the Trusts or Monolines actually brought claims over two of the specific HLC R&W breaches relied upon by Mr. Payne in proving ResCap's "chain of causation" (*i.e.*, the "representation regarding documentation programs" and the "representation regarding proxy Mortgage Loan Schedules"). (*See* HLC's 1st Opp. Br. at 26-28.)

The Court granted ResCap's motion on this issue. (*See generally* Trial Tr. at 2987-90.) The uncontested, unconverted, and unimpeached factual and expert testimony concerning causation conclusively established five facts. ***First***, RFC, in its sole discretion,[14] determined that 57 at-issue RMBS Trust loans and 38 at-issue Monoline loans involved both HLC R&W breaches and RFC R&W breaches. (*See, e.g.*, *id*. at 1831-832, 1857-60 (Payne).) ***Second***, specific HLC R&W breaches directly caused specific RFC R&W breaches. (*See, e.g.*, ResCap Causation Br. at 2 (gathering numerous record citations).) ***Third***, the RMBS Trusts and Monolines asserted loan-level breach claims when they filed claims against RFC in the bankruptcy. (*See, e.g.*, *id*. at 6-7 (gathering numerous record citations).) ***Fourth***, professionals involved in the bankruptcy considered these loan-level

---

[14]     In its summary judgment decision, the Court held that the Client Guide "grant[ed] RFC sole discretion to determine Events of Default in all circumstances," and that no evidence suggested that RFC exercised that discretion "dishonestly, maliciously, or otherwise in subjective bad faith." *In re Rescap*, 332 F. Supp. 3d at 1153, 1185.

breach claims to be a substantial source of RFC's liability. (*Id.* (citing testimony from Mr. Pfeiffer and Mr. Sillman).) ***Fifth***, RFC incurred "loss and liabilities" when it settled those loan-level breach claims, for which it now seeks indemnity under the terms of the Client Guide.

HLC introduced no evidence to the contrary, fact or expert, and in its opposition to ResCap's JMOL motion, HLC pointed to only a few shards of evidence it claimed a reasonable juror could rely on in finding that ResCap had not met its burden as to causation.[15]

First, HLC argued that RFC had not proven that HLC's breaches were a contributing cause of two of the Monoline settlements, Ambac and Syncora. HLC based its argument entirely on its criticism of the allocation modeling of Dr. Snow, *i.e.*, that Dr. Snow's breach rate analysis across the Monoline settlements was flawed because he treated them as one "global settlement," rather than as multiple, individual settlements. However, that issue (*i.e.*, the credibility of Dr. Snow, and the integrity of his sampling model) related only to damages and allocation, both of which remained issues for the jury to decide.

---

[15] This minimal evidentiary showing was unsurprising. HLC's summary judgment briefing on causation relied heavily on its expert, Professor Steven Schwarcz, and various theories he advanced involving RFC R&W breaches that were purportedly "solely caused" by RFC, and then settled for value in the bankruptcy. *See In re Rescap*, 332 F. Supp. 3d at 1167-68 (declining to grant ResCap summary judgment on causation, largely because of Professor Schwarcz's theories). However, the Court excluded much of Professor Schwarcz's testimony in its October 22 "RFC sole responsibility" order, *see In re ResCap*, 2018 WL 5257641, and HLC declined to put Schwarcz on the stand at trial for any other purpose.

Second, HLC argued that a reasonable juror could find that ResCap had not proven

causation as to two discrete R&W categories: R&Ws regarding Mortgage Loan Schedules

based on "proxy data," and R&Ws regarding documentation program representations.

As to Mortgage Loan Schedule R&Ws, there was no doubt that RFC made such

R&Ws to the Trusts and Monolines, and that breaches based on those R&Ws therefore

contributed to the bankruptcy settlements. (*See, e.g.*, Trial Tr. at 1871 (Payne).) Rather,

HLC appeared to argue that the absence of the original data on the Mortgage Loan

Schedules was fatal to the success of those breach determinations. However, the Court

considered this issue in its *Daubert* ruling, and then again in its motion in limine ruling. In

both cases, the Court noted that basing an R&W breach on "proxy data" from a third-party

source was entirely permissible because it supplied the exact same data that was included in

the original schedules. *See In re Rescap*, 2018 WL 4489685, at *10 (*Daubert* ruling); *In re

ResCap*, 2018 WL 4863597, at *19-20 (motion in limine ruling).

As for the documentation program R&Ws, it appeared from expert submissions prior

to trial that HLC disagreed with Mr. Payne and Mr. Butler's interpretation of those

representations. *See, e.g.*, *In re Rescap*, 332 F. Supp. 3d at 1167-68 (overviewing HLC's

then-argument over "documentation program R&Ws," in which the parties disputed

whether such "pool-wide" RFC "documentation program R&Ws" were "functionally

equivalent to underwriting representations"). However, none of that evidence was

presented at trial through HLC's witnesses. (*Cf. supra* n.15.) Accordingly, on this record,

there was no argument HLC could have made to the jury explaining how losses arising from

breaches of RFC's "documentation program R&Ws" resulted in ResCap failing to meet its burden on causation.

For these reasons, the Court granted ResCap's motion as to causation.

## VI.    ResCap's Client Guide Motion

In this motion, ResCap argued that uncontroverted evidence demonstrated that the Client Guide, and its accordant R&Ws and indemnification remedies, applied to all loans for which ResCap was seeking indemnification, including so-called "bulk loans" and "pay option ARM loans." This was especially so because HLC's corporate representative, Ms. Rebecca Barton, effectively testified to that effect, and because "all parties agree[d] that HLC's loans were governed by R&Ws and remedies, and the only identified R&Ws or remedies [were] those" found in the Client Guide. (*See* ResCap Client Guide Br. at 3-7.)

By contrast, HLC argued that a reasonable juror could find that RFC purchased "bulk loans" and "pay option ARM loans" from HLC outside the Client Guide, largely because one of its witnesses, former HLC Senior Vice President of Secondary Markets, Mr. Rian Furey, explicitly testified as such, and "because RFC did not purchase bulk loans [and pay option ARM loans, neither of which complied with the Client Guide's "underwriting criteria"] under any of the Client Guide's three permitted methods for loans that do not comply with the Client Guide in certain respects." (*See* HLC 2d Opp. Br. at 7-11, 22-28, 30-31, 33-36.)

The Court denied ResCap's motion. (*See generally* Trial Tr. at 3350-51.) Although the Court acknowledged the overwhelming evidence suggesting that the Client Guide and its R&Ws and remedies governed the sale of all loans purchased by RFC from HLC, including the testimony of HLC witnesses Ms. Barton and Mr. James Svinth (Mr. Furey's boss), Mr.

Furey's testimony that, in his view, the Client Guide did not cover "bulk loans" and "pay option ARM loans" created a factual dispute that only the jury could resolve. (*See, e.g.*, *id.* at 3102-03, 3078-84 (bulk loans), 3091-93 (pay option ARM loans) (Furey).) Although ResCap's cross-examination of Mr. Furey certainly challenged Mr. Furey's credibility (*see* ResCap Client Guide Br. at 4), the Court could not consider that issue in reaching this ruling. *See Stevenson*, 354 F.3d at 745. Moreover, given further inferences that could be drawn from the evidence about the manner in which "bulk loans" and "pay option ARM loans" were handled, such as the arguable failure of RFC to enter into a written variance with HLC when purchasing bulk loans underwritten to other purchasers' underwriting guidelines, a reasonable juror could find that RFC purchased those two categories of loans outside the Client Guide, and therefore without the accordant R&Ws and remedies at issue in this case.

For these reasons, the Court denied ResCap's motion as to the applicability of the Client Guide. *Accord Watkins Inc. v. Chilkoot Distrib., Inc.*, 655 F.3d 802, 805 (8th Cir. 2011) (holding that, under Minnesota law, "[o]rdinarily, the existence of a contract is a question of fact to be determined by the jury"); *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 532 (8th Cir. 2006) (same).

## VII.    ResCap's Assetwise Direct Criteria Agreement Motion[16]

In this motion, ResCap argued that, regardless of what the Court held with respect to

"bulk loans" and "pay option ARM loans," no reasonable juror could find that the R&Ws

listed in the Assetwise Direct Criteria Agreement (the "AW Agreement") superseded the

Client Guide's R&Ws. This was so because only one witness discussed the AW Agreement

based on personal experience (RFC's former Sales Director, Ms. Renee Bangerter, who was

responsible for sending this agreement to HLC), and she testified that the AW Agreement's

R&Ws merely supplemented, rather than superseded, the Client Guide's R&Ws. (*See*

ResCap Assetwise Br. at 1-2.) Moreover, ResCap contended, even if the AW Agreement

R&Ws superseded the Client Guide R&Ws, that would not matter because "all 21

[Assetwise] loans identified by [ResCap's re-underwriting expert, Mr. Payne] remain[ed] in

breach [under the AW Agreement's R&Ws]." (*See id*. at 3 (identifying and discussing each

of these loans).)

For its part, HLC argued that a reasonable juror could find that the AW Agreement

superseded the Client Guide because the AW Agreement "contain[ed] no language

specifying that the Client Guide's [R&Ws] appl[ied] in addition to those set forth in the

---

[16]    Unlike "bulk loans" and "pay option ARM loans," the Court's summary judgment decision directly addressed HLC loans purchased using RFC's "Assetwise system." *See In re Rescap*, 332 F. Supp. 3d at 1175-78. Although the Court ruled that the unrefuted evidence showed that RFC did not "intend[] a blanket waiver of its remedies of the provisions of the Client Guide when utilizing Assetwise" – because the Client Guide "expressly anticipate[d] RFC's use of Assetwise" and stated that the Guide's R&Ws would still apply "even if the parties used Assetwise," *id*. at 1178 – the Court held that a narrow triable issue of fact remained "as to whether the [Assetwise] Agreement *superseded* the Client Guide" "with respect to the [R&Ws] for which HLC was responsible," *id*. at 1177 (emphasis added).

Agreement itself," (HLC 2d Opp. Br. at 38), and because a companion document to the AW Agreement, the "Assetwise Direct License Agreement," contained an indemnity provision that arguably replaced the Client Guide's indemnification provision (*id.* at 40).

The Court granted ResCap's motion. (*See generally* Trial Tr. at 3351-54.) First, only Ms. Bangerter testified as to her contemporaneous understanding of the AW Agreement, and she testified that the AW Agreement did not supersede the Client Guide; no other witness provided substantial testimony on this issue. (*See, e.g.*, *id.* at 647-650, 661-62.) For instance, Ms. Bangerter testified that the "seven points," or R&Ws, listed in the AW Agreement "were not meant to replace the 20 to 30 pages of R&Ws in the Client Guide," and were merely "additional requirements." (*Id.* at 650, 662 (cleaned up).) Bangerter could also not "recall ever telling anyone at HLC that the AW Agreement modified the Client Contract or Guide," nor did she even "have the authority" to do so. (*Id.* at 648-49 (cleaned up).) She further stated that no one "from HLC ever disagreed that Client Guide Section 4A [concerning R&Ws] applied to their Assetwise loans." (*Id.* at 683, 685 (cleaned up).) HLC neither presented testimony to the contrary, nor even attempted to seriously call this portion of Ms. Bangertner's testimony into question on cross-examination.

Moreover, the text of the AW Agreement's R&W section plainly required reference to the Client Guide; no reasonable juror could read it as a stand-alone agreement. (*See* ResCap's Assetwise Br. at 2-3.) As Ms. Bangerter observed, the seven R&Ws in the AW Agreement made little sense without cross-reference to the Client Guide's R&W section. (*See, e.g.*, Trial Tr. at 681-83 (discussing this need with respect to the AW Agreement's R&Ws requiring "accurate calculation of income and assets" and "no fraud and

misrepresentation").). Indeed, even HLC's witness, Mr. Furey, testified that the R&Ws in the AW Agreement were "somewhat vague," and that "it would be fair to presume that all seven refer to provisions in the Client Guide." (*Id*. at 3176-77 (cleaned up).) Finally, even under HLC's AW Agreement theory, RFC had established R&W breaches for the 21 breaching loans identified by ResCap's expert, Mr. Payne. (*See* ResCap's Assetwise Br. at 3.)[17]

For these reasons, the Court granted ResCap's motion as to Assetwise.

## VIII.  ResCap's Equitable Estoppel (and Waiver) Motion

In this motion, ResCap argued that no reasonable juror could find that HLC had met its burden of proving the affirmative defense of equitable estoppel. In other words, ResCap contended, no reasonable juror could find that a "person of authority" at RFC induced HLC to sell it loans on the understanding that such loans would not have to comply with the Client Guide R&Ws and remedies. Not only did no RFC or HLC employee testify at trial that anyone at RFC ever "agreed to abandon" those portions of the Guide in return for loan sales, ResCap pointed out, the former traders HLC put on in support of its estoppel defense (*i.e.*, Mr. Furey and Mr. Smith) testified that they were not sure if the RFC employees with whom they met even had the authority to make such a promise. (*See* ResCap's Esoppel Br. at 1-4).

---

[17]    Moreover, HLC's argument concerning the AW Direct Licensing Agreement missed the mark because no witness provided testimony about how that "companion" agreement interacted with either the AW Agreement or the Client Guide. Hence, in the face of Ms. Bangertner's unequivocal testimony, a juror could only speculate that the Licensing Agreement's indemnity provision somehow superseded the Client Guide's indemnity provision.

In response, HLC argued that a reasonable juror could find that "RFC induced HLC to sell more loans with the implicit understanding that they need not comply with the Client Guide" R&Ws and remedies. (HLC 2d Opp. Br. at 46.) In making this argument, HLC relied almost entirely on a February 2006 dinner meeting between RFC employees Ms. Martha Forget and Mr. Alan Joseph and HLC traders Mr. Smith and Mr. Furey, three of whom testified at trial (*i.e.*, Forget, Smith, Furey).[18] At this meeting, Ms. Forget, on behalf of RFC, agreed to buy "bulk loans" from HLC even though those loans were not underwritten to the underwriting guidelines contained in RFC's Client Guide; rather, they were underwritten to competitor guidelines. (*Id*. at 47-50.) From this evidence, HLC argued, a reasonable juror could infer that RFC made "representations and inducements" that it would not enforce Client Guide R&Ws and remedies with respect to those loans, and that HLC reasonably relied on those "representations and inducements" in selling RFC those "bulk loans." (*Id*.)

The Court granted ResCap's motion. (*See generally* Trial Tr. at 3354-56.) This affirmative defense, on which HLC undoubtedly bore the burden of proof, operated as an alternative to HLC's argument that the Client Guide did not apply at all to "bulk loans" or "pay option ARM loans." As the Court suggested in its summary judgment decision, HLC's argument was that, even if the Client Guide technically applied to all loan sales, equity demanded that RFC be estopped from enforcing the R&W and remedial provisions of the Client Guide as to certain categories of loans. *See In re ResCap*, 332 F. Supp. 3d at 1174-75.

---

[18]     Mr. Joseph passed away before this litigation commenced.

This defense required proof that: (1) RFC made promises or inducements to HLC concerning the relevant provisions of the Client Guide, (2) HLC reasonably relied upon those promises, and (3) HLC would be harmed if estoppel was not applied. *See id.* at 1174 (citing *Hyrda-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1980)).

As to the first element, it was HLC's affirmative burden to establish that RFC made "promises or inducements" to HLC that, despite the presence of a voluminous written contract that had governed the parties' relationship for years, HLC could sell RFC loans, en masse, that would not have to comply with a critical portion of that written contract, *i.e.*, the R&Ws and remedies. HLC's only substantial evidence in support of this first element was a February 2006 meeting and dinner, four years after the parties started doing business. (*Accord* Sept. 14, 2018 Hr'g Tr. [Doc. No. 4470] at 13-14 (noting that HLC could support this first element of estoppel with either "actual communications between . . . people with the authority to be able to make th[e] decision [to buy loans outside the Client Guide] between the two companies, or it could be an internal document reflecting that communication").) However, it was uncontroverted that no person at this meeting, either from RFC or HLC, mentioned the Client Guide, much less discussed waiving any provision of the Client Guide, including the at-issue R&Ws and remedies, in return for bulk loan sales. (*See* ResCap Estoppel Br. at 1-3 (gathering record citations).) In fact, Mr. Furey and Mr. Smith both agreed that, at this dinner, the parties only discussed whether RFC would entertain purchasing "bulk loans" that had been originated for other program parameters or underwriting guidelines, such as those of RFC's competitor, Countrywide Financial. (*See, e.g.*, Trial Tr. at 3037-39 (Smith), 3148-49 (Furey).)

Thus, even drawing all inferences from this evidence in the light most favorable to HLC, as the Court must, a reasonable juror could not infer that RFC affirmatively promised or induced HLC to sell it bulk loans *wholly* outside the Client Guide. (*Cf.* Oct. 1, 2018 Order [Doc. No. 4497] at 7 (distinguishing between evidence concerning "generalized variances from RFC's *underwriting criteria*," which would *not* support an estoppel defense, and "evidence of a stated departure from the provisions and remedies of *the Client Guide* as to specific HLC loans or bulk transactions, made by a person of authority at RFC," which *would* support an estoppel defense).)[19] By extension, a reasonable juror could not infer that RFC affirmatively waived its right to enforce the Client Guide's remedies or R&Ws. By the admission of HLC's witnesses, the subject was simply never discussed. Setting aside any credibility issues with HLC's witnesses, the best that could be inferred from this February 2006 meeting and dinner was that no "meeting of the minds" occurred as to whether the Client Guide's R&Ws and/or remedies applied *at all* to those at-issue loans. However, that

---

[19] The Court acknowledges that Minnesota case law suggests that a party to a contract may support an estoppel defense with a counter party's "silence[,] negative omission to act when it was [their] duty to speak or act," or suggestive "course of conduct." *See, e.g.*, *Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc.*, 698 N.W.2d 449, 454 (Minn. Ct. App. 2005); *see also St. ex rel. Swanson v. 3M Co.*, 845 N.W.2d 808, 819 (Minn. 2014) (holding that, for a waiver defense, "intent to waive [a contractual provision] may be inferred from conduct"). However, at trial, HLC introduced no evidence, beyond mere speculation, from which a reasonable juror could find that RFC's "silent" "course of conduct" induced HLC to sell it loans outside the Client Guide's R&W and remedial provisions. As the Court noted above, it appears that nobody, from either party, even considered this subject at the time of the loan sales. (*See, e.g.*, Trial Tr. at 3147-48 (Furey) (agreeing that the applicability of Client Guide R&Ws never "became a question until this litigation was filed") (cleaned up).)

question went to contract formation, which the Court had deemed a jury issue (*see supra* Section VI), and not to equitable estoppel.

For these reasons, the Court granted ResCap's motion as to estoppel.[20]

Dated:  June 12, 2019                                 s/Susan Richard Nelson
                                                                  SUSAN RICHARD NELSON
                                                                  United States District Judge

---

[20]     After the Court's oral ruling, the Court clarified that, given the Client Guide's explicit requirement of a written waiver, alongside the unique facts of this case, the Court had treated HLC's waiver and estoppel defenses as essentially one and the same, at least with respect to "bulk loans" and "pay option ARM loans." (*See* Trial Tr. at 3358-59; *accord In re ResCap*, 332 F. Supp. 3d at 1174, 1177.) As such, to the extent a waiver defense survived the Court's summary judgment order, the Court granted ResCap's motion with respect to that defense, too. (*Cf.* HLC 2d Opp. Br. at 50-52 (citing the same evidence in support of both its waiver defense and its estoppel defense).)