# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: ResCap Liquidating Trust Litigation<br><br>_____<br><br>*This document relates to*:<br><br>ResCap Liquidating Trust v. Primary Residential Mortgage, Inc., No. 16-cv-4070 | Case No. 13-cv-3451 (SRN/HB)<br><br><br>**MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1
II. BACKGROUND .............................................................................................. 1
   A.   Contractual Relationships ....................................................................... 1
       1.   General Rules of Interpretation ..................................................... 4
       2.   Knowledge, Reliance and Waiver ................................................. 5
       3.   Specific Representations & Warranties ......................................... 7
       4.   Events of Default & Remedies ...................................................... 8
       5.   Repurchase ..................................................................................... 9
       6.   Indemnification ............................................................................ 10
   B.   Mortgage Market & Bankruptcy Proceedings ...................................... 11
       1.   Housing Market Trends ................................................................ 11
       2.   Proposed, Pre-Bankr. Original RMBS Settlement & Subsequent Bankr. Filing ... 12
       3.   Global Bankr. Settlement Approved by Bankruptcy Court ................... 14
       4.   Plaintiff's Requested Relief ......................................................... 20
   C.   Procedural History ................................................................................ 20
       1.   First-Wave Actions ...................................................................... 20
          a.   Consolidated Action Common-Issue Summary Judgment Ruling .................. 21
          b.   Trial & Trial Rulings .......................................................... 22
          c.   Non-Consolidated RMBS Proceedings in this District ..................... 23
III. DISCUSSION ............................................................................................... 24
   A.   Principles of Law of Contractual Indemnity ....................................... 24
   B.   Principles of Contract Interpretation .................................................... 28
   C.   Summary Judgment ............................................................................... 30
   D.   Threshold Inquiry of Plaintiff's Contractual Indemnity Claim ............... 34
       1.   Reasonableness of RFC's Bankruptcy Settlements ................................. 34
          a.   PRMI's New Evidence Regarding the Reasonableness of the Settlements ..... 39
          b.   First-Wave Evidence Regarding the Reasonableness of the Settlements ....... 44
       2.   Whether RFC's Bankruptcy Extinguished RFC's Liabilities ................. 48
       3.   The Application of the Client Guide ............................................. 49
          a.   Effect of Assetwise & Countrywide Documents on the Guides ............... 49
       4.   Rights in the Guides ..................................................................... 55
          a.   Sole Discretion .................................................................... 55
          b.   Indemnity for Liabilities and Losses .................................. 60
          c.   Effect of RFC's Alleged Wrongdoing on Recovery ......................... 68
          d.   Expired Loans ...................................................................... 73
   E.   Causation ............................................................................................... 77
       1.   Appropriate Causation Standard ................................................. 77
       2.   ResCap's Reliance on Proxy MLS Provided by Mr. Dudney ................ 80

3. Trust Representations .................................................................. 83
    a. MLS Representation to Trusts .......................................... 84
    b. Default Representations to the Trusts................................. 89
**F. PRMI's Defenses** .......................................................................... **92**
  1. PRMI's "Bad Faith" Defense ........................................... 92
  2. PRMI's "Sole Cause" Defense............................................ 107
  3. PRMI's Knowledge and Reliance Defenses ....................... 112
  4. PRMI's Statute-of-Limitations Defense............................. 117
  5. PRMI's Assetwise & Countrywide Estoppel & Waiver Defenses .................... 118
    a. Anecdotal Evidence ...................................................... 120
    b. Assetwise-Approved Loans ........................................... 124
    c. Countrywide-Approved Loans ...................................... 133
  6. PRMI's Mitigation Defense ............................................. 135
**G. Damages** ...................................................................................... **137**
  1. Use of Statistical Sampling ............................................. 137
  2. Value Attributable to Servicing Claims ............................ 140
  3. Allocated Breaching Loss Methodology........................... 140
    a. General Methodology ................................................... 140
    b. Application of the Allocated Breaching Loss Methodology ...................... 143
      (1) Additional Settling Trusts/Single, Unallocated Claim .......................... 144
        (a) Supplemental Term Sheet ............................... 149
        (b) Judge Glenn's Findings of Fact ...................... 151
        (c) Recovery Analysis ........................................ 156
        (d) Trustee Declarations ..................................... 158
        (e) Contemporaneous Evidence .......................... 158
      (2) Relative Strength of Claims and Defenses ......................... 159
        (a) Strength of Representations ........................... 162
        (b) Strength of Defenses.................................... 164
      (3) Non-Indemnifiable Claims ................................. 167
        (a) Ally Claims ................................................. 169
        (b) Allowed Fee Claim ...................................... 170
**H. Liability Overall** .......................................................................... **172**
**IV. CONCLUSION** .................................................................................. **173**

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

Before the Court is the Motion for Summary Judgment [Doc. No. 5221] filed by Defendant Primary Residential Mortgage, Inc. ("PRMI"), and the Motion for Partial Summary Judgment [Doc. No. 5274] filed by Plaintiff ResCap Liquidating Trust ("ResCap").[1] For the reasons set forth below, Defendant's motion is deferred in part, denied in part, and denied in part as moot, and Plaintiff's motion is granted in part and denied in part.

## II. BACKGROUND

In December 2016, ResCap commenced this lawsuit against PRMI, asserting claims of breach of contract and indemnification. This case is part of a second wave of lawsuits brought by ResCap against numerous originating mortgage lenders. ResCap filed its initial wave of such lawsuits in this District beginning in 2013.

### A. Contractual Relationships

As in all of these cases, this lawsuit stems from the bankruptcy of the Minnesota company formerly known as the Residential Funding Corporation ("RFC").[2] For several years prior to RFC's 2012 bankruptcy filing, RFC and PRMI participated in the residential

---

[1]     The parties' *Daubert* motions will be addressed in a separate order.

[2]     RFC was a wholly owned subsidiary of GMAC Residential Holding Company, LLC, which was in turn a wholly owned subsidiary of Residential Capital, LLC. (Compl. [Doc. No. 1] ¶ 17.) Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group, LLC, which was in turn a wholly owned subsidiary of Ally Financial, Inc. (*Id.*) Upon the approval of RFC's Chapter 11 bankruptcy plan, discussed in greater detail below, GMAC Residential Holding Company, LLC's interest in RFC was canceled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights and interests and now controls RFC. (*Id.*)

1

mortgage backed securities ("RMBS") market. RFC functioned as a middleman. In its role as a buyer, it purchased mortgages from banks and originating lenders such as PRMI. *See In re ResCap Liquidating Tr. Litig.*, 332 F. Supp. 3d 1101, 1117–18 (D. Minn. 2018) ("*Common SJ Order*"); (Smallwood Decl. [Doc. No. 5225], Ex. 1 (Hawthorne Rpt. ¶¶ 17–18).)[3] Then, as a seller, RFC pooled together its RMBS, i.e., bundles of hundreds of home mortgage loans, and sold them to securitization trusts ("the Trusts"). *Common SJ Order*, 332 F. Supp. at 1117–18, 1122–23; (Smallwood Decl. [Doc. No. 5225], Ex. 1 (Hawthorne Rpt. ¶¶ 17–18).) The Trusts paid for the loans by issuing securities to investors, for which the mortgage loans served as collateral. *Common SJ Order*, 332 F. Supp. at 1117. Some of these purchasers required that the securities be insured by monoline insurers (the "Monoline Insurers")[4] as a hedge against investment risk. *See id.* RFC additionally functioned as a "master servicer"

---

[3]  Exhibits submitted in support of Defendant's summary judgment motion, and in opposition to Plaintiff's motion, are attached to the Declarations of Jesse Smallwood [Doc. No. 5225] (Exs. 1–38); [Doc. No. 5297] (Exs. DX-1–DX-60); [Doc. No. 5329] (Exs. 39–48) (collectively, "Smallwood Decl."). In addition, exhibits submitted in support Defendant's *Daubert* motion, and in opposition to Plaintiff's *Daubert* motion, are attached to the Smallwood *Daubert* Declarations [Doc. No. 5256] (Exs. 1–17); [Doc. No. 5316] (Exs. DX-A–DX-S); [Doc. No. 5332] (Exs. 18–21) (collectively, "Smallwood *Daubert* Decl.").

Exhibits submitted in support of Plaintiff's summary judgment motion, and in opposition to Defendant's motion, are attached to the Declarations of Isaac Nesser [Doc. No. 5278] (Exs. 1–32]; [Doc. No. 5310] (Exs. 33–40) (collectively, "Nesser Decl."). In addition, exhibits submitted in support of Plaintiff's *Daubert* motion, and in opposition to Defendant's *Daubert* motion, are attached to the Declarations of Anthony Alden [Doc. No. 5285] (Exs. A–V); [Doc. No. 5319] (Exs. W–HH); [Doc. No. 5339] (Exs. II–NN) (collectively, "Alden Decl.").

[4]  A monoline insurer undertakes to pay the principal and interest on a bond in the event of a default. *Common SJ Order*, 332 F. Supp. 3d at 1123 n.10.

for many of the securitizations, overseeing the work of the primary servicers.  (Smallwood Decl. [Doc. No. 5225], Ex. 1 (Hawthorne Rpt. ¶ 18).)

As a seller, RFC entered into contracts with the Trusts in which it made representations and warranties ("R&Ws") concerning the underwriting quality and credit characteristics of the mortgage loans.  *Common SJ Order*, 332 F. Supp. at 1118; (Smallwood Decl., Ex. 1 (Hawthorne Rpt. ¶ 18.)

In its role as a buyer of loans from originating lenders, or "Clients," RFC and the lenders, including PRMI, entered into agreements called "Client Contracts." *Common SJ Order* at 1118.  The Client Contracts also incorporated the terms of longer, more detailed agreements called  "Guides."  (*See, e.g.*, Nesser Decl., Ex. 1 (Mar. 30, 2000 Client Contract) at 1.)  RFC and PRMI entered into a Client Contract in March 2000, and a subsequent Client Contract in June 2001.  (*Id.*, Exs. 1 (Mar. 30, 2000 Client Contract) & 2 (June 25, 2001 Client Contract).)  The Guide that the March 2000 Client Contract references is the AlterNet Guide, (Nesser Decl., Ex. 1 (Mar. 30, 2000 Client Contract) at 1), while the Guide that the  June 2001 Client Contract references is the Client Guide.  (*Id.*, Ex. 2 (June 25, 2001 Client Contract) at 1.)  The March 2000 Client Contract stated that it could not be amended or modified orally, and no provision could be waived or amended "except in writing signed by the party against whom enforcement is sought."  (*Id.*, Ex. 1 (Mar. 30, 2000 Client Contract) ¶ 2.)  The June 2001 Client Contract stated that it could "only be amended in writing signed by both parties." (*Id.*, Exs. 1 (Mar. 30, 2000 Client Contract) at  & 2 (June 25, 2001 Client Contract).)

As relevant to the parties' arguments, the Court also notes one additional type of agreement between RFC and corresponding lenders.  At various times, originating lenders

used RFC's automated electronic loan underwriting program, Assetwise, when submitting loans to RFC. *Common SJ Order*, 332 F. Supp. at 1136, 1175. The originating lenders who used Assetwise, such as PRMI, signed the Assetwise Direct Criteria Agreement ("Assetwise Agreement"). (Nesser Decl., Ex. 6 (Jan. 19, 2001 Assetwise Agmt.); Smallwood Decl., DX-40 (June 3, 2002 Assetwise Agmt.).)

## 1. General Rules of Interpretation: Client Guide §§ 141 and 113

While many of the provisions in the AlterNet Guide and Client Guide are materially identical, (*see* Pl.'s App'x 1 [Doc. No. 5277-1] (Spreadsheet Comparing Client & AlterNet Guide Provisions)), there are some differences. Section 141 of the January 1, 2003 Client Guide—Section 113 in later versions from January 1, 2005 forward—provides "General Rules of Interpretation" applicable to all provisions of the Client Guide. Some provisions in the Client Guide's "General Rules of Interpretation" are not present in the AlterNet Guide. (*See id.* § 113(A)–(C).) In particular, Client Guide Section 141(A)/Section 113(A) addresses the term "knowledge," as that term is used in the Client Guide. (*Id.* § 113(A); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(A).) Section 141(B)/Section 113(B) addresses RFC's "sole discretion." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § 113(B); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(B).) These provisions are not present in the AlterNet Guide.

The Client Guide's "knowledge" standard holds an originating lender/Client to a strict standard of both actual and constructive knowledge:

(A) "Knowledge" Standard

Whenever any representation, warranty, or other statement contained in this Client Guide is qualified by reference to a Client's "knowledge" or "to the best of" a party's "knowledge", such "knowledge" shall be deemed to include knowledge of facts or conditions of which Client, including (without limitation) any of its directors, officers, agents, or employees, either is actually aware or should have been aware under the circumstances with the exercise of reasonable care, due diligence, and competence in discharging its duties under this Client Guide and the Program Documents. All matters of public record shall be deemed to be known by the Client. Any representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of Client, unless Client demonstrates otherwise. "Due diligence" means that care which Client would exercise in obtaining and verifying information for a Loan in which Client would be entirely dependent on the Mortgaged Property or Mortgagor's credit as security to protect its investment.

(Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(A); Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § 113(A).)

Section 141(B)/Section 113(b) of the Client Guide vests RFC with broad authority to make determinations of fact and decisions to act, stating:

(B) GMAC-RFC's Sole Discretion

Whenever any provision of this Client Guide contract requires []RFC to make a determination of fact or a decision to act, or to permit, approve or deny another party's action such determination or decision shall be made in []RFC's sole discretion.

(Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(B); Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § 113(B).)

## 2. Knowledge, Reliance and Waiver: AlterNet Guide § 250 & Client Guide § A200

In both the AlterNet Guide, Section 250, and the Client Guide, Section A200, the originating lenders made substantively identical general R&Ws to RFC. They acknowledged

that RFC purchased loans in reliance on the originating lenders' R&Ws, and the originating lenders agreed to assume liability for any misrepresentations for breaches, regardless of their knowledge or RFC's knowledge. (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200; Nesser Decl., Ex. 3 (AlterNet Guide) § 250.) Moreover, the originating lenders agreed that RFC could not waive any provisions of the AlterNet Guide or the Client Guide unless it made such a waiver in writing:

> [AlterNet/Client] Representations and Warranties and Covenants[5]
>
> The [AlterNet Seller] Client acknowledges that [RFC] GMAC-RFC purchases Loans in reliance upon the accuracy and truth of the [AlterNet Seller's] Client's warranties and representations and upon the [AlterNet Seller's] Client's compliance with the agreements, requirements, terms and conditions set forth in the [AlterNet Seller] Client Contract and this [AlterNet] Client Guide.
>
> All such representations and warranties are absolute, and the [AlterNet Seller] Client is fully liable for any misrepresentation or breach of warranty regardless of whether it or [RFC] GMAC-RFC actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty.
>
> The representations and warranties pertaining to each Loan purchased by [RFC] GMAC-RFC survive the Funding Date, any simultaneous or post-purchase sale of servicing with respect to the Loan and any termination of the [AlterNet Seller] Client Contract, and are not affected by any investigation or review made by, or on behalf of, [RFC] GMAC-RFC except when expressly waived in writing by [RFC] GMAC-RFC.

(Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200; Nesser Decl., Ex. 3 (AlterNet Guide) § 250; *Id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A200.)

---

[5]  Differences between the two guides are denoted with the AlterNet Guide's text appearing in brackets.

### 3. Specific Representations and Warranties: AlterNet Guide § 251-1 and Client Guide § A202

AlterNet Guide Section 251-1 and Client Guide Section A202 both require originating lenders to make specific R&Ws to RFC regarding "individual loans," including information about the loans' eligibility and accuracy. (Nesser Decl., Ex. 3 (AlterNet Guide) § 251-1; *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202.) Among other things, the originating lenders represent that they have: verified the accuracy of information used by borrowers to obtain the loans, (*id.*, Ex. 3 (AlterNet Guide) § 251-1(A); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(A)); ensured the proper completion and execution of loan forms, (*id.*, Ex. 3 (AlterNet Guide) § 251-1(D); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(D)); complied with applicable laws, (*id.*, Ex. 3 (AlterNet Guide) § 251-1(D); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(D)); ensured that no default or other breach of loan terms existed in any loan, (*id.*, Ex. 3 (AlterNet Guide) § 251-1(G); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(G)); confirmed the market value of the mortgaged property, (*id.*, Ex. 3 (AlterNet Guide) § 251-1(T); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(T)); and, in the Client Guide, not sold any "high risk" loans to RFC. (*Id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A202(J)(1)(d).)

### 4. Events of Default and Non-Exclusive, Cumulative Remedies: AlterNet Guide §§ 260–270 and Client Guide §§ A208—A210[6]

If originating lenders breach these R&Ws by committing an "Event of Default," both the AlterNet Guide and the Client Guide grant RFC wide-ranging recourse. Under AlterNet Guide Section 270 and Client Guide Section A209, "Non-Exclusive, Cumulative Remedies," the Guides broadly provide that "RFC may exercise any remedy outlined in this [] Guide," as well as "[a]ny other rights which it may have at law or in equity deemed appropriate to protect its interest." (Nesser Decl., Ex. 3 (AlterNet Guide) § 270(A); Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A209(A); *see also* (Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A209(A)) (stating, in versions of the Client Guide dating from January 1, 2001, "[]RFC may exercise any remedy outlined in this Client Guide or as allowed by law or in equity."). Moreover, the Guides state that RFC's exercise of its remedies resulting from an originating lender's default will not prevent it from exercising one or more "other remedies in connection with the same Event of Default " and/or any other rights which it may have at law or in equity." (Nesser Decl., Ex. 3 (AlterNet Guide) § A270(A); *id.*, Ex. 4 (Client Guide Version 1-03-G01) § A220(A); Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A209(A); Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A209(A).)

---

[6] With respect to the Client Guide, these provisions are found in Section A210 of the Client Guide, Version 1-03-G01, effective January 1, 2003, and Sections A208 and A209 of the Client Guide, Version 1-05-G04, effective November 21, 2005.

### 5. Repurchase: AlterNet Guide § 271 and Client Guide § A210[7]

The Guides provide RFC with several remedies, including repurchase and indemnity. Under the repurchase provision of both the AlterNet Guide and Client Guide, if RFC determines that an Event of Default has occurred with respect to a particular loan, it can require the originating lender to repurchase the loan within 30 days of receiving notification from RFC. (Nesser Decl., Ex. 3 (AlterNet Guide) § 271(C); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A221(A); Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A210(A).) The repurchase provision sets forth a specific procedure and formula for determining the repurchase price of a loan. (*See* Nesser Decl., Ex. 3 (AlterNet Guide) § 271(A)–(H); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A221(A)–(H); Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A210(A)–(H).) In addition, it states, "[]RFC is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase. However, any delay in making this demand does not constitute a waiver by []RFC of any of its rights or remedies." (Nesser Decl., Ex. 3 (AlterNet Guide) § 271(C); *id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A221(A); Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A210).) Even if RFC determines that repurchase is not the appropriate remedy, under both the AlterNet Guide and Client Guide, the originating lender is nevertheless obliged to pay RFC "all losses, costs and expenses incurred by []RFC and/or the Loan's Servicer as a result of an Event of Default,"

---

[7] In earlier versions of the Client Guide, the repurchase provision is found in Section A221. (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A210(A); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A221(A).)

including reasonable attorneys' fees and related costs incurred in connection with any enforcement efforts. (Nesser Decl., Ex. 3 (AlterNet Guide) § 271(C); *id*., Ex. 4 (Client Guide, Version 1-03-G01) § A221(A); Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A210(A).)

### 6. Indemnification: AlterNet Guide § 274 and Client Guide § A212[8]

The Guides also provide RFC with wide-ranging indemnification in the event of an originating lender's default. The indemnification provision requires the originating lender to indemnify RFC from "all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees, and expenses resulting from any Event of Default." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A212); Nesser Decl., Ex. 3 (AlterNet Guide) § 274; Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A212.)

Versions of the Client Guide from December 1, 2005 forward provide examples of the type of Client conduct requiring indemnification:

> This includes, without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract, (iii) any claim, demand, defense or assertion against or involving []RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by []RFC in reliance upon any warranty, obligation or representation made by the Client contained in the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the Client in information required under Regulation AB or any successor regulation.

---

[8] In earlier versions of the Client Guide, the indemnification provision is found in either Section 274 or Section A223. (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A212); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A223.)

(Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A212.)

Versions of the Client Guide from July 1, 2002 forward contain additional language regarding the loan originators' broad indemnification obligations to RFC:

> In addition, Client shall indemnify []RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by []RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by Client, or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan. With regard to legal fees or other expenses incurred by or on behalf of []RFC in connection with any such litigation or governmental proceeding, Client shall reimburse []RFC for such fees and expenses. . . . Except for notices for reimbursement, []RFC is not required to give Client notice of any litigation or governmental proceeding that may trigger indemnification obligations. Client shall instruct its officers, directors and agents (including legal counsel) to cooperate with []RFC in connection with the defense of any litigation or governmental proceeding involving a Loan. []RFC has the right to control any litigation or governmental proceeding related to a Loan, including but not limited to choosing defense counsel and making settlement decisions.

(Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A212; Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A212.) This particular language is not present in the AlterNet Guide or in earlier versions of the Client Guide.

## B. Mortgage Market & Bankruptcy Proceedings

### 1. Housing Market Trends

Nationwide, the mortgage industry experienced a boom from approximately 2001 to 2003. *Common SJ Order*, 332 F. Supp. 3d at 1117. Immediately after that period, however, the volume of originating loans began to decline due to rising long-term interest rates. *Id.* Not long afterward, a second mortgage boom ensued. *Id.* But because the prime borrowing pool

had been significantly depleted, "[l]enders provided mortgage loans to many high-risk borrowers with questionable ability to repay, fueled in large part by the opportunity to package and sell those mortgages into the growing market for [residential] mortgage-backed securities ("[R]MBSs")." *Id.* (quoting *In re Barclays Bank PLC Securities Litig*., No. 09 Civ. 1989 (PAC), 2017 WL 4082305, at *4 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 Fed. App'x 41 (2d Cir. 2018)). Starting in 2007, the loans in RFC-sponsored and -serviced securitizations experienced a high rate of default. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 20.) In 2008, the housing market collapsed, and the Trusts suffered substantial losses. (*Id.*)

Shortly thereafter, various Trusts and Monoline Insurers sued RFC for breaching the R&Ws that RFC had made when selling those entities (or their insureds) its RMBS, *i.e.*, bundles of home mortgages. *Common SJ Order*, 332 F. Supp. 3d at 1122–24. In addition to claims for breaches of the R&Ws, the Trusts and Monoline Insurers asserted claims of fraud against RFC, as well as servicing-related claims arising from RFC's sale of the allegedly defective mortgage loans. *Id.* at 1123; (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 22.)

### 2. Proposed, Pre-Bankruptcy Original RMBS Settlement and Subsequent Bankruptcy Filing

On May 13, 2012, RFC entered into a proposed $8.7 billion settlement ("Original RMBS Settlement") of claims brought by two groups of RMBS Trust investors that had holdings in approximately 392 securitization trusts. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 26.) Absent settlement, RFC's then-expert Frank Sillman estimated that lifetime losses for these trusts could have ranged between $45.6 billion to $49.8 billion. (*Id.*, Ex. 14 (Bankr. Findings of Fact) ¶ 101.)

The following day, and as contemplated by the proposed Original RMBS Settlement, RFC filed for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). *Common SJ Order*, 332 F. Supp. 3d 1123. Shortly thereafter, the Bankruptcy Court appointed an examiner to investigate RFC's pre-petition activities. (Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) ¶ 3.)

Multiple entities filed RMBS-related proofs of claim with the Bankruptcy Court in order to obtain damages. *Common SJ Order*, 332 F. Supp. 3d at 1124. This included six RMBS Trustees with proofs of claim covering 1,000 trusts with a combined original principal balance of over $226 billion. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 100.) Their most significant claims concerned alleged breaches of the R&Ws that RFC had made in the Governing Agreements for the securitizations. (*Id.* ¶ 101.) Among their other claims, RMBS Trustees also asserted common-law fraud or negligent misrepresentation claims against RFC to the extent that it had actual or imputed knowledge that the mortgage loans failed to comply with RFC's R&Ws. (*Id.* ¶ 104.)

Additionally, several Monolines filed 32 proofs of claim with the Bankruptcy Court, asserting claims for tens of billions of dollars in actual and potential losses. (*Id.* ¶ 107.) Like the RMBS Trustees' claims, the Monolines' claims generally alleged breaches of R&Ws. (*See id.* ¶¶ 108–17.)

After filing for bankruptcy, the debtors sought the approval of the proposed, pre-bankruptcy Original RMBS Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. *Common SJ Order*, 332 F. Supp. 3d at 1124. However, some stakeholders opposed the proposed Original RMBS Settlement, including the Official Committee of Unsecured

Creditors, ("the Creditors' Committee"), a committee appointed to represent all general unsecured creditors. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 27; *id.*, Ex. 14 (Bankr. Findings of Fact) ¶ 102.) Some objectors found the proposed settlement amount unreasonably high, (*id.,* Ex. 1 (Hawthorne Rpt.) ¶ 127), while others found it too low. (*Id.* ¶ 128.) The parties engaged in substantial discovery and extensively litigated issues concerning the approval of the proposed Original RMBS Settlement. (*Id.* ¶¶ 118–30.)

### 3. Global Bankruptcy Settlement Approved by Bankruptcy Court

In light of the objections, the Bankruptcy Court encouraged a new round of global settlement negotiations. (Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) ¶ 102.) United States Bankruptcy Judge Martin Glenn, who oversaw the bankruptcy proceedings, appointed another sitting federal bankruptcy judge to serve as a mediator, and additionally authorized Lewis Kruger as the Chief Restructuring Officer to negotiate a settlement of the claims against Plaintiffs. *Common SJ Order*, 332 F. Supp. 3d at 1124.

On May 13, 2013, RFC, the RMBS Trustees, the Monolines MBIA and FGIC, and others, agreed to the terms of a bankruptcy plan support agreement[9] (the "Plan Support Agreement") and the accompanying Plan Term Sheet. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 142.) After further negotiations, the parties filed an agreed-upon Supplemental Term Sheet on May 23, 2013. (*Id.*) The RMBS Trustee portion of the Global

---

[9]     As its name suggests, a plan support agreement (or "PSA") is pre- or post-petition contract between the debtor and certain creditors, in which the parties agree to support a proposed reorganization plan, subject to specific terms or conditions. "[P]lan support agreements . . . are meant to lock up support for a proposed plan in advance of the plan confirmation hearing." Isaac Sasson, *Judicial Review of Plan Support Agreements: A Review and Analysis,* 9 N.Y.U. J.L. & LIBERTY 850, 851–52 (2015).

Settlement included the claims of the 392 ResCap-sponsored trusts that originated between 2004 and 2007 and participated in the proposed Original RMBS Settlement, as well as hundreds of additional trusts (the "Additional Settling Trusts") that were not part of the proposed Original RMBS Settlement. (*Id.* ¶ 149.) The Supplemental Term Sheet provides that "all RMBS Trust Claims of the Original Settling Trusts and the Additional Settling Trusts shall be fully and finally allowed as non-subordinated unsecured claims in the aggregate amount of $7.051 billion for the Original Settling Trusts and in the aggregate amount of $250 million for the Additional Settling Trusts (collectively, the 'Allowed RMBS Trust Claims') and allocated . . . [$7.091 billion] to the RFC Debtors." (*Id.*; Smallwood Decl., Ex. 12 (PSA); Smallwood *Daubert* Decl., DX-B (Suppl. Term Sheet) at 5.)

Pursuant to the Plan Support Agreement and Term Sheets, RFC and the Creditors' Committee filed a proposed Chapter 11 Bankruptcy Plan (as amended, "the Chapter 11 Plan"), and a disclosure statement. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 145.) Almost all of the creditors that voted on the Chapter 11 Plan (95.7%) voted to accept it. (*Id.*, Ex. 14 (Bankr. Findings of Fact ¶¶ 1, 265).)

Among the Chapter 11 Plan's defined terms, "'RMBS Settlement' means, as part of the Global Settlement, the settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims, through approval of the Original RMBS Settlement Agreements as expanded, modified and superseded as set forth in Article IV.C of the Plan." (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 30.) It also states that "'RMBS Trust Claims means all claims . . . of the RMBS Trusts[.]" (*Id.*) Similarly, "RMBS Trusts" is

defined as "all residential mortgage backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors serve as sponsor, depositor, servicer, master servicer or in similar capacities, or as Loan Group in such RMBS Trust, as applicable." (*Id.*)

With respect to the RMBS Trustees' claims, the Chapter 11 Plan states that upon the Bankruptcy Court's entry of a confirmation order, that order "shall constitute approval of the RMBS Settlement, on the terms set forth herein." (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) § IV.C.2 at 58.) It further states that "[t]he Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein." (*Id.* at 59.) As to the settlement amount, the Bankruptcy Plan provides that "[e]ntry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims . . . in the aggregate amount[]" of approximately $7.1 billion against the RFC Debtors.[10] (*Id.*)

In December 2013, Judge Glenn issued both his 133-page Findings of Fact regarding the confirmation of the proposed Chapter 11 Plan and the Confirmation Order itself. (*See* Smallwood Decl*.,* Ex. 14 (Bankr. Findings of Fact) at 1, ¶¶ 18–50) (approving Second Am. Ch. 11 Plan); Nesser Decl., Ex. 26 (Bankr. Confirm. Order).) In his Findings of Fact, Judge Glenn noted the parties' respective risks and their time-consuming efforts to reach an informed resolution:

---

[10] Additionally, the Plan reflected resolution of the Monolines' claims against RFC as follows: MBIA ($1.45 billion), FGIC ($415 million), Ambac ($22.8 million), and Syncora ($7 million) (collectively, the "Monoline Settlements," and collectively with the RMBS Settlement, the "Settlements"). (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 32.)

The settlement reflects a reasonable balance between the litigation's possibility of success and the settlement's future benefits. Each party to the negotiations that led to the settlement had access to a wealth of information gathered over the course of months-long investigations conducted by the Committee and the voluminous materials made available from the Examiner's investigation. To facilitate settlement negotiations, the parties reviewed extensive document discovery, briefed the merits of the claims, and exchanged written and oral presentations regarding their legal positions.

(Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) ¶ 239) (citations omitted).

He further noted that the parties found the Settlements reasonable, stating, "With the knowledge accumulated in this process, each party independently determined that the settlement of the Estates' claims against the Ally Released Parties reflected a reasonable resolution of the claims." (*Id.*) Moreover, Judge Glenn found that "each [individual] settlement was reasonable, (*id.* ¶ 178), that the Chapter 11 Plan proponents had exercised reasonable business judgment in entering into the Plan Documents, which he also deemed "fair and reasonable." (*Id.* ¶ 51 & n.11.)

As to the individual components comprising the Global Settlement, he found that the new RMBS Settlement resolved: "(1) alleged and potential claims for breaches of R&Ws held by all RMBS Trusts; (2) all alleged and potential claims for damages arising from servicing; and (3) any cure claims . . . ." (*Id.* ¶ 103).) Absent settlement, Judge Glenn recognized the significant financial risks in litigating the parties' claims:

The potential losses for RMBS Trusts asserting breaches of representations and warranties range from $42.4 billion to $43.2 billion, excluding losses that are insured by a Monoline. Of that amount, $32.9 billion are historical losses to Debtor-sponsored trusts, and $1.45 billion represent historical losses in non-Debtor sponsored trusts that correspond to the percentage of loans in those trusts sold by the Debtors. The additional forecasted losses range from $7.76 billion to $8.4 billion for the Debtor-sponsored RMBS Trusts, and $300 to $400 million for the portion of non-Debtor-sponsored

RMBS Trusts corresponding to the portion of loans sold by the Debtors. Absent settlement, the likely amount of recoverable damages for the RMBS Trusts' representation and warranty claims, after consideration of legal defenses and litigation costs, ranges from $7.38 billion to $8.6 billion. This range does not account for servicing claims and cure claims.

(*Id.* ¶ 106) (internal citations omitted). Judge Glenn further stated that but for the approval of the RMBS Settlement, the R&W claims "would have to be asserted, litigated and liquidated on an individual basis." (*Id.* ¶ 118.) And if these claims were litigated individually, Judge Glenn found that they "would be subject to significant litigation risks and factual and legal defenses." (*Id.*) Additionally, because litigating these claims would be an expensive and time-consuming undertaking, he concluded that doing so "would deplete the Debtors' estates, and might result in diminished recoveries to all creditor constituencies, including the RMBS Trusts." (*Id.*)

In addition to the RMBS Trusts' R&W claims, the mediation also included the RMBS Trusts' Servicing Claims. (*Id.* ¶ 119.) Certain RMBS Trustees retained the financial advisory firm of Duff & Phelps, LLC ("Duff & Phelps") to identify and quantify their claims. (*Id.* ¶¶ 113–14).) Duff & Phelps sought to quantify Plaintiffs' liability as a servicer with respect to: (1) misapplied and miscalculated payments; (2) wrongful foreclosure and improper loss mitigation practices; and (3) extended foreclosure timing issues caused by improper or inefficient servicing conduct such as falsified affidavits, improper documentation, and improper collection practices. (*Id.* ¶ 119.) Judge Glenn noted Duff & Phelps' finding that the debtors' potential liability as a servicer under these three bases could be as high as $1.1 billion, but that asserting such claims would involve "significant risk and uncertainty." (*Id.*) Under the Plan, the servicing-related claims,

settled as "RMBS Cure Claims," were allowed in an aggregate amount of $96 million. (*Id.*) Judge Glenn noted that of the total RMBS component of the Global Settlement, the servicing related claims, "RMBS Cure Claims," were settled and allowed in an aggregate amount of $96 million. (*Id.*)

Judge Glenn made similar findings regarding Plaintiffs' financial exposure for the Monolines' claims. (*Id.* ¶¶ 126–37, 143–54, 213–15.) He stated that absent a settlement, Plaintiffs were "almost certain to become embroiled in additional, complex litigation with the Monolines over the validity, amount and possible subordination of their asserted claims." (*Id.* ¶ 213.)

Judge Glenn found that the Settlements resulted from good faith, arms-length negotiations, were in the best interests of the parties and claimholders, (*id.* ¶¶ 51), were proposed in good faith and in conformity with the Bankruptcy Code, (*id.* ¶¶ 18–26, 27, 51, 121–22), and, as noted, were reasonable. (*Id.* ¶¶ 51, 178, 201, 239.) The Bankruptcy Settlements also contemplated further recovery for the investors who acquired RFC's rights against the correspondent lenders. (*See* Nesser Decl., Ex. 26 (Bankr. Confirm. Order) ¶ 48) (authorizing the creation of a "Liquidating Trust," into which RFC was to transfer and assign its assets, and preserving the Liquidating Trust's (and Estates') causes of action); *id.*, Ex. 25 ( Second Am. Ch. 11 Plan) at 75.)

In light of his findings, in December 2013, Judge Glenn approved the Chapter 11 Plan. (Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) at 1.) He likewise approved the Global Settlement, set forth in Article IV of the Chapter 11 Plan, and each component

of the Global Settlement, including the RMBS Settlement. (Nesser Decl., Ex. 26 (Bankr. Confirm. Order) ¶¶ 7, 9.)

### 4. Plaintiff's Requested Relief

ResCap seeks relief here based on 539 loans that PRMI sold to RFC, which were included in the Global Settlement, and had actual or expected losses. (*Id.*, Ex. 5 (At-Issue Loan Spreadsheet).) ResCap's reunderwriting expert, Dr. Butler, opines that over 60% of these loans in a 150-loan sample contained at least one material underwriting breach of PRMI's R&Ws that materially and adversely affected the loan's credit risk. (*Id.*, Ex. 9 (Butler Rpt.) at Ex. 2; Pl.'s Mem. [Doc. No. 5276] at 3.) ResCap further contends that at least 45% of the sampled loans materially breach the R&Ws that RFC made to an RMBS Trustee or Monoline. (Nesser Decl., Ex. 9 (Butler Rpt.) at Ex. 2; Pl.'s Mem. at 3.) Plaintiff's damages expert, Dr. Snow, calculates a damages claim of approximately $5.5 million. (Nesser Decl., Ex. 8 (Snow Suppl. Rpt.) at App'x A.2, Figure 7.)

## C. Procedural History

### 1. First-Wave Actions

RFC's creditors formed the ResCap Liquidating Trust to sue the dozens of banks and mortgage lenders that had sold RFC the loans bundled into RFC's securities, on grounds that those lenders breached *their* (corresponding) R&Ws to RFC, and thus caused RFC to breach *its* R&Ws to the Trusts and Monoline Insurers, which, in turn, contributed to RFC incurring $9 billion in liabilities. *Common SJ Order*, 332 F. Supp. 3d at 1144. As noted, beginning in 2013, ResCap began filing cases in the First Wave of litigation in this District.

In January 2015, the judges of the District agreed to consolidate the then-59 active

ResCap cases before the undersigned judge, Magistrate Judge Keyes, and Magistrate Judge

Bowbeer.  (Jan. 27, 2015 Consolidation Order [Doc. No. 100] at 3); *In re RFC & Rescap*

*Liquidating Tr. Action*, 399 F. Supp. 3d 827, 833 (D. Minn. 2019).  The First Wave of cases

in the Consolidated Action then proceeded through joint discovery for the next three years,

with this Court holding frequent case management conferences with all participating counsel.

### a.  Consolidated Action Common-Issue Summary Judgment Ruling

In April 2018, ResCap and the remaining nine defendants in the Consolidated Action

(the other 50 defendants had settled), filed dueling summary judgment motions on "common

issues," as well as *Daubert* motions. (*See* [Doc. Nos. 3194, 3243, 3251, 3253, 3264, 3421,

3518, 3602, 3713, 3720, 3884, 3889, 3894, 3909].)   Many of the parties' arguments in the

First-Wave, common-issue summary judgment motions are also raised by the parties here.

On August 15, 2018, the Court issued its summary judgment opinion on common

issues in the First Wave of cases in the Consolidated Action. *Common SJ Order*, 332 F. Supp.

3d 1101.  The decision resolved some issues in favor of ResCap, other issues in favor of the

remaining defendants, and left yet other issues for jury determination. For instance, the Court

ruled that ResCap had sole discretion under the Client Guide to determine R&W breaches,

that ResCap could prove its case with statistical sampling, and that ResCap could seek

indemnification for the liabilities it incurred during the bankruptcy, rather than just out-of-

pocket losses. *See id.* at 1151, 1154, 1158.   The Court also ruled in the defendants' favor on

certain issues, including the exclusion of two of the three damages models that ResCap

proffered (both of which provided for substantially higher damages than the model the Court

found acceptable), and a ruling that much of ResCap's breach of contract claim was time-barred. *See id.* at 1189, 1198, 1205.[11]

### b. Trial & Trial Rulings

Of the First-Wave cases in the Consolidated Action, the first and only case to proceed to trial was ResCap's case against Home Loan Center, Inc. ("HLC"), *ResCap Liquidating Tr. v. Home Loan Center, Inc.*, 14-cv-1716 (SRN/HB). The HLC trial took place from October 15 to November 7, 2018. At the conclusion of the defendant's case, following substantial briefing and oral argument, the Court granted JMOL to ResCap on several issues, including the reasonableness of the settlements and HLC's equitable estoppel defense. (*See generally In re ResCap Liquidating Tr. Litig.* ("HLC JMOL Order"), 399 F. Supp. 3d 804 (D. Minn. 2019). However, the Court allowed the question of the Client Guide's applicability to go to the jury, along with the determination of what amount of damages, if any, HLC owed ResCap. *Id.*

The jury returned a $28.7 million verdict in favor of ResCap, representing approximately 70% of the damages that Plaintiff's expert, Dr. Snow, testified was a conservative estimate of the damages to be allocated to HLC.[12] (*See HLC* Trial Tr. [Doc. No. 4719] at 2098 (Snow) (stating that, under his Allocated Breaching Loss damages model,

---

[11]     ResCap later agreed to drop its breach of contract claim as to all remaining First-Wave defendants. (*See* Oct. 4, 2018 Stipulation [Doc. No. 4513].)

[12]     Following rulings on the award of attorneys' fees, preverdict prejudgment interest, and postverdict prejudgment interest, the Court directed entry of judgment against HLC in the total amount of $68,484,502.06, inclusive of the jury's award of damages. (*See ResCap Liquidating Tr. v. Home Loan Ctr., Inc.*, 14-cv-1716, June 21, 2019 Order [Doc. No. 83].)

nearly $41.3 million was the most likely, conservative and reliable estimate of damages to be allocated to HLC).)

### c. Non-Consolidated RMBS Proceedings in this District

Also relevant here are two proceedings that were not part of the Consolidated Action, but arose from the same general underlying facts: *Residential Funding Co., LLC v. Universal American Mortgage Co., LLC*, 13-cv-3519 (PAM/HB), and *Residential Funding Company, LLC v. First Mortgage Corporation*, 13-cv-3490 (SRN/HB). In *UAMC*, Judge Magnuson issued a ruling on the parties' cross motions for summary judgment and motions to exclude expert opinions. *Residential Funding Co. v. Univ. Am. Mortg. Co.* ("UAMC"), No. 13-cv-3519 (PAM/HB), 2018 WL 4955237 (D. Minn. Oct. 12, 2018). Judge Magnuson's ruling was generally consistent with the *Common SJ Order*, differing only in that his ruling was more favorable to ResCap. He found, on summary judgment, that the Bankruptcy Settlement was reasonable as a matter of law, *id.* at *5, and that provisions in the Client Guide precluded the affirmative defense of waiver and estoppel. *Id.* at *7–8. The parties to the *UAMC* matter settled their disputes prior to trial.

In *First Mortgage*, a case that was formerly part of the Consolidated Action until June 2018, the Court ruled on the parties' cross motions for summary judgment in December 2018. *Residential Funding Co. v. First Mortgage* ("*First Mortg.*"), No. 13-cv-3490 (SRN/HB), 2018 WL 6727065 (D. Minn. Dec. 21, 2018). As to ResCap's motion for summary judgment on the reasonableness of the Bankruptcy Settlement, the Court cited to overwhelming evidence in the *HLC* record. *Id.* at *5. Finding the same facts equally applicable, and no new evidence from First Mortgage raising a disputed fact question, the Court granted ResCap's

motion. *Id.* at \*6. In addition, the Court found that ResCap's Allocated Breaching Loss damages methodology "provides a reasonable, non-speculative basis to allocate the Settlements." *Id.* at \*9. Ultimately, the parties settled the case prior to trial.

## III. DISCUSSION

Prior to addressing the parties' arguments, the Court reviews general principles of the law of contractual indemnity, and foundational rules of contract interpretation, as they are helpful to the analysis of many of the parties' arguments.

### A. Principles of Law of Contractual Indemnity

Under the common law indemnity doctrine, "[a] right of indemnity arises when a party seeking indemnity has incurred liability due to a breach of a duty owed to it by the one sought to be charged, and such a duty may arise by reason of a contractual obligation." *Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc.*, 616 N.W.2d 288, 291 (Minn. Ct. App. 2000).[13] As such, common law indemnity is considered an equitable remedy. *See Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 755 (Minn. 1985) ("Indemnity is, however, an equitable doctrine that does not lend itself to hard-and-fast rules, and its application depends upon the particular facts of each case."); *see also Lambertson v. Cincinnati Welding Corp.*, 257 N.W.2d 679, 685 (Minn. 1977)

---

[13] The Minnesota Supreme Court draws no distinction between common law indemnity claims whether the underlying duty is established under tort principles or express contract terms. *Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 755 n.6 (Minn. 1985) (citing Restatement of Restitution § 85 (Am. Law Inst. 1937)) ("Although we have previously recognized indemnity to reimburse a party only for a liability arising from a tort, the principles underlying the rules are the same for a liability arising out of a contract.").

("Contribution and indemnity are variant common-law remedies used to secure restitution and fair apportionment of loss among those whose activities combine to produce injury."); *Hendrickson v. Minn. Power & Light Co.*, 104 N.W.2d 843, 846–47 (Minn. 1960), ("Indemnity is the remedy securing the right of a person to recover reimbursement from another for the discharge of a liability which, as between himself and the other, should have been discharged by the other. . . . In the modern view, principles of equity furnish a more satisfactory basis for indemnity."), *overruled in part on other grounds by Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362 (Minn. 1977); *Shore v. Minneapolis Auto Auction, Inc.*, 410 N.W.2d 862, 866 (Minn. Ct. App. 1987) ("Indemnification is a flexible, equitable remedy designed to accomplish a fair allocation of loss among parties. Such a remedy should be used to achieve fairness as applied to a particular set of facts.").

"In the contractual context," however, "a claim based on an express indemnification provision is a legal, rather than equitable, claim." *Johnson v. Johnson*, 902 N.W.2d 79, 85 (Minn. Ct. App. 2017); *see also Hendrickson*, 104 N.W.2d at 848 (expressly recognizing that a duty to indemnify can arise "[w]here there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved"). "Indeed, when the duty to indemnify arises from contractual language, it generally is not subject to equitable considerations; rather, it is enforced in accordance with the terms of the contracting parties' agreement." 41 Am. Jur. 2d *Indemnity* § 13 (2019).

Under Minnesota law, and as more specifically described throughout this Order, "[a]n indemnity agreement is a contract, which is to be construed according to the principles generally applied in the construction or interpretation of other contracts."

*Buchwald v. Univ. of Minn.*, 573 N.W.2d 723, 726 (Minn. Ct. App. 1998); *see also Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 761 (Mich. Ct. App. 2004) ("Contractual indemnity is an area of law guided by well-settled general principles. Nonetheless, each case must ultimately be determined by the contract terms to which the parties have agreed."). An indemnity contract is "to be given 'a fair construction that will accomplish its stated purpose.'" *Sorenson v. Safety Flate, Inc.*, 235 N.W.2d 848, 852 (Minn. 1975) (*quoting N.P. Ry. Co. v. Thornton Bros. Co.*, 288 N.W. 226, 227 (Minn. 1939)).

In these claims of contractual indemnity, the threshold question is whether that for which the indemnitee seeks indemnification—whether it be losses, damages, or liabilities—falls within the language of the contract. This initial inquiry involves not only interpreting the indemnity contract to determine its scope, but also evaluating whether the facts of the case fit within that scope. *See Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) (holding that unambiguous contract language required three conditions to be met before one party would indemnify another, that one of those conditions was not met, and hence that there was no duty to indemnify); *see also* 41 Am. Jur. 2d *Indemnity* § 13 (describing the "threshold question [of] whether the fact situation is covered by the indemnity contract" as requiring "only a straightforward analysis of the facts and the contract terms").

Assuming that the facts fall within the indemnity contract, particular issues arise when a party seeks indemnity for a settlement, as is the case here.[14]  Although "the right to recover indemnity is not lost by reason of any settlement with the claimant," *Altermatt v. Arlan's Dep't Stores*, 169 N.W.2d 231, 232 (Minn. 1969) (per curiam), where one party seeks to recover from another "for a settlement 'entered into *before* trial . . . , the party seeking indemnification must show the settlement was reasonable and prudent.'" *Jackson Nat'l Life Ins. Co. v. Workman Sec. Corp.*, 803 F. Supp. 2d 1006, 1012 (D. Minn. 2011) (emphasis added) (quoting *Osgood v. Med., Inc.*, 415 N.W.2d 896, 903 (Minn. Ct. App. 1987)).  "The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982).  As more thoroughly explained below, what is reasonable and prudent "involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.*  With respect to the considerations of the underlying liability, "[t]he party seeking indemnification need only show it *could have* been liable under the facts shown at trial not whether they *would have* been liable." *Jackson*, 803 F. Supp. 2d at 1012  (citing *Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1083 (D. Minn. 1991)). Indeed, "[r]easonableness . . . is not determined by conducting the

---

[14]     As noted by the Eighth Circuit, indemnity cases involving pre-trial settlements can be particularly challenging to analyze.  *See Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 n.4 (8th Cir. 2004) ("If indemnity is based on a settlement, then indemnity can be more difficult to analyze") (quoting 22 Britton D. Weimer, et al., *Minn. Prac., Insurance Law & Practice* § 3:2 (2013)).

very trial obviated by the settlement." *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990).

## B. Principles of Contract Interpretation

There is no dispute that Minnesota law applies to the interpretation of the Client Contracts, the AlterNet Guide and the Client Guide, as well as to RFC's breach of contract and indemnity claims. (*See* Nesser Decl., Ex. 1 (Mar. 30, 2000 Client Contract) ¶ 10) ("This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota"); *id.*, Ex. 2 (June 25, 2001 Client Contract) ¶ 13) (same). When construing a contract under Minnesota law, a court's "primary goal . . . is to determine and enforce the intent of the parties." *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)). Where the contracting parties' intention is ascertainable from the language of a written contract, the construction of the contract is for the court. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990). If the parties' intent is unambiguously expressed, "[t]he language found in a contract is to be given its plain and ordinary meaning." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d at 63, 67 (Minn. 1979); *Bass v. Ring*, 9 N.W.2d 234, 236 (1943)). While courts apply the plain and ordinary meaning of contractual terms to the interpretation of a contract, those terms are construed in the context of the entire contract. *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012) (citing *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 165 N.W.2d 554, 556 (1969)).

In construing a contract, courts attempt to harmonize all of the contract's provisions. *Chergosky*, 463 N.W.2d at 525. Also, "[b]ecause of the presumption that the parties intended the language used to have effect," courts "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Id.* at 526.

"A contract is ambiguous if, based on the language alone, it is reasonably susceptible of more than one interpretation." *Art Goebel,* 567 N.W.2d at 515. "If there is ambiguity, extrinsic evidence may be used, and construction of the contract is a question of fact for the jury unless such evidence is conclusive." *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005) (citing *Donnay v. Boulware*, 144 N.W.2d 711, 716 (1966)). While ambiguity in a contract can be construed against the drafter, *see, e.g.*, *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs.*, 913 N.W.2d 687, 693 (Minn. 2018)), courts should do so only after attempting to "determine the parties' intent behind an ambiguous term, using extrinsic evidence if available." *Id.* at 694. Moreover, "this rule has less application as between parties of equal bargaining power or sophistication," *Re-Sols. Intermediaries, LLC v. Heartland Fin. Grp., Inc.*, No. A09-1440, 2010 WL 1192030, at *3 (Minn. Ct. App. Mar. 30, 2010), and where both parties are represented by sophisticated legal counsel during the formation of the contract. *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960 (8th Cir. 2000).

As a general matter, Minnesota upholds principles of freedom of contract, in which "parties are generally free to allocate rights, duties, and risks," *Lyon Fin. Servs. v. Ill. Paper & Copier Co.,* 848 N.W.2d 539, 545 (Minn. 2014), and "[c]ourts are not warranted in interfering with the contract rights of parties as evidenced by their writings which purport

to express their full agreement," *Cady v. Bush*, 166 N.W.2d 358, 362 (Minn. 1969). Indeed, "[w]here the parties have contracted to create duties that differ or extend beyond those established by general principles of law, and the terms of the contract are not otherwise unenforceable, the parties must abide by the contractual duties created." *Grand Trunk W. R.R.*, 686 N.W.2d at 761. Terms of those contract provisions must "be given their ordinary meaning, as well as the interpretations adopted in prior cases." *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, 796 F.3d 962, 969 (8th Cir. 2015) (quoting *Boedigheimer v. Taylor*, 178 N.W.2d 610, 613 (Minn. 1970)).

## C. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' " if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party.[15] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In

---

[15] However, where the moving party seeks summary judgment on an affirmative defense, the nonmoving party "must . . . come forward with evidence to support [its] affirmative defenses in its opposition." *Residential Funding Co. v. Terrace Mortg. Co.*, 850 F. Supp. 2d 961, 964 (D. Minn. 2012), *aff'd*, 725 F.3d 910 (8th Cir. 2013).

responding to a motion for summary judgment, however, the nonmoving party may not "'rest on mere allegations or denials,' but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

Plaintiff seeks summary judgment on the following: (1) issues decided in Wave One; (2) issues decided in *HLC*, *UAMC*, or *First Mortgage*; (3) that the Guides' R&Ws and remedies govern PRMI's at-issue loans; (4) that certain trust rep breaches contributed to RFC's liability; (5) that the RMBS Trust Settlement allowed a single unallocated claim; and (6) that PRMI is liable to ResCap not only on the specific loans in question, but also as to indemnity generally. (*See* Pl.'s Mem. at 4–21.)

As to the first category—issues decided in Wave One—ResCap requests that the Court find that: (1) the Client Guide grants Plaintiff sole discretion to determine Events of Default as to all circumstances, including as to (a) materiality and (b) Events of Default in the Global Sample; (2) the indemnity provisions in the Client Guide and AlterNet Guide impose a contributing cause standard of causation, not a proximate cause standard, and to establish causation, Plaintiff is simply required to show that Defendant's Events of Default increased RFC's risk of loss to the RMBS Trusts and Monolines; (3) Plaintiff is entitled to indemnity for liabilities, not just losses; (4) the Guides' remedies apply to foreclosed and liquidated loans, and do not terminate with the "life of the loan"; (5) RFC's alleged wrongdoing does not bar recovery; (6) RFC's bankruptcy neither extinguished the Allowed Claims nor Defendants' indemnity obligations for them; (7) the Allocated Breaching Loss methodology provides a reasonably certain basis for assessing and allocating damages that

is not speculative, remote, or conjectural, and is a highly sophisticated methodology for determining damages; (8) the Guides preclude knowledge- and reliance-based defenses, requiring the dismissal of Defendant's 16th (reliance), 17th (knowledge), 28th (acquiescence), 29th (ratification), and 33rd (diligence) defenses; (9) RFC's purchase of Assetwise-approved loans did not constitute a blanket waiver of RFC's rights to enforce the Guides and their remedies; (10) Plaintiff's indemnity claim is timely; and (11) statistical sampling is appropriate. (*Id.* at 4–7.)

With respect to the issues decided in *HLC*, *UAMC*, or *First Mortgage*, Plaintiff seeks summary judgment on the following eight issues: (1) to prove an estoppel defense, Defendant may not seek to introduce anecdotal, hearsay evidence that simply reflects generalized variances from RFC's underwriting criteria, but rather, it must offer evidence of a stated departure from the provisions and remedies of the Guides as to specific Defendant loans or specific bulk transactions, made by a person with authority at RFC; (2) there can be no waiver of the provisions of the Guides unless RFC expressly made such a waiver in writing; (3) the Assetwise Agreement did not displace the Guides, and no reasonable fact finder could read the Assetwise Agreement as a stand-alone agreement; (4) the methods that Plaintiff's expert Mr. Dudney used to obtain missing mortgage loan schedule ("MLS") information were reliable, and basing an R&W breach on such proxy data from a third-party source is entirely permissible; (5) there is no evidence that RFC was the sole cause of significant non-indemnifiable liability; (6) RFC's Bankruptcy Settlements were reasonable and in good faith; (7) RFC reasonably attributed little to no value to servicing claims; (8) the 15th defense in Defendant's answer, which is the affirmative

defense of mitigation based on purported servicing deficiencies, must be dismissed with prejudice because the Bankruptcy Court specifically allocated as between servicing and other claims, and Defendant can cite no evidence providing that the Bankruptcy Settlement should have been less than it was and, therefore, Defendant's allocated share should be less than it is, due to the failure of those settling the case to reasonably consider alleged servicing errors.  (*Id.* at 7–9.)

Defendant moves for summary judgment on the following issues:  (1) Plaintiff's allocation methodology fails under *UnitedHealth Group, Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017), *aff'g*, 47 F. Supp. 3d 863 (D. Minn. 2014), *and*, 941 F. Supp. 2d 1029 (D. Minn. 2013); (2) Plaintiff may not seek indemnity for its negligence or fraud; (3) Plaintiff may not seek indemnity for RFC's liabilities; (4) Plaintiff is barred from recovering damages on "expired" loans; (5) Plaintiff's indemnity claim related to the MBIA Settlement fails; (6) Plaintiff's claim for RFC's attorney's fees fails; and (7) Plaintiff's breach of contract claim fails.  (*See* Def.'s Mem. [Doc. No. 5223] at 8–39.)

Because several of the issues in the parties' cross-motions for summary judgment overlap, the Court finds it appropriate to address the issues topically, rather than to address each motion in turn.  Accordingly, the Court will address the motions in tandem and decide whether, as to each issue raised, either party is entitled to judgment as a matter of law.

### D. Threshold Inquiry of Plaintiff's Contractual Indemnity Claim[16]

#### 1. Reasonableness of RFC's Bankruptcy Settlements

ResCap argues that, as a matter of law, RFC's Bankruptcy Settlements were reasonable and made in good faith. (Pl.'s Mem. at 8.) ResCap urges the Court to grant summary judgment on this issue given that this Court, following the *HLC* trial, held twice that the same settlements were reasonable and made in good faith. (*Id.*) (citing *HLC JMOL Order*, 399 F. Supp. 3d at 812–819; *First Mortg.*, 2018 WL 6727065, at *4–6).) PRMI acknowledges both rulings. (Def.'s Opp'n [Doc. No. 5295] at 32.) PRMI also acknowledges that Judge Magnuson ruled on this very issue in *UAMC*, and that Judge Glenn ruled on this issue in the bankruptcy proceedings, both holding that the settlements were reasonable. (*Id.* at 32–35.) But, PRMI contends that (1) new evidence supports its position that the settlements were unreasonable; (2) certain evidence presented at the *HLC* trial raises triable issues of fact regarding the reasonableness of the settlements; and (3) Judge Magnuson was wrong in relying on Judge Glenn's "hearsay findings" on the reasonableness of the settlements. (*Id.*)

---

[16]     PRMI also urges the Court to dismiss Plaintiff's breach of contract claim. (Def.'s Mem. at 33–34.) While ResCap responds that it is premature to dismiss its claim at this stage, (Pl.'s Opp'n [Doc. No. 5309] at 30), it acknowledges that Plaintiff withdrew its contract claim in Wave One before the *HLC* trial. [*See* Doc. No. 4513.] Thus, resolving this apparent conflict now appears unnecessary, because ResCap plans to update the Court regarding whether it consents to dismissal of its contract claim here. (Pl.'s Opp'n at 30.) Accordingly, at this time, the Court will defer any ruling on this issue until Plaintiff provides the Court with such an update, which Plaintiff is ordered to do by the pretrial conference in this case. [*See* Doc. No. 5350].

PRMI also separately moves for partial summary judgment on this issue, but with respect to only the MBIA Settlement. (Def.'s Mem. at 31–33.) PRMI asserts that ResCap cannot prove this settlement was reasonable under Minnesota law in order to obtain indemnity for the MBIA Settlement. (*Id.* at 32.) To obtain indemnity, PRMI alleges that it is "necessary for Plaintiff to show the settling parties could have been liable for the settlement amount had the case gone to trial." (*Id.*) The parties here do not dispute that MBIA settled its claims against six ResCap entities for $3.619 billion collectively as follows: $719 million from ResCap; $1.45 billion from GMACM; and $1.45 billion from RFC, RFMSII, RAMP and Homecomings (all part of the RFC debtor group). (*See* Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 32)); (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) § IV.D.) PRMI alleges that "no Minnesota court could find that a settlement of $3.619 billion is reasonable where [MBIA's] complaint alleged only $2.2 billion collectively against [these] six related entities." (Def.'s Mem. at 31–33.)

As the parties correctly observe, after the *HLC* trial, the Court ruled twice on this very issue.[17] *HLC JMOL Order*, 399 F. Supp. 3d at 814; *First Mortg.*, 2018 WL 6727065, at *4–6. In determining whether the bankruptcy settlements were entered into in good faith and for a reasonable amount, the Court applied the test set forth in *Miller*, 316 N.W.2d at 735, requiring "objective proof of good faith and reasonableness." *HLC JMOL Order*, 399 F. Supp. 3d at 813 ("An objective analysis of good faith and reasonableness, in turn requires

---

[17]    PRMI is correct that in the August 15, 2018 Consolidated Summary Judgment Order, the Court denied Plaintiff's motion on these issues. *Common SJ Order*, 332 F. Supp. 3d at 1157. The Court cited the need for a full-record on such a fact-intensive inquiry. *Id.*

an analysis of what the parties knew or could have known at the time of the settlement; knowledge obtained years later, of new facts or new law, cannot inform the reasonableness of the settlement at the time it was made."). In the *JMOL* Order, this Court found that the record contained the following uncontroverted evidence that the settlements were entered in good faith and reasonable:

- ***First***, the bankruptcy settlements were entered into after a lengthy mediation conducted by a federal bankruptcy judge, Judge James Peck.

- ***Second***, an independent Chief Restructuring Officer, Lewis Kruger, presided over the mediation and ultimately approved the settlements. He testified at trial that his goal was to achieve "a consensual deal that treated creditors fairly and established claims of creditors in a way that was appropriate," and emphasized that his decision to enter into the settlements was informed by his discussions with his advisors and with all of RFC's principal creditor constituencies.

- ***Third***, RFC's expert in the bankruptcy case, Mr. Frank Sillman, testified that the settlements reached were reasonable.

- ***Fourth***, the RMBS Trusts' expert, Mr. Allen Pfeiffer, testified that the settlements reached were reasonable.

- ***Fifth***, all constituencies to RFC's bankruptcy supported the settlements, including parties such as the Creditors' Committee that opposed the original RMBS Trust settlement. For instance, Mr. John Dubel, the chairperson of the Creditors' Committee, testified that litigating these issues would have involved great uncertainty and "numerous complex and novel issues of fact and law."

- **Sixth**, the RMBS Trusts supported the settlements.

- **Seventh**, ResCap's expert witness, Mr. Hawthorne, an experienced RMBS litigator and an expert on RMBS litigation, testified that the settlements were entered into in good faith and were reasonable.

- **Eighth**, Judge Glenn, who presided over RFC's bankruptcy in the Southern District of New York, approved the settlements after having rejected an earlier proposed settlement.

*Id.* at 814–815 (noting further that it was "undisputed" that the "factual evidence arising out of the settled litigation was highly complex, involving analyses of over 100,000 loans and RFC's accordant exposure to many billions of dollars in damages.")

And in the face of this "overwhelming, uncontroverted evidence of good faith and reasonableness," the Court determined that no reasonable juror could find the settlements anything but reasonable, because "[t]o do so [they] would have to disagree with: (1) every professional to consider the issue, (2) the experts on both sides of the bankruptcy . . . and (3) every constituency with an interest in the settlements, including the Creditors' Committee, the RMBS Trusts, and the only expert to opine on the issue in [the HLC] case, Mr. Hawthorne." *Id.* at 819.[18]

Yet PRMI now asserts that it intends to present, at trial, several experts who raise triable issues of fact regarding the reasonableness of RFC's settlements. (Def.'s Opp'n at

---

[18]    Following this determination, this Court found the facts above from the *HLC* record equally applicable in *First Mortgage*, and determined no new evidence raised a disputed fact question.  2018 WL 6727065 at *6.

32–35.)  ResCap, by contrast, relies on one expert, experienced RMBS litigator Donald

Hawthorne, to opine on the reasonableness of the settlements.  In a 236-page report, Mr.

Hawthorne, who also testified at the *HLC* trial, opined on the reasonableness of these

settlements by "analyzing RFC's potential exposure, litigation risks, and the legal strengths

of RFC's claims and defenses, *together*."  *HLC JMOL Order*, 399 F. Supp. 3d at 816

(emphasis in original); (*see also* Alden Decl., Ex. T (Hawthorne Rpt. ¶ 34).)  Mr.

Hawthorne also evaluated the settlement amounts against "various benchmarks" available

to RFC when it entered into the settlements.  (Alden Decl., Ex. T (Hawthorne Rpt. ¶ 34).)

To challenge certain strands of Mr. Hawthorne's analysis on which he bases his

reasonableness conclusion, PRMI intends to rely on four separate experts, including the

expert testimony of an experienced RMBS litigator David Woll.  (Def.'s Opp'n at 32–35.)

ResCap responds that PRMI's "purported new evidence is unavailing" because no PRMI

expert (1) opines on reasonableness; or (2) considers litigation risks or costs.  (Pl.'s Reply

[Doc. No. 5337] at 8.)  As to the MBIA settlement specifically, ResCap alleges that the

"purported new evidence is irrelevant."  (*Id*.)  ResCap further alleges that while PRMI

offers one MBIA-related argument, this argument was rejected before by the Court.  (*Id*.)

The Court agrees with ResCap.  Even assuming PRMI's new evidence is admissible,

it is not probative of the reasonableness of RFC's settlements.  As explained further below,

PRMI challenges Plaintiff's view of the legal strength of RFC's defenses at the time it

entered the settlements.  But two accomplished RMBS litigators, such as Messrs. Woll and

Hawthorne, could disagree about the strengths of RFC's defenses at the time of settlement

without impacting a fact finder's conclusion as to whether the claims were settled for a

reasonable amount. As in any negotiated settlement between parties, RFC's settlements appropriately reflect a middle ground between differing opinions of counsel about the legal risk of the claims. Viewing the strength of RFC's legal defenses in a vacuum, therefore, does not inform the Court about the reasonableness of the compromise or the "reasonable range of potential recoveries." *HLC JMOL Order*, 399 F. Supp. 3d at 813. Additionally, the testimony of PRMI's other experts, even when considered "collectively" as PRMI urges the Court to do (Def.'s Opp'n at 34), raises no triable issues of fact that the settlements were unreasonable.

Finally, as to PRMI's evidence that it acknowledges was introduced at the *HLC* trial, the Court sees no basis to depart from its prior ruling. The Court addresses PRMI's evidence below.

### a. PRMI's New Evidence Regarding the Reasonableness of the Settlements

At the outset, the Court notes that, while the party seeking indemnity for a settlement must prove the settlement was reasonable and entered in good faith, the issue does not turn on whether there was "a single correct or perfect settlement." *HLC JMOL Order*, 399 F. Supp. 3d at 813; (*see also* Def.'s Opp'n at 33.) As this Court explained following the *HLC* trial, "Minnesota precedent makes clear that the issue is whether the settlement for which a party seeks indemnification fell within a reasonable range of potential recoveries." *HLC JMOL Order*, 399 F. Supp. 3d at 813 (internal citation omitted). In evaluating objective indicia of good faith and reasonableness, the fact finder must consider whether a reasonable, prudent person would have entered into the settlement based on:

(i)     an analysis of the defendant's potential exposure at trial,

(ii)    the strengths and weaknesses of the claims and defenses, both factually and legally,

(iii)   the risks of proceeding to trial, and

(iv)    the costs and burdens of litigation.

*Id.* (internal citation omitted).  Keeping these principles in mind, the Court addresses PRMI's new evidence on the reasonableness of RFC's settlements.

First, PRMI seeks to challenge Mr. Hawthorne's view of the legal strength of two of RFC's defenses when it entered into the settlements.  For the first RFC-defense, PRMI alleges that "Messrs. Woll, Schwarcz, and Burnaman and Ms. Keith explain that RFC's trust-level representations were not nearly as strong as Mr. Hawthorne suggests."  (Def.'s Opp'n [Doc. No. 5309] at 34.)  For instance, Mr. Woll opines that "many of the RFC securitizations" did not include a "compliance with guidelines" representation (a "Compliance Rep") and a "no fraud or misrepresentation" representation (a "No Fraud Rep").  (*See, e.g.*, Smallwood Decl., Ex. 26 (Woll Rpt.) ¶ 10.)  According to PRMI, the lack of certain trust-level representations for RFC securitizations "significantly weakened [] repurchase claims relating to these securitizations and strengthened RFC's defenses."  *Id.*  The second RFC-defense that PRMI challenges is the strength of RFC's statute-of-limitations defense.  PRMI asserts that, "contrary to Mr. Hawthorne's opinion", Mr. Woll explains that "a reasonable defendant in RFC's position would have concluded it had a significant likelihood of success on its statute-of-limitations defense."  (Pl.'s Opp'n at 34.)

In analyzing RFC's legal defenses, Mr. Woll confirmed that he is not "offering an opinion that [a] $7 billion allowed claim was unreasonable in light of the litigation risks that RFC faced at the time of settlement." (Alden Decl., Ex. Q (Woll Dep.) at 207.) Mr. Woll opines, however, that "[a]ll other things being equal, a reasonable defendant in RFC's position during the settlement period would have ascribed a lower settlement value" to claims on securitizations that (i) did not include a Compliance Rep or a No Fraud Rep; and/or (ii) were subject to the six-year statute-of-limitations defense. (Smallwood Decl., Ex. 26 (Woll Rpt.) ¶ 10).) Mr. Woll appears to concede, however, that "all other things" were not equal for the claims that RFC was attempting to settle. (Alden Decl., Ex. Q (Woll Dep.) at 224–225.) In fact, Mr. Woll admits that if RFC did not settle, RFC would still have to defend against "breach claims" that potentially included stronger trust-level representations. (*Id.* at 224.)

As to the statute-of-limitations defense, while Mr. Woll opines that, if successful, the defense had the ability to eliminate "more than 300 of the 506 trusts covered by the settlements," this Court finds that Mr. Woll, again, provides no analysis on the impact this defense had on a reasonable range for settlement. (Smallwood Decl., Ex. 26 (Woll Rpt. ¶ 8); *see also* Alden Decl., Ex. Q. (Woll Dep.) at 15) ("Q. Are you challenging Mr. Hawthorne's conclusion that the RMBS trustee settlement was reasonable? A. Insofar as is set forth in my report, I disagreed with Mr. Hawthorne's assessment of the strength of the claims. I am disagreeing with him . . . with respect to those aspects."). The impact on the settlement range could be determined, in part, on an assessment of the expected losses of those trusts, but Mr. Woll did not assess the expected losses, nor did he otherwise

compare the statute-of-limitations defense with other litigation risks, including other potential claims and defenses. (Smallwood Decl., Ex. 26 (Woll Rpt. ¶ 8).)

Thus, even if the Court credits Mr. Woll's opinion over Mr. Hawthorne's opinion, there is no evidence in the record, expert or otherwise, that suggests that the settlements were unreasonable. Mr. Woll's analysis of two legal defenses in a vacuum, at most, reflects a middle ground between differing opinions of counsel about potential litigation risk of the settled claims, rather than the reasonableness of RFC's compromise. That the claims in fact settled for an amount significantly below RFC's exposure showcases the lack of probative value of Mr. Woll's testimony on this issue.

Indeed, Mr. Woll does not dispute that RFC's exposure surpassed $42 billion. *HLC JMOL Order*, 399 F. Supp. 3d at 815. In the face of this high potential for liability, RFC settled its liability for approximately $7.1 billion, comprising a relatively small percentage of RFC's overall exposure. This substantial discount strongly suggests, as Mr. Woll's expert testimony would corroborate (Smallwood Decl., Ex. 26 (Woll Rpt.) ¶ 10), that at the time of settlement, the parties must have believed that RFC had meritorious defenses and the RMBS Trusts and Monolines had litigation risk going forward. *HLC JMOL Order*, 399 F. Supp. 3d at 816 n.9. So, even accepting Mr. Woll's testimony in its entirety, this Court cannot conclude, one way or the other, whether the strength of certain legal defenses is probative of the reasonableness of RFC's settlements at the time of settlement, especially since Mr. Woll disavows any analysis of RFC's "$7 billion allowed claim" in light of the

litigation risks at issue.[19]  (Alden Decl., Ex. Q (Woll Dep.) at 207); *see also HLC JMOL*

*Order,* 399 F. Supp. 3d at 818 (citing *Sip-Top, Inc. v. Ekco Grp., Inc.* 86 F.3d 827, 830 (8th

Cir. 1996) ("When the record contains no proof beyond speculation to support the verdict,

judgment as a matter of law is appropriate.")).

The record therefore suggests that Mr. Woll cannot rebut, beyond mere speculation,

the overwhelming evidence that RFC's Settlements were reasonable and made in good

faith.  *See HLC JMOL Order*, 399 F. Supp. 3d at 817 (finding a "non-movant's case cannot

rest solely upon [] speculation and conjecture lacking in probative evidentiary support.")

(internal citation omitted).  For all these reasons, the Court holds that Mr. Woll's expert

testimony does not raise triable issues of fact regarding whether RFC's settlements fall

within a "reasonable range of potential recoveries."  *Id.* at 813.

And upon further review, the Court finds that none of PRMI's other experts

considered litigation risks or costs when assessing RFC's defenses in the context of RFC's

settlements.  (Smallwood Decl., DX-17 (Keith Rpt.) ¶¶ 109–54; *id.*, DX-44 (Burnaman

Rpt.) ¶¶ 55–92.)  For instance, as to the strength of RFC's trust-level representations, PRMI

expert Steven Schwarcz also testified he is not opining on whether RFC had liability, or

whether a party in RFC's position should have perceived no risk on certain trust-level

---

[19]     Additionally, the Court notes that Mr. Woll's specific criticisms about the relative
strength of RFC's defenses do not appear to apply to the MBIA Settlement.  Mr. Woll
acknowledged that MBIA's claims did not have statute-of-limitations issues. (Alden Decl.,
Ex. Q. (Woll Dep.) at 108; (*see also* Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 489).)
Similarly, MBIA's securitizations contained trust-level representations that PRMI's
experts believed were stronger than the trust-level representations contained in other trusts.
(*See, e.g.*, Smallwood Decl., Ex. 26 (Woll Rpt.) ¶¶ 80 n.69, 88) (MBIA securitizations had
Compliance Rep and lacked Fraud Disclaimer).)

representations. (*Id.*, DX-49 (Schwarcz Dep.) at 55.) The legal risk that certain trust-level representations presented was also disclaimed by PRMI expert Kori Keith. (*See id.*, DX-14 (Keith Dep.) at 56 ("I don't make legal distinctions or offer legal opinions. So to the extent that something was a legal issue, I would have relied on counsel.").) Thus, the Court finds the new evidence that PRMI intends to offer at trial, even when considered "cumulatively," does not raise triable issues of fact regarding whether RFC's settlements were reasonable.

### b. Evidence Raised in First-Wave Actions Regarding the Reasonableness of the Settlements

Second, PRMI seeks to introduce evidence presented at the *HLC* trial to raise triable issues of fact regarding the reasonableness of RFC's settlements. PRMI intends to rebut Mr. Hawthorne's analysis that RFC's settlements were "reasonable by comparing it to other RMBS settlements[.]" (Def.'s Opp'n at 34.) Yet, as PRMI appears to concede, this evidence was presented at the *HLC* trial by the same expert PRMI relies on now, Phillip Burnaman. (*Id.*) During the *HLC* trial, this Court found that "Mr. Burnaman expressly disqualified himself as an expert on reasonableness on at least three different occasions." *HLC JMOL Order*, 399 F. Supp. 3d at 816.

Nonetheless, "entirely setting aside his credibility," this Court determined that Mr. Burnaman's testimony was "simply not probative of reasonableness." *Id.* In fact, this Court specifically found his analysis of other settlements irrelevant to whether RFC's settlements were reasonable:

> If the other settlements to which Mr. Burnaman testified were considered in
> the context of the changing law at the time, such as the law on causation and

the law on the statutes of limitations, one could then evaluate whether they were comparable. But because Mr. Burnaman expressly disavowed such analysis, no reasonable juror could conclude, one way or the other, whether those settlements were comparable or not and therefore whether they were probative of the reasonableness of the RMBS Trust settlement in this case.

*Id*. at 816–17. PRMI provides no basis for this Court to depart from its prior ruling. Indeed, Mr. Burnaman confirmed that he would not change anything about his testimony in the *HLC* trial, and he was not offering an opinion that the RFC settlements were unreasonable. (Smallwood Decl., DX-48 (Burnaman Dep.) at 16–18.)

PRMI also urges this Court not to follow Judge Magnuson's holding in *UAMC* that the very same settlements were reasonable, because the decision improperly relied on Judge Glenn's "hearsay findings" concerning the reasonableness of the settlements. (Def.'s Opp'n at 34–35.) PRMI alleges that Judge Glenn's hearsay findings are "not admissible to prove reasonableness." (*Id.*) Even assuming PRMI is correct, PRMI appears to overlook this Court's own holding in the First-Wave actions that "Judge Glenn's *order* approving the bankruptcy settlements is distinct from Judge Glenn's *finding* that the settlements were reasonable; the former was admissible for its legal effect (and as an objective indicia of good faith), while the latter was inadmissible as hearsay." *HLC JMOL Order*, 399 F. Supp. 3d at 814 n.8 (emphasis added). Again, the Court "solely relie[s] on the fact that Judge Glenn approved the settlements, and that [ResCap's expert] Mr. Hawthorne considered that approval indicative of reasonableness and good faith."[20] *Id.*

---

[20] Indeed, during oral argument for the present motion, ResCap correctly reiterated that "a Bankruptcy Court cannot approve a settlement unless it is reasonable, and it must take into account the chance of success on the litigation." (*See* Dec. 2, 2019 Hr'g Tr. [Doc. No. 5352] at 65–66.)

Nonetheless, PRMI continues to urge this Court, as the fact finder here, to determine that the settlements were unreasonable despite Judge Glenn's approval of the settlements. But, to do so, the Court, this time around, would have to disagree with: (1) its own two holdings after the *HLC* trial; "[(2)] every professional to consider the issue, [(3)] the experts on both sides of the bankruptcy the experts on both sides of the bankruptcy . . . , and [(4)] every constituency with an interest in the settlements, including the Creditors' Committee, the RMBS Trusts, and the only expert to opine on the issue in [the HLC] case, Mr. Hawthorne." *See HLC JMOL Order*, 399 F. Supp. 3d at 819.

As to the MBIA Settlement, as explained above, the Court finds none of PRMI's "new" evidence probative of the reasonableness of RFC's settlements. However, PRMI argues, as contended in the First-Wave actions, that the MBIA Settlement is unreasonable for indemnification purposes, entitling "PRMI judgment relating to that settlement." (Def.'s Opp'n at 35; *see also* Def.'s Mem. at 31–33.) PRMI alleges that it is entitled to judgment because "no Minnesota court could find that a settlement of $3.619 billion is reasonable where the complaint alleged only $2.2 billion collectively against six [ResCap] entities." (Def.'s Mem. at 32.) ResCap responds that PRMI seeks summary judgment on grounds that this Court rejected. (Pl.'s Reply at 28–29) (citing *In re ResCap Liquidating Tr. Litig.,* 2018 WL 4929393, *3 (D. Minn. Oct. 11, 2018)).

The Court agrees with ResCap. In previously assessing the admissibility of evidence regarding the MBIA Settlement, this Court held that "the law permits Plaintiff to seek indemnification from [First-Wave defendants] for a portion of MBIA's full Allowed Claim against RFC [for $1.45 billion], unhindered by any partial recoveries MBIA may

have received from ResCap or GMAC Mortgage." *See In re ResCap Liquidating Tr. Litig.*, 2018 WL 4929393 at *3.

Moreover, this Court relied on the *Ivanhoe* doctrine and Minnesota law[21] in concluding that evidence concerning MBIA's recovery against other ResCap debtors is irrelevant. *Id.* at *2. As the Court explained, a creditor in bankruptcy is entitled to allowance of its full claim against a debtor, even if that creditor has claims against or recovers from other entities on the same debt or obligation. *Id.*; *see also Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245–47 (1935). Because this Court found no evidence in the record of a risk of "double recovery" by MBIA, this Court held that Plaintiff was not barred from seeking indemnification for a portion of MBIA's full Allowed Claim against RFC. *In re ResCap Liquidating Tr. Litig.*, 2018 WL 4929393 at *2 (finding no evidence suggesting "that MBIA had come anywhere close to receiving full satisfaction on its claims at the time of the settlement, whether from RFC [or other ResCap entities] . . . or has received such a recovery since."). PRMI does not seek to introduce evidence to the contrary about MBIA's recovery. Plaintiff therefore need not demonstrate reasonableness of such settlements, as PRMI contends. (Def.'s Mem. at 32–33.) PRMI moreover points to no new authority that would require this Court to reconsider applying its previous ruling to PRMI.

---

[21] PRMI suggests that this Court did not consider this question under Minnesota law. (Def.'s Mem. at 32–33.) In light of the plain language of the ruling, the Court finds no merit to PRMI's suggestion.

Accordingly, the Court denies PRMI's motion for summary judgment on this issue and grants summary judgment to ResCap that the RFC Bankruptcy Settlements were reasonable and in good faith.

### 2. Whether RFC's Bankruptcy Extinguished RFC's Liabilities

ResCap next seeks summary judgment that RFC's Bankruptcy Settlement did not extinguish the Allowed Claims or PRMI's indemnity obligations for them. (Pl.'s Mem. at 6.) In support, ResCap again cites to the *Common SJ Order*, which in turn cited to a June 2015 decision by this Court holding that "although the estate of a debtor normally ceases to exist once a Chapter 11 plan is confirmed," it is also true that the "termination of a bankruptcy estate is expressly subject to the terms and provisions of the confirmed plan, which need not state in explicit terms that the bankruptcy estate is to continue in existence." 332 F. Supp. 3d at 1142 (citations omitted) (internal quotation marks omitted). Regarding RFC's Bankruptcy Settlement, the Court held that the Confirmation Order and Plan approving the settlement "contemplated the very relief that [RFC] seek[s] in this consolidated action" by authorizing the creation of a "Liquidating Trust" (i.e., ResCap) in which "RFC was to transfer and assign its assets, and they preserved the Liquidating Trust's (and Estates') causes of action[.]" *Id.* PRMI's only response to this motion is a bare assertion—in its motion for summary judgment that RFC be barred from seeking indemnification in light of its negligence or intentional misconduct—that "RFC's liabilities were released and extinguished in bankruptcy." (Def.'s Opp'n at 14; *see also* Def.'s Mem. at 27 (incorporating prior briefing as to the extinguishment question).)

The Court grants ResCap's motion for summary judgment on this issue: RFC's Bankruptcy Settlement did not extinguish the Allowed Claims. *See Common SJ Order*, 332 F. Supp. 3d at 1141–45 (holding that "the applicable language [of the confirmation order and bankruptcy plan for RFC] in this case did not extinguish the Allowed Claims themselves or Defendants' obligation to indemnify [RFC] for them"). PRMI only incorporates its prior briefing on the issue, and offers no basis to depart from the Court's prior ruling. The Court sees no basis to reach a different conclusion. Accordingly, ResCap's motion for summary judgment on this issue is granted.

### 3. The Application of the Client Guide

#### a. The Documentation Surrounding Assetwise- or Countrywide-Based Loans Does Not Amend, Supersede, or Narrow the Guides

ResCap seeks a ruling affirming this Court's prior orders in the *HLC* case that the Assetwise Agreement was not a stand-alone agreement that constituted a blanket waiver of the Client Guide's provisions, nor did it supersede the Client Guide. (Pl.'s Mem. at 6–7.) It also affirmatively moves for summary judgment that the Guides govern *all* of the At-Issue loans; essentially, the inverse of its first request. (*Id.* at 9–12.)

As to the first request, ResCap points to this Court's *Common SJ Order*, in which the Court held that "Defendants are barred—by the contract that the parties signed—from arguing that RFC's purchase of Assetwise-approved loans constitutes a blanket waiver of RFC's rights to enforce the Client Guide and its remedies." 332 F. Supp. 3d at 1178. ResCap also cites to one of this Court's orders issued later in the *HLC* case, in which the Court noted that it had "rejected [at summary judgment] Defendants' generalized argument

that RFC waived its rights altogether to enforce the Client Guide simply by using Assetwise." (*HLC Oct. 1, 2018 Order* [Doc. No. 4497] at 3.)

In response, PRMI asserts that ResCap is attacking "strawmen" and that PRMI is *not* arguing that RFC's purchase of Assetwise-approved loans was a "blanket waiver" of RFC's rights to enforce the Client Guide, or that the Assetwise agreement was a "stand-alone agreement." (Def.'s Opp'n at 16–17.) Rather, PRMI asserts that the Assetwise agreement worked "in conjunction with other agreements to make [Assetwise] available to PRMI, set PRMI's monthly fee to use the system, and identify the subset of representations that would continue to be PRMI's responsibility." (*Id.* at 17.)

Accordingly, it appears that PRMI does not contest ResCap's particular request for summary judgment that RFC's purchase of Assetwise-approved loans did not constitute a "blanket waiver" of RFC's right to enforce the Client Guide's remedies. As such, because the Court sees no reason to depart from its prior holding on this issue, *see* 332 F. Supp. 3d at 1178, ResCap's motion for summary judgment is granted, and PRMI is barred from arguing that RFC's purchase of Assetwise-approved loans was a general "blanket waiver" of RFC's right to enforce the Client Guide's R&Ws and remedies.

As to the second request, ResCap seeks a ruling that the Guides, along with their R&Ws and indemnification remedies, apply to *all* At-Issue Loans, including Assetwise-approved loans and a single sample loan that was originated to underwriting criteria of Countrywide, which was also an originating lender. (Pl.'s Mem. at 9.) It appears to the Court that PRMI concedes that the AlterNet Guide or Client Guide apply to all loans *other* than those underwritten pursuant to Assetwise or originated to Countrywide's underwriting

criteria. (*See* Alden Decl., Ex. L (Keith Rpt.) ¶¶ 32 ("AlterNet Seller Guide applied to loans sold . . . pursuant to the March 30, 2000 Client Contract."), 44 ("[W]ith the exception of the Countrywide pool . . . loans sold after the execution of the June 25, 2001 Client Contract were sold pursuant to the RFC Client Guide."). Setting aside, for a moment, those loans originated to Assetwise or Countrywide, there is no genuine dispute of material fact that the Guides governed all other loans, and ResCap's motion on that point is granted.

As to the Assetwise- and Countrywide-based loans, PRMI makes two arguments. First, PRMI argues that while not displacing the Guides entirely, Assetwise- and Countrywide-based loans functionally *amended* the Guides by subjecting PRMI to a reduced set of R&Ws consistent with the Assetwise Agreement and the Countrywide underwriting parameters. (Def.'s Opp'n at 16–18.) Pointing to the underlying documents, such as the Assetwise Agreement itself, PRMI contends that all of the R&Ws in the Guides were superseded by the Assetwise Agreement, except for the seven listed in the Agreement, which "remained PRMI's responsibility." (*Id.*) The Assetwise Agreement provided that the following "items" continued to be the originating lender's responsibility:

1. Accurate Calculation of Income and Assets
2. Fraud and Misrepresentation
3. Appraisal Requirements (as defined in the [] Client Guide)
4. Title Requirements
5. Non-arm's Length Transactions
6. Non-Warrantable Condos
7. 1031 Exchanges

(Nesser Decl., Ex. 6 (Jan. 19, 2001 Assetwise Agmt.) at 1; Smallwood Decl., DX-40 (June 3, 2002 Assetwise Agmt.) at 1.) PRMI's corporate representative characterized them as "streamlined" R&Ws. (*See* Nesser Ex. 11 (Zitting Dep.) at 462, 464.)

However, ResCap correctly notes that Assetwise was RFC's internet-based, automated underwriting tool. (Nesser Decl., Ex. 6 (Jan. 19, 2001 Assetwise Agmt.) at 1; Smallwood Decl., DX-40 (June 3, 2002 Assetwise Agmt.) at 1.) In contrast to the 584-page AlterNet Guide and the 683-page Client Guide, (*see* Nesser Decl., Exs. 3 (AlterNet Guide); 4 (Client Guide, Version 1-03-G01), the Assetwise Agreement was a two-page document, signed only by the originator, limited to: (1) installation of Assetwise and training; (2) R&Ws; and (3) performance/volume expectations. (Nesser Decl., Ex. 6 (Jan. 19, 2001 Assetwise Agmt.) at 1; Smallwood Decl., DX-40 (June 3, 2002 Assetwise Agmt.) at 1.). Furthermore, ResCap points out that the Assetwise Agreement could not amend the Guides, as it was not signed by RFC, as the Client Contracts require. (Pl.'s Mem. at 10.) RFC employee Ann Leigh Richardson, who provided the Assetwise Agreements to PRMI, testified that she was authorized to *offer* the Assetwise Agreements for PRMI's acceptance, (Smallwood Decl., DX-2 (Richardson Dep.) at 41–42), however, ResCap correctly observes that the Client Contracts require RFC's signature for any modifications to the agreements. (Nesser Decl., Exs. 1 (Mar. 30, 2000 Client Contract) ¶ 2 & 2 (June 25, 2001 Client Contract) ¶ 3.)

As ResCap also notes, the Client Contracts fail to incorporate by reference the Assetwise Agreement. Instead, as relevant here, they reference the AlterNet Guide and the Client Guide. (Nesser Decl., Ex. 1 (Mar. 30, 2000 Client Contract) §§ 1 ("[RFC] has approved [PRMI] to sell Loans to . . . [RFC] under the Guide(s) checked below."), 3(b) ("[PRMI] makes the [R&Ws] set forth in the Guides."); *id.*, Ex. 2 (June 25, 2001 Client Contract) §§ 1, 4) (same). The 2001 Client Contract also contains a merger clause,

expressly stating that it "restates, amends, and supersedes any and all prior Contracts or agreements between the parties except [subservicing agreements]." (*Id.*, Ex. 2 (June 25, 2001 Client Contract) § 9.) It further provides, "This Contract . . . constitutes the entire understanding between the parties and supersedes all other agreements, covenants, [R&Ws], understandings and communication." (*Id.*, Ex. 2 (June 25, 2001 Client Contract), § 13.) Thus, even assuming for the sake of argument PRMI's position that the Assetwise Agreement was the operative governing agreement as of January 19, 2001, five months later, the June 25, 2001 Client Contract would have superseded it, by its express terms.

Moreover, both the AlterNet Guide and the Client Guide contain an R&W section providing that PRMI is "fully liable for any misrepresentation or breach of warranty regardless of whether it or RFC actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200; Nesser Decl., Ex. 3 (AlterNet Guide) § 250; *Id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A200.) Moreover, PRMI's R&Ws "survive the Funding Date . . . , and are not affected by any investigation or review made by, or on behalf of, RFC except when expressly *waived in writing* by RFC." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200; Nesser Decl., Ex. 3 (AlterNet Guide) § 250; *Id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A200) (emphasis added).

In addition, beginning with the January 1, 2001 Client Guide, the parties agreed that RFC could only waive the default of PRMI's obligations "by a written waiver specifying the nature and terms of such waiver." (Pl.'s App'x 1 (Spreadsheet Comparing Client &

AlterNet Guide Provisions) § A209(B); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A220; Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A209.)

Furthermore, beginning with the January 1, 2003 Client Guide, in Section A410/Section G401(b), the parties expressly agreed that the specific use of Assetwise did not relieve PRMI from its obligations under the Client Guide, stating, "[PRMI is] still bound by the [R&Ws] as detailed in this Guide." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § G401(B); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A410.) The Client Guide further states that "use of Assetwise does not relieve Clients of Loan eligibility and underwriting requirements set forth in this Client Guide." (Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § G401(B); Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A410.)

PRMI's second argument about the reduced R&Ws surrounding the Assetwise- and Countrywide-based loans is based on "testimony from individuals who executed the agreement, testimony about PRMI's responsibilities when using [Assetwise], and evidence of subsequent commitments that not only reference [Assetwise], but require its use." (Def.'s Opp'n at 18.) Based on that evidence, PRMI argues that issues of disputed fact preclude granting ResCap's motion as it relates to Assetwise-approved loans. (*Id.*) This argument, however, bears on PRMI's defenses of estoppel and waiver rather than the affirmative applicability of the Guides. Therefore, the Court will address this argument in its discussion of PRMI's defenses, *infra* § III(F)(5). Barring the defenses of waiver and estoppel, discussed below, the Guides apply to all At-Issue loans.

### 4. Rights in the Guides

As the Court has previously observed, the Guides grant RFC "wide-ranging discretion and recourse." *Common SJ Order*, 332 F. Supp. 3d at 1120 (discussing Client Guide). As relevant here, the Court addresses RFC's rights under the Guides to: (1) exercise its sole discretion in determining Events of Default; (2) seek indemnification for its liabilities and losses; (3) obtain relief despite its own alleged wrongdoing; and (40 obtain relief for certain "expired loans."

### a. Sole Discretion

ResCap seeks summary judgment that the Client Guide grants it "sole discretion" to determine all Events of Default in all circumstances, including as to materiality and any Events of Default in the global sample. (Pl.'s Mem. at 4.) ResCap points to this Court's *Common SJ Order*, in which the Court held "[b]ased on the plain language of the [Client Guide] the parties willingly signed . . . the Client Guide grants RFC sole discretion to determine Events of Default in all circumstances" as stated in Section 113(B) of the Guide. 332 F. Supp. 3d at 1153. The Court noted that Section 113(B) "grants RFC sole, unreviewable discretion to make determinations of fact" which includes and involves "declaring Events of Default." *Id.*; (Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(B) (renumbered in 2003 version of Client Guide).) The Eighth Circuit, affirming another prior decision of this Court on the subject, also held that the Client Guide gives RFC sole discretion to determine Events of Default. *See Residential Funding Co., LLC v. Terrace Mortg. Co.* (*Terrace II*), 725 F.3d 910, 916 (8th Cir. 2013).

ResCap also points to several clarifying orders that extend or otherwise explain the reach of the *Common SJ Order*'s holding to encompass determinations of the materiality of breaches, as well as determinations of Events of Default in the global sample. (Pl.'s Mem. at 4.) Specifically, ResCap cites to this Court's October 1, 2018 Order in the *HLC* case which held that because RFC has sole discretion under the Client Guide (as discussed in the *Common SJ Order*), it also possessed sole discretion to determine breaches of loans in the global sample because such a determination "is integral to [RFC]'s proof of breaches in this case and the proper allocation of responsibility to [Defendant] . . . ." (*HLC Oct. 1, 2018 Order* at 9–10.) With respect to materiality, ResCap cites to *First Mortg.*, 2018 WL 6727065, at *14 in which this Court held that the determination of whether a breach under the Client Guide is "material" is "part of the exercise of RFC's sole discretion to determine breaches."

PRMI contends that the Court should reject ResCap's motion for several reasons. First, it argues that ResCap does *not* have sole discretion with respect to loans sold under the AlterNet Guide due to the lack of any "sole discretion" provision. (Def.'s Opp'n at 8.)

Second, PRMI revives the same argument made by defendants in the *Common SJ Order* and asserts that the Court should depart from its prior ruling regarding ResCap's "sole discretion" under the Client Guide because Section 113(B)—the Client Guide provision underlying the Court's prior ruling—is "not an independent grant of power" but rather a "General Rule[] of Interpretation." (*Id.* at 9.) In PRMI's view, Section 113(B) only provides a rule for interpreting other "provisions" of the Client Guide. (*Id.*) PRMI also contends that Section 113(B) applies only if another provision explicitly requires RFC

to make a determination of fact or a decision to act; put another way, the section is triggered only if a provision "requires" RFC—and not some other decisionmaker—to make a determination. (*Id.*) Much like the defendants in the *Common SJ Order*, PRMI cites to the *Terrace* decisions previously issued by this Court and argues that to the extent RFC possessed sole discretion, it was only over decisions to require repurchase under Section A210, which contains conditional language that "[i]f [RFC] determines that an Event of Default has occurred . . . the Client agrees to repurchase the loan." (Def.'s Opp'n at 9–10 (citing Smallwood Decl., Ex. 35).) In contrast, PRMI asserts, there is no triggering "determines" language in the *indemnity* provisions of the Client Guide, which means that the question of whether a breach has occurred for indemnity purposes remains with the fact finder. (*Id.* at 10.)[22]

---

[22]     PRMI also argues that the Court ruled in the first wave *Common SJ Order* that RFC does not have the discretion to determine whether RFC breached its separate representations to trusts or monoline insurers. (Def.'s Opp'n at 11 (citing *Common SJ Order*, 332 F. Supp. 3d at 1168–69).) That is not a correct recitation of this Court's ruling. The Court held that summary judgment was *inappropriate*—not that RFC lacked such discretion—as to whether RFC's pool-wide Credit Grade and Documentation Program R&Ws were functionally equivalent to underwriting representations (and whether RFC was entitled to damages resulting from alleged breaches of those representations) because both parties offered experts on the point, setting up a fact question for the fact finder. *Common SJ Order*, 332 F. Supp. 3d at 1168–69. Later at trial, however, the Court noted that defendants had not provided any evidence raising a genuine dispute for the jury on the question and granted ResCap judgment as a matter of law with respect to causation. *HLC JMOL Order*, 399 F. Supp. 3d at 822.

In any event, ResCap does not seek summary judgment that it had sole discretion to determine whether it breached its representations to any trusts or monoline insurers. Accordingly, PRMI's argument on this point is irrelevant.

The Court grants ResCap's motion for summary judgment on this issue and affirms its prior rulings that RFC possessed the sole discretion under the Client Guide to make factual determinations including whether an Event of Default has occurred. The "sole discretion" clause has been present in the Client Guide—and therefore applicable to PRMI through the Client Contract between RFC and PRMI—since June 2001. (*See* Nesser Decl., Ex. 2 (June 25, 2001 Client Contract) at 1.) Its language is plain and unambiguous: "Whenever *any* provision of this Client Guide contract requires []RFC to make a determination of fact or a decision to act, or to permit, approve or deny another party's action such determination or decision shall be made *in []RFC's sole and absolute discretion*."[23] (Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § 141(B) (renumbered in 2003 version of Client Guide) (emphasis added).) This language grants RFC the "sole, unreviewable discretion to make determinations of fact" which includes determining that "an Event of Default has occurred." *Common SJ Order*, 332 F. Supp. 3d at 1153. Once such a determination has been made—which necessarily encompasses determining whether the fact being determined is "material," *see First Mortg.*, 2018 WL 6727065, at *14—other sections of the Client Guide provide noncumulative, nonexhaustive remedies that RFC may exercise under the Guide. (*See* Nesser Decl., Ex. 4

---

[23]    With respect to "sole discretion," the 2003 Client Guide uses identical language to the 2001 Client Guide. (*See* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § 113.) The only change to that language occurred in 2005, when the term "absolute" was removed. (*Compare id.*, *with* Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § 113.)

(Client Guide, Version 1-03-G01) §§ A221(A)–(D) (repurchase obligations – later renumbered to A210(A)–(D)), 274 (indemnification – later renumbered to A212).)[24]

PRMI's arguments regarding "sole discretion" after June 2001 are merely attempts to revive an interpretation of the Client Guide previously rejected by the Court. The Court previously rejected PRMI's contention that RFC possessed "sole discretion" only as to provisions of the Client Guide with "triggering" language requiring RFC to make a determination as a "strained reading" of the Guide's language. *Common SJ Order*, 332 F. Supp. 3d at 1153. Section 113(B)'s language, the Court held, was "clear [and] unambiguous" and granted RFC "sole, unreviewable discretion to make determinations of fact." *Id*. The language of Section A210—and Section A212 for that matter—"simply speak[s] of *remedies* that RFC may exercise under the contract," and each "presupposes that RFC has [sole discretion] and then simply sets forth the [originator's] obligations once the discretion has been exercised." *Id.* at 1153–54. The Court sees no reason to depart from its prior holding on this point.

---

[24] PRMI asserts as an additional argument that the Court should not hold that sole discretion rests with ResCap regarding the five loans sold between January and June 2001 because the Client Guide was not yet incorporated into the parties' contractual agreements. (Def.'s Opp'n at 8.) PRMI is correct that there is no "sole discretion" clause in any pre-2001 agreement between RFC and PRMI. (*See* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § 113(A)–(C) (noting that Plaintiff was unable to locate a "sole discretion" provision in any versions of the Client Guide or other documents prior to January 1, 2001).) However, PRMI's assertion as to the five loans sold between January and June 2001 is effectively conceded by ResCap, which notes it is *not* seeking a ruling that five sampled loans sold between that time period are covered by the Client Guide. (*See* Pl.'s Mem. at 3 n.1.)

Accordingly, ResCap's motion for summary judgment as to RFC's "sole discretion" under the Client Guide's language is granted.[25]

### b. Indemnity for Liabilities and Losses

ResCap next argues that this Court should hold, as a matter of law, that Plaintiff may seek indemnity for its liabilities *and* losses, as opposed to only losses. (Pl.'s Mem. at 5.) In support, ResCap points to this Court's *Common SJ Order*, in which the Court held that both the pre- and post-December 2005 versions of the Client Guide require originators to indemnify RFC for losses *and* liabilities, and not just actual losses incurred. 332 F. Supp. 3d at 1158 ("At the outset, this Court concludes, as a matter of law, that the post-December 2005 Client Guide requires Defendants to indemnify RFC for the liabilities as well as for out-of-pocket losses."), 1159 ("The Court reaches the same conclusion as to the pre-December 2005 Client Guide."). PRMI also moves for summary judgment on this issue, but requests that the Court depart from its prior order and hold, as a matter of law, that the pre-December 2005 Client Guide and AlterNet Guide do not provide loan-level indemnification for "liabilities." (Def.'s Mem. at 27.)[26]

It is undisputed by the parties that loan-level indemnification is governed by Sections A212 and A202(II) of the Client Guide. The pre-December 2005 version of

---

[25] To the extent that the parties dispute whether a standard of "bad faith" or "reasonableness" apply to the exercise of RFC's sole discretion, that issue is addressed in detail at *infra* § III(F)(1) of this Order.

[26] Alternatively, PRMI argues that because RFC's liabilities were released and extinguished in bankruptcy, this point is moot. (Def.'s Mem. at 27.) The Court addresses PRMI's arguments regarding the purported release and extinguishment of claims through RFC's bankruptcy *supra* at § III(D)(2).

Section A212 required originators to indemnify RFC from "all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses" including "any claim" against RFC based on or resulting from a "breach of any [R&W] or obligation made by []RFC in reliance upon any [R&W or] obligation" made by the originator. *Common SJ Order*, 332 F. Supp. 3d at 1159–60. The post-December 2005 version of Section A212 is substantially similar, but expressly adds the term "liabilities." *Id.* at 1158. Finally, Section A202(II)—which remained substantially the same in every version of the Guides—states that originators "recognize[d] that it [wa]s []RFC's intent to securitize some or all of the loans sold to []RFC" and that they agree to "indemnify and hold []RFC harmless from and against any loss, damage, . . . reasonable attorneys' fees, judgment, . . . or *liability incurred* by []RFC" as a result of any material misstatement or omission by an originator, or for any claim, demand, defense, or assertion against or involving RFC based on an originator's breach of R&Ws. *Id.* at 1161.

The Court held that the post-December 2005 language encompassed indemnity for both losses and liabilities because (1) the term "judgments" was used in addition to "losses," indicating coverage beyond losses alone; (2) the language expressly encompassed indemnity for "liabilities,"; and (3) the term "claim," under Minnesota law, encompassed both losses and liabilities. *Id.* at 1158–59. As to the pre-December 2005 version of Section A212—which lacked the express term "liabilities"—the Court held that it too encompassed both losses and liabilities because the section had always included indemnity for judgments (which encompassed liabilities), and distinguished between "losses" and "claims" (which

include liabilities). *Id.* at 1159–61.[27] Finally, the Court held that Section A202(II) provided an alternative basis for holding that ResCap could pursue both losses and liabilities because its plain language obligates originators to indemnify RFC for "*any . . . liability incurred by []RFC* as a result of any material misstatement in or omission from *any information* provided by [defendants] to []RFC." *Id.* at 1162.

PRMI also moves for summary judgment on this issue, but requests that the Court depart from its prior order and hold, as a matter of law, that the pre-December 2005 Client Guide and AlterNet Guide did not provide loan-level indemnification for "liabilities." (Def.'s Mem. at 27.) PRMI contends that the Court should have construed the pre-December 2005 version of Section A212 against the drafter (RFC) in accordance with a Minnesota Supreme Court case, *Staffing Specifix, Inc.*, 913 N.W.2d at 694, which states that even among parties of relatively equal sophistication and bargaining power, the doctrine of *contra proferentem* applies. (Def.'s Mem. at 28.) PRMI also argues that the term "claim" in the pre-December 2005 version of Section A212 does not authorize indemnity for liabilities because the term "claim" is just one possible occurrence that *may* cause losses, damages, or penalties, which, if caused, would then be subject to indemnification. (*Id.*) Similarly, PRMI cites *Ziino v. Baker*, 613 F.3d 1326, 1328–29 (11th Cir. 2010), in asserting that the Court erred in relying on the term "judgments" because while the Bankruptcy Court's order approving the Allowed Claims against RFC constitutes

---

[27] The Court also rejected defendants' assertion that because RFC drafted the contract, the Court was required to construe the pre-December 2005 version of Section A212 against RFC because the parties were sophisticated, experienced, and were both represented by counsel when negotiating the contract. *Common SJ Order*, 332 F. Supp. 3d at 1161.

a "final judgment," it is not a "money judgment" triggering indemnification obligations. (Def.'s Mem. at 29.)  PRMI also asserts that the addition of the term "liabilities" in 2005 is evidence that it was not contemplated by the Client Guide prior to that point, and that the term was added specifically to expand indemnity provisions in light of the Securities and Exchange Commission's promulgation of Regulation AB.  (*See* Def.'s Opp'n at 1–15.) Finally, PRMI asserts that the Court's alternative basis for its ruling, under Client Guide Section A202(II), was erroneous because that provision only covers claims based on misstatements or misrepresentations made about PRMI itself, not about any loans.  (Def.'s Mem. at 30.)

The Court grants ResCap's motion for summary judgment, denies PRMI's request for summary judgment, and holds, in accordance with its prior ruling, that both the pre- and post-December 2005 language of Section A212 (and, relevant here, the 1997 AlterNet Guide) require PRMI to indemnify ResCap for both liabilities and actual losses.  As an initial matter, the Court sees no reason—and PRMI offers none—to depart from its ruling with respect to the post-December 2005 language of Section A212.  Indeed, the post-December 2005 language expressly encompasses indemnification for "liabilities."  (*See* Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A212.)  Accordingly, ResCap is granted summary judgment as to the post-December 2005 language of Section A212 of the Client Guide, and PRMI's request on that point (to the extent it is inconsistent with such a holding) is denied.

Turning to the pre-December 2005 language in Section A212—which had remained essentially unchanged since RFC and PRMI's initial AlterNet Guide in 1997, (*see id.*, Ex.

35 (AlterNet Guide Excerpt re: Indemnity) § 274)—the Court finds PRMI's arguments about why it should depart from its prior ruling to be unpersuasive. First, regarding the canon of *contra proferentem*, the Court was aware of the Minnesota Supreme Court's decision in *Staffing Specifix* when it issued the *Common SJ Order*; indeed, the case is cited in the order itself. *See Common SJ Order*, 332 F. Supp. 3d at 1131 (citing *Staffing Specifix, Inc.*, 913 N.W.2d at 694). In *Staffing Specifix*, the Minnesota Supreme Court discussed the "canon of *contra proferentem*" and noted that "[i]n cases involving parties of relatively equal sophistication and bargaining power, we have always treated *contra proferentem* as a supporting—*not deciding*—rationale, even if we have not said explicitly that extrinsic evidence must be considered before ambiguous terms are construed against the drafter." 913 N.W.2d at 693 (emphasis added). The Court went on to say that it has "applied the rule of *contra proferentem* only *after* an attempt is made to determine the parties' intent behind an ambiguous term, using extrinsic evidence if available." *Id.* at 694. Accordingly, "[o]nly if a preponderance of the evidence *does not* prove the parties' intent should the jury construe ambiguous terms against the drafter." *Id.* (emphasis added). As such, while *Staffing Specifix* certainly stands for the proposition that *contra proferentem* <u>may</u> apply where the parties are relatively equal in terms of negotiating power—a proposition not inconsistent with this Court's *Common SJ Order*—the case does not stand for the proposition that contractual ambiguity and the absence of extrinsic evidence *requires* the canon to be wielded as a dispositive sword. Rather, the canon functions as a supporting basis for interpreting a contract in one way absent any indication to the contrary.

Yet, as the Court previously noted, there *are* indications to the contrary contained within the pre-December 2005 language. First, Section A212 has always included indemnity for "judgments," and while the Bankruptcy Court's approval of the Settlements between RFC and the Trusts and Monoline insurers may not have been an *executable money judgment* for the purposes of Federal Rule of Civil Procedure 69—which is the only relevant point of law established by PRMI's supporting caselaw, *Ziino*, 613 F.3d at 1328–29—that does not mean the judgment is not a liability. Indeed, allowed claims in a final bankruptcy judgment are "valid liabilities," *see In re Palisades at West Paces Imaging Center, LLC*, 501 B.R. 896, 906 (N.D. Ga. 2013), even though they are not automatically enforceable through a writ of execution pursuant to Fed. R. Civ. P. 69.

Second, PRMI's argument about the term "claim"—that it is a mere subset of losses—is a prior argument rejected by this Court in the *Common SJ Order* as inherently ungrammatical and leading to a harsh and absurd result. 332 F. Supp. 3d at 1160. To the contrary, the use of the terms "losses" and "claims" in the pre-December 2005 language suggest that the indemnity provisions encompass both actual losses and claims of loss. *Id.* As explained by the Court, these terms show that the parties intended that the indemnity provisions encompass liabilities in addition to actual losses. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019) ("Unlike contract rules that help interpret the meaning of a term, and thereby uncover the intent of the parties, *contra proferentem* is by definition triggered *only* after a court determines that it *cannot* discern the intent of the parties." (emphasis added)).

Third, PRMI's assertion that the term "liabilities" was added in 2005 because of the SEC's Regulation AB, and that prior to that point the language did not cover "liabilities," misses the mark. PRMI's own exhibit—a December 1, 2005 Bulletin provided by RFC to PRMI explaining changes being made to Section A212—shows *two* changes made to Section A212: (1) the addition of the term "liabilities,"; and (2) later on in the paragraph, the addition of indemnity for "any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the Client in information *required under Regulation AB or any successor regulation.*" (*See* Smallwood Decl., DX-39 (Dec. 1, 2005 RFC Bulletin re: Changes to Client Guide) at 4 (emphasis added).) The term "liabilities" is not connected to, or inherently intertwined with, the update later in the same paragraph that specifically references Regulation AB. PRMI's assertion that "liabilities" must necessarily have been added because of Regulation AB simply does not follow when the only other change to Section A212 *explicitly references Regulation AB and updates* the section to include indemnity for untrue statements, omissions, or false and misleading information provided to RFC in violation of Regulation AB. The Court is still persuaded, as it previously mentioned, that the addition of the term "liabilities" was mere clarification of—and not a substantive addition to—Section A212 of the Client Guide. *Common SJ Order*, 332 F. Supp. 3d at 1161.

Finally, assuming that *Staffing Specifix* requires the application of the canon of *contra proferentem* to the pre-December 2005 version of Section A212 because it is ambiguous, Section A202(II) provides an alternative basis for requiring PRMI to indemnify RFC's wrongdoing. Section A202(II) requires originators to indemnify RFC

for "any loss, damage . . . reasonable attorneys' fees, judgment . . . *or liability incurred*"

by RFC as a result of "*any* material misstatement in or omission from *any* information

provided by the [originator] to []RFC; or from any *claim, demand, defense or assertion*

against or involving []RFC based on or grounded upon" such misstatements, omissions, or

breaches by RFC made in reliance on the originator's misstatements or omissions.  (*See*

Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A202(JJ) (later renumbered to

A202(II) in late 2003).)  That language has been present in the AlterNet Guide and

succeeding Client Guides since 1997,  (*see* Nesser Decl., Ex. 3 (AlterNet Guide) § 251-

1(MM); *see also* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide

Provisions) § A202(II) (noting variation and origin of language in that provision)), and

accordingly serves as a valid alternative basis for holding PRMI to its indemnity

obligations.

And although PRMI argues that Section A202(II) only requires indemnification for

misrepresentations or omissions related to information about PRMI itself, (*see* Def.'s Mem.

at 30), that is merely an attempt to resuscitate an argument previously rejected by the Court

as being too narrow under the Client Guide's language.  *See Common SJ Order*, 332 F.

Supp. 3d at 1162 (rejecting narrow interpretation of § A202(II) in Client Guide because the

term "any" did not limit the potentially false information provided by defendants to

information about defendants themselves).  PRMI offers no reason for this Court to depart

from its prior holding.  Accordingly, Section A202(II) is an independent basis for ResCap

to seek indemnity for its liabilities and losses.  *Id.*

In summary, consistent with its prior order, the Court holds that ResCap is entitled to summary judgment on this issue and that under either Section A212 or Section A202(II) of the Client Guide (and any prior versions of those sections that apply) ResCap may recover for both its liabilities *and* its losses. PRMI's motion to the contrary is denied.

### c. Effect of RFC's Alleged Wrongdoing on Recovery

ResCap seeks summary judgment that any alleged wrongdoing by RFC does not bar recovery against PRMI. (Pl.'s Mem. at 5.) In support, ResCap cites to this Court's *Common SJ Order*, in which the Court held that Sections A202(II) and A212 "clearly and unequivocally express the parties' intent to transfer liability to [d]efendants for RFC's own acts of negligence." 332 F. Supp. 3d at 1134. The Court also held because there was no "threshold finding that RFC engaged in fraud or other misconduct with respect to the claims underlying the [bankruptcy] [s]ettlments, and the Client Guide expressly permit[s] RFC to seek indemnification for its own negligence" there was "no public policy violation in permitting [ResCap] [from] seek[ing] indemnification for [those] claims." *Id.* at 1137.[28]

PRMI moves for summary judgment on this issue, and requests that this Court depart from its prior ruling and hold that ResCap may not seek indemnity for settling unproven allegations that RFC engaged in negligence and fraud. (Def.'s Mem. at 22.) It argues that the Client Guide does not unequivocally authorize RFC to seek indemnity for negligence because, strictly construed, the Client Guide's provisions are not specific

---

[28] ResCap also cites to *First Mortgage* and *UAMC* in support. Those decisions reached the same conclusion on this issue. *See First Mortg.*, 2018 WL 6727065, at *13; *UAMC*, 2018 WL 4955237, at *8.

enough to encompass negligence. (*Id.* at 22–23.) Rather, PRMI contends that Sections A202(II) and A212, which require indemnification for any "breach of any representation, warranty or obligation," refer to "*breach of contract* by RFC[.]" (*Id.* at 23 (citations omitted) (emphasis in original).) With respect to fraud, PRMI asserts that the Court erred by failing to address, as a threshold question, whether the Client Guide even contemplated indemnity for fraud. (*Id.*)

PRMI also argues that the Court erred in holding that Minnesota's public policy against indemnity for fraud is inapplicable where a party settles prior to adjudication of liability. (*Id.* at 22–23.) It asserts that the Court's citation to *St. Paul Fire & Marine Ins. v. Perl*, 415 N.W.2d 663 (Minn. 1987) ("[T]here has never been a finding of illegal or even intentional misconduct . . . [so the public policy] issue need not be reached[.]") takes the case out of context, and argues that securities fraud cases instruct that allowing indemnity for settling fraud would be equivalent to treating a party as if it had been adjudicated as free of liability. (Def.'s Mem. at 26 (citation omitted).) Because ResCap has provided no evidence that it would *not* have been found liable for fraud, PRMI asserts, public policy bars ResCap from seeking indemnity from PRMI. (*Id.* at 26–27.)

ResCap responds by asserting that the *Common SJ Order* held that the indemnity provisions in the Client Guide need not specifically identify negligence or fraud to cover such claims. (Pl.'s Opp'n at 25.) Moreover, ResCap asserts that the Client Guide requires indemnity for fraudulent actions for the same reasons it requires indemnity for negligent actions; the language is broad enough to encompass it. (*Id.* at 18 n.13.) The fact that fraud claims require a showing of scienter does not remove them from the reach of the indemnity

provisions because Section A200 of the Client Guide requires the originator to expressly acknowledge their indemnity obligations regardless of RFC's knowledge of any breaches of the Guides' R&Ws. (*Id.* at 18–19, n.13.) Finally, ResCap contends that PRMI's reliance on federal securities cases is inapposite because they involve different federal public policy, and in any event, PRMI has no evidence that RFC engaged in any misconduct whatsoever. (Pl.'s Opp'n at 19–21.)

The Court declines to depart from its prior holding on this issue, and grants summary judgment to ResCap that its alleged wrongdoing—whether based on theories of negligence or fraud—does not bar it from seeking indemnity from PRMI. The Court's prior decision was based on the language of Section A202(II) and A212 of the Client Guide. *Common SJ Order*, 332 F. Supp. 3d at 1133. Section A202(II)—which has bound the parties since 1997, (*see* Pl.'s App'x (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A202(II))—states that PRMI agreed to indemnify RFC for "any claim, demand, defense or assertion against or involving []RFC based on or ground upon, or resulting from such misstatement or omission [by PRMI] or a breach of any representation, warrant or obligation *made by []RFC* in reliance [PRMI's] misstatement or omission." *Common SJ Order*, 332 F. Supp. 3d at 1133 (citation omitted) (emphasis in original). Similarly, Section A212—also present in some form since the beginning of the parties' business relationship, (*see* Pl.'s App'x (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A212))— required PRMI to indemnify RFC for "liabilities resulting from 'any breach of any representation, warranty or obligation *made by []RFC* in reliance upon any warranty, obligation or representation made by the [PRMI] contained in the Client Contract[.]' "

*Common SJ Order*, 332 F. Supp. 3d at 1133 (citation omitted).  These provisions "expressly apprised Defendants of their indemnification obligations for RFC's own negligent conduct."  *Id.* at 1133–34 (citation omitted).

The Court previously rejected several of the arguments raised here.  It rejected an assertion that the indemnification provisions in Sections A202(II) and A212 were limited to underlying claims of breach of contract, and not negligence.  *Id.* at 1134.  The language of the Client Guide, the Court noted, broadly encompassed *any* claim for *any* breach of *any* "representation, warranty *or obligation*" made by RFC (Section A212), as well as *any* claim against RFC based on or grounded upon, or resulting from, defendants' "misstatement or omission or a breach of any representation, warranty or *obligation* made by []RFC in reliance upon such misstatement or omission" (Section A202(II)), including negligence claims.  *Id.*  PRMI offers no meaningful reason to depart from the Court's prior holding.  Accordingly, the Court rejects that argument again here.

The Court also found that alleged fraud by RFC was indemnifiable, and that defendants' assertions that such a provision was void as to intentional misconduct were misplaced.  *Id.* at 1134–35.  Specifically, the Court noted in the absence of a judgment or finding of intentional conduct on the part of the indemnitee (i.e. RFC)—a finding indisputably absent here—mere claims of intentional misconduct, denials of motions to dismiss fraud claims, or acknowledgment by RFC of the potential risk of a fraud judgment were insufficient to create a threshold finding that RFC engaged in fraud or other intentional misconduct for indemnification purposes.  *Id.* at 1135–37.  PRMI's assertion that the Court improperly construed the Minnesota Supreme Court's decision in *St. Paul*

*Fire & Marine Insurance Company* is meritless; indeed, that case clearly holds that where there "has never been a finding of illegal or even intentional misconduct" by the party seeking indemnity, the question of whether attempted indemnification for intentional misconduct violates public policy "need not be reached" at all. 415 N.W.2d at 667. The Court will not rewrite Minnesota law regarding the applicability of its public policy exceptions.

PRMI's citations to federal securities cases rely on different public policy considerations—unique to the federal system—and therefore do not override unequivocal Minnesota law. For example, PRMI's citation to *Perry v. Duoyuan Printing, Inc.*, 232 F. Supp. 3d 589 (S.D.N.Y. 2017), *vacated in aid of settlement*, 2018 WL 6803721 (S.D.N.Y. Sept. 25, 2018)—in which the court held that settlement of fraud or intentional misconduct claims did not bar the court from voiding an indemnity provision—is inapt because the underlying policy considerations were uniquely federal: "[I]n the *unique context of federal securities law*, underwriters [the party seeking indemnification] are part of an important regulatory mechanism not to be undermined . . . [such that] 'the policy of encouraging the settlement of litigation . . . must bow to the *aforesaid federal securities law principles*.' " *Id.* at 594–95 (citations omitted) (emphasis added). Similarly, PRMI's reference to *Donaldson Lufkin & Jenrette Securities Corp. v. Star Technologies, Inc.*, 561 N.Y.S.2d 371, 374 (N.Y. Sup. Ct. 1990) is inapplicable because the holding by the court there was also based on "federal [securities] policy"; indeed, the court noted that "[a]lthough the law favors resolution of disputes, allowing a wrongdoer to obtain indemnity because he pays

before a jury verdict rather than afterward would not encourage the reasonable care required of underwriters *under federal law*." *Id.* at 373–74 (emphasis added).

In sum, the Court affirms its prior rulings on this issue. Accordingly, ResCap's motion for summary judgment that it may seek indemnity regardless of any alleged wrongdoing on its part is granted, and PRMI's motion to the contrary is denied.

### d. Expired Loans

Another common basis on which the parties move for relief is whether Plaintiff may recover for certain foreclosed upon and liquidated loans, an issue previously decided by this Court in Wave One. (Def.'s Mem. at 30–31; Pl.'s Mem. at 5); *Common SJ Order*, 332 F. Supp. at 1137–1141. PRMI seeks partial summary judgment—grounded on the same construction of the same contractual provision raised by First-Wave defendants—as to Plaintiff's claims for PRMI loans sold to RFC that were foreclosed upon, or as PRMI calls them, "expired" loans. (Def.'s Mem. at 30–31.) PRMI points to Section A209(C) of the Client Guide, which states:

> [ ]RFC's remedies for breach of the [R&Ws] and covenants shall survive the sale and delivery of the Loan to [ ]RFC and funding of the related purchase price by [ ]RFC, and will continue in full force and effect *for the remaining life of the Loans*, notwithstanding any termination of this Client Guide and the related Funding Documents, or any restrictive or qualified endorsement on any mortgage Note or assignment of mortgage or Loan approval or other examination of or failure to examine any related mortgage Loan file by [ ]RFC.

(Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04) § A209(C) (emphasis added).

PRMI appears to assert that this provision controls the time period, subject to any tolling agreements, in which RFC could file lawsuits arising from a breach of the R&Ws. (Def.'s Mem. at 30.) PRMI argues, as defendants contended in the First-Wave actions, that this provision provides a discrete survival period for RFC to assert a remedy beyond the date of sale, at which point, RFC's right to seek recovery would have allegedly expired as a matter of law. (*Id.* (incorporating prior briefing from Wave One).) PRMI asserts that once the "life of the Loans" ceases to exist, which appears to be upon foreclosure, Plaintiff's right to assert a claim related to the loans also allegedly ceased to exist. (*Id.*)

This Court held, however, as a matter of law, that Plaintiff's remedies extend to foreclosed and liquidated loans. *Common SJ Order,* 332 F. Supp. at 1137–41 ("[T]he plain language of Section A209(C) does not implicate the time in which RFC must file a claim for relief, nor does it eliminate, wholesale, RFC's right to make a claim related to foreclosed or liquidated loans.") PRMI does not point to any new authority or findings that would necessitate this Court to reconsider its prior ruling.

PRMI in fact overlooks other Client Guide provisions that reinforce the conclusion that Section A209(C) does not impose a time limitation different from the six-year statutory period. Although a loan's existence, under Minnesota law, typically ends upon foreclosure (although not always), *Common SJ Order*, 332 F. Supp. at 1140, the Client Guide did not so strictly limit RFC's remedies. For example, with respect to the right to repurchase, Section A210(B) states, "[ ]RFC may demand that a Client repurchase, and Client must repurchase, a Loan *after foreclosure. . .*" *Id.* And, language in Section 205(C) of the Client

Guide, extending RFC's remedies to the "latest of" several events, contemplates losses related to foreclosure because these loans have not yet been "paid in full":

> Client's representations, warranties and covenants with respect to each Loan, and [ ]RFC's remedies for Client's breach of such representations, warranties and covenants with respect to each Loan will continue in full force and effect until the latest of: (i) the date such Loan **has been irrevocably paid in full**, (ii) the date the last limitations period for bringing claims against [ ]RFC or its successors or assigns concerning the subject matter of Client's representations and warranties with respect to such Loan expire under all applicable law, and (iii) the date any claim, suit or other proceeding against [ ]RFC or its successors or assigns concerning the subject matter of Client's representations, warranties and covenants with respect to such Loan have been conclusively determined or settled and all applicable appeals have been exhausted.

*Id.* Additionally, PRMI appears to ignore that RFC's repurchase formula factored in the calculation of liquidation proceeds, which is equal to the sum of: (1) the actual principal balance of the loan at the time of repurchase; (2) all interest and fees incurred in recovering on the loan; (3) a buy-out fee; (4) RFC's potential additional purchase amounts; (5) minus the amount of *any proceeds realized* by the owner of the loan *upon the final liquidation* of the loan. *Id.* Because PRMI's interpretation is inconsistent with other provisions of the Client Guide, it conflicts with the principle that contracts are to be construed as a whole, and with harmonization of all provisions. *Id.* (citing *Chergosky*, 463 N.W.2d at 525–26).

And, as further elaborated by this Court, several Client Guide provisions would be nullified under PRMI's reading of Section A209(C). *Id.* at 1141; (*see also* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) §§ 113(A) & (B) (providing that RFC had "sole" discretion to determine Events of Default) A200 (providing that RFC's R&Ws were not affected by any investigation or review made by RFC unless expressly

waived in writing); A210 (disclosing no requirement that RFC anticipate breaches or demand repurchase of the loans within any particular time).)[29] For instance, if RFC's clock to bring a suit ended after foreclosure when a loan was defective enough to require PRMI to repay losses RFC incurred, this time limitation could invade RFC's "sole and exclusive discretion" to make the call itself. And if delaying after discovering a defect would risk waiving RFC's right to demand repayment for foreclosed loans, this limitation would prejudice RFC's right not to investigate any loan documentation. *Common SJ Order*, 332 F. Supp. at 1141. Imposing a time limitation would, in effect, render these other bargained-for terms meaningless. *Id.* ("The Client Guide does not require RFC to anticipate breaches or, demand repurchase within any particular time period, if at all. Again, courts are to avoid any contract interpretation that would render a provision meaningless.") (internal citation and quotation marks omitted)).

Finally, PRMI appears to single out one statement from this Court's Order to suggest that this Court limited the scope of Plaintiff's available remedies under Section A209(C) to liabilities and losses incurred during the life of a loan. (Def.'s Mem. at 30, n. 8.) This Court, however, made clear that Section A209(C) "does not [] preclude recovery

---

[29]     Because PRMI relies on the Client Guide, Version 1-05-G04, effective November 21, 2005, as its basis to seek partial summary judgment on ResCap's claim for "expired" loans, (*see* Def.'s Mem. at 30–31; *see also* Smallwood Decl., Ex. 34 (Client Guide, Version 1-05-G04)), the Court compares Section 209(C) of the Client Guide with other provisions from this version of the Client Guide. PRMI has cited no specific provisions in earlier versions of the Client Guide that would necessitate the Court to alter its prior holding on this issue in Wave One. Thus, slight differences in language between the provisions cited above and earlier versions of the Client Guide, (*see* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions)), do not impact the Court's holding. *Common SJ Order*, 332 F. Supp. at 1137–1141.

for RFC's losses and liability on foreclosed or liquidated loans." *Common SJ Order*, 332 F. Supp. at 1141. And, as PRMI concedes, this Court further clarified that Section A209(C) "does not vitiate RFC's right to seek relief simply because a loan ended in foreclosure prior to the Settlements." *Id*. at 1138; (Def.'s Mem. at 30 n.8.) This interpretation of Section A209(C), as discussed above, is consistent with other provisions of the Client Guide that expressly preserve RFC's remedies for foreclosed and liquidated loans.

The Court therefore finds no basis to alter its prior ruling on this issue. *Common SJ Order*, 332 F. Supp. at 1137–41. Section A209(C) of the Client Guide does not limit the scope of remedies for foreclosed or liquidated loans. The Court denies PRMI's motion for summary judgment on this issue and grants summary judgment to ResCap that its remedies extend to foreclosed and liquidated loans.

## E. Causation

The parties raise several arguments related to the proof of causation in this case, including the appropriate causation standard to be applied to ResCap's claims, ResCap's reliance on proxy MLS data provided by its expert, Mr. Dudney, and the effect of certain representations that RFC made to the Trusts, i.e., "trust reps," on its risk of loss and liability. Each is discussed in turn.

### 1. Appropriate Causation Standard

ResCap seeks summary judgment that the appropriate causation standard applicable to its indemnity claims against PRMI is "contributing cause" causation, and not a "proximate cause" standard. (Pl.'s Mem. at 5.) In support of its request, ResCap points to the *Common SJ Order*, in which the Court held that the contract terms of the Client Guide

77

required ResCap to "show that the losses and liabilities for which [it] seek[s] indemnity have a 'cause and result relationship' with, or a 'causal connection' to, Defendants' breaches of R & Ws or Events of Default." 332 F. Supp. 3d at 1164 (citations omitted). The Client Guide's relevant sections—A212 and A202(II)—regarding indemnity use the phrases "resulting from," "arising from," and "incurred . . . as a result of," which under Minnesota law are synonymous as meaning "causally connected with, not proximately caused by." *Id.* (citation omitted) (internal quotation marks omitted); (Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) §§ A202(JJ) (later renumbered to A202(II) in late 2003), 274 (later renumbered to A212 in late 2003); Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) §§ A202(II), A212.) Accordingly, the Court held that the Client Guide's language "does not require that [ResCap] show that any individual Defendant's breaches were the *sole* cause of [ResCap]'s liabilities and losses—it merely requires that [ResCap] show that an individual Defendant's breaches were a *contributing* cause of those liabilities and losses." *Common SJ Order*, 332 F. Supp. 3d at 1164 (citation omitted) (emphasis in original). This decision was affirmed by the Court in another order involving a different defendant. *See First Mortg.*, 2018 WL 6727065, at *10 (noting the Court finds "no basis to depart" from the prior determination and holding that "contributory cause is the applicable causation standard" under the Client Guide).

PRMI's response recycles prior arguments already rejected by the Court. It asserts that ResCap is required to show "but-for" causation, namely that PRMI's alleged breaches were a "but for" cause of the claims RFC settled in bankruptcy. (Def.'s Opp'n at 12.) Further, PRMI contends that to the extent ResCap cites to *First Mortgage* for the

proposition that the applicable causation standard is merely whether PRMI increased the risk of loss, PRMI asserts that ResCap is misrepresenting *First Mortgage* by conflating a dispute over "materiality" of breaches with "causation" between breaches and damages. (*Id.* at 12–13.)

The Court sees no basis to depart from its prior orders on this issue. The same language regarding the causation standard for indemnity—which the Court previously ruled establishes "contributing cause" causation—has been present between Plaintiff and PRMI since their first contract back in 1997. (*See* Nesser Decl., Ex. 3 (AlterNet Guide) § 251-1 (MM) (using "incurred . . . as a result of" and "resulting from" language).) That language has remained consistent since 1997 and has only been expanded upon through the later-applicable Client Guide. (*See* Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) §§ A202(JJ), 274; Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A202(II), A212.) As the Court noted in its *Common SJ Order*, parties to a contract may contract to create "duties that differ or extend beyond those established by general principles of law" and the "[t]erms of those contract provisions must be given their ordinary meaning, as well as the interpretations adopted in prior cases." *Common SJ Order*, 332 F. Supp. 3d at 1163 (citations omitted) (internal quotation marks omitted). ResCap and PRMI have, through the applicable Guides, contracted for a "contributing cause" standard of causation and the Court is bound to enforce the contract's plain language. *Id.* at 1165.

With respect to PRMI's argument about *First Mortgage*, and its "increased risk of loss" language, the Court clarifies the context in which that language is used. PRMI is

correct in that the language appears in the section of the *First Mortgage* order discussing defendants' assertion that a disputed fact issue exists over whether its breaches of its R&Ws were "material" to RFC's losses and liabilities, *see First Mortg.*, 2018 WL 6727065, at *14, but incorrect in its contention that consideration of "increased risk of loss" is not relevant to causation. Indeed, the "materiality" section containing the language at issue deals with whether breaches are *material*, and therefore, capable of having contributed to RFC's exposure to the Trust and Monoline Insurers. *Id.* ResCap was *always* required to show that PRMI's breaches "increased RFC's risk of loss to the RMBS Trusts and Monolines" because otherwise PRMI's breaches would not be material to the issues in this litigation, and could not meet even a "contributing cause" standard. *Id.* Put simply, the language at issue neither expanded nor narrowed the "contributing cause" standard set forth by this Court in its *Common SJ Order*, 332 F. Supp. 3d at 1165.

Accordingly, ResCap's request for summary judgment as to "contributing cause" causation is, to the extent noted above, granted. Pursuant to the applicable Guide's provisions and consistent with the Court's prior orders on this subject, ResCap need only show that PRMI's breaches of any R&Ws were a contributing cause of the liabilities and losses settled in the Bankruptcy Settlements. *See Common SJ Order*, 332 F. Supp. 3d. at 1165; *First Mortg.*, 2018 WL 6727065, at *10.

## 2. ResCap's Reliance on Proxy MLS Provided by Mr. Dudney

ResCap moves for summary judgment that the methods its expert, Mr. Dudney, used to obtain missing MLS information were reliable, and that basing a determination of a R&W breach on such "proxy data" from a third-party source is permissible. (Pl.'s Mem.

at 8.)  In support, ResCap cites two prior decisions by this Court.  First, it points to this Court's *Common Daubert Order*, in which the Court held that Mr. Dudney's use of third-party sources—namely, the SEC EDGAR database, and two different private companies that held information related to RMBS securities—to obtain information that went missing from the original mortgage loan schedules in some of the At-Issue loans was reliable because the sources were reliable, contained the exact same data as the original MLSs, and Mr. Dudney tested and compared overlapping data to ensure he corroborated his research. *In re RFC & ResCap Liquidating Tr. Litig.* ("*Common Daubert Order*"), Nos. 13-cv-3451 (SRN/HB, 14-cv-1716 (SRN/HB), 2018 WL 4489685, at *18 (D. Minn. Sept. 19, 2018). Second, ResCap points to this Court's *HLC JMOL Order*, 399 F. Supp. 3d at 822, in which this Court held that "basing an R&W breach on 'proxy data' from a third-party source was entirely permissible because it supplied *the exact same data that was included in the original* [MLSs]."

PRMI responds that the issue is *not* whether Mr. Dudney's schedules are reliable proxies for MLSs that existed at the time of securitization; rather, PRMI asserts that the issue is whether, at the time of the May 2013 Bankruptcy Settlements, the bankruptcy parties possessed the missing MLSs.  (Def.'s Opp'n at 32.)  Because ResCap has not provided any evidence that the bankruptcy parties had that information, PRMI argues, Mr. Dudney's analysis does not provide a valid basis for asserting breach claims under *UnitedHealth*.  (*Id.*)  Further, PRMI argues that ResCap cannot establish causation for claims based on proxy MLSs because there is "no evidence that [the Trust and Monolines asserted breach claims] based on 'proxies' for missing MLSs."  (*Id.*)  Accordingly, PRMI

asserts that there is no connection between ResCap's proxy MLS claims and the claims actually asserted in the bankruptcy. (*Id.*)

The Court grants ResCap summary judgment on this issue. First, as ResCap notes, it does not appear that PRMI opposes summary judgment that Mr. Dudney used reliable sources to obtain missing MLS information and data; it offers no evidence or argument to the contrary and, as noted above, the Court's prior orders have adequately summarized the reliable nature of Mr. Dudney's data collection methods. *See Common Daubert Order*, 2018 WL 4489685, at \*18; *HLC JMOL Order*, 399 F. Supp. 3d at 822; (Def.'s Opp'n at 31–32.)

Second, PRMI's argument that the bankruptcy parties did not have the proxy MLS documents at the time of the 2013 Bankruptcy Settlement ignores the whole reason Mr. Dudney provided the proxy data in the first place. It was an identical substitute for information that was *originally* in the MLSs but had *subsequently* gone missing. Indeed, the Court noted that Mr. Dudney's proxy data "supplied the exact same data that was included in the original MLS schedules for the RFC securitizations," and that his proxy MLS data was extremely accurate. *See Common* Daubert *Order*, 2018 WL 4489685, at \*18. Mr. Dudney's cross-reference of the proxy data between three third-party sources yielded only *one* mismatch in data *out of 68,121 unique data points*. *Id.* PRMI's argument that the absence of proxy data at the time of settlement somehow implicates ResCap's attempt to recover for breaches now simply ignores the fact that the proxy data's only purpose was to recover data that *existed* at the time of the settlement, but was subsequently lost. It is not the case—as this Court's prior orders have established—that the data never

existed at all, or somehow did not form a basis for the claims asserted against RFC in its bankruptcy proceeding.

Third and finally, PRMI's causation argument—that there is no evidence that the Trusts and Monoline Insurers asserted breach claims against RFC in bankruptcy *based on proxy MLSs*, and therefore no connection exists between ResCap's proxy MLS claims and the claims asserted in the bankruptcy—merely takes too literal of an approach as to the nature of proxy MLS data. As ResCap notes, the relevant inquiry is not whether Mr. Dudney's actual proxy *documents* were used to assert claims against RFC in bankruptcy; it is whether the proxy *data* (i.e., the actual information obtained by Mr. Dudney as a substitute for information that had gone missing) increased RFC's exposure in bankruptcy. (Pl.'s Reply [Doc. No. 5337] at 7.) Because the proxy MLS data was identical to the original MLSs, *see Common Daubert Order*, 2018 WL 4489685, at *18, and the claims brought against RFC were based on the original MLSs, *id.*, PRMI's claim has no merit.

In summary, ResCap motion for summary judgment that Mr. Dudney used reliable methods to obtain missing MLS information, and that basing an R&W breach on such "proxy data" from a third-party source is permissible, is granted.

### 3. Trust Representations

ResCap seeks summary judgment on two categories of breaches that it asserts were or could be considered breaches of trust representations, which it argues, increased its risk of loss and contributed to its liability: (1) RFC's "MLS Rep" to Trusts; and (2) RFC's "Default Rep" to Trusts. (Pl.'s Mem. at 12–16.)

### a.  MLS Representation to Trusts

RFC asserts that when it issued RMBS to the Trusts, it provided detailed loan-by-loan information in the MLSs.  (*Id.* at 13.)  Among other things, RFC represented to the Trusts that the information in the MLSs were "true and correct in all material respects." (Nesser Decl., Ex. 14 (MLS Rpt.) § 4(xiv).)  Plaintiff notes that other courts have construed the plain language of this type of representation, or "MLS Rep," to guarantee the accuracy of the MLSs' loan-level information.  (Pl.'s Mem. at 13 (citing *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr.  I 2007-1 v. Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 509–10 (S.D.N.Y. 2018) ("Like the majority of courts to have considered this exact issue, this Court agrees with [plaintiff's] interpretation."); *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 429 (S.D.N.Y. 2016) ("MLS Warranty imposes a form of strict or absolute liability for a materially untrue or incorrect statement on the MLS."); *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 654464/2012, 2013 WL 6153207, at *3 (N.Y. Sup. Ct. Nov. 21, 2013) (MLS Rep "is effectively warranting the truth of the specific facts behind the loan"), *aff'd*, 136 A.D.3d 1, 8 (N.Y. App. Div. 2015) (MLS Rep guaranteed the "veracity of information"), *aff'd*, 65 N.E.3d 1275 (N.Y. 2016); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2013 WL 1845588, at *27–29 (N.Y. Sup. Ct. Apr. 29, 2013) (granting summary judgment to plaintiff that loan-level inaccuracies on 1,414 loans violated MLS Rep breaches, but finding issue of fact remained in dispute as to whether the inaccuracies were material)).)

ResCap thus requests that the Court hold as a matter of law "that because RFC's MLS Reps could be construed as guaranteeing the accuracy of information in the MLS, inaccurate MLS information attributable to PRMI increased RFC's risk of loss and thereby contributed to RFC's indemnifiable liability." (*Id*. at 13–14.) It contends that the Court need not determine that the MLS Rep *unambiguously* guaranteed loan-level accuracy. (*Id.* at 14.) Rather, ResCap argues that "it is sufficient for a party in RFC's position during the Settlement period to have reasonably perceived an increased risk of liability on such a theory." (*Id.*) It argues that the Court need not go beyond the plain language of the MLS Rep, supported by the case law noted above, in finding that the language of the MLS Rep created risk to RFC.

In response, PRMI contends that ResCap conflates materiality and causation, and wrongly argues that it need only show that an MLS Rep could be construed in a particular manner "by some unidentified person" in order to show that it increased RFC's risk of loss. (Def.'s Opp'n at 27.) It argues that instead, under *UnitedHealth*, ResCap must prove how a "reasonable party" in RFC's position would have interpreted the representations at the time of the Settlements in May 2013. (*Id.* (citing 870 F.3d at 863).) To that end, it notes that some of Plaintiff's legal authority interpreting the MLS Rep post-dates the Settlements. (*Id.* at 29.) PRMI also contends that there is a genuine dispute of material fact as to how a reasonable party in RFC's position in May 2013 would have interpreted the representation. (*Id.* at 28.) It asserts that its experts understood the MLS Rep to simply warrant that the MLS accurately reflected information set forth in the underlying files, as opposed to whether the loan files themselves were objectively free of fraud or misrepresentation. (*Id.*

(citing Smallwood Decl., Exs. DX-44 (Burnaman Rpt.) ¶¶ 83–88; DX-45 (Schwarcz Rpt.) ¶¶ 97–100); DX-42 (Keith Rpt.) ¶¶ 85, 99).)

Moreover, PRMI points to "no fraud or misrepresentation" representations and disclaimers present in a certain loans' origination.  (*Id.*)  It asserts that for Plaintiff to construe an MLS Rep as the equivalent of a "no fraud" representation "would be contrary to the 'purpose and industry understanding' of the MLS representation, as well as 'basic principles of commercial drafting.' "  (*Id.* (citing Smallwood Decl., DX-45 (Schwarcz Rpt.) ¶¶ 85, 98–99).)  And as to 324 trusts to which RFC affirmatively disclaimed fraud, PRMI contends that even if borrower fraud triggered a breach of the MLS representation, "a reasonable party in RFC's position would have understood the disclaimers to negate any liability."  (*Id.* at 28–29; *see also* Smallwood Decl., DX-44 (Burnaman Rpt.) ¶ 86.)

ResCap counters that resort to extrinsic evidence is unnecessary, and that *UnitedHealth*, which concerns allocation, not causation, is inapplicable in this context. (Pl.'s Reply at 14–15.)  As to causation, it argues that because the Global Settlement settled RFC's risk, ResCap need only show that RFC believed it faced a viable claim—not that the claim would have actually succeeded if it were tried.  (Dec. 2, 2019 Hr'g Tr. [Doc. No. 5352] at 138–39.)

Even applying PRMI's standard of how a reasonable party in RFC's position at the time would have interpreted the representations, ResCap points to testimony and documents showing that investors had asserted this theory and RFC believed it was liable. (Nesser Decl., Ex. 17 (*HLC* Trial Tr.) at 1089–90 (Lundsten testifying that inaccurate loan-level information would be a breach of the MLS Rep); *id.*, Ex. 7 (Butler Suppl. Rpt.) at 4

("RFC was subject to investor repurchase demands alleging that objectively inaccurate information on the [MLS] breached the MLS R&W, even in the absence of a No Fraud R&W. This demonstrates that industry participants understood that objectively inaccurate information, even if the result of a misrepresentation, breached, or could be construed to breach, the MLS R&W."); *id.*, Exs. 21, 23 (repurchase evidence referenced in Butler Suppl. Rpt. at 4 n. 17).)

Further, ResCap asserts that PRMI's experts have failed to rebut the opinion of Plaintiff's reunderwriting expert, Dr. Butler, that certain "underwriting defects . . . could be construed to constitute" MLS Rep breaches. (*Id.*, Ex. 22 (Butler Rpt.) at 114–17.) Rather, PRMI's experts have testified that they did not consider "whether a reasonable person could construe the MLS [Rep] as being breached by borrower misrepresentations," (Alden Decl., Ex. C (Burnaman Dep.) at 37), were not offering an opinion as to RFC's potential legal liability at the time of the settlements for breaches of various Trust Reps, (*id.*, Ex. N (Keith Dep. [Rough Tr.]) at 293–94), and conceded that they did not consider whether there was a risk of liability to RFC based on "plaintiff's expert's interpretation of th [Trust Reps]." (*Id.*, Exs. H (Schwarcz Dec. 2017 Dep.) at 109–10; I (Schwarcz Oct. 2019 Dep.) at 110–12.)

As to the impact of a fraud disclaimer or no-fraud representation on RFC's risk, ResCap asserts that no evidence supports PRMI's position. (Pl.'s Reply at 16 n.8 (citing Alden Decl., Ex. E (Farley Dep.) at 52–53; 61–63; 90–91 (stating that fraud disclaimer was not a "silver bullet" and did not supersede Trust Reps); Nesser Decl., Ex. 18 (Lundsten Dep.) at 95–96; Alden Decl., Ex. NN (Steinhagen Dep.) at 116 (repurchase could be

required if there was a misrepresentation, despite fraud disclaimer); Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 284 n.345 (fraud disclaimer "would have been a risky and unattractive" defense strategy); Nesser Decl., Ex. 7 (Butler Suppl. Rpt.) at 7–8 (fraud disclaimer would not have eliminated risk); Alden Decl., Ex. O (Woll Rpt.) ¶ 10 (opining only that a party in RFC's position "would have ascribed a lower settlement value" to deals with fraud disclaimers); Alden Decl., Ex. I (Schwarcz Dep.) at 55–57; 61 (offering no opinion on whether a fraud disclaimer would eliminate risk).)

The Court finds that PRMI's reliance on *UnitedHealth* is misplaced. *UnitedHealth* concerned the allocation of damages as between indemnifiable claims and non-indemnifiable claims. 870 F. 3d at 863 ("The *allocation inquiry* examines how a reasonable party in [the plaintiff's] position would have valued the covered and non-covered claims." (emphasis added)). The ruling that ResCap seeks concerns causation, not allocation.

PRMI further argues that the legal authority on which Plaintiff relies, in which courts interpreted the MLS Rep to clearly vouch for the accuracy of the information within the MLS, is not probative of what the parties understood at the time of the settlement because some of these cases post-date the Settlement period. (Def.'s Opp'n at 29.) While the Court declines to find the language of the MLS Rep determinative as a matter of law, it nevertheless finds that these opinions provide useful guidance concerning RFC's potential liability, as they involve the same contractual language.[30]

---

[30] In *UnitedHealth*, the Eighth Circuit acknowledged that post-settlement events provide some relevant information, stating, "Events and circumstances happening after

The parties' experts, however, clearly dispute the import of the MLS Reps, including whether they were understood to vouch for the accuracy of the loan files themselves or whether they merely guaranteed accurately transcribed information in the loan files, or whether they were understood as such by *RFC*, or industry participants generally. Given the experts' diverging opinions on this subject, the Court finds that a genuine issue of material fact is in dispute and therefore precludes summary judgment on this issue. As such, Plaintiff's motion for partial summary judgment on this basis is denied.

### b. Default Representations to the Trusts

Among the R&Ws that RFC made to the Trusts was a "Default Rep," stating that "there is no material default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage." (*See*, *e.g.*, Nesser Decl., Ex. 15 (Assignment & Assumption Agmt. for RFMSII 2007-HSA2 Tr.) § 4(s).) Plaintiff asserts that, in other cases, courts have found that Default Reps warranted against borrower fraud or misrepresentation, which are defined as events of default in underlying mortgage documents. (Pl.'s Mem. at 15 (citing *Countrywide Home Loans, Inc.*, 2013 WL 1845588, at \*23–26 (granting summary judgment regarding the existence of Default Rep breaches based on borrower misrepresentations in 610 loans); *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at \*6 (S.D.N.Y. Oct. 11, 2005) (finding defendant strictly liable under Default Rep due to borrower fraud); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 165

___

settlement are relevant only insofar as they inform how a reasonable party would have valued and allocated the claims at the time of settlement." 870 F.3d at 864.

A.D. 3d 108, 115 (N.Y. App. Div. 2018) (rejecting argument that Default Rep relates only to payment defaults, and finding it a question for the jury to decide)).)

ResCap seeks a ruling on summary judgment that, as a matter of law, because the Default Reps could be construed as warranting against defaults caused by borrower fraud or misrepresentation, PRMI's R&W breaches based on such fraud or misrepresentations increased RFC's risk of loss and thus were a contributing cause of RFC's indemnifiable liability. (*Id.* at 15.) In addition to the legal authority noted above, Plaintiff argues that uncontradicted evidence shows that investors had asserted this theory, and RFC believed it was liable under it. (Nesser Decl., Ex. 17 (*HLC* Trial Tr.) at 1090–92 (witness Lundsten stating that Default Rep meant "that under the terms of the Note or the Mortgage, none of the events that would result in a default or a breach or a violation . . . occurred . . . [F]or example, fraud or misrepresentation . . . would make this rep untrue); *id.*, Ex. 7 (Butler Suppl. Rpt.) at 6) (stating that "RFC was subject to investor repurchase demands alleging that loans with misrepresentations breached the No Default R&W, even in the absence of a No Fraud R&W *and the presence of a "fraud disclaimer.*" This demonstrates that industry participants understood that misrepresentation defects breached, or could be construed to breach, the No Default R&W." (emphasis in original)).

Also, ResCap argues that while its expert opines that certain "underwriting defects . . . could be construed to constitute" Default Rep breaches, (*id.*, Nesser Decl., Ex. 22 (Butler Rpt.) at 111–12), Defendant's experts fail to rebut that opinion. (Pl.'s Mem. at 16 (citing Alden Decl., Ex. C (Burnaman Dep.) at 33 (stating that he did not consider whether a reasonable person would construe the Default Rep as being breached by

borrower misrepresentations); *id.*, Ex. N (Keith Dep.) at 87 (agreeing that she was not offering an opinion on whether a reasonable person could construe the Default Reps as being breached by borrower misrepresentations).)

In response, PRMI argues that a genuine dispute of fact exists as to whether a reasonable party in RFC's position would have interpreted the Default Rep to warrant against borrower fraud or misrepresentation if the underlying mortgage documents defined such misconduct as a default. (Def.'s Opp'n at 35.)  It points to the opinions of its experts that reasonable industry participants did not understand the Default Rep to be a general warranty against borrower fraud or misrepresentation.  (*Id.* (citing Smallwood Decl., Exs. DX-44 (Burnaman Rpt.) ¶¶ 88–92; DX-45 (Schwarcz Rpt.) ¶¶ 92–96; DX-42 (Keith Rpt.) ¶¶ 123–27).)  And, as with its arguments concerning MLS Reps, it argues that the subjective opinions of RFC or its investors are not relevant to the analysis.  (*Id.* at 31.)  In addition, it argues that one of the cases on which Plaintiff relies postdates the May 2013 settlement, *see MBIA Ins. Corp.*, 165 A.D.3d at 108, and in another, the defendant did not raise whether borrower fraud constituted a default, *Trust for Certificate Holders of Merrill Lynch*, 2005 WL 2582117, at *5.  Moreover, PRMI argues that this case, unlike those on which ResCap relies, involved express fraud disclaimers.  (Def.'s Opp'n at 31 (citing Smallwood Decl., DX-45 (Schwarcz Rpt.) n.90).)

The Court finds that genuine issues of material fact are in dispute, precluding summary judgment here.  The parties' experts disagree about the import of the Default Rep, as well as the impact of the fraud disclaimer, which appeared in certain deals.  (*See*

Pl.'s Reply at 16 n.8.)  Accordingly, Plaintiff's motion for partial summary judgment on this basis is denied.

## F. PRMI's Defenses

PRMI asserts several defenses in response to ResCap's claims, many of which are the subject of various motions for summary judgment.  These defenses include bad faith, "sole cause," knowledge and reliance, statute of limitations, estoppel and waiver for Assetwise- and Countrywide-based loans, and mitigation.  Each is discussed below.

### 1. PRMI's "Bad Faith" Defense

ResCap moves for summary judgment that PRMI's twentieth affirmative defense, which asserts that ResCap's Complaint is barred in whole or in part by RFC's breach of the covenant of good faith and fair dealing, should be dismissed as a matter of law because there is no evidence of subjective bad faith on RFC's part.  (Pl.'s Mem. at 18–19.)  That defense, as set forth in PRMI's Answer, states:

<u>**Twentieth Defense**</u>

The Complaint is barred, in whole or in part, by Plaintiff's breach of the covenant of good faith and fair dealing in that Plaintiff, among other things, (i) failed to timely notify Defendant of any defaults or defects and/or because Plaintiff chose to pay entities seeking recovery on Defendant's loans more than Plaintiff was obligated to pay; (ii) did not declare Events of Default in good faith; (iii) declared events of default and took other actions concerning the loans in a manner inconsistent with the parties' prior course of dealing; (iv) demanded repurchase loans without a legitimate basis; and (v) demanded repurchase of loans that were paid in full.

(PRMI Answer [Doc. No. 2156] at 25.)

ResCap argues that this "grab bag of assertions"—purportedly supported by the expert testimony of Ms. Kori Keith and her allegations that some of Mr. Butler's breach

allegations are made in bad faith (*see* Pl.'s Mem. at 19–20)—should be dismissed as inconsistent with Minnesota law pertaining to the implied covenant of good faith and fair dealing, as well as this Court's prior orders. (*Id.*) More specifically, ResCap argues that in order to show a breach of the implied covenant of good faith and fair dealing under Minnesota law, as reflected in this Court's prior orders, PRMI must have evidence that RFC acted dishonestly, maliciously, or in *subjective* bad faith in exercising its discretion to declare breaches of the Client Guide. (*Id.* at 20.) Because no such evidence exists, ResCap argues, PRMI's twentieth affirmative defense should be dismissed. (*Id.*)

ResCap's position is consistent with this Court's prior holding in the *Common SJ Order*, in which the Court rejected consolidated defendants' bad faith defense and noted that while every contract in Minnesota contains an implied covenant of good faith and fair dealing, "actions are done in bad faith" only where "a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties." 332 F. Supp. 3d at 1184 (citing *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998)) (internal quotation marks omitted). The Court further noted that " 'the substantial weight of authority is that the covenant is breached only by conduct that *is dishonest or malicious* or otherwise *in subjective bad faith*.' " *Id.* (quoting *BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 965 (D. Minn. 2007)) (emphasis added). And while the covenant continues to apply in contracts where one party bargains for contractual discretion, "it is only 'where contractual discretion is being enforced or construed to deny a party the benefit of the bargain or render the contract illusory, that courts will, as a gap filler, require that the

discretion be exercised reasonably.' " *Id.* (quoting *RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*, No. 03-cv-2609 (DSD/SRN), 2003 WL 25836278, at *9 (D. Minn. Dec. 2, 2003)). Because there was "no evidence that in bringing [its] lawsuit, exercising its sole discretion, and engaging in extensive re-underwriting of the at-issue loans, [ResCap] acted 'dishonestly, maliciously, or otherwise in subjective bad faith,' " the Court rejected consolidated defendants' assertions of bad faith. *Id.* at 1185.

PRMI raises several counterarguments. It first contends that this Court's prior order as to the legal standard for the implied covenant of good faith and fair dealing is incorrect, and that a "commercial reasonableness" standard should govern. In support, it relies on several cases from various judges of this court, as well as a recent Minnesota Court of Appeals decision. (Def.'s Opp'n at 22.) It also argues that the Client Guide itself requires RFC to act reasonably when applying underwriting judgment. (*Id.* at 23–24.) Next, PRMI contends that the Court's adoption of a purely objective good-faith test when ruling on RFC's settlements, but its use of a subjective good-faith test for evaluating the implied covenant of good faith and fair dealing, constitutes an inconsistent use of good faith standards. (*Id.* at 24.) Finally, PRMI asserts that Ms. Kori Keith's opinions raise triable issues of fact as to whether Mr. Butler's re-underwriting was in good faith. It contends that even under a subjective standard of good faith, Ms. Keith's testimony provides a basis for a reasonable fact finder to rule in PRMI's favor. (*Id.* at 24–26.) The Court addresses each point in turn.

First, PRMI argues that the Court's *Common SJ Order* misstates the standard under Minnesota law, and that the duty of good faith and fair dealing instead "requires a

contracting party to observe *reasonable* commercial standards." (Def.'s Opp'n at 22–23.)

The Court is unpersuaded by PRMI's argument and declines to depart from its prior

holding. PRMI's citations to several cases purportedly supporting its position do nothing

to alter the Court's prior holding because the cases cited either interpret different states'

contract law, are consistent with this Court's prior order, or apply Uniform Commercial

Code (UCC) standards of good faith (and not common law). For example, PRMI cites to

*H Enterprises International, Inc. v. General Electric Capital Corp.*, for the proposition that

the "duty of good faith requires that [plaintiff] exercise its [contractual] discretion

reasonably." 833 F. Supp. 1405, 1421 (D. Minn. 1993) (citing *Beraha v. Baxter Health

Care Corp.*, 956 F.2d 1436, 1444 (7th Cir. 1992)). But aside from being a relatively

perfunctory statement of the legal standard at issue, that case was applying Illinois law—

indeed, the *Beraha* decision cited within contains a lengthy discussion of Illinois appellate

courts' discussions on the meaning of the implied covenant of good faith and fair dealing,

*see Beraha*, 956 F.2d at 1443–44 (citations omitted)—and is therefore inapplicable to this

Minnesota-law contract dispute. Similarly, PRMI's citation to *Jesberg v. Baxter

Healthcare Corp.* is equally inapposite, as the good faith standard of commercial

reasonableness set forth in that case relies on Minnesota's UCC, which contains a different

definition of good faith for contracts to which the UCC applies. No. 97-1062 (PAM/RLE),

2006 WL 228872, at *5 (D. Minn. Jan. 30, 2006) (citing Minn. Stat. § 336.1-201(20)

(2006) (defining "good faith" as "honesty in fact and the observance of reasonable

commercial standards of fair dealing")).

PRMI also points to *i-Systems, Inc. v. Softwares, Inc.* to support its position, yet the as ResCap points out in its reply (*see* Pl.'s Reply at 18), that case recites essentially the same standard that the Court set forth in its *Common SJ Order*, and even uses the same language: "actions in bad faith" occur when " 'a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties.' " No. 02-cv-1951 (JRT/FLN), 2004 WL 742082, at *12–13 (D. Minn. Mar. 29, 2004) (citations omitted). The Court sees no inconsistency between its prior order and the language of *Softwares, Inc.* Additionally, PRMI's citation to *LeMond Cycling, Inc. v. PTI Holding, Inc.*, from which it appears PRMI drew the "commercial reasonableness" language, ignores the fact that the court's use of the phrase "commercially reasonable efforts" in that opinion stemmed from a unique contract provision in the parties' contract that *required* one of the parties to " 'use its commercially reasonable efforts to develop, produce, market and distribute a good quality representative [product] line[.]' " No. 03-cv-5441 (PAM/RLE), 2005 WL 102969, at *1, *7 (D. Minn. Jan. 14, 2005). There is no such provision in the Client Guide binding RFC. Of course, as PRMI points out, a 2005 version of the Client Guide states that RFC is "committed to standards of reasonableness" in underwriting. (Smallwood Decl., DX-35 (Client Guide, Version 1-05-G04) § 402.) However, contrary to PRMI's assertion, that section's plain language by no means imposes an *express obligation* on RFC to follow PRMI's asserted definition of commercial standards of reasonableness. (*Id.*)

At the heart of PRMI's argument is its citation to *Western National Mutual Insurance Company v. Prospect Foundry*, an unreported decision from the Minnesota

Court of Appeals. A17-0992, 2018 WL 1787687 (Minn. Ct. App. Apr. 16, 2018). In that case, the court noted in a footnote that "Minnesota's appellate courts have not settled whether the state's common law limits an implied-covenant claim only to the unjustifiable hindrance of performance or if this claim could include the behaviors in Section 205, comment d, of the Restatement (Second) of Contracts[.]" *Id.* at *4 n.3. Still, the Court noted that it found comment d of the Restatement to be "persuasive." *Id.* Comment d of Section 205 states that "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified" and that "the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." Restatement (Second) of Contracts § 205 cmt. d (Am. Law Inst. 1981). Furthermore, comment d notes that while "[a] complete catalogue of types of bad faith is impossible" several examples such as "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" can all constitute bad faith. *Id.* Beyond pointing to *Prospect Foundry*'s discussion of the expanded standard of bad faith in the Restatement as evidence that this Court's prior order is incorrect, PRMI also notes that a recent opinion from a different judge on this Court, Judge Schiltz, stated that the *Prospect Foundry* decision "might impose broad obligations of the type described in the Restatement." *Selective Ins. Co. of S.C v. Sela*, ___ F. Supp. 3d ___, No. 16-CV-4077 (PJS/SER), 2019 WL 3858701, at *3 (D. Minn. Aug. 16, 2019).

The Court finds that this authority supports its prior ruling. *Prospect Foundry*'s language did not alter Minnesota's standard as to the implied covenant of good faith and fair dealing. *Prospect Foundry*'s panel affirmed a jury instruction setting forth the standard for applying the covenant of good faith and fair dealing. 2018 WL 1787687, at *4. Notably, the instruction at issue did not contain the phrase "ulterior motive" or the term "subjective." *Id.* However, the panel's affirmation of a jury instruction does not equate to an alteration of Minnesota's longstanding precedent on the implied covenant of good faith and fair dealing. Indeed, the panel noted that its standard of review for the jury instruction's content was for an abuse of discretion, which occurs when the instruction "destroys the substantial correctness of the charge as a whole, causes a miscarriage of justice, or results in substantial prejudice." *Id.* (citation omitted). The jury instruction stated that the implied duty of good faith and fair dealing required that the entity subject to the duty "act[] honestly in performing [its] part of the contract, whether it be negligently or not," which the panel concluded "preserved the substantial correctness of the charge and did not result in a miscarriage of justice[.]" *Id.* Under the deferential abuse-of-discretion standard of review, the court's affirmation of a jury instruction as substantially correct does not create precedent departing from other Minnesota case law on the implied covenant of good faith and fair dealing.

Moreover, as ResCap points out in its reply brief (*see* Pl.'s Reply at 19), PRMI's reliance on Judge Schiltz's decision in *Sela* as evidence that *Prospect Foundry* marks a shift in Minnesota law entirely ignores the remainder of what Judge Schiltz said about the case. In his opinion, Judge Schiltz acknowledged *Prospect Foundry*'s footnote, then

promptly concluded the panel's reliance on the Restatement was *not persuasive or authoritative* for several reasons. *Sela*, 2019 WL 3858701, at *3. He noted that the language relied upon by PRMI is dicta because the panel in *Prospect Foundry* had already found that one of the parties had unjustifiably hindered the contracts at issue in the case; consequently, there was no need to decide whether the implied covenant contained any other obligation that the party had breached. *Id.* He also pointed out that the precise message *Prospect Foundry* was trying to convey is muddied by the fact that comment d of Section 205 of the Restatement contains numerous examples of potential violations of the implied covenant of good faith and fair dealing, yet the court declined to state whether it found every duty, some of the duties, or only the duty on which the trial court instructed on to be persuasive or authoritative. *Id.* at *4. Finally, Judge Schiltz noted that the *Prospect Foundry* panel declined to provide any guidance or explanation as to *why* the guidance of comment d was persuasive, and did not "explain why *over a century of common law* should be upended" by the Restatement. *Id.* The Court finds Judge Schiltz's opinion to be well reasoned and agrees with his conclusions on the matter.

PRMI's next argument—without citation to any authority—is that the Court's adoption of a purely objective good-faith test when ruling on the reasonableness of RFC's bankruptcy settlements, but its use of a subjective good-faith test for evaluating the implied covenant of good faith and fair dealing, are inconsistent and unfair to PRMI. (Def.'s Opp'n at 24.) The Court disagrees. PRMI's argument ignores the fact that the *subjective* good-faith standard used for the implied covenant of good faith rests on policy concerns that are markedly different than the policy concerns underlying the *objective* good-faith standard

used in evaluating the reasonableness of settlements. *Compare Common SJ Order*, 332 F. Supp. 3d at 1184 (" '[T]he substantial weight of [Minnesota] authority is that the covenant [of good faith and fair dealing] is breached only by conduct that *is dishonest or malicious* or otherwise *in subjective bad faith.*' " (quoting *BP Prods. N. Am. Inc.*, 534 F. Supp. 3d at 965)), *with HLC JMOL Order*, 399 F. Supp. 3d at 813 (noting that "[g]iven [the] policy concern [about collusion in *Miller-Shugart* settlements], Minnesota law requires objective proof of good faith and reasonableness" in order to establish a settlement was proper). It would be improper for the Court to conflate two legal standards designed to address two different legal issues where the standards used for each issue reflect distinct policy concerns.

Ultimately, in order to survive summary judgment, the legal standard applicable to PRMI's bad faith defense requires that PRMI raise a genuine dispute of material fact as to whether RFC acted dishonestly, maliciously, or otherwise in *subjective* bad faith. *Common SJ Order*, 332 F. Supp. 3d at 1185. The Court now turns to the evidence presented by PRMI attempting to establish a dispute of material fact.

PRMI offers the testimony of Ms. Keith in an attempt to show that Mr. Butler's re-underwriting on behalf of ResCap was done in bad faith. (*See* Alden Decl., Ex. L (Keith Rpt.) at 33–51.) However, for the reasons noted below, each of Ms. Keith's assertions fail to raise a genuine dispute of material fact, and accordingly PRMI's bad faith defense fails a matter of law.

Ms. Keith opines that one of Mr. Butler's opinions—that certain loans breached the RFC Client Guide due to missing documents in the loan files—cannot be maintained in

good faith because Mr. Butler fails to differentiate between different types of loan files that would contain different documents, and because in her opinion, "many of [the missing] documents almost certainly were present in the files at the time the loans were sold," although she offers nothing beyond her opinion as to that fact for most of the breach allegations raised by Mr. Butler.  (*Id.* at ¶¶ 72, 74.)  Beyond her own opinion that Mr. Butler's breach allegations are likely inaccurate, she also opines that in a few instances, the documents at issue were in fact present in the loan file (*see id.* at ¶¶ 78–79 (citing *one* example)), RFC's records indicated the document was present at origination although the document itself is not in the loan file, (*see id.* at ¶¶ 80–81 (citing *one* example)), or Mr. Butler failed to consider documents contained in first lien files where he reviewed only second lien files, (*see id.* at ¶¶ 82 (citing *one* example)).

Ms. Keith also opines that because Mr. Butler's breach allegations rest on inaccurate facts, clear misapplication of RFC's Client Guide guidelines, and misinterpretations of the documents contained in various loan files, his continued claim that the breach allegations remain valid is evidence of bad faith.  (*Id.* at ¶¶ 83, 90)  In support, Ms. Keith cites to one example where Mr. Butler asserts a breach based on a purported prior sale of the property within 180 days of the acquisition by the home-seller.  (*Id.*)  However, Ms. Keith notes, the document relied on by Mr. Butler lacks a chain of title indicating when the seller obtained the property, and only shows that the seller took out a mortgage within the prior 180 days, "which *may* have been a refinance."  (*Id.* (emphasis added).)  Ms. Keith also notes that the appraisal in the loan file stated that "MLS indicates no prior sale within 1 yr." and that consequently "no reasonable underwriter would maintain a breach finding

based on such a misinterpretation of the loan file." (*Id.*) Moreover, Ms. Keith contends that Mr. Butler misapplied basic underwriting standards (*see id.* at ¶ 84), misapplied the RFC Client Guide's guidelines regarding document exceptions and credit upgrades (*see id.* at ¶¶ 86–87), and in some cases applied the wrong Client Guide standards, (*see id.* at ¶¶ 88–89). Each of these, Ms. Keith opines, could be the product of mistake or a lack of due diligence, but in any event Mr. Butler's continued assertion of breaches in those situations is evidence of bad faith. (*Id.* at ¶¶ 87–89.)

In response, ResCap argues that in this Court's prior ruling on motions in limine in the *HLC* case, the Court held that its conclusion that RFC possesses the sole discretion to declare a breach—reaffirmed in this order, *see supra* § III(D)(4)(a)—rendered "any re-underwriting evidence disputing RFC's exercise of its sole discretion to identify [] breaches of its [R&Ws] called for in the Client Guide . . . irrelevant under Fed. R. Evid. 401[.]" *In re RFC & ResCap Liquidating Trust* ("HLC MIL Order"), Nos. 13-cv-3451 (SRN/HB), 14-cv-1716 (SRN/HB), 2018 WL 4863597, at *9 (D. Minn. Oct. 8, 2018). It also contends that Mr. Butler's purported mistakes, misapplication of Client Guide guidelines, and misinterpretation of loan documents constitute at most honest mistakes, negligence, or an unreasonable exercise of discretion, all of which do not amount to bad faith. (Pl.'s Mem. at 19 (citing *Common SJ Order*, 332 F. Supp. 3d at 1184).)

The Court agrees with ResCap on these points. As an initial matter, in light of RFC's sole discretion to declare breaches, Ms. Keith's opinions disputing re-underwriting evidence (whether in the form of an opinion, dispute over what the guidelines mean, or how RFC would underwrite loans, etc.) is irrelevant as a matter of law. *HLC MIL Order*,

2018 WL 4863597, at *9. But even if it were relevant, it does nothing to establish any dishonesty, maliciousness, or subjective bad faith on RFC's part in declaring a breach. At most, it shows mistakes, or an unreasonable use of RFC's sole discretion. Yet honest mistakes and negligence do not equal maliciousness or subjective bad faith. *See Common SJ Order*, 332 F. Supp. 3d at 1184. Moreover, even if RFC's exercise of its sole discretion under the Client Guide is "objectively unreasonable" it still is not in bad faith unless "those decisions were made dishonestly, maliciously, or otherwise in subjective bad faith." *See BP Prods. N. Am., Inc.*, 534 F. Supp. 2d at 968. Ms. Keith's examples of the occasional potential error by Mr. Butler simply fail as a matter of law to establish any malicious motive by ResCap in pursuing indemnity for R&W breaches based on violations of RFC's Client Guide. To the contrary, as this Court has previously noted, ResCap is motivated by its "fiduciary duty to pursue remedies on breaching loans, for unitholders' benefit." *Common SJ Order*, 332 F. Supp. 3d at 1185 (citation omitted) (internal quotation marks omitted).

Ms. Keith also contends that Mr. Butler erroneously alleges breaches on 22 of the PRMI Allegedly Breaching Loans based on recalculated values taken from "retrospective AVM" run by another of ResCap's experts, Dr. Kilpatrick. (Alden Decl., Ex. L (Keith Rpt.) at ¶ 91.) Ms. Keith states that "[i]n [her] opinion, given the unreliability of retrospective AVMs, [she] disagrees generally with Mr. Butler's use of these retrospective AVM to recalculate the LTV ratios of a loan and allege breaches on that basis." (*Id.*) However, Ms. Keith limits her opinion to situations where she felt that the loan files contained contemporaneous evidence of valuation such that the use of AVMs would be inappropriate or in bad faith. (*Id.*) She asserts—without any citations other than her own

experience—that the industry generally does not rely on retrospective AVMs. (*Id.* at ¶ 92.) Ms. Keith then cites to one example where Mr. Butler relied on a retrospective AVM despite the presence of a contemporaneous AVM in the loan file, and argues that doing so constitutes bad faith re-underwriting. (*Id.* at ¶ 97.) In response, ResCap argues that Ms. Keith's opinion—that the use of retrospective AVMs is unreliable, especially where contemporaneous AVMs exist in the loan file—simply does nothing to establish subjective bad faith on RFC's part, and accordingly fails to raise a genuine dispute of material fact. (Pl.'s Mem. at 19.) The Court again agrees with ResCap as to these contentions by Ms. Keith. Given the fact that RFC had sole discretion to determine breaches, even if the use of a retrospective AVM was objectively unreasonable, it still does not establish dishonesty, maliciousness, or subjective bad faith. *See BP Prods. N. Am., Inc.*, 534 F. Supp. 2d at 968.

Ms. Keith posits that Mr. Butler's breach allegations based on breaches of R&Ws that RFC purportedly identified at the time of origination, but nevertheless accepted, show he engaged in bad faith re-underwriting. (Alden Decl., Ex. L (Keith Rpt.) at ¶ 98.) She notes that RFC's pre-funding diligence included loan review by RFC personnel, who flagged any issues or defects with the loans; in some cases, RFC then accepted the loan anyway after changes were made to the loan file or the issue was resolved. (*Id.* at ¶ 99.) She then points to two examples where Mr. Butler alleges breach findings based on issues with the loan that RFC identified prior to funding, but that RFC accepted based on either a modification to the loan file or a resolution of the issue, and asserts that no reasonable underwriter would maintain breaches under those circumstances. (*Id.* at ¶ 100–101.) For its part, ResCap argues that this point cannot constitute bad faith because the Client Guide

*expressly* gives ResCap the right to declare breaches even if RFC conducts a review of the loan file and is aware of any defects in origination. (Pl.'s Mem. at 20); *see Common SJ Order*, 332 F. Supp. 3d at 1182 ("The plain language of [the Client Guide] is clear: under the parties' bargain, whether RFC actually relied on the R & Ws or had knowledge of any potential defects is wholly irrelevant.").

The Court agrees with ResCap. Section A200 of the Client Guide is, as the Court has explained, a risk-shifting scheme. By agreeing to the provision, PRMI expressly acknowledged that "PRMI's R & W's [to RFC] were not affected by *any investigation or review made by RFC* unless expressly waived in writing" and that "whether RFC . . . had knowledge of any potential defects is wholly irrelevant." *Common SJ Order*, 332 F. Supp. 3d at 1182 (emphasis added). Accordingly, RFC's assertion of breaches based on issues it previously identified and cleared could not possibly constitute bad faith because the parties' contract expressly permits RFC to exercise its sole discretion to do exactly that. Indeed, as this Court previously noted, "the implied covenant of good faith and fair dealing simply cannot preclude enforcement of the terms of the contract." *Id.* at 1185 (citing *RBC Dain Rauscher, Inc.*, 2003 WL 25836278, at *9).

Finally, Ms. Keith contends that Mr. Butler's breach allegations based on "plainly immaterial deviations" from the RFC Client Guide are in bad faith because no reasonable re-underwriter would maintain such breaches over such immaterial deviations. (Alden Decl., Ex. L (Keith Rpt.) at ¶ 102.) Rather, Ms. Keith states, it is her opinion "that not every issue—even if a technical violation of an underwriting guidelines—increases a loan's credit risk." (*Id.*) Moreover, she argues, Mr. Butler's own materiality assessments differ

from RFC's materiality assessments at the time of origination.  (*Id.* at ¶ 105.)  And, for at least two loans, Mr. Butler's alleged breach was so immaterial (differences of, for example, fractions of a percent in terms of compliance with a stated guideline) that, in Ms. Keith's opinion, no reasonable underwriter would maintain a breach in good faith based on the alleged defect.  (*Id.* at ¶¶ 107–108.)  In response, ResCap argues that Ms. Keith's opinion as to materiality is irrelevant because, once again, RFC is entitled to determine materiality at its sole discretion.  (Pl.'s Mem. at 20.)

ResCap is correct.  Per this Court's ruling in *First Mortgage*, RFC possessed the sole discretion to determine materiality as to breaches.  2018 WL 6727065, at *14 ("While [RFC] is simply required to show that First Mortgage's breaches increased RFC's risk of loss to the RMBS Trusts and Monoline, Plaintiff's analysis accounts for materiality, and is part of the exercise of RFC's sole discretion to determine breaches.").  Accordingly, Ms. Keith's opinion as to materiality is irrelevant.  But even if it were relevant, it shows at most an arguably unreasonable exercise of RFC's discretion to declare breaches because Ms. Keith admits that the loans to which her objection applies still constitute "technical violations" of the Client Guide's underwriting guidelines.  (Alden Decl., Ex. L (Keith Rpt.) at ¶ 102.)  Accordingly, even if RFC's determination that a loan origination breached the Client Guide's R&Ws is objectively unreasonable, it still does not constitute bad faith.  *See BP Prods. N. Am. Inc.*, 534 F. Supp. 3d at 965.

Ultimately, the Court declines to depart from its prior holding as to the subjective standard of bad faith applicable to PRMI's bad faith defense.  Moreover, as noted above, none of PRMI's arguments, nor any of Ms. Keith's opinions, raise a genuine dispute of

material fact sufficient to permit PRMI's bad faith defense to survive summary judgment. Accordingly, ResCap's motion for summary judgment as to PRMI's twentieth affirmative defense of bad faith is granted, and PRMI is barred from pursuing it at trial.

## 2. PRMI's "Sole Cause" Defense

ResCap also requests summary judgment that because there is no evidence that RFC was the "sole cause" of any liability, PRMI should be precluded from arguing as much during trial. (Pl.'s Mem. at 8.) In support, ResCap cites to this Court's October 22, 2018 Order explicitly addressing HLC's argument that RFC was the "sole cause" or "solely responsible" for its harm or damages with respect to some or all of the loans. *See In re RFC & ResCap Liquidating Tr.* ("Oct. 22, 2018 HLC Order"), 2018 WL 5257641, at *1 (D. Minn. Oct. 22, 2018). Quoting another prior order from the *HLC* case, the Court noted that although ResCap bears the burden of establishing its damages and allocation, if HLC wished to cross-examine ResCap's expert on RFC-only liability due to a "gap" or "mismatch" between HLC's R&Ws to RFC and RFC's R&Ws to the Trusts and Monoline Insurers, it had to present some "non-speculative, admissible evidence in support of [the] defense." *Id.* at *3. Because HLC's only expert on the issue—Professor Steven Schwarcz—could not identify any actual RFC-only R&W breaches, and consequently, because any such evidence or arguments made on that subject would be utterly speculative and carry a substantial risk of unfair prejudice and juror confusion that far outweighed its

probative value, the Court denied HLC's request to present a "sole cause" defense.[31]  *Id.* at *6.

PRMI responds—and even appears to request summary judgment to the contrary, (Def.'s Opp'n at 40 (noting that ResCap's failure on this issue "mandate[es] entry of judgment for PRMI" on the issue))—that the Court should deny this request by ResCap and incorporates its prior arguments on the issue, including its reference to the expert report of Professor Schwarcz.  (*Id.* at 38 n.19 (incorporating prior arguments), 39 (incorporating Schwarcz report).)   It contends that under *UnitedHealth*, 870 F.3d at 863, it is solely Plaintiff's burden to value non-indemnifiable breach claims and because it has not done so, it is not entitled to summary judgment on the issue.  (Def.'s Mem. at 38.)  Moreover, PRMI argues, its own expert Professor Schwarcz has "explained there were multiple ways RFC *could* breach its trust-level representations without the breach resulting from an originator breach."  (*Id.* at 39 (citations omitted) (emphasis added).)  And, PRMI asserts, ResCap's own expert, Dr. Snow, acknowledges that loans in certain trusts made up of loans that were underwritten using non-Client Guide criteria could have breached RFC's R&Ws to the Trusts or Monoline Insurers without any originator breach.  (*Id.* (citations omitted).) Because ResCap has not provided evidence that there were no loans for which RFC was the sole cause of RFC's breach of any R&Ws to the Trusts and Monoline Insurers, and because it never allocated any portion of RFC's settlements to non-indemnifiable (i.e., breaches "solely caused" by RFC) claims, PRMI asserts that any claim to the contrary

---

[31]     The Court barred the "sole cause" theory regardless whether labeled an "affirmative defense . . . or a rebuttal[.]"  *Oct. 22, 2018 HLC Order*, 2018 WL 5257641, at *6.

would be mere speculation. (*Id.*) PRMI also argues that it has no obligation to present "any evidence" on allocation, and remains free to "point[] out the flaws" in ResCap's approach. (*Id.* at 39–40 (citation omitted).)

The Court disagrees with PRMI's arguments and reaffirms its holding in the *Oct. 22, 2018 HLC Order*, 2018 WL 5257641, at *6.[32] To the extent PRMI incorporates prior briefing, the Court has already ruled on those arguments and will not pass on them again. With respect to its current contentions, PRMI continues with the same argument that the Court has rejected on this question for quite some time. It is certainly true that ResCap bears the burden of proof on establishing its damages and allocation, *see id.* at *3, just as it is true that PRMI is not required to prove anything related to allocation, *see UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 882 n.15 (D. Minn. 2014), *affirmed*, 870 F.3d 856. However, without *some* non-speculative hypothetical basis for the defense, those two truths do not simultaneously grant PRMI license to argue that there are RFC-only breaches that PRMI should not be required to indemnify. *See Oct. 22, 2018 HLC Order*, 2018 WL 5257641, at * 7–8 (noting that HLC's "sole responsibility" evidence merely invited the jury to speculate that ResCap failed to meet its burden on allocation and damages based on *alleged* fraudulent behavior and not based on any actual problems with ResCap's Allocated Breaching Loss Methodology)).

---

[32]     The Court also affirmed this ruling in *First Mortgage*, 2018 WL 6727065, at *13, where it acknowledged the prior *Oct. 22, 2018 HLC Order* and held that First Mortgage's "sole cause" defense—substantively identical to PRMI's here—failed because First Mortgage offered "no fact evidence []or expert evidence in support of its sole-cause defense, [and had not] identified any [R&Ws] that RFC allegedly breached that do not overlap with First Mortgage's breaches."

Yet even here, PRMI points to nothing other than "purely hypothetical" expert opinion—which is insufficient—that RFC *could* have *possibly* made R&Ws to the Trusts and Monolines that were independent from any R&Ws made by PRMI to RFC. Indeed, the testimony PRMI cites from Professor Schwarcz's expert report—its only expert on the subject—merely states that RFC's R&Ws to the Trusts and Monolines were "broader" than some of PRMI's R&Ws such that it was *possible* that RFC could have breached R&Ws to those trusts and insurers even without a breach by PRMI. (*See* Smallwood Decl., DX-45 (Schwarcz Expert Rpt.) ¶¶ 112–125 (noting several times that RFC "*could*" have breached without a PRMI breach, but not once demonstrating any evidence that RFC *did* in fact breach an R&W to a trust or insurer that was independent from a breach of PRMI's R&Ws).) PRMI's citation to the deposition of ResCap's expert, Dr. Snow, is equally unavailing; all Dr. Snow stated was that it was possible that an RFC-only breach could have occurred, but he explicitly notes that he could not "give anything more than [']it's possible[']" because he had "not seen any evidence" indicating it was in fact true. (*See id.*, Ex. 53 (Snow Dep.) at 239.) PRMI essentially argues that ResCap has failed to prove a negative, but offers only speculation as to any "evidence" of RFC-only liability. That is simply insufficient to overcome ResCap's request for summary judgment; after all, "[t]he moving party's burden cannot be enhanced to require his proof of a negative; that is, not only is there no evidence in the record, but [defendant's] evidence need not be disproved." *See Windon Third Oil & Gas Drilling P'ship v. Fed. Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947 (1987), *overruling on other grounds recognized by Parker Excavating, Inc. v. Lafarge West, Inc.*, 863 F.3d 1213, 1223 (10th

Cir. 2017); *see also Grady v. Becker*, 907 F. Supp. 3d 975, 982 (D. Minn. 2012) (noting that where a defendant requests a plaintiff to prove a negative for summary judgment purposes, "[w]hat better proof could [the plaintiff] offer than the fact he [has no evidence]?"). Indeed, summary judgment requires more than unsupported assertions; that rule applies to defenses just as much as it applies to claims. *See Celotex Corp.*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims *or defenses*, and we think it should be interpreted in a way that allows it to accomplish this purpose." (emphasis added)).

The Eighth Circuit's *UnitedHealth* decision does not alter this result. In that case, the Eighth Circuit noted that all a plaintiff need do to survive summary judgment with respect to settlement allocation was offer "a non-speculative basis to allocate a settlement between covered and non-covered [here, indemnifiable and non-indemnifiable] claims." 870 F.3d at 856. As noted in the Court's discussion of ResCap's Allocated Breaching Loss Methodology, ResCap has done so here. *See infra* § III(G)(3). To paraphrase this Court's prior ruling, "[PRMI] cannot make up for the fact that it never developed a factual record to support Professor Schwarcz's assertion that 'sole responsibility' claims constituted a 'significant potential source of non-indemnifiable liability,' by 'handing' dozens of [documents] 'to the jury' in a complex securitization case and 'asking the jury to perform the [allocation] analysis that it failed to ask [its experts] to perform." *Oct. 22, 2018 HLC Order*, 2018 WL 5257641, at *7 (quoting *UnitedHealth*, 47 F. Supp. 3d at 881). Accordingly, while ResCap must still bear its burden to establish its damages and allocation at trial, it has established that is has a non-speculative basis to do so, and PRMI

is not permitted to present purely hypothetical and utterly speculative expert testimony arguing that RFC-sole responsibility claims constitute a significant potential source of non-indemnifiable liability. Therefore, ResCap is granted summary judgment on this point.

### 3. PRMI's Knowledge and Reliance Defenses

ResCap seeks summary judgment that the Client Guide's language precludes PRMI's knowledge- and reliance-based defenses, and that accordingly the Court should dismiss five of PRMI's defenses: Nos. 16 (reliance), 17 (knowledge), 28 (acquiescence), 29 (ratification), and 33 (diligence). (Pl.'s Mem. at 6.) Those defenses, per PRMI's answer, are as follows:

**Sixteenth Defense**

The Complaint is barred, in whole or in part, because Plaintiff did not rely on the representations and warranties on which Plaintiff is suing, and to the extent Plaintiff did rely on such representations and warranties, Plaintiff's reliance was not reasonable or justified.

**Seventeenth Defense**

The Complaint is barred . . . because any alleged defects in the loans purchased from Defendant were not material, and Plaintiff would have purchased the loans from Defendant even if it had known about such defects.

. . . .

**Twenty-Eighth Defense**

The Complaint is barred . . . under the doctrine of acquiescence.

**Twenty-Ninth Defense**

The Complaint is barred . . . under the doctrine of ratification.

. . . .

**Thirty-Third Defense:**

The Complaint is barred . . . because Plaintiff failed to perform adequate due diligence regarding the underlying mortgage loan sales.

(PRMI Answer [Doc. No. 2156] at 24, 26–27.)

In support of its argument, ResCap points to this Court's *Common SJ Order* in which the Court granted ResCap summary judgment dismissing the consolidated defendants' knowledge- and reliance-based defenses for ResCap's breach of contract and indemnity claims based on the language of Section A200 in the Client Guide. 332 F. Supp. 3d at 1180–83. Specifically, ResCap was granted summary judgment on four defenses: (1) that RFC did not rely on the R&Ws on which it was suing; (2) to the extent it did rely, RFC's reliance was not reasonable or justified; (3) RFC would have purchased the loans from defendants even if it had known about defects; and (4) RFC knew of defects prior to sale and purchased the loans anyway. *Id.* at 1179.

PRMI opposes the present motion, arguing that the Client Guide's language in Section A200 does not bar knowledge- or reliance-based defenses. (Def.'s Opp'n at 21–22.) Specifically, PRMI asserts that Section A200 "says only that the client is liable 'regardless of whether it or [RFC] actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty.' " (*Id.* at 22 (citing Smallwood Decl, Ex. 35).) PRMI contends that language means RFC is not precluded from asserting a breach where it knew or could have known "the underlying *facts* giving rise to the breach" but argues that RFC *is preclude*d from asserting a breach where RFC "actually identified the *alleged breach itself*, concluded it was not material, and bought the loan anyway." (*Id.*at 22.) It also takes the position that Section A200's language stating that any "investigation or review" by RFC does not affect the originator's R&Ws still does not preclude PRMI from putting on evidence that RFC's

review found that the loan did not materially breach. (*Id.*) Finally, PRMI incorporates prior briefing used for the *Common SJ Order* as well. (*Id.* at 22 n.13.)

The Court grants ResCap's request for summary judgment on this issue and dismisses PRMI's 16th (reliance), 17th (knowledge), 28th (acquiescence), 29th (ratification), and 33rd (diligence) defenses. Relevant here, Section A200 of the Client Guide—which has bound PRMI and RFC since their 1997 AlterNet Guide using identical language, (*see* Pl. App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200 (noting that in § 250 of the AlterNet Guide, the same language used in the later Section A200 was present))—states as follows:

> The Client acknowledges that []RFC purchases Loans *in reliance upon the accuracy and truth of the Client's warranties and representations and upon the Client's compliance with the agreements, requirements, terms and conditions set forth* in the Client Contract and this Client Guide.
>
> All such representations and warranties are absolute, and the Client is fully liable for any misrepresentation or breach of warranty *regardless of whether it or []RFC actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise* to such misrepresentation or breach of warranty.
>
> The representations and warranties pertaining to each Loan purchased by []RFC . . . *are not affected by any investigation or review made by, or on behalf of, []RFC except when expressly waived in writing* by []RFC.

(Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A200 (emphasis added).) The Court has already held—and declines to revisit its holding—that "the plain language . . . especially when read in context of the entire contract, *precludes* Defendants' knowledge- and reliance-based defenses." *Common SJ Order*, 332 F. Supp. 3d at 1181. Where the Client Guide applies—and, as noted above, either it or a predecessor version

applied to PRMI—"Defendants are precluded, as a matter of law, from asserting the reliance- and knowledge-based defenses at issue here." *Id.*

The Court noted that Section A200 functioned as a risk-shifting scheme, and that by agreeing to the provision, PRMI

> expressly acknowledged the following: (1) that [RFC] [was] buying loans in reliance upon the accuracy of their R & Ws; (2) that [PRMI] [was] fully liable for any misrepresentation of or breach of warranty *regardless* of whether RFC had any knowledge of the misrepresentation or breach; and (3) that [PRMI's] R & Ws were not affected by any investigation or review made by RFC unless expressly waived in writing. The plain language of these provisions is clear: under the parties' bargain, whether RFC actually relied on the R & Ws or had knowledge of any potential defects is wholly irrelevant.

*Id.* at 1182. PRMI's current attempt to distinguish between having knowledge of "underlying facts giving rise to a breach" and knowledge of the "alleged breach itself" places far too narrow a construction on the plain language of the Client Guide, and accordingly does nothing to alter this conclusion.[33]

Moreover, contrary to PRMI's argument, even if RFC reviewed and accepted a loan despite knowing that the loan was not in compliance with the Client Guide, unless RFC expressly waived the Client Guide's R&Ws in writing, the plain language of Section A200's risk-shifting scheme preserved RFC's right to pursue remedies for R&W breaches. (*See* Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A200 (requiring written

---

[33]    The Court sees little difference between having knowledge of the underlying facts of a breach and having knowledge of a breach. Indeed, in this context, it is difficult to imagine a scenario where RFC would know the underlying facts of a breach and not also know about the breach itself, and PRMI acknowledges that "RFC is not precluded from [pursuing relief] where it knew or could have known the underlying facts giving rise to the breach." (Def.'s Opp'n at 22.) PRMI's attempt to get around the plain language of Section A200 is simply unavailing.

waiver of Client Guide's terms).) Indeed, as the Court previously noted, " '[e]ven if RFC bought loans knowing they did not comply with the Guide and without relying on Defendants R & Ws, doing so would not waive A200 or estop RFC from enforcing it. Indeed, the very *purpose* of A200 was to enable RFC to buy loans under those circumstances.' " *Common SJ Order*, 332 F. Supp. 3d at 1183 (citation omitted).

In light of the plain language of Section A200 of the Client Guide, and in accordance with this Court's prior ruling, PRMI's 16th and 17th defenses—which contain identical language to the defenses the Court explicitly addressed in its *Common SJ Order*—are dismissed. *Compare* 332 F. Supp. 3d at 1179 (discussing four defenses at issue), *with* (PRMI Answer [Doc. No. 2156] at 24.)

PRMI's other knowledge- and reliance-based defenses not explicitly addressed in the Court's prior order are also dismissed for the same reasons. To show the applicability of the doctrine of acquiescence (PRMI's 28th defense) or the doctrine of ratification (PRMI's 29th defense), PRMI would have to show RFC's full knowledge of a loan's breach; this Court has previously noted that fact. *See In re RFC & ResCap Liquidating Trust Litig.*, 2015 WL 2451254, at *8 (D. Minn. 2015) (noting that the doctrines of "acquiescence[] and ratification" require "the element of full knowledge of the party against whom the doctrines are to be applied"). Yet, even assuming RFC had full knowledge, such knowledge is expressly and entirely made irrelevant under Section A200. (*See* Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01) § A200.) Similarly, the fact that RFC may have failed to perform adequate due diligence on the underlying mortgage loan sales (PRMI's 33rd defense) is equally barred by Section A200, which expressly states

116

that PRMI's R&Ws are "absolute" and apply "*regardless of whether* [PRMI] or []RFC actually had, *or reasonably could have been expected to obtain*, knowledge of the facts giving rise to such misrepresentation or breach of warranty." (*Id.* (emphasis added).)[34] Summary judgment in favor of ResCap on this issue is therefore warranted; PRMI is precluded from presenting the above reliance- or knowledge-based defenses at trial.

### 4. PRMI's Statute-of-Limitations Defense

ResCap next seeks summary judgment that its indemnity claim is timely, and that accordingly any statute-of-limitations defense is barred. (Pl.'s Mem. at 7.) In support, ResCap cites to this Court's prior *Common SJ Order*, in which the Court held that "the accrual date for indemnification claims based on loans sold to RFC prior to May 14, 2006 is not the date of sale, but rather, the date on which RFC's liability became finally fixed and ascertained." 332 F. Supp. 3d at 1191 (citations omitted). RFC's liability therefore became "fixed in December 2013 when the [Bankruptcy] Settlements were approved by the Bankruptcy Court," and as such "the statute of limitations for loans sold to RFC before May 14, 2006 accrued as of December 2013 and . . . are therefore timely." *Id.* PRMI's response consists of summarily incorporating prior arguments that this Court has already rejected. (*See* Def.'s Opp'n at 44.) Accordingly, the Court grants ResCap's motion for summary judgment on this issue and holds that ResCap's indemnity claim against PRMI is timely and may proceed.

---

[34] To the extent PRMI incorporates prior briefing on the issue of its knowledge- and reliance-based defenses, this Court has addressed those arguments in its *Common SJ Order*.

## 5. PRMI's Estoppel and Waiver Defenses for Assetwise- and Countrywide-based Loans

PRMI asserts that the quality- and credit-related R&Ws in the Guides did not apply to loans underwritten through Assetwise or pursuant to Countrywide underwriting parameters, based on the parties' course of conduct and verbal representations. Conversely, ResCap argues that the Guides' R&Ws applied to all of the At-Issue Loans, including those underwritten to Assetwise and Countrywide underwriting guidelines, and therefore PRMI fails to raise triable issues of fact with respect to its defenses of waiver and estoppel.

As the Court held earlier, *see supra* § III(D)(3)(a), except for the potential defenses of waiver and estoppel, the R&Ws set forth in the Guides apply to all At-Issue loans. Regardless of the language in the Guides, however, PRMI contends that the parties' course of conduct regarding Assetwise- and Countrywide-approved loans required it to comply with only a reduced set of R&Ws.

"A party seeking to invoke the doctrine of equitable estoppel has the burden of proving three elements: (1) that promises or inducements were made; (2) that it reasonably relied upon the promises; and, (3) that it will be harmed if estoppel is not applied." *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1990). As the Court noted in the *HLC JMOL Order*, 399 F. Supp. 3d at 826 n.19, Minnesota case law suggests that a party to a contract may support an estoppel defense with a counter party's "silence[,] negative omission to act when it was [their] duty to speak or act," or suggestive "course of conduct."

*See, e.g., Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc*., 698 N.W.2d 449, 454 (Minn. Ct. App. 2005)

"Waiver is the intentional relinquishment of a known right." *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011). The burden of proving waiver rests on the party asserting waiver. *Id.* To show a valid waiver, that party must prove two elements: "(1) knowledge of the right, and (2) an intent to waive the right." *Id.* "Waiver may be express or implied—'knowledge may be actual or constructive and the intent to waive may be inferred from conduct.' " *Id.* (quoting *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn. 2009)); *see also St. ex rel. Swanson v. 3M Co.*, 845 N.W.2d 808, 819 (Minn. 2014) (stating, "intent to waive [a contractual provision] may be inferred from conduct."). "Although waiver can be express or implied, both types of waiver require an expression of intent to relinquish the right at issue." *Frandsen*, 801 N.W.2d at 182 (citation omitted). Mere inaction is insufficient to establish waiver. *Id.*

The application of waiver and estoppel is generally fact dependent, and thus, the defenses typically involve questions of fact. *Swanson*, 845 N.W.2d at 819 (discussing waiver); *N. Petrochemical Co. v. U. S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979) (discussing estoppel). The mere presence of a non-waiver clause *alone* does not preclude the defenses of waiver and estoppel. *Pollard*, 698 N.W.2d at 453–54 (Minn. 2005). Applying these precepts in the *Common SJ Order*, the Court analyzed all of the evidence in the record, including the defendants' anecdotal evidence, as well as the Client Guide's non-waiver provision, and found that defendants had failed to raise a triable issue of fact that RFC's use of Assetwise constituted a *blanket waiver* of all of the requirements of the

Client Guide. 332 F. Supp. 3d at 1177–78. As discussed earlier, PRMI does not advance a blanket waiver argument here. Rather, it argues that particular loans were subject to a more limited set of quality- and credit-related R&Ws, but were otherwise subject to the Guides' R&Ws.

ResCap raises several arguments related to these defenses. First, ResCap seeks summary judgment that PRMI, in attempting to prove its estoppel defense, may not seek to introduce "anecdotal, hearsay evidence" that simply reflects "generalized variances from RFC's underwriting criteria" and must instead offer evidence "of a stated departure from the provisions and remedies of the" Client Guide as to specific PRMI loans or bulk transactions, made by a "person of authority" at RFC. (Pl.'s Mem. at 7.) Second, unlike in the Court's prior orders (and as noted above), ResCap also seeks an affirmative ruling that the Guides' R&Ws govern *all* At-Issue loans, including Assetwise-approved loans and a single sample loan that was originated to underwriting criteria of Countrywide. (*Id.* at 9.) Finally, ResCap seeks summary judgment that the Guides' provisions require that any waiver of its terms be in writing. (*Id.* at 7.) The Court addresses these arguments in turn.

### a. Anecdotal Evidence

In support of its argument that PRMI may not attempt to prove its waiver and estoppel defenses based on anecdotal evidence, ResCap points to this Court's prior October 1, 2018 pre-trial order, in which the Court addressed evidence that HLC sought to admit to prove its equitable estoppel defense. (*See HLC Oct. 1, 2018 Order* at 4.) Again, in the First Wave, the defendants argued that the parties' use of Assetwise constituted a wholesale waiver of the Client Guide's R&Ws and estopped ResCap from enforcing those terms. The

Court noted that several categories of evidence that HLC sought to introduce—the agreement between itself and RFC regarding the use of Assetwise, RFC's purported business strategy to acquire non-Client Guide compliant loans, and RFC's purchase of bulk loan packages—were not sufficient evidence supporting "the very limited circumstances under which estoppel evidence might be relevant at trial." (*Id.* at 6.) Despite holding as much, the Court stated that there still may "be specific instances in which a *high-ranking person* at RFC stated that the provisions and remedies of the Client Guide were inapplicable" such that estoppel was not completely barred. (*Id.* at 6, 7.) However, the Court held that "HLC may *not seek to introduce anecdotal, hearsay evidence* that simply reflects generalized variances from RFC's underwriting criteria" and must instead "offer evidence of a stated departure from the provisions and remedies as to specific HLC loans or specific bulk transactions, made by a person with authority at RFC." (*Id.* (emphasis added).)

PRMI responds by arguing that the record here readily supports inferences that RFC induced PRMI to sell loans on non-Client Guide underwriting terms, and that PRMI relied in good faith on RFC's inducements. (Def.'s Opp'n at 19.) It contends that ResCap misstates the standard for equitable estoppel in Minnesota and argues that all it needs to show is that PRMI altered its position for the worse in "'good faith reliance upon the conduct of the party seeking to enforce the contract.'" (*Id.* (quoting *Multi-Tech Sys., Inc. v. Floreat, Inc.*, 2002 WL 432016, at *4 (D. Minn. Mar. 18, 2002).) The silent negative omission of a party when that party was under a duty to speak or act can, PRMI notes, constitute a course of conduct for purposes of estoppel; no stated departure by a high-

ranking person at RFC is required. (*Id.* at 19–20 (citing *HLC JMOL Order*, 399 F. Supp. 3d at 826 n.19).) Moreover, PRMI argues that there is ample evidence—"both general and loan-specific"—showing that individuals at RFC with actual or apparent authority engaged in conduct that estops RFC from asserting certain breaches. (*Id.* at 20.) Specifically, PRMI points to statements made by RFC that purportedly demonstrate that Assetwise provided "full" credit underwriting, "automatic upgrades," and "reduced documentation" requirements. (*Id.* at 20 (citing Smallwood Decl., DX-2 (Richardson Dep.) at 22; *id.*, DX-3 (Jan. 10, 2001 Letter from Richardson to Flitton) at Bates 0009; *id.*, DX-7 (Maki Dep.) at 120, 131).) PRMI also asserts that RFC "regularly" instructed PRMI to rely on written loan approval certificates issued by Assetwise even if they departed from Client Guide requirements, (*see id.*) and in some cases required PRMI to use Assetwise, (*id.* (citing Smallwood Decl., DX-15 (Dec. 28, 2001 Master Commitment Letter); DX-16 (July 7, 2003 Master Commitment Letter); DX-22 (Sept. 18, 2006 Master Commitment and Variance Letter).)

Given that the defendants in the First Wave, including HLC, asserted blanket waiver/blanket estoppel defenses based on the mere use of Assetwise, the Court required the defendants to present some evidence from a person in authority at RFC demonstrating such a wholesale departure from the Client Guide's requirements. Here, however, PRMI advances a narrower defense, specific to Assetwise and Countrywide loans, arguing that they were subject to the credit- and quality-related R&Ws in the Assetwise Agreement or Countrywide R&Ws, but were otherwise subject to all other provisions of the Guides.

However, much like in the prior HLC decisions, PRMI confuses specific variances from *underwriting criteria* in the Guides with variances from the Guides' *R&Ws and remedies*; the two are not one and the same. In order to prove that ResCap waived the Guides' quality- and credit-related R&Ws or should be estopped from enforcing all of the Guides' R&Ws and remedies, even as applied to loans made under different underwriting criteria, PRMI must show that an RFC agent with at least apparent authority[35] to bind RFC either represented or promised that certain provisions of the Guides' R&Ws or remedies did not apply, or failed to speak up and ensure that that was the understanding when under a duty to do so, and that PRMI relied to its detriment on those representations. *See Common SJ Order*, 332 F. Supp. 3d at 1174 (citation omitted).

Anecdotal evidence showing only generalized variances related to underwriting criteria does not satisfy the evidentiary burden required to show estoppel, and the admissibility of all evidence is subject to exclusion under the hearsay rule. Whether or not it proves sufficient ultimately to meet its burden of proof, PRMI may submit relevant and clear anecdotal evidence, subject to these requirements and the applicable evidentiary rules. Plaintiff's motion is therefore denied in this regard. The Court now turns to the evidence provided by PRMI for Assetwise- and Countrywide-based loans.

---

[35] Notably, apparent authority "is usually based on an affirmative act of the principal," such as a "manifestation by the principal that another is its agent . . . [and] the person who deals with the supposed agent must know of these manifestations at the time of dealing[,] and . . . the manifestation of apparent authority must be by the principal's actions, not the agent's." *Roof Depot, Inc. v. Ohman*, 638 N.W.2d 782, 787 (Minn. Ct. App. 2002) (citations omitted).

### b. Assetwise-Approved Loans

In support of its estoppel and waiver defenses, PRMI cites to testimony from its Rule 30(b)(6) witness, Dave Zitting, in which he discussed the R&Ws applicable to Assetwise-approved loans. (*See, e.g.*, Nesser Decl., Ex. 11 (Zitting Dep.) at 181–82.) Zitting was one of PRMI's co-founders in 1998, and also served as its President and CEO until his departure in 2018. (*Id.* at 16–17.) He continues to serve as a general advisor on PRMI's governing board. (*Id.* at 21–22.) He testified to his understanding that PRMI's Assetwise-approved loans were governed by the applicable quality- and credit-related R&Ws in the Assetwise Agreement, in lieu of the broader quality- and credit-related R&Ws in the Guides. (*Id.* at 181–82; *see also id.* at 140–41).) However, he acknowledged that *other* Guide R&Ws, unrelated to the credit and quality of the loans, applied to the Assetwise-approved loans. (*Id.* at 181–82) ("If it was underwritten through AssetWise, we were to follow AssetWise. And were there other things in the Client Guide that were outside the credit decisioning, as you clearly pointed out? Yes. We need to follow those. Those were common and customary business conduct reps and warrants, as you pointed out. As it related to the quality of the mortgage transaction, all of that, our understanding, was within AssetWise."), *but see id.* at 505 ("All the guidelines, plus some, were in AssetWise."), 180 ("[T]he Client Guide was in AssetWise, and it was a living, breathing, evolving thing within AssetWise."), 118 ("[Assetwise] had all of the rules and guidelines built into it."). In fact, at his deposition, Zitting looked through the Client Guide and identified at least a dozen R&Ws that were not in the Assetwise agreement, but, he believed, remained PRMI's responsibility because they were beyond Assetwise's

verification abilities. (*Id.* at 150–60, 169–71, 181–82.) Zitting conceded that he did not know whether RFC and PRMI had ever entered into a written agreement providing that Assetwise-approved loans were deemed compliant with all of the requirements of the Guides. (*Id.* at 183.)

PRMI also points to the testimony of one of its employees, Yvonne Flitton, who stated that language in the Master Commitment documents between RFC and PRMI requiring that "[a]ll loans must comply with the loan eligibility and all other loan requirements contained in the Client Guide," was simply nonsensical because, in her opinion, PRMI believed that an approval from Assetwise on a loan was "tantamount to compliance with any RFC requirements and criteria." (Smallwood Decl., DX-1 (Flitton Dep.) at 270–71.) Yet Mrs. Flitton also testified that when relying on Assetwise reports, she would "use the Client Guide . . . as a resource." (*Id.* at 34.) Even where "the [Assetwise] conditions were quite clear . . . [if, for example] it said to verify two years of self employment . . . [because t]here can be a variety of ways that that can be verified . . . we would go to the Client Guide to see what was an acceptable way to verify." (*Id.*) Put another way, Mrs. Flitton agreed that she would "use the Client Guide to provide *context to conditions* on the AssetWise findings report." (*Id.* (emphasis added).) Indeed, the example cited by Mrs. Flitton as to when she would look to the Client Guide is mirrored in the first bullet point of the Assetwise Agreement—Accurate Calculation of Income and Assets—that does not explicitly reference the Client Guide. (*See* Smallwood Decl., DX-3 (Assetlock Amendment) at 00020.)

PRMI also points to statements made by ResCap's 30(b)(6) deponent—Renee Bangerter—in which she noted that the seven listed items in the Assetwise Agreement "continued to be PRMI's responsibility." (*Id.* at Ex. 4 (Bangerter Dep.) at 88.) However, PRMI cites her testimony out of context; she also stated that the "characteristics in Assetwise Direct . . . are just bullet points . . . . You would still have to refer back to [the Guides to] understand what a misrep (sic) meant" and that PRMI would still be responsible under the Guides' R&Ws if, for example, it "knew something was on the [borrower's] credit report or – and it didn't disclose it – if they knew of additional financing and [] didn't disclose it . . . ." (*Id.* at 88–89.) Ms. Bangerter further explained that the seven "bullet points" listed in the Assetwise Agreement were merely bullet points that needed to be defined elsewhere; citing the accurate income R&W as an example, she noted that "there's different ways of calculating income" and that "[j]ust [] making that statement" in the Assetwise Agreement was insufficient because "[PRMI] could come up with a different methodology for doing that than we did." (*Id.* at 99.) Indeed, when pressed as to whether the seven bullet points in the Assetwise Agreement were the *only* R&Ws applicable to PRMI after it agreed to use Assetwise, Ms. Bangerter had this to say:

> Q: So am I correct that it – it's your understanding in your testimony as a ResCap Liquidating Trust corporate witness that the [R&W]s in the AssetWise Direct Criteria Agreement, *as defined by RFC in fuller detail*, were the [R&W]s that applied to loans PRMI sold to RFC that were approved by AssetWise []?

> A: They could. Some of them. *That was some of them.*

> Q: What do you mean "some of them"?

> A: There's entire section (sic) in the guide section 2A that outlines [R&W]s in detail.

(*Id.* at 99–100 (emphasis added).) At no point did Ms. Bangerter ever state that *only* the R&Ws listed in the Assetwise Agreement applied to PRMI; indeed, her testimony indicates that the contrary is true, as she referenced Section 2A of the Client Guide. Moreover, as this Court noted previously, Ms. Bangerter had "personal experience" with these documents because she was the one "responsible for sending th[e] agreement" to originators. *HLC JMOL Order*, 399 F. Supp. 3d at *824.

Next, PRMI contends that the testimony of one of its managers, Kathlene Meadows, and an RFC employee, Sharon Maki, supports its waiver and estoppel arguments. (Def.'s Opp'n at 4, 5 n.4). Ms. Meadows stated that her understanding was that the "Client Guide was incorporated in Assetwise and we could follow our Assetwise findings." (Smallwood Decl., DX-6 (Meadows Dep.) at 112.) She also testified that she obtained that understanding from PRMI's "management team" but does not know how PRMI's management team obtained that understanding. (*Id.*) However, she admitted that she was never made aware of the Client Guide's provision that stated that any client using Assetwise was "still bound by the [R&W]'s as set forth in th[e] Client Guide." (*Id.* at 115–16 (referencing Section A401(B) of the Client Guide).) In the same vein, PRMI notes that an RFC employee, Sharon Maki, testified that "for Assetwise-approved loans, the Assetwise Findings Report would be the basis for the [loan's] underwrite, not a full underwrite to the Client Guide" because it was a "different way to get to the same spot." (*Id.*, DX-7 (Maki Dep.) at 237–39.) However, Ms. Maki's testimony appears to refer only

to *underwriting* a loan, and she qualified her statement, testifying that "regardless of whether or not a particular client used Assetwise, it was still bound by the [R&W]s of the Client Guide." (*Id.* at 239–40.)

Finally, PRMI points to the testimony of its expert Kori Keith, a loan specialist who opined that PRMI "would never have [used Assetwise] if they felt like they were held to all the criteria within the RFC Client Guide" and that "logically speaking, that cannot be the case and it doesn't match my experience." (*Id.*, DX-14 (Keith Dep.) at 226–27.) However, when asked whether one would have to "review the client guide to interpret the seven bullet points listed under '[R&Ws]'," she stated "[t]hat, I do have to assume because it doesn't explicitly say that. I think it would be a better document if it did say that. I did ponder why only the appraisal requirements referred back to the []RFC Client Guide and really couldn't determine any reason why just [the appraisal requirements specifically referencing the Client Guide] was specifically going back." (*Id.* at 189–90.) Indeed, when asked whether the "Title Requirements" bullet point—which does not explicitly reference the Client Guide—required reference to the Guide for clarity, she stated "[t]hat would be my assumption based on my working knowledge of – you know, in the industry. Although, like I said, it doesn't say that here." (*Id.* at 190.) Similarly, when asked whether the "Non-Arm's Length Transactions" bullet point—also devoid of any reference to the Client Guide—required reference to the Guide for clarity, she stated, "[y]ou wouldn't have to look at that to know what an arm's length transaction is, *but you would have to look at it*

*to know what to do with them.*" (*Id.* at 190–91.)[36]  Put succinctly, Ms. Keith admits that her own industry experience would lead her to assume that even the Assetwise Agreement bullet points that do not explicitly reference the Client Guide constitute a reference to, and would require review of, the Client Guide itself for the bullet points to make sense.

As to documentary evidence, PRMI has produced no written waiver between PRMI and RFC, as the Guides require. (*See* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200; Nesser Decl., Ex. 3 (AlterNet Guide) § 250; *Id.*, Ex. 4 (Client Guide, Version 1-03-G01) § A200.)  And while PRMI is correct that nonwaiver clauses in contracts can be waived by conduct, *see Pollard*, 698 N.W.2d at 454, even where the purported conduct would only waive the underlying at-issue provision of the contract, *see Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, 460 F.3d 1047, 1054–55 (8th Cir 2006) (interpreting Minnesota law), PRMI conflates RFC's acceptance of loans underwritten to different *underwriting criteria*—which RFC appears to have provided in a few instances, (*see* Smallwood Decl., DX-15 (Dec. 28, 2001 Master Commitment Letter); *id.*, DX-16 (July 7, 2003 Master Commitment Letter); DX-22 (Sept. 18, 2006 Master Commitment and Variance Letter))—with RFC written approvals for variations in the Client Guide's R&Ws, of which PRMI cites no examples and the Court finds none.  Indeed, PRMI's own cited evidence—an Assetwise Informational Brochure—clearly states that Assetwise "automates *the underwriting process*," and is "an *underwriting* tool" designed to quickly analyze a loan and determine whether it complies with "[]RFC's *underwriting*

---

[36]  Ms. Keith was not asked about other bullet points that do not reference the Client Guide.

parameters[.]" (*Id.*, DX-43 (Assetwise Informational Brochure) at RC23253255 (emphasis added).) And a cursory review of any variances from its Client Guide underwriting criteria (*see id.*, DX-15, DX-16, DX-22) demonstrates that RFC's approval expressly contemplated *continued application* of the Guides, and only permitted variances to the extent the document was inconsistent with Guide parameters, (*id.*, Exs. 15 (Dec. 28, 2001 Master Commitment Letter) at 086801 (noting that the commitment to purchase the loans at issue in the document was "in accordance with the provisions of this Master Commitment and subject to the terms and conditions set forth in the . . . Client Guide" and that the Master Commitment only controlled where it conflicted with the Client Guide's provisions); 16 (July 7, 2003 Master Commitment Letter) at 0230836 (same language regarding Client Guide applicability); 22 (Sept. 18, 2006 Master Commitment and Variance Letter) at 04567458 (same language regarding Client Guide applicability).) Each of those documents varies only in their underwriting requirements; they say nothing about a variation in R&Ws contained in the Guides.

As to the use of Assetwise to support an estoppel defense, PRMI refers to much of the same evidence, discussed above. In the Court's *HLC JMOL Order*, it noted that the only witness to provide any substantive testimony on the issue at the *HLC* trial was Renee Bangerter. 399 F. Supp. 3d at 824. Bangerter testified that the Assetwise Agreement did not supersede the Client Guide. *Id.* She stated that the seven-point R&Ws listed in the Assetwise Agreement were not meant to replace the 20 to 30 pages of R&Ws in the Guides, but were merely additional requirements. *Id.* She could not recall ever telling anyone at HLC that the Assetwise Agreement modified the Client Guide, or that she even possessed

the authority to do so.  *Id.*  Mr. Zitting, a person of authority at PRMI, has testified to his understanding that the quality- and credit-related R&Ws of the Guides were essentially superseded by the "streamlined" R&Ws of the Assetwise Agreement.  (Nesser Decl., Ex. 11 (Zitting Dep.) at 181–82; *see also id.* at 140–41).)  However, it is unclear whether there is admissible evidence that an agent of RFC stated that the provisions and remedies of the Guides were inapplicable to Assetwise-approved loans.  At best, Zitting testified that RFC's unnamed staff in sales and training told PRMI to "follow" Assetwise.  (*Id.* at 214–16.)  While PRMI refers to RFC's form letter that accompanied the Assetwise Agreement, (*see* Smallwood Decl., DX-3 (Letter forwarding Assetwise Agmt.) at 00009), the letter discusses underwriting guideline variances and does not address the Guides' provisions or remedies.  Similarly, "approval certificates" that PRMI cites do not address departures from the Guides' provisions or remedies, and again, appear to address only underwriting guideline variances.  (*See* Pl.'s Opp'n at 20.)

Moreover, PRMI must identify the loans to which its Assetwise-based waiver and estoppel defenses apply.  (*HLC* 10/1/2018 Order at 7.)  Embedded within another memorandum, PRMI identifies one loan.  In its opposition memorandum, it cites a footnote in its *Daubert* opposition memorandum, purportedly containing "an example" of a specific loan subject to its estoppel defense.  (Def.'s Opp'n at 21 (citing Def.'s *Daubert* Opp'n at 21 n.13).)[37]  The loan referenced in the footnote is Loan 10381337.  (Def.'s *Daubert* Opp'n at 21 n.12.)  Loan 10381337 bears an Assetwise evaluation date of December 22, 2005.

---

[37]    Even so, PRMI cites to footnote 13, when the loan in question appears to be identified in footnote 12.  (Def.'s *Daubert* Opp'n at 21.)

(Smallwood Decl., DX-J (Excerpt from Loan File, No. 10381337).) As such, it was subject to the Client Guide's Assetwise-specific language, in place since 2003, that "[a]pproved [Assetwise] Clients are still bound by the [R&Ws] as detailed in this Guide," and the "use of Assetwise does not relieve [PRMI] of Loan eligibility and underwriting requirements set forth in this Guide." (Nesser Decl., Ex. 4 (Client Guide, Version 1-03-G01).)

In general, the Court finds ResCap's evidence persuasive on the question of whether the Guides applied to all Assetwise-approved loans, and is skeptical that PRMI has sufficient factual evidence concerning specifically-identified Assetwise-approved At-Issue Loans that support its waiver and estoppel defenses.[38] Nonetheless, it will permit PRMI to offer evidence concerning specifically-identified Assetwise-approved loans on this basis.

---

[38] Indeed, the evidence cited by PRMI in its opposition brief suggests that the Guides' provisions related to R&Ws and remedies *remained* in full effect even where the purportedly differing underwriting criteria was accepted by RFC. (*See* Smallwood Decl., DX-2 (Richardson Dep.) at 22 (noting Assetwise's use was encouraged by RFC), 30 (noting Assetwise automates the "credit underwriting portion"); DX-3 (Jan. 10, 2001 Letter from Richardson to Flitton) at Bates 0009 (noting that Assetwise provides a "full credit underwrite"); DX-7 (Maki Dep.) at 120 (noting RFC had great confidence in the Assetwise system), 131 (noting that Assetwise was an "automated *underwriting* system" that often went "over and above" what is usually required for underwriting (emphasis added)); DX-15 (Dec. 28, 2001 Master Commitment Letter) at 086801 (noting that the commitment to purchase the loans at issue in the document was "in accordance with the provisions of this Master Commitment and subject to the terms and conditions set forth in the . . . Client Guide" and that the Master Commitment only controlled where it conflicted with the Client Guide's provisions); DX-16 (July 7, 2003 Master Commitment Letter) at 0230836 (same language regarding Client Guide applicability); DX-22 (Sept. 18, 2006 Master Commitment and Variance Letter) at 04567458 (same language regarding Client Guide applicability).)

Accordingly, Plaintiff's motion is denied as to the application of the Guides to the Assetwise-approved Loans, and as to the dismissal of Defendant's waiver and estoppel defenses based on Assetwise.

### c. Countrywide-Approved Loans

ResCap also seeks a ruling on summary judgment that the Guides apply to a single sample loan pool originated to Countrywide's underwriting criteria, and that PRMI's waiver and estoppel defenses based on this loan fail. (Pl.'s Mem. at 9.)

In August 2005, RFC sought to capture PRMI's business that was instead going to Countrywide. (Smallwood Decl.,DX-24 (RFC email chain).) In October 2005, PRMI offered RFC the opportunity to bid on a $7 million loan pool "underwritten to Countrywide's guidelines." (*Id.*, DX-25 (Crawford Email to Zaloumis).) RFC won the bid. (*See id.*, DX-27 (Overgard Email to Gehrke).) On summary judgment, ResCap argues that there is no evidence showing that when RFC agreed to purchase a Countrywide-underwritten loan, "it was thereby agreeing to displace the Client Contract and incorporated Guides altogether." (Pl.'s Mem. at 9–10.)

In October 2005, when RFC purchased the Countrywide loan, Section A200 of the Client Guide was in force, stating that the Client Guide's R&Ws survived the Funding Date and were not affected by any investigation or review made by RFC, except when expressly waived in writing by RFC. (*See* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) § A200.) PRMI has identified no such writing in which RFC expressly waived the Client Guide's R&Ws.

PRMI's 30(b)(6) witness, Zitting, could not recall a conversation in which anyone at RFC told him that RFC's purchase of the Countrywide-underwritten loans included Countrywide's R&Ws, to the exclusion of the Guides' R&Ws.   In the *HLC* case, the Court denied JMOL to ResCap on a similar issue where HLC's witness recalled particular discussions with RFC concerning their purchase of bulk loans to the Countrywide "guide," and that when HLC sold loans to RFC based on bid tapes, HLC "was relying on RFC's agreement to purchase the loans based upon the disclosed characteristics."  (*HLC* Trial Tr. [Doc. No. 4724] at 3102); *see also HLC JMOL Order*, 399 F. Supp. 3d at 823.  Here, Zitting testified to his understanding that when RFC purchased loans that had been underwritten to Countrywide's requirements, it was also accepting Countrywide's R&Ws.   (Nesser Decl., Ex. 11 (Zitting Dep.) at 350–53.)  While Zitting could not recall if RFC ever stated as much to PRMI, he testified, "By taking them, they did.  They had to have.  There's no other—it's just common sense.  There's no possible way they could have not."  (*Id.* at 353, *see also id.* at 360.)

Although PRMI's evidence is thin, as with the Assetwise loans, the Court will permit PRMI to offer evidence in support of its waiver and estoppel defenses with respect to the R&Ws applicable to the Countrywide loan.[39]   Accordingly, Plaintiff's motion is denied as to the application of the Guides to the Countrywide loan, and with respect to PRMI's waiver and estoppel defenses based on that loan.

---

[39]     It is unclear whether PRMI asserts both waiver and estoppel defenses with respect to the Countrywide loan, or merely waiver.  (*See* Def.'s Opp'n at 19.)

### 6. PRMI's Mitigation Defense

Finally, ResCap moves for summary judgment that PRMI's mitigation defense—that RFC, "in its role as servicer, failed to mitigate losses on the loans . . . for which it seeks indemnity"—fails as a matter of law. (Pl.'s Mem. at 8.) In support, ResCap points to this Court's prior discussion in *First Mortgage* (which cited the *Common SJ Order*), where the Court explicitly stated that the Bankruptcy settlement "specifically allocated as between servicing and other claims." *First Mortg.*, 2018 WL 6727065, at \*12 (citing *Common SJ Order*, 332 F. Supp. 3d at 1126, 1202). Moreover, ResCap cites to this Court's minute order in the *First Mortgage* case in which it precluded *First Mortgage* from bringing a substantively identical mitigation defense. (*See* Minute Entry Order, *Residential Funding Co., LLC v. First Mortg. Corp.*, 13-cv-3490 [Doc. No. 225]; *see also* Jan. 31, 2019 Hr'g Tr., *First Mortg.*, 13-cv-3490 [Doc. No. 298], at 71 ("There is simply no competent factual evidence to support [a mitigation] defense even if it were legally permitted").)

PRMI contends there is a fact issue with respect to mitigation. As to the Trust Settlements, and Dr. Snow's 1% ($73 million) allocation of trust servicing claims, it asserts that number is far too low because (1) Dr. Snow improperly weighted the value of servicing claims; and (2) Mr. Hawthorne's testimony that servicing claims held a de minimis value during the settlement ignores the maximum possible damages exposure RFC faced from such claims. (Def.'s Opp'n at 41–42.) As to the Monoline Settlements, PRMI contends that (1) Dr. Snow's 0% allocation relies on the wrong information; (2) ignores the aggressive manner in which the Monolines pursued RFC; (3) ignores that other Monolines received servicing cure claim settlements in various amounts; and (4) ignores that MBIA

in particular actually litigated servicing claims against RFC and asserted $76 million in damages.  (*Id.* at 43–44.)  It also argues that "the bankruptcy court did *not* perform" any "allocation for the MBIA and FGIC Settlements[.]"  (*Id.* at 44 n.25.)

The Court agrees with ResCap, grants its motion, and precludes PRMI from presenting a mitigation defense at trial.  The only competent evidence before the Court with respect to servicing claims is Mr. Hawthorne's still-uncontroverted opinion that servicing claims brought by the Trust and Monoline Insurers against RFC were "not a significant driver of the overall settlement amounts for" either the Trust or Monoline Settlements because such claims were entitled to "little, if any, weight" given their questionable viability at the time of settlement.  (Alden Decl., Ex. T (Hawthorne Rpt.) at ¶ 257; *see also id.* at ¶ 271 (finding Dr. Snow's 0% Monoline servicing claim allocation reasonable).)  PRMI's only expert on the subject, Mr. Burnaman, expressly disqualified himself from opining on this issue.[40]  As such, PRMI offers *no evidence* in support of their mitigation defense.[41]  Accordingly, the Court grants ResCap's motion for summary judgment on this issue, and bars PRMI from presenting a mitigation defense at trial.

---

[40]    In the *HLC* trial, Burnaman noted he could not opine on the legal viability of the servicing claims asserted by the Monolines against RFC, and has since confirmed he would not change that testimony.  *See HLC JMOL Order*, 399 F. Supp. 3d at 820; (Smallwood Decl., DX-48 (Burnaman Dep.) at 16–18).)

[41]    As noted elsewhere in this order, PRMI's arguments regarding the reasonableness of the bankruptcy settlement (*see supra* at § III(D)(1)) and RFC's minimal value allocation to servicing claims (*see infra* at § III(G)(2)) have been rejected.

### G. Damages

The parties have advanced various arguments surrounding the appropriate measure of damages in this case.  Each is addressed in turn.[42]

#### 1.  Use of Statistical Sampling

ResCap moves for summary judgment that it may use statistical sampling as a method of proof for its claims.  (Pl.'s Mem. at 7.)  In support, ResCap cites this Court's *Common SJ Order*, in which the Court granted a motion for summary judgment by ResCap—and denied consolidated defendants' motion to the contrary—holding that the use of statistical sampling as a form of proof was appropriate.  332 F. Supp. 3d at 1151. The Court noted that "[a]s a general matter, statistical sampling is a commonly used and accepted means of assembling and analyzing data, particularly in complex litigation," and that both the United States Supreme Court and the Eighth Circuit had approved the use of sampling methodologies as a means of establishing breach and causation in various cases. *Id.* at 1146 (citing *Tyson Foods, Inc. v. Bouaphakeo*, ___ U.S. ___, 136 S. Ct. 1036, 1046 (2016) ("A representative or statistical sample, like all evidence, is a means to establish or defend against liability[.]"); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d

---

[42]     PRMI moves for partial summary judgment precluding ResCap from seeking damages for "attorney's fees incurred by RFC in bankruptcy and pre-bankruptcy litigation."  (Def.'s Mem. at 33; *see also* Compl. ¶ 83.)  ResCap does not contest the dismissal of such incurred fees.  (Pl.'s Opp'n at 29–30.)  In light of this conclusion, PRMI's motion is denied as moot.

However, ResCap's claim for (i) other fees and interest, including the fees and interest incurred in pursuing recovery from PRMI, is not dismissed by this Court's ruling; and (ii) indemnification for a portion of the RMBS Trusts' recovery that went to counsel for the Institutional Investors in RFC's bankruptcy is discussed *infra* § III(G)(3)(b)(3)(b).

901, 916 (8th Cir. 2005) (approving use of sampling methodology for breach and causation in breach of contract litigation)).

In the order, the Court disagreed with the consolidated defendants' assertion of a "clear trend" moving away from statistical sampling in RMBS cases, noting that "the question of whether sampling is permitted frequently turns on the scope of remedies available under the parties' governing agreement." *Id.* at 1146–47 (collecting cases). Numerous cases involving a large number of mortgage loans have used statistical sampling as a method of proof, the Court noted, with the distinction between when it is permitted and when it is not usually turning on whether the governing agreement "includes a sole remedy provision." *Id.* at 1148–49 (collecting cases). Here, the Client Guide's language (1) did not require RFC to provide notice to an originator of litigation potentially implicating the originator's indemnity obligations; (2) did not require RFC to demand repurchase where a breach of the originator's R&Ws has occurred; and (3) "perhaps most importantly . . . does not limit [RFC's] remedies to a single type." *Id.* at 1149. Indeed, the Client Guide permits RFC—and by extension, ResCap—to exercise any remedy outlined in the Guide or as allowed by law or in equity. *Id.* (citing Client Guide § A209)). Indeed, the language also provided that RFC's exercise of one or more remedies did not place any limits or otherwise prevent RFC from exercising any other remedies or rights it may have at law or in equity either. *Id.*

The Client Guide's use of the occasional singular noun when discussing loans— language like "[e]ach of the loans," discussing information "related to each loan," or ensuring "that each loan is in compliance"—also does not undermine the appropriateness

of statistical sampling. *Id.* at 1149 (quoting Client Guide § A202)). Indeed, the Court previously noted that the "each loan" language—or any language in the Client Guide for that matter—"does not state that [RFC] must prove breaches loan by loan," but rather only requires that originators "make their representations loan by loan." *Id.* (citing *Deutsche Bank Nat'l Tr. Co.*, 289 F. Supp. 3d at 506 (rejecting singular noun language argument where the governing agreement did not require plaintiff to identify and offer proof as to each loan at issue)). And in any event, the Court noted, "[t]he use of sampling evidence here is particularly important for another reason," namely, that "[e]stablishing liability and damages in this case without the use of sampling would be unmanageable." *Id.* at 1150.

Ultimately, the Court held that the use of statistical sampling was appropriate, noting that "statistical sampling is not guesswork . . . [nor] a shot in the dark." *Id.* at 1151 (citation omitted) (internal quotation marks omitted). Rather, it is a "well-established and scientifically sound method of inferring (to varying degrees of certainty) how many *individual* loans in the pool contain material breaches." *Id.* (citation omitted) (internal quotation marks omitted) (emphasis in original).

PRMI opposes ResCap's motion on this issue but in support of its position only incorporates prior briefing—rejected in the *Common SJ Order*—on the subject. (*See* Def.'s Opp'n at 49.) Accordingly, PRMI's arguments on this issue have been addressed in the Court's prior *Common SJ Order*, and the Court affirms its prior decision granting ResCap the right to use sampling as a method of proof. Indeed, the same provisions of the Client Guide discussed in the *Common SJ Order*—Sections A202 and A212—are present in materially identical provisions of the AlterNet Guide and succeeding versions of the Client

Guide that have bound RFC and PRMI since 1997. (*See* Nesser Decl., Ex. 3 (AlterNet Guide) §§ 251-1(A), (B), (E), (F) (predecessor section to § A202); 274 (predecessor section to A212); *see also* Pl.'s App'x 1 (Spreadsheet Comparing Client & AlterNet Guide Provisions) §§ A202 & A212.) Therefore, ResCap's motion for summary judgment as to its right to use statistical sampling as a method of proof is granted.

### 2. Value Attributable to Servicing Claims

ResCap moves for summary judgment that Plaintiff's allocation of servicing claims of (1) $73 million for the RMBS Trust Settlement and (2) no amount for the Monoline Settlements was reasonable. (Pl.'s Mem. at 3.) The Court has so previously ruled. *See HLC JMOL Order*, 399 F. Supp. 3d at 819–21; *HLC MIL Order*, 2018 WL 4863597, at *2. Plaintiff's servicing claim allocation relies primarily on Mr. Hawthorne's unrebutted opinions on this issue, including his opinion that it is reasonable to allocate "no amount to servicing claims for the Monoline Settlements[.]" (Alden Decl., Ex. T (Hawthorne Rpt.) at ¶¶ 255–71.) PRMI offers no new argument or evidence that would cause the Court to change its prior rulings on this issue. Therefore, ResCap's motion is granted on this issue.

### 3. Allocated Breaching Loss Methodology

#### a. General Methodology

ResCap moves for summary judgment that its methodology for allocating breaching losses—the "allocated breaching loss approach"—is a reasonably certain, non-speculative methodology for assessing and allocating damages. (Pl.'s Mem. at 6.) In support of its position, ResCap cites to this Court's *Common SJ Order*, in which the Court held that ResCap's "Allocated Breaching Loss Approach offers a reasonably certain basis for

assessing and allocating damages that is not 'speculative, remote, or conjectural.' " 332 F. Supp. 3d at 1203 (citation omitted).[43] ResCap asserts that because it has not changed its methodology in any relevant way here, the Court should reaffirm and adopt its prior ruling here. (Pl.'s Mem. at 6.)

The Allocated Breaching Loss Approach "measures damages in relation to the liabilities RFC incurred in the Settlements rather than the economic harm caused by breaching mortgages." *Common SJ Order*, 332 F. Supp. 3d at 1198. To do so, RFC "attempts to divide and allocate RFC's bankruptcy liabilities associated with the Trust Claims and Monoline Claims among the loans that [PRMI] and non-defendants sold to RFC." *Id.* RFC then "introduces a 'Settlement Factor' to reflect the discount from the bankruptcy settlement relative to the overall value of claims by investors and insurers." *Id.* Finally, RFC "multiples the Settlement Factor by the [PRMI's] Trust Breaching Losses to determine the Defendant's share of the allowed claims in favor of investors" and "repeats [the] process for the Monoline Breaching Losses to determine the Defendant's share of the allowed claims in favor of each insurer." *Id.* The resulting number "is a Defendant's purported measure of damages." *Id.* at 1198–99. The Court determined that this

---

[43]     ResCap also cites to two other decisions. First, it cites to this Court's prior decision in *First Mortgage*, which upheld the *Common SJ Order*'s determination on this issue. *See* 2018 WL 6727065, at *8 (noting that First Mortgage failed to present any expert opinion or other evidence challenging the *validity* of the Allocated Breaching Loss Approach model). Second, it cites to Judge Magnuson's decision in *UAMC*, which upheld this Court's *Common SJ Order* determination on this issue. *See UAMC,* 2018 WL 4955237, at *4 (noting the Allocated Breaching Loss Approach "complies with Minnesota's requirement that a plaintiff prove damages to a reasonable certainty that need not be mathematically precise").

141

methodology—and not two other methodologies proposed by ResCap, *see id.* at 1192–98 (rejecting "Breaching Loss Approach"), 1204–05 (rejecting "Allocated Loss Approach")—used "concrete and verifiable" numbers resulting in a "reliable, non-speculative basis for calculating damages[.]" *Id.* at 1204.

PRMI has moved for summary judgment on this issue as well, arguing that ResCap's Allocated Breaching Loss Method is speculative and therefore barred as a matter of law. (Def.'s Mem. at 8.)  PRMI advances several arguments—some of which the Court has previously addressed—in support of its motion.  Specifically, PRMI asserts that: (1) ResCap's Allocated Breaching Loss Method fails because it starts from the wrong settlement amount; (2) ResCap's allocation fails to account for critical differences in the relative strength of claims and defenses across trusts, and purportedly bases this argument on testimony specific to PRMI; and (3) ResCap fails to value certain non-indemnifiable claims, including ones not addressed in the First Wave.  (*Id.*)

PRMI's only challenge to the methodology itself—compared to, say, other damages models—is based on the fact that the Court's ruling on the Allocated Breaching Loss Approach was a denial of the consolidated defendants' motion for summary judgment, and not an affirmative grant of summary judgment to the contrary.  (Def.'s Opp'n at 35–36.) Beyond that, PRMI's arguments focus on ResCap's *application* of the damages allocation methodology to this case.  (*See* Def.'s Mem. at 8–22.)  While it is true that "[a] denial of summary judgment is not a grant of summary judgment on that issue for the other side," *see Ricci v. Urso*, 974 F.2d 5, 6 (1st Cir. 1992), the Court finds that its holding and reasoning from its *Common SJ Order* essentially accomplished the same thing: the *basis*

for denying the consolidated defendants' motion was that the Allocated Breaching Loss Approach met the reasonableness/non-speculative threshold required under the law. *Common SJ Order*, 332 F. Supp. 3d at 1203–04. Accordingly, the Court now grants summary judgment and holds that the Allocated Breaching Loss Approach is a reasonably certain, non-speculative methodology for assessing and allocating damages in this case.

### b. Application of the Allocated Breaching Loss Methodology

Plaintiff seeks a ruling on summary judgment that the RMBS Trust Settlement allowed a single, unallocated claim. (Pl.'s Mem. at 16–18.) It argues that Judge Glenn allowed the RMBS Trust claims resulting from the settlement of *all* RMBS Trust claims in the aggregate amount of $7.091 billion, and not for separate settlement allocations between the Original Settling Trusts and the Additional Settling Trusts. (*Id.*) Plaintiff points to the Chapter 11 Plan and Judge Glenn's Confirmation Order and Findings of Fact, all of which refer to and/or allow the aggregate RMBS Trust Settlement. (*Id.*)

Defendant moves for summary judgment on Plaintiff's allocation methodology more broadly, on this issue and two others. It asserts that ResCap's methodology fails under *UnitedHealth* because it: (1) fails to account for separate settlement amounts with respect to the Original Settling Trusts and the Additional Settling Trusts; (2) ignores the relative strength of claims and defenses; and (3) fails to value non-indemnifiable claims. (Def.'s Mem. at 8–23.)

As this Court has previously noted, *UnitedHealth* stands for the proposition that an "insured . . . must present a non-speculative basis to allocate a settlement between covered and non-covered claims," but "need not prove allocation with precision." 870 F.3d at 863;

*see also RSUI Indemn. Co. v. New Horizons Kids Quest, Inc.*, 933 F.3d 960, 966 (8th Cir. 2019) (directing the district court, on remand, "to allocate 'as best it can [an] unallocated jury award between covered and uncovered claims," without indicating which party bears burden of allocation).

### (1) Additional Settling Trusts/Single, Unallocated Claim

PRMI contends that ResCap's entire damages allocation is impermissibly speculative because its methodology fails "the most basic requirement for allocation by not starting from the correct settlement amounts."[44] (Def.'s Mem. at 8.) It asserts that ResCap ignores the fact that in Bankruptcy Court, the parties agreed to "radically different" settlement amounts as between the Original Settling Trusts and the Additional Settling Trusts. (*Id.* at 8–10.) Defendant asserts that Plaintiff's damages expert, Dr. Snow, starts with the "wrong" total amount of allowed claims by allocating to RFC debtors the aggregate settlement amount. (Smallwood Decl., Ex. 19 (Snow Dep.) at 19, 26–27.) Then, after deducting amounts for servicing and NDS trusts, he allocates the remainder ($6.749 billion) based on each originator's share of total breaching losses across all of the Trusts that participated in the Global Settlement. (*Id.*) PRMI argues that Snow's methodology fails to account for whether PRMI-attributable breaching losses were in RFC Trusts among the Original Settling Trusts, or the Additional Settling Trusts, for which the non-aggregated, component settlement was significantly less. (Def.'s Mem. at 10–11.) PRMI

---

[44] In support of its position, PRMI offers the Supplemental Report of its expert, Dr. McCrary. (*See* Alden Decl., Ex. S (Suppl. McCrary Rpt.).) The Court will address his supplemental opinion in further detail in the forthcoming order on the parties' *Daubert* motions.

maintains that the losses on its at-issue loans were predominantly associated with the Additional Settling Trusts. (*Id.* (citing Smallwood Decl., Ex. 19 (Snow Dep.) at 31–32.) Furthermore, PRMI argues that even if the Court denies its summary judgment motion on this issue, the Court should deny Plaintiff's cross motion because of the existence of triable issues of fact. (Def.'s Opp'n at 36.)

Plaintiff, however, asserts that nothing in the Chapter 11 Plan, Confirmation Order, or Findings of Fact allocates $250 million to the Additional Settling Trusts. (Pl.'s Mem. at 17; Pl.'s Opp'n at 2.) Thus, it argues that the Allocated Breaching Loss Approach, offered by Dr. Snow, begins with the correct RMBS Trust Settlement Amount: the aggregate amount that Judge Glenn approved and allowed. (Pl.'s Opp'n at 2.)

As explained below, the Court finds, as a matter of law, that the RMBS Settlement allowed a single unallocated claim, and that Plaintiff's damages methodology is not impermissibly speculative as a result of calculating damages based on that single, unallocated claim.

A general overview of Chapter 11 proceedings and precepts provides important context for the analysis of this issue. Bankruptcy judges are authorized to "hear and determine all cases arising under title 11 [the Bankruptcy Code] and all core proceedings arising under title 11, or arising in a case under title 11[.]" 28 U.S.C. § 157. Among other things, a "core proceeding" includes the "allowance or disallowance of claims against the estate . . . and estimation of claims or interests for the purposes of confirming a plan under chapter 11[.]" *Id.* § 157(b)(2)(B). Under Section 101(5)(A) of the Bankruptcy Code, a "claim" is defined as a "right to payment," 11 U.S.C. § 101(5)(A), and Section 502

provides for the allowance and disallowance of claims. While filed claims are generally deemed allowed, when a party in interest objects, "the court, after notice and a hearing, shall determine the amount of such claim . . . , and shall allow such claim in such amount." 11 U.S.C. § 502(a)–(b).

Section 1123 of the Bankruptcy Code proscribes the mandatory and discretionary provisions of a Chapter 11 reorganization plan. 11 U.S.C. § 1123. Among the mandatory provisions, a Chapter 11 plan must designate classes of claims for treatment under the debtors' reorganization plan. *Id.* § 1123(a)(1). Among the discretionary provisions, a Chapter 11 plan may provide for a settlement of any claim or interest belonging to the debtor. *Id.* § 1123(b)(3)(A).

With respect to bankruptcy settlements, "a settlement or compromise made in bankruptcy is not enforceable in advance of bankruptcy court approval." *Am. Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1024 (8th Cir. 2010) (citations omitted); *see also* Fed. R. Bankr. P. 9019(a) ("Upon motion by the trustee and after notice and hearing, the court may approve a compromise or settlement."). When a Chapter 11 plan is confirmed by the Bankruptcy Court, "the provisions of a confirmed plan bind the debtor . . . and any creditor[.]" 11 U.S.C. § 1141(a); *In re Dial Bus. Forms, Inc.*, 283 B.R. 537, 539 (B.A.P. 8th Cir. 2002) ("Confirmation of a plan 'acts like a contract.'").

Because ResCap seeks indemnity from PRMI for a portion of the Allowed Claims, the Court consults the December 11, 2013 Confirmation Order and Findings of Fact to identify the RMBS Trust claims that Judge Glenn allowed. In his Findings of Fact, Judge Glenn stated, "In the context of the Plan Mediation, the RMBS Trustees contemplated that

the resolution of the RMBS Trust Claims should include the RMBS Representation and Warranty Claims of *all* RMBS Trusts for which the Trustees acted, and not just the RMBS Representation and Warranty Claims of the Original Settling RMBS Trusts." (Nesser Decl., Ex. 27 (Bankr. Findings of Fact) ¶ 117) (emphasis added). Judge Glenn also observed that the RMBS Trusts' servicing claims against RFC were "wrapped into the RMBS Settlement." (*Id.* ¶ 119.)

In the Confirmation Order, Judge Glenn approved the Chapter 11 Plan and allowed the claims set forth in the Plan, stating, "Pursuant to [S]ection 502 of the Bankruptcy Code, the RMBS Trusts shall have Allowed Claims against the Debtor Groups in the amounts and allocations set forth in Article IV.C.2 of the [Chapter 11] Plan." (Nesser Decl., Ex. 26 (Bankr. Confirm. Order) at 35, ¶ 9.)

Turning to the Chapter 11 Plan, it states that upon the Bankruptcy Court's entry of a confirmation order, the confirmation order "shall constitute approval of the RMBS Settlement, on the terms set forth herein." (*Id.*, Ex. 25 (Second Am. Ch. 11 Plan) § IV.C.2 at 58.) It further states that "[t]he Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein." (*Id.* at 59.) As to the amount of the settlement to the RMBS Trusts, Article IV.C.2 of the Chapter 11 Plan—the provision that the Confirmation Order expressly references—states that "[e]ntry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims . . . in the aggregate amount[] of . . . $7,091.2 million against the RFC Debtors[.]" (*Id.*) The Chapter 11 Plan clearly defines "RMBS Trust Claims" as "*all* claims . . . of the RMBS Trusts," and "RMBS Trusts"

as "*all* residential mortgage backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors serve as sponsor, depositor, servicer, master servicer or in similar capacities, or as Loan Group in such RMBS Trust, as applicable." (*Id.* at 30) (emphasis added). The Chapter 11 Plan does not refer to two separately allocated RMBS Trust settlements between the Original Settling Trusts and the Additional Settling Trusts.

As noted, a confirmed Chapter 11 plan functions like a contract, to which general rules of contract interpretation apply. *In re Schellhorn*, 280 B.R. 847, 853 (N.D. Iowa 2002). Some courts have held that a plan should be "analyzed according to the principles of contract law of the state in which the plan was confirmed." *Id.* (citing *In re UNR Indus., Inc.*, 212 B.R. 295, 301 (Bankr. N.D. Ill. 1997)). Here, whether the language of the Chapter 11 Plan is analyzed under the laws of New York or Minnesota, both states apply the same fundamental rules of contract interpretation. One such rule, applicable here, is that where the language of a contract is clear and unambiguous, the agreement is to be enforced according to its terms. *See, e.g., Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363–64 (N.Y. Ct. App. 2009); *Turner*, 276 N.W.2d at 63, 67. The Court finds that the language in the Chapter 11 Plan is clear and unambiguous. The amount of the Allowed Claim for all RMBS Trusts is $7.091 billion (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) § IV.C.2 at 59.) That is the single unallocated amount that Judge Glenn approved in the Confirmation Order. (Nesser Decl., Ex. 26 (Bankr. Confirm. Order) at 35, ¶ 9.)

Despite this clear, unambiguous language, PRMI maintains that a separate RMBS Trust claim allocation of $250 million for the Additional Settling Trusts remained part of the Chapter 11 Plan that was ultimately approved and allowed by Judge Glenn in his Confirmation Order and Findings of Fact. In support of its position, PRMI relies on: (1) the Supplemental Term Sheet; (2) the Findings of Fact; (3) the Recovery Analysis annexed to the Disclosure Statement; and (4) Trustee Declarations.

### (a) Supplemental Term Sheet

The Supplemental Term Sheet, dated May 23, 2013, and attached as Exhibit B to the May 13, 2013 Plan Support Agreement, contains separate allocations for the Original Settling Trusts and the Additional Settling Trusts. (*See* Nesser Decl., Ex. 29 (Suppl. Term Sheet) at 70.) But neither the Supplemental Term Sheet nor the Plan Support Agreement are the operative documents here, although Judge Glenn approved them in June 2013. (*Id.*, Ex. 30 (Order Approving PSA).) The Plan Support Agreement was an agreement that procedurally bound the parties to support a proposed, definitive Chapter 11 plan in the future. It did not determine the Allowed Claims. In his June 2013 Order approving the Plan Support Agreement, Judge Glenn stressed that the Plan Support Agreement, to which the Supplemental Term Sheet was attached, was an early and limited part of the confirmation process,

> [I]t is important to keep in mind the limited issues the Court must decide now and the context in which the issues arise. The Court is asked to enter an interlocutory order approving an agreement between the Debtors and many of their key creditor constituencies that . . . have reached an agreement to support a reorganization plan consistent with the terms of the PSA and its two attached term sheets. The PSA is *not* a disclosure statement and it is *not*

a reorganization plan; those are important, indeed critical, steps yet to come[.]

(*Id.* at 2.)

Judge Glenn was careful to note that his approval of the Plan Support Agreement did not mean that a plan embodying its terms would ultimately be confirmed, (*id.* at 3, 13), making clear that "[a]pproval of the PSA does *not* bind the objecting parties or the Court from challenging (in the case of the objectors) or rejecting (in the case of the Court) a plan substantially on the terms set forth in the PSA." (*Id.* at 3) (emphasis in original); *see also* Nesser Decl., Ex. 31 (PSA Hr'g Tr.) at 53) (Judge Glenn stating that his upcoming ruling on the Plan Support Agreement would serve as an interlocutory order, and absent a confirmed plan that embodies its terms, the PSA "disappears."). He recognized that while "the PSA is an important step in the process; it is far from the last step." (*Id.* at 13.) Judge Glenn further distinguished the different legal standards applicable to the Plan Support Agreement and the forthcoming Chapter 11 Plan, stating "[t]he standards applicable to the approval of the PSA are *not* the standards applicable to approval of a disclosure statement or confirmation of a plan." (Nesser Decl., Ex. 30 (Order Approving PSA) at 3) (emphasis in original).

The May 23 Supplemental Term Sheet, and the fact that the parties reached agreement in May, did not render the Global Settlement *effective* in May 2013, much less did it *allow claims* based on the Supplemental Term Sheet. As this Court has previously observed, "It is a recognized principle of bankruptcy law that a bankruptcy court is required to approve any compromise or settlement proposed in the course of a Chapter 11

reorganization before such compromise or settlement can be deemed effective." *HLC MIL Order*, 2018 WL 4863597, at *15 (D. Minn. Oct. 8, 2018) (quoting *Am. Prairie Constr. Co.*, 594 F.3d at 1024); *see also Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 279 (8th Cir. 2015) ("Prior to the settlement agreement becoming enforceable, the bankruptcy court needed to approve the agreement."). Approval did not occur until Judge Glenn issued his Findings of Fact and Confirmation Order in December 2013, allowing the claims on the unambiguous terms that he expressly approved, as set forth in the Chapter 11 Plan. Those terms did not include separate allocations for the Original Settling Trusts and Additional Settling Trusts, as PRMI acknowledges. (Def.'s Mem. at 12) ("[T]he plan does not recite the separate settlement amounts for the Original and Additional Settling Trusts[.]"). Nor are any such allocations present in the Confirmation Order or Findings of Fact.[45]

### (b) Judge Glenn's Findings of Fact

PRMI asserts that in Judge Glenn's December 2013 Findings of Fact, he refers to the terms of the Supplemental Term Sheet as "final," and to the Chapter 11 Plan as being

---

[45] At the summary judgment hearing, PRMI argued that ResCap's current view of Allowed Claims, limited to those found in the Chapter 11 Plan, Confirmation Order, and Findings of Fact, is inconsistent with a position that it took in Wave One on servicing-related claims. (Dec. 2, 2019 Hr'g Tr.) at 82–83.) PRMI contends that in Wave One, ResCap relied on $96 million of servicing related "RMBS Cure Claims" found in the Supplemental Term Sheet, but not in the Chapter 11 Plan. (*Id.*) The Court disagrees with PRMI's characterization. Judge Glenn specifically allowed the $96 million servicing-related claim in his Findings of Fact, which was issued in conjunction with the Confirmation Order. (Nesser Decl., Ex. 27 (Bankr. Findings of Fact) ¶ 119) ("Under the Plan, the servicing related claims are settled as "RMBS Cure Claims" and allowed in an aggregate amount of $96 million.") Plaintiff's position is not inconsistent.

consistent with the term sheets. (Def.'s Mem. at 11–12.) PRMI further contends that Judge Glenn refers to the parties as having reached the "final terms" of a settlement "in May [2013]" as "embodied in the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Term Sheet, dated May 23, 2013." (Def.'s Mem. at 12) (citing Smallwood Ex. 14 (Bankr. Findings of Fact) ¶¶ 5, 79). Even if this were an accurate characterization of Judge Glenn's remarks, which it is not, procedurally, the mere fact of settlement in May 2013 did not render the claims allowed, for the reasons stated above.[46]

Moreover, PRMI misstates the legal effect of two separate findings from Judge Glenn. In Paragraph 5, on which PRMI relies, Judge Glenn simply recounts the history of the parties' lengthy mediation process, noting that in May 2013, "[a]fter several months of mediation negotiations, [the parties] reached a settlement embodied in the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Term Sheet, dated May 23, 2013." (*Id.* ¶ 5.) Contrary to PRMI's suggestion, Judge Glenn did not say that the parties had reached the "final terms" of the settlement on May 23. Rather, he stated that the "final terms" were reached on May 9, 10, and 13, 2013—well before the

---

[46]     Likewise, the fact that Plaintiff's expert Donald Hawthorne referred to underlying testimony from Bankruptcy CRO Krueger that the "final" terms of the Global Settlement were "hammered out" in May 2013, (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 141), does not advance PRMI's position. Again, the claims that Judge Glenn allowed were those set forth in the Chapter 11 Plan, which does not contain a separate allocation for the Additional Settling Trusts. Plaintiff's experts have referenced May 2013 for the starting point of ResCap's damages methodology because that is when the parties agreed to the $7.091 billion in Allowed Claims that the Bankruptcy Court ultimately approved. (*See* Pl.'s Reply at 17 n.9.)

existence of the Supplemental Term Sheet. (*Id.* ¶ 79.) Yet, despite this "finality," he observed that the negotiation process was not static. The parties continued to negotiate, leading to "the execution and filing of the Supplemental Term Sheet (along with the Plan Support Agreement and Plan Term Sheet) at approximately 9:00 a.m. on May 23, 2013." (*Id.* ¶ 81.) And even after May 2013, Judge Glenn observed that the parties engaged in "further arm's-length negotiations" prior to the filing of the Chapter 11 Plan, Disclosure Statement, and Disclosure Statement Motion. (*Id.* ¶ 83.)

PRMI also points to Paragraph 82 in the Findings of Fact in which Judge Glenn continues his historical narrative, stating, "After those filings, the Plan Proponents, in consultation with various parties in interest, drafted the [Chapter 11] Plan, which implemented and was consistent with the terms of the Plan Support Agreement and Term Sheets, as well as the related Disclosure Statement and motion seeking approval of the Disclosure Statement and solicitation procedures." (*Id.* ¶ 82.) PRMI also notes that one of the provisions of the Plan Support Agreement called for the parties to file a Chapter 11 Plan "in accordance with" the terms of the Plan Support Agreement and term sheets, and take no action "inconsistent with" the Plan Support Agreement. (Smallwood Decl., Ex. 48 (Order Approving PSA) at 7.) Defendant argues that for the Chapter 11 Plan to "implement," "embody," and be "consistent with" the Plan Support Agreement, Term Sheets, and Disclosure Statement, it must have included all of the terms of those earlier documents. It contends that although the separate allocations were unstated, they remained in place, explaining, "The bankruptcy plan simply describes the claims in a [different] way," leading to the same total. (Def.'s Opp'n at 38.)

The Court disagrees. First, for the Chapter 11 Plan to "embody," be "consistent with," and "in accordance with" the Plan Support Agreement, it was not required to be identical. It bears repeating that the operative documents here are the Chapter 11 Plan, the Confirmation Order, and Findings of Fact. They defined and *allowed* the Allowed Claims for which ResCap seeks indemnity—they did not simply *describe* the claims. The fact that the Chapter 11 Plan, and subsequently, the Confirmation Order and Findings of Fact, lack a separate allocation for the Original Settling Trusts and the Additional Settling Trusts is legally significant. As this Court has previously observed, "Indeed, the Settlements would not have had legally binding effect without Judge Glenn's Findings of Fact and subsequent approval." *HLC MIL Order*, 2018 WL 4863597 at *15 (citing *Am. Prairie Constr. Co.*, 594 F.3d at 1024).

Second, there were, in fact, differences between the Plan Support Agreement and the Plan. In addition to the Plan not adopting a separate $250 million allocation to the Additional Settling Trusts, a change occurred with respect to junior secured noteholders. The Supplemental Term Sheet provided that junior secured noteholders would not receive post-petition interest on their claims, but the Chapter 11 Plan was amended to adopt a junior secured noteholder settlement, without any amendment to the Plan Support Agreement. (*Compare* Nesser Decl., Ex. 29 (Suppl. Term Sheet) at 69 *with* Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 18, § I.A.155.) Another difference between the Plan Support Agreement and the Chapter 11 Plan concerns the distribution of proceeds for servicing-related claims, or "RMBS Cure Claims." The Supplemental Term sheet called for $96 million in servicing-related claims to be paid in cash as a priority distribution. (Nesser

Decl., Ex. 29 (PSA) at 5, ¶ 7.) However, after the parties learned that a priority distribution of cash proceeds would have adverse tax consequences to the RMBS Trusts, (*RFC Bankr.*, No. 12-12020-mg, Major Decl. [Doc. No. 5677] ¶ 34), the parties utilized a weighted claim procedure to calculate and make distributions of the proceeds, as reflected in Article IV.C.3(c) and (d) of the Plan. (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 59–60.)

In addition, Judge Glenn signaled that his approval of the Plan Support Agreement did not necessarily mean that he would approve a Chapter 11 Plan even on the same terms as the Plan Support Agreement. (*Id.*, Ex. 30 (Order Approving PSA) at 13.) The Plan Support Agreement also contemplated that there would be differences as to the content of the Plan Support Agreement, the Chapter 11 Plan, and other approved Plan documents. It provided that in the event of conflict, the "the terms and provisions of the Plan shall control." (*Id.*, Ex. 29 (PSA) § 10.2.) Also, it stated that any material variations required only the approval of the parties. (*Id.* § 2(c).)

Third, the Chapter 11 Plan was generally consistent with the Plan Support Agreement, although it was not identical in every respect. As Plaintiff has noted, the Global Settlement resolved a myriad of complicated issues. The fact that some elements changed between the filing of the Plan Support Agreement and the Chapter 11 Plan does not render the Plan inconsistent or in violation of the Plan Support Agreement. The Chapter 11 Plan provided for an aggregate RMBS Trust settlement in the same total amount set forth in the Supplemental Term Sheet to the Plan Support Agreement.

While PRMI suggests that the actions underlying any removal of the $250 million allocation were secretive or surreptitious, it offers no evidence to support its speculation.

To the contrary, the Chapter 11 Plan was available for the creditors to review. Judge Glenn himself noted that while the parties to the Plan Support Agreement agreed to support a Chapter 11 Plan consistent with the terms of the Plan Support Agreement and accompanying term sheets, the Plan Support Agreement gave them the right to withdraw support for a plan under a variety of circumstances. (Nesser Decl., Ex. 30 (Order Approving PSA) at 13.) The consenting claimants were free to object on the grounds that the Plan violated the Supplemental Term Sheet, if they so believed. PRMI argues that the lack of objections means "nothing," because the claim amounts against each debtor were identical on the Plan Support Agreement and Chapter 11 Plan. But again, if the separate allocation to the Additional Settling Trusts was a bedrock element, then any parties who were concerned about its absence from the Chapter 11 Plan were free to object to the single, unallocated RMBS Trust Settlement. They did not do so.

### (c) Recovery Analysis

PRMI also points to the Debtors' Recovery Analysis, ("Recovery Analysis") annexed as Exhibit 7 to the Disclosure Statement for the Chapter 11 Plan that was filed on August 23, 2013. The Recovery Analysis, attached to the filing of the Chapter 11 Plan, provides creditors with "an estimate of the proceeds that may be generated as a result of the orderly liquidation of the assets of the debtors." (Smallwood Decl., Ex. 15 (Recovery Analysis, Ex. 7 to Aug. 2013 Chapter 11 Plan) ¶ 4.) It also contains a broad disclaimer about the mutable nature of the Recovery Analysis, stating,

> Underlying the Recovery Analysis are a number of estimates and material assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the

Debtors. In addition, various decisions upon which certain assumptions are based are *subject to change*. Therefore, there can *be no assurance* that the assumptions and estimates employed in determining the recovery value of the assets will result in an accurate estimate of the proceeds that will be realized. In addition, amounts of Claims against the Estates *could vary significantly* from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors *could vary materially* from the estimates provided herein.

(*Id.*) (emphasis added).

Noting that the General Unsecured Claims subject to analysis include the RMBS Trust Claims, the Recovery Analysis states, "The treatment of many of these claims in the Recovery Analysis is assumed to be subject to the settlement terms agreed upon by the Consenting Claimants." (*Id.* ¶ 38.) Paragraph 40 addresses the RMBS Trust portion of the Global Settlement and includes the separate allocation of $7.051 billion for the Original Settling Trusts and $250 million for the Additional Settling Trusts. (*Id.* ¶ 40.) However, in the tabular presentation of the Recovery Analysis, there is no $250 million allocation for the Additional Settling Trusts, but only the aggregate amount of $7.091 billion. (*Id.* at p. 32 of 159.)

The Recovery Analysis does not support PRMI's position. Not only does the Recovery Analysis table provide the aggregate settlement amount, the Recovery Analysis is couched in qualifications, stating that its treatment of claims is "assumed" to be subject to the parties' settlement terms, it is intended to provide an "estimate" of the settlement proceeds, and that ultimate recovery by the creditors could vary considerably from the terms of the Recovery Analysis.

### (d) Trustee Declarations

PRMI also asserts that "multiple trustees" recognized the separate $250 million allocation for the Additional Settling Trusts. (Def.'s Reply [Doc. No. 5327] at 4 (citing Smallwood Decl., Exs. 42–45 (June 10, 2013 Decl. of Trustees)).) But as Plaintiff notes, the Trustee Declarations on which PRMI relies, were authored in June 2013, in support of the Plan Support Agreement. Unsurprisingly, they reflect the Trustees' understanding of the RMBS Trust allocation *at that time*, as the Supplemental Term Sheet had recently been filed as an attachment to the Plan Support Agreement. However, five months later, the same Trustees submitted declarations in support of confirmation. (*See* Nesser Decl., Ex. 25 (Confirmation Order) at 1–2 & n.2.) In their subsequent declarations, the same Trustees upon whom PRMI relies for their prior declarations seek entry of a confirmation order, approving the Allowed Claims of the RMBS Trusts in the aggregate amount of $7.091 billion. (*See RFC Bankr.*, No. 12-12020-mg (Bankr. S.D.N.Y.) [Doc. Nos. 5674, 5677, 5690].)

### (e) Contemporaneous Evidence

As to the underlying rationale for PRMI's allocation argument, i.e., its contention that ResCap's damages allocation fails to account for the significantly lower $250 million allocation to the Additional Settling Trusts, ResCap asserts that the Bankruptcy parties' own experts concluded that the Additional Settling Trusts were entitled to a much greater percentage of the total RMBS Trusts' claim. (Pl.'s Opp'n at 4.) It notes that the RMBS Trustees' experts, Duff & Phelps, calculated "roughly a billion dollars of damage for the [A]dditional [S]ettling [T]rusts." (Nesser Decl., Ex. 36 (Pfeiffer Dep.) at 190; *see also id.*,

Ex. 34 (RMBS Trust Scheds. 3G & 3R (calculating over $970 million of origination claims against RFC and GMAC related to the Additional Settling Trusts); *id.*, Ex. 35 (Pfeiffer Decl.) ¶ 23.) Further, ResCap states that when "isolating the 155 RFC-sponsored Additional Settling Trusts (as PRMI does at 9–10), Duff & Phelps attributed to those trusts $557.7 million in claims against RFC." (Pl.'s Opp'n at 4 (citing Nesser Decl., Ex. 37 (Spreadsheet derived from Schedule 3R of Ex. 34)).) ResCap also notes that its expert in Bankruptcy, Frank Sillman, applied a 35.1% breach rate and a 41–47% litigation discount to the claims of the Additional Settling Trusts, (*id.* at 5 (citing Nesser Decl., Ex. 38 (Sillman Decl.) ¶ 59)), which, when applied to the purported losses on the Additional Settling Trusts as asserted by PRMI, would result in a claim of $518 to $594 million for those trusts. (*Id.*)

For all of the foregoing reasons, the Court finds, as a matter of law, that the RMBS Trust Settlement allowed a single unallocated claim. The operative legal documents—the Chapter 11 Plan, Confirmation Order, and Findings of Fact—unambiguously allow a single unallocated claim to the RMBS Trusts. Judge Glenn did not approve the Global Settlement when he approved the Plan Support Agreement. He only did so through his Confirmation Order and Findings of Fact. The operative legal documents are clear and unambiguous. Accordingly, Plaintiff's summary judgment motion on this issue is granted. The portion of Defendant's cross motion on allocation regarding Plaintiff's purported failure to account for separate settlement allocations is denied.

### (2) Relative Strength of Claims and Defenses

PRMI also argues that Plaintiff's allocation methodology fails because it does not account for the relative strength of claims and defenses across trusts. (Def.'s Mem. at 13.)

It argues that under the district court's ruling in *UnitedHealth*, a plaintiff's allocation must be based on the "*relative value*" of settled claims. (*Id.* (citing 870 F.3d at 865 (emphasis in original).) It asserts that a plaintiff must offer evidence of not only the maximum possible damages, "but also the likelihood that the claimant will win those damages." (*Id.* (citing *UnitedHealth*, 47 F. Supp. 3d at 889).) PRMI contends that Dr. Snow's allocation fails because it unreasonably "assumes RFC would have viewed each breach claim as having the same likelihood of success and thus would have settled on each allegedly breaching loan for the same percentage of losses." (*Id.* (citing Smallwood Decl., Ex. 21 (Feb. 2018 Snow Dep.) at 294)).) By following this approach, PRMI contends that Dr. Snow ignores that representations varied across trusts, and that older trusts were subject to a statute-of-limitations defense. (*Id.* at 13–14.)

ResCap, however, argues that *UnitedHealth* does not call for an all-or-nothing approach, requiring it to "account for every possible strength or weakness of the settled claims on a loan-by-loan and trust-by-trust basis"—an argument that the Court previously rejected in Wave One. (Pl.'s Opp'n at 8 (citing *Common SJ Order*, 332 F. Supp. 3d at 1191, 1203–04).) It contends that the Allocated Breaching Loss Approach properly allocates based on each defendant's losses and breach rates, providing the fact finder with specific damages amounts based on that criteria. (*Id.* at 8–9.) Moreover, Plaintiff posits that PRMI fails to address "how one could reasonably isolate and value a single purported loan-by-loan distinction in a vacuum, or which loan-by-loan distinctions should be accounted for, and which should not." (*Id.* at 9.)

160

The Court denies summary judgment to PRMI on this issue. As with the defendants in Wave One, PRMI reads *UnitedHealth* incorrectly. *See Common SJ Order*, 332 F. Supp. 3d at 1203–04. *UnitedHealth* provides that "[t]o survive summary judgment, an insured need not prove allocation with precision, but it must present a non-speculative basis to allocate a settlement between covered and non-covered claims." 870 F.3d at 863; *see also RSUI Indem. Co.*, 933 F.3d at 966 (directing the district court, on remand, to "allocate 'as best it can' [an] unallocated jury award between covered and uncovered claims"). Plaintiff need not factor every single difference in trust representations and the strength of certain defenses into its allocation in order to meet this standard. As the Court has previously found, the Allocated Breaching Loss Approach "offers a reasonably certain basis for assessing and allocating damages that is not 'speculative, remote, or conjectural.'" *Common SJ Order*, 332 F. Supp. 3d at 1203–04; *see also UAMC*, 2018 WL 4955237, at *4; *First Mortg.*, 2018 WL 6727065, at *7–9. PRMI's arguments do not provide a basis for precluding the *use* of Plaintiff's allocation methodology.

There are genuine disputes of material fact, however, as to the significance of certain differences in trust representations and the strength or weakness of certain defenses, discussed below, that could bear on the *amount* of Plaintiff's damages allocation. Therefore, the Court will permit the parties to offer non-speculative evidence relevant to the effect, if any, of the strength and weaknesses of the trust representations and certain defenses on Plaintiff's damages allocation, subject to the admissibility of such evidence.

### (a) Strength of Representations

PRMI asserts that RFC's trust representations "varied from deal to deal," (Def.'s Mem. at 14 (citing Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 73)), focusing on three specific variations: (1) RFC represented to only 17 trusts that loans were "underwritten in substantial compliance with the criteria set forth in the [Client Guide]"; (2) RFC represented to only 61 trusts (all of which closed in 2006 or later) that "[no] fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan"; and (3) for 324 trusts, the majority of which closed in 2005 or earlier, RFC made a no-fraud representation, but also disclaimed liability for breaches of other representations that "also constituted fraud in the origination of the mortgage loan." (*Id.* (citations omitted).) Despite PRMI's contention that its loans "were concentrated in trusts that lacked no-fraud representations and had fraud disclaimers," (*id.* at 16 (citing Smallwood Decl., Ex. 19 (Snow Dep.) at 47)), it argues that Dr. Snow's methodology fails to account for these differences, requiring entry of judgment for PRMI. (*Id.*)

The evidence demonstrates the existence of a genuine dispute of fact regarding whether there is a material difference in the strength of the trust representations, precluding summary judgment. For instance, as to whether a trust with a No Default Rep had "less valuable" repurchase claims than trusts that lacked the representation, Plaintiff's expert Mr. Hawthorne testified that it "would have been . . . unreasonable of RFC to have regarded its potential exposure any differently as between a material default representation and a no fraud or misrepresentation representation." (Nesser Decl., Ex. 39 (Dec. 2017 Hawthorne Dep.) at 128–29.)

ResCap's expert, Steven Butler, opines that when RFC's trust representations did not include a no-fraud representation, other underwriting defects could still be construed as a breach of different trust representations. (Smallwood Decl., Ex. 25 (Butler Rpt.) at 126, 133–34.) In addition, Plaintiff's expert Donald Hawthorne has testified that certain trust reps (the Credit Grade and Doc Program Reps) were "functionally the equivalent of the guidelines representation." (Pl.'s Opp'n at 9 (citing Nesser Decl., Ex. 39 (Dec. 2017 Hawthorne Dep.) at 17; Alden Decl., Ex. T (Hawthorne Rpt.) ¶¶ 273–79)).) PRMI offers the opinion of David Woll, who opines that even if litigants could have based claims on other representations, "a reasonable defendant in RFC's position would have attributed less settlement value to those claims" than to claims based on underwriting or no-fraud representations. (Def.'s Mem. at 14–15 (citing Smallwood Decl., Ex. 26 (Wall Rpt.) ¶¶ 10, 77, 70).)

As to RFC's fraud disclaimers, PRMI's expert Ms. Kori Keith opines that the presence of a fraud disclaimer effectively disclaimed RFC's liability "with respect to fraud or misrepresentation in the origination of the loan," rendering other R&Ws that Plaintiff construes as no-fraud representations essentially moot. (Smallwood Decl., Ex. 17 (Keith Rpt.) ¶ 117–18.) But Mr. Butler disputes her opinion, asserting that RFC understood that a fraud disclaimer was not a "silver bullet" that displaced or superseded the trust representations, "and that a breach of a trust representation—even if caused by fraud or misrepresentation in a trust with a 'fraud disclaimer'—could require RFC to repurchase a loan." (*Id.*, Ex. 27 (Butler Suppl. Rpt.) at 7.) Likewise, Donald Hawthorne testified that he did not believe that trusts with fraud disclaimers had weaker repurchase claims than

trusts without the disclaimers, and such disclaimers were "not likely to be a great consequence in this context." (Nesser Decl., Ex. 39 (Dec. 2017 Hawthorne Dep.) at 104–05.)

In sum, the parties offer conflicting evidence regarding the impact of the strength of trust representations. PRMI fails to demonstrate that Plaintiff's allocation methodology must be excluded on this basis as a matter of law. Again, to the extent that PRMI has admissible evidence relevant to the impact of trust representation differences on Dr. Snow's calculations, it may offer it.

### (b) Strength of Defenses

Defense expert David Woll opines that even if Mr. Butler were correct in his construction of the other RFC representations, RFC's defenses against claims arising from trusts with fraud disclaimers would have been "significantly stronger" than RFC's defenses against claims arising from trusts without such disclaimers. (Smallwood Decl., Ex. 26 (Woll Rpt.) ¶ 92.) PRMI argues that this opinion is unrebutted, asserting that Mr. Butler fails to address how a reasonable defendant would have assessed the relative strength of RFC's defenses, (Def.'s Mem. at 15) (citing Smallwood Decl., Ex. 27 (Butler Rpt.) at 7), and Mr. Hawthorne merely acknowledges that there may have been disputes over fraud disclaimers. (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) n.345.) PRMI contends that Mr. Hawthorne, like Mr. Butler, fails to rebut Mr. Woll's opinion that a reasonable defendant would have reviewed its defenses as relatively stronger with respect to claims arising from trusts with fraud disclaimers. (Def.'s Mem. at 16.)

In addition, PRMI asserts that Plaintiff's allocation methodology fails to acknowledge the strength of RFC's statute-of-limitations defense. (*Id.*)  Plaintiff's expert Donald Hawthorne opines that at the time of the May 2013 Global Settlement, both parties could make "colorable arguments" about the likelihood of success of the statute-of-limitations defense.  (Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 319.)  But he contends that a defendant in RFC's position "could have had no confidence that any such . . . defense would be successful," (*id.* at ¶ 337), although New York courts ultimately validated the defense.  *ACE Sec. Corp. v. DB Struct. Prod., Inc.*, 977 N.Y.S.2d 229 (N.Y. App. Div. 2013), *aff'd*, 36 N.E.3d 623 (N.Y. 2015).  Mr. Hawthorne testified that given the uncertainty of the defense at the time of settlement, "a reasonable litigant would have seen little difference in the value" between claims involving potentially time-barred trusts versus those falling within the limitations period.  (Nesser Decl., Ex. 39 (Dec. 2017 Hawthorne Dep.) at 266–67.)

Mr. Woll opines that even if this defense was viewed as a toss-up at the time, a reasonable defendant in RFC's position would have still "assigned a lower settlement value to claims that were subject to this defense than to other equivalent claims not subject to the defense."  (Smallwood Decl., Ex. 26 (Woll Rpt.) ¶ 8.)  PRMI asserts that Mr. Hawthorne tacitly agrees with Mr. Woll because, in addressing RFC's settlements with MBIA and FGIC, he notes that the bulk of MBIA's and FGIC's claims were timely, as they involved trusts not subject to the statute-of-limitations defense.  (Def.'s Mem. at 17 (citing Smallwood Decl., Ex. 1 (Hawthorne Rpt.) ¶ 489, 501).)  Moreover, PRMI asserts, RFC

did, in fact, consider the statute of limitations when reaching the Original Settlement and the Global Settlement. (*Id.* (citing Smallwood Decl., Ex. 1 (Hawthorne Rpt.) n.404).)

ResCap responds that even if a potential statute-of-limitations defense impacted the Global Settlement, "it was not a basis on which to differentiate on a trust-by-trust basis." (Pl.'s Opp'n at 11.) It notes that in allocating the RMBS Settlement among the Trusts, the Trustees themselves, who served as fiduciaries to their investors, allocated based on breaching losses, without distinguishing between potentially time-barred trusts and non-time-barred trusts. (*Id.*) Mr. Hawthorne observes that this was also true of other mass trustee settlements before and after the settlement period, including the Countrywide, JP Morgan, and Citi settlements. (Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 336.)

PRMI responds that the RMBS Trusts' allocation is irrelevant because it is a "plaintiff-side" allocation. (Def.'s Mem. at 18–19.) However, as ResCap notes, PRMI relies heavily on arguments made by another plaintiff in RFC's bankruptcy, MBIA. (*Id.* at 18 n.2; Alden Decl., Ex. O (Woll Rpt.) ¶ 30.) Moreover, Plaintiff observes that experts for both the RMBS Trusts and RFC did not distinguish among the Trusts based on statute of limitations in assessing the potential damages. (Pl.'s Opp'n at 12 (citing Nesser Decl., Ex. 38 (Sillman Decl.) ¶¶ 51–52, 59) (applying the same settlement-factor discount to breaching losses for all RMBS Trusts, without regard to vintage, to account for litigation defenses and expenses).) But PRMI contends that the mere fact that the RMBS Trusts' expert, Mr. Sillman, a non-lawyer, did not account for the defense is immaterial, since RFC's own counsel testified that RFC would have likely raised the defense in litigation. (Def.'s Reply at 7 (citing Smallwood Decl., Ex. 47 (Suppl. Lipps Decl.) ¶ 99).)

As with the conflicting evidence concerning the strength of trust reps, the parties dispute the impact of the strength of defenses on Plaintiffs' allocation methodology. PRMI may offer admissible evidence that is relevant to the effect of the defenses on Dr. Snow's damages' calculations. This does not preclude Plaintiff's use of the Allocated Breaching Loss methodology, however, and PRMI's motion is denied on this basis.

### (3) Non-Indemnifiable Claims

Again relying on *UnitedHealth*, PRMI argues that Plaintiff's allocation methodology fails because it does not value certain non-indemnifiable claims. (Def.'s Mem. at 19 (citing 870 F.3d at 856).) It cites the district court's decision in *UnitedHealth*, in which the court noted that because relative value is a "comparative judgment," the plaintiff must value both indemnifiable and non-indemnifiable claims. (*Id.* (citing 47 F. Supp. 3d at 683).) PRMI incorporates Wave One summary judgment briefing on this subject, (*id.* (citing Doc. No. 3251 at 24–49; Doc. No. 3894 at 8–21)), and also "highlights key examples, including some not addressed in the first wave." (*Id.*) The two new examples concern: (1) the value of non-indemnifiable Trust and Monoline claims against RFC's corporate parent, Ally; and (2) PRMI's contention that through the Allowed Fee Claim, the RMBS Trust Settlement "covered non-indemnifiable claims for attorney's fees payable to counsel for the Institutional Investors." (Def.'s Mem. at 21.)

As to PRMI's arguments incorporated from Wave One, ResCap urges the Court to apply its prior ruling from the *Common SJ Order*, and reject PRMI's arguments concerning the value of purportedly non-indemnifiable claims asserting fraud or negligence, and the

value of purportedly non-indemnifiable breaches arising from RFC's sole responsibility. (Pl.'s Opp'n at 13.) ResCap argues that the Court should likewise reject PRMI's new arguments. (*Id.* at 13–15.) It asserts that because Ally was not a "debtor" in Bankruptcy Court, no claims were allowed against Ally to the RMBS Trusts or Monolines, (*id.* at 14–15), and the Allowed Fee Claim was a non-allocated part of the RMBS Trust Settlement that does not warrant further allocation. (*Id.* at 15–16.)

For the reasons set forth in the *Common SJ Order*, the portion of PRMI's motion incorporating Wave One arguments is denied. *See* 332 F. Supp. 3d at 1203–04. As the Court previously explained, the Settlements at issue involved related claims in a single action, in contrast to *United Health*, which primarily involved unrelated ERISA and antitrust claims from two separate cases from different jurisdictions. *Id.* In addition, the claims here are premised on very similar or identical Trust Agreement contracts, under which investors raised similar arguments against RFC. *Id.* Further, RFC has offered competent testimony concerning fraud or negligence and sole responsibility from its expert Donald Hawthorne. (*See, e.g.*, Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 22–24, 215–71.) Subsequently, Dr. Snow incorporated Mr. Hawthorne's opinions into the Allocated Breaching Loss methodology.

PRMI provides no reason to depart from this prior ruling other than its "respectfully" submitted argument that the Court has "essentially flipped the burden of proof onto the defendant to value non-indemnifiable claims." (Def.'s Mem. at 20.) The Court has done no such thing. As the Eighth Circuit has held, a plaintiff need not prove allocation with precision. *UnitedHealth*, 870 F.3d at 863; *RSUI Indem. Co.*, 933 F.3d at

966. Plaintiff bears the burden of establishing a non-speculative damages allocation that allocates a settlement between covered and non-covered claims. ResCap has done so sufficiently to withstand summary judgment in this regard. Accordingly, with respect to PRMI's indemnifiable/non-indemnifiable allocation arguments incorporated from Wave One, the Court relies on its ruling in the *Common SJ Order*, 332 F. Supp. 3d at 1203–04, and denies PRMI's motion. The Court turns to PRMI's newly asserted arguments concerning Ally and the Allowed Fee Claim.

### (a) Ally Claims

PRMI argues that ResCap's allocation methodology fails to account for the value of non-indemnifiable Trust and Monoline claims against RFC's parent, Ally. (Def.'s Mem. at 21 (citing Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) ¶ 91).) PRMI contends that investors argued that Ally was ultimately responsible for the Trusts' "repurchase and servicing claims," (Smallwood Decl., Ex. 31 (Oct. 2011 Ltr. From Patrick to Solomon)), "[a]nd MBIA and FGIC actively litigated against Ally." (*Id.*, Exs. 32 & 33 (Notices of Removal).)

In the Global Settlement, the Bankruptcy Estates and third-party claimants agreed to release claims against Ally in exchange for Ally's $2.1 billion contribution to the debtors' estates. (*Id.*, Ex. 14 (Bankr. Findings of Fact) ¶¶ 91, 93–94.) As Plaintiff's expert Donald Hawthorne notes, "[n]either the RMBS Trusts nor the Monolines were allocated a distinct portion of the Ally Contribution." (Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 164.) Defendant acknowledges that Ally was not in bankruptcy, and the Trusts and Monolines therefore did not receive Allowed Claims against Ally, but it argues that "they received

169

consideration for releasing their claims by way of cash Ally contributed to the debtors' estates and against which they did receive allowed claims." (Def.'s Mem. at 22 (citing Smallwood Decl., Ex. 14 (Bankr. Findings of Fact) ¶ 94) (explaining that Ally contribution resolves third-party claims against Ally).) PRMI contends that while ResCap correctly asserts that there were no Allowed Claims against Ally, ResCap's failure to allocate on this basis "elevates form over substance," as the Trusts and Monolines agreed to release claims against Ally in exchange for Ally's contribution to the settlement. (Def.'s Reply at 8.)

Plaintiff asserts that there are no Allowed Claims against Ally to be allocated. (Pl.'s Opp'n at 14–15.) The RMBS Trust Claims, which the RMBS Trust portion of the Global Settlement resolved against RFC for $7.091 billion, consist of claims against the "Debtors." (Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 59, § IV.C.2.a; *id.* at 30, § IA.267.) Nor did the Monolines receive Allowed Claims against Ally, ResCap argues. (*See id.* at 64–65, § IV.D.1–4; Scheck Decl., Ex. H [Doc. No. 5824] at ECF p. 12.)

The Court finds that Plaintiff's damages methodology does not fail because it does not account for the "Ally Claims." Ally was not a debtor in Bankruptcy Court. PRMI's summary judgment motion, in this regard, is denied.

### (b) Allowed Fee Claim

PRMI also argues that ResCap's damages methodology fails to account for an Allowed Fee Claim. (Def.'s Mem. at 21.) Specifically, the RMBS Trust Settlement "covered non-indemnifiable claims for attorney's fees payable to counsel for the Institutional Investors," and PRMI argues that Plaintiff's model does not account for it. (*Id.*) It contends that because Plaintiff does not identify any provision of the Trust

Agreements that required RFC to pay the attorney's fees, "Plaintiff cannot show that originator breaches resulted in any duty to pay those fees." (*Id.*)

The Chapter 11 Plan states that the "Allowed Fee Claim" was a portion of the Allowed RMBS Trust Claims. (*See* Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 3, § IA.12.) As Plaintiff notes, "[t]he RMBS Trusts agreed to distribute a portion of their own recoveries to counsel for their Institutional Investors." (Pl.'s Opp'n at 16 (citing Nesser Decl., Ex. 25 (Second Am. Ch. 11 Plan) at 3, § IA.12) (defining "Allowed Fee Claim" as "5.7% of the Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors as fees via direct allocation to counsel")); *id.* at 63, § IV.C.6 ("For the avoidance of doubt, the amount of the Allowed Fee Claim shall reduce the total Units (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and shall have no impact on any other party entitled to a distribution under this Plan.").) The Institutional Investors' fees were not a separate claim against RFC outside the bounds of indemnification. The Allowed RMBS Trust Claim paid for the fees.

PRMI argues that Plaintiff cannot credibly maintain that with the Ally Settlement, discussed above, "the form of the Allowed Claims controls," yet be permitted to recover for the Allowed Fee Claim, which was part of the Allowed RMBS Trust Claim. (Def.'s Reply at 8.) These two positions are not irreconcilable. As Plaintiff properly notes, "The fact that the RMBS Trusts agreed to give some of their recovery to attorneys for their investors has no bearing on RFC's liability to the RMBS Trusts, nor on PRMI's obligation to indemnify RFC for that liability." (Pl.'s Opp'n at 16.)

Accordingly, the Court finds that PRMI's argument on the Allowed Fee Claim allocation does not preclude ResCap's use of the Allocated Breaching Loss Methodology. Its motion is therefore denied in this regard.

## H. Liability Overall

Finally, ResCap moves for summary judgment on liability generally. (Pl.'s Mem. at 20.) In support, it asserts that PRMI (1) sold loans to RFC subject to the Guides; (2) breached R&Ws in the Guides; and (3) contributed thereby to RMBS and Monoline Claims that were the subject of (4) a reasonable, good faith settlement. (*Id.* (citation omitted).) ResCap contends that if the Court rules in its favor on its other motions for summary judgment—specifically, its motions related to the Guides' applicability, sole discretion, contributing cause, reasonableness of the bankruptcy settlements, and PRMI's defenses— then there are no genuine disputes of fact remaining as to the four elements listed above. (*Id.*) In response, PRMI argues that "indemnity generally" is not warranted, and disputes that Plaintiff has established liability for *any* loan for all the other reasons discussed in its motion papers. (Def.'s Opp'n at 26 & n.16.)

The Court denies ResCap's request for summary judgment on this issue. As noted above, the Court will permit PRMI to offer evidence related to its estoppel and waiver defenses, particularly with regard to the applicability of the Guides' R&Ws to loans originated to Assetwise or Countrywide underwriting criteria (*see supra* at § III(F)(5)), and declines to rule as a matter of law on the import of RFC's MLS Rep and Default Rep (*see supra* at § III(E)(3)). Accordingly, genuine issues of material fact related to certain aspects of liability remain, and summary judgment is therefore precluded.

172

**IV.    CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.      Defendant's Motion for Summary Judgment [Doc. No. 5221] is deferred in part, denied in part, and denied in part as moot; and

2.      Plaintiff's Partial Motion for Summary Judgment [Doc. No. 5274] is granted in part and denied in part.


Dated:  December 20, 2019                              s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge