# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: ResCap Liquidating Trust Litigation | Case No. 13-cv-3451 (SRN/HB) |
| _____ | |
| *This document relates to*: | **MEMORANDUM OPINION AND ORDER ON MOTIONS TO EXCLUDE EXPERTS' OPINIONS** |
| ResCap Liquidating Trust v. Primary Residential Mortgage, Inc., No. 16-cv-4070 | |

**TABLE OF CONTENTS:**

I.    INTRODUCTION ................................................................................................................ 1

II.   BACKGROUND ................................................................................................................ 1

III.  DISCUSSION ................................................................................................................... 1

    A.    **Legal Standard** ..................................................................................................... 1

    B.    **PRMI's Motion to Exclude Expert Testimony** ..................................................... 3

        1.   Dr. Karl Snow ................................................................................................... 4

            a.   Qualifications and Opinion ...................................................................... 4

            b.   Objections and Analysis ........................................................................... 5

                 i.   Whether Dr. Snow's Allocated Breaching Loss Approach Improperly Allocates Based on the Wrong Settlement Amount ................... 5

                 ii.   Whether Dr. Snow's Allocated Breaching Loss Approach Is Invalid Under *UnitedHealth* ........................................................ 6

                 iii.  Whether Portions of Dr. Snow's Allocation Opinion Should be Limited Based on the Sampling Populations ........................... 7

                 iv.  Whether Dr. Snow's Opinion on Allocation of the Monoline Settlements Should be Limited ..................................... 11

        2.   Steven Butler ................................................................................................... 15

            a.   Qualifications and Opinion .................................................................... 15

            b.   Objections and Analysis ......................................................................... 17

                 i.   Whether Mr. Butler's Opinions Regarding Certain Representations and Disclaimers are Beyond his Expertise ........................... 17

                 ii.   Whether Mr. Butler Impermissibly Relied on 30(b)(6) Testimony ................... 22

                 iii.  Whether Mr. Butler's Opinions Impermissibly Relied on MLS Proxy Data ...... 24

        3.   Donald Hawthorne ........................................................................................ 25

            a.   Qualifications and Opinion .................................................................... 25

         4.   Drs. John Kilpatrick, Albert Lee, and Mr. Steven Albert ............................... 27

            a.   Qualifications and Opinion .................................................................... 27

            b.   Objections and Analysis ......................................................................... 28

    C.    **ResCap's Motion to Exclude Expert Testimony** ................................................ 29

        1.   Phillip Burnaman ........................................................................................... 29

            a.   Qualifications and Opinion .................................................................... 29

            b.   Objections and Analysis ......................................................................... 31

                 i.   Whether Mr. Burnaman's Servicing-Related Opinions Should be Excluded ..... 31

                 ii.   Whether Mr. Burnaman's RMBS Settlement Comparisons Should Be Excluded ...................................................................... 32

                 iii.  Whether Mr. Burnaman's Loss Causation Opinion Should be Excluded .......... 33

                 iv.  Whether Mr. Burnaman's Opinions about MLS Proxy Data Should Be Excluded ...................................................................... 34

                 v.   Whether Mr. Burnaman's Opinions about RFC's Mental State Should Be Excluded ...................................................................... 35

                 vi.  Whether Mr. Burnaman's Opinions about RFC's History and Market Roles Should be Excluded as Inadmissible Fact Testimony ....................... 38

vii.    Whether Mr. Burnaman's Opinions Relying on Experts from Other Cases Should be Excluded ...................................................................... 39

viii.    Whether Mr. Burnaman's Repurchase Protocol Opinions Should Be Excluded .................................................................................... 41

ix.    Whether Mr. Burnaman's Opinions about Sponsors' Timeliness Defense Should be Excluded ...................................................................... 44

2.    Steven Schwarcz .............................................................................. 45

a.    Qualifications and Opinion .................................................. 45

b.    Objections and Analysis ...................................................... 46

i.    Whether Mr. Schwarcz's Sole-Responsibility Opinions Should Be Excluded .................................................................................... 47

ii.    Whether Mr. Schwarcz's Opinions about RFC's Mental State Should Be Excluded .................................................................................... 49

iii.    Whether Mr. Schwarcz's Opinions about RFC's History and Market Roles Should be Excluded as Inadmissible Fact Testimony ..................................... 51

iv.    Whether Mr. Schwarcz's Opinions Relying on Experts from Other Cases Should be Excluded ...................................................................... 52

3.    Lee Kennedy .................................................................................... 55

a.    Qualifications and Opinion .................................................. 55

b.    Objections and Analysis ...................................................... 57

4.    Kori Keith ........................................................................................ 60

a.    Qualifications and Opinion .................................................. 60

b.    Objections and Analysis ...................................................... 62

i.    Whether Ms. Keith's Loss Causation Opinion Should be Excluded ............... 62

ii.    Whether Ms. Keith's Opinions about RFC's Mental State Should Be Excluded .................................................................................... 63

iii.    Whether Ms. Keith's "Bad Faith" Opinion Should be Excluded ................... 66

iv.    Whether Ms. Keith's Contractual Interpretation Opinions Should Be Excluded .................................................................................... 67

5.    Dr. Justin McCrary .......................................................................... 70

a.    Qualifications and Opinion .................................................. 70

6.    David Woll ....................................................................................... 71

a.    Qualifications and Opinion .................................................. 71

b.    Objections and Analysis ...................................................... 75

IV.  CONCLUSION ............................................................................................... 79

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Before the Court are the parties' cross motions to exclude certain expert opinions and testimony. On December 11, 2019, the Court heard oral argument on the parties' motion. For the reasons set forth below, Defendant's Motion to Exclude Certain Opinions of Plaintiff's Experts [Doc No. 5252] is granted in part, denied in part, and denied in part as moot, and Plaintiff's Motion to Exclude Certain Opinions of Defendant's Experts [Doc No. 5282] is granted in part, denied in part, and denied in part as moot.

## II.    BACKGROUND

The factual and procedural background of this litigation is thoroughly set forth in the Court's December 20, 2019 Memorandum Opinion and Order on Motions for Summary Judgment, *In re ResCap Liquidating Tr. Litig.*, Nos. 13-cv-3451, 16-cv-4070, 2019 WL 7038234, ___ F.3d ___ (D. Minn. Dec. 20, 2019) ("*PRMI SJ Order*") [Doc. No. 5361], which is incorporated by reference here.

## III.    DISCUSSION

### A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citation omitted) (internal quotation marks omitted).

These requirements reflect the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., in which the Court emphasized the district court's gatekeeping obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to technical and other specialized expert testimony). Under *Daubert*, the cornerstone for admissibility is assistance to the trier of fact. *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005). When this Court sits as the finder of fact, however, there is "less need for the gatekeeper to keep the gate[.]" *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (citation omitted) (internal quotation marks omitted), *cert. denied*, 568 U.S. 888 (2012). Nonetheless, the Court still must assess whether expert testimony satisfies *Daubert*, while under a more "relax[ed] application for bench trials." *Id.* (citation omitted).

Under this standard, proponents must demonstrate by a preponderance of evidence that the expert's opinion is reliable. Courts generally support "an attempt to liberalize the rules governing the admission of expert testimony," and favor admissibility over exclusion. *See Lauzon*, 270 F.3d at 686 (citation omitted) (internal quotation marks omitted); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of the testimony and not its admissibility, *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

### B.     PRMI's Motion to Exclude Expert Testimony

PRMI moves the Court for an order excluding (1) in its entirety, the testimony of ResCap's damages expert, Dr. Karl Snow; (2) certain opinions of re-underwriter Mr. Steven Butler, relating to the interpretation of certain trust-level representations, warranties, and disclaimers, as well as his reliance on MLS proxy data; (3) certain opinions of Mr. Donald Hawthorne regarding re-underwriting performed in RFC's bankruptcy and his discussion of financial reports; and (4) in its entirety, the opinions of ResCap's appraisal

experts, Dr. John Kilpatrick, Mr. Steven Albert, and Dr. Albert Lee. (Def.'s Mem. at 1–2.)[1] The Court addresses each expert in turn.

### 1. Dr. Karl Snow

#### a. Qualifications and Opinion

Karl Snow, PhD, is an economist and partner at the Bates White economic consulting firm. (Smallwood Decl., Ex. 11 (Snow Damages Rpt.) ¶¶ 5–6.) ResCap retained Dr. Snow to provide expert analysis regarding the measure and allocation of damages, (*see id.* ¶ 3), and he crafted the Allocated Breaching Loss Approach methodology for doing so. (*Id.* ¶ 36.)

The Allocated Breaching Loss model measures damages in relation to the liabilities that RFC incurred in the Settlements, rather than the economic harm caused by breaching mortgages. *In re RFC & ResCap Liquidating Tr. Litig.* ("Common SJ Order"), 332 F. Supp. 3d 1101, 1198 (D. Minn. 2018). To assess damages that RFC incurred on RMBS Trust claims, Dr. Snow measures PRMI's share as a product of a settlement factor and the total losses on PRMI's breaching loans. *Id.* To measure damages under this approach, Dr. Snow estimates breach rates based on samples drawn from approximately 463,000 at-issue loans.

---

[1] Exhibits submitted in support of Defendant's Motion to Exclude Experts' Opinions, and in opposition to Plaintiff's motion, are attached to the Declarations of Jesse Smallwood [Doc. No. 5256] (Exs. 1–9); [Doc. No. 5256] (Exs. 10–17); [Doc. No. 5232] (Exs. 18–21); [Doc. No. 5316] (Exs. A–S) (collectively, "Smallwood Decl."), unless otherwise noted.

Exhibits submitted in support of Plaintiff's Motion to Exclude Experts' Opinions, and in opposition to Defendant's motion, are attached to the Declarations of Anthony Alden [Doc. Nos. 5285, 5286] (Exs. A–V); [Doc. No. 5319] (Exs. W–HH); [Doc. Nos. 5339, 5340] (Exs. II–NN) (collectively, "Alden Decl."), unless otherwise noted.

(Smallwood Decl., Ex. 4 (Snow Suppl. Rpt.) at App. B.) His methodology excludes loans that had less than $500 of loss or were less than 90 days delinquent as of May 2013. (*Id.*, Ex. 11 (Snow Damages Rpt.) ¶¶ 38–40).)

For damages that RFC incurred as a result of the Monoline Settlements, Dr. Snow utilizes the same general framework for allocating Monoline claims as he does for RMBS Trust claims. However, for the Monoline Settlements, Dr. Snow also assesses breach rates to account for the fact that each monoline insurer settled with RFC for different amounts and paid out different amounts on insurance claims. (*Id.* ¶¶ 56, 75–87.)

### b. Objections and Analysis

PRMI argues that Dr. Snow's opinion should be excluded in its entirety because: (1) he fails to consider that the parties agreed to different settlement amounts as between the Original Settling Trusts and the Additional Settling Trusts; and (2) his opinions are invalid under *UnitedHealth Group Inc. v. Executive Risk Specialty Insurance Co.*, 870 F.3d 856 (8th Cir. 2017). (Def.'s Mem. at 3–6.) Alternatively, PRMI argues that certain of Dr. Snow's opinions should be limited for the following reasons: (1) he drew his samples from the wrong population; and (2) portions of his Monoline Opinions are flawed. (*Id.* at 7–22.) The Court will respond to each argument in turn.

### i. Whether Dr. Snow's Allocated Breaching Loss Approach Improperly Allocates Based on the Wrong Settlement Amount

As noted, PRMI moves to exclude Dr. Snow's opinion, arguing that he fails to consider that as part of the Global Settlement in Bankruptcy Court, the parties agreed to different settlement amounts as between the Original Settling Trusts and Additional

Settling Trusts. (Def.'s Mem. at 3–6.) Thus, PRMI argues, Dr. Snow's methodology is fatally flawed because it starts with the wrong number. (*Id.*) PRMI also sought summary judgment on this basis.

In its December 20, 2019 Order, the Court rejected PRMI's argument and found as a matter of law that Dr. Snow's Allocated Breaching Loss methodology was based on the correct settlement amount, i.e., the single unallocated RMBS Trust Settlement amount that United States Bankruptcy Judge Glenn allowed and approved in December 2013. *PRMI SJ Order*, 2019 WL 7038234, at *63–69. Accordingly, the Court denies as moot PRMI's motion to exclude Dr. Snow's opinion on this basis.

### ii. Whether Dr. Snow's Allocated Breaching Loss Approach Is Invalid Under *UnitedHealth*

PRMI argues that Dr. Snow's opinion should be excluded because it does not satisfy the requirement of *UnitedHealth*, 870 F.3d at 862, namely, that an allocation of claims in settlement must account for the relative strength and value of indemnifiable claims compared to non-indemnifiable claims. (Def.'s Mem. at 6.) In particular, PRMI asserts that Dr. Snow's allocation fails to account for the relative strength of claims and defenses across trusts, nor does it account for the value of non-indemnifiable claims. (*Id.* at 6.) PRMI also sought summary judgment on this basis.

Consistent with its prior rulings, the Court finds that Dr. Snow's opinions are admissible and consistent with *UnitedHealth*. *See PRMI SJ Order*, 2019 WL 7038234, at *69–70; *Common SJ Order*, 332 F. Supp. 3d at 1203–04. As the Court has explained, "*UnitedHealth* provides that '[t]o survive summary judgment, an insured need not prove

allocation with precision, but it must present a non-speculative basis to allocate a settlement between covered and non-covered claims.' " *PRMI SJ Order*, 2019 WL 7038234, at *69 (quoting 870 F. 3d at 863). Thus, "Plaintiff need not factor every single difference in trust representations and the strength of certain defenses into its allocation in order to meet this standard." *Id.* Accordingly, the Court denies as moot PRMI's motion on this basis.

### iii. Whether Portions of Dr. Snow's Allocation Opinion Should be Limited Based on the Sampling Populations

Alternatively, PRMI seeks to exclude portions of Dr. Snow's opinions, arguing that he drew his samples from the wrong populations. (Def.'s Mem. at 7.) It argues that Dr. Snow's original allocation methodology "rests on a patently false assumption about the population of loans that gave rise to the bankruptcy settlements." (*Id.*) For similar reasons, PRMI argues that another of Dr. Snow's allocation scenarios, "Breach Scenario I," should be excluded.[2] (*Id.*)

In addition to allocating the Bankruptcy Settlements based on his original methodology, Dr. Snow undertook additional analysis in response to criticisms from PRMI and defendants in the First-Wave actions. Specifically, he sought to determine the extent to which PRMI's damages allocation would have changed, if at all, if performing loans had been included in his calculations. Dr. Snow presents the results of that analysis in the form of three scenarios, which Dr. Snow refers to as "breach scenarios," embodying a range of

---

[2] Although PRMI initially moved to exclude Dr. Snow's opinion regarding Breach Scenarios I and II, (*see* Def.'s Mem. at 7–11), PRMI appears to waive any objection to testimony about Breach Scenario II based on PRMI's reply and oral argument at the hearing on the parties' *Daubert* motions. (Def.'s Reply at 7; Dec. 11, 2019 Hr'g Tr. [Doc. No. 5360] at 75.)

assumptions.  (Pl.'s Opp'n at 3.)   In Breach Scenario I, Dr. Snow assumes, among other things, that PRMI's performing loans had the same breach rate as its at-issue Loans.  In Breach Scenario II, Dr. Snow assumes, in relevant part, (*id.* at 3), that PRMI's performing loans had zero breaches and the remaining performing loans had the global at-issue Loan breach rate.  (*Id.*)  In Breach Scenario III, Dr. Snow adopts what ResCap characterizes as the "extreme assumption" that PRMI's performing loans had zero breaches and all the remaining performing loans had breaches.  As one might expect, Breach Scenarios II and III result in lower damages estimates.  (Smallwood Decl., Ex. 4 (Snow Suppl. Rpt.), App. B., Figs. 14 & 16.)  PRMI does not move to exclude Dr. Snow's opinions with respect to Breach Scenarios II and III.

Expert testimony must be based on reliable methods to be admissible. Fed. R. Evid. 702. " 'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.' "  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co*., 70 F.3d 968, 974 (8th Cir. 1995)). "To assess the admissibility of survey evidence, the court should consider . . . whether [] the proper universe was examined and the representative sample was drawn from that universe[.]"  *Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007) (citation omitted).  However, simply because a survey does not "perfectly represent" the examined population "does not make it irrelevant or unhelpful" since sample surveys "by their very nature, are sketches, not exact replicas, of the examined population." *Khoday v. Symantec Corp*., 93 F. Supp. 3d 1067, 1082–83 (D. Minn. 2015) (citation omitted) (internal quotation marks omitted).

Here, PRMI argues in particular that the "original method" and "Breach Scenario I" are flawed because they estimate breach rates based on samples drawn from 464,000 at-issue loans. (Def.'s Mem. at 1–5; Def.'s Reply at 2–3.) By taking this approach, PRMI stresses that Dr. Snow excluded approximately 702,000 loans that were not paid in full as of the time of the Settlements. (Def.'s Mem. at 9–10.) Thus, PRMI contends that Dr. Snow's sampling protocol violates the statistical principle that samples must be drawn from the appropriate population, which, in this case, includes loans that had not been paid in full at the time of the Settlements. (*Id*. at 12–13.) Because Dr. Snow fails to abide by that rule, PRMI argues, his sampling protocol produces biased results and is unreliable because his conclusions are based on an inaccurate picture of the Settlements. (*Id*. at 10–11.) Therefore, PRMI contends that Dr. Snow's analysis depends on a "fundamentally unsupported" assumption about the correct loan population, and should be excluded. (*Id*. at 10–12.) ResCap counters that this Court admitted Dr. Snow's methodology in Wave One and should do so again here. (Pl.'s Opp'n at 2.)

The Court agrees with ResCap. As the Court previously explained, Dr. Snow's decision to sample from the at-issue Loans "makes good sense given that the purpose of his study is to allocate the bankruptcy claims among [d]efendants, and those claims are premised on losses to loans sold by RFC. Thus, conceptually, those damages would necessarily have flowed from the loans that actually experienced economic losses, *i.e.* the At-Issue Loans." *In re RFC & ResCap Liquidating Tr. Litig.* ("Common Daubert Order"), Nos. 13-cv-3451 (SRN/HB), 14-cv-1716 (SRN/HB), 2018 WL 4489685, at *5 (D. Minn. Sept. 19, 2018). PRMI argues the Court should depart from this prior ruling. (Def.'s Reply

at 3.) Without citing any authority, PRMI asserts that the Court's previous ruling is inapplicable because PRMI only moves to *limit* Dr. Snow's testimony on this basis, not exclude it "*in toto*." (*Id.*) The Court finds PRMI's argument unpersuasive on the merits. Accordingly, the Court denies PRMI's motion to exclude Dr. Snow's "original method and Breach Scenario I" on the basis that he sampled from the wrong population.

PRMI further contends that the Court should exclude Breach Scenario I because it impermissibly assumes that PRMI committed breaches on un-sampled performing loans, for which ResCap allegedly "offered no evidence of breaches." (*Id.* at 7.) However, ResCap asserts that PRMI "misconstrues the meaning and purpose of Dr. Snow's three 'Breach Scenarios.'" (Pl.'s Opp'n at 2.) ResCap explains that these scenarios are not independent methods for allocating the Bankruptcy Settlements, as PRMI contends. (*Id.*) Rather, the scenarios are the "results of an analysis that Dr. Snow conducted to demonstrate the propriety of his actual methodology." (*Id.*) While PRMI argues that Scenario I should be excluded because ResCap has no evidence that PRMI committed breaches on performing loans, (Def.'s Reply at 3), it does not object to Scenarios II and III, although all three scenarios stem from the same methodology. (Pl.'s Opp'n at 2.)

The Court declines to exclude Dr. Snow's opinion regarding Breach Scenario I. An expert's opinion should be excluded "only if [it] is so fundamentally unsupported that it can offer no assistance to the [fact finder.]" *Hose*, 70 F.3d at 974 (citation omitted) (internal quotation marks omitted). PRMI's argument as to Breach Scenario I goes to weight of the evidence, and PRMI's "remedy is not exclusion, but instead cross-examination and the presentation of contrary evidence[.]" *See Gilliland v. Novartis Pharm.*

*Corp.*, 34 F. Supp. 3d 960, 968 (S.D. Iowa 2014) (citation omitted) (internal quotation marks omitted). Accordingly, the Court denies PRMI's motion to exclude Dr. Snow's opinion concerning Breach Scenario I.

### iv. Whether Dr. Snow's Opinion on Allocation of the Monoline Settlements Should be Limited

PRMI next argues for the exclusion of portions of Dr. Snow's opinion regarding the allocation of the Monoline Settlements. (Def.'s Mem. at 14.) PRMI contends that Dr. Snow uses three allocation methods with respect to the Monoline Settlements: (1) "his original 'blended' Monoline method; (2) a new 'settlement-by-settlement' method, and (3) a new so-called 'conservative' method." (*Id.*) PRMI seeks to exclude the first two of these methods. (*Id.*)

As to Dr. Snow's original "blended" monoline analysis, PRMI moves for its exclusion, arguing that it depends on an "unsupported and unrealistic assumption that breach rates would be the same across monoline settlements and across pools." (*Id.* at 18–22.) ResCap counters that this argument is based on a "false assertion"—according to ResCap, Dr. Snow *never* assumed that breach rates would be the same across monoline settlements and across pools. (Pl.'s Opp'n at 4.) Rather, ResCap contends that Dr. Snow's methodology "uses a weighted-average monoline breach rate (*i.e.*, a blended monoline breach rate) *precisely* to account for differences in monoline-specific breach rates." (*Id.*) (internal citation omitted) (emphasis in original). ResCap further urges the Court to hold, as it did in Wave One and at the *HLC* trial, that Dr. Snow's use of a blended monoline breach rate is admissible. (Pl.'s Opp'n at 4.)

PRMI acknowledges this ruling. (Def.'s Mem. at 18.) However, PRMI contends that this Court should depart from its prior ruling because Dr. Snow's assumption for his breach rates is (1) "unsupported by the record"; (2) and "undermined by the new settlement-by-settlement analysis he performed in this case." (*Id*.) PRMI contends that Dr. Snow's original monoline analysis should be excluded for an additional reason not addressed in Wave One: Dr. Snow could "inject bias" into his calculations because he "erroneously includes in his samples, [1] loans from pools with no payments and [2] no PRMI loans." (*Id.* at 20.)

The Court declines to exclude Dr. Snow's blended monoline breach rate analysis. Contrary to PRMI's argument, (Def.'s Mem. at 18), Dr. Snow does not assume that breach rates would be the same across Monoline Settlements and across pools. (Smallwood Decl., Ex. 7 (Snow Sampling Rpt.) ¶¶ 93–96; *Id.*, Ex. 11 (Snow Damages Rpt.), ¶¶ 56, 82; *HLC* Trial Tr. [Doc. No. 4725] at 3203 ("I am not assuming that . . . the [] monoline breach rate is equal to the [] MBIA breach rate and the [] Ambac breach rate . . . . The monoline breach rate reflects a blended average of those different monoline specific breach rates.").) Rather, as Plaintiff notes, by performing an alternative allocation using individual breach rates for each monoline pool, rather than a blended breach rate, Dr. Snow arrives at a fairly similar result of $402,000 under the blended approach, and $441,000 under the monoline-specific approach. (Smallwood Decl., Ex. 4 (Snow Suppl. Rpt.) Figs. 12, 20.) In addition, given that Plaintiff seeks less than $450,000 based on PRMI's allocated contribution to the Monoline Settlements, "the cost of adding precision [to Dr. Snow's methodology] would have dwarfed Plaintiff's *total damages claim.*" (Pl.'s Opp'n at 5) (emphasis in original).

Had Plaintiff narrowed the margin of error by underwriting an additional 1,425 loans, it would have cost ResCap $11.5 million to do so. (Alden Decl., Ex. Y (Snow Suppl. Rpt.) ¶¶ 4–5); *id.*, Ex. Z (McCrary Dep.) at 134–37.) The Court agrees with Plaintiff that Dr. Snow was entitled to balance the benefit of any additional precision against its cost.

Nor is the Court persuaded by Defendant's argument that Dr. Snow "injects bias" into his calculation by sampling from pools without PRMI loans or insurance claim payments. As the Court previously ruled, "[Defendants] assert that the underlying data Dr. Snow uses is relatively spare with respect to a number of individual insurers. They further contend that Dr. Snow's sample[s] . . . do not incorporate loans from some of the insurance pools that Dr. Snow opines about. [T]hese contentions . . . relate to . . . precision . . . not admissibility." *Common Daubert Order*, 2018 WL 4489685, at *6. If PRMI has admissible evidence showing that breach rates in pools with PRMI loans were materially different from pools without them, or that breach rates in pools that received insurance payments were materially different from breach rates in pools that did not receive such payments, it may cross examine Dr. Snow on these bases.

As to Dr. Snow's new settlement-by-settlement monoline analysis, PRMI argues that the Court should exclude this portion of his opinion because "his samples are too small to reliably estimate monoline-specific breach rates." (Def.'s Mem. at 22–23.) Dr. Snow estimates global monoline breach rates for the individual Monoline Settlements using loans in his Global Sample from pools insured by the particular monoline, although he concedes that he cannot do so for the Syncora Settlement, as his Global Sample does not contain any loans from Syncora pools. (Smallwood Decl., Ex. 1 (Oct. 8, 2019 Snow Dep.) at 116–17.)

For the other three settlements, Dr. Snow estimates global breach rates by considering 45 loans for Ambac, 38 loans for FGIC, and 22 loans for MBIA. (*Id*., Ex. 8 (McCrary Rpt.) at Ex. 12.)[3]

PRMI asserts that on its face, the use of a sample size of less than 100 loans is "unprecedented in RMBS litigation." (Def.'s Mem. at 22 (citing *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012).) Further, PRMI maintains that these small samples do not allow Dr. Snow to reliably estimate monoline-specific breach rates, and this settlement-by-settlement monoline analysis therefore should be excluded. (*Id*.)

In response, ResCap contends that PRMI simply attacks "doubts about precision" which this Court held in Wave One, "go to the weight and not admissibility of an expert's opinion." (Pl.'s Opp'n at 7 (citing *Common Daubert Order*, 2018 WL 4489685, at *6).) ResCap further responds that "the relevant margin of error in dispute amounts to only $77,651." (*Id*.) Thus, ResCap alleges that any comparison of the sample sizes to other RMBS litigation ignores that "(a) the dollar amount of Plaintiff's monoline allocation [] is at least an order of magnitude smaller than the dollar amounts at issue in those other cases;

---

[3]     PRMI further asserts that Dr. Snow's "small samples" are still overstated, (Def.'s Mem. at 22–23), because Dr. Snow erroneously includes loans from pools with no payments or no PRMI at-issue loans, as noted in the discussion of Snow's blended analysis. (*Id*.) PRMI contends that excluding such loans from the global sample results in only 10 loans from Ambac pools, 4 loans from Syncora pools, and 16 loans from MBIA pools. (*Id*. at 23.) PRMI argues that such small sample sizes render Dr. Snow's analysis unreliable. (*Id*.)

and (b) an effort to shrink the margin of error in the manner PRMI's expert has suggested would have cost multiples of Plaintiff's total claim[.]" (*Id.*)

PRMI concedes that the relevant margin of error for this sample size amounts to only $77,651. (Def.'s Reply at 8.) Nonetheless, PRMI asserts that this margin was "derived [] erroneously" from a sample that includes "loans from pools with no payments or no PRMI at-issue Loans." (*Id.*)

As with the Court's ruling on Dr. Snow's blended analysis, Defendant's challenges go to the weight of Dr. Snow's opinion, rather than its admissibility. Even under the legal authority that PRMI cites, other courts have allowed RMBS experts to testify based on sample sizes within this range. *See Fed. Hous. Fin. Agency*, 2012 WL 6000885, at *9 (stating, with respect to a 100-loan sample, "[i]n choosing to use a blunter sampling instrument with respect to securitizations with Certificates backed by different [supporting loan groups], the plaintiff runs the risk that its proof will be found wanting. But that is not an issue to be decided in the context of this *Daubert* motion. Rather, [the factfinder] will decide what weight to assign the plaintiff's samples after considering arguments that the defendants will no doubt make regarding the inadequacy of those samples and the plaintiff's rebuttals" (footnote omitted)).

### 2. Steven Butler

#### a. Qualifications and Opinion

Steven Butler is a consultant with wide-ranging business experience in the banking, mortgage, loan origination, and underwriting fields. (*See* Smallwood Decl., Ex. 14 (Butler Rpt.) at 6–9.) ResCap retained Mr. Butler to opine on whether (1) the underwriting and/or

15

credit quality of the loans sold by PRMI to RFC complied with PRMI representations; and (2) the materially breaching loans he identified complied with R&Ws made in documents governing the loans' securitizations (i.e., trust-level R&Ws). (*Id.* at 1–2.) To formulate his opinions, Mr. Butler evaluated the at-issue loans to determine whether they (a) were likely to be repaid and were supported by adequate collateral when initially evaluated; (b) complied with the documentation requirements for the borrower's credit profile; (c) fulfilled hazard and title insurance requirements; and (d) complied with various contractual and legal requirements, such as various disclosure requirements under federal statutes and anti-predatory lending requirements under state statutes. (*Id.* at 1.) Mr. Butler further directly supervised the re-underwriting of the at-issue loans. (*Id.* at 4.)

Based on those assessments, Mr. Butler determined that 106 (or 67.52%) of the mortgage loans sold by PRMI to RFC contained one or more material underwriting defects that breached PRMI's R&Ws to RFC that materially and adversely affected the credit risk of the loan. (*Id.* at 3.) Additionally, he concluded that 78 (or 49.68%) of the materially breaching loans contained one or more material underwriting defects that either constituted, or could be construed to constitute, breaches of RFC's trust-level R&Ws that materially and adversely affected the credit risk of the loan. (*Id.*) Finally, he found that 32 (or 69.47%) of the materially breaching loans similarly contained underwriting defects that either constituted, or could be construed to constitute, breaches of RFC's securitization-level monoline R&Ws that materially and adversely affected the credit risk of the loan. (*Id.*)

### b. Objections and Analysis

PRMI argues that Mr. Butler's opinions about the meaning of certain trust-level R&Ws made by RFC to the Trusts should be excluded.  (Def.'s Opp'n at 24–27.)  It also contends that Mr. Butler should not be permitted to "parrot" inadmissible testimony from ResCap's 30(b)(6) corporate designee.  (*Id.* at 27.)  Finally, PRMI argues that Mr. Butler's opinions relying on substitute mortgage loan schedules (MLSs) created by ResCap's expert, Mr. Dudney, should be excluded.  (*Id.* at 29.)  The Court addresses each issue in turn.

### i. Whether Mr. Butler's Opinions Regarding Certain Representations and Disclaimers are Beyond his Expertise

PRMI argues that Mr. Butler's opinions regarding certain representations and disclaimers in RFC's contracts should be excluded because he has no specialized knowledge or expertise regarding those provisions.  (Def.'s Mem. at 23–27.)  Expert witnesses have "testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his [or her] discipline."  *Kumho Tire,* 526 U.S. at 148 (citation omitted) (internal quotation marks omitted).  Still, an expert "may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology." *Teska v. Potlatch Corp*., 184 F. Supp. 2d 913, 919 (D. Minn. 2002) (citation omitted) (internal quotation marks omitted.)  As such, the Court, as gatekeeper, must "ensure that an expert witness does not opine on subjects beyond his expertise."  *Hale Cty. A & M Transp. v. City of Kansas City*, 998 F. Supp. 2d 838, 843 (W.D. Mo. 2014) (citation omitted).

Here, PRMI argues that Mr. Butler's opinions stray beyond his areas of expertise for a number of reasons. First, PRMI asserts that Mr. Butler has no specialized knowledge or expertise in pool-wide credit grade representations,[4] document-type representations,[5] and fraud disclaimers.[6] As to the two trust-level representations, PRMI argues that Mr. Butler is not competent to testify on these types of representations because he has never "drafted, or supervised the drafting of" such representations. (Def.'s Mem. at 25.) PRMI further alleges that prior to 2007, Mr. Butler had "no experience at all" with interpreting trust-level representations. (*Id*.) According to PRMI, Mr. Butler's "sum total of [] experience interpreting any trust-level representation is in the context of advising clients in litigation or pre-litigation putback analyses." (*Id*.) Because Mr. Butler could not identify any assignment prior to his work in the First-Wave actions where he analyzed whether loans breached pool-wide credit grade and/or loan documentation representations, PRMI alleges that Mr. Butler's opinions about the interpretation of those specific representations should be excluded. (*Id*. at 25–26.)

---

[4]  A pool-wide "Credit Grade" representation provides that no more than certain percentages of the pooled loans have certain credit grades. (Def.'s Mem. at 24, n.6 (citing Smallwood Decl., Ex. 14 (Butler Rpt.) at 104).)

[5]  Documentation-type representations are guarantees concerning the percentage of loans in an RMBS Trust that were underwritten under certain document types. (*See* Smallwood Decl., Ex. 14 (Butler Rpt.) at 106 (discussing an example loan documentation representation).)

[6]  Generally, a trust-level "No-fraud" representation is a guarantee that no fraud or misrepresentation took place in connection with the origination of any mortgage loan contained within a securitization. (Smallwood Decl., Ex. 14 (Butler Rpt.) at 110.) A disclaimer, on the other hand, disclaims responsibility for borrower misrepresentations.

PRMI next argues that Mr. Butler has no specialized knowledge or expertise in origination fraud disclaimers.  (*Id.* at 26–27.)  PRMI further alleges that Mr. Butler has "no experience with this type of disclaimer, either from an industry perspective or in the context of his work as a consultant."  (*Id.* at 27.)  Because Mr. Butler could not identify any assignment prior to his work in the First-Wave actions where he has re-underwritten loans in a deal that contained a fraud disclaimer, PRMI alleges that Mr. Butler's opinions about the interpretation of those specific representations should be excluded.  (*Id.* at 25–26.)

ResCap counters that Mr. Butler's opinions regarding RFC's representations and disclaimers are well within his area of expertise as a consultant, in both business and litigation settings, in determining whether loans comply with underwriting guidelines.  (Pl.'s Opp'n at 10.)  Plaintiff further notes that, contrary to PRMI's assertions, Mr. Butler's "significant experience underwriting and re-underwriting loans to loan programs and credit grades . . . informs his ability to interpret Trust Reps on the same subjects."  (*Id.* (citing Alden Decl., Ex. FF (Jan. 16, 2018 Butler Dep.) at 98, 137).)

ResCap also contends that PRMI is mistaken to suggest that Mr. Butler cannot testify about two "cherry-picked" trust-level representations unless he previously encountered those exact representations, and attacks PRMI's position in two ways.  (*Id.* at 10–11.)  First, ResCap argues that this Court rejected a nearly identical argument in Wave One, although it was applied to Mr. Hawthorne.  (*Id.* (citing *Common Daubert Order*, 2018 WL 4489685, at *11).)  Specifically, First-Wave defendants argued that Mr. Hawthorne was not "competent to testify on credit grade or documentation-type representations because he ha[d] never participated in an RMBS securitization" and his experience

allegedly did not touch on the contractual provisions at issue. *Common Daubert Order*, 2018 WL 4489685, at *11. This Court rejected that argument, holding the relevant question was not whether Mr. Hawthorne had pre-existing familiarity with the specific contract language at issue, but rather whether he was qualified by his general experience to assess the provisions. *Id.* at *12. Citing other federal and New York state courts, ResCap asserts that other courts have come to similar conclusions in denying motions to strike Mr. Butler's re-underwriting reports challenging his qualifications to opine on specific types of loans also "cherry-picked" by defendants. (Pl.'s Opp'n at 11 (citing, e.g., *MBIA Ins. Corp. v. Countrywide Home Loans, Inc*., No. 602825/08, 2013 WL 12197741, *3 (N.Y. Sup. Ct. Apr. 29, 2013).)

Second, ResCap notes that other courts have not excluded Mr. Butler's opinion on pool-wide prospectus R&Ws. (*Id.* at 9 (citing *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc*., No. 11-30039-MGM, 2015 WL 2130060, at *6 (D. Mass May 7, 2015); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp.3d 441, 559 (S.D.N.Y. 2015), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017), *cert. denied sub nom.*, 138 S. Ct. 2697 (2018).

Based on the foregoing argument, the Court grants in part and denies in part PRMI's motion to exclude Mr. Butler's opinion on the basis that he provides opinions beyond the scope of his expertise. Its motion is denied to the extent PRMI asserts that Mr. Butler is not qualified because he has no specialized knowledge of certain trust-level representations and liability disclaimers. Mr. Butler is trained by experience and intimately familiar with

the types of contracts and underwriting guidelines at issue in the instant litigation. Indeed, as the Court noted previously when facing an identical argument against Mr. Hawthorne, the fact that Mr. Butler has "never written a representation clause or liability disclaimer in the RMBS context does not disqualify him or take away from his depth of experience." *Common Daubert Order*, 2018 WL 4489685, at *12. Moreover, as the court held in *MBIA Insurance Corp.*, ResCap has shown that "Mr. Butler has sufficient experience, training and knowledge in the loan industry and the banking industry at large to serve as an expert." 2013 WL 12197741, at *3. Any alleged lack of knowledge in this particular area of Mr. Butler's expertise goes to the weight and not the admissibility of his testimony. *See Robinson*, 447 F.3d at 1100 ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." (citation omitted)).

However, PRMI's motion is granted to the extent Mr. Butler opines on the meaning of the at-issue contracts and provisions in this litigation. Experts may not testify to the meaning of a contract where the language is unambiguous. *See Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) ("If [a] contract is unambiguous, the interpretation is a question of law . . . [and] the court cannot consider anything other than the contract." (citations omitted)). Even when a contract is ambiguous, expert testimony is only permitted to the extent it clarifies technical terms or provisions in the contract; an expert may not simply offer their personal opinion about a contract's meaning or applicability. *See N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) ("Absent any need to clarify or define terms of art, science, or trade, expert

opinion testimony to interpret contract language is inadmissible." (citation omitted) (internal quotation marks omitted)). Rather, Mr. Butler's opinions as to the contracts in this litigation are limited to his understanding of normal industry practices and customs with respect to contract provisions like the clauses at issue, as well as how a reasonable industry participant would view certain contractual provisions or clauses. *See Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) (permitting expert testimony about what reasonable industry participants would do or think about certain actions).

### ii. Whether Mr. Butler Impermissibly Relied on 30(b)(6) Testimony

PRMI seeks to exclude any testimony by Mr. Butler relying on Rule 30(b)(6) testimony of ResCap's corporate designee, Teresa Farley, as further support for his opinions about trust-level representations and the fraud disclaimer. (Def.'s Mem. at 27–29.) PRMI claims that since "Mr. Butler has no experience or expertise regarding interpretation of certain trust-level representations" he impermissibly "acts as a conduit for inadmissible hearsay from Plaintiff's corporate designee." (*Id.* at 27.) And although the Court has deemed Mr. Butler qualified to testify about fraud disclaimers and the pool-wide representations from an industry perspective, *see supra* § III(B)(2)(i), PRMI argues he should nevertheless be "precluded from parroting the testimony of Plaintiff's corporate designee." (*Id.* at 29.) PRMI further alleges that Mr. Butler's opinion on "RFC's understanding" is particularly flawed because it relies on a corporate designee who lacks relevant personal knowledge. (Def.'s Reply at 12.)

ResCap responds to each of PRMI's arguments in turn. First, ResCap asserts that Mr. Butler's opinion is not a conduit for hearsay. (Pl.'s Opp'n at 16–17.) ResCap agrees that his opinion relies in part on Ms. Farley's testimony, but it asserts that Mr. Butler properly considers it in the context of a variety of sources, including other documents and deposition testimony. (*Id.* at 16 (citing Alden Decl., Ex AA (Oct. 31, 2019 Rough Butler Dep.) at 14–15).) ResCap notes that Ms. Farley's testimony is not the only cited evidence. (*Id.* at 16–17.) Second, ResCap argues that an expert can rely on testimony by a corporate designee, and that in any event, PRMI's own re-underwriting expert, Kori Keith, does the same thing. (*Id.* (citations omitted).) Ultimately, ResCap asserts, it is proper for Mr. Butler to cite discovery materials to further support his opinion—the same opinion he has been offering for over two years—and there is no distinction between other discovery evidence cited by Mr. Butler and the one deposition PRMI now seeks to exclude from his scope of available evidence. (*Id.* at 17–18.)

The Court denies PRMI's motion on this issue. Pursuant to Federal Rule of Evidence 703, "[i]f experts in [a] particular field would reasonably rely on [the] facts or data [at issue] in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." There is nothing inherently wrong with a party's expert relying on the same party's corporate designee testimony, so long as the expert's reliance comports with Fed. R. Evid. 703. *See In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 16-2740, 2019 WL 3817658, at *2 (E.D. La. Aug. 14, 2019) (denying motion to exclude expert testimony relying on corporate designee of the party that hired the expert and noting the "great liberality" afforded to experts in determining the basis of their opinions).

Accordingly, even assuming the underlying testimony relied upon by the expert is hearsay, the appropriate test is whether an expert in the field "would reasonably rely on those kinds of facts or data" in forming their opinion. Fed. R. Evid. 703. If so, the underlying facts "need not be admissible for the opinion to be admitted." *Id.*

PRMI offers no persuasive reason why it would be unreasonable for Mr. Butler to rely on Ms. Farley's testimony in reaching his conclusions, and the Court finds none. And in any event, PRMI ignores the fact that Mr. Butler cites more than just Ms. Farley's testimony; he also cites to the testimony of Lisa Lundsten and Julie Steinhagen, as well as several documents and communications produced in discovery consistent with his opinion. (*Id.* at 7–8 (citations omitted).) The Court holds that Mr. Butler's reliance on Ms. Farley's testimony does not render his opinions relying on such testimony inadmissible. To the extent PRMI wishes to criticize Mr. Butler's reliance on the testimony of Ms. Farley—a deposition PRMI itself sought to obtain over ResCap's objection (*see* Order re: 30(b)(6) Dep. Topics [Doc. No. 5091] at 2 (noting PRMI sought competent 30(b)(6) testimony on this very subject))—it may do so through cross-examination. *See Robinson*, 447 F.3d at 1100.

###### iii. Whether Mr. Butler's Opinions Impermissibly Relied on MLS Proxy Data

Incorporating arguments raised by First-Wave defendants, PRMI moves this Court for an order precluding Mr. Butler from relying on Mr. Louis Dudney's proxy MLS data. (Def.'s Mem. at 29–30.) ResCap urges the Court to follow its prior rulings rejecting this argument. (Pl.'s Opp'n at 18 (citing *Common Daubert Order*, 2018 WL 4489685, at *18–

19; *In re RFC & ResCap Liquidating Tr. Litig.* ("HLC MIL Order"), Nos. 13-cv-3451 (SRN/HB), 14-cv-1716 (SRN/HB), 2018 WL 4863597, at *19–20 (D. Minn. Oct. 8, 2018); *In re RFC & ResCap Liquidating Tr. Litig.* ("HLC JMOL Order"), 399 F. Supp. 3d 804, 822 (D. Minn. 2019)).)

The Court denies PRMI's motion on this issue. PRMI raises no new arguments about the admissibility or reliability of Mr. Dudney's MLS proxy data, and the Court sees no reason to depart from three orders in which it has upheld the use of such data. *See Common Daubert Order*, 2018 WL 4489685, at *18–19 (denying Consolidated Defendants' motion to exclude underwriter opinions relying on Mr. Dudney's data sets); *HLC JMOL Order*, 399 F. Supp. 3d at 822 (noting that the use of MLS "proxy data" from a third-party source was "entirely permissible because it supplied the exact same data that was included in the original schedules"); *PRMI SJ Order*, 2019 WL 7038234, at *37–38 (same). Accordingly, PRMI's motion on this issue is denied.

### 3. Donald Hawthorne

#### a. Qualifications and Opinion

Donald Hawthorne is a career litigator with extensive experience in post-financial collapse RMBS cases, including as lead counsel for an institutional investor that challenged the sufficiency of a settlement in one such case. (Alden Decl., Ex. T (Hawthorne Rpt.) ¶¶ 4–9.) ResCap retained Mr. Hawthorne to offer his expert opinion on the good faith and reasonableness of the RFC Bankruptcy Settlements. (*Id.* ¶ 1.) ResCap also relies upon Mr. Hawthorne's opinion to assess the strengths and weaknesses of claims against RFC in the bankruptcy case as part of its attempt to measure and allocate damages. (*Id.* ¶¶ 190–271.)

To formulate his opinion, Mr. Hawthorne evaluated several key factors iterated in this Court's *PRMI SJ Order*, which is incorporated herein by reference. (*See* 2019 WL 7038234, at *19; Alden Decl., Ex. T (Hawthorne Rpt.) at pp. 66–220.) Based on these factors, Mr. Hawthorne concluded that the Trustee and Monoline Settlements were reasonable and made in good faith. (Alden Decl., Ex. T (Hawthorne Rpt.) ¶ 473.)

Incorporating arguments raised by First-Wave Defendants, PRMI moves to exclude four categories of Mr. Hawthorne's opinions: "(i) impermissible speculation regarding re-underwriting experts in the ResCap bankruptcy; (ii) opinions regarding the purported quality and reliability of re-underwriting analyses performed by Mr. Butler; (iii) parroting of third-party financial analysts' unverified opinions; and (iv) assertions that the bankruptcy settlements were reached in good faith." (Def's Mem. at 30.) The Court previously allowed Mr. Hawthorne to testify on all four categories. *Common Daubert Order*, 2018 WL 4489685, at *13-16.

While the Court sees no basis to depart from its prior ruling, it notes that in the *PRMI SJ Order*, this Court held that, as a matter of law, RFC's Bankruptcy Settlements were reasonable and made in good faith. 2019 WL 7038234, at *23. Accordingly, to the extent that PRMI moves to exclude certain of Mr. Hawthorne's testimony that relate to the reasonableness of the Settlements, PRMI's motion is denied as moot. However, Mr. Hawthorne is permitted to testify as to the strength of certain legal defenses and trust representations, to the extent that Dr. Snow relies upon his opinion for Plaintiff's damages allocation.

### 4.     Drs. John Kilpatrick, Albert Lee, and Mr. Steven Albert

#### a.     Qualifications and Opinion

Plaintiff intends to offer the opinions of three experts on appraisal issues: Drs. John Kilpatrick, Albert Lee, and Mr. Steven Albert.  Dr. John Kilpatrick is a former academic who holds a PhD in finance and is a real estate market expert.  *Common Daubert Order*, 2018 WL 4489685, at *8.  He is the current Chairman and Co-Managing Director of Greenfield Advisors economic consulting firm.  *Id.*  Plaintiff retained Dr. Kilpatrick to evaluate whether the original appraisals of the residential properties that collateralized the subject loans were inflated and if so, what impact accurate appraisals would have had on the loan-to-value ratios ("LTV ratios").  *Id.* at *8.  This determination was initially relevant because one of Plaintiff's principal allegations is that PRMI breached its contractual obligations to provide accurate and credible appraisals for the properties that collateralized the mortgages they originated and sold to RFC.  *Id.*

Here, Dr. Kilpatrick uses the Greenfield Automated Valuation Model ("GAVM") to identify Inflated Appraisals, defined as appraisals that exceeded the GAVM's value prediction by 15% or more.  *Id.* at *8.  GAVM is a computer program that retroactively assesses what an accurate appraisal would have been at the time the subject loans were issued and predicts the value of individual properties based on a regression analysis of large aggregations of housing market data as well as specific inputs.  *Id.*  Dr. Kilpatrick collaborated with a second expert, Dr. Albert Lee, to implement the GAVM.  (*See* Common Daubert Smallwood Decl., Ex. 28 (Kilpatrick Rpt.) [Doc. No. 3228] at 2.)  If the GAVM's estimated value exceeded the original appraised value by 15% or more, a third expert,

Steven Albert, reviewed the original appraisal to opine on whether the original appraisal violated the Uniform Standards of Professional Appraisal Practice ("USPAP") and was "noncredible." (*See* Common Daubert Smallwood Decl., Ex. 27 (Corrected Albert Rpt.) [Doc. No. 3227] ¶¶ 2–3.)

### b.    Objections and Analysis

Incorporating arguments raised by First-Wave defendants, PRMI moves this Court for an order precluding Dr. John Kilpatrick, Mr. Steven Albert, and Dr. Albert Lee from offering any opinions relating to appraisals. (Def.'s Mem. at 29–30.) PRMI specifically requests that the Court preclude the appraisal experts from relying on post-settlement tax assessed values as inputs into their automated valuation model because holding otherwise would violate *UnitedHealth*'s command to allocate based only on what the parties knew at the time of settlement. (*Id.* (citing 870 F.3d at 863).) For its part, ResCap urges the Court to follow its prior rulings rejecting this argument. (Pl.'s Opp'n at 19 (citing *Common Daubert Order*, 2018 WL 4489685, at *8–16).)

The Court denies PRMI's motion. Previously, the Court addressed these exact same arguments in its *Common Daubert Order*, and held that the reliability of Plaintiff's appraisal experts' GAVM method goes to weight not admissibility, and explicitly rejected PRMI's argument regarding post-settlement tax assessed values because *UnitedHealth* permits the use of information post-dating a settlement " 'only insofar as [it] inform[s] how a reasonable party would have valued and allocated the claims at the time of settlement.' " 2018 WL 4489685, at *10 (quoting *UnitedHealth*, 870 F.3d at 864.) Because ResCap's appraisal experts' use of the post-settlement tax-assessed values was a method "to assess

information that *was available* to the parties at the time of settlement," the Court found no violation of *UnitedHealth*'s commands.  *Id.*  PRMI offers no reason to depart from the Court's prior conclusion, and the Court sees none.  Accordingly, PRMI's motion on this issue is denied.

## C.  ResCap's Motion to Exclude Expert Testimony

ResCap moves the Court for an order excluding (1) several opinions offered by Phillip Burnaman II concerning servicing, the RMBS Trust Settlements, MLS proxy data, loss causation, RFC's mental state, history, and market role, the repurchase protocol in RFC's PSAs, the RMBS sponsors' timeliness defense, and any opinions relying on experts from other cases; (2) several opinions offered by Professor Steven Schwarcz concerning RFC's purported sole responsibility for liability stemming from breaches of Trust R&Ws, RFC's mental state, history, and market role, and any opinions relying on experts from other cases; (3) the testimony of Lee Kennedy in its entirety; (4) the testimony of Kori Keith concerning loss causation, RFC's mental state, RFC's purported bad faith breach allegations, and the applicability of contracts; (5) the opinion of Dr. Justin McCrary concerning allocation to Additional Settling Trusts; and (6) the testimony of David Woll in its entirety.  (Pl.'s Mot. to Exclude Expert Test. [Doc. No. 5282] at 1–2.)  The Court addresses each expert in turn.

### 1.  Phillip Burnaman

#### a.  Qualifications and Opinion

Phillip Burnaman is the Chief Risk Officer and Chief Operating Officer of Dendera Capital, LP, a private investment fund.  (Alden Decl., Ex. A (Burnaman Rpt.) ¶ 1.)  Mr.

Burnaman holds an MBA in finance and has worked in the mortgage finance industry for over 33 years. (*Id.* ¶¶ 2, 10.) In support of his "expertise in all aspects of RMBS and commercial mortgage-backed securities," Mr. Burnaman points to his work at Citigroup between 1990 and 1994, where he "performed all the tasks related to the acquisition of whole loan portfolios, including extensive loan-level due diligence, underwriting reviews, and valuation of mortgage portfolios in excess of $4 billion," and later at ING Bank between 1994 and 2004, where he managed a portfolio containing RMBS and "reviewed mortgage securitization transactions for their suitability as investments." (*Id.* ¶¶ 1–4.) Mr. Burnaman is also a member or former member of several industry organizations and has provided consulting or expert testimony in several cases since the mortgage crisis. (*Id.* ¶ 9.) Mr. Burnaman was hired by PRMI to review certain statements and opinions contained in the expert reports of Donald Hawthorne, Steven Butler, Dr. Karl Snow, and Louis Dudney. (*Id.* ¶ 12.) He was asked to opine on RMBS industry custom and practice and perform a comparison of RFC's RMBS trust settlement with other RMBS settlements with the goal of assessing whether the settlement was reasonable. (*Id.*)

Relevant here, Mr. Burnaman opines that Mr. Hawthorne's settlement analysis failed to adequately consider the servicing claims settled by RFC, and that his comparison of comparator RMBS settlements is flawed. (*Id.* ¶¶ 118–130, 142–162.) He also opines that material loan breaches typically occur early in the life of a loan, undercutting the link between PRMI's loans and ResCap's damages. (*Id.* ¶¶ 97–105.) With respect to underwriting methods, Mr. Burnaman asserts that ResCap's reliance on MLS proxy data is misplaced and "contrary to market expectations," (*id.* ¶¶ 95–96), and that the repurchase

clause (dubbed the "Repurchase Protocol" by him) in RFC's Pooling and Servicing Agreements (PSAs) required that repurchase requests be made on a loan-by-loan basis subject to dispute by originators, (*id.* ¶¶ 60, 75–76.) He also opines on the strength of the statute-of-limitations defenses purportedly available to RFC at the time of settlement, (*id.* ¶ 151 n.142) and offers his opinion as to RFC's history and role in the RMBS marketplace, (*id.* ¶¶ 17, 19–25, 27, 31) and its intentions when making trust-level R&Ws, (*id.* ¶¶ 69, 71, 73.) Finally, at least once in his report, Mr. Burnaman relies on non-present, non-testifying Wave One experts. (*See id.* ¶ 166.)

### b.  Objections and Analysis

ResCap objects to the above-identified opinions of Mr. Burnaman on various grounds. The Court addresses each issue in turn.

#### i.  Whether Mr. Burnaman's Servicing-Related Opinions Should be Excluded

ResCap seeks to exclude Mr. Burnaman's opinion that Mr. Hawthorne's opinion about the reasonableness of the RFC Bankruptcy settlement improperly undervalued the servicing claims that had been brought against RFC. (Pl.'s Mem. at 4–5.) In support, RFC points to the Court's *HLC JMOL Order*, in which it held that Mr. Burnaman had disqualified himself from opining on the reasonableness of RFC's bankruptcy settlement and the legal viability of the servicing claims, and that accordingly his opinions related to Mr. Hawthorne's opinion on reasonableness were barred. (*Id.* at 4 (citing 399 F. Supp. 3d at 820–21).)

Mr. Burnaman has since testified that he would not change any of his prior testimony from the *HLC* case; accordingly, he remains disqualified from opining on this issue. (*See* Alden Decl., Ex. C (Oct. 8, 2019 Burnaman Dep.) at 16–18.) Additionally, in its *PRMI SJ Order*, the Court held that, as a matter of law, RFC's Bankruptcy Settlements were reasonable and made in good faith. 2019 WL 7038234, at *23. Accordingly, ResCap's motion to exclude Mr. Burnaman's testimony rebutting Mr. Hawthorne's valuation of the servicing claims brought against RFC is denied as moot.

### ii. Whether Mr. Burnaman's RMBS Settlement Comparisons Should be Excluded

Mr. Burnaman criticizes the opinion of Plaintiff's expert Mr. Hawthorne, who opines generally that RFC's Settlements were reasonable and reached in good faith. (*See* Def.'s Opp'n at 30 (citation omitted).) In that context, Mr. Burnaman opines, *inter alia*, that Mr. Hawthorne's comparisons to other RMBS settlements are flawed. (Alden Decl., Ex. A (Burnaman Rpt.) ¶ 142–62.) ResCap seeks to exclude this opinion because Mr. Burnaman previously disqualified himself from testifying as to the reasonableness of RFC's Bankruptcy Settlements. (Pl. Mem. at 5–6 (citing *HLC JMOL Order*, 399 F. Supp. 3d at 817).)

In its *PRMI SJ Order*, the Court held that, as a matter of law, RFC's Bankruptcy Settlements were reasonable and made in good faith. 2019 WL 7038234, at *23. Accordingly, ResCap's motion to exclude Mr. Burnaman's testimony rebutting Mr. Hawthorne's comparison of RFC's settlements to other RMBS settlements is denied as moot.

### iii.  Whether Mr. Burnaman's Loss Causation Opinion Should be Excluded

ResCap also seeks to exclude Mr. Burnaman's "loss causation" opinions, in which he generally asserts that an underwriting breach is purportedly unlikely to have caused a loss on a loan that has paid for a period of time.  (Pl.'s Mem. at 6 (citing Alden Decl., Ex. A (Burnaman Rpt.) ¶¶ 97–105).)  In support, ResCap points to the Court's prior *Common Daubert Order*, in which the Court excluded Mr. Burnaman's opinion on the subject because his own "general sources" and "career experience," along with the deposition testimony of some RFC personnel, did not amount to competent, reliable evidence establishing a break in causation.  2018 WL 4489685, at *21.  In response, PRMI contends that Mr. Burnaman is opining that reasonable industry participants understood that breach claims on loans that "performed two to three years before default were relatively weaker than claims with earlier defaults" and that most of PRMI's allegedly-breaching sample loans performed for two years or more.  (Def.'s Opp'n at 35.)  Such opinions, PRMI contends, are directly relevant to the damages allocation inquiry under *UnitedHealth*.  (*Id.*)

The Court grants ResCap's motion to exclude these opinions.  Nothing has changed between Mr. Burnaman's testimony on this subject in *HLC* and this case, and accordingly, Mr. Burnaman's testimony on this issue is still unreliable due to a lack of competent, reliable evidence on this supposed "break in causation."  *See Common Daubert Order*, 2018 WL 4489685, at *21.  Because Mr. Burnaman's testimony on this point is unreliable, it will be excluded from trial.  *Id.*

### iv. Whether Mr. Burnaman's Opinions about MLS Proxy Data Should be Excluded

ResCap seeks to exclude Mr. Burnaman's opinion that it would have been "contrary to market expectations" for a trust or investor to assert a breach claim of an MLS representation without relying on the actual MLS, and that Mr. Dudney's "reconstituted MLS is not a reliable equivalent to an actual MLS." (Pl.'s Mem. at 7 (quoting Alden Decl., Ex. A (Burnaman Rpt.) at 95–96).) In support, ResCap points to the Court's *Common Daubert Order*, as well as its *HLC JMOL Order*, in which the Court held that Mr. Dudney's MLS proxy data could be relied upon by Plaintiff's experts because it was reliable and supplied the exact same data that was included in the original schedules. *See* 399 F. Supp. 3d at 822 ("[B]asing an R&W breach on 'proxy data' from a third-party source was entirely permissible because it supplied the exact same data that was included in the original schedules."); 2018 WL 4489685, at *18–19 (same). In response, PRMI contends that Mr. Burnaman's opinion regarding the MLS proxy data is admissible because (1) his opinion that using MLS proxy data is "contrary to industry practice" goes directly to the damages allocation inquiry under *UnitedHealth*, and (2) certain missing documents in the proxy MLSs render them unreliable compared to original MLSs, and that even if Mr. Dudney's data is admissible, Mr. Burnaman's opinion should be admissible as an expert dispute on the issue. (Def.'s Opp'n at 32–33.)

The Court grants ResCap's motion to exclude Mr. Burnaman's opinions on this issue. In its *PRMI SJ Order*, the Court held that "Mr. Dudney used reliable sources to obtain missing MLS information and data," and that his data was an "identical substitute

for information that was *originally* in the MLSs but had *subsequently* gone missing." 2019 WL 7038234, at \*37. Accordingly, PRMI's *UnitedHealth* allocation argument—that the MLS proxy data was not available at the time of settlement and cannot be considered—fails because the MLS proxy documents *contained the same data* as the original MLSs. *Id.* Additionally, PRMI's continued assertion as to the unreliability of Mr. Dudney's proxy data is simply unavailing: Mr. Dudney's proxy MLSs were "extremely accurate," and his cross-reference check "of the proxy data between three third-party sources yielded only *one* mismatch in data *out of 68,121 unique data points*." *Id.* Mr. Burnaman's contention to the contrary has been consistently rejected by this Court: "because the proxy MLS data was identical to the original MLSs," *see Common Daubert Order*, 2018 WL 4489685, at \*18, "and the claims brought against RFC were based on the original MLSs," *id.*, PRMI's claim of unreliability simply has no competent evidence supporting it. *PRMI SJ Order*, 2019 WL 7038234, at \*37.

### v. Whether Mr. Burnaman's Opinions about RFC's Mental State Should be Excluded

ResCap seeks to exclude Mr. Burnaman from offering any opinions as to RFC's mental state, intentions, or motivations regarding its trust-level R&Ws. (Pl.'s Mem. at 8.) Specifically, ResCap points to one instance[7] in Mr. Burnaman's report where he

---

[7] In its opening memorandum, ResCap pointed to three purported statements made by Mr. Burnaman in his report that it alleged were inadmissible speculation regarding RFC's mental state. (*See* Pl.'s Mem. at 8.) However, in its reply, ResCap admitted it misquoted Mr. Burnaman, and restricted its motion to exclude to only the statements made in paragraph 73 of Mr. Burnaman's report. (*See* Pl.'s Reply at 7 n.9.) Accordingly, the Court only considers whether certain statements in paragraph 73 of Mr. Burnaman's report should be excluded.

purportedly opines on what RFC intended to do with its trust-level R&Ws. Such an opinion, ResCap argues, is inadmissible speculation. (*See id.* at 9 (citing Alden Decl., Ex. A (Burnaman Rpt.) ¶ 73 ("It is contrary to my industry knowledge and years of direct experience to think that RFC would have employed different, poorly defined, and circuitously worded [R&Ws] in order to achieve the exact same result it could have achieved using a single, straightforward, and standardized underwriting guideline [R&W].") In response, PRMI contends that Mr. Burnaman is opining as to industry practice and custom, and that such an opinion is entirely appropriate for an expert with his qualifications. (Def.'s Opp'n at 36–37.) The language cited by ResCap, PRMI notes, opines "*not* on RFC's 'state of mind,' but on customary industry practice," and in any event, ResCap's own witness, Mr. Butler, opines as to RFC's state of mind too. (*Id.*)

As both parties acknowledge, "[e]xpert testimony on 'the intent, motives, or states of mind of corporations . . . ha[s] no basis in any relevant body of knowledge or expertise" and accordingly experts "may not proffer an opinion relating to what individuals [within a company or agency] thought with respect to certain documents or about their motivations." *Kruszka*, 28 F. Supp. 3d at 931. However, this rule does not bar expert testimony that an entity acted in accordance with regulations or established procedure, or other fact-based testimony as to what an entity actually did—as opposed to what it was motivated by, thought, or intended—because such evidence does not cross the line into inadmissible testimony. *Id.*

While the language at issue is certainly related to what RFC may have thought at the time—and therefore treads the line of inadmissible speculation—on balance, the Court

holds that it does not cross that line, and accordingly the Court denies ResCap's motion on this point.[8]  The language ResCap takes issue with does not appear to be an opinion as to what RFC actually intended, thought, or was motivated by when issuing its trust-level R&Ws.  Rather, it states Mr. Burnaman's opinion that Plaintiff's interpretation of RFC's pool-wide R&Ws—namely, that they could be construed as underwriting guideline R&Ws—is "contrary to [his] industry knowledge and years of direct experience" because of the existence of "straightforward[] and standardized underwriting guideline [R&W]" language that could have been used if RFC had intended to do what Plaintiff argues it did. (Alden Decl., Ex. A (Burnaman Rpt.) ¶ 73.)  An opinion about what common industry-accepted language RFC could have used is not speculation as to RFC's state of mind.  To the contrary, it consists of an opinion about whether an entity's actions were consistent with normal regulations or established procedures in a given field, which is an admissible form of expert opinion (assuming the other aspects of Fed. R. Evid. 702 are met).  *See Kruszka*, 28 F. Supp. 3d at 931.  Notably, ResCap does not argue that Mr. Burnaman is somehow unqualified to discuss industry customs or practice.  Accordingly, Mr. Burnaman's opinion on that point is admissible.

---

[8]    ResCap makes the same motion with respect to certain expert testimony offered by David Woll, Kori Keith, and Professor Schwarcz.  (Pl.'s Mem. at 8.)  The Court discusses the specific language at issue for each expert in their respective sections in this order.

### vi. Whether Mr. Burnaman's Opinions about RFC's History and Market Roles Should be Excluded as Inadmissible Fact Testimony

ResCap next moves to exclude Mr. Burnaman's testimony about RFC's history and market roles as "inadmissible fact testimony." (Pl.'s Mem. at 9–10.) Specifically, it points to statements made by Mr. Burnaman detailing RFC's role in the industry, including how RFC was designed to allow "access to expanding financing alternatives," was poised to "take advantage of the mortgage-market disruptions," and that a "significant component of RFC's growth was in new, non-standard mortgage products." (*Id.* at 9 (quoting Alden Decl., Ex A (Burnaman Rpt.) ¶¶ 17, 19–25, 27, 31).) ResCap contends that such testimony is an impermissible "back door" for an expert to offer extensive tilted fact testimony and should be excluded. (*Id.* at 10.) In response, PRMI contends that all Mr. Burnaman is doing is providing background factual support and a general overview of RFC's position in the RMBS market, based on his "extensive industry experience" and not a "summarization of documents" as ResCap contends. (Def.'s Opp'n at 39.)

The Court denies ResCap's motion on this issue. This case requires " '[]expert[s] to educate the factfinder about general principles' " of the RMBS markets. *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). The issues here involve the complex residential mortgage-backed securities industry, a subject *not* within the knowledge or experience of lay people. *Id.* (noting that background information testimony by an expert is not appropriate where the subject is within the knowledge or experience of lay people, such "what happens to memory over time"). Accordingly, Mr. Burnaman may testify about the

general background and history of the industry, including his own personal knowledge about RFC's position in the industry, in order to educate the factfinder. To the extent ResCap disagrees with the factual basis for his testimony, or wishes to contradict his assertions, it may cross-examine him or have a similarly qualified expert testify as to their different understanding of the RMBS market and RFC's role within that industry. *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005) ("Generally, even post-*Daubert*, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.' " (citation omitted)). The Court notes, however, that this ruling does *not* permit Mr. Burnaman to serve as a conduit for inadmissible hearsay, nor does it permit him to testify as to RFC's mental state, intentions, plans, knowledge, or motivations within the RMBS markets. To the extent that is a possibility based on Mr. Burnaman's report, the Court will consider specific objections at trial.

> **vii.** **Whether Mr. Burnaman's Opinions Relying on Experts from Other Cases Should be Excluded**

ResCap seeks to exclude certain opinions by Mr. Burnaman purportedly made in reliance on other expert opinions offered in the Wave One litigation. (Pl.'s Mem. at 10–11.) Specifically, ResCap points to one instance in Mr. Burnaman's report where he opines that "an expert for certain earlier Defendants also re-underwrote the global sample and found far lower breach rates when applying the correct, industry-standard interpretations of the [R&Ws] made by RFC to the at-issue trusts" without identifying which expert he is

relying on. (*Id.* at 11 n.4.) PRMI offers no response as to Mr. Burnaman's reliance on this undisclosed Wave One expert.[9]

The Court agrees with ResCap and bars Mr. Burnaman from testifying as to the non-present opinions of an unidentified non-testifying Wave One defense expert. As the Eighth Circuit has noted, "Fed. R. Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views." *United States v. Grey Bear*, 883 F.2d 1382, 1392–93 (8th Cir. 1989); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) (finding an abuse of discretion where expert was permitted to testify as to the conclusions reached by non-present, non-testifying experts and how much their opinions overlapped). Even PRMI's own case law states that while an "expert [may] base an opinion on facts or data not admissible in evidence if it is of the type reasonably relied upon by experts in that particular field," experts are not permitted to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000).

Here, Mr. Burnaman opines about an unidentified Wave One expert's opinion, without offering any discussion about his assessment of the validity of, the methodology used within, or the reasoning underlying the opinion, much less its factual basis. (*See*

---

[9]     PRMI does assert that Mr. Hawthorne himself relies on a "slew of expert reports from other cases," including the underlying bankruptcy proceedings. (Def.'s Opp'n at 41.) As noted *supra* at § III(B)(3), Mr. Hawthorne's testimony, however, regarding the reasonableness of the Bankruptcy Settlements, is no longer needed, and accordingly this point is moot.

Alden Decl., Ex. A (Burnaman Rpt.) ¶ 166 (merely stating, in a very general manner, what the undisclosed Wave One defense expert said).) Allowing Mr. Burnaman to testify as to what that expert concluded would render him a conduit of inadmissible hearsay, in violation of the rules of evidence. *See* Fed. R. Evid. 703. Moreover, the failure of Mr. Burnaman to identify the expert he relies on results in serious prejudice to ResCap because it could not critique the underlying expert opinion through either cross-examination or deposition. Accordingly, ResCap's motion on this issue is granted.

### viii. Whether Mr. Burnaman's Repurchase Protocol Opinions Should be Excluded

ResCap seeks to exclude Mr. Burnaman's opinions regarding the repurchase clause of RFC's PSAs. (Pl.'s Mem. at 11.) Specifically, Mr. Burnaman opines that the repurchase clause of RFC's PSAs, which he terms the "Repurchase Protocol," required that repurchase requests to originators be made on a loan-by-loan basis, and permitted originators or the sponsor a genuine opportunity to dispute an alleged breach by investigating the allegations under the Repurchase Protocol. (Alden Decl., Ex. A (Burnaman Rpt.) ¶ 60.) Mr. Burnaman also opines that because Credit Grade and Loan Program trust-level R&Ws do not concern the characteristics of any particular loan, those trust-level R&Ws cannot be enforced through the Repurchase Protocol. (*Id.* ¶¶ 75–76.)

ResCap seeks to exclude these opinions for three reasons. First, it argues that any opinions concerning the applicability of, and the rights and obligations under, the Repurchase Protocol are legal opinions, which Mr. Burnaman is unqualified to offer. (Pl.'s Mem. at 12 (citing Alden Decl., Ex. B (Mar. 20, 2018 Burnaman Dep.) at 19–21, 251).)

Second, ResCap contends that Mr. Burnaman's opinions about the Repurchase Protocol are irrelevant because ResCap is not seeking a remedy under the Repurchase Protocol and neither Mr. Burnaman nor any other PRMI expert has attempted to connect the Repurchase Protocol to the reasonableness of the Bankruptcy Settlements. (*Id.*) Finally, even assuming the opinion was relevant, ResCap argues that Mr. Burnaman provides no support for his opinion that the Repurchase Protocol does not apply to the Credit Grade and Loan Program R&Ws, which are made in the same section of the Trust Agreements for which the Repurchase Protocol provides a remedy. (*Id.* (citations omitted).)

In response, PRMI contends that Mr. Burnaman is offering an opinion on the RMBS industry's "standard process" for dealing with breach claims that required "loan-specific investigation," and that investors were "well aware" of the differences between pool-wide R&Ws and loan-level R&Ws, the latter of which could be enforced through the Repurchase Protocol. (Def.'s Opp'n at 33–34.) PRMI argues that this opinion is relevant and admissible for two reasons: (1) Mr. Burnaman is qualified to opine on industry practices— and how a reasonable industry participant would have understood these provisions—by virtue of his own experience; and (2) Mr. Burnaman's opinions are directly relevant to how a reasonable RMBS sponsor would have understood pool-wide representations, and more specifically, how no reasonable RMBS sponsor would have understood RFC's trust-level R&Ws to be enforceable through the loan-by-loan Repurchase Protocol, which is responsive to ResCap's experts that opine that such pool-wide R&Ws could be construed as loan-level representations. (*Id.* at 34.) PRMI contends that even though ResCap is not seeking a remedy under the Repurchase Protocol, Mr. Burnaman's opinion is still relevant

because the "relevant inquiry" is what "breach allegations and repurchase demands [] RFC faced in the bankruptcy." (*Id.* at 34 n.18.)

In reply, ResCap argues that how the industry treated breach claims is irrelevant where unambiguous contracts govern whether the Repurchase Protocol applies to RFC's trust-level R&Ws. (Pl.'s Reply at 10.) Moreover, ResCap contends that Mr. Burnaman's experience as an industry participant is insufficient to support the opinion he reaches regarding the Repurchase Protocol and is accordingly mere *ipse dixit*. (*Id.*)

The Court grants ResCap's motion and excludes Mr. Burnaman's opinion regarding the Repurchase Protocol. As an initial matter, Mr. Burnaman's opinion on this issue is irrelevant. The Court has already held that RFC's Bankruptcy Settlements were reasonable and made in good faith, *see PRMI SJ Order*, 2019 WL 7038234, at *23, so his opinion cannot go to the reasonableness of RFC's settlement. Moreover, ResCap notes it is not seeking a remedy under the Repurchase Protocol, which renders Mr. Burnaman's purported "industry"-based opinions about the meaning of the PSA's repurchase clause irrelevant as to the claims at issue.

Regardless, experts may not testify to the meaning of a contract where the language is unambiguous. *See Winthrop Res. Corp.*, 361 F.3d at 470. Even when a contract is ambiguous, expert testimony is only permitted to the extent it clarifies technical terms or provisions in the contract; an expert may not simply offer their personal opinion about a contract's meaning or applicability. *See N. Am. Specialty Ins. Co.*, 111 F.3d at 1281. Here, Mr. Burnaman does not offer testimony as to any specialized terms or provisions, but even if he did, Mr. Burnaman cannot opine on the meaning of RFC's PSA repurchase clause

because he is not a lawyer and expressly disavows any ability to offer a legal interpretation on the meaning of contracts.  (*See* Alden Decl., Ex. B (Mar. 20, 2018 Burnaman Dep.) at 19–21.)   Accordingly, Mr. Burnaman's opinion regarding the Repurchase Protocol is excluded.

### ix.      Whether Mr. Burnaman's Opinions about Sponsors' Timeliness Defense Should be Excluded

ResCap seeks to exclude Mr. Burnaman's opinion on the strength of RFC's statute-of-limitation defenses at the time of its Bankruptcy Settlements.  (Pl.'s Mem. at 12–13 (citing Alden Decl., Ex. A (Burnaman Rpt.) ¶ 151, n.142).)   Mr. Burnaman notes in a footnote of his report—while criticizing Mr. Hawthorne's comparator settlement analysis with respect to the reasonableness of RFC's Bankruptcy Settlements—that while he is not a lawyer and cannot opine on the "state of statute-of-limitations law at the time of any settlements . . . based on my experience [] sponsors have long viewed their statute-of-limitations defenses as being strong and have taken this into account in settling RMBS claims."  (Alden Decl., Ex. A (Burnaman Rpt.) ¶ 151 n.142.)

In its *PRMI SJ Order*, this Court held that, as a matter of law, RFC's Bankruptcy Settlements were reasonable and made in good faith.   2019 WL 7038234, at *23. Accordingly, PRMI's motion to exclude Mr. Burnaman's testimony as to the strength of RFC's purported statute-of-limitations defense at the time of settlement—which was offered in the context of criticizing Mr. Hawthorne's comparison of RFC's settlements to other RMBS settlements—is denied as moot.

## 2. Steven Schwarcz

### a. Qualifications and Opinion

Professor Steven Schwarcz is the Stanley A. Star Professor of Law & Business at Duke University School of Law, and an attorney with several years of experience in securitization practice where he helped "pioneer the development of securitization as a discipline." (Alden Decl., Ex. G (Schwarcz Rpt.) ¶¶ 1–2.) He is a published author on asset securitization, and teaches law school courses on securitization and structured finance, among other things. (*Id.* ¶¶ 2–3.) Professor Schwarcz was hired by PRMI to respond to Plaintiff's expert's interpretations of a number of the representations and warranties that RFC made to the at-issue trusts, as well as to the damages methodology presented by Plaintiff's experts. (*Id.* ¶ 6.) The Court previously addressed Professor Schwarcz's opinion in the *Common Daubert Order*. *See* 2018 WL 4489685, at *23.

Relevant here, Professor Schwarcz again offers his opinion that the allocation methodology used by ResCap's damages expert, Dr. Snow, is flawed because it assumes all breaches of RFC's R&Ws to the Trusts and Monolines also constituted breaches of originating banks' R&Ws to RFC. (*Id.* ¶ 112.) Professor Schwarcz opines that "the R&Ws that RFC made to the trusts and monolines were different in many respects than the R&Ws that RFC received from originators [like PRMI], such that an originator could breach its R&Ws in various ways without causing a corresponding breach of RFC's R&Ws to the trusts or monolines." (*Id.*) Specifically, he again opines that there are three *possible* scenarios where RFC breached trust-level R&Ws independent of any origination R&W breaches: (1) breaches of RFC's representation that loans were underwritten pursuant to

45

the standards in the Client Guide, when applied to loans for which RFC had granted originating banks an exception to the Client Guide's underwriting standards; (2) any breach of RFC's R&Ws that occurred after the effective date of the originating bank's R&Ws (that is, after RFC's purchase of the loan); and (3) any breach of RFC's R&Ws concerning RFC's own conduct or status, rather than the characteristics of the loans. (Alden Decl., Ex. G (Schwarcz Rpt.) ¶¶ 112–25.)

Professor Schwarcz also provides his own take on the history of RFC and its role as a market participant, (s*ee id.* ¶¶ 18–21, 25–32, 34, 37, 40–42), and offers a number of opinions related to what RFC knew, intended, or believed at various points in his report. (*Id.* ¶¶ 55, 59, 62, 67, 74, 84, 93.) Finally, Professor Schwarcz references other experts' opinions from the Wave One litigation (and not testifying in this case) that purportedly support or comport with his opinions. (*Id.* ¶¶ 19 n.10 (citing to "various expert reports" from Wave One that "confirm" his conclusions), 20 (relying on Wave One re-underwriting reports), 115 (same), 119 (relying on Justice Carpinello's report from Wave One).)

### b. Objections and Analysis

ResCap moves to exclude several opinions offered by Mr. Schwarcz, including (1) his opinion that ResCap's allocation methodology fails to account for a portion of RFC's settlements that are not indemnifiable because RFC was solely responsible for those liabilities (i.e., the "sole responsibility" theory); (2) any of his opinions that go to RFC's mental state, intentions, or motivations; (3) his discussion of RFC's history and market role; and (4) his opinions that rely on experts from other cases. (Pl.'s Mem. at 8–11.) The Court addresses each issue in turn.

### i.      Whether Mr. Schwarcz's Sole-Responsibility Opinions Should be Excluded

ResCap first seeks to exclude Professor Schwarcz's sole-responsibility opinions because they lack any evidentiary support, and accordingly amount to mere speculation. (Pl.'s Mem. at 8.)  In support, ResCap cites to this Court's October 22, 2018 order in which the Court addressed this precise issue and ultimately precluded Professor Schwarcz from opining on the "sole responsibility" theory due to the lack of any non-speculative evidence supporting it.  *In re RFC & ResCap Liquidating Tr. Action* ("Oct. 22, 2018 HLC Order"), Nos. 13-cv-3451 (SRN/HB), 14-cv-1716 (SRN/HB), 2018 WL 5257641, at *8 (D. Minn. Oct. 22, 2018).  In that order, the Court noted that despite *eight* separate opportunities to proffer evidence in support of the "sole responsibility" theory, Professor Schwarcz failed to provide evidentiary support sufficient to carry his "sole responsibility" opinion beyond pure speculation. *Id.* at *6 n.9.  "[R]egardless of whether [defendant's] 'sole responsibility' argument is considered an affirmative defense on causation, or a rebuttal to ResCap's allocation case," the Court stated, Professor Schwarcz had failed to present "competent expert testimony to guide [the jury] in analyzing [sole responsibility] evidence" and, accordingly, without "such expert analysis, the probative value of [the] evidence [was] far outweighed by the risk of unfair prejudice and juror confusion." *Id.* at *6.  As such, Professor Schwarcz was barred from opining as to RFC's alleged "sole responsibility" for certain trust-level breaches. *Id.* at *8.

In response, PRMI argues that the Court should not follow its prior ruling and incorporates Wave One briefing in support.  (Def.'s Opp'n at 23–25.)  PRMI also contends

that Professor Schwarcz's opinions on "sole responsibility" are valid critiques of Dr. Snow's damages allocation methodology, and that the Court's prior order impermissibly flipped the burden of proof for damages onto PRMI by permitting ResCap to "ask[] the factfinder to assume, with no expert analysis, that RFC was not solely responsible for even a single trust-level breach [claim]." (*Id.* at 25–26.)

The Court grants ResCap's motion to exclude this portion of Professor Schwarcz's opinions. As an initial matter, the Court rejects any invitation to return to, or request for reconsideration of, Wave One briefing on this issue. Those questions have long been decided, and the Court sees no reason to depart from its prior conclusions. The fact remains that whether characterized as a causation argument or allocation critique, PRMI offers no competent evidence sufficient to permit the "sole responsibility" theory to go to the factfinder. Indeed, Professor Schwarcz admitted in his recent deposition that nothing has changed between his opinion in the *HLC* case and his opinion in this case. (*See* Alden Decl., Ex. I (Oct. 23, 2019 Schwarcz Dep.) at 13 ("Q. Sitting here today, is there anything that you would want to change in your Wave 1 deposition testimony? A. I do not recall that there is anything I would wish to change in that Wave 1 testimony."), 14 (testifying that there are no "significant" differences between the way Professor Schwarcz prepared his report for Wave One litigation and this case).)

As to PRMI's contention about the burden of proof, the Court has already noted in explicit detail that while "[i]t is certainly true that ResCap bears the burden of proof on establishing its damages and allocation . . . [and it is] true that PRMI is not required to prove anything related to allocation . . . without *some* non-speculative hypothetical basis

for the [sole responsibility theory], those two truths do not simultaneously grant PRMI license to argue that there are RFC-only breaches that PRMI should not be required to indemnify." *PRMI SJ Order*, 2019 WL 7038234, at \*49 (citing *Oct. 22, 2018 HLC Order*, 2018 WL 5257641, at \* 7–8). "PRMI points to nothing more than 'purely hypothetical' expert opinion—which is insufficient—that RFC *could* have *possibly* made R&Ws to the Trusts and Monolines that were independent from any R&Ws made by PRMI to RFC[.]" *Id.* But purely speculative expert opinion is not admissible. *See Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (noting that where an expert fails to provide a basis for the court to believe his opinions are "anything more than unabashed speculation" such an opinion "flunk[s] the reliability prong of *Daubert*"). Accordingly, ResCap's motion on this point is granted, and Professor Schwarcz's opinions related to "sole responsibility" are excluded.

ii.    **Whether Mr. Schwarcz's Opinions about RFC's Mental State Should be Excluded**

ResCap also seeks to exclude any reference made by Professor Schwarcz to RFC's mental state, intention, or motivation behind its trust-level R&Ws. (Pl.'s Mem. at 8–9.) It argues that such evidence is inadmissible speculation. (*Id.* at 9.) In response, PRMI contends that Professor Schwarcz is merely opining as to "how a reasonable sponsor would have acted, and noting that RFC, in fact, acted that way." (Def.'s Opp'n at 37.)

As the Court noted above, "[e]xpert testimony on 'the intent, motives, or states of mind of corporations . . . ha[s] no basis in any relevant body of knowledge or expertise" and accordingly experts "may not proffer an opinion relating to what individuals [within a

company or agency] thought with respect to certain documents or about their motivations." *Kruszka*, 28 F. Supp. 3d at 931. However, experts (who otherwise satisfy Fed. R. Evid. 702) may still testify that an entity acted in accordance with regulations or established procedure—and may testify as to what an entity actually did—because such evidence does not cross the line into inadmissible testimony. *Id.*

Applied to Professor Schwarcz's opinions, the Court concludes that some of his testimony must be excluded, but that other portions remain admissible. For example, in a few instances, Professor Schwarcz appears to be opining on how market participants in the securitization markets usually act, or how they would view certain actions, but also offers opinions related to what RFC knew or intended. (*See, e.g.*, Alden Decl., Ex. G (Schwarcz Rpt.) ¶¶ 55 (opining that "the absence of [certain] R&Ws would have reflected a conscious business decision by RFC"), 59 (noting that "RFC . . . knew how to make an underwriting guidelines R&W when it wanted (or was required) to" but where it did not do so, "commercial parties [in the industry]" and RFC "would have understood that the absence of an express, industry-standard underwriting Guidelines R&W meant that it was not making any representations or warranties about the loans' compliance with underwriting guidelines"), 62 (testifying about what market participants would have thought about Plaintiff's theory regarding RFC's trust-level R&Ws).) To the extent Professor Schwarcz opines about what RFC *knew*, *thought*, or *intended* about trust-level R&Ws, his testimony is inadmissible. *Kruszka*, 28 F. Supp. 3d at 931. However, to the extent his testimony opines on how market participants usually conduct business, or how they would view

certain actions by RFC or other entities like it, such testimony falls within Professor Schwarcz's area of expertise and is admissible. *Id.*

The Court cannot definitively identify every instance of admissible, as opposed to inadmissible, testimony offered by Professor Schwarcz on this issue. Nevertheless, the Court holds that ResCap's motion incorporates the correct legal standard, and that in at least a few instances discussed above, Professor Schwarcz's testimony must be excluded because it impermissibly opines on RFC's state of mind. Accordingly, ResCap's motion to exclude Professor Schwarcz's opinions about RFC's state of mind, intentions, or motivations is granted. However, Professor Schwarcz is not barred from offering testimony on industry understanding and practice, to the extent it does not go to RFC's mental state. The Court will address specific objections at trial.

### iii. Whether Mr. Schwarcz's Opinions about RFC's History and Market Roles Should be Excluded as Inadmissible Fact Testimony

ResCap next moves to exclude Professor Schwarcz's testimony about RFC's history and market roles as "inadmissible fact testimony." (Pl.'s Mem. at 9–10.) Specifically, it points to statements made by Professor Schwarcz detailing RFC's role in the industry, how it generally conducted business, how it would require its originators to underwrite loans, and how it deviated from its own Client Guides. (*Id.* at 10 (citing Alden Decl., Ex. G (Schwarcz Rpt.) ¶¶ 18–20, 115).) ResCap contends that such testimony is an impermissible "back door" for an expert to offer extensive tilted fact testimony and should be excluded. (*Id.* at 10.) In response, PRMI contends that all Professor Schwarcz is doing

is providing background factual support, which in turn provides context for his opinions in order to assist the factfinder. (Def.'s Opp'n at 38–39.)

The Court denies ResCap's motion on this issue. As the Court noted above, this case involves issues not within the normal knowledge or experience of lay people; expert testimony is required to " 'educate the factfinder about general principles' " of the RMBS markets. *Coutentos*, 651 F.3d at 821 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). Given his background, Professor Schwarcz may testify about the general history of the industry, and RFC's role within it, in order to educate the Court as the factfinder. To the extent ResCap disagrees with the factual basis for his testimony, or wishes to contradict his assertions, it may cross-examine him or have a similarly qualified expert testify as to their different understanding of the RMBS market and RFC's role within that industry. *See Marvin Lumber & Cedar Co.*, 401 F.3d at 916. Still, just like the Court's ruling above with respect to Mr. Burnaman (*see supra* at § III(C)(1)(b)(vi)), this ruling does *not* permit Professor Schwarcz to serve as a conduit for inadmissible hearsay, nor does it permit him to testify as to RFC's mental state, intentions, plans, knowledge, or motivations within the RMBS markets. To the extent that is a possibility based on Professor Schwarcz's report, the Court will consider specific objections at trial.

   **iv.**   **Whether Mr. Schwarcz's Opinions Relying on Experts from Other Cases Should be Excluded**

ResCap seeks to exclude certain opinions by Professor Schwarcz purportedly made in reliance on other expert opinions offered in the Wave One litigation. (Pl.'s Mem. at 10–11.) Specifically, ResCap points to several instances in Professor Schwarcz's report in

which he opines that his "review" or "understanding" of certain Wave One expert reports—notably, the Broeksmit reports and Justice Carpinello's Wave One report—comport with his opinion about various issues in this case. (*Id.* at 10–11, 11 n.4 (citation omitted).) Professor Schwarcz opines that his "review of the record and the re-underwriting reports [he] reviewed in connection with the report [he] served in the 'Wave I' cases indicates that" originators like PRMI would "often sell loans to RFC subject to variances and exceptions[.]" (Alden Decl., Ex. G (Schwarcz Rpt.) ¶ 20; *see also id.* ¶¶ 115 (same).) With respect to Justice Carpinello's report, he opines that he has "reviewed [it] and understands that, in his opinion, a significant portion of RFC's monoline settlements was likely attributable to fraud claims because such claims would have increased the monolines' recoverable damages." (*Id.* ¶ 119.) Notably, Justice Carpinello's Wave One report was previously excluded by this Court. *See Common Daubert Order*, 2018 WL 4489685, at *27.

In response, PRMI contends that Professor Schwarcz identifies the reports he relies on and only cites them for a proposition that ResCap has purportedly conceded: "that RFC often purchased loans from originators pursuant to third-party guidelines or as exceptions from the Client Guide's criteria." (Def.'s Opp'n at 40.) ResCap argues in reply that that proposition is absolutely contested in this case, and accordingly, the issue is not a "noncontroversial proposition." (Pl.'s Reply at 9.) Additionally, ResCap asserts, it cannot depose or cross-examine Broeksmit or Justice Carpinello, and permitting the use of Wave One expert reports will only create a sideshow at trial over Wave One issues. (*Id.*)

The Court agrees with ResCap and bars Professor Schwarcz from testifying as to the non-present, non-testifying opinions of either Broeksmit or Justice Carpinello. "Fed. R. Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views." *Grey Bear*, 883 F.2d at 1392–93; *see also Mike's Train House, Inc.*, 472 F.3d at 409. As noted above, even PRMI's own case law states that while an "expert [may] base an opinion on facts or data not admissible in evidence if it is of the type reasonably relied upon by experts in that particular field," experts are not permitted to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d at 1357.

Here, Professor Schwarcz's opinions about Wave One expert opinions—and his testimony about what they concluded and how those opinions overlap with or are consistent with his own opinion—is entirely inadmissible hearsay because he offers no personal assessment of the validity of the underlying opinions, their methodology or reasoning, or their factual basis. (*See* Alden Decl., Ex. G (Schwarcz Rpt.) ¶¶ 20, 115 (stating only that he had reviewed the re-underwriting reports from the Wave One litigation, and merely reciting what they say), 119 (same as to Justice Carpinello's report).) Allowing Professor Schwarcz to testify as to what those experts concluded would permit him to be a conduit for inadmissible hearsay, in violation of the rules of evidence. *See* Fed. R. Evid. 703. Moreover, because neither Broeksmit nor Justice Carpinello are experts in this case, permitting him to testify about those experts' conclusions would prejudice ResCap because it could not critique either underlying opinion at trial.

Additionally, the purportedly noncontroversial proposition advanced by Professor Schwarcz through these experts is anything but: the Court recently held that a fact issue exists over whether and to what extent RFC waived, or should be estopped from enforcing, the Client Guides' R&Ws based on its purchase of loans purportedly underwritten to other underwriting parameters. *See PRMI SJ Order*, 2019 WL 7038234, at *58–59.[10] Accordingly, ResCap's motion on this issue is granted.

### 3. Lee Kennedy

#### a. Qualifications and Opinion

Mr. Lee Kennedy has approximately 30 years of experience in the residential real estate valuation field, including over 15 years of experience in the testing and validation of automated valuation models (AVMs). (Alden Decl., Ex. K (Keith Rpt.) at 37 (prior report summarizing qualifications).) He is the founder and managing director of AVMetrics, LLC, which specializes in independent testing of residential AVMs. (*Id.*) In addition to serving as an expert in several cases, Mr. Kennedy has conducted training classes for bank examiners on AVM fundamentals, applications, and risk mitigation, and has written or

---

[10] This is particularly true with respect to Justice Carpinello's opinion, which the Court previously excluded and about which PRMI offers no reason to depart from that decision. *See Common Daubert Order*, 2018 WL 4489685, at *27. Rather, PRMI asserts that the Court need not rule on Professor Schwarcz's reliance on Justice Carpinello's opinion because it has no intention of presenting testimony based on Justice Carpinello's report. (Def.'s Opp'n at 41 n.20.) It contends that Professor Schwarcz cited to the report to preserve PRMI's appellate rights pursuant to the parties' stipulation on the matter. (*See* Order on ResCap-PRMI Triantis-Carpinello Stip. [Doc. No. 5130].) The Court disagrees. The stipulation entered into by the parties already preserved PRMI's appellate rights as to Justice Carpinello's report; PRMI had no need to cite to the report again. In order to ensure a clear record on this point, and avoid any issues at trial, the Court has ruled on the issue.

contributed to several articles about AVMs and residential real estate valuation. (*Id.* at 19–24 (prior expert involvement), 26–28 (publications), 38.)

PRMI hired Mr. Kennedy to rebut certain opinions offered by ResCap's expert, Dr. John Kilpatrick, regarding the accuracy of appraisals for loans sold by PRMI to RFC. (*Id.* ¶ 1.) Mr. Kennedy was specifically asked to opine on Dr. Kilpatrick's analysis and conclusions concerning his use of the GAVM which was used to retrospectively revalue the properties that collateralized a sample of subject loans that were included in RFC's bankruptcy settlements with various trusts and Monoline Insurers. (*Id.*) This area is not new to Mr. Kennedy; he conducted a similar analysis of Dr. Kilpatrick's opinions during the Wave One litigation, and expressly incorporates those findings into his opinion here. (*Id.* ¶¶ 1–6.)

For the same reasons that Mr. Kennedy disagreed with Dr. Kilpatrick in Wave One, he opines here that Dr. Kilpatrick's construction, validation, and use of the GAVM for the PRMI sample of loans—and the assertions and conclusions he draws therefrom—is inappropriate and "contrary to industry standards, unreliable, and unsupportable." (*Id.* ¶ 6.) More specifically, he opines that the GAVM is "not an accurate or precise measure of value," and Dr. Kilpatrick's conclusions drawn from the inaccurate and unreliable GAVM values are "unsupportable and his use of the GAVM value estimates is incorrect." (*Id.* ¶ 21.) Mr. Kennedy does not offer an opinion as to whether ResCap—or any of its experts—is declaring breaches in bad faith.

### b. Objections and Analysis

ResCap moves to exclude Mr. Kennedy's opinions in their entirety because his opinion that the GAVM is unreliable is irrelevant in light of the "sole discretion" possessed by RFC to determine breaches under the Client Guides. (Pl.'s Mem. at 13.) ResCap notes that because it possesses sole discretion to determine breaches, the Court previously held that any opinion offered by Kennedy must go to a limited set of four categories of evidence: (1) evidence rebutting ResCap's loan-level findings with respect to loans originated through the AlterNet Guide and Countrywide; (2) evidence showing ResCap should be estopped from claiming specific breaches on specific loans based on the reduced set of R&Ws contained in the Assetwise Direct Criteria Agreement between RFC and PRMI; (3) evidence that ResCap exercised its sole discretion to declare breaches in bad faith; and (4) PRMI's proposed rebuttal concerning the use of MLS proxy documents to determine trust level breaches. (*See Order re: Scope of PRMI's Responses to ResCap's Expert Reports* [Doc. No. 5166] at 5–6.)   However, ResCap argues, Mr. Kennedy's report fails to encompass any of those limited categories, offers the same opinion as before, and should therefore be excluded as irrelevant and in violation of the Court's expert rebuttal order. (Pl.'s Mem. at 13–14.)

In response, PRMI argues that Mr. Kennedy's opinion regarding the reliability of the GAVM is relevant for evaluating Mr. Butler's breach allegations, and for evaluating whether Plaintiff is exercising RFC's sole discretion in good faith. (Def.'s Opp'n at 22–23.)   Specifically, PRMI contends that Plaintiff's continued reliance on the GAVM, notwithstanding the fact that RFC used contemporaneous AVMs to evaluate loans, is

evidence of bad faith because Plaintiff's GAVMs conflict with its own contemporaneous AVMs. (*Id.* at 23.) PRMI also argues that Mr. Kennedy's opinion that the GAVM relies on post-settlement data runs afoul of *UnitedHealth*'s requirement that ResCap allocate RFC's settlements based on what the parties knew at the time of settlement. (*Id.* (citing 870 F.3d at 863).)

In reply, ResCap asserts that (1) the Court has already rejected PRMI's *UnitedHealth* argument regarding the use of the GAVM; (2) ResCap's acceptance of Dr. Kilpatrick's opinion over Mr. Kennedy's opinion is not evidence of subjective bad faith, particularly where it finds Dr. Kilpatrick's opinion to be more persuasive; and (3) PRMI's argument that ResCap's reliance on the GAVM conflicts with RFC's contemporaneous AVMs (aside from lacking any evidence showing the contemporaneous AVMs to be correct) ignores the knowledge- and reliance-provisions of the Guides, which permit RFC to declare a breach regardless of what it knew about a given loan file. (Pl.'s Reply at 11–12 (citations omitted).)

The Court grants ResCap's motion and excludes Mr. Kennedy's opinions in their entirety.[11] The Court has already held that PRMI has failed to raise a genuine dispute of material fact with respect to its bad faith defense, and barred PRMI from pursuing it at trial. *See PRMI SJ Order*, 2019 WL 7038234, at *48. Notably, in arguing the bad faith issue to

---

[11] The Court has already held that the use of the GAVM does not violate *UnitedHealth* because the GAVM "uses post-settlement values as a method to assess information that *was available* to the parties at the time of settlement[.]" *Common Daubert Order*, 2018 WL 4489685, at *10. PRMI offers no reason to depart from this conclusion, and the Court declines to do so.

the Court, PRMI *did not* rely on Mr. Kennedy's opinions, and instead focused on Ms. Kori Keith's opinions. *Id.* at *45–48. But even if PRMI had argued that Mr. Kennedy's opinions bear on its now-barred bad faith defense, his opinions do not provide any basis for a reasonable factfinder to conclude that ResCap is declaring breaches "dishonestly, maliciously, or otherwise in *subjective* bad faith." *Id.* at *45. Even assuming that (1) GAVM is not a perfect retroactive valuation model; and (2) ResCap's reliance on it is objectively unreasonable, the Court has already held that "even if the use of a retrospective AVM was *objectively* unreasonable, it still does not establish dishonesty, maliciousness, or subjective bad faith." *Id.* at *46.

Moreover, ResCap is also correct that with respect to any potential conflict between RFC's contemporaneous AVM appraisals and its retrospective GAVM appraisals, the Court has already held several times that the Guides' knowledge- and reliance-sections established that PRMI's R&Ws to RFC were "not affected by *any investigation or review made by RFC* unless expressly waived in writing" and that RFC's knowledge of any potential defects in a loan file "is wholly irrelevant." *Id.* at *47 (citation omitted) (internal quotation marks omitted). Accordingly, even if RFC possessed a contemporaneous AVM appraisal at the time of the loan's origination, and even if a retrospective GAVM appraisal conflicts with that contemporaneous valuation, "the parties' contract expressly permits RFC to exercise its sole discretion" to assert breaches based "on issues it previously identified[.]" *Id.* The implied covenant of good faith and fair dealing " 'cannot preclude enforcement of the terms of the contract' " itself. *Id.* (citation omitted).

That leaves Mr. Kennedy's overarching opinion that the GAVM itself is unreliable and contrary to industry practice and should not form the basis for breach allegations made by RFC. However, as the Court has held, because Plaintiff possesses the sole discretion to declare breaches, *see id.* at *28, Mr. Kennedy's opinions disputing the reliability or accuracy of Dr. Kilpatrick's GAVM—and by extension, the opinion of Mr. Butler, who relied on the model—are "irrelevant as a matter of law." *Id.* at *46 (discussing the same concept with respect to Ms. Kori Keith); *see also In re RFC & ResCap Liquidating Tr. Action* ("HLC MIL Order"), Nos. 13-cv-3451 (SRN/HB), 14-cv-1716 (SRN/HB), 2018 WL 4863597, at *9 ("This Court's Summary Judgment ruling on sole discretion renders irrelevant under Fed. R. Evid. 401 any re-underwriting evidence disputing RFC's exercise of its sole discretion to identify [defendant's] breaches of its [R&Ws] called for in the Client Guide."). Accordingly, ResCap's motion to exclude Mr. Kennedy's opinions in their entirety is granted.

### 4. Kori Keith

#### a. Qualifications and Opinion

Ms. Kori Keith is the founder of Lakewood Mortgage Advisors, a due diligence and consulting firm providing loan sale advisory and due diligence services. (Alden Decl., Ex. L (Keith Rpt.) ¶ 5.) She has worked in the residential mortgage industry for over twenty years in several different roles: loan officer, processor, underwriter, broker, and account executive on the origination side. (*Id.* ¶ 1.) She has also worked in the secondary market of the mortgage industry as a due diligence underwriter, transaction manager of whole loan trades, servicing oversight manager, and as Senior Vice President of the contract finance

department for a capital assets firm. (*Id.*) Ms. Keith's experience extends to originating and underwriting various types of residential loans across the credit grade spectrum, as well as to second lien mortgage loans. (*Id.*) Ms. Keith holds a Bachelor of Science degree from the University of Arkansas, and is a Certified VA Loan Specialist. (*Id.* ¶ 6.) She has been deposed as an expert witness four times in the past four years. (*Id.* ¶ 8.)

PRMI hired Ms. Keith to rebut the methodology and findings of Plaintiff's expert, Mr. Butler, regarding his re-underwriting of a sample of mortgage loans that PRMI sold to RFC. (*Id.* ¶ 9.) She opines that many of Mr. Butler's findings of breaches of PRMI's R&Ws are either erroneous and/or unsupported, and that even limiting her opinion in light of the Court's prior orders, (1) several of Mr. Butler's breach allegations assert breaches under the Client Guide where the loan was not sold to RFC pursuant to the Client Guide; (2) Mr. Butler's findings ignore the Assetwise Direct Approval Certificates contained in the loan files, which subjected those loans to a reduced set of streamlined R&Ws different from the full Guide R&Ws; and (3) many of Mr. Butler's breach allegations are so baseless and contrary to the loan-level evidence that asserting a breach on those grounds constitutes bad faith re-underwriting. (*Id.* ¶ 24.) Based on her conclusions, Ms. Keith opines that 28 of the 82 PRMI Allegedly-Breaching Loans have no breaches at all. (*Id.*) Related to these opinions, Ms. Keith also offers one opinion related to loss causation. She contends that it is an accepted industry standard that "any default after a loan has performed for 36 months is unrelated to underwriting defects", and that in such circumstances, it is "highly unlikely that there [is] any correlation between the underwriting of [a] loan and its eventual default[.]" (*Id.* at 34 n.119.)

Ms. Keith also opines that Mr. Butler's breach allegations based on RFC's trust-level R&Ws—namely, that RFC's trust-level representations encompassed violations of PRMI's own representations to RFC—are premised on fundamentally flawed interpretations of those representations because they were not the equivalent to "no-fraud" representations or Guide "compliance" representations. (*Id.* ¶ 25.) Accordingly, Ms. Keith opines that she cleared 66 of the 82 at-issue loans from any securitization representation breaches, and that even assuming she was wrong, she was able to clear at least 56 of the loans. (*Id.* ¶ 26.) Overall, Ms. Keith concludes that only 13 loans had viable PRMI R&W breaches, or, assuming Mr. Butler is correct as to the trust-level R&Ws, at most, 19 loans had viable breaches. (*Id.* ¶ 27.)

### b. Objections and Analysis

ResCap requests that Ms. Keith's opinions regarding (a) loss causation; (b) RFC's purported mental state; (c) bad faith; and (d) the applicability of certain contracts, be excluded. (Pl.'s Mem. at 14–18.) The Court addresses each request in turn.

### i. Whether Ms. Keith's Loss Causation Opinion Should be Excluded

ResCap moves for the exclusion of Ms. Keith's opinion that if a loan has performed for two to three years, it is "highly unlikely" to have defaulted as a result of origination underwriting defects. (Pl.'s Mem. at 6.) In support of its motion, ResCap points to this Court's prior *Common Daubert Order* in the First Wave litigation, in which the Court excluded Mr. Burnaman's testimony on the exact same point because he relied only on general sources, his own career experience, and the deposition testimony of certain RFC

repurchase personnel. 2018 WL 4489685, at *21. That evidence was insufficient to establish a break in causation, the Court held, and was therefore "unreliable" and excluded at trial. *Id.* In response, PRMI contends that Ms. Keith is not opining on loss causation, but rather merely noting that certain loans at issue in her bad faith analysis performed for more than 36 months prior to their first serious delinquencies, and that such a fact is "relevant to good faith" because "the very loans that Plaintiff now claims are in material breach performed for such a long period before delinquency." (Def.'s Opp'n at 35–36.)

The Court excludes Ms. Keith's testimony on this issue. PRMI's argument that Ms. Keith's opinion is relevant to her bad faith analysis ignores the fact, discussed *infra* at § III(C)(4)(b)(iii), that the Court has barred PRMI from introducing a bad faith defense at trial. *See PRMI SJ Order*, 2019 WL 7038234, at *48 ("ResCap's motion for summary judgment . . . is granted, and PRMI is barred from pursuing [a bad faith defense] at trial.") ResCap's motion to exclude this opinion by Ms. Keith is therefore granted.

### ii. Whether Ms. Keith's Opinions about RFC's Mental State Should be Excluded

ResCap next argues that to the extent Ms. Keith opines about RFC's purported mental state or intentions, such an opinion should be excluded.[12] (Pl.'s Mem. at 8–9.) Specifically, ResCap takes issue with Ms. Keith's assertion that the purpose of RFC's trust-level Loan Documentation Representation was "to warrant the maximum percentage of loans in the trust that were underwritten with reduced documentation," as opposed to

---

[12] ResCap also seeks exclusion of "mental state" opinions offered by Mr. Burnaman, Professor Schwarcz, and Mr. Woll, in addition to Ms. Keith. (Pl.'s Mem. at 8–9.) Those experts are addressed in their corresponding sections of this order.

warranting Guideline compliance, because "RFC *knew how to make, and did make*, a Guideline Representation when it wanted to us[e] much less cryptic language." (Alden Decl., Ex. L (Keith Rpt.) ¶ 136 (emphasis added); Pl.'s Reply at 7 n.9 (noting this portion of Keith's Report).) ResCap also takes issue with Ms. Keith's assertion that the "purpose of [the Credit Grade Representations] was not to certify the loan's compliance with a specific set of underwriting guidelines, but rather to certify the maximum percentage of loans that had been classified by RFC in the less-creditworthy categories of RFC's credit-grades" and that "had the securitization parties intended . . . to represent that the loans were correctly underwritten in accordance with specific criteria, they *could have and would have* used much clearer language." (Alden Decl., Ex. L (Keith Rpt.) ¶ 143 (emphasis added); Pl.'s Reply at 7 n.9 (noting this portion of Keith's report).) These statements are impermissible speculation, ResCap contends, because they opine on RFC's mental state at the time of securitization, and RFC's intentions, and, additionally, because Ms. Keith cites no evidence in support of these opinions. (Pl.'s Mem. at 8–9; Pl.'s Reply at 7–8.) In response, PRMI argues that Ms. Keith is merely offering testimony that "plainly addresses industry practice, not RFC's mental state." (Def.'s Opp'n at 37.)

As the Court noted above, "[e]xpert testimony on 'the intent, motives, or states of mind of corporations . . . ha[s] no basis in any relevant body of knowledge or expertise" and accordingly experts "may not proffer an opinion relating to what individuals [within a company or agency] thought with respect to certain documents or about their motivations." *Kruszka*, 28 F. Supp. 3d at 931. However, experts (who otherwise satisfy Fed. R. Evid. 702) may still testify that an entity acted in accordance with regulations or established

procedure—and may testify as to what an entity actually did—because such evidence does not cross the line into inadmissible testimony. *Id.*

Applied to Ms. Keith's opinions, the Court concludes that some of her testimony must be excluded, but that other portions remain admissible. For example, in a few instances, Ms. Keith appears to be opining on how certain trust-level representations are viewed in the industry (*See* Alden Decl., Ex. L (Keith Rpt.) ¶¶ 118 (opining as to how No-Fraud Representations are reasonably understood), 120 (agreeing with Burnaman and Schwarcz that MLS R&Ws were not understood to be No-Fraud Representations within the industry), 125 (agreeing with Burnaman and Schwarcz that market participants would view No Default Representations as RFC representing *only* that it was not aware of monetary defaults on the loans in the securitization).) Such testimony does not go to RFC's mental state, intentions, or motivations, and is within the scope of Ms. Keith's admissible expert knowledge.

At other times, however, Ms. Keith's opinions contain either a mix of admissible and inadmissible testimony, or entirely cross the line into inadmissible territory. When discussing RFC's trust-level Guideline Representations, for example, she opines that "*RFC knew how to make, and did make*, a Guidelines Representation when it wanted to[.]" (Alden Decl., Ex. L (Keith Rpt.) ¶ 136 (emphasis added).) Her opinion as to what RFC actually did is admissible, but her opinion as to what RFC *knew* or *thought* about Guideline Representations is inadmissible. In other instances, however, Ms. Keith's testimony entirely crosses the line by opining about the reason RFC—and in some cases, other securitization parties—made certain representations. For example, she states that in

65

making a Credit Grade Representation, RFC's "*purpose . . . was . . .* to certify the maximum percentage of loans that had been classified by RFC in the less-creditworthy categories of RFC's credit-grades" and that had the "securitization parties [which included RFC] *intended* the Credit Grade Representations to represent that loans were correctly underwritten . . . [those parties] could have and *would have* used much clearer language." (*Id.* ¶ 143 (emphasis added).) Testimony as to RFC's purpose or motivation, and what it *would have done*, is pure speculation and is not admissible as expert opinion. *See Kruszka*, 28 F. Supp. 3d at 931.

The Court cannot definitively identify every instance of admissible, as opposed to inadmissible, testimony offered by Ms. Keith on this point. Nevertheless, the Court holds that ResCap's motion incorporates the correct legal standard, and that in at least a few instances discussed above, Ms. Keith's testimony must be excluded because it impermissibly opines on RFC's state of mind. Accordingly, ResCap's motion to exclude Ms. Keith's opinions going to RFC's state of mind, intent, or motivation is granted. However, Ms. Keith is not barred from offering testimony on industry understanding and practice, to the extent it does not go to RFC's mental state. If necessary, the Court will address specific objections at trial.

### iii. Whether Ms. Keith's "Bad Faith" Opinion Should be Excluded

ResCap argues that Ms. Keith's opinions regarding alleged bad-faith re-underwriting by Mr. Butler should be excluded as irrelevant and contrary to the applicable legal standard requiring proof of subjective dishonesty, maliciousness, or the presence of an ulterior motive required to demonstrate bad faith. (Pl.'s Mem. at 14.) PRMI disagrees,

arguing that Ms. Keith's testimony is relevant because it shows Mr. Butler's re-underwriting was, for certain loans, entirely in bad faith due to contradictory evidence in the loan files themselves.  (Def.'s Opp'n at 14–18.)

In the *PRMI SJ Order*, the Court concluded that "none of PRMI's arguments, nor any of Ms. Keith's opinions, raise a genuine dispute of material fact sufficient to permit PRMI's bad faith defense to survive summary judgment" and barred PRMI from presenting the defense at trial.  2019 WL 7038234, at *48.  Therefore, Ms. Keith's opinions regarding any bad faith re-underwriting are barred as a matter of law.  ResCap's motion is denied as moot.

### iv.    Whether Ms. Keith's Contractual Interpretation Opinions Should be Excluded

Finally, ResCap moves to exclude Ms. Keith's opinions as to which contracts apply to particular at-issue loans.  (Pl.'s Mem. at 15–18 (citing Alden Decl., Ex. L (Keith Rpt.) ¶¶ 32 ("[T]he AlterNet Seller Guide applied to loans sold by PRMI to RFC pursuant to the March 30, 2000 Client Contract."), 44 (concluding that, with minor exceptions, loans sold after June 25, 2001 were subject to the Client Guide, whereas loans sold before that were subject to "reduced R&Ws" in Assetwise), 47 (concluding that the loans in the Countrywide bulk pool were sold pursuant to Countrywide's Guide, not the RFC Client Guide)).)  Such opinions are improper, ResCap argues, because (1) contract interpretation is up to the Court, not an expert witness; (2) the contracts are unambiguous, eliminating the need for any testimony as to their meaning; (3) even if ambiguous, Ms. Keith does not

offer any testimony as to the meaning of specialized terms, which is all she would be permitted to offer. (*Id.* at 15–18.)

In response, PRMI contends that ResCap's expert, Mr. Butler, opines on the same exact point—which contracts apply—and that if Ms. Keith's opinions on the applicability of contracts are excluded, the same should be said for Mr. Butler. (Def.'s Opp'n at 19–20.) PRMI contends that Mr. Butler opines that the Client Guide applied to all Mortgage Loans sold by PRMI to RFC. (*Id.* (citations omitted).) Mr. Butler also testified that his opinions were based on his experience "as a mortgage loan underwriter or reunderwriter, in terms of what the contracts say[.]" (*Id.* (citations omitted).) Finally, PRMI contends that Ms. Keith's review of loans sold through Assetwise is relevant to PRMI's estoppel and waiver defenses, and that her analysis of specific PRMI loans that had Assetwise Direct approval certificates conflicts with Mr. Butler's allegations that the full Client Guide applied to those loans. (*Id.* at 21.) In reply, ResCap states that Mr. Butler is *not* opining as to which of the parties' contracts apply to particular loans, but rather assuming that certain contracts apply and matching them to particular loans based on his underwriting experience. (Pl.'s Reply at 15 (citing Alden Decl., Ex. MM (Butler Oct. 31, 2019 Dep.) at 145–146 ("I'm not opining on which agreements applied. That's a legal determination that's part of this whole case.")).)

The Court grants ResCap's motion in part and denies it in part. As an initial matter, the Court has already held as a matter of law that "[b]arring the defenses of waiver and estoppel . . . the Guides apply to all At-Issue loans." *PRMI SJ Order*, 2019 WL 7038234, at *26. Accordingly, expert testimony (whether from Ms. Keith or Mr. Butler) regarding

the affirmative applicability of the Guides to all at-issue loans is irrelevant. But even if it were relevant, ResCap is correct that expert testimony as to the applicability of contracts is inadmissible because, where the contract is unambiguous, it is the Court's role—and only the Court's role—to apply the plain language of the contract. *See Winthrop Res. Corp.*, 361 F.3d at 470. Where the contract is ambiguous, expert testimony is only permitted to the extent it clarifies technical terms or provisions in the contract; an expert may not simply offer a personal opinion as to a contract's meaning or applicability. *See N. Am. Specialty Ins. Co.*, 111 F.3d at 1281. Both parties' experts violate this rule. (*See* Alden Decl., Ex. L (Keith Rpt.) ¶¶ 32, 44, 47; Smallwood Decl., Ex. 14 (Butler Rpt.) at 30.) To the extent ResCap and PRMI's experts opine, as a matter of fact, as to the meaning and applicability of the contracts at issue here, such opinions are inadmissible. Still, Ms. Keith may offer, to the extent she has the expertise, her understanding of how a reasonable industry participant would view certain contractual clauses, or how a reasonable industry participant would react to or view such clauses.[13]

However, the Court previously denied ResCap's motion for summary judgment with respect to PRMI's waiver and estoppel defenses for Assetwise- and Countrywide-approved loans, noting that while it found ResCap's evidence to be largely persuasive,

---

[13]    Moreover, this does not mean experts are barred from offering opinions based on the *assumption* that certain agreements govern parties' business relationships. Indeed, it is fundamentally appropriate for experts to offer opinions based on certain assumed facts or circumstances in order to assist the fact finder. *See Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) (noting the "critical distinction" between "an expert testifying that a disputed fact actually occurred . . . and an expert giving an opinion based upon factual assumptions," namely, that "[t]he former is manifestly improper, [while] the latter is not." (citation omitted) (internal quotation marks omitted)).

PRMI would still be permitted to offer evidence that RFC (through ResCap) should be estopped from applying the Guides' full panoply of R&Ws, or that RFC waived the Guides' full R&Ws, concerning specifically-identified Assetwise-approved loans and Countrywide-approved loans. *PRMI SJ Order*, 2019 WL 7038234, at \*58–59. Ms. Keith opines on those issues and will be permitted to offer testimony showing loan-specific evidence indicating that RFC either waived or should be estopped from enforcing the Guides' full R&Ws. (*See* Alden Decl., Ex. L (Keith Rpt.) ¶¶ 32–44 (opining as to, among other things, the course of conduct surrounding PRMI's use of Assetwise); ¶¶ 46–47 (opining that loans underwritten to Countrywide guidelines were not subject to the terms and conditions of the RFC Client Guide).) Similarly, ResCap will be permitted to cross-examine Ms. Keith on those subjects. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence.").

In sum, ResCap's motion to exclude Ms. Keith's opinions as to the applicability of certain contracts is granted in part, to the extent Ms. Keith or Mr. Butler opine as to the applicability of certain contracts, and denied in part, to the extent Ms. Keith offers an expert opinion as to loan-specific evidence supporting PRMI's estoppel and waiver defenses.

### 5. Dr. Justin McCrary

#### a. Qualifications and Opinion

ResCap seeks to exclude certain opinions of PRMI's statistics expert, Dr. McCrary. Dr. McCrary generally rebuts Plaintiff's damages expert, Dr. Snow. However, in a Supplemental Report, submitted past the expert report deadline and without leave of court,

Dr. McCrary opines that Dr. Snow's allocation methodology is flawed because it does not consider the different settlement amounts as between the Original Settling Trusts and the Additional Settling Trusts. (Pl.'s Mem. at 18 (citing Alden Decl., Ex. S (McCrary Suppl. Rpt.) ¶¶ 4–7).)

In its *PRMI SJ Order*, the Court ruled that Dr. Snow considered the correct settlement amount under the Allocated Breaching Loss model. 2019 WL 7038234, at *63–69. Accordingly, ResCap's motion to exclude Dr. McCrary's opinion on this ground is granted.

### 6. David Woll

#### a. Qualifications and Opinion

David Woll is a former partner of the law firm Simpson Thatcher & Bartlett. He has extensive experience handling RMBS cases, including as lead counsel representing the RMBS defendant in *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 977 N.Y.S.2d 229 (N.Y. App. Div. 2013), *aff'd*, 25 N.Y.3d 581 (N.Y. 2015), and as defense counsel in the First-Wave actions. (*See* Def.'s Opp'n at 2; *see also* Alden Decl., Ex. Q. (Woll Dep.) at 304–05.) PRMI retained Mr. Woll to rebut certain opinions offered by Plaintiff's expert, Mr. Hawthorne. (Def.'s Opp'n at 2.) Mr. Woll opines that in negotiating the Bankruptcy Settlements, a "reasonable defendant in RFC's position" would have allocated less value to claims subject to certain legal defenses, including the statute-of-limitation defense. (*Id.* (citing Alden Decl., Ex. O (Woll Rpt.) ¶ 8).) This is "because the statute of limitations had the ability to eliminate RFC's liability for claims relating to certain trusts." (*Id.*) Mr. Woll

further opines that "a reasonable defendant would have concluded it was more likely than not to succeed on the defense, given the state of the law." (*Id.* ¶ 9.)

However, Mr. Woll acknowledges that the state of the law pre-dating the Settlement Period contained divergent New York state court decisions on the statute-of-limitations issue. (*Id.* ¶¶ 42, 56–60.) For instance, in *Nomura*, he acknowledges that the court held that the statute of limitations runs from the time of breach of the mortgage representations, not from the time plaintiff elected to make demands for repurchase. (*Id.* (citing *Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, 39 Misc. 3d 1226(A) (N.Y. Sup. Ct. 2013).) In *ACE*, on the other hand, the court ruled that the statute of limitations begins to run anew when a repurchase demand is made and declined. (*Id.* (citing *ACE Securities Corp. Home Equity Loan Trust, Series 2006-SL2 v. DB Structured Products, Inc.*, 40 Misc. 3d 562 (N.Y. Sup. Ct. 2013)).) Although Mr. Woll concedes that these "divergent" outcomes contributed to "uncertainty" on this issue, (*id.* ¶ 56), Mr. Woll opines that the "flaws in the *Ace* decision," a case that he participated in, would have led an "objective observer" to conclude that appellate courts in New York were more likely to agree with the holding in *Nomura*. On appeal, the lower court's decision in *Ace* was indeed overturned, but the appellate court adopted the holding articulated in *Nomura* eight days after the Settlement Period ended. (*Id.* ¶ 18.)

In support of these opinions, Mr. Woll incorporates an analysis prepared by a third-party vendor, Analysis Group ("AG") as to the number of RMBS Trusts whose claims would have been allegedly time-barred because of statute-of-limitation defenses. At his deposition, Mr. Woll explained that he discussed with AG the analysis it previously

performed in Wave One, and testified about the steps he took to "refresh or recorroborate" that work. (Alden Decl., Ex. Q. (Woll Dep.) at 309.)  Specifically, he explained that AG identified the closing dates of the at-issue trusts and reviewed tolling agreements between RFC and the trusts. (*Id*. at 309–10.)  For trusts that were not subject to tolling agreements, AG counted the number of trusts closing more than six years before the bankruptcy. (*Id*. at 310.)  For trusts with such agreements, AG determined, in their view, whether the agreement was inadequate because it was entered more than six years after closing or expired before the bankruptcy. (*Id*.)  Adding up all these trusts, AG opined that claims involving loans in 339 of the 506 trusts were time barred. (*Id*.)

To further elaborate on AG's methodology, PRMI explained during oral argument that defense counsel provided the tolling agreements for AG's review:[14]

> To be clear, and to clear up any controversy or mystery surrounding how AG got these documents, just as is standard in this litigation and with respect to many of the experts, the way they got them came from us.  From counsel. We went through the record. We ran standard searches. We looked through the documents that RFC primarily produced.  We found any tolling agreement we could find that appeared to relate to these trusts, and we provided them to AG for their analysis, and [AG] performed their analysis.

(Dec. 11, 2019 Hr'g Tr. [Doc. No. 5360] at 31.)  PRMI moreover argues that it was "entirely reasonable" for Mr. Woll to rely on AG's work. (Def.'s Opp'n at 4.)  Mr. Woll testified that he indeed took certain steps to ensure the reliability of AG's work. (*Id*. (citing Alden Decl., Ex. Q. (Woll Dep.) at 311).)   For quality control, he spot-checked closing

---

[14]   ResCap asserts that Mr. Woll suggested that AG had located the tolling agreements without defense counsel's assistance in the First-Wave action. (Pl.'s Reply at 17–18; Dec. 11, 2019 Hr'g Tr. [Doc. No. 5360] at 37–38.)

dates of certain trusts by reviewing the underlying documents. (*Id*.) He also reviewed the tolling agreements that AG determined were inadequate and verified those conclusions. (*Id*.) Mr. Woll concluded the AG's analysis was "reasonable and reliable." (Alden Decl., Ex. O (Woll Rpt.) ¶ 73.)

Second, PRMI argues that Mr. Woll contests Mr. Hawthorne's opinion that RFC's trust-level representations gave rise to substantial liability. (Def.'s Mem. at 2.) Mr. Woll explains that, for "many trusts, RFC did not make representations regarding compliance with underwriting guidelines or the absence of fraud, and that RFC often disclaimed fraud liability." (*Id*. (citing (Alden Decl., Ex. O (Woll Rpt.) ¶ 10).) Mr. Woll further opines that a reasonable defendant would have attributed less value to certain claims based on those representations than to claims based on actual underwriting or no-fraud representations. (*Id*.)

And, although Mr. Woll concedes that he has not reviewed the report offered by Plaintiff's damages expert, Dr. Snow, PRMI argues that Mr. Woll's testimony is "responsive" to Plaintiff's damages allocation. (*See* Dec. 11, 2019 Hr'g Tr. at 32; *see also* Alden Decl., Ex. Q. (Woll Dep.) at 11.) Specifically, PRMI argues that Mr. Woll's opinion about the legal strength of certain defenses, including the strength of certain trust representations, is an "input[]" that is "relied upon by [PRMI's] damages expert, Professor McCrary, in rebutting Dr. Snow's methodology." (*See* Dec. 11, 2019 Hr'g Tr. at 64; *see also* Alden Decl., Ex. R (McCrary Rpt.) ¶¶ 14, 51, 161.) At his deposition, Mr. Woll also testified that his "opinions regarding the relative strength of claims bears on allocation." (Alden Decl., Ex. Q (Woll Dep.) at 16.)

### b.  Objections and Analysis

ResCap seeks to exclude Mr. Woll's opinions in their entirety.  In light of the Court's ruling on summary judgment holding RFC's Bankruptcy Settlements reasonable as a matter of law, *PRMI SJ Order*, 2019 WL 7038234 at *23, Plaintiff's motion to exclude Mr. Woll's testimony rebutting the opinions of Mr. Hawthorne regarding the reasonableness of the Bankruptcy Settlements is denied as moot.

The Court now addresses whether Mr. Woll is permitted to testify about the legal strength of certain defenses and claims on the grounds that they might bear on Plaintiff's damages allocation.  As noted above, PRMI argues that Mr. Woll's testimony is an "input[]" that is "relied upon by [PRMI's] damages expert, Professor McCrary, in rebutting Dr. Snow's methodology."  (*See* Dec. 11, 2019 Hr'g Tr. at 64.)  ResCap, nevertheless, seeks to exclude Mr. Woll's testimony on two grounds.  First, ResCap argues that Mr. Woll's opinion "parrots an unreliable analysis" that he did not conduct.  (Pl.'s Mem. at 19–22.)  Second, ResCap argues that Mr. Woll is unable to be a "truly objective" expert because he participated in the *Ace* litigation as an advocate and spent over two years as defense counsel in the First-Wave actions.  (*Id.* at 22–24.)  Thus, ResCap asserts, Mr. Woll should be unable to opine regarding how a "reasonable defendant in RFC's position" would have valued the relative strengths of certain claims and defenses.  The Court addresses each objection in turn.

ResCap first argues that Mr. Woll's proffer of AG's analysis should be excluded. (*Id.* at 20–22.)  ResCap contends that PRMI did not disclose the methodology that AG used, and Mr. Woll "admitted during his deposition that he is unable to provide such a

disclosure." (*Id*. at 20 (citing Alden Decl., Ex. Q (Woll Dep.) at 312).)  ResCap argues that

Mr. Woll did not "verify that [AG] exhausted all potential sources of tolling agreements to

make sure that they found all relevant tolling agreements." (*Id*. (citation omitted).)

ResCap further argues that Mr. Woll misrepresents the "nature and provenance" of

AG's analysis. (*Id*. at 21.)  In particular, ResCap notes that Mr. Woll did not disclose that

AG's analysis was generated on behalf of a First-Wave defendant, for which he served as

lead defense counsel. (*Id*. at 21–22.)  Moreover, ResCap contends that by excluding Justice

Carpinello's opinion in Wave One, the Court essentially precluded AG's analysis. (*Id*. at

22 (citing *Common Daubert Order*, 2018 WL 4489685, at *27).)

In response, PRMI asserts that Mr. Woll was "amply familiar" with AG's

methodology, as explained above. (Def.'s Opp'n at 4.)  PRMI contends that to the extent

ResCap suggests that AG failed to "exhaust all potential sources of tolling agreements,"

ResCap does not point to a single agreement that it overlooked. (*Id*. at 5.)  PRMI further

contends that this criticism goes to matters for cross-examination. (*Id*.)  PRMI also

vigorously contests ResCap's remaining criticisms about the "provenance" of AG's

analysis, (Def.'s Opp'n at 5–6), but asserts that these issues only concern "credibility,"

which is also an issue for cross-examination.  Finally, PRMI argues that the Court excluded

Justice Carpinello's opinion in the First-Wave actions for reasons "completely unrelated"

to AG's findings. (Def.'s Opp'n at 6) (citing *Common Daubert Order*, 2018 WL 4489685,

at *27).)

After careful review of the record and arguments, the Court denies the motion to

exclude Mr. Woll's opinion proffering AG's analysis.  ResCap's arguments about the

reliability of the analysis go to weight rather than admissibility. Although Recap asserts that Mr. Woll was required to "supervise and direct" AG's work, (Pl.'s Reply at 17), the Court finds that Mr. Woll's use of this data satisfies the requirements of admissibility. While an expert may not simply adopt data without attempting to assess its validity, an expert may rely on another expert's work if the expert himself is "sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *See In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D Ga. 2000). In this case, Mr. Woll sufficiently examined AG's methodology and analyzed AG's results in the context of his opinion about the strength of the statute-of-limitations defense. Accordingly, Mr. Woll may testify concerning the implications of AG's analysis in the context of his assessment of the strength of RFC's legal defenses. The Court cautions that this testimony is only permitted as an "input" for Dr. McCrary and is so limited.

ResCap also argues that Mr. Woll's opinion should be excluded because he is "unreliable" and not "truly objective" due to his prior representation of the defendant in *ACE* and a First-Wave defendant. (Pl.'s Mem. at 22–24.) PRMI counters that an expert witness's alleged bias goes to the weight, not the admissibility, of the testimony. (Def.'s Opp'n at 7.)

After careful consideration, the Court denies the motion to exclude Mr. Woll based on his prior representation. Although the Court finds that his participation in *Ace* casts doubt on the usefulness of his opinion concerning how a "reasonable defendant in RFC's position" would value the relative strengths of the claims, doubts regarding the usefulness

of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and should be explored on cross-examination.

Finally, the Court turns to ResCap's contention that a portion of Mr. Woll's opinion regarding RFC's knowledge of trust-level R&Ws should be excluded as inadmissible speculation about RFC's state of mind. (Pl.'s Mem. at 8, 9 n. 3 (citing Alden Decl., Ex. O (Woll Rpt.) ¶ 83 ("[T]he fact that industry participants, including RFC, certainly knew how to include a Compliance Rep where they intended it would have served as a strong rebuttal to any contention, had it been made, that the Pool-Wide Reps warranted guideline compliance.")).) PRMI responds by arguing that this language is not an opinion as to RFC's mental state, but rather an opinion that a "reasonable defendant in RFC's position" would have made when analyzing the strength of claims asserted against it at the time of the Bankruptcy Settlements. (Def.'s Opp'n at 37.)

As the Court noted above, "[e]xpert testimony on 'the intent, motives, or states of mind of corporations . . . ha[s] no basis in any relevant body of knowledge or expertise" and accordingly experts "may not proffer an opinion relating to what individuals [within a company or agency] thought with respect to certain documents or about their motivations." *Kruszka*, 28 F. Supp. 3d at 931. However, experts (who otherwise satisfy Fed. R. Evid. 702) may still testify that an entity acted in accordance with regulations or established procedure—and may testify as to what an entity actually did—because such evidence does not cross the line into inadmissible testimony. *Id.*

The Court grants in part and denies in part ResCap's motion on this point. Mr. Woll's opinion contains both admissible and inadmissible testimony. For example, Mr.

Woll's statement that RFC "knew how to include a Compliance Rep where they intended it," (Alden Decl., Ex. O (Woll Rpt.) ¶ 83), is clearly an opinion as to what RFC knew, and therefore concerns its mental state. The Court grants ResCap's motion to exclude that opinion as inadmissible speculation. *See Kruszka*, 28 F. Supp. 3d at 931. However, the remaining portion of the sentence, read in context, appears to offer an opinion that industry participants generally knew what a "Compliance Rep" was, and that such knowledge would have served as a "strong rebuttal" by the industry to ResCap's interpretation of its pool-wide R&Ws. (*See* Alden Decl., Ex. O (Woll Rpt.) ¶ 83.) Such an opinion goes to industry standards and practice, rather than to RFC's own knowledge, and accordingly is admissible. The Court will entertain any appropriate objections to Mr. Woll's testimony at trial to the extent it strays from industry standards and practice.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.    Defendant's Motion to Exclude Certain Opinions of Plaintiff's Experts [Doc No. 5252] is granted in part, denied in part, and denied in part as moot; and,

2.    Plaintiff's Motion to Exclude Certain Opinions of Defendant's Experts [Doc No. 5282] is granted in part, denied in part, and denied in part as moot.

Dated:   January 14, 2020                          s/Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge