1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MINNESOTA

3     ------------------------------------------------------------

4

5       In Re: RFC and RESCAP Liquidating Trust Litigation

6

7              File No. 13-cv-3451 (SRN/HB)

8

9          ResCap Liquidating Trust,

10                   Plaintiff,

11              v.

12          Primary Residential Mortgage, Inc.

13                  Defendant.

14

15              File No. 16-cv-4070 (SRN/HB)

16

17                St. Paul, Minnesota

18                  Courtroom 7B

19                 March 12, 2020

20                   8:32 a.m.

21    ------------------------------------------------------------

22                    BEFORE:

23          The Hon. **SUSAN RICHARD NELSON,**

24          United States District Judge

25          **BENCH TRIAL - VOLUME XII**

CARLA R. BEBAULT, CRR, FCRR
(651) 848-1220

1

2      Official Court Reporters:      Carla R. Bebault, RMR, CRR
                                      Lori A. Simpson, RMR, CRR

3
       U.S. Courthouse, Suite 146
4      316 North Robert Street
       St. Paul, Minnesota 55101

5
       **A P P E A R A N C E S**
6      **For Plaintiffs:**

7      **Isaac Nesser, Esq.**
       **Jeffrey Carl Miller, Esq.**
8      **QUINN EMANUEL URQUHART & SULLIVAN**
       51 Madison Avenue
9      22nd Floor
       New York, New York 10010-1603

10
       **Anthony Paul Alden, Esq.**
11     **Matthew R. Scheck, Esq.**
       **QUINN EMANUEL URQUHART & SULLIVAN**
12     865 South Figueroa Street
       10th Floor
13     Los Angeles, California 90017-2543

14     **Donald G. Heeman, Esq.**
       **Jessica J. Nelson, Esq.**
15     **Randi Winter, Esq.**
       **Lori Quinn, Esq.**
16     **SPENCER FANE**
       150 South Fifth Street
17     Suite 1900
       Minneapolis, MN 55402

18
                        **For Defendants:**
19
       **Matthew V. Johnson, Esq.**
20     **Jesse T. Smallwood, Esq.**
       **Matthew B. Nicholson, Esq.**
21     **David Keith Clouser, Esq.**
       **WILLIAMS & CONNOLLY LLP**
22     725 12th Street NW
       Washington, DC 20005

23
       **Elizabeth V. Kniffen, Esq.**
24     **ZELLE HOFFMAN VOELBEL & MASON, LLP**
       500 Washington Avenue South, Suite 4000
25     Minneapolis, MN 55415

1                          **I N D E X**

                                                          PAGE
2

**JIM CRAWFORD**
3    Direct Examination By Mr. Clouser               2405
     Cross Examination By Ms. Winter                 2440
4    Redirect Examination By Mr. Clouser             2482

5    **JUSTIN MCCRARY**
     Direct Examination By Mr. Nicholson             2486
6    Cross-Examination By Mr. Nesser                 2595

7


8
     PLAINTIFF'S EXHIBITS                            REC'D
9        25                                          2411
         29                                          2462
10       30                                          2462
         38                                          2460
11       39                                          2461
         41                                          2462
12       42                                          2462
         98                                          2402
13       145                                         2634
         153                                         2644
14       357                                         2474
         462                                         2402
15

16   DEFENDANT'S EXHIBITS                            REC'D
         84                                          2401
17       98                                          2401
         200                                         2401
18       217                                         2422
         227                                         2431
19       257                                         2425
         443                                         2653
20       494                                         2632
         497                                         2632
21       502                                         2632
         508                                         2632
22       509                                         2632
         510                                         2632
23       511                                         2632
         512                                         2632
24       513                                         2632
         514                                         2632
25       515                                         2632
         516                                         2632

```
 1      517                                                2632
        518                                                2632
 2      519                                                2632
        520                                                2632
 3      521                                                2632
        522                                                2632
 4      523                                                2632
        536                                                2633
 5      537                                                2653
        539                                                2633
 6      541                                                2633
        568                                                2632
 7      569                                                2632
        578                                                2634
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               **P R O C E E D I N G S**

2                   **IN OPEN COURT**

3               THE COURT:  All right.  Well, I want to start by

4       thanking the administrative folks from Williams & Connolly,

5       from Zelle, from Quinn Emanuel, from Spencer Fane.  My

6       staff, I mean, really, they have been e-mailing me at all

7       hours of the morning.  This has been an incredible effort to

8       make this work, and I think those are the folks who really

9       deserve a lot of credit.  Of course, not to mention the

10      folks in Utah, the folks in SDNY.  Everybody has really come

11      together.  I'm very impressed with the effort that's gone

12      into this.  So on behalf of the Court, I thank all of you.

13              We are here for our pre-meeting this morning

14      before we begin with Mr. Crawford, I believe, in Utah.  Is

15      there anything the parties wish to address with the Court?

16              Mr. Nicholson.

17              MR. NICHOLSON:  Good morning, Your Honor.  Matt

18      Nicholson from Williams & Connolly for PRMI.  I wanted to

19      address one issue regarding Dr. McCrary's testimony.  He's

20      expected to testify later today via video.

21              This morning at 7:41 a.m. we received an e-mail

22      from plaintiff's counsel adding two new exhibits to their

23      cross disclosure for Dr. McCrary.  These exhibits were,

24      first, Mr. Woll's trial testimony from this trial and

25      second, a declaration of Jeffrey Lipps.

1           Now, we objected to these disclosures because they

2     are untimely.  I believe the disclosure process required

3     plaintiff to disclose cross exhibits three days ago so that

4     we could prepare Dr. McCrary and it's obviously untimely to

5     disclose something at 7:41 a.m. the morning of a witness's

6     testimony.

7           Now, of these two documents, I'm less concerned

8     about Mr. Woll's trial testimony.  I'll say to the Court

9     that Dr. McCrary did rely on Mr. Woll's opinions and he has

10    reviewed Mr. Woll's trial testimony.

11          But I do have very significant concerns with

12    respect to the declaration of Jeffrey Lipps, which was the

13    second document disclosed.  That's DTX-537.  This is a

14    document that Mr. -- or Dr. McCrary does not rely on in his

15    report, does not cite at any point, hasn't been asked about

16    it at any of his depositions, that we didn't know that they

17    intended to use until this morning.

18          I haven't had a chance to talk to Dr. McCrary.  I

19    don't even have the ability to contact him to let him know

20    that this has been added.  He was travelling to the SDNY

21    this morning.  I talked to him before he left, but he can't

22    even have a cell phone in the SDNY, so there's no even way

23    for me to alert him that this has been added to his cross

24    disclosure, much less to discuss it with him.

25          Like I said, it's a document that he doesn't even

1   rely on.  So I think it's unfair to add this so late in the

2   game.  So we would ask that that document be stricken from

3   plaintiff's cross disclosure.

4          Thank you.

5          THE COURT:  Thank you.  Wholly apart from the

6   merits of your position, which I will address after I hear

7   from plaintiffs, my understanding, Mr. Nicholson, is that it

8   is true that Dr. McCrary can't have a cell phone with him,

9   but that there is a lawyer -- and maybe Joe can correct me

10  if I'm wrong -- who has a cell phone who is with him.  Am I

11  right about that?

12         MR. NICHOLSON:  Go ahead.

13         THE COURT:  There is -- Mr. Clouser, there's a way

14  to reach him?

15         MR. CLOUSER:  Yes, one of plaintiff's counsel is

16  at the courthouse and she has a cell phone.  That is my

17  understanding.  And so if we need to call, we could contact

18  plaintiff's counsel and they presumably could contact

19  Dr. McCrary.

20         THE COURT:  And this is not a comment on the

21  merits of your position.  I just wanted the record to be

22  clear that if you needed to communicate with him for

23  whatever reason, that I wanted to make sure there was a way

24  to reach him.

25         There was some question about whether I could do

1    an order permitting him to have a cell phone, but the sense

2    I had from the Clerk's Office is that that might not be

3    acknowledged, so I didn't go ahead and do that.  Otherwise I

4    probably would have done that.  But the reason I didn't go

5    forward and push it or call out there was because I

6    understood there was a communication means.

7              MR. NICHOLSON:  Yes, Your Honor, I understand

8    that.

9              THE COURT:  Okay.

10             MR. NICHOLSON:  And Dr. McCrary left early this

11   morning to be at SDNY so that he will be there well in

12   advance of whenever his testimony begins.  It is our

13   understanding that if we needed to give him some emergency

14   message or alert him to when the testimony would start, that

15   plaintiff would relay that via that cell phone with their

16   counsel, but we don't have the ability as defense counsel to

17   contact him.

18             THE COURT:  The other -- I mean, while we're

19   talking about it, we were notified this morning as well, and

20   maybe all of you were too, that the bench is considering the

21   possibility of closing down the SDNY for any outsiders,

22   including witnesses, today, but they will presumably tell us

23   if that occurs.

24             MR. NICHOLSON:  Okay.  We don't have any

25   information about that at this time, but we'll advise the

```
1     Court if we do hear that.

2                THE COURT:  Okay.  Thank you, Mr. Nicholson.

3                Okay.  Who wishes to address this.

4                MR. NESSER:  Good morning, Your Honor.

5                THE COURT:  Good morning.

6                MR. NESSER:  Before I start, I thought it would be

7     appropriate to return the thank you, I think, on behalf of

8     everyone for the Court's efforts yesterday, which were

9     remarkable by any standard.

10               On the issue of the exhibits, as Mr. Nicholson

11    indicated, the Woll transcript is part of the trial

12    transcript.  Frankly, it's not clear to me that it was

13    necessary to disclose it.  We did it just to be safe.  But

14    it's trial transcript for impeachment, so I don't believe

15    that's an issue.  And as Mr. Nicholson indicated, Dr.

16    McCrary has already read that and so it seems pretty clear

17    that that ought to be okay.

18               On Mr. Lipps's declaration, again, that was purely

19    for impeachment purposes potentially.  It may not be

20    something that we wind up using.  And, of course, we had

21    the -- I believe it was an agreement with Mr. Butler that

22    experts can be asked questions about materials that they did

23    not rely upon.

24               And so I think it ought to be okay, but in any

25    event, our view is that this is -- this ought to be just
```

1    addressed in the context of the examination as and if it

2    occurs, because it's not clear to me that it will.

3              THE COURT:  All right.  It sounds like -- yeah, I

4    would be glad to hear from Mr. Nicholson again, but it

5    sounds like the concern is that he has not reviewed the

6    declaration of Mr. Lipps.

7              MR. NESSER:  Yes.  That's understood, Your Honor.

8              THE COURT:  Let me hear from Mr. Nicholson for a

9    moment.

10             MR. NICHOLSON:  So, Your Honor, I don't see how

11   this would be relevant to the issue of impeachment, the

12   Lipps declaration.  It's not Dr. McCrary's prior statement

13   and it's not something that he relies on in his report, so I

14   don't see how it could be used to impeach him.

15             With respect to Mr. Nesser's second argument that

16   you can cross-examine an expert with materials not relied

17   on, we agree with that as a general proposition, but you

18   have to disclose those through the protocol so that the

19   expert has a chance to prepare for cross-examination on that

20   document.  And there was no opportunity here whatsoever to

21   prepare Dr. McCrary to testify on the Lipps declaration.

22             So I don't think either of those arguments

23   provides a valid basis for them to include this on the cross

24   disclosure and it should be stricken now.  There's no reason

25   to wait until the context of his testimony.

1          THE COURT:  All right.  I think there doesn't seem

2     to be a concern about Mr. Woll's trial testimony.

3     Apparently Dr. McCrary has reviewed it and has relied on

4     Mr. Woll's opinions.

5          But I'm concerned that Dr. McCrary has not

6     reviewed the declaration of Jeffrey Lipps nor was it

7     disclosed to him until this morning.  So I think it's fair

8     that that not be used for cross-examination.

9          Okay.  Mr. Nesser.

10          MR. NESSER:  One other separate issue.

11          THE COURT:  Sure.

12          MR. NESSER:  Apropos to the discussion at the

13     beginning of the hearing, the order that the Court issued

14     yesterday is something that I think others certainly at

15     Quinn would be interested in seeing given we're dealing with

16     these issues in lots of courts.  Does the Court expect to

17     issue a redacted version of that or is that something the

18     parties can redact by agreement?  That was a question sent

19     to me.

20          THE COURT:  I think it's redacted primarily out of

21     concern for the privacy of the lawyers from Quinn.  So I

22     have to think about whether I should formally ask you for

23     permission or the law firm for permission to do that.  I

24     think that's why -- there's nothing else in the order

25     that's --

1          MR. NESSER:  Well, there was Mr. Crawford's wife.

2          THE COURT:  Well, that's true, yes, and that would

3     be very important to redact, yeah.  I don't know.

4     Mr. Nicholson, do you have a thought about that?

5          I think the Court could do a redacted order, yeah.

6     Perhaps the parties could meet and confer and propose

7     redactions and then I would know what your views were on

8     that.

9          Mr. Nicholson.

10         MR. NICHOLSON:  We would be willing to meet and

11    confer on that.  Just to note, I think there is personal

12    information about Mr. Crawford as well as Dr. McCrary's

13    family, so we would want to have an opportunity to redact

14    that as well.

15         THE COURT:  That's true.  Okay.  Why don't you

16    meet and confer.  You can decide what to redact.  I would be

17    glad to do a redacted order.  Thank you, Mr. Nesser.

18         MR. NESSER:  Thank you.

19         THE COURT:  All right.  Anything else we should

20    address?

21         Yes, Mr. Clouser.

22         MR. CLOUSER:  Yes, Your Honor.  Keith Clouser from

23    Williams & Connolly on behalf of PRMI.

24         At this time we've got a couple of things that

25    PRMI intends to move into evidence.

1              So, first, pursuant to the parties' agreement,

2     PRMI moves into evidence the designated deposition testimony

3     of Sharon Maki and Kathlene Meadows subject to the

4     plaintiff's objections and counter-designations and the

5     Court's forthcoming rulings on those objections.  This is in

6     lieu of live trial testimony in this case.

7              THE COURT:  Have you provided the Court with those

8     fully marked-up transcripts?

9              MR. CLOUSER:  We have not yet.  The specific

10    designations being offered and the transcripts -- we

11    intended to file on the docket the chart of designations

12    with objections, as we did previously, and then we would

13    submit binders containing the transcripts highlighted and

14    any exhibits that are associated with the designated

15    testimony.

16             THE COURT:  And two questions.  Do you have an

17    anticipated date that you would do so and are there

18    objections to the admission of the exhibits?

19             MR. CLOUSER:  We hoped to do so this afternoon in

20    terms of filing, the designations on the record.  And with

21    respect to exhibits, there are objections to those exhibits,

22    so they will be moved into evidence subject to those

23    objections and the court's ruling, as we have done before.

24             THE COURT:  Okay.  So the sooner the better.  I

25    mean, it doesn't have to be this afternoon, but certainly no

1    later than midweek next week I'd like a complete set of all

2    of the deposition designations.

3              MR. CLOUSER:  Yes, Your Honor.  We will make

4    sure --

5              THE COURT:  And I think these may be the only ones

6    I don't have.  Is that correct?

7              MR. CLOUSER:  I believe that's correct, Your

8    Honor.

9              THE COURT:  Okay.

10             MR. CLOUSER:  So in connection with the testimony

11   of Sharon Maki, PRMI moves into evidence the following

12   documents subject to plaintiff's objections and the Court's

13   forthcoming rulings on those objections:  DTX-102, which

14   corresponds to Deposition Exhibit 605-0014; DTX-050, which

15   corresponds to Deposition Exhibit 605-0015; as well as

16   Deposition Exhibit 145-0011; DTX-787, which corresponds to

17   Deposition Exhibit 605-0020; DTX-082, which corresponds to

18   Deposition Exhibit 605-0021; DTX-083, which corresponds to

19   Deposition Exhibit 605-0022; and DTX-085, which corresponds

20   to Deposition Exhibit 605-0023.

21             THE COURT:  Okay.  So let me review these.  Tell

22   me if I got this right.  DTX-102, DTX-050, DTX-787, DTX-082,

23   DTX-083, and DTX-085 are received into evidence.

24             MR. CLOUSER:  Your Honor, those are being moved in

25   subject to objections.

1           THE COURT:  Oh, there's objections.

2           MR. CLOUSER:  I apologize, Your Honor.

3           THE COURT:  Sorry.  They are not received in

4    evidence.  I didn't understand that you were moving exhibits

5    that were subject to objections.

6           MR. CLOUSER:  My apologies, Your Honor.

7           THE COURT:  I don't think we've done that every

8    time.  I'm not sure, but all right.

9           MR. CLOUSER:  And then in connection with the

10   testimony of Kathlene Meadows, PRMI moves into evidence the

11   following documents subject to plaintiff's objections and

12   the Court's forthcoming rulings on those objections:

13   PTX-083, which corresponds to Deposition Exhibit 601-0023.

14   And that was PTX.

15          THE COURT:  PTX.

16          MR. CLOUSER:  Thank you, Your Honor.  At this time

17   PRMI also moves into evidence DTX-789.  This is a Rule 1006

18   summary exhibit prepared from a voluminous spreadsheet

19   produced by plaintiff in this action that reflects

20   information regarding the 463,000-plus loans contained in

21   the global population of at-issue loans from which

22   plaintiff's expert sampled.

23           PRMI disclosed this exhibit in connection with the

24   four-day disclosure protocol and understand plaintiffs have

25   not raised any objection to the introduction of this summary

1    exhibit.

2            THE COURT:  All right.  Do plaintiffs wish to

3    respond to the motion to admit DTX-789?

4            MR. MILLER:  I apologize, Your Honor.  Could we

5    have a moment to confer?

6            THE COURT:  Oh, of course.

7            MR. MILLER:  Thank you.

8            (Pause in proceedings.)

9            MR. MILLER:  Your Honor, I think we'll need a

10   couple of hours to review this exhibit.  If it's okay with

11   the Court, we would like to take some time today and to

12   formulate whether we have an objection to this.

13           THE COURT:  That's fine.  We'll just defer ruling

14   on it.

15           MR. MILLER:  Thank you.

16           THE COURT:  Mr. Clouser.

17           MR. CLOUSER:  Just to note for the record, this

18   exhibit was disclosed to plaintiffs four days ago in

19   connection with the four-day disclosure protocol and

20   transmitted to the Court two days ago, cc'ing plaintiffs.

21   So they should be well aware of the Exhibit, but

22   nevertheless we will move on.

23           Finally, Your Honor, PRMI seeks to move into

24   evidence the complete set of available deal documents for

25   the at-issue trusts.  These documents are Exhibits

1      DTX-1001.0001 through --

2             THE COURT:  Try that again.  1001.

3             MR. CLOUSER:  DTX-1001.0001 through DTX-1001.049,

4      DTX-1006.0001 through DTX-1006.0055, and DTX-1016.0001

5      through DTX-1016.0506.

6             Each set of deal documents PRMI believes is

7      independently relevant, as each contains representations

8      that the parties contend were the basis of claims made in

9      the bankruptcy.  And these documents are not cumulative

10     because each document is an operative agreement for a

11     specific deal that is at-issue in this litigation.

12            PRMI believes it is appropriate to provide the

13     fact-finder the complete set of these documents rather than

14     the patchwork set that is currently in the record for these

15     deal documents.

16            And we also think it's helpful to have these deal

17     documents in the record in the event that the Court is

18     interested in reviewing any particular language from a deal

19     or set of deals.

20            With respect to -- the parties have agreed that

21     with respect to individual deal documents or sets of deal

22     documents, those documents may be introduced and are

23     stipulated to be admissible.  And we don't believe there's

24     any meaningful distinction between introducing a subset of

25     the deal documents, which has been done in this case already

1    and stipulated to in this case already, and introducing the

2    complete set of deal documents, as PRMI is proposing to do.

3              THE COURT:  So, as I understand it, there is a

4    disagreement about this?

5              MR. CLOUSER:  Plaintiffs have indicated that they

6    object to the introduction of all of the deal documents.

7              THE COURT:  Okay.  Let me hear from the

8    plaintiffs.

9              MR. MILLER:  Good morning, Your Honor.  Jeff

10   Miller on behalf of plaintiffs.

11             THE COURT:  Good morning.

12             MR. MILLER:  So the parties have been going back

13   and forth over the last month, I suppose, on how to handle

14   these underlying transaction documents and the plaintiff's

15   position has been that it is unnecessary and in our view

16   inappropriate to lard up the record with thousands of

17   transaction documents that have never been the subject of

18   any testimony from any witnesses in this action.

19             And that position is partly founded on the concern

20   that the effort to introduce these exhibits is motivated by

21   some desire to have these documents in the record for a

22   purpose that hasn't been disclosed and hasn't been the

23   subject of this trial.

24             So to that end we've had a working agreement with

25   PRMI to introduce deal documents if being used with a

1    witness in a meaningful fashion, which has reflected our

2    position that if either side has something meaningful to do

3    with the deal documents or intends to do something

4    meaningful with the transaction documents, they could be

5    introduced.

6            Last week PRMI asked us about introducing the 1006

7    exhibit, which was DTX-786, that summarizes the at-issue

8    representations across the 506 at-issue trusts.  Professor

9    Schwarcz discussed that exhibit in his testimony, it had a

10   role in his testimony, and we agreed to the admission of

11   that exhibit and thought that that was the end of that

12   issue.

13           So now that PRMI is seeking to introduce all of

14   the transaction documents underlying the 506 trusts strikes

15   us as perplexing because we understood that the entire point

16   of DTX-786, the 1006 exhibit, was to summarize those

17   transaction documents and that 1006 was admitted.

18           So what PRMI is now seeking to do is to introduce

19   1,010 documents into evidence.  About half of these, I

20   believe it's the DTX-1016.001 through .0506, so 506, so I

21   believe half of these are Pooling and Servicing Agreements,

22   which can run hundreds of pages.  It's the veritable

23   definition of voluminous writings that cannot be

24   conveniently examined in court, which is precisely what Rule

25   1006 was designed to address.

1                     So the Rule 1006 is in evidence and the question

2        now is what is the need for introducing these additional

3        transaction documents and what is their purpose.  PRMI has

4        not articulated a basis other than in the event there is a

5        dispute in post-trial briefing concerning the documents, the

6        Court would have them as a resource.

7                     But the vague hypothetical possibility that an

8        issue may arise later is not a basis for adding thousands

9        of -- or over a thousand transaction documents to the record

10       now.  If there's a dispute later, the parties can address it

11       then, as is appropriate.

12                    Our other concern is foundation.  PRMI has not

13       laid the foundation for these thousand documents they want

14       to introduce.

15                    So, in closing, we don't believe that literally

16       over 1,000 documents need to be moved into evidence.  The

17       parties have been entering deal documents as they have been

18       used with witnesses and those witnesses have established

19       their foundation.  Many witnesses have testified at length

20       about the meaning of those transaction documents and the

21       risk they created for RFC, and that's the issue before the

22       Court.

23                    PRMI has a 1006 in evidence as substantive

24       evidence that summarizes the transaction documents.  So

25       there's no need for these additional documents.

1           And, moreover, PRMI wouldn't be able to lay

2     foundation with a witness for them, which is why there's a

3     Rule 1006 in the first place.

4           So we would object to the admission of these

5     thousand-plus documents into evidence.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           Mr. Clouser.

9           MR. CLOUSER:  Thank you, Your Honor.  As an

10    initial matter, PRMI proposes to submit these documents

11    electronically on a thumb drive so as not to create a

12    massive amount of paper for Your Honor or for the Court in

13    general.  That, I think, should alleviate the concern about

14    the extent of the pages of these documents.

15          With respect to the issue raised by plaintiff's

16    counsel regarding foundation, the parties had agreed that

17    deal documents could be introduced without respect to a

18    witness and without respect to establishing the foundation

19    of those documents at trial.

20          On trial day February 14th plaintiff moved in,

21    without a witness, a set of documents the plaintiff

22    contended were a representative sample or a representative

23    set of the deal documents.  PRMI obviously disagrees that it

24    is a representative set.  But setting that aside, at that

25    time plaintiff's counsel noted that the parties had an

1   agreement that any set of transaction documents that they

2   would like into evidence could be moved into evidence.

3           But, you know -- so although plaintiff has

4   objected to moving in the entire set of deal documents, we

5   believe there's no meaningful distinction between the two

6   positions.

7           THE COURT:  I think the question is this.  The

8   question is whether it's unnecessarily duplicative.  And if

9   the point is to provide a document that shows me all the

10  reps and warranties in these deal documents, that apparently

11  has been accomplished through the 1006 summary in DTX-786.

12          And so I think the fear is ambush, that in

13  closings or in findings of fact later on there will be a

14  disclosure of something in the deal documents that was never

15  discussed by a witness or an attorney.

16          And so when I weigh and balance that, I guess I

17  need to understand what in the deal documents I would look

18  for other than what appears on the 1006 summary.

19          MR. CLOUSER:  Your Honor, the 1006 identifies --

20  it's essentially a count of the representations that are in

21  that voluminous set, but does not provide the Court the

22  language of all of the representations in the deal documents

23  itself.

24          THE COURT:  But I've seen lots of versions of the

25  language.  I'm not sure that the language -- that I'm going

1    to see a version -- or perhaps that's what the ambush worry

2    is, is that there's something there that you want to spring

3    later.

4             So I need to be satisfied that there really is a

5    reason over and above the 1006 summary, because otherwise it

6    sounds utterly redundant.

7             MR. CLOUSER:  Your Honor, we do not intend to

8    ambush with, you know, information that wasn't discussed at

9    trial.

10            THE COURT:  So you wouldn't be addressing either

11   in closings or in any subsequent finding of fact or

12   conclusions of law any part of those deal documents that

13   hasn't already been discussed?

14            MR. CLOUSER:  I do not believe so, although --

15   yeah, I don't believe so, Your Honor.  The deal documents --

16   the intent to move in the deal documents would be to provide

17   the Court, rather than the haphazard set of, you know, a

18   document from this deal, but not all of the documents from

19   one deal, you know, the haphazard set that is in the record

20   at the moment, this would simply provide a complete set of

21   the deal documents that were referenced at trial and the

22   remainder of the at-issue deal documents.

23            THE COURT:  Okay.  Mr. Miller, do you think

24   there's an agreement that we can reach here that if at no

25   time in the future in this litigation or on appeal there is

1    any reference to any portion of the deal documents that were

2    not, in fact, in some way disclosed during the trial, either

3    in the 1006 summary or in testimony of a witness, that then

4    just for the sake of the record we would have all the deal

5    documents?

6            MR. MILLER:  Your Honor, if I may have a moment to

7    discuss with my team?

8            THE COURT:  Sure, sure.

9            (Pause in proceedings.)

10           THE COURT:  Okay.  Mr. Miller.

11           MR. MILLER:  Your Honor, I think the Court has

12   ably articulated our concern.  And as to the proposal

13   between the parties or for the parties, I think our concern

14   continues to be that these have been addressed at length,

15   various versions of various representations have been

16   addressed at length between the parties and so I think

17   plaintiff's issue is we're frankly -- we don't know what

18   there could be other than what's already been presented in

19   Court.

20           And so the question of they will be admitted as

21   long as they are not used outside of Court, we just -- our

22   concern right now is it just seems to be sort of uncharted

23   territory, which is risky, as has previously been discussed

24   in this court.  So that's our concern.

25           THE COURT:  All right.  Mr. Clouser.

1            MR. CLOUSER:  Thank you, Your Honor.  We sort of

2    agree with plaintiffs that it's a little bit of uncharted

3    territory and so what we propose to do, PRMI can identify a

4    representative set of the deal documents that were discussed

5    by PRMI's experts at trial.  So for each trust that was

6    disclosed or discussed by an expert, one of PRMI's experts,

7    Mr. Schwarcz, Mr. Burnaman, Mr. Woll, or Ms. Keith, PRMI can

8    identify a representative set of -- or a set of the deal

9    documents that includes the complete documents for each of

10   those deals.  That would be a substantially smaller number

11   and I think would be consistent with what plaintiff has done

12   in their own case-in-chief.  So we're willing to meet and

13   confer with plaintiffs about that.

14           THE COURT:  Okay.  I'll just hear back from you on

15   that.

16           MR. CLOUSER:  Thank you, Your Honor.

17           THE COURT:  You bet.  All right.  Yes.

18           MS. QUINN:  For continuity, Your Honor, Laurie

19   Quinn of Spencer Fane for plaintiff.  At this time we

20   thought we would just move in a handful, I think there were

21   five or six total exhibits relating to the depositions that

22   defense counsel just entered into evidence and I do not

23   believe there are any objections to our exhibits.

24           THE COURT:  Okay.  So, as I understand it, you are

25   seeking the admission of exhibits to the depositions of Maki

1    and Meadows?

2              MS. QUINN:  That is correct.

3              THE COURT:  And you don't believe there's any

4    dispute about them?

5              MS. QUINN:  I do not believe we've heard of any or

6    that defendant has posed any objections.  I'm sure they will

7    correct me if I'm wrong.

8              THE COURT:  Okay.  Go ahead.

9              MS. QUINN:  So with respect to Ms. Maki, the Trust

10   moves into evidence DTX-084, which corresponds with

11   Deposition Exhibit 605-0024, and I do not believe there's an

12   objection.

13             MR. CLOUSER:  No objection.

14             MS. QUINN:  Same witness, DTX -- the Trust moves

15   into evidence DTX-098 and that corresponds with Deposition

16   Exhibit 605-0027.

17             MR. CLOUSER:  No objection, Your Honor.

18             MS. QUINN:  And then finally for Ms. Maki, the

19   Trust moves into evidence DTX-200, which corresponds with

20   Deposition Exhibit 145-0024.

21             MR. CLOUSER:  No objection.

22             THE COURT:  All right.  DTX-084, DTX-098, and

23   DTX-200 are received into evidence.

24             MS. QUINN:  And then moving on to Ms. Meadows, the

25   Trust moves into evidence PTX-098, and that corresponds with

1    Deposition Exhibit 601-0020.

2                MR. CLOUSER:  No objection, Your Honor.

3                MS. QUINN:  And then PTX-462, corresponding with

4    Deposition Exhibit 601-0021.

5                MR. CLOUSER:  No objection.

6                MS. QUINN:  And then, finally, just for the

7    record, I believe this has actually been admitted already,

8    but this will relate to Ms. Meadows as well, PTX-1052,

9    corresponding to Deposition Exhibit 601-0022.

10               THE COURT:  All right.  The Court has confirmed

11   that PTX-1052 has previously been admitted.  And PTX-098 and

12   PTX-462 are received into evidence.

13               MS. QUINN:  And then also -- thank you, Your

14   Honor.  With respect to Ms. Meadows, it was unclear if this

15   was part of Mr. Clouser's piece, so we would like to

16   affirmatively move in a set of affirmative designations with

17   respect to Ms. Meadows.  We understand PRMI objects.  So I

18   just want to put that on the record.

19               And in addition clarify for the Court, and we can

20   do this in writing if need be at a later time, that these

21   affirmative designations are not part of our case-in-chief

22   or a rebuttal.  They are just within the scope of what her

23   cross-examination would have contained had she been called

24   live.

25               So we think it's well within the parties'

 1    agreement as well as Rule 32 that we could designate

 2    affirmatively in addition to counter-designations.

 3              THE COURT:  Okay.  And you will make sure that

 4    there's one deposition transcript that contains all of that?

 5              MS. QUINN:  That remains the parties' intention,

 6    that everything will be in one chart, one transcript, and

 7    made clear for the Court.

 8              THE COURT:  Very good.  Thank you.  Anything

 9    further today so we don't keep Mr. Crawford waiting any

10    longer?

11              All right.  Is everyone comfortable just moving

12    in?  I'm sensitive of the time and his participation.

13              MR. CLOUSER:  Yes, Your Honor.

14              THE COURT:  All right.  Let's go ahead and do

15    that, then.

16              Let's see.  Do we know if the witness is there?

17              (Discussion held off the record.)

18              THE COURT:  All right.  Apparently there are some

19    logistics to take care of here, so we will take a 10-minute

20    break.  Court is briefly adjourned.

21         (Recess taken at 9:08 a.m.)

22                        *    *    *    *    *

23         (9:16 a.m.)

24                         **IN OPEN COURT**

25              THE COURT:  Please be seated.

1             All right.  For the record, the Court notes that

2      Mr. Crawford will be testifying now via live video

3      transmission from the United States District Court for the

4      District of Utah.  And on March 10th the Court issued an

5      order permitting this remote contemporaneous testimony

6      because of serious and significant concerns regarding the

7      ongoing coronavirus or COVID-19 virus outbreak.

8             For the sake of the record, the Court would note

9      that the Court and counsel can clearly see Mr. Crawford and

10     at all times I will ensure that the Court and counsel can

11     see and clearly hear him when he testifies.

12            As I understand it, the only time this may change

13     is if there is enlarging evidence on a screen, but other

14     than that, at all times there should be no issue with the

15     Court being able to fully understand Mr. Crawford and

16     evaluate his testimony.

17            All right.  At this time, Mr. Crawford, can you

18     hear me?

19            THE WITNESS:  Yes, I can.

20            THE COURT:  All right.  Sir, if you would please

21     raise your right hand.

22            Do you swear in the testimony you're about to give

23     to tell the truth, the whole truth, and nothing but the

24     truth, so help you God?

25            THE WITNESS:  I do.

```
 1                THE COURT:  Very good.  All right.  As I
 2      understand it, now you're going to see Mr. Clouser on the
 3      video.  Can you see him?
 4                THE WITNESS:  I can, yes.
 5                THE COURT:  And he will be the one asking you
 6      questions on behalf of PRMI now.  Okay?
 7                THE WITNESS:  Okay.
 8                THE COURT:  Mr. Clouser.
 9                            (Jim Crawford)
10                         DIRECT EXAMINATION
11      BY MR. CLOUSER:
12      Q.  Good morning.  Would you please introduce yourself to
13      the Court.
14      A.  My name is Jim Crawford.
15      Q.  And, Jim, where are you testifying from today?
16      A.  Salt Lake City, Utah.
17      Q.  And where do you currently work?
18      A.  Here in Salt Lake City at PRMI.
19      Q.  What position do you currently hold?
20      A.  I'm currently the branch controller of a retail branch
21      in Salt Lake City.
22      Q.  And what is a branch controller?
23      A.  Typically I handle the finances of the branch, the
24      accounting, HR.  Essentially I just help run the branch.
25      Q.  Tell us a little bit about yourself.  Where are you
```

```
1    from?
2    A.  Originally from California, but moved to Utah when I was
3    about six, so I have been here for over 40 years.  I'm
4    married, have two kids, two grandkids.  I graduated from the
5    University of Utah with an economics degree back in 1996.
6    Q.  When did you start working at PRMI?
7    A.  July 2001, I believe.
8    Q.  Before you started at PRMI, tell us about your work
9    experience.
10   A.  Well, prior to PRMI I worked for a mortgage company
11   called Crossland Mortgage, where I was a secondary marketing
12   analyst, which meant that I established rate sheets for our
13   sales force.
14   Q.  And was Crossland Mortgage a loan originator?
15   A.  Yes, it was.
16   Q.  So moving forward in time, you said you started at PRMI
17   in 2001?
18   A.  Correct.
19   Q.  What was your role when you started at PRMI?
20   A.  Secondary marketing manager.
21   Q.  And at the time you started at PRMI, how was PRMI
22   structured?
23   A.  It had two divisions.  One, a retail division, which
24   dealt with borrowers with prime credit; and a wholesale
25   division, which dealt with borrowers with subprime or poor
```

1    credit.

2    Q.  And which side of the business did you work in?

3    A.  The wholesale division.

4    Q.  Who did you work with in the wholesale division?

5    A.  I worked with Yvonne Flitton, Scott Peterson, A.J.

6    Swope, Robb Plehn, Wendy Miller, to name a few.

7    Q.  And what was your impression of your co-workers?

8    A.  I enjoyed them very well.  They are really good people.

9    Q.  Can you describe for the Court your role as a secondary

10   marketing manager in the wholesale division at PRMI.

11   A.  Sure.  We established rate sheets and matrices for our

12   sales group that they could use to get borrowers in the

13   door, and on the back end we were responsible for selling

14   closed loans on the secondary market.

15   Q.  You mentioned rate sheets.  Can you provide a little

16   context as to what that is.

17   A.  It was a physical rate sheet, like an Excel spreadsheet

18   that had loan-level details that the loan officers and the

19   sales executives would use to price out a loan.

20   Q.  Were rate sheets used for underwriting loans?

21   A.  No.

22   Q.  And you also mentioned selling closed loans to

23   investors.  What did that entail?

24   A.  That meant that after the borrower closed a loan and

25   they were in their homes, we would take those loans and put

```
 1    them in a pool and sell them on the secondary market.
 2    Q.  Your position as a secondary marketing manager, was that
 3    an executive level position at PRMI?
 4    A.  No, it was not.
 5    Q.  In your role as secondary marketing manager, did you
 6    underwrite loans?
 7    A.  No, I did not.
 8    Q.  Who were the investors to whom you sold loans as a
 9    secondary marketing manager?
10    A.  RFC, Countrywide, HSBC.
11    Q.  And at RFC, who were your counterparts, who did you work
12    with?
13    A.  I typically worked with the sales director, sales
14    manager, Renee Bangerter, Lori Zaloumis, Tina Diehl, people
15    in that role.
16    Q.  And how long were you in the role of secondary marketing
17    manager at PRMI?
18    A.  Approximately five years.
19    Q.  And when did you change roles?
20    A.  At the end of 2005, the first of 2006, I was promoted to
21    vice president of the wholesale division.
22    Q.  Did your responsibilities change at that time?
23    A.  It did.  As secondary marketing manager I managed a
24    small group of two people and that changed to now managing
25    the sales force, the underwriters, the processors, the
```

1   closers, the wholesale division.

2   Q.  And how long were you vice president of wholesale?

3   A.  Just a month or so.

4   Q.  And why such a short period of time?

5   A.  PRMI decided to shut down their wholesale division.

6   Q.  I'd like to focus now on your time as a secondary

7   marketing manager at PRMI between 2001 and the end of 2005.

8   Can you provide an overview of the process of how loans were

9   originated at PRMI in the wholesale division.

10  A.  Yeah.  We would provide rate sheets and matrices to our

11  sales force.  They would work with brokers to get a borrower

12  in the door.  Once the borrower was in the door, we would

13  then, you know, underwrite the loan, close the loan, and

14  eventually sell the loan in the secondary markets.

15  Q.  And how did PRMI underwrite the loan?

16  A.  We ran things through Assetwise Direct.

17  Q.  When you sold closed loans to investors, did you sell

18  them one by one or multiple loans at a time?

19  A.  Primarily multiple loans at a time in pools, but there

20  were occasions where we would sell them loan by loan.

21  Q.  Why sell loans in pools as opposed to one by one?

22  A.  We would get a higher price selling them in a pool.

23  Q.  And was that typical in the industry, to get a higher

24  price for a pool?

25  A.  Yes, it was.

1    Q.  When you started at PRMI, were bulk pool sales the

2    primary way PRMI's wholesale division was selling loans to

3    RFC?

4    A.  Yes, it was.

5    Q.  Now, when selling a bulk pool of loans to RFC, how did

6    you offer a bulk pool?  What was that process?

7    A.  The process is we would provide a bid tape, which was

8    just an Excel spreadsheet that had all of the loan-level

9    details on it so they could review and decide if they wanted

10   to purchase these loans.

11             MR. CLOUSER:  I'd like to show the witness

12   PTX-025.  It has not yet been admitted, so it should not be

13   brought up on the screen.

14   BY MR. CLOUSER:

15   Q.  Mr. Crawford, if you could turn in your binder to

16   PTX-025.

17   A.  Got it.

18   Q.  What is this document?

19   A.  This is an e-mail from one of our employees to RFC

20   offering the latest bulk pool that we had.  It looks like it

21   had 24 units for just under $2.3 million.

22   Q.  And you were copied on this e-mail, correct?

23   A.  Correct.

24   Q.  What is the date of this e-mail?

25   A.  August 2nd, 2002.

1   Q.  Do you have any reason to believe you did not receive

2   this e-mail?

3   A.  No, I do not.

4           MR. CLOUSER:  Your Honor, PRMI moves into evidence

5   PTX-025.

6           THE COURT:  Any objection.

7           MS. WINTER:  No objection.

8           THE COURT:  PTX-025 is received in evidence.

9   BY MR. CLOUSER:

10  Q.  Mr. Crawford, what is the purpose of this type of

11  communication?

12  A.  It was to let RFC know that we had a pool of loans

13  available for sale.

14  Q.  And looking at the attachment to that document, what is

15  that?

16  A.  Sorry.  Let me try to find it.  I got it here.

17          This is a copy of the bid tape that we sent out to

18  RFC.

19  Q.  And who were these loans being offered to again?

20  A.  RFC.

21  Q.  Did PRMI originate these loans with the intent to sell

22  them to RFC?

23  A.  We did.  That was our normal business practice, was to

24  originate and underwrite loans to investor guidelines with

25  the intent of selling them those loans.

```
1    Q.  Is there anything on this document that indicates these

2    loans were intended for RFC?

3    A.  There are a couple of things.  In the notes in Section 1

4    it says, "All loans underwritten to RFC guidelines."  And

5    then in the final column it has all their Assetwise Direct

6    approvals.

7    Q.  And looking at that final column, why did you include

8    that column that referenced whether loans had been approved

9    by Assetwise Direct?

10   A.  Well, we wanted RFC to know that they were all run

11   through Assetwise Direct.

12   Q.  Was this the standard form that bid sheets took when you

13   were selling loans to RFC during your time as secondary

14   marketing manager?

15   A.  Yes.

16   Q.  And after you sent a bid tape to RFC, what happened next

17   in the ordinary process of selling loans to RFC?

18   A.  RFC would review this bid tape, decide if they want to

19   purchase the pool, and then they would offer a bid back to

20   us.

21   Q.  And what happened next in the process?

22   A.  We would accept the bid.  Once that was done, we would

23   then ship the physical files to RFC so they could review

24   them.  During their review process they would pend loans,

25   kick out loans, and then we would work with them to get the
```

1    information they need to get the loans to purchase.

2    Q.  When RFC provided a bid and PRMI agreed to that bid, was

3    there any sort of confirmation process?

4    A.  RFC would send over a bulk confirmation letter once that

5    was agreed upon.

6          MR. CLOUSER:  I'd like to show the witness

7    PTX-026.  This has already been admitted into evidence.

8          THE COURT:  Okay.

9    BY MR. CLOUSER:

10   Q.  And, Mr. Crawford, if you will turn to the second page,

11   do you see this document?

12   A.  I do.

13   Q.  And what is this document?

14   A.  This is an example of a bulk confirmation letter.  It

15   shows the --

16   Q.  It --

17   A.  I'm sorry, go ahead.

18   Q.  I apologize for interrupting.  Please continue.

19   A.  It just shows the number of loans that were being

20   purchased and the volume.

21   Q.  Have you seen this type of letter before?

22   A.  I have.

23   Q.  And looking at this letter, do you see in the second

24   sentence it says, "GMAC-RFC has agreed to purchase this pool

25   of loans at a price of 104.750 percent providing they meet

 1    the requirements of the GMAC-RFC Client Guide and" --

 2              COURT REPORTER:  Wait.

 3              THE COURT:  Why don't we try that again.  When

 4    you're reading, just go slow.

 5    BY MR. CLOUSER:

 6    Q.  Do you see in the second sentence of the letter it says,

 7    "GMAC-RFC has agreed to purchase this pool of loans at a

 8    price of 104.75 percent providing they meet the requirements

 9    of the GMAC-RFC Client Guide and are of investment quality"?

10    A.  I do.

11    Q.  Was that typical language in bulk confirmation letters

12    from RFC?

13    A.  Yes, it was.

14    Q.  And was it standard process for RFC to confirm a bulk

15    purchase with a bulk confirmation letter like this?

16    A.  Yes, it was.

17    Q.  What would happen after PRMI received a bulk

18    confirmation letter?

19    A.  We would then ship the files to them so RFC could review

20    the files, and we would work with them on getting any

21    information or documents that they required to purchase the

22    loan.

23    Q.  When you shipped loans to RFC, how did you prepare the

24    files?

25    A.  Well, RFC required us to have a stacking order, so a

1   specific order of documents with the Assetwise Direct being

2   on top of the documents.

3   Q.  And did you have an understanding of why RFC wanted the

4   Assetwise Direct approval on the top of the document?

5   A.  My understanding was in their review process, they

6   reviewed it off the Assetwise Direct.

7   Q.  Okay.  What happened if RFC did not bid on a pool or

8   PRMI did not accept a bid?

9   A.  I don't recall that ever happening, but we would have,

10  in turn, sold the loan to other investors.

11  Q.  And you said you don't recall that happening.  What do

12  you mean?

13  A.  My recollection is that we agreed and accepted every bid

14  RFC gave us.

15  Q.  In your experience -- strike that.

16          You mentioned that loans intended for RFC were

17  originated using Assetwise Direct; is that correct?

18  A.  Correct.

19  Q.  What did Assetwise Direct do in your understanding?

20  A.  Assetwise Direct --

21          MS. WINTER:  Objection, Your Honor, foundation.

22          THE COURT:  I think you're going to have to

23  establish foundation with him.  He's been explicit that he

24  wasn't an underwriter.

25          MR. CLOUSER:  Sure.

1    BY MR. CLOUSER:

2    Q.  Mr. Crawford, in your role as secondary marketing

3    manager, did you have an understanding of Assetwise Direct?

4    A.  I did.

5    Q.  And what was the basis of your understanding?

6    A.  Well, through internal management meetings, you know, we

7    talked about it quite often throughout, you know, my time

8    there.  I had discussions with my counterparts at RFC about

9    Assetwise Direct and just normal business conversations.

10   Q.  And in your understanding, what did Assetwise Direct do?

11   A.  It chose the product and the credit grade for the

12   borrower, and it also potentially upgraded their credit in

13   some cases.

14   Q.  And when you say, "it chose the product," what do you

15   mean?

16   A.  The loan program that RFC was offering.

17   Q.  And what did you mean by selecting the credit grade?

18   A.  The credit grade would be what the borrower was slotted

19   into.  It basically told us that this borrower met this

20   criteria under this RFC program.

21   Q.  And you also mentioned potential upgrades in Assetwise

22   Direct.  What did you mean by that?

23   A.  Well, occasionally Assetwise Direct would upgrade a

24   borrower to a higher credit grade.

25   Q.  Why did PRMI use Assetwise Direct to originate loans for

1      RFC?

2      A.   It was my understanding that it was required.  I know it

3      was required by PRMI and as well as RFC.

4      Q.   And what's the basis for your understanding that it was

5      required?

6      A.   Well, like I said, it was PRMI policy that it was

7      required.  And then just in my discussions with my

8      counterparts at RFC --

9                MS. WINTER:  Objection, hearsay.

10               THE COURT:  Hold on one second.  He has to be --

11     he has already started the answer.  Why don't you finish the

12     answer.

13               THE WITNESS:  In my discussions with my

14     counterparts at RFC, they always asked did you run it

15     through Assetwise approval; and if so, what did it tell you.

16               THE COURT:  All right.  Now.

17               MS. WINTER:  Objection, hearsay with respect to

18     his testimony as to what RFC told him.

19               MR. CLOUSER:  Your Honor, it goes to the effect on

20     the listener.  RFC is communicating to PRMI via Mr. Crawford

21     and their statements to him influence his understanding of

22     the system.  It's the effect on the listener.

23               THE COURT:  So you're not -- you don't think the

24     Court should consider this evidence for the truth of the

25     matter asserted?

1              MR. CLOUSER:  The Court should consider the

2      evidence for the effect on the listener.  In addition, it is

3      non-hearsay under 801(d)(2)(D) because the people that he is

4      talking about are employees of RFC speaking in connection

5      with their employment as they interact with Mr. Crawford in

6      his role as secondary marketing manager.

7              THE COURT:  Meaning that every employee of RFC

8      binds RFC?

9              MR. CLOUSER:  No.  Meaning that the Court can

10     accept it for the truth as non-hearsay.

11             MS. WINTER:  May I respond, Your Honor?

12             THE COURT:  Any employee -- I'm sorry.  Go ahead.

13             MS. WINTER:  With respect to the argument that

14     it's not hearsay under 801(d)(2), Your Honor, Mr. Crawford

15     has not identified any specific by name or even title, so we

16     don't know who the employee is, whether they were acting

17     within the scope of their agency.  And the Eighth Circuit

18     has recognized that in this instance a statement by an

19     unknown author is not admissible as an admission by a

20     party-opponent and that's from the *Cedeck vs. Hamiltonian*

21     *Federal Savings and Loan Association* case, 551 F.2d. 1136 at

22     page 1138 from 1977.

23             THE COURT:  You don't disagree with that law, do

24     you?

25             MR. CLOUSER:  I don't disagree with that law, Your

1    Honor.  May I ask Mr. Crawford a follow-up question about

2    the individuals with whom he recalls speaking?

3              THE COURT:  He would have to have a specific

4    recollection of a conversation with a specific individual

5    and the time and all that, not just generally we talked

6    about.  But you may ask, yes.

7              So are you moving on, then?

8              MR. CLOUSER:  I am going to move on, Your Honor.

9              THE COURT:  All right.  Then just for the record,

10   I will permit the testimony, but not for the truth of the

11   matter asserted.

12             Go ahead.

13             MR. CLOUSER:  Thank you, Your Honor.

14   BY MR. CLOUSER:

15   Q.  Mr. Crawford, just to refresh, you testified that you

16   recall people asking you did you use Assetwise Direct and

17   what did Assetwise Direct say.  Is that a fair recollection

18   of your testimony?

19             MS. WINTER:  Objection, hearsay.

20             THE COURT:  Okay.  What people?  What are we

21   talking about here.  People generally or RFC people?

22             MR. CLOUSER:  Sorry, Your Honor.  My understanding

23   from Mr. Crawford's testimony is that he said that people at

24   RFC had said to him what did Assetwise -- did you use

25   Assetwise Direct and what did it say.

```
1              THE COURT:  You may ask him if he has a specific

2     recollection of a specific conversation with someone he can

3     identify at RFC who specifically gave him an answer, but I

4     need to know who that person was and what their position was

5     to determine whether or not they would somehow bind RFC.

6     BY MR. CLOUSER:

7     Q.  Mr. Crawford, whom do you recall communicating with at

8     RFC?

9     A.  I typically spoke with folks like Renee Bangerter and

10    Lori Zaloumis and Tina Diehl.

11    Q.  And do you remember what those individuals said to you

12    regarding Assetwise Direct?

13             THE COURT:  No, there has to be -- not generally.

14    There needs to be a specific memory of a specific

15    conversation.  You may ask him that question:  Do you have a

16    specific memory of a specific conversation?

17             MR. CLOUSER:  Your Honor, I'll move on.

18             THE COURT:  Okay.

19    BY MR. CLOUSER:

20    Q.  Mr. Crawford, do you recall RFC ever telling you that

21    PRMI should not use Assetwise Direct?

22             MS. WINTER:  Objection, hearsay.

23             THE WITNESS:  No.

24             THE COURT:  All right.  You can ask his

25    understanding of PRMI rules and what PRMI did, but unless
```

```
1    you identify someone at RFC who spoke with him who has the

2    authority to bind RFC, it's a hearsay question.

3              MR. CLOUSER:  But, Your Honor, the answer was that

4    there was no such communication.

5              THE COURT:  All right.  You may go on.  But I just

6    want to alert you your questions are raising the specter of

7    an inappropriate answer, so make sure you predicate them

8    with the right words.

9              MR. CLOUSER:  Thank you, Your Honor.  Your Honor,

10   I'd like to show the witness DTX-217.

11             THE COURT:  DTX, right?

12             MR. CLOUSER:  DTX-217.  This has not been admitted

13   into evidence yet.

14             THE COURT:  All right.

15   BY MR. CLOUSER:

16   Q.  Mr. Crawford, do you have that document in front of you?

17   A.  I do.

18   Q.  And what is this document?

19             THE COURT:  All right.  Hold on.  I don't have the

20   document.  Did you give me all documents for direct

21   examination?

22             MR. CLOUSER:  We did, Your Honor.

23             THE COURT:  DTX-217 is not in my book.  All right.

24   I have another copy.

25             MR. CLOUSER:  Apologies, Your Honor.
```

```
 1                THE COURT:  You may go ahead.

 2   BY MR. CLOUSER:

 3   Q.  What is this document, Mr. Crawford?

 4   A.  This is an e-mail from me to Tina on a loan scenario

 5   where it looks like it was -- it fit their guidelines per

 6   their matrix, but we couldn't get an Assetwise approval, so

 7   I was asking for her help.

 8   Q.  Who is Tina Diehl?

 9   A.  I believe she was a sales assistant.

10   Q.  A sales assistant where?

11   A.  For RFC.

12   Q.  And do you have any reason to doubt you sent or received

13   the e-mails in this document?

14   A.  No.

15                MR. CLOUSER:  Your Honor, PRMI moves DTX-217 into

16   evidence.

17                THE COURT:  Any objection?

18                MS. WINTER:  No objection.

19                THE COURT:  DTX-217 is received into evidence.

20   BY MR. CLOUSER:

21   Q.  Looking at the bottom of the e-mail in this chain, the

22   earliest in time, I think you were explaining what this

23   issue that you were raising was.  Can you provide context.

24   A.  Well, specifically it looks like we had a loan scenario

25   that we couldn't get approved in Assetwise and we weren't
```

1    sure why.  It talks about the terms of the loan and

2    basically asking, you know, what was I missing, you know,

3    can you help me out with it.

4    Q.  Why were you the one contacting RFC about this issue?

5    A.  Well, it was normal for me to have discussions about

6    loans with RFC.

7    Q.  And why was that normal, for you to have discussions

8    with RFC?

9    A.  Well, part of my job responsibilities, any time someone

10   had a question, they would run it up the ladder to me and I

11   would contact RFC to try to get whatever issue it may be

12   resolved.

13   Q.  And looking at this document, Ms. Diehl responded to

14   your original e-mail, correct?

15   A.  Correct.

16   Q.  And what was her response?

17   A.  Her response was that it is currently on the matrix, but

18   has not been released in our Client Guide, therefore not yet

19   programmed into Assetwise.

20   Q.  And you followed up with another question, correct?

21   A.  I did.  I asked her if we had to manually underwrite the

22   loan since we couldn't get an Assetwise approval.

23   Q.  And Ms. Diehl responded yes, correct?

24   A.  Correct.

25   Q.  What did that tell you?

```
 1    A.  Well, it told me that the Client Guide and Assetwise

 2    didn't match and that we had to underwrite this loan

 3    manually.

 4    Q.  Did PRMI ordinarily manually underwrite loans for RFC?

 5    A.  No.  By far and large, we ran everything through

 6    Assetwise Direct to get Assetwise approvals on them.

 7    Q.  And do you recall whether PRMI had to pay a fee to use

 8    Assetwise Direct?

 9    A.  I do.  We paid $300 a month.

10    Q.  Were you required to pay that fee the whole time you

11    were using Assetwise Direct, to your recollection?

12    A.  Yes.

13              MR. CLOUSER:  I'd like to show the witness

14    DTX-257.  This is not yet in evidence.

15    BY MR. CLOUSER:

16    Q.  Mr. Crawford, do you recognize these documents?

17    A.  I do.  They are invoices from RFC.

18    Q.  Would you have seen these invoices in your work as a

19    secondary marketing manager?

20    A.  Yes.

21    Q.  Flipping through this document, do you recognize any of

22    the handwriting on the document?

23    A.  It's definitely my handwriting.

24              MR. CLOUSER:  Your Honor, PRMI moves into evidence

25    DTX-257.
```

```
1              MS. WINTER:  No objection.

2              THE COURT:  DTX-257 is received into evidence.

3    BY MR. CLOUSER:

4    Q.  Mr. Crawford, I'd like to take a look at DTX-257-39.

5    A.  Okay.

6    Q.  When is this invoice dated?

7    A.  November 28th, 2001.

8    Q.  And what is included in this invoice?

9    A.  The Assetwise monthly fee and some recapture of

10   premiums.

11   Q.  And at the bottom of this page there's some handwriting

12   that says, "Requested check 12-5-01."  Do you see that?

13   A.  I do.

14   Q.  Is that your handwriting?

15   A.  Yes, it is.

16   Q.  All right.  And turning to the next page, what is this

17   document?

18   A.  This is the internal check request form that I gave to

19   our accounting department so they would pay that invoice.

20   Q.  And did this check request include money for the

21   Assetwise Direct fee?

22   A.  Yes, it did.

23   Q.  Let's look at DTX-257-23.

24   A.  Okay.

25   Q.  When is this invoice dated?
```

1    A.  July 29th, 2002.

2    Q.  And what is this invoice for?

3    A.  Again, the Assetwise monthly fee and premium recapture.

4    Q.  Did PRMI pay the Assetwise Direct fee in connection with

5    this invoice?

6    A.  Yes, they did.

7    Q.  And let's look at one more, DTX-257-17.

8    A.  Okay.  I got it.

9    Q.  When is this invoice dated?

10   A.  July 27, 2004.

11   Q.  And what is this invoice for?

12   A.  The Assetwise Direct monthly fee and, again, premium

13   recapture.

14   Q.  And did PRMI pay the Assetwise Direct fee in connection

15   with this invoice?

16   A.  Yes, we did.

17   Q.  Did RFC ever remove PRMI's access to Assetwise Direct

18   during your time as secondary marketing manager?

19   A.  No.

20   Q.  To your knowledge, did RFC ever stop invoicing PRMI the

21   $300 monthly fee for PRMI's access to Assetwise Direct while

22   you were secondary marketing manager?

23   A.  No.

24   Q.  When you first started in the wholesale division at

25   PRMI, was RFC an important investor to your division?

1    A.  RFC was our biggest investor.

2    Q.  How long did RFC maintain the status as your biggest

3    investors in the wholesale division?

4    A.  2003, 2004, to the best I remember.

5    Q.  And why did that change?

6    A.  Countrywide came out and expanded their loan products

7    that they were offering and they were offering a higher

8    price for the pools that we were selling, so the production

9    moved from RFC to Countrywide.

10   Q.  And when you said expanding its products, Countrywide

11   expanding its products, what did you mean by that?

12   A.  I mean they were offering loan programs that would allow

13   us to reach more borrowers to build our business.

14   Q.  Can you provide some examples?

15   A.  They had programs that would allow customers to go to a

16   higher LTV, a lower FICO score, things like that.

17   Q.  And what happened as a result of the changes Countrywide

18   was making?

19   A.  Well, the result was the production moved from RFC to

20   Countrywide.

21   Q.  And when you say, "the production," are you referring to

22   PRMI's production?

23   A.  Yes, I am.

24   Q.  How did RFC react to Countrywide's capture of market

25   share?

```
 1                    MS. WINTER:  Objection, calls for hearsay.

 2                    THE COURT:  It does.  You'll have to ask that

 3         question differently.

 4                    MR. CLOUSER:  I'd like to show the witness

 5         DTX-184.  This has been already admitted into evidence.

 6                    THE WITNESS:  Okay.

 7         BY MR. CLOUSER:

 8         Q.  Mr. Crawford, what is this document?

 9         A.  This is an e-mail that I sent to RFC about a Countrywide

10         pool that we sold so they could look at it.

11         Q.  And you sent this e-mail to Renee Popiolek; is that

12         correct?

13         A.  Correct.

14         Q.  Who is Renee Popiolek?

15         A.  She was a sales director at RFC.

16         Q.  Did Ms. Popiolek at some point leave RFC?

17         A.  She did.  2005, I believe.

18         Q.  And what happened after she left RFC?

19         A.  I believe Lori Zaloumis took on her role.

20         Q.  Looking back at this e-mail, when is this dated?

21         A.  November 24th, 2004.

22         Q.  And so at this time was Ms. Popiolek still the sales

23         director at RFC for PRMI?

24         A.  I believe so, yes.

25         Q.  And what's going on in this exchange with Ms. Bangerter?
```

```
 1    A.   This -- in this exchange it's just me offering Renee an

 2    example of a pool that we sold to Countrywide to see if they

 3    had any interest.

 4    Q.   And what was your understanding of why Ms. Bangerter was

 5    asking for this information?

 6    A.   They were trying to win back our business, PRMI's

 7    business.

 8    Q.   Were you offering this pool for RFC to bid on?

 9    A.   No.   This pool had already been sold.

10    Q.   Mr. Crawford, do you recall you were deposed in this

11    case a week ago or two weeks ago?

12    A.   Yes, I do.

13    Q.   Had you been deposed before?

14    A.   No.

15    Q.   Were you nervous at your deposition?

16    A.   Sure.   Very.

17    Q.   Do you recall at your deposition being shown this

18    document?

19    A.   I do.

20    Q.   And what happened?

21    A.   I mistook this for an e-mail that we actually sent to

22    RFC, you know, to bid on a pool, but I realized it and so I

23    brought it up back in my deposition.

24    Q.   And are you confident today your recollection of this

25    e-mail that you have provided to the Court?
```

```
 1    A.  Yes.

 2    Q.  So let's take a quick look at the attachment, which is

 3    DTX-184-3.  What is this?

 4    A.  This was a copy of the pool that I sent so she could

 5    take a look at it.

 6    Q.  Is there anything in this attachment that indicates this

 7    pool was not intended for RFC?

 8    A.  Yeah, in the Notes section under number 1 it says, "All

 9    loans underwritten to Countrywide guidelines."

10    Q.  Anything else?

11    A.  Well, it lacks the column with the Assetwise Direct

12    approval like we would send on the RFC bid tapes.

13    Q.  At this time were you having ongoing discussions with

14    RFC about how RFC could win back product from PRMI?

15    A.  Yeah, that was typical in all my discussions with RFC

16    throughout my time.

17    Q.  Was there ever a time when RFC was able to get product

18    from PRMI that was originated for Countrywide?

19    A.  There was one incident, yes.

20    Q.  What do you recall about that instance?

21    A.  Well, I recall that it was a one-off thing.  Like I

22    mentioned before, our business practice was to originate,

23    close, and sell loans to a specific investor.  This was the

24    first and only instance where we originated loans to one

25    investor guidelines and sold it to another investor.
```

```
1    Q.  And do you recall approximately when this occurred?

2    A.  Late 2005, I believe.

3    Q.  And at that time was RFC still trying to win back

4    business from PRMI?

5    A.  I believe so, yes.

6              MR. CLOUSER:  Your Honor, I'd like to show the

7    witness DTX-227.  This has not yet been admitted.

8              THE COURT:  Okay.

9    BY MR. CLOUSER:

10   Q.  Mr. Crawford, are you at that document?

11   A.  I am.

12   Q.  What is this document?

13   A.  This is an e-mail that I sent to Lori Zaloumis just

14   telling her that it was good to see her yesterday and then

15   eventually asking her if she had interest in putting a bid

16   on a $7 million pool underwritten to Countrywide guidelines.

17   Q.  When is this e-mail dated?

18   A.  This is dated October 20th, 2005.

19   Q.  Do you have any reason to doubt that you sent and

20   received the e-mails in this chain?

21   A.  No.

22             MR. CLOUSER:  Your Honor, PRMI moves DTX-227 into

23   evidence.

24             MS. WINTER:  No objection.

25             THE COURT:  DTX-227 is received into evidence.
```

1     BY MR. CLOUSER:

2     Q.  This e-mail mentions a visit.  Did you regularly meet

3     with RFC sales directors?

4     A.  Yeah, they typically visited our office quite often.

5     Q.  And do you recall meeting with Ms. Zaloumis on

6     October 19th, 2005?

7     A.  I do not.

8     Q.  Do you have any reason to doubt that you met with

9     Ms. Zaloumis on that occasion?

10    A.  No.

11    Q.  In this e-mail you say, "Onto the serious stuff, I'd

12    like to extend an offer to you to see if RFC would like to

13    bid on a $7 million pool underwritten to Countrywide's

14    guidelines."  Do you see that?

15    A.  I do.

16    Q.  And what did you mean by that?

17    A.  Exactly what it says, that we had a pool of loans that

18    were underwritten and closed to Countrywide guidelines and

19    to see if they had any interest in purchasing them.

20    Q.  Earlier I think you mentioned this was a one-off type of

21    deal?

22    A.  Correct.  My recollection, this is the only time we ever

23    originated loans to one investor guidelines and sold them to

24    the other.

25    Q.  And why was that uncommon?

```
 1    A.  Well, it was our normal business practice to originate

 2    loans under an investor's guidelines with the intent of

 3    selling that loan to that investor.

 4    Q.  And looking at this e-mail, Ms. Zaloumis responded to

 5    you.  Do you see that?

 6    A.  I do.  She asked if they were subprime.

 7    Q.  And what did you understand from her response?

 8    A.  That they were interested in looking at this pool.

 9            MR. CLOUSER:  I'd like to show the witness

10    DTX-229.  This has already been admitted.

11            THE COURT:  Okay.

12            THE WITNESS:  Okay.  I have it.

13    BY MR. CLOUSER:

14    Q.  Looking at the bottom e-mail in this chain, is that an

15    e-mail from you to Lori Zaloumis dated October 20th, 2005?

16    A.  It is.

17    Q.  And the timestamp on that e-mail is 5 o'clock p.m.  Do

18    you see that?

19    A.  I do.

20    Q.  Was that e-mail -- so the previous document we looked

21    at, DTX-227, the timestamp is 4:41 p.m.  Did you send this

22    bottom e-mail to Lori Zaloumis about 20 minutes after your

23    prior e-mail?

24    A.  I did.

25    Q.  And looking at the attachment to this document,
```

1    DTX-229-3, what is this?

2    A.  This is an example of the bid tape or the pool of loans

3    with all the loan-level details.

4    Q.  And is this different from the typical bid tapes that

5    you would send to RFC?

6    A.  It is.  This one -- because these loans were originated

7    and closed to Countrywide, you can see in the notes it says

8    that they were all loans -- or guidelines -- I can't read

9    it.  Sorry.  It's a little small.  So it says, "All loans

10   underwritten to Countrywide."

11   Q.  And why did you include that note at the bottom of the

12   tape, "all loans underwritten to Countrywide"?

13   A.  Just so it was clear what type of loans that they were

14   buying.

15   Q.  What do you recall about the communications with RFC on

16   this pool?

17   A.  I don't recall having any more communication.

18   Q.  Did RFC bid on this pool?

19   A.  They did.

20   Q.  And did RFC ultimately -- or did PRMI accept RFC's bid

21   on this pool?

22   A.  We did.

23   Q.  Did anyone at RFC ever say that RFC's Client Guide would

24   apply to these loans?

25            MS. WINTER:  Objection, calls for hearsay.

1           THE COURT:  Hold on just one second.  You can ask

2     the question whether somebody, some executive, somebody with

3     authority at RFC, if he has a specific recollection of a

4     specific conversation.  You have to ask --

5     BY MR. CLOUSER:

6     Q.  Mr. Crawford, do you have any recollection of any

7     executive or anyone with authority from RFC telling you the

8     RFC Client Guide applied to these loans?

9           MS. WINTER:  Objection.  Same objection, Your

10    Honor.

11          THE COURT:  Hold on one second.  What is the

12    objection now?

13          MS. WINTER:  Hearsay with respect to him

14    soliciting communications from RFC without identifying the

15    person, the place, the time.

16          THE COURT:  Okay.  I think he has to lead up to

17    that.  So this is a "yes" or "no" question.  If he says,

18    "Yes," then you need to identify the person, the place, the

19    time, all that.  Okay?

20          MR. CLOUSER:  Your Honor, I'd also note that

21    statements by RFC individuals to PRMI about this pool are

22    offered for the effect on the listener.  It is PRMI's

23    understanding of the nature of the deal that was --

24          THE COURT:  So you don't care whether this

25    evidence is accepted for the truth of the matter asserted?

 1              MR. CLOUSER:  I think it should be for both, but I

 2      would -- I mean --

 3              THE COURT:  I don't understand what -- why it

 4      matters what the effect is on the listener because the

 5      argument is that there should be estoppel.  So the question

 6      is whether there is -- what do we have here?

 7              THE CLERK:  That's the Southern District of New

 8      York.

 9              THE COURT:  Who is that?

10              THE CLERK:  That's Dr. McCrary in the Southern

11      District of New York.

12              THE COURT:  All right.  Let's take a minute here

13      and make sure Dr. McCrary is taken off the screen.  There we

14      go.

15              MR. CLOUSER:  Your Honor, so the question I just

16      asked is a question about the absence of communication,

17      which is non-hearsay.  So I think that may resolve any

18      objection.

19              THE COURT:  The question you just asked is about

20      the absence of communication?  I don't think you said -- all

21      right.  Why don't you ask a different question.

22              MR. CLOUSER:  Sure.

23              THE COURT:  I mean, has he previously testified

24      that he never had any communication?  Is that what you're

25      saying?

1          MR. CLOUSER:  Yes, Your Honor.

2          THE COURT:  So you can say is it true from your

3     prior testimony that.

4     BY MR. CLOUSER:

5     Q.  Mr. Crawford, did you have any communications with RFC

6     regarding whether RFC's Client Guide -- strike that.

7          Mr. Crawford, did Ms. Zaloumis ever say to you

8     that the RFC Client Guide applied to this pool?

9     A.  No.

10    Q.  Did she ever say anything further to you about this pool

11    after RFC bid and PRMI accepted the bid?

12    A.  No.

13    Q.  Did anyone at RFC say that even though these loans were

14    Countrywide loans, RFC was only buying them pursuant to

15    RFC's Client Guide?

16    A.  No.

17    Q.  If someone had told you that, what would your reaction

18    have been?

19          MS. WINTER:  Objection, calls for speculation.

20          THE COURT:  It does.  That's sustained.

21    BY MR. CLOUSER:

22    Q.  We talked earlier about an example of a bulk

23    confirmation letter from RFC on an earlier pool.  Do you

24    recall that?

25    A.  I do.

1    Q.  Did you ever receive a bulk confirmation letter from RFC

2    on this deal?

3    A.  No, we did not.

4    Q.  If someone from RFC told you that it was buying these

5    loans subject to the RFC Client Guide, is that something

6    that would have required your sign-off?

7    A.  That would have required me to go to my boss.

8    Q.  Is that something that would have had to come through

9    you?

10   A.  Yeah, typically being the point person, you know, I

11   would be handling, you know, most of the discussions about

12   this.

13   Q.  Mr. Crawford, what was your understanding of the

14   guidelines applicable to this pool?

15   A.  I don't recall ever having a discussion about that.

16   Q.  When you communicated to RFC, what did you communicate

17   to RFC about the guidelines applicable to this pool?

18   A.  That these loans were originated and underwritten to

19   Countrywide guidelines.

20   Q.  In connection with bulk pools, did RFC sometimes kick

21   certain loans out of a pool that it didn't want to buy?

22   A.  That was typical.  They would -- they would drop a few

23   loans.  They would also pend loans so we could get documents

24   that they needed to get them comfortable and eventually have

25   them purchased.

1    Q.  Do you recall if RFC pended or kicked loans from this

2    Countrywide pool?

3    A.  I believe they did.

4    Q.  Did RFC's decision to pend or kick loans from the

5    Countrywide pool affect your understanding of the applicable

6    guidelines to this pool?

7    A.  No.  Kicking loans out and pending loans is a normal

8    part of the process, but the deal was the deal and it was

9    that we were selling Countrywide loans that were

10   underwritten to Countrywide guidelines.

11   Q.  Was it your understanding that the RFC Client Guide

12   applied in any way to this pool?

13   A.  No.

14   Q.  Did RFC ultimately purchase most of the loans in this

15   Countrywide pool?

16   A.  I believe so, yes.

17   Q.  Could RFC have unwound the deal after agreeing to the

18   bid?

19   A.  I guess that's possible, but I've never seen that

20   happen.  That would have been a huge, huge issue for us.

21   Q.  And in this case, they didn't attempt to unwind the bid,

22   did they?

23   A.  They did not.

24   Q.  At some point you mentioned PRMI closed its wholesale

25   division, correct?

```
 1    A.  Correct.
 2    Q.  Did you decide to remain at PRMI?
 3    A.  I did.
 4    Q.  Why did you decide to remain at PRMI?
 5    A.  I enjoyed the people that I worked with and the company.
 6            MR. CLOUSER:  Thank you.  No further questions,
 7    Mr. Crawford.
 8            THE COURT:  Very good.
 9            Counsel, you may proceed.
10            MS. WINTER:  Good morning, Your Honor.  Randi
11    Winter for Spencer Fane.
12                      CROSS EXAMINATION
13    BY MS. WINTER:
14    Q.  Good morning, Mr. Crawford.  It's nice to see you again.
15    A.  Good morning.
16    Q.  I just want to make a couple things clear for the record
17    and make sure you're settled in there.  Do you have three
18    binders of exhibits from our side that you have access to?
19    A.  I do.
20    Q.  Okay.  And are there a few other people present in the
21    room with you there today?
22    A.  There is.
23    Q.  And is one of them Mr. Armstrong, who is PRMI's vice
24    president and associate general counsel?
25    A.  It is.
```

```
1    Q.  Are there also a couple of representatives -- or at

2    least one representative from our side, the plaintiff's

3    side, Mr. Anthony Quinn?

4    A.  Yes.

5    Q.  All right.  Anyone else in the room?

6    A.  No.

7    Q.  Okay.  Thank you.  I'd like to start just by making sure

8    we're clear on dates of employment for you and your

9    involvement with RFC.

10            So I understand from your direct testimony that

11   you started at PRMI in July 2001?

12   A.  Correct.

13   Q.  And PRMI was already selling loans to RFC by that time,

14   right?

15   A.  Correct, yes.

16   Q.  So you were not involved, for example, in negotiating

17   either of the Client Contracts that PRMI had with RFC, those

18   predated your employment?

19   A.  Correct.

20   Q.  And both of those contracts are contracts you don't have

21   memory of ever reviewing during the course of your

22   employment at PRMI?

23   A.  Correct.

24   Q.  So you have no personal knowledge of PRMI's obligations

25   under either of those contracts?
```

1    A.  That's correct.

2    Q.  And you have no memory of ever discussing either of

3    those contracts with anyone at PRMI or anyone at RFC?

4    A.  I cannot remember a specific time, no.

5    Q.  Now, in your own words, you were not the reps and

6    warrants guy at PRMI; is that right?

7    A.  That's correct.

8    Q.  And when you say you're not the reps and warrants guy,

9    you're referring to the fact that you did not negotiate

10   representations and warranties on behalf of the company?

11   A.  Correct.

12   Q.  Nor did you participate in any sort of contract talks?

13   A.  That's correct.

14   Q.  And you never had a discussion with anyone about what

15   representations and warranties applied to any of the loans

16   that PRMI sold to RFC during the course of your employment,

17   right?

18   A.  That is correct.

19   Q.  And you also, though, have no idea who was the reps and

20   warrants guy at PRMI during the time period it was selling

21   loans to RFC?

22   A.  Well, I understood that it would have been my boss or

23   Dave Zitting, you know, the CEO.

24   Q.  Mr. Crawford, I took your deposition about three weeks

25   ago, right?

1    A.  Yes.

2    Q.  And in front of you there should be a spiral-bound

3    notebook marked PTX-458, which is your deposition

4    transcript.  Do you have that handy?

5    A.  I do.

6    Q.  All right.  If you could turn to the page that has the

7    stamp 458-51 on the bottom.

8    A.  I've got it.

9    Q.  And do you recall that I asked you during your

10   deposition who was the representations and warranties guy at

11   PRMI, right?

12   A.  Yes.

13   Q.  And if you look at the lines on page 199, 17 to 24, I

14   first asked you:

15       "Question.  A couple times today you referenced the fact

16   that you're not the rep and warrant guy at PRMI, right?"

17       And your answer was:  "Correct."

18       And then I asked you:  Back in this timeframe when RFC

19   and PRMI were doing business, who do you view as the reps

20   and warrants guy at PRMI?"

21       And your answer there was:  "I would have no idea."

22           Did I read that correctly?

23   A.  You did.

24   Q.  I'd like to discuss with you now your knowledge of

25   PRMI's use of selling loans to RFC using Assetwise.  Okay?

1    A.  Okay.

2    Q.  While working at PRMI, as you mentioned on direct, you

3    never had any underwriting responsibilities, right?

4    A.  Right.

5    Q.  And you never input information into Assetwise yourself?

6    A.  Correct.

7    Q.  In fact, you never personally used Assetwise at all?

8    A.  Correct.

9    Q.  But despite your lack of direct involvement with

10   Assetwise, you did understand there were certain steps that

11   a PRMI underwriter needed to take before inputting

12   information into Assetwise?

13   A.  Correct.

14   Q.  For example, an underwriter would need to figure out how

15   to calculate a borrower's income because Assetwise wasn't

16   capable of doing that, right?

17   A.  That's right.

18   Q.  And the same is true with respect to assets.  Assetwise

19   was not capable of accurately calculating a borrower's

20   assets on its own?

21   A.  Correct.

22   Q.  And PRMI was responsible for making sure all of the

23   information it put into Assetwise was accurate?

24   A.  Correct.

25   Q.  Because the Assetwise system was relying on that

1    information to be accurate in order to issue a decision on

2    whether RFC was interested in purchasing that loan?

3    A.  Yes.

4    Q.  And having never used Assetwise yourself, though, you're

5    unsure whether PRMI could rely on an Assetwise approval if

6    the information PRMI put into Assetwise was wrong to begin

7    with?

8    A.  I'm sorry.  Can you repeat that?

9    Q.  Sure.  You are unsure, having not used Assetwise

10   yourself, whether PRMI could rely on an Assetwise approval

11   if the information PRMI put into the system was wrong to

12   begin with?

13   A.  If I understand your question, I mean, I do know that if

14   the information was put in accurately, that we could rely on

15   the approval.  But it makes total sense if the information

16   was input incorrectly, that that approval wouldn't apply.

17   Q.  Okay.  Thank you.

18           Now I'd like to talk to you now about your

19   recollection of communications with RFC about Assetwise.

20   All right?

21   A.  Okay.

22   Q.  And you can't identify any specific person from RFC who

23   ever told you that PRMI was required to run all loans

24   through Assetwise?

25   A.  I could not put a specific time, place, or person, no.

1   Q.  You don't recall ever discussing with RFC what

2   representations and warranties applied to the loans that

3   were run through Assetwise?

4   A.  I never had that discussion, no.

5   Q.  You never shared your beliefs regarding what

6   representations and warranties you thought applied to loans

7   run through Assetwise with RFC, did you?

8   A.  No, it was my understanding that anything that was run

9   through Assetwise would apply to RFC's guides.

10  Q.  And you had that understanding based on conservations

11  with PRMI management?

12  A.  Yes.

13  Q.  You're not aware of anyone else at PRMI ever sharing

14  their beliefs with RFC about what reps and warrants applied

15  to Assetwise loans?

16          MR. CLOUSER:  Objection, speculation.

17          THE COURT:  Overruled.

18          THE WITNESS:  Correct.

19  BY MS. WINTER:

20  Q.  Now, no one at RFC ever represented to you that loans

21  approved by Assetwise were subject to a streamlined set of

22  reps and warrants, did they?

23  A.  They did not.

24  Q.  And no one ever stated from RFC that PRMI would be

25  protected if they ran all loans through Assetwise?

 1    A.  No.  It was just my understanding that as long as we ran

 2    it through Assetwise and we input the information correctly,

 3    that we could rely on that Assetwise approval and satisfy

 4    the Client Guide.

 5    Q.  That was your understanding, but you don't have any

 6    specific recollection of any specific person from RFC who

 7    ever made that representation to you, right?

 8    A.  Correct.

 9    Q.  No one from RFC represented to you ever that certain

10    provisions of the Client Guide were inapplicable to

11    Assetwise loans?

12    A.  Not that I recall.

13    Q.  And you're not aware of any documents that exist

14    anywhere where RFC represented to PRMI that certain

15    provisions of the Client Guide would not apply to Assetwise

16    loans?

17    A.  Not that I recall.

18    Q.  And the same is true with respect to the AlterNet Seller

19    Guide.  You're not aware of any documents that exist

20    anywhere where RFC indicated that the AlterNet Seller Guide

21    provisions would not apply to Assetwise loans?

22            MR. CLOUSER:  Objection, foundation.

23            THE COURT:  Wait a minute.  It sounds like she's

24    just reading from his deposition.

25            MR. CLOUSER:  Also, I think there was an

 1    inconsistency in the names of the companies.

 2              THE COURT:  Why don't you ask the question again.

 3              MS. WINTER:  I can rephrase, Your Honor.

 4    BY MR. WINTER:

 5    Q.  Mr. Crawford, are you familiar with the AlterNet Seller

 6    Guide that RFC published for a time period?

 7              MR. CLOUSER:  Objection, foundation.  He wasn't at

 8    the company at the time.

 9              THE COURT:  She's asking whether he was aware.

10    She's trying to lay the foundation.

11              You may proceed.  You may answer the question,

12    Mr. Crawford.

13              THE WITNESS:  I was aware of it.

14    BY MS. WINTER:

15    Q.  And you're not, though, aware of documents that exist

16    where someone from RFC represented the provisions of that

17    AlterNet Seller Guide would not apply to Assetwise loans?

18    A.  I am not aware of.

19    Q.  No one from RFC ever stated to you that an Assetwise

20    approval superseded the AlterNet Guide or the Client Guide?

21    A.  I cannot recall any specific person, no.

22    Q.  Similarly, you don't recall any specific conversations

23    with any specific RFC representatives where they told you to

24    use Assetwise because the Client Guide was outdated?

25    A.  I cannot remember any specific person, place, or time.

1    Q.  Let's shift gears a bit and talk about the RFC Client

2    Guide.

3            Mr. Crawford, was it your understanding that

4    certain RFC loan programs were not available in the paper

5    Client Guide and were only available in Assetwise?

6    A.  That was my understanding.

7    Q.  And which ones do you recall only being available in

8    Assetwise but not the Client Guide?

9    A.  Oh, I couldn't remember.  It's been too long.  Sorry.

10   Q.  That's okay.  Not expecting you to.

11           Now, I know you were not present for his

12   testimony, but earlier in the trial Mr. Zitting testified

13   that RFC's Home Solutions product was not published in the

14   RFC Guide.  Does that refresh your recollection at all

15   personally as to whether you remember that one being in the

16   Guide?

17   A.  It does not.

18   Q.  How about the Payment Option ARM program, do you recall

19   one way or the other whether that one was in the Guide?

20   A.  I do not recall.

21   Q.  In your third volume you have handy there, there's a

22   previously admitted exhibit, PTX-1052.

23   A.  Okay.

24   Q.  Let me know when you've gotten to it.

25   A.  I've got it.

1    Q.  Okay.  And you're at tab 1052?  It's probably the very

2    last one in the binder.

3    A.  Okay.  I've got it.

4    Q.  Do you recognize this Exhibit PTX-1052 as an example of

5    an RFC Client Guide?

6    A.  I do.

7    Q.  If I could have you turn to page 1052-35.

8    A.  Okay.

9    Q.  Do you see that this section is titled 2A,

10   Representations, Warranties, and Covenants?

11   A.  I see that.

12   Q.  And am I correct that you have no specific recollection

13   of ever discussing this provision of the Client Guide with

14   anyone at RFC or PRMI?

15   A.  Correct.

16   Q.  And you do not personally recall ever considering

17   whether any of the representations and warranties outlined

18   in this chapter of the Client Guide apply to the loans that

19   PRMI sold to RFC?

20   A.  Correct.  I've never looked at this.

21   Q.  Now, I know you've testified you were not the reps and

22   warrants guy at PRMI, but you were nevertheless aware during

23   this time period that there were certain representations and

24   warranties that were standard in the industry, right?

25   A.  Correct.

1    Q.  For example, a prohibition on fraud and

2    misrepresentation is an industry standard rep and warrant

3    that all investors required as a general business practice,

4    right?

5    A.  Yes.

6              MR. CLOUSER:  Objection, foundation.

7              THE COURT:  Overruled.

8    BY MS. WINTER:

9    Q.  And a prohibition on fraud and misrep in origination was

10   an industry standard misrep for both loans submitted through

11   an automated underwriting system like Assetwise as well as

12   loans submitted outside an automated underwriting system,

13   right?

14   A.  Right.

15   Q.  If you could turn to page 1052-49, at the top of that

16   page there's a subdivision KK, No Fraud or

17   Misrepresentation.  Are you with me there?

18   A.  I am.

19   Q.  And is this an example of an investor requiring a

20   representation and warranty that there was no fraud or

21   misrep in the origination of a loan?

22   A.  I don't know because I never looked at this.

23   Q.  All right.  You've never -- you don't recall any

24   investor ever being willing to buy loans without an

25   assurance from PRMI that there was no fraud or misrep in the

1    origination of the loan, right?

2    A.  True, yes.

3    Q.  And you can't think of any set of investor guidelines

4    that would permit misrepresentation in the origination of a

5    loan?

6    A.  No.

7    Q.  If you could turn to page 1052-325.

8    A.  Okay.

9    Q.  This chapter is titled Payment Option Loan Program.  Do

10   you see that there at the top?

11   A.  I do.

12   Q.  Does this refresh your recollection as to whether the

13   Payment Option Loan Program was published in the RFC Client

14   Guide?

15   A.  It does not.

16   Q.  We'll do the same thing quickly with page 347.  If you

17   could turn to that page.

18   A.  I'm there.

19   Q.  And does this chapter titled Home Solution Loan Program

20   refresh your recollection as to whether that program was

21   published in the printed RFC Client Guide?

22   A.  It does not.

23   Q.  If you could look in the same binder you're in now,

24   Volume 3, at PTX-361, which is already admitted.

25   A.  Okay.

1                    (Pause in proceedings.)

2                    THE WITNESS:  Okay.  Sorry.  I think I'm there

3     now.

4     BY MS. WINTER:

5     Q.  All right.  Does the first page of this Exhibit at 361

6     reflect an e-mail to you and several other individuals from

7     an RFC sales associate Lora Dunlap?

8     A.  Yes.

9     Q.  The subject line of this e-mail was "GMAC-RFC Client

10    Guide Update"?

11    A.  Correct.

12    Q.  And one of the other individuals she copied on this

13    e-mail was your boss, Scott Peterson?

14    A.  Correct.

15    Q.  And you agree that in this e-mail RFC was transmitting

16    to you and Mr. Peterson updates to the RFC Client Guide?

17    A.  Correct.

18    Q.  It also indicates here that, if you wanted, you could

19    access the Client Guide and these updates through RFC's

20    Internet portal?

21    A.  Yes, correct.

22    Q.  But as I understand it, you don't recall whether, in

23    fact, you ever actually did access RFC's Client Guide

24    online?

25    A.  No, I do remember.  In my job duties I didn't need to

1   access it, so, yeah, I never looked at the Client Guide.

2   Q.  If you could turn to page 361-48.

3   A.  Okay.

4   Q.  This chapter is titled 4(a) Assetwise.  Do you see that

5   at the top?

6   A.  I do.

7   Q.  And the second section is titled Client Responsibilities

8   and Exclusions?

9   A.  I see that.

10  Q.  The first sentence under that section states, "Approved

11  GMAC-RFC clients are still bound by the representations and

12  warranties as detailed in this Client Guide."  Correct?

13  A.  I see that, yes.

14  Q.  And so at least as of March 9th, 2004, when RFC sent you

15  the e-mail attaching this chapter of the Guide, RFC was

16  communicating its expectation that PRMI was still bound by

17  the reps and warrants in the Client Guide for Assetwise

18  loans, right?

19              MR. CLOUSER:  Objection, Your Honor.

20              THE COURT:  What's the basis of the objection?

21              MR. CLOUSER:  Speculation as to what RFC was

22  doing.

23              THE COURT:  Overruled.

24              THE WITNESS:  Well, not ever accessing the Client

25  Guide, you know, I didn't pay attention to that.  It was

1   always my understanding that if we had Assetwise approval,

2   it met the client's requirements.

3   BY MS. WINTER:

4   Q.  So having not accessed the Client Guide, you didn't pay

5   attention to this communication from RFC in March of 2004

6   telling you that the Client Guide's reps and warrants still

7   applied to Assetwise loans?

8   A.  I did not look at that, no.

9   Q.  The next paragraph of this section A-401 states,

10  "Additionally use of Assetwise does not relieve clients of

11  loan eligibility and underwriting requirements set forth in

12  this Client Guide."  Right?

13  A.  Yes.

14  Q.  And you never had any discussions with anyone at PRMI

15  about whether that language was inconsistent with your

16  understanding of the parties' business relationship, right?

17  A.  Correct.  It was always my understanding that we could

18  rely on the Assetwise Direct certificate.

19  Q.  And for that same reason, you never had any discussions

20  with RFC indicating you believed this language was

21  inconsistent with your business understanding?

22  A.  Not specifically to this.

23  Q.  If you could turn to the next page, it's 361-49.

24  A.  Okay.

25  Q.  You'll see under section 402 here, subdivision A2 has a

1    statement that reads, "The loan must conform to program

2    criteria underwriting and loan eligibility requirements.

3    Assetwise provides program eligibility grading and slotting.

4    Clients are responsible to ensure the loan conforms to

5    GMAC-RFC Client Guides."  Right?

6    A.  I do see that.

7    Q.  So here on a March 2004 e-mail RFC is again conveying to

8    PRMI that while Assetwise does program eligibility, grading

9    and slotting, like you mentioned in your testimony earlier

10   today, PRMI nevertheless remained responsible to make sure

11   the loan conformed with RFC's guidelines?

12   A.  It was my understanding that we did so by having an

13   Assetwise Direct approval.

14   Q.  You never discussed this provision with anyone at RFC or

15   PRMI?

16   A.  Not specifically, no.

17   Q.  You can put that one away.  Thank you, Mr. Crawford.

18          I'd like to talk to you next about the bulk

19   process of selling loans to RFC, which you covered some in

20   your direct testimony.

21   A.  Okay.

22   Q.  I just want to make sure I have this understanding

23   correct.  So from July 2001, when you started, until the

24   wholesale division closed in 2006, it sold subprime loans to

25   RFC?

1    A.  Correct.

2    Q.  And as you mentioned, PRMI had a separate retail

3    provision -- or division, excuse me, that sold prime loans.

4    You don't recall the retail division actually selling loans

5    to RFC in that time period?

6              MR. CLOUSER:  Objection, foundation.

7              THE COURT:  Well, I think the question is whether

8    he recollects.  You may answer the question.

9              THE WITNESS:  I don't recall.

10   BY MS. WINTER:

11   Q.  And as you mentioned on direct, one of your primary

12   responsibilities in secondary marketing in the wholesale

13   division was to take loans that were already closed and

14   funded, package them up and sell them to an investor like

15   RFC in bulk?

16   A.  Correct.

17   Q.  And you oversaw two secondary marketing assistants, A.J.

18   Swope and Rob Plehn, whose primary functions were to make

19   sure the loans were shipped and delivered to investors and

20   to follow up with the investors to resolve any pend items?

21   A.  Yes, that's correct.

22   Q.  And so on direct you looked at PTX-025, which was an

23   example of one of your secondary marketing assistants

24   sending a bid tape offering a pool of loans to RFC, right?

25   A.  Right.

 1    Q.  And then you said if RFC was interested in bidding on

 2    the pool of loans, they would send back an e-mail attaching

 3    a bulk confirmation letter?

 4    A.  Well, they would offer the bid and if we accepted it,

 5    then they would send the bulk confirmation letter.

 6    Q.  And you looked at one of those on your direct at

 7    PTX-026, right?

 8    A.  Right.

 9    Q.  Okay.  Now, I apologize because I think this is going to

10    be a little bit tedious, but we can probably do it

11    expeditiously.  I just want to have you confirm a couple

12    more examples of those bid tapes and bulk confirmation

13    letter transactions so that we can admit them into evidence.

14    All right?

15    A.  Okay.

16    Q.  So the first one I'll have you turn to is PTX-038, which

17    is in Volume 3.

18    A.  I'm sorry.  PTX what?

19    Q.  038.

20    A.  This starts at 39.

21            (Discussion off the record.)

22    A.  Give me a second.  They make these too hard.  What were

23    you saying about expediting this?  Okay.  I believe I'm

24    there.

25    Q.  All right.  When you have a chance to review it, could

1    you confirm that PTX-038 is another example of one of your

2    secondary marketing assistants offering a pool of loans to

3    RFC by e-mail?

4    A.  It is, yes.

5    Q.  And the subject line there says, "Forward PRMI bulk

6    number 51."  Am I correct that the number 51 reference is

7    reflecting the fact that this is the 51st pool of loans that

8    PRMI has offered to RFC?

9    A.  That would be correct, yes.

10   Q.  And, again, like the one you reviewed on your direct at

11   PTX-025, the attachment to that e-mail is the bid tape with

12   all the loan characteristics for the loans in that pool?

13   A.  Correct.

14   Q.  And on direct you alluded to the fact that there was a

15   column typically on these bid tapes.  In this instance it's

16   the last column on the final page of the spreadsheet

17   indicating whether or not PRMI had Assetwise approvals for

18   the loans in the pool?

19   A.  Yes, that's correct.

20   Q.  And if it indicates "yes" for each loan, that's

21   confirming there was, in fact, an Assetwise approval?

22   A.  Yes, correct.

23   Q.  If you could turn to the next Exhibit, PTX-39.

24          THE COURT:  Do you want to seek to admit the

25   exhibit?

1              MS. WINTER:  Yes, Your Honor, I was going to do it

2      in combination with the next one since they are related, but

3      I certainly can.

4              THE COURT:  I think we better do them one at a

5      time.

6              MS. WINTER:  Your Honor, plaintiff offers PTX-38

7      into evidence.

8              THE COURT:  Any objection?

9              MR. CLOUSER:  No objection, Your Honor.

10             THE COURT:  PTX-38 is received into evidence.

11     BY MS. WINTER:

12     Q.  Mr. Crawford, are you ready with me at PTX-39?

13     A.  I am.

14     Q.  And is this another example of RFC transmitting back a

15     bulk confirmation letter providing purchase details for its

16     offer to buy this pool of loans?

17     A.  I believe so, yeah.

18     Q.  And if you look at the bulk confirmation letter itself,

19     which is at 39-2, it similarly has the same language that

20     Mr. Clouser asked you about on direct, reflecting the fact

21     that RFC was agreeing to purchase this pool provided they

22     meet the requirements of the GMAC-RFC Client Guide and are

23     of investment quality, right?

24     A.  Right.

25             MS. WINTER:  Your Honor, plaintiff moves PTX-39

1    into evidence.

2           THE COURT:  Any objection?

3           MR. CLOUSER:  No objection, Your Honor.

4           THE COURT:  PTX-39 is received into evidence.

5    BY MS. WINTER:

6    Q.  Mr. Crawford, we're going to do this two more times.

7           MS. WINTER:  And, in fact, if it's fine with the

8    Court and opposing counsel, I could just read the numbers of

9    the exhibits and have him confirm they are bid tapes and

10   confirmation letters before offering them.

11          THE COURT:  Sure.

12          MR. CLOUSER:  Okay.

13   BY MS. WINTER:

14   Q.  So the ones I'll have you look at, Mr. Crawford, are

15   PTX-41 with its related response at PTX-42.

16   A.  I'm sorry.  The second one was PTX?

17   Q.  42.

18   A.  Not 042?

19   Q.  Yeah, it might have a zero in front of it.

20   A.  Sorry.  I have it now.  Okay.

21   Q.  Are PTX-41 and PTX-42 another instance where PRMI

22   offered a pool of loans to RFC and then RFC confirmed its

23   interest in purchasing vis-a-vis a bulk confirmation letter?

24   A.  Yeah, I believe so.

25   Q.  And one last time I'll have you do the same thing with

1    respect to the exhibits at PTX-29, 029, and PTX-030.

2    A.  Yeah.

3    Q.  Again, are those instances where PRMI is offering a bulk

4    pool and RFC is demonstrating its interest to purchase with

5    a bulk confirmation letter?

6    A.  Yes.

7              MS. WINTER:  Your Honor, plaintiff would move into

8    evidence PTX-029, PTX-030, PTX-041, and PTX-042.

9              THE COURT:  Any objection?

10             MR. CLOUSER:  No objection, Your Honor.

11             THE COURT:  PTX-029, PTX-030, PTX-041, and PTX-042

12   are received into evidence.

13   BY MS. WINTER:

14   Q.  Now, Mr. Crawford, we've looked at some of these

15   transactions where PRMI offered a bid tape, RFC sent back a

16   bulk confirmation letter.  Do you recall there coming a

17   point in time in the parties' relationship in the 2004

18   timeframe when RFC stopped sending bulk confirmation letters

19   back when it accepted loans in a bulk pool?

20   A.  I don't recall that ever happening, no.

21   Q.  Do you recall one way or the other whether it did or

22   didn't happen?

23   A.  No, I believe we got confirmation letters on all their

24   bulk pools.

25   Q.  Have you -- well, strike that.

1                  Do you have any memory as you sit here today in

2       court ever actually reviewing a bulk confirmation letter

3       received from RFC in or after 2004?

4       A.  I cannot remember a specific instance, no.

5       Q.  But PRMI did still sell bulk pools of loans to RFC in

6       2004 and 2005?

7       A.  Correct.

8                  MS. WINTER:  Your Honor, I'm moving on to another

9       topic.  I'm happy to continue, but if it's appropriate time

10      for a morning break --

11                 THE COURT:  Okay.  Just for the sake of the folks

12      in New York, about how much time do you predict you have

13      left?

14                 MS. WINTER:  Maybe 15 minutes.

15                 THE COURT:  All right.  Okay.  We will take a

16      15-minute break.  It's about 10:40.  We will resume in

17      15 minutes.  I would ask that the New York folks be updated

18      on our schedule.  Court is briefly adjourned.

19          (Recess taken at 10:42 a.m.)

20                          *    *    *    *    *

21          (10:59 a.m.)

22                            **IN OPEN COURT**

23                 THE COURT:  Ms. Winter, you may proceed.

24                 MS. WINTER:  Thank you, Your Honor.

25      BY MS. WINTER:

1    Q.  Mr. Crawford, I'd like to talk to you about the pool of

2    Countrywide loans sold to RFC now.  All right?

3    A.  Okay.

4    Q.  As mentioned on your direct today, as of the date of

5    your deposition about three weeks ago your recollection was

6    that you sold that Countrywide pool to RFC Sales Director

7    Renee Bangerter?

8    A.  I believe it was sold to Lori Zaloumis.

9    Q.  But your recall three weeks ago was that you had sold it

10   to Ms. Bangerter?

11   A.  I did mix that up back then.

12   Q.  If you would look in Volume 1 in front of you, we're

13   going to take a look again at DTX-184, which you discussed

14   with Mr. Clouser.

15   A.  Okay.  I got it.

16   Q.  Okay.  So this is the e-mail where you at least at the

17   time of your deposition thought you were offering a

18   Countrywide pool to RFC for sale through Ms. Bangerter,

19   right?

20   A.  This is the one I mixed up, yeah.

21   Q.  And you have confirmed today that testimony was

22   inaccurate?

23   A.  Yes.

24   Q.  The reason your testimony was inaccurate is because you

25   can't remember any of the specifics of the transaction where

```
1    RFC purchased a pool of loans underwritten to Countrywide
2    guidelines, right?
3    A.  Repeat that.  I'm sorry.  I missed the question.
4    Q.  You can't remember any of the specifics of the
5    transaction where RFC purchased a pool of loans underwritten
6    to Countrywide guidelines?
7    A.  No, I can remember some of the things.
8    Q.  What you can remember is offering the pool and RFC
9    eventually purchasing it?
10   A.  In addition, I believe that there were discussions about
11   loans that were pended and kicked out of the pool.
12   Q.  And you can't remember anything beyond that?
13   A.  Not that I recall.
14   Q.  On direct you testified that you are confident in your
15   recollection of this e-mail that you've provided to the
16   Court today, but the only thing you really remember about it
17   is that you sent it because RFC was looking to gain back
18   business?
19   A.  Correct.
20   Q.  And besides Ms. Bangerter, you do not have any specific
21   recollection of any conversations you had with any RFC
22   employees discussing RFC's interest in buying loans
23   underwritten to Countrywide guidelines?
24   A.  Just the one instance where we sold them the loans.
25   Q.  And by that you're referring to the actual e-mail where
```

1    you asked Ms. Zaloumis whether she was interested in having

2    RFC bid on a pool of Countrywide loans?

3    A.  Correct.

4    Q.  On direct you testified that Ms. Zaloumis never said

5    anything further to you about that pool of loans beyond what

6    was reflected in the e-mail.  Do I have your testimony

7    accurate?

8    A.  Yes, you do.

9    Q.  But in truth, you don't recall one way or the other

10   whether you had additional conversations with Ms. Zaloumis

11   beyond what's reflected in the e-mails?

12   A.  That would be correct.

13   Q.  And after you offered the bulk pool to RFC, you turned

14   the bulk sale process over to your assistant, Mr. Plehn?

15   A.  Correct.

16   Q.  And you don't recall playing any further role in the

17   process of RFC buying those loans from that point forward?

18   A.  Correct.

19   Q.  However, you do recall Mr. Plehn making you aware of a

20   concern he had that RFC was kicking loans out of the pool

21   during its due diligence review for not complying with RFC's

22   guidelines?

23   A.  Correct, I remember that.

24   Q.  In the third volume I'm going to have you turn to

25   PTX-351, and this is an exhibit that's not yet admitted.

CASE 0:13-cv-03451-SRN-HB   Doc. 5490   Filed 03/16/20   Page 92 of 287

```
 1    A.   Okay.  I'm there.  Sorry.  What was the number?

 2    Q.   351.  This is an e-mail from Tina Diehl at RFC to

 3    another RFC employee, Sheila Lichty, copying Ms. Zaloumis,

 4    dated November 3rd, 2005, right?

 5    A.   Correct.

 6    Q.   The subject line is "PRMI"?

 7    A.   Correct.

 8    Q.   And without reading it aloud, could you confirm whether

 9    the first paragraph of this e-mail is consistent with your

10    recollection of Mr. Plehn's concern shared with you?

11    A.   It does.

12    Q.   And in her e-mail here Ms. Diehl then goes on to quote

13    an actual e-mail sent to her by Mr. Plehn, right?

14              MR. CLOUSER:  Objection, Your Honor.

15              THE COURT:  I'm sorry.  Hold on.  What's the

16    objection?

17              MR. CLOUSER:  I thought she was asking to read it.

18              THE COURT:  Are you withdrawing the objection?

19              MR. CLOUSER:  I'm withdrawing the objection.

20              THE COURT:  Very good.

21    BY MS. WINTER:

22    Q.   Mr. Crawford, in her e-mail here Ms. Diehl quotes an

23    e-mail sent to her by Mr. Plehn, right?

24    A.   It looks like that way, yes.

25    Q.   And at the time you sent this e-mail Mr. Plehn was a
```

1     PRMI employee?

2     A.  I believe so, yes.

3              MR. CLOUSER:  Objection.  This is double hearsay.

4     So the e-mail that is purporting to be quoted is in a layer

5     of hearsay.

6              THE COURT:  All right.  Have you offered the

7     e-mail yet?

8              MS. WINTER:  I have not, Your Honor.

9              THE COURT:  Let's do this in order.  Are you going

10    to offer the e-mail or do you have more questions to ask of

11    the witness first?

12             MS. WINTER:  I did want to lay some more

13    foundation for the exhibit first.

14             THE COURT:  Why don't you do that.

15    BY MS. WINTER:

16    Q.  So at the time you sent the e-mail that's quoted here,

17    Mr. Plehn was a PRMI employee, right?

18    A.  I'm sorry.  Did you say when I sent the e-mail?

19    Q.  No.  When Mr. Plehn sent the e-mail that Ms. Diehl is

20    quoting, he was a PRMI employee?

21    A.  Oh, I believe so, yes.

22    Q.  And the concerns he raised here were within the scope of

23    his PRMI employment, right?

24    A.  Correct.

25    Q.  And this e-mail refreshes your recollection regarding

1    Mr. Plehn's concerns about the Countrywide pool?

2    A.  Yes.

3    Q.  And if you turn to the attachment, it reflects the

4    reasons RFC had pended and declined certain loans in the

5    pool?

6              MR. CLOUSER:  Objection, foundation.

7              THE COURT:  Well, I think this is a problem.  I

8    mean, I think you can use this e-mail to refresh his

9    recollection.  But he wasn't a recipient of this e-mail and

10   so I'm not sure --

11             MS. WINTER:  Sure, Your Honor.

12             THE COURT:  -- he has a foundation to render

13   the -- to answer the question you asked.

14             MS. WINTER:  Okay.  May I attempt to establish the

15   exception to the hearsay rule that I think might apply to at

16   least parts of the e-mail?

17             THE COURT:  Well, first of all, you'd have to

18   offer it.  But the real question is do you first want to

19   explore his understanding of Mr. Plehn's -- is that how you

20   say it?  -- Mr. Plehn's concerns?

21             MS. WINTER:  Sure.

22             THE COURT:  Because he can use the e-mail to

23   refresh his recollection even if the e-mail doesn't become

24   an exhibit.

25             MS. WINTER:  Thank you, Your Honor.

```
 1    BY MS. WINTER:

 2    Q.  Mr. Crawford, Mr. Plehn shared with you concerns that

 3    RFC was declining loans in the pool because they did not

 4    meet RFC guidelines as opposed to Countrywide guidelines,

 5    right?

 6    A.  That's what I recall.

 7    Q.  And that's consistent with what's reflected in this

 8    e-mail?

 9    A.  I believe so, yes.

10    Q.  And you testified on direct examination that it was a

11    routine part of the process for RFC to pend loans when

12    buying them in bulk from PRMI and PRMI would then respond

13    and try to address the pend concerns, correct?

14    A.  Correct.

15    Q.  And is the attachment to this e-mail consistent with

16    that practice?

17    A.  Correct.

18            MS. WINTER:  Your Honor, plaintiff offers PTX-351

19    into evidence.

20            THE COURT:  Why don't you explain how you get

21    around hearsay.

22            MS. WINTER:  Sure.  So the first paragraph of the

23    e-mail, Your Honor, is capturing Mr. Plehn's state of mind

24    regarding his concerns.  And it's also plain from the

25    contents of the e-mail itself that it reflect Ms. Diehl's
```

1    present sense impression of an event or condition made as

2    she was perceiving it.  So that part of the e-mail would

3    fall under 803.1 and 803.3.

4         The second part, which is the quote of Mr. Plehn's

5    e-mail itself, is not hearsay because Mr. Crawford has

6    confirmed that Mr. Plehn had these concerns and he had these

7    concerns in the scope of his agency as a PRMI employee.

8         And, finally, Mr. Crawford has laid foundation

9    establishing that the attachment reflecting the status of

10   loans that were pended and declined was a standard part of

11   the parties' bulk process and therefore falls under the

12   business record exception.

13        THE COURT:  All right.  Response, Mr. Clouser?

14        MR. CLOUSER:  Your Honor, this is -- first, the

15   layer of hearsay that is Ms. Diehl's statements, counsel

16   said it fell under the present sense impression.  There's no

17   indication in this e-mail that she's recording things that

18   she's observing as she is recording them, so it should not

19   fall under that exception.  And so that -- they have not

20   established that this meets the second level of hearsay.

21        Additionally, this is an RFC document, so

22   Mr. Crawford cannot lay business records foundation for RFC.

23        THE COURT:  All right.  I think I agree with that.

24   The objection is sustained.

25   BY MS. WINTER:

1    Q.  Turning to your testimony about the Countrywide pool

2    from your -- questions from Mr. Clouser, Mr. Crawford, you

3    never discussed with RFC the representations and warranties

4    that would apply to the Countrywide pool, right?

5    A.  That is correct.

6    Q.  And you're not aware of anyone else at PRMI, including

7    Mr. Plehn, for example, discussing the applicable

8    representations and warranties with RFC either, right?

9    A.  Correct.

10   Q.  And you never went back and consulted PRMI's contracts

11   with RFC to consider what they might say with respect to

12   what guidelines would govern loans that RFC was buying from

13   PRMI at that time?

14   A.  I never had a discussion.

15   Q.  You recall PRMI offering at least one additional

16   Countrywide pool to RFC after this one, right?

17   A.  I believe so.

18   Q.  And again if you could turn in your binder to an exhibit

19   that's not yet admitted, PTX-357.

20   A.  Okay.  I'm there.

21   Q.  The first e-mail at the bottom of the first page is from

22   Mr. Plehn to several RFC employees and you're copied on it,

23   right?

24   A.  Yes, correct.

25   Q.  And the subject line is "Another Pool for Bid"?

```
1     A.  Correct.
2     Q.  Here Mr. Plehn is conveying PRMI's offer to RFC to bid
3     on another Countrywide pool of loans, right?
4     A.  Correct.
5     Q.  And he writes in here --
6              MS. WINTER:  Actually, Your Honor, first I would
7     offer the exhibit into evidence.
8              MR. CLOUSER:  Objection, Your Honor, to hearsay
9     for the top portion of the e-mail.
10             THE COURT:  Which top portion?
11             MR. CLOUSER:  So everything above that bottom-most
12    e-mail is hearsay and inadmissible.
13             MS. WINTER:  Your Honor, the rest of the e-mail is
14    not being offered for the truth of the matter asserted.
15             THE COURT:  It's not being?
16             MS. WINTER:  No.  It's truly just this bottom one.
17             THE COURT:  Well, with that understanding --
18             MR. CLOUSER:  Understood.  No objection to the
19    bottom-most e-mail.
20             THE COURT:  The lowest e-mail or the first e-mail
21    from Mr. Plehn, that portion of PTX-357 is received in
22    evidence.  It does have an attachment to it.  I presume
23    there's no objection to that?
24             MR. CLOUSER:  No objection, Your Honor.
25             THE COURT:  So that and the attachment are
```

1    received in evidence.

2    BY MS. WINTER:

3    Q.  In his e-mail at the bottom of the first page Mr. Plehn

4    indicates to RFC, "These are Countrywide loans and they have

5    been underwritten to their guides.  Let me know if you are

6    able to make exceptions on some of these loans that may not

7    fit exactly with your criteria."  Did I read that correctly?

8    A.  Yeah, I believe so.

9    Q.  And you have no basis to dispute that Mr. Plehn had

10   authority in his role as secondary marketing assistant to

11   offer this pool to RFC under these circumstances?

12   A.  Will you repeat that for me one more time?

13   Q.  Mr. Plehn had authority in his role as a secondary

14   marketing assistant to offer this pool to RFC under these

15   circumstances, right?

16   A.  Under what circumstances?

17   Q.  That they had been underwritten to Countrywide

18   guidelines and he's asking RFC if they would be able to make

19   some exceptions for loans that did not meet RFC criteria.

20   A.  So are you asking me if he had the authority to make

21   exceptions?  I guess I don't understand the question.

22   Q.  Sure.  I'm asking you if he had authority to offer the

23   pool to RFC under the circumstances in that he understood

24   he'd have to get exceptions from RFC for loans that did not

25   meet RFC's criteria.

1    A.  He had the authority to offer the pool.  The whole

2    exceptions, I have no idea about that, though.

3    Q.  Do you recall --

4    A.  I don't know --

5    Q.  I'm sorry.  I didn't mean to interrupt you.

6    A.  No, I was just going to say I don't recall exceptions

7    being made or, if you look at it on this side, they are

8    Countrywide loans underwritten to Countrywide guidelines.

9    They clearly aren't going to fit RFC guidelines.  So if they

10   are going to purchase that, it would be our expectation that

11   they are purchasing that with the knowledge that they were

12   underwritten to a competing investor's guidelines.

13          So in that sense, they internally may have to make

14   exceptions, but Robb offering the pool, it was clearly

15   offered as a Countrywide pool with Countrywide loans

16   underwritten to Countrywide guidelines.  I hope all that

17   rambling makes sense.

18   Q.  It did.  Thank you.

19          And, similarly, when you were on direct discussing

20   the pool that RFC actually bought, you indicated that it was

21   your recollection that they ended up buying fewer loans in

22   the pool than had been originally offered, right?

23   A.  Yeah, it was typical that they would kick out some loans

24   and pend loans, that's true.

25   Q.  And they did so in that instance?

```
 1    A.  Yes.
 2    Q.  On direct you testified about a packet of RFC invoices,
 3    which are at DTX-257 in your first volume.
 4    A.  I'm sorry.  DTX-357?
 5    Q.  257.
 6    A.  Okay.  I'm there.
 7    Q.  And you explained that these e-mails, some of them
 8    reflect your approval for PRMI to pay RFC a charge for the
 9    use of Assetwise.  Am I right?
10    A.  There weren't e-mails.  They are invoices.
11    Q.  I'm sorry.  Yes, invoices.  You were approving PRMI to
12    pay RFC invoices reflecting Assetwise fees?
13    A.  Correct.
14    Q.  And these invoices also reflect other charges from RFC
15    to PRMI for various premiums and fees?
16    A.  Correct.
17    Q.  You indicated the handwriting, for example, on the top
18    of the first few pages, that's your handwriting?
19    A.  It is, yes.
20    Q.  So, for example, that first page it's got a checkmark
21    and I think it reads, "Okay per Jim."  Is that you
22    authorizing payment for the invoice?
23    A.  Yes, it is.
24    Q.  This first page, for example, reflects a different fee.
25    It's relating to a price premium recapture fee relating to a
```

1    loan.

2    A.  Okay.

3    Q.  Is that your understanding?

4    A.  It looks that way, yeah.

5    Q.  And you are aware that the loan on this invoice is from

6    the Countrywide pool that we have been discussing today that

7    RFC purchased from PRMI?

8    A.  You did bring that up at my deposition, yes.

9    Q.  And sitting here today three weeks later, you have no

10   basis to dispute that, do you?

11   A.  No.

12              MR. CLOUSER:  Objection, foundation.

13              THE COURT:  Overruled.

14   BY MS. WINTER:

15   Q.  And the reason you're able to confirm today that this is

16   a Countrywide pool loan is because the borrower and loan

17   information reflected in the invoice is also reflected in

18   the bid tape that you reviewed with Mr. Clouser earlier

19   today, for example, at DTX-229?

20   A.  Correct.

21   Q.  And am I correct that this price premium recapture

22   reflects an instance when a loan was paid off shortly after

23   the loan was purchased by RFC, so PRMI was paying back that

24   premium to RFC for the loan?

25   A.  That is my recollection, yes.

1    Q.  And if you could turn then to Volume 3, back to the

2    Client Guide exhibit at PTX-1052.

3    A.  1052.  Okay.  There.

4    Q.  And when you're there, page 65.

5    A.  Okay.

6    Q.  This chapter is titled A216, Premium Recapture, right?

7    A.  Yes.

8    Q.  And on the next page, number 66, subdivision B has a

9    provision stating, "90-day recapture period for all other

10   loans," and it reads, "If any loan other than a bulk

11   AlterNet or credit GAAP loan or subset thereof pays off or

12   is liquidated within 90 days from its funding date, then

13   client must repay the entire original premium GMAC-RFC paid

14   for the loan."

15        That description is consistent with your

16   understanding of the premium price recapture fee reflected

17   on the invoice we just reviewed at DTX-257-1?

18   A.  Are you asking if that loan falls within this particular

19   90-day period?  Is that --

20   Q.  Well, if the description of this fee and when it applies

21   that's outlined here in the Client Guide, if that's

22   consistent with your understanding of the premium fee

23   reflected on the invoice that you approved for payment on

24   the Countrywide loan.

25   A.  Well, like I said before, I never opened the Client

1    Guide, so I can't tell.  But I do clearly know that there

2    was a recapture policy that RFC had.

3    Q.  And you agreed to follow that policy and pay that fee

4    with respect to this particular loan reflected at 257-1 from

5    the Countrywide pool?

6    A.  I have no idea why I paid that invoice.  There's too

7    many inconsistencies.  There's some for longer than that

8    that were paid.  So my answer is I don't know why I paid

9    that.

10   Q.  To be fair, Mr. Crawford, I didn't ask you why you paid

11   it.  I just asked for confirmation that you did indeed

12   approve that invoice for payment with respect to the fee

13   charged for the Countrywide loan.  Is that right?

14   A.  I did approve that, yes.

15   Q.  And if you could then turn to page 570 in the same

16   exhibit of the Client Guide.

17   A.  I'm there.

18   Q.  This page has a definition for a servicing release

19   premium, which is a one-time premium paid to the client for

20   the servicing rights on a mortgage loan, correct?

21   A.  If you say so.  I've never looked at it.

22   Q.  But that description of that servicing release premium

23   is consistent with the premium charged in the second invoice

24   at 257-2, which also related to Countrywide pool loans,

25   right?

```
 1                    MR. CLOUSER:  Objection, foundation.
 2                    THE COURT:  Well, let's see if he knows.
 3      Overruled.
 4                    THE WITNESS:  I don't understand the question.
 5      BY MS. WINTER:
 6      Q.  Well, if you need to go back and refer, take a look
 7      again at the invoices at DTX-257.
 8      A.  Okay.  I got it.
 9      Q.  And specifically the invoice at 257-2 reflects a
10      servicing release premium that was charged by RFC to PRMI
11      for two loans, correct?
12      A.  Correct.
13      Q.  And you are aware that those are both loans from the
14      Countrywide pool that RFC purchased, right?
15      A.  Yes, I believe so, yes.
16      Q.  And, again, this is an invoice you approved for payment?
17      A.  Correct.
18      Q.  And the servicing release premium fee reflected on this
19      invoice is consistent with the description of that premium
20      we just reviewed in the RFC Client Guide?
21      A.  But, like I said, you know, I didn't review the Client
22      Guide and I don't know the legalities of it, so I don't --
23      if you're asking was it paid off before 90 days, I would say
24      yes.
25      Q.  I'm just asking if the definition in the Client Guide is
```

1    consistent with your understanding of what the servicing

2    release premium was back in this time period, not whether or

3    not it actually was from the Guide or applied.

4    A.  I don't know.

5    Q.  Do you have your deposition in front of you, the

6    transcript, PTX-458?

7    A.  I've got it.

8    Q.  If you could turn to page 74.

9    A.  Okay.

10   Q.  And specifically transcript page 293, lines 5 through 10

11   I asked you:

12       "Question:  So is that definition there on page 4-476 of

13   the Client Guide defining the servicing release premium, is

14   that consistent with your understanding of the nature of

15   this charge?

16       "Answer:  Yes, it is."

17           Did I read that correctly?

18   A.  You did.

19           MS. WINTER:  Nothing further, Your Honor.

20           THE COURT:  Very good.  Anything further,

21   Mr. Clouser?

22           MR. CLOUSER:  Yes, brief redirect, Your Honor.

23           THE COURT:  Okay.

24

25

1          **REDIRECT EXAMINATION**

2      BY MR. CLOUSER:

3      Q.  Good morning again, Mr. Crawford.

4      A.  Hello.

5      Q.  Counsel had just asked you about premium recapture and

6      servicing recapture fees.  Do you recall those questions?

7      A.  I do.

8      Q.  Did all investors, to your knowledge, have premium

9      recapture policies?

10     A.  They did, yes.

11     Q.  And did you routinely pay premium recapture invoices

12     when any investor sent them to you?

13     A.  Yes.

14     Q.  You were asked on cross-examination about loan programs

15     that were not in the RFC Client Guide.  Do you recall those

16     questions?

17     A.  I do.

18     Q.  And counsel showed you a copy of the RFC Client Guide at

19     PTX-1052.  Could you pull that out?

20     A.  Okay.  I've got 1052.

21     Q.  And what's the date of this Client Guide?

22     A.  It says effective July 22nd, 2005.

23     Q.  Do you know what date PRMI started selling Home

24     Solutions loans to RFC?

25     A.  I don't remember specifically.

CASE 0:13-cv-03451-SRN

2483

```
 1    Q.  And do you recall what date PRMI started selling POA,

 2    Payment Option ARM, loans to RFC?

 3    A.  I believe, you know, 2005.

 4    Q.  Looking at page 1052-5, do you see at the bottom of that

 5    page there's a subheading, Chapter 6, Payment Option Loan

 6    Program?

 7    A.  I do.

 8    Q.  And right beneath that do you see that it says, "Added

 9    Payment Option Program to Client Guide"?

10    A.  I see that.

11    Q.  Do you know one way or another whether PRMI was selling

12    Payment Option ARM loans to RFC prior to that date?

13    A.  I don't recall.

14    Q.  Are you aware of the dates and time periods included in

15    any agreements between PRMI and RFC concerning Payment

16    Option ARM loans?

17    A.  Not that I recall, no.

18    Q.  Counsel also showed you PTX -- strike that.

19            Are you aware of the dates and time periods

20    included in any agreements between PRMI and RFC concerning

21    Home Solution loans?

22    A.  Not that I recall, no.

23    Q.  Counsel asked you some questions about the

24    representations and warranties sections in this Client

25    Guide.  Do you recall that?
```

```
 1    A.  I do.

 2    Q.  And counsel showed you page 1052-49.  If you could turn

 3    to that page.

 4    A.  Okay.

 5    Q.  And specifically counsel directed you to section KK.  Do

 6    you recall that?

 7    A.  I do.

 8    Q.  Do you see that in that section it refers to L Loans?

 9    A.  I do see that.

10    Q.  All right.  Please turn to page 1052-561 of the Client

11    Guide.

12    A.  Okay.  I'm there.

13    Q.  And do you see the definition there for L Loan?

14    A.  I do.

15    Q.  It says -- it defines L Loans as a loan sold or intended

16    to be sold by the client to GMAC-RFC and that meets or is

17    intended to meet all the requirements of this Client Guide.

18    Do you see that?

19    A.  I do.

20    Q.  When you offered the pool of Countrywide loans to RFC,

21    were those loans intended to meet all the requirements of

22    the RFC Client Guide?

23    A.  No.  Those loans were originated and closed to meet the

24    Client Guide of Countrywide.

25              MR. CLOUSER:  Thank you.  No further questions.
```

```
1              THE COURT:  Ms. Winter, anything further?
2              MS. WINTER:  Nothing further, Your Honor.
3              THE COURT:  Very good.  All right.  Mr. Crawford,
4      thank you very much.  You are all done, sir.
5              THE WITNESS:  Thanks everyone.
6              MR. CLOUSER:  Thank you, Mr. Crawford.
7              THE COURT:  All right.  I think we should get
8      started on Dr. McCrary, so we'll take about 5 to 10 minutes,
9      whatever it takes to get him up there, and we'll come back
10     in a few minutes.  Court is briefly adjourned.
11             One more thing.  If we could have another copy of
12     the McCrary demonstratives, please.  There was just one
13     copy.  Thank you.
14         (Recess taken at 11:31 a.m.)
15                       *    *    *    *    *
16         (11:44 a.m.)
17                       IN OPEN COURT
18             THE COURT:  Please be seated.
19             Good morning, Dr. McCrary.  This is Judge Nelson.
20     Can you see me at the moment?
21             THE WITNESS:  I can't.  I can hear you.  Now I can
22     see you actually.  Hi.
23             THE COURT:  Okay.  Very good.  Hi.  If you would
24     raise your right hand, sir.
25             Do you swear in the testimony you're about to give
```

```
 1    to tell the truth, the whole truth, and nothing but the
 2    truth, so help you God?
 3              THE WITNESS:  I do.
 4              THE COURT:  Very good.  Now we're going to switch
 5    that screen over so that you can see Mr. Nicholson, who will
 6    be asking you some questions, but I will be sitting here
 7    listening to every word.  Okay?
 8              THE WITNESS:  Okay.  Thank you, Your Honor.
 9              THE COURT:  Very good.  Mr. Nicholson.
10                      (Justin McCrary)
11                     DIRECT EXAMINATION
12    BY MR. NICHOLSON:
13    Q.  Good morning, Dr. McCrary.  For the record --
14    A.  Good morning.
15    Q.  -- Dr. McCrary, would you please tell me where you're
16    testifying from today.
17    A.  I'm currently in the Southern District of New York
18    courthouse in Courtroom 15A, I believe.
19    Q.  Okay.  And so you're testifying via video conference?
20    A.  Yes, that's correct.
21    Q.  And can you hear me okay?
22    A.  I can hear you fine.  I don't know whether you can hear
23    me.  I take it you'll let me know if I become inaudible.
24    Q.  I will.  Thank you.  And can you see me okay as well?
25    A.  Yes, I can.
```

1    Q.  Okay.  Thank you.  And so if we have any issues today

2    with the connection and you can't see me or hear me, just

3    please let me know and we'll try to make the best of it.

4    Okay?

5    A.  Understood.

6    Q.  Now, Dr. McCrary, at a very high level, would you please

7    explain what you're here to -- well, I should say what

8    you're there in New York to testify about today.

9    A.  Right.  I was asked to review and respond to Dr. Snow's

10   sampling and damages methodology.

11   Q.  Okay.  And before we get into your opinions, I'd like to

12   ask you a few questions about your background.

13        What do you do for a living?

14   A.  I teach.  I'm a professor at Columbia Law.

15   Q.  And are you involved in research there?

16   A.  Yes.

17   Q.  And what is the focus of your research?

18   A.  I'm an economist by training.  My work is empirical in

19   nature, which means I draw upon data.  My work in particular

20   applies data to real-world problems.  I would probably say

21   the bulk of my research has been centered on policing,

22   employment, anti-trust, and more recently securities

23   regulation.

24   Q.  Okay.  And in connection with your testimony today, have

25   you prepared a set of demonstrative slides?

1    A.  I have.

2    Q.  And I understand that we'll be pulling some of the

3    slides up today on the screen, but it may be a bit hard for

4    you to see them because they may be small.  Do you have a

5    paper copy of your demonstrative slides with you just in

6    case?

7    A.  I do.  I have a paper copy here and there's also a clerk

8    from Quinn, who is here in the courtroom with me, and she

9    has a binder of those demonstratives as well.

10   Q.  Great.  Thank you.

11           And in particular, have you prepared a

12   demonstrative slide that summarizes your professional

13   experience?

14   A.  I have.

15           MR. NICHOLSON:  Geoff, could we pull up slide

16   DDX-17-2.

17   BY MR. NICHOLSON:

18   Q.  Dr. McCrary, are you able to see that slide?

19   A.  I am kind of.  Actually, it's hazy and actually the

20   image of me blocks the lower right-hand portion of it.  Do

21   you mind handing me a copy of the slide show?

22           THE COURT:  I think it would make sense if

23   Dr. McCrary used the paper copies of the slides.  I have

24   paper copies.  Everyone here has paper copies.

25           MR. NICHOLSON:  And I'm happy to proceed that way.

1    I'll ask Geoff to pull up slides for the corner.  Sometimes

2    I'll ask him to enlarge them.  It's my understanding the

3    Court has the ability just for a minute or a couple seconds

4    to enlarge them onto the video screen.

5             THE COURT:  If you need to.  I mean, I have it

6    right in front of me, so I'm not sure that we need to do

7    that.

8             MR. NICHOLSON:  I'm happy to proceed however the

9    Court prefers.

10   BY MR. NICHOLSON:

11   Q.  Dr. McCrary, from now on I'll just direct you to the

12   paper slides --

13   A.  Okay.

14   Q.  -- and we'll work from paper if that's okay with you.

15   A.  That's fine with me.

16   Q.  So, Dr. McCrary, looking at 17.2, is this the slide that

17   you were referring to about your professional experience?

18   A.  Yes.

19   Q.  Great.  And before we dive into the slide here, could

20   you describe for the Court your educational background.

21   A.  Sure.  So I obtained a Ph.D. in economics at the

22   University of California-Berkeley.  I obtained that degree

23   in 2003 and have been teaching since.  Prior to that I

24   obtained an undergraduate degree in public policy from

25   Princeton University and obtained that degree in 1996.

1   Q.  Now, after you obtained your undergraduate degree, did

2   you go straight into your Ph.D. program?

3   A.  No, I did not.  I decided to work for a couple of years.

4   I wanted to see what it was that an economist actually did

5   before I embarked on a Ph.D. program, so I went to work at

6   National Economic Research Associates for a short stint and

7   then for a longer stint worked at the Federal Reserve Bank

8   of New York.

9   Q.  And what type of work did you do at those two places?

10  A.  I don't remember the exact title that they gave me.  I

11  believe at the New York Fed I was referred to as an

12  assistant economist.  The job description would have been

13  similar across the two, which is I assisted Ph.D.

14  economists, got a sense of how they were approaching the

15  problems that they were trying to approach, and helped them

16  with respect to the details of their investigations.

17  Q.  And, Dr. McCrary, for purposes of the court reporter, if

18  I could just ask you to slow down a little bit in your

19  answers.  I think it would be helpful and appreciated.

20  A.  Understood, and apologies to the court reporter.

21  Q.  No problem.

22          Now, turning to your Ph.D. in economics, did the

23  coursework in connection with your Ph.D. involve training in

24  statistical methods?

25  A.  Yes.  I would describe that as extensive training.

```
 1   Q.  And are you familiar with the field known as
 2   econometrics?
 3   A.  Yes, econometrics is sometimes referred to as the
 4   application of statistical principles to economic data, but
 5   in many ways statistics and econometrics are two parallel
 6   fields.
 7   Q.  And was econometrics part of your study in your Ph.D.
 8   program?
 9   A.  It was.  It was one of the two field examinations which
10   I undertook while I was obtaining my Ph.D.
11   Q.  And does econometrics play a part in your research today
12   as a professor?
13   A.  Yes.  I don't necessarily describe myself this way, but
14   many of my peers would describe me has an econometrician, in
15   particular an applied econometrician, focused on applying
16   econometrics to real-world data.
17   Q.  Now, after you received your Ph.D., what did you do
18   next?
19   A.  I took a position at the University of Michigan in the
20   Economics Department and School of Public Policy.
21   Q.  And did you teach classes as part of that job?
22   A.  I did.  The first course that I taught at the University
23   of Michigan I believe was called something like introductory
24   statistics.  I taught that course for a number of years
25   while I was there.  I also taught courses on advanced
```

1   economic theory and also the advanced econometrics course in

2   the Economics Department.

3   Q.  And where was it that you worked next?

4   A.  After Michigan I proceeded to the University of

5   California, where I took up a position in the law school.

6   And then after that I switched to Columbia University, where

7   I currently teach.

8   Q.  Okay.  Focusing on the University of California, is it

9   University of California at Berkeley?

10  A.  Yes, that's correct.  You could just call it Berkeley if

11  you prefer.

12  Q.  Sure.  And what positions did you hold there at

13  Berkeley?

14  A.  Well, I was initially an untenured professor of law.  I

15  believe the official title for that is actually acting

16  professor of law at Berkeley.  Then I was promoted to tenure

17  in 2010, at which point I was professor of law.

18  Q.  Now, as a Ph.D. economist, how was it that you ended up

19  teaching at a law school?

20  A.  Well, around 2007 or so I had an offer from the

21  Wisconsin Econ Department and I had an offer from the law

22  school at Berkeley.  The -- probably the easiest way to

23  characterize many of my early papers especially is that they

24  had one foot in economics and one foot in law.  For example,

25  my dissertation, which was published in *The American*

1    *Economic Review*, was a study of the impact of pattern or

2    practice litigation brought against municipal police

3    departments and in particular trying to understand the

4    effects that that litigation had on work force composition,

5    in particular whether it increased diversity on the police

6    department.  And within economics, people thought of that as

7    a study of affirmative action; and within law, people

8    thought of that as a study of the social impact of law.  I

9    don't really care which way you characterize it, but that

10   was behind Berkeley's interest in me as a candidate.

11   Q.  Now, at Berkeley did you teach any courses concerning

12   statistical sampling?

13   A.  I did.  I taught a course for a number of years in the

14   Ph.D. program that the law school runs that was parallel to

15   the course on statistics that I used to teach at the

16   University of Michigan, and I also continued to teach an

17   advanced econometrics course in the Economics Department.

18   Q.  At Berkeley did any of your teaching involve the issue

19   of estimating damages?

20   A.  Well, I had written an article on damages estimation

21   while I was at Berkeley and I drew upon that in my teaching.

22   In particular I ended up developing a course in the law

23   school that at the time was called litigation and

24   statistics.  I teach that now at Columbia where it's called

25   litigation economics and statistics.  But I would describe

1    damages estimation in that class as part of the curriculum.

2    Q.  Okay.  And at Berkeley, were you involved in something

3    called the D lab?

4    A.  Yes.  D lab was not the official name of the

5    organization.  It was instead called the Social Sciences

6    Data Laboratory.  But that was an attempt by the campus to

7    focus graduate training on big data problems, and I was the

8    first director of the D lab.

9    Q.  Okay.  And how long were you a professor at Berkeley?

10   A.  I think I was a professor there for ten and a half

11   years, but around ten years.

12   Q.  Okay.  Now let's talk about your current job at

13   Columbia.  At Columbia do you teach any classes related to

14   statistical sampling?

15   A.  Yes, I do.  I alluded a moment ago to that class that I

16   taught at Berkeley called litigation and statistics, and I

17   have taught that at Columbia now I believe twice and am

18   preparing to do so a third time.

19   Q.  Would you describe that class in a little bit more

20   detail.

21   A.  Sure.  So that's a class where I teach students about

22   the techniques of economics and statistics and describe to

23   them the content of those ideas and how they might arise in

24   litigation context, including damages estimation.

25   Q.  And, Dr. McCrary, on your slide you list your work at

1    the National Bureau of Economic Research.  Would you tell us

2    what that is.

3    A.  Yes.  The National Bureau of Economic Research is the

4    preeminent association of economists in the world.  It's an

5    organization where you become a member by being invited to

6    become one.

7              And I was initially asked to join the National

8    Bureau in I believe 2006, where at that time I was a faculty

9    research fellow.  And then later, when I was promoted to

10   tenure, they promoted me as well to a faculty research

11   associate.  As well, as part of that charge, for 11 years I

12   co-directed the crime working group of the National Bureau

13   of Economic Research.

14   Q.  On your slide you also list expert and advisory work.

15   Do you see that?

16   A.  I do, yes.

17   Q.  Have you ever done advisory work for governmental

18   agencies?

19   A.  I have.  So, for example, I'm sitting here in the

20   Southern District of New York.  One of those engagements was

21   to help the Southern District to gauge the efficacy of a

22   re-entry program for probationers that are under the

23   supervision of the Southern District.  That's an example.

24   Q.  And did that assignment involve designing a sampling

25   protocol?

1    A.  That did.

2    Q.  Okay.  Could you describe that in a little bit of

3    detail.

4    A.  Sure.  So the board of judges was interested in

5    understanding what would be the best way to introduce a

6    re-entry court.  They wanted to do so in a way that was fair

7    and equal, but they also didn't have the resources to have

8    everybody participate and so they asked for me to devise a

9    sampling scheme that would select probationers at random

10   from entering cohorts.

11   Q.  Okay.  I would like to ask you about your expert work.

12   Have you previously offered expert opinions concerning

13   statistical sampling?

14   A.  Yes, I have.

15   Q.  And at a high level, can you describe the types of cases

16   in which you've offered expert opinions on sampling.

17   A.  A wide variety.  Some of them have been anti-trust

18   matters.  Some have been securities regulation matters.

19   Some have been employment.  Others have been contractual.

20   And others have been RMBS matters.

21   Q.  Now, with respect to RMBS matters, about how many cases

22   have you offered opinions in regarding statistical sampling?

23   A.  I'm not sure of the exact number, but I think it's

24   around a dozen or maybe a little bit above that.

25   Q.  Great.  And regarding your expert work more generally,

1    have you previously offered opinions relating to the

2    estimation of damages?

3    A.  Yes, I have.

4    Q.  At a high level, can you describe the types of cases in

5    which you've offered expert opinions on damages.

6    A.  That's parallel with what I described a moment ago.  I

7    believe it's right that that's typically anti-trust,

8    contracts, RMBS matters, and also employment.

9    Q.  And in your expert work, how often is it that you would

10   say you address issues relating to damages?

11   A.  I'm not sure of the exact number, but something like

12   probably one out of three cases or one out of four,

13   something like that.

14   Q.  Okay.  And in the specific context of RMBS litigation,

15   have you offered opinions relating to damages?

16   A.  Yes.

17   Q.  Okay.  And in RMBS litigation, have you been engaged as

18   an expert by plaintiffs or by defendants?

19   A.  In RMBS cases, by defendants only.

20   Q.  Okay.  And outside the RMBS context, have you been

21   engaged by plaintiffs as an expert?

22   A.  I have.  Usually it's defendants, but I have been

23   retained by plaintiffs.

24   Q.  Okay.  Turning back to your slide, you mention

25   peer-reviewed publications and research.  Have you published

1    research relating to statistical sampling?

2    A.  Yes.  I think it's right that all of my papers save one

3    have pertained to concepts of statistics.

4    Q.  And are those papers, do they concern the application of

5    statistics to problems or are they theoretical in nature

6    only?

7    A.  I think I only have one theoretical statistical paper.

8    All of my other papers are applications, that is to say,

9    taking statistics and applying them to real-world data

10   problems, kind of like the dissertation article that I

11   described to you moments ago regarding pattern or practice

12   litigation.

13   Q.  Earlier I believe you mentioned an article relating to

14   the estimation of damages.  At a high level, can you

15   describe that article relating to damages.

16   A.  Yes.  So I had been engaged as a consulting expert for a

17   number of years where I had observed testifying experts

18   disagreeing vehemently about two different approaches to

19   damages estimation and I thought that that was striking

20   because there were a set of conditions under which those two

21   approaches were exactly the same and I thought resolving

22   that and clarifying that would be helpful.  That's a paper

23   that I wrote together with Dan Rubinfeld.

24   Q.  Okay.  Thank you.

25             Now, on your slide it says that your publications

1    have been cited over 4,000 times.  Can you explain to the

2    Court what that means.

3    A.  Yes.  In publications, in particular peer review, but

4    also more broadly, what scholars would do is on a particular

5    point where they were trying to cite to authority, they

6    would cite to another authoritative source and so one way

7    that scholars try to determine whether or not their work is

8    having impact is they look at the extent to which they are

9    cited by others in the field.

10           And what that bullet says is simply that across

11   all of the papers that I've written, they have been cited

12   some 4,000 times.  And I pulled the estimate from Google

13   Scholar, so it's as accurate as Google Scholar is.

14   Q.  Thank you.  Now, Dr. McCrary, have you been involved in

15   reviewing research done by others, other scholars?

16   A.  Yes, that's a common aspect of being a professor.

17   Q.  And you refer on your slide to refereeing manuscripts

18   for academic journals.  Would you describe what that means.

19   A.  Yes.  So my articles are overwhelmingly in what would be

20   described as peer-reviewed journals.  Peer-reviewed journals

21   are journals where for the article to be published by the

22   editor, the editor would draw upon the views of experts in

23   the field.

24           So if a manuscript is submitted to a journal, the

25   editor would select five or six different referees, send the

1    manuscript to them and ask for their comments and take that

2    into consideration when deciding what to do with the paper.

3         So referees are instructed to make recommendations

4    as to whether the paper ought to be rejected due to not

5    applying professional standards, whether the paper might be

6    considered for publication after revisions and then as a

7    referee you're supposed to spell out what those revisions

8    would be, and then sometimes you make the recommendation to

9    publish as is.  So it's a low, medium, high, so to speak,

10   categorization of the caliber of the work.

11   Q.  And on your slide you also refer to serving on Ph.D.

12   committees and evaluating individuals for tenure and

13   promotion.  Would you describe that work for the Court,

14   please.

15   A.  Yes.  So each of those is done in concert with other

16   professors, but it happens at a different scale.

17        So, for example, Ph.D. committee work is typically

18   done with two or possibly three other professors, and the

19   group of professors is to determine whether or not the Ph.D.

20   candidate has done work that is of quality sufficient to

21   warrant a Ph.D.  Sometimes that results in counseling the

22   student out of the program.  More often than not, it results

23   in describing to the student things that they need to

24   consider, critiques that they need to address, things of

25   that nature.  And then ultimately making a recommendation as

1    to the university regarding whether the individual ought to

2    obtain their Ph.D.

3             The work regarding assessing individuals for

4    tenure or promotion more broadly is parallel to that, but it

5    happens at a larger scale.  So while work for Ph.D.

6    committees occurs on a scale of three to four professors,

7    work assessing whether or not a professor deserves a

8    promotion occurs at a scale of usually 35 to 50, maybe even

9    70, and that's an extensive discussion that the faculty as a

10   whole has where, again, there's a judgment that is discussed

11   regarding the quality of the work that the candidate has put

12   forward.

13   Q.  And when evaluating individuals for tenure and

14   promotion, what types of factors do you consider?

15   A.  Usually there are three big categories that people

16   describe for promotion and that would be scholarship,

17   teaching, and service.  Teaching is fairly clear.  Service

18   is things like that Ph.D. committee assignment that I

19   described.  But probably the most important one is the

20   quality of the research.  That's the thing that's actually

21   hardest to do well, so it's more often than not the case

22   that people do a good job teaching and they show up to their

23   committee assignments when they are supposed to and perform

24   those tasks well, but scholarship is quite a bit harder to

25   execute on correctly, requires a lot of diligence and so

1    that's usually where you would focus your attention.

2    Q.  Now, on your slide you refer to appearing as a

3    discussant at conferences.  Would you describe that for us,

4    please.

5    A.  Yes.  Sometimes at a conference you present your own

6    work.  Sometimes you also would present the -- your own view

7    regarding the work of others.  So as a discussant, you would

8    discuss a paper.

9         That would depend a little bit on whether I was at

10   a conference which involved only academics or if I was at a

11   conference that involved, as many do these days, a mixture

12   of academics and policymakers.

13        The focus of the comments that you would give as a

14   discussant if it's just an academic conference would usually

15   be about relatively more specific questions.  And if you

16   think of the context where policymakers are present, you're

17   often trying to describe what's the bottom line to the

18   research, what are its implications for policy-making,

19   things of that nature.

20   Q.  Okay.  And are there any other contexts in which you

21   make presentations regarding policy issues?

22   A.  Well, I suppose one was last fall when I made a

23   presentation to the board of judges here at the Southern

24   District.  I alluded earlier to my work on their re-entry

25   court.  And at that time I made a presentation to the board

1    of judges about how feasible sampling would be.  And so that

2    was similarly a presentation, something akin to a

3    conference.  I forget how many people were in that room, but

4    I want to say 30 or so.  That felt pretty similar.

5              MR. NICHOLSON:  Your Honor, PRMI tenders

6    Dr. McCrary as an expert in the fields of statistics,

7    economics, and damages.

8              THE COURT:  Any objection?

9              MR. NESSER:  Yes, Your Honor.  Dr. McCrary has not

10   proffered a damages model --

11             COURT REPORTER:  I'm sorry.  I can't --

12             THE COURT:  Is your microphone on, Mr. Nesser?

13   There we go.

14             MR. NESSER:  Dr. McCrary has not proffered a

15   damages model in the case.  Dr. McCrary was not qualified as

16   a damages expert in the *HLC* trial.  Dr. McCrary has

17   testified in no respect to any damages work, I believe, that

18   he has done since the *HLC* trial that ought to change the

19   analysis in any respect.  And there's been no evidence that

20   Dr. McCrary has ever proffered a damages model in the

21   context of an RMBS litigation.

22             THE COURT:  Do you wish to respond, Mr. Nicholson?

23             MR. NICHOLSON:  Yes, Your Honor.  I mean, first of

24   all, it's correct that Dr. McCrary isn't affirmatively

25   offering a damages model, but what he's doing is evaluating

1    the damages model that has been put forward by Dr. Snow,

2    which involves both damages and statistics.

3              Dr. McCrary is clearly qualified to assess the

4    damages components of that model.  He has published research

5    on damages.  He teaches on damages.  He has served as a

6    damages expert in other cases.

7              The opinions that he is offering in this case are

8    not quite the same as the ones in the *HLC* case because his

9    assignment was broader and concerns some additional issues.

10   So the *HLC* case I don't think is the relevant issue here.

11             He clearly has the qualifications in order to

12   assess the damages components of Dr. Snow's work.  He, like

13   Dr. Snow, is an economist with experience in econometrics,

14   experience in statistics.  He's clearly qualified to comment

15   on the damages components of Dr. Snow's methodology.

16             THE COURT:  Mr. Nesser, anything further before I

17   rule?

18             MR. NESSER:  Your Honor, I would only point out

19   that to say that somebody is an expert in damages generally

20   is one thing, but the purported opinions that -- to the

21   extent that there are going to be any opinions offered today

22   that go beyond statistics, there's going to be opinions

23   about how to measure damages or what's an appropriate

24   measure of damages in the context of an RMBS litigation and

25   he has no experience at all with respect to measuring

1    damages in an RMBS litigation.

2              MR. NICHOLSON:  Your Honor, may I just respond

3    briefly?  I believe that's incorrect.  Dr. McCrary testified

4    that he has been involved as an expert in RMBS litigation.

5    He has also in his deposition explained, and I'm happy to

6    elicit it from him here, that as part of his work in RMBS

7    cases he has been involved in estimating damages as well.

8              So I don't think there's any basis to say that he

9    has no expertise in this.  He has similar expertise to

10   Dr. Snow.  He's perfectly qualified to comment on Dr. Snow's

11   methodology.

12             MR. NESSER:  Your Honor, to begin with, Dr. Snow

13   has worked on -- I believe he testified he's worked on 75

14   RMBS matters over the last 15 years.

15             But putting that aside, again, the expertise and

16   experience that Dr. McCrary has in the field of damages with

17   respect to RMBS is in the context of offering statistical

18   opinions that happen to bear on a damages analysis and he's

19   done that, of course, in multiple RMBS cases.  That's

20   different than saying that Dr. McCrary is qualified to opine

21   on what an appropriate measure of damage is or what an

22   appropriate damage allocation might be on the facts of this

23   case.

24             THE COURT:  All right.  To the extent that there

25   are concerns about Dr. McCrary's qualifications, I believe

1    they go to the weight of the evidence, not whether he can be

2    qualified as an expert here today and I think they can be

3    fully addressed in cross-examination.  So the objection is

4    overruled and Dr. McCrary is so received.

5            MR. NICHOLSON:  Thank you, Your Honor.

6            And just to seek the Court's guidance, I'm about

7    to enter a new phase.  Would you like to take a break at

8    this stage or keep going for some time?

9            THE COURT:  Well, we could take our lunch break

10   now.  I know that we are in discussions with the Southern

11   District of New York about how long we can go today in light

12   of the difference in time.

13           MR. NICHOLSON:  Yes, Your Honor.

14           THE COURT:  I don't know the answer to that yet.

15   I suspect it will be 4:00 or 4:30, which would be 5:00 or

16   5:30 their time.  But I should have an answer during the

17   lunch hour.

18           I've also asked them whether -- we had not

19   previously raised tomorrow with them.  Now that's being

20   raised with them.  I should get an update then later,

21   perhaps during the lunch hour, on whether there's any

22   concern about whether the courthouse will be closed to folks

23   tomorrow in New York.

24           The other question I've asked of the Southern

25   District is whether we could begin at 8:00 a.m. Minneapolis

```
 1     time, which would be 9:00 a.m. New York time, which would

 2     hopefully give us enough time to get through Dr. McCrary

 3     tomorrow.

 4              So there's a lot up in the air here.  With that

 5     said, however, we will take a lunch hour and come back at

 6     1:30 Central Time.  So, Dr. McCrary, I understand that will

 7     be 2:30 your time.

 8              Anything further we should discuss today right now

 9     before the lunch break?

10              MR. NICHOLSON:  Your Honor, on a completely

11     unrelated note --

12              THE COURT:  Yes.

13              MR. NICHOLSON:  -- the parties have been meeting

14     and conferring about the bankruptcy-related exhibits in

15     connection with the Lipps stipulation.  I'm happy to report,

16     and I think Mr. Scheck will say the same, that we have

17     narrowed those disputes and I think there's a set that the

18     parties agree can come into evidence for non-hearsay

19     purposes.

20              I think there are disputes on a small number,

21     discrete disputes on a small number of exhibits, and

22     Mr. Scheck and I will be happy to address those today,

23     perhaps right before we get into Dr. McCrary.

24              THE COURT:  Do we need to address that before we

25     continue with Dr. McCrary?
```

```
 1              MR. NICHOLSON:  Well, in light of the timing
 2     concerns, I think we can postpone that.  But I just wanted
 3     to advise the Court.
 4              THE COURT:  It might make sense to do it at the
 5     end of the day --
 6              MR. NICHOLSON:  You're right.
 7              THE COURT:  -- when Dr. McCrary is forced to
 8     leave.
 9              MR. NICHOLSON:  I'm happy to do that.  I just
10     wanted to advise the Court that we had that issue.
11              THE COURT:  Anything further?
12              Okay.  Court is adjourned until 1:30.
13          (Lunch recess taken at 12:14 p.m.)
14                        *   *   *   *   *
15          (1:37 p.m.)
16                       IN OPEN COURT
17
18              THE COURT:  Good afternoon.
19              Good afternoon, Dr. McCrary.  This is Judge Nelson
20     and we're going to proceed if you're all ready to go.
21              THE WITNESS:  I am ready, Your Honor.  Thank you.
22              THE COURT:  All right.  Mr. Nicholson.
23              MR. NICHOLSON:  Thank you, Your Honor.
24     BY MR. NICHOLSON:
25     Q.  Good afternoon, Dr. McCrary.  Excuse me.  Feedback.
```

```
 1              Dr. McCrary, just to confirm, are you able to see

 2     and hear me okay?

 3     A.  I am, yes.

 4     Q.  Terrific.  Dr. McCrary, I'd like to turn to your

 5     assignment in this matter.  At a very high level, will you

 6     describe the nature of your assignment for the Court?

 7     A.  Yes.  I touched upon that earlier in my testimony.  My

 8     assignment was to review the expert reports submitted by

 9     Dr. Snow and to gauge the quality of the sampling and

10     damages methodology that he put forward.

11     Q.  So as part of your assignment, did you review Dr. Snow's

12     written reports?

13     A.  Yes, I did.

14     Q.  Okay.  And did you also review Dr. Snow's testimony from

15     this trial?

16     A.  Yes, I did.

17     Q.  And have you prepared a slide that summarizes your main

18     opinions in this matter?

19     A.  I have.

20     Q.  Dr. McCrary, would you look at slide DDX-17.3, please?

21     A.  Yes.

22     Q.  Is this the side you are referring to?

23     A.  This is, yes.

24     Q.  Okay.  At a high level, would you please summarize your

25     first main opinion?
```

1    A.  Yes.  The first main opinion pertains to the relative

2    strength of claims and defenses; and at a high level the

3    idea is that if there is a defendant who has relatively more

4    loans and trusts that are subject to weaker claims or

5    stronger defenses, then that might be a defendant where you

6    might argue that there should be a discount applied, and

7    that's the basic idea associated with the first idea on the

8    slide.

9    Q.  And in relation to this first opinion, does Dr. Snow

10   make any assumption as part of his analysis regarding the

11   strength of claims and defenses?

12   A.  He does.  There's an implicit assumption in his

13   approach, which is that every loan has the same quality in

14   terms of strength of claims and defenses.  So they're all

15   treated on an equal basis, even though it may be right that

16   some trusts may be quite different than others.

17   Q.  At a high level, what's the significance of this first

18   opinion?

19   A.  I think that the significance of this first opinion is

20   pretty decisive, actually, which is the primary

21   justification for a sampling and extrapolation exercise is

22   that it would lead to an unbiased estimate; and in this

23   context I believe that the failure to attend to these

24   concerns leads the estimates, in fact, to be biased and in

25   particular for PRMI, for the damages amount that is put

1    forward by Dr. Snow to be overstated.

2    Q.  Okay.  Let's turn to your second main opinion here.

3    Would you please give the Court a summary of that opinion.

4    A.  Yes.  So Dr. Snow applies his damages methodology to the

5    trust settlement and also to the four monoline settlements.

6    This second opinion pertains to the trust settlements, and

7    it's my view that that approach violates three of the

8    pillars of statistics as I'll outline in my testimony today.

9    Q.  And setting aside your opinions on the strength of

10   claims and defenses, and if we focus only on this second

11   opinion here, do the violations with respect to the trust

12   settlement render Dr. Snow's trust methodology completely

13   unusable?

14   A.  I think that type of statement is probably overly

15   strong.  I think it's right that the trust methodology is

16   one that is not completely unusable and instead would

17   require some adjustments.  It's not correct that Dr. Snow's

18   damages numbers that he testified to makes those

19   adjustments, but I believe adjustments could be made and

20   that would allow for recovery from missteps.

21   Q.  Let's turn to your third main opinion here.  Would you

22   please give the Court a summary of that opinion.

23   A.  Yes.  So with respect to the monoline settlements, it's

24   my view that that approach violates all five of the pillars

25   that I'll testify regarding in a moment, and that is that

1    all five of those pillars are ones that would traditionally

2    support a statistical analysis.  In my view, the monoline

3    methodology is entirely unreliable and ought not be used.

4    Q.  And Dr. McCrary, are you aware that in response to your

5    report Dr. Snow has now offered what he calls a settlement

6    specific approach in a non-extrapolated calculation for the

7    monolines?

8    A.  Yes.

9    Q.  Do those new approaches change your view that his

10   original monoline methodology is unreliable?

11   A.  They don't.  My critiques of his monoline methodology

12   pertain to sampling and to extrapolation specifically.  The

13   non-extrapolated approach to the monoline settlements

14   actually is an approach that I would have said might be

15   workable, unlike those that involve extrapolation.

16   Q.  So is it your view here that Dr. Snow hasn't offered any

17   potentially reliable way to estimate monoline damages?

18   A.  I'm not sure that I would necessarily say that the

19   non-extrapolated approach was reliable, but it might be;

20   whereas, the approaches to monoline damages estimation

21   engaged in by Dr. Snow that do rely upon sampling, I think

22   that those are fundamentally unreliable.

23   Q.  Thank you.  Dr. McCrary, let's turn to your first

24   opinion and discuss that in an a little bit more detail.

25            Now, in connection with your opinion regarding the

1    strengths of claims and defenses, did you review the

2    opinions of any other experts?

3    A.  I did.

4    Q.  And whose opinions did you review?

5    A.  David Woll's.

6    Q.  And at a high level, what's your understanding of

7    Mr. Woll's opinions?

8    A.  At a high level, my understanding of Mr. Woll's opinion

9    is that for PRMI -- well, better said, that a reasonable

10   defendant in RFC's position would have taken into account

11   the relative strength of claims; and in particular, that if

12   there are claims that have -- that are weaker or that have

13   stronger defenses, that that's something that ought to be

14   true on a trust-by-trust basis, and he reaches opinions

15   specifically regarding specific trusts with respect to

16   strength of claims.

17   Q.  And did Dr. Snow account for any variations in the

18   strength of claims and defenses as part of his damages

19   methodology?

20   A.  No.

21   Q.  And earlier I think you referred to an assumption that

22   he made.  Would you explain that in a little bit more

23   detail?

24   A.  Yes.  The implicit assumption is that all loans have the

25   same strength of claim and same defenses; whereas, if you

1    look on, for example, trust-by-trust basis, some trusts

2    might have a statute of limitations defense, but there's not

3    an effort made by Dr. Snow to take that into account.  So

4    implicitly what's assumed is that each trust has equal

5    strength of claims and defenses.

6    Q.  And I think earlier you referred to the concept of bias.

7    Can you explain how that concept relates to your opinion

8    here?

9    A.  Yes.  Well, it's a fairly straightforward point.  Let me

10   try to make it as simple as I can.  The basic idea is that

11   if a particular defendant, such as PRMI, have their loans in

12   trusts where those trusts were subject to weaker claims or

13   to stronger defenses, then it would be appropriate for there

14   to be a discount applied to those trusts, and in particular

15   to the loans that are in that trust.  When that's not done,

16   the defendant in question, in this case PRMI, has an

17   overstated damages number associated with Dr. Snow's

18   methodology.

19   Q.  Now, in general, would it have been possible for

20   Dr. Snow to design a methodology to account for the strength

21   of claims and defenses?

22   A.  Yes, I believe it would have been.

23   Q.  And based on your review of his reports, did you see any

24   indication that he explored ways to account for the strength

25   of claims and defenses?

```
1    A.   No, I don't believe that he explored that.  He had some
2    testimony regarding that, but that was not in his reports.
3    Q.   Okay.  Let's talk about some of Mr. Woll's specific
4    opinions.  Did you review his opinions concerning the
5    no-fraud representations and the fraud disclaimers?
6    A.   I did.
7    Q.   Okay.  And at a very high level, can you give or explain
8    your understanding of those opinions.
9    A.   I touched upon this earlier.  It's my understanding of
10   his opinion that a reasonable defendant would have taken
11   into account in particular a lack of no fraud
12   representations or fraud disclaimers associated with
13   particular trusts.
14   Q.   And did you investigate whether PRMI's loans were in
15   trusts that either lacked fraud -- I'm sorry -- that either
16   lacked no-fraud representations or included fraud
17   disclaimers?
18   A.   I did, yes.
19   Q.   And did you prepare some slides with those findings?
20   A.   I did, yes.
21   Q.   Dr. McCrary, could you look at DDX-17.4, please?
22   A.   Yes.
23   Q.   Would you please describe your findings on this slide.
24   A.   Yes.  This is a chart that has two bars.  The left-hand
25   bar corresponds to the set of global loans.  The right-hand
```

1    bar corresponds to the set of PRMI loans.  And what the

2    chart shows is that PRMI has relatively more loans in trusts

3    that lack no-fraud representations, and in particular the

4    percent of losses associated with PRMI's loans are to a

5    greater extent in trusts that lack no-fraud representations.

6    Specifically, PRMI has 94 percent of its losses in such

7    trusts and that's a much higher number than the number for

8    the overall global sample, which is instead at 83 percent.

9    Q.  And these loss numbers here, where do those come from?

10   A.  What I'm doing there is I'm taking Dr. Snow's actual

11   plus expected losses and saying those are the losses

12   associated, according to Dr. Snow, with specific loans.  All

13   I'm doing here is I'm determining on the basis of Mr. Woll's

14   opinion what fraction of those losses are in such trusts.

15   Q.  Thank you.  Let's look at slide DDX-17.5.  Do you have

16   that, Dr. McCrary?

17   A.  I do.

18   Q.  Okay.  Would you please describe your findings on this

19   slide.

20   A.  This slide is parallel to the prior slide.  So, again,

21   if you look on the left you see loans for the global, and if

22   you look on the right you see loans for PRMI.  And the chart

23   shows that, overall, the percentage of losses in trusts with

24   fraud disclaimers is much higher for PRMI than it is

25   generally.  In particular, for PRMI, 72 percent of its

1    losses are in trusts with fraud disclaimers; and that's a

2    much higher number again than the 48 percent that

3    corresponds to all loans.

4    Q.  Okay.  How would you say these two percentages compare?

5    A.  I would say that for PRMI it's about one and a half

6    times as high as it is for the global sample.

7    Q.  And as part of his allocation methodology, did Dr. Snow

8    account for the percentage of losses on PRMI loans that were

9    in trusts that either lacked a no-fraud representation or

10   included fraud disclaimers?

11   A.  No.  And Dr. Snow's methodology, each trust gets handled

12   on an equal basis.

13   Q.  And let's return to Mr. Woll's opinions.  Did you review

14   his opinions concerning the statute of limitations defense?

15   A.  I did, yes.

16   Q.  Okay.  At a very high level, what's your understanding

17   of that opinion?

18   A.  Again, it's my understanding of Mr. Woll's opinion that

19   a reasonable defendant, a reasonable party such as RFC,

20   would take into account statute of limitations defenses and

21   that that would affect their settlement.

22   Q.  And did you investigate whether PRMI's loans were in

23   trusts subject to statute of limitations defenses?

24   A.  I did.

25   Q.  And did you prepare a slide on your findings on that

1    issue?

2    A.  I did.

3    Q.  Okay.  Let's look at DDX-17.6, please.  Let me know when

4    you're there.

5    A.  I am.

6    Q.  Okay.  Dr. McCrary, would you please describe your

7    findings on this slide.

8    A.  Again, this chart parallels the prior two.  What you see

9    on the left is the number of corresponding to global, and

10   the number on the right is for PRMI.  And what you see is

11   that PRMI has relatively greater share of losses in trusts

12   that are subject to statute of limitations defenses.  In

13   particular for PRMI, the estimate is 69 percent; whereas,

14   for the global, the estimate is 35 percent.  So about a

15   factor of two difference.

16   Q.  Okay.  And as part of his allocation methodology, does

17   Dr. Snow account for the percentage of losses on PRMI loans

18   in trusts subject to statute of limitations defenses?

19   A.  No.  Again, there's no attempt made to adjust for

20   statute of limitations defenses and how that might apply

21   differently to some trusts than for others.

22   Q.  And did Dr. Snow use as part of his trust damages

23   methodology what's called a settlement factor?

24   A.  He did.  He uses 28 percent across the board.

25   Q.  And is that settlement factor affected in any way by

1    statute of limitations defenses?

2    A.  No.  It's the same number regardless.

3    Q.  And earlier you said you reviewed Dr. Snow's trial

4    testimony.  Is that right?

5    A.  Yes, that's correct.

6    Q.  In general, do you recall Dr. Snow testifying about

7    whether accounting for the strength of claims and defenses

8    would affect the margin of error on his damages estimates?

9    A.  That is consistent with what Dr. Snow testified to, yes,

10   that's what I took him to be saying.

11   Q.  Okay.  What's your reaction to that testimony?

12   A.  I thought that that really misses the point.  I think

13   it's possibly true that there may be some effect of a

14   methodology that tried to take account of relative strength

15   of claims and defenses on a margin of error.  I haven't seen

16   him quantify that, but that might be right.

17          But the central point is not related to margin of

18   error and the need to take account of that for that type of

19   an approach.  The central issue instead is that failing to

20   take account of that leads to bias for particular

21   defendants; and for a defendant such as PRMI, where there

22   are relatively weaker claims associated with loans that they

23   have in particular trusts or relatively stronger defenses,

24   that means that for them the damages number that Dr. Snow

25   puts forward is overstated.

1    Q.  Okay.  Dr. McCrary, I would like to turn to your

2    opinions regarding whether Dr. Snow's methodology violates

3    the pillars of statistical sampling.  At a high level, can

4    you describe what your opinions are on that issue?

5    A.  Are you asking now about the trust or about the monoline

6    settlements?

7    Q.  You can just discuss both at a high level.

8    A.  Well, at a high level, statistics relies upon many

9    different types of approaches and knowledge, but when I

10   teach the subject, I describe statistics as leaning on five

11   pillars, and I've outlined those here in a demonstrative for

12   the Court.  But it's my view that the trust methodology in

13   particular violates three of those, and that the monoline

14   methodology violates all five.

15   Q.  And would you look at slide DDX-17.7, please.

16   A.  Yes.

17   Q.  Is this the slide you were referring to?

18   A.  It is.

19   Q.  Okay.  Would you please describe the first pillar of

20   statistics here.

21   A.  The first pillar is probably the simplest one to

22   understand, which is that a statistical analysis has to

23   start by asking the right question.  In a way there's

24   nothing technical about that, yet it's so important that

25   even people who are truly advanced statistically need to be

1    reminded of that question again and again.

2    Q.  And can you explain -- what's the content of this first

3    pillar?

4    A.  Well, the content of the first pillar is that it's very

5    easy to think of a question that you have an easy time

6    answering without thinking carefully about, well, what is it

7    that ultimately needs to be decided, what is the statistical

8    information supposed to be for.  So whenever I teach

9    students about designing samples, I always ask them, What

10   are you going to use the data for?  In particular, what are

11   you trying to answer?  What are you trying to address?  And

12   it may be right that if you don't think carefully about

13   that, you could find yourself in a situation not dissimilar

14   from the one here, whereby there's a sample drawn that's

15   intended for one purpose that may not be appropriate for

16   another purpose.

17   Q.  Now, does this mean that a sample designed to answer one

18   question can never be used to answer a different question?

19   A.  No, I think that's overly strong, but I would say it's

20   case by case.  There are contexts where you would say the

21   sample drawn from this particular purpose really ought not

22   to be used for some other purpose; and you'll see

23   descriptions of that, for example, in government statistics

24   and other kinds of information.  Authors, for example, will

25   caution an interpretation of their figures.  But in other

1    contexts, it may be possible, for example, to engage in

2    bounding exercises that may say the maximal impact of having

3    drawn the sample for this other purpose on the current

4    analysis is X, and you may be able to actually quantify what

5    that is.

6    Q.   Okay.  Let's turn to your second pillar.  Would you

7    describe that pillar for the Court, please.

8    A.   This one is one that most people are familiar with just

9    from a very basic understanding of statistics, which is that

10   if you are going to use a sample for a particular purpose,

11   it has to be representative of and drawn from the correct

12   population.  You would not try to defend a statistical

13   exercise when it was actually drawn from an incorrect

14   population.  You would usually go back and draw from the

15   correct population.

16   Q.   And suppose that you drew your sample from a subset of

17   the correct population.  Does that mean the sample is

18   completely unusable?

19   A.   No.  My answer here parallels actually the answer to

20   your prior question, in part because the first and second

21   pillar have some overlap.  That is to say, if you draw a

22   sample for one purpose and you want to use it for another

23   purpose, it may be right that you can engage in a bounding

24   analysis like the circumstance that I described before where

25   it might be right that if you started trying to answer one

1    question and pivoted, you might be able to engage in an

2    adjustment that would allow you to recover from that.

3    Q.  So can you give us an example of how that type of

4    bounding analysis would work?

5    A.  Sure.  So, for example, if you were trying to estimate

6    the poverty rate for Minnesota, it might be the case that

7    you had drawn a sample of homeowners and you had estimated

8    the poverty rate based on the set of homeowners that were in

9    your sample.  If you have an estimate of the population that

10   were homeowners, you could try to back out what would be the

11   population of people who were not homeowners and say, well,

12   people in that subsample could either be designated poor or

13   not on the basis of whether their income was below or above

14   the poverty line respectively; and then you might say there

15   are two scenarios where I could make up the data, which is

16   to say bracket what could be the maximal effect on my actual

17   bottom line number of the fact that I actually didn't sample

18   from the entire population of Minnesota.  I only sampled

19   homeowners.

20          So that's a simple example in which you would take

21   an estimate that corresponded to a subgroup and you would

22   then give two numbers, below and above that, corresponding

23   to what's called a bounding analysis.

24   Q.  So if I'm understanding you correctly, you would assume

25   that either all renters either were above the poverty rate

1       or all were below; is that what you are saying?

2       A.   That's correct.

3       Q.   Okay.  And are those realistic assumptions to make?

4       A.   No, of course not.  So they're not intended to be

5       realistic.  They're intended instead to stick to the science

6       of sampling and statistics.  Statistics is a field in which

7       we approach things scientifically and we defend a

8       statistical approach not by saying it might be right, but

9       instead articulating here are the conditions under which it

10      would be correct.

11               And when we engage in bounding analyses, we're

12      following in that same tradition of being precise and

13      scientific in our calculations.  What we're doing is saying

14      here is the information that the sample conveys.  One of the

15      primary proponents of bounding in the modern era is Charles

16      Manski.  Charles Manski has often been described as on the

17      short list for the Nobel Prize specifically for this idea;

18      and I probably won't quote him exactly right, but the

19      essence of his writing in this area is the sample really

20      doesn't generate any more information than the bound.  If

21      you've drawn from the wrong population, you have drawn from

22      the wrong population and that limits the amount of

23      information that the sample can confer.

24      Q.   Let's turn to the third pillar now.  Would you briefly

25      describe that pillar, please.

1    A.  Yes.  And actually it might be helpful, since Your Honor

2    is looking at the same slide, I'll just read it and in part

3    that's because there is language there that's technical

4    unlike the first two pillars.

5              So the third pillar as I have articulated it here

6    is "Ensure that the methodology produces an accurate margin

7    of error that is sufficiently precise."  And there's

8    actually three different technical ideas running around

9    inside of there and so let me pause to elaborate on each of

10   those.

11             The first is margin of error.  That's a familiar

12   concept to many of us.  We read in the newspaper that

13   there's a statistician who has put forward an estimate and

14   then they say plus/minus, and then there's a number that

15   follows after the plus/minus.  The number that follows after

16   is a margin of error, and it says how much uncertainty is

17   there attached to my sample estimate by virtue of the fact

18   that I sampled.

19             And that is to say when you draw a sample, you

20   might have gotten some specific configuration of data.  If

21   you had drawn a different sample, you might have gotten a

22   different estimate.  And the margin of error quantifies how

23   big of a swing that is.  So that's the first technical idea.

24             The second technical idea is accuracy.  So a mild

25   embarrassment to the field of statistics is not only do we

1    have estimates, but it turns out our margins of error are

2    themselves estimates, which is to say we don't always know

3    for sure what the margin of error actually is.  We instead

4    have a methodology for estimating it also.

5         And what that means is that just because somebody

6    has put forward a margin of error doesn't necessarily mean

7    that it's actually the correct margin of error.  It's quite

8    possible for a margin of error itself to be too small, which

9    then understates the amount of uncertainty there is attached

10   to the bottom line estimate.

11        Then finally, the third piece that I wanted to

12   pause on with respect to the third pillar is that that

13   margin of error if it is accurate is hopefully sufficiently

14   precise that it's actually a helpful piece of information.

15   It is possible for there to be estimate that is estimated

16   with such imprecision that it's actually no longer

17   informative regarding the bottom line question, and so to me

18   that's a violation of the third pillar of statistics.

19   Q.  I think on that note, I believe Dr. Snow has testified

20   that the margin of error relates only to the precision of

21   your estimate and not to the reliability of the estimate.

22   Do you agree with that statement?

23   A.  No, I don't.  I think that that is taking the term

24   "reliability" and twisting it, in my mind.  If there's an

25   approach that yields margin of error that is so wide that it

1    conveys no additional information above and beyond what you

2    have before you engaged in the sample, I don't understand

3    how that could be reliable for any particular purpose.

4    Q.  Let's turn to the fourth pillar.  Would you please

5    describe that pillar for the Court.

6    A.  Yes.  So as it's stated on the page, that fourth pillar

7    is to ensure that the sample estimate is unbiased.  And here

8    I don't mean bias in the traditional sense.  I mean this in

9    the statistical technical sense, which is to say the

10   unbiasedness of a sample estimate is the claim that before

11   you actually engaged in the number, your best estimate

12   actually for the true value that you're looking for is going

13   to be the estimate that you, in fact, obtain.  And in this

14   context that can be justified, that is to say, there are

15   circumstances such as, for example, sampling from the

16   correct population, that might lead to results like that,

17   and those are statistical approaches and methodologies that

18   are esteemed, and those that are deemed to be biased are

19   those that are eschewed.

20   Q.  And is it possible to have an estimate that is precise

21   but also biased?

22   A.  Yes.  The traditional way that I would explain this to

23   students would be through the idea of an archer.  You can

24   have an archer who is shooting arrows at a barn, say, and

25   they've got a bull's eye set up towards the left hand of the

1    barn; and it may be right that those arrows are clustered at

2    the one bull's eye, but if the correct target was actually

3    on the right-hand side of the barn, not the left, you would

4    say, Well, those are clustered tightly together, they're

5    precise, but they're actually focused on the wrong thing.

6    And in that context you would say that that would be an

7    archer who had great precision for the wrong thing or a

8    biased archer with precision.

9    Q.  Let's turn to the fifth pillar.  Would you describe that

10   for us.

11   A.  Yes.  So that pillar would be to be apparent and to use

12   justified assumptions.  What I mean by that is statistical

13   analyses frequently invoke assumptions, and of course for

14   the consumer of that statistical information, they're owed

15   an understanding of what those assumptions are so that they

16   can gauge the value of the statistical information for

17   themselves.

18          So the first part of that is to be transparent

19   about what it is that you are assuming.  The second part of

20   that is you can make assumptions, but that doesn't somehow

21   turn them into truth.  So the second part of that is to make

22   sure that the assumptions that you're employing are ones

23   that have a reasoned basis for being true, not just that

24   you've assumed it to be so, but rather that you have a good

25   reason for thinking that that is so.

1    Q.  Can you give us an example that illustrates this fifth

2    pillar?

3    A.  There are many, but one of them would be, for example, a

4    homogeneity assumption.  This comes up with respect to my

5    opinion regarding Dr. Snow's methodology later on.  But this

6    idea would be that if you've assumed that two things are

7    actually equal and estimated a single number, that doesn't

8    actually make it the case that it's that single number.

9    Instead, those could be two different quantities.

10                So, for example, if you were going back to the

11   Minnesota poverty rate example, if you were trying to use a

12   national sample to estimate things, it might be right that

13   you had a very small sample size in Minnesota.  And so if

14   you tried to repurpose that national analysis for a focus on

15   Minnesota, one thing that you could consider, that I would

16   not counsel but one might consider it, is to make an

17   assumption that Minnesota is like the rest of the nation.

18   And to the extent that that assumption is wrong, you're

19   following statistical analysis would of course be incorrect.

20                There could be a statistical analysis that took

21   the national sample and formed an actual estimate, but the

22   assumption that would be employed there would not be one

23   that was justified.  It was simply assumed.  So in that

24   context I would say that would be an error.  A better

25   approach would be to go back and draw a sample that was

1   specific to Minnesota if you were trying to estimate the

2   poverty rate for Minnesota.

3   Q.   Okay.   We've now gone through your five pillars.

4   Dr. McCrary, are these the only five pillars in the field of

5   statistics?

6   A.   No, I don't think anybody would say anything along those

7   lines.   I certainly don't want to.   Statistics relies on

8   principles.   It's a field of mathematics and is a scientific

9   subject.   There are many different aspects to statistics.

10  These are simply the five aspects of statistics that are

11  relevant to my concerns regarding Dr. Snow's methodology as

12  applied in this case.

13        In other contexts it might be right that there

14  were other principles of statistics that would be more

15  relevant, and some of these might in such a case still be

16  something that I would be concerned about and would want to

17  emphasize, and maybe others would fall away.

18  Q.   So in other cases have you focused on a different number

19  of pillars than five pillars?

20  A.   I may have.   I don't think it's right that in each case

21  these five pillars would necessarily be what the Court wants

22  to focus on.

23  Q.   Now, returning to these five pillars, are these pillars

24  that you teach in your statistics classes?

25  A.   They are.

1    Q.  And what types of classes have you taught them in?

2    A.  All of the classes that I've taught pertaining to

3    statistics ranging from introductory classes on the subject

4    where undergraduates or policy students are absorbing that

5    information for the first time, all the way up to the

6    advanced econometrics classes that I've taught at the

7    University of Michigan and at UC-Berkeley.  That is to say

8    classes where students will have studied statistics for

9    several years as an undergraduate and will have had three

10   years of graduate course work under their belt, it would

11   still be true that you would want to start by reminding

12   those students to start by asking the right question.

13   Q.  Okay.  Do these pillars have any importance in real

14   world applications of sampling?

15   A.  Absolutely.  I think that if you approach real world

16   problems, you find that it's frequently right that you would

17   want to review each of these for engaging whether or not

18   it's right, that you have been able to produce a statistical

19   quantity that's helpful for a real world context.

20   Q.  Okay.  And now I would like to shift gears and discuss

21   how these five pillars relate to your opinions on Dr. Snow's

22   methodology.  Have you prepared some slides on this?

23   A.  I have.

24   Q.  Okay.  And would you look with me at slide 17.8, please?

25   A.  Yes.  I'm there.

1   Q.  And, Dr. McCrary, would you briefly describe your

2   opinions here regarding the first pillar.

3   A.  Yes.  It's my view that Dr. Snow began by trying to

4   answer one question and designed a sampling protocol that

5   was consistent with that; and then later his assignment

6   changed and he was asked to answer different questions.  And

7   with respect to that, I think that mismatch between his

8   sampling methodology and what ultimately gets put to leads

9   to errors with respect to the bottom line.

10  Q.  Okay.  And would you now look at slide 17.9, please.

11  A.  Yes, I'm there.

12  Q.  And would you briefly describe your opinions on this

13  slide regarding the second pillar.

14  A.  Yes.  So here the opinion that I've described here is

15  one that's quite simple, which is that Dr. Snow drew loans

16  from the sample of what's termed "at-issue" loans, and those

17  aren't actually all of the loans that are covered by the

18  settlements.  They are a subset of those.

19  Q.  Okay.  And let's turn to slide 17.10.  Would you briefly

20  describe your opinions regarding the third pillar on this

21  slide.

22  A.  Yes.  Dr. Snow's margins of error are large.  Very

23  large.  That's true for both the trust settlement as well as

24  for the monoline settlements, but for the monoline

25  settlements it's accentuated.

1    Q.  And are there any issues with respect to the monoline

2    settlements on whether the margin of error itself was

3    accurate?

4    A.  There are.  So there are assumptions -- and this circles

5    back to the fifth pillar -- there are assumptions invoked

6    with respect to the monolines that are perhaps rather

7    implicit as opposed to explicit, and those actually lead the

8    stated margins of error to likely be inaccurate.

9    Q.  And let's look at slide 17.11, please.

10          Dr. McCrary, would you briefly describe your

11   opinions on this slide regarding the fourth pillar.

12   A.  Yes.  With respect to the fourth pillar, Dr. Snow's

13   estimates of breach rates as well as damages are biased.

14   Q.  And how does this relate to the first main opinion you

15   gave regarding the strength of claims and defenses?

16   A.  Well, strength of claims and defenses is one aspect of

17   bias, but that's not the only one.  So if you look at the

18   details of Dr. Snow's approach, he draws his sample to

19   generate a count-based breach rate estimate, but actually

20   when it goes to damages, he uses loss weighting, and there's

21   some extra slippage that gets introduced in that context.

22          Further, it's also true that ultimately there's a

23   question not of estimating a breach rate, but instead of

24   allocation.  And with respect to the allocation, what's

25   needed is not necessarily just an estimate of a breach rate,

1    but actually the breach rate for PRMI in this particular

2    case relative to an estimated breach rate overall for the

3    global sample.  And the ratio of two things is actually

4    something that's a little bit tricky to do, but that's part

5    of his allocation methodology.

6    Q.  And are there any particular issues of bias that relate

7    to the monoline settlements?

8    A.  Yes.

9    Q.  At a high level for now.

10   A.  Fair.  So with respect to the monoline settlements, I

11   have made an allusion a moment ago to the invocation of an

12   assumption, in particular a homogeneity assumption, and

13   that's an assumption which also leads to bias with respect

14   to the monoline settlements particularly.

15   Q.  Okay.  And let's look at the slide 17.12, please.  I

16   think you may have just been discussing this, but can you

17   talk about your opinions as they relate to the fifth pillar,

18   again, at a very high level for now.

19   A.  Yes.  Apologies.  Sometimes I speak with too much

20   detail.  But Dr. Snow's analysis does depend on assumptions

21   and it's true that sometimes those assumptions are more

22   implicit than explicit.  What I've tried to do in my reports

23   is to flesh this out to make sure that those are understood.

24           Sometimes those assumptions in particular are

25   assumptions that are very hard to justify and, in fact, are

1    very contrary to the available evidence, and I've tried to

2    make sure that that's understood because I think that that's

3    a very important aspect of any statistical analysis.

4    Assumptions that are invoked have to be clear to the

5    consumer of the information and they also have to have a

6    reasoned basis for being true.

7    Q.  And in going back to your first opinion regarding

8    strength of claims and strength of defenses, is there any

9    connection between that opinion and this pillar?

10   A.  There can be as well.  So in particular, the equal

11   treatment, so to speak, of different trusts, even if it's

12   right, that the strength of claims and defenses may differ

13   substantially across them, that's something that's not so

14   clear until you are digging into the analysis.  I don't

15   think it's right that that's an assumption that Dr. Snow

16   flags for the trier of fact.

17   Q.  And if we take a step back from these five pillars, is

18   it your view as a matter of statistics that sampling is

19   inappropriate in this case?

20   A.  No.  I am aware that there are some legal contexts where

21   it's determined as a matter of law that sampling is not

22   appropriate, but as a statistical matter, I would say that

23   one can use sampling to estimate damages generally, and it's

24   possible I believe in a context like this to use sampling

25   for such a purpose.  I take the issue of whether or not it's

1   correct as a matter of law to be a separate consideration

2   that's not my domain.

3   Q.  Okay.  Let's turn now to the issue of the way that

4   Dr. Snow designed his sample.  In terms of Dr. Snow's

5   assignment, do you have an opinion on what led him to

6   violate the pillars of statistics you've been discussing?

7   A.  Well, I believe it's right that Dr. Snow is put in a

8   very difficult position.  I've reviewed Dr. Snow's

9   background.  I don't have any reason to doubt that he knows

10  what he's doing with respect to statistics, but it's also

11  true that he had constraints that were put upon him by

12  virtue of instructions he was given by counsel.  And it's my

13  view that the change with respect to his assignment actually

14  led to most of the errors that we see, and that's

15  particularly pronounced for the monoline settlements.

16  Q.  Now, just to be clear, did Dr. Snow design his sampling

17  protocol for the PRMI case in particular?

18  A.  No.  It's my understanding that at the time that he

19  designed his sample, PRMI was not even a defendant.  So he

20  designed his sample for the First Wave cases and PRMI was a

21  defendant later on, is my understanding.

22  Q.  Okay.  And did you create a slide discussing the design

23  of Dr. Snow's sampling protocol?

24  A.  I did.

25  Q.  Okay.  And could we look at slide 17.13, please?

```
 1    A.  Yes.  I'm there.

 2    Q.  Okay.  Is this the slide you are referring to?

 3    A.  It is, yes.

 4    Q.  And just to orient us, can you describe what the two

 5    columns on this slide represent?

 6    A.  Of course.  The left-hand column is an attempt to give a

 7    30,000-foot perspective on what Dr. Snow had planned to do

 8    initially.  The right-hand column is instead what Dr. Snow

 9    eventually did, and that would be after his change in

10    assignment.

11    Q.  Okay.  Let's start with the left-hand column.  Would you

12    describe what Dr. Snow planned to do.

13    A.  Right.  So my understanding of what Dr. Snow set out to

14    do is to, step one, draw a defendant sample; step two,

15    estimate a count-based breach rate.  The third consideration

16    is that that was supposed to be for what were deemed

17    at-issue loans, quote, unquote; and then finally to estimate

18    loss on a defendant's breaching loans.

19    Q.  And let's turn to the right-hand column.  Would you

20    describe what Dr. Snow actually did with his protocol.

21    A.  Right.  So with the sampling and damages methodology

22    that Dr. Snow puts forward, there's both the defendant

23    sample, but also a global sample.  Instead of using

24    count-based breach rates, there's a use of loss-weighted

25    breach rates.  It's also true that that pertains not to all
```

1    at-issue loans, but instead for subpopulations of those

2    loans.

3              And then finally there's allocation, determining a

4    defendant's share of the five separate settlements, the

5    trust settlement and the four monoline settlements.

6    Q.  Okay.  I would like to ask you a few questions about the

7    differences between these two columns.  First of all, what

8    is the difference between a count-based breach rate and a

9    loss-weighted breach rate?

10   A.  Right.  So a count-based breach rate is an idea that is

11   rooted in each loan counts equal; that is to say, if I am

12   engaging in a sample scheme, I'll have an equal probability

13   of drawing all loans.  If you juxtapose that with loss

14   weighting, the idea is you want to focus on the loans that

15   have greater losses.  That would be more consistent

16   withdrawing a sample in a different way using what's

17   sometimes referred to as dollar unit sampling, where the

18   sample would be more inclined to include a loan if it had

19   more losses.  If you think of count-based versus

20   loss-weighted, loss-weighted intuitively just gives more

21   weight to loans with more losses.

22   Q.  Now, in terms of the margin of error, is there any

23   significance to switching from a count-based to a

24   loss-weighted breach rate?

25   A.  There is.  So with respect to a sample that is designed

1    to estimate a count-based breach rate, it may be right that

2    you have a particular margin of error that you could hit.  A

3    loss-weighted breach rate estimate, however, has an

4    additional source of variability, which is the losses

5    associated with that particular loan.

6             So if you approach the problem in terms of loss

7    weighting and you're using a sample that's actually based on

8    a count-based approach, you have extra slippage; and that's

9    at root why Dr. Snow misses his targets for the margins of

10   error on the breach rate estimate.

11   Q.  So which type of breach rate did Dr. Snow ultimately use

12   in his damages calculations?

13   A.  In his damages calculation Dr. Snow uses loss-weighted

14   breach rates.

15   Q.  Did he use the count-based breach rate as an input into

16   damages?

17   A.  No, he did, not as an input into damages.

18   Q.  Okay.  And how does this shift from count-based breach

19   rates to loss-weighted breach rates by Dr. Snow relate to

20   the first pillar of sampling?

21   A.  Well, if you had started by asking the question what am

22   I going to do with the sample, if the answer was I'm going

23   to estimate damages, then that would have led to a different

24   sampling scheme.  In particular, I touched upon this

25   earlier.  There's a concept of dollar unit sampling where

1   you would say instead of having each loan have an equal

2   chance of getting selected into your sample, maybe a loan

3   should have a chance of getting selected into the sample

4   that's proportional to the loss associated with that loan.

5   And that's a common approach and that would be referred to

6   as dollar unit sampling in the sense of losses being

7   measured in dollars.

8   Q.  So if he had used dollar unit sampling, could Dr. Snow

9   have designed his samples to guarantee a loss-weighted

10   breach rate with a particular margin of error?

11   A.  Yes.

12   Q.  And earlier you said you reviewed Dr. Snow's trial

13   testimony; is that right?

14   A.  Yes.

15   Q.  And do you have an understanding of why he didn't use

16   dollar unit sampling here?

17   A.  I think he described that as being rooted in two

18   different ideas.  One is count-based is what he was used to

19   doing; and then the other was that it was his view that that

20   might lead to some problems with respect to the replacement

21   of loans in the event of a determination by a reunderwriter

22   that a loan was not re-underwritable.

23   Q.  Now, focusing on the second issue, the replacement of

24   loans, do you have a view on whether Dr. Snow is correct

25   about that?

1    A.  I do.  It's my view that Dr. Snow is incorrect on that

2    point.

3    Q.  And can you explain why that is?

4    A.  Yes.  So the replacement idea works as follows:  If a

5    reunderwriter determines that a particular loan is not

6    re-underwritable, the idea of the backup sample is you would

7    then replace that loan with one from the backup sample; and

8    that has some challenges associated with it in terms of

9    statistical principles, but that's the basic idea that

10   Dr. Snow had regarding his backup samples.

11           If he had instead done something like dollar unit

12   sampling, the idea is essentially the exact same.  So if

13   there's a loan that the reunderwriter determined was not

14   re-underwritable, let's suppose that loan had $100,000 in

15   losses.  You would then turn to the backup sample.  The

16   backup sample would be shuffled in a random order, and you

17   would then proceed down the list sampling additional loans

18   until you had gotten a total amount of replacement loans

19   that exceeded $100,000 in losses.

20   Q.  Now, would it have been a problem if the losses on the

21   backup sample loans exceeded the losses on the original loan

22   that you were replacing?

23   A.  No.  Let me walk you through two simple ways that this

24   would work, and I will go back to my hypothetical of the

25   loan that's to be replaced has loss of $100,000.  Here's one

1      very simple scenario.

2              You turn to the first loan in the backup sample

3      and it turns out that loan has $100,000 of loss also, so

4      then you draw that loan in.  The other possibility is that

5      it's got an amount of loss that's in excess of 100,000, and

6      in that case you say -- you add it to the list.  You

7      actually have additional precision by virtue of the fact

8      that it has additional loss, more than you are looking to

9      get with it.

10             The third possibility is that the first loan that

11     you're turning to in the backup sample actually doesn't have

12     $100,000.  So, in other words, we've gone through $100,000

13     exactly, above $100,000, and below.  In the event that it's

14     below, you simply turn to the next loan in question until

15     the total amount of loans that have been replaced is at

16     least equal to $100,000.

17             And in that case what happens when your total

18     amount of loss exceeds $100,000 is the same as in the

19     scenario I told you before.  You have a total amount of loss

20     that's above your target which leads to better precision,

21     not worse.  It's actually very simpler -- very simple in

22     terms of how the process is to be adjusted and is one that I

23     would have expected him to have done.

24     Q.  And I think you mentioned that there was another reason

25     why Dr. Snow didn't use dollar unit sampling.  What's your

1    understanding of that reason?

2    A.  So this is somewhat flimsier in terms of its support,

3    but he simply said that that's what he had done before.  I

4    would have said that the better approach to sampling is to

5    actually start from the science and not necessarily simply

6    do something that one had done before.

7    Q.  And a couple times today you've mentioned the term

8    "at-issue loans".  Is that a statistical term?

9    A.  No, that's not, and when -- when I'm careful, I'll try

10   to say, quote, at-issue, unquote.  That's a term that I

11   believe somehow emerged in the conversation about assignment

12   perhaps with counsel, but is instead a designation of a

13   subpopulation of the loans as being, quote, at-issue,

14   unquote.

15          I'm not -- you know, I don't have a view as to

16   what's legally at issue, but my understanding is that that's

17   broader and that that's all of the loans that would be in

18   settlements, the trust or the monoline settlements.

19   Q.  Okay.  And do you have an understanding of what the term

20   "at-issue" loans means?

21   A.  Yes.  So it's defined in Dr. Snow's reports.  So the

22   definition that he adopts is there have to be at least $500

23   of actual losses or the loan has to be 90 days plus

24   delinquent or in foreclosure or real estate owned.

25   Q.  Okay.  And how did Dr. Snow's assignment change with

1    respect to these at-issue loans?

2    A.  So it's my understanding that he was instructed to focus

3    on the at-issue loans.  If you think of the broader set of

4    loans that are at issue, there are attempts that one could

5    make later to recover from that misstep with respect to

6    designating a subpopulation as being of interest instead of

7    the population, but it's my understanding that there was not

8    an attempt made to go back and to resample the portion of

9    the population that was omitted in the first instance.

10   Q.  I think you referred to "subpopulations".  What's the

11   significance of the fact that Dr. Snow shifted from all

12   at-issue loans to just subpopulations of at-issue loans?

13   A.  Well, what it does is it means that there's a slippage

14   with respect to the numbers that he comes up with.  They

15   actually are not correct for the relevant population.  So if

16   you think of the context that we're in, it's hard to justify

17   sampling from the wrong population when you could sample

18   from the correct population, and that's what was done here.

19        That would obligate a statistician to point out,

20   well, here are the bottom-line implication for my numbers of

21   having sampled from the wrong population, and that can be

22   done and I've described that.

23   Q.  Now, with respect to subpopulations of loans, is there

24   any particular issue that comes up with respect to the

25   monoline estimates?

1   A.  Well, the monoline settlements themselves are a

2   different type of issue altogether in the sense of the

3   samples that Dr. Snow drew were not focused on the question

4   of separate settlements; but when he goes to actually

5   approach the monoline settlements, he uses the sample that

6   he drew for other purposes and examines the subset of loans

7   that happen to fall into the monoline settlements and that

8   leads to quite a bit of difficulty statistically.

9   Q.  Let's talk specifically about Dr. Snow's methodology for

10  allocating the trust settlement.  Okay?

11  A.  Okay.

12  Q.  Now, did you create some slides regarding the trust

13  settlement?

14  A.  I did.

15  Q.  Okay.  And we'll go through those one by one, but at a

16  high level, is it your opinion that Dr. Snow's analysis of

17  the trust settlement violates the pillars that we've been

18  discussing?

19  A.  It's my view that it violates three of the pillars.

20  It's not as unworkable as the monoline settlement approach,

21  but it is an approach that has some problems associated with

22  it.

23  Q.  Okay.  And let's start with the second pillar, actually.

24  Did Dr. Snow draw his samples from the correct population

25  for purposes of allocating the trust settlement?

1    A.  No, he did not.

2    Q.  Why is that?

3    A.  Well, if you think of the issue that we were just

4    talking about, the quote, at-issue, unquote, loans, that's a

5    subset of the loans that are covered by the settlements; and

6    so from that perspective from the start Dr. Snow's samples

7    are drawn from the wrong population.

8    Q.  And is there any way in which Dr. Snow's samples are

9    overinclusive with respect to the trust settlement?

10   A.  With respect to the trust settlement, yes.  So you could

11   describe Dr. Snow's samples as being both underinclusive and

12   overinclusive, but overinclusive in the sense of some of the

13   loans are actually not covered by the trust settlement.

14   Q.  And did you create a slide regarding whether Dr. Snow's

15   sampled from the wrong population?

16   A.  I did.

17   Q.  Let's look at slide 17.15, please.

18   A.  Yes, I'm there.

19   Q.  Okay.  And at a high level, would you explain what this

20   slide shows.

21   A.  Yes.  So this slide is showing a count of loans where

22   available, total losses associated with those loans, and the

23   percentage of total losses associated with those loans for

24   four different groups.  The first is what Dr. Snow

25   designates, quote, at-issue, unquote, loans.  The second

1    category is loans that were already paid in full.  I forget

2    the exact label.  I believe it's May 2013.  The third

3    category is loans that were performing but were not included

4    in the at-issue loans, so in that category.  And then

5    finally, the nondebtor-sponsored trusts, and that's in the

6    fourth row of the table.

7    Q.  And you see the title there "Bankruptcy Population"?

8    A.  Yes.

9    Q.  And what does that mean?

10   A.  That means that, it's my understanding, that all of the

11   loans that are in all four of those groups would form

12   instead the correct population for this matter.

13   Q.  And I think you mentioned the first category was

14   "At-Issue" Loans.  How many loans were in that category?

15   A.  So as the chart shows, approximately 463,000.

16   Q.  And what were the total losses on those loans?

17   A.  Total losses, $42.289 billion.

18   Q.  And just for clarity, where do those loss figures come

19   from?

20   A.  Those parallel what I reported on before; that is to

21   say, I'm taking Dr. Snow's numbers for losses.

22   Q.  And the second category of loans here, "Paid-in-Full,"

23   how many loans were in that category and what were the

24   losses?

25   A.  So that's 1.3 million loans, so many more than the

1   "at-issue" loans, but of course since they're paid in full,

2   they have zero losses.

3   Q.  And the third category, "Performing Loans," how many

4   loans were in that category?

5   A.  Performing loans, there's approximately 237,000 and they

6   have total losses of 897 or 898 million.

7   Q.  And the fourth category of loans, "NDS Trusts" loans,

8   did Dr. Snow ever identify how many loans were in that

9   category?

10  A.  No, I don't believe that he did.  However, there are

11  aggregated losses associated with those that Dr. Snow has

12  hut forward, and that's $1.687 billion.

13  Q.  Okay.  And if you wanted to allocate the bankruptcy

14  settlements based on breaching losses, what population of

15  loans would you sample from?

16  A.  Well, if you were looking for an allocation approach for

17  the overall set of loans and you wanted to focus on losses,

18  you would look at the, quote, at-issue, unquote, loans.  You

19  would neglect the paid-in-full loans since there were no

20  losses associated with them.  You would turn to the

21  performing loans and then the NDS loans.  So those three

22  groupings.

23  Q.  And in the paid-in-full loans, would you need to look at

24  them for any purpose?

25  A.  You wouldn't need to look at them unless you were

1    focusing instead on something like what Dr. Snow has done

2    with respect to his a count-based approach.  In that

3    context, it's of course right that the argument regarding

4    them having zero losses would say not be as relevant.

5    Q.  Okay.  And did Dr. Snow draw his samples here from the

6    full populations of loans with losses?

7    A.  No.  What Dr. Snow does is he samples loans only from

8    that first line group, the, quote, at-issue, unquote, loans.

9    Q.  And in your view, was it an error for Dr. Snow to sample

10   just from the at-issue loans?

11   A.  I think it is an error.  I think it's very hard to

12   justify drawing your samples from the wrong population.  I

13   think that in this context the better course of action would

14   be to ask what is the sample actually going to be used for;

15   and if the answer to that question is it's supposed to cover

16   all of the bankruptcy settlement, I don't really see the

17   justification for focusing on a subset.

18   Q.  You've said several times that you reviewed Dr. Snow's

19   trial testimony.  From that testimony, do you have an

20   understanding of why he sampled from just these at-issue

21   loans?

22   A.  Yes.  It's my understanding from his testimony that he

23   was told to make an assumption that that was the population

24   of interest.

25   Q.  In his testimony, did you see any statistical

1    justification from sampling from just the at-issue loans?

2    A.  No.  I don't think there could be a statistical

3    justification for sampling only from the, quote, at-issue,

4    unquote, loans.

5    Q.  Okay.  In looking at your slide here, what percentage of

6    the losses across the RFC and NDS trusts were associated

7    with the at-issue loans?

8    A.  The at-issue loans are 94.2 percent of the total losses

9    for all of the bankruptcy population.

10   Q.  And does that affect your view of whether it was correct

11   for Dr. Snow to sample from just the at-issue loans?

12   A.  No.  So, again, it's true that 94 percent is not as bad

13   as if that was a much lower number.  At the same time, it's

14   hard to understand why you should sample from the wrong

15   population when you could sample from the correct one.

16   Q.  And suppose that Dr. Snow had sampled from the full

17   population of loans with losses.  Would that have required

18   him to draw larger samples?

19   A.  No.  I would have expected him in that context that he

20   would have instead just focused his same sample size on the

21   correct population as opposed to the wrong population.

22   Q.  Okay.  And when you issued your reports during the First

23   Wave of these cases, did you raise the issue that Dr. Snow

24   had sampled from the wrong population?

25   A.  I did.

1    Q.  And then when you issued your report in this case, did

2    you again raise that issue?

3    A.  I did.

4    Q.  And at any point did Dr. Snow go back and sample from

5    the performing loans or the NDS Trust loans?

6    A.  No, I don't believe so.

7    Q.  Okay.  What did Dr. Snow do in response to your point

8    about sampling from the wrong population?

9    A.  Well, to a certain extent, Dr. Snow assesses something

10   like a bounding analysis such as that that I described

11   initially.

12   Q.  And as part of that bounding analysis, does he make

13   certain assumptions?

14   A.  Yes.

15   Q.  Okay.  And have you prepared a slide regarding

16   Dr. Snow's analyses, or at least some of those analyses?

17   A.  Yes, I have.

18   Q.  Okay.  Let's look at slide 17.16, please.

19   A.  Yes.  I'm there.

20   Q.  Could you describe for us the first line here that

21   refers to 100 percent NDS Breach Rate.

22   A.  Yes.  So one of the adjustments that Dr. Snow considers

23   is he tries to take account of the fact that the population

24   was, in fact, a subpopulation by augmenting the loan

25   population with the NDS loan population, but making an

1    assumption regarding what the breach rate would have been

2    for those loans.

3              He estimates something -- or rather, he makes an

4    assumption, really, to borrow information from other samples

5    that he doesn't have regarding NDS loans, and uses a breach

6    rate estimate of 60.4 percent.

7              And that's actually not the maximal impact of

8    failing to sample from the NDS loans.  Instead, the maximal

9    impact of failing to sample from the NDS loans is what I've

10   laid out here in the first row, and that's labeled

11   "100 Percent NDS Breach Rate."

12             Then the rest of the table describes Dr. Snow's

13   estimate, what the adjusted estimate is if you instead use

14   100 percent for the NDS breach rate, the impact of that, and

15   then the percentage change, and that's for the first row.

16   Q.  And what is the impact of that analysis?

17   A.  The impact of that analysis for PRMI's damages would be

18   a decline in damages, according to Dr. Snow's methodology,

19   of $125,000.

20   Q.  Okay.  And earlier in the trial Dr. Snow testified that

21   it was reasonable to assume that the NDS trusts had the same

22   breach rates as RFC's trusts based on his review of Duff &

23   Phelps' analysis in the bankruptcy.  Do you have a reaction

24   to that?

25   A.  I did.  I was surprised by that when I first encountered

1    it and so I looked into that.  Duff & Phelps didn't sample

2    from the NDS trusts either, so there's actually no support

3    for that contention as far as I understand it.  So instead

4    what's true is that there is an attempt to borrow

5    information, so to speak, but that borrowing is something

6    that essentially makes up an assumption that doesn't have

7    any support with which I'm aware.

8    Q.  So just to be clear, what population of loans was Duff &

9    Phelps looking at?

10   A.  So Duff & Phelps was involved, is my understanding, in

11   the earlier phase of the litigation.  They were looking at a

12   set of loans that weren't loans that corresponded to the NDS

13   loans.

14   Q.  Okay.  In his trial testimony Dr. Snow also mentioned

15   that the NDS trusts and the RFC trusts were similar in terms

16   of vintage and product type.  Does that support an

17   assumption, in your view, that the NDS trusts and the RFC

18   trusts had the same breach rate?

19   A.  No.  So statistics as a science is not one where we say

20   we're going to advance an estimate because we might get

21   lucky and it's right.  Instead we advance an estimate and

22   describe here are the reasons why this is likely to be the

23   correct number; or if there is sampling uncertainty

24   associated with that number, we say here's the likely range

25   that's attributable to the sampling uncertainty.

1          It's inappropriate for there to be an assertion of

2    similarity based on two simple variables.  For example, if

3    you thought of it the other way around, that is to say, is

4    it right that I know that two different subpopulations are

5    likely to be the same, it would be easy to reject that type

6    of assumption.  If you look in the real world, it's rarely

7    right that two subpopulations are exactly right, and so to

8    assert that when I found two things that are the same,

9    therefore I know that those subpopulations are exactly

10   right, in my mind that's simply a mistake.

11          If you will, we could go back to the Minnesota

12   poverty rate example.  If -- so I was born in Minnesota and

13   then moved to Alabama.  I can tell you they are two really

14   different places.  If you went about trying to figure out

15   something about Minnesota versus Alabama, you could try to

16   talk about those two different places and you could try to

17   make a case somehow that Alabama and Minnesota are the same,

18   so that somehow you could take, for example, an estimated

19   poverty rate for Alabama and impute that to Minnesota.

20          It would not be an approach that I would

21   recommend.  I would think it would be right that it would be

22   easy to find, however, two variables that were similar

23   between Alabama and Minnesota, even if it's right that the

24   bottom line number is very different.  And here I think that

25   that's basically what's happening.  That is to say, you have

1     two variables that may be similar between the NDS loans and

2     the other loans, but that doesn't establish that everything

3     is similar.  In particular, I wouldn't think that it would

4     be right that that would be something that would allow you

5     to get away from an examination of representations and

6     warranties as an example.

7     Q.  And based on your review of his reports, did Dr. Snow

8     ever analyze whether the NDS trusts and the RFC trusts were

9     similar in terms of representations and warranties?

10    A.  No, I don't believe he examined them.

11    Q.  Okay.  And so let's look back at your slide here.  And

12    focusing on the second line, "Alternative Breach Rate

13    Assumptions for Unsampled Loans in RFC Trusts."

14    Dr. McCrary, would you explain what that line shows.

15    A.  Yes.  So Dr. Snow does something like this analysis, but

16    he doesn't do it correctly.  This is a little bit like the

17    first scenario where Dr. Snow had adopted something like a

18    bounding approach to take account of the fact that he had

19    sampled from the wrong population, but he didn't actually do

20    the bound correctly.  So the maximal impact that I spelled

21    out in the first row corresponds to assuming a 100 percent

22    NDS breach rate.

23         With respect to the second, here, to have the

24    bound done correctly, you had need to have a zero percent

25    breach rate for PRMI and a 100 percent breach rate for the

1    global loans.  And that's actually one of the approaches

2    that Dr. Snow undertakes.  He undertakes some others as well

3    that are not actually bounding analyses, just changing those

4    underlying assumptions.

5           And parallel to the first row, the remaining

6    columns basically spell out both his initial estimate, the

7    adjusted estimate, the impact of that, and the percentage of

8    change.

9    Q.  And what would be the impact of this bounding analysis

10   in the second line here?

11   A.  In the second line the impact of this bounding analysis

12   would be $207,000.

13   Q.  And during his testimony Dr. Snow used the word

14   "extreme" to describe the assumptions under this bounding

15   analysis.  Do you have a reaction to that?

16   A.  I do.  I think that misunderstands the exercise.  If you

17   sample from the wrong population as opposed to the correct

18   population, you have to take steps to figure out by how much

19   did that actually adjust your numbers.  So of course the

20   better practice would be to avoid bounding altogether and

21   sample from the correct population; but given that the die

22   is cast and Dr. Snow is using his approach, which focuses on

23   the subpopulation, the bounding analysis that I've displayed

24   here is by construction making extreme assumptions because

25   that's the situation in which we find ourselves by virtue of

2557

1    Dr. Snow's approach.

2    Q.  And I think you mentioned that Dr. Snow did some other

3    analyses where he assumed other breach rates.  Could you

4    describe those analyses?

5    A.  Yes.  I would have described those analyses as not

6    actually being bounding analyses.  Those would instead be

7    attempts to make assumptions about what might be true

8    regarding the unsampled population, and to carry through

9    calculations predicated on those assumptions even if it's

10   right that they were not necessarily supportable.

11   Q.  Okay.  And as a matter of statistics, do you have an

12   opinion on whether those other analyses are appropriate?

13   A.  No, I think that it's right that if you sample from the

14   wrong population, again, the appropriate steps to take are

15   bounding analyses.

16   Q.  Okay.  Let's look back at your slide one more time.

17   Would you say that the adjustments for Dr. Snow's failure to

18   sample the NDS trusts and these other unsampled loans in the

19   RFC trusts were minor in nature?

20   A.  It probably depends on how you think of that.  So the

21   final column lists the percentage change; and for the first

22   row that's 2.3 percent and the second row that is

23   3.8 percent.  And that's another way of saying that the

24   $125,000 and the $207,000 are small relative to Dr. Snow's

25   estimate.  That being said, they're not necessarily small.

1    So $125,000 and $207,000 are substantial sums of money, of

2    course.

3              So like with many quantity of considerations, it

4    would really depend on how you were thinking about the

5    numbers relative to what is one of the key questions in a

6    quantitative analysis.

7    Q.  Now, in his final damages estimate did Dr. Snow make any

8    adjustment for failing to sample from either the NDS trusts

9    or the performing loans?

10   A.  No, not in his final damages approach, no.

11   Q.  And as a statistician, do you have an opinion on whether

12   it was appropriate for Dr. Snow to make no such adjustment?

13   A.  No.  It's my view that if you, again, sample from the

14   wrong population, you should instead engage in the bounding

15   analysis to know what's the maximal effect that that could

16   have happened -- that could have had, rather, on the numbers

17   that you're putting forward for the end purpose.

18   Q.  Okay.  And Dr. McCrary, I would like to switch gears a

19   little bit and talk about your opinions regarding the

20   margins of error on Dr. Snow's trust breach rates.  Okay?

21   A.  Okay.

22   Q.  All right.  So just how do the margins of error on his

23   trust breach rates compare to the margins of error that he

24   targeted for his count-based breach rates?

25   A.  Well, it's very simple, really.  So his targeted margins

1    of error pertain to count-based breach rates.  The

2    loss-weighted breach rates stated margins of error are

3    already in excess of that; but for the bottom line damages

4    numbers, what he needs is not breach rate in isolation, but

5    rather the ratio of breach rates, estimated breach rates,

6    for PRMI and the global sample respectively.

7              And it turns out that both that top number and the

8    bottom number are subject to sampling uncertainty, so they

9    each have their own margin of error; but when you take the

10   ratio, the two of them conspire to create a yet larger

11   margin of error.  So for the trust settlement overall, the

12   overall margin of error is 26 percent, which is a very wide

13   swing.

14   Q.  Okay.  And did you prepare a slide regarding the margin

15   of error on Dr. Snow's trust damages estimate?

16   A.  I did.

17   Q.  Okay.  Let's look at slide 17.18.

18   A.  Yes.

19   Q.  Okay.  Would you explain what this slide shows.

20   A.  Yes.  So a moment ago I testified that Dr. Snow's margin

21   of error associated with the trust settlements is 26

22   percent.  That's the number that you see in the upper right

23   in the text box.  The chart itself is demonstrating the

24   distribution, and I'll explain that idea in an a little bit,

25   of Dr. Snow's trust damages number.

1              What does the distribution mean?  The distribution

2        is something that characterizes where would the numbers have

3        fallen if we had gotten different samples than we actually

4        had.  And what the chart shows on the X-axis is different

5        numbers of damages estimates for the trust settlements

6        specifically, and there's a blue curve that you see

7        superimposed that looks a little bit like a bell.  The shape

8        of that is approximately what you would describe as a bell

9        curve, and that shows a height that is showing what's the

10       more likely values that you are going to get.

11             You also see three different vertical black lines.

12       The center vertical black line is at Dr. Snow's actual

13       dollar figure, that is to say $5.098 million, and then the

14       left and the right-hand black vertical lines are showing the

15       lower and upper bounds of what's called a confidence

16       interval.  That's the two numbers that a statistician would

17       assert are likely to cover the true number had, instead of a

18       sample, an enumeration of the population had been

19       undertaken.

20       Q.  At trial Dr. Snow testified that it's typical to report

21       a margin of error on damages in terms of dollars instead of

22       percents.  Do you have a reaction to that?

23       A.  I think that really misstates the case.  It's frequently

24       right that you would characterize a swing in terms of

25       percents just to understand how to absorb the information.

1          For example, people have been talking a lot about

2     the stock market over the past few days and it would be very

3     common for people to say I don't really understand how big

4     the drop in the Dow was.  Was it a 10 percent drop or not?

5     So it would be very common for people to use percents to

6     think about dollars.

7     Q.  In your opinion, is an margin of error of plus or minus

8     26 large for a damages estimate like this?

9     A.  It is large, yes.

10    Q.  And can you give us an example to illustrate that?

11    A.  Well, if we think of, for example, the Minnesota

12    Department of Revenue coming to a taxpayer and saying we've

13    estimated that you owe back taxes of $5,098, and then the

14    taxpayer learns that actually underneath that estimate there

15    was a sample that was used, and that the uncertainty

16    attached to that means that they might owe as little as

17    $3,836; then I think the taxpayer would be a little bit

18    taken aback at the idea that they had to hand over $5,098.

19         So from that perspective, I'd say that those kinds

20    of swings with respect to a money demand is something which

21    can be very wide in a concrete context.

22         MR. NESSER:  Your Honor, I would move to strike

23    the last answer on the basis that it's a non-disclosed

24    opinion.

25         THE COURT:  All right.  Can you show me where it's

1    disclosed?

2              MR. NICHOLSON:  Your Honor, the concept that he is

3    discussing is discussed in his report at paragraphs -- I

4    believe it's, off the top of my head -- 105 and 106.

5              THE COURT:  All right.  And which report are we

6    talking about?

7              MR. NICHOLSON:  Sure.  We're discussing the

8    report -- his rebuttal report, PTX-258, at paragraphs 105 --

9              THE COURT:  August 23rd?

10             MR. NICHOLSON:  I believe that's correct.  Oh, I'm

11   sorry, no, August 9, 2019.

12             THE COURT:  Okay.  And what paragraphs?

13             MR. NICHOLSON:  Right.  So paragraph 105, page 39.

14   In terms of PTX, it's 258-42.

15             THE COURT:  One minute.  Okay.  Again, page

16   258-42?

17             MR. NICHOLSON:  Sure, yeah.

18             THE COURT:  105?

19             MR. NICHOLSON:  Right.  So the concept that

20   Dr. McCrary is addressing is the one that he discusses here.

21   Dr. Snow also fails to address the implications of having

22   such a large margin of error of his trust damages estimate.

23   As discussed in the McCrary First Wave rebuttal report,

24   given the wide margins of error for Dr. Snow's trust damages

25   estimate, one can have little certainty that his pooling

 1     estimate represents the actual damages.

 2              And so what Dr. McCrary was just discussing there

 3     was just a real world example of how that would play out.

 4              THE COURT:  Let me take a minute to read paragraph

 5     105.

 6              MR. NICHOLSON:  Sure.

 7          (Pause in proceedings.)

 8              MR. NICHOLSON:  The example Your Honor --

 9              THE COURT:  Let me --

10              MR. NICHOLSON:  Sure.

11          (Pause in proceedings.)

12              THE COURT:  Okay.

13              MR. NICHOLSON:  The example he was using to

14     illustrate that about the Minnesota Department of Revenue is

15     the exact same example he used at the *HLC* trial and there

16     was no objection there.  It's simply an illustrative example

17     to describe this conceptual point that he is making.

18     There's no basis for a motion to strike.

19              THE COURT:  Mr. Nesser.

20              MR. NESSER:  Your Honor, the example was never

21     disclosed.  The fact that Mr. Rand in a context of a jury

22     trial where there were many objections being made chose not

23     to object to that one I don't think is relevant here.

24              THE COURT:  All right.  I think it's fair.  You

25     can ask him about the sample -- what he describes as an

1    example in his report.

2              MR. NICHOLSON:  And I will.

3              THE COURT:  All right.  Well, then I think the

4    objection is well taken and that portion of the testimony is

5    struck.

6    BY MR. NICHOLSON:

7    Q.  So, Dr. McCrary, I guess at a conceptual level, does the

8    margin of error on a damages estimate go only to precision

9    and not reliability?

10   A.  No.  What I would say instead is that the wider the

11   margin of error, the lower the degree of confidence that you

12   have in the estimate itself.

13   Q.  Okay.  And earlier at the trial I think Dr. Snow

14   testified that his point estimate was the most likely

15   estimate of damages.  I believe those were the words he

16   used.  Do you have a reaction to that?

17   A.  Yes.  It's my view that that misunderstands the broader

18   context in which a statistical quantity is going to be used.

19   What Dr. Snow meant by that I think is a simple mathematical

20   statement, which is I don't think he was saying anything

21   more complicated than the blue curve has a peak that is

22   close to his estimate.  That, however, entirely ignores the

23   broader context in which that number is going to be used.

24              So there is an asymmetry with respect to mistakes

25   with respect to getting a number that's below or above a

1    particular number.  It's more consequential for, of course,

2    those to whom money demand is being made if the number is

3    big as opposed to small.

4    Q.  And in your professional experience, have you seen ways

5    that parties have addressed damages estimates that have

6    large margins of error?

7    A.  Yes, I have.

8    Q.  And can you give us an example that you're familiar

9    with.

10   A.  Sure.  So a simple real-world example of this is CMS

11   audits.  So if CMS goes to a hospital and says we've been

12   engaged in some investigations; part of those investigations

13   involve sampling.  On the basis of those investigations

14   we've determined that this is the dollar amount that you owe

15   back to the government.  What they do in that context is

16   they internalize, if you will, the costs of imprecision

17   associated with their own decision about how large of a

18   sample to undertake.

19         So in particular, they don't assess the hospital

20   in that context with their estimate of what the hospital

21   owes.  Instead what they do is they take a percentile at the

22   lower edge of the distribution of the sample.

23   Q.  And what percentile do they take, or percentiles?

24   A.  They have been inconsistent about this from

25   investigation to investigation.  Their manual or handbook

1    states that they are to take 10 percent of -- the 10th

2    percentile specifically, but I also have experience in which

3    they've actually asserted that the 5th percentile is instead

4    what's owed.

5    Q.  Okay.  And did you create a slide showing how the CMS

6    approach would apply to Dr. Snow's estimate of trust

7    damages?

8    A.  I did.

9    Q.  Okay.  Let's look at slide 17.19, please.

10   A.  I'm there.

11   Q.  Okay.  Dr. McCrary, would you briefly describe what this

12   slide shows.

13   A.  This slide is parallel to the prior slide.  The X-axis

14   corresponds to a dollar amount.  The blue curve is

15   Dr. Snow's estimated sampling distribution associated with

16   the trust damages number; and the black vertical bars are

17   superimposed at the 5th and 10th percentiles of that

18   sampling distribution respectively.  So rather than the

19   $5.089 million figure that was Dr. Snow's estimate, the CMS

20   approach would be $4.26 million or $4.023 million.

21   Q.  Okay.  And just let me -- just for clarification, let me

22   ask you a question about the distribution here.  Does this

23   include any adjustment for the failure to sample from the

24   performing loans or the NDS trusts?

25   A.  No, it does not.

1   Q.  And just in general, if one were to make the adjustments

2   for the performing loans or the NDS trusts, how would that

3   affect the 5th and 10th percentiles here just directionally?

4   A.  It would move them to the left; that is to say, they

5   would be adjusted down.  The same would hold, for example,

6   with respect to the relative strength of claims and defenses

7   point.

8           MR. NICHOLSON:  Your Honor, I'm moving on to a new

9   unit.  I just wanted to advise the Court of that in case you

10  would like to --

11          THE COURT:  We could take our afternoon break.

12  The good news, I don't know if this is good news for

13  Dr. McCrary, but the good news is that the Southern District

14  of New York has agreed to go until 6:00 p.m. his time, or

15  5:00 p.m. our time.  So that's very kind of them, and I will

16  follow up with a personal letter to them.  So we will --

17          MR. NICHOLSON:  Thank you, Your Honor.

18          THE COURT:  -- come back at about 3:15.  Court is

19  briefly adjourned.

20  (Recess taken at 3:02 p.m.)

21                  *    *    *    *    *

22  (3:20 p.m.)

23                  **IN OPEN COURT**

24          THE COURT:  Before we start up with Dr. McCrary

25  again, Mr. Nicholson, the chief judge in this district has

1    ordered an emergency meeting for the morning to talk about

2    restrictions in this district related to coronavirus and

3    it's a must show for me.

4              MR. NICHOLSON:  Okay.

5              THE COURT:  So, I'm not going to go to

6    Minneapolis, but I will appear by phone.  The trouble is

7    that we're going to have to start later.  I had hoped to

8    start at 8:00 a.m. with Dr. McCrary.  Now it looks like we

9    won't start until 9:15 a.m. St. Paul time, which it would be

10   10:15 a.m., Dr. McCrary, your time.  I just don't see any

11   way around it.  All right?

12             Okay.  You may proceed, Mr. Nicholson.

13   BY MR. NICHOLSON:

14   Q.  Welcome back, Dr. McCrary.  Just to confirm, can you

15   hear and see me okay?

16   A.  I can.

17   Q.  Okay.  Great.  I would like to turn to your opinions

18   regarding Dr. Snow's methodology for allocating the monoline

19   settlements.  Okay?

20   A.  Okay.

21   Q.  Now, in your opinion, does Dr. Snow's analysis of the

22   monoline settlements violate any of the pillars that you've

23   been discussing?

24   A.  Yes.  I believe it violates all five of those pillars.

25   Q.  Okay, let's start with the first one.  With respect to

1    the monoline settlements, did Dr. Snow design his sampling

2    protocol to answer the right question?

3    A.  No, I don't believe that Dr. Snow in designing his

4    sampling protocol had thought of allocation, and I don't

5    think that he had thought of doing so for the monoline

6    settlements specifically.  It was designed instead to

7    estimate breach rates for defendants.

8    Q.  Just to be clear, are the monoline settlements separate

9    settlements?

10   A.  Yes, they're four separate monoline settlements.

11   Q.  Okay.  And now, did Dr. Snow design his protocol to

12   sample from each of those four separate settlements?

13   A.  No, he did not.

14   Q.  And, Dr. McCrary, are you familiar with the concept of

15   stratified sampling?

16   A.  Yes.  Stratified sampling is a common point of

17   discussion in sampling textbooks and would be an approach

18   whereby you would divide up the population and to mutually

19   exclusive and exhaustive groups and then sample within each

20   of those.  That might be a particularly appropriate approach

21   in a context such as this where there was a need to approach

22   the five total settlements, that is to say the trust

23   settlement and the four monoline settlements, separately.

24   Q.  And so are there advantages to stratifying a sample

25   ahead of time?

1    A.  Yes.  One --

2    Q.  Go ahead.

3    A.  Yes.  So one example of stratifying ahead of time that

4    can be advantageous is sometimes you know that you're going

5    to have to generate estimates that are specific to subgroups

6    A example of that would be, for example, here where you have

7    a need to allocate for the trust settlement and also for

8    each of the four monoline settlements.  There are other

9    technical considerations as well, but that's the leading

10   one.

11   Q.  Okay.  And did you create a slide regarding the number

12   of loans from each monoline settlement in Dr. Snow's global

13   sample?

14   A.  I did.

15   Q.  Okay.  And let's look at slide 17-22 -- or 17.22.

16   A.  I'm there.

17   Q.  Great.  Would you please explain what this slide shows

18   as it relates to the first and second pillars.

19   A.  Yes.  With respect to the first and second pillars,

20   asking the right question and drawing the sample so that

21   it's representative of the correct population, the overall

22   global sample is something that has 410 loans in it, and

23   there is a subsample of that that corresponds to monolines.

24   And so in particular, the global monoline subsample has 105

25   loans in it.  That's notably smaller, of course, than the

1    overall global sample.

2           But if you are coming back to the point that

3    you've raised in your question a few moments ago, there's

4    not one monoline settlement.  There's actually four separate

5    monoline settlements for Ambac, FGIC, MBIA and Syncora; and

6    for those four monoline settlements, the number of loans are

7    45, 38, 22, and zero respectively for the global sample.

8    Q.  And are those small samples for each monoline

9    settlement?

10   A.  Obviously for Syncora there is literally no information

11   in the global sample, but it's also true that for even the

12   largest of those, the Ambac loans at 45, that's a very small

13   sample size.  That's a fragile basis for making a

14   consequential decision.

15   Q.  Did you prepare a similar slide with respect to the PRMI

16   sample?

17   A.  I did.

18   Q.  Let's look at DDX-17.23.

19   A.  I'm there.

20   Q.  Would you explain what this slide shows in terms of the

21   first and second pillars.

22   A.  Yes.  This line parallels the prior slide, but it's

23   specific to the PRMI sample as opposed to the global sample.

24   So in the PRMI sample overall there's 150 loans.  The

25   monoline subsample of that is only 39 loans.  But if you

1      focus on the four separate monoline settlements, they are

2      associated with much smaller sample sizes.  For Ambac, FGIC,

3      MBIA, and Syncora, those loan counts are 27, 9, 2, and 1

4      respectively.

5      Q.  And again, are these small samples on a monoline-

6      specific basis?

7      A.  These are.  I would say that these are extraordinarily

8      small.  For Syncora, MBIA, and FGIC, you have 1, 2, and 9

9      loans respectively.  The largest of the four monolines,

10     Ambac, only has 27 loans, and that itself is in many ways

11     number bound.

12     Q.  Now, in connection with his original monoline

13     methodology, how did Dr. Snow estimate his breach rates?

14     A.  Well, with respect to Dr. Snow's monoline approach,

15     breach rates are something that could be thought of as

16     having a defendant-specific component, but ultimately

17     there's going to be, with respect to this kind of situation,

18     a challenge that he's going to confront, which is those

19     extraordinarily small sample sizes.

20          So what Dr. Snow elected to do is to ignore the

21     fact that the four monolines are, in fact, four separate

22     settlements and to pool them together to estimate one

23     blended rate overall.

24     Q.  And how does he apply that blended breach rate to the

25     specific monoline settlements and pools?

1    A.  He applies it to all four of the monoline settlements.

2    So in particular, what that's going to mean is that if you

3    take the example of FGIC with, say, 9 loans, he's going to

4    borrow information from completely different monoline

5    settlements to come up with that blended monoline rate; and

6    then he's going to apply that to FGIC.

7    Q.  And how does it apply at a pool level?

8    A.  At a pool level it's the same issue.  So although there

9    are different pools, he is sampling overall from all of the

10   pools with respect to the global sample.  PRMI is only in a

11   subsample -- a subset, rather, of those pools.  So PRMI's

12   loans would be reduced, but with respect to the global,

13   there's a mismatch with respect to the PRMI pool definition.

14   Q.  So you referred to FGIC.  So let's imagine a specific

15   pool that was insured by FGIC.  How would the approach work

16   with respect to that specific pool?

17   A.  Well, this is parallel to what I was describing a moment

18   ago.  For that specific pool, information would be borrowed,

19   in my view inappropriately, from other pools that were not

20   pools in which PRMI had loans, for example, for FGIC, but

21   also information would be borrowed from entirely different

22   monoline settlements, in particular Ambac, MBIA, and

23   Syncora.

24   Q.  Earlier we discussed the fifth pillar, which concerns

25   assumptions.  Does Dr. Snow's original monoline methodology

1    depend on any assumptions?

2    A.  Yes.  So the approach that I just described is one that

3    is making an implicit assumption that everything is equal

4    across loan pools and also across monoline settlements.

5    Q.  And so can you explain why it is that Dr. Snow's

6    approach relies on that assumption?

7    A.  Well, Dr. Snow wouldn't have had to have relied on

8    anything like an assumption if he had instead engaged in

9    monoline stratification, for example, like we touched upon

10   earlier.  I believe that he was caught in an awkward

11   position whereby his sample was not up to the task and it

12   was an attempt to repurpose that sample.  But I think it's

13   probably correct that when confronted with a sample size of

14   2, for example, if we look at PRMI for MBIA, Dr. Snow

15   wouldn't have tried to come up with a quantity based on a

16   sample size of 2; and in that context he is in many ways

17   making an error that's of a different type, which is to

18   introduce bias into his estimates, but borrowing information

19   from other settlements.

20   Q.  Okay.  And is there a name in statistics for the type of

21   assumption that Dr. Snow is making here?

22   A.  There is.  We have technical language in statistics

23   sometimes.  So we call that a homogeneity assumption, which

24   just means everything is the same as opposed to being

25   different.  When I described this idea for students, I refer

1    to it in plain English instead as the oranges are apples

2    assumption.

3    Q.  And why do you call it the oranges are apples

4    assumption?

5    A.  Well, all of us know that oranges and apples are two

6    fruits, but that they're not the same thing.  And in one

7    context it might be appropriate to make an assumption that

8    the two things are both fruits, for example; but in another

9    context if you were making the assumption that they were

10   equal, that might be wrong.  So you would have to justify on

11   a case-by-case basis, assuming that they were equal.  So you

12   would have to ask for what purpose am I making that

13   assumption, and does that possibly introduce bias into my

14   underlying estimates.

15   Q.  So kind of connecting the two, how is that oranges are

16   apples assumption relate to what Dr. Snow is doing in his

17   monoline analysis?

18   A.  Well, in his monoline analysis Dr. Snow is assuming that

19   all four monoline settlements are the same.  There is

20   evidence that is strongly against that assumption, but

21   that's the assumption that's being made.

22   Q.  And in your opinion, has Dr. Snow offered any evidence

23   to support an assumption that these monoline settlements

24   were the same?

25   A.  No, I don't believe that there's any credible

1    information that would support such an assumption.

2    Q.  And with respect to settlement factors, can you describe

3    the settlement factors that Dr. Snow applies to the

4    different settlements, the monoline settlements.

5    A.  Yes.  Dr. Snow's monoline settlement factors themselves

6    vary by a factor of about 10, ranging from below 10 percent

7    up to 90 percent.

8    Q.  And what does that tell you with respect to this fifth

9    pillar?

10   A.  That tells you that by Dr. Snow's own damages

11   methodology, it's acknowledged that the different monolines

12   are very different from one another, yet there is one breach

13   rate that's estimated overall across the four different

14   monoline settlements.

15   Q.  Now, have you done any analysis of whether the breach

16   rates would likely vary across the settlements?

17   A.  I have.

18   Q.  And at a high level, what did you conclude?

19   A.  At a high level, I concluded that there was strong

20   evidence that the different monoline settlements had very

21   different characteristics associated with their loans; and

22   when I examined that evidence, I concluded that I would not

23   have wanted to have made a homogeneity assumption had I been

24   in Dr. Snow's shoes since it seems as though that's

25   contradicted by the available evidence.

1    Q.  Okay.  Have you prepared some slides regarding this

2    analysis?

3    A.  I have.

4    Q.  Okay.  Let's look at slide 17.28.  Let me know when you

5    get there.

6    A.  I'm there.

7    Q.  Great.  So could you please explain what this slide

8    shows.

9    A.  Yes.  So this is a slide which is showing for the four

10   different monoline settlements the distribution of vintage.

11   "Vintage" refers to the year that the loans were originated.

12   And there are four different pie charts.  Rather than walk

13   through them, I can just tell you what the bottom-line

14   conclusion from them is, which is that no one of these pie

15   charts looks like any of the other three; that is to say,

16   they all have very different distributions of vintage.

17   Q.  And did you do any investigation of whether differences

18   in vintage matter in terms of breach rates?

19   A.  I did.

20   Q.  And what did you find?

21   A.  I found that for those different vintages, you saw very

22   different estimated breach rates.

23   Q.  And were those differences statistically significant?

24   A.  They were at all conventional levels.  And what that

25   tells you as the bottom line is that vintage is very

1   different across the four different monoline settlements,

2   and it tells you that vintage is itself something that's

3   predictive of breach rates; and yet Dr. Snow estimates a

4   single breach rate across all four monolines.  I take that

5   to be contrary to the available evidence.

6   Q.  Now, this evidence of breach rates, is that based on

7   plaintiff's reunderwriter or defendant's reunderwriter?

8   A.  That's based off plaintiff's re-underwriter.

9   Q.  Okay.  Now, let's look at slide 17.30, please.

10  A.  Yes, I'm there.

11  Q.  Okay.  Would you explain what this slide shows.

12  A.  This slide is parallel to the slide previously, but

13  instead of examining vintage, this looks at product type;

14  that is to say different loan products.  And the bottom-line

15  conclusion of these charts is the same as what you saw in

16  the prior slide, which is to say no one of these pie charts

17  looks like the other three.

18          So in particular, product types are different

19  across the different monoline settlements; and I did an

20  analysis that's parallel to the one that you just asked me

21  about regarding vintage in which I examined estimated breach

22  rates according to the different product types and they are

23  themselves very different.

24  Q.  And was that based on plaintiff's reunderwriting as

25  well?

1    A.  Again, that was based off of plaintiff's reunderwriter;

2    and what you see is that product type, just like vintage, is

3    predictive of strong differences in breach rates and the

4    underlying characteristic itself is different across the

5    four different settlements, suggesting strongly to me that

6    it's an error to assume that the breach rate would be the

7    same across the four different monoline settlements.

8    Q.  So in light of all this analysis, would you kind of sum

9    up your final opinion regarding whether Dr. Snow's monoline

10   analysis violates the fifth pillar?

11   A.  I would say that these homogeneity assumptions that I've

12   underscored here are implicit rather than explicit in

13   Dr. Snow's approach.  Moreover, I would say that they are

14   contrary to the available evidence.  So yes, I would say

15   that that violates the fifth pillar.

16   Q.  And does that violation have any implication for the

17   reliability of Dr. Snow's monoline estimate?

18   A.  It does.  Making an assumption that is not justified can

19   have decisive implications for an analysis; and in

20   particular, would have the consequence of leading the

21   estimates to be biased and would also lead them to have

22   misstated margin of errors; that is to say, the margins of

23   error would not reflect the fact that the assumption was

24   false.  That's not how they're calculated.

25   Q.  Okay.  Let's look at slide 17.32, please.

1          Dr. McCrary, would you explain what this slide

2     shows at a high level.

3     A.  Yes.  And I touched upon this earlier in my testimony,

4     but this is a depiction of a fact associated with PRMI,

5     which is that there are overall 153 different insured loan

6     pools that the monoline subsamples are drawn from, but PRMI

7     only has loans and payments corresponding to 20 of those 153

8     loan pools.  So the orange circle that's depicted here in

9     the chart is a subset of the overall set of 153 insured loan

10    pools.

11    Q.  So in terms of Dr. Snow's allocation of damages, which

12    pools are being allocated damages in the PRMI case?

13    A.  In the PRMI case, he's allocating PRMI monoline damages

14    only to the 20 insured loan pools; but what's happening is

15    that he's using information from all 153 that correspond to

16    the global sample.  And if you look at that, that's a

17    mismatch with respect to the coverage.

18    Q.  And how does this issue on this slide relate to the

19    second and fourth pillars?

20    A.  Well, with respect to the second pillar, the second

21    pillar says that you want to draw a sample that's

22    representative of the correct population.  Here, the correct

23    population for PRMI would have been those 20 pools.

24          If you think of the fourth pillar, the fourth

25    pillar is that your estimate ought to be unbiased, and I

1    would say that both of those would be violated with respect

2    to PRMI and the monoline samples.

3    Q.  And based on your review of Dr. Snow's opinions, have

4    you seen any statistical justification for including loans

5    in his samples from pools with either no PRMI loans or no

6    payments?

7    A.  No, I don't believe that there could be a statistical

8    justification for that.  It's just an error.

9    Q.  Okay.  And let's look at slide 17.33, please.

10   Dr. McCrary, would you explain what this slide shows.

11   A.  Yes.  So this tries to depict the implications for the

12   sample sizes if we attend to this last point regarding the

13   relevant pools.  So the chart shows sample sizes for the

14   PRMI sample and for the global sample in the first and

15   second columns respectively.  The PRMI sample has 150 loans

16   in the full sample.  The monoline subsample that Dr. Snow

17   uses has 39 loans associated with it.  The monoline

18   subsample from the relevant pools is 27; that is to say,

19   there are 27 loans in that.

20          And the effects for the global sample are more

21   striking.  So for the global sample there are 410 loans in

22   the total sample.  The monoline subsample, per Dr. Snow, has

23   105 loans; but in the relevant pools there are only 30

24   loans.

25   Q.  Okay.  And those bottom-line numbers there, 27 and 30,

1    do those refer to blended monoline subsamples?

2    A.  Yes.  So those are actually across all four of the

3    monoline settlements.  So if we focus on specific monoline

4    settlements, the facts are much more striking in terms of

5    the small sample sizes.

6    Q.  Okay.  And so in terms of pillar two, what's the

7    significance of this slide?

8    A.  Well, this slide shows you that by drawing from the

9    incorrect population and instead trying to use a sample that

10   was drawn for a very different purpose, we end up with a

11   scenario where we have 27 PRMI loans and the relevant pools

12   for all four monoline settlements; and for the global sample

13   we end up with 30, again, spread across four different

14   monoline settlements.  And those are just unworkably small

15   sample sizes, but that's even more true once we look at

16   specific monoline settlements.

17   Q.  Then, Dr. McCrary, let's talk about pillar three

18   concerning margins of error.  In your opinion, does

19   Dr. Snow's monoline estimate violate pillar three?

20   A.  Yes.  Even if you take the numbers on their face, the

21   margin of error associated with the monoline estimate that

22   Dr. Snow puts forth is larger by quite a margin than is the

23   trust settlement number, and yet that stated margin of error

24   is not actually the actual margin of error.  The stated

25   margin of error relies on the underlying assumption of

1   homogeneity, which as I hope my testimony today has

2   clarified, is almost surely false.

3   Q.  And let's look at slide 17.34, please.  And Dr. McCrary,

4   can you describe what this slide shows regarding the margins

5   of error.

6   A.  Yes.  So the implication of the small sample sizes is

7   that even the reported margins of error that rely upon the

8   homogeneity assumption themselves are much larger than

9   Dr. Snow's target margins of error.  So what this slide

10  shows you is what those targets were for the PRMI and global

11  samples, the targeted margin of error was 8 percentage

12  points and 5 percentage points respectively, but the

13  reported margin of error for the loss-weighted monoline

14  breach rate is 19.1 percentage points and 12.4 percentage

15  points for the PRMI and global samples respectively.  That

16  is to say, well above their stated goal.

17  Q.  And in your view, are these margins of error correct?

18  A.  No.  It's actually my view that those are themselves

19  understated because they invoke an assumption which is very

20  unlikely to be true.

21  Q.  Okay.  So in light of all these issues we've discussed,

22  in your view is Dr. Snow's original estimate of the monoline

23  damages usable?

24  A.  No.  It's my view that while the trust settlement, some

25  adjustments could be made that would render that estimate

1    itself something that was workable, that the monoline

2    estimates themselves are fundamentally unreliable and ought

3    not be used.

4    Q.   Okay.  And I think you mentioned this earlier, but are

5    you aware that Dr. Snow has now put forward a settlement

6    specific estimate of monoline damages?

7    A.   I am.

8    Q.   And does that settlement specific estimate change your

9    view on the reliability of his original monoline estimate?

10   A.   No, it does not.

11   Q.   And why is that?

12   A.   Well, for one reason, I would say that my view regarding

13   his original approach is rooted in statistical principles

14   and statistical principles don't change with respect to his

15   new approach.

16        The second reason, though, is that that approach

17   that you are describing relies on different data.  So if you

18   look at the approach, it's in my view not correct that that

19   somehow endorses or blesses the original approach that he

20   undertakes.

21   Q.   And can you just explain what that change in data is?

22   A.   So there are additional loans that he uses with respect

23   to that second approach, and so the underlying comparison is

24   really two things changing at once, not one thing.

25   Q.   Okay.  And were those loans part of his original sample?

1    A.  No, they were not.

2    Q.  Okay.  Now, let's look at 17.36, please.

3    A.  I'm there.

4    Q.  Okay.  Dr. McCrary, can you explain what this slide

5    shows in terms of the first and third pillars?

6    A.  Yes.  So this is showing the first and -- sorry.  For

7    the PRMI and the global samples, this is showing the

8    settlement specific sample sizes and it's showing them in

9    the entries in the table.  So, for example, for Syncora,

10   MBIA, FGIC and Ambac, you see for the PRMI sample we have 1,

11   9, 9, and 27 loans respectively.  For MBIA, the 9 is listed

12   as 2 plus 7 because there were 7 new loans associated with

13   MBIA.  That's the underlying change that I alluded to a

14   moment ago.  And for the global sample, we see sample sizes

15   of 0, 22, 38, and 45 respectively.

16   Q.  So how does this relate to the third pillar here?

17   A.  The relationship to the third pillar is that if you look

18   at the settlement-specific approach, the sample sizes

19   undergirding those are very small and that would be a flimsy

20   basis for coming up with an estimate.  Margins of error,

21   even those that are reported are large, but if they were

22   calculated accurately, they would be yet larger in my view.

23   Q.  Let's look at slide 17.37, please.  Dr. McCrary, would

24   you explain what this slide shows.

25   A.  Yes.  So if you look at those two slides, those two

1    slides are parallel to one another.  The focus here is on

2    the relevant pools as opposed to overall.  So for Syncora

3    and MBIA and the PRMI sample, you don't see a change with

4    respect to the underlying entries; that is to say, there is

5    one loan corresponding to Syncora, 9 for MBIA, the 2 as well

6    as the new 7, but for FGIC and Ambac the relevant sample

7    sizes fall to 5 and 19 respectively.  And for the global

8    sample, Syncora remains at 0 loans, but MBIA, FGIC and Ambac

9    have 16, 4, and 10 loans respectively in the relevant pools.

10   Q.  So in relation to pillar two, what's the significance of

11   this slide?

12   A.  Well, again, pillar two is to draw your sample from the

13   correct population and for your sample to be representative

14   of that population.  For the monolines, it's very hard for

15   me to understand why there would be a population that would

16   be any different from PRMI than the relevant pools that

17   corresponded to PRMI.  So that would be the appropriate

18   notion of the population and that's not what the samples are

19   actually drawn from.

20   Q.  Okay.  In your opinion, are Dr. Snow's samples

21   sufficient to estimate settlement-specific damages in a

22   reliable manner?

23   A.  No.  I don't think that for the monoline methodologies

24   that depend upon sampling that they can be rescued.  I think

25   that they are just fundamentally unreliable and ought not be

1     used.  That's my view.

2     Q.  Okay.  And now let's talk about Dr. Snow's new

3     non-extrapolated estimated monoline damages.  In your

4     opinion, does that non-extrapolated estimate show that his

5     original monoline estimate is reliable?

6     A.  No.  Again, so we know from statistical principles that

7     that first approach is not reliable.  That's not a good

8     basis for making a serious decision.  At the same time, the

9     non-extrapolated numbers don't rely on sampling.  So that

10    might be a workable approach for estimating monoline

11    damages.

12    Q.  And is there any reason why you think it wouldn't be

13    appropriate to compare the non-extrapolated estimate to his

14    original estimate?

15    A.  Well, again, I think that if you're using different

16    data, I think that you're going to get different

17    conclusions, but I think the core point is comparing the two

18    and somehow thinking that that leads to a conclusion that an

19    approach that we know is not reliable is somehow endorsed,

20    that's just simply not how statistics works.

21    Q.  Okay.  And before we conclude, I would like to ask you

22    just a few -- for your reaction to a few more parts of

23    Dr. Snow's testimony.

24              Dr. Snow testified that sampling on a pool-by-pool

25    basis would have required more than 10,000 loans.  Do you

1    have a reaction to that?

2    A.  I don't think that that's necessarily -- I don't think

3    that that's that realistic.  I think that the sampling on a

4    settlement-by-settlement basis would have been very

5    practical, and something like that might have been not just

6    practical, but might have handled a large number of

7    different issues and challenges that Dr. Snow ran into.

8    Q.  Okay.  How many global sample loans would Dr. Snow have

9    needed had he drawn settlement-specific samples?

10   A.  Using his own approach, when I calculated that figure,

11   it was approximately 1,300 loans.  In other words, much

12   lower than 10,000.

13   Q.  Okay.  And suppose that Dr. Snow had drawn those global

14   sample loans back in 2016, do you have an opinion on whether

15   he could have used them in other cases?

16   A.  Yes, it's my understanding that in the early round of

17   cases there were some 20 different cases pending, and of

18   course it's right that the global sample was to be used with

19   respect to any particular defendant.

20           MR. NESSER:  Objection, Your Honor.  I move to

21   strike that answer on the basis that --

22           THE COURT:  Is your mic on?

23           MR. NESSER:  I'm sorry, Your Honor.  I move to

24   strike that answer.  It was effectively an opinion about

25   what would have been procedurally permitted by Your Honor.

1              THE COURT:  Has this opinion been disclosed?

2              MR. NICHOLSON:  I think so, Your Honor.  He's

3       discussed his opinion about like how many you would have to

4       sample on a settlement-by-settlement basis.  We've had many

5       discussions in this case about how there were more -- there

6       was more than one case in 2016 when Dr. Snow drew his global

7       sample.  I think it's entirely appropriate for Dr. McCrary

8       to respond to Dr. Snow on that point and say that had you

9       drawn these global sample loans, you could have used them in

10      more than one case.

11             THE COURT:  Mr. Nesser.

12             MR. NESSER:  Dr. McCrary is a statistician.  He

13      has no basis to opine on what would have been permissible

14      for Dr. Snow to use or not use under the Case Management

15      Orders entered in this case.

16             MR. NICHOLSON:  He's not opining on what would

17      have been permissible under the Case Management Orders.

18      He's saying that if hypothetically he had drawn those loans

19      in 2016, could they have been used in other cases.  He's not

20      opining on what the Court would have held about that.

21             MR. NESSER:  Your Honor, it was not hypothetical.

22      He literally asked him how many cases were pending at that

23      time.

24             MR. NICHOLSON:  And, Your Honor, Dr. Snow has

25      testified on the issue of litigation constraints repeatedly

1    in these cases over and over again.  All of those opinions

2    on litigation constraints are premised on his view from

3    counsel about what Your Honor would have held or wouldn't

4    have held had they asked to redesign their sample.

5            So I think it's a bit strange that Dr. Snow is

6    allowed to testify, you know, with leeway on litigation

7    constraints when there's no basis for that other than what

8    apparently plaintiff's counsel has told him, but I can't ask

9    a question that's very simple, which is supposing that he

10   had drawn a global sample loans of 1,300 loans back in 2016,

11   could he have then used them in other cases?

12           MR. NESSER:  Your Honor, the constraints that

13   Dr. Snow talked about in his testimony were explicitly

14   characterized as constraints that he understood to exist

15   because they had been communicated to him by counsel.

16   Dr. Snow never opined independently as a statistician on

17   what the procedural and legal constraints were that actually

18   existed in the world as Dr. McCrary is purporting to do now.

19           If the question that Mr. Nicholson is trying to

20   ask Dr. McCrary is whether, you know, in a hypothetical

21   world Dr. Snow could have constructed a different

22   methodology back in 2016 using 1,300 loans, I have no

23   objection to that.  But the opinion that Dr. McCrary is

24   purporting to offer now about what would have been

25   procedurally and legally permissible is just not anything he

1    has a basis to opine on.

2            MR. NICHOLSON:  Your Honor, Mr. Nesser is

3    completely mischaracterizing the question.  I didn't ask him

4    to opine on the procedural propriety of anything.  I didn't

5    ask him to opine on what Your Honor would have ruled.  I

6    asked exactly what Mr. Nesser is saying is permissible,

7    which is supposing that Dr. Snow had, in fact, drawn these

8    sample loans back in 2016, could he then have used them in

9    other cases.  That is an entirely permissible opinion.  It

10   doesn't require any speculation about litigation

11   constraints.  It's supposing that Dr. Snow had done this.

12           THE COURT:  Okay.  The question is:  "And suppose

13   that Dr. Snow had drawn those global sample loans back in

14   2016, do you have an opinion on whether he could have used

15   them in other cases?"

16           MR. NICHOLSON:  That "could he have used them,"

17   I'll take out "do you have an opinion," if that resolves the

18   objection.

19           THE COURT:  Well, it would depend on a lot of

20   things that he's not qualified to testify about, right?  I

21   think you should -- I'm going to strike this, but I'm going

22   to let you rephrase it so his opinions are limited to his

23   role as a statistician.

24           MR. NICHOLSON:  Okay.

25   BY MR. NICHOLSON:

1    Q.  So, Dr. McCrary, the global -- let's talk about the

2    global monoline samples, okay?  Are those -- were those

3    global monoline samples used in more than just one case?

4    A.  Yes.

5    Q.  Okay.  And they were used in more than just the PRMI

6    case specifically?

7    A.  Yes.

8    Q.  So if you had more loans in a global monoline sample,

9    they could have been used in other cases as well; is that

10   correct?

11   A.  Yes.

12   Q.  Okay.  Now, Dr. McCrary, I just have one question about

13   the non-extrapolated approach by Dr. Snow.  As far as the

14   number of loans that could have been reviewed on that --

15   under that approach, what's the maximum number that

16   plaintiff could have reviewed under a non-extrapolated

17   calculation?

18   A.  Well, for the non-extrapolated approach, there's not a

19   need for the global sample, so that's zero.  And for PRMI,

20   there's only 95 loans total.  So from that perspective --

21   for that approach -- so from that perspective it would be 95

22   loans total, 95 plus zero.

23   Q.  Okay.  Thank you.  Now, just in conclusion, Dr. McCrary,

24   in all -- in light of all of the issues we've been

25   discussing, could you please summarize your final opinions

1   regarding Dr. Snow's sampling and damages methodologies.

2   A.  Yes.  So in my testimony today I've touched upon three

3   main ideas.  The first is that there's no attempt made by

4   Dr. Snow in his methodology to adjust for the differing

5   strengths across the trusts of claims and defenses, and that

6   that leads to bias, and in particular for PRMI that leads

7   their damages estimate to be overstated.

8           Second, for the trust methodology, I have concerns

9   regarding Dr. Snow having drawn from the incorrect

10  population and having conducted a sample that was designed

11  for one purpose and then put to another purpose.  That leads

12  to two qualitatively different types of adjustments that I

13  believe are obligatory in that context.

14          The first is a bounding analysis to accommodate

15  the fact that the, quote, at-issue, unquote, loans were not,

16  in fact, the only loans that were at issue.  Instead that

17  was all of the loans associated with the bankruptcy

18  settlements, and that type of bounding analysis ought to be

19  done.

20          The second point was that if you look at the

21  margins of error associated with the trust methodology,

22  trust numbers at the end have a margin of error of 26

23  percent, which is a very wide swing.  It's my view that the

24  proper approach there is for the designer of the sample to

25  ask for money that's more consistent with the CMS pattern,

1   which is to adjust the numbers downwards so that imprecision

2   associated with the estimate is something the consequences

3   of which are borne by the designer of the sample.

4          Turning to the monoline settlements, my view is

5   that all of the approaches to estimating damages for the

6   monoline settlements that are based on sampling are

7   fundamentally unworkable.  When you get down to the actual

8   sample sizes for the relevant pools for the specific

9   monoline settlements, they are shockingly small and ought

10  not to be used for any serious decisions.

11         With respect to figuring out an alternative

12  approach, it is true that Dr. Snow's non-extrapolated

13  approach doesn't rely on sampling and so that might be a

14  workable approach for the Court to consider.

15         MR. NICHOLSON:  Thank you, Dr. McCrary.

16         Your Honor, I have no further questions at this

17  time.

18         THE COURT:  Thank you, Mr. Nicholson.

19         Mr. Nesser, should we take five minutes while you

20  set up or do you think you can move ahead?

21         MR. NESSER:  I think five minutes would be

22  terrific.

23         THE COURT:  Okay.  We'll take five minutes.  We'll

24  be back in five.

25  (Recess taken at 4:00 p.m.)

```
 1                        *    *    *    *    *

 2       (4:10 p.m.)

 3                           IN OPEN COURT

 4

 5            THE COURT:  All right.  Are you ready?

 6            THE WITNESS:  Yes, Your Honor.

 7            THE COURT:  Very good Mr. Nesser.

 8                         CROSS-EXAMINATION

 9       BY MR. NESSER:

10       Q.  Good afternoon, Dr. McCrary, from Minnesota.

11            Dr. McCrary, there's no dispute for purposes of

12       this case that PRMI sold dozens of breaching loans to RFC,

13       correct?

14       A.  That sounds to me like you're asking me about something

15       that's not about statistics.  I suppose it would depend on

16       how you define the term "breaching," but I think I know what

17       you mean, which is that there are breaching loans as

18       determined by the plaintiff's re-underwriter.

19       Q.  And what damages should the Court award for those

20       breaching loans?

21       A.  I think you're asking me a question that was not part of

22       my assignment.  I was asked to review Dr. Snow's analysis.

23       I've done so, and I have described my views regarding his

24       approach.

25       Q.  Dr. McCrary, you emphasized in your testimony earlier
```

1    that your research over the last 10 or 15 years addresses

2    real-world problems, right?

3    A.  Yes, that's correct.

4    Q.  And real-world data?

5    A.  That's right.  So I draw upon a wide variety of

6    different data sources in my work, that's true.

7    Q.  And you, in fact, said that in your career you've

8    written only one theoretical paper regarding statistics,

9    right?

10   A.  I think that is what I said, yes.

11   Q.  And yet here the scope of your assignment did not

12   encompass, nor did your expert opinion in this matter

13   encompass, advancing what you would describe as an

14   affirmative allocation model, right?

15   A.  That's correct.  I was not asked to put forward an

16   affirmative damages model myself.

17   Q.  Was the decision not to put forward an alternative

18   damages number your decision or counsel's decision or

19   perhaps something in between?

20   A.  I just simply wasn't asked to do that.

21   Q.  So it was counsel's decision?

22   A.  Yes.  The assignment that was given to me was simply the

23   assignment.  I didn't volunteer that I wanted to estimate

24   damages or anything like that.

25   Q.  Why not?

```
1    A.  In an expert engagement I take the assignment as given.

2    So the assignment that is asked for is something that is

3    governed by all kinds of considerations.  It's not really

4    part of my domain.  Somebody says are you able to execute on

5    the following task and I say, Yes, I am --

6    Q.  Right.  Because --

7    A.  -- or, No, I'm not.

8    Q.  Because calculating damages, alternative damages, that

9    would have been a real-world application; that's what you

10   just said is not your domain, right?

11   A.  I think I must have gotten turned around on your

12   question.  Could you say that again?  I think the answer to

13   your question is no, but I might have misunderstood it.

14   Q.  Dr. McCrary, as of the date of your testimony in the HLC

15   trial, you had not proffered by way of opinion or testimony

16   any damages model on behalf of any of the clients that had

17   engaged you, correct?

18   A.  You're talking about the RFC matter generally; and if I

19   understand you right, the answer is, yes, that's right, I

20   had not been asked to do that by any of the defendants.

21   Q.  And since the date of your testimony in the HLC trial,

22   you have not proffered by way of opinion or testimony any

23   damage model on behalf of any of the clients that have

24   engaged you, correct?

25   A.  That's also correct.
```

1    Q.  And, Dr. McCrary, you're not a lawyer?

2    A.  No, I'm not a lawyer.

3    Q.  And you're not offering any legal opinions here, right?

4    A.  No, sir.

5    Q.  You're not a bankruptcy expert?

6    A.  No, sir.

7    Q.  You're not holding yourself out as an expert on the

8    valuation of RMBS claims?

9    A.  That's also correct.

10   Q.  And it's also correct that you are not holding yourself

11   out as an expert on the valuation of claims more broadly,

12   right?

13   A.  That's correct.  My expertise is in economics and in

14   statistics.

15   Q.  And, Dr. McCrary, you filed a report in what we've been

16   referring to as ResCap's Wave One actions.  Do you know what

17   I mean when I use that term?

18   A.  I think I do, yes.

19   Q.  And you wrote every word of that report, right?

20   A.  Yes, I did.

21   Q.  You wrote all of the words?

22   A.  I did, yes.

23   Q.  And putting aside typographical errors or something of

24   that nature, the substance of that report was true at the

25   time you prepared it, right?

```
 1    A.  I believe that it was, yes.

 2    Q.  And that was on October 27, 2017?

 3    A.  That might be right.  I don't remember the date, but

 4    I'll take you at your word.

 5    Q.  And you also testified under oath in a deposition in

 6    Wave One, correct?

 7    A.  I believe that's also correct, yes.

 8    Q.  And you gave truthful testimony in that deposition?

 9    A.  Yes.

10    Q.  That was November 1, 2018?

11    A.  Same as before, I don't remember the date, but I'll take

12    you at your word.

13    Q.  And likewise, your expert reports and deposition

14    testimony in the Trust's case against PRMI, those have been

15    truthful and accurate as well as far as you're aware,

16    correct?

17    A.  Yes, that's correct.

18    Q.  And just for the record, your report in this case was --

19    or your first report in this case was August 9, 2019, and

20    your deposition was October 23, 2019?

21    A.  I remember August 9 from Mr. Nicholson's question.  I

22    don't remember offhand the date of the deposition, but

23    again, I'll take you at your word.

24    Q.  And, Dr. McCrary, you're here as an objective expert,

25    right?
```

```
1    A.  My obligation is to the trier of fact, that's correct.

2    Q.  You're here as an objective expert, yes?

3    A.  Yes.

4    Q.  And as an objective expert, your role is to describe

5    what kinds of conclusions are supported and what kinds of

6    conclusions are not supported in a neutral way, right?

7    A.  I would agree with that, yes.

8    Q.  And as part of that, you testified today about pillars

9    of statistics, yes?

10   A.  That's correct, my testimony touched upon the five

11   pillars that I talked about.

12   Q.  Right.  And today you identified five pillars that you

13   say Dr. Snow violated?

14   A.  It was a bit more specific than that, but I don't mean

15   to quibble, yes.

16   Q.  And sitting here today, you're not aware of a statistics

17   textbook that discusses pillars, right?

18   A.  It's not usually the way that the information is

19   presented.  I've actually, over the years as I've taught the

20   subject, wondered if I shouldn't actually write a statistics

21   textbook myself, but I've never gotten around to it.  I

22   don't think it's right that you could find a textbook that

23   describes the five pillars in the same way that I have, but

24   all five of those pillars are addressed between the lines in

25   virtually every treatise on statistics I've ever
```

1    encountered.

2            For example, margins of error, unbiasedness,

3    transparency regarding assumptions.  Transparency regarding

4    assumptions and justifying them is probably more about

5    applications of statistics, so it might not show up in a

6    textbook as readily as the other two.  But the second

7    pillar, for example, that the sample be representative of

8    the population, I think that's probably in every statistics

9    textbook; and the first pillar is probably largely unstated,

10   but in my experience is a very important one.

11   Q.  Dr. McCrary, the list of pillars that you identified

12   today and the order you identified them and the words that

13   you used to describe them, that's something that you

14   developed as part of your teaching career, right?

15   A.  You know, I don't remember exactly when the first time

16   that I was trying to communicate that.  It could have been

17   in the context of teaching or it could have also been more

18   broadly trying to describe the ideas of statistics.  I have

19   expertise in statistics and I do find that that can lead

20   people to ask me questions about it, but it's not exactly a

21   subject that excites people, so I have over the years tried

22   to find ways to communicate it effectively and the pillars

23   is one way that I would use to communicate that.

24   Q.  Okay.  And now, Dr. McCrary, a pillar is like a big,

25   massive, like, foundational heavy thing that doesn't move,

1    right?

2    A.  I think we're on the same page, yes.

3    Q.  And, in fact, you also testified -- you testified today

4    that statistics is a field of mathematics and a scientific

5    subject, right?

6    A.  Some people would say that statistics is a subfield of

7    mathematics, that's correct; and it, of course, is right

8    that it has aspects to it that are technical.  I would agree

9    with that.

10   Q.  Because you testified today that statistics is a field

11   of mathematics and a scientific subject, right?  You used

12   those words.

13   A.  I believe you're quoting me accurately.  I don't have

14   the transcript in front of me, but I think that's about what

15   I was trying to say, yes.

16   Q.  And you said today that statistical principles don't

17   change, right?

18   A.  Statistical principles don't change.  I suppose some of

19   them might have greater application in one context than in

20   another, but a concept such as the second pillar, you should

21   have a sample that's drawn from the correct population,

22   something like that is foundational and doesn't change.

23   Q.  Dr. McCrary, you said about a half an hour ago that

24   statistical principles don't change, right, you used those

25   words?

1    A.  Again, I'm not looking at the transcript, but I don't

2    object to the specific word choice.  It's probably about

3    what I was trying to say.

4    Q.  Okay.  And but in any event, when you've made reference

5    to pillars, you've been describing general statistical

6    principles, right?

7    A.  Yes, I think that's correct.

8    Q.  And those pillars, in other words, describe the core

9    propositions of the field of statistics?

10   A.  I wouldn't have said that.  I've touched upon, in my

11   discussion with Mr. Nicholson, that there's a wide range of

12   principles of statistics, and not all of them have relevance

13   to Dr. Snow's methodology in this case.  I touched upon five

14   pillars that I thought of as particularly problematic for

15   the monoline settlement approach, and it turns out that

16   three of those were also, in my view, a problem with respect

17   to the trust settlements.  But I'm not trying to articulate

18   the five settlement -- the five pillars as being somehow

19   exhaustive of the subject of statistics.

20   Q.  Dr. McCrary, is it correct to say that the pillars of

21   statistics describe -- the pillars you've discussed describe

22   the core propositions of the field of statistics?

23   A.  I was trying to give a clear version of no to that

24   answer.  So maybe I should have started out by saying no and

25   allow me to explain.  But when you say "the core

```
1    principles," I take you to mean is that all of the core
2    principles of statistics, and that's not what I'm trying to
3    testify to.  I think that would be inaccurate.
4    Q.  Because it's important to distinguish between a
5    situation in which we're talking about core principles
6    generally; and on the other hand a situation in which you're
7    talking about the core principles, right?  It's important to
8    make that distinction, yes?
9    A.  Well, I don't know about -- I don't know that I totally
10   understand your question, but I was drawing a distinction in
11   my mind between the core principles, which I thought of as
12   something like enumeration, which I wasn't trying to do,
13   versus are they core principles.  I definitely agree with
14   the statement that they're core principles.  I wouldn't have
15   agreed that they were all of the core principles.
16   Q.  Okay.  But do you agree, sir, that sampling -- that the
17   pillars you've talked about refer to core principles of
18   statistics, yes?
19   A.  Yes.
20   Q.  Okay.  And you've taught statistics in many classrooms,
21   I think you've testified?
22   A.  Yes, that's correct.  I've taught statistics many times.
23   Q.  And you said when you've taught those statistics in
24   classrooms, you've taught -- you've described it as leaning
25   on five pillars.  Those were your words today?
```

1    A.  That might be right.  And also just to clarify, that

2    being more applicable in some classroom settings than in

3    others.  I think it's right that earlier today I testified

4    that it would be particularly relevant in the context of

5    introducing somebody to the field of statistics, and it

6    would be less the point of emphasis in an introductory

7    lecture for, for example, a more advanced class.  At the

8    same time in the advanced class you would circle back to the

9    same types of topics.

10   Q.  That's fine.  And what might be relevant in one

11   classroom might be different in terms of focus, but the core

12   principles of statistics don't change.  That was your

13   testimony today, right?

14   A.  I believe that summarizes or paraphrases what it was

15   that I said, yes.

16   Q.  And in your Wave One report, Dr. McCrary, you said,

17   quote, sampling an extrapolation as a methodology rests on

18   three core propositions.  Correct?

19   A.  I don't remember the words, but that might be right.

20   Q.  And in your deposition in Wave One you testified that,

21   quote, There are three pillars to extrapolation from a

22   sample to a population.  Right?

23   A.  I don't remember whether or not those are my exact

24   words, but again, I take you at your word.

25   Q.  And when you said that sampling an extrapolation rests

```
1    on three core propositions and three principles, you didn't
2    say they rest on at least three, right?
3    A.  No, I didn't.
4    Q.  And you didn't --
5    A.  Well, better said, I'm not -- I don't have the benefit
6    of looking at the same thing that you said I might have said
7    that later on, but I'm just taking you at your word.
8    Q.  Well, why don't we grab it, then.  Could you open your
9    Wave One report, which I understand is PTX-217.
10   A.  Sure.  Happy to.  What page do you want me to go to?
11   Q.  15, paragraph 32.
12   A.  Oh, I'm sorry.  I must be looking at the wrong one.
13   I've got a binder that has several -- can you remind me
14   what's the date of the report under our discussion?
15   Q.  October 27, 2017.
16   A.  Hum.  Yes, paragraph 32.  I've got it now.
17   Q.  And in paragraph 32 you say, quote, in the second
18   sentence, Sampling an extrapolation as a methodology rests
19   on three core propositions.  Right?
20   A.  Yes, that is what the sentence reads.
21   Q.  Those were your words?
22   A.  They were.
23   Q.  And you didn't say they rest on at least three core
24   propositions, right?
25   A.  I did not, no.
```

```
 1    Q.  And you didn't say there are three core propositions
 2    relevant to this case, right?
 3    A.  No, I did not.
 4    Q.  Because there's a difference between saying there are
 5    three core propositions and here are the three core
 6    propositions, right?
 7    A.  I agree that there's a difference, yes.
 8    Q.  Okay.  And why don't you pull out, please, your
 9    transcript from your deposition in Wave One.  That's
10    PTX-237.
11    A.  Just a moment.  The clerk is getting me the... okay.
12    What page?
13    Q.  Page 35.
14    A.  Okay.  Oh, sorry.  35 of the little quadrants?
15    Q.  PTX-35.
16    A.  No, I know, but there's 35 --
17    Q.  Oh, I'm sorry.  Yes, it's --
18    A.  You know, there's like four little pages.
19    Q.  Yeah, yeah, it's 134.
20    A.  I actually don't see it on that page.  For me, page 134
21    starts with, "In other words, what characteristics
22    directionally were different?"
23    Q.  That's right.  If you look at -- I'm sorry.  Hang on.
24    A.  Maybe it's the other 134?  No, can't be that.
25    Q.  It's at 135, line 7.
```

```
 1    A.  Uh-huh.

 2    Q.  And what do you say there?  You say:  "As described in

 3    my report, there are three pillars to extrapolation from

 4    sample to population and that's as true here as it is in any

 5    other scenario."  Right?

 6    A.  Yes, you read that correctly.

 7    Q.  And you didn't say there are at least three pillars to

 8    extrapolation, right?

 9    A.  No, I didn't.  That's not what the words say.  On the

10    other hand, if the question had been put to me, Are there

11    other pillars, it's probably right that I would have said

12    there might be.  I'm not sure.

13    Q.  But that wasn't the question that was put to you, right?

14    A.  I don't know actually to be clear.  That might have been

15    asked later in the deposition.  I don't remember all of the

16    questions that were asked.

17    Q.  But what you volunteered in that deposition is that

18    there were three, and you didn't say at least three and you

19    didn't say three relevant to that case.  You said three,

20    yes?

21    A.  That's right.  You've quoted me correctly in terms of

22    both my report and the deposition transcript, at least the

23    page that we were talking about and the paragraph in my

24    report that we were talking about.

25    Q.  And you said that's true in that case as in any other
```

1    scenario, and that's because the principles of statistics

2    don't change, right?

3    A.   That's correct.

4    Q.   And after identifying the three pillars of statistics in

5    your Wave One report and in your transcript, you went on to

6    opine that Dr. Snow's methodology in Wave One violated all

7    three of those three pillars, right?

8    A.   I believe that's correct, yes.

9    Q.   Okay.  And, Dr. McCrary, you served as a statistics

10   expert in a case called *Lopez vs. Liberty Mutual*?

11   A.   I believe that's correct also, yes.

12   Q.   And you served an expert report there December 21, 2018

13   under penalty of perjury?

14   A.   I'm not sure of the exact date, but I'll take you at

15   your word; and regarding under penalty of perjury, of

16   course.

17   Q.   And in an expert report there you said -- in your expert

18   report there you said, quote, Statistical analysis rests on

19   four pillars.  Yes?

20   A.   I'm not looking at it, but that might be correct.

21   Q.   Well, why don't you pull it out.  It's PTX-250-5.

22   A.   Just a moment.  Give the clerk a moment.  Let's move

23   this so we don't spill water.  PTX-250?

24   Q.   Yep, dash 5.

25   A.   Dash 5?

```
 1    Q.  Yeah, at paragraph 14.  Are you there?

 2    A.  Yes, I am, yes.

 3    Q.  And you have a big Roman numeral heading there that says

 4    "Summary of Opinions," yes?

 5    A.  Yes, that's right.

 6    Q.  And then you have paragraph 14, which starts by saying:

 7    "Statistical analysis rests on four pillars."  Right?

 8    A.  Yes.

 9    Q.  Okay.  And, again, you didn't say rests on at least four

10    pillars, right?

11    A.  No, I did not.

12    Q.  And you didn't say there were four pillars that happened

13    to be relevant in Lopez, right?

14    A.  No, I did not.

15    Q.  And you didn't say that in the science and mathematics

16    of statistics there are lots of principles, but there are

17    four of them that happen to be relevant here that you are

18    going to talk about.  You said there were a total of four,

19    right?

20    A.  No, I didn't say that there were a total of four.  The

21    paragraph says what it says.  You're not wrong about that,

22    and I didn't give the sort of caveats that you're asking

23    about, no.

24    Q.  Right.  And in paragraph 15 you then say that the expert

25    -- plaintiff's expert in that case happened to have violated
```

1    all four, right?

2    A.  Give me a moment to review paragraph 15.

3         (Witness reviews document.)

4    A.  Yes, that's correct.

5    Q.  Okay.  And now that was -- I think you can now look and

6    can confirm for me.  That report was one that you signed

7    again under penalty of perjury on December 21, 2018.  Yes?

8    A.  If it's important, I can find the signature page.  Give

9    me just a moment.

10   Q.  You can look at the header.

11   A.  Yes, the date is correct, December 21, 2018, and I --

12   yes.

13   Q.  And I think we established earlier that you testified at

14   trial in the *HLC* case to a jury in this courtroom, or at

15   least the courtroom that I'm in, that there were a big five

16   set of pillars, right?

17   A.  That might be right.  I don't remember whether or not I

18   said five or perhaps four.

19   Q.  Okay.

20   A.  I don't recall.

21   Q.  Why don't we pull that out, then.  PTX--- well, before

22   we do that, if you don't remember whether you would have

23   said that there are five pillars of the science and

24   statistics or perhaps four?

25   A.  Well, to be clear, and this actually comes up with

1    respect to the paragraph 14 that you were asking me about,

2    as I was looking at the first part that you were quoting

3    from, I was noticing that, for example, the second, third

4    and fourth ones that are listed in paragraph 14 are

5    contained among the five --

6    Q.  Yes.

7    A.  -- that I have talked about here in the PRMI matter, and

8    the first one that I talk about here is actually about

9    pillar five that I described in PRMI.

10   Q.  And --

11   A.  The first component of the first pillar that I list in

12   that matter is something that was not an issue in the PRMI

13   case and so I didn't feel any need to articulate it.

14   Q.  Right.

15   A.  That's another way of saying that this is really a

16   matter of exposition.  Sometimes you might combine two ways

17   of thinking about a problem in one pillar, and that's what I

18   did in that report.

19   Q.  Okay.  And turn then, as we were discussing, to PTX-276,

20   please.  And if you can go to PTX-276-21.  Are you with me?

21   A.  I am.

22   Q.  Okay.  And at line 12, this was as part of your direct

23   examination by Mr. Smallwood, and at line 12 Mr. Smallwood

24   asked the question:  "You list here four principles or four

25   pillars as you've described them.  Are there a lot of other

```
 1    core pillars or are these kind of like the big four?"

 2              And you answered:  "These are, I would say, four

 3    of the big five.  I would say these are the four that are

 4    relevant to Dr. Snow's analysis or in particular to my

 5    criticism of Dr. Snow's analysis."

 6              Right?

 7    A.  Yes.

 8    Q.  I read that correctly?

 9    A.  I believe you read that correctly, yep.

10    Q.  Okay.  And you said this morning again that Dr. Snow --

11    and you said this morning that Dr. Snow violated five,

12    right?

13    A.  No.  I believe that misstates my testimony.  I tried to

14    be quite clear that there's a difference between the

15    monoline settlements and the trust settlements.

16    Q.  Right.

17    A.  For the monolines I think it's right that all five are

18    violated, but for the trust settlements I think that's only

19    three.

20    Q.  Okay.  And do you recall in HLC in trial that you had a

21    demonstrative exhibit in which you talked about pillars?

22    A.  I think that that's probably right, but I don't remember

23    offhand the demonstrative that you're thinking of.

24    Q.  And --

25    A.  I am happy to review it if you would like.
```

1    Q.  -- would you be surprised if I told that you

2    demonstrative listed four pillars?

3    A.  No.

4    Q.  Because the number of pillars that exist in the world of

5    statistics just depends on which case you happen to be

6    involved in at that time, yeah?

7    A.  No, I believe that also is misstating the record.  If

8    you look at the articulations that I gave in this matter and

9    the *HLC* matter and the prior report, the *Liberty Mutual* one

10   that you were having me look at, there's extensive overlap

11   in what I articulate.

12   Q.  Sure.

13   A.  And that was actually part of what I was trying to help

14   you understand with respect to paragraph 14 of *Liberty*

15   *Mutual*.

16   Q.  I appreciate that.  We will come back to that.

17          Now, in connection with Dr. Snow's trust

18   settlement damages expert, it's your view that Dr. Snow drew

19   his samples from the wrong population in the first instance,

20   yes?

21   A.  That's correct, yes.

22   Q.  And there should probably be some adjustment, in your

23   view, for the fact of the population being the wrong one in

24   the first instance?

25   A.  Yes, that's correct.

```
1    Q.  And in your professional objective expert opinion, that

2    adjustment is minor, correct?

3    A.  I think what I said earlier is accurate as I said it at

4    the time, which is it depends on how you view it whether or

5    not that adjustment is minor or not.  So 2.3 and 3 ought, I

6    think it's 3.08 percent in terms of the adjustments, are,

7    for example, smaller than 10 percent.  Around the same time

8    I talked about a 10 percent market correction.

9              Certainly it's right that those numbers are

10   smaller than 10, but I also tried to emphasize that it

11   depends on perspective and if you talked about the dollar

12   magnitudes associated with that, those might actually be

13   taken to be more consequential depending upon the

14   perspective that you would opt.

15   Q.  And the dollar amount that you were talking about when

16   you made that comment was something like $330,000, give or

17   take.  Does that sound about right?

18   A.  I think it was $125,000 and $207,000, something like

19   that.  So, yes, that sounds about right.

20   Q.  And so is that -- so what is that?  Is that 330?  Did I

21   calculate that right?

22   A.  332, I think, but...

23   Q.  And is 332 minor or not minor?

24   A.  If you ask me for $332,000, certainly I'm going to

25   consider that to be very consequential.  So I suppose it
```

1    depends upon the context, but I would have said that that's

2    a serious amount of money.

3    Q.  In the context of this case, is that dollar amount

4    minor?

5    A.  It's not for me to say.

6    Q.  Okay.

7    A.  So I just simply tried to describe that there are --

8    it's right that there are adjustments that can be made, and

9    I tried to describe the implications of those from a

10   statistical perspective.

11   Q.  Dr. McCrary, could you turn to PTX-276, please.

12   A.  Got it, yes.

13   Q.  That's your trial testimony in *HLC*, right?

14   A.  Yes, I believe that's correct.

15   Q.  And if you would go to PTX-276-72.  I'm sorry.  Yeah, I

16   have it right.  If you would go to PTX-276-72, and we're on

17   page 2709 of the transcript.  Are you with me?

18   A.  I think I am, yes.

19   Q.  Okay.  And on line 16, as part of your direct

20   examination at the *HLC* trial in front of a jury,

21   Mr. Smallwood asked you the question:  "I'm going to ask you

22   a different final question.  Can you just sum up for the

23   jury your overall opinion as to Dr. Snow's methodology with

24   respect to the trust settlement?"

25            You answered:  "Sure.  Earlier today I testified

1    that there could be a sample which is drawn from the wrong

2    population that may have some flaws with it that are not

3    fatal, but that require some adjustment.  I would have said

4    that in connection with the trust settlement damages

5    estimate, that there should probably be some adjustment.

6    It's minor for the fact of the population is actually the

7    wrong one in the first instance and I've tried to quantify

8    that for the jury."

9            Right?

10   A.  Yes.

11   Q.  So earlier, a couple minutes ago when you said it's

12   really not for you to say whether dollar amount is minor,

13   you did, in fact, say that it was minor in the *HLC* trial,

14   right?

15   A.  I did, yes.

16   Q.  Okay.  And if you would turn to transcript page 2964 --

17   I'm sorry -- 2694, PTX-276-57.  Are you there?

18   A.  Uh-huh.  I am.

19   Q.  And on line 2 you're testifying again as part of your

20   direct examination in front of a jury, and you said:  "If

21   you adjust for the fact that there's both the performing

22   loans left out as well as the NDS trusts are left out, that

23   adjusts the estimate down to about 5 and a half million, and

24   so the impact there is, you know, almost $350,000 or about 6

25   percent."

1          Right?

2     A.  Yes.

3     Q.  And the $350,000, that's what you are calling minor in

4     the paragraph we looked at a minute ago, right?

5     A.  Yes, that's right.

6     Q.  And $350,000 is more than $330,000, right?

7     A.  That's also correct.

8     Q.  Okay.  Dr. McCrary, in your opinion, the issue you

9     identified with the wrong population in this case does not

10    render Dr. Snow's trust damages inherently unreliable,

11    right?

12    A.  I would have said that, and do say, that if you sample

13    from the wrong population, that does give you an obligation

14    to make adjustments to recover from that initial misstep,

15    but I would have also said, and do say, that you can do that

16    analysis and it moves the numbers, but that doesn't render

17    the underlying approach fundamentally unreliable.

18    Q.  Right.  And you've done a bounding analysis here, right?

19    A.  Yes, that's correct.

20    Q.  And that's the bounding analysis that appears I think in

21    your demonstrative DDX-17-16?

22    A.  Do you want me to check and make sure you're right?

23    Q.  Sure.

24    A.  Yes, I believe that's correct.

25    Q.  And the bounding analysis that you conducted there, as

1    we said a moment ago, concluded that the maximal impact of

2    the NDS issue and the performing loan issue is $330,000?

3    A.  Yes, I think that -- well, 332, but I don't want to

4    quibble.  Yes, that's right.

5    Q.  And that number is based on the assumptions that are at

6    the bottom of the page?

7    A.  Yes, that's correct.  The ones that are listed with the

8    asterisk and the double asterisk.

9    Q.  And those assumptions you testified today are not meant

10   to be realistic, right?

11   A.  That's correct.  The idea of the bounding exercise is

12   not to adopt assumptions that are -- they're different from

13   the assumptions that you would say are characterized in

14   pillar five, for example.

15   Q.  Right.  So these are not real-world assumptions, right?

16   A.  I think that's more of a word play, honestly.  I think

17   that what they are is a set of assumptions that are invoked

18   along the way to answering a simple question, which is

19   what's the maximal effect of sampling from the wrong

20   population on the bottom-line numbers.

21   Q.  But those are meant to be extreme assumptions, right?

22   A.  Well, I don't know if I would have said it that way.  I

23   would have said it the way that I just said it now, which is

24   the objective of the bounding analysis is to impute data as

25   opposed to having it.  The reason you don't have it is

```
 1    because there was a sample that was conducted from the wrong
 2    population.  So in that context you have to impute the data
 3    in order to understand what's the maximal impact of that
 4    misstep; and when you impute the data, it is true that you
 5    take the outer edge of what's possible.  So it can be taken
 6    to the extreme in that sense.
 7    Q.  Okay.  And, in fact, about two hours ago you used the
 8    word "extreme" in reference to these assumptions, right?
 9    A.  I don't recall the specific words, but I'm happy to look
10    back at the testimony if you would like.
11    Q.  Okay.  And, Dr. McCrary, you're not testifying that the
12    NDS breach rate actually is 100 percent, right?
13    A.  No, I'm not.
14    Q.  And you're not testifying that PRMI loans excluded from
15    Dr. Snow's sampling population have a zero percent breach
16    rate, right?
17    A.  No, I'm not.
18    Q.  And you're not testifying that global loans excluded
19    from Dr. Snow's sampling population have a 100 percent
20    breach rate, right?
21    A.  No, I'm not.  I'm just conducting a bounding analysis.
22    Q.  And so if we were to -- and those were extreme
23    assumptions, right?
24    A.  They are the assumptions that you need to do in order to
25    conduct a bounding analysis.
```

1    Q.  And they're not meant to be realistic, right?

2    A.  That's not their objective, no.

3    Q.  Okay.  And if one were to actually use reasonable

4    assumptions, one would arrive at an impact of less than

5    $330,000, right?

6    A.  The trouble is one doesn't know what would constitute a

7    reasonable assumption in this context precisely because

8    there weren't any loans from those unsampled populations.

9    Q.  But it doesn't matter, right, because any assumption

10   other than the ones you have on this piece of paper would

11   generate an impact lower than $330,000.  Right?

12   A.  That's the point of conducting a bounding analysis.

13   Q.  Okay.  And you don't know what that number actually

14   would be other than to say it's somewhere south of $330,000?

15   A.  That's correct, I don't.

16   Q.  Now, Dr. McCrary, loan vintage -- I'm sorry.  Hang on.

17   Apologies.  Loan vintage and product type are obvious

18   correlates that are associated with the possibility of

19   different breach rates, right?

20   A.  Yes, that's right.  I would agree with that.

21   Q.  And most people paying attention to RMBS litigation

22   generally know that vintages are associated with the

23   likelihood of putative breaches of representations and

24   warranties and similarly for product types, right?

25   A.  It's not for me to say what other people know, but I

1    take you to be saying something that's correct.

2    Q.  Well, you did, in fact, say that.  Right?

3    A.  I don't know if that's what I said.  It might be, but

4    I'm just trying to be clear about the basis for my opinion.

5    I don't literally know what's in somebody else's head.

6    Q.  Well, why don't we open then PTX-266, please.

7    A.  Where would you like for me to go?  Yes, I am.

8    Q.  266-167.

9    A.  I'm there.

10   Q.  And we're talking -- there's a question at line 15.

11   This is deposition that you gave in this case, right, in the

12   PRMI --

13   A.  Yes, that's correct.

14   Q.  And I asked you the question:  "Why did you choose to

15   look at vintage and product type in particular."  Right?

16           And you said, answer:  "There are obvious

17   correlates that are associated with the possibility of

18   different breach rates.  They are very different across the

19   different monoline insurers and I found that that was -- and

20   I found that was sufficient to establish the point."

21           Then I asked you:  "Are there other obvious

22   correlates associated with different breach rates?"

23           And you answered:  "Sitting here today, I'm not

24   thinking of any, but there might be."

25           Then I asked you:  "How did you know those were

1    obvious correlates?"

2            And you answered:  "I suppose that most people

3    paying attention to RMBS litigation generally know vintages

4    associated with the likelihood of putative breaches of

5    representations and warranties similarly for product types.

6    Suppose I was drawing generally upon my experience in RMBS

7    litigation."

8            Right?

9    A.  Yes.

10    Q.  And so that's what you said in PRMI.  So -- and when you

11    were analyzing -- in fact, what we saw here in this excerpt

12    is that in PRMI when you were analyzing whether breach rates

13    were likely to be different across different monolines, the

14    only loan-level characteristics you looked at were vintage

15    and product type, right?

16    A.  I believe that's correct, yes.

17    Q.  You set out to do an analysis of those two factors and

18    no other factors, right?

19    A.  I don't know that I set out to not do other factors, but

20    those are the factors that I knew that I could draw upon and

21    that I did.

22    Q.  You set out to do an analysis of those factors and no

23    other factors, right?

24    A.  Again, I'm not sure that that's right.  You're asking me

25    about things that happened a long time ago.  I did that

1    analysis.  I knew that I could draw upon it, and I tried to

2    execute upon that.  That's all.

3    Q.  Wait a minute.  A long time ago.  I'm asking about

4    something that you said on October 23, 2019.  Why don't you

5    look at line 25 of page that we were just reading from,

6    266-168, and I asked the question:  "So you set out to do an

7    analysis of those two factors and no other factors?"

8                You answered:  "I believe that's correct, yes."

9                Did I read that correctly?

10   A.  I believe you did, yes.

11   Q.  Okay.  And you've criticized Dr. Snow for not sampling

12   any loans from the NDS trusts to estimate an NDS

13   trust-specific breach rate, yes?

14   A.  Yes.

15   Q.  And you believe that Dr. Snow therefore has no idea what

16   the breach rates are for loans in the NDS trusts, yes?

17   A.  I believe that that overstates it.  I would have said

18   that we don't have an estimate for the NDS trusts.

19   Q.  You believe it overstates it to say that Dr. Snow has no

20   idea what the breach rates are for loans in the NDS trusts?

21   A.  I mean, maybe I'm being overly attentive to your words,

22   but no idea in my mind means like literally no idea and I

23   think that that's an extreme statement.  I'm sure he has

24   some idea, but it's not true that he has an estimate of the

25   NDS breach rate.

```
1    Q.  You're not comfortable with the word "no idea"?  Why --

2    A.  I'm not trying to split hairs.  I'm just trying to say

3    the assertion that he has no idea seems to me really strong.

4    At the same time I don't believe it's right that he's put

5    forward an estimate of that.

6    Q.  Overly strong, okay.  Open, please, 258 -- PTX-258,

7    please.

8    A.  Got it.  What page?

9    Q.  258, page 38.  And if we look at -- are you with me?

10   A.  I think so.  Which paragraph?

11   Q.  And before we go further, so this is your expert report

12   in this case, yeah?

13   A.  Yes, this appears to be.

14   Q.  Okay.  And in paragraph --

15   A.  Yeah, I am flipping around in a lot of documents, but I

16   have looked at the cover page and it looks to be the report

17   for this case.

18   Q.  Right, and you wrote all the words in this document,

19   right?

20   A.  Yes.

21   Q.  Okay.  And in paragraph 95 down at the bottom of this

22   page in the last sentence you say:  -- well, I can read both

23   sentences.  You say:  "Furthermore, although Dr. Snow

24   allocates a portion of the trust-allowed claim to the NDS

25   trusts as explained above, Dr. Snow did not sample any loans
```

1    from them to estimate an NDS trust-specific breach rate.  He

2    therefore has no idea what the breach rates are for loans in

3    the NDS trusts despite that he allocates a portion of the

4    trust settlement to those trusts."

5              Have I read that correctly?

6    A.  You did, yes.

7    Q.  Okay.  And you're aware, Dr. McCrary, that Dr. Snow has

8    testified that he couldn't get loan-level information on all

9    of the NDS loans, right?

10   A.  Yes, I am familiar with some of his testimony in that

11   regard.

12   Q.  And you have no reason to doubt that testimony, right?

13   A.  I take him at his word, yes.

14   Q.  Okay.  But Dr. Snow was able to get trust-level data

15   concerning losses and trust-level characteristics in the NDS

16   trusts, right?

17   A.  I believe that's correct, yes.

18   Q.  And he was able to get information about the loan

19   vintage and the product type of the loans in the NDS trusts,

20   right?

21   A.  Yes, that's correct.

22   Q.  The same two factors you looked at in your monoline

23   analysis when you set out to conduct that analysis, right?

24   A.  Yes, that's right.

25   Q.  And Dr. Snow obtained calculations of breach rates for

1    the NDS trusts by loan vintage and product type from the

2    bankruptcy, right?

3    A.  Yes, I'm familiar with that.

4    Q.  And based on that loan vintage and product type data,

5    Dr. Snow conducted -- concluded -- let me start again.

6    Based on that loan vintage and product type data, Dr. Snow

7    concluded that the loss-weighted trust breach rate is very

8    similar for the RFC and NDS trusts, right?

9    A.  I would have said that he concluded that vintage and

10   loan type were similar between them.

11   Q.  And sitting here today -- well, but those are the only

12   two factors that you looked at when you set out to conduct

13   an analysis on the monoline issue, right?

14   A.  To be clear, I think the right way to understand this is

15   if you're trying to assert that two things are the same,

16   it's easy to disprove that, which is to say you really only

17   need to look at one characteristic if you're trying to argue

18   that one sample is like another.  And so it's not the case

19   that it's symmetric in that way.

20   Q.  And but it's true, we've established, that when you set

21   out to conduct your monoline analysis, you looked at loan

22   vintage and product type, those two factors and no other

23   factor, yes?

24   A.  That's right, yes.

25   Q.  And those are the same factors that Dr. Snow looked at

 1   in his NDS analysis, right?

 2   A.  That's correct, they are.

 3   Q.  And sitting here today, you have no basis to know

 4   whether the loans in the NDS trusts have a breach rate above

 5   or below the global breach rate that Dr. Snow calculated,

 6   right?

 7   A.  I don't think that anybody has an ability to estimate a

 8   breach rate for the NDS trusts because there hasn't been

 9   samples taken from them.

10   Q.  You have no idea, right?

11   A.  As to what?  I'm sorry.

12   Q.  We can move on.  If the breach rate, Dr. McCrary, in the

13   NDS trusts was lower than the breach rate in the global

14   sample, and PRMI's damages under Dr. Snow's allocation

15   methodology would go up, yes?

16   A.  That's correct, yes.

17   Q.  And let's switch gears unless --

18            MR. NESSER:  Are we out of time, Your Honor?

19            THE COURT:  Well, I think that that depends.  I

20   think the SDNY is thinking we're going to conclude at about

21   6:00 p.m. their time.  I know this is hard to do,

22   Mr. Nesser.  Is there any way to generally guesstimate how

23   much time you have left on cross?

24            MR. NESSER:  I would guess another hour.

25            THE COURT:  Okay.  I think we're going to be fine.

1    If we don't do closings tomorrow, we can perhaps do them in

2    writing or something, or by phone or something like that.

3    Mr. Johnson?

4              MR. JOHNSON:  If he has an hour on cross, is there

5    any reason we wouldn't be able to do closings tomorrow?

6              THE COURT:  No.  It's just that everybody

7    underestimates the time; but you're right, if we have time

8    to do closings tomorrow, we will have time to do closings.

9    But I'm not worried really about the schedule tomorrow.

10   Remember we are going to start a little later tomorrow at

11   9:15, 10:15 Dr. McCrary's time, so we will have some

12   restrictions at the end of the day.

13             I don't know what's going to happen with the

14   courthouse.  There's a lot of unknowns at this point.  I

15   think we all need to be flexible, but I think it is safe for

16   us to adjourn for the day today, which is the immediate

17   question.

18             All right.  If there is any more information that

19   the Court receives between now and tomorrow morning at 9:15,

20   we'll do our best to communicate with you.  But otherwise, I

21   will see you then.  I know there's some issues that we need

22   to discuss about exhibits and the like.  We'll have to

23   figure out a time to do that.  I suppose we could do some

24   right now.

25             Do we need to adjourn so we can cut off the

```
 1    connection with SDNY?  Are we able to proceed?

 2               THE WITNESS:  I can step out of the room if that's

 3    what you're asking.

 4               THE COURT:  I think what we are able to -- so,

 5    Dr. McCrary, we will see you in the morning.  Thank you very

 6    much.

 7               THE WITNESS:  Wonderful.  Thank you.

 8               (Witness excused at 5:00 p.m.)

 9               THE COURT:  All right.  Very good.  Let's see what

10    we can address.  All right.  Who wishes to address the Court

11    first?

12               One moment.  Let me check with the court reporter

13    here.  I hadn't asked her about her schedule.

14               (Discussion held off the record.)

15               THE COURT:  All right.  Mr. Nicholson.

16               MR. NICHOLSON:  Matt Nicholson for PRMI, Your

17    Honor.

18               As I mentioned earlier, there are a couple of

19    bankruptcy -- well, more than a couple, but there's a list

20    of bankruptcy-related exhibits that the parties I think

21    would like to move into evidence.  There are a number of

22    them that the parties have met and conferred on and I

23    understand there's no objection.  So I would like to move in

24    defendant's documents.  These are being moved in pursuant to

25    the stipulation related to Mr. Lipps' testimony that these
```

1    documents are authentic and be moved in without a sponsoring

2    witness.

3            THE COURT:  Okay.  And there's no objection to

4    their admissibility; is that correct?

5            MR. NICHOLSON:  Correct, yeah.  And I will specify

6    the purpose for which they're being admitted.  And so I

7    thought I would go through the ones for PRMI that I

8    understand there's no objection on.  Mr. Scheck will do the

9    same for plaintiff, and then we could address the handful

10   that there are objections on.

11           THE COURT:  Okay.

12           MR. NICHOLSON:  Okay.  So the first category

13   consists of proofs of claim filed against RFC in the

14   bankruptcy, and we seek to admit these for the non-hearsay

15   purpose of showing the claims that RFC faced in the

16   bankruptcy, and I can read those into the record.

17           THE COURT:  Okay.  The non-hearsay -- what do you

18   mean?

19           MR. NICHOLSON:  So not for the truth of the

20   allegations in --

21           THE COURT:  Not for the truth?

22           MR. NICHOLSON:  -- but for the types of claims

23   that were being made.

24           THE COURT:  Okay.  So you concede it's hearsay.

25   They're not being admitted for the truth of the matter, but

1   rather to show the types of claims that were made; is that

2   right?

3              MR. NICHOLSON:  Just as a matter of terminology,

4   they would be hearsay if being offered for the truth, and we

5   are not seeking to do that.

6              THE COURT:  That's right.

7              MR. NICHOLSON:  We are just seeking to use them

8   non-hearsay to as evidence of the types of claims RFC faced

9   in the bankruptcy.  It's consistent with what plaintiff has

10  done.  They've moved in various proofs of claim.  We're

11  simply doing the same thing for the same purpose.

12             THE COURT:  Okay.

13             MR. NICHOLSON:  So these are DTX-494, DTX-497,

14  DTX-502, DTX-508, DTX-509, DTX-510, DTX-511, DTX-512,

15  DTX-513, DTX-514, DTX-515, DTX-516, DTX-517, DTX-518,

16  DTX-519, DTX-520, DTX-521, DTX-522, DTX-523, DTX-568,

17  DTX-569.

18             THE COURT:  Okay.  For the limited purpose

19  articulated by Mr. Nicholson, the following DTX documents

20  are received into evidence.  DTX-494, DTX-497, DTX-502,

21  DTX-508, DTX-509, DTX-510, DTX-511, DTX-512, DTX-513,

22  DTX-514, DTX-515, DTX-516, DTX-517, DTX-518, DTX-519,

23  DTX-520, DTX-521, DTX-522, DTX-523, DTX-568 and DTX-569.

24             MR. NICHOLSON:  That's consistent with my list,

25  Your Honor.

1          THE COURT:  Thank you, Mr. Nicholson.

2          MR. NICHOLSON:  And the second category that we're

3     seeking to move in, and for which I understand there's no

4     objection are three briefs filed in the bankruptcy.  We're

5     seeking to admit these for non-hearsay purpose for effect on

6     listener and information that was available to RFC at the

7     time of the settlement.  The three exhibits are DTX-536,

8     DTX-539, DTX-541.

9          THE COURT:  Okay.  For the limited purpose

10    articulated by Mr. Nicholson, the following documents are

11    received into evidence:  DTX-536, DTX-539, and DTX-541.

12         MR. NICHOLSON:  Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Nicholson.

14         Mr. Scheck.

15         MR. SCHECK:  Good afternoon, Your Honor.  Matthew

16    Scheck from Quinn Emanuel.

17         Mr. Nicholson correctly described the sort of

18    process we went through and we were able to resolve on all

19    but a few.  I want to make sure -- we're going to move a

20    couple of additional documents into evidence that are not

21    objected to.  I want to make sure I don't duplicate because

22    we had some on our list, so I will try to be a little

23    careful.  The first is PTX-145.

24         THE COURT:  Just before you continue, are these

25    documents all being offered for the limited purpose

1    articulated by Mr. Nicholson?

2            MR. SCHECK:  Yes, sorry, I was going to get to

3    that.  I should have prefaced it.  PTX-145 is for the

4    limited purpose articulated by Mr. Nicholson.  It is not a

5    proof of claim.  It is a brief by the Steering Committee of

6    investors in connection with the 9019 in the bankruptcy, in

7    the original settlement.

8            THE COURT:  Thank you.

9            MR. SCHECK:  We are also moving PTX--- I'm sorry.

10   DTX-578, which is also a brief that is the Debtor's Brief in

11   Support of Confirmation, also being used -- offered for a

12   non-hearsay purpose.  And I believe those are the only two

13   that are not duplicative of Mr. Nicholson's list.  The

14   remaining exhibits have objections to them and I can address

15   those now and then, of course, give Mr. Nicholson a chance

16   to address.

17           THE COURT:  Okay.  PTX-145 and DTX-578 are

18   received into evidence for the limited purpose identified by

19   both Mr. Scheck and Mr. Nicholson.

20           How many documents are we going to discuss that

21   have objections, just so I have some idea?

22           MR. SCHECK:  Yes.  It is four documents for which

23   there are objections, which fall into two categories.

24           THE COURT:  Okay.

25           MR. SCHECK:  And so the first is PTX-153, and that

1   is the RMBS trustees' statement regarding the 9019 original

2   settlement.  And as Your Honor may recall, the RMBS trustees

3   were not the parties that entered into the original RMBS

4   settlement in the bankruptcy and Judge Glenn asked the RMBS

5   trustees to submit a statement on their position regarding

6   that original settlement, and that statement reflects --

7   that brief on behalf of the trustees reflects the trustees'

8   position on the claims at issue, the reasonableness of that

9   original settlement, and the allocation of that settlement.

10              THE COURT:  So that is a statement that would have

11  been available at the time of the mediation of the

12  settlement?

13              MR. SCHECK:  Yes.  And our view is that we have

14  come to an agreement after discussions that, you know,

15  briefs -- certain briefs filed by the parties should come in

16  for -- you know, can come in for a non-hearsay purpose, and

17  we don't see any basis to distinguish between, for example,

18  the objection of MBIA that PRMI seeks to put in and the RMBS

19  trustees' statement, particularly in the context where

20  Mr. Woll, for example, an expert witness, got up and

21  purported to in his statements admittedly speculate

22  regarding the intentions and incentives of the RMBS

23  trustees; that the RMBS trustees' position is best reflected

24  in the position they gave, which was available to the

25  parties.

1            The other thing I'll say about the relevance of

2    the RMBS trustees' statement is there has been an ongoing

3    sort of dispute in this case since before trial about

4    Mr. Pfeiffer because there's some -- been some arguments by

5    PRMI that Mr. Pfeiffer and Duff & Phelps -- the declaration

6    was put in after the supplemental term sheet in May 2013.

7            Now, we've taken the position that there's a

8    reason there's a settlement period here, because a

9    settlement is effective when it's approved by the bankruptcy

10   court.  Nonetheless, what this RMBS trustee's statement

11   shows is two important things about the allocation.

12           First, this statement was put in in December of

13   2012, and it was filed February 2013, and the reason for

14   that is Judge Glenn was actually trying to encourage

15   settlement and so he had a scheduling order where he asked

16   the parties to exchange all of these expert reports and

17   briefs in December of 2012, but they wouldn't be filed until

18   after February 1, 2013.

19           So in December 2012 the RMBS trustees put in a

20   statement that said we have reviewed the original

21   allocation, the net losses allocation, and they said we've

22   talked with parties-in-interest and there are objections to

23   this allocation.  And so we have asked the debtors, RFC and

24   the other debtors, and the steering committee of investors,

25   to revise that allocation and we've done this based on the

1     advice of Duff & Phelps, and they have agreed to use the

2     revised allocation methodology, which we all know became the

3     breaching loss methodology that Dr. -- I'm sorry --

4     Mr. Hawthorne discussed, I didn't mean to elevate him there.

5     And so that was done in December 2012.

6              So it shows, first, that the revised allocation

7     was discussed among numerous parties-in-interest that the

8     doters had agreed to revise that allocation and were part of

9     this -- were part of the discussions and the decision, and

10    that it was ultimately the debtors that decided to revise

11    that methodology prior to May 2013, and of course ultimately

12    put it in their plan of reorganization.  So it's relevant

13    for that reason.

14             And secondly -- well, actually, I'm sorry, I

15    covered both of them in that sentence because it was that

16    the debtors were involved, something that has been disputed

17    because PRMI has referred to as just the trustees'

18    allocation, and secondly the timing.

19             So unless Your Honor has questions about that

20    document, I can move on to the next one.

21             THE COURT:  Okay.

22             (Counsel confer.)

23             MR. SCHECK:  Mr. Nicholson asked a fair question,

24    which is do we want to address them one at a time or all in

25    a row?

1          THE COURT:  Well, you said there were two

2    categories.  Is this one of two in one category?

3          MR. SCHECK:  This is actually one of one in one

4    category.  The other three are in the other category.  So I

5    would be happy to let Mr. Nicholson respond.

6          THE COURT:  That might make sense.

7          MR. NICHOLSON:  Matt Nicholson for PRMI.

8          Your Honor, we object to the admission of PTX-153.

9    The primary purpose that Mr. Scheck has articulated for

10   admitting this document are for the background facts that

11   are represented in that document regarding supposed

12   negotiations over the creation of the trust allocation

13   methodology among the RMBS trusts.

14          So setting aside the relevance issues, because we

15   think this has little if any relevance, there's a core

16   hearsay problem here.  This is a background section in a

17   brief purporting to describe facts about, as Mr. Scheck I

18   think is articulating it, who participated in discussions,

19   what they said, and when they said it.  These statements are

20   being offered for their truth about who supposedly

21   participated, when they participated, and what they said.

22   That is a core hearsay problem.

23          On top of that, there are multiple layers of

24   hearsay in this document.  It is an out-of-court statement

25   by the trustees purporting to talk about what was told to

1     them by the parties to the original settlement -- I'm not

2     even clear who was saying what -- but it's double hearsay

3     because the trustees' out-of-court statement about an

4     out-of-court statement by an unidentified parties to the

5     original settlement.  So it's being used for hearsay

6     purpose.

7          If plaintiff wanted to prove facts about the

8     mechanics of coming up with the RMBS trust allocation, they

9     should have called fact witnesses to establish those facts.

10    They can't cure that problem of proof now by relying on the

11    background statement of a hearsay brief that itself contains

12    multiple levels of hearsay.

13         Now, as I understand it, there were two principle

14    other arguments by Mr. Scheck.  The first was that this is

15    relevant to show the Trust's view that the allocation

16    between Duff & Phelps was fair and equitable.  I'm really

17    not sure what the relevance of that is because this case

18    isn't about whether Duff & Phelps' allocation was reasonable

19    for purposes of allocating among the trusts.  This case is

20    about whether their allocation is reasonable here under

21    *UnitedHealth* for purposes of allocating amongst originators.

22         But setting that aside, I don't think they should

23    be able to put in this brief for -- I think what it's being

24    used for is the truth of the statement that this allocation

25    method is fair and equitable and reasonable.

1          On top of that, I heard Mr. Scheck articulate that

2     this brief contains information available to the parties at

3     the time of settlement.  That type of reason for relevance

4     pertains to the *UnitedHealth* inquiry, right, where you look

5     at the information available to the parties at the time of

6     settlement.  That's information about the strengths of the

7     claims and defenses.

8          And here, if you look at this very short document,

9     it doesn't really contain any discussion whatsoever of the

10    strengths of the claims and defenses.  There's no

11    discussion, say, of the statute of limitations.  There's no

12    discussion of the reps and warranties.  It's just a

13    generalized statement that these trustees think that their

14    allocation method among themselves is reasonable.

15         So I don't think that it pertains to the

16    *UnitedHealth* inquiry, so it's not relevant to that.  It's

17    really being used for a hearsay purpose to try to, I think,

18    fix a gap in their case that they should have called fact

19    witnesses, I suppose, if they wanted to prove facts about

20    this negotiation.  They shouldn't be able to cure that

21    through a hearsay document at this late juncture.

22         Thank you.

23         THE COURT:  Mr. Scheck, do you wish to respond to

24    the hearsay concerns raised by Mr. Nicholson?

25         MR. SCHECK:  Very briefly, if I may, Your Honor.

1    I don't recall stating that this would be used to show that

2    the allocation was fair and equitable.  So I don't think

3    that was a consideration.

4           I will say the timing of it can't be a hearsay.

5    The idea is that the revised allocation was done in a

6    document that was filed February 4, 2013, but that was

7    signed December 2012 and served on the parties-in-interest,

8    including the debtors.  So that timing issue remains

9    relevant.

10          The other thing I will say, it's actually simply

11   not true that it doesn't discuss the strengths and

12   weaknesses of claims.  In paragraph 11 of that document the

13   trustees specifically state their view that the allocation

14   methodology sufficiently accounts for the differences among

15   the characteristics of each settling trust.  That was

16   information available to the parties; and Mr. Nicholson

17   raised *UnitedHealth*, and I know we have our disagreements

18   about *UnitedHealth*, but one of the things that's interesting

19   is that Judge Schiltz and the district court opinion in

20   *UnitedHealth* -- well, I'll take a step back.

21          First, *UnitedHealth* never says anywhere that it is

22   only the view of the defendant that counts.  That is just

23   nowhere in the opinion.  In fact, it refers to parties when

24   it talks about what was available to the parties.

25          Secondly, Judge Schiltz's opinion has an

1    interesting footnote because he says UnitedHealth raised the

2    prospect of potentially offering a different type of

3    evidence to support allocation, which is allocation among

4    the claimants themselves.  And what Judge Schiltz said was

5    he didn't say that wouldn't be relevant.  That would be

6    crazy.  That has nothing to do with UnitedHealth.  He said

7    but they never offered that evidence.  That's what he said

8    in the footnote.  They never offered it.  So it became a

9    nonissue.  But nobody at any level has ever suggested that

10   the only view that could possibly matter is that of the

11   defendant themselves.

12          And the last thing I'll say about the document is

13   it reflects the views of the defendant itself, RFC, because

14   RFC -- sorry -- the trustees said specifically in this

15   document in a footnote if the debtors and the steering

16   committee do not change this allocation methodology, we

17   reserve our right to object.  So we are putting in our

18   statement of support on the basis that the debtors have

19   agreed that they are going to change this methodology.  And

20   it is the debtors that had to put that methodology into the

21   plan and go before Judge Glenn and ask for that plan,

22   including the settlement and the allocation, to be approved.

23          So I went on far longer than my promised very

24   briefly, but that would be my response, Your Honor.

25          THE COURT:  Mr. Nicholson.

1           MR. NICHOLSON:  30 seconds on the hearsay issue.

2     Your Honor, on the hearsay issue, I mean, the only

3     response -- substantive response I hear from Mr. Scheck is

4     that this goes to the timing of changes made in the

5     allocation methodology.  But of course whether there were

6     changes made at a certain time or not depends on the truth

7     of the statements that are in the brief about those changes

8     being made.

9           And so his shift to timing does not address the

10    hearsay problem.  That's dependent upon truth.  And there

11    was no real response as to hearsay on how this is being used

12    for who participated, what was said, and what was done about

13    it.  In fact, Mr. Scheck in the end focused -- was

14    describing what the trustees said about what the debtors

15    said about the Duff allocation.  That's double hearsay, Your

16    Honor, so I don't think it comes in for that purpose.

17          And as to allocation, there's just a bare

18    statement here that the RMBS allocation accounts for

19    differences among trustees for purposes of distributing

20    among the trustees themselves.  There's nothing about the

21    underlying information, the underlying strength of the

22    claims.  They're just trying to use it for the bare

23    conclusion that's being made.  They're trying to use that

24    conclusion for its truth to bolster their case and I don't

25    think that that should be permitted.

1          Thank you.

2          THE COURT:  Well, I think the fair thing to do is

3    to admit it for the limited purpose that the other documents

4    are being limited for, because whether it's conclusory or

5    not, it was available to the parties at the time of the

6    mediation.  So -- and whether or not the date this was

7    distributed is hearsay, I would have to think about that a

8    little bit.  I'm not sure it is.

9          So I will admit it on the same basis as the other

10   documents are being admitted today.

11         Let's move on to the second category.

12         MR. SCHECK:  Sorry.  Good afternoon again, Your

13   Honor.  The other category involves three declarations that

14   were also put in in the 9019.  It is DTX-443, which is the

15   supplemental declaration of Jeffrey Lipps; DTX-547, which is

16   the reply declaration of Jeffrey Lipps; and DTX-538, the

17   reply declaration of Frank Sillman.

18         And, Your Honor, on these I think two overall

19   points that I want to make.  The first is the parties have

20   agreed that brief statements of various parties should come

21   in primarily for an argument that actually PRMI has been

22   making for a long time, which is it was information

23   available to the parties.  And we agree in this context

24   where there is not a jury, there is not a danger of

25   prejudice because a jury would have a lot harder time

1   distinguishing between the truth versus the limited purpose.

2   And we see little distinction between the briefs that were

3   mentioned -- or sorry -- the briefs that were agreed upon

4   and these declarations, which were served as part of that

5   same litigation, the 9019 litigation; and, in fact, are the

6   subject of many of the briefs.

7           One of the documents that PRMI has used a lot and

8   offered into evidence today is the MBIA objection, and that

9   objection, speaking of hearsay on hearsay, is a big part of

10  it that they've used is the characterization of Mr. Lipps'

11  declaration itself, which is to say that MBIA argues in its

12  objection that Mr. Lipps says the statute of limitations was

13  a potential defense.

14          And so we have a situation where information

15  available to the parties involves an objection that refers

16  to a declaration, but of course the declaration itself is

17  information available to the parties.

18          The other piece that I think is important is on

19  January 23rd I stood up here as part of the pretrial

20  conference and I made a point that it looked to me like PRMI

21  was going to try and introduce every instance of somebody at

22  RFC or a representative or anyone in the bankruptcy saying

23  statute of limitations is a potential defense.  And what I

24  said to that is I don't know that we need that because we

25  can all stipulate that it was a potential defense.  Nobody

1     is disputing that.

2           But that's what they want.  They want just that

3     statement, just that quote from Mr. Lipps' declaration from

4     the MBIA objection in, because the parties were aware that

5     Mr. Lipps said statute of limitations was an issue.  The

6     parties were aware that MBIA made that point.

7           What they don't want is any of the context or

8     explanation surrounding it, the explanation that there were

9     strong counter-arguments to the statute of limitations that

10    we saw that Mr. Woll ignored.  That's what they don't want.

11    But you can't do that.  The Federal Rules of Evidence say

12    you can't do that.  Federal Rule 106, rule of completeness,

13    it's not just for deposition designations.  It also includes

14    a situation like this where you want to stand up and say

15    statute of limitations was a defense.  Mr. Lipps himself

16    said so.  Okay, let's look two lines down where he explains

17    the context of that and what it means.

18          And during Mr. Hawthorne's testimony, Mr. Johnson

19    was asking him questions and said, Well, you acknowledge

20    that Mr. Lipps said it was a defense; and Mr. Hawthorne said

21    yes; and then two lines down and Mr. Johnson said, I move to

22    strike that.  But that's what they want.  They don't want

23    the context, but it's admissible under 106.

24          And so we believe those are admissible for the

25    same reason the briefs are, and I'll give Mr. Nicholson a

1   chance to respond.

2           THE COURT:  Thank you.

3           Mr. Nicholson.

4           MR. NICHOLSON:  Thank you, Your Honor.  Matt

5   Nicholson for PRMI.

6           Discussing Mr. Lipps' declarations, I understand

7   Mr. Scheck's argument to be that these are equivalent to the

8   briefs that we discussed earlier, but I think that they are

9   readily distinguishable in two ways.

10          The first way is that this is an expert

11  declaration.  It's an expert declaration offered by

12  Mr. Lipps, who I believe is sitting in the courtroom, who

13  was counsel for RFC.  It explained his substantive views as

14  a purported expert on the state of the law at the time.

15          So I think when a party seeks to use an expert

16  declaration, as plaintiff is seeking to do here, they are

17  really trying to use it for the truth of the opinions that

18  are offered therein.  Those opinions only matter, of course,

19  if they are true.  They're not seeking to use this solely

20  for information available at the time.

21          And the Court has articulated -- this Court has

22  articulated a particular concern with parties seeking to use

23  experts from other cases as experts in this case.  And

24  that's essentially what the plaintiff is trying to do here.

25  They are enlisting RFC's purported expert in the bankruptcy,

1    Mr. Lipps, as a second expert here on issues like statute of

2    limitations.  I would note for the record that I believe

3    that Mr. Lipps' declarations were actually struck in the

4    bankruptcy and he was required to submit limited

5    declarations only on facts.

6            And that takes me to the second point, which is

7    this document is completely different than the briefs that

8    we discussed earlier because there's a classic sword and

9    shield problem.  Your Honor may recall that Mr. Lipps has

10   been deposed about this document.  We sought discovery about

11   this document in connection with his deposition in the First

12   Wave, and he was precluded from testifying about the bases

13   for the opinions offered in his declaration because

14   plaintiff asserted privilege.

15           Now, that was their choice to assert privilege and

16   to present that testimony, but it has collateral

17   consequences and one of those consequences is that having

18   invoked the privilege as a shield, they can't now put

19   Mr. Lipps' declarations into evidence as a sword when we

20   haven't had the opportunity to depose him on the bases for

21   his opinions there.

22           Now, I'd also note that this same issue came up in

23   the *HLC* trial, and the Court will recall that Mr. Lipps was

24   limited to testifying as a witness about historical facts,

25   not about his legal opinions on the state of the law at the

1      time of the bankruptcy.

2              Now, obviously if Mr. Lipps had testified live

3      here, we think that the same rule would have applied.  That

4      he would have only been able to testify about historical

5      facts pertaining to the bankruptcy.  He wouldn't have been

6      able to offer the legal opinions about the state of the law

7      in his declaration.

8              And the result should be no different, Your Honor,

9      just because plaintiff is now seeking to instead of calling

10     Mr. Lipps, to put in his declaration itself.  It's the same

11     analysis.  There would obviously be a problem with Mr. Lipps

12     testifying about those opinions live, and there's equally a

13     sword and shield problem about them putting in his

14     declarations into evidence now.

15             Now, Mr. Scheck also referred to an incompleteness

16     problem.  I think that that argument is misplaced here.

17     That argument would have merit if we were seeking to, say,

18     introduce into evidence Mr. Lipps' declarations, but only

19     one paragraph of them or only one sentence.  We've made no

20     effort to do that.  We're not seeking to admit these

21     declarations into evidence at all.

22             What Mr. Scheck was referring to is that both

23     sides' experts considered a number of hearsay documents from

24     the bankruptcy as part of their expert opinions.  Experts

25     are allowed to rely on hearsay, so both sides did it.  And

1   the experts have given opinions that are in connection with

2   Mr. Lipps and so both experts, Mr. Woll and Mr. Hawthorne,

3   were cross-examined about their opinions insofar as they

4   relate to Mr. Lipps' declaration.

5           So there's been an airing of the disputes about

6   the meaning of the declaration through the experts.  What

7   can't be done now is for the declarations to come in as

8   substantive evidence to be used as an expert in another case

9   and where there's this really serious sword and shield

10  problem where we never had an opportunity to depose

11  Mr. Lipps about the underlying bases for his opinions

12  because of the assertions of privilege.

13          THE COURT:  All right.  Well, I'm confused so,

14  Mr. Scheck, I need you to clarify for me.  Are you seeking

15  to introduce the Lipps' declaration as an expert opinion or

16  are you seeking to introduce -- and I should say Mr. Sillman

17  as well -- the three declarations as non-hearsay for the

18  limited purpose of adding to the pile of things that folks

19  have before them at the time of the mediation?

20          MR. SCHECK:  Well, it's certainly the latter, Your

21  Honor, because all of these -- I mean, Mr. Cornell for

22  example, we did not designate his deposition.  I think we

23  did some counter-designations, but PRMI designated

24  Mr. Cornwell, Dr. Cornwell's deposition.  He was an expert

25  in the bankruptcy.  He's not an expert here.  And a great

1    swath of that deposition is counsel reading to Mr. Cornell

2    from his expert report -- I'm sorry, a great swath of the

3    designations reading from his expert report, which was not a

4    declaration, and saying do you see that?  Yes.  And that's

5    the designations.

6              So if we're going to open the door to talk about

7    what's proper in terms of information available to the

8    parties, it becomes a distinction you can't draw between

9    some of the designations we're dealing with here, some of

10   the briefs we're dealing with.  I mentioned the MBIA brief.

11   What PRMI has used it for primarily is their statement about

12   Mr. Lipps' statement about the statute of limitations and

13   their argument about statute of limitations.

14             Now, to be fair, they use it for some other things

15   about arguments that were made by MBIA.

16             But if we're going to start drawing that line, it

17   is not the Sillman declaration and the Lipps declarations.

18   It really is all of these issues.  So we just don't believe

19   that you can agree to put some subset here in front of the

20   Court when it boils down to all the same thing.  We are not

21   offering Mr. Lipps as an expert.  And I do want to clarify a

22   couple of other things.

23             Mr. Lipps' declarations were not struck in the

24   bankruptcy.  His declarations related to the FGIC settlement

25   were treated in part as briefs, which by the way, supports

1    the notion that they should be in because they would be

2    similar to a debtor's brief.  Some of it was struck to the

3    to the extent that the debtors were trying to use a reliance

4    on counsel defense.  That was the FGIC ones.

5           But Judge Glenn never struck the original

6    declarations.  There was debate about them, but in the end

7    many of the paragraphs of those FGIC declarations that were,

8    in fact, partially struck were instead accepted by the Court

9    as additional briefing.  And so it really is no different

10   than the other subject matter that the parties have agreed

11   upon and that the Court is accepting only for the limited

12   purpose.

13          The last thing I'll say is that the parties

14   designated Mr. Kruger's deposition and Mr. Kruger was the

15   chief restructuring officer who signed the Plan Support

16   Agreement and Supplemental Terms Sheet on behalf of RFC and

17   the other debtors, and Mr. Kruger testified that he

18   specifically reviewed in advance of signing that document

19   Mr. Sillman's declaration from the original settlement.  So

20   I cannot think of a more quintessential information

21   available to the party than that one.

22          Unless Your Honor has questions, I'll sit down.

23          THE COURT:  I think the only fair way to do this

24   is to, again, allow these three declarations, DTX-43 [sic],

25   DTX-537, and DTX-538 into evidence for the very limited

1       purpose, non-hearsay purpose, of having before us the

2       information that was available to the parties at the time of

3       the settlement, which is very important under any

4       *UnitedHealth* analysis.

5              Fortunately, we don't run into the concerns that

6       we might with a jury, that they would have a hard time

7       sorting through the use of these exhibits for the truth of

8       the matter asserted versus the limited use of having a more

9       complete record about what was available to the parties at

10      the time of the settlement, but the Court is clearly able to

11      do so.

12             And I'm very concerned that by not allowing this

13      in, it would be a cherry-picked record, and that is hardly

14      going to advance the ball here.  Let's take a look at what

15      was before the parties at the time that they settled this

16      case.

17             So again, I will permit these last three

18      declarations into evidence, again, only for that limited

19      purpose.

20             Mr. Nicholson.

21         (Counsel confer.)

22             MR. SCHECK:  Sorry.  I have one correction and

23      then one issue that came up.  I believe Your Honor said

24      DTX-43 and that is DTX-443.

25             THE COURT:  443.  I'm sorry.  I wrote that down

1    incorrectly.

2              MR. SCHECK:  And there might be some confusion

3    because I believe Mr. Nicholson was saying that he didn't

4    think that the Sillman declaration was one of the exhibits

5    mentioned.  I haven't had a chance, between standing up, to

6    look if that's correct, but perhaps before admitting

7    DTX-538, maybe we should talk and we could just chat in the

8    morning.

9              THE COURT:  That's no problem.

10             MR. SCHECK:  Okay.  I apologize, Your Honor.

11             THE COURT:  I wrote down 538 and I put Sillman,

12   but why don't we clarify that.

13             MR. NICHOLSON:  Yeah, we would just like to be

14   heard on that one as well, because I think the issues are

15   separate from this.

16             THE COURT:  Why don't we do that in the morning.

17             MR. NICHOLSON:  Thank you.

18             THE COURT:  Anything else we should address this

19   evening?  Mr. Nicholson.

20             MR. NICHOLSON:  Your Honor, there is one more

21   issue, and I think we need to address it now because it's

22   relevant to closings in the morning or in the afternoon --

23             THE COURT:  Before we get there, you folks aren't

24   going to be able to get out of the courthouse, and I suspect

25   that's something of interest to you.  So don't just walk out

1    of here.  You're going to have to have my staff accompany

2    you.  So whatever you are doing in these small conference

3    rooms after we finish this, do it quickly so that they can

4    go home too.

5            Go ahead.

6            MR. NICHOLSON:  Okay.  So there's an issue about

7    DTX-789, which is a summary exhibit.

8            THE COURT:  789?

9            MR. NICHOLSON:  Yes, Your Honor.

10           THE COURT:  Is this something we can talk about

11   tomorrow or not?

12           MR. NICHOLSON:  So we have an interest in talking

13   about it now because it's relevant to closing and slides

14   that go into that and things that need to be done tonight.

15           THE COURT:  All right.  This is a 1006 exhibit?

16           MR. NICHOLSON:  Yes, Your Honor.  So this exhibit

17   was served under the four-day disclosure protocol, as

18   Mr. Clouser, I believe, mentioned earlier today.  There was

19   no objection by plaintiff pursuant to the disclosure

20   protocol.  This is a -- just for background, this is a

21   summary exhibit prepared by a paralegal that is just simply

22   taking data from a spreadsheet provided by the plaintiff in

23   discovery about the global population of loans and simply

24   calculating very basic percentages based on this giant --

25           THE COURT:  Who will be the sponsoring witness for

1      this?

2                    MR. NICHOLSON:  Your Honor, the sponsoring witness

3      would be the paralegal who prepared it; and had they

4      objected pursuant to the four-day disclosure protocol, that

5      person would be here now to answer basic questions about how

6      they just calculated these simple percentages.  There was no

7      objection raised to the document at all, much less for a

8      request for a 1006 hearing.  We would have been happy to

9      have that paralegal appear here.

10                    And so I fail to see how they have any valid

11     objection now.  I think any objection at this point has been

12     waived.  And there really is no need anyway for a paralegal

13     to testify about its creation because it is simply adding up

14     percentages -- or calculating percentages based on this

15     Excel spreadsheet that they provided in discovery.  So

16     there's been no objection.  It's a very simple objective

17     1006.  It raises none of the purported issues that were

18     discussed in connection with the repurchase database 1006

19     earlier.

20                    This is prepared, like I said, by a paralegal, by

21     a nonlawyer.  That's standard practice when preparing 1006;

22     and like I said, had they raised any objection three days

23     ago to it, we would gladly put that person up.  But having

24     heard no objection, of course we didn't bring into court

25     today the paralegal to testify about it.  And I don't think

1    that there's any need to because, like I said, it's a very

2    simple calculation of statistics based on their own

3    spreadsheet of the global population.

4              THE COURT:  Who wishes to address this?

5    Mr. Miller.

6              MR. MILLER:  Thank you, Your Honor.  I will keep

7    this brief in the interest of everyone's evening schedules.

8              So Mr. Nicholson is correct that this was served

9    under the four-day disclosure and, frankly, Your Honor, we

10   overlooked it because it wasn't attached to a witness, and

11   in order to have a 1006 exhibit it has to have a sponsoring

12   witness.  This is, of course, very similar, almost

13   completely similar, to what we went through with DTX-736,

14   also known as DDX-11, which was the supposed 1006

15   summarizing the investor repurchase database, and the

16   critical issues and flaws that that exhibit suffered from

17   are of course what this exhibit suffers from, which is that

18   there's no fact witness or expert who can sponsor it, and

19   also that -- whether it was created by a paralegal or not --

20   these exhibits cannot be sponsored by attorneys, members of

21   the trial team, members of the law firm that are trying the

22   case.

23             We have since objected.  We put in an objection

24   over the course of the day today, so we do have an objection

25   on the record; and we, of course, object today.  As to

1    whether a paralegal would have been available, again,

2    doesn't address the 1006 issue; and also no witness, no

3    paralegal witness has been disclosed in any of their witness

4    disclosures, so I don't know about that one.

5            And that's all I have on that, Your Honor.

6            THE COURT:  All right.  Very good.

7            Mr. Nicholson, are you aware of authority that

8    permits the trial team to get up and explain how they come

9    up with a 1006 exhibit?  I've not ever seen that before.

10           MR. NICHOLSON:  Your Honor, my --

11           THE COURT:  Suppose they had objected, what would

12   you have done?

13           MR. NICHOLSON:  This paralegal that prepared this

14   is not a member of the trial team.  It's an employee of the

15   Zelle law firm and has no connection to the case.  So the

16   assertion that --

17           THE COURT:  Well, the Zelle law firm is part of

18   the trial team.

19           MR. NICHOLSON:  Is not -- correct, but this

20   paralegal has had no participation in the case.  It is

21   standard practice to have a paralegal serve as a 1006

22   exhibit.

23           THE COURT:  It's a standard practice?  Where does

24   that come from?

25           MR. NICHOLSON:  Your Honor, it comes from

1    plaintiff's own authority.  Your Honor, when we had a

2    dispute about the 1006 exhibit, they cited several cases and

3    one of those cases addressed the fact that it's standard,

4    especially in criminal cases, for a paralegal working with a

5    prosecutor's office to summarize documents in an objective

6    way and put in one of these documents like this and testify

7    about it.  There's nothing -- someone has to serve as that

8    person.  This is a document that's served in litigation by

9    plaintiff.

10            THE COURT:  That's why typically experts create

11   these documents.

12            MR. NICHOLSON:  Your Honor, I don't think that

13   that's -- there's no -- if you look at 1006, there's

14   absolutely no requirement to even have a sponsoring witness.

15   There's especially no requirement that it be an expert; and

16   plaintiff's own authority indicates it can be a paralegal.

17   And here there's no concern about any sort of bias by the

18   paralegal.  It was not a member of the trial team.

19            On top of that, Your Honor, I mean, this is a

20   classic example of sandbagging.  They did not -- whether it

21   was intentional or not, that's the effect.  Mr. Miller says

22   it was overlooked.  I take him at his word that it was

23   overlooked, but it was overlooked nonetheless.  The fact of

24   the matter is for them to object now at this late juncture

25   on the eve of closing argument I think is sandbagging in

1    effect.

2           We gladly would have brought this paralegal in

3    today to answer any questions that Mr. Miller had.  He

4    didn't raise any substantive concerns as far as I could tell

5    about the data there, but even if he did, the proper way to

6    do it would have been to lodge an objection in a timely

7    manner, for us to bring in the paralegal and for her to

8    explain how she did this, and there was no objection

9    whatsoever on that score.  So I think it's too late in the

10   day for them to raise it now.

11          THE COURT:  Okay.  I'm not going to rule on the

12   basis of waiver.  I'm going to have to go back and look at

13   that case law.  It's not been my experience for 40 years

14   that we have paralegals on the -- the law firm is the part

15   of the trial team.  So this is a paralegal at a law firm

16   that is your local counsel.

17          MR. NICHOLSON:  You're right, Your Honor.

18          THE COURT:  So this is not the standard -- trust

19   me -- the way this is done.  It's not standardly done by a

20   paralegal from one of the law firms representing a party.

21   But I will be glad to go back and look at the case law.

22          There might be an unusual situation in a criminal

23   case where it's done, but to suggest or represent to the

24   Court this is the standard way this is done, which is what

25   you have said, is just not true.  It's a exaggeration.  But

1    I will go back and take a look and see; and if it's possible

2    for a paralegal at one of the law firm who is local counsel

3    representing one side to get on the stand, they're here,

4    we'll have them get on the stand tomorrow.

5              So I'll take a look at it tonight and we'll figure

6    out how to go from there.

7              MR. NICHOLSON:  Your Honor, I just wanted to add

8    one point.  The case that I am referring to is plaintiff's

9    own case.  It referred to paralegals doing this in criminal

10   cases.  The paralegals for the Government U.S. Attorney's

11   Office, right?  That is the exact same kind of situation

12   here.  A paralegal employed by one of the firms involved.  I

13   don't see how it's any different.

14             And if Your Honor disagrees with it being standard

15   practice, I'm happy to accept that you have much more

16   experience in these matters than I do, and so perhaps that

17   label is not correct; but I don't think that there's any

18   barrier to having a paralegal serve this purpose and

19   plaintiff's own authority I think indicated that.

20             THE COURT:  All right.  Well, I'm going to have to

21   take a look at that case law tonight and I will make a

22   judgment in the morning, but you should have the paralegal

23   ready to go in the morning.

24             MR. NICHOLSON:  Yes, Your Honor.

25             THE COURT:  All right.  Anything further tonight?

1              All right.  So my staff will help you get out of

2        the building.  We'll see you tomorrow morning.

3              Court is adjourned.

4        (Court adjourned at 5:49 p.m.)

5                         *       *       *

6              We, Lori A. Simpson, and Carla R. Bebault, certify

7        that the foregoing is a correct transcript from the record

8        of proceedings in the above-entitled matter.

9

10

11           Certified by:   *s/ Lori A. Simpson*
                             Lori A. Simpson, RMR, CRR
12
             Certified by:   *s/ Carla R. Bebault*
13                           Carla R. Bebault, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25