1        UNITED STATES DISTRICT COURT

2          DISTRICT OF MINNESOTA

3   ------------------------------------------------------------

4

5    **In Re: RFC and RESCAP Liquidating Trust Litigation**

6

7          File No. 13-cv-3451 (SRN/HB)

8

9        **ResCap Liquidating Trust,**

10               **Plaintiff,**

11            **v.**

12       **Primary Residential Mortgage, Inc.**

13             **Defendant.**

14

15          File No. 16-cv-4070 (SRN/HB)

16

17           St. Paul, Minnesota

18             Courtroom 7B

19            March 13, 2020

20             9:21 a.m.

21   ------------------------------------------------------------

22              BEFORE:

23       The Hon. **SUSAN RICHARD NELSON,**

24        United States District Judge

25       **BENCH TRIAL - VOLUME XIII**

1

2       Official Court Reporters:      Carla R. Bebault, RMR, CRR
                                       Lori A. Simpson, RMR, CRR
3
        U.S. Courthouse, Suite 146
4       316 North Robert Street
        St. Paul, Minnesota 55101
5
        **A P P E A R A N C E S**
6
                          **For Plaintiffs:**
7
        **Isaac Nesser, Esq.**
8       **Jeffrey Carl Miller, Esq.**
        **QUINN EMANUEL URQUHART & SULLIVAN**
9       51 Madison Avenue
        22nd Floor
10      New York, New York 10010-1603

11      **Anthony Paul Alden, Esq.**
        **Matthew R. Scheck, Esq.**
12      **QUINN EMANUEL URQUHART & SULLIVAN**
        865 South Figueroa Street
13      10th Floor
        Los Angeles, California 90017-2543
14
        **Donald G. Heeman, Esq.**
15      **Jessica J. Nelson, Esq.**
        **SPENCER FANE**
16      150 South Fifth Street
        Suite 1900
17      Minneapolis, MN 55402

18                        **For Defendants:**

19      **Matthew V. Johnson, Esq.**
        **Jesse T. Smallwood, Esq.**
20      **Matthew B. Nicholson, Esq.**
        **David Keith Clouser, Esq.**
21      **WILLIAMS & CONNOLLY LLP**
        725 12th Street NW
22      Washington, DC 20005

23      **Elizabeth V. Kniffen, Esq.**
        **ZELLE HOFFMAN VOELBEL & MASON, LLP**
24      500 Washington Avenue South, Suite 4000
        Minneapolis, MN 55415
25

1                              **I N D E X**

2                                                              PAGE

3   **JUSTIN MCCRARY**
      Continued Cross-Examination By Mr. Nesser          2666
      Redirect Examination By Mr. Nicholson             2714
4

5
    Closing Argument by Mr. Johnson                     2746
6   Closing Argument by Mr. Nesser                       2793

7

8

9

10  DEFENDANT'S EXHIBITS                                     REC'D
        538                                              2743
11
    DEFENDANT'S DEMONSTRATIVES EXHIBITS                  REC'D
12      18                                               2738

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                      IN OPEN COURT
 3
 4          THE COURT:  Good morning, everyone.  Good morning,
 5     Dr. McCrary.
 6          THE WITNESS:  Good morning, Your Honor.
 7          THE COURT:  Do you have a lawyer there to assist
 8     you with the documents?
 9          THE WITNESS:  I have someone to assist me with the
10     documents.  I believe she has not yet passed the bar, but
11     she's here.
12          THE COURT:  Whatever.  There's somebody there to
13     help you with the documents.  I don't think she has to have
14     passed the bar.
15          THE WITNESS:  I don't think so either.
16          THE COURT:  Very good.  Mr. Nesser, do you wish to
17     proceed?
18          MR. NESSER:  I'm pleased to see we have a better
19     view today.
20          THE WITNESS:  There were different IT people this
21     morning.
22                      (Justin McCrary)
23                 CONTINUED CROSS-EXAMINATION
24     BY MR. NESSER:
25     Q.  Dr. McCrary, welcome back.  Did you consult with counsel
```

CARLA R. BEBAULT, RMR, CRR, FCRR
(651) 848-1220

1   last night?

2   A.  I confirmed that I was supposed to be here.  There was

3   some confusion about whether the courthouse was going to be

4   closed and I wanted to make sure that I had the correct

5   understanding of that.  Other than that, no.

6   Q.  And, Dr. McCrary, I wanted to talk about margins of

7   error.  One of your pillars of statistics relates to the

8   accurate calculation of the margin of error, yes?

9   A.  Sufficient precision, yes, that's correct.

10  Q.  And for the trust settlements, the margin of error that

11  Dr. Snow calculated is arguably more or less correct?

12  A.  I'm sorry.  If I heard you right you said, "is arguably

13  more or less."  I'm not sure I understand.

14  Q.  For the trust settlements the margin of error that

15  Dr. Snow calculated is arguably more or less correct, yes?

16  A.  Oh.  You said, "more or less correct"?

17  Q.  Yes.

18  A.  I think that there are reasons to question the margin of

19  error calculation, but I don't believe that they come in at

20  this matter.

21  Q.  So you have some criticisms of it, but it's probably in

22  the right ballpark, yes?

23  A.  That might be a good way to say that, yes.

24  Q.  And you've testified that Dr. Snow's margins of error

25  are wide, yeah?

1    A.  That's correct.

2    Q.  And to begin with, you're not opining that Dr. Snow's

3    margins of error are too wide, right?

4    A.  I'm not sure I understand the distinction you're drawing

5    between wide and too wide.

6    Q.  Dr. McCrary, could you turn, please, to PTX-266.

7    A.  Yes.

8    Q.  And that's your deposition in PRMI, yes?

9    A.  Yes.

10   Q.  And could you turn, please, to page 108, PTX -- I'm

11   sorry.  Yeah, transcript page 108.

12   A.  Yes, I'm there.

13   Q.  And at lines 4 through 11 I asked you the question:

14       "You have an opinion in this case that Dr. Snow's

15   margins of errors are too wide?

16       "Answer:  I would have said that I'm not sure as to the

17   modifier 'too,' but it's certainly my opinion that

18   Dr. Snow's margins of error are wide."

19            And, Dr. McCrary, there's no bright-line rule for

20   a margin of error, right?

21   A.  That's correct, there's not a bright-line rule.

22   Q.  And the factors that someone would consider in making

23   that nonbright-line determination in this case or in any

24   case is context specific?

25   A.  I think that's correct as well.

1    Q.  And, in fact, the margin of error that gets used in a

2    given context is going to depend upon a broad set of

3    considerations that you, Dr. McCrary, are not in a position

4    to enumerate because every context is different, yes?

5    A.  I think if one tried to enumerate it, it's probably

6    right that you might have in a specific context something

7    else that would occur to you and so I do think it's not

8    necessarily possible to enumerate all of the contextual

9    factors.

10   Q.  But one of the factors relevant to an assessment of the

11   relevant margin of error could involve the question of

12   whether one is in a civil versus a criminal context, right?

13   A.  I suppose it's right that in a criminal context in

14   general the legal process, it's my understanding, requires

15   more certainty than it does in a civil, yes.

16   Q.  And as to what the trier of fact in a civil case or a

17   criminal case might determine to be a sufficiently narrow

18   margin of error, you're not aware of there being a

19   bright-line rule as to that issue either, right?

20   A.  That's correct, I'm not aware of a bright-line rule

21   generally or in the specific context you're asking me about.

22   Q.  And you're also not sure it's appropriate for you,

23   Dr. McCrary, to weigh in on what factors a trier of fact

24   ought to take into account in assessing whether the margin

25   of error is appropriately wide, yes?

1    A.  Well, my role as an expert witness is to help the trier

2    of fact understand matters of statistics.  It's not to tell

3    anybody how to do their job.  And I take the decision as to

4    how to account for margin of error as contextual and outside

5    of the domain of statistics.

6    Q.  So you --

7    A.  Statistics would be about instead trying to characterize

8    what would be the margins of error and from a decision

9    theoretic perspective to discuss the extent to which that

10   might adjust, for example, an estimate, as I've testified

11   to.  But other than that, no.

12   Q.  And so when you say that Dr. Snow's margins of errors

13   are wide, what you mean is that you have a strong suspicion

14   that if you were in a seminar room, the width of those

15   margins of error is something that would come up, right?

16   A.  I think actually your question has two parts to it where

17   my answers are different.  So it is right that if there were

18   a seminar context where this kind of an estimate came up and

19   this kind of margin of error, and here I am making reference

20   to the trust settlement damages estimate because I take that

21   to be what you're asking me about still, it is right that

22   that is my view that would certainly be a question.

23          There was another part to your question, however,

24   which asked whether or not that was the basis for my view

25   that it was a wide margin of error and the answer to that

1    question would be no.

2    Q.  And, Dr. McCrary, you're not sure what number the

3    consensus in that seminar room would have been if the

4    question were asked what is too wide, right?

5    A.  Again, I don't think that there's a bright-line rule.

6    And for the same reason that there's not a bright-line rule,

7    I would say that consensus is a concept that's inapropos.

8    What would happen instead in a seminar context is people

9    would ask, well, what is this estimate going to get used

10   for.  That's the decision theoretic aspect of statistics and

11   the economic aspect of econometrics.

12   Q.  Dr. McCrary, you wrote that it would be reasonable and

13   conservative to consider using a lower bound of the

14   confidence interval as the measure of damages, right?

15   A.  I'm not looking at the page that you're quoting from,

16   but that sounds as though that's consistent with my opinion

17   and I take it that you're quoting from a report of mine.

18   Q.  And, Dr. McCrary, whether or not that's what it said,

19   you would agree, sitting here today, that it would be

20   reasonable and conservative to consider using the lower

21   bound, right?

22   A.  Yes, I think that that's correct.

23   Q.  And you have never opined in any report and in any

24   testimony that Dr. Snow actually should have used the lower

25   bound, right?

1    A.  I'm not sure that that's correct.  It is my view that

2    it's certainly correct that he should have considered it,

3    and I think it's also correct that in the context of a money

4    demand that that's an appropriate approach.  I'm familiar

5    with that approach from other contexts and to me that aligns

6    the incentives.

7            If you're going to design a sampling and damages

8    methodology that's associated with great imprecision, it

9    seems as though, since the consequence of that imprecision

10   falls upon the party who has to pay the money damages, it

11   aligns incentives if the designer of that bears the

12   consequence of that imprecision.

13   Q.  And so, Dr. McCrary, are you testifying here today that

14   in your view it would have been reasonable and

15   conservative -- I'm sorry.

16           Are you testifying here today that in your view

17   you believe Dr. Snow should actually have used the lower

18   bound of the confidence interval as the measure of damages?

19   A.  I suppose my view is really somewhere in between those

20   two.  I wasn't asked to put forward an affirmative damages

21   methodology myself.  It's certainly my view that in light of

22   the imprecision associated with Dr. Snow's methodology, that

23   he ought to have considered that.  As to whether or not he

24   should have, I think it's right that that's closer to asking

25   me an affirmative question and I wasn't asked that.

```
1    Q.  Okay.  And you've not offered that opinion?

2    A.  What I've offered instead is that I don't think that's a

3    bad idea and, in fact, it's certainly one that ought to have

4    been considered.

5    Q.  Okay.  And you cited the CMS Manual in your testimony

6    yesterday, correct?

7    A.  Yes, that's correct.

8    Q.  And you talked about -- actually, I don't know that you

9    cited the manual.  You talked about a CMS practice of using

10   the lower bound, right?

11   A.  No, you were right the first time.  I cited both to the

12   manual and also to their practice.

13   Q.  All right.  And it's correct, Dr. McCrary, that the CMS

14   Manual does not require the lower bound be used in all

15   cases, right?

16   A.  It has language that might be taken to suggest

17   exceptions.  That's not my understanding from their

18   practice.  But, yes, the manual seems as though it is a bit

19   open-ended.

20   Q.  The manual says that in most situations the lower bound

21   should be used, right?

22   A.  I don't have the manual in front of me.  I take it that

23   you're quoting from it faithfully, so I'll just take you at

24   your word.

25   Q.  So, Dr. McCrary, you're agreeing for purposes of your
```

1    testimony today that the manual says that only in most

2    situations is the lower bound used, according to the CMS

3    Manual, right?

4    A.  Well, I'm not really sure what happens if it turns out

5    you're not quite using the correct language and then I

6    testify that you are.  So I don't necessarily want to say

7    yes, but, again, if you want me to accept that as a

8    hypothetical, I'm happy to.

9    Q.  And the manual also says that reviews to assist law

10   enforcement with the identification, case development, and

11   investigation of suspected fraud or other unlawful

12   activities may use different sampling methodologies, right?

13   A.  I don't remember that passage.  Again, I don't doubt

14   that you're quoting from the document, but that's not a

15   passage that I recall reviewing sitting here today.

16   Q.  Dr. McCrary, can you just open up PTX-260, please.  And

17   my only question for you is going to be can you just confirm

18   that that is a version of the CMS Manual that you have been

19   referring to.

20   A.  Yes, this appears to be.

21   Q.  Dr. McCrary, you have not cited any textbook or any

22   peer-reviewed journal article stating that statistics always

23   requires using the lower bound of a confidence interval in a

24   circumstance like this one?

25   A.  No, I've not.

1    Q.  And aside from CMS, you're not aware of examples in

2    which agencies or entities other than CMS use the lower

3    bound, right?

4    A.  I myself don't have personal experience with

5    investigations that involve sampling except in the CMS

6    context.  So what I was trying to do was to point to things

7    that I knew to be correct and the CMS example is the example

8    with which I have familiarity.

9    Q.  And you're not aware of examples in which agencies or

10   entities other than CMS use the lower bound, correct?

11   A.  As I said, I don't have direct experience with

12   investigations by other regulatory agencies.  That is to say

13   I'm not familiar with the processes that are followed for

14   other investigations.

15   Q.  And so as a result of that, you're not aware of examples

16   in which agencies or entities other than CMS use the lower

17   bound, correct?

18   A.  That's correct.  I wouldn't have experience with respect

19   to agencies that I didn't have experience with respect to.

20   Q.  Now, Dr. McCrary, your research addresses real-world

21   problems with real-world data.  And, again, I think you said

22   yesterday you have only written one theoretical paper

23   regarding statistics in your lifetime, right?

24   A.  I believe that was my testimony yesterday yes.

25   Q.  And in all of that real-world work, have you ever

1    advocated for the use of the lower bound of the confidence

2    interval that you had developed?

3    A.  I can think of contexts where that's an aspect of the

4    consideration, but I have never been in a position of

5    writing an article where the consumer of that information

6    would then be in a position of asking for money damages.

7    Q.  But, Dr. McCrary, can you answer my question, please,

8    which is:  In all of the real-world work that you testified

9    about yesterday, you've never once advocated for the use of

10   the lower bound of a confidence interval that you had

11   developed, right?

12   A.  No.  So I was trying to be clear, and apologies if I

13   wasn't.  I have never been in the context in my research

14   that the consumer of statistical information here would be

15   in and, no, I have not for that reason ever advocated the

16   utilization of the lower bound of a confidence interval.

17   Q.  Okay.  Dr. McCrary, turning to monoline allocation

18   issues, your opinion is that Dr. Snow could have explored

19   using sampling on a settlement-by-settlement basis to

20   improve the reliability of his monoline estimate, yes?

21   A.  Yes, that's correct.

22   Q.  And your opinion is that sampling from the population of

23   interest to achieve a 5 percent point maximum margin of

24   error on a count-based breach rate would have only required

25   a total of 1,330 loans?

1    A.  Yes, that's correct.

2    Q.  And you offered that opinion in this case, right?

3    A.  Yes, I did.

4    Q.  And when you offered that opinion, you didn't know how

5    much it would have cost to re-underwrite a loan, right?

6    A.  No, I was not drawing upon a specific number in terms of

7    cost.

8    Q.  And you weren't drawing on a general number either,

9    right?

10   A.  No.  I was simply reporting what Dr. Snow's methodology

11   would involve had he done sampling on a monoline settlement

12   by monoline settlement basis.

13   Q.  And at the time you offered that opinion about 1,330

14   loans, you didn't know how much the trust or PRMI had spent

15   on re-underwriting in these cases, right?

16   A.  That's correct.

17   Q.  And during your deposition, Dr. McCrary, we discussed a

18   declaration that Mr. Alden signed in which he calculated the

19   approximate cost to re-underwrite a loan in this case, yes?

20   A.  I have recollection of that document, yes.

21   Q.  And Dr. -- and Mr. Alden -- I'm sorry.  And Dr. Snow

22   discussed that declaration in his supplemental report,

23   right?

24   A.  Yes, I believe that's correct.

25   Q.  And that was a supplemental report that Dr. Snow had

1   issued before your deposition in this case, right?

2   A.  Yes, that's also correct.

3   Q.  But at least as of the date of your deposition, you

4   couldn't remember ever having even read Mr. Alden's

5   declaration, right?

6   A.  I believe that might be right, but -- this may sound

7   funny, but I don't actually remember not having remembered

8   that.  But I take it at your word that you probably asked me

9   that and I probably said I don't remember at that time.

10  Q.  And have you seen it since?

11  A.  I believe that it was included in the list of the

12  documents that you might draw upon and that I laid eyes upon

13  it.  I forget which day, but relatively recently.

14  Q.  Okay.  And other than that, do you recall seeing

15  Mr. Alden's declaration at any point after your deposition?

16  A.  No, I don't recall.  I may have, but I don't recall

17  having done so.

18  Q.  So the only time you ever remember having seen or read

19  Mr. Alden's declaration was in the last several days because

20  we disclosed it as part of your examination materials?

21  A.  No.  I also recall having reviewed it in the context of

22  the deposition, as we were just discussing.

23  Q.  Well, Dr. McCrary, you just testified that at the time

24  of the deposition, you hadn't remembered seeing it.

25  A.  No, that's not what I testified to or it certainly

 1    wasn't my intent.  And I'm not sure that it matters much,

 2    but the -- for clarity, what I think is true is that you

 3    asked me a question in my deposition about whether I

 4    recalled having seen that document.  I believe it's right

 5    that I said no.  I believe it's right that you also then

 6    asked me to review that document, that I then did.  And

 7    subsequent to that deposition, a few days ago I reviewed the

 8    same document briefly.

 9    Q.  Dr. McCrary, you're saying that we looked at the

10    declaration during your deposition?

11    A.  That's my memory.  It might be wrong, but that is my

12    recollection.

13    Q.  Dr. McCrary, we never looked at that declaration during

14    your deposition, right?

15    A.  That's not my memory.  But, again, as said, I might be

16    wrong about that.

17    Q.  Okay.  And in any event, you're at this point in time

18    aware that Mr. Alden has calculated that it costs the trust

19    about $8,000 to re-underwrite a single loan in this

20    litigation, right?

21    A.  I am aware that that's his testimony, yes.

22    Q.  And across 1,330 loans, that's $10.6 million, more or

23    less?

24    A.  So I'm not sitting here with a calculator, but, again,

25    I'll take it that you've done that calculation correctly.

1    Q.  Okay.  And another criticism that you've raised is that

2    Dr. Snow ought to have considered calculating monoline

3    damages on a monoline-by-monoline basis, right?

4    A.  Yes, that's correct.

5    Q.  And you understand that Dr. Snow generated an analysis

6    in this case that attempts to address that criticism?

7    A.  I am, yes.

8    Q.  You've opined that we should disregard those estimates,

9    though, and that they can't be used, right?

10   A.  Those that are based on sampling, yes, I think that's

11   correct.

12   Q.  And part of the reason why you think that Dr. Snow's

13   settlement-by-settlement numbers can't be used is because

14   you believe Dr. Snow should have started with the universe

15   of loans that were insured by each monoline insurer and

16   drawn a sample from that population rather than using a

17   sample that had already been drawn for another purpose and

18   looking to the loans that happened to have been insured by a

19   given monoline insurer, right?

20   A.  There was a lot in that question.  Let me just try to

21   clarify my view on this.  My view is that Dr. Snow's

22   methodology clarifies that he thinks the sample sizes on a

23   settlement-by-settlement basis are too small.  That's why he

24   initially made the move, I believe, to make an assumption,

25   the incorrect one, regarding retrades being the same across

1    all monoline settlements.

2    Q.  But in addition to the issues of sample size, if I

3    understand what you testified just now, you also had a

4    concern that Dr. Snow had -- should have started with the

5    universe of loans that were insured by each monoline insurer

6    and drawn samples rather than using a sample that had

7    already been drawn for some other purpose, right?

8    A.  Yes.  So what I tried to testify to is that stratifying

9    by settlement would have led to an appropriate sample size

10   for each of the settlements that were to be allocated.

11   Q.  And Dr. Snow's failure to generate

12   settlement-by-settlement numbers using samples that had been

13   drawn for that specific purpose is part of the reason you

14   believe those numbers are not usable, right?

15   A.  I'm not sure I fully understand the question.  Could you

16   try asking it again?

17   Q.  I can ask a different one.  Dr. McCrary, do you recall

18   testifying about this settlement-by-settlement issue during

19   the *HLC* trial?

20   A.  I do, yes.

21   Q.  And you prepared demonstratives that you used to

22   illustrate your testimony on that issue?

23   A.  Yes, I recall my demonstratives from the *HLC* trial.

24   Q.  And you prepared them because you believed they would be

25   helpful to the fact-finder, right?

1     A.  Yes, that's correct.

2     Q.  You wouldn't have put something in front of a jury that

3     you believed should be disregarded and couldn't be used,

4     right?

5     A.  No, that's correct.

6     Q.  Can you take a look at PTX-461-19, please.

7     A.  Give me just a moment.  Thank you.  PTX-461-19?

8     Q.  Yep.

9     A.  Yes, I'm there.

10    Q.  And we're looking at a demonstrative from your *HLC*

11    testimony, right?

12    A.  Yes.

13    Q.  And the heading of this slide is Violation of Pillars

14    One and Four?

15    A.  Yes.

16    Q.  And that slide reflects HLC damages calculated from

17    Dr. Snow's work papers on a settlement-by-settlement basis,

18    right?

19    A.  Yes, that's correct.

20    Q.  And it presents breach rates based on samples that had

21    already been drawn for another purpose and just happened to

22    have been insured by a given monoline insurer, right?

23    A.  I'm not sure that I follow.

24    Q.  The numbers on this slide reflect the samples that had

25    already been drawn by Dr. Snow for his original

1    nonsettlement-by-settlement purpose, right?

2    A.  Well, the first two columns contain counts of the number

3    of loans.  They do correspond to Dr. Snow's sample.  And the

4    final column presents Dr. Snow's damages calculation.  And

5    the slide is included for a specific point and I'm not

6    really sure that I understand your question.

7    Q.  Dr. McCrary, the question is this slide presents breach

8    rates in the final column -- I'm sorry.  This slide --

9    A.  No.

10   Q.  Yeah, I apologize.  Dr. Snow [sic], this slide presents

11   data based on samples that had already been drawn for

12   another purpose, right?

13   A.  Yes.  I think just for clarity of the record, you called

14   me Dr. Snow just now.

15   Q.  I apologize.

16   A.  So the --

17   Q.  It was not intentional.

18   A.  It's okay.  So I'm Dr. McCrary.

19          So the final column pertains to damages, not to

20   breach rates.

21   Q.  Correct.

22   A.  But I did try to clarify in my initial attempt at

23   answering your question that, yes, the sample sizes that are

24   presented here --

25   Q.  Um-hum.

1    A.   -- are the sample sizes that correspond to Dr. Snow's

2    sample, which, yes, was wrong for different purposes.

3    Q.   And those are loans that just happen to have been

4    insured by a given monoline insurer.

5            Dr. McCrary, before we move on, by the way, the

6    heading of the slide talks about pillars one and four.

7    A.   Yes.

8    Q.   And what was pillar four in *HLC*?

9    A.   Pillar four was what corresponds to pillar five in the

10   presentation of the five pillars that I presented yesterday

11   and in my prior report, that is to say, specifically to be

12   transparent and use justified assumptions.

13   Q.   So pillar four in *HLC* was assumptions and that became

14   pillar five here?

15   A.   Yes, that's correct.

16   Q.   And what's pillar four here?

17   A.   That's what I just told you about.

18   Q.   What's pillar four in this case?

19   A.   Oh, sorry.  By "here" I thought you were referring to

20   the pillar four in the document.

21   Q.   I know it gets confusing.  In this trial what is pillar

22   four?

23   A.   Pillar four is unbiasedness.

24   Q.   Okay.  And what does "unbiasedness" mean?

25   A.   As I tried to clarify in my direct testimony yesterday,

1    unbiasedness is not something that is intended to convey

2    anything like the license of that term.  It's a technical

3    statistical idea and it refers to the proposition that the

4    sampling distribution should be centered at the truth, that

5    is to say, what would be obtained if one had enumerated all

6    of the loans as opposed to sampled from them.

7    Q.  And I think you testified yesterday that one of the ways

8    in which Dr. McCrary -- I did it again -- one of the ways in

9    which Dr. Snow violated pillar number four in this case has

10   to do with the strength of claim issues that you've raised,

11   right?

12   A.  Yes, I believe that's correct.

13   Q.  So when we talk about pillar four and unbiasedness in

14   this case, we're talking about strength of claim?

15   A.  No and yes, I suppose.  A "yes" in the sense that

16   strength of claim is something which -- strength of claim

17   defenses would be something that in the PRMI case would lead

18   to bias and in particular for damages to be overstated, but

19   it wouldn't be limited to that.

20   Q.  I --

21   A.  -- would be "no."

22   Q.  I think -- I'm sorry.  Go ahead.

23   A.  No, it's okay.  I was just trying to clarify that

24   yesterday in my direct I also tried to be clear that another

25   aspect of bias is the estimate for the monoline settlements

1    because the assumption that gets invoked in order to support

2    the monoline settlement damages numbers is the homogeneity

3    assumption, that is to say, that all of the monoline

4    settlements are the same as one another.  And I presented

5    evidence to the contrary and argued specifically that that

6    means that that assumption is false; and if that assumption

7    is false, the estimate that results from that assumption is

8    biased as well.

9    Q.  And that last monoline heterogeneity issue, that was an

10   issue you had in HLC, too, right?

11   A.  Yes, that's correct.

12   Q.  But what's new in this case about pillar four in your

13   opinion is strength of claim, right?

14   A.  I think you're asking me the same question you asked

15   before where I said the answer was yes and no.

16   Q.  Let's move on.  So, Dr. McCrary, you believe that

17   Dr. Snow's allocation approach suffers from various flaws,

18   right?

19   A.  Yes, that's correct, and I've tried to lay those out.

20   Q.  And one of them is that, as we said, it doesn't account

21   for strength of claim, right.

22   A.  Strength of claim and defenses, yes.

23   Q.  And you believe it's a flaw that Dr. Snow doesn't take

24   into account in particular that the claims brought by the

25   trusts and monolines during the bankruptcy proceedings may

1    not have had an equal probability of success on every loan

2    due to the differing characteristic of the loans and trusts

3    in which they were securitized, yes?

4    A.  Yes.  I'm not 100 percent sure, but you sound to me like

5    you're quoting to me from my own report.

6    Q.  And yesterday you characterized that as I think a

7    fundamental problem in Dr. Snow's analysis?

8    A.  I might have said that that was a fundamental problem.

9    I don't recall that language specifically, but that's not

10   inconsistent with my opinion.

11   Q.  And that's not an opinion that you offered in Wave One,

12   right?

13   A.  That's correct.

14   Q.  So in Wave One you were representing how many parties?

15   A.  I don't recall, but we could look it up.

16   Q.  Many parties?

17   A.  I was retained on behalf of I think it's something like

18   20 different entities, yes.

19   Q.  Okay.  And you spent a couple of years in Wave One

20   working for those 20-some odd defendants?

21   A.  I forget the gap in between my initial retention and the

22   trial, but I'll take you at your word.

23   Q.  It was a long time.  And during that time you had a job

24   to evaluate the opinions that Dr. Snow had offered

25   concerning statistics and damages, right?

1    A.  Yes, that's correct.

2    Q.  Same assignment you had here, right?

3    A.  I would have said that the scope of my assignment was

4    somewhat broader with respect to the PRMI matter than it was

5    for the HLC matter.

6    Q.  But the engagement that you had in Wave One was to

7    assess Dr. Snow's damages and statistical work and the

8    engagement that you had here was to assess Dr. Snow's

9    damages and statistical work, correct?

10   A.  At a high level that's correct, but I was not asked the

11   question in the *HLC* trial or, better said, I wasn't asked

12   the question in the *HLC* assignment about strength of claims

13   and defenses.

14   Q.  Why not?

15   A.  I don't know.

16   Q.  Did you flag it?  It was a fundamental problem with

17   Dr. Snow's analysis.  Did you ever raise your hand and say

18   actually there's a whole another pillar that Dr. Snow's

19   methodology violates in a fundamental way, we should maybe

20   include this in my report; did you ever say that?

21   A.  No, but it's also true that strength of claims and

22   defenses is not one of the pillars of statistics.

23   Q.  But it violates one of the pillars of statistics?

24   A.  No.  Having an estimate that is biased violates a pillar

25   of statistics.

1    Q.  And you believe that Dr. Snow's failure to take into

2    account strength of claim generated by his estimate, that

3    violates a pillar of statistics, right?

4    A.  That's correct, I do believe that.

5    Q.  And notwithstanding that, at no point in all of your

6    work in Wave One did you raise your hand and say, hey, you

7    know what, I'm issuing reports and I'm offering deposition

8    and trial testimony and maybe we should say something about

9    this fundamental violation of a pillar of statistics, right,

10   never said that?

11   A.  I did not say that, no.

12   Q.  Okay.  And can you please turn to DDX -- I'm sorry.  Do

13   you have your *HLC* demonstratives in front of you still?

14   A.  I don't.  The clerk took them away.  Do you want me to

15   get them back?

16   Q.  Yes.  Could you?

17   A.  I've got them now.

18   Q.  And turn to slide number 3, please.

19   A.  I'm there.

20   Q.  And this is the slide from *HLC* in which you describe the

21   pillars of statistics that you testified about in that case?

22   A.  Yes.

23   Q.  And there's nothing on this slide about -- that uses the

24   word "bias," right, the word "bias" doesn't appear on this

25   slide?

1    A.  That's correct, the word "bias" doesn't appear on this

2    slide.

3    Q.  And, Dr. McCrary, you said in your direct testimony

4    yesterday that it would have been possible for Dr. Snow to

5    design a method to account for the strength of claims and

6    defenses?

7    A.  Yes, that's right.

8    Q.  You never offered that opinion in any report issued in

9    any case in these actions ever, right?

10   A.  I'm not sure I follow.  We've already gone over the fact

11   that that wasn't part of my assignment in *HLC*.  And that

12   being said, I think it's right that that's fully consistent

13   with the opinions that I have offered in this trial.

14   Q.  Well, Dr. McCrary, you testified yesterday and I

15   understand that you believe it was a mistake that Dr. Snow

16   never considered strength of claim, right?

17   A.  Yes.

18   Q.  And that's one thing, but it's another thing to say that

19   it would have been possible for Dr. Snow to design a method

20   to account for the strength of claims and defenses, right,

21   that's a separate question?

22   A.  I suppose you could -- I suppose you could draw the

23   lines in that way.  I don't see it that way, but I

24   understand the distinction you're trying to draw.

25   Q.  And do you have your report from this case in front of

1    you?

2    A.  I don't, but I'm sure I will shortly.

3    Q.  Do you recall -- well, I'll just ask the question.  Do

4    you recall anywhere in your report in this action offering

5    the opinion that it would have been possible for Dr. Snow to

6    design a method to account for the strength of claims and

7    defenses?

8    A.  I don't know sitting here today whether or not the

9    report contains language that's consistent with the

10   line-drawing that you're doing now.  It might and so I

11   wouldn't wants to say affirmatively it does not.  But I

12   don't think of it as distinct from the opinion that I've

13   submitted and the written report.

14   Q.  Okay.  Can you open PTX-258.

15   A.  Yes, I have it in front of me.  Which page would you

16   like me to go to?

17   Q.  The page in which you express the opinion that it would

18   have been possible for Dr. Snow to have designed a method to

19   account for the strength of claims and defenses.

20   A.  And to be clear, I'm not trying to say that I said

21   exactly what it is that your question is about.  I'm just

22   saying I don't recall every single word in the report, but

23   it's not in my view inconsistent with the opinion that I

24   submitted.

25   Q.  That's okay.  Can you answer my question?

 1   A.  Would you like for me to -- I think you're asking me to

 2   re-read my report right now.

 3   Q.  I would like you to identify the page in your report in

 4   which you express, in words or substance, the opinion that

 5   Dr. Snow could have designed a methodology to account for

 6   the strength of the claims and the weakness of claims.

 7   A.  I want to be respectful of everybody's time, but at the

 8   same time I don't really know how to answer your question

 9   without flipping through page by page.

10   Q.  I think with the Court's permission, you can take a

11   minute to do that.

12              THE COURT:  You can go ahead and review your

13   report.

14              THE WITNESS:  Okay.

15              (Pause in proceedings.)

16              THE WITNESS:  So the portion of the report that is

17   about the questions that you're asking about is at the very

18   end and looking over the specific language that I used in

19   paragraph 160, that's I think closest to the mark in terms

20   of what you're asking about.  I don't think it draws the

21   same line that you do.  So in particular it highlights that

22   Dr. Snow doesn't take account of the distinctions in his

23   methodology.  So the specific language is almost exactly

24   that which I just read.

25   BY MR. NESSER:

1    Q.  Okay.

2    A.  But it doesn't then reach the extra line-drawing that

3    you were just engaged in in your question saying is it

4    possible.  That being said, if someone had asked me is it

5    your view that it would be possible to account for these

6    distinctions in this methodology, I think the answer to that

7    is yes.

8    Q.  Well, we know that because you said that yesterday for

9    the first time.  So, Dr. McCrary, you have not described a

10   methodology --

11            MR. NICHOLSON:  Your Honor, move to strike

12   counsel's last response.  He was testifying and badgering

13   the witness, not asking a question.

14            THE COURT:  Overruled.

15   BY MR. NESSER:

16   Q.  Dr. McCrary, you've also not described a methodology for

17   determining which strengths and weaknesses should be taken

18   into account, right?

19   A.  That's correct, I've not.

20   Q.  And is it your understanding from -- I'm sorry.  It's

21   your understanding from the expert reports of Mr. Woll and

22   Mr. Burnaman and Mr. Hawthorne that there was not an equal

23   probability of success on every loan relevant to the case,

24   right?

25   A.  That is my understanding, yes.

```
1    Q.  And you rely on those experts for the conclusion that

2    there was not an equal probability of success on every loan

3    in every trust, right?

4    A.  That's correct.

5    Q.  As a statistician, you don't have any independent basis

6    to opine on whether one loan or another loan on one issue or

7    another issue or a defense or a claim had a higher or a

8    lower probability of success, right?

9    A.  That's correct.  So my expertise is in economics and

10   statistics, and I am relying on other experts for their view

11   regarding strength of claim and defenses.

12   Q.  And one of the things that you rely on the experts for

13   is, let's use as an example, Mr. Woll's opinion that a

14   reasonable litigant in RFC's position would have ascribed

15   less value to claims that were subject to the statute of

16   limitations defense than to equivalent claims not subject to

17   the defense, right?

18   A.  Yes, that's correct.

19   Q.  That's because the probability of success on a loan with

20   a statute of limitations defense would have been lower?

21   A.  That's my understanding, yes.

22   Q.  And if somebody had wanted to take into account the

23   probability of success on loans with a statute of

24   limitations defense, one would need an estimate of the

25   probability of success on that defense, right?
```

```
 1    A.  That's correct.  You would apply -- so this is the point

 2    where I think you're drawing a distinction in your prior

 3    line of questioning that I don't really see.  So I think the

 4    adjustment would be straightforward, which is to say if a

 5    defendant had loans that were in trusts which had a statute

 6    of limitations defense, I think it would be appropriate for

 7    those loans to have a damages estimate that would have a

 8    haircut and for defendants who didn't have those same

 9    defenses to not receive that same haircut and instead for

10    their damages to be more.

11    Q.  And the haircut would reflect how likely a party would

12    have been to prevail on a statute of limitations defense,

13    right?

14    A.  Yes.  And this is I think what you were getting at with

15    respect to your question in regards to probabilities.

16    Q.  So how would somebody determine the likelihood of

17    success on a statute of limitations defense?

18    A.  So it's my view that that would not be something that

19    Dr. Snow would have done on his own and he would have

20    instead relied upon other experts to perform an estimate of

21    their assessment of the probability of success.

22    Q.  Wait.  You have expressed the view today and yesterday

23    that it would have been feasible for Dr. Snow to design a

24    methodology that took this into account, right?

25    A.  That's correct.  And actually in this line of
```

1    questioning you and I have clarified what that methodology

2    would be.  I think it's fairly obvious.

3    Q.  And where would ou have gotten the probability of

4    success on a statute of limitations defense from?

5    A.  Again, so it's not my view that you would have had to

6    have had a statistical estimate of that.  Instead one could

7    have used a probability that could have been obtained from

8    another expert, for example.

9    Q.  What kind of expert?

10   A.  Someone who had expertise with respect to, for example,

11   statute of limitations defenses and to the extent that they

12   were present in some trusts and not in others.

13   Q.  A lawyer?

14   A.  Someone who had that expertise, who, yes, could be a

15   lawyer.

16   Q.  So you would ask the lawyer, hey, can you estimate for

17   me the probability of success on a statute of limitations

18   defense?

19   A.  I would probably ask someone who had relevant expertise,

20   so not just any lawyer, but someone who had experience in

21   the area, but yes.

22   Q.  And how would you know whether that -- the response that

23   you got back was accurate?

24   A.  So usually when you, as an expert, say I'm presenting a

25   methodology and that methodology uses an input that is

1    another expert, you don't necessarily say that their

2    analysis is correct.  You simply say that you're relying

3    upon that.

4    Q.  Right.  But your opinion is that it would have been

5    possible for Dr. Snow to design a methodology that took into

6    account strengths and weaknesses, right?

7    A.  That's correct, yes.

8    Q.  And in order for it to be possible to design such a

9    methodology, it has to be possible to get accurate

10   assessments of the likelihood of success on each of those

11   probabilities, right -- on each of those claims and

12   defenses, right?

13   A.  Yes, I believe that that's correct, yes.

14   Q.  So when you testified that it would have been possible

15   to design such a methodology necessarily you're expressing a

16   view that it would have been possible to get accurate

17   measures of the probabilities of success, let's say, on a

18   statute of limitations defense, right?

19   A.  Yes.  I think the clearest way to say this is what

20   Dr. Snow's methodology does currently is that it's taking a

21   stance also on the probability of success and it's saying

22   that it's actually equal for all loans, and it's my view

23   that you don't have to make that assumption and that it

24   would have been appropriate to consider other assumptions

25   and in particular it would have been appropriate to consider

1    using as an input an approach that would have allowed for a

2    haircut for defendants who had loans in trusts that had

3    stronger defenses, as an example.

4    Q.  Would it have been possible to get reliable, accurate

5    estimates of the likelihood of success on a statute of

6    limitations defense as to the loans in this case?

7    A.  I don't see what would have prevented someone from

8    having offered that as an input into Dr. Snow's methodology.

9    That being said, I'm not trying to say that I myself have

10   that knowledge or know of there being such a probability in

11   the record.

12   Q.  You have no idea whether it's possible to accurately

13   assess the likelihood of success on statute of limitations,

14   right?

15   A.  That's not a domain of my expertise and so I wouldn't

16   want to say that I have knowledge about that now.

17   Q.  Okay.  And if somebody were to give you an estimate of

18   their assessment of the likelihood of success on statute of

19   limitations, that uncertainty would be -- would that be

20   equivalent to a bias issue or a margin of error issue or

21   both?

22   A.  So the estimate from the expert that you're suggesting

23   is not one that I take to be associated with sampling, so

24   therefore it would have neither bias nor margin of error

25   considerations attached to it.

1    Q.  Okay.  But it might just be completely wrong, right?

2    A.  Again, if you put forward an analyses in which you are

3    relying upon the view of another expert, you are doing

4    exactly what that sounds like, you're relying upon their

5    expertise.

6         So if you were trying to understand whether or not

7    that number was likely to be correct, you would review, for

8    example, their qualifications and want to make sure that

9    they, in fact, had the experience that would be appropriate

10   with that opinion, but it would not be a statistical inquiry

11   whether or not that number was correct.

12   Q.  But if the lawyer told you that he or she didn't have

13   full confidence in the estimate, that's something you would

14   have to take into account, right?

15   A.  I want to make sure I understand your hypothetical.  I

16   think you're asking me if I was being asked to submit an

17   opinion that was relying upon another expert and that expert

18   had been retained by the same counsel that had retained me,

19   but that counsel expressed skepticism regarding the

20   qualifications of the expert upon whom I was to rely, what

21   would be my reaction?

22   Q.  Not the qualifications.  If the expert expressed

23   uncertainty about the accuracy of his or her assessment of

24   the likelihood of success.

25   A.  Oh, I'm so sorry.  Before I thought you were saying that

1    counsel informed me as to their uncertainty.  But if I

2    understand you correctly now, you're saying the expert who

3    submitted an opinion --

4    Q.  Yes, correct.

5    A.  -- expresses uncertainty.

6              Okay.  If the expert were to express uncertainty

7    as to their estimate, I would probably do what I do when I

8    go to the doctor and I would ask them can you give me a

9    range.  So if there is uncertainty, what -- in your

10   experience, what are the numbers that are low, what are the

11   numbers that are high.

12   Q.  I see.  Okay.  And in your report you testified about

13   statute of limitations as a strength and weakness issue,

14   right?

15   A.  I described that, yes, as one of the defenses that as I

16   understood it was relevant.

17   Q.  And you also in your report and in your testimony talked

18   about underwriting representations as being a factor

19   relevant to strengths and weaknesses, right?

20   A.  Yes, I believe that that's correct as well.

21   Q.  And, again, an underwriting representation on that

22   issue, again you would presumably have to go out, find an

23   expert, ask that expert to give you their assessment of the

24   probability of success on that issue, and if they were not

25   sure, you would ask them for a range, right?

1    A.  I'm not exactly sure what you mean by they are not sure.

2    What I would be asking them for is what do you think is a

3    good estimate.  If they expressed concern about the scope of

4    the assignment, they felt like they had a hard time giving a

5    number, I would want to take that into account and I would

6    say, well, do you feel like you could actually do something

7    like express a low and a high number --

8    Q.  Um-hum.

9    A.  -- with some confidence.

10   Q.  What if they said they couldn't?

11   A.  Then I'm not sure that such an approach would be

12   workable in the end.

13   Q.  Okay.

14   A.  If they thought that it was genuinely not possible --

15   Q.  Okay.

16   A.  -- to come up with some way to characterize the strength

17   of claims or defenses, then I think it's right that it

18   wouldn't be a feasible approach.

19   Q.  And in addition to statute of limitations and trust reps

20   we were just discussing, your report also talks about

21   no-fraud representations and fraud disclaimers as two other

22   strength of claim issues, right?

23   A.  Yes, that's correct.

24   Q.  And, again, as to those two, you could go out -- or you

25   would have to go out, find an expert, ask them what their

1    assessment was or what their range of assessments were and
2    so forth, right?
3    A.  Yes, it's the same basic approach.
4    Q.  And so we've talked about, I think, five different
5    issues, right, statute of limitations, underwriting rep, no
6    fraud, fraud disclaimer, and, I'm sorry, we didn't talk
7    about there's a monoline issue as well that you talk about
8    in your report?
9    A.  I believe that's correct as well.
10   Q.  Okay.  And so those five issues.  And it's possible,
11   Dr. McCrary, that if a party won or if a party prevailed on
12   one of those five issues, that that would impact the
13   likelihood that the party would prevail on one or more of
14   the other issues, right?
15   A.  You're asking me about the expertise of an expert upon
16   whom I would intend to rely.  So that's not part of my
17   expertise.
18   Q.  So as far as you know -- well, let me ask it this way.
19   You can't exclude the possibility that if a party were to
20   prevail on one of the five issues, that that would increase
21   the likelihood that it would prevail on one or more of the
22   other of the five issues, right?
23   A.  That's correct.  That's not part of my expertise and in
24   light of that I wouldn't be in a position to exclude that as
25   a possibility.

1    Q.  And, Dr. McCrary, am I correct in understanding that

2    that kind of an issue, where an increase in one of the

3    factors might impact the likelihood on the others, is that

4    referred to in statistics as correlation?

5    A.  No, that's a different underlying idea.

6    Q.  So what would you call this issue of when one of the

7    factors might influence the outcome on another of the

8    factors?

9    A.  I suppose I see how you're describing that as

10   correlation.  You're just simply saying, if I understand you

11   correctly, that the one event influences the other event.

12   In statistics we think of correlation and population in a

13   sample context.  You're describing a context where it's a

14   single number as opposed to either a dataset or an infinite

15   set of possible databases, which is usually how statistics

16   refers to that idea.  But I think I understand what you're

17   getting at.  So with that understanding I would say, yes,

18   that's about correlation.

19   Q.  Okay.  And you could ask -- so am I correct in

20   understanding that you would have to ask this expert we've

21   been talking about whether there was correlation between

22   these five issues, right?

23   A.  I'm not sure that you would have to.  Again, this is

24   probably related to the fact that, you know, I was not asked

25   to do this as part of an affirmative assignment.

1    Q.  Um-hum.

2    A.  These are the kinds of things that I would want to

3    consider, but I'm actually not sure that you would have to

4    ask such an expert to do that.

5    Q.  Well, if the expert had come to you and said, hey, here

6    are ranges of probabilities on each of the five issues we've

7    been discussing, but, Dr. McCrary, I just want you to

8    understand that if I win issue number one, my likelihood of

9    success on issue number two goes up by 50 percent, right, if

10    an expert had told you that, you would need to take that

11    into account in some way in your methodology, right?

12    A.  That stands to reason, yes, that if they expressed that

13    view, you would want to take that into account as well, yes.

14    Q.  So if they expressed that view, you would need data on

15    all of the correlations, right?

16    A.  No, and this gets back to the distinction that we were

17    just drawing between the views of the expert upon whom you

18    would rely in such a context and the other concept of a

19    dataset.  The expert here would not be submitting a dataset.

20    I don't believe the expert here would be submitting their

21    view.

22    Q.  I apologize.  I didn't mean "data" in that sense, but we

23    can continue.

24         So, Dr. McCrary, we've stalked about five strength

25    of claim issues.  You don't contend those are the only

1    issues as to which RFC's likelihood of success could have

2    varied as among trusts or loans, right?

3    A.  That's correct.  I would not have the expertise to

4    exclude other possibilities.

5    Q.  And, in fact, you relied on Mr. Woll, right?

6    A.  That's correct, I relied on Mr. Woll.

7    Q.  And you read Mr. Woll's testimony at trial in this case

8    and Mr. Woll said with respect to repurchase claims as of

9    the settlement period, the issues that he had focused on in

10   his report were not, in fact, the only issues, right,

11   remember that?

12   A.  I do.

13   Q.  Okay.  And you also relied on Mr. Hawthorne, right, in

14   respect of these strength of claims issues, right?

15   A.  That's correct, yes.

16   Q.  And Mr. Hawthorne also discussed the existence of other

17   strength of claim issues, right?

18   A.  I believe that's also correct.  Again, this isn't my

19   expertise.

20   Q.  Um-hum.

21   A.  But I am aware of testimony along the lines of your

22   question.

23   Q.  And you reviewed Mr. Woll's trial testimony, you said?

24   A.  I believe that's correct, yes.

25   Q.  Did you review Mr. Hawthorne's trial testimony?

```
1    A.  I don't recall having done so, no.

2    Q.  Why not?

3    A.  I don't know.

4    Q.  Okay.  And Mr. Hawthorne, I will represent to you,

5    testified that causation and materiality and election of

6    remedies and other breach disputes also would have presented

7    strength of claim issues either on a trust or loan basis.

8    Okay?

9    A.  Okay.

10   Q.  And you didn't discuss those issues in your report, of

11   course, right?

12   A.  No, I did not.

13   Q.  And you didn't discuss them in your testimony because

14   you didn't even read Mr. Hawthorne's testimony, right?

15   A.  I didn't discuss those in my testimony, no.

16   Q.  Okay.  And you have no idea, Dr. McCrary, whether PRMI's

17   loans were disproportionately subject to a causation

18   defense, right?

19   A.  I have not reviewed any evidence along those lines and

20   so, no, I don't have any sense of that.

21   Q.  You have no idea whether PRMI's loans were

22   disproportionately subject to the other defenses

23   Mr. Hawthorne talked about, causation, election of remedies

24   and so forth?

25   A.  That's correct, I don't know that.
```

1    Q.  For all you know, if someone had considered those

2    issues, PRMI's damages allocation would have gone up, right?

3    A.  I suppose that's possible.  I've not seen any evidence

4    of that and haven't seen that Dr. Snow considered the

5    possibility.  But what you say is I think strictly speaking

6    correct.

7    Q.  And you testified yesterday that had Dr. Snow taken

8    strength of claim into account in his allocation, it would

9    have -- I'm sorry.

10            You testified yesterday that Dr. Snow's failure to

11   take strength of claim into account in his allocation

12   resulted in a biased estimate that operated against PRMI's

13   interest, right?

14   A.  That's correct, yes.

15   Q.  And in doing so, you made an implicit assumption, didn't

16   you, that every PRMI loan has the same quality in terms of

17   the exposure to causation and materiality and election of

18   remedies and other breach disputes, right?

19   A.  No.  So what I tried to testify to was as follows:

20            First, that unless every loan has the same

21   strength of claim and defenses, then the methodology that

22   Dr. Snow has put forward is going to be biased for specific

23   defendants.

24            Second, that the available evidence that I

25   presented suggests that the strength of claims and defenses

1   is something that weighs in PRMI's favor.

2          However, just now you've clarified that it's not

3   true that I'm trying to say that those are the only factors.

4   So in that context, I think I would say it's possible that

5   there would be other factors which would push against the

6   conclusion that estimates for PRMI are overstated.

7          And the sharpest way to say my opinion is that the

8   evidence associated with the three considerations that I put

9   forward suggests that PRMI's damages estimate is overstated.

10  Q.  Are you aware of any principled basis to have taken into

11  account some defenses, but not others?

12  A.  I'm not sure that I know what you mean.  It is the case

13  that in general one ought to look at defenses and I would

14  trust in the advocacy process to reveal which ones ought to

15  be the focus, especially those for which there is evidence.

16  Q.  And so you're not testifying that the four or five

17  issues you talked about in your report, that those are the

18  only issues that one would have to take into account in a

19  strength of claim methodology, right?

20  A.  That's correct.  I'm not trying to say that I've

21  enumerated all of the things which might go into strength of

22  claim or defenses.

23  Q.  Now, Dr. McCrary, it's possible that the margin of

24  error -- you said -- let me ask a different question.

25          As a non-lawyer statistician, Dr. McCrary, you

1    have no basis to opine on the extent to which assigning

2    estimates of likelihood of success on any given defense

3    would require speculation, right?

4    A.  I'm not really sure that I understand the question.  To

5    be clear, what I've articulated is a position in which

6    experts frequently find themselves, where one expert will

7    advance an opinion that relies upon the opinion of another.

8         When that's true, it's right that if the opinion

9    upon whom one is relying, if that opinion is deemed to be

10   speculative or somehow there's testimony that it is

11   speculative, it's, of course, right that the expert who is

12   relying upon that opinion, their analysis falls in the sense

13   that they have relied upon them.

14        But it's not the case that I would have the

15   expertise to describe whether it would be speculative.

16   Q.  So if there was testimony, let's say, in RFC's

17   bankruptcy that an attorney would have to assign highly

18   speculative percentages to various claims and defenses and

19   that doing so would result in an end product little better

20   than guesswork that provided no meaningful guidance, if that

21   testimony had been offered in the bankruptcy, you would have

22   no basis to dispute that, right?

23   A.  Again, I'm not here in the position of Mr. Woll and the

24   experts who would have expertise with respect to strength of

25   claims and defenses.  I'm relying upon their testimony.

1    Q.  And as a statistician, if it were the case that making

2    those assessments would be speculative and guesswork that

3    provided no meaningful guidance, if that were true, do you

4    believe that it would still be possible to generate a

5    methodology that took into account strengths and weaknesses?

6    A.  Of course.  So the methodology that Dr. Snow has put

7    forward has already taken a stance with respect to strength

8    of claims and defenses.  It simply asserts that all of the

9    loans in all of the trusts all have equal probabilities of

10   success.

11        What one can do is one can devise a methodology

12   that takes as an input what those probabilities are and

13   whether or not it's right that the probabilities in question

14   are determined by the trier of fact to be speculative,

15   that's something the methodology doesn't have to take a view

16   on at all.

17        It simply says here's a methodology that accepts

18   as an input a factor that is to be applied to loans that are

19   in some trusts that a particular defendant might be in,

20   which might have a particularly favorable configuration of

21   claims and defenses or a particularly weak configuration of

22   claims and defenses.

23   Q.  Dr. McCrary, do you remember testifying yesterday that

24   there are situations in which a margin of error can be so

25   wide that it's just no longer informative regarding the

1   bottom-line question, the estimate is no longer informative?

2   A.  Yes, that's correct.

3   Q.  And you testified that it's possible for margin of error

4   to be so wide that it conveys no additional information

5   above and beyond what you have before you engaged in the

6   sampling exercise, right?

7   A.  Yes, that's correct.

8   Q.  And so in the same way, if this hypothetical legal

9   expert we have been discussing came to you and said the

10  estimates I'm about to give you are no better than guesswork

11  and provide no meaningful guidance, but here are some ranges

12  anyway, in that situation do you believe as a statistician

13  it would be appropriate to use those numbers and come

14  testify about them in a courtroom?

15  A.  If the available expert testimony upon which I was being

16  asked to rely in such a context were consistent with what

17  you just described, then in that context I would have

18  probably approached the problem the way that Dr. Snow did,

19  that is to say, if there is genuinely no ability to have any

20  assessment of the relative strength of claims and defenses,

21  then I think it's right that you can't actually take that

22  into account.  But setting that aside, I would say that you

23  could design a methodology that would use those numbers as

24  inputs.

25  Q.  Dr. McCrary, in *HLC* the point estimate on Dr. Snow's

1   trust allocation was approximately $5.8 million.  Do you

2   recall that?

3   A.  I don't actually recall the figures off the top of my

4   head, but if you want for me to accept that as a

5   hypothetical, I'm happy to.

6   Q.  Can you just pull out PTX-461.  Those are your

7   demonstratives in *HLC*.

8   A.  I'm there.

9   Q.  And slide 13.

10  A.  Yes.

11  Q.  Does that refresh your recollection that Dr. Snow's

12  point estimate on the trust allocation in *HLC* was

13  approximately $5.8 million?

14  A.  Yes, $5.842 million.

15  Q.  Okay.  And would you turn to slide 29.

16  A.  Yes.

17  Q.  And does that refresh your recollection that Dr. Snow's

18  point estimate on his monoline allocation in *HLC* was

19  approximately $34.8 million?

20  A.  Yes, 34.808 million.

21  Q.  So the $5.8 million trust allocation in *HLC* is

22  approximately 14 percent of the total damages allocation

23  that Dr. Snow calculated, right?

24  A.  I'm happy to assume that you did the arithmetic on that

25  right.

1    Q.  Okay.  Dr. McCrary, with respect to the trust

2    settlement, if we analogize Dr. Snow's methodology to a car,

3    you would say that the car has some problems, like maybe the

4    windows don't go down or something like that and that it's

5    in need of a tune-up, right?

6    A.  I think I recall testimony along those lines that I

7    offered at the *HLC* trial, yes.

8    Q.  So you would agree with the statement that I just asked

9    you about?

10   A.  Yes, I think that that's right.

11   Q.  Okay.  And you agree as well that Dr. Snow's trust

12   settlement analysis has some problems attached to it, but

13   that you don't think those problems are something that would

14   render the trust settlement analysis unusable, right?

15   A.  That's right.  I think that the trust settlement

16   analysis, setting aside the strength of claims and defenses,

17   is one that is workable.

18          MR. NESSER:  I have nothing further, Your Honor.

19          THE COURT:  Thank you, Mr. Nesser.

20          Mr. Nicholson.  You know, I suppose this might be

21   a good time for a morning break.  Does that sound like a

22   good idea?

23          MR. NICHOLSON:  That's fine, Your Honor.

24          THE COURT:  It's 10:30.  We'll come back at 10:45.

25   Court is briefly adjourned.

```
 1              (Recess taken at 10:31 a.m.)

 2                              *    *    *    *    *

 3              (10:48 a.m.)

 4                          IN OPEN COURT

 5              THE COURT:  Mr. Nicholson.

 6                       REDIRECT EXAMINATION

 7     BY MR. NICHOLSON:

 8     Q.  Good morning, Dr. McCrary.  Can you hear me okay?

 9     A.  I can now.

10     Q.  Great.  I'd like to ask you a few follow-up questions if

11     I could.  Okay?

12              I would like to start by asking you about the

13     issue concerning the relative strengths of claims and

14     defenses across the loans and trusts.  By way of background,

15     can you remind me what assumption Dr. Snow implicitly made

16     about the strength of claims and defenses across loans and

17     trusts?

18     A.  Implicitly he makes the assumption that the strength is

19     equal across all loans and all trusts.

20     Q.  And did he provide any evidence supporting that

21     assumption?

22     A.  No, I'm not aware of any analysis of that question.

23     Q.  And if that assumption is wrong, then what's the

24     implication for his damages estimate?

25     A.  Unless it's correct, the implication would be that it
```

1    would be biased for specific defendants.  Those who had

2    relatively better positions in the sense of the trust that

3    they were in had either weaker claims against them or

4    stronger defenses, their estimate of damages would be

5    overstated and vice versa for other defendants.

6    Q.  Thank you.  Now Mr. Nesser asked you a number of

7    questions about other defenses that might have been raised

8    in the bankruptcy.  Do you recall that generally?

9    A.  I do.

10   Q.  Mr. Nesser mentioned a causation defense.  Do you recall

11   that?

12   A.  I do recall him asking me about that, yes.

13   Q.  And he mentioned an election of remedies defense.  Do

14   you recall that?

15   A.  I do recall that as well, yes.

16   Q.  Okay.  And does the fact that there may have been other

17   defenses change your view about whether Dr. Snow has a basis

18   to assume that the strength of claims and defenses was the

19   same across loans and trusts?

20   A.  No, it doesn't.

21   Q.  And why is that?

22   A.  Well, the fact that there might be other considerations

23   doesn't somehow justify the assumption that there are no

24   differences.  In fact, the evidence that I pointed to I

25   think confirms beyond a doubt in my mind that there are

1    differences in terms of the strength of claims and defenses,

2    at least if the testimony of Mr. Woll is correct.  And I've

3    relied upon that for that opinion.

4         So what that would mean is that there's strong

5    evidence that those considerations would differ.  Then

6    saying that there might be other factors as well actually

7    would be more likely to amplify that.  It would be unusual

8    for somehow other considerations to somehow have a

9    countervailing effect and for those two things to cancel one

10   another out in such a way for all defendants to be in the

11   same position.

12   Q.  And after you issued your report in this case, did

13   Dr. Snow issue a supplemental report?

14   A.  He did.

15   Q.  Okay.  And in his supplemental report, did Dr. Snow ever

16   assess the percentage of PRMI loans subject to causation

17   defenses?

18   A.  No, he did not.

19   Q.  In his supplemental report, did Dr. Snow ever assess the

20   percentage of PRMI loans subject to election of remedies

21   defenses?

22   A.  No, I don't believe he did.

23   Q.  In his supplemental report, did Dr. Snow offer any

24   opinion that considering a causation defense or an election

25   of remedies defense would cause PRMI's damages to go up?

1   A.  No, I don't believe he did.

2   Q.  Now, Mr. Nesser also asked you a series of hypothetical

3   questions about I believe a lawyer expert who was supposed

4   to have told you that estimating the probability of success

5   on any of these issues was completely speculative and

6   guesswork.  Do you recall that line of questions generally?

7   A.  I do.

8   Q.  Now, in Dr. Snow's report, did he cite any expert report

9   for the proposition that estimating the probabilities of

10  success was completely speculative and guesswork?

11  A.  No, I don't believe that he did.

12  Q.  Okay.  And Mr. Nesser also asked whether you offered

13  this opinion regarding strength of claims and defenses in

14  the Wave One cases.  Do you recall that generally?

15  A.  I do.

16  Q.  Now, was your assignment in this case different than it

17  was with respect to the First Wave cases, like the *HLC* case?

18  A.  Yes, it was.  As I told Mr. Nesser, my scope of

19  assignment was somewhat broader in this case than it was in

20  *HLC*.

21  Q.  And are you aware that in the *HLC* case there was a

22  damages expert named Dr. Torous?

23  A.  I am aware of that, yes.

24  Q.  And are you aware that he addressed different issues

25  than you did?

1    A.  I am aware of that as well, yes.

2    Q.  Okay.  And Mr. Nesser also asked you about your

3    testimony from the *HLC* case regarding the trust settlement

4    and I think comparing it to a car.  Do you remember that?

5    A.  I do recall that, yes.

6    Q.  Okay.  And I think when you responded to that and how it

7    applies here, you said something like, and you can correct

8    me if I'm wrong, but setting aside the strength of claims

9    and defenses issue, that's more or less your opinion here.

10   Is that generally right?

11   A.  I think that's correct, yes.

12   Q.  Okay.  And you said, "setting aside strength of claims

13   and defenses."  So can you explain what you meant by that?

14   A.  Yes.  What I meant by that is that if you are

15   considering not just the trust settlement criticisms that I

16   advance specifically, that is to say, the second portion of

17   the opinion that I described in my direct testimony, but

18   you're also considering strength of claims and defenses,

19   that would be a consideration that would lead to the

20   conclusion that the estimate of damages for PRMI was

21   overstated, as I tried to clarify in my direct.

22   Q.  And that's the bias issue you were referring to earlier?

23   A.  That's correct.

24   Q.  Okay.  Thank you.

25          Now, Dr. McCrary, I'd like to turn briefly to an

1    issue that Mr. Nesser raised yesterday.  Okay?  Do you

2    recall that Mr. Nesser asked you a series of questions about

3    Dr. Snow's analysis of breach rates for the NDS trusts?

4    A.  Yes, I do.

5    Q.  Okay.  And in particular, he asked you some questions

6    about Dr. Snow's conclusion that because NDS trusts have

7    similar vintages and product types to RFC trusts, that he

8    concluded that they have very similar breach rates.  Do you

9    recall that line of questioning generally?

10   A.  I do.

11   Q.  Okay.  And Mr. Nesser also asked you some questions

12   about your opinions here that because the monoline

13   settlements are different in terms of vintage and product

14   type, that you can't assume that they have the same breach

15   rates.  Do you remember that generally?

16   A.  I do.

17   Q.  Okay.  Now, just at a high level, is there a difference

18   between what you have to do to show that two populations are

19   the same versus what you have to do to show that two

20   populations are different?

21   A.  There is.  And maybe my testimony wasn't as clear as it

22   could have been on this point, but what I tried to testify

23   to in my direct was the following:  And I believe I used the

24   word "asymmetry" at that time and that's the right way to

25   understand that.

1          If you're trying to see whether or not two

2     populations are the same, you would need to do a relatively

3     searching inquiry to understand whether they were the same

4     across a wide variety of dimensions.  It wouldn't be

5     sufficient to say I checked two of them and so we should

6     hope that they are similar for the other.

7          If you're instead trying to see whether or not

8     there is evidence that two populations are different, you

9     don't really need to look much further than one or two

10    variables in order to reach the conclusion, oh, actually

11    these two things are pretty different from one another.

12          In my direct when I tried to clarify that, I used

13    the example of Minnesota versus Alabama, two places that I

14    take to be very different from one another.  That being

15    said, you could almost surely find two variables that are

16    similar between the two.  That wouldn't necessarily

17    establish that they were the same, however.

18    Q.  And so if Dr. Snow wanted to conclude that the NDS

19    trusts and the RFC trusts had the same breach rate, would he

20    have needed to look at factors beyond vintage and product

21    type?

22    A.  Yes.

23    Q.  Okay.  And with respect to your opinion regarding

24    whether it's reasonable to assume that monoline settlements

25    had different -- strike that.

1          Regarding your opinion on whether it's reasonable

2     to assume that the monoline settlements each had the same

3     breach rate, was it sufficient for you to look at

4     differences in vintage and product type to assess that

5     assumption?

6     A.  I believe that it was.  It's also consistent with the

7     fact that Dr. Snow's own settlement factor varied

8     substantially across those.

9     Q.  Can you explain that a little bit more.  Why was it

10    sufficient for purposes of your analysis to look at those

11    two factors, whereas it was not sufficient for purposes of

12    Dr. Snow's NDS analysis, just to close up the loop?

13    A.  The general idea of similarity of two populations is one

14    that occurs in pretty unusual circumstances.  More commonly

15    it's right that two different populations are quite

16    different from one another.

17         So, if you will, think of a context that many of

18    us have even seen in RMBS litigation where there is an

19    assertion made that the sample is representative of the

20    broader population.  There you would often engage in a

21    comparison between the sample and the broader population,

22    and you would do that in a searching way, across a wide

23    variety of characteristics.

24         If instead you were trying to understand whether

25    or not one sample might be different from another sample,

1    you actually don't need to do as deep of an investigation of

2    that because as soon as you reach the conclusion that a few

3    variables are different, the bulk of the evidence

4    immediately persuades that those two are, in fact,

5    different.

6           And that's actually the situation that we find

7    ourselves in here and that's what I was trying to

8    communicate with the word "asymmetry."  It depends upon

9    which direction you're trying to go, how searching that

10   inquiry needs to be.

11   Q.  Thank you.  Yesterday as well as today Mr. Nesser asked

12   you a series of questions about the number of pillars of

13   sampling that you have discussed in particular cases.  Do

14   you remember that generally?

15   A.  I do.

16   Q.  Okay.  And just for clarity, can you explain why you

17   focus on particular pillars in some cases and particular

18   pillars in other cases.

19   A.  It's an attempt to communicate.  It's really an

20   expositional matter more than anything else.  I would say

21   that the pillars that I describe in a particular context are

22   the ones that are relevant for the discussion of that case.

23   If there is not relevance of a particular pillar, I wouldn't

24   go to discuss that in a particular case.

25   Q.  So the fact that you've focused on particular pillars in

```
1    particular cases, does that mean that the underlying pillars
2    of statistics as a discipline change?
3    A.  No, not at all.
4          As an example, for example, the trust settlements,
5    in my view, the methodology put forward violates pillars one
6    through three.  It would have been a mistake to have
7    organized those as pillars one, three, and five because it
8    would have been just more complicated to describe it.  So I
9    would have reorganized it so they would be the first three
10   as opposed to some other subset.
11         So in general I would say that it's not my view
12   that the pillars that I have described are squarely attached
13   to the number.  Instead it's about the idea.  And if you
14   look across the body of my testimony regarding the pillars
15   of statistics, I've always expressed the same ideas.
16   Q.  And following up on this, Mr. Nesser asked you a series
17   of questions about the pillars that you discussed in the HLC
18   case in particular.  Do you recall that?
19   A.  I do.
20   Q.  Okay.  Could I ask you to look at your testimony from
21   the HLC case.  It's at PTX-276.
22   A.  Yes.
23   Q.  If we could have assistance from our friends in the
24   courtroom, that would be helpful.
25   A.  Yes.
```

1    Q.  Great.

2    A.  PTX-276, I've got that.

3    Q.  Yeah.  If you look at the numbers on the bottom of the

4    page, can you turn to PTX-276-21.

5    A.  Yes, I'm there.

6    Q.  Okay.  And do you see line 12?

7    A.  I do.

8    Q.  Okay.  And do you see that there it says --

9              MR. NESSER:  Your Honor, objection.  I don't know

10   on what basis he is reading prior testimony to the witness.

11             THE COURT:  You're not trying to impeach him.  So

12   what are you doing?

13             MR. NICHOLSON:  There's been a suggestion by

14   Mr. Nesser there's some sort of inconsistency.  I'm going to

15   just ask him what he meant by his testimony here.  I can

16   focus on a particular word without reading the testimony.

17             THE COURT:  Well, I think you can ask him a

18   question, but you typically wouldn't use his deposition for

19   any purpose other than to impeach him.

20             MR. NICHOLSON:  Okay.  He was asked about this

21   testimony and --

22             THE COURT:  You can say do you recall the

23   testimony.

24             MR. NICHOLSON:  Yep.

25   BY MR. NICHOLSON:

1    Q.  Dr. McCrary, do you recall testifying in that case that

2    there were -- the four pillars you were discussing were,

3    quote, four of the big five?

4    A.  Yes, I do.

5    Q.  And by "big five," were you referring to the same five

6    pillars that you discussed in this trial?

7    A.  I believe that I was, yes.

8    Q.  Okay.  And do you recall that also in your *HLC* testimony

9    you later discuss the concept of bias?

10   A.  Yes.

11   Q.  And is bias one of the pillars that you discuss in this

12   case?

13   A.  It is.  It is the fourth pillar in this case.

14   Q.  Okay.  So Mr. Nesser also asked you a series of

15   questions about a declaration by one of plaintiff's

16   attorneys named Mr. Anthony Alden.  Do you recall that

17   generally?

18   A.  Yes, I do.

19   Q.  Okay.  And Mr. Nesser asked you about Mr. Alden's

20   estimate that it costs the trust about $8,000 per loan for

21   re-underwriting.  Do you recall that generally?

22   A.  I do.

23   Q.  Okay.  And I think yesterday you testified that had

24   Dr. Snow used a non-extrapolated approach, the maximum

25   number of loans he would need for a monoline analysis would

1    be 95 loans.  Do you recall that generally?

2    A.   That's right, corresponding to the PRMI sample.

3    Q.   Right.  And 95 times 8,000 is only $760,000.  Is that

4    about right?

5    A.   That sounds about right.  Again, I don't have a

6    calculator, but I'll assume you did that calculation

7    correctly.

8              MR. NICHOLSON:  Thank you.  No further questions

9    at this time, Your Honor.

10             THE COURT:  Mr. Nesser, anything further of

11   Dr. McCrary?

12             MR. NESSER:  Nothing further, Your Honor.

13             THE COURT:  Very good.  All right.  Dr. McCrary,

14   you're all set.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  All right.  Very good.  I think it

17   might be advisable to use this time to address any remaining

18   issues.  I know there's a pending issue about the Rule 1006

19   summary.  Is there any additional argument the parties have,

20   Mr. Nicholson, Mr. Scheck -- or Mr. Miller, sorry?

21             MR. NICHOLSON:  I'm happy to address that, Your

22   Honor.  I know there was discussion yesterday evening about

23   whether the law allows a paralegal to offer a 1006 exhibit

24   into evidence or whether it must be prepared by an expert

25   witness.

1          I discussed a case cited by plaintiff earlier

2     discussing that a paralegal, you know, is an example of

3     someone who can offer that.  And we've provided the Court a

4     letter that is -- it details many cases in which courts have

5     admitted 1006 exhibits from paralegals, prepared by

6     paralegals.  We think that makes -- those cases are good

7     law.  I haven't found any case to the contrary on that issue

8     yet.

9          THE COURT:  Well, what about the Eighth Circuit?

10         MR. NICHOLSON:  So the Eighth Circuit case that

11    plaintiff cites is a case standing for the proposition that

12    a lawyer arguing the case cannot present, prepare a

13    demonstrative -- I'm sorry, a summary exhibit.  And that was

14    rooted in the idea that a lawyer basically shouldn't take

15    his closing argument or her closing argument and summarize

16    it into an exhibit and move it in through 1006.

17         That's not what's happening here.  It's simply a

18    paralegal taking a document that was produced by the

19    plaintiff pursuant to its Rule 26 disclosures, summarizing

20    it in a completely objective way.

21         It's simply the percentage of loans originated --

22    the number of loans and percentages per year for the global

23    sample and the PRMI -- I'm sorry, the global population and

24    the PRMI population.  It's simply taking an Excel

25    spreadsheet and just adding up the columns and calculating

1    that.

2            Now, plaintiff has cited only one case in addition

3    to that Eighth Circuit case, which we think is completely

4    inapt, and in that case they say it involved a paralegal.

5    But what happened there -- it's a case from the Northern

6    District of Iowa -- there was a paralegal nurse who prepared

7    a chronology of medical records for a patient.  The lawyer

8    then took that chronology and pulled out the items that the

9    lawyer thought were most favorable to his or her argument

10   and then created a separate summary exhibit, which he then

11   tried to move into evidence.  And the Court said that that

12   was not going to be permissible because that was

13   argumentative and it was created by the lawyer.

14           That's not what we have here.  There's no second

15   layer here of the lawyer going in and creating the exhibit

16   based on something that the paralegal initially did.

17           THE COURT:  Wouldn't it be fair to say, though,

18   that no witness in this case will rely on this exhibit, that

19   this exhibit is being prepared for one purpose and that is

20   for a lawyer during closing argument to use it as a document

21   as part of his closing argument?

22           MR. NICHOLSON:  Your Honor, I think that --

23           THE COURT:  "Yes" or "no."

24           MR. NICHOLSON:  It will be used in closing, but I

25   don't --

1            THE COURT:  Is it going to be used by any witness

2    in this case?

3            MR. NICHOLSON:  Here is the key point, and I don't

4    think --

5            THE COURT:  Answer my question first.

6            MR. NICHOLSON:  It is not going to be used by any

7    witness in this case.  The witnesses on facts and experts

8    are over.

9            But the idea that a 1006 exhibit only comes in if

10   it's then specifically used by a fact witness is incorrect.

11   I don't know where that concept comes from.  The 1006 rule

12   refers to as 1006 being summaries of underlying documents

13   that are too voluminous to be able to understand or

14   comprehend without a summary.  So this is exactly what this

15   is doing.  It's summarizing a document produced by plaintiff

16   in this litigation pursuant to its Rule 26 obligations.

17           And this document, by the way, is presenting

18   basic, basic facts.  These are simply the percentages of

19   loans in their own global population by year -- by number

20   and percentage by year.  I think it's telling that plaintiff

21   is so strenuously objecting to such basic information.  And

22   this is information that no fact witness could testify to.

23           THE COURT:  So the underlying data from which this

24   summary was made is independently admissible?

25           MR. NICHOLSON:  Your Honor, I think it would be.

1    We're not seeking to admit it, the entire spreadsheet.  The

2    document that it's relying on was the spreadsheet produced

3    by plaintiff to us as part of their damages disclosures.  I

4    think it's an operative disclosure in discovery under

5    Rule 26.  That's how it was understood, I think, by the

6    parties and by the Court when the Court ordered them to do

7    more disclosures about their change in their damages model.

8    I think this is their own statement to us.  I think it is

9    admissible.

10              We're not seeking to admit the entire voluminous

11   spreadsheet with 464,000 loans and there's no requirement

12   that the underlying document be into evidence in order to

13   move the 1006 in.

14              In fact, plaintiff has taken the opposite position

15   on the trust-level documents.  They have told us that we

16   can't move in all the underlying documents.  We can only

17   move in the 1006.  So we disagree with that, that you can't

18   do it, but it's certainly not true that you have to do it to

19   get in the 1006.

20              So we think it is admissible.  It's highly

21   relevant.  It goes to one of the core issues in the case,

22   which is how many loans in this population were sold in

23   early years by PRMI versus the global.  It's been a focus of

24   this case that PRMI's loans are older, they are in older

25   trusts, and they, in our view, had less impact on the

1    settlement because of that.  This is simply reflecting those

2    numbers from plaintiff's own damages disclosure.

3              And so I think it's highly relevant.  I think that

4    the -- it's entirely appropriate for a paralegal to testify

5    about how she created this basic spreadsheet and we're happy

6    to have her do that today.  She's prepared to do that.  We

7    can put her on.  It won't take long at all if plaintiff

8    wants to do that.

9              But there's no reason why this shouldn't be

10   admitted, and I guess I'll leave it there.

11             THE COURT:  All right.  Mr. Miller.

12             MR. MILLER:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. MILLER:  I think the Court has very aptly

15   articulated plaintiff's concerns, so I will endeavor to keep

16   this very brief.

17             But, you know, literally what's happening here is

18   that this document was created for the purpose of closing.

19   Obviously not created to be used with a witness because

20   there are no remaining witnesses that have been disclosed to

21   be called.  So there's no testimony about it.  It's -- and

22   our concern is it is a pure ambush document.  It's being set

23   up to make a record on appeal and for closing and not in

24   conjunction with a witness.

25             And just to highlight one of our concerns in

1    particular, this document is essentially a summary of a

2    summary.  And while we view this as a matter of law, I don't

3    think any witness who Primary could call today would be able

4    to lay foundation for the underlying summary or in

5    particular the documents underlying that summary.  So we

6    almost have a double foundation issue here.

7            And just to reiterate what we pointed out in our

8    letter in slightly more detail, the Eighth Circuit appears

9    to be very firm on this point that counsel and those

10   operating at the direction of counsel who are on the legal

11   side of things cannot put in a 1006 -- cannot be the witness

12   who sponsors a 1006 exhibit.

13           And while I think the main factor is those cases

14   that PRMI cites are outside of the Eighth Circuit, in

15   addition to that I think there are other distinguishable

16   characteristics, mainly all of the documents underlying the

17   exhibits in those cases are either admitted into evidence or

18   at the very least admissible, regarded as admissible.

19           Those cases also, as far as I can tell, either

20   explicitly -- where it's explicitly addressed the witness

21   was disclosed during the pretrial phase and not on the eve

22   of closing.

23           So, Your Honor, I think this fails under 1006 and

24   should not be admitted, and no foundation could be laid even

25   if we were to reach that stage.

1          Thank you.

2          THE COURT:  Okay.  Mr. Nicholson.

3          MR. NICHOLSON:  Two points.  As to the foundation

4     for the underlying summary, again -- and counsel didn't

5     disagree with this -- it is a Rule 26 disclosure.  It's one

6     of their operative disclosures in the case.  It doesn't need

7     a separate fact witness to testify about that.  It is an

8     operative disclosure, so there's no need for a separate

9     witness to testify.

10          If plaintiff has concerns about the summary

11     exhibit, which we think are misplaced, we would gladly move

12     into evidence the entire database that they produced to us

13     as part of their disclosures.  This was an effort to make

14     things more efficient and to summarize the content of that

15     for the Court.

16          As to this issue of ambush, I find that highly

17     ironic because we disclosed this to plaintiff four days --

18     pursuant to the four-day disclosure.  Plaintiff didn't say

19     anything about it, apparently neglected even to look at it.

20          THE COURT:  Well, the four-day disclosure has to

21     do with the identity of exhibits to be used with a witness.

22     That's what the four-day disclosure is.  So this document

23     falls outside of that.

24          MR. NICHOLSON:  And, Your Honor, so the only other

25     place you would disclose it would be a witness list, but

1    there was no requirement to disclose 1006 witnesses on the

2    witness list that I'm aware of.  In fact, plaintiff didn't

3    disclose any 1006 witnesses in its witness list and yet they

4    proceeded to produce to us several 1006 documents that they

5    might use to produce summaries.

6              So clearly the understanding on both sides was

7    that you didn't need to disclose these witnesses in your

8    witness list.  If that had been the understanding, plaintiff

9    would have had to identify a witness too.

10             This was raised with them in the four-day

11   disclosure.  They had plenty of time to raise any concern.

12   They apparently neglected to do that.  And the failure on

13   their part to raise any issue that they had in a timely

14   matter, shouldn't redound against us and prevent us from

15   being able to call the witness today to testify about what

16   is extremely simple, that she took a spreadsheet and just

17   summed up columns and came up with the basic numbers, the

18   totals by year, and the percentages.  There's no possible

19   prejudice for plaintiff to have a witness testify about such

20   basic exercises.

21             Thank you.

22             MR. MILLER:  Nothing further, Your Honor.

23             THE COURT:  Very good.  All right.  The Court is

24   prepared to rule.

25             On the eve of trial the defendants disclosed a

1    1006 summary, which is a summary of a Rule 26 disclosure

2    that is itself a summary.  That exhibit was not tethered to

3    a witness because there was never any intention to have a

4    witness testify about the exhibit.  The intention was on the

5    eve of the closing argument for that summary to be used by

6    counsel in the closing argument.

7            When one looks at the state of the law, there are

8    very few cases, in fact, that address this issue directly.

9    The only case cited by the defense where there was actually

10   an objection raised to the preparation of the summary by a

11   paralegal from the defendant's law firm is the First Circuit

12   case.  The other cases, some of them directly say there was

13   no objection raised, but there's no discussion of an

14   objection raised.

15           So I think it is safe for the Court to say that

16   the First Circuit and the Eighth Circuit disagree about

17   this.  But this Court is in the Eighth Circuit and this

18   Court reads the *Grajales-Montoya* case from the Eighth

19   Circuit differently than counsel for the defense does.

20           Counsel for the defense draws a distinction

21   between a trial team lawyer and a paralegal working for that

22   trial team in preparing this summary at one of the

23   defendant's law firms representing that defendant.  I don't

24   see that distinction drawn in any case and I suspect the

25   Eighth Circuit wouldn't find a distinction there.

1          Now, I agree that the Eighth Circuit case is

2     older.  It's 1997.  However, it was written by a current

3     member of the Eighth Circuit.  And, as counsel for the

4     plaintiffs pointed out, there is a subsequent case from the

5     Northern District of Iowa that specifically addresses this

6     very issue in the Eighth Circuit case and finds that that

7     court is bound by the authority in *Grajales-Montoya*.  I

8     similarly am bound by that authority.

9          So there is one circuit that has disagreed with

10    it.  Other courts have permitted it, but not because there's

11    been an objection.  It's just been introduced.

12         And so based on all of those reasons, the Court

13    will not permit this last-minute, eve-of-closing exhibit to

14    be introduced for purposes of closing argument.

15         All right.  Let's move on to any other issues we

16    have on documents or anything else before closing.

17    Mr. Clouser.

18         MR. CLOUSER:  Good morning, Your Honor.  Keith

19    Clouser from Williams & Connolly on behalf of PRMI.

20         I'm pleased to report the parties have met and

21    conferred regarding the admission of certain deal documents

22    and my understanding is we have an agreement that PRMI will

23    submit a subset of deal documents into evidence.

24         There are 117 of them and so rather than reading

25    them into evidence, we have prepared, with agreement from

1    plaintiff, I believe, DDX-18, which just lists the deal

2    documents that PRMI seeks to move into evidence.

3              So we'd like to submit to the Court DDX-18.

4              THE COURT:  And that's DDS?

5              MR. CLOUSER:  X.

6              THE COURT:  DDX-18.  And that is a demonstrative,

7    if you will, that contains all of the deal documents that

8    the parties have agreed may be received into evidence and

9    you're comfortable with a record in that fashion?

10             MR. CLOUSER:  Correct, Your Honor.

11             THE COURT:  Okay.  And you're asking me to admit

12   into evidence DDX-18, correct?

13             MR. CLOUSER:  And the documents that are

14   identified on that exhibit.

15             THE COURT:  Okay.  Any objection to that,

16   Mr. Miller.

17             MR. MILLER:  Your Honor, our understanding is

18   these are deal documents that have been disclosed and at

19   least partly used with their witnesses and so no objection

20   to those being admitted into the record.

21             THE COURT:  Okay.  Now, are any of these documents

22   being introduced for a limited purpose, such as the purposes

23   we identified yesterday, or are these being introduced for

24   all purposes?

25             MR. CLOUSER:  I believe these are being introduced

1     for all purposes, Your Honor.

2               THE COURT:  All right.  Well, hearing no

3     objection, DDX-18 and all of the documents identified in

4     that exhibit are received in evidence.

5               And you're going to hopefully docket that so the

6     Court has a copy of it.

7               MR. CLOUSER:  We will file it on the docket and I

8     have a copy to hand to the Court, if I may.

9               THE COURT:  Thank you.  You may approach.

10              MR. CLOUSER:  Thank you, Your Honor.

11              THE COURT:  All right.  Mr. Scheck.

12              MR. SCHECK:  Good morning, Your Honor.  Matthew

13    Scheck for the plaintiff.

14              Your Honor may recall yesterday we entered some

15    exhibits into evidence from the bankruptcy and at the end

16    there was a little bit of confusion as to one of the

17    exhibits, DTX-538, which was the reply declaration of Frank

18    Sillman from the 9019 in the bankruptcy.

19              And I discussed with Mr. Nicholson the confusion

20    there was that when I spoke, I categorized the three

21    declarations together, meaning the two declarations from

22    Mr. Lipps and the declaration from Mr. Sillman, and I

23    focused my argument primarily on Mr. Lipps.

24              What I said about the Sillman declaration was, I

25    think if I recall, it's sort of the quintessential

1    information available to the parties because Mr. Kruger

2    testified in deposition testimony as the CRO, who bound the

3    parties to the settlement, that he relied on -- or reviewed

4    the Sillman declaration from the original settlements.

5           And that was the argument I made, but to be fair

6    to Mr. Nicholson, my argument was focused on Mr. Lipps and I

7    think he did not have an opportunity to respond on

8    Mr. Sillman and so with the Court's permission obviously I

9    wanted to give him the opportunity to respond before that

10   exhibit is admitted.

11          THE COURT:  Okay.  Mr. Nicholson.  And this is

12   DTX-538?

13          MR. SCHECK:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. NICHOLSON:  Thank you, Your Honor, and thank

16   you, Mr. Scheck.

17          So plaintiff, as I understand it, has sought to

18   admit this reply declaration from Mr. Sillman as information

19   that was available to RFC at the time of the bankruptcy.

20   That could only be relevant to two issues as I see it.  One

21   would be the reasonableness of the bankruptcy settlements,

22   which is an issue that's no longer a live issue in this case

23   in light of the Court's summary judgment ruling, and the

24   second way it could be relevant is to allocation.

25          But plaintiff hasn't articulated any way in which

1      this Sillman reply declaration bears at all on their

2      position on allocation.  I don't know that any of their

3      experts have relied on this at all with respect to

4      allocation, and I'm not aware of any argument that they are

5      making that this is relevant to allocation.

6              So our concern is that what it's really being used

7      for is not a non-hearsay purpose relating to allocation, but

8      a hearsay purpose relating to causation, that is, we think

9      it's being used for its truth in an effort to show what

10     Mr. Sillman supposedly actually did at the time -- in the

11     course of the bankruptcy.

12             Plaintiff has to prove in this case causation.  It

13     needs to show that its theory that an underwriting guideline

14     violation causes a violation of the pool-wide reps was

15     actually something that caused the claims in the bankruptcy.

16             But they have a gap in proof because none of the

17     bankruptcy experts ever discussed that kind of theory.  They

18     don't even discuss the pool-wide reps at all.  So they have

19     offered this highly speculative theory that even though the

20     experts didn't mention the pool-wide reps, they must have

21     been looking at them.

22             So we think that what this is trying -- that

23     plaintiff is going to try to use this as an effort to

24     bolster that theory to try to show the truth of what

25     Mr. Sillman supposedly did.

1           We think the document doesn't actually support

2      plaintiff's theory.  It instead shows that Mr. Sillman just

3      did an expedited review where he made an assumption where he

4      treated substantial compliance with guidelines as a proxy

5      for breaches of reps and warrants without actually analyzing

6      what the trust-level reps were.

7           But setting aside our disagreement about the

8      meaning of the document, we don't think it's proper to use

9      this out-of-court statement by Mr. Sillman to show what he

10     actually did.

11          And to remind the Court, this is the document that

12     Mr. Hawthorne put up on the screen as part of one of his

13     demonstrative slides when he was making this causation

14     argument about what Mr. Sillman supposedly actually did.  So

15     I think it's being used for a hearsay purpose.

16          I would also say that the parties have designated

17     testimony from Mr. Sillman himself from his deposition.

18     That's the testimony they should be relying on.  Plaintiff

19     shouldn't be able to put in this out-of-court statement now

20     to show what Mr. Sillman supposedly did.

21          So we don't think this document should come in at

22     all, but if it does, it should be limited to -- although I

23     don't think it's relevant to this, the information available

24     to RFC at the time of the bankruptcy, it shouldn't be

25     allowed to be used for its truth to bolster any causation

1    argument.

2              Thank you, Your Honor.

3              THE COURT:  Thank you.

4              Mr. Scheck.

5              MR. SCHECK:  Very briefly, Your Honor.  I don't

6    want to recount the arguments I made yesterday because I do

7    believe they are equally applicable to Mr. Sillman's

8    declaration.  I want to just do two things.

9              First is make clear we are not seeking to offer

10   this into evidence for the truth of the matter asserted.  It

11   is for the limited purpose in line with the documents that

12   were entered yesterday, as Mr. Nicholson just described.  So

13   that's the first clarification.

14             The second is that, again, just to kind of briefly

15   revisit yesterday, this becomes a problem with respect to

16   all of the various depositions, briefs, and declarations

17   that we have been talking about.  They all have that same

18   danger and we have agreed that the Court may review for the

19   limited purpose and that we may submit to the Court for the

20   limited purpose all of these various things and we can't

21   just start selecting some, because the deposition

22   designations have the same issues, frankly.

23             And with that, unless Your Honor has questions,

24   I'll take my seat.

25             THE COURT:  All right.

1              MR. SCHECK:  Thank you.

2              THE COURT:  Well, I mean, the good news is that

3      the Court is the fact-finder here and understands that this

4      exhibit is being introduced not for the truth of the matter

5      asserted, but rather limited to evidence, like so many other

6      documents in this case, of what was available to the parties

7      at the time of the mediation.

8              And so when I do my findings of fact, it will be

9      clear that I'm not relying on this in any way for the truth

10     of the matters asserted; and I presume when the parties

11     submit their findings of fact, it will be clear that it's

12     not being used for that purpose.

13             And whether the Court views the -- this limited

14     purpose as being relevant to allocation, we'll just have to

15     wait and see how the findings of fact play out.

16             So as with so many documents that have now been

17     introduced, DTX-538 is received for that limited purpose.

18             All right.  Anything else about documents?

19             All right.  Should we take a minute to talk about

20     the parties' views on when the proposed findings of fact and

21     conclusions of law should be submitted to the Court?

22             Mr. Nesser.

23             MR. NESSER:  Your Honor, certainly we would defer

24     to the Court's practices on that issue.  I think from our

25     perspective, we've had a lot of downtime and the Trust would

1    be prepared to file its proposed findings of fact and

2    conclusions of law quickly, on an order of, you know, two or

3    three weeks, I would say.

4            THE COURT:  All right.  And is it the Trust's view

5    that these should be done simultaneously or there should be

6    an opportunity to review each other's proposed findings and

7    respond?

8            MR. NESSER:  Your Honor, my understanding of what

9    we had seen in prior cases before Your Honor was that they

10   were done simultaneously and so we, I think, just assumed

11   Your Honor would prefer for it to happen that way here as

12   well.  If the Court has a different preference, of course we

13   will be happy to discuss it; or if the Court is open to

14   different approaches, we're happy to discuss that, too.

15           THE COURT:  Okay.  Thank you, Mr. Nesser.

16           Mr. Nicholson.

17           MR. NICHOLSON:  Thank you, Your Honor.  We haven't

18   formed a final view on that issue of the timing.  As to

19   Mr. Nesser's proposal, I think maybe three weeks might seem

20   reasonable.  We're happy to meet and confer with them about

21   that or whether maybe more time, but that three weeks seems

22   generally the right ballpark, I think.

23           With regard to responding to each other's or

24   filing simultaneously, it's my understanding it's normally

25   done simultaneously, but we're happy to meet and confer

1    about that too and get back to the Court on our view.

2            THE COURT:  Given that, I think we should just set

3    a deadline for three weeks and have simultaneous

4    submissions.

5            MR. NICHOLSON:  Okay.

6            THE COURT:  All right.  So whatever three weeks is

7    from today, that will be the deadline for that submission.

8            Now, it's entirely possible that PRMI, in fact,

9    provided the Court with those additional designations.  Did

10   that happen, Mr. Clouser?

11           MR. CLOUSER:  Your Honor, we have not filed the

12   chart yet on the docket.  We have to send it to plaintiff.

13   We had to reformat some of the charts for filing and so I

14   need to send that to the plaintiff today for final

15   confirmation that it's consistent with them.

16           THE COURT:  Okay.  So you should have no trouble

17   getting that finalized by Monday or Tuesday of next week?

18           MR. CLOUSER:  That's correct, Your Honor.

19           THE COURT:  And I think that should be all that's

20   outstanding.  Am I right about that?

21           MR. CLOUSER:  In addition, we will be filing the

22   list that I provided you today with the deal documents.  But

23   other than that, I think that's everything.

24           THE COURT:  Okay.  Oh, yes.  There was a request

25   for a redacted copy of the Court's order earlier this week.

1    Have the parties had a chance to meet and confer on that

2    question?

3              Ms. Nelson.

4              MS. NELSON:  We have, and we will be submitting

5    something to the Court.

6              THE COURT:  Okay.  Very good.  All right.

7    Anything else?

8              All right.  Then we will begin with closings at

9    1:30.  Court is adjourned.

10       (Lunch recess taken at 11:32 a.m.)

11                      *    *    *    *    *

12   (1:27 p.m.)

13                        **IN OPEN COURT**

14

15             THE COURT:  Mr. Johnson, you look ready to go.

16             MR. JOHNSON:  Yes, Your Honor.  Thank you.

17             THE COURT:  You may proceed.

18             MR. JOHNSON:  Plaintiff's counsel talked in

19   opening statement about the real world.  That real world is

20   nowhere to be found in the case presented by plaintiff at

21   trial.  Plaintiff's case concerns loans overwhelmingly sold

22   by PRMI between 2000 and 2005, but the RFC bankruptcy

23   concerned trusts from 1998 to 2007.

24             Plaintiff ignores the substantial differences

25   between early trusts and those from 2006 and 2007.

1       Plaintiff asserts a pool wide -- a theory on pool-wide reps

2       that has no connection whatsoever to the real world.

3       Plaintiff ignores the real-world implications of RFC's fraud

4       disclaimer.  Plaintiff ignores entirely the real-world

5       defense of the statute of limitations defense available to

6       RFC with respect to 339 of 506 at-issue trusts.

7               Plaintiff ignores how the PRMI-RFC relationship

8       functioned in the real world when RFC actually was in

9       business, including with respect to Assetwise Direct.  And

10      plaintiff asserts that the Court should allow it to make

11      sweeping assumptions on damages because it failed to obtain

12      any real-world data.

13              If plaintiff had taken the real world into

14      account, we never would have even been here today.  It's

15      undisputed that RFC rarely made a standard industry rep that

16      loans -- each loan in a securitization complied with the

17      applicable underwriting guidelines.  Indeed, RFC made fewer

18      and very different reps than the reps it received from

19      originators.  Faced with the absence of a compliance rep,

20      plaintiff has attempted to create such a loan-level rep out

21      of two pool-wide reps; the credit grade rep and the loan doc

22      rep.  The language meaning and how these reps would be

23      breached are very different than a loan-level compliance

24      rep.

25              So what actual evidence did plaintiff bring to

1   bear on the issue?  Little to none.  Plaintiff presented

2   Ms. Farley's view that when she was at RFC in the 1990s, she

3   thought these reps could be breached by a single loan; and

4   Ms. Farley wasn't even at the company when it started making

5   the pool-wide credit grade rep and she didn't identify any

6   contemporaneous documents supporting her view.  And she had

7   to concede that as to both -- as to both pool-wide reps, the

8   percentages RFC were permitted -- the percentages provided

9   by RFC were permitted to move by more than a single loan.

10          First, as to the pool-wide loan documentation rep,

11   in the example that she used on direct, the characteristics

12   of the pool were substantially representative and may vary,

13   and Ms. Farley agreed that the percentages could change

14   somewhat.

15          Also as to the pool-wide credit grade rep in the

16   example that she used on direct, the characteristics in the

17   pool could change up to 5 percent, and Ms. Farley agreed

18   that that was the case.  And despite conceding these

19   variances, Ms. Farley still contended that in the $2 billion

20   deal with almost 20,000 loans that she testified about on

21   direct, a single loan could breach the pool-wide credit

22   grade rep.  Now, that, quite simply, is not credible

23   testimony.

24          Mr. Butler was plaintiff's re-underwriter.

25   Mr. Butler's only experience with trust-level reps is from

1    being hired by plaintiff's lawyers demanding repurchase of

2    loans.  In those 12 years of litigation he saw compliance

3    rep in virtually every single case, but in all of the 30

4    plus years of consulting, Mr. Butler had no experience with

5    the pool-wide loan doc or credit grade reps.  He went so far

6    as to say that the percentages listed in the credit grade

7    rep were not relevant to him, raising the question of how he

8    possibly could determine that there was a breach of such a

9    rep.

10           Nor could Mr. Butler identify any meaningful

11   repurchase history as to these pool-wide reps.  Of the

12   nearly 10,000 loans in the RFC's investor repurchase

13   database, Mr. Butler could not identify a single demand

14   based on the pool-wide loan doc program rep.

15           And he mentioned one repurchase demand on one loan

16   based on the pool-wide credit grade rep, and even on that

17   loan the repurchase history refers to the Prospectus

18   Supplement, not to the credit grade rep.  It's not

19   surprising that in the real world there was no repurchase

20   history based on RFC's pool-wide reps.  Industry

21   participants did not understand the pool-wide reps to be

22   loan-level reps, much less that those reps effectively were

23   a compliance rep.

24           The lack of any repurchase demands also lays bear

25   plaintiff's assertion that these pool-wide reps must have

1    been loan-level compliance reps because they're in a section

2    of a deal document discussing the repurchase protocol.  As

3    PRMI's experts testified, the placement of a rep in the deal

4    documents does not transform what clearly is a pool-wide rep

5    into a loan-level rep.  No industry participant would have

6    understood it that way, and clearly none did based on the

7    lack of any repurchase history.  At most, the placement

8    creates a question of how a remedy would be fashioned if it

9    were established that there were material breach of one of

10   the pool-wide characteristics in the reps.

11           Nor does plaintiff's argument establish that these

12   are equivalent to a compliance rep.  So plaintiff can't

13   sustain its burden to prove causation on this evidence.  And

14   in turning to the bankruptcy, the evidence got no better for

15   plaintiff.  Now, we don't know how the bankruptcy

16   settlements ultimately were reached because they're covered

17   by mediation privilege, but we do know that the bankruptcy

18   parties never discussed the pool-wide reps at all in their

19   many motions, objections, and replies.  The only oblique

20   reference that plaintiff could find in the bankruptcy is to

21   a generalized list of reps in the background section of a

22   proof of claim describing various types of things that the

23   reps pertained to.

24           The reference actually disproves plaintiff's

25   assertion, which is likely why it was only mentioned once

1       during the entire trial on re-redirect.  While the proof of

2       claim refers to each mortgage loan in describing the

3       compliance rep and other reps regarding the various

4       characteristics of each specific mortgage loan, when it

5       discusses owner occupancy and documentation-type reps, it

6       refers to percentages of a mortgage pool.

7              This clear distinction between loan-level and

8       pool-wide reps is directly counter to plaintiff's efforts

9       here to transform these pool-wide reps into ones under which

10      loan-level repurchase claims could be asserted.

11             Now, plaintiff blames the lack of cases

12      interpreting these pool-wide reps as loan-level reps on the

13      purported uniqueness of RFC's reps.  But even if that were

14      the case, it doesn't somehow turn these loan-level reps --

15      turn these pool-wide reps into loan-level reps.  Plaintiff

16      hasn't pointed to any cases holding that pool-wide reps are,

17      in fact, loan-level reps; and neither does it explain how

18      RFC received virtually no repurchase demands out of nearly

19      10,000 in the RFC repurchase -- investor repurchase database

20      that even mentions either pool-wide rep.  And it doesn't

21      explain why it never came up in the many issues debated in

22      the bankruptcy that these purportedly unique pool-wide reps

23      actually were loan-level reps.

24             So plaintiff turned to Mr. Hawthorne.  Now, he

25      included only one paragraph on the pool-wide credit grade

1    rep and two paragraphs on the pool-wide loan doc rep in his

2    500-paragraph expert report.  And apart from cases brought

3    by this plaintiff, he is not aware of any other case in

4    which loan-level breaches of these pool-wide reps have been

5    alleged.

6            But Mr. Hawthorne did point to a number of other

7    RFC reps that could have subjected RFC to substantial

8    liability.  And what does plaintiff -- and what plaintiff

9    does in the absence of any actual evidence from the

10   bankruptcy about consideration of the pool-wide reps is to

11   point to mere shreds and have Mr. Hawthorne speculate as to

12   evidence that's not there.  Contrary to Mr. Hawthorne's

13   assertions, the unsecured creditors committee

14   re-underwriter, Mr. Morrow, did not look at RFC's reps at

15   all to the trusts.

16           Debtors' re-underwriter, Mr. Sillman, didn't

17   re-underwrite to RFC's reps either.  He made an assumption

18   based on the few trusts he had time to look at that all

19   trusts had a compliance rep.  And there's no evidence that

20   the re-underwriter for the plaintiff's side trustees, Duff &

21   Phelps, even identified or mentioned, much less applied, the

22   pool-wide reps in its re-underwriting.

23           Plaintiff could have deposed these re-underwriters

24   and asked them whether they, notwithstanding all of the

25   evidence to the contrary, actually applied the pool-wide

1    reps in their re-underwriting, and whether they considered

2    those reps to be the equivalent of a compliance rep, but

3    they never did.  Maybe because they didn't want the answer.

4           Now, step back and think for a moment about how

5    plaintiff is attempting to prove its case on causation with

6    respect to the pool-wide reps.  Plaintiff designates

7    snippets of deposition testimony from Morrow, Cornell,

8    Sillman and Pfeiffer, puts it up on a slide, but they say

9    nothing about the pool-wide reps.  Instead, plaintiff had

10   Mr. Hawthorne come in and speculate on their state of mind

11   that they must have been referring to the pool-wide reps

12   when they talked in their reports about the compliance rep

13   despite that no words ever came out of their mouths or

14   flowed from their pens.  To say that's an odd way to try to

15   carry a burden would be an understatement.

16          So that leaves plaintiffs with attempting to

17   premise its entire causation case on the idea that the

18   pool-wide reps presented some amorphous increased risk of

19   liability to RFC.  But that's not sufficient.  To satisfy

20   its causation burden, plaintiff must do more than allege an

21   increased risk in the air.  Rather, it must show that these

22   representations actually were a source of RFC's purported

23   bankruptcy liabilities, and they've come nowhere close to

24   satisfying that most basic standard.  There's no such

25   evidence to speak of.

1              Unlike plaintiff, PRMI presented expert testimony

2      from actual industry experts regarding these pool-wide reps.

3      Mr. Burnaman testified from the perspective of an RMBS

4      investor.  He said that where sponsors made an underwriting

5      rep, it took the form of RFC's compliance rep.  RFC provided

6      such a rep infrequently and could do so because investors

7      had a comfort level with a sponsor like RFC who had a long

8      track record of performance.  In light of all of

9      Mr. Burnaman's industry experience, he was not aware of any

10     instance where repurchase demands on individual loans were

11     made based on pool-wide reps.

12             And even if one were to conceive of doing so, the

13     deal documents were clear that the percentages in these

14     pool-wide reps were subject to change.  The pool-wide reps

15     were not warranting the type of precision that plaintiff's

16     experts are claiming in this case.

17             Professor Schwarcz testified from the perspective

18     of someone who put these transactions together.  He

19     testified that no reasonable industry participant would have

20     viewed the pool-wide credit grade rep as a loan-level rep

21     warranting compliance with underwriting criteria, and he

22     testified similarly with respect to the pool-wide credit

23     grade rep.  Professor Schwarcz, in all of his experience,

24     had never even heard of anyone taking the position that such

25     pool-wide reps actually were loan-level reps or that these

1    reps concerned guideline compliance.

2         Ms. Keith likewise testified that these reps are

3    very different from a loan-level compliance rep and that she

4    had never even seen a party seek repurchase of individual

5    loans based on alleged allegations of a pool-wide rep.

6         The testimony of PRMI's industry experts is

7    consistent with the factual record.  There's a dearth of

8    evidence concerning the nearly 10,000 pre-bankruptcy

9    repurchase demands based on pool-wide reps, and the

10   bankruptcy debtors never pointed to the pool-wide reps as a

11   potential source of liability.  The re-underwriters in

12   bankruptcy never alleged any breach of these pool-wide reps,

13   and objections were made on the basis that most trusts did

14   not have a compliance rep, including by MBIA at

15   approximately 80 percent of the original trust settlement --

16   original trusts in the original settlement did not receive

17   protection through representations and warranties concerning

18   the underwriting standards.

19        Plaintiff refers to the real world to say that it

20   would be too difficult and complex to allege and prove a

21   breach of the pool-wide reps if those reps could not be

22   breached by a single loan.  But whether the issue is one of

23   complexity or simply that no one ever viewed these pool-wide

24   reps as loan-level reps, much less the equivalent of a

25   compliance rep, or some combination of those things, the

1    inescapable fact is that such reps were not the basis for

2    liability to RFC, either before or during the bankruptcy.

3    The overwhelming evidence shows that plaintiff has not come

4    close to satisfying its burden on causation with respect to

5    these pool-wide reps.

6            Now, there's no dispute in the case that RFC

7    seldom provided a no-fraud rep.  As Professor Schwarcz

8    testified, RFC only starting providing this no-fraud rep in

9    2006 in later deals.  And as Mr. Burnaman testified, this

10   no-fraud rep provided in those later deals by RFC took the

11   form of a standard no-fraud rep in the industry.  If the

12   borrower lied, the sponsor covered it.

13           So was fraud in the origination something that

14   sponsors and investors just ignored prior to the inclusion

15   of a no-fraud rep?  No.  It was dealt with through other

16   mechanisms, as PRMI's experts explained.  Mr. Burnaman

17   discussed several ways that the industry accounted for

18   potential borrower fraud in securitization deals.  One way

19   was through over-collateralization to cover credit losses,

20   including those due to borrower fraud.

21           Another way was for the sponsor to create a

22   special fraud reserve that allowed increases in proceeds

23   while setting aside cash dedicated specifically to covering

24   losses related to borrower fraud.

25           And another way was providing -- by providing a

1       no-fraud rep under which case the over-collateralization

2       would be less and the proceeds in the deal would increase,

3       but there would be recourse against the seller for borrower

4       fraud.  As Mr. Burnaman explained, this over-

5       collateralization structure, the fraud reserve, and later

6       the no-fraud rep would have made no sense if fraud had

7       always been covered by the no default and MLS reps.

8            Professor Schwarcz testified about sponsor's

9       pass-through reps made by originators to trusts and

10      investors.  This provided recourse with respect to borrower

11      fraud.  And Ms. Farley testified that this was the very

12      purpose of including such a pass-through provision in its

13      deals.

14           Ms. Keith testified about how a no-fraud rep is a

15      subject of heavy negotiation between the parties, and the

16      price of the deal can be impacted by the negotiation.

17           Although parties and courts in the throes of

18      litigation may forget this, reps and warrants are not the

19      only way that parties to an RMBS transaction allocate risk.

20      The testimony from PRMI's experts illustrates various ways

21      this can occur with respect to borrower fraud and

22      misrepresentation.  PRMI's experts testified that the no

23      default and MLS reps serve very different functions compared

24      to a no-fraud rep, and industry did not understand these

25      reps to cover borrower fraud.

1          The MLS and no-default reps had been provided in

2     securitizations from essentially the beginning.  The

3     no-default rep was generally understood in the industry

4     primarily to cover payment default, not as a substitute for

5     a no-fraud rep.  And the MLS rep was understood to warrant

6     the information in the Mortgage Loan Schedule had properly

7     been entered.

8          And as Ms. Keith reminded us, there was a time

9     when the Mortgage Loan Schedule was not populated

10     automatically.  It had to be hand entered into a

11     spreadsheet.  So the idea that the MLS had to accurately

12     reflect the information for the loan mattered.  In 2020 or

13     in 2000 -- even in 2013, it might seem strange to have such

14     a rep about transcription.  But when you think about the

15     relative lack of technology at the time this rep came into

16     existence, it makes sense.

17          But beyond those facts, RFC expressly disclaimed

18     plaintiff's MLS and no default interpretations.  RFC made

19     this fraud disclaimer in the large majority of its pre-2006

20     trusts while excluding it from the large majority of its

21     post-2006 trusts.

22          RFC disclaimed that it was taking on the risk

23     through its reps of allegations based on other

24     representations.  It was, as we saw RFC call it, exculpatory

25     language.  Professor Schwarcz testified that it would make

1    no sense to accept a convoluted interpretation that another

2    rep was the equivalent of a no-fraud rep while disregarding

3    the fraud disclaimer.  And plaintiff's experts were not

4    aware of a single case where it was asserted, much less

5    held, that borrower fraud and misrepresentation breach the

6    MLS and no-default reps where there was an express fraud

7    disclaimer.  Mr. Hawthorne had never seen one; and while

8    Mr. Butler, contrary to his deposition testimony, thought he

9    had been in such a case, he couldn't identify any fraud

10   disclaimer when shown the reps for the trust at issue in

11   that case.  The only thing plaintiff's witnesses could say

12   is that RFC's fraud disclaimer does not apply because

13   Mr. Butler only alleged misrepresentations.

14        But this distinction does not stand up under

15   scrutiny and certainly does not pass plaintiff's purported

16   real-world test.  PRMI's experts all explained that industry

17   participants did not draw the fine line that Mr. Butler

18   asserts.

19        Mr. Butler -- or Mr. Burnaman testified that

20   industry participants did not distinguish between types of

21   untrue statements.  Professor Schwarcz testified that

22   incorrect statements by a borrower were disavowed by RFC

23   through the fraud disclaimer; and Ms. Keith testified that

24   in the mortgage industry the terms are used interchangeably.

25   This was particularly true with respect to the types of

1    blatant misrepresentations alleged by Mr. Butler and other

2    RMBS plaintiffs.

3              Nor has plaintiff pointed to any contemporaneous

4    document drawing the distinction that plaintiff attempts to

5    draw in this case either prior to RFC's bankruptcy or during

6    the bankruptcy itself.

7              Indeed, we know that RFC took this position in the

8    bankruptcy.  After Mr. Butler discussed the testimony of

9    RFC's in-house lawyer expert on securitization, John

10   Ruckdaschel on direct examination, he was asked on cross

11   about another part of Mr. Ruckdaschel's testimony in his

12   bankruptcy deposition where he discussed the fraud

13   disclaimer.  And he said, "If the substance of the

14   repurchase claim sounds in fraud or a misrepresentation on

15   the borrower's part, if it has exculpatory language, it's

16   specifically disavowing it with respect to the servicer or,

17   said another way, fraud risk has been transferred.  Fraud

18   or," and he corrected himself and said, "Fraud or

19   misrepresentation risk has been transferred into the related

20   securitization."

21             Now, Mr. Butler said that Mr. Ruckdaschel was

22   mistaken, apparently not only knowing Mr. Ruckdaschel's mind

23   better than Mr. Ruckdaschel himself, but also knowing RFC's

24   position in the bankruptcy better than its in-house expert

25   on securitization.  But even Mr. Butler acknowledged that

1    there is some mix and match to his mind between fraud and

2    misrepresentation.

3            So plaintiff has not shown that the no default and

4    MLS reps are the equivalent of a no-fraud rep and such an

5    interpretation was expressly disclaimed in trusts where RFC

6    included a fraud disclaimer.  In such circumstances,

7    plaintiff has not demonstrated that allegedly breaching PRMI

8    loans caused RFC to breach the MLS or no-default rep.

9            But separate and apart from the issue of

10   causation, the evidence clearly has established that claims

11   based on borrower fraud and misrepresentation are much

12   stronger on trusts that included an actual no-fraud rep than

13   they were on trusts that lacked such a rep.  And that

14   disparity in the strength of claims is magnified on trusts

15   where RFC included a fraud disclaimer.

16           Now, the first threshold issue is whether claims

17   on trusts with a no-fraud rep were stronger than claims

18   lacking such a rep, and the answer to that question is

19   clearly yes.  The no-fraud rep is explicit while plaintiff's

20   position on the no default and MLS reps is based on

21   implication.

22           Unlike the no-fraud rep, industry participants

23   opposed the argument that plaintiffs began to advance in the

24   throes of the financial crisis on the no default and MLS

25   reps.  And there was a paucity of case law as of the

1       bankruptcy settlement period addressing plaintiff's

2       arguments concerning the no default and MLS reps.  And on

3       this point, Mr. Hawthorne and Mr. Woll basically agree.

4       Indeed, so undeveloped was the law that Mr. Hawthorne cited

5       statements from discovery hearings as to both reps.

6               So it cannot be said that as of the settlement

7       period claims of fraud and misrepresentation concerning

8       trusts lacking a no-fraud rep were as strong as such claims

9       concerning trusts that had a no-fraud rep.

10              Now, the second issue is that this disparity in

11      strength of claims was exacerbated as to trusts where RFC

12      made a fraud disclaimer.  RFC added the fraud disclaimer in

13      the mid 1990s because GMAC's legal group had concerns about

14      borrower fraud, and the goal was to prevent as much

15      potential liability to RFC as possible.

16              All of this was expressly disclosed to investors

17      in the Prospectus Supplement to avoid any confusion.  In

18      that disclosure RFC did not say that it thought the fraud

19      disclaimer would be ineffective or that it would still be

20      liable under other reps it had made.  Rather, it stated in

21      no uncertain terms that it was not liability for borrower

22      fraud.  As Ms. Farley said when asked why RFC didn't say

23      that in its disclosure, she said, Why would we given that

24      RFC thought it had an argument?

25              So the history of the fraud disclaimer, the fraud

1   pass-through, and the no-fraud rep shows that RFC took

2   conscious and well-thought-out steps to minimize its

3   potential liability as long as it could do so; and to

4   suggest, as plaintiff does now, that all those steps were

5   meaningless defies belief.  It surely ignores the real

6   world.

7           But plaintiff failed to ascribe any difference in

8   strength of claims to trusts where RFC included a fraud

9   disclaimer.  And while, as one might expect, plaintiff's

10  witnesses all attempted to minimize the importance of the

11  fraud disclaimer, they all agreed that the fraud disclaimer

12  provided RFC with an argument.  Ms. Farley testified that

13  RFC included the fraud disclaimer to minimize its risk and

14  she agreed that having an argument was better than not

15  having one.  Mr. Butler testified similarly.  And

16  Mr. Hawthorne also agreed that the fraud disclaimer gave RFC

17  an argument.

18          Now, neither Ms. Farley nor any of plaintiff's

19  experts could identify any RFC documents stating or

20  suggesting that the fraud disclaimer would be ineffective,

21  and plaintiff did not establish that that was the case

22  through RFC's own historical practices.

23          Mr. Butler relied on RFC's investor repurchase

24  database to support his opinions.  But he pointed to only a

25  single loan out of nearly 10,000 loans in that database

1    which he contends was repurchased based on an allegation of

2    fraud or misrepresentation in a deal with a fraud

3    disclaimer.  And he was confronted on cross with evidence

4    that RFC denied repurchase for fraud and misrepresentation

5    on more than 80 loans based on the presence of a fraud

6    disclaimer.  That's a 1 to greater than 80 ratio.

7         In light of Mr. Butler's reliance on RFC's

8    investor repurchase database, is there any doubt that

9    plaintiff would have elicited testimony about how

10   ineffective the fraud disclaimer was if substantially more

11   loans could be identified than the single instance about

12   which Mr. Butler testified?  And if that were the case,

13   plaintiffs certainly would have presented that evidence.

14        And if there's any doubt that -- and is there any

15   doubt that if such repurchase demands involving the fraud

16   disclaimer were made or agreed to anywhere near as often as

17   they were in the far fewer trusts where RFC made an actual

18   no-fraud rep, that plaintiff would have elicited that

19   evidence in support of its position on the relative strength

20   of claims?  Of course it would have.

21        Mr. Hawthorne tried to minimize the importance of

22   the fraud disclaimer based on the purported distinction

23   between repurchase claims based on misrepresentation and

24   those based on fraud.  Of course, Mr. Hawthorne pointed to

25   no statements by RFC that it made such a distinction.

1          But if RFC actually had done so, it would have

2     been easy to establish that fact through the investor

3     repurchase database, but Mr. Hawthorne never did that.

4     Instead, his opinion on the fraud disclaimer in his expert

5     report was limited to a single footnote.  And Mr. Butler

6     acknowledged instances where RFC denied repurchase claims

7     alleging misrepresentation based on the presence of a fraud

8     disclaimer.

9          Now, like Mr. Hawthorne, PRMI's expert David Woll

10    was not aware of any court decisions addressing whether the

11    no default or MLS reps cover borrower fraud and

12    misrepresentation in a deal that included a fraud

13    disclaimer.  But Mr. Woll disagreed that RFC would be

14    limited in any significant way by plaintiff trying to cast

15    its allegations as one of misrepresentation rather than

16    fraud.  And Mr. Woll testified that the defense arguments

17    would be much stronger where a fraud disclaimer was made

18    compared to a no-fraud rep.

19         In addition to making real-world sense, that

20    opinion is consistent with the evidence from this trial.  In

21    the real world, RMBS litigants were aware of how the

22    strength of claims and defenses differed between trusts.

23         Now, under the applicable law, it's plaintiff's

24    burden to prove how a reasonable defendant in RFC's position

25    would have assessed the relative strength of claims asserted

1    against it.  And in addition to ignoring the fraud

2    disclaimer, plaintiff assigns no value to RFC's statute of

3    limitations defense, and that's simply not credible.

4         And there's no real-world dispute -- there's no

5    real dispute that the statute of limitations was a colorable

6    defense as to claims asserted against many of the trusts at

7    issue in the bankruptcy.

8         It's undisputed that the statute of limitations

9    was raised by RFC in the bankruptcy.  Ms. Hamzehpour,

10   ResCap's general counsel, testified that the statute of

11   limitations would have been asserted in litigation; and

12   Mr. Kruger, the chief restructuring officer for the debtors,

13   was aware of the statute of limitations issue.  RFC raised

14   the statute of limitations defense to exclude pre-2004

15   trusts from the original settlement, and the bankruptcy

16   parties objected that the allowed claim amount of the

17   original settlement was too high based on the statute of

18   limitations.

19        The Unsecured Creditors Committee argued that the

20   statute of limitations applied to 2004, 2005, and some 2006

21   loans and trusts in the original settlement.  And MBIA

22   argued that the failure to consider the statute of

23   limitations defenses to those trusts was problematic.

24        And while we don't know what it actually happened

25   in the negotiations that led to the RMBS settlement in May

```
 1    2013 when 155 pre-2004 RFC trusts and hundreds of others

 2    were added to the trusts in the original settlement, the

 3    parties actually -- when that did occur, the parties

 4    actually negotiated a lower allowed claim settlement amount.

 5    The only reasonable inference is that RFC did take into

 6    account the statute of limitations in negotiating that

 7    settlement.  The pre-2004 trusts were an afterthought.

 8              Against all of this, plaintiff relies on

 9    Mr. Hawthorne.  The opinions disclosed in Mr. Hawthorne's

10    report concerned evaluations of the reasonableness of the

11    settlements, not allocation.  In the hundreds of paragraphs

12    in his report he never even cited the relevant standard for

13    analyzing allocation among indemnitors who are not parties

14    to the underlying settlements, and he never even referred to

15    the cases laying out that standard in his materials relied

16    on, which included many, many cases.

17              Even if one considers the undisclosed opinions

18    Mr. Hawthorne volunteered at trial, those opinions do not

19    satisfy plaintiff's burden.  Contrary to his report,

20    Mr. Hawthorne said at trial that he thought plaintiffs had

21    the better of the statute of limitations argument at the

22    time of the settlements.

23              But even if Mr. Hawthorne's view was deemed to be

24    that of a reasonable defendant at the time, notwithstanding

25    all of the evidence to the contrary, that would not satisfy
```

1    plaintiff's burden.  As Mr. Woll explained, even if that

2    view were correct, a reasonable defendant still would take

3    the statute of limitations into account in settling claims.

4         Both Mr. Hawthorne and Mr. Woll discuss the

5    increase in RMBS repurchase case filings in 2011 on trusts

6    that closed in 2005 and 2012 pertaining to 2006 trusts.

7    Mr. Woll provided a detailed and thorough explanation for

8    his opinions and the bases for them.  He testified that the

9    basic principles of New York law that had been established

10   as of the settlement period favored defendant's position on

11   the statute of limitations.

12        Mr. Woll discussed the cases that were relied on

13   by plaintiffs and defendants, what those cases considered

14   and did not consider, and why they were relied on.  The

15   federal court cases defendants relied on considered the

16   statute of limitations in RMBS cases under New York law.

17   The only case relied on by plaintiffs that even considered

18   the statute of limitations under New York law failed to even

19   cite New York authority, and the weakness of that case was

20   specifically discussed in the bankruptcy.

21        And Mr. Woll explained that ultimately the New

22   York appellate courts unanimously adopted the defendant's

23   position.  And the issue is not just how the *ACE* appellate

24   decisions came out.  It was how they got to their results by

25   relying on longstanding principles of New York law to reject

1    the plaintiff's novel theory.  The very principles relied on

2    were those that would be predictive for a reasonable

3    defendant to weigh how the issue likely would be resolved.

4           Now, every chance he could, Mr. Hawthorne

5    interjected comments on failure to notify and equitable

6    estoppel theories.  But he had to admit that failure to

7    notify, which would require claims against RFC as a master

8    servicer, never was even raised.

9           Equitable tolling, as a general matter, is only

10   available in exceptional circumstances.  The theory has

11   never been successfully raised in an RMBS case to this very

12   day, and there were not any exceptional circumstances in the

13   RFC bankruptcy given that the certificate holders and

14   trustees could discover and assert breaches themselves.

15          Mr. Woll explained that the theories -- that these

16   theories would not have diminished the statute of

17   limitations defense from the perspective of any reasonable

18   defendant.  Mr. Woll opined that a reasonable defendant

19   definitely would have ascribed a lower settlement value to

20   claims subject to the statute of limitations even if it were

21   a 50/50 proposition.  But Mr. Woll's opinion was that it was

22   not a 50/50 proposition, and the defendant's position had a

23   significantly better chance of ultimately prevailing than

24   the plaintiff's position did.

25          This defense, as Mr. Woll testified, applied to

1   339 of the 506 at-issue trusts.  Plaintiff raised several

2   collateral issues that had nothing to do with the statute of

3   limitations in an attempt to rationalize its decision to

4   ignore the defense entirely.

5           Mr. Hawthorne claimed that it was a sign of

6   uncertainty that Duff & Phelps, on behalf of the plaintiff's

7   side trustees, didn't distinguish based on the statute of

8   limitations defense when dividing up the allowed claims

9   amongst themselves.

10          Now, there's zero evidence that Duff & Phelps even

11  analyzed the statute of limitations defense, much less how

12  it viewed the defense.  There's zero evidence that RFC

13  played any role in the trustee's allocation of those allowed

14  claims as Mr. Kruger testified.  And we know, in fact, that

15  the vice president of one of the trustees specifically

16  referred to how the statute of limitations could have barred

17  claims as to certain trusts.  Duff & Phelps' exercise on

18  plaintiff of plaintiff's side trustees does not reflect how

19  a reasonable defendant in RFC's position would have viewed

20  the defense.

21          Mr. Hawthorne did not do anything to investigate

22  the cross-motivation of plaintiff's side trustees in

23  institutional investors.  He doesn't know why trustees who

24  got full releases in the bankruptcy did what they did; but

25  in any event, it's irrelevant under the law.  What is

1    relevant is what a reasonable defendant would have done.

2          Mr. Hawthorne also cited the bankruptcy court's

3    confirmation of how plaintiffs divvied up the allowed claims

4    as a rejection of the statute of limitations defense.  Now,

5    that truly is grasping at straws.  He pointed to zero

6    evidence, and there isn't any, that the statute of

7    limitations defense even was considered by the bankruptcy

8    court.  There was no reason for the bankruptcy court to do

9    so.  No one was objecting at that point.  It was a

10   consensual settlement.

11         The Confirmation Order hardly was an articulation

12   of Judge Glenn's views.  As Mr. Woll noted, when he finally

13   considered the issue, he adopted defendant's position on the

14   issue prior to *ACE III.*

15         And Mr. Hawthorne tried to rely on plaintiff's

16   side allocations in other mass settlements as somehow

17   reflective of the state of law.  That's obviously not the

18   case.  Now, whether we're talking about ResCap or other mass

19   settlements, they involved the same lawyers from many of the

20   same institutional investors and many of the same trustees,

21   including HSBC Bank U.S.A., which is on the plaintiff's side

22   of *ACE*.

23         Mr. Hawthorne admitted that the *Countrywide*

24   settlement, which included 2004 to 2007 trusts and occurred

25   prior to ResCap, did not have any statute of limitations

1    issue to speak of.  And as we saw, the experts in *J.P.*

2    *Morgan* and the *Citi* settlements, which included 2005 to 2007

3    trusts, specifically addressed the issue that the widespread

4    holdings of the Gibbs & Bruns investor groups provided an

5    incentive to ignore the differences between trusts,

6    including which of those were subject to the statute of

7    limitations defense.

8         It's obvious that what these plaintiffs did in

9    dividing up settlement proceeds amongst themselves had

10   nothing to do with the law.  They did what they did

11   regardless of the state of the law.  And of course courts

12   give more deference when approving an uncontested settlement

13   to how consenting plaintiffs voluntarily divide up things

14   amongst themselves.

15        That the *J.P. Morgan*, *Citi*, and *WaMu* settlements

16   all were post *ACE II*, and for the latter two post *ACE III,*

17   proves the point.  As Mr. Wall testified, that these

18   settlements and their approvals cannot be viewed as any

19   indication of the strength of the statute of limitations

20   defense.  But none of this is of any relevance to this case,

21   which is about allocating settlements among nonindustry --

22   or nonparticipating indemnitors.

23        And finally, Mr. Hawthorne says that because

24   Mr. Sillman didn't treat the trusts differently, that must

25   indicate something about the statute of limitations defense,

1    but it was clear that Mr. Hawthorne was wrong.  He said he

2    thought Mr. Sillman did consider the strength of claims, but

3    then Mr. Hawthorne had to admit that Mr. Sillman didn't do

4    so, and of course he didn't.  He couldn't.  Mr. Sillman is a

5    nonlawyer.  His so-called litigation discount for evaluating

6    reasonableness was based on only three things: debtor's

7    repurchase experience, industry repurchase data, and his own

8    experience with repurchase demands.  He never even analyzed

9    the statute of limitations.

10            Rather than rely on case law to evaluate the

11   strength of claims, plaintiff relied on a nonlawyer in

12   bankruptcy who never even considered the defense.  And we

13   know that RFC itself actually did consider the statute of

14   limitations in the bankruptcy.

15            So having failed to account whatsoever for these

16   issues, plaintiff, through Mr. Hawthorne, asserted

17   essentially that there are too many defenses to do so; but

18   the statute of limitations defense is the only defense

19   discussed in his report where he does not characterize the

20   plaintiff's position as stronger than the defendant's

21   position.  He said that the law was clear as to put-back

22   causation defenses that a defect caused a loan to default

23   that such defenses were unlikely to be successful, and that

24   election of remedies was not a strong defense or one in

25   which a defendant in RFC's position could place any

1    reliance.

2            The statute of limitations is different.  It's a

3    complete defense.  Its application is binary.  It had the

4    most support in case law and legal precedence.  And even if

5    a reasonable defendant would have taken into account some of

6    the other defenses that were available, it just shows that

7    plaintiff's approach is even more flawed.  It's a problem

8    with plaintiff's approach, not some redeeming aspect of it.

9            That there may be more than one possible defense

10   does not mean that you just ignore the strongest defenses.

11   Were all of these defenses accounted for, they all likely

12   would have helped PRMI given that PRMI's loans were

13   disproportionately concentrate in earlier trusts.  So by

14   focusing on the statute of limitations defense, PRMI was

15   being conservative.

16           Mr. Hawthorne also said that it was not

17   appropriate to quantify any defenses in any way, that he

18   couldn't put a number on anything.  The implication of

19   Mr. Hawthorne's testimony is that an indemnity can ignore

20   the strength of claims by identifying minor arguments and

21   conflating them with essential issues.  That's not the law.

22   On *UnitedHealth* it's inherent that a plaintiff must value

23   the strength of claims on the underlying claims and

24   defenses.

25           And by the way, Mr. Hawthorne had no problem

1    putting a dollar value on servicing claims, including no

2    value whatsoever for monoline servicing claims when it had

3    the effect of increasing plaintiff's damages.  Plaintiff's

4    allocation methodology assigns no value to servicing --

5    assigns values to servicing claims and claims regarding the

6    NDS trusts, and it assigns dollar value to the alleged

7    breach claims for which it contends PRMI is responsible.

8            So clearly, plaintiff can value claims.  Indeed,

9    Mr. Hawthorne was asked to consider a 2002 trust that was

10   subject to the statute of limitations defense and had a

11   fraud disclaimer, and to contrast it with a 2007 deal with

12   no statute of limitations issue that had a no-fraud rep.

13   Mr. Woll testified that the defense as to the 2002 trusts

14   were a great deal stronger than the 2007 trust, and that

15   there was a dramatic difference between them.  Mr. Woll

16   didn't have to make any great leaps to render that

17   testimony.  We all know that what he said is undeniably

18   true.

19           Now, in order to recover as to a particular loan,

20   plaintiff must establish first that Mr. Butler's allegation

21   that PRMI materially breached a rep to RFC at the loan level

22   is correct; and second, if so, that Mr. Butler correctly

23   asserts that such an origination-level breach caused RFC to

24   materially breach a corresponding rep to the trusts that

25   resulted in a bankruptcy liability.

1          As to the loans PRMI sold to RFC some 20 years ago

2     under the AlterNet Seller Guide, the evidence showed that

3     Mr. Butler's allegation of material breach were not, in

4     fact, correct.  Mr. Butler alleged in his expert report that

5     these loans breached the RFC Client Guide.  He only asserted

6     whether the loan breached the AlterNet Seller Guide as part

7     of a truncated alternative analysis included for the first

8     time in his supplemental report; and at trial he essentially

9     transformed his alternative allegations into his primary

10    ones.

11          As Ms. Keith explained, there are two main

12    problems with Mr. Butler's allegations, even though the

13    allegations in his supplemental report.  First, the fact

14    that he uses a guide for more than three years prior; and

15    second, that a number of his breach allegations are

16    factually baseless even under the 1997 guide.

17          Now, Mr. Butler could not recall ever previously

18    using such a guide.  He agreed it was something you wouldn't

19    want to do, and Ms. Keith similarly could not recall any

20    such instance.  Mr. Butler agreed that there certainly was a

21    question as to whether the guide was the correct one.  He

22    acknowledged that the RFC Client Guide was updated several

23    times a year during this period.

24          And so we know one just can't assume that the

25    guides match up.  For instance, the 2001 Client Guide

1   contains a no-fraud rep as to both first and second lien

2   loans.  But the July 1997 AlterNet Seller Guide only

3   contains that rep as to second lien loans.  In light of all

4   of this, Mr. Butler's only retort was that he was not given

5   a more recent guide to use.  Now, that's on plaintiff for a

6   number of reasons, but it's not a valid excuse.

7          Many of Mr. Butler's breach allegations are

8   completely baseless, even under the 1997 AlterNet Seller

9   Guide as a couple of examples show.  Mr. Butler made

10  allegations such as he did on loan 4115211 that PRMI was

11  responsible for RFC's decision to upgrade the loan to permit

12  a higher LTV.  Now, that makes no sense.  And in any event,

13  Ms. Keith demonstrated that the loan was properly upgraded

14  based even on the 1997 AlterNet Seller Guide.

15         And Mr. Butler made allegations such as he did on

16  loan 4550405 that the property was flipped without any

17  actual evidence of a prior sale, much less the purchase

18  price of such a sale.  And even if it were such a

19  transaction, Ms. Keith explained how Mr. Butler

20  mischaracterized the AlterNet Seller Guide provision he

21  relies on and failed to establish any breach of it.

22         Now, after years of resisting the obvious fact

23  that Assetwise Direct provided PRMI a full credit underwrite

24  to RFC's program terms and criteria, even plaintiff's

25  witnesses didn't really fight this at trial.

1          Ms. Bangerter was the RFC sales director to PRMI

2     from August or so of 2001 through May of 2005.  Now, this

3     was after PRMI signed its second client contract which

4     incorporated the RFC Client Guide after the AlterNet Seller

5     Guide and after PRMI's implementation of Assetwise Direct.

6     She testified that the rules in Assetwise Direct were based

7     on the Client Guide, and that using the system would help

8     PRMI not make violations to the Client Guide.

9          Assetwise Direct provided a full credit underwrite

10    to RFC's credit underwriting criteria.  It could upgrade

11    loans to, for instance, be approved at an 85 LTV when the

12    standard loan programs allowed a 75 LTV; and it took into

13    account compensating factors.

14         And she agreed that a client like PRMI couldn't

15    represent that the program terms and criteria for credit

16    underwriting in the published Client Guide were satisfied

17    when RFC's automated system was applying the credit terms

18    and criteria.  We walked through agreements signed by

19    Ms. Bangerter that required PRMI to use Assetwise Direct.

20    RFC never removed PRMI's access to Assetwise Direct as it

21    could under the Assetwise Direct criteria agreement, and it

22    never revoked PRMI's license to use Assetwise Direct under

23    its accompanying software license agreement.

24         Now, Ms. Butler -- or Ms. Bangerter, excuse me,

25    was asked on redirect examination by plaintiff's counsel

1    what RFC would do if it felt that a loan was not prudently

2    originated despite having a valid Assetwise approval, and

3    Ms. Bangerter testified that RFC would return the loan to

4    the seller.  But of the nearly 2,400 loans PRMI sold to RFC

5    during the course of their relationship, plaintiff hasn't

6    identified a single instance where RFC returned a loan to

7    PRMI on that basis.  If such an instance existed, I'm sure

8    we would have seen it.

9          Leigh Ann Richardson, the person at RFC who helped

10   PRMI implement Assetwise Direct and sign the agreements with

11   PRMI concerning its responsibilities when using the system,

12   testified similarly; that Assetwise Direct pulled the credit

13   report for the borrower.  She agreed that PRMI couldn't

14   represent and warrant that RFC's credit decisions based on

15   Assetwise Direct were correct, nor would that make any

16   sense.

17         Ms. Maki was RFC's lead underwriter assigned to

18   the PRMI account.  She testified consistent with other

19   witnesses as to what Assetwise Direct approval meant for

20   PRMI.  Ms. Maki testified that Assetwise Direct would go

21   beyond the punished criteria.  Ms. Maki agreed with the

22   statements provided to her by RFC regarding Assetwise

23   approvals, and approval is valid even though certain loan

24   parameters outlined in the Client Guide are not met.  It

25   reduces the need to apply each and every credit policy and

1    parameter stated in the guide; and that validation of an

2    Assetwise Findings Report equated to compliance with the

3    Client Guide.

4              Mr. Zitting's testimony concerning how Assetwise

5    Direct functioned actually was very consistent with what

6    RFC's witnesses said.  That Assetwise Direct ensured

7    compliance with RFC's credit underwriting terms and criteria

8    was what the system did.  Mr. Zitting testified how

9    Assetwise Direct was used from the point of sale through the

10   sale of the loan to RFC, just as RFC encouraged, expected,

11   and effectively required PRMI to do.

12             He discussed agreements throughout the course of

13   the parties' relationship that included RFC products not

14   even offered in the Client Guide and for which PRMI was

15   required, both as a practical and contractual matter, to use

16   Assetwise Direct; and how that functionality meant that PRMI

17   had to run its entire RFC-dedicated production through the

18   system.

19             RFC never told PRMI that it could not rely on

20   Assetwise Direct approval certificates to comply with RFC's

21   program terms and criteria for credit underwriting, and to

22   do so would have negated the whole purpose of the system.

23             And Mr. Zitting talked about his many meetings

24   with RFC, including many specific meetings where RFC

25   reiterated its expectations for PRMI's use of Assetwise

1    Direct.

2            Now, the testimony of other PRMI witnesses was

3    consistent with what Mr. Zitting said.  Ms. Flitton, PRMI's

4    head of its wholesale division, testified that the number

5    one benefit of using Assetwise Direct was giving PRMI

6    confidence that its loans -- that its loans met RFC's

7    criteria.  That PRMI relied on the Assetwise Direct

8    certificates provided by RFC.

9            Mr. Crawford confirmed that the $300 a month

10   access fee, which was called for in the Assetwise Direct

11   Criteria Agreement, was invoiced and paid consistently over

12   the years.

13           Kathy Meadows testified that PRMI underwriters

14   relied on Assetwise Direct approval certificates provided by

15   RFC to show that PRMI met the conditions that were

16   specified; and if they did, the approval was valid.

17           And even PRMI pool coordinator in 2001 and 2002,

18   A.J. Swope, testified that Assetwise Direct had all of RFC's

19   eligibility requirements and a bunch of algorithms to take

20   into account credit, income, all the loan details, and

21   return back whether this loan met RFC's criteria.

22           The evidence is clear that RFC encouraged,

23   acknowledged -- that RFC encouraged, directed, and even

24   required PRMI to use Assetwise Direct; that PRMI relied on

25   those communications from RFC and the Assetwise Direct

1   approval certificates that RFC provided; and that PRMI did

2   so to its detriment because of the allegations made by

3   Mr. Butler 15 to 20 years after the fact.

4          Mr. Butler now basically concedes the importance

5   of Assetwise Direct approval certificates after ignoring

6   them in his expert report and later only acknowledging

7   Assetwise Direct at all in his supplemental alternative

8   findings.

9          With respect to those allegations, and the new

10   ones he made from the stand, Mr. Butler demonstrated a

11   striking lack of understanding of the basics of how

12   Assetwise Direct worked.  Perhaps that's because he never

13   personally used an automated system.

14          Mr. Butler made allegations, such as he did on

15   loan 4113350, that even though Assetwise Direct made an

16   upgrade based on the credit score that it pulled that

17   allowed an 85 LTV instead of a 75 LTV, somehow PRMI's

18   underwriter should have looked at the Assetwise and

19   recognized the wrong score.  Now, that frankly is absurd.

20   PRMI had to use the score that the system pulled, as

21   Ms. Keith explained.

22          Another example is loan 6231616.  There,

23   Mr. Butler alleges a lack of 12 months of verified housing

24   history.  But as Ms. Keith explained, the Assetwise Direct

25   approval certificate did not require housing history.

1          Mr. Butler then shifted at trial and said, well,

2     the certificate was invalid because the borrower alleged 12

3     months of housing history on his application.  But Ms. Keith

4     explained that housing history is not even a field that is

5     input into Assetwise Direct by a user, so there was no way

6     this information could have impacted Assetwise Direct's

7     credit decision.

8          Whether viewed as plaintiff being estopped from

9     alleging breaches of reps that a loan complied with credit

10    terms and criteria or requirements for credit underwriting,

11    or that RFC waived such compliance with such reps through

12    the Assetwise Direct Criteria Agreement, the result is the

13    same.  Mr. Butler's breach allegations fail on Assetwise

14    Direct approved loans that PRMI is permitted to challenge.

15         Now, Ms. Bangerter testified on direct examination

16    that Countrywide allowed riskier loans than RFC, and she

17    volunteered on cross-examination that Countrywide products

18    were a lot more expansive than RFC's products.

19         In light of that testimony, the proposition

20    asserted by plaintiff that PRMI, after Ms. Bangerter left

21    RFC for Countrywide, blindly just sold a pool of subprime

22    loans originated for Countrywide to RFC under some phantom

23    agreement that RFC's Client Guide applied to those loans

24    makes absolutely no sense whatsoever.

25         Mr. Crawford testified that PRMI did no such

1    thing.  He was explicit that the pool was all Countrywide

2    loans.  And RFC understood this.  "Countrywide product with

3    CLOUT.  Trying to get back the business that is getting

4    pulled away from Countrywide."  And RFC never followed up

5    other than to ask if the loans were subprime.

6           So as we see on the previous e-mail, with any type

7    of documents such as a bulk confirmation letter to assert

8    that the Client Guide reps would apply to these Countrywide

9    loans.  There was no such agreement or communication, nor

10   could there be, as the Countrywide loans were never intended

11   to meet all the requirements of the Client Guide as they

12   would have to be to invoke the Client Guide reps.

13          Now, Ms. Keith also provided no review of the

14   application of different scenarios with respect to

15   Mr. Butler's allegation on trust-level reps, and those

16   numbers do not presume anything about Mr. Butler's

17   origination-level allegations on the 12 sample loans that

18   PRMI is permitted to challenge.

19          Now, starting with the 66 sample loans that

20   Mr. Butler alleges breach trust-level reps, Ms. Keith

21   explained that not accepting breach allegations on the

22   pool-wide credit rep reduces that number to 48 loans; and

23   not accepting the breach allegations on the pool-wide loan

24   doc rep reduces that number further to 45 loans.

25          If the Court were not to accept the breach

1        allegations on loans and trusts where RFC made a fraud

2        disclaimer, the number would be reduced further to 18 sample

3        loans.

4                And it's important to note that this category

5        includes five sample loans where Mr. Butler alleges a breach

6        of the no-default rep, but that rep includes a qualifier

7        that there's no default to the best of RFC's knowledge.

8        Mr. Butler admitted he made no determination as to RFC's

9        knowledge where such a knowledge component was included in

10       the rep, and he alleged that a PRMI loan breached the rep.

11       And not accepting breach allegations on the no default or

12       MLS or pool-wide occupancy reps, the number of sample loans

13       deemed to be in breach were reduced to eight loans.

14               Now, plaintiff is seeking $5.398 million from

15       PRMI; and far from allocating PRMI's fair share of RFC's

16       purported bankruptcy liabilities, plaintiff has failed to

17       take into account many central issues.  Those failures have

18       the effect of substantially increasing PRMI's alleged

19       damages.

20               At the instruction of counsel, Dr. Snow completely

21       ignored the strength of claims and defenses.  The evidence

22       showed that these were significant issues that RFC did and

23       would have raised.

24               Mr. Woll testified that a reasonable defendant

25       would have viewed claims on earlier trusts differently than

1    claims on later trusts.

2           Dr. McCrary testified that these strength of claim

3    issues were significant for PRMI.  By wide margins, PRMI's

4    loans were concentrated in trusts that were the subject of

5    weaker claims compared to all at-issue loans.  So this was

6    true of the no-fraud rep; the fraud disclaimer, where there

7    was a 50 percent difference; and the statute of limitations

8    defense, where there was a 100 percent difference.

9           Plaintiff was required to account -- plaintiff was

10   required under the law to account for differences in the

11   strength of claims when allocating RFC's purported

12   bankruptcy liabilities to PRMI.  Plaintiff had every

13   opportunity to do so.

14          The early vintage of PRMI's at-issue loans was no

15   secret.  By the time expert reports were submitted, PRMI was

16   the only remaining defendants.  There was no issue of, as

17   Dr. Snow called it, litigation constraints.

18          And even after receiving PRMI's rebuttal expert

19   reports identifying these strength of claims issues, PRMI --

20   or plaintiff's experts never even attempted to address them

21   in their supplemental reports.  Instead, plaintiff's damages

22   methodology treats every claim on every trust identically,

23   regardless of significant variations in the strength of

24   claims and defenses, and Dr. Snow does so on the explicit

25   instruction of counsel.  The consequence of this is that

1    plaintiff has not proven damages to a reasonable degree of

2    certainty, and its claims against PRMI therefore fail.

3              But even if plaintiff somehow were deemed to

4    overcome its failure to comply with the law, Dr. Snow's

5    damages estimate grossly overstates PRMI's damages.

6    Dr. Snow's damages estimate assumes that all of Mr. Butler's

7    originator and trust-level breach allegations are correct.

8    As previously discussed, PRMI submits that the evidence

9    clearly has shown that this is not the case.

10             First, all 12 loans at the originator level that

11   PRMI is permitted to challenge are part of Dr. Snow's

12   damages estimate.  An adjustment deducting those loans or a

13   subset of them from the 66 allegedly breaching PRMI sample

14   loans, would change both the damages estimate and the

15   confidence interval bounds of that estimate.

16             And second, at the trust level, Ms. Keith has

17   presented testimony on the number of loans that are subject

18   to breach allegations by Mr. Butler.  This includes the

19   breach allegations based on, or subject to, pool-wide credit

20   grade and loan doc reps, the fraud disclaimer, the MLS no

21   default and pool-wide occupancy reps.  And an adjustment

22   deducting being these loans or a subset of them would change

23   both the damages estimate and the confidence interval bounds

24   of that estimate.

25             Now, Dr. Snow agreed that at the time he developed

1    his sampling methodology he did not anticipate using

2    sampling to allocate RFC's bankruptcy settlements.  When he

3    was told to allocate, he operated under the assumption,

4    based on counsel's instruction, that non-at-issue loans did

5    not account for a single dollar of the allowed claims, so he

6    never sampled them.

7         Dr. Snow did not sample any of the 238,000

8    performing loans with 900 million in loss that is

9    plaintiff's counsel did not deem to be at issue.  Dr. Snow

10   could have drawn supplemental samples for the performing

11   loans, but counsel never asked him to do that.  Instead,

12   Dr. Snow assumed a breach rate for the PRMI performing

13   loans, despite having no specific information about the

14   breach rate for those loans.

15        So Dr. Snow presented a conservative assumption in

16   his supplemental report to deal with his lack of data; and

17   under that conservative assumption, Dr. Snow's damages

18   estimate would increase by $207,315.

19        Dr. Snow also did not sample any loans from the

20   nondebtor-sponsored trusts which did not fit counsel's

21   at-issue loan definition.  Because the NDS trusts were not

22   sampled, and therefore none were re-underwritten, Dr. Snow

23   made an assumption about the breach rate of those NDS loans.

24   Dr. Snow did not have information about the NDS trusts as to

25   originators, the representations and warranties that RFC

1    made, or how many of those trusts were subject to the

2    statute of limitations defense or were not subject to it.

3           So Dr. Snow prepared an analysis with more

4    conservative assumptions for the NDS trusts; and according

5    to that analysis, Dr. Snow's damages estimate would decrease

6    by $125,318.  In the real world, statisticians and

7    economists own the flaws in their data and methodologies and

8    account for those flaws.  As Dr. McCrary testified, you do

9    that by bounding at the maximum possible impact.  You don't

10   just make another flawed assumption.

11          Dr. Snow's damages estimate is subject to wide

12   margins of error that create a large confidence interval.

13   Due in part to the fact that Dr. Snow designed his samples

14   to provide a count-based breach rate, but then used those

15   samples to determine a loss-weighted breach rate, he went

16   well past his predicted maximum margins of error.

17          This results in a total margin of error of 25

18   percentage points, of roughly plus or minus 25 percent

19   points.  In dollar terms, it's a range of $2,680,000.

20          Dr. McCrary addressed what to do in this

21   situation.  When you have a wide margin of error, you can

22   have little confidence that the point estimate represents

23   the true amount of damages.  And in that situation

24   Dr. McCrary explained the proper approach is for the

25   designer of the sample to bear the cost of its imprecision

1        by taking the lower bound.

2                    Now, Dr. Snow determined an estimate of damages

3        for loans and pools wrapped by monoline insurers by

4        combining the five monoline settlements into subsets of his

5        PRMI and global populations, and this approach suffers from

6        numerous problems.

7                    Dr. Snow estimated blended monoline breach rates

8        across pools for all settlements.  Now, despite agreeing

9        that monoline breach rates would not be the same across

10       pools, Dr. Snow applies the same PRMI and global breach

11       rates across pools.  And Dr. Snow agreed that there was no

12       statistical justification for his decision to include 39 of

13       the 105 global monoline subsample loans that were from pools

14       with no net insurance payments.

15                   When you look at the number of loans for each

16       monoline insurer in his global subsample, the numbers are

17       very small.  45 Ambac loans, which is overstated for reasons

18       I'll discuss; 38 FGIC loans; and 22 MBIA loans.  Dr. Snow is

19       not aware of any RMBS case in which an expert has estimated

20       a breach rate based on sample sizes that are this small.

21       And when Dr. Snow estimated the global breach rates based on

22       each monoline settlement from his tiny subsamples, those

23       breach rates varied from 55.5 percent to 90.9 percent.

24                   So in light of all these problems, Dr. Snow

25       developed an approach that he called the lower bound

1    non-extrapolated analysis for alleged monoline damages.

2    This non-extrapolated calculation is $115,563 lower than his

3    original monoline estimate.

4        And even this amount is overstated since it

5    includes 27 PRMI loans that were not in the one RFC-

6    sponsored Ambac trust that was the subject of an origination

7    based proof of claim in the bankruptcy.  On this point

8    Mr. Hawthorne agreed that Ambac never filed an amendment to

9    its proof of claim, and he didn't know if there was ever

10   some other unidentified attempt or undefined attempt by

11   Ambac to amend its proof of claim.

12       And nothing in the stipulation of settlement

13   discusses any origination claims against RFC on any other

14   trusts; only the timely-filed proofs of claim against the

15   various debtors are discussed.  There's no evidentiary or

16   statistical justification for including loans from these

17   other Ambac trusts in Dr. Snow's samples and damages

18   estimates, and Dr. Snow agreed that he had not accounted for

19   this issue in his analysis.

20       To the extent plaintiff talks about PRMI's fair

21   share of RFC's proportionated bankruptcy liabilities, its

22   approach to damages has the opposite effect.  It

23   substantially drives up PRMI's alleged damages.  Plaintiff's

24   instruction that Dr. Snow ignore the central strength of

25   claims issues in his allocation methodology is contrary to

1    the law.  As a result, plaintiff's claim must fail.

2            But even if the Court were to disagree, Dr. Snow's

3    damages estimate does not account for plaintiff's failure to

4    establish many of its breach allegations and it does not

5    include adjustments for the series of assumptions that he

6    made in his sampling and damages methodologies.  As a

7    result, further adjustments are entirely warranted.  Indeed,

8    they all were offered by Dr. Snow himself in light of the

9    flaws in his damages estimate.

10           In the real world, not every case is the same.

11   The evidence has shown that PRMI was different for a whole

12   host of reasons.  Plaintiff ignores these facts entirely,

13   but this Court should not.

14           Thank you.

15           THE COURT:  Thank you, Mr. Johnson.

16           We will take about ten minutes and plaintiffs can

17   get ready.  Court is adjourned briefly.

18   (Recess taken at 2:30 p.m.)

19                    *    *    *    *    *

20   (2:40 p.m.)

21                       **IN OPEN COURT**

22

23           THE COURT:  Is the plaintiff prepared to close?

24           MR. NESSER:  Yes, Your Honor.

25           THE COURT:  Very good.  Before you start,

1    Mr. Nesser, have the parties discussed whether or not the

2    demonstratives from the closings should be -- a copy should

3    be shared with the Court?

4              MR. NESSER:  No, Your Honor.  I don't know that we

5    have --

6              THE COURT:  Why don't you talk about it

7    afterwards.  I mean, I think the Court would appreciate a

8    copy from each side.  You may proceed.

9              MR. NESSER:  Your Honor, before I proceed, I did

10   want to note, I don't know whether it's required, I suspect

11   not, but for the record the Trust renews any of its summary

12   judgment motions and preserves its arguments in response to

13   PRMI's.

14             Okay.  So, Your Honor, first before I start, I did

15   want to acknowledge and thank my team at Quinn Emanuel and

16   Spencer Fane and Carpenter Lipps and our graphics people,

17   who have all done incredible work around the clock for a

18   long period of time, and hopefully I will be able to

19   communicate what they have put together for me.

20             So, Your Honor, I think it's fair to say that we

21   are where we said we would be.  In opening what we said to

22   the Court was that we would prove that PRMI's at-issue loans

23   were overwhelmingly in breach and that the question would

24   not be whether they owed money, but rather how much.

25             We also said that we would present a practical,

1    common-sense approach to determining PRMI's fair share,

2    reflecting the way that people in the real world make

3    investment and litigation decisions, and we did that as

4    well.

5         And third, we said that PRMI and its experts would

6    respond with hyper-technical formalistic readings of

7    documents and the law that they would seek to convert

8    meaningful and enforceable loan-level representations into

9    meaningless unenforceable pool-wide remedies, and that they

10   would make repeated demands for false precision up to and

11   including the remarkable assertion that PRMI's fair share

12   for its proven breaches is zero.  And, Your Honor, that's

13   what happened.

14        In my presentation today I'll be addressing three

15   sort of big groups of issues.  The first is PRMI's breaches.

16   The second is causation, and then finally damages.

17        And before I start, on the first element I think

18   the issues are pretty well defined.  There are a dozen

19   loans.  There are Assetwise, AlterNet and Countrywide

20   issues, and we'll talk about those in due course.

21        But on the second and third issues, which I've

22   said are causation and damages, I did kind of want to frame

23   things upfront because I think there's been a certain

24   myopia, maybe is the right word, in the presentation that we

25   heard from PRMI over the course of trial, both in closing

1     and in the evidence that was proffered.

2               If one listened to PRMI's trial presentation, one

3     would be forgiven for thinking that this case was about

4     whether the statute of limitations defense was viable or

5     whether a breach claim on an MLS rep was viable, or whether

6     any of the other 15 claims and defenses was viable, and

7     whether there are differences in the strengths of those

8     various claims and defenses.

9               But, Your Honor, that is not what matters.  What

10    matters, if we consider what actually does matter, what we

11    find is that causation and damages not only are proven, but

12    actually are proven with no dispute from any PRMI witness;

13    and it's remarkable to say that, but I believe it is true.

14              For causation, Your Honor, what matters is whether

15    PRMI's breaches created a risk of liability.  If the answer

16    is yes and we have proven causation, and the evidence at

17    trial proved that the answer, in fact, is yes because the

18    parties in the bankruptcy reasonably treated the Client

19    Guide as a proxy for the trust representations and because

20    RFC faced reasonable risk of liability on each of the

21    specific breaches at issue.

22              And, Your Honor, it's astonishing, but it is true

23    that no PRMI witness contradicted those assertions.  Not

24    one.  We heard a lot of testimony about, well, the credit

25    grade rep didn't mean this, and the MLS rep didn't mean

1    that, but we heard no testimony from any witness on their

2    side talking about whether there was an absence of

3    litigation risk, and that's the question. So that's

4    causation.

5            And then on damages, what matters is what a

6    reasonable person would have done, what a reasonable

7    allocation would have been. And whether, as relevant here,

8    whether it would have been reasonable to allocate based on

9    breaching losses in light of all of the facts and

10   circumstances and claims and defenses that were at play in

11   RFC's bankruptcy.

12           If the answer is yes, then the allocation issue is

13   resolved. And the answer, Your Honor, is yes because the

14   testimony is, again, undisputed that a reasonable person in

15   RFC's position, faced with tens of billions of dollars of

16   potential liability on hundreds of thousands of loans across

17   hundreds of trusts, in the real world would have settled on

18   the basis of breaching losses.

19           There is no evidence, and there's no witness who

20   testified that a party in RFC's position would or could have

21   allocated based on speculation about the likelihood of

22   success on each of a long list of untested, interconnected

23   defenses and other issues on a loan-by-loan basis. And,

24   Your Honor, it really is the case that there was no witness

25   who contradicted those conclusions. The closest we heard

1    was Mr. Woll.

2         But as Your Honor remarked at the pretrial

3    conference, Mr. Woll was talking about four or five cherry-

4    picked issues, and he opined about them explicitly, all else

5    equal, and he didn't take into account the full picture of

6    what was going on in the bankruptcy, including the dozen

7    other some odd issues that one would have had to have taken

8    into account if one were serious about looking at strength

9    of claim.

10         And so there is no expert who testified that a

11   strength of claim allocation would have been the reasonable

12   thing to do, would have been a feasible thing to do; and as

13   we'll discuss, the evidence is that it would not have been

14   reasonable or feasible.  And so that's allocation.

15         So my mantra, hopefully, will be causation

16   requires only real-world risk, not proven liability; and

17   allocation only requires real-world reasonableness, not

18   false precision.

19         And I think what sort of unites those issues and

20   the way in which, you know, the way in which they've been

21   approached by PRMI is that I think PRMI's approach is

22   effectively the kind of approach that one might have taken

23   if one were in RFC's position litigating the underlying

24   claims in the bankruptcy, right?  But that's not what we're

25   doing.  This is an indemnity case and the Court has

1     recognized that repeatedly over the years, and the fact that

2     it's an indemnity claim has implications for the law and for

3     the facts; and we've tried to, I think, take account of

4     those and I think what happens is that PRMI just has not.

5               So that's a long-winded introduction.  I'll turn

6     to the issue of breach.

7               So of course the Court has already determined that

8     the Client Guide and the AlterNet Guide apply to all of the

9     at-issue loans.  There's no dispute about that.  The Court

10    heard testimony from Mr. Butler that 94 of those 150 loans

11    in the sample he reviewed had at least one material breach;

12    and so, again, that's almost two-thirds of the loans that he

13    looked at had a breach, and that's what we said you would

14    hear -- and that's what we said the Court would hear in

15    opening and that's what the Court did hear.

16              For 82 of the loans, Mr. Butler's breach

17    determination is not disputed because those were

18    determinations made in RFC's -- in the Trust's sole

19    discretion.  For the remaining 12, we do have disputes; and

20    I think the evidence at trial indicated that the Trust's

21    positions are correct and PRMI's positions are not.

22              So I'll start with AlterNet.  There are seven

23    AlterNet loans.  Ms. Keith's primary objection on the

24    AlterNet loans is that somewhere, we don't know where, but

25    somewhere Ms. Keith says I think there's probably another

1    AlterNet Guide that Mr. Butler never found.  And not a

2    single witness supported -- fact witness supported that

3    speculation.  We asked Ms. Keith, Have you ever seen a

4    document that suggests that such an AlterNet Guide existed

5    in the world at any point in time?  She said, No.

6          And, in fact, she conceded that, quote, "Nobody

7    here knows whether the AlterNet Guide changed over that

8    three-year period."  And so her opinion on this issue, Your

9    Honor, was completely speculative.  And more broadly, the

10   notion that in six years of litigation with all the work

11   that's been done by both sides, somehow some document out

12   there that just slipped through the cracks is, we think, not

13   correct.

14         And for four of the seven AlterNet loans, Your

15   Honor, that is Ms. Keith's only rebuttal to the breach

16   determination.  And so if Your Honor rejects that notion,

17   then those breaches are proven.

18         For the remaining three, the Court heard

19   loan-level testimony from Mr. Butler and from Ms. Keith.  I

20   expect we'll treat that in the Findings of Fact and

21   Conclusions of Law and won't bore the Court with loan-level

22   discussion here.  So that's AlterNet.

23         The next issue is Countrywide, and there's one

24   loan.  And, again, it's odd what's happened because the

25   facts, and I think the legal conclusions to some extent

1    are -- it may be an exaggeration to say not disputed, but

2    certainly this is not the position that I think even we

3    expected to be in.

4              So on that, there's one Countrywide loan.  It's

5    undisputed that there's about $700 a month debt that the

6    borrower took out a month or so before the at-issue loan.

7    He never disclosed it, but that was a misrepresentation.  It

8    also triggered a DTI violation.  Ms. Keith doesn't dispute

9    that the debt actually existed, doesn't dispute that it

10   ought to have been disclosed, and doesn't dispute that under

11   any set of guidelines that exist in the world, I'm

12   exaggerating a tiny bit, but under any set of guidelines

13   with which these familiar she doesn't dispute that a

14   misrepresentation would be a breach.  And so why does it

15   matter, why does it matter at all whether the Countrywide

16   guidelines applied or the RFC guidelines applied?  It just

17   doesn't.

18             And I won't belabor it, but the Court heard on the

19   issue of whether a misrepresentation is a breach under any

20   set of guidelines, Mr. Crawford testified to that.

21   Ms. Flitton testified to that as well.

22             Your Honor, that's all I have to say on

23   Countrywide.

24             On the Assetwise loans, there are five of them.

25   One of them is also an AlterNet bucket.  It's been a lot, a

1    tremendous amount of time and attention and money spent on

2    these five loans, for better or worse, and I'll address them

3    as best I can quickly.

4            So first of all, this has been pitched as a waiver

5    and estoppel situation; but, Your Honor, waiver and

6    estoppel, the Court doesn't even need to get to waiver and

7    estoppel because on every one of these five loans Mr. Butler

8    identified a breach of a representation and warranty that

9    PRMI concedes remained its responsibility even under loans

10   submitted through Assetwise.  And so the notion that there's

11   anything to do with waiver or estoppel on those breaches is

12   just besides the point because we've asserted breaches that

13   they don't even contend were waived and that they don't

14   contend were the subject of an estoppel.

15           And, Your Honor, as we discussed in the pretrial

16   conference, with the exception of the AlterNet loan, those

17   breach determinations were made in the Trust's sole

18   discretion and so are not subject to challenge, just like

19   any other breach determination.

20           And to the extent the Court disagrees, by the way,

21   on sole discretion issue with respect to this point and

22   elects to look and rule on each of these underlying breach

23   determinations, I did want to point out one thing that

24   perhaps would have gotten lost in the shuffle.  Certainly I

25   was made more sensitive to it recently, which is one of the

1    representations and warranties that PRMI concedes remained

2    applicable even in an Assetwise regime is the representation

3    and warranties in the Client Guide that required PRMI to

4    prudently underwrite all of the loans that it was issuing

5    and selling to RFC.  So the prudent underwriting requirement

6    applied all the time even in PRMI's view.

7         And why that matters is that because on I believe

8    four out of the five Assetwise loans, at least, Mr. Butler

9    testified that those loans were not prudently underwritten.

10   And so there were also obviously technical issues, technical

11   breaches.  What does the verification of employment look

12   like and what does the W-2 look like and so forth, but --

13   and the Court, of course, you know, may elect to look at

14   those issues and if it does it will find that Mr. Butler was

15   correct, we believe.

16        But even putting aside those technical issues,

17   there's this prudent underwriting issue, and that applies

18   and we think demonstrates a breach in any universe apart

19   from waiver and estoppel.  And Mr. Zitting, I should say,

20   was I believe -- at least it was Mr. Zitting who testified

21   that PRMI had to make sure that every loan was prudently

22   underwritten and that was his testimony at trial.

23        So we think the Court need not address waiver or

24   estoppel.  We don't think you need to get there.  But if the

25   Court does get there, what I believe the Court will find is

1      that there's been no evidence sufficient to support PRMI's

2      burden on an affirmative defense of waiver or estoppel.

3              As to waiver, it's undisputed that the Client

4      Guide and the AlterNet Guide required waivers to be in

5      writing.  It's undisputed that there was no such writing.

6      Certainly I don't believe any such writing was introduced in

7      the course of trial.  And so we don't think that that's a

8      meaningful argument.

9              With respect to estoppel and to the extent that

10     there's a waiver by conduct kind of an argument, likewise,

11     we heard promise after promise over month after month about

12     how at trial there was going to be evidence that satisfied

13     the Court's standard on waiver and estoppel.  And the plain

14     answer is that there was no such evidence introduced.  Not a

15     single witness from PRMI has been able to identify a single

16     conversation, or even a single person at RFC who told them

17     that RFC would not seek to enforce the provisions of the

18     guide as long as they complied with Assetwise.

19             And putting aside kind of all the niceties of what

20     the precise legal standard is, what we heard from

21     Mr. Zitting remarkably was what he is relying upon is his

22     feelings on the issue and his vague, quote, vague

23     recollections.  That's not my word vague.  He said his

24     recollections on these issues are vague.

25             And so I'll read just a little bit of it.

1    Mr. Zitting was asked, "You can't name a single RFC

2    representative who told PRMI not to do more than what the

3    Assetwise system is asking for?"  He said, "Oh, I vaguely

4    remember Renee -- I don't remember specific dates or, you

5    know, the setting of the conversation.  This was so many

6    years ago, 15 or 19 years ago.  I wish I did.  It was just

7    so long ago, but that's essentially what the communication

8    always was."  Et cetera.

9            And then the follow-up question was, "Do you

10   recall Ms. Bangerter actually saying that to you?"

11           And the answer was:  "Again, I couldn't place the

12   date or the setting.  It's just more of a feeling of that

13   conversation and others over the phone with different people

14   at RFC.  Hard to place exactly when."  And so on and so

15   forth.

16           The Court also heard from Mr. Crawford who

17   testified similarly that he can't recall any specific person

18   at RFC ever stating -- I think we have a slide -- ever

19   stating that an Assetwise approval superseded the AlterNet

20   or Client Guides.  That he can't recall anyone from RFC

21   representing that certain provisions of the guides were

22   inapplicable, and that he never discussed the

23   representations and warranties applicable to any of the

24   loans PRMI sold to RFC with anyone from RFC or from PRMI.

25           And it was surprising I think to all of us, at

1    least on this side of the room, that Mr. Crawford was the

2    guy who was represented as he's the one who is going to come

3    and support this defense.  And what did he say over and over

4    again?  Well, I wasn't the reps and warranties guy.  I never

5    discussed representations and warranties with anybody.  And

6    so if Mr. Crawford is the witness who purportedly supports

7    this defense, we think clearly the affirmative defense has

8    not been proven.

9           Your Honor, that's what I have to say about

10   breach, the first big topic for today.  I'll turn now to the

11   second kind of big bucket of issues, which is causation.

12          So, Your Honor, the legal standard is clear.  Your

13   Honor has held that we don't need to show that PRMI's

14   breaches were the cause.  We need only to show that the

15   breaches were a contributing cause of the liabilities that

16   were settled in the bankruptcy.  And because this is an

17   indemnity case involving a settlement, the contributing

18   cause standard is not whether those breaches actually -- I'm

19   sorry -- is whether PRMI's breaches increased RFC's risk of

20   liability on the claims asserted by the trusts and the

21   monolines and that was settled.

22          And we know, Your Honor, undisputed testimony, we

23   know that PRMI's breaches or the types of breaches that

24   we've identified in PRMI's loans did give rise to risk that

25   RFC settled in its bankruptcy.

```
 1              So, first, we had testimony from RMBS trusts --

 2    first we had, I'm sorry -- first we have evidence that the

 3    RMBS trusts and monolines asserted claims for origination

 4    defects.  RFC's -- what's going on with this?  I'm sorry.

 5    I'm sorry, Your Honor.  RFC's representation --

 6              MR. JOHNSON:  Sorry, Your Honor.  Objection.  This

 7    is the very issue that we discussed with the Court about

 8    relying on the testimony for the truth of the matter

 9    asserted.  The Sillman declaration on the previous slide, or

10    I don't know if it is the next slide.

11              THE COURT:  Mr. Nesser, do you wish to respond to

12    that objection?

13              MR. NESSER:  Maybe Mr. Scheck wants to take this

14    one.

15              MR. SCHECK:  Your Honor, I believe the objection

16    was not to what we're actually about to talk about, but

17    rather to a different slide; but in that respect, the

18    objection should be overruled because frankly what

19    Mr. Sillman testified at deposition about this, and that's

20    in evidence as part of the deposition designation.  I mean,

21    we can get to it when it comes up, but this has been

22    addressed.  It's been addressed in connection with

23    Mr. Hawthorne's testimony as well.

24              MR. JOHNSON:  They expressly represented that they

25    were admitting this, and the Court said it was admitting it
```

1    for another purpose.  If they wanted to use Mr. Sillman's

2    deposition, they could have.

3           THE COURT:  All right.  I don't think we're there

4    yet.  Right now we're with Mr. Lipps, so let's wait until it

5    comes.

6           MR. NESSER:  Thank you, Your Honor.  So what I was

7    about to say is, again, the question is risk and first point

8    that we want to make here we know there was risk because we

9    know the claims that were asserted against RFC were claims

10   for origination-level breaches.  Right?  We had Mr. Lipps

11   testify that RFC's rep and warranty breaches in MBIA, quote,

12   were a result of the characteristics of the loans.  He

13   testified that Kathy Patrick and Talcott Franklin alleged

14   breaches of the loan-level characteristics in the trusts and

15   were making rep and warranty claims.

16          And we have testimony -- we have a document that's

17   in evidence indicating that the RMBS trustees had repurchase

18   claims against the debtors on account of any defective

19   mortgage loans sold by the debtors to the PLS trusts.

20   Finally, we have Deutsche Bank's proof of claim that

21   asserted claims as to defective mortgage loans.

22          And so there's no real -- I don't think there's

23   any real dispute about this.  Those were the claims that

24   were being asserted.  Now, it's not just that those were the

25   claims that were asserted, though.  This is also an issue of

1    how were those claims assessed.  How was RFC's risk of

2    liability on those claims for origination-level breaches

3    assessed?  And the answer is they were assessed based on the

4    existence or nonexistence of origination-level breaches.

5              And so I think this is the same slide that Your

6    Honor saw in our opening statement.  Mr. Sillman

7    testified --

8              MR. JOHNSON:  Your Honor, I renew my objection.

9    It's not his testimony.

10             MR. SCHECK:  Your Honor, there is a citation for

11   the left side of this for Mr. Sillman.  That is from his

12   deposition.  That is precisely this because the questioner

13   read quote by quote from the declaration and Mr. Sillman

14   answered the question.

15             So if Mr. Johnson's objection is that we should

16   replace this DTX-538 with something else, that's fine, we

17   will do an amended slide; but it's not a well-taken

18   objection in the first instance because the declaration

19   itself is admissible to show what it is that was being done.

20   RFC -- everything they have said in this case is about what

21   did the reasonable defendant at the time know, and we have

22   disputes with that.

23             But what RFC did, right, and what Mr. Kruger was

24   aware of at the time of the settlement was this.  This is

25   what he was looking at, what Mr. Sillman did; and so this

1    objection, which is frankly unnecessary interruption, should

2    be overruled for both of those reasons, substantively and as

3    a matter of form.

4            THE COURT:  Why don't we just substitute on this

5    slide at some later date the testimony of Mr. Sillman.

6            MR. NESSER:  Thank you, Your Honor.

7            So we have Mr. Sillman's testimony.  We have as

8    well Mr. Pfeiffer's testimony.  He testified that the

9    re-underwriters determined whether the initial origination

10   was done in conformance the guidelines.  He said that they

11   were focused on the reps between the debtor and the trust,

12   and we were focused on the underwriting guidelines during

13   the underwriting process as well.

14           We have testimony from Mr. Morrow, and Mr. Morrow

15   represented the committee that was opposing the settlement

16   and he did underwriting too; and what he said was the

17   re-underwriting process was narrowly tailored to identify

18   material compliance with the ResCap guidelines.

19           And so Mr. Hawthorne, who is the only expert in

20   this case who has looked at the work done by the

21   re-underwriters in the bankruptcy, testified that that's

22   what everybody was doing; they were determining breach rates

23   by re-underwriting against the guidelines.  That testimony

24   by Mr. Hawthorne is not contested.

25           We also have undisputed testimony, Your Honor,

1    that the -- that in fact each of the representations at

2    issue did, in fact, increase RFC's risk of liability.  This

3    is a pretty dense slide, but Mr. Hawthorne testified that it

4    was reasonable for RFC to not materially distinguish its

5    risk of credit grade, loan program, and express guideline

6    compliance reps.  He said there was risk on all of them.

7            Mr. Hawthorne said the no fraud and the no default

8    and the MLS reps gave RFC a risk of liability, an underlying

9    misrepresentations.  Mr. Butler identified instances where a

10   material breach by PRMI created risk to RFC for a potential

11   repurchase, and he went on.

12           Ms. Farley, as well, testified we believe that we

13   had risk if the reps we're providing on the Mortgage Loan

14   Schedule were inaccurate.  Ms. Farley, a fraud disclaimer

15   did not eliminate RFC's risk of fraud.

16           And by the way, I wanted to acknowledge Ms. Farley

17   is back here today with us.  We appreciated her coming.

18           And so over and over and over again, Your Honor,

19   the witnesses that the Trust put up testified explicitly

20   about risk, right?  They said the question is risk and risk

21   related to what?  Risk related to these representations and

22   so we'll deal with it, but ultimately the question is risk

23   and that's what they were opining about.

24           And by contrast, the experts that we heard from on

25   PRMI's side didn't address risk at all, or to the extent

1      that they did they, conceded that it existed.

2              So Mr. Schwarcz -- I'm sorry, Professor Schwarcz

3      said the issue of risk of liability is beyond the scope of

4      what I'm purporting to opine on in my report.

5              And Mr. Burnaman said, I'm not an attorney, so I'm

6      not qualified to offer a legal opinion.

7              And Ms. Keith testified that she was also not

8      testifying about RFC's legal liability.  So none of them had

9      a word to say about risk.

10             What we then heard from Mr. Woll was, well,

11     Mr. Woll identified statute of limitations and a couple of

12     other issues where he said, in fact, there were claims, but

13     they were defenses, so that was effectively an

14     acknowledgement that risk existed on those.

15             He acknowledged that the fraud disclaimer was

16     uncharted territory, and he said that uncharted territory

17     means there's risk.  He did not dispute that there was case

18     law supporting the Trust's positions on the MLS and the

19     no-default rep during the settlement period, and he never

20     once opined that there was an absence of risk as a general

21     matter on the various reps that we have been discussing in

22     the case other than those couple.

23             And so Mr. Woll just didn't address the relevant

24     question.  He kept himself confined to a very narrow issue,

25     and that's fine, but that narrow issue doesn't resolve the

1    question of causation.

2         And so, Your Honor, this is in our view as far as

3    the Court needs to go.  We have the evidence that the claims

4    asserted were claims of risk on the origination level.  We

5    have evidence that every single party in the bankruptcy was

6    underwriting to the origination reps.  We have expert

7    testimony and fact testimony that's been introduced that

8    there was risk, and we have no expert or fact testimony on

9    the other side.

10        I want to address, before I move on, something

11   that Mr. Johnson said.  He said, Well, there's no evidence

12   that like a credit grade rep was ever asserted in the

13   bankruptcy, and that argument I think has at least two

14   problems associated with it.

15        One of them is they concede that, for example, a

16   substantial compliance rep created risk.  There's no proof

17   of claim that asserts a substantial compliance rep.  That's

18   just not how it worked.  The claims -- the proofs of claim

19   didn't assert, like, here's the precise contract provision

20   that my claim relates to.  The proofs of claim said

21   representations and warranties.  And that's why everybody in

22   the bankruptcy was underwriting to the origination reps.

23   That's point one.

24        Point two is if Mr. Johnson is correct that nobody

25   had in mind ever, you know, that there was liability on

1    credit grade or potential liability on credit grade or loan

2    program or all the rest, if that's true, then what that

3    means is that Mr. Johnson is asking Your Honor to infer that

4    every single party in the bankruptcy and Judge Glenn were

5    just wrong.  They just made a mistake.  And we know that

6    Professor Schwarcz in other context said it was a mistake.

7          But on this issue also they're just asking Your

8    Honor to say everybody was wrong, the people there at the

9    time incentivized to get this right all just made a mistake,

10   and that's just not correct.

11         So, Your Honor, I don't want to talk too much

12   about in the weeds on what does the MLS rep mean and what

13   does the fraud disclaimer mean and so forth because I think

14   what I've been trying to communicate, hopefully clearly, is

15   that that's not the question that this Court is primarily

16   being asked to answer.  The primary question is whether

17   there was risk, not whether Mr. Butler is correct when he

18   says that the MLS rep means X.  But I do think it's

19   important just to briefly spin through it and so I will try

20   to do that.

21         So in my opening, and Ms. Farley I think testified

22   eloquently on this, you know, what I said was that all these

23   trust rep disputes seem as if there was, you know, a

24   disparate group of 12 different language disputes.  But what

25   I said is really they were a dispute about one document.

1      There's one dispute about one document.  That document was

2      the Assignment and Assumption Agreement.

3              That was a tiny exaggeration because the loan

4      program rep, of course, is in the PSA, but in substance,

5      right, the question and the dispute that divides the parties

6      is whether the representations in the Assignment and

7      Assumption Agreement were meant to be and understood as

8      meaningful, enforceable, loan-level representations and

9      warranties.  Ms. Farley testified that of course they were.

10     That's literally what that document was for, right?

11             That we had other deal documents that were

12     intended to, and that did, make disclosures on a pool-wide

13     basis, right?  That was dealt with in the Pro Supps and so

14     forth, right?  That the function of the Assignment and

15     Assumption Agreement and the function of the PSA, as

16     relevant here, was precisely to make loan-level

17     representations to convert those disclosures into things

18     that could be remedied on a loan-level basis.

19             And the Court heard no testimony to the contrary

20     regarding the purpose of those documents; and I think that

21     that, as I said, you know, on day one, I do think that that

22     in a sense resolves all of these kinds of, you know,

23     different -- six or ten different language disputes.

24             So, for example, on the MLS rep and the no-default

25     rep, I won't rehash the plain language arguments.  I won't

1    rehash the court cases.  But Ms. Farley testified that the

2    MLS rep -- that PRMI's position on the MLS rep, in her

3    opinion, is illogical because it was a fundamental

4    representation.  Everybody was looking at the MLS.

5         What Ms. Farley said is that RFC took steps to

6    confirm the substantive accuracy of the information on the

7    MLS.  Ms. Farley testified that when people asked to have

8    additional fields added, RFC resisted doing that because RFC

9    understood that it would be acquiring additional substantive

10   liability if that information was substantively wrong.

11        And likewise, on no default, Ms. Farley testified

12   from her personal recollection.  She had a phone call with a

13   ratings agency.  She said, Hey, maybe we can revise this so

14   that it limits no default to payment defaults and that she

15   was laughed at.  She was embarrassed -- she had been

16   embarrassed to ask.  And that testimony on MLS and on no

17   default is consistent with the purpose and meaning of this

18   Assignment and Assumption Agreement.

19        So what do we get from PRMI's experts?  We got

20   PRMI's experts ultimately just twisting themselves in knots,

21   arguing that the representations don't mean what they say.

22        So one example, among many, is that the Court

23   heard Mr. Schwarcz talking about the no-default rep and he

24   was asked -- Professor Schwarcz, I apologize, I keep doing

25   that.  Professor Schwarcz was asked about the no-default rep

1    and he was asked about one version of the no-default rep

2    that specifically carves out payment defaults, right?  So it

3    specifically said there are no defaults excluding payment

4    defaults.

5           And so the question was, Well, what does that

6    mean?  If your position is no default is only payment

7    default, what does this mean?  And he says, Well, I don't

8    know how far it would go beyond payment defaults.  I don't

9    know -- I'm not sure how far I understand that testimony

10   other than that perhaps it's a concession that it does go

11   beyond payment defaults; and to the extent that it is,

12   that's consistent with our position.  To the extent that

13   it's not, I just think this testimony doesn't make a whole

14   lot of sense.  And that's all I'll say for now on those.

15          On the credit grade and loan program reps, the

16   second bucket of these, Ms. Farley testified clearly what

17   those were about and what they were for.  She said that, as

18   I indicated a moment ago, right, that there were specific

19   securitization shelves designed to have loans with riskier

20   loan programs and for those shelves the investors said I'm

21   not satisfied with the pool-wide representations being made

22   in the Pro Supp.  I want it to have teeth.  Those were

23   Ms. Farley's words, right?  And so what was negotiated was a

24   clause in the Assignment and Assumption Agreement, right,

25   that had this loan-level remedy; that that was the purpose

1    and that that was the effect.  And the same on the credit

2    grade rep.

3              And that makes sense, Your Honor, right?  But

4    again, and part of why it makes sense, Your Honor, is that

5    the Assignment and Assumption Agreement and the PSA in

6    relevant part attach these representations to a repurchase

7    remedy, right?  They all say that the remedy for a breach of

8    this credit grade or loan program rep is repurchase.  And

9    every witness in this trial agreed that the repurchase

10   remedy is strictly a loan-level remedy.  And so if there

11   were any doubt on the question of whether the credit grade

12   and loan program reps were meant to be loan-level remedies,

13   loan-level reps, the answer, well, it's attached to a

14   loan-level remedy.  What else could it mean?

15             And so we asked the experts on PRMI's side about

16   this and again, we got just this testimony that that's

17   difficult to comprehend.

18             Mr. -- Professor Schwarcz, as the Court will

19   perhaps remember, testified that, Well, it was a mistake.

20   That was his language.  He said it made no -- it makes no

21   sense, quote; and he said, quote, It's poor drafting.  And

22   so that was his explanation.  Your Honor, that's frankly

23   it's not an explanation.  It's a concession.  It's a

24   concession that his position about the meaning of the loan

25   program and credit grade rep is impossible to square with

1          the actual language of the contracts as they exist.

2                    And, you know, fundamentally the notion that these

3          representations, negotiated and drafted by dozens of the

4          country's most sophisticated lawyers and business people,

5          hundreds of times over a decade, across billions of dollars

6          of transactions, somehow just over and over and over again

7          just had mistakes in them is difficult to take seriously.

8          Certainly there's no evidence that anybody at any point in

9          time has ever said, other than Professor Schwarcz, that

10         those clauses were mistakes.

11                   And by the way, all of this is particularly

12         difficult to swallow given Professor Schwarcz's testimony

13         that RFC was, quote, a highly-sophisticated sponsor.  And so

14         we think this is pretty clear.

15                   On the fraud disclaimer, the last piece of this

16         causation, which I recognize is going on a little long,

17         Ms. Farley testified the fraud disclaimer was not a silver

18         bullet against loans with fraud in the origination; that RFC

19         didn't think it was going to be effective necessarily

20         because fraud has a very high standard of proof and the

21         disclaimer on its face does not cover misrepresentations.

22                   So, again, in response we have PRMI's paid

23         experts -- there's no fact witness on any of these issues

24         other than Ms. Farley -- so we have PRMI's paid experts

25         coming in and testify to things that really just --

1      Ms. Keith said, you have to read the fraud disclaimer,

2      quote, in the literal way it's written.  But then she goes

3      on to say that it applies to both fraud and misrep even

4      though misrep is not written.

5            And Professor Schwarcz opined that the

6      securitization agreements were drafted by highly-

7      sophisticated counsel using, quote, plain language that does

8      not, quote, operate by implication.  But that he nonetheless

9      believes that the fraud disclaimer covers misrepresentation,

10     I guess, by implication even though the word

11     "misrepresentation" doesn't appear in the document.

12           Mr. Burnaman, like PRMI's other experts, testified

13     that he didn't differentiate between fraud and

14     misrepresentation, but then he admitted that legally they

15     are, in fact, different.

16           So if the question is whether they're legally

17     different, which it is, and the answer is Mr. Burnaman

18     agrees.

19           I do want to, by the way, just make a note.

20     Professor Schwarcz's testimony that fraud and

21     misrepresentation mean the same thing was a pretty

22     remarkable thing to have heard from a professor of law at

23     the Duke Law School.  And, but, you know, this is where we

24     are.

25           Your Honor, PRMI also went on for pages and pages

1    in its opening making promises about repurchase evidence

2    that the Court would hear about supporting its trust rep

3    theories.  The Court heard none -- no evidence, no such

4    evidence.

5            So, Your Honor, before I move on from causation, I

6    do want to take a step back, right, and again put all this

7    together and ask the real-world question.  People are making

8    jokes about the MTV show, *The Real World*.  But take a step

9    back and ask in the real world, like, how would this have

10   played out in PRMI's imagination, right?

11           So in PRMI's imagination, RFC and its counsel

12   would have stood up in court and told Judge Glenn, right, I

13   know that there are all these rep and warranty claims being

14   asserted against me, but I'm not liable, and do you want to

15   know why?  Number one, I'm not liable because the MLS and

16   the no-default reps don't mean what they say, because the

17   credit grade and loan program reps were a mistake, and

18   because, oh, by the way, my loans were replete with fraud

19   and so I'm not liable because actually my loans have fraud

20   in them.

21           And on top of that, what they would have had RFC

22   do is to say that the loan program and the credit grade

23   representations, that those were only pool-wide remedies,

24   right, and so that people would have had to go out and

25   underwrite every single loan in the pool in order to

1    determine whether those were breached.  That was a process,

2    Your Honor, that Ms. Keith, and I believe others of the

3    experts testified, would just not have been workable, right?

4    It would be, I think the quote was, mind-numbingly complex.

5    Right?

6              So what they would have RFC do is to say we have

7    to engage in this mind-numbingly complex, basically

8    impossible task of re-underwriting every loan in the pool in

9    a context where, real world, what would have happened?  What

10   would have happened is they would have found more breaches.

11   And that would have been obviously opposite of what RFC

12   would have been trying to accomplish.  And so it's just not

13   plausible that this is how things would have progressed.

14             So causation.  The third and last piece of this is

15   allocation.  Your Honor, damages only arises if this Court

16   has already determined that PRMI's loans are in breach and

17   if causation has been proven.  And in that context, the

18   Court has already recognized that the law provides some

19   flexibility, right?

20             Eighth Circuit has explained that once the fact of

21   loss has been shown, the difficulty of proving its amount is

22   not a barrier to recovery as long as there's proof of a

23   reasonable basis upon which to approximate the amount.

24             Your Honor in the summary judgment, Common Summary

25   Judgment Order held to prove damages a plaintiff must offer

1   a reasonably certain, though not necessarily mathematically

2   precise, basis to demonstrate who owes what for its claims.

3            And so the question, Your Honor, is not whether

4   the allocation approach that we've suggested is perfect.

5   The question is whether it's reasonable.  And as I said, you

6   know, upfront at the top in my promised mantra has not

7   materialized, is that allocation only requires real-world

8   reasonableness, not false precision, and what PRMI is

9   advocating for would amount to false precision.

10           So how do we know that the breaching loss

11  allocation approach that we've proposed is a reasonable way

12  to proceed?  Well, we know that for a number of reasons.

13  Number one, first and fundamental, I want to flag this as

14  its own issue, its own piece of evidence, is we know that

15  it's a reasonable way to allocate the RFC settlement because

16  it is how the parties allocated the RFC settlement.

17           And the response that we heard at various points

18  from PRMI's witnesses is, well, no, no, that was just an

19  allocation between the plaintiffs and so that doesn't count.

20  But, Your Honor, that's just wrong.  The allocation was a

21  part of the plan and a part of the settlement that was

22  proposed and supported explicitly by RFC, by the trustees,

23  and by others; and it was part of the plan and part of the

24  settlement that was explicitly approved by Judge Glenn.

25           And so -- and Judge Glenn held that the settlement

1    was fair and reasonable and, quote, in the best interest of

2    the debtors and the investors in each RMBS trust.  And I

3    should have also noted that the Creditors Committee as well

4    was a party to that allocation.

5            And so the notion that this was just a plaintiff's

6    side allocation, it doesn't matter for purposes of this

7    case, is wrong.  And more fundamentally, the notion that the

8    actual allocation by the actual people in the real world

9    dealing with this in real time is not relevant, which is I

10   think effectively what the PRMI's witnesses have been

11   suggesting, also is in our view just not correct.

12           So that's number one, right?  We know it's

13   reasonable because that's how people actually did it.

14           Number two, we also know it's reasonable because

15   Mr. Hawthorne testified that every RMBS settlement of which

16   we are aware, every major one, allocated either on the basis

17   of net losses or on the basis of breaching losses.  Nobody

18   on either side has provided any evidence to the Court of any

19   case in history in which anyone has allocated based on

20   strengths and weaknesses or statute of limitations in the

21   way that PRMI is suggesting.

22           And, Your Honor, these allocations, by the way,

23   again, are not just plaintiff's side allocations.  These are

24   allocations approved by courts across the country, including

25   Judge Kyle in Ramsey County recently; and each of them was

1       of course not only -- was of course approved by trustees,

2       right?  The trustees.  And the reason why that matters is

3       the trustees have duties to act for the benefit of the very

4       people who had the most at stake, for the people who are

5       getting the money.  And Mr. Woll admitted that the trustees

6       had duties to all of their investors; that he was not

7       opining that the trustees had breached those duties, and

8       that he had no basis to believe that the trust investors

9       were just indifferent about what they were going to receive.

10              So this is the second kind of big category of

11      evidence for why the breaching loss approach is reasonable.

12      And what's the alternative?  What's the alternative to a

13      breaching loss allocation that we've heard from PRMI?

14              So they argue that, well, we should have allocated

15      based on strengths and weaknesses.  And as I said to begin

16      with, there is no evidence of any party in history having

17      done that.  And number two, none of PRMI's paid experts were

18      able to come in here and testify that that's what RFC could

19      have done, or should have done, under the circumstances of

20      the bankruptcy, all things considered.

21              And there's undisputed evidence that, in fact, it

22      would not have been possible, not have been feasible to

23      allocate in the way that PRMI is suggesting.  And so

24      Mr. Hawthorne testified, "I believe that assigning

25      probabilities, precise quantitative probabilities to

1    different litigation factors like these inevitably requires

2    sort of false precision."

3            And he also testified, "Trying to put specific

4    numbers to a claim is always going to be contestable and it

5    gets increasingly unrealistic if you try to deal with a

6    number of intersecting probabilities and numerically derive

7    some kind of quantitative assessment of the likelihood of

8    success as a whole."

9            And finally, Mr. Lipps in his -- in the bankruptcy

10   said, "In order to conduct a litigation risk --

11           MR. JOHNSON:  Objection.

12           MR. NESSER:  Perhaps I could finish the sentence,

13   but...

14           THE COURT:  All right.  Hold on.

15           Mr. Johnson?  Mr. Johnson, do you want to --

16           MR. JOHNSON:  Yes, he is using Mr. Sillman again

17   as an expert.  Or I'm sorry, Mr. Lipps as an expert for the

18   truth of the matter asserted.

19           MR. SCHECK:  Your Honor, if I may, before -- after

20   the last disruption I thought about this a little bit more

21   and I thought about the slide that Mr. Johnson put up of the

22   MBIA objection.  And it said, well, 80 percent of the trusts

23   don't have the substantial compliance reps.  And I thought,

24   well, what's that being offered for?  And he would have to

25   say -- can't say it's for the truth.  Can't argue that

1    that's for that there were differences, right?  It has to be

2    that the parties were aware of that; that that was something

3    said by a participant in the bankruptcy.

4         Now, I would ask how is that distinguished?

5    Because otherwise this disruption is just what it is and

6    needless disruption.

7         THE COURT:  Mr. Johnson, that is a point that

8    crossed my mind as well when you referred to the MBIA

9    objection.  How do you respond to that?

10        MR. JOHNSON:  The difference -- it was an argument

11   that RFC was raised -- that was raised and RFC didn't

12   respond to, or did respond to but didn't respond

13   specifically to.

14        The MBIA objection is different in kind.  It was

15   an objection raised, an argument raised against the --

16        THE COURT:  But it was not offered for the truth

17   of the matter asserted.

18        MR. JOHNSON:  It was argued for the effect on --

19   it was information available to RFC that there was objection

20   -- there was this objection to the settlement.

21        THE COURT:  Mr. Scheck.

22        MR. SCHECK:  I'm sorry.  I guess I would respond

23   with a question of how is it that Mr. Lipps' declaration was

24   not information available to RFC?  Is there some rule that

25   it's information available to RFC, but only if it's

1    proffered by certain parties?  It can't be defendants only,

2    because we know that MBIA is a plaintiff.  So there's just

3    no distinction here.  It's an unprincipled distinction.

4                 THE COURT:  All right.  These are arguments and

5    I'm going to let them proceed and the Court will view the

6    basis of the argument on both sides; and if the Court has

7    some concern about the use of these documents, the Court

8    will act accordingly.

9                 You may proceed, Mr. Nesser.

10                MR. NESSER:  Thank you, Your Honor.

11                So we talked about Mr. Hawthorne.  We talked about

12   Mr. Hawthorne's testimony about assigning probabilities in

13   this context, which has not been meaningful or realistic.

14                And Mr. Lipps, as well, in the bankruptcy said

15   that, quote -- well, I'll read it.  "That in a developing

16   area of law, such as this one, an attorney cannot reliably

17   or meaningfully assign probabilities to the potential

18   outcomes."  He said there were numerous unresolved issues of

19   law.  He said it was a fledgling area.  And then he said

20   that, "In order to conduct litigation risk analysis on an

21   RMBS case, given all of that, an attorney would have to

22   assign highly speculative percentages to the resolution of

23   all of these issues."  And that he then said, "The end

24   result is little better than guesswork and therefore

25   provides no meaningful guidance."

1           And I think that was pretty powerful to begin

2    with, but I think it also required additional resonance in

3    light of what the Court heard from Dr. McCrary today.

4    Dr. McCrary, I asked him the question.  If it were the

5    case -- if it were the case that as a factual matter it's

6    not possible to assign probabilities in any meaningful way,

7    right, probabilities that apply meaningful guidance, what

8    would you have done?  And he says, "Well, I guess I would

9    have done the same thing that Dr. Snow did.  I would have

10   probably approached the problem the way that Dr. Snow did.

11   That is to say, if there's genuinely no ability to have any

12   assessment of the relative strengths of claims and defenses,

13   then I think it's right that you can't actually take that

14   into account."

15          Your Honor, that is Dr. McCrary; and Mr. Johnson

16   stood up and said, Well, we can look at some of them or

17   maybe we could get probabilities, but there's just literally

18   no evidence of that.  That's just argument.

19          So one other piece of evidence, by the way, that

20   this is not a reasonable way to allocate the settlement is

21   Wave One.  Right?  We had dozens of defendants.  Not one of

22   them argued that there was an allocation problem because of

23   a strength of claim issue.  And why is that?  Well, part of

24   the reason, I suspect, it's consistent with the evidence

25   that's been introduced, is that when you're dealing with all

1    of these strengths of claims issues and you're making

2    probability assessments one by one by one on issues that

3    each one of them is going to impact a different originator

4    differently depending on their concentration of loans, it's

5    just not feasible to do that in a principled way that's

6    going to make everybody happy.

7            And so I understand PRMI coming here and saying,

8    Well, I found these four factors that happen to favor me on

9    a strength of claim basis, right?  And I suppose that's

10   understandable that they would want to do that.  But you

11   can't just isolate the things that help you and ignore

12   everything else that doesn't help you.

13           And I want to talk a little bit about why it is

14   that it would not have been possible to take everything into

15   account.  So, Your Honor, conservatively I was trying to

16   kind of count up how many strength of claim issues have been

17   introduced in evidence and I counted 17.  I counted 17.

18           So we have the fraud disclaimer, the fraud rep,

19   the credit grade rep, the loan program rep, the substantial

20   compliance rep, the MLS rep, the no-default rep -- and

21   recall we have two flavors of the no-default rep, so we're

22   now up to nine -- causation, that's ten.  I'm now out of

23   fingers.  Materiality is 11.  Election of remedies, other

24   breach-level disputes, and we have a cluster of statute of

25   limitations issues.  Statute of limitations with no tolling

1     agreement.  Statute of limitations with a tolling agreement

2     with investors, statute of limitations with a tolling

3     agreement with a trustee, equitable tolling.

4          And so there are 17 of these issues.  There were

5     others that were the subject of testimony.  For example,

6     Dr. McCrary in his report said that there was a differential

7     strength of claim issue relating to whether specific claims

8     had been included in the monoline proof of claim, right?  So

9     that, I suppose, is another one.  And so this is just a

10    selection of part of what we're talking about.

11         And so not only that, not only are there 17, but

12    they interact with one another.  Mr. Hawthorne testified,

13    right, that there are some of them that if you win one, the

14    likelihood of success on the other increases and vice versa.

15         And we had a hypothetical that we did with

16    Mr. Hawthorne and with Dr. Snow that I think kind of

17    illustrated some of what we're dealing with here.  And so

18    the hypothetical, the Court may recall, involved the

19    borrower who said he made $100,000 a year and, in fact, it

20    was $80,000 a year, in a transaction with a fraud disclaimer

21    and in a transaction with one of the three flavors of

22    no-default rep.

23         And so if you wanted to conduct this strength of

24    claim analysis on that loan, well, first question I suppose

25    is would RFC have asserted the fraud disclaimer?  Because we

1    heard testimony from Ms. Farley and from others that it

2    would have been pretty difficult for RFC to stand up in

3    court and say I'm not liable because I was involved with a

4    security that is replete with fraud.  So that's a

5    percentage, right?  Maybe they will assert it.  Maybe they

6    won't.

7         Then let's say they assert the fraud disclaimer.

8    Next question.  Can you actually prove fraud, right?  Can

9    you prove fraud?  And so that's a probability too because,

10   as we heard from multiple witnesses, fraud is difficult to

11   prove.

12        Let's say you don't prove fraud or let's say you

13   decide not to prove fraud.  Well, then the question you have

14   is this is a misrepresentation.  Does a representation give

15   rise to liability under a no-default representation, and

16   under the specific no-default representation that we are

17   talking about here?  Well, that's a probability too, right?

18        Now, Your Honor, I don't know how many

19   probabilities you have to add to this chart.  There are a

20   lot of them.  You then have to ask the question, How do they

21   relate to one other?  So presumably if RFC -- the extent to

22   which RFC would assert a fraud disclaimer would depend upon

23   whether it was likely that RFC actually could prove fraud.

24   That's just one example.  But there are other ways in which

25   these could intersect, and Mr. Hawthorne talked about that

1    fact.

2              And so this, just very quickly, becomes completely

3    unworkable.  And, Your Honor, this is just an example

4    involving one loan and a few of the 17-some-odd issues that

5    would have had to have been taken into account.

6              So now, Your Honor, ask the question, what would

7    happen if we expanded this to 17 issues across hundreds of

8    thousands of loans?  It's just not a feasible way to proceed

9    and it's probably why it's not the way that the parties in

10   the real world actually did proceed.

11             And I will say one other thing, which is we've

12   heard lots of criticism from Dr. McCrary about all of the

13   uncertainties and margins of error issues in Dr. Snow's

14   damages methodology.  Your Honor, imagine if we had included

15   all of these probabilities and intersecting probabilities on

16   top of that.  I shudder to think how many pillars of

17   statistics we would have been accused of violating in that

18   circumstance.

19             So, Your Honor, that brings me close to the end.

20   Just a couple of things to talk about on the calculation.

21             So Dr. Snow has estimated and has calculated a

22   allocation of $5.4 million.  I should pause and say that's a

23   lot of money relative -- that's not a lot of money relative

24   to what's been required to litigate this.  But putting that

25   to one side, the calculation is $5.1 million for the trust

1      settlement, $400,000 for the monoline settlement.

2              And I'll be kind of brief here.  Dr. McCrary in

3      his testimony talked a lot about how in his view Dr. Snow's

4      assignment changed over the course of these cases and that

5      that had all kinds of negative implications for Dr. Snow's

6      results.  I would suggest, Your Honor, that the only expert

7      in this case whose assignment changed over the course of

8      these cases in a way that negatively impacted his opinions

9      is Dr. McCrary.

10             And what I mean by that is Dr. McCrary was, of

11     course, HLC's expert at trial and he testified in that trial

12     that, number one, trust allocation is basically okay.  He

13     said that again today.

14             Number two, he testified, well, the monoline

15     allocation is problematic.

16             And number three, his testimony on strength of

17     claim was a null set.  He said nothing at all about strength

18     of claim.

19             And so what happens now that you have PRMI and

20     Dr. McCrary now has to find something to nitpick about and,

21     well, he can't talk much about the trust rep allocation

22     because he's already said that it's basically fine.  He

23     can't say anything really consequential on the monoline

24     allocation because, number one, it's in the scheme of things

25     not a relatively large amount of money and we now have a

1    non-extrapolated number that he doesn't dispute that's

2    within a hundred some thousand dollars of his actual sampled

3    monoline allocation, right?  So he doesn't have anything

4    consequential to say on the monoline side.

5            So what does he do?  Well, what he does is invent

6    a whole new pillar of statistics and say we violated it

7    because we didn't take into account strength of claim, which

8    he now claims is a fundamental error, a fundamental

9    violation of statistics that he happened never to have

10   raised in years of litigation in Wave One.  I think, Your

11   Honor, to recite that chronology is to demonstrate why it

12   has no merit.

13           Your Honor, I think to conclude, the Trust in this

14   case, I think we've tried to and I think we have been

15   reasonable.  We're seeking only PRMI's fair share of the

16   liability that it caused based on an assessment of what real

17   people in the real world did and would do.  And we would ask

18   the Court to reject PRMI's unrealistic hyper technical

19   readings and reject its suggestion that its fair share of

20   the liability is zero.  So we would accordingly request that

21   the Court order $5.4 million plus interest and fees.

22           Before I sit down, I did just want to thank Your

23   Honor and chambers for all of the time and attention and

24   extraordinary work certainly over the last few days, which

25   is really deeply appreciated by everybody.

1              Thank you.

2              THE COURT:   Thank you, Mr. Nesser.

3              All right.   Mr. Nicholson.

4              MR. NICHOLSON:   Ten seconds.   At the beginning of

5    his argument Mr. Nesser said out of an abundance of caution

6    he was renewing his summary judgment motions for preserving

7    purposes of appeal.   You know, I don't know if it's

8    necessary, but I just wanted to note for the record we renew

9    our oppositions to those motions as well as our cross

10   motions for summary judgment.   I just wanted that to be

11   clear since he raised it.

12             THE COURT:   All right.   And for the sake of the

13   record, I suppose the Court ought to say that the rulings

14   stand.

15             All right.   Well, thank you very much.   You know,

16   it's really a pleasure to try a case with such talented

17   counsel.   And when I think back of what we've survived, we

18   have gone through marriages and children and grandchildren

19   and Bar Mitzvahs.   We've gone through a government shutdown.

20   We've gone through sequestration and now a pandemic.   So

21   it's been quite a ride.   So I think it's fair to say that

22   the Court and chambers appreciates all the cooperation we've

23   gotten from counsel and the parties and their staff.

24             The Court will look forward to receiving the

25   proposed findings and proposed conclusions of law and will

1    of course work diligently to get them out as soon as we can.

2              Ms. Nelson.

3              MS. NELSON:  One question that just occurred to

4    me, Your Honor, is whether Your Honor would like to have a

5    full set of binders with the admitted exhibits at some

6    point.

7              THE COURT:  Well, given the number of deal

8    documents and the like, I don't know.  Why don't you let us

9    see.  I think maybe the better thing to do is if we need

10   something, we'll reach out.

11             MS. NELSON:  Okay.

12             THE COURT:  I think that's the better way to

13   approach it.

14             MS. NELSON:  We could also provide it

15   electronically if it would be helpful to have --

16             THE COURT:  If you provided it electronically, I

17   think that would be a really good idea.

18             MS. NELSON:  Okay.  Thank you, Your Honor.

19             THE COURT:  All right.  Very good.  Anything

20   further?

21             MR. JOHNSON:  Your Honor, assuming -- I won't

22   assume that there's agreement, but if there is agreement,

23   should we just -- we have copies of the slides that you

24   asked for.  Should we hand those up now?

25             THE COURT:  Yes, I think that would be helpful.

1          MR. JOHNSON:  Okay.

2          THE COURT:  All right.  Very good.

3          Court is adjourned.

4     (Court adjourned at 3:48 p.m.)

5                         *      *      *

6

7          We, Lori A. Simpson and Carla R. Bebault, certify

8     that the foregoing is a correct transcript from the record

9     of proceedings in the above-entitled matter.

10

11         Certified by:  *s/ Lori A. Simpson*
                           Lori A. Simpson, RMR, CRR
12
           Certified by:  *s/ Carla R. Bebault*
13                         Carla R. Bebault, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25